# United States District Court

FILED

FOR THE
NORTHERN DISTRICT OF CALIFORNIA

NOV 10 2016

VENUE: SAN FRANCISCO

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

---

UNITED STATES OF AMERICA,

V.

SUSHOVAN HUSSAIN

CR16 0462

DEFENDANT(S).

---

# INDICTMENT

18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud;
18 U.S.C. § 1343 – Wire Fraud; and
18 U.S.C. §§ 981(a)(1)(C) & 982(a) & 28 U.S.C. § 2461 – Criminal Forfeiture

A true bill.

Karen Williams
Foreman

Filed in open court this 10 day of

November 2016.

M Fong [signature]
Clerk

SALLIE KIM
United States Magistrate Judge

Bail, $ NO BAIL WARRANT

[signature]

AO 257 (Rev. 6/78)

# DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT ☐ INFORMATION ☒ INDICTMENT ☐ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

## OFFENSE CHARGED

18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud;
18 U.S.C. § 1343 – Wire Fraud; and
18 U.S.C. §§ 981(a)(1)(C) & 982(a) & 28 U.S.C. § 2461 – Criminal Forfeiture

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY: Maximum penalties for all counts;
20 years of imprisonment (18 U.S.C. §§ 1349, 1343);
$250,000 fine or twice gross gain or loss (18 U.S.C. § 3571(b)(3);
3 years of supervised release (18 U.S.C. § 3583(b)(2)); and
$100 special assessment (18 U.S.C. § 3013)

DEFENDANT - U.S

SUSHOVAN HUSSAIN

DISTRICT COURT NUMBER
CR16 0462 CRB

FILED
NOV 10 2016
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## PROCEEDING

Name of Complaintant Agency, or Person (& Title, if any)

Federal Bureau of Investigation

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY ☐ DEFENSE
SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant
MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

Name and Office of Person Furnishing Information on this form: ALEX TSE
Attorney for the United States
Acting Under Authority Conferred By 28 U.S.C. § 515

Name of Assistant U.S. Attorney (if assigned): Robert S. Leach

## DEFENDANT

**IS *NOT* IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges
2) ☐ Is a Fugitive
3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) ☐ On this charge
5) ☐ On another conviction } ☐ Federal ☐ State
6) ☐ Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution

Has detainer been filed? ☐ Yes ☐ No } If "Yes" give date filed

DATE OF ARREST Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY Month/Day/Year

☐ This report amends AO 257 previously submitted

## ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS ☐ NO PROCESS* ☒ WARRANT Bail Amount: None

If Summons, complete following:
☐ Arraignment ☐ Initial Appearance

** Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

Date/Time: Before Judge:

Comments:

ALEX TSE (CABN 152348)
Attorney for the United States,
Acting Under Authority Conferred By
28 U.S.C. § 515

FILED

NOV 10 2016

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

CRB

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>SUSHOVAN HUSSAIN,<br>Defendant. | Case No. CR16 0462<br><br>VIOLATIONS: 18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud; 18 U.S.C. § 1343 – Wire Fraud; 18 U.S.C. §§ 981(a)(1)(C) & 982(a) & 28 U.S.C. § 2461 – Criminal Forfeiture<br><br>SAN FRANCISCO VENUE |

INDICTMENT

The Grand Jury charges:

Introductory Allegations

At all times relevant to this Indictment, unless otherwise indicated:

A. Autonomy Corporation plc

1. Autonomy Corporation plc ("Autonomy") was a company incorporated in England and Wales with a registered office in Cambridge, United Kingdom. Autonomy was the holding company of a group of companies engaged in software development and distribution. Autonomy maintained dual headquarters in San Francisco, California, and Cambridge.

2. Autonomy's major subsidiaries included Autonomy, Inc. ("AU Inc."), with offices in San Francisco and San Jose, California; Interwoven, Inc. ("Interwoven"), with offices in San Jose; and ZANTAZ, Inc. ("Zantaz"), with offices in Pleasanton, California.

3. Autonomy was a public company whose shares were listed on the London Stock Exchange under the trading symbol "AU" and were bought, held, and sold by individuals and entities throughout the United States. In 2010, $592,358,000 of Autonomy's $870,366,000 in reported revenues (approximately 68%) came from the United States and other countries in the Americas.

B. The Defendant

4. Defendant SUSHOVAN HUSSAIN was a resident of the United Kingdom. From approximately June 2001 until November 2011, he was Chief Financial Officer of Autonomy. He also was a director of Autonomy from approximately June 2003 until November 2011. HUSSAIN was a qualified Chartered Accountant.

