KEKER, VAN NEST & PETERS LLP
JOHN W. KEKER - # 49092
jkeker@keker.com
JAN NIELSEN LITTLE - # 100029
jlittle@keker.com
BROOK DOOLEY - # 230423
bdooley@keker.com
KATE E. LAZARUS - # 268242
klazarus@keker.com
NICHOLAS D. MARAIS - # 277846
nmarais@keker.com
IAN KANIG - # 295623
ikanig@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:     415 397 7188

Attorneys for Defendant
SUSHOVAN HUSSAIN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  v.<br><br>SUSHOVAN HUSSAIN,<br><br>  Defendant. | Case No. 3:16-cr-00462-CRB<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR AN ORDER DIRECTING THE GOVERNMENT TO REVIEW THE FILES OF HEWLETT-PACKARD AND MORGAN, LEWIS & BOCKIUS LLP; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:     May 10, 2017<br>Time:     1:30 p.m.<br>Dept.:    Courtroom 6, 17th Floor<br>Judge:    Hon. Charles R. Breyer<br><br>Case Filed: November 10, 2016<br><br>Trial Date: TBD |

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD IN THIS ACTION:**

PLEASE TAKE NOTICE that on Wednesday, May 10, 2017, at 1:30 p.m., or as soon thereafter as counsel may be heard, in Courtroom 6, 17th Floor, of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Sushovan Hussain will and hereby does move for an order directing the United States to review all documents in the possession, custody, or control of the prosecution team, which includes the Hewlett-Packard Company and its lawyers at Morgan, Lewis & Bockius LLP.

This motion is based on this Notice of Motion and Motion and the Memorandum of Points and Authorities, the Declaration of Brook Dooley, and Proposed Order filed herewith, as well as any reply papers that Mr. Hussain may submit, oral argument of counsel, the complete files and records in this action, and such additional matters as the Court may consider.

Respectfully submitted,

DATED: April 26, 2017                        KEKER, VAN NEST & PETERS LLP

By:   */s/ John W. Keker*
       JOHN W. KEKER
       JAN NIELSEN LITTLE
       BROOK DOOLEY
       KATE E. LAZARUS
       NICHOLAS D. MARAIS
       IAN KANIG

       Attorneys for Defendant
       SUSHOVAN HUSSAIN

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Since 2012, the Hewlett-Packard Company ("HP") and its lawyers at Morgan, Lewis & Bockius LLP ("Morgan Lewis") have investigated Defendant Sushovan Hussain on behalf of the government. Documents produced by the government in discovery show that HP and Morgan Lewis led and shaped the investigation of Mr. Hussain after HP contacted the government in November 2012. For this reason, the government has a constitutional duty under *Kyles v. Whitley* to review the complete investigatory files of HP and Morgan Lewis for *Brady/Giglio* materials. *See* 514 U.S. 419, 437-38 (1995) (to fulfill its *Brady* obligation, the prosecution must review not only its own files, but also the files of "others acting on the government's behalf"); *accord Comstock v. Humphries*, 786 F.3d 701, 709 (9th Cir. 2015).

HP and Morgan Lewis Lewis have conducted an extensive investigation for the government's benefit. In January 2013, the government formalized HP's role as an unofficial member of its prosecution team in a confidential cooperation agreement. After that, at the government's request, HP and Morgan Lewis interviewed 50 witnesses and presented detailed summaries to the government; HP and Morgan Lewis compiled binders of key documents related to more than 40 witnesses; and HP and Morgan Lewis gathered and analyzed documents related to all of the allegations that now appear in the indictment. HP's lawyers made more than ten in-depth presentations of their findings to the government. HP even agreed, at the government's urging, to settle a threatened civil claim against Autonomy's auditors, Deloitte, to facilitate Deloitte's cooperation with the government and its testimony before the grand jury. It is no wonder that an FBI agent at one point referred to HP's lawyers as the "Morgan Lewis All-Stars."

