Pages 1 - 27

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER, JUDGE

UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,       )
                               )
  VS.                          )      **No. CR 16-462 CRB**
                               )
SUSHOVAN HUSSAIN,              )
                               )
              Defendant.       )
_____)      San Francisco, California
                                      Wednesday, May 10, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:            Brian J. Stretch
                          United States Attorney
                          450 Golden Gate Avenue, 11th Floor
                          San Francisco, California  94102
                  BY:  **ADAM A. REEVES**
                       **ROBERT S. LEACH**
                       **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:            KEKER, VAN NEST & PETERS LLP
                          633 Battery Street
                          San Francisco, California  94111
                  BY:  **JOHN W. KEKER, ESQUIRE**
                       **JAN NIELSEN LITTLE, ESQUIRE**
                       **BROOK DOOLEY, ESQUIRE**

Reported By:  Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
              Official Reporter

| | |
|---|---|
| 1 | **Wednesday - May 10, 2017**                                    **1:47 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  Calling criminal action CR 16-0462, USA |
| 5 | versus Sushovan Hussain. |
| 6 | **MR. REEVES:**  Adam Reeves and Bob Leach for the |
| 7 | United States.  Good afternoon, Your Honor. |
| 8 | **MR. KEKER:**  Good afternoon, Your Honor.  John Keker, |
| 9 | Jan Little, and Brook Dooley for Mr. Hussain, who is present in |
| 10 | court. |
| 11 | **THE COURT:**  So let's deal with the -- let's deal with |
| 12 | the date of trial first. |
| 13 | **MR. KEKER:**  Okay. |
| 14 | **THE COURT:**  Notwithstanding my protestations that it |
| 15 | would be tried this year, the parties have apparently agreed |
| 16 | that it can be tried next year, for whatever those reasons are |
| 17 | out there.  And I guess I was treated to all of those reasons |
| 18 | out there, and what I'd have to do, and who did what first, and |
| 19 | what was said, and what wasn't said, and so forth.  And that's |
| 20 | great.  But I don't care.  I'll try it on January 29th. |
| 21 | I don't even have a calendar for next year. |
| 22 | Will I be here next year, Lashanda?  Am I scheduled to be |
| 23 | here? |
| 24 | **THE CLERK:**  Let me double-check. |
| 25 | **MR. KEKER:**  We'll remind you, Your Honor. |

 1    **THE COURT:**  You may have to.  That's the problem.  I

 2   may have reached the point where you have to remind me.

 3        Okay.  So you've all agreed on January 29th.

 4    **MR. KEKER:**  With one -- with the caveat, Your Honor,

 5   which I think should not be a problem at all, we are trying to

 6   work out authenticity stipulations to avoid custodian of record

 7   Rule 15 depositions, flying around the world trying to get.

 8   And we believe that we're going to be able to do that.

 9        And if for some reason that breaks down, we're going to

10   come back and talk to you about that, because it shouldn't

11   break down.

12    **THE COURT:**  One thing I'm not going to do is

13   reschedule the trial date.  I don't know what I'm going to do,

14   but I'm not going to reschedule the trial date.

15        So I would encourage you to work out all stipulations in

16   connection with authenticity.

17    **MR. KEKER:**  There would be no excuse not to.

18    **THE COURT:**  And you will.  You will.

19    **MR. REEVES:**  The only excuse might be if they're not

20   authentic.

21    **THE COURT:**  Really?

22    **MR. REEVES:**  But we'll work on that.

23    **THE COURT:**  Really?  No, no, authenticate everything.

24   Yes, if they're not authentic --

25    **MR. REEVES:**  We're certainly happy to work with

1   defense.  And we've begun that process.

2   　　　　THE COURT:  Great.

3   　　　　MR. REEVES:  Thank you for the trial date, Your Honor.

4   　　　　THE COURT:  Okay.  As we get closer, I'll figure out

5   when the pretrial date should be and so forth.  But I think

6   it's premature to set it.  Though I will -- this is what I am

7   going to do:  I'm going to -- I'm going to set the jury

8   selection date.

