KEKER, VAN NEST & PETERS LLP
JOHN W. KEKER - # 49092
jkeker@keker.com
JAN NIELSEN LITTLE - # 100029
jlittle@keker.com
BROOK DOOLEY - # 230423
bdooley@keker.com
KATE E. LAZARUS - # 268242
klazarus@keker.com
NICHOLAS D. MARAIS - # 277846
nmarais@keker.com
IAN KANIG - # 293625
ikanig@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:     415 397 7188

Attorneys for Defendant
SUSHOVAN HUSSAIN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SUSHOVAN HUSSAIN,<br><br>Defendant. | Case No. 3:16-cr-00462-CRB<br><br>**DEFENDANT SUSHOVAN HUSSAIN'S MOTION TO DISMISS INDICTMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:          September 20, 2017<br>Time:          11:00 a.m.<br>Dept.:         Courtroom 6 – 17th Floor<br>Judge:        Hon. Charles R. Breyer<br>Date Filed:  November 10, 2016<br>Trial Date:  February 26, 2018 |

1186303

# TABLE OF CONTENTS

**Page**

I.    SUMMARY OF ARGUMENT ......................................................................................1

II.   BACKGROUND .......................................................................................................3

III.  ARGUMENT.............................................................................................................4

    A.    Legal Standard ..............................................................................................4

    B.    The wire fraud charges should be dismissed because the alleged
        misconduct occurred abroad. ........................................................................5

        1.    The wire fraud statute does not apply to extraterritorial conduct. ...............5

        2.    The first scheme—an alleged "fraud" on Autonomy shareholders—
              is extraterritorial and should be dismissed.....................................................6

        3.    The second scheme—an alleged "fraud" on Dutch-based Bidco—is
              extraterritorial and should be dismissed. ....................................................10

    C.    The securities fraud charge should be dismissed because the indictment
        does not allege that Mr. Hussain acted "in connection with" HPQ
        securities. ....................................................................................................11

        1.    18 U.S.C. § 1348 proscribes fraud "in connection with" U.S.-listed
              securities. ..................................................................................................11

        2.    The indictment does not allege a scheme to defraud "in connection
              with" the purchase or sale of HPQ securities..............................................12

        3.    Section 1348 is unconstitutionally vague as applied to Mr. Hussain. .......15

IV.   CONCLUSION........................................................................................................16

1186303

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page(s)</u>

3

<u>Federal Cases</u>

4

*Absolute Activist Value Master Fund Ltd. v. Ficeto*
    677 F.3d 60 (2d Cir. 2012)...........................................................................................7

5

*Donaldson v. Severn Sav. Bank, F.S.B.*
6
    No. CV JKB-15-901, 2015 WL 7294362 (D. Md. Nov. 18, 2015) ...........................11

7

*EEOC v. Arabian American Oil Co.*
    499 U.S. 244 (1991).....................................................................................................5

8

*Johnson v. United States*
9
    135 S. Ct. 2551 (2015) ...............................................................................................15

10

*Morrison v. Nat'l Australia Bank Ltd.*
    561 U.S. 247 (2010)...........................................................................................1, 5, 6, 7

11

*RJR Nabisco, Inc. v. European Cmty.*
12
    136 S. Ct. 2090 (2016) ........................................................................................5, 6, 8

13

*Russell v. United States*
    369 U.S. 749 (1962) ....................................................................................................4

14

*U.S. S.E.C. v. Pirate Inv'r LLC*
15
    580 F.3d 233 (4th Cir. 2009) ...............................................................................12, 14

16

*United States v. All Assets Held at Bank Julius*
    No. CV 04-0798 (PLF), 2017 WL 1508608 (D.D.C. Apr. 27, 2017)...........2, 6, 8, 9

17

*United States v. Chesney*
18
    10 F.3d 641 (9th Cir. 1993) ........................................................................................4

19

*United States v. Davis*
    905 F.2d 245 (9th Cir.1990) .......................................................................................9

20

*United States v. Gasperini*
21
    No. 16-CR-441 (NGG), 2017 WL 2399693 (E.D.N.Y. June 1, 2017) ..................6, 8

22

*United States v. Hawit*
    No. 15-CR-252 (PKC), 2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) .......................6

23

*United States v. Jordan*
24
    813 F.3d 442 (1st Cir. 2016).....................................................................................14

25

*United States v. Keith*
    605 F.2d 462 (9th Cir. 1979) ......................................................................................4

26

*United States v. Mahaffy*
27
    No. 05-CR-613, 2006 WL 2224518 (E.D.N.Y. Aug. 2, 2006)................2, 11, 12, 13

28

*United States v. Mandell*
    752 F.3d 544 (2d Cir. 2014).......................................................................................7

ii

1186303

*United States v. Melvin*
    No. 3:14-CR-00022-TCB, 2015 WL 7116737 (N.D. Ga. May 27, 2015) ........................ 12, 13

*United States v. Motz*
    652 F. Supp. 2d 284 (E.D.N.Y. 2009) ...................................................................... 11

*United States v. O'Hagan*
    521 U.S. 642 (1997) .......................................................................................... 12

*United States v. Sidorenko*
    102 F. Supp. 3d 1124 (N.D. Cal. 2015) ................................................................ 5, 9

*United States v. Vilar*
    729 F.3d 62 (2d Cir. 2013) ........................................................................... 2, 5, 6, 7

