1  ALEX G. TSE (CABN 152348)
   Attorney for the United States
2  Acting under Authority Conferred by 28 U.S.C. § 515

3  BARBARA J. VALLIERE (DCBN 439353)
   Chief, Criminal Division
4
   ADAM A. REEVES (NYBN 2363877)
5  ROBERT S. LEACH (CABN 196191)
   Assistant United States Attorneys
6
        450 Golden Gate Avenue, Box 36055
7       San Francisco, California 94102-3495
        Telephone: (415) 436-7157
8       Fax: (415) 436-7234
        adam.reeves@usdoj.gov
9
   Attorneys for United States of America
10
                    UNITED STATES DISTRICT COURT
11
                  NORTHERN DISTRICT OF CALIFORNIA
12
                     SAN FRANCISCO DIVISION
13

14  UNITED STATES OF AMERICA,            )  Case No. CR 16-462 CRB
                                         )
15        Plaintiff,                     )  UNITED STATES' OPPOSITION TO
                                         )  DEFENDANT'S MOTION TO DISMISS
16     v.                                )  INDICTMENT
                                         )
17  SUSHOVAN TAREQUE HUSSAIN,            )  Date:  September 20, 2017
                                         )  Time:  11:00 a.m.
18        Defendant.                     )  Court:  Hon. Charles R. Breyer
    ─────────────────────────────────── )
19

20                        **INTRODUCTION**

21        The United States respectfully submits its Opposition to Defendant's Motion to Dismiss

22  Indictment filed August 25, 2017 (Document 113).  The motion should be denied because (1) Counts

23  One through Fifteen sufficiently allege domestic violations of the wire fraud and conspiracy statutes,

24  and (2) Count Sixteen sufficiently alleges fraud "in connection with" securities of Hewlett-Packard

25  Company ("HP").

26        In his motion to dismiss, the defendant, Sushovan Hussain, argues that "there is no basis to

27  UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT,
28  CASE NO. CR 16-462 CRB                              1

believe that Mr. Hussain would ever 'reasonably [have anticipated] being 'haled into court' in this country" for statements Autonomy made in England in 2009 or 2010."  Document 113 at 9.  Not so, when, as charged, the defendant is alleged to have *personally travelled to California in early 2011 on multiple occasions* to use "Autonomy's false and misleading financial statements from 2009, 2010, and early 2011 to make Autonomy more attractive to a potential purchaser like HP."  Document 52 (Superseding Indictment) at ¶ 21.

At bottom, the Superseding Indictment charges this defendant with personally coming into the Bay Area – the heart of the Northern District of California – for the specific purpose of spinning his (false) claims about Autonomy's alleged financial success.  Of course the defendant could reasonably expect to be prosecuted in the very jurisdiction where he allegedly pumped his false and misleading story.  In 2011, when it served his purposes, the defendant anchored his company on One Market Street in downtown San Francisco, used near daily telephone calls to California to carry out key aspects of his fraudulent revenue scheme, and closed his multi-billion dollar scheme to defraud using domestic wires to HP in Palo Alto, into and out of the Northern District of California.  Today, in stark contrast, in his motion to dismiss, the defendant retreats to the margins of some allegedly ambiguous, extraterritorial, borderless netherworld.  This case rightly belongs in this country, in this state, and in this Court.

## STATEMENT OF FACTS

### A.  Autonomy's Deep Connection to Silicon Valley

In the 2000s, when it was pushing its way into the tech world, Autonomy boasted about its deep connections to the United States, in general, and Silicon Valley, in particular.  According to Michael Lynch, a founder of Autonomy, "[o]ne of the key driving forces of the company was to go [to Silicon Valley] and live out there [in California]."  Maija Palmer, *Tech profit preaching in the US*, *Financial Times*, Aug. 19, 2009 (Attachment A).  In or about November 2005, at or about the time Autonomy acquired Verity, Inc., a tech company in Sunnyvale, Lynch and his co-founder took turns living in Silicon Valley, often for six months at a time, and tried to maintain a constant presence in the

Bay Area.  *Id*.   So much so, Lynch said "[he was] on the phone to US management 20 times a day."  *Id*.

