1    KEKER, VAN NEST & PETERS LLP
     JOHN W. KEKER - # 49092
2    jkeker@keker.com
     JAN NIELSEN LITTLE - # 100029
3    jlittle@keker.com
     BROOK DOOLEY - # 230423
4    bdooley@keker.com
     KATE E. LAZARUS - # 268242
5    klazarus@keker.com
     NICHOLAS D. MARAIS - # 277846
6    nmarais@keker.com
     IAN KANIG - # 293625
7    ikanig@keker.com
     633 Battery Street
8    San Francisco, CA 94111-1809
     Telephone:    415 391 5400
9    Facsimile:    415 397 7188

10   Attorneys for Defendant
     SUSHOVAN HUSSAIN

11
                    UNITED STATES DISTRICT COURT
12
                  NORTHERN DISTRICT OF CALIFORNIA
13
                     SAN FRANCISCO DIVISION
14

15   UNITED STATES OF AMERICA,              Case No. 3:16-cr-00462-CRB

                    Plaintiff,              **REPLY IN SUPPORT OF DEFENDANT
16                                          SUSHOVAN HUSSAIN'S MOTION TO
           v.                               DISMISS INDICTMENT**
17
     SUSHOVAN HUSSAIN,                       Date:      September 26, 2017
18                                           Time:      1:30 p.m.
                    Defendant.               Dept.:     Courtroom 6 – 17th Floor
19                                           Judge:     Hon. Charles R. Breyer

20                                           Date Filed: November 10, 2016

21                                           Trial Date: February 26, 2018

22

23

24

25

26

27

28

1188414

1

# **TABLE OF CONTENTS**

**Page**

I.    SUMMARY OF THE ARGUMENT ................................................................................1

II.   ARGUMENT ..............................................................................................................2

    A.   The government introduces all-new, irrelevant allegations—and tries to twist the indictment—to cover up gaps in its case..................................................2

    B.   The wire fraud counts should be dismissed because the alleged misconduct occurred beyond the borders of the United States. ...................................................3

        1.   The government never addresses its first scheme—the alleged "fraud" on Autonomy's shareholders. ...........................................................4

        2.   The extraterritorial second scheme—the alleged "fraud" on Dutch-based Bidco—cannot be saved by unrelated conduct..................................6

    C.   The securities fraud count should be dismissed because the indictment does not allege that Mr. Hussain acted in connection with HP securities, and the charge is unconstitutionally vague........................................................................10

        1.   The indictment does not allege a violation of section 1348......................10

        2.   Section 1348 as applied to Mr. Hussain is unconstitutionally vague. .......13

III.  CONCLUSION.............................................................................................................14

REPLY IN SUPPORT OF MOTION TO DISMISS INDICTMENT
Case No. 3:16-cr-00462-CRB

1188414

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

<u>Federal Cases</u>

4

*Absolute Activist Value Master Fund Ltd. v. Ficeto*
   677 F.3d 60 (2d Cir. 2012)................................................................................................ 4

5

6

*In re Ames Dep't Stores Inc. Stock Litig.*
   991 F.2d 953 (2d Cir. 1993)........................................................................................... 12

7

*Janus Capital Grp., Inc. v. First Derivative Traders*
   564 U.S. 135 (2011)........................................................................................... 10, 12, 13

8

9

*Marine Bank v. Weaver*
   455 U.S. 551 (1982)........................................................................................................ 13

10

*McGann v. Ernst & Young*
   102 F.3d 390 (9th Cir. 1996) ................................................................................... 12, 13

11

12

*Morrison v. Nat'l Australia Bank Ltd.*
   561 U.S. 247 (2010)................................................................................................ *passim*

13

*Oaktree Principal Fund V, LP v. Warburg Pincus LLC*
   2017 WL 3187688 (C.D. Cal. Jan. 17, 2017) .............................................................. 12

14

15

*Petroleos Mexicanos v. SK Eng'g & Const. Co.*
   572 F. App'x 60 (2d Cir. 2014) ...................................................................................... 7

16

*SEC v. Chicago Convention Ctr., LLC*
   961 F. Supp. 2d 905 (N.D. Ill. 2013) ............................................................................. 5

17

18

*SEC v. Rana Research, Inc.*
   8 F.3d 1358 (9th Cir. 1993) .......................................................................................... 12

19

*SEC v. Traffic Monsoon*
   2017 WL 1166333 (D. Utah March 28, 2017)............................................................... 5

20

21

*SEC v. Wolfson*
   539 F.3d 1249 (10th Cir. 2008) .................................................................................... 12

22

*SEC v. Zandford*
   535 U.S. 813 (2002)....................................................................................................... 13

23

*Semerenko v. Cendant Corp.*
   223 F.3d 165 (3d Cir. 2000)........................................................................................... 12

24

25

*United States v. All Assets Held at Bank Julius*
   2017 WL 1508608 (D.D.C. Apr. 27, 2017).................................................................... 7

26

*United States v. Buckley*
   689 F.2d 893 (9th Cir. 1982) ........................................................................................ 13

27

28

1188414

*United States v. Georgiou*
  777 F.3d 125 (3d Cir. 2015)................................................................................. 8, 10