5. As Autonomy's most senior finance officer, HUSSAIN was responsible for the preparation of Autonomy's financial statements.

C. Hewlett-Packard Company

6. Hewlett-Packard Company ("HP") was a Delaware corporation with principal executive offices in Palo Alto, California. HP provided computing and imaging products, technologies, software, and services to customers.

7. HP was a public company whose shares were listed on the New York Stock Exchange under the trading symbol "HPQ" and were bought, held, and sold by individuals and entities throughout the United States.

D. HP's Purchase of Autonomy

8. On or about August 18, 2011, HP and Hewlett-Packard Vision B.V. ("HP Vision"), an indirect wholly-owned subsidiary of HP, entered into an Offer Agreement with Autonomy and publicly announced an offer to acquire Autonomy for approximately $11 billion.

9. On or about August 18, 2011, in a press release announcing the acquisition, HP emphasized that "Autonomy's recent operating and financial performance has been strong." HP also stated that "[o]ver the last five years, Autonomy has grown its revenues at a compound annual growth rate of approximately 55 percent and adjusted operating profit at a rate of approximately 83 percent." Among the acquisition's "[s]trategic and financial benefits," HP said Autonomy would enhance HP's financial profile because "Autonomy's strong growth and profit margin profile complement[ed] HP's

efforts to improve its business mix by focusing on enterprise software and solutions. Autonomy [had] … a consistent track record of double-digit revenue growth, with 87 percent gross margins and 43 percent operating margins in calendar year 2010."

10. Under the terms of the offer, HP, through HP Vision, offered to buy all the outstanding shares of Autonomy for £25.50 ($42.11) per share in cash.

11. On or about October 3, 2011, when all conditions relating to the offer had been satisfied, HP's acquisition of Autonomy closed and HP acquired control of Autonomy. At or about that time, HUSSAIN became an employee of HP.

12. On or about October 3, 2011, HUSSAIN owned or controlled approximately 399,274 shares of Autonomy. After the acquisition closed, and his shares were acquired by HP, HUSSAIN made at least $7.7 million.

E. Autonomy's Financial Statements

13. From in or about 2004 to in or about July 2011, Autonomy issued quarterly and annual financial statements to the investing public in the United Kingdom, the United States, and other places. In its statements to the public, Autonomy said that the financial statements were prepared in accordance with regulations for public companies in the United Kingdom. Autonomy also stated that its annual financial statements were audited, and its quarterly financial statements were reviewed, by an independent auditor in the United Kingdom.

14. In its quarterly and annual reports, Autonomy stated that its financial statements had been prepared in accordance with International Financial Reporting Standards ("IFRS") and, in particular, the accounting requirements for revenue recognition defined by International Accounting Standard 18 – Revenue ("IAS 18"). In its quarterly and annual financial statements, Autonomy made statements about the "revenue" it recognized in the quarter and its "gross margin," an alleged measure of its profitability.

15. For example, Autonomy, in its quarterly financial statements, claimed to have revenue (in millions of U.S. dollars) and a gross margin in the approximate amounts specified below:

| Quarter | Revenue | Gross Margin |
|---|---|---|
| Q3 2009 | $191.6 | 85.6% |
| Q4 2009 | $223.1 | 89.4% |

| Q1 2010 | $194.2 | 88.9% |
|---|---|---|
| Q2 2010 | $221.1 | 86.3% |
| Q3 2010 | $210.6 | 87.6% |
| Q4 2010 | $244.5 | 86.3% |
| Q1 2011 | $219.8 | 88.3% |
| Q2 2011 | $256.3 | 87.1% |

16. In its annual reports and elsewhere, Autonomy held itself out as a "pure software" company. For example, in its 2009 annual report, Autonomy claimed it "operates in the realm of pure software." It stated: "Autonomy is one of the very rare examples of a pure software model."

F. HP Relied on Autonomy's Financial Statements

17. Between January and August 2011, the defendant and others acting on behalf of Autonomy gave and otherwise provided Autonomy's financial statements and documents reflecting Autonomy's results for the year ended 2009, the year ended 2010, the first half of 2011, and other periods to persons at, or acting on behalf of, HP in the course of HP's consideration of whether to buy Autonomy and, if so, for what price.

18. Among other information, HP relied on the accuracy and truthfulness of the statements and disclosures made in Autonomy's historically reported financial statements including, but not limited to, Autonomy's claims about its financial performance and revenues and its claim to be a "pure software" company with high gross margins.