Accepting the benefit of HP's cooperation and the product of Morgan Lewis's many hours of work also imposes responsibilities on the government. Despite the formal agreement between the government and HP and the broad investigation that HP and Morgan Lewis conducted on the government's behalf, the government refuses to acknowledge its duty to review their investigation files for *Brady/Giglio* material. This unnecessarily risks a *Brady* violation. While the government has provided the defense with material from HP's and Morgan Lewis' files, that

material was selected by HP and Morgan Lewis to provide to prosecutors. The government has not done an independent review of the investigative files of HP or its lawyers, who, at least for the initial stages of this matter, were the government's principle investigators. Neither the government nor Mr. Hussain has any assurances that HP or its lawyers have disclosed to prosecutors—in addition to material that helps the government—all evidence that is material and favorable to Mr. Hussain's defense. Indeed, HP has every incentive to withhold such material, as it pursues its $5 billion lawsuit against Mr. Hussain in England. Accordingly, Mr. Hussain requests that the Court order the government to review HP and Morgan Lewis's files for *Brady*/*Giglio* materials.[1]

## II. BACKGROUND

### A. HP and Morgan Lewis investigated Autonomy and Mr. Hussain on behalf of the government prior to the indictment.

On November 20, 2012, HP announced an $8.8 billion write-down associated with its acquisition of Autonomy, more than $5 billion of which to they attributed "serious accounting improprieties, misrepresentations and disclosure failures" by former Autonomy management. Declaration of Brook Dooley ¶ 9. The same day, HP announced that it had referred the matter for criminal investigation. *Id.*

Even before HP's November 20, 2012 announcement, however, HP and its lawyers at Morgan Lewis were already working with the government. Morgan Lewis gave its first presentation to the Securities and Exchange Commission ("SEC") on November 16, 2012, and held further calls with the SEC on November 26 and December 5, 2012. *Id.* ¶ 10. On December 11, 2012, at the government's request, HP supplied a list of key Autonomy witnesses. *Id.*

On January 16, 2013, the United States Attorney's Office ("USAO") and the SEC formalized a cooperation agreement with HP. The agreement provides that, "[i]n light of the interest of the [SEC] and the [USAO] in determining whether there have been any violations of

---

[1] At this time, Mr. Hussain's proposed order is limited to HP and Morgan Lewis. HP has engaged numerous other law firms and advisors in the course of this matter, however, and, as more evidence becomes available, Mr. Hussain reserves his right to seek an order directing further government review.

federal securities or other laws, and H-P's interests in investigating and analyzing the circumstances and people involved in the events at issue, H-P will provide to the [SEC] an oral briefing and the compilation of pre-existing documents[.]" *Id.* ¶ 11 & Ex. A.  The agreement also purports to protect HP's attorney-client and attorney work product privileges (and "any other privilege applicable as to third parties") even as HP and Morgan Lewis shared work product and confidential communications and documents with the government.  *Id.*  HP and its lawyers presented the second round of their findings to the government that same day.  *Id.* ¶ 12.  And then in March 2013, Morgan Lewis presented to the government again. *Id.*

From November 2012 to March 2013, a team of Morgan Lewis lawyers—led by Leslie Caldwell, formerly a federal prosecutor in the Northern District of California, Head of the Enron Task Force, and subsequently the Assistant Attorney General for the Criminal Division—conducted 50 interviews of 39 witnesses, including many former Autonomy employees.  *Id.* ¶ 13. In July 2013, HP provided the government with Morgan Lewis's summaries of these interviews along with the exhibits used during its interviews.  *Id.* ¶ 14.

Thereafter, HP's lawyers at Morgan Lewis made at least six more presentations to the government.  In *February 2014*, Morgan Lewis presented to the government on one of Autonomy's reseller customers.  *Id.* ¶ 15.  In *September 2014*, they made a presentation about allegations that Autonomy concealed accounting improprieties from HP in the lead-up to HP's acquisition of Autonomy.  *Id.*  In *April 2015*, they presented HP's analysis of Autonomy's accounting determinations.  *Id.*  Four days later, Morgan Lewis returned to present HP's damages case to the government.  *Id*.  In *June 2015*, they presented on UK financial reports.  *Id.*  Then, in *July 2015*, Morgan Lewis gave a two-day presentation to the government, focused on, among other topics, Autonomy's disclosures regarding its hardware sales and revenue recognition regarding sales to value-added resellers.  *Id*.