9   　　　　THE CLERK:  Yes.

10  　　　　THE COURT:  So --

11  　　　　THE CLERK:  23rd?

12  　　　　THE COURT:  I've got to get the calendar.

13  　　　　THE CLERK:  Okay.

14  　　　　THE COURT:  Very good.  Jury selection January 23rd.

15  And we will have -- let me -- we will have a questionnaire.

16  　　　　MR. REEVES:  Yes.

17  　　　　THE COURT:  I may have the jury come in -- you know

18  what?  We'll do jury selection on the 25th.  And I'll have the

19  jury panel come in earlier, do the questionnaire -- why are you

20  shaking your head?

21  　　　　THE CLERK:  You're not here the 25th.  You're in

22  Miami.

23  　　　　THE COURT:  I'm in Miami?

24  　　　　THE CLERK:  Yes.

25  　　　　THE COURT:  Somebody else thinks I'm going to be here.

1    Okay.  So that's not going to work.

2        I may have the jury panel come in the preceding week.  I

3    can do that.  So we'll stick with the 23rd.  I'll have my jury

4    panel come in the week of January 15th, sometime there.  I'll

5    have questionnaires filled out.  You'll get copies of the

6    questionnaires.  It has been my experience that it shortens the

7    jury selection process.

8        I mean, I can't understand this thing about the state law.

9    I can't understand what the opposition is to questionnaires.

10       Now, I mean, I will admit I was -- I came from the old

11   school where I was very reluctant to have questionnaires,

12   thinking it was a way of delay.  It's just the opposite.  It's

13   just the opposite.

14       It actually -- it actually results in counsel being in a

15   better position to figure out who they want and who they don't

16   want on the jury.

17       So rather than getting 12 people of whom -- the last of

18   which people the lawyers know the least amount, the least

19   amount, they actually know something about these people.

20       So that doesn't mean that I allow questions like:  Do you

21   read, you know, Rod & Gun, Fish & Game?  How did you vote in

22   the last election?  And what programs do you like?

23       Which I'm sure would tell you a lot about the people.  But

24   I do allow some -- in the questionnaire, some latitude to try

25   to figure out something about these people so you can make an

```
 1   intelligent choice.
 2        And then it goes like that (indicating).  It's very, very
 3   quick.  I mean, obviously, you ask questions in voir dire.
 4            MR. KEKER:  When do you do hardships, Your Honor?
 5            THE COURT:  I do very limited hardship.
 6        So the hardships I have done traditionally are students,
 7   caretakers of small children or the elderly, and people who --
 8   well, those are the initial hardships.  And then if they have
 9   health problems or if they have a prepaid vacation, I generally
10   excuse all those people.
11        If they come in and say, I'm the sole support and
12   something, I want them actually to come in and tell us about
13   it.
14        So I'll do some limited hardships.  But, you know, if you
15   start to get out there how you get out of jury service, they
16   get out of jury service, you know.  People aren't dumb.  They
17   figure out, gee, I don't have to serve if I say I'm, you know,
18   this or that or I can't do it.
19        Inconvenience is not a justification for being excused,
20   that it's inconvenient.  It's inconvenient for everybody.
21   Okay.
22            MR. REEVES:  There's a standard jury selection form
23   that I know the United States Attorney's Office has worked on
24   with the defense bar that we can use as a beginning point.
25            THE COURT:  Right.  I think that's a good starting
```

1  point.

2      This questionnaire was drafted by the

3  U.S. Attorney's Office, the Federal Public Defender's Office,

4  and CJA counsel.  And I've used it now in my criminal cases.

5  And it's been great.

6      I'm prepared to use it.  And I'm prepared to put some

7  additions on it, you know, because I -- I get to strike out the

8  additions I don't like.

9      But, you know, go to it.  Exchange copies back and forth.

10  See what you can agree on.  And we can take care of that.  And

11  I'll have the people come in.

12      I also will need -- we're talking about next year, but I

13  also will need a pretty good idea of how long the case is going

14  to go.  And I don't think you're in a position today to answer

15  that.

16          **MR. KEKER:**  (Shakes head.)