*United States v. Wey*
    No. 15-CR-611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) ....................................... 14

**Federal Statutes**

18 U.S.C. § 1343 ........................................................................................................... 1

18 U.S.C. § 1348 ................................................................................................... *passim*

**Federal Rules**

Fed. R. Crim. P. 7(c)(1) ........................................................................................... 4

DEFENDANT'S MOTION TO DISMISS INDICTMENT
Case No. 3:16-cr-00462-CRB

1186303

1

## NOTICE OF MOTION AND MOTION

2   TO ALL PARTIES AND THEIR COUNSEL OF RECORD IN THIS ACTION:

3         PLEASE TAKE NOTICE that on September 20, 2017, at 11:00 a.m. or as soon thereafter

4   as counsel may be heard, in Courtroom 6, 17th Floor of the United States District Court for the

5   Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant

6   Sushovan Hussain will and hereby does move the Court to dismiss the indictment pursuant to

7   Federal Rule of Criminal Procedure 12(b)(3)(B) for failure to state an offense under any of the

8   criminal statutes it invokes.

9         This motion is based upon the following Memorandum of Points and Authorities, the

10  Declaration of Nicholas D. Marais submitted herewith and the exhibits attached thereto, oral

11  argument, and the pleadings and exhibits on file with the Court.

12                                              Respectfully submitted,

13  Dated:  August 25, 2017                     KEKER, VAN NEST & PETERS LLP

14

15                                    By:   _/s/ John W. Keker_
                                              JOHN W. KEKER
16                                            JAN NIELSEN LITTLE
                                              BROOK DOOLEY
17                                            KATE E. LAZARUS
                                              NICHOLAS D. MARAIS
18                                            IAN KANIG

19                                            Attorneys for Defendant
                                              SUSHOVAN HUSSAIN
20

21

22

23

24

25

26

27

28

1186303

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   SUMMARY OF ARGUMENT

This Court should dismiss the indictment against defendant Sushovan Hussain because the facts alleged therein do not support the crimes charged.

This case arises out of the foreign acquisition of one foreign entity by another. Autonomy was a London- and Cambridge-based software company, whose shareholders (the first of the government's "victims") bought and sold Autonomy's securities on the London Stock Exchange. In 2011, after an abbreviated period of due diligence—conducted according to English takeover rules and practices—Hewlett-Packard Company's Dutch subsidiary, Bidco, bought Autonomy. In so doing, Bidco published an offer document that specifically stated that the offer was prepared according to English "requirements, format and style, all of which differ from those in the United States," and then bought out Autonomy's securities holders, in England, by transferring pound sterling from one English bank account to another.

Given the extraterritorial nature of this case, it is unsurprising that the government has spent five years casting about for a theory and a victim, most recently in a superseding indictment that tacked on a sixteenth count and alleged a scheme to defraud an all-new category of securities holders.  With that superseding indictment, the government now appears to have settled on three distinct "victims" and three separate schemes to defraud—each of which is fundamentally flawed.

First, the government alleges that Mr. Hussain and others "engaged in a fraudulent scheme to deceive **purchasers and sellers of Autonomy securities** about the true performance of Autonomy's business…."  ECF No. 52 (Superseding Indictment, "SI") at ¶ 19 (emphasis added). While the government would ordinarily have charged that as "securities fraud" under Section 10(b), it knows that it cannot do so here because it could not meet the *Morrison* requirements: Autonomy was a foreign company, whose shares were listed on the London Stock Exchange; and there is no allegation that Autonomy's shares were ever bought or sold in the United States.  *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 273 (2010).  Undoubtedly aware of this fatal shortcoming, the government attempts instead to recast its first securities fraud theory as a scheme to defraud under the wire fraud statute, 18 U.S.C. § 1343—the nub of which is that

Mr. Hussain (working in Autonomy's offices in England) and Autonomy's finance team (also in England) published quarterly financials that led some unidentified individuals to invest in their company (on the London Stock Exchange).  In other words, all or substantially all of the conduct in this so-called "wire fraud" occurred in England and the "scheme" to defraud *Autonomy*'s shareholders can neither be said to entail a "substantial amount of conduct in the United States" nor to support "a domestic application of wire fraud."  *See, e.g.*, *United States v. All Assets Held at Bank Julius*, No. CV 04-0798 (PLF), 2017 WL 1508608, at *15 (D.D.C. Apr. 27, 2017).

Second, the government alleges that Mr. Hussain and others engaged in a scheme to defraud **HP and Bidco**.  *See, e.g.*, SI, ¶¶ 21, 23, 26.  Here, too, the government's case turns on extraterritorial conduct: the "defrauded" entity, Bidco, is Dutch; the "perpetrators" are English; and the "property" at issue was English currency in English bank accounts.  To sidestep these problems, the indictment attempts—as the government has long attempted—to conflate two distinct corporate entities, HP and Bidco.  *See, e.g.*, *id.* at ¶ 8 (alleging, inaccurately, that both HP and Bidco "entered into an Offer Agreement with Autonomy").  But that effort is divorced from reality: HP carefully and intentionally left the transaction to Bidco, a foreign entity that used foreign funds to acquire a foreign target.  *See, e.g.*, *id.* at ¶¶ 26(cc)–(ee).  As a result, the answer to the decisive legal question—"whether the relevant conduct occurred in the territory of a foreign sovereign," *United States v. Vilar*, 729 F.3d 62, 70 (2d Cir. 2013)—is "yes."