Connectivity to Silicon Valley and its tech cache was so essential to Autonomy that, by in or about 2003, Autonomy located its headquarters both in downtown San Francisco, at One Market Street, and Cambridge, United Kingdom.  Document 52 at ¶ 1.  Headquartering in California facilitated Autonomy's ability to expand aggressively into the Bay Area tech sector.  In 2003, Autonomy bought Virage, Inc., in San Mateo; in 2005, it acquired Verity, Inc., in Sunnyvale; in 2007, it took over ZANTAZ, Inc., in Pleasanton; and, in 2009, it landed Interwoven, Inc., in San Jose.

By 2009-2011, scores of Autonomy employees in California, and other parts of the United States, reported to the defendant, Sushovan Hussain, who functioned as the second most powerful executive at the company, with day-to-day control over all aspects of its sales and operations.  By 2010, approximately $592 million of Autonomy's approximately $870 million in (alleged) total revenues – more than 68% – was generated in the United States (and other countries in the Americas) from sales managed by its One Market Street headquarters in downtown San Francisco.  Document 52 at ¶ 3.  By 2009-2011, Autonomy's most important customers included premiere financial services companies on Wall Street in New York, other Fortune 500 companies in the United States, and the United States government.

### B.    Fraudulent Deals Were Done with VARs in New York and Virginia

One of the means by which the defendant inflated Autonomy's alleged revenues was through transactions with counterparties – valued added resellers or VARs – in New York and Virginia.  For example, in late December 2009, Hussain caused Autonomy to enter into a $4 million software transaction with a VAR in New York that was subject to an oral side agreement assuring the VAR in New York that Autonomy would provide the money for the license fee.  Document 52 at ¶ 26(d).  Hussain later caused Autonomy to pay the New York VAR millions of dollars – through United States banks – for services that were never performed, just so the New York VAR could roundtrip the money back to Autonomy to pay for the software.  *Id.* at ¶ 26(i).

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT,
CASE NO. CR 16-462 CRB                               3

In 2009-2011, the defendant used three inter-related VARs in Virginia, in metro Washington, D.C, to carry out other important parts of his scheme to defraud.  On or about January 1, 2010, after Q4 2009 had closed, Hussain phoned one VAR in Virginia seeking its agreement to a software transaction, which Hussain then back-dated and booked as "2009" revenue.  *Id.* at ¶ 26(e).  (At the time, Hussain was about to acquire the VAR in Virginia for approximately $55 million, yet another Autonomy acquisition of a tech company in the United States.)  In January 2011, Hussain backdated another agreement with another VAR in Virginia, which ultimately was emailed by a San Francisco-based Autonomy employee for presentation to Autonomy's auditors.  *Id.* at ¶¶ 26(q) & 28.  And in April 2011, Hussain caused a Virginia VAR to prepare and backdate another agreement to license software; the senior officer of the Virginia VAR was so concerned about the deal that Hussain traveled to San Francisco to calm him down.  *Id.* at ¶ 26(x).

From 2009-2011, throughout the period of the scheme to defraud, the defendant routinely used United States banks to make payments to the VARs in New York and Virginia.  He constantly telephoned Autonomy's headquarters in San Francisco and sent and received emails to and from California, New York, Virginia, and other parts of the United States, to carry out the scheme to falsely inflate Autonomy financial statements.  To maintain control, Hussain traveled to California, New York, and Virginia, and presided over Autonomy's annual sales meetings in Miami, Florida.  In February 2011, Hussain – from New York – ordered a false management representation letter be signed and sent to Autonomy's auditors.  *Id.* at ¶ 26(t).  On occasions too numerous to list, Hussain used domestic wires in the United States to commit overt acts in furtherance of the scheme.