*United States v. Hawit*
  2017 WL 663542 (E.D.N.Y. Feb. 17, 2017)................................................................ 7

*United States v. Kazzaz*
  592 F. App'x 553 (9th Cir. 2014) ................................................................ 8, 9, 10

*United States v. Kim*
  246 F.3d 186 (2d Cir. 2001)..................................................................................... 8

*United States v. Mandell*
  752 F.3d 544 (2d Cir. 2014).................................................................................. 4, 5

*United States v. Martoma*
  2013 WL 6632676 (S.D.N.Y. Dec. 17, 2013) ....................................................... 5, 6

*United States v. Melvin*
  143 F. Supp. 3d 1354 (N.D. Ga. 2015) .................................................................. 14

*United States v. Prevezon Holdings LTD.*
  122 F. Supp. 3d 57 (S.D.N.Y. 2015)........................................................................ 7

*United States v. Sidorenko*
  102 F. Supp. 3d 1124 (N.D. Cal. 2015) ................................................................... 9

*United States v. Singhal*
  876 F. Supp. 2d 82 (D.D.C. 2012) ...................................................................... 9, 10

*United States v. Trapilo*
  130 F.3d 547 (2d Cir. 1997)................................................................................. 8, 9

*United States v. Vilar*
  729 F.3d 62 (2d Cir. 2013)........................................................................... 4, 5, 8, 9

*United States v. Williams*
  553 U.S. 285 (2008)............................................................................................. 14

## Federal Statutes

15 U.S.C. § 78aa .................................................................................................. 5

18 U.S.C. § 1348.......................................................................... 2, 10, 11, 13, 14

REPLY IN SUPPORT OF MOTION TO DISMISS INDICTMENT
Case No. 3:16-cr-00462-CRB

1188414

## I.  SUMMARY OF THE ARGUMENT

The Court should dismiss the indictment because the government's allegations fail to support the charged counts.  *Each* of the government's three alleged schemes suffers from fatal deficiencies.  To the extent the government accuses Mr. Hussain of defrauding *Autonomy's* shareholders, it has failed to show that either the scheme *or* the purchase of securities occurred in the U.S.  To the extent the government alleges a scheme to defraud *HP*, it fails to recognize that the transaction that started this whole case was a deal between foreign entities that took place abroad.  And insofar as the government accuses Mr. Hussain of defrauding *HP's* shareholders, it relies solely on HP's statements, which is deficient under the law.  Rather than address these shortcomings, the government's opposition serves only to highlight them.

*First*, the government ignores the supposed U.S.-based purchasers and sellers of Autonomy securities.  As Mr. Hussain explained in his motion, this first scheme is a classic securities fraud case, and under *Morrison*, the government ought to demonstrate that these "purchases" took place in the U.S.  But even if this scheme is evaluated as a "wire fraud," the government still needs to demonstrate that conduct integral to that scheme occurred in this country.  It does not.  In fact, it barely mentions these supposed Autonomy shareholders at all, choosing instead to focus its energies on what it perceives as the real "victim," Hewlett-Packard.

*Second*, the government ignores the post-*Morrison* trend away from extraterritorial application of this country's criminal laws.  Instead, because it cannot escape the fact that this was a deal between two foreign entities—Autonomy and Bidco—it urges this Court to hark back to older cases that required only an incidental use of "the wires."  But even on that outmoded, expansive approach, the government's case fails, because its new claims that Bidco used U.S. accounts to transfer U.S. funds are contradicted by the indictment itself.  *Compare* ECF No. 115 ("Opp."), 12:10–15 *with* ECF No. 52, Superseding Indictment ("SI"), ¶ 10.

*Third*, to support Count 16—which alleges that Mr. Hussain defrauded HP's shareholders—the government twists both the facts *and* the law.  It falsely asserts that *Mr. Hussain* caused HP to issue a press release, or alternatively, that HP issued the release, but did so in reliance on Mr. Hussain's "attest[ing] to the accuracy of Autonomy's financial

1188414

1  statements."  Neither the indictment, nor the representation letter the government relies on, nor

2  any other evidence in this case, supports those claims.  And because the government cannot find a

3  single section 1348 case that fits its current allegations, it turns instead to section 10(b)

4  jurisprudence, without acknowledging that *Janus Capital Group, Inc. v. First Derivate Traders*

5  precludes that very argument.

6        The transaction at the heart of this case was an offshore acquisition of one foreign

7  company by another, so it is perhaps unsurprising that the government's schemes fail to

8  demonstrate an adequate nexus to the United States or to U.S.-listed securities.  Nothing in the

9  government's opposition cures those deficiencies.  The Court should dismiss the indictment.

10  **II.    ARGUMENT**

11
12
        **A.    The government introduces all-new, irrelevant allegations—and tries to twist the indictment—to cover up gaps in its case.**

13        In responding to Mr. Hussain's motion to dismiss, the government first stretches the

14  allegations in the indictment and then adds a raft of all-new claims—ranging from the travel

15  arrangements of Autonomy's former CEO (who is not a defendant in this case) to acquisitions

16  made *by* Autonomy in the mid-2000s (years before the alleged schemes to defraud began).  If

17  anything, the government's new gloss highlights rather than plugs the gaps in its case.