The Scheme to Defraud

19. Beginning no later than in or about October 2009, defendant HUSSAIN, together with others, engaged in a fraudulent scheme to deceive purchasers and sellers of Autonomy securities and HP about the true performance of Autonomy's business, its financial condition, and its prospects for growth.

20. The objectives of the scheme to defraud were, among other things, (a) to ensure that Autonomy reported that it had met or exceeded projected quarterly results for, among other things, revenue, gross margin, net income, and earnings per share, (b) to maintain and increase defendant's position within the company, and to enrich themselves and others through bonuses, salaries, and options,

and (c) to artificially increase and maintain the share price of Autonomy securities to, among other things, make Autonomy attractive to potential purchasers and HP.

21. In furtherance of the scheme to defraud, HUSSAIN, and others, used a variety of means and methods, including:

    a. Artificially inflating revenues by, among other things, (i) backdating written agreements to record revenue in prior periods; (ii) recording revenue on contracts that were subject to side letters or other agreements with contingencies or other terms impacting revenue recognition; (iii) improperly recording revenue for reciprocal or roundtrip transactions whereby Autonomy granted a software license to a counterparty which purchased product or services from Autonomy at a greater price; (iv) improperly recording revenue where all of the criteria in IFRS, IAS 18, and Autonomy's revenue recognition policy had not been satisfied; and (v) structuring or restructuring contracts to accelerate revenue recognition while reducing future recurring revenue;

    b. Making false and misleading statements to Autonomy's independent auditor about the facts and circumstances of transactions allegedly supporting the recognition of revenue, expenses, costs, and other items in Autonomy's financial statements, including, but not limited to, (i) backdating contracts, invoices, agreements, and other documents in order to make it appear that they had been reached with a counterparty in a prior period; (ii) falsely representing, among other things, that Autonomy's auditors had been provided all relevant information and that there were no undisclosed side letters; and (iii) making false and misleading statements about whether the criteria in IFRS, IAS 18, and Autonomy's revenue recognition policy had been satisfied;

    c. Making false and misleading statements to market analysts covering Autonomy about its financial statements, the true performance of its business, its financial condition, and its prospects for growth;

    d. Making false and misleading statements to Autonomy's regulators in response to inquiries about its financial statements;

  e. Making false and misleading statements that Autonomy was a "pure software" company while concealing the fact that Autonomy was engaged in hidden, loss-making, resales of hardware, separate from its disclosed practice of selling "appliances";

f. Making and causing fraudulent entries to Autonomy's books and records;

g. Issuing materially false and misleading quarterly and annual reports; and

h. Intimidating, pressuring, and paying off persons who raised complaints about or openly criticized Autonomy's financial practices and performance.

22. As part of the scheme to defraud, HUSSAIN, and others, caused Autonomy to make materially false and misleading statements directly to HP regarding Autonomy's financial condition, performance, and business, including:

a. Making false and misleading statements regarding the nature of Autonomy's products and concealing Autonomy's non-appliance hardware sales;

b. Making false and misleading statements regarding Autonomy's top customers;

c. Making false and misleading statements regarding Autonomy's top contracts; and

d. Making other false and misleading statements during HP's "due diligence" about Autonomy prior to announcing the acquisition.

COUNT ONE: (18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud)

23. The factual allegations in Paragraphs 1 through 22 are re-alleged and incorporated by reference.

24. Beginning at a time unknown to the Grand Jury, but not later than in or about October 2009, and continuing until in or about October 2011, in the Northern District of California and elsewhere, the defendant,

SUSHOVAN HUSSAIN,

and others, did knowingly conspire to devise and intend to devise a scheme and artifice to defraud as to a material matter and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, and, for the purpose of executing such scheme and artifice and attempting to do so, did transmit, and cause to be transmitted, by

means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

Means and Methods of the Wire Fraud Conspiracy

25. In furtherance of the conspiracy and to effect the objectives thereof, on or about the dates listed below, in the Northern District of California and elsewhere, HUSSAIN, and others, used the following means and methods, among others:

a. On or about October 20, 2009, Autonomy issued a press release about, among other things, its financial performance in the third quarter of 2009.

b. On or about December 31, 2009, Autonomy entered into a First Amendment to License and Distribution Agreement with a counterparty in the United States whereby the counterparty licensed "EDD" or electronic data discovery software for approximately $4 million plus maintenance and support.

c. On or about January 1, 2010, HUSSAIN called an officer of a counterparty in the United States that Autonomy was about to acquire and asked if the counterparty would agree to a transaction to license software from Autonomy, which ultimately was recorded as revenue in the fourth quarter of 2009.