The government also asked Morgan Lewis to compile key documents for 43 different witnesses.  *Id.* ¶ 16 & Ex. B.  Morgan Lewis obliged, and between July 2015 and May 2016, curated and produced dozens of witness binders to the United States.  *Id.* ¶ 17.  The FBI was apparently so pleased with this work product that one of its agents referred to HP's lawyers as the

3
MOTION FOR REVIEW OF HEWLETT-PACKARD AND MORGAN LEWIS DOCUMENTS
Case No. 3:16-cr-00462-CRB

1  "Morgan Lewis All-Stars."  *Id.* ¶ 18 & Ex. C.  One of the lead attorneys from Morgan Lewis
2  responded: "Flattery will get you everywhere[.]"  *Id.*
3     Based on the timing of the government's requests and Morgan Lewis's productions, it
4  appears that the government used HP's witness binders to conduct its own interviews.  For
5  example, Morgan Lewis sent the government a witness binder for HP's former Chief Technology
6  Officer Shane Robison on July 15, 2015, and then, on July 22, 2015, the government interviewed
7  Mr. Robison.  Similarly, former Autonomy employee Brent Hogenson's binder was produced on
8  August 26, 2015, and the government interviewed Mr. Hogenson on September 10, 2015.  *Id.* ¶
9  17.  HP's lawyers also created interview materials for the government's trip to London to
10 interview witnesses in May 2016.  *Id.* ¶ 19.
11    The government also tasked HP and its lawyers at Morgan Lewis with compiling
12 documents and summaries regarding key topics in the case.  For example, in June 2016, the
13 USAO requested that HP and Morgan Lewis perform a forensic analysis of a list of Autonomy's
14 top contracts that was provided to HP during the due diligence period in August 2011.  *Id.* ¶ 20.
15 Three days later, Morgan Lewis responded with a spreadsheet created by HP's finance team in
16 the U.K.  *Id.*  In May 2015, Morgan Lewis provided a detailed set of responses to questions raised
17 by the prosecutors during Morgan Lewis's April 2015 presentation on reseller transactions.  *Id.*
18 Then in July 2015, HP's lawyers sent over documents responsive to further questions from the
19 government regarding additional reseller transactions.  *Id.*  Indeed, by November 2015, the USAO
20 had asked Morgan Lewis to provide revenue analyses for nearly three dozen reseller transactions.
21 *Id.*  The government also enlisted HP and Morgan Lewis to bolster its case that this Court has
22 jurisdiction over this case.  In November 2015, the USAO asked Morgan Lewis to produce
23 evidence that HP received Autonomy's press releases for 2010 and 2011 "as a result of an
24 interstate wire."  *Id.* ¶ 21.  The USAO also asked for all bank records relating to HP's payment
25 for Autonomy's shares that "originated from, passed through, or was received in ND Cal."  *Id.*
26    HP and its lawyers were even tasked with rebutting defense counsel's arguments.  For
27 example, at an August 29, 2016 meeting with the USAO, defense counsel explained that HP
28 knew that Autonomy had sold hardware because Autonomy sourced some of that hardware from

1   HP itself. *Id.* ¶ 22. That same day, the USAO asked HP, through its counsel at Morgan Lewis, to

2   produce all documents relating to these sales. *Id.* In response, HP provided the United States