17          **THE COURT:**  So that's a conversation --

18          **MR. KEKER:**  Your Honor, we submitted -- with the

19  status report, we submitted a proposed schedule.  And the only

20  thing on it that matters to us is there was a date for

21  discovery motions and a date for substantive motions.  And I

22  think those dates were July 12 for discovery motions and

23  September 20 for dispositive motions.

24          **THE COURT:**  Does the government object?

25          **MR. REEVES:**  No.  Those two dates are good for us,

1    Your Honor.

2              **THE COURT:**  Fine.  They are set.  Okay.

3              **MR. KEKER:**  Okay.  Good.

4              **MR. REEVES:**  One little detail --

5              **THE COURT:**  Wait a minute.  I'm not here when?

6              **THE CLERK:**  You can do it the 14th.

7              **THE COURT:**  Pardon me?

8              **THE CLERK:**  You're available on the 14th.

9              **THE COURT:**  Can we do it on the 14th?

10             **MR. REEVES:**  July 14th?

11             **THE CLERK:**  Yes.

12             **MR. REEVES:**  That's Friday; right?

13             **THE CLERK:**  Yes.

14             **MR. REEVES:**  Yes, that's fine.

15             **THE COURT:**  Okay.  Thank you.

16             **MR. REEVES:**  One little detail, Your Honor.  The

17   government would like to bring a motion.  And we'll plan to

18   schedule it in accordance with that schedule.

19             **THE COURT:**  Good.  Okay.

20             **MR. REEVES:**  All right.

21             **MR. KEKER:**  Might we know what motion the government

22   plans to bring?

23             **THE COURT:**  Secret motion.

24             **MR. REEVES:**  No.  We've discussed it.  It relates to a

25   statement Mr. Hussain made to the FRC in London.

1          **MR. KEKER:**  Oh, okay.

2          **MR. REEVES:**  And to his production of emails to HP.

3          **THE COURT:**  Okay.  Whatever motions the government or

4  the defense wishes to bring, that's fine.

5          **MR. REEVES:**  Thank you, Your Honor.

6          **THE COURT:**  Now let's go to the defense motions.

7  There are basically four: motion for bill of particulars;

8  motion for disclosure of grand jury materials; motion for a

9  *Brady* order; and motion to direct the government to review HP

10  files.

11      Let me take the last one first, because the last one is,

12  what I would say, essentially somewhat novel.

13          **MR. KEKER:**  Mr. Dooley is doing the *Brady* motion and

14  the Morgan Lewis motion, Your Honor.  I'm doing the other two.

15          **THE COURT:**  I've read everything.

16          **MR. DOOLEY:**  Good afternoon, Your Honor.

17          **THE COURT:**  Good afternoon.

18      And here is what -- my concern and why I have some

19  difficulty in granting your motion.

20      As I understand it, a law firm -- was it Morgan Lewis?

21          **MR. REEVES:**  Yes, Morgan Lewis.

22          **MR. DOOLEY:**  Morgan Lewis.

23          **THE COURT:**  Morgan Lewis, at the request of

24  Hewlett-Packard, the board of directors, or perhaps others,

25  conducted an investigation of the circumstances surrounding the

1    events that led to the lawsuits and ultimately to this

2    prosecution.

3         And they did so at the behest of the board of directors,

4    not at the behest of the government, at the beginning.  I mean,

5    they were retained by Hewlett-Packard or the board.  They were

6    not retained by the government.  They didn't act in the first

7    instance at the request of the government, as I understand the

8    record.

9         Subsequently, or perhaps in connection with this

10   investigation -- its investigation, or over some period of

11   time, they go to the government.  And whether they were

12   requested to come in or they themselves initiated, I don't

13   know.  And maybe it makes a difference.  We can talk about

14   that.

15        They came in and they said, look, we have conducted this

16   investigation, and we're willing to share the results of that

17   investigation, at least in part, with you, United States

18   government.  But as a condition, we want certain things.