Third, in a recently added sixteenth count, the government attempts to stretch 18 U.S.C. § 1348 beyond its limits by alleging a new scheme to defraud **purchasers and sellers of Hewlett-Packard securities** in August 2011.  Section 1348, however, is not a general purpose fraud statute; it requires a nexus to U.S.-listed securities.  *See, e.g.*, *United States v. Mahaffy*, No. 05-CR-613, 2006 WL 2224518, *12 (E.D.N.Y. Aug. 2, 2006).  And the only allegations of conduct by Mr. Hussain in August 2011 involve representations he made to Bidco in the course of its acquisition of Autonomy.  The indictment does not allege that Mr. Hussain acted in any way "in connection with" HPQ securities, as required by section 1348.  Because this count is devoid of any nexus with U.S.-listed securities, it is facially invalid and unconstitutionally vague, and it, too, must be dismissed.

## II.      BACKGROUND

Mr. Hussain is a citizen and resident of the United Kingdom and was the CFO of U.K.-based software company Autonomy.  Like other members of Autonomy's finance team, he worked in Autonomy's London and Cambridge offices.  Autonomy's quarterly and annual reports—which were published from England—were prepared in accordance with U.K. regulations and U.K. accounting standards, *see* SI, ¶¶ 13–14, and reviewed and audited by Deloitte UK, *see, e.g.*, ECF Nos. 50–51.

On or about August 18, 2011, HP's offshore subsidiary, HP Vision B.V. (or "Bidco"), entered into an offer agreement to acquire Autonomy, and the deal closed on October 3, 2011.  SI, ¶¶ 8, 11.  According to the indictment, HP and Bidco are alleged to have relied on "the accuracy and truthfulness of the statements and disclosures made in Autonomy's historically reported financial statements…." *Id.*, ¶ 18.  A little more than a year later, HP announced that it was taking an $8.8 billion impairment charge "related to Autonomy"—the majority of which, it claimed, was "linked to serious accounting improprieties, misrepresentations and disclosure failures."  At the same time, HP referred the matter to the U.K.'s Serious Fraud Office, the U.K.'s Financial Reporting Council, the Department of Justice, and the Securities and Exchange Commission.  HP also filed a civil suit against Mr. Hussain (and former Autonomy CEO, Michael Lynch) and threatened to sue Deloitte UK—all of which it chose to do in England.  *See, e.g.*, ECF No. 50.

Meanwhile, on the other side of the Atlantic, the Department of Justice investigated HP's allegations for four years before seeking an indictment against just one man, Mr. Hussain.  That indictment alleges one omnibus "scheme to defraud," but in reality, the government appears to have settled on three different theories or "schemes."

*First*, it accuses Mr. Hussain ("and others") of carrying out a "fraudulent scheme to deceive purchasers and sellers of Autonomy securities about the true performance of Autonomy's business, its financial condition, and its prospects for growth."  *Id.* at ¶ 19.  In this first scheme, the government alleges, Mr. Hussain and others artificially inflated Autonomy's financials by accelerating revenue; made false statements to Autonomy's auditors, analysts, and regulators; and issued false financial statements and press releases.  *Id.* at ¶ 22.  As alleged, this scheme was not

1186303

directed at HP at all, but was instead allegedly carried out between 2009 and mid-2011 with the intent to defraud *Autonomy*'s shareholders.

*Second*, the indictment alleges a quite different wire fraud scheme, carried out in August 2011, with an altogether different purpose ("inducing" Bidco to buy Autonomy).[1]  In this second scheme, the government argues that Mr. Hussain and others made misrepresentations during the August 2011 negotiations and due diligence process that culminated in Bidco's purchase of Autonomy—all as part of an alleged scheme to make Autonomy more attractive to purchasers.

*Third*, in an attempt to shore up jurisdictional shortcomings, the government added a securities fraud "scheme"—a scheme to defraud not Autonomy's shareholders, but *HP*'s, in violation of 18 U.S.C. § 1348.  When the government introduced this third theory, it relied almost entirely on pre-existing allegations, claiming only that, in August 2011, Mr. Hussain (acting alone) violated 18 U.S.C. § 1348 in connection with HPQ securities.  SI, ¶ 30.  The government did not add any allegations regarding any additional conduct in August 2011, any transaction involving HPQ securities, or any connection between Mr. Hussain and HPQ securities.

## III.   ARGUMENT

### A.   Legal Standard

An indictment must contain a "definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  It must contain each element of the charge.  *See United States v. Chesney,* 10 F.3d 641, 643 (9th Cir. 1993) ("An indictment's failure to state an element of the charged offense is a fundamental defect."); *United States v. Keith*, 605 F.2d 462, 464 (9th Cir. 1979).  An indictment must set forth the elements in order "to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had."  *Russell v. United States*, 369 U.S. 749, 768 (1962).

---

[1] The government has previously attempted to blur the lines between these distinct schemes. At the May 10 hearing, AUSA Leach repeatedly told the Court that the indictment "alleges *a scheme* to defraud Autonomy securities holders, the ultimate purchaser of which was Hewlett-Packard Corporation through its subsidiary."  ECF No. 64 (Hr'g Tr. (May 20, 2017)), 22:15–18.  But they involve different conduct, at different times, with different targets, and they should have been charged under different statutes.  *Compare* SI, ¶ 19 (describing one scheme "to deceive purchasers and sellers of Autonomy securities") *with id.* at ¶ 21 (describing an effort "to make Autonomy more attractive to a potential purchaser like HP").