## C.    The Defendant Came to California to Defraud HP in Palo Alto

On March 4, 2011, the defendant – and others participating by video conference – came to Palo Alto and touted Autonomy's (false) financial performance in 2009 and 2010 to senior HP executives considering a possible acquisition of Autonomy.  *Id.* at ¶¶ 26(v) & 28.  In July and August 2011, when HP's representatives asked financial questions of Autonomy as part of its due diligence, Hussain – in telephone calls with HP representatives in Palo Alto – provided detailed (and misleading) answers.  *Id.*

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT,
CASE NO. CR 16-462 CRB                            4

at ¶¶ 23 & 28.  He also used domestic wires in the United States to send emails to HP executives in Palo Alto providing false and misleading information to HP.  *Id.* at ¶¶ 23 & 28.  And, on August 18, 2011, the defendant, in San Francisco, personally signed documents (falsely) attesting to the accuracy of Autonomy's financial statements and consummating HP's acquisition of Autonomy for approximately $11 billion.  *Id.* at ¶¶ 22 & 26(bb).

What the defendant knew – but which HP and its advisors did not know – was Autonomy's financial statements in 2009, 2010, and the first quarter and second quarter of 2011, were materially false and misleading.  *Id.* at ¶ 22.  From 2009 through July 2011, the defendant fraudulently "managed" earnings at Autonomy.  *Id.*  He used backdated contracts, concealed side agreements, and falsified management representation letters, among other deceptions, to lie to Autonomy's auditors.  *Id.*  The amounts of false revenue generated by this revenue recognition fraud were large enough to insure that, for certain key quarters, Autonomy met or exceeded the all-important performance expectations set by the market analysts who covered Autonomy.  *Id.*  In this way, the defendant engaged in an elaborate scheme to defraud designed to make Autonomy (falsely) appear to be worth more than it really was.  The scheme was designed to defraud purchasers and sellers of Autonomy securities in the U.S. and HP was the biggest purchaser of them all.

On August 18, 2011, HP, in Palo Alto, announced that it had agreed to buy Autonomy for approximately $11 billion.  *Id.* at ¶ 8.  Beginning on or about October 3, 2011, at or about the time the acquisition formally closed, HP executives authorized the transfer of *over $3 billion in U.S. dollars* from bank accounts in New York held in the name of Hewlett-Packard Company (not "Bidco") for the purpose of funding the complex and elaborate acquisition of Autonomy's outstanding shares.  *See generally id.* at ¶ 26(cc) to (ee).

## ARGUMENT

## I.   LEGAL STANDARD

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c).  An indictment satisfies this rule if it contains

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT,
CASE NO. CR 16-462 CRB                                    5

"the elements of the charged crime in adequate detail to inform the defendant of the charge and to enable him to plead double jeopardy."  *United States v. Buckley*, 689 F.2d 893, 896 (9th Cir. 1982); *see United States v. Fernandez*, 388 F.3d 1199, 1219 (9th Cir. 2004) ("[A]n indictment setting forth the elements of the offense is generally sufficient.").  Indeed, "[t]he use of a 'bare bones' information – that is one employing the statutory language alone – is quite common and entirely permissible so long as the statute sets forth fully, directly and clearly all essential elements of the crime to be punished."  *United States v. Crow*, 824 F.2d 761, 762 (9th Cir. 1987).  The government need not allege its theory of the case or supporting evidence.  *See Buckley*, 689 F.2d at 897.  On a motion to dismiss under Federal Rule of Criminal Procedure 12(b), a court must presume the allegations to be true, *see Buckley*, 689 F.2d at 897, and "[t]he court must look at the indictment as a whole, include facts which are necessarily implied, and construe it according to common sense."  *United States v. Kaplan*, 836 F.3d 1199, 1216 (9th Cir. 2016).

## II.   THE MOTION TO DISMISS SHOULD BE DENIED BECAUSE THE SUPERSEDING INDICTMENT PROPERLY ALLEGES VIOLATIONS OF THE WIRE FRAUD STATUTE

### A.   The Defendant Used "Domestic Wires" to Carry Out the Scheme Because the Wires Originated or Ended in the United States

The Supreme Court has established a two-step framework for analyzing alleged extraterritoriality issues.  First, the Court must determine "whether the statute gives a clear, affirmative indication that it applies extraterritorially."  *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016).  If so, the scope of extraterritorial application turns on any limits Congress has imposed on the statute's foreign application.  *Id.*  If the statute is not extraterritorial, "then at the second step [the court] determine[s] whether the case involves a domestic application of the statute, and [the court] [does] this by looking to the statute's 'focus.'"  *Id.*  "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that