18        First, the government tries to bolster its case against *Mr. Hussain*, and demonstrate that he

19  might have expected to be haled into court here, by arguing that *other* (non-defendant) Autonomy

20  personnel had sufficient contacts with this country.  *See, e.g.*, Opp. at 2:19–3:2 (alleging that

21  Dr. Lynch and another co-founder "took turns living in Silicon Valley");[1] *id.* at 3:3–8 (alleging

22  that Autonomy acquired U.S.-based companies years before any talks with HP or Bidco).  The

23  government has chosen to indict Mr. Hussain, not Autonomy's co-founders, and it must therefore

24  demonstrate a domestic application of the wire-fraud statutes *as to him*.

25

26

27
28
[1] The government attaches, without explanation, an eight-year-old newspaper article that has nothing to do with Mr. Hussain.  The implication—that Dr. Lynch's travel arrangements in the mid-2000s should somehow be imputed to Mr. Hussain today—is absurd.  In any event, this article is irrelevant, lacks foundation, and constitutes hearsay; Mr. Hussain objects to its use here.

2

1188414

1    Second, many of the government's new claims are contradicted by the indictment.  For

2  instance, realizing the shortcomings of its securities fraud case, the government now claims that

3  Mr. Hussain personally "caus[ed] a false and misleading press release to be disseminated to

4  [HP's] investors," *id.* at 15:19–22; the indictment, though, makes clear that this was *HP*'s press

5  release, and that it was HP who chose what to "state" and what to "emphasize."  SI, ¶ 9.

6  Elsewhere, to shore up its argument that Mr. Hussain used the U.S. wires to defraud HP, the

7  government now alleges that HP "authorized the transfer of *over $3 billion in U.S. dollars* from

8  bank accounts in New York," *id.* at 5:17–22 (citing SI, ¶¶ 26(cc) *et seq.*); in fact, the indictment

9  says the opposite.  *See* SI, ¶¶ 26(cc)–(ee) (alleging, in the only paragraphs dealing with wire

10  transfers, that *Bidco* wired *British pounds* from its London-based Citibank account).  The

11  government may now appreciate that the indictment's allegations fail to support—and, in various

12  instances, actually undermine—the charged counts.  But its belated attempts to rewrite the

13  indictment, or to rely on evidence about unnamed third parties, do not save its case.

14    Finally, despite months of prompting and despite the many new factual allegations that the

15  government injected into its opposition, the government remains completely silent about any

16  alleged "purchasers and sellers of Autonomy securities" other than HP.  It says nothing about

17  who these non-HP buyers were, or where they were located, or when, how, or where they

18  supposedly acquired Autonomy securities.  The government's silence as to these would-be

19  victims makes clear what the government has tried to avoid acknowledging for so long—that the

20  only victim that matters to the government is HP.

21
        **B.**       **The wire fraud counts should be dismissed because the alleged misconduct**
22                       **occurred beyond the borders of the United States.**

23    The government alleges that Mr. Hussain participated in two distinct wire-fraud schemes.

24  In the first, he is accused of misrepresenting Autonomy's financial position to unidentified, U.S.-

25  based purchasers of Autonomy securities—a classic securities fraud case that the government has

26  dressed up as wire fraud because it knows that it cannot meet the *Morrison* standard.  In the

27  second, the government alleges that Mr. Hussain misled *Hewlett-Packard* to induce it to buy

28  Autonomy, a transaction that occurred abroad and involved foreign entities and foreign finance.

REPLY IN SUPPORT OF MOTION TO DISMISS INDICTMENT
Case No. 3:16-cr-00462-CRB

1188414

1   These schemes should both be dismissed.

### 1.   The government never addresses its first scheme—the alleged "fraud" on Autonomy's shareholders.

4   The government has repeatedly hedged about just who was supposedly defrauded through

5   the alleged schemes—so much so that, in April, Mr. Hussain asked this Court to order the

6   government to specify its alleged victim(s). *See, e.g.*, ECF No. 41 (Mot. for Bill of Particulars),

7   7:2–8 ("If the victims are securities holders, the government should say so, and should specify the

8   identity of at least some individuals or institutions, such that Mr. Hussain (and this Court) can

9   ensure that there is indeed a 'sufficient nexus between the defendant and the United States….'").

10  Still today, the government seeks to keep its options open, vaguely claiming that the victims were

11  "[p]urchasers and sellers of Autonomy securities, including HP and its subsidiaries…." ECF

12  No. 64 (Hr'g Tr. (May 10, 2017)), 23:16–22.  And yet, in its opposition brief, the government

13  makes no effort to defend or substantiate this first alleged scheme—a scheme "designed to

14  defraud purchasers and sellers of Autonomy securities in the U.S."  Opp., 5:15–16.

15  This first scheme is a classic securities fraud case—alleged material misstatements that

16  induced investors to purchase securities—that the government has instead styled as wire fraud.