d. On or about January 4, 2010, HUSSAIN caused a side letter to be signed respecting a transaction ultimately recorded as revenue in the fourth quarter of 2009.

e. On or about February 3, 2010, Autonomy issued a press release about, among other things, its financial performance in the fourth quarter (year-end) of 2009.

f. On or about February 22, 2010, Autonomy issued its Annual Report and Accounts for the year ended 31 December 2009.

g. On or about March 10, 2010, Autonomy paid a counterparty $1,425,000, by means of a check written on an account maintained at a financial institution in San Francisco, for "EDD Processing" that was not performed.

h. On or about April 1, 2010, an Autonomy officer in the United States called the principal of a counterparty in the United States and asked if the counterparty would agree to a

transaction to license software from Autonomy, which ultimately was recorded as revenue in the first quarter of 2010.

i. On or about April 21, 2010, Autonomy issued a press release about, among other things, its financial performance in the first quarter of 2010.

j. On or about April 21, 2010, an Autonomy officer told the market and others following Autonomy securities "[w]e have very little interest in just selling hardware . . . what we are not doing here is acting as a generic company that resells hardware like Morse or something like that. Obviously, those people do that business and we have no interest in it."

k. On or about July 22, 2010, Autonomy issued a press release about, among other things, its financial performance in the second quarter of 2010.

l. On or about July 28, 2010, HUSSAIN caused Autonomy to fire a finance officer in the United States who questioned whether Autonomy's financial statements were accurately stated.

m. On or about October 19, 2010, Autonomy issued a press release about, among other things, its financial performance in the third quarter of 2010.

n. On or about December 29, 2010, HUSSAIN directed Autonomy employees to prepare a side letter for a transaction that would not otherwise close in the fourth quarter of 2010.

o. On or about January 18, 2011, HUSSAIN caused an Autonomy employee in San Francisco to backdate a draft, unexecuted license agreement with a counterparty.

p. On or about January 26, 2011, HUSSAIN caused an Autonomy officer to e-mail a backdated license agreement to Autonomy's independent auditors.

q. On or about February 1, 2011, Autonomy issued a press release about, among other things, its financial performance in the fourth quarter (year-end) of 2010.

r. On or about February 22, 2011, while in the United States, HUSSAIN directed an Autonomy officer to sign, on Hussain's behalf, a management representation letter to Autonomy's independent auditors stating that there were no side letters excluded from Autonomy's signed sales contracts.

s. On or about February 22, 2011, Autonomy issued its Annual Report and Accounts for the year ended 31 December 2010.

KLW 11/10/16

t. On or about March 4, 2011, ~~HUSSAIN,~~ while in Palo Alto, HUSSAIN participated in a video conference among participants in Palo Alto and the United Kingdom to present financial and other information about Autonomy to HP.

u. On or about April 4, 2011, HUSSAIN caused a counterparty in the United States to prepare and backdate an agreement to license Autonomy software, which ultimately was recorded as revenue in the first quarter of 2011.

v. On or about April 14, 2011, HUSSAIN met in San Francisco with the counterparty and an Autonomy officer and discussed a backdated licensing agreement.

w. On or about April 21, 2011, Autonomy issued a press release about, among other things, its financial performance in the first quarter of 2011.

x. On or about July 27, 2011, Autonomy issued a press release about, among other things, its financial performance in the second quarter of 2011.

y. On or about August 4, 2011, HUSSAIN caused Autonomy to provide to HP and its advisors false and misleading listings of Autonomy's top contracts and customers.

z. On or about August 18, 2011, while in San Francisco, and to induce the offer by HP and HP Vision, HUSSAIN executed a letter irrevocably undertaking to accept the offer, agreeing to recommend the offer to others, and warranting that all information provided by him for inclusion in any document issued in connection with the offer was true and accurate in all respects and not misleading in any respect.

aa. On or about October 17, 2011, HP Vision wired £439,030,699.34 from Citibank account xx291, in the name of Hewlett-Packard Vision B.V., to Royal Bank of Scotland account xx035, in the name of Capita Registrars Limited Crest Clearing Account.

bb. On or about October 17, 2011, HP Vision wired £127,335,580.50 from Citibank account xx291, in the name of Hewlett-Packard Vision B.V., to Royal Bank of Scotland account xx615, in the name of Capita Registrars Ltd Re: Hewlett-Packard Vision B.V./Autonomy Corporation Plc – Takeover Cash Consideration A/C.

cc. On or about October 31, 2011, HP Vision wired £130,874,158.22 from Citibank account xx291, in the name of Hewlett-Packard Vision B.V., to Royal Bank of Scotland account xx035, in the name of Capita Registrars Limited Crest Clearing Account.