3   with several productions relating to hardware. *Id.*

**B.  At the request of the government, HP settled its threatened lawsuit against Autonomy's auditors.**

HP's role on the prosecution team was not limited to interviewing witnesses and gathering documents. In 2014, HP sent a letter to Autonomy's auditors at Deloitte threatening a civil lawsuit in England. In 2015, the government apparently began to fear that it was not getting the cooperation it wanted from Deloitte. As the government observed at the time, "the auditor's testimony is often highly relevant" in an accounting fraud case—but the lingering specter of a major civil suit was "chilling Deloitte's desire to cooperate." *Id.* ¶ 23 & Ex. D. So, on November 4, 2015, the government's prosecutors met with HP's lawyers to explain that Deloitte's representatives had "expressed a willingness to cooperate" if circumstances changed, but until then, they were unwilling to travel to the United States to testify. *Id.* According to the government's own minutes of that meeting, it called HP in "to discuss with HP the effects of their civil claims on the Government's ability to meet its burden at trial." *Id.*

On March 17, 2016, the prosecutors had a follow-up meeting with both HP's and Deloitte's lawyers to discuss "the Government's concerns about its access to evidence" in this case. *Id.* ¶ 24 & Ex. E. According to the FBI's summary, the prosecutors explained that "it was in [the government's] best interest to make sure all of the issues between Deloitte and HP were resolved, if possible." *Id.* The government "wanted to encourage the two sides to try to come together for this meeting to see if a resolution regarding cooperation from the Deloitte auditors was possible." *Id.* HP proposed a resolution: at "the same time they signed a resolution with Deloitte, Deloitte would sign a cooperation agreement with the government." *Id.*

That is, it appears, what happened. HP settled its claim with Deloitte in or about April 2016; Deloitte signed a cooperation agreement with the United States on April 28, 2016; and <u>Deloitte's witnesses appeared before the grand jury in June 2016</u>. *Id.* ¶ 25 & Ex. F.

5
MOTION FOR REVIEW OF HEWLETT-PACKARD AND MORGAN LEWIS DOCUMENTS
Case No. 3:16-cr-00462-CRB

1158336

**C.     Mr. Hussain attempted to resolve this issue with the government.**

On January 6, 2017, defense counsel sent the government a letter requesting that it produce all *Brady*/*Giglio* materials, including those "within the possession, custody, or control of entities or persons who conducted an investigation in contemplation of, or in furtherance of, cooperating with, or producing information to the government, including the Hewlett-Packard Company or its agents." *Id.* ¶ 26.

Subsequently, during a March 9, 2017, telephone conference, defense counsel asked counsel for the government to confirm that it would search not only its own files, but the files of HP and HP's agents, including Morgan Lewis. *Id.* ¶ 27. Counsel for the government responded that those entities were not participating in the investigation and that the government did not intend to conduct any searches other than asking HP for relevant materials. *Id.*

The parties had a further telephone conference on April 6, 2017. During this call, counsel for the government reiterated its position and stated that Mr. Hussain would have to file a "prosecution team" motion. *Id.* ¶ 28.

**III.    ARGUMENT**

Pursuant to *Brady v. Maryland* and its progeny, the government has a continuing obligation to disclose all evidence that is material and favorable to the defense. 373 U.S. 83, 87 (1963). To fulfill this constitutional duty, the prosecution must review not only its own files, but also the files of *"others acting on the government's behalf." Kyles*, 514 U.S. at 437-38 (emphasis added); *accord Comstock*, 786 F.3d at 709. *Kyles* places no limitation on the type of actor that may serve as an agent "acting on the government's behalf." It does not even matter whether the prosecution has actual control over an agent. *See United States v. Cerna*, 633 F. Supp. 2d 1053, 1059 (N.D. Cal. 2009) ("The duty is to turn over all favorable evidence known to the prosecutor *or that he could have learned from others acting on his behalf*. If the federal prosecutor chooses to have a state agency act as a lead investigating agency, then the agency has voluntarily obligated itself to the *Brady* obligation.") (emphasis added). The relevant determination is whether there is a "close working relationship" between the prosecution and the agent working on behalf of the government. *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992)

6
MOTION FOR REVIEW OF HEWLETT-PACKARD AND MORGAN LEWIS DOCUMENTS
Case No. 3:16-cr-00462-CRB

1158336

("Given the close working relationship between the Washington metropolitan police and the U.S. Attorney for the District of Columbia . . . the duty must reach the police department's homicide and Internal Affairs Division files.").