19        I think the most important one was, it will not constitute

20   a waiver of any privileges that we have so that if we disclose

21   X, Y and Z, the fact that we are disclosing X, Y and Z should

22   not constitute a waiver of any privileges that we otherwise

23   would enjoy.

24        And the government agreed.  And then the disclosures were

25   made.  Whatever they were.  And the government either said

1  thank you or didn't say thank you, and they left.  And that

2  was --

3          **MR. REEVES:**  We said thank you.

4          **THE COURT:**  Okay.  That was the end of that, that

5  phase of it.

6      And, as I understand the motion, the motion is, look, we

7  want to look -- we, the defense in this case, want to look at

8  the files or what was gathered in connection with the

9  investigation.  The reports or whatever.  All the materials.

10     Maybe it's twofold.  It is, we want to look at that or we

11  want to direct the United States government to look at that to

12  determine whether or not there's any *Brady* material in those

13  files.

14     And the law, as I understand it, is that the government is

15  not responsible for conducting an investigation of the

16  existence of *Brady* materials for -- of any entity of which

17  either they do not control or, two, they have not retained to

18  act as their investigator in the matter.  And the government

19  says, we didn't do either.

20     And then they say the third thing, which is sort of a by

21  the way, by the way, you want this stuff, go subpoena it.

22  We're not saying it's unavailable.  But there is a way that you

23  can get it.  Maybe it's complicated, but there's a way that you

24  can get it.

25     And so my question to you is, why isn't the government

1    right?

2        Because I think they are.  And the cases that you cite are

3    cases that are quite different from this case.  So this would

4    be an unusual case.  Now, maybe it should be what the law

5    should be.  But it's not, in my view, what the law is.

6        Go ahead.

7            **MR. DOOLEY:**  Thank you, Your Honor.

8        I think there are two critical points where I think I

9    disagree with your -- with your summary.

10       The first is, I think you're right that in the initial

11   instance the Morgan Lewis firm -- and that's the firm that

12   we're talking about here -- principally was retained by the

13   company to begin the investigation.

14       And then they brought the initial fruits of their

15   investigation to the government, initially to the SEC and then

16   to the Department of Justice, which opened its investigation on

17   November 21st, 2012, the day after HP's public announcement of

18   the write-down.

19       So initially it was an investigation that was undertaken

20   by Morgan Lewis, having been hired by HP.

21       I think very quickly thereafter, Your Honor, what you see

22   is this is not simply Morgan Lewis conducting an investigation,

23   completing it, and then taking the finished product and

24   bringing it to the government.

25       What you see is, at the government's request and on the

1  government's behalf, Morgan Lewis and, I believe, HP working

2  with their lawyers, responding to numerous queries from the

3  government, numerous requests, both for the collection of

4  information, the review of documents, the production of

5  documents, and the -- the production of analysis.

6      And so I don't think it's simply the case that HP hires

7  Morgan Lewis, Morgan Lewis does its job, closes the file, and

8  then hands the file to the government, such that the government

9  can say, well, you know, we weren't really directing what was

10  going on here.

11      I mean, a good example -- and we cite it in our papers,

12  Your Honor -- the government went to Morgan Lewis and said,

13  hey, here are these 40-plus witnesses that we think are pretty

14  important.  Can you go collect what you think are the key

15  documents and put them in binders for us?

16      And Morgan Lewis said yep, and compiled those binders.

17  That's classic work product.  That's investigative work that's

18  being done by Morgan Lewis.  And that at the --

19          **THE COURT:**  What happened to those binders?

20          **MR. DOOLEY:**  Presented to the government.

21          **THE COURT:**  Okay.

22          **MR. DOOLEY:**  So that's --

23          **THE COURT:**  You're not asking for anything in those

24  binders.  I mean, those binders they have to turn over to you.

25          **MR. REEVES:**  They've been turned over.

1          **MR. DOOLEY:**  But, Your Honor -- that's true, Your

2     Honor.  Those binders have been turned over.  So we don't have

3     a dispute about the binders.  The question is what didn't make

4     it into the binders, Your Honor.

5          **THE COURT:**  But that's the problem.  That's the

6     problem.  It wasn't disclosed to the government.  It wasn't

7     disclosed to the government.