**B.    The wire fraud charges should be dismissed because the alleged misconduct occurred abroad.**

The first two of the government's alleged schemes are both charged under the wire fraud statute, although the schemes, "means and methods," and supposed victims are quite different. The first scheme to defraud alleges classic securities fraud: that Mr. Hussain and others recognized revenue when they shouldn't have, which led to material misrepresentations in quarterly financial statements, which allegedly "deceive[d] purchasers and sellers of Autonomy securities about the true performance of Autonomy's business…."  SI, ¶ 19.  But, because the government knows that *Morrison* and *Vilar* foreclose a traditional securities fraud case for such extraterritorial conduct, they have attempted to plead around those cases by charging Mr. Hussain with deceiving purchasers or sellers of foreign stocks on a foreign exchange by using the U.S. wires.  The second scheme to defraud—alleging that Mr. Hussain defrauded Bidco—faces fatal extraterritoriality problems too: HP structured the deal to occur entirely offshore.  And so here, too, the government attempts to stretch its case beyond the facts, pretending that HP and Bidco are one and the same despite the very corporate formalities that HP put in place to position this deal abroad.  Regardless of the government's maneuvering, charges under the wire fraud statute require an adequate nexus to the United States, and the government's efforts to manufacture jurisdiction fall short of what the law demands.

**1.    The wire fraud statute does not apply to extraterritorial conduct.**

There is no doubt that "when a statute gives no clear indication of an extraterritorial application, it has none." *Morrison*, 561 U.S. at 255; *EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 248 (1991); *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016).  As a result, a broad range of criminal statutes do not apply to extraterritorial conduct—including, as this Court has previously noted, the wire fraud statute at issue in the first fifteen counts. *United States v. Sidorenko*, 102 F. Supp. 3d 1124, 1129, 1132 (N.D. Cal. 2015) (finding that, "[b]ecause there is no clear indication of extraterritorial intent" in the wire fraud statute, it has no extraterritorial application).

Because the wire fraud statute does not apply extraterritorially, "the only question [the Court] must answer in the individual case is whether the relevant conduct occurred in the territory

5

1186303

of a foreign sovereign." *Vilar*, 729 F.3d at 70 (concluding that it would be "clear or obvious error to apply Section 10(b) and Rule 10b-5 to extraterritorial criminal conduct in light of *Morrison*"). To do that, courts look to "the statute's 'focus'": "if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *RJR Nabisco,* 136 S. Ct. at 2101. Increasingly, courts that analyze the wire fraud statute's focus have turned to a more "holistic" assessment of the alleged misconduct:

> [A] complaint alleges a domestic application of wire fraud when (1) a defendant or coconspirator commits a **substantial amount of conduct** in the United States, (2) the conduct is **integral** to the commission of the scheme to defraud, **and** (3) at least some of the conduct involves the use of U.S. wires in furtherance of the scheme to defraud.

*Bank Julius*, 2017 WL 1508608, at *15 (emphases added); *see also United States v. Gasperini*, No. 16-CR-441 (NGG), 2017 WL 2399693, at *8 (E.D.N.Y. June 1, 2017) ("Congress's focus in enacting the wire fraud prohibition was to regulate frauds, and not solely a means of perpetrating a fraud."); *United States v. Hawit*, No. 15-CR-252 (PKC), 2017 WL 663542, at *5 (E.D.N.Y. Feb. 17, 2017) (courts "must conduct a more holistic assessment of the conduct that constitutes the alleged fraud scheme, including consideration of whether the scheme involves only incidental or minimal use of U.S. wires.").[2]

### 2.   The first scheme—an alleged "fraud" on Autonomy shareholders—is extraterritorial and should be dismissed.

In the superseding indictment, the government alleges that Mr. Hussain "engaged in a fraudulent scheme to deceive *purchasers or sellers of Autonomy securities* about the true performance of Autonomy's business, its financial condition, and its prospects for growth."  SI, ¶¶ 19, 20, 22 (emphasis added).  To be clear, these allegations are specifically about *Autonomy* shareholders, whom the government has distinguished from the HP and Bidco corporate entities,

---

[2] In *Hawit*, Judge Pamela Chen found that an indictment alleged sufficient U.S.-focused misconduct because it involved far more than just "the use of wire facilities and financial institutions located *in* the United States"; the scheme, as alleged, included the "sales of broadcasting and other commercial rights *in* the United States, … holding the centennial edition of the Copa America *in* the United States, announcing *in* the United States the decision to hold the centennial edition of the Copa America in the United States, and phone calls and meetings *in* the United States related to the bribery…."  *Hawit*, 2017 WL 663542, at *6.