1    occurred in U.S. territory." *Id.*; *see Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).[1]

2    The wire fraud statute, 18 U.S.C. § 1343, provides in relevant part:

3            Whoever, having devised or intending to devise any scheme or
             artifice to defraud, or for obtaining money or property by means of
4            false or fraudulent pretenses, representations, or promises,
             transmits or causes to be transmitted by means of wire, radio, or
5            television communication in interstate or foreign commerce, any
             writings, signs, signals, pictures, or sounds for the purpose of
6            executing such scheme or artifice, shall be fined . . . or imprisoned
             . . . under this title . . . .
7

8    As the Ninth Circuit has recognized, "[t]he focus of the mail and wire fraud statutes is upon the misuse

9    of the instrumentality of communication. . . . [These statutes] do not penalize the victimization of

10   specific persons; rather, they are directed at the instrumentalities of fraud." *United States v. Garlick*,

11   240 F.3d 789, 792-93 (9th Cir. 2001) (citations and internal quotations omitted); *see also United States*

12   *v. Trapilo*, 130 F.3d 547, 552 (2d Cir. 1997) ("[The] focus [of the wire fraud statute] is upon the

13   misuse of the wires, not the regulation of state affairs." (internal quotation marks and citation

14   omitted)).

15   Accordingly, a wire fraud or wire fraud conspiracy charge alleging the use of the wire facilities

16   of the United States in furtherance of a fraudulent scheme constitutes a domestic application of the

17   wire fraud statute because the focus, or intended purpose, of the statute is to prevent the misuse of U.S.

18   wires in furtherance of fraudulent schemes. *See United States v. Kazzaz*, 592 Fed. Appx. 553, 554-55

19   (9th Cir. 2014) (rejecting extraterritoriality challenge to guilty plea factual basis because stipulation to

20

---

21   [1]   After *Morrison*, Congress enacted Section 929P(b)(1) & (2) of the Dodd-Frank Act, providing
     clear, affirmative indication that Section 17(a) of the Securities Act and Section 10(b) of the Securities
22   Exchange Act may be applied extraterritorially in actions by the United States and the SEC. *See* 15
     U.S.C. §§ 77v & 78aa; *SEC v. Traffic Monsoon, LLC*, 2017 WL 1166333, at *9-*13 (D. Utah Mar. 28,
23   2017). In fact, on November 15, 2016, the SEC brought civil securities charges against the former
     CEO of Autonomy's U.S.-based operations. *See In re Christopher Egan*, Order Instituting Cease-and-
24   Desist Proceedings Pursuant to Section 8A of the Securities Act, Making Findings, and Imposing a
     Cease-and-Desist Order, File No. 2-17678 (Nov. 15, 2016), *available at*
25   https://www.sec.gov/litigation/admin/2016/33-10256.pdf. The SEC found that the former CEO
     "participated in an accounting scheme orchestrated by Autonomy's U.K.-based senior-most executives
26   to meet internal sales targets and analyst revenue expectations" and that "Autonomy issued materially
     false and misleading financial reports that overstated revenues in 10 consecutive quarters."