17  That rebranding is an attempt to escape *Morrison*, which leaves the government's first scheme

18  dead on arrival.  Under *Morrison*, the government must show either (*i*) that Autonomy listed its

19  securities on a domestic stock exchange or (*ii*) that the "purchase or sale of the [Autonomy]

20  securities at issue [was] made in the United States."  *See generally Morrison v. Nat'l Australia*

21  *Bank Ltd.*, 561 U.S. 247, 273 (2010); *United States v. Vilar*, 729 F.3d 62, 70 (2d Cir. 2013);

22  *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 70 (2d Cir. 2012) (dismissing

23  complaint because the "few allegations that mention or even hint at the location of the securities

24  transactions at issue in this case" failed to "adequately allege the existence of domestic securities

25  transactions"); *United States v. Mandell*, 752 F.3d 544, 548 (2d Cir. 2014) (transaction is only

26  domestic "when the parties incur irrevocable liability to carry out the transaction within the

27  United States or when title is passed within the United States").  It does neither.

28  Instead, the government attacks *Morrison* itself, claiming that when Congress enacted the

1188414

Dodd–Frank Act in 2010, it "provid[ed] clear, affirmative indication" that the United States could return to pursuing extraterritorial misconduct. That theory has been discredited.[2]  In fact, the Dodd–Frank Act is silent on *Morrison*'s and *Vilar*'s central holding—that, whether a securities fraud case is civil or criminal, it must be premised on securities that were listed on a domestic exchange or purchased or sold within the United States. *See, e.g.*, *Vilar*, 729 F.3d at 74 (focusing on "whether the relevant conduct occurred in the territory of a foreign sovereign"). What Dodd–Frank did was confirm that federal courts have *jurisdiction* to hear securities fraud cases no matter where the alleged misconduct occurred—a proposition that was never in dispute. *See, e.g.*, *Morrison*, 561 U.S. at 254 ("The District Court here *had jurisdiction* under 15 U.S.C. § 78aa to adjudicate the question *whether* § 10(b) applies to National's conduct."); *see also SEC v. Chicago Convention Ctr., LLC*, 961 F. Supp. 2d 905, 913 (N.D. Ill. 2013) ("The plain meaning, when looked at in isolation, therefore, suggests that Section 929P(b) is a jurisdictional rather than substantive provision."). And even if the government *were* right about Dodd–Frank, *Morrison* is by no means the last word on this: a long line of cases since Dodd–Frank, including *Vilar*, have continued to hold that criminal securities fraud cases require a U.S.-based trade in the securities at issue. *See, e.g.*, *United States v. Mandell*, 752 F.3d 544, 548 (2d Cir. 2014) ("Section 10(b) and Rule 10b-5 cannot apply to 'extraterritorial criminal conduct in light of *Morrison*'"); *United States v. Martoma*, No. S1 12 CR 973 (PGG), 2013 WL 6632676, at *3 (S.D.N.Y. Dec. 17, 2013) (applying two-prong *Morrison* test after Dodd–Frank).

Even if one were to view the first scheme as an alleged "wire fraud," as the government charges, the government fails to demonstrate that "a substantial amount" of conduct "integral to the commission of the scheme" occurred in the United States. In fact, the government barely discusses this scheme at all, despite the strong evidence that the "integral" conduct occurred in England, where Autonomy made its revenue recognition decisions, maintained its books, published its press releases and financial statements, listed its securities on the London Stock

---

[2] In urging this Court to ignore Supreme Court precedent, it offers only limited "authority": (*i*) a Utah case, *SEC v. Traffic Monsoon*, 2017 WL 1166333 (D. Utah March 28, 2017), which is currently on appeal before the Tenth Circuit, and in which the District Court conceded that "there are grounds for a difference of opinion" with its conclusion; and (*ii*) uncontested "charges" brought by the SEC against Christopher Egan as part of a settlement and cooperation agreement.

1188414

1    Exchange, and, in the government's view, "increased and maintained the share price of

2    Autonomy securities." *See generally* ECF No. 113 ("Motion"), 7–8.  Indeed, when it comes to a

3    scheme to defraud "purchasers and sellers of Autonomy securities in the U.S.," the only conduct

4    that could possibly have occurred in the United States is the *purchase* of the securities (which is

5    precisely what the government would need to show to sustain a securities fraud case in the wake

6    of *Morrison*).  Neither the Superseding Indictment nor the government's opposition brief make

7    any such claim; nor do they attempt to meet the *Morrison* standards or demonstrate sufficient

8    U.S.-based conduct to support a domestic wire-fraud count.  The government's first scheme (and

9    with it, Counts 1 through 3 and 6 through 8) must be dismissed.

10
                       **2.      The extraterritorial second scheme—the alleged "fraud" on Dutch-
11                              based Bidco—cannot be saved by unrelated conduct.**

12           In its second scheme, the government alleges that Mr. Hussain misled HP and Bidco to

13    "induce" them to buy Autonomy.  *See, e.g.*, SI, ¶ 26(bb).  As set out in the indictment, the

14    government's theory is that Mr. Hussain and others "used Autonomy's false and misleading

15    financial statements … to make Autonomy more attractive to a potential purchaser," *id.* at ¶ 21;

16    that HP and Bidco "entered into an Offer Agreement with Autonomy and publicly announced an

17    offer to acquire Autonomy for approximately $11 billion," *id.* at ¶ 8; and that Mr. Hussain sold

18    his shares to HP and "made at least $7.7 million," *id.* at ¶ 12.