All in violation of Title 18, United States Code, Section 1349.

COUNTS TWO THROUGH FIFTEEN: (18 U.S.C. § 1343 – Wire Fraud)

26. The factual allegations in Paragraphs 1 through 25 are re-alleged and incorporated by reference.

27. On or about the dates set forth below, in the Northern District of California and elsewhere, the defendant,

SUSHOVAN HUSSAIN,

did knowingly, and with intent to defraud, devise and intend to devise a scheme and artifice to defraud as to a material matter and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, and, for the purpose of executing such scheme and artifice and attempting to do so, did transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, namely:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| TWO | 1/26/2011 | E-mail from J.S. in the Northern District of California to S.C. dated 1/26/2011 regarding "FW: autn_boa" |
| THREE | 2/1/2011 | Press release titled "Autonomy Corporation plc Announces Results for the Year Ended December 31, 2010," distributed from Cambridge, England, to the Northern District of California |
| FOUR | 2/3/2011 | Video conference involving participants in Palo Alto, California, and the United Kingdom |
| FIVE | 3/4/2011 | Video conference involving participants in Palo Alto, California, and the United Kingdom |
| SIX | 4/4/2011 | E-mail from M.H. to S.E. in the Northern District of California dated 4/4/2011 regarding "Prisa VAR" |
| SEVEN | 4/21/2011 | Press release titled "Autonomy Corporation plc Trading Update for the Quarter Ended March 31, 2011," distributed from the United Kingdom to the Northern District of California |
| EIGHT | 7/27/2011 | Press release titled "Autonomy Corporation plc Announces Interim Results for the Six Months Ended June 30, 2011," distributed from United Kingdom to the Northern District of California |

| | | |
|---|---|---|
| NINE | 8/1/2011 | Conference call to United States toll free number (866) 409-2889 by multiple numbers in the Northern District of California and United Kingdom |
| TEN | 8/2/2011 | Conference call to United States toll free number (866) 409-2889 by multiple numbers in the Northern District of California and United Kingdom |
| ELEVEN | 8/3/2011 | Conference call to United States toll free number (866) 409-2889 by multiple numbers in the Northern District of California and United Kingdom |
| TWELVE | 8/4/2011 | Conference call to United States toll free number (866) 409-2889 by multiple numbers in the Northern District of California and United Kingdom |
| THIRTEEN | 8/4/2011 | E-mail from A.H. in the United Kingdom to F.M. and others in the Northern District of California regarding "Project Daniel 1Room" attaching "Data Room Updates 509381013.4DOC" |
| FOURTEEN | 8/5/2011 | E-mail from A.K. to M.S. and others in the Northern District of California regarding "RE: Tesla: Updated Legal DD Questions" |
| FIFTEEN | 10/4/2011 | E-mailed letter from Capita Registrars in the United Kingdom to M.S. and A.J. in the Northern District of California, requesting payments of £5,445,493,678.35 and £24,065,825.50 |

Each in violation of Title 18, United States Code, Sections 1343.

FORFEITURE ALLEGATION: (18 U.S.C. §§ 981(a)(1)(C) & 982(a) & 28 U.S.C. § 2461 – Criminal Forfeiture)

28. The factual allegations in Paragraphs 1 through 27 are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a), and Title 28, United States Code, Section 2461.

29. Upon conviction of any of the offenses alleged in Counts One through Fifteen, the defendant,

SUSHOVAN HUSSAIN,

shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a), and Title 28, United States Code, Section 2461, any property, real and personal, which constitutes or is derived from proceeds traceable to said violations, including but not limited to a sum of not less than $7.7 million, representing the amount of proceeds obtained as a result of the offenses alleged in Counts One through Fifteen.

30. If, as a result of any act or omission of the defendant, any of said property

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to or deposited with a third person;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

any and all interest defendant has in any other property shall be forfeited to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a), and Title 28, United States Code, Section 2461.

All in violation of Title 18, United States Code, Sections 981(a)(1)(C) and 982(a), and Title 28, United States Code, Section 2461.

DATED: November 10, 2016

A TRUE BILL

Karen Williams
FOREPERSON

ALEX TSE
Attorney for the United States,
Acting Under Authority Conferred By
28 U.S.C. § 515

Barbara J. Valliere
BARBARA J. VALLIERE
Chief, Criminal Division

(Approved as to form: Robert Leach)
AUSA ROBERT S. LEACH

(Approved as to form: A. Reeves)
AUSA ADAM A. REEVES