There is no reason why the files of private entities who have acted on behalf of the government in the furtherance of a criminal prosecution should be exempt from *Brady*/*Giglio* review. *Kyles* does not limit the government's duty to review its agents' files to public entities. Regardless, the Supreme Court's state-action doctrine has long-recognized that if "there is a sufficiently close nexus between the State and . . . [a private] entity . . . the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). Such "[a] nexus of state action exists between a private entity and the state when the state . . . is entwined in the management or control of the private actor or provides the private actor with significant encouragement, either overt or covert, or when the private actor operates as a willful participant in joint activity with the State or its agents, is controlled by an agency of the State, has been delegated a public function by the state, or is entwined with governmental policies." *United States v. Stein*, 541 F.3d 130, 147 (2d Cir. 2008) (concerning KPMG's cooperation with the government). Indeed, the manner that the government now relies on private actors to serve as its criminal investigators suggests that courts should routinely consider private actors to be members of the prosecution team. *See* Abbe D. Lowell & Christopher D. Man, *Federalizing Corporate Internal Investigations and the Erosion of Employees' Fifth Amendment Rights*, 40 Geo. L.J. Ann. Rev. Crim. Proc. xix-xxi (2011) ("The government's involvement with corporate internal investigations often is sufficient to trigger a judicial finding that the actions by corporate internal investigators constitute state action . . . [A] finding of state action is particularly appropriate where the government has 'made plain not only its strong preference for [the private conduct], but also its desire to share the fruits of such intrusions.'").

All of these considerations are present here. It is clear that HP and Morgan Lewis have acted on the government's behalf (and at its behest) in investigating Mr. Hussain and that there has been a "close working relationship" between HP, Morgan Lewis, and the government from 2012 through the present day.

1. HP and Morgan Lewis have met the government's every investigative demand—interviewing dozens of witnesses, gathering documents and compiling witness dossiers, providing synopses of the company's allegations and theories, responding to defense arguments, and presenting their findings to the government. The government was so pleased with Morgan Lewis's work that an FBI agent described them as "All Stars." Every aspect of this case has been investigated for the government by HP and Morgan Lewis—the definition of a prosecution team member.

    More than that, the government enlisted HP's help to lean on Autonomy's former auditor Deloitte, suggesting that HP settle its threatened civil suit (for pennies on the dollar) in exchange for Deloitte's cooperation in the criminal case. Again, HP obliged. After four-and-a-half years of enlisting—and benefiting from—HP and Morgan Lewis's help, the government must now fulfill its obligation to review HP and Morgan Lewis's investigatory files for *Brady*/*Giglio* material.

    Absent an order from the Court, there is an unacceptable risk that material evidence favorable to Mr. Hussain's defense will not be uncovered and disclosed in advance of trial—a risk that is heightened because HP is plainly motivated to help the government secure a guilty verdict from the jury. Under these circumstances, Mr. Hussain cannot rely on HP and Morgan Lewis to produce such evidence to the government voluntarily. Likewise, because Mr. Hussain does not know what material evidence favorable to his defense HP and Morgan Lewis hold in their files, he cannot subpoena such evidence pursuant to Rule 17.

//
//
//
//
//
//
//
//
//

## IV. CONCLUSION

For the reasons set forth above, and as set forth in the proposed order, Mr. Hussain requests that the Court direct the government to review HP's and Morgan Lewis's files as part of its *Brady*/*Giglio* review. If there is any doubt about whether HP and its lawyers constituted agents within the meaning of *Brady*, the Court should hold an evidentiary hearing to resolve the matter. *See Cerna*, 633 F. Supp. 2d at 1060 (ordering evidentiary hearing to determine whether an entity constituted an agent within the meaning of *Kyles*).

DATED: April 26, 2017                                KEKER, VAN NEST & PETERS LLP

By: */s/ John W. Keker*
JOHN W. KEKER
JAN NIELSEN LITTLE
BROOK DOOLEY
KATE E. LAZARUS
NICHOLAS D. MARAIS
IAN KANIG

Attorneys for Defendant
SUSHOVAN HUSSAIN