8          So you're asking the government now to go back to Morgan

9     Lewis and say, you know all those things you didn't tell us

10    about, now tell us about.  We need to know.

11         I don't think that's an appropriate order any more -- any

12    more than any other third party out there who supplies

13    information to the government.

14         Yes, you get that.  No question about it.  You get what

15    they supply.  But do you get what they didn't supply?  And the

16    answer, in my view, is no.  I mean, it's not the law.

17         **MR. DOOLEY:**  Your Honor, our view of it is that the

18    principal -- there certainly -- I mean, Your Honor is right,

19    there isn't a case where a federal court has directed a

20    U.S. Attorney's Office to review the files of a private law

21    firm.  That is certainly true.

22         However, the principle of the *Kyles* case and the cases

23    that flow out of that, there's no principled reason why that

24    wouldn't extend to a private law firm that was undertaking an

25    investigation at the direction, we would say, of the

1   government.

2       In the *Kyles* cases, you have orders directing the

3   U.S. Attorney's Office to review the files of local police

4   departments, state investigative agencies where they're working

5   with the prosecutors.

6       So I don't see the principled distinction between where

7   the -- where a federal prosecutor is working with the San

8   Francisco Police Department to collect information and they're

9   then required to review the files of the police department for

10  *Brady* material.

11      I don't see how that's any different in principle than

12  what we have here, which is an entity that's conducting a

13  wide-ranging investigation, has discretion about what to

14  provide to the government, can make -- can sit on exculpatory

15  material.

16      And I would further add, Your Honor, this is --

17      **THE COURT:**  Let me ask a question.  I think that's a

18  pretty good point.  That's a pretty good point.

19      Let me ask you a question.  Is there another way you can

20  get this information?

21      **MR. DOOLEY:**  That's the Rule 17 point, Your Honor.

22      And I think there's a couple of problems with Rule 17 as a

23  solution here.  Number one, we don't know what we don't know.

24      I mean, Rule 17, of course, has a specificity requirement

25  that in order to request the documents, you kind of can't make

1   a wide-ranging request.

2       And we don't know -- I mean, I suppose we could say

3   exculpatory material found in preparation of the 43 witness

4   binders.  But we don't know specifically what we're going to be

5   asking for and what information Morgan Lewis might not have

6   passed on.

7           THE COURT:  Well --

8           MR. DOOLEY:  So that's problem number one.  I think

9   there's another problem.

10          THE COURT:  Yeah, what's the second problem?

11          MR. DOOLEY:  The second problem is the privilege

12  problem, Your Honor, that the Morgan Lewis and HP and the

13  government have worked out an arrangement where, okay, the

14  government is not going to argue privilege, but you can be

15  certain --

16          THE COURT:  But that happens in a lot of cases where

17  there are privileges.

18      What Morgan Lewis would have to do is present a privilege

19  log ultimately.  And it may very well be that the material will

20  be submitted under seal and the Court make some determination.

21      I think the second point we have a process for that.

22          MR. DOOLEY:  Okay.  And to be clear --

23          THE COURT:  By the way, I'm not saying that's not a

24  point.  I'm just saying there is a process to address that

25  point.

1    **MR. DOOLEY:**  To be clear, Your Honor, we don't accept

2    that the privilege hasn't been waived.  I mean, that's a --

3    but --

4        **THE COURT:**  Whatever the government said, that doesn't

5    necessarily bind you.

6        **MR. DOOLEY:**  Couldn't agree more.

7        **THE COURT:**  Well, here's what -- the first point I'd

8    sort of -- is a little cloudy.

9    Because if the government says to the private party,

10   "Could you go out and get this?  Can you go out and get that?"

11   and so, forth, at some point they cross a line.

12   I don't know where that point is.  In *Kyles* I think they

13   actually hired -- was it *Kyles*, didn't they hire --

14       **MR. REEVES:**  That's the Seventh Circuit case.  *Kyles*

15   was state actors.