*see, e.g.*, *id.* at ¶ 21, and from HP's own shareholders, *id.* at ¶ 30.  In this first scheme, the government's theory appears to be that, from as early as 2009—years before Bidco and Autonomy discussed any acquisition—Autonomy's executives misled their own shareholders by "ensur[ing] that Autonomy reported that it had met or exceeded projected quarterly results for, among other things, revenue, gross margin, net income, and earnings per share."  *Id.* at ¶ 20. This "scheme to deceive purchasers and sellers of Autonomy securities about the [company's] true performance" is alleged to have involved:

- Revenue recognition issues—"inflating revenues" by "improperly recording" various sales despite backdated contracts, side letters, reciprocal arrangements, and in other instances where the (English) accounting standards went unmet, *id.* at ¶¶ 22(a), 26(d)–(f), 26(i)–(j), 26(p)–(r), 26(t), 26(w), 26(x);

- "Making and causing fraudulent entries to Autonomy's books," *id.* at ¶ 22(f);

- "Issuing materially false and misleading quarterly and annual reports" for each quarter from the start of 2009 to the middle of 2011, *id.* at ¶¶ 22(g), 26(a)–(c), 26(g)–(h), 26(k), 26(m), 26(o), 26(s), 26(u); and thereby

- "Increas[ing] and maintain[ing] the share price of Autonomy securities," *id.* at ¶ 20.

Each of these "means and methods" comprises conduct that occurred in another country. Although the scheme, as alleged, should sound in securities fraud, the government all but acknowledges that it cannot meet the *Morrison* and *Vilar* tests because no Autonomy securities were bought or sold in the United States.[3]  Thus, it rebrands this scheme as a "wire fraud," for which the nexus to the U.S. is apparently that Autonomy published quarterly press releases and "distributed" them into this District.  *See, e.g.*, Counts Three (2010 annual results "distributed from Cambridge, England, to the Northern District of California"), Seven, Eight.  But that is not enough, and the government's attempts to rescue its case fail in at least three ways:

First, the government should not be allowed to plead its way around *Morrison*.  If the

---

[3] For conduct to fall within Section 10(b)'s reach, the securities at issue must be listed on a domestic exchange, or the purchase or sale of the security at issue must have been made in the United States. *United States v. Mandell*, 752 F.3d 544, 548 (2d Cir. 2014) (transaction "is domestic when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States"); *see also Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012).  Nowhere does the indictment allege that Autonomy shares were traded in the United States, or that they were purchased or sold here.

7

indictment alleges that *Autonomy* securities holders were misled into buying shares, the government must demonstrate that those shares were traded on a domestic exchange or that irrevocable liability passed to purchasers within the United States.  It does neither.

Second, the government fails to demonstrate that the "conduct relevant to the focus" of the wire fraud statute occurred domestically.  *See, e.g.*, *RJR Nabisco*, 136 S. Ct. at 2101.  Here, the press releases at issue were prepared and published in England, in accordance with English accounting rules and policies, and Autonomy shares were only available for purchase on the London Stock Exchange.  The indictment waves at shareholders "throughout the United States," SI at ¶ 3, but never alleges that Mr. Hussain "commit[ted] a substantial amount of conduct" here, let alone that such conduct was "integral to the commission of the scheme to defraud."  *Bank Julius*, 2017 WL 1508608, at *15 (D.D.C. Apr. 27, 2017); *see also Gasperini*, 2017 WL 2399693, at *8 (concluding that the court had jurisdiction only after finding that "the alleged domestic conduct … [was] both 'substantial' and 'integral to the commission' of the underlying scheme").

Instead, the indictment is replete with allegations of misconduct that occurred beyond this country's borders—as even a cursory review of the government's alleged "means and methods" makes clear.  There, the government claims that Mr. Hussain ("and others"):

- Instructed Autonomy's finance department to recognize revenue when "all of the criteria in IFRS, IAS 18, and Autonomy's revenue recognition policy had not been satisfied…."  SI, ¶ 22(a); *see also id.* at ¶ 22(f).  There is no allegation that Autonomy's revenue-recognition decisions were made in the U.S. or made in accordance with U.S. policies.  (Quite the contrary: IFRS and IAS 18 are *U.K.* accounting standards, and Autonomy's finance department was located, and made decisions, in England.)

- Made "false and misleading statements to Autonomy's independent auditor about the facts and circumstances of transactions allegedly supporting the recognition of revenue…."  *Id.* at ¶ 22(b).  There is no allegation that any of these statements were made in the United States.  Autonomy was audited by Deloitte UK, whose personnel lived and worked in England.

- Made "false and misleading statements to market analysts covering Autonomy about its financial statements…."  *Id.* at ¶ 22(c); *see also id.* at ¶ 22(e).  The government never alleges that any U.S.-based market analysts attended Autonomy's presentations.

- Made "false and misleading statements to Autonomy's regulators in response to inquiries about its financial statements."  *Id.* at ¶ 22(d).  Here, the government appears to have in mind the Financial Reporting Review Panel, a committee that operates under the purview of the U.K. Financial Reporting Council.

1186303

- "Issu[ed] materially false and misleading quarterly and annual reports." *Id.* at ¶ 22(g). But Autonomy's quarterly and annual reports were prepared by its finance department in England, reviewed by Deloitte UK, approved in England, and published in England (and the indictment never alleges otherwise).

In Count One, where the government details the alleged "means and methods of the wire fraud conspiracy," it again leans heavily on extraterritorial conduct: Autonomy's decisions about when to recognize revenue—which were taken in England; the preparation and publication of press releases—which happened in England, *see, e.g.*, *id.* at ¶¶ 26(a)–(c), (f)–(h), (k)–(o), (s), (u); and the company's issuing annual reports—which happened in England, *id.* at ¶ 26(u). Recognizing these shortcomings, the government bends over backwards to find "wires" into the United States—claiming, for instance, that "Autonomy entered into a[n agreement] with a counterparty in the United States," *id.* at ¶ 26(d).  But even taking those allegations at face value, they certainly do not constitute "a substantial amount of conduct in the United States." *Bank Julius*, 2017 WL 1508608, at *15.  The core of the government's first scheme—Mr. Hussain's alleged scheme to defraud *Autonomy* shareholders—is not these incidental agreements or emails. Rather, it is Autonomy's decisions about whether to recognize revenue on those underlying deals and its announcements to the market—"means and methods" that occurred entirely in England.