27

using electronic communications to transmit a payment to a bank in Alabama provided sufficient domestic nexus for wire fraud); *United States v. Kim*, 246 F.3d 186, 189-191 (2d Cir. 2001) (noting that Congress amended the wire fraud statute in 1956 to include the words "foreign commerce," in response to a failed prosecution of "an individual who made a fraudulent telephone call from Mexico to the United States and successfully argued that § 1343 did not cover such a foreign communication."); *Trapilo*, 130 F.3d at 552-553 ("[A]s the statute plainly states, what is proscribed is use of the telecommunication systems of the United States in furtherance of a scheme . . . . Nothing more is required.  The identity and location of the victim, and the success of the scheme, are irrelevant. . . .  We concern ourselves only with what has been expressly forbidden by statute – the use of the [U.S.] wires in the scheme to defraud. . . . Our goal is simply to vindicate the intended purpose of the statute, that is, to prevent the use of our telecommunications systems in furtherance of fraudulent enterprises." (internal quotation marks, citation and alterations omitted)); *see also Pasquantino v. United States*, 544 U.S. 349, 371 (2005) (affirming wire fraud conviction based on phone calls between New York and Maryland package stores to further a scheme to defraud Canada of excise taxes on alcohol and stating that the use of "U.S. interstate wires to execute a scheme to defraud a foreign sovereign" is the "domestic element of [the defendants'] conduct . . . [and] what the Government is punishing"); *United States v. Hayes*, 118 F. Supp. 3d 620, 628 (S.D.N.Y. 2015) (holding in context of wire fraud conspiracy charge that "Congress's legislative concern was to prevent the use of [U.S. wires] in furtherance of fraudulent enterprises," so "the location of the wires is the court's primary concern" (internal quotation marks and citations omitted)).

Defendants with far fewer connections to the United States than Hussain have been properly prosecuted here for wire fraud.  For example, in *United States v. Gilboe*, 684 F.2d 235, 238 (2d Cir. 1982), the Second Circuit found jurisdiction under Section 1343 against a non-resident alien whose acts occurred outside the United States.  The court found that "telephone and telex conversations with a ship broker" in Long Island and payments "electronically transferred through Manhattan banks to

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT,
CASE NO. CR 16-462 CRB                                   8

accounts in the Bahamas" were sufficient, holding that "jurisdiction under § 1343 is satisfied by a defendant's use of the wires to obtain the proceeds of his fraudulent scheme." *Id.* at 237-38.

Other courts have likewise upheld application of the wire and mail fraud statutes to cases involving foreign defendants or foreign activity where the fraud schemes were executed using domestic interstate wires or mailings. *See United States v. Georgiou*, 777 F.3d 125, 138 (3d Cir. 2015) (no extraterritorial application where defendant used email to direct co-conspirator's participation in the fraud and wired money from a Canadian bank to an undercover FBI agent's account in Pennsylvania); *United States v. Lyons*, 740 F.3d 702, 718 (1st Cir. 2014) (rejecting extraterritoriality claim because the "communications giving rise to these convictions had at least one participant inside the United States and therefore fall within the statute's scope"); *United States v. Coffman*, 574 Fed. Appx. 541, 557 (6th Cir. 2014) (rejecting extraterritoriality challenge where Canadian investors mailed or wired funds to the United States); *Hayes*, 99 F. Supp. 3d at 421 (where defendant conducted fraud scheme from overseas but used domestic wires to execute scheme, "[t]he culpable conduct underlying the... [wire fraud] count therefore occurred in the United States" and there was no extraterritorial application of statute); *United States v. Singhal*, 876 F. Supp. 2d 82, 97 (D.D.C. 2012) (rejecting extraterritoriality challenge to mail fraud charges where scheme was executed by mailings from overseas company to United States, because once the mails are used, that domestic activity makes further analysis of extraterritoriality unnecessary); *United States v. Hijazi*, 845 F. Supp. 2d 874, 906-07 (C.D. Ill. 2011) (finding the wire fraud statute is properly applied to a Lebanese citizen where the "majority of [his] own conduct occurred overseas"); *United States v. Approximately $25,829,681.80 in Funds (Plus Interest) in the Court Registry Investment System,* No. 98 Civ. 2682, 1999 WL 1080370, at *3 (S.D.N.Y. Nov. 30, 1999) ("[T]he use of wires in the United States to transfer the funds would clearly allow this Court to exercise jurisdiction over the underlying wire fraud claim."). *Compare United States v. Sidorenko*, 102 F. Supp. 3d 1124, 1127, 1131 (N.D. Cal. 2015) (Breyer, J.) (dismissing indictment that involved "wholly foreign conduct and wholly foreign actors" whose use of wires did not reach or pass through the United States).