19           But, as Mr. Hussain notes in his motion, the government's allegations are purposefully

20    misleading.  It was Dutch-based *Bidco*, not HP, that bought Autonomy.  It was *Bidco*, not HP,

21    that transferred billions of pounds from its U.K. bank accounts to Autonomy's U.K. bank

22    accounts.  And it was *Bidco*, not HP, that purchased Mr. Hussain's shares.  Through HP's careful

23    and considered design, Bidco is an entirely separate and entirely foreign entity.

24           In its opposition, the government neither challenges these corrections nor explains its

25    earlier, misleading claims.  Instead, it proposes several work-arounds, none of which is enough to

26    resuscitate its indictment.

27           *First*, the government retreats to the edges of wire fraud jurisprudence, arguing that the

28    heart of a "wire fraud" case is not the fraud, but the wire.  Opp., 11:10–11.  Increasingly, that is

REPLY IN SUPPORT OF MOTION TO DISMISS INDICTMENT
Case No. 3:16-cr-00462-CRB

1188414

no longer how courts assess extraterritoriality.  *See, e.g.*, *Petroleos Mexicanos v. SK Eng'g &*

*Const. Co.*, 572 F. App'x 60, 61 (2d Cir. 2014) (affirming dismissal of RICO case because,

although there were "minimal contacts with the United States," the key "activities involved in the

alleged scheme … took place outside the United States"); *United States v. Hawit*, No. 15-cr-252

(PKC), 2017 WL 663542, at *5 (E.D.N.Y. Feb. 17, 2017) (courts "must conduct a more holistic

assessment of the conduct that constitutes the alleged fraud scheme, including consideration of

whether the scheme involves only incidental or minimal use of U.S. wires"); *United States v.*

*Prevezon Holdings LTD.*, 122 F. Supp. 3d 57, 72 (S.D.N.Y. 2015) (finding a wire fraud scheme

extraterritorial because, despite minimal contact with the United States, it involved "a foreign

conspiracy against a foreign victim conducted by foreign defendants participating in foreign

enterprises").

The government argues that these cases—cases finding that Congress's intent in enacting

the wire fraud statute was to regulate *fraud*, not just the *means* of perpetrating fraud—are

"contrary to *Morrison* and Ninth Circuit law."  Opp., 11:10–17 (citing no Ninth Circuit law).  The

government is wrong.  These cases are instead part of a growing trend to think more critically

about the reach of the U.S. criminal laws; to analyze fraud allegations in light of "a new

framework for determining whether a federal statute applies extraterritorially," *United States v.*

*All Assets Held at Bank Julius*, No. 04-0798 (PLF), 2017 WL 1508608, at *2 (D.D.C. Apr. 27,

2017); and to consider, in a more holistic way, whether the alleged fraud "involves only

incidental or minimal use of U.S. wires."  *Hawit*, 2017 WL 663542, at *5.  Rather than

"contradicting" *Morrison*, these new cases breathe life into *Morrison*'s guiding principle:

> For it is a rare case of prohibited extraterritorial application that lacks all contact
> with the territory of the United States.  But the presumption against extraterritorial
> application would be a craven watchdog indeed if it retreated to its kennel
> whenever some domestic activity is involved in the case.

*Morrison*, 561 U.S. at 266.[3]  If anything, it is the government that now wills this Court to

---

[3] Remarkably, the government notes that, in *Morrison*, the Supreme Court rejected the "conduct
and effects" test and the "significant and material conduct" test.  That statement is true, but not in
the way the government thinks.  By striking the conducts-and-effects test, the Supreme Court
*raised*, rather than lowered, the bar for plaintiffs and the government—it held that it was no
longer enough simply to show that foreign fraud involved some conduct in, or had some effect

7

1188414

contradict *Morrison*, asking it to buck the emerging trend against extraterritoriality and find that what matters is not where the "deception" occurred, but whether there was *any* use of U.S. wires at all.  Opp. at 11.  The government's proposed approach is outdated and meets neither the letter nor the spirit of cases like *Morrison* and *Vilar*.

*Second*, the government argues that Mr. Hussain is fair game because "[d]efendants with far fewer connections to the United States than Hussain have been properly prosecuted here for wire fraud."  Opp. at 8:21–22.  Again, it is vital to note that the government fails—or chooses not—to acknowledge a marked and growing trend away from the policing of foreign conduct.  *Morrison* was decided in 2010; *Vilar* in 2013; but the government opens its comparative analysis by citing to cases from the 1980s.  More importantly, the government's claim that a long list of other defendants had "far fewer connections" to this country is not borne out by the cases it cites:

- In *U.S. v. Kim*, the Second Circuit found application of the wire-fraud statute appropriate because "the fraud at issue here involved *an American perpetrator* and a victim headquartered in New York," and was "furthered by wire transmissions to and from New York…."  As a result, the fact that the (American) defendant implemented his scheme from Croatia was immaterial.  *United States v. Kim*, 246 F.3d 186, 189 (2d Cir. 2001).

- In *U.S. v. Trapilo*, the defendant was accused of participating in a scheme to evade Canadian taxes on liquor.  Unlike here, the defendants and the alleged misconduct were *in the United States*: the scheme was carried out from a reservation in upstate New York, the "conspiracy's hub," and the defendants were accused of "order[ing] large shipments of liquor" from *United States* suppliers using "interstate telephone calls, facsimiles, and wire transmissions."  *United States v. Trapilo*, 130 F.3d 547, 549 (2d Cir. 1997).