16       **THE COURT:**  Didn't they hire --

17       **MR. DOOLEY:**  In the Seventh Circuit case, I think the

18   case is --

19       **MR. REEVES:**  *Gray*.

20       **MR. DOOLEY:**  -- *Gray*, there is reference to the fact

21   that there was a private investigator that had been hired.

22       **THE COURT:**  That's not this case.  I mean, I just

23   think that that's so distinguishable.

24   I don't think the United States government can go out and

25   hire X to do something and say, oh, by the way, no, we don't

1    have any duty.  That's a different story.

2        So here there was no hiring.  So this is what I'm going to

3    do:  I'm going to deny the motion without prejudice.  I am

4    going to -- if you feel it's important to pursue, and I think

5    you do, you go by way of Rule 17(c) subpoenas.

6        I think, if I have to review the subpoena before it goes

7    out, I will do so with the understanding that -- that you have

8    to be given some latitude and specificity because, in fact, you

9    don't know what you don't know.

10       On the other hand, I don't think you could use terms such

11   as "any exculpatory evidence," and so forth.  I think you have

12   to be far more specific because you're not -- you can't require

13   them to exercise a judgment, a standard as a private citizen

14   that is -- or a private party that is not -- they're not

15   government employees.  They may have been at one time, but

16   they're not under that same structure or stricture or set of

17   terms.

18       So we can debate about that when the subpoenas come out

19   and see whether we're able -- I'm quite sure that Morgan Lewis

20   will be in here relatively quickly.

21           **MR. DOOLEY:**  They're here today, Your Honor.

22           **THE COURT:**  They're here today.  Great.  So they'll --

23   I invite them to come in if they have any problem with the

24   subpoenas.  And we'll adjudicate that.  Okay.

25           **MR. DOOLEY:**  Thank you, Your Honor.

1        **THE COURT:**  Okay.  So that's that motion.

2        As to the *Brady* order, the question in my mind is:  Why is

3   it important in this case to have a *Brady* order?

4        Because there is a *Brady* policy and there is -- which is

5   acknowledged by the United States government.  They are under a

6   continuing obligation.

7        I think the one point that I agreed with you, since I

8   try -- apparently there's something I agree with you on, is

9   that it shouldn't be, quote, a *Brady* dump at the end of the

10  case.

11       They should be, and I'm sure they are, under a continuing

12  obligation that once something is presented to them, once they

13  become aware of a document, a statement, an item of evidence

14  that may have *Brady* implications, they are to turn it over

15  forthwith.

16       They are not going to sit around and hold on to it and

17  say, well, once we give it to them before the trial, we're

18  okay.  I don't want that to happen here.

19       I don't want there to be a lot of surprises in the case.

20  I assume there will always be some surprises.  But I want

21  disclosures.  I want the case to run smoothly.  I want the

22  parties to be in a position where they have digested the

23  evidence and prepared their positions.

24       So, again, I'm not going to enter a formal *Brady* order.

25  But I am saying that there is an order in place and that they

1   are required to act in accordance with what I've just

2   articulated.  Okay.

3           MR. DOOLEY:  Thank you, Your Honor.

4           THE COURT:  As to the disclosure of grand jury

5   materials and bill of particulars, I'm denying those motions.

6           MR. KEKER:  May I be heard?

7           THE COURT:  It once again -- even without being heard,

8   Mr. Keker.

9       I'll listen, but it seems to me that the discovery --

10  there's been some clarification in the superseding indictment.

11  I think it provides sufficient notice, at this point, and -- so

12  there we are.

13          MR. KEKER:  That's -- that's very clear.

14      I think what's happened in the last week shows the need

15  for both the bill of particulars and this grand jury colloquy,

16  to find out what the grand jury thought they were indicting

17  about.

18      In their response to our bill of particulars and colloquy,

19  they said, oh, the indictment is clear.  Just go read it.  They

20  didn't tell us but two days later, last Friday I think we got a

21  copy of a superseding indictment, in which they changed a

22  number of things which I think are very significant.

23      And we don't understand what Mr. Hussain is going to be

24  tried for.