Third, the Due Process Clause requires a "sufficient nexus between the defendant and the United States so that such an application of a domestic statute to the alleged conduct would not be arbitrary or fundamentally unfair." *Sidorenko*, 102 F. Supp. 3d at 1132 (citing *United States v. Davis*, 905 F.2d 245, 248–49 (9th Cir.1990)).  Mr. Hussain lived and worked in England; Autonomy published financial results in England, according to English accounting rules; and there are no allegations that Mr. Hussain sought or solicited U.S.-based purchasers of Autonomy securities.  Even on the government's account, neither Mr. Hussain nor others at Autonomy entered into talks with HP or Bidco until 2011.  *See* SI, ¶ 17.  On those facts, there is no basis to believe that Mr. Hussain would ever "reasonably [have anticipated] being 'haled into court' in this country" for statements Autonomy made in England in 2009 or 2010.  *Sidorenko*, 102 F. Supp. 3d at 1133.  The government's allegations about a foreign, "fraudulent scheme to deceive purchasers or sellers of *Autonomy securities*" are beyond the reach of either the securities or wire

fraud statutes, and Counts One through Three and Six through Eight must be dismissed.

### 3. The second scheme—an alleged "fraud" on Dutch-based Bidco—is extraterritorial and should be dismissed.

Next, the government alleges that Mr. Hussain (and others) "caused Autonomy to make materially false and misleading statements to HP regarding Autonomy's financial condition, performance, and business…."  SI, ¶ 23.  As part of this second scheme to defraud, it alleges that:

- Mr. Hussain made various misrepresentations to HP and Bidco, during their due-diligence period, about "the nature of Autonomy's products," its "hardware sales," and its "top customers" and "top contracts," *id.* at ¶¶ 23(a)–(d);

- "[T]o induce the offer by HP and [Bidco], Hussain executed a letter … warranting that all information provided by him … was true and accurate," *id.* at ¶ 26(bb); and

- Relying on these alleged misrepresentations, Bidco bought and paid for Autonomy through a series of offshore wire transfers, *id.* at ¶¶ 26(cc)–(ee).

The crux of this second scheme appears to be an alleged effort by Autonomy's executives to "obtain[] money or property" from Bidco "by means of false or fraudulent … representations," all or substantially all of which happened in England.  As the final offer document (the "Offer") makes clear, this deal was struck between Autonomy and "*Hewlett-Packard Vision B.V.*"—not HP.  *See* Declaration of Nicholas D. Marais ("Marais Decl."), Ex. A.  The Offer required that shareholders mail their responses to Cambridge, England; set deadlines in "UK time"; described the offer price in pound sterling, *see id.* at iii; and explained that "HP Vision, in aggregate has received irrevocable undertakings from the Autonomy Directors to accept … the Offer," *id.* at 2.  Ultimately, even the government concedes that the acquisition closed—and money exchanged hands—outside the United States.  *See* SI, ¶¶ 26(cc)–(ee).  HP and Bidco studiously structured this transaction so as to avoid any contact with (or any tax obligations to) the United States, and when the acquisition ultimately soured, *Bidco* sued Mr. Hussain in England.

Because the government is worried about finding a domestic "victim," it obfuscates these clear corporate boundaries and stretches to portray HP and Bidco as one and the same.  *See, e.g.*, SI at ¶¶ 8 (claiming that "HP and Hewlett-Packard Vision B.V. … entered into an Offer Agreement with Autonomy"); 12 (claiming, incorrectly, that Mr. Hussain's shares were "acquired by HP"); 17 (alleging that Mr. Hussain "gave and otherwise provided" financial statements to

"persons at, or acting on behalf of, HP").  They are not, and HP sought to stay as far away from this deal as possible. (HP's English lawyers have told the High Court that there are "literally hundreds of companies" separating HP from Bidco.)

This Court should reject the government's second scheme and dismiss Counts One, Four, Five, and Nine through Fifteen.

### C.  The securities fraud charge should be dismissed because the indictment does not allege that Mr. Hussain acted "in connection with" HPQ securities.

Finally, the government alleges a third scheme—one in which Mr. Hussain "intentionally execute[d]" a scheme to defraud *HP*'s shareholders by means of representations he made to HP itself.  That scheme, embodied in Count 16, should be dismissed because the indictment does not allege that Mr. Hussain acted "in connection with" HPQ securities, a necessary element under 18 U.S.C. § 1348, and is thus also void for vagueness.

#### 1.  18 U.S.C. § 1348 proscribes fraud "in connection with" U.S.-listed securities.

Enacted as part of the Sarbanes-Oxley Act in 2002, 18 U.S.C. § 1348 requires a sufficient nexus between the alleged scheme to defraud and a U.S.-listed security.  Under the statute, it is a crime to knowingly "execute[], or attempt to execute[], a scheme" to defraud any person—or to use "false or or fraudulent pretenses, representations, or promises" to obtain money or property— "**in connection with** … any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934…."  18 U.S.C. § 1348 (emphasis added).