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT,
CASE NO. CR 16-462 CRB                                   9

In this case, each of the wires alleged in the Superseding Indictment originated or terminated in the Northern District of California.  They include:

- An email from an Autonomy officer in California to a Finance employee in the United Kingdom transmitting a backdated contract on which Autonomy recognized revenue (Count Two);

- Press releases wired from the United Kingdom to HP executives in Palo Alto while Hussain was trying to sell Autonomy using false financial statements (Counts Three, Seven, and Eight);

- Video conference calls between HP executives in Palo Alto and Autonomy executives in the United Kingdom in which Autonomy was trying to sell itself with false financial statements – including one where Hussain was physically present in Palo Alto (Counts Five and Six);

- An email from an officer of a VAR in Virginia to an officer of Autonomy in San Francisco with a backdated contract on which Hussain recognized revenue (Count Seven);

- Telephone calls using a U.S. toll-free number among participants in the United Kingdom and Palo Alto, in which Hussain pitched Autonomy to HP (Counts Nine Through Twelve);

- Emails from the United Kingdom to HP executives in Palo Alto relating to the due diligence around the acquisition (Counts Thirteen and Fourteen);

- Emails from the "escrow agent" in the United Kingdom demanding HP executives in Palo Alto cause the payment of billions of pounds for the acquisition (Count Fifteen).

Because the wires alleged in the Superseding Indictment originated or terminated in the Northern District of California, the indictment states domestic violations of the wire fraud statute.

**B.     The Non-Binding, Unpublished District Court Cases Cited by the Defendant Do Not Require a Different Result**

The defendant ignores this long-line of authority and instead relies on a handful of unpublished district court cases stating, or assuming, that the "focus" of the wire fraud statute is the fraudulent scheme (not the use of domestic wires).  Document 113 at 6 (citing *United States v. All Assets Held at Bank Julius*, No. CV 04-0798 (PLF), 2017 WL 1508608, at *15 (D.D.C. Apr. 27, 2017); *United States*

*v. Gasperini*, No. 16-CR-441 (NGG), 2017 WL 2399693, at *8 (E.D.N.Y. June 1, 2017); and *United States v. Hawit*, No. 15-CR-252 (PKC), 2017 WL 663542, at *5 (E.D.N.Y. Feb. 17, 2017)).

For example, in *Bank Julius*, a civil *in rem* action, the district court held that a civil complaint must allege (1) a defendant or coconspirator committed a substantial amount of conduct in the United States, (2) the conduct was integral to the commission of the scheme to defraud, and (3) at least some of the conduct involved the use of U.S. wires in furtherance of the scheme to defraud. 2017 WL 1508608, at *15. *Hawit* found that the indictment was satisfied by a "holistic assessment of the conduct that constitutes the alleged fraud scheme, including consideration of whether the scheme involves only incidental or minimal use of U.S. wires." 2017 WL 663542, at *5.

To the extent these cases suggest the "focus" of the wire fraud statute is something other the instrumentalities of communication, they are contrary to *Morrison* and Ninth Circuit law. *Morrison* expressly rejected the argument that, in assessing the focus of Section 10(b) of the Exchange Act, one should look to "the place where the deception originated" because Section 10(b) "does not punish deceptive conduct, but only deceptive conduct in connection with" certain securities. 561 U.S. at 266. This is also true of wire fraud, which punishes only frauds where a defendant "transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings . . . for the purpose of executing such scheme or artifice." *See* 18 U.S.C. § 1343. The Court in *Morrison* also expressly rejected the argument that Section 10(b) applies domestically if the "fraud involves significant conduct in the United States that is material to the fraud's success." The defendant's contention that the Court should effectively use a "conduct and effects" test or "significant and material conduct" test has been rejected by the Supreme Court. 561 U.S. at 258-259.

Nevertheless, even under these erroneous standards, the Superseding Indictment is sufficient. For over two years, the defendant inflated Autonomy's publicly-reported revenue through transactions in the United States with VARs in Virginia and New York. He used United States banks to make payments to those counterparties. He made repeated phone calls and sent and received numerous emails to Autonomy officers in San Francisco, as part of the scheme. He traveled to the Northern

1    District of California – three times in 2011 alone – to meet with HP executives to tout Autonomy's

2    (false) financial performance and sign deal documents necessary to ensure the scheme's success.