- In *U.S. v. Georgiou*, the Third Circuit used the *Morrison* test to analyze whether the defendant's stock trades were "domestic" in nature.  It noted that Mr. Georgiou had executed "manipulative [stock] trades … through market makers located *in the United States*"—in other words, it found that his misconduct had led to the domestic purchase and sale of securities, allegations that are nowhere to be found in this indictment.  *See United States v. Georgiou*, 777 F.3d 125, 131 (3d Cir. 2015), cert. denied, 136 S. Ct. 401 (2015).

- In *U.S. v. Kazzaz*, the defendant was charged with defrauding the United States government by paying "more than $947,500 in unlawful kickbacks" to a

on, the United States.  *Morrison*, 561 U.S. at 261 ("Rather than guess anew in each case, we apply the presumption [against extraterritoriality] in all cases, preserving a stable background against which Congress can legislate with predictable effects.").

8

1188414

California-based contractor to win "more than $23 million in U.S. funds" from the Department of Defense.  More than that, Kazzaz stipulated not just that he "used the wire facilities of the United States," *see* Opp. at 7–8, but that he mailed checks "*to Alabama*" and "us[ed] electronic communications to transmit a payment *to a bank in Alabama*."  *U.S. v. Kazzaz*, 592 F. App'x 553, 555 (9th Cir. 2014).

- In *U.S. v. Singhal*,[4] the defendant was accused of making false statements by furnishing four reports *to the SEC* in Washington, D.C.  The statements themselves were mailed from abroad, but the fraud was perpetrated on a U.S. institution using the U.S. mail system.  *U.S. v. Singhal*, 876 F. Supp. 2d 82 (D.D.C. 2012).

In sum, the government's cited cases each involve either a U.S.-based perpetrator or a U.S.-based victim.  This case, by contrast, involves neither.

*Third*, the government argues that, whatever the appropriate standard, its indictment is "sufficient" because Mr. Hussain "personally travelled to California in early 2011 on multiple occasions … to make Autonomy more attractive to a potential purchaser like HP."  Opp. at 2:2–6.  But the indictment makes no such claims.  It alleges only that Mr. Hussain "met with representatives of HP about a potential acquisition of Autonomy by HP."  SI, ¶ 21.  In any event, the government misses the point.  The alleged scheme—and indeed this entire case—is not about years-old meetings that Autonomy may have had with "potential purchasers," just as it is not about *Autonomy*'s acquisition of *other* U.S. companies in the mid-2000s.  *See, e.g.*, Opp. at 3:3–8.  It is, instead, about a deal inked in 2011 between two foreign entities using foreign funds.

The Due Process Clause puts a limit on the government's global police powers by requiring a "sufficient nexus between the defendant and the United States…."  *Sidorenko*, 102 F. Supp. 3d at 1132.  And not just any nexus—enough of a nexus that "an application of a domestic statute *to the alleged conduct* would not be arbitrary or fundamentally unfair."  *Id.*  Here, Mr. Hussain is not in the same spot as other defendants: his alleged scheme was not carried out from within the United States (as the schemes were in *Trapilo* or *Pasquantino*); he is not alleged

---

[4] In *Singhal*, the District of Columbia premised its decision on its understanding that *Morrison* should not be applied to criminal cases.  A year later, the Second Circuit took a different view in *United States v. Vilar*, and in the years since, the *Vilar* holding—that securities fraud laws "do not apply to extraterritorial conduct, regardless of whether liability is sought criminally or civilly"— has taken hold.  *See generally Vilar*, 729 F.3d at 67; *United States v. Sidorenko*, 102 F. Supp. 3d 1124, 1128, 1132 (N.D. Cal. 2015).

REPLY IN SUPPORT OF MOTION TO DISMISS INDICTMENT
Case No. 3:16-cr-00462-CRB

1188414

1    to have defrauded a U.S. entity, let alone the U.S. government (as in *Kazzaz* or *Singhal*); and the

2    government does not accuse him of trading in or manipulating U.S. shares or markets (as in

3    *Georgiou*).  Instead, the alleged scheme was carried out in England by U.K. citizens; Mr. Hussain

4    is alleged to have defrauded a Dutch special-purpose entity; and the Autonomy shares that Bidco

5    bought were traded on the London Stock Exchange.  There is no reason for Mr. Hussain to have

6    expected—based on accounting decisions made in England, according to English accounting

7    rules, generating financial results published in England, and an acquisition that occurred abroad—

8    that he would be hauled halfway across the world by overzealous U.S. authorities.

9        The government has alleged two wire-fraud schemes, both of which involve foreign

10   transactions in foreign shares of a foreign company.  Those schemes, as alleged, constitute an

11   attempt to apply the wire-fraud statutes to extraterritorial conduct, and they should be dismissed.