25      You said you don't want any surprises.

1        The government is still casting around for a victim.   Who

2   is the victim?   They took HP out.   HP is no longer the victim

3   except a little bit.

4        Now HP's shareholders.   What shareholders?   Shareholders

5   that have had stock in their account since 1970?   Or are we

6   just talking about people who bought after -- after the

7   announcement of this merger?

8        And, if so, what -- what -- those shareholders can't bring

9   a direct action.   The shareholders don't have a claim.   Only

10  the corporation would have a claim.

11       We don't know what they're -- what they're talking about.

12  And it matters because what you've got here, as we've said

13  several times, is a Netherlands corporation.

14       Forget about down the road.   We've got a Netherlands

15  corporation using cash from the British Virgin Islands, buying

16  a foreign company that's only sold on the London Stock

17  Exchange.   And they say at first, oh, some of the victims are

18  autonomy shareholders.   Autonomy can only be sold on the London

19  Stock Exchange.

20       And now they say that HP's shareholders -- I mean, we need

21  to know two things.   We need to know the theory on which

22  Mr. Hussain is going to be tried.   And we need to know the

23  theory that the grand jury was presented with when they brought

24  the indictment.

25       And if they're trying to -- to charge or if they're trying

1    to try him on a theory that wasn't presented to the grand jury,

2    that should raise concerns.  That's a constitutional right.

3    And in terms of not getting any surprises, who are the victims?

4        And then, in particular, on the bill of particulars, we've

5    given them -- and you've seen the letters.  In great detail, we

6    said these are the ones that we understand you're complaining

7    about.  These are the ones you claim are backdated.  These are

8    transactions that you claim are side letters.  These are the

9    transactions at issue.

10        All we're asking is, tell us that we're right that this is

11    all there is, we're not going to be surprised by something

12    else.  That's why we asked you to sign the bill of particulars

13    order.

14        So I think on both grounds, we need help here.

15            **MR. LEACH:**  Your Honor, the superseding indictment

16    alleges a scheme to defraud autonomy securities holders, the

17    ultimate purchaser of which was Hewlett-Packard corporation

18    through its subsidiary.

19        It also alleges a scheme to defraud HP security holders --

20    purchasers.  There's no ambiguity about that.

21            **THE COURT:**  So they're the victims?

22            **MR. LEACH:**  Yes.

23            **MR. KEKER:**  I didn't -- did you under- -- I didn't

24    understand what he just said.

25        Autonomy security holders are people who live in England

that -- mail fraud doesn't have extraterritorial jurisdiction.

So autonomy security holders are people in England buying stock on a stock -- on the London Stock Exchange.  Has nothing to do --

**THE COURT:**  You understood what he said.  What you're saying is if that's what he means, what he said, if he means what he said, there's no jurisdiction.

**MR. KEKER:**  No, but he just went on to say that somehow these autonomy -- these autonomy security holders were bought by this Netherlands company using British Virgin Islands money, and HP shareholders are defrauded.

What is -- just in plain language, who's the victim?  Who is Mr. Hussain supposed to have been obtaining -- seeking to obtain money and property from?  Who is the victim here?

**THE COURT:**  I thought he said the shareholders of HP.

**MR. LEACH:**  I'll say it again, Your Honor.  Purchasers and sellers of autonomy securities, including HP and its subsidiaries, and HP -- purchasers of HP.

**THE COURT:**  That's what he says.  You may disagree --

**MR. KEKER:**  Purchaser's of HP what?

**MR. LEACH:**  Securities on the New York Stock Exchange, as alleged in Count 16 of the superseding indictment.

**THE COURT:**  That's what they say.  I have no idea whether they're right, wrong.  That's what he's saying.  That's what he says in his indictment.  That's the reason why I'm not

1   going to grant a bill of particulars.

2          **MR. KEKER:**  This is the same prosecution team that

3   told us, in their opposition, just go read the indictment.  And

4   then two days later they changed it significant -- you know

5   what you're charged with; go read the indictment.  And then

6   they changed it in significant ways.  And now we're supposed to

7   go back to and read the indictment.  We still don't understand

8   it.