To "prove a violation of 18 U.S.C. § 1348, the Government must show: (1) fraudulent intent; (2) a scheme or artifice to defraud; and (3) a nexus with a security" registered under the Exchange Act.  *United States v. Motz*, 652 F. Supp. 2d 284, 295 (E.D.N.Y. 2009) (quoting *United States v. Mahaffy*, No. 05-CR-613, 2006 WL 2224518, at *12 (E.D.N.Y. Aug. 2, 2006)).  Section 1348 was modeled on the wire fraud and bank fraud laws, but "[i]n the case of securities fraud, the additional element to be shown is a nexus with a security."  *Donaldson v. Severn Sav. Bank, F.S.B.*, No. CV JKB-15-901, 2015 WL 7294362, at *3 (D. Md. Nov. 18, 2015).

Courts interpreting section 1348 have noted the plain-language need for a nexus between the conduct and the securities.  The Eastern District of New York's decision in *Mahaffy* contains

the most substantive discussion of section 1348's "in connection with" element that the defense

has seen.  In that case, defendant stockbrokers allowed day traders to secretly listen to the

brokers' internal speaker systems for customers' order information, information which included

orders large enough to influence the price of the traded securities.  2006 WL 2224518, at *3.  In

exchange, the day traders paid bribes to the brokers.  The *Mahaffy* court held "though not with the

intention of identifying the outer boundary of the statute's application, the requirement that the

scheme be 'in connection' with a security is satisfied where as a result of the scheme, **the**

**defendants either benefitted, or attempted to benefit, from trading in securities**."  *Id.* at *12

(emphasis added; citing *United States v. O'Hagan,* 521 U.S. 642 (1997)).  Additionally, in

interpreting section 1348, the Northern District of Georgia observed "[t]he words 'in connection

with' ordinarily mean **associated with, related to, or the like**."  *United States v. Melvin*,

No. 3:14-CR-00022-TCB, 2015 WL 7116737, at *6 (N.D. Ga. May 27, 2015) (emphasis added).

Decisions interpreting section 10(b) also provide a useful analogue and are instructive on

the importance of the "in connection with" language.[4]  The Fourth Circuit has identified four

factors that may guide the determination of whether section 10(b)'s "in connection with the

purchase or sale of any security" requirement has been met: "(1) whether a securities sale was

necessary to the completion of the fraudulent scheme; (2) whether the parties' relationship was

such that it would necessarily involve trading in securities; (3) whether the defendant intended to

induce a securities transaction; and (4) whether material misrepresentations were disseminated to

the public in a medium upon which a reasonable investor would rely."  *U.S. S.E.C. v. Pirate Inv'r*

*LLC*, 580 F.3d 233, 244 (4th Cir. 2009) (citations omitted).

## 2. The indictment does not allege a scheme to defraud "in connection with" the purchase or sale of HPQ securities.

Count 16 is defective because the indictment does not allege that Mr. Hussain defrauded

any person or falsely obtained any money or property "in connection with" HPQ securities.  That

count alleges that in or about August 2011, Mr. Hussain—acting alone—violated section 1348.

SI, ¶ 30.  The indictment's only allegations of conduct in August 2011 are that:

---

[4] Although section 1348 is not coterminous with section 10(b) of the Securities Exchange Act, both address fraud in the securities market.

- On or about August 4, 2011, Mr. Hussain caused Autonomy to provide to HP and its advisors lists of Autonomy's top contracts and customers. SI, ¶ 26(aa).

- On or about August 18, 2011, in San Francisco, Mr. Hussain executed a letter accepting Bidco's offer, agreeing to recommend it to others, and warranting that information he provided "for inclusion in any document issued in connection with the offer was true and accurate in all respects and not misleading in any respect." *Id.*, ¶ 26(bb).

- On or about August 18, 2011, Bidco entered into an Offer Agreement with Autonomy and "publicly announced an offer to acquire Autonomy for approximately $11 billion." *Id.*, ¶¶ 8, 10.

- On or about August 18, 2011, HP issued a press release announcing the acquisition, in which HP included information about Autonomy's financial performance and the benefits to HP from the Autonomy acquisition. *Id.*, ¶ 9.

None of these allegations states that Mr. Hussain attempted to defraud anyone in connection with shares of HPQ, or that Mr. Hussain obtained money or property in connection with the purchase or sale of HPQ securities. The indictment does not allege that Mr. Hussain (or anyone else) made any false or misleading statements regarding HP, its finances, or HPQ securities. The indictment does not allege that Mr. Hussain obtained any HPQ shares as a result of the acquisition, or that anyone (let alone Mr. Hussain) executed or even contemplated any transactions in HPQ securities. There is no allegation of any conduct related to HPQ securities.