3    Under any measure, this was a "substantial amount" of conduct in the United States which was

4    "integral" to the commission of the scheme to defraud.

5            The defendant also places out-sized significance on the fact that the HP subsidiary that

6    formally acquired the Autonomy shares was incorporated outside the United States.  This reliance is

7    misplaced.  First, if the location of the victim drove the extraterritoriality analysis, *Pasquantino* and

8    *Trapilo* would come out the other way.  After all, the victim in each case was the Canadian

9    government.  Second, the wire fraud statute "condemns the intent to defraud" and the "success of the

10   scheme[] [is] irrelevant."  *Trapilo*, 130 F.3d at 554.  The fact that HP chose to consummate the

11   transaction through a foreign subsidiary does not mean that the defendant, through his attempts and

12   execution of the scheme, did not intend to defraud a United States entity by defrauding HP executives

13   in Palo Alto.  Finally, the defendant cites no authority to justify ignoring the fact that over $3 billion in

14   U.S. dollars held in the name of "Hewlett-Packard Company" in accounts in New York banks were

15   used to pay for Autonomy's shares.  Document 52 at ¶ 10.

16           The defendant's "Bidco" – corporation-without-a-country – argument fails.

17           **C.    The Superseding Indictment Alleges a Sufficient Domestic
                 Nexus to Satisfy the Due Process Clause**

18

19           "[I]n order to apply extraterritorially a federal criminal statute to a defendant consistent with

20   due process, there must be a sufficient nexus between the defendant and the United States so that

21   such an application of a domestic statute to the alleged conduct would not be arbitrary or

22   fundamentally unfair."  *United States v. Davis,* 905 F.2d 245, 248–49 (9th Cir.1990) (internal

23   citation omitted).  This requirement "ensures that a United States court will assert jurisdiction only

24   over a defendant 'who should reasonably anticipate being haled into court' in this country." *United*

25   *States v. Klimavicius–Viloria,* 144 F.3d 1249, 1257 (9th Cir.1998) (quoting *World–Wide Volkswagen*

26   *Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 580, 62 L.Ed.2d 490 (1980)).  Here, the defendant's

27   UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT,
     CASE NO. CR 16-462 CRB                                    12

28

travel to California and his repeated phone calls and emails to the United States amply satisfy any due process concerns.

**III.    THE INDICTMENT SUFFICIENTLY ALLEGES SECURITIES FRAUD "IN CONNECTION WITH" HP SECURITIES**

Title 18 U.S.C. § 1348 provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—

> (1) to defraud any person in connection with any commodity for future delivery, or any option on a commodity for future delivery, or any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d)); or

> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any commodity for future delivery, or any option on a commodity for future delivery, or any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d));

> shall be fined under this title, or imprisoned not more than 25 years, or both.

18 U.S.C. § 1348.

The elements of a violation of 18 U.S.C. § 1348(1) are (1) fraudulent intent, (2) a scheme or artifice to defraud, and (3) a nexus with a security.  *See United States v. Coscia*, 866 F.3d 782, __ (7th Cir. Aug. 7, 2017); *United States v. Mahaffy*, 693 F.3d 113, 125 (2d Cir. 2012) (citing *United States v. Motz*, 652 F. Supp. 2d 284, 294 (E.D.N.Y. 2009)).

The Ninth Circuit has long held – in the analogous context of Section 10(b) – that "[w]here the fraud alleged involves public dissemination in a document such as a press release, annual report, investment prospectus or other such document on which an investor would presumably rely, the 'in

connection with' requirement is generally met by proof of the means of dissemination and the materiality of the misrepresentation or omission."  *See SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1361-62 (9th Cir. 1993); *McGann v. Ernst & Young*, 102 F.3d 390, 397 (9th Cir. 1996) ("[A]n accounting firm acts 'in connection with' securities trading when it produces an audit report that it knows its client will include in a Form 10–K.").  Other circuit courts have consistently held that dissemination of a press release or SEC filing to the investing public satisfies the "in connection with" element of the securities laws.  *See In re Ames Dept. Stores Inc. Stock Litig.*, 991 F.2d 953, 966-968 (2d Cir. 1993); *Semerenko v. Cendant Corp.,* 223 F.3d 165, 176 (3d Cir. 2000).