12   **C.    The securities fraud count should be dismissed because the indictment does not allege that Mr. Hussain acted in connection with HP securities, and the**
13   **charge is unconstitutionally vague.**

14       The government's opposition confirms that its section 1348 case against Mr. Hussain rests

15   solely on his August 18, 2011 letter to Bidco.  Opp. at 15.  Yet the government fails to cite a

16   single case in which a defendant was charged with securities fraud because of nonpublic

17   statements made in the course of a business transaction.  Worse, while the government leans

18   heavily on decisions applying section 10(b), the government neglects to mention that the Supreme

19   Court has limited liability under that statute to individuals who actually *have control over* the

20   public statements at issue, a holding that is inconsistent with the government's theory in this case.

21   *See Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011).  In addition to

22   misstating the law, the government misrepresents the indictment and the facts.  Contrary to the

23   government's opposition brief, there is no allegation or evidence that Mr. Hussain attested to the

24   accuracy of Autonomy's financial statements in the August 2011 letter to Bidco, or that HP

25   issued a press release in reliance on the letter.  In short, the government's positions are not

26   supported by the law or the allegations in the indictment, and Count 16 should be dismissed.

27       **1.    The indictment does not allege a violation of section 1348.**

28       The only allegations the government points to in support of Count 16 are that Mr. Hussain

1188414

1    warranted to Bidco "that all information provided by him for inclusion in any document issued in

2    connection with the offer was true and accurate in all respects and not misleading in any respect,"

3    and that *HP* issued a press release that contained certain statements about Autonomy's finances.

4    SI ¶¶ 9, 26(bb).  These allegations do not add up to a connection between Mr. Hussain and HP

5    securities.  Mr. Hussain *is not alleged* to have made or to have caused anyone else to have made

6    any misleading public statements about HP: the indictment *does not* allege that Mr. Hussain made

7    any misrepresentation in a press release, that Mr. Hussain drafted any portion of any press

8    release, that Mr. Hussain had any control over HP's press release, that Mr. Hussain directed

9    anyone at HP to include any information in the press release, or even that Mr. Hussain provided

10   the information that HP decided to include in its press release.

11          The government tries to gloss over the limits of its allegations by incorrectly claiming that

12   Mr. Hussain "attest[ed] to the accuracy of Autonomy's financial statements" and that HP issued a

13   press release "[b]ased in part on Hussain's warranty."  Opp. at 5:2–5; 15:4–6.[5]  The indictment

14   contains no such allegations, and the defense is aware of no evidence in the government's

15   voluminous case file that could support these unfounded assertions.  To the contrary, Mr. Hussain

16   signed the August 18, 2011 letter in his capacity as an Autonomy shareholder, not as an officer,

17   and the letter concerns Mr. Hussain's promise to sell his own shares to HP.  Only directors who

18   held Autonomy shares signed the letters.  Further, to the extent this warranty provision reaches

19   anything more than information Mr. Hussain provided about his shares, which is by no means

20   certain, it would reach only information that he personally provided to HP, not any information

21   that HP might have received during the acquisition.

22          Unsurprisingly, the government does not cite any section 1348 case in support of its novel

23   claim that a defendant acts "in connection with" securities simply by making representations to

24   the management of an issuer company.  Instead, the government asserts that section 10(b) is

25   "analogous" to section 1348 and cites a number of cases involving that law.  But the government

26   neglects to mention a Supreme Court decision on section 10(b) that squarely rejects the

27   _____

28   [5] Any contention that HP relied on the warranty section of Mr. Hussain's letter is belied by HP's
     decision not to assert a breach of warranty claim in its pending civil suit against Mr. Hussain.

1188414

1   government's theory.  In *Janus*, the Supreme Court held that a mutual fund investment adviser

2   cannot be held liable under Rule 10b-5 for false statements included in its client mutual funds'

3   prospectuses because the advisor "did not make the statements in the prospectuses." *Janus*, 564

4   U.S. at 137–38.  The Supreme Court held that "[f]or purposes of Rule 10b-5, the maker of a

5   statement is the person or entity with *ultimate authority over the statement*, including its content

6   and whether and how to communicate it." *Id.* at 142 (emphasis added).  "Without control, a

7   person or entity can merely suggest what to say, not 'make' a statement in its own right." *Id.*

8   After *Janus*, even "defendants who requested, influenced, helped create, or supplied information

9   for the relevant false statements cannot be liable under 10b-5." *Oaktree Principal Fund V, LP v.*

10  *Warburg Pincus LLC*, No. CV 15-8574 PSG (MRWx), 2017 WL 3187688, at *6 (C.D. Cal. Jan.

11  17, 2017).  The government does not, and could not, allege that Mr. Hussain had the ultimate

12  authority over HP's August 18, 2011 press release, or over any other announcements HP made

13  regarding the acquisition, and thus the government's theory fails to satisfy the requirements of

14  "analogous" section 10(b).