9          In any event, just in terms of surprise, so you're not

10  going to help us with theory, but if there's transactions we

11  present them.  We say:  These are the transactions we

12  understand you allege are backdated.  These are the

13  transactions you understand are side letters.  Are there any

14  others?

15         Make them at least tell us that.

16         **THE COURT:**  Well, I don't know.  I do not require the

17  government, in little cases or in big cases, to lay out their

18  path of proof.  That's up to the government to decide.

19         Now, as we get closer, I will require witness lists.  I

20  will require exhibit lists.  And from that, I think that you

21  will get a pretty good idea of what path they are going in.  I

22  will require them -- won't do it today, but I'll require it.

23         Because the last time somebody required it was

24  Judge Alsup, though the Ninth Circuit took a different view.

25  Which I'm not going to comment on the Ninth Circuit.  But be

1  that as it may, I'll streamline the case.  I'm just not doing

2  it today.

3      The question today is, do we have adequate notice of the

4  theory and some of the particulars that give rise to the

5  criminal charge?  I think the answer is yes.  I think you have

6  that.

7      **MR. KEKER:**  Can I ask one particular?

8      When we talk about HP shareholders, are we talking about

9  HP shareholders for all time, back to the beginning of the

10  garage in Palo Alto, or are we talking about something having

11  to do --

12      **THE COURT:**  I don't think they're --

13      **MR. KEKER:**  -- with autonomy?

14      Well, I mean, we don't know.  Are they --

15      **THE COURT:**  Let me ask you, Mr. Keker, do you feel in

16  this case that you have adequate resources available to the

17  defense to prepare the case even if it does go back to the --

18  Mr. Hewlett and Mr. Packard --

19      **MR. KEKER:**  What I was going to tell you is that,

20  based on the amount of material we've gotten from the

21  government and that we have from the civil case, it would take

22  a team of ten lawyers, at a page a minute it would take five

23  years to review the government's production, and it would take

24  60 years to review the civil production.

25      So, of course, we're much faster than a page a minute.

1  But, sure, we'll make it.  It would be nice to know what the

2  theory is.

3          **THE COURT:**  It would be nice, but I think we know

4  enough.

5      Okay.  So those motions are denied.  With, again, the

6  understanding I'm going to have an exhibit list.  I'm going to

7  have a witness list.  And I'll address that as time goes on.

8          **MR. KEKER:**  Got it.  Thank you.

9          **THE COURT:**  Okay?

10          **MR. KEKER:**  Yes.  Thank you, Your Honor.

11          **THE COURT:**  Thank you for coming in.

12          **MR. REEVES:**  Thank you, Your Honor.

13          **MR. LEACH:**  Your Honor, may we exclude time?

14          **THE COURT:**  I'll exclude time until January 20 --

15  whatever that date is.

16          **MR. KEKER:**  And can I ask that Mr. Hussain, who will

17  be coming back and forth, be excused from the motions dates,

18  the July date and the September date?

19          **THE COURT:**  Any objection?

20          **MR. LEACH:**  No, Your Honor.

21          **THE COURT:**  He's put up an adequate bond, hasn't he?

22          **MR. KEKER:**  He put up the bond that you decided was

23  adequate, yes.

24          **MR. REEVES:**  Very adequate.

25          **THE COURT:**  All right.  That will be outstanding.

1          **MR. KEKER:**  It's outstanding.  And he's very well

2    aware of that.

3          **THE COURT:**  Great.  Thank you.

4          **MR. KEKER:**  Thank you, Your Honor.

5          **MR. REEVES:**  Thank you, Your Honor.

6          (At 2:19 p.m. the proceedings were adjourned.)

7                         -  -  -  -

8

9

10                    <u>CERTIFICATE OF REPORTER</u>

11          I certify that the foregoing is a correct transcript

12    from the record of proceedings in the above-entitled matter.

13

14    DATE:   Friday, May 19, 2017

15

16

17                    _Katherine Sullivan_

18    _____

19          Katherine Powell Sullivan, CSR #5812, RMR, CRR
                        U.S. Court Reporter
20

21

22

23

24

25