To the contrary, the August 2011 allegations suggest that the securities fraud count is premised on Mr. Hussain's alleged provision of a list of Autonomy contracts to Bidco or his execution of a letter in which he accepted Bidco's acquisition offer and warranted the accuracy of information he provided for inclusion in any document issued in connection with the offer. But such conduct is far removed from HPQ securities. The representations Mr. Hussain made to Bidco in August 2011 were not in any way "associated with" or "related to" HPQ securities, and there is no allegation that they were included, referenced, or relied on in connection with any HP announcements (which simply related Autonomy's historical financial performance). *See Melvin*, 2015 WL 7116737, at *6. Mr. Hussain did not benefit or attempt to benefit from trading in HPQ securities on the basis of his representations to Bidco. *See Mahaffy,* 2006 WL 2224518, at *12. And none of the factors that the Fourth Circuit identified in the section 10(b) context are present in here: (1) no sale of HPQ securities was necessary to the completion of any alleged fraudulent

1186303

scheme; (2) there is no relationship that "would necessarily involve trading in securities"; (3) there is no allegation that Mr. Hussain "intended to induce a securities transaction"; and (4) Mr. Hussain is not alleged to have publicly disseminated any information in a medium upon which HPQ investors would reasonably rely. *Pirate Inv'r*, 580 F.3d at 244. This is not even a case in which the defendant is alleged to have made any misrepresentations in connection with a transaction by a U.S.-listed company. The alleged misrepresentations were made to Bidco, **a foreign company**, in connection with its acquisition of Autonomy, **a U.K.-based corporation**, completed with Bidco's money, all **offshore funds**.

The indictment's only allusion to the HPQ securities market is the allegation that HP issued a press release which included information about Autonomy's financial performance. SI, ¶ 9. The government's theory seems to be that Mr. Hussain made representations to Bidco during due diligence, and that HP subsequently made its own public statements incorporating those representations. Apparently, the government believes that liability under section 1348 may attach any time a misrepresentation is made to a foreign subsidiary of a U.S. public company, and the public company then makes public statements in reliance on the misrepresentation, regardless of whether the speaker has any interest in or purpose to affect the purchase or sale of the public company's securities. Such a theory erases the statute's "in connection with" securities requirement, and converts a "securities fraud" statute into a "fraud on a public company" statute.

The government's allegation is an unprecedented and unjustifiable expansion of the statute. The defense is not aware of any other instance in which the government has charged a defendant under section 1348 on the basis of statements made to the management of a publicly traded company. To the contrary, every charge under section 1348 that the defense has reviewed involved a scheme that was specifically associated with a securities transaction. *See, e.g., United States v. Wey*, No. 15-CR-611 (AJN), 2017 WL 237651, at *10 (S.D.N.Y. Jan. 18, 2017) ("pump and dump" scheme to inflate the price at which defendant could sell stock); *United States v. Jordan*, 813 F.3d 442, 444 (1st Cir. 2016), *cert. denied,* 136 S. Ct. 2528 (2016) ("kickback" scheme involving sale of stock).

At most, the indictment's third scheme appears to allege that Mr. Hussain sought to

1    deceive Bidco's management, and by extension, HP's management.  If this scheme comprises

2    alleged misrepresentations to *Bidco*, it is duplicative of the government's second scheme, which,

3    as discussed above, is beset with its own problems.  If, instead, it is meant to reach some form of

4    derivative "misrepresentation" to *HP*'s management (and, further down the line, HP's

5    shareholders), then it falls beyond the purview of section 1348.  Congress drafted a law about

6    fraud "in connection with" securities.  Section 1348's express requirement of a nexus to securities

7    contradicts any suggestion that Congress intended to make a federal crime out of lying to the

8    management of public companies (much less to the management of offshore subsidiaries).

9         Count 16 might at least be comprehensible if Mr. Hussain were charged for fraud in

10   connection with *Autonomy* securities—securities that he owned and which Bidco agreed to

11   acquire in August 2011.  *See* SI, ¶ 12.  But of course section 1348 only reaches classes of

12   securities that are traded under the Exchange Act, and so the statute does not apply to transactions

13   in Autonomy securities, which were traded on the London Stock Exchange.  The government has

14   therefore attempted an end-run around the law's territorial limitations by tying the charge to HPQ

15   securities.  Count 16 is another failed effort to fit the square pegs of foreign conduct and foreign-

16   listed securities into the round hole of U.S. criminal law, and should be dismissed.

17              **3.      Section 1348 is unconstitutionally vague as applied to Mr. Hussain.**

18        Count 16 is subject to dismissal for another reason: it is unconstitutionally vague as

19   applied to Mr. Hussain.  The government violates the Fifth Amendment's guarantee of due

20   process "by taking away someone's life, liberty, or property under a criminal law so vague that it

21   fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites

22   arbitrary enforcement."  *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015).  The indictment

23   fails to allege any action taken by Mr. Hussain "in connection with" U.S.-listed securities and is

24   thus an arbitrary and standardless application of section 1348 that deprives him of the fair notice

25   to which he is constitutionally entitled.  Mr. Hussain could never have anticipated that by making

26   representations to Bidco in the course of its acquisition of a foreign company, he would be

27   charged with fraud in connection with HPQ securities.  Because Mr. Hussain lacked notice of the

28   boundaries of section 1348, the statute is unconstitutional as applied to him.

1

## IV.     CONCLUSION

2         For the foregoing reasons, defendant Sushovan Hussain respectfully asks that the Court

3   dismiss the indictment in this case.

4                                             Respectfully submitted,

5   Dated:  August 25, 2017                   KEKER, VAN NEST & PETERS LLP

6

7                               By:   */s/ John W. Keker*
                                      JOHN W. KEKER
8                                     JAN NIELSEN LITTLE
                                      BROOK DOOLEY
9                                     KATE E. LAZARUS
                                      NICHOLAS D. MARAIS
10                                    IAN KANIG

11                                    Attorneys for Defendant
                                      SUSHOVAN HUSSAIN

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S MOTION TO DISMISS INDICTMENT
Case No. 3:16-cr-00462-CRB

1186303