For example, in *SEC v. Wolfson*, 539 F.3d 1249, 1261-1264 (10th Cir. 2008), the Tenth Circuit, citing *Rana Research*, held that a consultant to a public company committed fraud "in connection with" the purchase and sale of securities through the distribution of false and misleading statements in SEC filings.  The court reasoned that the public documents at issue (periodic financial reports filed with the SEC) were "plainly designed to reach investors" and that the consultant "very well knew that the statements contained in the [SEC filings] would be communicated to investors."  Because the filings were unquestionably material to investors' decisions to transact in the company's stock, the court held that the misstatements and omissions were made "in connection with" the purchase or sale of securities.  *Id*. at 1263.  The court cited "several of our sister circuits" for the proposition that because documents such as SEC filings and press releases "are designed to reach investors and to influence their decisions to transact in a publicly-traded security, any misrepresentations contained within the documents are made 'in connection with' the purchase or sale of that security."  *Id*. at 1262 (citing *Semerenko*, 223 F.3d at 176; *SEC v. Savoy Indus., Inc.,* 587 F.2d 1149, 1171 (D.C. Cir. 1978); *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 861–62 (2d Cir. 1968) (en banc)).

Here, the Superseding Indictment sufficiently states an offense.  As an initial matter, it tracks each of these essential elements, specifying that Hussain's fraud was in connection with securities of HP and purchases and sales of HP securities.  Document 52 at ¶ 30.  Nothing more is required.

In addition, the Superseding Indictment alleges that on or about August 18, 2011, while in San Francisco, and to induce the offer by HP and HP Vision, Hussain executed a letter warranting that all information provided by him for inclusion in any document issued in connection with the offer was true and accurate in all respects and not misleading in any respect.  Document 52 at ¶ 26(bb).  Based in part on Hussain's warranty, HP issued, among other things, a press release and other documents making false representations about Autonomy's historical financial performance.  At trial, the United States will prove investors bought HP securities based on these false and misleading claims about Autonomy's historical performance.  This is securities fraud under a well-established line of cases.

Hussain's fallback argument that Section 1348 is unconstitutionally vague likewise fails.  His lone cite, *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015), involves the "residual clause" of the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B).  He fails to cite the district court cases that have rejected similar vagueness challenges to 18 U.S.C. § 1348.  *See United States v. Melvin*, 143 F. Supp. 1354, 1371-1374 (N.D. Ga. 2015); *United States v. Coscia*, 100 F. Supp. 653, 660 (N.D. Ill. 2015), *aff'd*, 866 F.3d 782, __ (7th Cir. Aug. 7, 2017); *United States v. Motz*, 652 F. Supp. 2d 284, 294-295 (E.D.N.Y. 2009).  Section 1348, which was modeled on the mail and wire statutes, *Motz*, 652 F. Supp. 2d at 296, was "intended to provide needed enforcement flexibility in the context of publicly traded companies to protect shareholders and prospective shareholders against all the types of schemes and frauds which inventive criminals may devise in the future."  *Id*. at 294 (internal quotations omitted).  Moreover, the requisite elements – fraudulent intent, a scheme or artifice to defraud, and a nexus with a security – are "straightforward."  *Id.* at 295.  Hussain's conduct – causing a false and misleading press release to be disseminated to investors to guarantee a multi-million-dollar pay-day – fits well within established case law on the "in connection with" element.  For these reasons, the statute is not unconstitutionally vague as applied to the defendant.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court deny the motion.

DATED:  September 8, 2017                    Respectfully Submitted,

ALEX G. TSE
Attorney for the United States
Acting under Authority Conferred
by 28 U.S.C. § 515

/s/
_____
ROBERT S. LEACH
ADAM A. REEVES
Assistant United States Attorneys

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT,
CASE NO. CR 16-462 CRB                    16