15        The authority cited in the government's opposition brief is either irrelevant or no longer

16  good law in light of *Janus*.  First, the government points to inapposite cases holding that the

17  making of a misrepresentation in a press release may constitute conduct that is "in connection

18  with" securities.  Opp. at 13–14.  But in almost every case the government cites, the defendants

19  themselves issued the public statements that contained the alleged misrepresentations.  *See SEC v.*

20  *Rana Research, Inc.*, 8 F.3d 1358, 1361 (9th Cir. 1993) (defendants put out the press release at

21  issue); *In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953, 955–56 (2d Cir. 1993) (director

22  and officer defendants allegedly disseminated false or misleading documents or statements); *SEC*

23  *v. Wolfson*, 539 F.3d 1249, 1251 (10th Cir. 2008) (defendant "drafted the relevant filings on the

24  company's behalf and otherwise played a significant role within the company.").  Second, the

25  government cites two decisions holding that auditors may incur section 10(b) liability for

26  producing fraudulent audit reports intended for inclusion in public filings.  Opp. at 14 (citing

27  *McGann v. Ernst & Young*, 102 F.3d 390, 397 (9th Cir. 1996); *Semerenko v. Cendant Corp.*, 223

28  F.3d 165, 177 (3d Cir. 2000)).  But to the extent these cases hold that a third party who does not

1188414

1    have authority over a public statement may be liable for misrepresentations in those statements,

2    the decisions do not survive *Janus*.[6]

3         At most, Count 16 alleges that Mr. Hussain attempted to defraud HP.[7]   However,

4    "Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all

5    fraud." *Marine Bank v. Weaver,* 455 U.S. 551, 556 (1982); *see also SEC v. Zandford,* 535 U.S.

6    813, 820 (2002) (the law "must not be construed so broadly as to convert every common-law

7    fraud that happens to involve securities into a violation of § 10(b).").   The government's failure to

8    marshal any securities fraud cases premised on alleged nonpublic misrepresentations reveals

9    Count 16 for what it is: an unprecedented overreach designed to circumvent the territorial

10   restrictions on the United States' authority.   The government's theory of liability under section

11   1348 fails for lack of a nexus between Mr. Hussain and HP securities, and Count 16 should be

12   dismissed.[8]

13              **2.        Section 1348 as applied to Mr. Hussain is unconstitutionally vague.**

14        The government claims that Count 16 is not vague because "Hussain's conduct—causing

15   a false and misleading press release to be disseminated to investors to guarantee a multi-million-

16   dollar pay-day—fits well within established case law on the 'in connection with' element."   Opp.

17   at 15.   But this characterization of Mr. Hussain's conduct is untethered to the indictment and the

18   evidence.   If Mr. Hussain actually caused false statements to be made to the securities markets so

19   that he could get paid, perhaps he might reasonably expect to be haled into court to answer to

20

21   [6] Moreover, even if these cases were good law, they are unavailing because Mr. Hussain was in
     no way similarly situated to an HP auditor.  Auditors are engaged for the purpose of reviewing
22   the company's financial information and preparing opinions for inclusion in communications to
     the market. *See, e.g.*, *McGann*, 102 F.3d at 397 (E&Y produced audit report to be included in
23   company's Form 10-K).  By contrast, the indictment lacks any allegation that Mr. Hussain had
     any responsibility for the preparation of the August 18, 2011 press release that HP disseminated.

24   [7] To the extent that allegedly defrauding HP could be a crime by virtue of using U.S. wires, such
     a charge would be duplicative of numerous other counts in the indictment. *But see supra* 6–10.

25   [8] In the alternative, the government retreats to the argument that Count 16 is sufficient just
26   because it tracks the language of the statute.  Opp. at 14.  But the indictment must "contain[] the
     elements of the charged crime in adequate detail to inform the defendant of the charge," "enable
27   him to plead double jeopardy," and ensure that the defendant is "being prosecuted on the basis of
     the facts presented to the grand jury" *United States v. Buckley*, 689 F.2d 893, 896 (9th Cir. 1982).
28   Here, the indictment does not inform Mr. Hussain of how he is alleged to have acted in
     connection with HP securities, and is therefore insufficient.

1188414

securities fraud charges.  But the indictment says no such thing, instead alleging *only* that Mr. Hussain warranted the accuracy of information he provided to HP.

In *United States v. Melvin*, the Court denied a vagueness challenge to section 1348 on the grounds that the alleged scheme to defraud, which involved insider trading, "was clearly connected with the purchase and sale of securities." *United States v. Melvin*, 143 F. Supp. 3d 1354, 1374 (N.D. Ga. 2015).  The Court observed that the defendant had "not offered any examples of a scheme that might be so tangentially related to securities that a person employing it would not be aware that his or her conduct fell within the statute." *Id.*  An example of just such a scheme is now before this Court.  A criminal statute must "provide a person of ordinary intelligence fair notice of what is prohibited." *United States v. Williams*, 553 U.S. 285, 304 (2008).  Section 1348 does not provide fair notice that signing a letter warranting the accuracy of information provided to the management of a public company (much less to an offshore entity) may be securities fraud.  The government's interpretation of the "in connection with" element is so broad that that the application of section 1348 to Mr. Hussain is unconstitutional.

## III.    CONCLUSION

Mr. Hussain respectfully asks that the Court dismiss the indictment in this case.


Dated:  September 18, 2017                                      KEKER, VAN NEST & PETERS LLP


                                                          By:   */s/ John W. Keker*
                                                                JOHN W. KEKER
                                                                JAN NIELSEN LITTLE
                                                                BROOK DOOLEY
                                                                KATE E. LAZARUS
                                                                NICHOLAS D. MARAIS
                                                                IAN KANIG

                                                                Attorneys for Defendant
                                                                SUSHOVAN HUSSAIN

14

1188414