**Volume 6**

**Pages 745 - 966**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
    VS.                         )       **NO. CR 16-00462 CRB**
                                )
SUSHOVAN TAREQUE HUSSAIN,       )
            Defendant.          )
_____)
                            San Francisco, California
                            Tuesday, March 6, 2018

                    <u>**TRANSCRIPT OF PROCEEDINGS**</u>

**<u>APPEARANCES:</u>**
For Plaintiff:
                        ALEX G. TSE
                        Acting United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                BY:  **ROBERT S. LEACH**
                     **ADAM A. REEVES**
                     **WILLIAM FRENTZEN**
                     **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:
                        KEKER & VAN NEST
                        633 Battery Street
                        San Francisco  CA  94111
                BY:  **JOHN W. KEKER**
                     **JAN NIELSEN LITTLE**
                     **BROOK DOOLEY**
                     **KATE LAZARUS**
                     **NIC MARAIS**
                     **CODY GRAY**
                     **ATTORNEYS AT LAW**


Reported By:  Pamela Batalo, CSR No. 3593, FCRR
              Official Reporters

## I N D E X

Tuesday, March 6, 2018 - Volume 6

**GOVERNMENT'S WITNESSES**                                    **PAGE**   **VOL.**

**BAIOCCO, JOHN (RECALLED)**
(PREVIOUSLY SWORN)                                              750      6
Cross-Examination resumed by Mr. Keker                         750      6
Redirect Examination by Mr. Frentzen                          785      6
Recross-Examination by Mr. Keker                              801      6
Further Redirect Examination by Mr. Frentzen                  802      6

**GEALL, MARK ALEXANDER LOUIE**
(SWORN)                                                        809      6
Direct Examination by Mr. Leach                               810      6
Cross-Examination by Ms. Little                               924      6

## E X H I B I T S

**TRIAL EXHIBITS**                               **IDEN**   **EVID**   **VOL.**

3                                                            850      6

57                                                           827      6

165                                                          919      6

199                                                          847      6

247                                                          852      6

270                                                          960      6

287                                                          878      6

289                                                          855      6

428                                                          885      6

513                                                          791      6

588                                                          894      6

619                                                          930      6

647                                                          940      6

## <u>I N D E X</u>

### <u>E X H I B I T S</u>

| <u>TRIAL EXHIBITS</u> | <u>IDEN</u> | <u>EVID</u> | <u>VOL.</u> |
|---|---|---|---|
| 661 | | 919 | 6 |
| 994 | | 920 | 6 |
| 996 | | 913 | 6 |
| 1128 | | 915 | 6 |
| 1154 | | 916 | 6 |
| 1186 | | 920 | 6 |
| 1531 | | 920 | 6 |
| 1624 | | 760 | 6 |
| 1788 | | 921 | 6 |
| 2023 | | 921 | 6 |
| 2523 | | 797 | 6 |
| 2762 | | 834 | 6 |
| 2763 | | 839 | 6 |
| 2765 | | 845 | 6 |
| 2767 | | 871 | 6 |
| 2769 | | 875 | 6 |
| 2771 | | 891 | 6 |
| 2772 | | 895 | 6 |
| 2773 | | 897 | 6 |
| 2774 | | 901 | 6 |
| 2776 | | 908 | 6 |

<u>**I N D E X**</u>

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 5317 | | 755 | 6 |
| 5325 | | 763 | 6 |
| 5394 | | 773 | 6 |
| 5400 | | 783 | 6 |
| 5402 | | 782 | 6 |
| 5406 | | 769 | 6 |
| 5407 | | 770 | 6 |
| 5440 | | 782 | 6 |
| 5466 | | 756 | 6 |
| 5469 | | 753 | 6 |
| 5506 | | 752 | 6 |
| 5802 | | 948 | 6 |
| 5803 | | 963 | 6 |
| 5828 | | 935 | 6 |
| 5829 | | 935 | 6 |
| 5830 | | 935 | 6 |
| 5831 | | 933 | 6 |
| 5832 | | 927 | 6 |

| | |
|---|---|
| 1 | **Tuesday - March 6, 2018**                                    **9:00 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | (Proceedings were heard out of presence of the jury:) |
| 5 | **THE COURT:**  Let the record reflect all parties are |
| 6 | present.  The jury is not present.  It turns out that one of |
| 7 | the jurors, the one with the family issue with her son, did not |
| 8 | return because her son has pneumonia; however, the other juror |
| 9 | did return. |
| 10 | So I'm prepared to proceed with using one of our |
| 11 | alternates.  Any comment? |
| 12 | **MR. REEVES:**  That sounds fine, Your Honor. |
| 13 | Did you get any further information about Ms. Botto and |
| 14 | her pregnancy and her -- |
| 15 | **THE COURT:**  I mean, she's here.  So I don't inquire if |
| 16 | they show up.  It's when they don't show up that I actually try |
| 17 | to ask questions. |
| 18 | **MR. REEVES:**  All right.  Well, we're ready. |
| 19 | **THE COURT:**  The only other thing was that she can |
| 20 | stand up or do whatever she wants to do. |
| 21 | **MR. REEVES:**  Okay.  Thank you. |
| 22 | **THE COURT:**  So we bring in the jury? |
| 23 | **THE CLERK:**  Yes. |
| 24 | (Proceedings were heard in the presence of the jury:) |
| 25 | **THE COURT:**  Let the record reflect that all jurors are |

1    present.

2         Thank you very much, ladies and gentlemen.  Thank you so

3    much for being prompt.

4         And we are beginning or resuming, I think that's the right

5    word.  We're resuming.

6         Mr. Keker, you may proceed.

7         And you are under oath.

8                        **JOHN BAIOCCO**,

9    Called as a witness for the GOVERNMENT, having been previously

10    duly sworn, testified further as follows:

11                 **CROSS-EXAMINATION**    (resumed)

12    BY MR. KEKER:

13    **Q.**    Thank you, Your Honor.

14         Good morning, ladies and gentlemen of the jury.

15         And good morning, Mr. Baiocco?

16    **A.**    Good morning.

17    **Q.**    Mr. Baiocco, at the end of the direct examination that you

18    had with the prosecutor, you were asked the question:

19              "Prior to December of 2011, did you do any EDD,

20         eDiscovery work for any customer?"  And your answer was

21         "no."

22         Do you recall that testimony?

23    **A.**    Yes.

24    **Q.**    Immediately after signing the license agreement with

25    Autonomy, did you start trying to bring in eDiscovery

 1  customers?

 2  **A.**   I would say pretty soon thereafter, yes.

 3  **Q.**   Did you try to bring in a company, as an eDiscovery

 4  customer, called Iovate?

 5  **A.**   I'm not sure about that.

 6  **Q.**   Would you look at 5506, please, sir.

 7  **A.**   Sure.   What book?

 8  **Q.**   It's in the second binder.

 9  **A.**   5506?

10  **Q.**   5506.   Look at the bottom email from Mr. Leonard, that's

11  to -- copied to you and Mr. Williams.

12  **A.**   Correct.

13  **Q.**   And the subject is Iovate.

14  **A.**   Yep.

15  **Q.**   And the date --

16          **THE COURT:**  Any objection?

17          **MR. FRENTZEN:**  No objection --

18          **THE COURT:**  Admitted.

19          **MR. FRENTZEN:**  Sorry, Your Honor.  If I could just --

20  there's -- I have no objection to the bottom portion.  There's

21  portions of this that do not relate or did not appear to go to

22  this witness.

23          **THE COURT:**  Okay.

24          **MR. FRENTZEN:**  I may not have an objection.  I just

25  haven't looked at the top part.

BAIOCCO - CROSS / KEKER

1          THE COURT:  Well, why don't you show the part that --

2          MR. KEKER:  We'll start with the bottom, Your Honor.

3          THE COURT:  Yeah, I mean, it will come in subject to a

4    motion to strike or redact.

5          MR. FRENTZEN:  Thank you, Your Honor.

6          (Trial Exhibit 5506 received in evidence)

7    BY MR. KEKER:

8    Q.   Friday, April 3, 2009, is three days after you signed this

9    eDiscovery agreement; right?

10   A.   Yes.

11   Q.   And Mr. Leonard is saying to Lepore with a copy to you,

12   "Thanks for quick call back T.J.  Here is the breakdown of the

13   Iovate deal.  It's a pending litigation.  Capax Global has

14   signed an NDA."  That stands for what?

15   A.   Nondisclosure agreement.

16   Q.   Right.  And they have -- it's a Canadian lawsuit with U.S.

17   attorneys down at the bottom?

18   A.   Right.

19   Q.   Does that refresh your recollection that you were working

20   on that deal?

21   A.   I mean, I'm not denying it.  I don't remember it, but I'm

22   not denying it by any stretch.

23   Q.   Look at 5469, please, sir.  That's also in that second

24   binder.

25   A.   5469?

BAIOCCO - CROSS / KEKER

1  Q.   Five four six nine.

2  A.   Okay.

3  Q.   Is that a series of emails that you're copied on and --

4  yeah.  You're copied on?

5  A.   Yep.

6          MR. KEKER:  I move it in.

7          MR. FRENTZEN:  No objection.

8          THE COURT:  Admitted.

9       (Trial Exhibit 5469 received in evidence)

10          MR. KEKER:  Could we see the bottom of 5569?

11  Q.   This is Leonard writing to Sass.  Sass was at Autonomy;

12  right?

13  A.   Correct.

14  Q.   And it's copied to you and to Mr. Williams.  And

15  Mr. Williams is the person that you hired to run your

16  eDiscovery business; right?

17  A.   Yes.

18  Q.   And the Iovate deal is a one-off pure services deal to do

19  search for litigation.  It's eDiscovery; right?

20  A.   Yes.  Although it says "pure services," so I'm not quite

21  sure what that means in that email, but when they're talking

22  about terabytes, yes.

23  Q.   And look at the one above that for Mr. Sass to

24  Mr. Leonard.  He says, "Thanks.  Spoke to Mike Sullivan."

25  A.   Right.

BAIOCCO - CROSS / KEKER

1    **Q.**    "Spoke to Mike Sullivan.  He is working with Steven on

2    this.  Apparently a few moving parts," blah, blah, blah.

3        But this is a deal that Mike Sullivan was involved in,

4    too; right?

5    **A.**    If Mr. Sass says so on there, yes.

6    **Q.**    Okay.  Well, look at 5317, please.  That's in the first

7    volume.

8            **THE COURT:**  5569 in evidence.

9            **MR. KEKER:**  I thought I moved it in, but if I

10   didn't...

11           **THE COURT:**  Okay.  I'm sure.  I'm just --

12           **THE CLERK:**  Is it 5469?

13           **MR. KEKER:**  It was 5469, Your Honor.

14           **THE COURT:**  Okay.  So I just didn't have the right

15   number.  Okay.  What is it.  It's 54 --

16           **MR. KEKER:**  Five four six nine.

17           **THE COURT:**  Thank you.  Okay.  So that's admitted.

18   **BY MR. KEKER:**

19   **Q.**    And now we're looking at 5317.

20       Is that a -- are those emails between Mike Sullivan and

21   Steve Williams?

22   **A.**    Am I in the right one?  What is it?  I'm seeing Stouffer

23   and me.

24           **MR. FRENTZEN:**  I don't see it.

25           **MR. KEKER:**  I'm looking at the wrong one.

1          5317.  I'm sorry.  I was looking at the wrong one.

2     **Q.**    Okay.  This is from Stouffer Egan to you dated April 6,

3     2009, one week after you signed the eDiscovery.

4          I move it in, Your Honor.

5               **THE COURT:**  Admitted.

6               **MR. FRENTZEN:**  No objection.

7               **THE COURT:**  Admitted.

8          (Trial Exhibit 5317 received in evidence)

9     **BY MR. KEKER:**

10    **Q.**    From Stouffer Egan, April 6, to you:

11              "John, Sushovan, Mike Sullivan and I identified 250K

12         of business we would like Capax to handle for us last

13         week.  That would be the first job.  Mike Sullivan should

14         be in touch tomorrow."

15         What business was that about?

16    **A.**    I have no idea.  That makes no sense whatsoever to me.

17    **Q.**    Did you get the email?

18    **A.**    Yeah.

19    **Q.**    And finally, 5466.  Finally on this subject, I should say.

20    **A.**    Is that in the next book again?

21    **Q.**    Yes.

22    **A.**    5466?

23    **Q.**    Yes.  Is that an email that you received from Mr. Sass

24    introducing you to Mike Sullivan?

25    **A.**    Yes, it is.

1          **THE COURT:**  Admitted.

2          (Trial Exhibit 5466 received in evidence).

3          **MR. KEKER:**  All right.  Could we put that up, the

4    bottom email first?

5    **Q.**   Now it's April 7th.

6          "John/Mike --" so it's to you and Mike Sullivan who

7          the jury saw, the first witness -- "I wanted to make a

8          quick intro as Mike will be making a call to John to touch

9          base and cover some of the business opportunities coming

10         down the pike for Capax."

11         Can we see the one above?

12         This is about the -- this one is from Mike Sullivan

13         back to Sass.  "He just called me.  We're all set."

14         They're talking about the Iovate deal?

15   **A.**   Correct.

16   **Q.**   That was an eDiscovery deal?

17   **A.**   Yes.

18   **Q.**   You're talking to Mike Sullivan about an Iovate -- about

19   an eDiscovery deal within a week of signing that contract?

20   **A.**   Yeah, absolutely.

21   **Q.**   You told the jury that you didn't have any eDiscovery work

22   until December 2011?

23   **A.**   No.  I said we weren't capable of doing any eDiscovery

24   work until that point.  This Autonomy was going to handle this

25   for us on their own, and it was going to be white labeled, so

1    they were going to be behind the scenes on Capax.  That's why

2    we were working with Mike.  They said if we had customers

3    before we were ready, that they would do the eDiscovery, and we

4    could put it on our paper.

5    Q.    The question that you were asked by the prosecutor is.

6              "Prior to December 2011, did you do any EDD,

7          eDiscovery work for any customer?"

8              And your answer was "no."

9    A.    And I don't believe we did that work, but we certainly

10   didn't do it ourselves, and if it did happen, Autonomy did it

11   on their EDD platform.

12        Are you trying to say I was ready six days after I -- I

13   didn't even have the software at that point.

14   Q.    Are you answering a question or are you just talking?

15   A.    Well --

16            MR. FRENTZEN:  I'm going to object to that.

17            THE COURT:  He is responding to your -- wait a minute.

18   He is responding to your question.  Okay.

19   BY MR. KEKER:

20   Q.    You began training Capax employees in the Boston -- in the

21   Autonomy Boston eDiscovery facility, didn't you?

22   A.    Yes.

23   Q.    And you sent employees to Boston as early as April 7th?

24   A.    No argument with that.

25   Q.    And you sent more of them in June.  And you sent more

**BAIOCCO - CROSS / KEKER**

1    training in the fall.  You kept sending these employees?

2    **A.**    Yes.

3    **Q.**    And then more in 2011.

4    **A.**    Yes.

5    **Q.**    And Capax was paid by Autonomy for training those

6    employees; right?

7    **A.**    I don't -- what do you mean "paid?"  They didn't pay us

8    for training our people.

9    **Q.**    Are you sure?

10   **A.**    No.  But I -- what --

11   **Q.**    Mr. Sullivan testified that Autonomy paid for the

12   training.  You would disagree with that; is that right?

13           **MR. FRENTZEN:**  I'm going to object that -- foundation,

14   argument, facts not in evidence.

15           **THE COURT:**  This is cross-examination.

16       Go ahead.

17       Do you understand the question?

18           **THE WITNESS:**  I guess I don't understand the question.

19   We did not invoice them for training our people or vice versa.

20   **BY MR. KEKER:**

21   **Q.**    Right.  Right.

22   **A.**    Right.

23   **Q.**    But you were being paid by them, weren't you?

24   **A.**    How?  You mean through the --

25   **Q.**    With money.

1   **A.**   I understand, but I -- in direct correlation to that, I

2   don't --

3   **Q.**   Look at 1624, please, sir.

4   **A.**   Where's that?

5   **Q.**   That's in the first binder.

6   **A.**   Sorry.

7   **Q.**   That's all right.

8   **A.**   I've got three books up here.

9   **Q.**   There's too many exhibits, no question.

10          **THE COURT:**   Okay.   Which one?   What are we looking at?

11          **MR. KEKER:**   1624, Your Honor.

12          **THE COURT:**   Okay.   Sixteen --

13          **MR. KEKER:**   One six -- one six.

14          **THE COURT:**   One six two four, an email from Allen

15  Gurney?

16          **THE WITNESS:**   I don't see that.

17          **THE COURT:**   Well, wait, wait, wait, wait, wait.   Let's

18  all make sure we're on the same --

19          **MR. KEKER:**   I beg your pardon.   This is in the

20  Government's binder.

21          **THE COURT:**   Okay.

22          **MR. KEKER:**   If I can -- could I walk up there and

23  share this with --

24          **THE COURT:**   Well, we'll just put it up.   I mean, it's

25  not in evidence yet.   I don't mind you giving him the book

BAIOCCO - CROSS / KEKER

```
 1   unless you need it yourself, so...
 2            MR. KEKER:  One six two four is an email from --
 3            MR. FRENTZEN:  No objection.
 4            THE COURT:  Okay.  Let it be --
 5            MR. KEKER:  Good.
 6            THE COURT:  I'm out.  Everybody has a lot of energy
 7   this morning.  I'm trying to catch up to it, which may be an
 8   impossible task.
 9       Anyway, 1624 is admitted, and then the jury can see it.
10        (Trial Exhibit 1624 received in evidence).
11   BY MR. KEKER:
12   Q.  The -- in 2000 -- in March of 2011, Mr. Gurney is writing
13   to Mr. Williams and copying you.
14       Who is Mr. Gurney?
15   A.  He was an employee of Capax that was an eDiscovery subject
16   matter expert for us.
17   Q.  And Williams is the head of eDiscovery?
18   A.  Yes.
19   Q.  And it's about staffing for UK data processing.
20   A.  Yes.
21   Q.  And it says, "Steve --" and I won't repeat it all, but:
22           "Steven, based on Fernando's comments below, my
23       expectation is that once we are up and running (steady
24       state post ramp-up), we'll need the following resource
25       types."
```

**BAIOCCO - CROSS / KEKER**

1      This was referring to getting ready for the British

2  Petroleum eDiscovery work in the United Kingdom; right?

3  **A.**   Yes.

4  **Q.**   All right.  And did you get ready and do things for that?

5  **A.**   We did.

6  **Q.**   Did Autonomy hire Capax -- we can take that down.

7      Did Autonomy hire Capax to do eDiscovery work for the

8  Federal Reserve Board?

9  **A.**   No.  That was a professional services engagement.

10 **Q.**   Well, let's look at it.  5325.

11     You did work for the Federal Reserve Board; is that right?

12 **A.**   Yes, we did.

13 **Q.**   Capax did?

14 **A.**   Yes.  A lot of work.

15 **Q.**   And it was Federal Reserve --

16 **A.**   Five --

17 **Q.**   -- had bought a lot of eDiscovery software from Autonomy,

18 hadn't they?

19 **A.**   I believe that's what it was, yes.

20 **Q.**   Look at 5325.

21         **THE COURT:**  Any objection?

22         **MR. FRENTZEN:**  Your Honor, I don't think this went to

23 the witness.

24         **THE COURT:**  This is an email from Salazar to Kanter.

25         **MR. KEKER:**  Yes, Your Honor.

1          **THE COURT:**  Okay.  November 16th, 2009.

2          **MR. KEKER:**  November 16, 2009.

3          **THE COURT:**  Any objection?

4          **MR. FRENTZEN:**  Your Honor, I'm sorry, this just didn't

5     go to the witness.  I don't know if the witness knows what this

6     is.

7     **BY MR. KEKER:**

8     **Q.**  Do you know what consult -- I'll lay a foundation,

9     Your Honor.

10         Do you know what consultant work orders are?

11    **A.**  I do.

12    **Q.**  And what are they?

13    **A.**  They're -- they're a work order to perform services at an

14    hourly rate or a fixed price bid based on a deliverable.

15    **Q.**  And were they called CTOs sometimes?

16    **A.**  They were.

17    **Q.**  All right.  The CTO was something that would be issued by

18    Autonomy to Capax to get some work done?

19    **A.**  Correct.

20    **Q.**  All right.  And were CTOs issued to Capax to get

21    eDiscovery work done?

22    **A.**  I mean, they were issued to do professional services --

23    right? -- so they weren't our engagements when we got a CTO

24    from Autonomy.  We would put people on the job.  And I believe

25    this was billable by the hour, this particular thing, I'm

1    not --

2    **Q.**    But to do eDiscovery work --

3    **A.**    I'm not sure of this particular -- I mean, yes, in some

4    cases to help them with eDiscovery and in some cases it was to

5    implement --

6    **Q.**    And then Capax and Autonomy would keep these in their

7    files, because they'd be -- these work orders were basically

8    contracts between the two?

9    **A.**    Yes.

10    **Q.**    And both sides would keep them in their files?

11    **A.**    Correct.

12    **Q.**    In their regular course of business; right?

13    **A.**    Yes.

14          **MR. KEKER:**    I move this in as a business record,

15    Your Honor.

16          **MR. FRENTZEN:**    Your Honor, it didn't come from Capax.

17          **THE COURT:**    I'm going to admit it.

18          (Trial Exhibit 5325 received in evidence)

19          **MR. FRENTZEN:**    That's fine.

20    **BY MR. KEKER:**

21    **Q.**    Could we look at -- this is the CTO for the Federal

22    Reserve -- let's look at the first page, Jeff, the email.

23          It says, "Capax/Federal Reserve Board CTO attached for

24    your signature."

25          And let's turn over and see what it's about, the

1    attachment.  Under project description:

2          "Verity has been engaged to perform certain tasks by

3    the Federal Reserve Board having a place of business in

4    Washington, D.C."

5    And then in the next paragraph, engagement background:

6          "Customer recently licensed Autonomy's IDOL, Ungate

7    legal hold, ALH, Ungate investigator and ECA, Merido, EDRM

8    and Introspect software to automate eDiscovery processes

9    such as legal hold administration, collection and

10   preservation of data analysis, and review of data," and so

11   on.

12   You were being hired to help with this eDiscovery project

13   at the Federal Reserve; right?

14          MR. FRENTZEN:  Objection.  Vague as to eDiscovery

15   project.  This is services, not eDiscovery work.

16   BY MR. KEKER:

17   Q.   Is this -- what is eDiscovery?

18   A.   Electronic data discovery.

19   Q.   And does it -- have you testified already that it involves

20   a couple of things.  It involves software, hardware -- three

21   things:  Software, hardware, and people.

22   A.   Yes.

23   Q.   Right.  And that's what -- and that's what the

24   eDiscovery -- between the software, the hardware and the

25   people, you get data stored, you get data indexed, you pull

1    data out, you put legal holds on it, you evaluate the case.

2    That's eDiscovery; right?

3    **A.**    Yes.

4    **Q.**    And this is not eDiscovery?

5    **A.**    I'm just -- it was eDiscovery.  It wasn't our platform.

6    We were purely professional services.  But, yes, that is

7    eDiscovery.

8    **Q.**    Okay.  Did -- did Mr. Williams sign most of these CTOs?

9    **A.**    I'm guessing he did, yes.

10    **Q.**    Let me just see if you remember some.  I can show you.

11    But do you remember working on eDiscovery for McAfee?

12    **A.**    I remember we did professional services for McAfee.

13    Absolutely.

14    **Q.**    For eDiscovery work for McAfee?

15    **A.**    Oh, I mean, pretty much all the work we did with Autonomy

16    was wrapped around that, yes.

17    **Q.**    Okay.  And do you remember working -- doing eDiscovery

18    work for McKesson, the big drug distributor?

19            **MR. FRENTZEN:**  I'm going to object again, vague.

20            **THE WITNESS:**  We did professional -- oh, sorry.

21    BY MR. KEKER:

22    **Q.**    On eDiscovery?

23    **A.**    Yes.

24            **THE COURT:**  Okay.  Wait.  I think the objection goes

25    to the time period, when -- of what point.

1          **MR. KEKER:**  Okay.  Then look at 5379.

2    **Q.**   That's in the first binder.

3    **A.**   I got it.

4    **Q.**   There's a lot of pages there.  Would you go to page 18?

5    **A.**   Okay.

6    **Q.**   And my question is did you do eDiscovery work for

7    McKesson?

8    **A.**   We did subcontract work for McKesson.

9    **Q.**   But look over at page 30.  Did Mr. Williams sign the CTO

10   dated January 27, 2010?

11   **A.**   Yes, he did.

12   **Q.**   And was that for eDiscovery work for McKesson?

13   **A.**   It was for professional services for eDiscovery work for

14   McKesson, yes.

15   **Q.**   Okay.  And we can go back to McAfee.

16        If you go back to page 7 and 8 of that same exhibit, we'll

17   get the date on McAfee.

18        **THE COURT:**  Before you do that, I'm trying to get a

19   clarification here, and maybe -- because maybe it will move

20   things along a bit.

21        You seem to be drawing a distinction between professional

22   services for electronic discovery and electronic discovery.

23        Is there some distinction in your mind between the two?

24        **THE WITNESS:**  Well, in this instance, I think the

25   distinction is were we -- was our platform up and ready and

BAIOCCO - CROSS / KEKER

1    were we working --

2            THE COURT:  I'm sorry.  You have to speak up.

3            THE WITNESS:  Were we working on our platform, and the

4    answer was we were not.  We were subcontracted to do the work

5    at a customer on Autonomy's own software; right.  It wasn't the

6    Capax-owned software.

7            THE COURT:  So that's the distinction -- the

8    distinction you draw, in response to many questions asked by

9    defense counsel today about *were you doing work on eDiscovery*,

10   the distinction in your mind was if you didn't have a platform

11   up and running, the answer would be no, but you did certain

12   things in connection with eDiscovery prior to the time that the

13   platform was, I don't know, built, constructed, whatever they

14   do.  Is that your distinction?

15           THE WITNESS:  Yes.

16           THE COURT:  And I'm not trying to put words in your

17   mouth.  I'm just trying to understand it so we don't go for

18   another hour or some period of time --

19           THE WITNESS:  Yeah.

20           THE COURT:  -- arguing or going back and forth as to

21   what is meant by whether you did eDiscovery or not, work.  Is

22   that the distinction?

23           THE WITNESS:  Yes, it is.

24           THE COURT:  Okay.  Then go ahead, Mr. Keker.

25           MR. KEKER:  Let me run through a list.

BAIOCCO - CROSS / KEKER

1    **Q.**    Did you do eDiscovery work for Freddie Mac, the home

2    mortgage loan company?

3    **A.**    In the same context as McAfee and FRB; correct.

4    **Q.**    Did you do it for Pfizer, the big pharmaceutical company?

5    **A.**    I think so.

6    **Q.**    Did you do it for Hawaii Pacific Health?

7    **A.**    Yes.

8    **Q.**    Did you do it for a Chiquita Banana?

9    **A.**    Yes.

10    **Q.**    Did you do it for Lincoln Financial?

11    **A.**    Yes.

12    **Q.**    H&R Block?

13    **A.**    Yes.

14    **Q.**    Union Pacific?

15    **A.**    Yes.

16    **Q.**    Harris Ranch?

17    **A.**    I don't remember, but --

18    **Q.**    It's a great steakhouse down I-5.

19         Did you do it for Philip Morris?

20    **A.**    Yes.

21    **Q.**    Did you do it for Office Depot?

22    **A.**    Yes.

23    **Q.**    And by September of 2010, you were complaining about all

24    the uncompensated hours that you were doing working on Autonomy

25    projects and not getting paid; right?

BAIOCCO - CROSS / KEKER

1    **A.**    Yes, because the hours ran out, and we were working beyond

2    those hours; correct.

3    **Q.**    Look at 5406, please, sir.  This is an email that you

4    wrote to Stouffer Egan on September 21, 2010.

5          I would move it in, Your Honor.

6             **MR. FRENTZEN:**  No objection.

7             **THE COURT:**  Admitted.

8          (Trial Exhibit 5406 received in evidence).

9    **BY MR. KEKER:**

10   **Q.**    And here's -- you're saying:

11          "Hey, Stouffer, here's that list I was referring to.

12       This is so conservative it's not funny.  Have you thought

13       about how we can work some funds through to help us?  Let

14       me know."

15       And then below from Steve Williams with a copy to you,

16   Mr. Williams says:

17          "In speaking with John, here is a list of approximate

18       overage on hours.  These are very conservative."

19       And then we can go down.  Show the rest of that page.

20       So overage -- so you got project, overage, primary reason,

21   comments.  So Office Depot, the overage is 250 hours.  SIG --

22   what's SIG?

23   **A.**    I'm not sure.

24   **Q.**    Okay.  Let's go to the second page.  Consumer Energy,

25   McAfee is there, 110 extra hours.  McKesson is there, 200

1    hours.

2         Go down to the bottom.

3         Pfizer is there, 400 extra hours.  Federal Reserve Board,

4    600 extra hours.  The total is 2,000 hours that you were

5    complaining that you were not being compensated for and you

6    want some more money; right?

7    A.    Correct.

8    Q.    Okay.  And then look at 55 -- 5407, the very next one.

9         And is this a series of emails that you wrote to various

10   people, including Andy Kanter?

11         MR. FRENTZEN:  No objection.

12         THE WITNESS:  Yes.

13         THE COURT:  Admitted.

14   What number is it, Mr. Keker?

15         MR. KEKER:  This is 5407, Your Honor.

16         THE COURT:  Okay.  Admitted.

17        (Trial Exhibit 5407 received in evidence)

18   BY MR. KEKER:

19   Q.    Let's start at the bottom.

20         You wrote in November of 2010.  This is more than a year

21   before you had your platform up and running; right?

22   A.    Yeah.

23   Q.    When did you have your platform up and running?

24   A.    Sometime in 2011.

25   Q.    And you were telling people in early 2011 that you had the

**BAIOCCO - CROSS / KEKER**

1    capability to do this work yourself, didn't you?

2    **A.**    I think we were probably telling them before that, but,

3    yeah.

4    **Q.**    You were telling people in 2010 that you had the

5    capability to do this work?

6    **A.**    Yes.

7    **Q.**    And it wasn't true?

8    **A.**    Nope.

9    **Q.**    Okay.

10    **A.**    Selling ahead of capability, so -- we do it all the time.

11    **Q.**    What do you do all the time?  Tell people that you have a

12    capability that you don't have?

13    **A.**    No.  But it takes sometimes six months to a year to close

14    a deal like that, so we felt like we were close enough that we

15    could advertise and get a deal, and we always have the backup

16    of Autonomy doing the work for us if we weren't ready.

17    **Q.**    In November of 2010, you wrote to Mr. Kanter:

18          "Stouffer and I discussed many times getting made

19          whole for all the unbillable hours we log on engagements.

20          Here's a quick snapshot of some.  We just got rejected for

21          $78,000 in payments," and so on.

22          Could we go down and look at that list?  It's actually on

23    the next page.

24    **A.**    Two pages.

25    **Q.**    Oh, let's look at the paragraph before we get to the list.

1       This is the next page.

2               "All this is what makes us a great partner.  We have

3       talked about cutting us a PO to get somewhat whole on

4       this."

5       And then can we go down and look at the list?

6       This is the -- it looks like the same or almost the same

7       list that we looked at before.

8       Could we see the next page?  Ending with the Federal

9       Reserve Board, Pfizer, and now the total is 2,330 hours that

10      you say you're not getting paid for.

11      **A.**   Yes.

12      **Q.**   Shifting subjects, you testified about some European

13      projects and said you got paid for European projects, but you

14      didn't have any European projects; do you remember that?

15      **A.**   Any European eDiscovery platform projects; correct.   I

16      remember that.

17      **Q.**   Well, you had -- you were working on European projects,

18      including British Petroleum, weren't you?

19      **A.**   We never got British Petroleum.

20      **Q.**   But you were putting things together for British

21      Petroleum.   We've talked about that.

22      You were working providing implementation to the Financial

23      Services Authority in England; right?

24              **MR. FRENTZEN:**  Objection.  Vague as to time.

25

BAIOCCO - CROSS / KEKER

BY MR. KEKER:

Q.   The first quarter 2010.  We went over this before.

A.   Yeah.  So you're right --

Q.   I'm sorry.

A.   You're correct on getting our platform ready and working
on that for British Petroleum.  I'm not sure if we actually had
paid resources on Federal -- FSA, but if -- I'm not denying it.

Q.   You did implementation work for FSA, and we went over it
before, didn't we?

A.   I don't remember.  But, I mean, I'm not denying that we
didn't do work on FSA, so...  Subcontracted work, professional
services.

Q.   I'll come back to that.

     You had that Peterborough National Health Service proposal
back in 2009 that we looked at before; right?  That's 5508 in
evidence.

A.   That was the last thing we looked at the last day, yes.

Q.   Right.  And, in fact, you were doing all the professional
services for Autonomy globally at this point, weren't you?

A.   Yes.

Q.   Look at 5394.  Let's just get that in the record.

          MR. FRENTZEN:  No objection.

          THE COURT:  Admitted.

     (Trial Exhibit 5394 received in evidence)

**BY MR. KEKER:**

**Q.**   Could we look at the PS?  Well, this is from -- I should

say it's from you to Jerry Hawk, your partner who was the

person -- your partner at Capax.

**A.**   Correct.

**Q.**   Okay.  And you're talking about the FSA deal in the

subject line, but the PS:

    "They are current on everything we have out with them

    and have, for all practical purposes, turned over all

    professional services globally to us, not to mention

    300,000 a month in support."

Now, the "all the professional services" includes all the

eDiscovery services globally; right?

    **MR. FRENTZEN:**  Objection.  I'm sorry.  Vague.  Does he

mean -- does he mean professional services for eDiscovery work,

which they were not doing?

    **THE COURT:**  I don't know.

**BY MR. KEKER:**

**Q.**   Do you know the question -- you got the question?

**A.**   We were doing professional services globally for most all

of Autonomy's products, correct.

**Q.**   And all their eDiscovery work?

**A.**   Oh, I don't know about all their eDiscovery work, but we

were working globally on eDiscovery professional services;

correct.

BAIOCCO - CROSS / KEKER

1    **Q.**   And you were --

2         **THE COURT:**  Maybe I -- I'm sorry.  I'm not following

3    this.  So can I ask a question?

4         **MR. KEKER:**  Of course.

5         **THE COURT:**  Is there a distinction between doing work

6    on eDiscovery and professional services on eDiscovery?

7         **THE WITNESS:**  Yes.

8         **THE COURT:**  Is there some distinction?

9      Okay.  Tell us about that.

10        **THE WITNESS:**  Okay.  So when we bought the software

11   for seven and a half million, that was for us to set up to do

12   our own eDiscovery work.  This is not working on our platform.

13   This is working on an Autonomy platform that we were trying to

14   mirror and helping them run some projects.  Some of it was

15   implementation work.  I don't even know what all the work was,

16   but it wasn't us doing eDiscovery on the platform that we had

17   purchased.

18        **THE COURT:**  So the distinction you draw in your mind,

19   or you're testifying to, is that if you are working essentially

20   on somebody else's platform, but rendering services in

21   connection with somebody else's platform, and the work that you

22   are doing on that -- or that platform is an eDiscovery

23   platform, you characterize that as professional services; is

24   that correct?

25        **THE WITNESS:**  Yes.

1          **THE COURT:**  Thank you.

2    **BY MR. KEKER:**

3    **Q.**  2559 is in evidence, so could we look at page -- and --

4    page 22.  Page 22 of 2559.

5          **THE COURT:**  Okay.

6          **MR. KEKER:**  We are going to put it up on the screen

7    unless you want to look at it.  If you want to look at it, hard

8    copy, you can.

9          **THE WITNESS:**  No.  This is good.

10   **BY MR. KEKER:**

11   **Q.**  Okay.  And this is an invoice in June of 2010 for

12   outsourced specialized EDD services, $200 per gigabyte for

13   European projects.

14        Do you see that?

15   **A.**  I do.

16   **Q.**  Now, you told us before that there was -- well, let's look

17   again at page 28.

18        Outsourced specialist EDD services, $200 per gigabyte for

19   European projects.  That's $150,000.  The one before was

20   $275,000?

21   **A.**  Yes.

22   **Q.**  Are these the hundred-thousand-dollar payments that you

23   were talking about in your direct testimony?

24   **A.**  I don't think so, because I think they were marked 1 of 7,

25   2 of 7, however.  These might be different.

1    Q.    And so before you got any payments, $100,000 payments for

2    European projects, you were getting payments in amounts

3    different than $100,000 for European projects; right?

4    A.    Yeah.

5    Q.    Let me ask some questions about this FISMA project.  I'm

6    not sure if it's FISMA or Federal Cloud.

7         You told us you first met Sushovan Hussain in April of

8    2011; right?

9    A.    Not as -- yes.  Met, met.  Correct.

10   Q.    In England?

11   A.    Correct.

12   Q.    And you were there, among other things, pitching a big

13   government award that your sister company, Autonomic, had won?

14   A.    Autonomic, yes.

15   Q.    Okay.  And that was a $2.5 billion award from the Federal

16   Government to do what?

17   A.    Host FedRAMP Certified in a government cloud.

18   Q.    So this was the Federal Cloud Project?

19   A.    Correct.

20   Q.    And Autonomic had a piece of the action.  Everybody had

21   bid on this, and Autonomic had won?

22   A.    Yes.

23   Q.    They were an 8A company?

24   A.    Yes, they were.

25   Q.    What's an 8A company?

BAIOCCO - CROSS / KEKER

1  **A.**   Small business, disadvantaged.

2  **Q.**   And does that get some kind of preference?

3     What does it mean commercially to be an 8A company?

4  **A.**   Oh, I think there is a set aside business that is

5  specifically for 8A-type businesses.

6  **Q.**   Okay.  This was a contract that MicroTech had bid on and

7  they lost, but Autonomic had gotten the piece?

8  **A.**   Autonomic, yes.

9  **Q.**   Autonomic.  And the other thing you were in England for

10  was this tools demonstration, showing some tools that would be

11  useful to the British Petroleum project?

12  **A.**   We were there to make sure that our datasets were similar

13  to the Autonomy datasets.  We were running them through each

14  platform, yes.

15  **Q.**   In March, just a few weeks before your visit, you had sent

16  teams of engineers to London to demonstrate these what were

17  called staging tools?

18  **A.**   I'm not denying that we didn't, yeah.  I don't know the

19  exact dates on it.  But the 6th they were definitely there

20  working, on April 6th.  I don't think before that they were in

21  the UK.  Maybe Boston.

22  **Q.**   What are these tools?

23  **A.**   Now you're asking me a technical question.  My

24  understanding was they were staging tools that sped up the

25  eDiscovery process, that made our system apparently function a

1    little better than the Autonomy system.

2    **Q.**   And Microsoft, your other partner besides Autonomy, paid

3    Capax to develop these tools for them, for Microsoft?

4    **A.**   No.

5    **Q.**   Look at the first interview that you gave to the Morgan

6    Lewis lawyers, the Hewlett-Packard lawyers.  And that's --

7            **THE COURT:**  What document are we talking about?

8            **MR. KEKER:**  This is Exhibit 560 --

9            **THE COURT:**  I'm sorry.  What is it?

10           **MR. KEKER:**  5604, Your Honor.

11           **THE COURT:**  And what volume is it, 56 --

12           **MR. KEKER:**  It's in a separate volume of all his -- if

13   I could approach the witness -- of all his prior --

14           **THE COURT:**  Well, I think we had the same volume.  I

15   just don't see that number.

16           **MR. KEKER:**  I may have said it wrong.  Five zero two

17   four, Your Honor.

18           **THE COURT:**  Okay.  There.  That, I have.

19       Okay.  And what page do you want him to look at?

20           **MR. KEKER:**  Page 6.

21           **THE COURT:**  Page 6.  Look at it.

22   **BY MR. KEKER:**

23   **Q.**   Take a look at page 6, and look at -- and look under Roman

24   Numeral VII, third paragraph down, the -- the last sentence.

25   **A.**   The last sentence?  The last sentence where?  At the end

1    of VII?

2    Q.    Excuse me.

3            MR. FRENTZEN:  I'm sorry, Your Honor.  I don't know if

4    we are refreshing, and it seems like there is two whole

5    paragraphs on this topic.

6            MR. KEKER:  It's the first paragraph under Roman

7    Numeral VII.

8            THE COURT:  The first paragraph?

9            MR. KEKER:  Yeah.

10           THE COURT:  Okay.  Hold on.

11           MR. FRENTZEN:  And is this to refresh?

12           MR. KEKER:  Yes.  I'm asking him to read the first

13   paragraph under Roman Numeral VII, particularly the last

14   sentence of that first paragraph right here.

15           MR. FRENTZEN:  Is this to refresh something in

16   particular?

17   BY MR. KEKER:

18   Q.    Okay.  Have you read it?

19   A.    Yes.

20   Q.    Let me ask you again.  Did Microsoft pay Capax to develop

21   these tools?

22   A.    No.  You're misunderstanding that paragraph completely.

23   Q.    Tell me what Microsoft paid for with respect to these

24   tools?

25   A.    Microsoft paid us on a regular basis to do development

**BAIOCCO - CROSS / KEKER**

1   work for their customers, but not these tools specifically.

2   They were not -- at that point they weren't even in the

3   eDiscovery business, so these tools were built for our

4   platform, for our use.  We never built one ounce of eDiscovery

5   software for Microsoft, nor did they ever pay for it.

6   Q.   All right.  So you were sell -- these tools were going to

7   make connection to the Autonomy software easier, faster; right?

8   A.   Yes.

9   Q.   The idea was they were to increase the processing speed;

10  right?

11  A.   Yes.

12  Q.   And Capax's tools were better, faster, and got better

13  results than anything Autonomy had?

14  A.   That's my understanding.

15  Q.   All right.  Would you look at Exhibit 5440?

16  A.   Are we in a different book now?

17         THE COURT:  Yes.

18         THE WITNESS:  All right.

19  BY MR. KEKER:

20  Q.   You can put that binder down.  5440 is in Volume 1.

21  A.   Yep.  I got it.

22  Q.   Oh, I beg your pardon.  That's not in front of you.  It's

23  in a folder.

24         THE COURT:  Is it Exhibit 5440?

25         MR. KEKER:  Exhibit 5440, Your Honor, is a new

1   exhibit.

2           THE COURT:  Okay.  Will you hand it to the Government?

3   BY MR. KEKER:

4   Q.   Is 5440 the proposal for selling these tools to Autonomy

5   that you made to Mr. Hussain on July 27, 2011?

6   A.   Yes.

7           MR. FRENTZEN:  No objection.

8           THE COURT:  Admitted.

9       (Trial Exhibit 5440 received in evidence)

10  BY MR. KEKER:

11  Q.   Okay.  And then let me show you another -- actually, let

12  me give you all of these.

13      5402?

14          THE COURT:  5442?

15          MR. KEKER:  No. 5402.  Five four zero two.

16  Q.   Is this an email that you got from Mr. Hussain on or about

17  July 28, 2011?

18  A.   Yes.

19          THE COURT:  Admitted.

20      (Trial Exhibit 5402 received in evidence)

21  BY MR. KEKER:

22  Q.   And was Mr. Hussain asking you for these tools to help

23  with our processing for the BP Gulf of Mexico case?

24  A.   Yes.

25  Q.   And then could we -- let me show you one more, 2216.

BAIOCCO - CROSS / KEKER

1           MR. FRENTZEN:  I think this is already in evidence.

2           MR. KEKER:  If it's in evidence --

3           THE CLERK:  Yes.

4           MR. KEKER:  It is in evidence?

5           THE CLERK:  Yes.

6           MR. KEKER:  All right.  Then we can put it up.

7           MR. FRENTZEN:  We admitted this, Your Honor.

8    BY MR. KEKER:

9    Q.   So is this the license agreement for the tools?

10   A.   Yes.

11   Q.   All right.  And then the final exhibit I want to show

12   you --

13          MR. FRENTZEN:  I think, for the record, that's 2216.

14          MR. KEKER:  Two two one six.  I agree.

15          THE COURT:  Yeah.  And that's already admitted.

16   BY MR. KEKER:

17   Q.   And then finally in these folder ones, is this an email

18   from Mr. Hussain to you, copying Pete Menell re people in

19   Chicago, August 2011?

20   A.   Yes.

21          MR. KEKER:  I move it in.

22          MR. FRENTZEN:  No objection.

23          THE COURT:  That's 5400?

24          MR. KEKER:  Five four zero zero, yes, sir.

25          (Trial Exhibit 5400 received in evidence)

BY MR. KEKER:

Q.  Can we show the bottom email?  Mr. Hussain says:

"John, I spoke to Pete" -- this is to you -- "I spoke

to Pete, and it's important that you try to get people to

Chicago today as he wants to start the process

immediately.  Please can you expedite?  It's important for

us."

What does that refer to, if you know?

A.  The use of our platform, getting it ready, and the tools.

Q.  Okay.  You asked your Capax technical team whether or not

these staging tools were worth the $6 million that Autonomy

paid for them, didn't you?

A.  I did.

Q.  And they told you that the Capax tools were better,

faster, got better results, and would -- could be worth 6

million because they decreased processing time if -- so if

Autonomy was processing enough data, the speed-up would be

worth it?

MR. FRENTZEN:  Objection, hearsay --

BY MR. KEKER:

Q.  That's what the tech team told you?

MR. FRENTZEN:  -- foundation.

THE COURT:  Well, I'll allow it.

THE WITNESS:  Yes.

BAIOCCO - REDIRECT / FRENTZEN

1   BY MR. KEKER:

2   **Q.**   And for all you knew, the tools could be worth $20

3   million?

4   **A.**   Yes.

5         **MR. KEKER:**   That's all I have.   Thank you,

6   Mr. Baiocco.

7         **THE WITNESS:**   Thanks.

8         **THE COURT:**   Redirect.

9         **MR. FRENTZEN:**   Thank you, Your Honor.

10                      <u>REDIRECT EXAMINATION</u>

11  BY MR. FRENTZEN:

12  **Q.**   I just wanted to start with that last Exhibit, 5400, I

13  think, if you don't mind.

14       If we could just blow up the top part.

15       Do you see a date there, Mr. Baiocco?

16  **A.**   August 17th.

17  **Q.**   Of what year?

18  **A.**   2011.   Sorry.

19  **Q.**   And Mr. Hussain is saying what down here?

20  **A.**   "Thanks, John.   We have a deadline that we need to meet."

21  **Q.**   Do you know what happened on August 18, 2011?

22  **A.**   I do.   That was the HP Autonomy announcement deal, yeah.

23  **Q.**   And in terms of the proposal on this, the staging tools,

24  Mr. Keker asked you about an interview in February of 2013 with

25  some lawyers from HP.

**BAIOCCO - REDIRECT / FRENTZEN**

1          At that time, did you express to them skepticism about

2    what those staging tools were worth?

3               MR. KEKER:  Objection, Your Honor.

4               MR. FRENTZEN:  106, Your Honor, as well as prior

5    consistent statements under 801(d)(1)(B)(ii).

6               THE COURT:  Objection overruled.

7               THE WITNESS:  I did.

8    BY MR. FRENTZEN:

9    Q.   What did you express to them back in 2013?

10   A.   That I didn't -- I was trying to decipher, were they

11   really worth this kind of money.

12   Q.   And again, in terms of the 6 million that you were

13   offered, did you have to negotiate that with Mr. Hussain?

14   A.   No.

15   Q.   And in what way did that correlate to debts related to --

16   between Capax and Autonomy there in August of 2011?

17   A.   Well, they never cleaned up the McAfee deal off our books,

18   so we essentially used that money to pay McAfee back.

19   Q.   So the money on the staging tools, much of that went back

20   to Autonomy?

21   A.   Yes.

22              MR. FRENTZEN:  May I have just one moment, Your Honor?

23   I'm just going to make a little space here for myself.

24              MR. KEKER:  Let me get these out of the way.

25                        (Pause in proceedings.)

BY MR. FRENTZEN:

Q.   Mr. Baiocco, is there a difference between doing eDiscovery work and providing support or professional services around eDiscovery work?

A.   There's a difference if you're comparing it to doing it on your own platform, yes.

Q.   And can you describe that for us, please, what the distinction is?

A.   Well, if we were using it like where we billed our own customer, Global Colleague, we were using the software we purchased to do eDiscovery on the software we owned, on hardware we owned in our own data center.

In these professional services instances we were working on subcontracted to Autonomy, enabling them to complete a project that was being either worked on by on prem software that the customer purchased that was at their location in their data center or potentially maybe working on it on software that was Autonomy software in Autonomy's data center.

Q.   All right.  And in terms of the purchase orders for outsourced EDD that we took a look at when you were last here, were those for providing support or financial services related to EDD work, or were those for Capax taking clients from Autonomy and doing EDD work for them?  Does that question make sense?

A.   No.  Can you say it again?

BAIOCCO - REDIRECT / FRENTZEN

1    **Q.**    Sorry.  Let's just go to the -- can we go to 2559, please,

2    Ms. Margen.

3    **A.**    Which one?

4    **Q.**    Sorry.  I can actually bring you the document, but if you

5    can see it up here, that would be great.

6          Could we go to the second page, please, Ms. Margen.  This

7    is the one that's -- give me one second.  Let's find one that's

8    upright.

9          Let's go, for example, to page 16 of 2559, if we could,

10   please.  And can you blow up the middle portion of that,

11   please, Ms. Margen?

12         All right.  Now, Mr. Baiocco, you were asked a lot of

13   questions about did Capax get CTOs sort of related to

14   eDiscovery work.  Do you recall that?

15   **A.**    I do.

16   **Q.**    What's listed here on this particular purchase order, is

17   that for providing support or professional services around

18   somebody else's eDiscovery work?

19   **A.**    No.

20   **Q.**    What is this supposed to be for?

21   **A.**    It's written like they're paying us to run the data

22   through our own -- our own platform that we would have built.

23   **Q.**    And so here, for example, this is EDD processing?

24   **A.**    Correct.

25   **Q.**    Was Capax ever doing -- sorry.  Not ever.  At this

**BAIOCCO - REDIRECT / FRENTZEN**

1    particular time in -- sorry -- in 2010, March, was Capax doing

2    EDD processing?

3    **A.**    No.

4    **Q.**    Did Capax do EDD processing for Autonomy in connection

5    with this purchase order?

6    **A.**    No.

7         **MR. FRENTZEN:**    And can we blow up the bottom, please,

8    Ms. Margen, the sticker price?  Sorry.  Right here.

9    **Q.**    So this purchase order, for example, for 1,425,000, does

10   this relate in any way to the documents that Mr. Keker showed

11   you and asked you about?

12   **A.**    No.

13   **Q.**    Is this false?  I mean, is this purchase order for

14   something that you couldn't do and were not doing?

15   **A.**    Yes, it is.

16   **Q.**    And did you do any of the work indicated here?

17   **A.**    No.

18   **Q.**    Now, in your sort of chasing of Autonomy for the money

19   they owed you, were you keeping track of money that Autonomy

20   owed to Capax?

21   **A.**    Yes.

22   **Q.**    Mr. Keker showed you a number of emails related to trying

23   to catch up on money owed to Capax by Autonomy.  Do you recall

24   that?

25   **A.**    Yes.

BAIOCCO - REDIRECT / FRENTZEN

1   **Q.**   All right.  And I believe the emails were -- the Court's

2   indulgence one moment.

3        I think Defense 5407.

4        May I have a moment?

5        Do you recall Defense 5407?  I can show it to you if you

6   need.

7   **A.**   Can you just refresh me?  A lot of numbers.

8   **Q.**   The chart from Steve Williams about what was owed to Capax

9   by Autonomy that Mr. Keker just showed you.

10  **A.**   All the overage for the hours, that was different.  That's

11  what we worked for free, in my opinion, what he showed me.

12       Yes.

13  **Q.**   And were any of those debts related to the payments here

14  in Government's 2559?  In other words, the purchase orders from

15  Autonomy for EDD -- for outsourced specialized EDD services or

16  for EDD processing or anything like that?

17  **A.**   No.  I'm not sure we got paid for those hours.  That was

18  just me showing them how much free work we were doing.

19  **Q.**   What kind of work?

20  **A.**   Profession -- those are all professional services hours

21  where we had one of our consultants at a customer working, and

22  they ran out of money to pay on it, and we continued to work

23  for free at our own expense.

24  **Q.**   So was any of the stuff that Mr. Keker showed you in those

25  charts, was any of that for eDiscovery work being done by

BAIOCCO - REDIRECT / FRENTZEN

1  Capax?

2  **A.**   No.

3  **Q.**   And, in fact, did you work out sort of an arrangement with

4  Autonomy to pay for these overages?

5  **A.**   I don't remember, because, I mean, we were always trying

6  to work them out, yeah.

7  **Q.**   Okay.  I'd like to show you a new exhibit.

8       Your Honor, if I could just have one second.  Here we go.

9       Counsel, I'm on Government's Exhibit 513.

10      Take a quick look through Government's 513 and see if you

11  recognize what that is, sir.

12  **A.**   (Witness reviews document.)

13      This is -- these are the support payments.

14          **THE COURT:**  Admitted.

15       (Trial Exhibit 513 received in evidence)

16          **MR. FRENTZEN:**  Thank you, Your Honor.

17  **Q.**   What do you mean by "support payments"?

18  **A.**   At that point we had taken over support for EAS for

19  certain.  I'm not sure if we had NearPoint at this point, but

20  that's when they had two, three thousand customers, and instead

21  of when they called, they would get Capax to pick up their

22  technical support questions, and we would fix the issues.

23  **Q.**   All right.  And just for example, on the first page

24  here --

25       And Ms. Margen, could we get the middle section of this?

BAIOCCO - REDIRECT / FRENTZEN

1       All right.  Is this for -- in contrast to the EDD purchase

2   orders from Autonomy, does this purchase relate to real work

3   done by Capax for real clients?

4   **A.**   Yes.

5   **Q.**   And, for example, does this, in terms of the cost, kind of

6   go down to the penny?

7   **A.**   Yes.

8   **Q.**   Does it list -- what are direct current clients and

9   indirect clients?

10  **A.**   I believe direct clients were customers that Autonomy had

11  actually sold the software to.  Indirect was where they were --

12  the customer was sold by a reseller.  So if there was a hundred

13  thousand dollars a year support, the reseller would, under

14  their agreement, probably collect 30 percent.  So then we

15  would -- we would be getting our portion of the 70,000 left

16  over versus if Autonomy was direct, we would be getting our

17  portion of the complete $100,000 a year contract.

18  **Q.**   Okay.  And these were for real clients?

19  **A.**   Yes.

20       **MR. FRENTZEN:**  Could we go to page 3 of this, please,

21  Ms. Margen?  Can we scroll down a little bit?  Thank you.

22  **Q.**   All right.  Mr. Baiocco, this is another purchase order

23  from Autonomy on page 3.

24       Can you tell us, here again on items line 1 and 2, is this

25  for -- what's this for?

**BAIOCCO - REDIRECT / FRENTZEN**

1   **A.**   The same as we spoke about a minute ago, direct and

2   indirect support.

3   **Q.**   What was item 3?

4   **A.**   That was for supplemental EAS support.  That was kind of a

5   catchall.

6   **Q.**   What do you mean by that?

7   **A.**   A way to get us whole for hours, for whatever was going on

8   that we might have been a shortfall on.

9   **Q.**   So is this something that was actually worked out between

10  Autonomy and Capax related to overages, if you will?

11  **A.**   I don't know if it was directly to overages, but, yeah, it

12  was on a lot of different topics.  But, yes, worked out between

13  us and Autonomy.

14  **Q.**   And I guess what I'm getting at is the emails we saw about

15  overages, did that have any relationship to Government's 2559,

16  the purchase orders and invoices for EDD?

17  **A.**   No, they did -- no.

18  **Q.**   I want to go back to 2559 again briefly.

19       Could we get page 23 up, please?  And could we blow up --

20  let's start with the -- on the top part, the date requested.

21  I'm sorry.  That's not the top.  It's sort of the -- great.

22       And the date here, is that UK date?

23  **A.**   June 25th, yes.

24  **Q.**   June 25th of 2010.  And just scroll down to see what this

25  is a purchase order for here in the middle.  Thank you.

1    Mr. Baiocco, what is this particular purchase request for?

2  **A.**  Outsourced EDD services for European projects.

3    **MR. FRENTZEN:**  Can we go down to the bottom, please?

4  **Q.**  And, Mr. Baiocco, can you make out here -- do you see a

5  couple of signatures under "authorized by"?

6  **A.**  I do.

7  **Q.**  And could you go down to the box at the bottom.  And if

8  you can, can you see first signatures and second signatures?

9  **A.**  Yes.

10  **Q.**  Can you make that out?  I'm not going to ask you to read

11  all those names, but do you see a line that says, "second

12  signature above 500 pounds"?

13  **A.**  I do.

14  **Q.**  And what names do you see there?

15  **A.**  Sushovan Hussain, Andy Kanter.

16  **Q.**  And do you see another one or some initials there?

17  **A.**  MRL.

18  **Q.**  Do you know who that is?

19  **A.**  I'm guessing Mike Lynch.

20    **MR. FRENTZEN:**  Could we go now to page 43, please.

21  I'm sorry.  Let's skip over that.  Let's go to page 45, please.

22  **Q.**  Is this another of these purchase orders?

23  **A.**  Yes.

24  **Q.**  And down below -- if we could just scroll down a little

25  bit -- what type of activity is this for?

1    **A.**    EDD processing.

2    **Q.**    Is that something that Capax could do at that time?

3    **A.**    I'm sorry.  What's the date?

4    **Q.**    This would be December of 2010.

5    **A.**    No.

6    **Q.**    And was that something that Capax did for Autonomy at that

7    point in time?

8    **A.**    No.

9    **Q.**    I just want to point out, do you see in the top right-hand

10   corner where it says, "RQ number"?

11   **A.**    Yes.

12   **Q.**    Do you see two initials there?

13   **A.**    I do.

14   **Q.**    What are they?

15   **A.**    AK and SH.

16   **Q.**    Do you know anybody at Autonomy with those initials?

17   **A.**    Yes.

18   **Q.**    Who?

19   **A.**    Andrew Kanter and Sushovan Hussain.

20            **MR. FRENTZEN:**  Can we see page 51?  Thank you.  Great.

21   **Q.**    Is this another purchase order for EDD processing and

22   additional EDD processing?

23   **A.**    Yes, it is.

24   **Q.**    June of 2011?

25   **A.**    Yes.

BAIOCCO - REDIRECT / FRENTZEN

1    **Q.**    Is that something that Capax did for Autonomy?

2    **A.**    No.

3    **Q.**    What initials are there on the RQ number?

4    **A.**    The same as before, AK and SH.

5             **MR. FRENTZEN:**  Page 55, please.

6    **Q.**    Same idea in July of 2011?

7    **A.**    Yes.

8    **Q.**    Same initials?

9    **A.**    Correct.

10            **MR. FRENTZEN:**   Could we get page 60, please, of 2559?

11   **Q.**    EDD processing?

12   **A.**    Yes.

13   **Q.**    Is that false?

14   **A.**    Yes.

15   **Q.**    And what initials?

16   **A.**    Same.  AK/SH.

17   **Q.**    Now, I think we established this, but in your relationship

18   with Autonomy, were you keeping track of how much you had paid

19   to Autonomy for these licensing fees and how much you were

20   getting back from them through these false purchase orders and

21   false invoices?

22   **A.**    Yes.

23   **Q.**    Approximately how much did you -- did Capax owe Autonomy

24   for the three different license deals?

25   **A.**    Just for the EDD processing?

BAIOCCO - REDIRECT / FRENTZEN

1   **Q.**   Correct.

2   **A.**   Around 15 million, all in.

3   **Q.**   Okay.

4   **A.**   With support and maintenance included in those.

5   **Q.**   So the first deal was for 7 and a half million on its

6   face?

7   **A.**   The software plus support maintenance; correct.

8   **Q.**   How much was the second one, if you recall?

9   **A.**   4 million or 4.2.

10  **Q.**   The third one that Mr. Hussain asked you to do in --

11  well --

12  **A.**   1.68.

13  **Q.**   I'd like to show you now what's been marked as

14  Government's 2523.

15       Do you recognize what Government's 2523 is, Mr. Baiocco?

16  **A.**   Yeah.  It looks like a document that Capax produced for

17  the Government to show them all the EDD processing invoices

18  collectively.

19           **MR. FRENTZEN:**  I'd offer 2553 into evidence.

20           **THE COURT:**  Admitted.

21           **MR. FRENTZEN:**  Sorry.  It's 2523.

22       (Trial Exhibit 2523 received in evidence)

23  **BY MR. FRENTZEN:**

24  **Q.**   Okay.  Can you just describe for us what is -- what's

25  depicted in 2523, Mr. Baiocco?

BAIOCCO - REDIRECT / FRENTZEN

1    **A.**    Just all the -- all the purchase order or invoices that

2    we've been going through that were listed as EDD processing.

3    **Q.**    So is this a collection of the false purchase orders and

4    the corresponding false invoices?

5    **A.**    Yes.

6           **MR. FRENTZEN:**    Could we go to the second page, please?

7    **Q.**    Is there a total at the bottom there, Mr. Baiocco?

8    **A.**    Yes.

9    **Q.**    And what was the total of all the false purchase orders

10   and invoices?

11   **A.**    15,045,000.

12   **Q.**    Did that make Capax whole on the licensing fees to

13   Autonomy based on those three contracts?

14   **A.**    Yes.

15   **Q.**    Was there a difference, Mr. Baiocco, in your mind between

16   the contracts between Capax and Autonomy related to providing

17   services and professional support and the licensing fee or EDD

18   contracts between Capax and Autonomy?

19   **A.**    Yes.

20   **Q.**    In what ways?

21   **A.**    I mean, we were actually doing the support and the

22   professional services.

23   **Q.**    Okay.  And to your knowledge, the EDD licensing fees, as

24   those were set up, was that money owed by Capax to Autonomy?

25   **A.**    Yes.

BAIOCCO - REDIRECT / FRENTZEN

1    **Q.**   Did those contracts cover any outsourced work -- Capax

2    doing outsourced work for Autonomy had Autonomy actually given

3    Capax customers to do EDD work for?  Does that make sense?

4    **A.**   I don't understand that one.

5         **MR. FRENTZEN:**  If we could, let's pull up Government's

6    32, please.

7    **Q.**   In other words, when Autonomy was sending you purchase

8    orders for you to invoice them for outsourced work that you

9    were not doing, was that actually governed by these licensing

10   agreements, or would that have required some additional

11   contracts to actually perform?

12   **A.**   I'm not sure of the answer to that.

13   **Q.**   Okay.  Did any contracts exist to do work for any of these

14   outsourced clients which didn't exist?

15   **A.**   No.

16   **Q.**   And this contract, the licensing agreement, that was debts

17   from Capax to Autonomy?

18   **A.**   Yes.

19   **Q.**   Was Autonomy sending purchase orders for invoices from

20   Capax covered by this agreement or would that have required an

21   additional agreement, in other words, an additional contract?

22   **A.**   So are you asking me if they would have got another -- an

23   outsourced customer they would have sent me something specific

24   to that customer?

25   **Q.**   That's the question.

**BAIOCCO - REDIRECT / FRENTZEN**

1   **A.**   Yes.  I mean, it didn't happen, so I can't answer it for

2   certain, but --

3   **Q.**   It never happened?

4   **A.**   Correct.

5   **Q.**   So all of these purchase orders and invoices, were those

6   dedicated to any client?

7   **A.**   No.

8   **Q.**   Because no clients existed?

9   **A.**   Right.

10  **Q.**   You're in the eDiscovery business now.  Are there issues,

11  requirements related to doing eDiscovery work for a client?

12  **A.**   Yes.

13  **Q.**   Is confidentiality, privacy, are those issues in doing

14  eDiscovery work?

15  **A.**   Yes.

16  **Q.**   What about data storage, and things like that are the

17  things that have to go into the contract?

18  **A.**   Yes.

19  **Q.**   Were there any contracts for any nonexisting clients that

20  Autonomy sent to you?

21  **A.**   No.

22          **MR. FRENTZEN:**  May I have one moment, Your Honor?

23                      (Pause in proceedings.)

24          **MR. FRENTZEN:**  That's all I have.  Thank you,

25  Mr. Baiocco.  Sorry for the pause.

BAIOCCO - RECROSS / KEKER

1      **THE WITNESS:**  No problem.

2                        <u>**RECROSS-EXAMINATION**</u>

3   BY MR. KEKER:

4   **Q.**   A few questions, Mr. Baiocco.  No binders.

5         During this period 2009 to 2000 -- through 2011, was Capax

6   referring to Autonomy orally and in writing in presentations,

7   and so on, as its partner?

8   **A.**   Yes.

9   **Q.**   And were you doing their EAS work all over the world?

10  **A.**   Yes.

11  **Q.**   And were you doing -- providing -- you said services,

12  services for their eDiscovery work all over the world?

13  **A.**   Yes.

14  **Q.**   And were you training people in their Boston office?

15  **A.**   Yes.

16  **Q.**   And did you have people in their Boston office working on

17  eDiscovery?

18  **A.**   Training.  I don't know if they were working on it, but,

19  yes.

20  **Q.**   You -- you got Autonomy to -- your partner bought you

21  hardware in June of 2009 to help set up your platform?

22  **A.**   Yes.

23  **Q.**   Right.  And you knew that they were looking for capacity

24  for overflow eDiscovery work, didn't you?

25  **A.**   That's what they said, yes.

BAIOCCO - FURTHER REDIRECT / FRENTZEN

1    **Q.**    All right.  And then in -- you were telling people you

2    were capable of doing eDiscovery work, weren't you?

3    **A.**    Yes.

4    **Q.**    You told Global Colleague in February of 2010; right?

5            **MR. FRENTZEN:**  Objection at this point.  Scope.

6            **THE COURT:**  Well, I'm going to allow it, because I

7    think it's moving ahead.

8            **MR. KEKER:**  A couple more questions.

9    **Q.**    You told people at Iovate that you were capable of it back

10    in 2009?

11    **A.**    Yes.

12    **Q.**    You told people at Peterborough, the health folks that you

13    were capable of it?

14    **A.**    Yes.

15    **Q.**    And then you showed up -- you got invited, and you showed

16    up with a tech team in England in March and April of 2011 --

17    2010 -- no, '11, I'm sorry, 2011, to do the British Petroleum

18    overflow work.  That's what you were trying to get; right?

19    **A.**    Yes.

20            **MR. KEKER:**  That's all I have.  Thank you, Your Honor.

21                    <u>FURTHER REDIRECT EXAMINATION</u>

22    BY MR. FRENTZEN:

23    **Q.**    Did Autonomy ever send you any work from BP?

24    **A.**    No.

25    **Q.**    In these questions Mr. Keker was asking you, in connection

1    with any of those, did Capax actually do eDiscovery processing

2    for any of those clients that you approached?

3    **A.**    Global Colleague eventually at the end of 2011, but not

4    the ones prior to that.  Not Iovate, not Peterborough.

5    **Q.**    Prior to Hewlett-Packard acquiring Autonomy, were you able

6    to do any of the work for any -- did you end up doing any of

7    the work for any of these clients?

8    **A.**    No.

9    **Q.**    Did Autonomy send you any clients?

10   **A.**    No.

11        **MR. FRENTZEN:**  Thank you.  Nothing further.

12   Thank you, Your Honor.

13        **THE COURT:**  Anything further?

14        **MR. KEKER:**  No, Your Honor.

15        **THE COURT:**  Okay.  You are excused.

16        **THE WITNESS:**  Thank you very much.

17        **THE COURT:**  So you may return to Boston.

18        On the other hand, if you would rather be here, you can

19   stay here as well.

20        Okay.  Thank you.  We're going to take our recess.

21        Ladies and gentlemen of the jury, we will be in recess

22   until 10:35.

23        Remember the admonition given to you:  Don't discuss the

24   case, allow anyone to discuss it with you, form or express any

25   opinion.

**PROCEEDINGS.**

1          (Proceedings were heard out of presence of the jury:)

2          **MR. KEKER:**  Your Honor, before we start the next

3   witness, we should talk to you about basically the fee issue,

4   the next witness with the fee issue.

5          **THE COURT:**  Okay.  Well, then let's do it now.  The

6   next witness is who?

7          **MR. GRAY:**  Cody Gray for defendant Sushovan Hussain.

8          **THE COURT:**  Sorry?

9          **MR. GRAY:**  I'm sorry, Judge.  Cody Gray for the

10  defendant.

11         **THE COURT:**  Right.  Who is the next witness?

12         **MR. REEVES:**  Marc Geall.

13         **THE COURT:**  Okay.  And the issue is, I assume with

14  Mr. Geall, that his attorneys' fees are being paid for by

15  Hewlett-Packard; is that the situation?

16         **MR. REEVES:**  I'm not sure, Your Honor.

17         **THE COURT:**  Okay.  But the question is -- if they

18  were, could that -- well, defense believes that they are, but

19  the question is could the question be asked.  That's the

20  question.

21         **MR. GRAY:**  Yes, Your Honor.

22         **THE COURT:**  Okay.  And I have before me the memoranda

23  submitted by both parties.  And as I understand, though it may

24  not apply to Mr. Geall, but I understand in the Government's

25  submission that they say that under the bylaws of

**PROCEEDINGS.**

1  Hewlett-Packard, they are under a duty to indemnify certain

2  individuals in connection with their legal expenses, in

3  connection with any government investigation.

4      Okay.  But mr. Geall would not be included in that group;

5  is that correct?  Because I looked at the bylaw -- I looked

6  at -- I looked at the email from Mr. Wong, which is attached to

7  the document.

8          **MR. REEVES:**  The articulation of the position by the

9  Court is true I believe for the U.S. witnesses, and it's less

10  clear for the UK witnesses, but it may be true, and we're still

11  running that down, or HP is still running that down.

12          **THE COURT:**  Mr. Geall is a UK witness; is that right?

13          **MR. REEVES:**  I would say so, yes, Your Honor.

14          **THE COURT:**  Okay.  So we don't know whether his

15  expenses are indemnified or not under the bylaws of

16  Hewlett-Packard?

17          **MR. REEVES:**  I don't know, Your Honor.

18          **THE COURT:**  Here is my take on the situation.  After

19  reviewing the memoranda, I think it's a -- I think it's

20  information that would be excluded under 403.  I think that

21  while arguably it's probative, the probative value -- the

22  probative nature of it is as explained by the defense.  It goes

23  to a potential bias of the witness.

24      On the other hand, it appears to me to be far outweighed

25  by all of the other issues that one has in a 403 determination.

**PROCEEDINGS.**

1    It seems to be a sideshow.  It seems to be -- we'd have to go

2    and explain what is meant by it, by what the bylaws provide,

3    what is customarily done in the businesses, and it seems to be

4    certainly collateral to the issues.  It seems to be a matter

5    that would consume a great deal of time, and I think it's --

6    its probative value is outweighed by those consideration.

7        So there you are.  You are a little bit behind the curve

8    right here, as you can see, but I will hear you out.

9            **MR. GRAY:**  All right.  Thank you, Your Honor.

10        I'll just start where you left off.  That's actually not

11    the conclusion that the Supreme Court reached in *Wood v.*

12    *Georgia*.  In that case the Supreme Court made clear that it's

13    important for the jury to know, when assessing a witness'

14    credibility, that their fees are being paid by a third party,

15    and it's especially true when the third party is an employer

16    who may be motivated to advance their own interests as opposed

17    to the witness' --

18            **THE COURT:**  That was a defendant, though, wasn't it?

19    It was the defendant?

20            **MR. GRAY:**  It was the defendant in that case, but the

21    logic is no different than it would we here.

22            **THE COURT:**  Oh, I think there is a great deal of

23    difference in the logic, because your logic actually would

24    assume that you could ask anybody in any case whether they're

25    remotely related to the case or the case focuses on them --

**PROCEEDINGS.**

1    that you would ask these questions:  "Who is paying your

2    attorneys' fees?"  And then you -- so I don't think it's

3    contrary to Supreme Court authority.  I think the Supreme Court

4    authority is very, very different, because it relates to that

5    defendant being paid, his attorney in a criminal prosecution --

6    I think it was a criminal progresses, was it?  I mean, maybe it

7    came up in habeas corpus, and so forth, but I think it was a

8    criminal prosecution.

9        Nevertheless, there is something key to a defendant being

10   represented in a criminal matter in which the attorney fees are

11   paid by somebody else.  That's -- that's a key distinction.  So

12   I think it's --

13        **MR. GRAY:**  We would disagree, Your Honor.  The point

14   is that your lawyer doesn't have only your interests at heart

15   necessarily.  There is a potential that they may not, because

16   they're getting paid by somebody else.  Whether or not that's a

17   criminal case or with respect to a witness, the logic of that

18   diluted interest is the same.

19        **THE COURT:**  Okay.  But you say -- when you say this is

20   contrary to the Supreme Court's decision, you are saying that

21   it's contrary to the logic of the Supreme Court's decision and

22   the logical extension of the Supreme Court's decision.  It's

23   not the Supreme Court's decision, because it came out of the

24   context of a criminal defendant.

25        I think that's a meaningful distinction.

1          **MR. GRAY:**  Fair enough.

2          **THE COURT:**  And I know you don't.  And I also

3  appreciate the fact that you think logically it should be

4  extended.  And I would say that there is some logic to your --

5  to your argument.  But the question is the further attenuated

6  out and the further -- and the more complicated the

7  determinations are made as to the motivations, and so forth,

8  and what went into it, and so forth, that brings into play 403.

9  So I don't think I would use 403 at all, because I think it

10  would be wrong in determining the criminal defendant.  I think

11  it's different with respect to witnesses, even though I

12  appreciate your argument.  And I think it just proves too much.

13          So I'm going to exclude it.  Thank you very much.  Now

14  we're taking a recess.

15          **MR. REEVES:**  Thank you, Your Honor.

16          **MR. GRAY:**  Thank you, Your Honor.

17                  (Recess taken at 10:24 a.m.)

18                (Proceedings resumed at 10:37.m.)

19      (Proceedings were heard in the presence of the jury:)

20          **THE COURT:**  Let the record reflect all parties are

21  present.

22          Let me address the scheduling.  We are going to meet on

23  the 16th, Friday the 16th, which was previously a dark day, but

24  we are going to utilize it for testimony.

25          On the Monday, the day that we just said one day at the

1   beginning of the week, we will have a slightly different

2   schedule.  We will not take a lunch break, but we will adjourn

3   sometime around 1 -- between 1:00 and 1:30 for the day.  So, in

4   other words, we will take our breaks during the day, but we

5   won't take that long lunch break, because the Court has to

6   attend a session over at the Ninth Circuit later on that day.

7        So it will be an abbreviated day.  You may lose about an

8   hour in the process.

9        Okay.  You have called your next witness.  Who is your

10  next witness?

11            MR. LEACH:  Thank you, Your Honor.

12       The United States calls Marc Geall.

13            THE COURT:  Okay.  Would you administer the oath to

14  Mr. Geall?

15            THE CLERK:  Please stand to be sworn.  Please raise

16  your right hand.

17                 MARK ALEXANDER LOUIE GEALL,

18  called as a witness for the Government, having been duly sworn,

19  testified as follows:

20            THE CLERK:  Thank you.  Please be seated.

21       Please state your full name for the record and spell your

22  last name.

23            THE WITNESS:  Mark Alexander Louie Geall, G-E-A-L-L.

24

25

1                          **DIRECT EXAMINATION**

2    **BY MR. LEACH:**

3    **Q.**    Good morning, Mr. Geall.  Where do you live?

4    **A.**    I live in London, in the UK.

5    **Q.**    Where are you currently employed?

6    **A.**    I'm employed by SAP.

7    **Q.**    What is SAP?

8    **A.**    SAP is a European software company.

9    **Q.**    How long have you been employed with SAP?

10   **A.**    Just over five years.

11   **Q.**    So going back to approximately 2012, 2013?

12   **A.**    Yes.  2012.

13   **Q.**    Would you briefly describe your educational background,

14   please.

15   **A.**    I did normal exams in the UK.  Did O levels and A levels,

16   and then I went to university.  Got a degree in engineering

17   from Cambridge University.

18   **Q.**    For those of us in the United States, what are A levels?

19   **A.**    A levels are the sort of exams that you do in preparation

20   for going to university.  So you need to get specific grades to

21   get into university.

22   **Q.**    And you graduated from Cambridge in 1993?

23   **A.**    That is correct.

24   **Q.**    Did you go into the software business after that?

25   **A.**    I did not, no.

**GEALL - DIRECT / LEACH**

1   **Q.**   Have you ever worked for a software company?

2   **A.**   I have, yes.

3   **Q.**   What company is that?

4   **A.**   SAP and Autonomy.

5   **Q.**   Okay.  After graduating from Cambridge, what did you do

6   for a living?

7   **A.**   Initially I worked for an engineering company called Rolls

8   Royce.  They make aircraft engines.

9   **Q.**   Then what did you do?

10   **A.**   I then went into financial services, investment banking

11   working for an investment bank called Cazenove.

12   **Q.**   What is Cazenove?

13   **A.**   Cazenove is a UK investment bank that ultimately got

14   acquired by JPMorgan.

15   **Q.**   And from 1998 to 2008, did you work as an analyst at

16   Cazenove and other investment banks?

17   **A.**   I did, yes.

18   **Q.**   Which investment banks?

19   **A.**   Cazenove.  I then went to Schroders, and Schroders was

20   acquired by Citigroup, and the bulk of the time I was at

21   Citigroup.

22   **Q.**   What is an analyst?

23   **A.**   An analyst is a financial professional.  Their job is to

24   analyze financial markets, so in my case the software industry.

25   So to basically write written research, to build financial

1    models, and basically to tell investors what stocks they should

2    or shouldn't buy.

3    **Q.**    How do you go about doing that?

4    **A.**    A number of ways, really.  Firstly, relationships with the

5    management teams at the companies under coverage, and so I

6    generally followed between 10 and 12 different companies.  I

7    would have relationships with each of those management teams,

8    the CEOs and the CFOs in particular.  We would analyze

9    financial reports, so annual reports that every company has to

10   publish as a publicly listed business, quarterly reports.  Also

11   spend time at sort of industry events, so trade shows and

12   industry events with companies that participated in that

13   particular industry, as well as talking to industry analysts,

14   so companies like Gartner and Forrester that basically take a

15   more technical view rather than the financial view of the

16   industry.

17   **Q.**    You said a lot there, Mr. Geall.  Let me make sure I

18   understand.

19        What is an annual report?

20   **A.**    An annual report is an official publication that companies

21   in the UK have to produce, which basically runs through the

22   performance of the business over the prior 12 months, but may

23   also go into a discussion around the strategy and the focus

24   areas for that business.

25   **Q.**    Are those important documents in your line of work?

1    **A.**    Very much so, yes.

2    **Q.**    You also mentioned something called a quarterly report.

3    What is that?

4    **A.**    So in the UK, companies can either report on a biannual

5    basis or on a half yearly basis or on a quarterly basis, and

6    the quarterly reports were again financial statements that were

7    basically produced to give information to financial analysts

8    and investors around the performance of a business at that

9    time.

10   **Q.**    And you were a financial analyst.  How does that differ

11   from the Gartners of the world that you mentioned in your prior

12   answer?

13   **A.**    So financial analysts will tend to have, I suppose, two

14   core sets of skills or understanding.  One is a financial

15   understanding, so good understanding of financial statements

16   such as profit and loss accounts, cash flow, balance sheets.

17   So understand, you know, the -- how a business is performing

18   based on its financial capabilities, as well as a good

19   understanding of an industry.  So, you know, what are the

20   technical drivers, is this company well positioned, is it

21   likely to be successful in its -- in its execution.

22   **Q.**    You talked a little bit about -- strike that.

23        What was the end result of your work as an analyst?  How

24   does that -- you've studied a company, you've have read the

25   annual report, you've read the quarterly report.  What do you

1   do with that information?

2   A.   I would say your activity breaks down into three different

3   areas.  One is doing in-depth analysis and research, so really

4   taking a view on a particular company or an industry, and

5   making a recommendation on that.

6        You know, that could be two months work or two months

7   activity.  So you'd spend about a third of your time maybe

8   coming up with this sort of more thematic or sort of

9   deeper-dive research.  You would spend about a third of your

10  time responding to the financial results, so every quarter, if

11  you have ten stocks under coverage, that's ten days of your

12  time responding to those results, and then a third of your time

13  on the road meeting with investors, talking to analysts, and

14  talking to investors in particular to basically articulate your

15  view on a stock or an industry.

16  Q.   Based on your work as an analyst, do investors rely on the

17  reports that the analysts publish?

18  A.   Yes, they do.

19  Q.   During this time period, 1999 to 2008, when you were an

20  analyst at Schroders and then Citigroup, what industry did you

21  focus on?

22  A.   Software and IT services.

23  Q.   What were some of the companies that you covered?

24  A.   SAP, Autonomy, Dessault System, Business Objects, Atos,

25  Capgemini, Logica, CMG, and Tutronics, I think.

**GEALL - DIRECT / LEACH**

1   **Q.**   Let me focus on the time period when you were covering

2   Autonomy.

3       How would you characterize your coverage of Autonomy

4   during the period that you covered them?

5   **A.**   Between '99 and 2008?  Generally quite positive.  I was

6   generally a buyer of the stock, so I would have a positive

7   recommendation of the stock.

8   **Q.**   Did you get to know Mike Lynch?

9   **A.**   I did, yes.

10  **Q.**   Did you get to know Sushovan Hussain?

11  **A.**   I did, yes.

12  **Q.**   How so?

13  **A.**   As I mentioned, part of the role as an analyst is to build

14  a relationship with the management teams.  Autonomy was no

15  different to any other company in my coverage.

16  **Q.**   At some point in time, did you accept a job offer from

17  Autonomy?

18  **A.**   I did, yes.

19  **Q.**   How did that come about?

20  **A.**   In 2008, I was looking at opportunities.  I had had a bit

21  of a falling out with my head of research at Citigroup and had

22  another offer internally within Citigroup, which was more on

23  the investment banking side.  I was having discussions with

24  Mike around that time, and he suggested that it was a good

25  opportunity for me to come to Autonomy and was that something I

1  wanted to do.

2  **Q.**   What were you hired to do?

3  **A.**   So I was hired in a role which was to head one of the

4  businesses, a business called Virage.

5  **Q.**   What was Virage?

6  **A.**   So Virage was a -- at one time it was an acquisition that

7  Autonomy had made around early sort of 2000 -- I think it was

8  sort of 2003, maybe 2005 time frame, which had basically the

9  video processing capabilities of the IDOL platform.

10  **Q.**   And when did you join Autonomy?

11  **A.**   In 2008.

12  **Q.**   What office did you work out of?

13  **A.**   I spent most of my time out of the Piccadilly office in

14  London.

15  **Q.**   Would you please describe the layout for us.

16  **A.**   This was a, I suppose, a Victorian building in the center

17  of London.  Autonomy had I think a couple of floors in this

18  building.  One of those floors was -- had basically the board

19  room where sort of many of the management meetings were.

20       Next to that was Mike Lynch's office.  Adjacent to that

21  was an office that Sushovan Hussain would use.  Initially I was

22  in that office when I was in London, and then you went through

23  to other offices, including the marketing team and other areas.

24  **Q.**   So for some period of time, you shared an office with

25  Sushovan Hussain?

1   **A.**   That is correct.

2   **Q.**   Roughly how long was that for?

3   **A.**   I would say certainly for the first sort of six to nine

4   months of my time at Autonomy.

5   **Q.**   What was Mr. Hussain's role at the time you joined

6   Autonomy?

7   **A.**   He was the CFO, or the financial director.

8   **Q.**   And by virtue of being in the same office with

9   Mr. Hussain, did you have the opportunity to observe him on SMS

10   calls?

11   **A.**   I did, yes.

12   **Q.**   What is an SMS call?

13   **A.**   It was a call that was run at different times during the

14   quarter to get information from the salespeople at Autonomy in

15   terms of how they were doing and did they need help closing or

16   executing deals.

17   **Q.**   Describe for us how Mr. Hussain would run those SMS calls.

18   **A.**   I mean, normally it was a conference call, a sales -- an

19   AE -- an account executive would dial in, and they would be

20   questioned on what deals he was working on and what deals he

21   was going to close in the quarter.

22   **Q.**   At this time period, 2008, did Autonomy have a formal head

23   of sales?

24   **A.**   I suppose technically it would have been Mike Mooney in

25   the U.S.

1    **Q.**   Did you observe that someone else within Autonomy was the

2    de facto head of sales?

3    **A.**   Well, I mean, Sushovan was quite involved in the sales

4    process, maybe more so than other CFOs I had come across at

5    different companies.  You know, based on discussions we had

6    had, it was clear that he was in regular contact with Mike

7    Mooney to understand, you know, how the business was

8    performing.

9    **Q.**   How did that differ from other companies you were

10   accustomed to covering?

11   **A.**   I would say unusual.  You know, there was -- I've one

12   other example of another company that had a similar setup, but

13   I would say generally unusual, because a CFO and head of sales

14   tend to have very different types of personality and very

15   different risk profiles.

16   **Q.**   What do you mean by that?

17   **A.**   The CFO is there to be prudent and to, you know, basically

18   challenge head of sales -- right? -- make sure that what's in

19   the pipeline really deserves to be in the pipeline, make sure

20   the numbers are what the numbers are; whereas head of sales

21   will tend to be, you know, typical alpha male, you know, who is

22   basically close to absolutely every deal under the sun, so he

23   just tends to be very, you know, optimistic and very aggressive

24   in terms of getting deals done.  Not normally the type of sort

25   of characteristics you would associate with a CFO.

1   **Q.**   You were initially hired to be the CEO of Virage; is that

2   right?

3   **A.**   Correct.

4   **Q.**   And that was one of the companies that Autonomy had

5   acquired prior to you joining?

6   **A.**   Correct.

7   **Q.**   At some point in time did your job responsibilities

8   evolve?

9   **A.**   They did, yes.

10  **Q.**   How so?

11  **A.**   So I'd say after about, well, six to nine months I

12  basically was asked by Mike Lynch to take a more active role in

13  investor relations.

14  **Q.**   What is investor relations?

15  **A.**   Investor relations is a function that most public

16  companies have.  It's a -- normally a small team that are

17  responsible for working with the leadership team at the

18  business to, you know, come up with an investor strategy to

19  arrange meetings with investors, to communicate with investors,

20  to work on the documentation that was shared, whether it was

21  quarterly presentations, sometimes quarterly earnings, to

22  basically be the conduit between the business and the

23  investment community.

24  **Q.**   Did Dr. Lynch offer you other responsibilities to entice

25  you into this investor relations role?

1    **A.**    He did.  I mean, I was not keen to do the role.  I didn't

2    go to Autonomy to be head of investor relations, so he also

3    offered me the opportunity to be responsible for corporate

4    strategy and M&A, mergers and acquisitions.

5    **Q.**    What is mergers and acquisitions, or M&A?

6    **A.**    This is the role where, you know, for companies, you are

7    interacting with investment banks, you are keeping an eye on

8    the market and the market opportunity, looking at potential

9    acquisitions, potential divestitures that the business may

10    have, and then normally involved in the process of doing due

11    diligence and transacting on companies.

12    **Q.**    You testified part of the responsibility of investor

13    relations was meeting with investors and quarterly earnings

14    reports.  Did I hear that correctly?

15    **A.**    Correct.

16    **Q.**    What does that involve?

17    **A.**    So most companies again in the UK -- it's not very

18    different to the U.S -- will invest -- will meet with investors

19    on a regular basis, probably quarterly after their results and

20    their earnings.  Earnings are quite a significant time for any

21    business, because that's where new information comes into the

22    market.  So invariably the company and the management team of

23    the company need to give indications to investors what is the

24    relevance of that information, what should we do with that

25    information, how does it impact the valuation or our desire to

**GEALL - DIRECT / LEACH**

1  hold their shares.

2  **Q.**    Are you familiar with the term "road show"?

3  **A.**    I am, yes.

4  **Q.**    What is a road show?

5  **A.**    A road show is a series of meetings between the management

6  of a company and investors, normally in a particular region or

7  location.

8  **Q.**    And during the time period 2009 through April of 2010, did

9  you participate in road shows on behalf of Autonomy?

10  **A.**    Sorry.  Can you repeat the dates?

11  **Q.**    First quarter of 2009 through the first quarter of 2010?

12  **A.**    Yes.

13  **Q.**    Where were those road shows?

14  **A.**    I can't remember specifically, but normally the agenda of

15  road shows that we undertook were predominantly in the UK and

16  Europe, so meeting with investors in London we would do every

17  quarter.  We would also meet with some European investors, so

18  maybe a day in Paris or a day in Switzerland to meet with

19  investors there, and then occasionally we would also go to

20  North America, either to the East Coast, so normally Boston and

21  New York, or to the West Coast, to San Francisco to meet with

22  investors as well.

23  **Q.**    Did Mr. Hussain ever join you for some of the road shows

24  in North America?

25  **A.**    He did, yes.

1   **Q.**   Tell us about that.

2   **A.**   So I think there was one road show that we were on; it

3   actually coordinated with a technology conference that one of

4   the investment banks was hosting and hosted every year, which

5   was in San Francisco.

6        So, you know, as part of -- as part of that, we met

7   with -- we met with investors together.

8   **Q.**   And the investors that you are meeting with in the

9   United States in this time period, 2009 and the first quarter

10  of 2010, who were some of the investors you recall?

11  **A.**   I mean, typically, we would meet with companies like

12  Fidelity Capital, potentially Putnam and others.

13  **Q.**   Let me draw your attention, Mr. Geall, to the time period

14  of the first quarter of 2009.

15       Do you have that time period in mind?

16  **A.**   Yep.

17  **Q.**   Okay.  During early 2009, were -- were there -- was there

18  an increase in some of the skeptics in the analyst community

19  that were covering Autonomy?

20           **MS. LITTLE:**  Objection.  Vague.  Also leading.

21           **THE COURT:**  Sustained.  Foundation.

22  **BY MR. LEACH:**

23  **Q.**   When Dr. Lynch hired you to become head of investor

24  relations, were there particular issues that he wanted you to

25  address with some of the analysts that were covering Autonomy?

1    **A.**    Yes.

2    **Q.**    Describe those for us, please.

3    **A.**    So at the time, there were a small number of institutions

4    that were I think quite cautious on the performance of the

5    stock.  They basically felt that Autonomy was using its M&A --

6            **MS. LITTLE:**  Objection.  Hearsay.

7            **THE COURT:**  Well, I think it goes -- well, let's see.

8        So is this being admitted -- why are you offering this?

9    It is hearsay, so the question is what are you offering it for?

10            **MR. LEACH:**  I'm offering it to give a sense of his job

11    responsibilities, what he was doing as the IR director to put

12    in context some of the disclosures he's making to investors.

13            **THE COURT:**  So, ladies and gentlemen, the witness was

14    asked how, I think in substance, how the Autonomy stock at this

15    particular period of time was viewed by investors.

16        And it is being admitted not for the truth of the matter.

17    That is to say, it's not being admitted to show that is what

18    investors thought about the stock; rather, it is being admitted

19    because it reflects or shows this witness' state of mind in

20    order -- in connection with the things that he did.

21        So that's a distinction that we draw all the time in

22    trials, and sometimes it's difficult to understand.  But the

23    distinction is that this witness is going to say he was aware

24    of certain things by being told certain things or being --

25    witnessing certain things and, as a result, he did certain

1    things.  So it's not being introduced for the truth, that is,

2    whatever investors thought about the stock; rather, it's being

3    admitted for the purpose of explaining why and what this

4    witness did.  So it goes to his state of mind.

5            **MS. LITTLE:**  I would just add an additional objection

6    that his state of mind is not relevant.

7            **THE COURT:**  Okay.  Overruled.  Go ahead.

8    **BY MR. LEACH:**

9    **Q.**   What were the marching orders that Dr. Lynch gave you,

10   Mr. Geall?

11   **A.**   Sorry?

12   **Q.**   In terms of engaging with the analyst community in this

13   early 2009 time period, what did you understand your

14   responsibility to be in dealing with them?

15   **A.**   I mean, I think, you know, every -- every company will

16   have, you know, bulls and bears, you know, companies that

17   are -- or investors that are positive or analysts that are

18   positive and negative, and the role of an investor relations

19   professional is to be able to communicate with those investors,

20   to articulate the equity story, you know, basically why you

21   should own this particular stock, why it's different to other

22   companies in that industry.

23           So, you know, part of my role and responsibility was to

24   interact both with positive analysts as well as negative

25   analysts and make sure that they understood, you know, why the

1  business was performing in a particular way.

2  **Q.**   You mentioned the term "bull."  What is a bull in your

3  world?

4  **A.**   A bull is somebody that is a buyer or positive on a

5  particular stock and would buy that in the market.

6  **Q.**   And you mentioned the term "bear."  What is that?

7  **A.**   Somebody who is less positive, potentially negative and

8  would potentially be a seller of the stock in the market.

9  **Q.**   Who were some of the bulls at this point in time in the

10  analyst community?

11  **A.**   UBS would have been a positive on the stock.  Citigroup

12  would have been positive on the stock.

13  **Q.**   Who were some of the bears?

14  **A.**   So Panmure Gordon would have been a bear on the stock.

15  Numis was a bear on the stock.  Astaire or Astaire Securities

16  was a bear on the stock.

17         **MR. LEACH:**  May I approach, Your Honor?

18         **THE COURT:**  Uh-huh.

19  **BY MR. LEACH:**

20  **Q.**   You mentioned some names there, Mr. Geall.

21     Numis, was there a particular analyst associated with

22  Numis?

23  **A.**   David Thomas.

24  **Q.**   And Astaire, what is that?

25  **A.**   It's a small breaking firm in the UK focused on UK -- UK

1    companies in particular.

2    **Q.**    Who was the analyst associated with Astaire?

3    **A.**    Paul Moreland.

4    **Q.**    I've placed before you some documents, Mr. Geall.

5    Would you please look at what has been marked as Exhibit

6    55?

7    **A.**    Okay.

8    **Q.**    Is this a true and correct copy of an earnings release for

9    Autonomy for the quarter ended March 31, 2009?

10   **A.**    I believe so yes.

11           **THE COURT:**  Admitted.

12           **MS. LITTLE:**  Objection, Your Honor --

13           **THE COURT:**  Sorry?

14           **MS. LITTLE:**  This one has a page missing.  I

15   believe -- Exhibit 55, at least the version that I have, has

16   the last page missing.

17           **MR. LEACH:**  Your Honor, I'm content to use 57.

18           **THE COURT:**  Are 55 and 57 the same?

19           **MS. LITTLE:**  My understanding is they are, Your Honor,

20   but one has a page missing.

21           **THE COURT:**  Okay.  So the Government wishes to

22   withdraw 55 and substitute 57?

23           **MR. LEACH:**  That's fine with the Government,

24   Your Honor.

25           **THE COURT:**  Okay.  So 55 withdrawn.  57 admitted.

1              (Trial Exhibit 57 received in evidence)

2     BY MR. LEACH:

3     Q.    Are you familiar with this document, Mr. Geall?

4     A.    I am.

5     Q.    Okay.  Is this something you reviewed prior to when it was

6     issued to the public?

7     A.    Potentially, yes.

8     Q.    Let me draw your attention to the top portion where it

9     says, "Autonomy Corporation PLC announces results for the first

10    quarter ended March 31, 2009."

11          Do you see that?

12    A.    I do.

13    Q.    Okay.  And then below that, there is a bullet "record Q1

14    results ahead of consensus."

15          What does "consensus" mean?

16    A.    Consensus is a term that relates to basically the mean

17    earnings expectations that investors or financial analysts had

18    for that stock for that quarter.

19    Q.    Okay.  When you were covering Autonomy and other

20    companies, would you create some estimate of what you thought

21    earnings were going to be for any particular quarter?

22    A.    Yes.

23    Q.    And how does that relate to the consensus estimate?

24    A.    I mean, theoretically, it should be the same; right?  If

25    you are looking at the same investors or the same financial

1   analysts and they have the same earnings expectations,

2   consensus should come out the same.

3   **Q.**   How does the consensus relate to the estimate for any one

4   particular analyst?

5   **A.**   Well, I mean, consensus is the mean, it's the average of

6   all the analysts that cover the stock.

7   **Q.**   And was this a metric that you paid attention to when you

8   were at Autonomy?

9   **A.**   Yes.

10  **Q.**   Why?

11  **A.**   Consensus is an indication of the market expectation.  If

12  you do better than the market, then the likelihood is the

13  shares will perform well.  If you do worse than the

14  expectation, the likelihood is the shares will perform badly.

15  **Q.**   And was this a number that Dr. Lynch paid attention to at

16  Autonomy?

17  **A.**   Yes.

18  **Q.**   Do you recall any experiences where you were criticized in

19  your role as investor relations for not managing the consensus

20  estimate well enough?

21  **A.**   Yes.

22  **Q.**   What happened?

23  **A.**   One quarter where I was in the investor relations

24  function, I had been on all day, I believe, it was the end of

25  the quarter.  Normally the process for consensus -- so

1   consensus is collected or should be collected by third party

2   companies like Blumberg or Thomson Reuters.  So what tends to

3   happen is a financial analyst will publish their expectations

4   ahead of the company reporting those earnings.  Invariably, we

5   would be in what was called closed season.  So closed season

6   means that we should not be providing any new information to --

7   to the analysts that were writing these research notes.

8        So these analysts would publish, and that would happen

9   every quarter, and every time a new set of earnings

10  expectations came out, the consensus would move.

11       One particular quarter, an analyst had published --

12           MS. LITTLE:  Objection.  Can we have some foundation

13  as to the time of this event?

14           THE COURT:  Sustained.

15       When did this happen?  You said one particular quarter.

16  Are you referring to -- you are referring to a particular

17  quarter.  Can you identify it?

18           THE WITNESS:  I can't, no.

19  BY MR. LEACH:

20  Q.   Is it at some point in time after early 2009 when you

21  assumed responsibility for investor relations?

22  A.   It was sometime between 2009 and 2010.

23  Q.   And do you recall a particular earnings consensus number

24  that this was associated with?

25  A.   Yes.  I can -- the number is vividly etched onto my brain.

**Q.**    What is that number?

**A.**    It was two hundred million euros or two hundred million dollars.

**Q.**    And when you returned from your vacation, where were you on vacation?

**A.**    I was in Barbados.

**Q.**    And when you returned from Barbados, did Mr. Hussain say something to you?

**A.**    So basically the analyst had published an update to numbers which should move to consensus, which I think Dr. Lynch was not happy about.  So when I came into the office one morning, Sushovan had mentioned that there had been a change to -- to one analyst's reports, and as a consequence consensus, and, you know, we might need to talk to Mike about it.

**Q.**    Did you and Mr. Hussain talk to Mike about it?

**A.**    We did, yes.

**Q.**    Tell us what happened.

**A.**    So, I mean, prior to the discussion with -- with Mike, I had explained that, you know, as a investor relations professional, you can't actually dictate what consensus is. You can only provide information that helps an analyst come to the right conclusion as to the performance of the stock.  So, you know, you can't give information in closed periods, so you cannot effectively manipulate it.  So it is what it is.

So, you know, there was really nothing I could have done.

1    I was on holiday.  We were in closed season, so we shouldn't

2    have been communicating with the analyst community anyway, so,

3    you know, it is what it is.

4        My hope was that I had Sushovan's backing in any

5    discussion that we have or would have with Mike consequently.

6        Later on that day, I was basically pulled in to the board

7    room with -- with Mike, Sushovan, and I believe Andy Kanter,

8    the COO, and Mike was pretty vocal in his displeasure with the

9    fact that, you know, I had let consensus get ahead of itself,

10   and as a consequence all the good work that Autonomy had done

11   to close the quarter and deliver the revenues was going to be

12   lost because market expectations were too high, and that was my

13   fault.

14   **Q.**   When you say he was vocal, what do you mean?

15   **A.**   Well, he was swearing at me across the boardroom table.

16   **Q.**   What are the consequences of missing the consensus

17   estimate?

18   **A.**   Normally your share price will go down.

19   **Q.**   Drawing your attention back to the press release, Exhibit

20   57, further down there is some rows where it says, "revenues."

21   Do you see that?

22   **A.**   I do, yes.

23   **Q.**   What were Autonomy's publicly reported revenues for March

24   of 2009?

25   **A.**   $129,779,000.

GEALL - DIRECT / LEACH

1    **Q.**    Beneath that there is a term "gross profit."  Do you see

2    that?

3    **A.**    I do.

4    **Q.**    There is something called "gross profit margin."  What is

5    that?

6    **A.**    The gross profit margin is a calculation, a margin

7    calculation which removes the cost of sales and is used within

8    the software industry and particularly by Autonomy to

9    demonstrate the purity of the business model.  It was a

10    software-based business, and, as such, should have a high gross

11    margin.

12    **Q.**    When you say it was used particularly by Autonomy, what do

13    you mean by that?

14    **A.**    So part of the equity story that was communicated to

15    investors included the fact that Autonomy had a very high gross

16    margin, probably one of the highest in the industry.  And this

17    was to do with the composition of its revenues being basically

18    software licenses, cloud subscription revenues or services.

19    **Q.**    What do you mean by cloud subscription revenue?

20    **A.**    So in the software industry, there are basically two

21    different ways of recognizing revenues.  The first is basically

22    an upfront license, which is traditionally how software

23    companies operated in I would say prior to the 2000 sort of

24    time frame where you would sell a license, let's say, for a

25    million dollars; you would recognize that million on that day,

1    and it would be booked as revenues on your profit and loss.

2        What we see more and more so these days is what's known as

3    cloud subscriptions.  This is a ratable revenue stream.  So

4    basically what you have is a company will basically contract

5    into maybe a one, two or three-year period.  Let's say that

6    that three-year period was 3 million in revenues.  Then you

7    would recognize a quarter of one year's revenues each quarter

8    as a subscription.  So in that case it would be $250,000 per

9    quarter for the length of the contract.

10   **Q.**   During your tenure in investor relations, did you have

11   occasion to discuss this concept of gross margin with Sushovan

12   Hussain?

13   **A.**   We would have -- we would have discussed the gross margin

14   and the performance of the business based on gross margin, yes.

15   **Q.**   Was this a metric that he paid attention to?

16   **A.**   Absolutely.

17   **Q.**   How so?

18   **A.**   As I mentioned, the equity story was built around the high

19   gross margin.  The gross margin was a metric that was called

20   out in pretty much every earnings call and every interaction

21   with investors relating to the purity of the business model.

22   So it would be something that was discussed internally pretty

23   much every set of results.

24   **Q.**   What do you mean by the purity of the business model?

25   **A.**   So Autonomy at the time was pretty unique in the industry

1    insofar it was very, very focused on -- on high margin software

2    licenses, had a lot less services revenues than your typical

3    software company.  A typical software company would have -- or

4    does have around 30 percent of its revenues as services.

5        Autonomy was less than 10 percent.  Every acquisition that

6    Autonomy did, it would basically reduce the amount of services

7    revenues that it did, so that your mix was -- was these high

8    margin licenses, subscription, and maintenance revenues.

9    **Q.**   During your road shows with investors, was this purity of

10   the business model a selling point for Autonomy?

11   **A.**   It was a foundation of the growth story and the business

12   model, yes.

13   **Q.**   Let me please draw your attention to the next exhibit,

14   what is marked as 2762.

15       Is this a true and correct copy of an email that you sent

16   to Mike Lynch and Sushovan Hussain on or about June 30th of

17   2009?

18   **A.**   I believe so, yes.

19           **MS. LITTLE:**  Mr. Leach, I don't think this was in the

20   exhibits you designated.  2762?

21           **THE COURT:**  2762.

22           **MS. LITTLE:**  No objection.

23           **THE COURT:**  Admitted.

24       (Trial Exhibit 2762 received in evidence)

25

1    BY MR. LEACH:

2    Q.    Mr. Geall, I draw your attention to the top portion of the

3    email.  There is an attachment titled "Fred Astaire note V1."

4    Do you see that?

5    A.    I do.

6    Q.    What is that a reference to?

7    A.    This is the attachment that came with the email.

8    Q.    Fred Astaire, is that a joke between you and Mr. Hussain?

9    A.    This was a commentary on a note written by the broker,

10   Astaire Securities, so it was, I suppose, a pun or a play on

11   words with Astaire.

12   Q.    Okay.  A comparison to the American dancer with Ginger

13   Rogers?

14   A.    I believe so, yes.

15   Q.    Why were you sending this to Mr. Hussain and Dr. Lynch?

16   A.    So this particular analyst, Paul Moreland, had written a

17   sort of a bearish note on Autonomy.  So I had reviewed the note

18   to, you know, outline the issues that the analyst was raising

19   so that we could respond to any incoming questions from

20   investors or other analysts.

21   Q.    Why were you soliciting Mr. Hussain's input for this?

22   A.    He was the CFO of the company.  I would always solicit his

23   input.

24   Q.    Let's look, please, at the attachment.

25         Page 2 of the exhibit, please, Ms. Margen.

1          And I draw your attention down to the bottom portion where

2     it says, "looking for explanations for weakness."  Do you see

3     that?

4     **A.**   I do.

5     **Q.**   Beneath that, there is some numbers, 1 and 2.  What do you

6     understand was being described here?

7     **A.**   So the first part is a -- is basically a statement

8     relating to the research notes, so the commentary was around

9     something called "day sales outstanding," which have a linkage

10    to cash conversion.  And this particular analyst, his forte was

11    cash conversion of companies; that's how he analyzed the

12    performance of the business, and, you know, was drawing the

13    cash conversion of Autonomy's performances as a concern.

14         And then after that, there's basically a statement in

15    italics relating to, you know, why this wasn't a concern for

16    Autonomy.

17    **Q.**   Okay.  So the italicized portion is your proposed

18    response; is that fair?

19    **A.**   Potentially it could have been, yes.

20    **Q.**   And it was what you were seeking input for from

21    Mr. Hussain?

22    **A.**   Yes.

23    **Q.**   You mentioned something called cash conversion.  What is

24    that?

25    **A.**   So cash conversion is the ability for a business to

1   convert its revenues into cash.  The motto is "cash is king,"

2   and companies that have a high margin tend to generate or

3   should generate more of their revenues or turn that into cash,

4   so cash can be used for reinvestment, so it's a positive for a

5   company.

6   **Q.**   If we can please look at the next page up at the top.

7        And I draw your attention to question 4 or item 4 where it

8   says, "when sales are not converted to cash/barter deals."  Do

9   you see that?

10  **A.**   Yes, I do.

11  **Q.**   What is a barter deal?

12  **A.**   A barter deal tends to be a deal between two

13  counterparties in the software industry.  It could be, you

14  know, effectively the swapping of products.  So both would

15  recognize revenues or potentially recognize revenues, but there

16  wouldn't necessarily be any cash flow between them.  Like a

17  swap deal.  Like a swap deal.

18  **Q.**   And as an analyst, what type of concern does a barter deal

19  raise?

20  **A.**   It's not necessarily a true reflection of the performance

21  of the business.

22  **Q.**   What do you mean by that?

23  **A.**   Most analysts wouldn't consider it as -- as bona fide

24  revenues.

25  **Q.**   Why?

1   **A.**   Because somebody didn't buy anything.

2   **Q.**   And the bullet -- the line here "when sales are not

3   converted to cash/barter deals," what did you understand the

4   concern Mr. Moreland and Astaire to be raising and that you

5   were trying to respond to with Mr. Hussain?

6           **MS. LITTLE:**  Objection as to Mr. Moreland's state of

7   mind.

8           **THE COURT:**  Overruled.  It's directed to this witness'

9   understanding of Mr. Moreland's state of mind.

10          **THE WITNESS:**  So, I mean, Paul Moreland was looking

11  for reasons why cash conversion was not what it should have

12  been.  And one of the questions he was raising was whether

13  barter deals were something that Autonomy was undertaking.

14  **BY MR. LEACH:**

15  **Q.**   And in italics below, could you please read the -- that

16  italicized portion for us?

17  **A.**   "Autonomy does not undertake barter deals.  Similarly, we

18  do not revalue existing debtors on acquisition to increase the

19  deferred income balances.  The complaint from many analysts is

20  that deferred is too low post acquisition, not too high."

21  **Q.**   What were you saying there?

22  **A.**   What I was saying was that Autonomy doesn't do barter

23  deals, so it shouldn't be a concern.

24          Also, there is a statement here relating to effectively

25  debtors, which is another concern that sometimes analysts have,

1    which is, you know, where you've basically sold a license but

2    haven't been paid by the customer.

3        After a certain period of time, you should write down that

4    deal and basically redo your financial statements, potentially.

5    **Q.**   Let me draw your attention to the next exhibit, please,

6    Exhibit 2763.

7        Do you recognize this document?

8    **A.**   I do, yes.

9    **Q.**   Is this a true and correct copy of an email you received

10   with a draft PowerPoint relating to Autonomy's earnings

11   announcement for the second quarter of 2009?

12   **A.**   I believe so.

13           **THE COURT:**  Admitted.

14       (Trial Exhibit 2763 received in evidence)

15   **BY MR. LEACH:**

16   **Q.**   Let me draw your attention, Mr. Geall, to the top portion

17   of the email.

18       There is some individuals listed there, one of whom is

19   Edward Bridges.  Who is he?

20   **A.**   Edward Bridges was the managing director at a company

21   called Financial Dynamics.  Financial Dynamics was an advisory

22   firm that Autonomy used for corporate communications.

23   **Q.**   What is Financial Dynamics?

24   **A.**   It's a company that was in the UK, based in the UK that

25   provided corporate communications advisory for publicly listed

1    companies.

2    **Q.**   Who is Peter Goodman?

3    **A.**   Peter Goodman was an employee of Autonomy.  He worked for

4    me in investor relations.

5    **Q.**   What is Mr. Goodman circulating to you and others at

6    Autonomy here?

7    **A.**   This would have been a draft for the presentation that we

8    would have used for the quarterly results, in this case the

9    second quarter of 2009.

10   **Q.**   Was it common practice for -- during your tenure at

11   Autonomy, to prepare a PowerPoint for investors, along with the

12   press release that Autonomy issued?

13   **A.**   Yes.

14   **Q.**   And did you have a hand in drafting those when you were in

15   investor relations?

16   **A.**   Yes.

17   **Q.**   Who else was involved in that?

18   **A.**   So, I mean, these took a similar format each quarter.

19   They would normally be started by Peter Goodman, who would do

20   the bulk of the work, and then there would have been

21   contributions potentially from the marketing team if it related

22   to customer references, from Steve Chamberlain and Sushovan as

23   it related to the financial characteristics and financial

24   performance of the business, potentially some commentary from

25   Mike Lynch relating to the strategy and direction of the

1    business.

2    **Q.**   Let me please draw your attention to the back half of this

3    PowerPoint, page 24 of the exhibit.

4        The title of this slide is "answer to questions received."

5    Do you see that?

6    **A.**   I do, yes.

7    **Q.**   What is this portion of the PowerPoint?

8    **A.**   So this -- this was part of an appendix.  The appendix

9    wouldn't necessarily have been presented as part of the formal

10   presentation, but was there for reference for investors and for

11   analysts so that they had additional information where

12   required.

13   **Q.**   And the questions received, what are the questions

14   received?  What do those relate to?

15   **A.**   So what Autonomy had started to do during this time period

16   was to publish questions and answers.  So where there were

17   questions coming from the financial community, from investors

18   or analysts, whether positive or negative, these would be

19   published to the -- to an investor bulletin board where

20   Autonomy would answer questions so that they were there and

21   transparent for all investors to go and look at and compare.

22   **Q.**   Who had responsibility for the investor bulletin board?

23   **A.**   The responsibility was ultimately with myself in investor

24   relations.

25   **Q.**   For finance questions, would anybody within Autonomy

1   review those questions and answers before they were posted?

2   **A.**    Yes.    It was common practice that, you know, all questions

3   were reviewed normally by Steve Chamberlain and Sushovan from a

4   financial perspective, and from Mike for an operational

5   strategy perspective.

6   **Q.**    On this slide down at the bottom, one of the questions is

7   "Do you do barter deals?    If so, could you quantify them."    Do

8   you see that?

9   **A.**    I do, yes.

10  **Q.**    And what is the answer on this slide?

11  **A.**    No, we do not do barter deals.

12  **Q.**    Where did you get that information?

13  **A.**    This information I would have discussed with -- with

14  Sushovan and Steve Chamberlain.

15  **Q.**    You testified earlier, Mr. Geall, in road shows -- in road

16  shows you would talk about Autonomy's equity story.    Do you

17  recall that testimony?

18  **A.**    I do.

19  **Q.**    What do you mean by equity story?

20  **A.**    It was -- I would say -- or it is good practice for a

21  company to understand how it differentiates itself in the

22  market, what are the growth drivers, why is it different to

23  other companies.    Any investor could be faced with thousands of

24  potential companies that they can invest in.    So building a

25  very clear, concise, easy to understand equity story enables

1    investors to understand why they should own your stock.

2    **Q.**    And in this 2009 time period, what was the equity story

3    that you articulated to investors?

4    **A.**    So in 2009, you need to remember the time period --

5    right? -- just after 2008 and the financial crisis, so a lot

6    of -- a lot of the opportunity that Autonomy was seeing at that

7    time was based on regulatory investment.  So financial services

8    institutions that were being sued as part of the -- as part of

9    the sort of post Lehman's effect where investing in eDiscovery

10   tools and other tools that helped them with that litigation

11   process.  And that was -- that was a growth driver for Autonomy

12   at a time when other businesses were still struggling.

13        Another part of the equity story was -- was the

14   accelerated growth from -- from acquisitions.  So Zantaz being

15   one acquisition, and then around this time frame as well

16   Interwoven, you see here.  Interwoven revenues is called out.

17   This was an acquisition that was done in an area where Autonomy

18   was delivering accelerated growth and improved margin to that

19   acquired business.

20   **Q.**    Was Autonomy's gross margin important to the equity story,

21   as you have described it?

22   **A.**    Yes.

23   **Q.**    How so?

24   **A.**    As I mentioned before, it was an indication of the purity

25   of the business model.  The fact that Autonomy had a pretty

1    stable set of revenues from the OEM business, which are also

2    high margin because the sales cost was very low, as well as

3    this, you know, attractive mix of cloud subscription revenues

4    and license revenues that were also high margin.

5    **Q.**   You mentioned the term OEM business.  What does that mean?

6    **A.**   OEM stands for -- was taken from the car industry for

7    original equipment manufacturer, but what it relates to in the

8    context of the software industry is where a vendor has a piece

9    of technology that is being utilized by other software

10   companies.  So in the case of IDOL, IDOL had a connector

11   portfolio that it acquired from a company call Verity, and that

12   was being licensed by other software companies, and then

13   technically when they sell their business, they should pay --

14   or when they sell their product, they will pay a royalty back

15   to Autonomy.  So it's a nice way of scaling the business,

16   because you're letting the entire industry sell your product

17   for you.

18   **Q.**   Let me please draw your attention to what has been marked

19   as Exhibit 2765.

20       Do you have that in front of you, Mr. Geall?

21   **A.**   I do.

22   **Q.**   Is this a true and correct copy of an email that Peter

23   Goodman sent to you, Sushovan Hussain, and Dr. Lynch?

24   **A.**   I believe it to be so.

25           **MR. LEACH:**  Your Honor --

1              **THE COURT:**  Admitted.

2              (Trial Exhibit 2765 received in evidence).

3              **MR. LEACH:**  Thank you, Your Honor.

4    **Q.**   The subject of this, Mr. Geall, is Q and A revised.  Do

5    you see that?

6    **A.**   Yes, I do.

7    **Q.**   What does that refer to?

8    **A.**   Well, the Q and A refers to questions and answers, and it

9    relates to a document or the attachment, investor Q and A

10   where, you know, a number of questions and associated answers

11   are being discussed.

12   **Q.**   Is that a reference to the website you described where

13   investors could have their questions posted and Autonomy would

14   respond to them?

15   **A.**   Yes.  So the likelihood with these -- this document would

16   then be uploaded to the investor bulletin board.

17   **Q.**   Do you know why Mr. Goodman is sending this to you and

18   Dr. Lynch and Mr. Hussain?

19   **A.**   Well, in this case he's asking for Mike's okay, and he

20   comments to Mike relating to the answers that are being

21   generated or being upgraded.

22   **Q.**   Let me draw your attention to page 6 of this exhibit.

23        And do you see the question and answer beneath 12th May,

24   2009?

25   **A.**   I do.

1  **Q.**   Is that the dating convention in the UK, to have the

2  number before the month?

3  **A.**   Yep.

4  **Q.**   And the question is "Do you do barter deals?"  Do you see

5  that?

6  **A.**   No, not in the -- okay.  Well, I seem to have a -- oh,

7  sorry.  12th of May.  I do.

8  **Q.**   Are we on page 6, Mr. Geall?

9  **A.**   Yeah.  I was looking at the 12th of May slightly below.

10  **Q.**   Was this the same question that you were addressing with

11  Mr. Moreland at the end of the second quarter of 2009?

12  **A.**   It would have been a continuation of that, yes.

13  **Q.**   Let me move forward in time, Mr. Geall, to September of

14  2009.

15       Are you familiar with something called SPE?

16  **A.**   I am, yes.

17  **Q.**   What is SPE?

18  **A.**   SPE stands for structured probabilistic engine.  SPE also

19  related to some of the functions within IDOL.

20  **Q.**   In or around September of 2009, did Autonomy announce a

21  new product launch relating to SPE?

22  **A.**   It did.

23  **Q.**   Let me draw your attention to what has been marked as

24  Exhibit 199.

25       Is this a copy of a press release dated September 16th,

1    2009, announcing the launch of SPE?

2    **A.**    It appears so, yes.

3              **MR. LEACH:**   Your Honor, I offer Exhibit 199.

4              **MS. LITTLE:**   No objection.

5              **THE COURT:**   Admitted.

6         (Trial Exhibit 199 received in evidence)

7    **BY MR. LEACH:**

8    **Q.**    Did you have a hand in drafting this, Mr. Geall?

9    **A.**    No.

10   **Q.**    Okay.  Why is that?

11   **A.**    This is a press release which went out to the industry

12   press.  It wasn't a financial release.

13   **Q.**    So you're responsible for the financial releases, others

14   are responsible for the product releases?

15   **A.**    Correct.

16   **Q.**    The title here is Autonomy applies its advanced meaning

17   based technology to transform database market.  Do you see

18   that?

19   **A.**    I do.

20   **Q.**    What did Autonomy tell the market IDOL structured

21   probabilistic engine was?

22   **A.**    IDOL SPE was a new product that was introduced into the

23   market.  It was doing something unique that hadn't been done

24   before, which was applying the mathematical capabilities of

25   IDOL, but to structure to data rather than unstructured data,

1    and that would open up a new market opportunity, so what was

2    known as an addressable market that would accelerate growth for

3    Autonomy.

4    **Q.**   You mentioned some terms, "structure data and unstructured

5    data."  What are those?

6    **A.**   So basically business information broadly comes in two

7    forms, structured or unstructured.  Structured is when it's in

8    a database.  So I don't know, think of it in your Microsoft

9    access database or even in a -- potentially even in an Excel

10   spreadsheet where you are able to quickly search and find that

11   information because it's being tagged.  You know where it is in

12   the database, so it's quickly -- it's easy to go and find it.

13   So think of it, you know, like putting something in a specific

14   slot on your bookshelf, you know where to go to get it.

15       Unstructured data is the information that we have in

16   emails, it's the information that we have when we record

17   telephone calls, it's the electronic information that doesn't

18   sit in the database, and that is what is known as unstructured

19   data.

20   **Q.**   Let me please draw your attention to the second page of

21   this press release.

22       In the top paragraph, do you see the reference to how SPE

23   can be used by an airline and customers searching for

24   particular flights?

25   **A.**   I do.

1    **Q.**    Would you please read that for us.

2    **A.**    "For instance, an airline can leverage IDOL SPE to improve

3    the online customer experience and increase sales.  A customer

4    searching for a flight from New York to San Francisco at a date

5    and time when all flights are sold out will automatically be

6    offered an alternative airport such as Oakland or San Jose

7    rather than returning no results to the customer's search.

8    IDOL SPE infers the result from patterns in the data and its

9    usage without the need for scripts or geographic information."

10    **Q.**    In your role in investor relations and in dealing with

11    investors, did you undertake some research about IDOL SPE to

12    try to better understand what this product was and what it

13    might mean for Autonomy?

14    **A.**    As an analyst, when I followed Autonomy, I had looked at

15    all of its acquisitions, it's historical acquisitions.  One of

16    those acquisitions was a business called NCorp, which was one

17    of the earlier technology acquisitions that Autonomy had made,

18    and that's what basically brought the IDOL SPE functions into

19    the IDOL product before -- well before this press release.

20    **Q.**    Please look at what has been marked as Exhibit 3.  Do you

21    recognize this?

22    **A.**    It's -- it's a document probably to the Stock Exchange in

23    the UK from 2005 relating to an acquisition.

24    **Q.**    An acquisition of NCorp by Autonomy; is that right?

25    **A.**    Correct.

1            **THE COURT:**  Admitted.

2            (Trial Exhibit 3 received in evidence)

3    **BY MR. LEACH:**

4    **Q.**    So this press release, Mr. Geall, is four years prior to

5    the announcement of SPE in September of 2009?

6    **A.**    Correct.

7    **Q.**    What is the subject of the press release?

8    **A.**    "Autonomy announces strategic acquisition of revolutionary

9    structured data technology."

10   **Q.**    What is the date of this release?

11   **A.**    The 21st of February, 2005.

12   **Q.**    Let me draw your attention to the top of page 2 of this

13   press release.

14        And I draw your attention to the line beginning for

15   example, say any --

16   **A.**    Yes.

17   **Q.**    Is this language that -- and if we could also highlight

18   the second example, please, Ms. Margen.

19        Would you please read that second example for us?

20   **A.**    "For example, say a traveler was looking for a flight from

21   San Francisco to New York costing less than $300 on Wednesday,

22   although no exact matches exist.  Using its understanding of

23   the specified data and its usage, Autonomy's PPSA can

24   automatically identify a flight from Oakland to New York as

25   highly suitable and relevant to the user's criteria."

1    **Q.**    Did this similarity in language between the NCorp

2    announcement and SPE cause you any concerns, Mr. Geall?

3    **A.**    It did, yes.

4    **Q.**    Why was that?

5    **A.**    My feeling was that most analysts, whenever they see a new

6    product launch, will go to Google and search for information on

7    this.  I did this in my role at Autonomy, and basically got a

8    near identical match between the press release that was made

9    for IDOL SPE and actually some of the press coverage that was

10   done on the back of the NCorp acquisition in 2005, and felt

11   that we would get challenging questions from investors and

12   analysts who noticed the similarity.

13   **Q.**    Why was that of a concern to you?

14   **A.**    The indication or the implication is that IDOL SPE as a

15   set of functionality already existed in IDOL and was already

16   being sold to customers, so why was this going to open up this

17   wonderful new market opportunity and new growth rates.

18   **Q.**    Did you speak to Dr. Lynch about the similarity between

19   the announcement of NCorp and the announcement of IDOL SPE?

20   **A.**    I did.

21   **Q.**    What did he say?

22   **A.**    He basically dismissed my statement as stupid, and

23   wouldn't probably go and do that, so don't worry about it.

24   **Q.**    Let me please draw your attention to what has been marked

25   as Exhibit 247.

1          Do you recognize this document?

2     **A.**   I do.

3     **Q.**   Is this a true and correct copy of an email you sent to

4     Sushovan Hussain and Mike Lynch in October of 2009 relating to

5     a company called Catalyst?

6     **A.**   I believe it to be.

7               **MR. LEACH:**  Your Honor, I offer Exhibit 247.

8               **THE COURT:**  Admitted.

9          (Trial Exhibit 247 received in evidence)

10              **MR. LEACH:**  Ms. Margen, if we could please look at the

11    first email in the chain.  Perfect.  Thank you.

12    **Q.**   Mr. Geall, this is from someone named Ian MacLeod at a

13    company call Catalyst.

14         What is Catalyst?

15    **A.**   Catalyst is a San Francisco-based boutique, M&A adviser

16    that was set up by Frank Quattrone.

17    **Q.**   Who is Frank Quattrone?

18    **A.**   Frank Quattrone is an investment banker in the U.S.

19    market.

20    **Q.**   Were you familiar with him?

21    **A.**   Yes.

22    **Q.**   How were you familiar with him?

23    **A.**   I mean, Frank was or is recognized as one of the

24    rainmakers in the industry.  Many technology deals will have

25    Catalyst either acting on their defense or as a target.

1   **Q.**   What do you mean by rainmaker?

2   **A.**   He's the -- he's the banker that people want to use if

3   they want to sell their company or if they want to buy a

4   company.

5   **Q.**   During your time in investor relations, this 2009 to

6   2000 -- early 2010 time period, did you have occasion to meet

7   with bankers at Catalyst?

8   **A.**   I did, yes.

9   **Q.**   What did you do?

10  **A.**   Sorry, in the meetings or --

11  **Q.**   Just how many meetings did you have?

12  **A.**   So I had -- well, I would have had an initial introductory

13  meeting with Catalyst in London.  I was introduced to the firm

14  through an investor of Autonomy, Phil Pierson at GLG.  He

15  introduced me to one of the people in this email, Jean

16  Tardy-Joubert, who was running the European office at Catalyst.

17  We had an initial meeting just to discuss the industry, for him

18  to position Catalyst and the potential value that Catalyst

19  could bring working closely with Autonomy.

20       On the back of that meeting, we proposed a meeting to Mike

21  to meet with Frank Quattrone.  Frank Quattrone was coming to

22  the UK and was keen to meet with Mike Lynch.  So on the back of

23  that initial meeting, we had a meeting with Frank, and Jean

24  Tardy-Joubert would have been involved as well.

25  **Q.**   Who do you mean by "we," Mr. Geall?

GEALL - DIRECT / LEACH

1   **A.**   We.   So myself and Mike Lynch.

2   **Q.**   Let's go to the top portion of this email, please,

3   Ms. Margen.

4        Would you please read what you wrote here to Mr. Hussain?

5   **A.**   "They continue to want to act as our defense.  I believe

6   Quattrone believes a bid is imminent.  That was clear based on

7   the work he had done for the last meeting."

8   **Q.**   What did you mean by "they continue to want to act as our

9   defense?"

10  **A.**   Well, I mean, my feeling from the meetings with Catalyst

11  was they wanted to be the adviser to Autonomy.  Based on their

12  assessment of the software industry at that time, they felt

13  that Autonomy was an attractive asset to acquire, and they

14  wanted to represent Autonomy if a deal was discussed.

15  **Q.**   Roughly, how many times did you meet with Catalyst during

16  your time period in IR?

17  **A.**   So I met with Catalyst, as I mentioned, initially in

18  London, then sponsored a meeting in London with Mike and Frank,

19  I met with Ian MacLeod when I was in San Francisco in late

20  2009, and then I had a follow-up meeting with Mike and Frank

21  Quattrone in London in early 2010, so four, I think.

22  **Q.**   Thank you.

23       Let me move forward in time to the earnings announcement

24  for the third quarter of 2009.

25       Do you recall that earnings announcement, Mr. Geall?

**GEALL - DIRECT / LEACH**

1    **A.**    I do, yes.

2    **Q.**    Would you please look at what has been marked as Exhibit

3    289.  Is this a true and correct copy of Autonomy's quarterly

4    earnings release for the third quarter of 2009?

5    **A.**    I believe it to be, yes.

6            **THE COURT:**  Admitted.

7        (Trial Exhibit 289 received in evidence)

8    **BY MR. LEACH:**

9    **Q.**    If we could please blow up the first half of this.

10    Wonderful.  Thank you.

11        Mr. Geall, up at the top, it says, "Autonomy Corporation

12    PLC announces results for the third quarter and nine months

13    ended September 30th, 2009."  Do you see that?

14    **A.**    I do.

15    **Q.**    On or around September 30th, 2009, did you learn of the

16    potential of a significant hardware contract between Autonomy

17    and EMC?

18            **MS. LITTLE:**  Objection.  Leading.

19            **THE COURT:**  Overruled.

20            **THE WITNESS:**  I did, yes.

21    **BY MR. LEACH:**

22    **Q.**    What happened?

23    **A.**    So I had left the office one evening.  I got a phone call

24    from Peter Goodman who --

25            **MS. LITTLE:**  Objection.  Hearsay.

1          THE COURT:  Overruled.

2          THE WITNESS:  I got a phone call from Peter Goodman --

3          THE COURT:  Again, this is going to state of mind, not

4    necessarily for the truth of the matter.

5          MR. LEACH:  Yes, Your Honor.

6          THE COURT:  I don't know enough about it.  Yeah.  Go

7    ahead.

8          THE WITNESS:  So Peter Goodman phoned me, because he

9    had seen a document on -- that had been left in the office on

10   the printer, I believe, that related to a contract between

11   Autonomy and EMC for a significant amount of hardware, and he

12   was asking me for advice as to what to do with it, because it

13   looked like sensitive information.

14   BY MR. LEACH:

15   Q.   What did you tell him to do with it?

16   A.   I asked him to see whether Andrew Kanter was still in the

17   office, because it was his document.  And when he told me that

18   he wasn't, he felt he had gone, and to either shred it or to

19   lock it up.

20   Q.   Did the potential of this large hardware contract cause

21   you any concerns?

22   A.   Subsequently it did.  It was -- it was unusual as to why

23   that would have been there, and it was a large amount of money.

24   Q.   What do you mean it was unusual?

25   A.   Well, Autonomy had built an equity story around the purity

1    of the business model.  It was a software-based business model.

2    It had started to build a cloud subscription-based business,

3    which would have led to some investment in capital expenditure

4    around data centers.  But that wasn't significant.  It wasn't a

5    huge amount.  So, you know, I wouldn't have expected Autonomy

6    to be, you know, doing large deals with hardware manufacturers.

7    Q.   Why wouldn't you expect that?

8    A.   Because it wasn't a common part of their business.

9    Q.   And what about the nature of the contract and the amount,

10   if anything, caused you concern?

11   A.   I mean, the concern for me was the quantum, the sort of

12   the 45 million.  The reason being this was similar to the

13   amount of additional costs that Autonomy had in Q3/2009, which

14   had been basically credited to the launch of IDOL SPE.

15   Q.   Why was that of note to you?

16   A.   Well, as I mentioned before, IDOL SPE to me didn't feel

17   like a new product.  I thought it was a set of capabilities

18   that IDOL already had.  There was a significant amount of

19   unusual costs in Q3/2009, so in this financial statement, the

20   aggregate was around 45, 46 million.  And over time, the

21   similarity between those two numbers, you know, I thought was

22   unusual and, you know, questioned whether the two were related.

23   Q.   Let me draw your attention to some of the numbers in the

24   press release, Mr. Geall.

25        Do you see the line revenues, 191,606?

1  **A.**   I do, yes.

2  **Q.**   What does that mean?

3  **A.**   So 191,606,000 would have been the revenues reported by

4  Autonomy in the third quarter of 2009.

5  **Q.**   Beneath that, it says, "gross profit adjusted."  Do you

6  see that?

7  **A.**   I do, yeah.

8  **Q.**   What was the amount?

9  **A.**   $163,962,000.

10 **Q.**   And what was the gross profit margin?

11 **A.**   86 percent.

12 **Q.**   What again is gross profit margin?

13 **A.**   So gross profit margin is the calculation that basically

14 strips out the cost of goods sold, which for a pure software

15 business should be a high margin, because it's a relatively low

16 cost.

17 **Q.**   What do you mean by a pure software business?

18 **A.**   A business that only sells software.

19 **Q.**   And was this gross profit margin adjusted of 86 percent

20 unusual for Autonomy?

21 **A.**   It was certainly lower than it had been historically.

22 **Q.**   Please explain for us how it was lower.

23 **A.**   So the trend in gross margin, if you look back over the

24 years, had been anywhere between 91 to 95, maybe even 96

25 percent at times, and that stability was something that, you

1   know, the business prided itself on and investors looked

2   towards.  So anything below, substantially below that would

3   have -- would have been -- would have been questioned.

4   **Q.**   What was the gross profit adjusted for the prior year,

5   September 30th of 2008?

6   **A.**   92 percent.

7   **Q.**   And what was the amount of the gross profit adjusted?

8   **A.**   Sorry.  So 117,310,000.

9   **Q.**   What are those numbers there in that column, September 30,

10  2008?

11  **A.**   So the second column, this relates to the results for

12  Autonomy in the prior year.  So looking at the historical

13  performance of the business.

14  **Q.**   And how did those numbers for the third quarter of 2008

15  compare to those numbers for the third quarter of 2009?

16  **A.**   Well, as you can see, the gross margin of 86 percent is --

17  is basically 6 percentage points lower than it was the prior

18  year.

19  **Q.**   Please look further down in the press release.  There's a

20  line under third quarter highlights.  The third bullet where it

21  says, "launched IDOL SPE with stronger than expected response

22  to Quick Start program," do you see that?

23  **A.**   I do.

24  **Q.**   The reference to IDOL SPE, that was the press release that

25  we observed from earlier in September?

1   **A.**   That is correct.

2   **Q.**   What is the Quick Start program?  What did you understand

3   it to be?

4   **A.**   I understood the Quick Start program to be an initiative

5   to get IDOL SPE into Autonomy's customers or Autonomy's

6   prospects as quickly as possible.  A target of 30 or 40

7   customers was selected.  And basically a piece of hardware,

8   appliance with IDOL SPE was basically put into the data center

9   of those customers so they could get access to IDOL SPE very

10  quickly.  Hence the name Quick Start.

11  **Q.**   Where did you get that understanding?

12  **A.**   I got that understanding from discussions with Mike and

13  Sushovan.

14  **Q.**   Going back to the gross profit margin difference between

15  86 percent and 92 percent, was that an important difference for

16  Autonomy?

17  **A.**   Yes.

18  **Q.**   Why?

19  **A.**   Because, as I mentioned, the gross margin had tended to be

20  stable and in excess of 90 percent.

21  **Q.**   And why does that matter?

22  **A.**   Because this was a high margin business based on selling

23  software, and it -- the story was built on that high margin

24  profile and the stability of that high margin profile.  So

25  anything that suggested that that had changed would be

1    questioned by the financial community.

2    **Q.**    Let me please direct your attention to the income

3    statement in the press release on page 6 of the exhibit.

4         What is this portion of the press release, Mr. Geall?

5    **A.**    So this is a -- basically a copy of the income statement.

6    So this is the detailed profit and loss accounts for the

7    business that basically compares the current quarter, so the

8    third quarter of 2009 with the prior year, but also compares

9    the nine-month period.  So the three quarters, first, second

10    and third quarter in 2009 versus the prior year.

11    **Q.**    So the column to the left, that's the -- those are the new

12    numbers?  That's what's being announced for September of 2009?

13    **A.**    Exactly.

14    **Q.**    And the column to the right, September 30th, 2008, that's

15    what happened in the three months in the prior year?

16    **A.**    Correct.

17    **Q.**    And then those two columns to the right, can you tell us

18    again what those are?

19    **A.**    So this is the -- the aggregate of the three quarters, so

20    Q1, Q2, and Q3, an aggregate comparing to the prior year.

21    **Q.**    Let me draw your attention to the line for sales and

22    marketing.  Do you see that?

23    **A.**    I do, yes.

24    **Q.**    What does that represent?

25    **A.**    So sales and marketing was the -- basically the costs in

1    the period relating to sales activity, so paying salespeople

2    their bonuses and their commissions as well as their salary,

3    any marketing investment that the business would have

4    undertaken, so this could have been trade shows or, you know,

5    marketing events that were undertaken, is the majority of what

6    you would expect in sales and marketing.

7    Q.    Is sales and marketing part of cost of revenues?

8    A.    It's not part of costs of goods sold, no.  It's part of --

9    basically the operating costs of the business.

10   Q.    How are those two things different?

11   A.    Well, so basically normally what a company does is they

12   have their costs of doing business.  This is the so-called

13   costs of goods sold.  If I'm a manufacturing business, then I

14   buy lots of inventory and then I sell that, so I tend to have a

15   low gross margin, because I have high costs.

16        For more services or software-based businesses, the

17   majority of your costs are in R&D, sales and marketing, or

18   what's known as G&A, which is general and administrative, and

19   this is used to calculate what is known as the operating

20   margin, so the operating performance of the business.

21   Q.    What was the amount of sales and marketing expense in the

22   third quarter of 2009?

23   A.    59,306,000.

24   Q.    Was that unusual?

25   A.    Yes.

**Q.**    Why?

**A.**    Because if you take a look at the growth in the business

between the third quarter of 2008 and the third quarter of

2009, you would expect sales and marketing to grow broadly in

line with revenues.  So if you look at the 127,105,000 and look

at the growth rate to 191,000,606, I think that's about 50

percent growth.  But if you take a look at the -- sorry, if you

take a look at the growth in sales and marketing at 35,390,000

and apply a similar growth rate to that, you would probably be

at about 51 or 52 million.

**Q.**    What did you understand the increase in sales and

marketing to be attributable to?

**A.**    The increase in sales and marketing was being attributed

to the launch of IDOL SPE.

**Q.**    Where did you get that understanding?

**A.**    From discussions with Mike and Sushovan.

**Q.**    And were there aspects of the hardware contract that

Mr. Goodman described to you in the launch of IDOL SPE that

caused you to question that?

**A.**    Well, when looking at all the additional costs that

occurred in the third quarter, then there was a marked

similarity.

**Q.**    What do you mean by that?

**A.**    It was the same order of magnitude of additional costs

that was being sort of prescribed to R&D costs and sales and

1    marketing costs, and, you know, that, to me, was looking a

2    little bit too much like a coincidence.

3        THE COURT:  Ladies and gentlemen, we are going to take

4    our recess now.  Remember the admonition.  Don't discuss the

5    case, allow anyone to discuss it with you, form or express any

6    opinion.  We will start at 1:00 sharp.  Thank you.

7        (Luncheon recess was taken at 12:03 p.m.)

8    **AFTERNOON SESSION**                                    **1:00 p.m.**

9        (Proceedings were heard out of presence of the jury:)

10        THE CLERK:  Come to order.  Court is now in session.

11        THE COURT:  Please be seated.  Let the record reflect

12    all jurors are present, parties are present.

13    You may proceed.

14        MR. LEACH:  Thank you, Your Honor.

15    **Q.**  Good afternoon, Mr. Geall.

16    **A.**  Good afternoon.

17    **Q.**  Before the break, we were focused on Exhibit 289, the

18    Q3/2009 press release.  Do you still have that handy,

19    Mr. Geall?

20    **A.**  I do.

21    **Q.**  Let me please draw your attention to page 8 of the

22    earnings release.  Excuse me.  Page 7.

23    Do you see at the top where it says, "condensed

24    consolidated balance sheet"?

25    **A.**  I do.

**PROCEEDINGS**

1    **Q.**    What is a balance sheet?

2    **A.**    A balance sheet is a financial statement that records the

3    assets and liabilities of a company.

4    **Q.**    Let me draw your attention to the portion under "current

5    liabilities."  There's a line for total trade and other

6    payables.

7         Do you see that?

8    **A.**    I do, yes.

9    **Q.**    What was the amount for the third quarter of 2009?

10    **A.**    Sorry.  Of trade or other payables?

11    **Q.**    The combined, total trade and other payables?

12    **A.**    109,925,000.

13    **Q.**    What are trade and other payables?

14    **A.**    It's basically money owed to third parties.

15    **Q.**    And was that amount, 109 million, unusual for Autonomy?

16    **A.**    It was, if you compare it to the prior year.  It was more

17    than three times the amount.

18    **Q.**    Why was that unusual?

19    **A.**    I mean, trade payables effectively represent the cash

20    profile of the business, and there would be some variation year

21    to year, and, you know, if a business is growing, you would

22    expect, you know, the payables number to grow, you know, in

23    proportion with the business, but you wouldn't suddenly expect

24    a major -- a major change.

25    **Q.**    Now, will you please look at page 8?

**PROCEEDINGS**

1    What is this portion of the press release?

2    **A.**   So this is the condensed consolidated cash flows.

3    **Q.**   What is the statement of cash flow?  What does this

4    represent?

5    **A.**   So this basically represents the cash movements that the

6    business has made during the quarter, so any investments that

7    they've made, any assets that have been acquired, working

8    capital movements that they've had in terms of, you know,

9    paying creditors or debtors.  Just reflects the cash in and the

10   cash out for the business.

11   **Q.**   How does the cash flow statement differ from the income

12   statement and the balance sheet?

13   **A.**   I mean, the three -- the three statements show three

14   different ways of looking at the company, so the P&L is looking

15   at the revenues and the profitability.  Now, there's a tie-in

16   between the P&L and the cash flow in terms of the profitability

17   is what generates the cash that is then measured in the cash

18   flow.  But similarly, the balance sheet is derived for

19   movements in cash flow.  So the three statements are related,

20   but they have three different views of the business.

21   **Q.**   Let me draw your attention to the middle portion of this

22   page.  There is a line, "payables."  Do you see that under

23   "changes in operating assets and liabilities"?

24   **A.**   I do, yes.

25   **Q.**   What does that represent?  What does "payables" represent?

**A.**    So this was basically the cash that was owed in that

quarter to third parties.

**Q.**    What was the cash owed to third parties at the end of

September 30th, 2009?

**A.**    43 million 834.

**Q.**    What was the cash owed to third parties at the end of

September 30th, 2008?

**A.**    It was a negative 3.146 million.

**Q.**    What does that mean?

**A.**    Because this was a cash movement, it would vary from

quarter to quarter, so sometimes it's a negative number,

sometimes it's a positive.  So this was basically showing that

there was basically a negative movement in terms of there was a

cash outflow for them as part of the working capital, where in

the current year there was effectively a 43 million benefit.

So the cash was still sitting in the balance sheets of

Autonomy, but was owed to -- effectively to third parties, but

hadn't been paid yet.

**Q.**    This 43,834,000 in payables at the end of September 30th

of 2009, was that unusual?

**A.**    Yes.

**Q.**    Why?

**A.**    The cash profile for Autonomy, historically you would

expect a negative receivables, as you've seen two lines up, so,

you know, the minus -- the minus 20 million for the three

1    months to the 30th of September.

2        The payable number tended to be a lot smaller in

3    magnitude, so, you know, you could have plus or minus, you

4    know, three, five million in any particular quarter, but it

5    would be unusual to have something of the -- of the magnitude

6    of 43,834,000 that is shown there.

7        Comparing to the prior year of minus 3 and also looking at

8    the full nine months of the prior year where it was only

9    2.6 million shows that this was normally a relatively small

10    number.

11    Q.    And the $43 million number, that's a change in the amount

12    that Autonomy owes?

13    A.    It was a change versus the prior quarter.

14    Q.    So in one quarter it goes from a small number to $43

15    million?

16    A.    You can work it out, because you've got the -- well, you

17    would need the first half results, but you see that for the

18    nine months, the flow was -- or the flow was 42.8 million of

19    which 43 million of that occurred in Q3.  So, you know, by

20    definition, it would have been sort of minus -- minus one

21    million for the first six months, and then it went from minus

22    one to effectively plus 43 in that quarter indicating 44, 45

23    million of payables that was -- that left in the quarter.

24    Q.    What did you understand that $43 million change to

25    represent?

**PROCEEDINGS**

1    **A.**   This was -- this related to a number of areas, as it was

2    explained to me.  One related to the sales and marketing

3    expense relating to the Quick Start program that included some

4    marketing in the quarter, some trade statements, some -- some,

5    you know, press activity.  So there would have been a marketing

6    charge, and it happened quite late in the quarter.

7         Also relating to, you know, the other marketing events

8    around the launch of IDOL SPE.

9    **Q.**   Where did you obtain that understanding?

10   **A.**   Discussions with Mike Lynch and Sushovan Hussain.

11   **Q.**   At the time this press release was issued, Mr. Geall, were

12   there aspects of the hardware contract that Mr. Goodman

13   described to you and your investigation relating to SPE that

14   caused you to question Autonomy's growth story?

15   **A.**   Not specifically the growth story at that point, but, you

16   know, started to -- to, I suppose, raise some red flags in

17   terms of the revenue profile for the business or the revenue

18   contribution for the business.

19   **Q.**   What do you mean by that?

20   **A.**   Well, I mean, there was clearly, you know, some

21   exceptional costs that occurred in that quarter, in Q3/2009.

22   As I mentioned at the start of my statement, you know, we had

23   just come out of the financial crisis, so everyone was waiting

24   for this recovery to come through, which wasn't coming through.

25        So it was -- it was tough to deliver -- tough to deliver

1    growth, and, you know, Autonomy had been sort of bucking that

2    trend, delivering better growth than many of the peers in the

3    industry that had a tough time because of regulatory

4    compliance, but now you were starting to see some questions

5    that maybe sort of called into question that.

6    **Q.**   What were the questions to you?

7    **A.**   Why was there this exceptional cost.  You know, if it did

8    relate to the contract that Peter Goodman had seen, what did

9    that mean?  You know, was the revenue composition essentially

10    as it was purported to be?

11    **Q.**   Why were you concerned about the revenue composition?

12    **A.**   Because, as I mentioned before, Autonomy was -- was valued

13    as a high growth, high margin software business.  And, you

14    know, as we see at the moment, hardware businesses tend to be

15    much lower multiples; right?  So a software business can trade

16    on anywhere between 3 and 8 times revenues.  If you're a cloud

17    software business, you can trade on 10 to 15 times

18    subscriptions.  A hardware business trades on about point six

19    times revenues.  So if there was a substantial amount of

20    hardware revenues, then the valuation would have been impacted.

21    That would have been a significantly lower valuation, and then

22    obviously the shareholders would pay a very different price for

23    that.

24    **Q.**   And what was it about the SPE aspect to this that, in your

25    mind, raised a concern?

1  **A.**   Whether IDOL SPE was a new product that was going to

2  generate that future growth.  If IDOL SPE was functionality

3  that was already included in IDOL, as I believed it was, then

4  there isn't a new market opportunity.  There isn't going to be

5  a, you know, 20-30 billion opportunity out there to go and sell

6  and accelerate the business.  So it would call into question

7  the growth opportunity the business had and the amount that the

8  investors would be willing to pay for that.

9  **Q.**   After the issuance of this press release, did you field a

10  number of questions from certain Autonomy investors?

11  **A.**   From analysts and investors, yes.

12  **Q.**   Would you please look at what has been marked as Exhibit

13  2767.

14      Do you have that in front of you, Mr. Geall?

15  **A.**   I do.

16  **Q.**   Is this a true and correct copy of an email that you

17  received from Sushovan Hussain on October 21, 2009, around the

18  time of the earnings release?

19  **A.**   I believe it to be so, yes.

20          **THE COURT:**  Admitted.

21       (Trial Exhibit 2767 received in evidence)

22  **BY MR. LEACH:**

23  **Q.**   If we could start, Mr. Geall -- if you could please orient

24  us.  The bottom portion of this appears to be an email from

25  someone named Derek Brown to investor.relations@autonomy.com

1    with a CC to you and Mr. Hussain.

2         Do you see that?

3    **A.**    I do.

4    **Q.**    Who is Derek Brown?

5    **A.**    Derek Brown was an analyst at a UK brokerage firm, I

6    believe at the time Seymour Pierce.

7    **Q.**    In the "to" line, investor.relations@autonomy.com, what

8    was that?

9    **A.**    This was a general email address that investors and

10   analysts should direct their questions to.  So it was an open

11   account for investor relations questions.

12   **Q.**    And do you understand why you and Mr. Hussain were cc'd on

13   this?

14   **A.**    I -- I assumed that Derek wanted to make sure that myself

15   and Sushovan were aware of the questions that he was sending

16   to -- to, you know, what may have been an unmonitored account.

17   **Q.**    Beneath that, there is some language in black and blue on

18   the screen.

19        What do you understand the black portion to be, and what

20   do you understand the blue portion to be?

21   **A.**    So the black text or the black font is the initial

22   questions that Derek submitted via email, and the blue was the

23   initial set of answers that Sushovan had added to that and then

24   forwarded to me.

25   **Q.**    Let me direct your attention, please, to the first

PROCEEDINGS

1   question that Mr. Brown had:

2           "What was the contribution to revenue from the Quick

3       Start program and at what margin?  I'm trying to

4       understand the movement in gross margin.  Is there some

5       hardware running through the COGS line?  I see from your

6       website that the new product COGS was 4 million.  What was

7       that related to?"

8       What again was the Quick Start program?

9   A.   So the Quick Start program was this initiative to get 30

10  or 40 customers onto the IDOL SPE product, and it was basically

11  taking IDOL SPE and putting it onto some hardware and then

12  shipping that to the customer so that they could start using

13  the product very quickly.

14  Q.   And that was something Dr. Lynch and Mr. Hussain told you?

15  A.   Correct.

16  Q.   There's an acronym, COGS.  What is COGS?

17  A.   Cost of goods sold.

18  Q.   What did you understand Mr. Brown to be asking in this

19  question?

20  A.   So in this question, he is asking effectively the impact

21  of Quick Start on the gross margin of the business.

22  Q.   Will you please read Mr. Hussain's proposed response for

23  us?

24  A.   "Delivering a functioning SPE platform includes hardware,

25  services, etc."

**PROCEEDINGS**

1    **Q.**    What did you understand that to mean?

2    **A.**    That Autonomy was shipping hardware and IDOL SPE as part

3    of the Quick Start program.

4    **Q.**    In number 3 it reads:

5    "Why was there such a large jump in trade and other

6    creditors from 80M in Q2/09 to 110M in Q3/09?"

7    Do you see that?

8    **A.**    I do, yeah.

9    **Q.**    What is trade and other creditors?

10   **A.**    This is basically a balance sheet item that basically

11   looks at the monies owed.

12   **Q.**    Is that another reference to the payables that we saw on

13   the balance sheet in the press release?

14   **A.**    Correct, yep.

15   **Q.**    And according to this question, there is a jump from 80

16   million in the second quarter of 2009 to 110 million in Q3/09?

17   **A.**    Correct.

18   **Q.**    What was the answer that Mr. Hussain proposed?

19   **A.**    To do with the SPE costs incurred late in the quarter

20   accrued in Q3, but paid in Q4.

21   **Q.**    What did you understand that to mean?

22   **A.**    That this related to the marketing costs around IDOL SPE,

23   the launch party and other things, and that these were accrued

24   in the quarter, but ultimately wouldn't get paid until the

25   subsequent quarter.

PROCEEDINGS

1    **Q.**    Please now look at what has been marked as Exhibit 2769.

2        Is this a true and correct copy of an email you sent to

3    Derek Brown with responses to the questions that he had?

4    **A.**    I believe it to be, yes.

5            **THE COURT:**  Admitted.

6        (Trial Exhibit 2769 received in evidence)

7    **BY MR. LEACH:**

8    **Q.**    Does this email follow the format of before where the

9    answers to the questions are in blue and large caps as opposed

10    to the initial questions from Mr. Brown?

11    **A.**    Yes.  The bold blue were my answers to the questions to

12    Derek.

13    **Q.**    Okay.  Would you please read your response to Mr. Brown to

14    his first question, "What was the contribution to revenue from

15    the Quick Start program and at what margin?"

16    **A.**    "COGS expenditure related to Quick Start program

17    delivering physical hardware and services to get initial Beta

18    customers up and running.  We have not given a revenue

19    contribution.  Assume very small at this stage."

20    **Q.**    Where did you get that information to respond to

21    Mr. Brown?

22    **A.**    From discussions with Sushovan and the email he'd sent me.

23    **Q.**    You wrote assume very -- not -- strike that.

24        You wrote:  "We have not given a revenue contribution.

25    Assume very small at this stage."

**PROCEEDINGS**

1    Do you see that?

2  **A.**  I do.

3  **Q.**  What did that mean?

4  **A.**  That related to the revenues from customers for IDOL SPE.

5  So Quick Start was a way of getting the product to the

6  customer.  It wasn't a way of generating revenues in the short

7  term.

8  **Q.**  Is this another way of saying that revenues from the Quick

9  Start program were very small at this stage?

10  **A.**  Correct.

11  **Q.**  And what does "very small" mean to you?

12  **A.**  I mean, normally I would assume, you know, less than 2 or

13  3 million.

14  **Q.**  Can we please look at the next page, please, your response

15  to the third question.

16    Do you see number 3 at the top in black?

17  **A.**  I do, yep.

18  **Q.**  Was this Mr. Brown's question about why payables went up

19  by $30 million between the second quarter of '09 and the third

20  quarter of '09?

21  **A.**  Yes, it was.

22  **Q.**  What was your response?

23  **A.**  This was purely do to -- can't speak.  Excuse me.  This

24  was purely to do with the SPE-related costs that were incurred

25  very late in the quarter.  This was accrued in Q3 and will be

**PROCEEDINGS**

1  paid in Q4.

2  **Q.**  Where did you get that information?

3  **A.**  From Sushovan's email and discussions with him.

4  **Q.**  In this quarter, the third quarter of 2009, did you also

5  participate in a call with analysts relating to the earnings

6  result?

7  **A.**  I did, yes.

8  **Q.**  Was that normal at Autonomy?

9  **A.**  To have a call with analysts?

10  **Q.**  Yes.

11  **A.**  Yes.  So every -- every quarter, we would either have a

12  physical meeting with analysts or a call with analysts.

13  **Q.**  What is the purpose of the call with the analysts?

14  **A.**  To communicate the performance of the business in that

15  quarter, to take any questions, and also to set the stage for

16  the subsequent quarter.

17  **Q.**  Would you please look at what has been marked as Exhibit

18  287.

19     Do you have that in front of you?

20  **A.**  I do.

21  **Q.**  Is this a true and correct copy of an email you sent to

22  Josie Oddy with a CC to Mr. Hussain on or about October 19th,

23  2009?

24  **A.**  (Witness reviews document.)

25     I believe it to be so, yeah.

PROCEEDINGS

1          **THE COURT:**  Admitted.

2              (Trial Exhibit 287 received in evidence)

3    **BY MR. LEACH:**

4    **Q.**   If we could please look at the top.

5          Who is Josie Oddy?  Am I pronouncing that correctly?

6    **A.**   Yes, I believe so.

7          She was -- she was the secretary receptionist in the

8    office at Piccadilly.

9    **Q.**   And is this you directing her to print certain documents

10   relating to the analyst call?

11   **A.**   That's correct.

12   **Q.**   Are those the attachments, QA first draft, MG version 14,

13   and financial cheat sheet?

14   **A.**   They are, yes.

15   **Q.**   Would you please look at the -- at page 2 -- excuse me --

16   page 3 of the exhibit.

17         What is this?

18   **A.**   So this was a sort of a -- I suppose, a cheat sheet that

19   was created and was placed in front of whoever was speaking to

20   the financial analysts and, you know, was giving some sort of

21   aid as to the type of questioning, what type of questioning,

22   but also who should probably answer that question.

23   **Q.**   Up at the top there is a row that says, "easy, okay,

24   trick, to MRL, short answer, website."

25         Do you see that?

**PROCEEDINGS**

1    **A.**    I do, yes.

2    **Q.**    What do those terms mean?

3    **A.**    So this was a visual cue that Mike used to indicate

4    whether this was an easy question, whether it was okay to

5    answer, whether it was a trick question, whether he should

6    answer, MRL, whether it should just be a very brief and short

7    answer, or whether the question should be referred to the

8    website.

9    **Q.**    Did you have an understanding of why this document was

10    created?

11    **A.**    So this was a document that was, you know, used to make

12    sure questions were handled appropriately as part of the

13    earnings call and just to make sure that, you know, those

14    answering were not sort of tricked into answering the wrong

15    question or answering something that they shouldn't answer.

16    **Q.**    How did this practice come about?

17    **A.**    It came about after one of the earnings meetings where

18    there was a question asked, and Sushovan I think answered that

19    question incorrectly, and it led to a lot of questions relating

20    to a period of adjustment that we had done with regard to one

21    of the acquisitions, I believe Interwoven at the time.  So this

22    was there to make sure that that wasn't repeated.

23    **Q.**    Was this in 2009?

24    **A.**    Yes.

25    **Q.**    Please look at page 5.  Excuse me.  Page 6 of the exhibit.

**PROCEEDINGS**

1          Up at the top, do you see where it says, "Q3/2009

2    conference call script"?

3    **A.**    I do.

4    **Q.**    What is this portion of the document?

5    **A.**    So this was basically the script that was written for each

6    of the individuals speaking through the prepared remarks at the

7    start of the earnings presentation.

8          So AK is Andrew Kanter.    RW is Rob Webb.    MG is myself.

9    MRL is Mike Lynch.    And there would also be SH, Sushovan

10   Hussain.

11   **Q.**    Who had a hand in crafting the script for the analyst

12   calls?

13   **A.**    I would have written part of the script, Pete Goodman

14   would have written part of the script.

15   **Q.**    Would you please look at page 17 of the exhibit?

16   **A.**    (Witness reviews document.)

17   **Q.**    Do you see the heading "consensus summary table"?

18   **A.**    I do, yes.

19   **Q.**    What does that refer to?

20   **A.**    So this was a table that took officially published

21   consensus from Blumberg, so the third column as it was at the

22   end of the quarter.    It also took a -- or basically showed the

23   company consensus, so this was the consensus that was compiled

24   by Financial Dynamics on behalf of Autonomy, and compared this

25   to the actual results in the quarter.    So the first column are

1    the actual results, how it compared to consensus.  So in this

2    case revenue was better than expected but profitability was

3    clearly much worse.

4        There was also the following quarter consensus, so what

5    Blumberg was saying for the -- the coming quarter, and then

6    what this was for the overall -- for the overall 12-month

7    period, in this case 2010.

8    Q.   Why is this consensus summary table included in this deck?

9    A.   We would have provided this to basically show where

10   results were versus consensus.  As I mentioned before, you know

11   consensus is an important indicator to how the stock may react,

12   so this was providing the facts and figures there so everyone

13   could see them.

14   Q.   Everyone, meaning all the participants from Autonomy on

15   the earnings call?

16   A.   Yes.  So this was an internal document, not for

17   distribution, and it was for, you know, Mike, Sushovan, Andy,

18   myself, Rob Webb in this case, to have so that we had all

19   available information.

20   Q.   You mentioned someone named Rob Webb.  Who was he?

21   A.   Rob Webb was the executive chairman of Autonomy.

22   Q.   What role is that?

23   A.   So Rob was appointed to the board as initially

24   nonexecutive chairman and then as executive chairman.  So he

25   was another board member with Sushovan and Mike Lynch.

1    **Q.**    Beneath the consensus summary table there are key

2    questions.

3        Do you see that?

4    **A.**    I do.

5    **Q.**    And do those key questions continue for a number of pages

6    up through page 28?

7    **A.**    They do, yes.

8    **Q.**    What are these?

9    **A.**    So every quarter we basically took sort of questions that

10    either had been asked in prior quarters or potential questions

11    that we felt would be asked during the quarter, and then we

12    would put a response to this.  So this was, you know, I'd say

13    best practice in terms of preparing for an earnings call,

14    making sure that we had assessed all the likely questions, you

15    know, positive and negative, and had responses to them.

16    **Q.**    Would you please look at page 23 of the exhibit.  And I

17    direct your attention to question 74.

18        Do you see that, Mr. Geall?

19    **A.**    I do.

20    **Q.**    Are these a series of questions relating to the Q3/2009

21    SPE launch?

22    **A.**    They are, yes.

23    **Q.**    Okay.  What is question 74?

24    **A.**    "SPE has launched now.  Can you comment on partner and

25    Beta program feedback?"

1   **Q.**   And what was the proposed response?

2   **A.**   "All feedback has been positive.  You see from the main

3   slides that IBM, Accenture, Wipro, etc. are on board with the

4   Quick Start program."

5   **Q.**   What did you understand that to mean?

6   **A.**   The implication here is that partners of Autonomy, so

7   companies like IBM and Accenture, were aware of this and were

8   working to support partners that were undertaking the Quick

9   Start program and the beta program.

10  **Q.**   Let me draw your attention to page 25.

11        Do you see the heading Moreland/Khan?

12  **A.**   I do.

13  **Q.**   What does that refer to?

14  **A.**   Two analysts, Paul Moreland, he was at Astaire, and then

15  Arbuthnot, and then Daud Khan who was at JPMorgan.

16  **Q.**   Why are these questions included in this document?

17  **A.**   So Paul Moreland and Daud Khan had been sort of two

18  analysts that had been quite sort of the negative on Autonomy,

19  questioning the cash conversion and the growth in the business,

20  and these were the types of questions that they may have asked

21  at that presentation.

22  **Q.**   In question 99, it says, "Why is Daud Khan not able to

23  attend these meetings?"

24        What does that refer to?

25  **A.**   This refers to the fact that Daud Khan was not being

**PROCEEDINGS**

1    invited to investor meetings or to the analyst meetings and was

2    asked to attend via conference call.

3    **Q.**    Why was he not invited?

4    **A.**    So he couldn't ask any questions.

5    **Q.**    To the right it says, "FSA requirement."

6         What does that mean?

7    **A.**    The response was that there was -- the FSA had asked for

8    him not to be invited to the meetings.

9    **Q.**    Where did you get that information?

10    **A.**    I don't remember.

11    **Q.**    Beneath that there is a question 100:  "Can you help us

12    understand why you have changed your revenue recognition policy

13    for hosted revenues?"

14         Do you see that?

15    **A.**    I do.

16    **Q.**    And the proposed answer is "We have not.  We adhere to SOP

17    97-2."

18         Do you see that?

19    **A.**    I do.

20    **Q.**    What is "SOP 97-2"?

21    **A.**    SOP 97-2 is a U.S. GAAP accounting policy for revenue

22    recognition for software companies.

23    **Q.**    And why was that the answer to this particular -- proposed

24    answer to this particular question?

25    **A.**    The feeling was that the U.S. accounting policies were or

1   are more mature than they are in Europe under IFRS.  And, you

2   know, SOP 97-2 is considered the gold standard in terms of

3   accounting, and by stating that Autonomy was auditing its

4   reports to the same standards as SOP 97-2 implied adherence to

5   that gold standard.

6   **Q.**   Was that something you heard Mr. Hussain say on more than

7   one occasion?

8   **A.**   It was, yes.

9   **Q.**   Would you please look at what has been marked as Exhibit

10  428.

11       Do you recognize this?

12  **A.**   I do.

13  **Q.**   Is this a true and correct copy of Autonomy's annual

14  report and accounts for the year ended December 31, 2009?

15  **A.**   I believe it to be so.

16       **THE COURT:**   Admitted.

17       (Trial Exhibit 428 received in evidence)

18  **BY MR. LEACH:**

19  **Q.**   As a general matter, Mr. Geall, what is this document?

20  How is it used?

21  **A.**   So for every publicly listed business in the UK, you need

22  to file a full set of reports and accounts at the end of the

23  year.  This is a reflection of the performance of your business

24  for the last 12 months.  It would be signed off by the board

25  members or certainly the CEO and CFO of the business.  It would

1    talk about the strategy of the business, the performance of the

2    business, but would also have detailed financial accounts, so

3    the P&L, the balance sheet, the cash flow, as well as all

4    associated notes for that.

5    **Q.**    Please look at page 15 of the exhibit.

6         What is this portion of the annual report?

7    **A.**    This is the financial review.

8    **Q.**    What is the financial review?

9    **A.**    So this is a summary of the important financial metrics

10   and financial movements and is a sort of a normally occurring

11   part of any financial report, and is signed off by the CFO.

12   **Q.**    If we could please scroll down to the bottom portion of

13   the page.

14        Who signed this financial review on behalf of Autonomy on

15   February 22nd, 2010?

16   **A.**    Sushovan Hussain, the CFO.

17   **Q.**    Would you please now look at page 13.

18        Is this part of the substance of the financial review that

19   Mr. Hussain has signed for?

20   **A.**    Yes, it is.

21   **Q.**    I direct your attention to the left column.  The second

22   bold heading at the top says "Cost of revenues."

23        Do you see that?

24   **A.**    I do.

25   **Q.**    What again are cost of revenues?

**PROCEEDINGS**

1  **A.**   So this is effectively the cost of revenue, so the cost of

2  generating your license sales, your services and, you know, is

3  a comparison between the current year and the prior year.

4  **Q.**   This says, "cost of revenues was up 95 percent from 45

5  million in 2008.  The increase is driven by increased revenues,

6  together with a shift in the mix of revenues at the beginning

7  of 2009 as a result of the Interwoven acquisition and by the

8  IDOL SPE Quick Start program."

9      Do you see that?

10 **A.**   I do.

11 **Q.**   What did you understand that to mean?

12 **A.**   So this is -- this is basically stating that the reason

13 why the cost of revenues nearly doubled, going up 95 percent,

14 was due to manufacturers.  One was the acquisition of

15 Interwoven that would have generated additional cost of

16 revenues, because it was a larger combined business, and the

17 second was relating to the hardware revenues relating to the

18 IDOL SPE Quick Start program.

19 **Q.**   What again was the IDOL SPE Quick Start program?

20 **A.**   So this was the initiative to accelerate adoption by some

21 target customers of IDOL SPE.

22 **Q.**   By doing what?

23 **A.**   By sending or shipping some hardware with IDOL SPE on that

24 hardware and to a customer so they could use the product.

25 **Q.**   In or around fourth quarter of 2009, did you attend a

**PROCEEDINGS**

1    investor conference hosted by Morgan Stanley in the Bay Area?

2    **A.**    I believe I did, yes.

3    **Q.**    Why did you go to that?

4    **A.**    So Morgan Stanley is a big investment bank.  Its

5    technology conference -- it has two, one in the U.S. and one in

6    the Europe.  They are two of the most respected financial

7    conferences out there.  Autonomy as a technology company was

8    invited, and it was usual for Autonomy to attend.  Normally

9    Mike Lynch would attend.  On this occasion I attended with

10   Sushovan.

11   **Q.**    Did you have occasion to meet with some of the technology

12   folks from Morgan Stanley responsible for purchasing Autonomy

13   product?

14   **A.**    I did, yeah.

15   **Q.**    Who was at that meeting?

16   **A.**    So this meeting was attended by myself, Sushovan, and

17   Stouffer Egan from Autonomy.

18   **Q.**    What was the purpose of the meeting?

19   **A.**    So this was a meeting at the end of a series of investor

20   meetings, so we met with a number of investors, and I think

21   this was probably the last or one of the last meetings.  And as

22   is often is usual at these types of events, you meet with the

23   investment bankers, they say, as an opportunity to meet with

24   management.  So the investment banking team of Morgan Stanley

25   sort of came in to have a meeting with Sushovan and Stouffer.

1  **Q.**   What do you mean the investment bankers view this as an

2  opportunity?  What did you mean by that?

3  **A.**   I mean investment banking is a relationship-driven

4  business.  They don't always get to meet with CEOs and CFOs, so

5  they always use a tech conference as a way of locking down

6  management and getting a meeting.

7  **Q.**   And do you recall anybody from Morgan Stanley making a

8  comment about some of Autonomy's transactions with Morgan

9  Stanley?

10  **A.**   So there were some discussions in the meeting as to

11  whether, you know, Morgan Stanley would -- would do any deals

12  or would buy any software from Autonomy in that quarter, and

13  the comment was made -- I don't remember exactly by who -- at

14  Morgan Stanley.

15        **MS. LITTLE:**  Objection, foundation.  He doesn't

16  remember.

17        **THE COURT:**  I couldn't hear it.

18        **MR. LEACH:**  I think Mr. Geall has said he doesn't

19  remember who made the comment, but he remembers somebody from

20  Morgan Stanley making the comment, that it was at a meeting

21  with Sushovan Hussain.  And I'm offering it for the effect on

22  the listener.

23        **THE COURT:**  Overruled.

24        **THE WITNESS:**  As part of the discussion, the question

25  was asked whether, you know, there would be an opportunity to

1    do any deals, to buy any software in the quarter, and the

2    comment was made that, you know, basically Morgan Stanley was a

3    little bored of buying out Autonomy at the end of each quarter.

4    **BY MR. LEACH:**

5    **Q.**    I'm sorry.  I didn't hear that last part.  A little tired

6    of --

7    **A.**    A bit tired of doing end-of-quarter deals to help them

8    make their numbers.

9    **Q.**    What was your reaction to that?

10   **A.**    I mean, a little surprised, but, you know, it was not

11   totally usual.

12   **Q.**    Let me move forward in time, Mr. Geall, to the first

13   quarter of 2010.

14       I would like you to please look at what has been marked as

15   Exhibit 2771.

16   **A.**    I don't think I have it.

17   **Q.**    Do you recognize this?

18   **A.**    I don't have it.  I don't have 2771.

19   **Q.**    Oh.

20       (Mr. Leach hands Mr. Geall the document.)

21   **BY MR. LEACH:**

22   **Q.**    Do you recognize this document, Mr. Geall?

23   **A.**    I do.

24   **Q.**    What is this?

25   **A.**    So this is an early version of the PowerPoint presentation

1  that we would use to present the Q4/2009 and full year results

2  for 2009 to investors.

3         **THE COURT:** Admitted.

4      (Trial Exhibit 2771 received in evidence)

5  **BY MR. LEACH:**

6  **Q.** Let me draw your attention to the top portion of the

7  email, Mr. Geall. I think we've seen most of these names

8  before, but there is someone named Jennifer Alves from fd.com.

9  Who is she?

10 **A.** Jennifer was or is one of Ed Bridges' team, so she was

11 familiar with the Autonomy account.

12 **Q.** Let me please draw your attention to page 11.

13     Do you see at the top the heading "IDOL SPE Q4/09

14 exceeding plan"?

15 **A.** I do.

16 **Q.** What did that mean?

17 **A.** That as of Q4, IDOL SPE, in terms of initial uptake, was

18 ahead of expectations.

19 **Q.** In the first bullet, there is that reference to Quick

20 Start program. Is this part of the information that caused you

21 to associate Quick Start with SPE?

22 **A.** Yes.

23 **Q.** Where did you get that information?

24 **A.** Through discussions with Sushovan and Mike.

25 **Q.** Further down there is a bullet that says, "key

1    differentiator in a 12 million deal."

2         Do you see that?

3    **A.**    I do.

4    **Q.**    What does that mean?

5    **A.**    This was basically stating that there was a large deal for

6    $12 million in the quarter, and that the inclusion of IDOL SPE

7    in that deal was a differentiator and a reason why the deal was

8    won.

9    **Q.**    Why was that included in this investor presentation for

10    the fourth quarter of 2009?

11    **A.**    At the time revenues were still small.  As you can see in

12    the subsequent bullet, total SPE revenue was approximately one

13    million, so still not meaningful to the business, but this was

14    showing that it was actually potentially important

15    differentiator to accelerate growth by allowing bigger deals to

16    close.

17    **Q.**    How is this PowerPoint used?

18    **A.**    This PowerPoint is initially used as part of the investor

19    meeting or investor call, but then would be used as part of the

20    investor road shows that we would undertake to communicate the

21    results with a broader audience.

22    **Q.**    Please look at what has been marked as Exhibit 588.

23    **A.**    588?

24    **Q.**    588, please.

25    **A.**    I don't think I have it.

1          (Mr. Leach hands Mr. Geall a document.)

2               **THE WITNESS:**  Thank you.

3     **BY MR. LEACH:**

4     **Q.**   Do you recognize this document?

5               **MS. LITTLE:**  Objection, Your Honor.  I think this one

6     is also missing the last page.

7               **THE COURT:**  Does 590 have it?

8               **MS. LITTLE:**  588.

9               **THE COURT:**  Pardon?

10              **MS. LITTLE:**  588?

11              **THE COURT:**  Yes.  But what about 590?  No.  They're

12    the same.

13              **MR. LEACH:**  I think they're the same from different

14    sources, Your Honor.  I'm pleased to use 590 if there is no

15    objection.

16              **MS. LITTLE:**  I think it's also missing the last page.

17              **THE COURT:**  Well, ladies and gentlemen, maybe we could

18    take a little recess now.

19         So remember the admonition given to you.  Don't discuss

20    the case, allow anyone to discuss it with you.  We will resume

21    at 2:15.

22         (Proceedings were heard out of presence of the jury:)

23              **THE COURT:**  Can we work this out?  Does the last page

24    make a difference?

25              **MS. LITTLE:**  I will double check.  I think it may be

1    missing a last page, but I'll double check.

2            MR. LEACH:  We will work it out, Your Honor.  This

3    won't be controversial.

4            MS. LITTLE:  I will say if it is missing a last page,

5    I'm fine with him taking the witness through it, and we can

6    substitute a page later.

7                        (Recess taken at 1:59 p.m.)

8                    (Proceedings resumed at 2:19 p.m.)

9        (Proceedings were heard in the presence of the jury.)

10            THE COURT:  Let the record reflect all jurors are

11   present, parties are present.

12       You may proceed.

13            MR. LEACH:  Thank you, Your Honor.

14       I understand the objection to Exhibit 588 has been

15   withdrawn.

16            THE COURT:  588 admitted.

17        (Trial Exhibit 588 received in evidence)

18   BY MR. LEACH:

19   Q.   Do you recognize this, Mr. Geall?

20   A.   I do.

21   Q.   What is this?

22   A.   This is the report document for the fourth quarter of

23   2009.

24   Q.   And is this a document you had a hand in preparing as the

25   head of investor relations?

**PROCEEDINGS**

1    **A.**    I would have had some contribution, but the majority of

2    the work would have been done -- sorry -- by Sushovan and Steve

3    Chamberlain and others.

4    **Q.**    Thank you.  You can put that to the side, and please look

5    at what has been marked as Exhibit 2772.

6    **A.**    Sorry.  2772?

7    **Q.**    Yes, please.  Is this a true and correct copy of an email

8    that you received from Mike Lynch in or around February of

9    2010?

10   **A.**    I believe it to be, yes.

11   **Q.**    Is Sushovan Hussain one of the recipients?

12   **A.**    He is, yes.

13        **THE COURT:**  Admitted.

14        (Trial Exhibit 2772 received in evidence)

15   BY MR. LEACH:

16   **Q.**    Up at the top, Mr. Geall, there is a reference to Astaire

17   note.  What does that mean?

18   **A.**    So this had been -- Paul Moreland, the analyst at Astaire,

19   had written a brief note relating to an acquisition that

20   Autonomy had done, and this had then been forwarded by Ed

21   Bridges to the Autonomy team.

22   **Q.**    What was the acquisition that Mr. Moreland was commenting

23   on?

24   **A.**    The acquisition of a business with MicroLink.

25   **Q.**    What was MicroLink?

PROCEEDINGS

1  **A.**   MicroLink was a U.S. federal reseller that resold Autonomy

2  product and Microsoft product.

3  **Q.**   When did Autonomy acquire MicroLink?

4  **A.**   I don't know the specific date.

5  **Q.**   Was it at some point in 2010?  Or around the time of this

6  email?

7          **MS. LITTLE:**  Objection, leading.

8          **THE COURT:**  Overruled.  We'd be here for six months.

9          **THE WITNESS:**  I do not remember if it was late 2009 or

10 early 2010, but it was around that time.

11 **BY MR. LEACH:**

12 **Q.**   Okay.  Let me draw your attention to page 2 of the

13 exhibit.  And I draw your attention to the line that says the

14 acquisition will cost 55M.

15     Do you see that?

16 **A.**   I do.

17 **Q.**   Is that roughly the amount of the MicroLink acquisition?

18 **A.**   I believe it to be, yes.

19 **Q.**   And what was the thrust -- what did you understand the

20 thrust of the questions relating about MicroLink to be here?

21 **A.**   So the thrust of the note is questioning why Autonomy

22 would buy MicroLink; that it didn't appear to be a strategic

23 asset so why spend the cash.  And then sort of begging the

24 question that it would just raise additional investor concerns

25 around cash generation and cash conversion for the business.

**PROCEEDINGS**

1    **Q.**    Are you familiar with the term "channel partner"?

2    **A.**    I am.

3    **Q.**    What is a channel partner?

4    **A.**    A channel partner is a third-party business that you --

5    that takes a company's software to market.  So effectively a

6    reseller, reselling your product into the market.

7    **Q.**    Did you consider MicroLink to be a channel partner of

8    Autonomy's?

9    **A.**    I did, yes.

10   **Q.**    And what is it about acquiring a channel partner that

11   raises questions in your mind?

12   **A.**    Well, I mean, channel partners are about giving you scale.

13   They give you access and reach to markets that you wouldn't

14   necessarily have access to.  So you already have a relationship

15   with them, so why acquire them?  There is no need to.

16   **Q.**    Please look at what has been marked as Exhibit 2773.

17        Is this a true and correct copy of an email from Mike

18   Lynch to you, Sushovan Hussain, and others on or about March

19   1st, 2010?

20   **A.**    I believe it to be, yes.

21            **THE COURT:**  Admitted.

22        (Trial Exhibit 2773 received in evidence)

23   BY MR. LEACH:

24   **Q.**    Let me please draw your attention to the bottom portion of

25   the first page, Mr. Geall.  There is an email from someone

1  named Michael Briest at ubs.com.  Who is he?

2  **A.**    Michael Briest is the lead analyst for laying software and

3  IT services companies at UBS.

4  **Q.**    He is someone you had an interaction with as the head of

5  IR?

6  **A.**    He was, yes.

7  **Q.**    Please look at page 2.  If you could take a moment,

8  please, to read the first starred portion at the top beginning

9  "could you just confirm?"

10  **A.**    "Could you just confirm to me that you only recognize

11  sales on sell-through, not sell-in at MicroLink and other

12  resellers.  It says in the reports and accounts that sales are

13  generally recognized if all products subject to resale are

14  delivered in the current period.  No right of return policy

15  exists.  Collection is probable, and the fee is fixed and

16  determinable.  I want to head off any concern that MicroLink

17  bought IDOL licenses in Q4 pre-acquisition, and you booked a

18  sale on them in Q4 even if they have not been delivered to the

19  final customer since.  I think it might be worth considering

20  putting this up on the question board."

21  **Q.**    What is sell-through in that first line?

22  **A.**    So this is -- this is effectively the timing of when you

23  recognize revenues through a channel partner.

24       So the normal expectation for companies is that you

25  recognize the revenue once they've sold to the end customer,

**PROCEEDINGS**

1    not when you have sold to the channel partner.

2         The reason being the risk of recognizing revenues too

3    early.

4    **Q.**   Mr. Briest goes on to write:

5              "I want to head off any concern that MicroLink bought

6              IDOL licenses in Q4 pre-acquisition, and you booked a sale

7              on them in Q4, even if they have not been delivered to a

8              final customer."

9         What did you understand Mr. Briest to be getting at there?

10   **A.**   So this relates to timing of any revenues that Autonomy

11   may have received from MicroLink, and whether they had been

12   recognized prior to the acquisition.

13        Once you acquire a business, you have the ability to

14   effectively write down any of its debts.  Potentially, you

15   know, if -- if Autonomy had recognized revenues that hadn't

16   been sold through to the end customer, then there would have

17   been the opportunity to write down that debt and not restate

18   revenues.

19   **Q.**   Why is that a concern?

20   **A.**   It's -- it would be a concern if -- if the business hadn't

21   really sold to an end customer prior to the acquisition.

22   **Q.**   Why?

23   **A.**   It would imply channel stuffing.

24   **Q.**   What was the response that you proposed to Mr. Briest's

25   question?

PROCEEDINGS

1    **A.**    That there were no Q4 revenues from MicroLink.

2    **Q.**    Why did you write that?

3    **A.**    Because that was the information I'd been told.

4    **Q.**    By whom?

5    **A.**    I do not remember.

6    **Q.**    If we could go to the first page of the email, please.

7         Before I ask my question about this, you used the word

8    "channel stuffing."  What is that?

9    **A.**    Channel stuffing is recognizing revenues before the

10   customer or the end customer has received the product.

11   **Q.**    Why is -- why is that an issue?

12   **A.**    Because there's a risk that the customer never pays for

13   the product, and you never actually receive the revenues.

14   **Q.**    What does that mean for a company like Autonomy?

15   **A.**    It would effectively inflate revenues in the short term,

16   and then once those debts were written off, there would be a

17   reversal in the future.

18   **Q.**    We have here Mike Lynch writing to you, "please check with

19   dish."

20        What do you think that means?

21   **A.**    I believe that was a typo by Mike.  I think that means

22   please check with Sush, which is how Mike chose to call

23   Sushovan.

24   **Q.**    And what's the remaining portion of his email?

25   **A.**    "Be sure he puts no more than 2 million revenue Q1 for

1    MicroLink."

2    **Q.**   Please look at what has been marked as Exhibit 2774.

3         Is this a true and correct copy of an email that you

4    received from Peter Goodman to Sushovan Hussain on or about

5    March 10, 2010?

6    **A.**   I believe it to be, yes.

7              **THE COURT:**   Admitted.

8         (Trial Exhibit 2774 received in evidence)

9    **BY MR. LEACH:**

10   **Q.**   Let me draw your attention to the first top portion of the

11   email.

12        Mr. Goodman is somebody who worked for you, Mr. Geall, in

13   or around this time?

14   **A.**   Correct.

15   **Q.**   And he's writing:

16        "Hi Sushovan, please can you approve the following

17        questions to go up on the website?"

18        What did you understand that to mean?

19   **A.**   This was the approval that we would normally have sought

20   from either Mike or Sushovan before posting any new questions

21   onto the investor bulletin board.

22   **Q.**   Please look at page 2.  And I direct your attention to the

23   middle of the page.

24        Do you see the question "Did Autonomy make any sales to

25   MicroLink in Q4/09?"

**PROCEEDINGS**

1    **A.**    I do.

2    **Q.**    Was that Mr. Briest's question?

3    **A.**    It was, yes.

4    **Q.**    Does this represent Mr. Goodman seeking Mr. Hussain's

5    approval to put the answer "no, there were no Q4/09 revenues

6    from MicroLink onto the website"?

7    **A.**    Correct.

8    **Q.**    In or around the first quarter of 2009, did you meet with

9    investment bankers from JPMC relating to analyst coverage of

10   Autonomy?

11   **A.**    Can you clarify the time?  You said Q1/2009?

12   **Q.**    Q1/2010, March of 2010, did you meet with investment

13   bankers at JPMC relating to JPMC's analyst coverage of

14   Autonomy?

15   **A.**    Correct.

16   **Q.**    Who attended that meeting?

17   **A.**    This was attended by Sushovan, Mike, myself, Andrew

18   Kanter.  I don't believe anybody else from Autonomy, but maybe

19   Rob Webb was there, but I don't fully recall, and I believe

20   four or five people from JPMorgan.

21   **Q.**    Who from JPMorgan, what portion of the company?

22   **A.**    So it was a mixture, so it was some of the investment

23   bankers at JPMorgan, as well as the head of accounting research

24   at JPMorgan.

25   **Q.**    What was the subject matter of the meeting?

1    **A.**    The subject matter was for Autonomy effectively to present

2    to the head of accounting at JPMorgan how Autonomy was

3    recognizing revenues, how it was constructing its report and

4    accounts to give confidence to him that some of the negative

5    research that Daud Khan was writing was misguided and not based

6    on fact.

7    **Q.**    Why were the investment bankers included in this meeting

8    about analyst coverage?

9    **A.**    This was a meeting that was basically sponsored by the

10    investment bankers.

11    **Q.**    But why the investment bankers if it relates to analyst

12    coverage?

13    **A.**    The investment bankers were keen to do business with

14    Autonomy.    They wanted to be an adviser to Autonomy, which

15    would have been very difficult to do with a negative analyst

16    covering the stock.

17    **Q.**    We talked earlier about Catalyst.    Do you recall that

18    testimony?

19    **A.**    I do.

20    **Q.**    Was the thrust of your meetings with Catalyst the

21    possibility that Catalyst would represent Autonomy in some form

22    of acquisition?

23    **A.**    The -- the presentations that Catalyst presented to Mike

24    and myself were showing potential acquisitions for Autonomy, so

25    they wanted to advise Autonomy on potential acquisitions, but

1  also sort of discussing if Autonomy needed some kind of

2  defense.  If it was acquired itself, then they would also be

3  happy to provide that service to the company.

4  **Q.**    In or around March of 2010, did you decide to leave

5  Autonomy?

6  **A.**    I did, yes.

7  **Q.**    And did you notify Dr. Lynch about your desire to leave

8  Autonomy?

9  **A.**    I did, yes.

10  **Q.**    Why did you want to leave Autonomy?

11  **A.**    When I had initially taken the role in investor relations,

12  I specified to Mike that that wasn't the role I wanted to do.

13  I went to Autonomy to be the CEO of Virage.  I had not wanted

14  to do IR at any company.  It wasn't a role I wanted to do.  So

15  at that time I stated, you know, if a better opportunity became

16  available, then I would take that.

17      In late sort of 2009 and early 2010, I was in discussions

18  with Deutsche Bank, and Deutsche Bank made me an offer that was

19  of interest.  Ms. Rohrbach is a financial analyst covering the

20  tech base.

21      I also had become uncomfortable in terms of, you know,

22  where Autonomy was and some of the questions that we've

23  obviously discussed today.

24  **Q.**    What do you mean by that?

25  **A.**    Just that, you know, my fear was that, you know, the

1    growth wasn't what it was purported to be, that, you know, the

2    use of acquisitions was being used to accelerate the organic

3    growth rate for the business.  And, you know, I didn't feel

4    overly comfortable continuing to have discussions with

5    investors that I had known for many years about things that I

6    was starting to question.

7    **Q.**    What were the things you were starting to question?

8    **A.**    So, I mean, there were, I suppose, a number of areas.

9        First, as I mentioned, how M&A or acquisitions were being

10   used to accelerate growth for the business.

11       The second one was relating to the OEM business and the

12   real size of the OEM business.  My understanding had become

13   that it was significantly less than what was being presented in

14   the reports and accounts and communicated to investors.

15       IDOL SPE in terms of, you know, the launch of a new

16   product that was going to drive incremental growth, but was it

17   really a product; as well as questions over, you know, the

18   hardware sales that may have occurred in Q3/2009 relating to

19   EMC, and whether that was being used to sort of -- or whether

20   IDOL SPE was being used to hide that fact.

21   **Q.**    You testified, Mr. Geall, that you were uncomfortable that

22   hardware sales were being -- SPE was being used to mask

23   hardware sales.  Is that fair?

24   **A.**    That was the conclusion I was coming to, yes.

25   **Q.**    What do you mean by that?

PROCEEDINGS

1    **A.**   Well, there was -- if you -- if you are recognizing the

2    revenues at a loss, then there is a lot of cost that needs to

3    be accounted for.  You know, if this was the general course of

4    business and it was cost of goods sold, then that all would

5    have gone into the COGS line, which clearly it wasn't.

6         Over this period as well there was the launch of a new

7    product, Arcpliance, that was also, you know, leading to

8    hardware becoming an increasing part of the business, but it

9    was difficult to explain in terms of the potential margin risk

10   and margin contribution that was there.

11   **Q.**   How did that relate to the SPE launch?

12   **A.**   So with IDOL SPE, it comes back to the fact that, you

13   know, it wasn't clear to me that the R&D was being done on a

14   new product, because this was a product or capabilities in the

15   product that already existed, as well as no sort of evidence

16   around the sales and marketing costs relating to the Quick

17   Start program.  And those combined costs were, you know, very

18   similar to the purported sort of hardware -- sale or hardware

19   deal with EMC.

20   **Q.**   You also mentioned a concern about OEM.  What did you mean

21   by that?

22   **A.**   So OEM was a very important part of the equity story.

23   This was the sort of ability to take IDOL and have basically

24   another software company embed IDOL into their technology and

25   go to market, so it gives you a huge scale into the market

**PROCEEDINGS**

1    because you're leveraging those companies' channels to sell.

2    This is a super high margin business.   The reason why Autonomy

3    had the high gross margin was the benefit of OEM, which should

4    have generated new revenues at minimal incremental sales and

5    marketing costs, because you're getting a royalty back from the

6    software vendor that is licensing your technology and selling

7    it.

8         I was pretty close to the individual at Autonomy that was

9    running the OEM business, somebody called Harold Collette.

10   And, you know, he had -- he had come to me because he had had

11   some questions around the OEM business and had to attend a

12   meeting in New York with Mike Lynch to discuss the OEM

13   business, and he was feeling increasingly uncomfortable with

14   that, so he was explaining to me what was really happening, and

15   it was indicating that the OEM business was, you know, a

16   fraction of the revenues that were being reported.

17   **Q.**   You also described something called accelerated growth

18   through acquisition.   What did you mean by that?

19   **A.**   So Autonomy, because of this ability to OEM IDOL and

20   quickly integrate it into other technologies, when Autonomy

21   made an acquisition like Interwoven, what Autonomy did was very

22   quickly integrate IDOL into the acquired company's products.

23   The rationale being that now if new deals of that product were

24   being sold to customers, that was done by -- that was driven

25   because of IDOL, not because of the legacy technology that had

PROCEEDINGS

1   been acquired, and, as such, Autonomy, I think, was able to

2   convince its auditors that this was now organic growth and not

3   acquired growth.

4   **Q.**    Prior to leaving Autonomy, did you continue to interact

5   with investors relating to the announcement of the Q1/2010

6   results?

7   **A.**    Sorry.  Can you repeat the question.

8   **Q.**    Prior to actually leaving Autonomy, did you continue to do

9   work around the first quarter of 2010 results announced to the

10   market?

11   **A.**    I did, yes.

12   **Q.**    Please look at what has been marked as Exhibit 2776.

13       Is this a true and correct copy of an email that you sent

14   to investors relating to Autonomy on or around April 22nd,

15   2010?

16   **A.**    It is, yes.

17           **THE COURT:**  Admitted.

18       (Trial Exhibit 2776 received in evidence)

19   **BY MR. LEACH:**

20   **Q.**    This email exchange is with someone named Hari Ramanan.

21   Do you see that?

22   **A.**    I do.

23   **Q.**    Who is this individual?

24   **A.**    Hari was a firm manager at a hedge fund called Eminence

25   Capital.

1    **Q.**    And the question you receive is:

2    "Mark, just trying to make sense of this.  In Q1, the

3    company took advantage of discounted offers to purchase

4    stock for the Arcpliance product in advance of Q2 sales

5    which affected the cash position.  How could this move the

6    needle on the cash position?"

7    What did you understand the thrust of this question to be?

8    **A.**    So this related to a comment that had been made relating

9    to the Q1 results where basically there were inventory or there

10    was inventory on the balance sheets that had been -- sorry --

11    inventory on the balance sheets that was explained as hardware

12    that had been purchased ahead of an opportunity to sell a new

13    product called Arcpliance in the subsequent quarter.  So rather

14    than this being recognized as revenues, it was sitting

15    effectively on the balance sheets as inventory, potentially

16    depreciating.  So this was a comment to explain what had

17    happened and why.

18    **Q.**    What is Arcpliance?

19    **A.**    Arcpliance was basically an appliance.  So an appliance is

20    a piece of hardware that has software on it, the benefit being

21    speed of deployment into a data center.  So Arcpliance was a

22    derivative of some software that Autonomy had for eDiscovery.

23    EDiscovery is the need to process digital information as part

24    of legal cases, which had been an important growth driver for

25    Autonomy.  Arcpliance was a way of speeding the deployment of

**PROCEEDINGS**

1  that into a customer data center by basically dropping the

2  appliance into the data center.

3  **Q.**    And you mentioned something about inventory.  What is

4  inventory?

5  **A.**    Inventory is a cash flow or balance sheet term that

6  relates to, you know, product that is effectively sitting

7  there; it could be in a warehouse that either you have

8  manufactured and are about to sell or, you know, are going to

9  resell into the market.

10  **Q.**    And so there was some inventory on Autonomy's balance

11  sheet at the end of Q1/2010?

12  **A.**    I believe that to be the case, yes.

13  **Q.**    Was that usual?

14  **A.**    No, it was not -- well, it was usual to have some level of

15  inventory, normally 2-or 300,000Ks worth of inventory, but at

16  this time I believe the number was closer to 10 million.  That

17  was unusual.

18  **Q.**    What was the explanation you gave to investors about this

19  $10 million in inventory?

20  **A.**    So similar to what was communicated here to Hari, that,

21  you know, this related to Arcpliance, which was a, you know,

22  product that Autonomy was selling or would be selling in 2010

23  to continue to deliver growth around eDiscovery, but it would

24  be, you know, a relatively small number of deals, because it

25  wasn't, you know, a core focus going forward.

PROCEEDINGS

1    **Q.**    What was the significance of attaching this to Arcpliance

2    or an appliance?

3    **A.**    The significance to investors was that the gross margin

4    would be lower than what was normal for Autonomy.  So, you

5    know, if we used the example of Autonomy generating a gross

6    margin of about 90 percent, if you have ten million of

7    inventory for that to be non-dilutive and to the gross margin,

8    you need to probably be generating at least 80 million of

9    software just for that 10 million of hardware; otherwise you

10    would be diluting the margins.

11    80 million in a quarter was, you know, a significant

12    amount of Autonomy's license revenue in the quarter.  So it

13    was, you know -- it would have become a very risky business,

14    because you would have been dependent on a relatively small

15    number of very large deals that may or may not close.

16    **Q.**    You wrote here:

17    "10M of stock bought in Q1 ahead of Arcpliance deals

18    that have closed in early Q2.  Should not expect this type

19    of run rate in the future."

20    Where did you get that information?

21    **A.**    Discussions with Sushovan.

22    **Q.**    And help me understand what you meant by this.

23    **A.**    So because the 10 million of stock was a relatively high

24    number, hardware tends to depreciate very quickly; right?  It's

25    not normal to buy hardware ahead of time, because its value in

1   a month or two months is significantly lower.

2       So here what was being communicated was that deals were

3   ready to be closed.  So that stock or that inventory sat on the

4   balance sheet, and there was minimal risk to Autonomy, because

5   the customer was just going through its procurement process,

6   and it would be quickly deployed and then the revenue

7   recognized in the subsequent quarter.

8   **Q.**   And were you saying the stock would be part of an

9   appliance?

10  **A.**   Here, yes.  The -- the commentary is that the stock is

11  hardware that would be used as part of the Arcpliance solution.

12  **Q.**   Why did you emphasize that?

13  **A.**   Because hardware was unusual.  As you see from the comment

14  from Hari, we thought hardware sales wasn't big, otherwise

15  being the communication from the management team at Autonomy,

16  but now this was a pretty material number of 10 million in the

17  quarter.

18  **Q.**   After you left Autonomy, where did you go?

19  **A.**   I went to Deutsche Bank.

20  **Q.**   What is Deutsche Bank?

21  **A.**   Deutsche Bank is a European investment bank.

22  **Q.**   What did you do for Deutsche Bank?

23  **A.**   I was their research analyst in charge of software and IT

24  services companies.

25  **Q.**   You went back to doing the work much like what you had

PROCEEDINGS

1  done before joining Autonomy?

2  **A.**    Correct.

3  **Q.**    You recognize what is marked as Exhibit 994?

4  **A.**    I don't have 994.

5  **Q.**    Forgive me.  996.  Do you recognize this document?

6  **A.**    I do, yes.

7  **Q.**    What is it?

8  **A.**    It is a research report published by Deutsche Bank for the

9  second quarter of 2010.

10          **MR. LEACH:**  Your Honor, I offer Exhibit 996.

11          **THE COURT:**  Admitted.

12      (Trial Exhibit 996 received in evidence)

13  BY MR. LEACH:

14  **Q.**    So when you went to Deutsche Bank you resumed covering

15  Autonomy from the outside, Mr. Geall?

16  **A.**    Ultimately I did, yes.

17  **Q.**    Okay.  Do you see your name listed as research analyst

18  just below the heading "weak 2Q yet fundamental investment case

19  remains"?

20  **A.**    I do, yes.

21  **Q.**    To the left there is someone named Josep Bori.

22      Who is he?

23  **A.**    Josep was the analyst who had been the number two on the

24  team.

25      Prior to my joining, when the lead analyst had left

**PROCEEDINGS**

1    Deutsche Bank, all stocks under coverage were transferred over

2    to Josep, so he was the main name on the stock, which is why

3    his name is here to the left.  Although I had started at

4    Deutsche Bank, I had not assumed coverage of any of the stocks

5    at that point.

6    **Q.**   Did you review this report before it was issued?

7    **A.**   I did, yes.

8    **Q.**   And you had some contribution to it, but not as much as

9    Mr. Bori; is that fair?

10    **A.**   It was technically his report, yes.

11    **Q.**   At what point in time did you first issue a report in your

12    own name relating to Autonomy?

13    **A.**   So I would have resumed coverage after the Q2 earnings

14    season, because we had 12 companies to get through, and I

15    published a much larger piece of research in October 2010.

16    **Q.**   Before we get to that, would you please look at what has

17    been marked as Exhibit 1128.

18        Is this a true and correct copy of a press release issued

19    by Autonomy on or about October 6, 2010?

20         **MS. LITTLE:**  Objection, Your Honor.  I think he was

21    gone from the company then.

22         **MR. LEACH:**  He is covering Autonomy, Your Honor.

23         **THE COURT:**  Well, you have to lay a foundation that he

24    saw it.

25

PROCEEDINGS

BY MR. LEACH:

Q.   Do you recall this press release, Mr. Geall?

A.   I do, yes.

Q.   Were you covering Autonomy around this date?

A.   I was, yes.

          THE COURT:   Admitted.

     (Trial Exhibit 1128 received in evidence)

BY MR. LEACH:

Q.   I draw your attention to the heading, Mr. Geall:

          "Autonomy expects to report Q3/2010 results around

     top end of model range; PBT expected to be up

     approximately 35 percent."

     What is PBT?

A.   PBT stands for profit before tax.

Q.   And does this press release also include lowering guidance

for the fourth quarter of 2010 for Autonomy?

A.   Yes, it does.

Q.   Where is that?

A.   "There are unique challenges to the summer months with a

consequence September catch-up, but we are also noticing

customers still showing volatility around their view of the

current macroeconomic situation.  This necessitates a prudent

approach to forecasting, and thus we expect to review our

internal model for the full year with a revenue reduction of

around 3 percent."

1    **Q.**   Is this good news or bad news for a company?

2    **A.**   This would be bad news.

3    **Q.**   Why is that?

4    **A.**   It's effectively a downgrading in expectations which

5    normally leads to a reduction in the share price.

6    **Q.**   What do you mean by a downgrading of expectations?

7    **A.**   So the management will either explicitly or implicitly,

8    you know, give an indication of the type of growth that they

9    expect to see, either in a current quarter or for the full

10   year.

11        Here, this term, our internal model for the full year was

12   the indication of the growth expectation that Autonomy had, and

13   by reducing that expectation it was effectively a downgrade in

14   forecasts.

15   **Q.**   Please look at what has been marked as Exhibit 1154.

16        Do you recognize this document?

17   **A.**   I do.

18   **Q.**   Is this a true and correct copy of a report that you

19   issued on Deutsche Bank's behalf on or about October 10, 2010,

20   relating to Autonomy?

21   **A.**   I believe it to be.

22        **THE COURT:**  Admitted.

23        (Trial Exhibit 1154 received in evidence)

24   **BY MR. LEACH:**

25   **Q.**   I draw your attention, Mr. Geall, to the top portion of

**PROCEEDINGS**

```
1    your report in the right where it says "recommendation change
2    hold."
3        Do you see that?
4    A.   I do.
5    Q.   And beneath -- in the heading, does it say, "The billion
6    dollar question, downgrading to a hold."
7        Do you see that?
8    A.   It does.
9    Q.   What does that mean?
10   A.   So the prior analyst, Josep Bori, had been a buyer of the
11   stock, so the recommendation was a buy.
12       Here, I was publishing a detailed report and downgrading
13   it from a buy to a hold.
14   Q.   What do you mean by a downgrade?  I guess what do you mean
15   by buy and hold?
16   A.   So as a financial analyst, you will have one of three
17   recommendations on any stock:  Buy, hold or sell.  If you're a
18   buyer, then you are recommending the investors should buy that
19   stock.  If you are a holder, you are recommending that they
20   effectively reduce their exposure or reduce their wait to that.
21   So if you are moving from a buy to a hold, you are taking a
22   more cautious stance.  And if you are a seller of the stock,
23   then you are basically saying, look, you should be short this
24   stock.  You don't want to earn it.  You should be short it.
25   And that's a very negative position to be on a stock.
```

1   **Q.**   At the time that you issued this report, what was your

2   expectation about how this would be perceived by your former

3   colleagues at Autonomy?

4   **A.**   I was not expecting them to be happy.

5   **Q.**   Why was that?

6   **A.**   For any analyst to downgrade a stock, you know, normally

7   will have some negative impact or implication.  For an analyst

8   who was well-known and well regarded in the industry who had

9   also been part of the management team at that company to

10  downgrade was, you know -- would be viewed probably even more

11  cautiously.

12  **Q.**   You used the term "short the stock."  What do you mean by

13  that?

14  **A.**   So within -- within the finance industry, you have the

15  ability to effectively short equities or short other vehicles,

16  so this is -- if you believe that the -- in this case, the

17  share price of a -- of a stock like Autonomy -- if you expect

18  it to be lower in the future, you basically effectively forward

19  sell it now, knowing that you can buy it back in the future at

20  a lower cost, therefore making money.

21      So many hedge funds use this as a way of taking a neutral

22  position in a particular market, so you could buy one stock and

23  you short another stock against it, so you would then have

24  limited exposure to that particular asset class or that

25  particular asset type.

**PROCEEDINGS**

1  **Q.**   After issuing this downgrade to a hold report in October

2  of 2010, did you continue to cover Autonomy up through the

3  acquisition of Autonomy by HP?

4  **A.**   I did, yes.

5  **Q.**   I've placed before you, Mr. Geall, a number of exhibits

6  I'd like to go through relatively quickly.

7      Do you recognize what has been marked as Exhibit 165?

8  **A.**   (Witness reviews document.)

9      I do, yes.

10 **Q.**   Is this a true and correct copy of an earnings release

11 issued by Autonomy for the second quarter of 2009?

12 **A.**   I believe it to be, yes.

13 **Q.**   Please look at Exhibit 588.

14            **THE CLERK:**   Is that admitted?

15            **MR. LEACH:**   It's admitted.   Excuse me.

16            **THE COURT:**   165, admitted.

17       (Trial Exhibit 165 received in evidence)

18 **BY MR. LEACH:**

19 **Q.**   Please look at Exhibit 661.

20      Is this a true and correct copy of an earnings release by

21 Autonomy for the first quarter of 2010?

22 **A.**   I believe it to be, yes.

23            **THE COURT:**   661, admitted.

24       (Trial Exhibit 661 received in evidence)

25

PROCEEDINGS

BY MR. LEACH:

Q.   Do you recognize Exhibit 994 as a true and correct copy of an earnings release by Autonomy for the second quarter of 2010?

A.   Sorry.  994?

Q.   Yes.

A.   994.  Yes, it is.

        THE COURT:  Admitted.

     (Trial Exhibit 994 received in evidence)

BY MR. LEACH:

Q.   Do you recognize Exhibit 1186 as an earnings release by Autonomy for the third quarter of 2010?

A.   I do, yes.

        THE COURT:  Admitted.

     (Trial Exhibit 1186 received in evidence)

BY MR. LEACH:

Q.   Do you recognize 1531 as an earnings release by Autonomy for the fourth quarter of 2010?

A.   I do, yes.

        THE COURT:  Admitted.

     (Trial Exhibit 1531 received in evidence)

BY MR. LEACH:

Q.   Do you recognize 1788 as a press release for the first quarter of 2011 by Autonomy?

A.   I do, yes.

        THE COURT:  Admitted.

**PROCEEDINGS**

1          (Trial Exhibit 1788 received in evidence)

2     **BY MR. LEACH:**

3     **Q.**    And finally, is 2023 a true and correct copy of a press

4     release issued by Autonomy announcing results for the second

5     quarter of 2011?

6     **A.**    It appears to be, yes.

7              **THE COURT:**  Admitted.

8          (Trial Exhibit 2023 received in evidence)

9     **BY MR. LEACH:**

10    **Q.**    Let me draw your attention to Exhibit 994, Mr. Geall, the

11    second quarter of 2010.

12         Is this the first earnings release after your departure of

13    the company?

14    **A.**    It was, yes.

15    **Q.**    In or around July 22nd, 2010, were you aware that Autonomy

16    had $31 million in hardware revenue for the second quarter?

17    **A.**    No.

18    **Q.**    Would that be relevant to your assessment of the value of

19    Autonomy's securities?

20    **A.**    Yes, it would.

21    **Q.**    Why?

22    **A.**    Because Autonomy was viewed as a software business

23    primarily that was delivering strong growth for -- with a high

24    margin revenue stream.  To have had that quantum of hardware in

25    its revenues would have indicated a totally different type of

**PROCEEDINGS**

1    business and a totally different business model, which would

2    have had a very different valuation.

3    **Q.**    Let me draw your attention to Exhibit 1186, the Q3/2010

4    press release.

5        On or around October 19th, 2010, were you aware that

6    Autonomy had in excess of $25 million in hardware revenue?

7    **A.**    No.

8    **Q.**    Would that be relevant to your assessment of the value of

9    Autonomy's securities?

10   **A.**    It would have been, yes.

11   **Q.**    Why?

12   **A.**    Because, again, it would have indicated that this wasn't a

13   pure software business, and that there was a much lower margin

14   revenue stream included in its -- in its P&L, and it would have

15   had a correspondingly low evaluation.

16   **Q.**    Could we please display Exhibit 1531?

17       Is this the announcement of the results for the fourth

18   quarter of 2010, Mr. Geall?

19   **A.**    It is, yes.

20   **Q.**    At or around the time of this announcement, were you aware

21   that Autonomy had in excess of $29 million in hardware revenue?

22   **A.**    I was not.

23   **Q.**    Would that be relevant to your assessment of the value of

24   Autonomy's securities?

25   **A.**    It would.

**PROCEEDINGS**

1    **Q.**    Why?

2    **A.**    Because it would have impacted the valuation of the

3    business.

4    **Q.**    If we could please display Exhibit 1788.

5         At or around the time of this press release, Mr. Geall,

6    were you aware that Autonomy had approximately 20 million in

7    hardware revenue?

8    **A.**    I was not.

9    **Q.**    Would that be relevant to your assessment of the value of

10   Autonomy's securities?

11   **A.**    It would.

12   **Q.**    Why?

13   **A.**    Because it would have impacted the valuation of the

14   business.

15   **Q.**    Please look at Exhibit -- if we could please display

16   Exhibit 2023.

17        At or around the time of this press release, were you

18   aware that Autonomy had approximately $20 million in hardware

19   revenue for this quarter?

20   **A.**    I was not.

21   **Q.**    Would that be relevant to your assessment of the value of

22   Autonomy's securities?

23   **A.**    It would.

24   **Q.**    Why?

25   **A.**    Because it would have impacted the valuation of the

1    business.

2              MR. LEACH:  Thank you, Mr. Geall.

3         Thank you, Your Honor.  I have nothing further.

4              THE COURT:  Ladies and gentlemen, do you want to stand

5    up and stretch before we start the cross?

6         Okay, Ms. Little, you may proceed.

7              MS. LITTLE:  Thank you, Your Honor.

8                        CROSS-EXAMINATION

9    BY MS. LITTLE:

10   Q.   Good afternoon.

11   A.   Good afternoon.

12   Q.   My name is Jan Little, and I represent Mr. Hussain.  And

13   we've not met before, have we?

14   A.   We have not.

15   Q.   Mr. Geall, I'm going to start out asking you some

16   questions about MicroLink.  Mr. Leach was asking you about

17   Exhibit 2772, which is in evidence.

18        If we could put that on the screen.

19        You recall this was the email where Mr. Moreland was

20   asking various questions about MicroLink.

21   A.   Correct.

22   Q.   And going up to the top of the email, Mr. Lynch, Dr. Lynch

23   responded with some answers to Mr. Moreland's questions;

24   correct?

25   A.   He did, yes.

1    **Q.**    And sometimes there are disagreements about why a purchase

2    was made or what the financial statements mean; correct?

3    **A.**    Correct.

4    **Q.**    And sometimes analysts are right and sometimes analysts

5    are wrong; correct?

6    **A.**    Correct.

7    **Q.**    And Mr. Lynch, Dr. Lynch here is responding that

8    Mr. Moreland is just wrong on this one; right?  He completely

9    misses the point, item number 3 there, he completely misses the

10   cleared point on MicroLink?

11   **A.**    Well, that's his argument there, yes.

12   **Q.**    You have no knowledge about the commercial rationale for

13   the acquisition of MicroLink, do you?

14   **A.**    Sorry?

15   **Q.**    Do you have any knowledge of the commercial rationale for

16   the purchase of MicroLink?

17   **A.**    Yes.

18   **Q.**    What was it?

19   **A.**    The rationale was that MicroLink was a federally cleared

20   business, which meant that it could sell to the U.S.

21   Government, and that they had employees that, you know, were

22   able to work on projects that employees of Autonomy would not

23   be able to work on, and therefore this would enable Autonomy to

24   sell more effectively into the U.S. Government.

25   **Q.**    And that's what Dr. Lynch is referring to when he talks

1    about the cleared point; correct?

2    **A.**   That is correct, yes.

3    **Q.**   Because you need clearances to work in a secure facility

4    with classified information?

5    **A.**   Absolutely.

6    **Q.**   We can take that down.

7         Mr. Leach also asked you some questions with respect to

8    MicroLink about sell-in versus sell-through.

9    **A.**   Uh-huh.

10   **Q.**   Do you recall that line of questioning?

11   **A.**   Yep.

12   **Q.**   Are you familiar with the International Financial

13   Reporting Standards, IFRS?

14   **A.**   I am, yes.

15   **Q.**   What are they?

16   **A.**   IFRS is the European standard for accounting.

17   **Q.**   Are you familiar with the fact that under IFRS, as opposed

18   to the rules of the United States, revenue can be recognized at

19   sell-in?  It doesn't have to be recognized at sell-through.

20   Are you familiar with that?

21   **A.**   I am, yes.

22   **Q.**   I also want to ask you about another email that Mr. Leach

23   asked you about relating to MicroLink.

24        This is Exhibit 2773 that's in evidence.

25        If we can put that on the screen.

1        And just to orient the jurors, up at the top, this was the

2    email where Dr. Lynch -- you sent it to Dr. Lynch, and

3    Mr. Hussain and Dr. Lynch responded:  "Please check with dish."

4    You recall that email?

5    **A.**    Yes.

6    **Q.**    And let's go down further in the email to the second

7    page -- let me find it -- where it says -- up at the top,

8    these -- there were no -- I can't read it.  There we go.

9        "There were no Q4 revenues from MicroLink."

10        Do you recall that?

11   **A.**    I do.

12   **Q.**    And those were your words; right?

13   **A.**    That was my email commentary, yes.

14   **Q.**    Okay.  I want to show you an email that Mr. Leach didn't

15   show you, which is Exhibit 5832.  That should be in the book in

16   front of you.  Got it?

17   **A.**    I've got it, yes.

18   **Q.**    Is this an email that you sent to Steven Chamberlain?

19   **A.**    It -- it appears so, yes.

20        **THE COURT:**  Admitted.

21     (Trial Exhibit 5832 received in evidence)

22        **MS. LITTLE:**  If we could put it up on the screen.

23   **Q.**    Let's look at the bottom part first, the email from

24   Mr. Briest.

25        So this is the original email that came from Mr. Briest;

1    correct?

2    **A.**    I believe so, yes.

3    **Q.**    And at this point you had not yet drafted your proposed

4    responses to the questions; correct?  They're not interlineated

5    in there like in Exhibit 2273; correct?

6    **A.**    Not in this email; correct.

7    **Q.**    Then if we go up to the top, again where you are sending

8    it to Mr. Chamberlain, the first person you sent Mr. Briest's

9    email to was Mr. Chamberlain -- right? -- not Dr. Lynch or

10    Mr. Hussain?

11    **A.**    I don't remember.

12    **Q.**    You can look at it.  You don't have your interlineated

13    responses in this one; right?

14    **A.**    But I don't know the timing of this email.

15    **Q.**    Well, but you could look at it.

16        Do you see your proposed response in this one about "no Q4

17    revenues from MicroLink."  It's not in there, is it?

18    **A.**    No.

19    **Q.**    So, in other words, you forwarded this to Mr. Chamberlain

20    before you drafted your proposed response?

21    **A.**    Possibly, yes.

22    **Q.**    Well, do you see your proposed response in there?

23    **A.**    No.

24    **Q.**    Okay.  We can take that down.

25        And then, as we've seen, we had Exhibit 2773 where you do

GEALL - CROSS / LITTLE

1  have your proposed response -- let's bring that back up,

2  actually.  2773.

3      You have your proposed response on the second page in

4  blue:  "There were no Q4 revenues for MicroLink;" correct?

5  **A.**  Correct.

6  **Q.**  Then if we go back up to the top, on the first page -- no.

7  At the top where Dr. Lynch responds.  He corrects you; right?

8  He says, "Be sure he puts no more than 2 million revenue" -- he

9  says Q1, which I think is a mistake "MLink;" correct?

10 **A.**  Why is it a mistake?

11 **Q.**  Well, Q1, it was actually in Q4; right?  Not Q1?

12        **MR. LEACH:**  Objection.  Assumes facts.

13        **MS. LITTLE:**  Okay.

14        **THE COURT:**  Well --

15        **MS. LITTLE:**  He talks about a two million --

16        **THE COURT:**  Is that a question?

17        **MS. LITTLE:**  I'll withdraw it.

18 **Q.**  Dr. Lynch responds with a reference to a 2M rev MLink;

19 correct?

20 **A.**  Correct.

21 **Q.**  That's a reference to two million revenue.  MLink is

22 MicroLink; right?

23 **A.**  Correct.

24 **Q.**  So Dr. Lynch is telling you that there actually is revenue

25 for MicroLink, although he says Q1?

1    **A.**    In Q1.  He is referring to Q1, not Q4.

2    **Q.**    Let's look at another email that Mr. Leach didn't show

3    you.

4         This is Exhibit 619.  Do you find that in your book?

5    **A.**    Yes, I've got it.

6    **Q.**    And we don't have to put it all on the screen, but if you

7    just look at the second and third page, this, again, is

8    Mr. Briest's question and your proposed answers; correct?

9         **THE COURT:**  I'm sorry.  This is 619?

10        **MS. LITTLE:**  619.  Oh, let me go back.

11   **Q.**   Is this an email, sir, that you were a part of involving

12   Dr. Lynch, you, Sushovan Hussain, Peter Goodman?

13   **A.**   It was, yes.

14        **THE COURT:**  Admitted.

15      (Trial Exhibit 619 received in evidence)

16        **MS. LITTLE:**  Thank you.  I forgot, Your Honor, sorry.

17        **THE COURT:**  It's just under a different title.

18   **BY MS. LITTLE:**

19   **Q.**   So, again, going down to the bottom email from Mr. Briest,

20   this is the same one we've been talking about; right?

21   **A.**   It is, yep.

22   **Q.**   And then if you go up on the up to the next one, we've got

23   Dr. Lynch's response:  "Please check with dish."

24        We are all familiar with that now; right?

25   **A.**   Correct.

GEALL - CROSS / LITTLE

1    **Q.**    And then if we go up to the very top of the email, we have

2    a response from Mr. Chamberlain; correct?

3    **A.**    Correct.

4    **Q.**    And Mr. Chamberlain writes "per MRL," that's Mike Lynch;

5    right?

6    **A.**    Uh-huh.

7    **Q.**    "Need to run MicroLink numbers through Sushovan.  Small

8    deal in Q4 also went through them."  Correct?

9    **A.**    Correct.

10    **Q.**    So now Mr. Chamberlain is also telling you that there was

11    a small deal, a $2 million deal, I would submit, in Q4, also

12    went through them, meaning MicroLink; right?

13    **A.**    Correct.

14    **Q.**    So now you have two people telling you about this deal?

15    **A.**    Actually, Steve Chamberlain here is asking whether

16    Autonomy or whether Sushovan is comfortable with no sales

17    statement regarding Q4.

18    **Q.**    Because, in fact, there is a small deal in Q4; right?

19    **A.**    Correct.  That's what he's saying here.

20    **Q.**    So nobody was hiding this MicroLink deal from you, were

21    they?

22    **A.**    What -- I'm sorry.  What MicroLink deal?

23    **Q.**    The deal that we've been talking about, the Q4 MicroLink

24    deal.  No one is hiding it from you, are they?

25    **A.**    It's saying here that there is a small deal potentially in

1    Q4.

2    **Q.**    No one is hiding it from you, are they?

3    **A.**    Correct.

4    **Q.**    Do you have trouble with my questions as opposed to

5    Mr. Leach's?

6    **A.**    No.

7    **Q.**    Mr. Geall, where were you on March 1st and March 2nd, 2010

8    when these emails were being exchanged?

9    **A.**    I do not know.

10    **Q.**    You testified on direct about a meeting with some

11    investment bankers in San Francisco.

12    **A.**    Yes, correct.

13          **MR. LEACH:**  Objection.  Misstates the -- misstates the

14    evidence.

15    **BY MS. LITTLE:**

16    **Q.**    Let me ask it this way.

17          Were you in San Francisco on March 1st attending the

18    Technology Media and Telecom Conference?

19    **A.**    I was at the conference.  I don't recall what day it was.

20    **Q.**    Okay.  Do you recall being at the Palace Hotel?

21    **A.**    I do, yes.

22    **Q.**    Let me show you -- if you would look in your book at

23    Exhibit 5831.  This might help you.  Do you have it there?

24    **A.**    I do, yes.

25    **Q.**    Is this an email from a Mr. Lucas at Morgan Stanley to you

1    and others, and then in turn you forward that to Stouffer Egan?

2    **A.**    It is, yes.

3              **MS. LITTLE:**  Move it in, Your Honor.

4              **THE COURT:**  Admitted.

5          (Trial Exhibit 5831 received in evidence)

6              **MS. LITTLE:**  Put that up on the screen.

7    **Q.**    So looking at the bottom email from Mr. Lucas, who is

8    Mr. Lucas?

9    **A.**    Christian Lucas was the European investment banker at

10   Morgan Stanley.

11   **Q.**    He is writing to Mr. Cook and Mr. Hussain and you talking

12   about "getting together this afternoon;" correct?

13   **A.**    Correct.

14   **Q.**    "Since we are all in town in the same place, it would be

15   great if we could grab a drink."

16         And then you write back, up at the top "work for you at

17   5:30 p.m. at the Palace;" correct?

18   **A.**    Correct.

19   **Q.**    That's the Palace Hotel down on Market Street in

20   San Francisco?

21   **A.**    Correct.

22   **Q.**    Does this remind you now that you were in San Francisco?

23   **A.**    Well, now I understand the dates, yes.

24   **Q.**    So were you in San Francisco?

25   **A.**    I was, yes.

1  **Q.**   And how about Mr. Hussain, was he in San Francisco with

2  you?

3  **A.**   He was, yes.

4  **Q.**   Do you recall, sir, that on the morning of March 1st while

5  these emails were circulating, Mr. Hussain had to leave the

6  conference?

7  **A.**   No.

8  **Q.**   I'd like you to take a look at three exhibits:  5828,

9  5829, and 5830.

10      Why don't you take a look at all three of those, and I'm

11  going to ask you if those are all emails involving you that

12  were sent on March 1st.

13  **A.**   (Witness reviews documents.)

14  **Q.**   You can take them one at a time.

15      5830, is that an email that you sent to Christian Lucas on

16  March 1st?

17  **A.**   Yes, it is.

18  **Q.**   And 5831, is that an email that you sent to Stouffer Egan

19  on March 1st?

20  **A.**   It is, yes.

21  **Q.**   And 5830 -- I've got to go backwards.

22      5829, is that an email that you sent to Mr. Mehta on March

23  1st?

24  **A.**   It is, yes.

25  **Q.**   And 5828, is that an email that you sent to Stouffer Egan

1  on March 1st?

2  **A.**   Sorry.  5828 or 5829?

3  **Q.**   5828.

4  **A.**   5828.  It is, yes.

5         **MS. LITTLE:**  I'd move 5828, 5829, and 5830 into

6  evidence.

7         **THE COURT:**  Admitted.

8       (Trial Exhibits 5828-5830 received in evidence)

9  **BY MS. LITTLE:**

10 **Q.**   Let's take 5830 and put it up on the screen.

11       Up at the very top, the email from you to Mr. Lucas, this

12 is at 10:30 in the morning; correct?

13 **A.**   Correct.

14 **Q.**   You say, "I might be around for dinner tonight.  What were

15 your plans?  Sushovan may now have to fly back to UK tonight,

16 so may not be able to meet with Frank."

17       Does that refresh your recollection about the fact that

18 Sushovan had to leave the conference?

19 **A.**   It states that he may have to fly back to the UK, yes.

20 **Q.**   Take a look at 5829.  You write to Mr. Mehta:  "Bad news,

21 I'm afraid.  I will have to cancel today, as I was traveling

22 with my CFO" -- that's Mr. Hussain; correct?

23 **A.**   Correct.

24 **Q.**   "And he has unexpectedly had to fly back to the U.S."

25       Did you mean UK?

GEALL - CROSS / LITTLE

1    **A.**    I probably did, yes.

2    **Q.**    "A family emergency."  And then you talk about how you

3    have to host a customer meeting, etc.  Correct?

4    **A.**    Correct.

5    **Q.**    And then 5828, your email to Mr. Egan.  And you write, in

6    the second sentence:

7              "Now that Sushovan is heading back to UK, can you

8         attend this with me and then follow along with Frank Cook

9         for a drink at 5:30;" correct?

10   **A.**    Correct.

11   **Q.**    Do you recall what the family emergency was that sent

12   Mr. Hussain back to the UK?

13   **A.**    I don't.

14   **Q.**    You don't recall it at all?

15       Do you recall in this early 2010 period Mr. Hussain

16   having -- Mr. Hussain's father having health issues?

17   **A.**    I do, yes.

18   **Q.**    Tell us about that.

19   **A.**    His father had health issues.

20   **Q.**    Do you know --

21   **A.**    I don't have more detail than that.

22   **Q.**    You don't have more detail than that.  Okay.

23       So getting back to Exhibit 2773 where we started, we don't

24   need to put it up on the screen, but you wrote the draft

25   response saying that there were no Q4 revenues; correct?

1    **A.**    Uh-huh.

2    **Q.**    And Dr. Lynch pointed out that you should check about a $2

3    million deal; correct?

4    **A.**    Correct.

5    **Q.**    And Mr. Chamberlain said that there was a small MicroLink

6    deal; correct?

7    **A.**    Correct.

8    **Q.**    And Mr. Hussain didn't respond, because he was heading

9    back to London; right?

10    **A.**    Okay.

11            **MR. LEACH:**    Objection.    Foundation.

12            **MS. LITTLE:**    Do we have to go through it all again?

13    **Q.**    Was he heading back to the UK that morning?

14            **THE COURT:**    I don't know whether he responded or not.

15    Ask him did he respond, for whatever reason.

16    **BY MS. LITTLE:**

17    **Q.**    Did Mr. Hussain respond, sir?

18    **A.**    Mr. Hussain would likely have flown back on the evening

19    flight, because most flights out of the U.S. are in the

20    evening.    So I could well have spoken to him in the morning.    I

21    don't remember.

22    **Q.**    We haven't seen any email where he responded, have we?

23    **A.**    But we were together in San Francisco, so he could have

24    verbally responded.

25    **Q.**    Oh, now you're saying he verbally responded.    Is that your

1  testimony?

2  **A.**  I'm saying I don't remember.

3  **Q.**  Okay.  He didn't respond to you, did he?

4  **A.**  I don't remember.

5  **Q.**  Mr. Geall, you spoke about Mike Mooney being the head of

6  sales; correct?

7  **A.**  Correct.

8  **Q.**  And Mr. Hussain would participate in sales calls?

9  **A.**  Correct.

10  **Q.**  And in your opinion that was unusual; correct?

11  **A.**  Correct.

12  **Q.**  Would you agree with me that it's important for a CFO to

13  understand where company revenue is coming from and how it's

14  going in a particular quarter?

15  **A.**  Absolutely.

16  **Q.**  And is it important for a CFO to understand the progress

17  of revenue, the pace of revenue, how it's coming in over the

18  quarter?

19  **A.**  Yes, it would be.

20  **Q.**  It's important for a CFO to know what to expect about the

21  company's ultimate performance for the quarter?

22  **A.**  Absolutely.

23  **Q.**  There is nothing wrong with that; right?  The more

24  information the CFO has, the better he can do his job; correct?

25  **A.**  Correct.

1  **Q.**  And you respected Mr. Hussain; right?

2  **A.**  I did, yes.

3  **Q.**  You've described him as humble and tough; right?

4  **A.**  Yes.

5  **Q.**  He was a suitable office mate, I assume?

6  **A.**  Yes.

7  **Q.**  And you never questioned his aptitude as a CFO, did you?

8  **A.**  No.

9  **Q.**  And you've not identified a single instance in which

10  Mr. Hussain directed you to hide information or mislead the

11  market, have you?

12  **A.**  Correct.

13  **Q.**  And you also were a big believer in Autonomy, weren't you?

14  **A.**  I was.

15  **Q.**  You thought it was unique in the software space,

16  especially because it had a lower percentage of services

17  revenues; right?

18  **A.**  Correct.

19  **Q.**  And when you left Autonomy, you had nothing but good

20  things to say about the company; right?

21  **A.**  I had no negative things to say initially, no.

22  **Q.**  I'd like you to take a look in your binder at Exhibit 647.

23  Is this an email that you sent to Dr. Lynch --

24  **THE COURT:**  647?

25  **MS. LITTLE:**  Yes.

1          THE COURT:  I'm looking at 647.

2          MS. LITTLE:  647.

3    Q.    Is this an email that you sent to Dr. Lynch on March 29th

4    with an attached letter?

5    A.    It is, yes.

6          MS. LITTLE:  Move it in, Your Honor.

7          THE COURT:  Admitted, 647.

8       (Trial Exhibit 647 received in evidence)

9    BY MS. LITTLE:

10   Q.    Let's take a look at the email.  You say to Dr. Lynch:

11         "As per discussion last week, apologies for the email

12         communication."

13         And then let's look at the attachment on the next page.

14         This is your letter of resignation to Dr. Lynch; correct?

15   A.    Correct, yes.

16   Q.    You write:  "It is with some sadness that I am tendering

17   my resignation from Autonomy;" right?

18   A.    Correct.

19   Q.    In the second paragraph you say:

20         "I would like to personally thank you for the

21         opportunity and insights you have given me during my two

22         years at Autonomy.  I have learned a great deal and

23         enjoyed my time interacting with employees, customers, and

24         investors.  Autonomy is a unique business, with a highly

25         committed and talented management team and employees."

1          Those are your words; right?

2    A.   They are, yes.

3    Q.   And in the next paragraph you say:

4          "In my new role I would hope to continue to build the

5          relationship further, particularly with yourself and

6          Sushovan.  And assuming a suitable break period, my

7          intention will be to initiate coverage later in 2010."

8          Those are your words, too?

9    A.   Correct.

10   Q.   And you didn't say anything in this letter about your

11   concerns about hardware or SPE or all these concerns that

12   you've been describing to the jury today?

13   A.   No.  This was a resignation letter.

14   Q.   I'm sorry?

15   A.   It was a resignation letter.

16   Q.   It was a resignation letter.  Isn't the time of your

17   resignation a pretty good time to bring up concerns?

18   A.   To what effect?

19   Q.   If you have great concerns, don't you want someone to look

20   into them, take care of them?

21   A.   That's why I had a meeting with Rob Webb.

22   Q.   We'll talk about that.

23        When you came on at Autonomy in May of 2008, you were --

24   you said you were the chief officer of Virage; right?

25   A.   Correct.

**GEALL - CROSS / LITTLE**

1    Q.    You've told the jury that you were not really happy about

2    serving in the investor relations role; correct?

3    A.    Correct.

4    Q.    You moved from Virage to investor relations in October of

5    2009; right?

6    A.    Correct.

7    Q.    So the only quarters that you were involved in the

8    reporting the financials for were the third quarter of 2009,

9    the fourth quarter of 2009, and the first quarter of 2010;

10    correct?

11    A.    No, because I would have been asked for input ahead of

12    that.  So as soon I was at Autonomy, Mike would ask me for

13    input for the quarterly results.

14    Q.    You weren't working in investor relations then; right?

15    A.    No.

16    Q.    Okay.  So any request for input would be informal, not

17    part of your official job as chief officer of Virage?

18    A.    Correct, yes.

19    Q.    And although you have experience in reading financial

20    statements, sir, you're not an accountant, are you?

21    A.    Correct.

22    Q.    You don't have any knowledge of how decisions on Autonomy

23    accounting were made, do you?

24    A.    Correct.

25    Q.    You didn't attend any meetings with Autonomy's auditors,

**GEALL - CROSS / LITTLE**

1  did you?

2  **A.**    Correct.

3  **Q.**    Do you know who Autonomy's auditors were?

4  **A.**    Yes.

5  **Q.**    Deloitte; correct?

6  **A.**    Yes.

7  **Q.**    You didn't attend any meetings with the audit committee?

8  **A.**    No.

9  **Q.**    And you have no knowledge about how Deloitte or the audit

10  committee made decisions or what documents they reviewed;

11  correct?

12  **A.**    Correct.

13  **Q.**    And you haven't seen any of Deloitte's work papers, have

14  you?

15  **A.**    Correct.

16  **Q.**    You also didn't work in the sales organization, did you?

17  **A.**    Correct.

18  **Q.**    And you didn't work in the marketing department?

19  **A.**    Correct.

20  **Q.**    So the activities of the sales organization and the

21  marketing department, you had no visibility into that?

22  **A.**    Well, there were a number of salespeople that shared the

23  same floor at Piccadilly, as did the marketing team.

24  **Q.**    But you weren't looking over their shoulder, at what they

25  were doing, did you?

1   **A.**   Well, we were in constant communication, and everyone was

2   talking, so, yes.

3   **Q.**   How about the U.S. sales operation?  You had no knowledge

4   of what was going on in the U.S. sales operation, did you?

5   **A.**   I did have discussions with Nicole Egan, the CMO, yes.

6   **Q.**   But they're in the U.S. and you're in London; right?

7   **A.**   Correct.

8   **Q.**   There was some questions about analyst call, Q and As that

9   you prepared.  Do you recall those questions?

10  **A.**   I do, yes.

11  **Q.**   Those Q and As were done just internally within Autonomy

12  management; correct?

13  **A.**   Correct -- well, and with Financial Dynamics, yes.

14  **Q.**   But they weren't released to the public?

15  **A.**   No.

16  **Q.**   And they're done internally, but those actual questions

17  and answers may never see the light of day, may never be asked,

18  may never be answered; right?

19  **A.**   Which ones?  The ones in the preparation?

20  **Q.**   In your preparation?

21  **A.**   Correct.

22  **Q.**   Those are just meant to be a brainstorming exercise for

23  management; correct?

24  **A.**   Correct, yes.

25  **Q.**   Okay.  And do you recall that during the actual analyst

1  meetings, Mr. Hussain would have his own handwritten notes that

2  he would use?

3  **A.**    Correct, yes.

4  **Q.**    And that's what he was using, not the script; right?

5  **A.**    He used his handnotes, yes.

6  **Q.**    Okay.  You've talked about consensus numbers, and the

7  consensus number is an average of estimates that the analysts

8  come up with; correct?

9  **A.**    Correct.

10  **Q.**    And you testified on direct that as an investor relations

11  person, you can't dictate what the consensus numbers are;

12  right?

13  **A.**    Correct.

14  **Q.**    But it's part of your job to provide information to

15  analysts to help them come to the right conclusion.  Those were

16  your words; right?

17  **A.**    Correct.

18  **Q.**    And as part of your job to tell the analysts if their

19  number seems too low, you tell them you think it's too low.  If

20  their number is too high, you tell them you think it's too

21  high; right?

22  **A.**    Before a certain period in the quarter, yes.

23  **Q.**    You want them to come to the right conclusion; right?

24  **A.**    Exactly, yes.

25  **Q.**    And you've testified about an incident involving Dr. Lynch

1    where Dr. Lynch was upset with you; right?  Do you recall that

2    testimony?

3    **A.**    Yes.

4    **Q.**    And you'd been on vacation.

5    **A.**    Correct.

6    **Q.**    And Dr. Lynch was upset because you hadn't done your job

7    of talking to the analysts and making sure they came to the

8    right conclusion; correct?

9    **A.**    Incorrect.

10   **Q.**    You had been on vacation, and you hadn't been in

11   communication with analysts about the consensus numbers; right?

12   **A.**    Because we were in closed period when you are not able to

13   talk to the financial markets and influence them.

14   **Q.**    So you couldn't have spoken to them anyway?

15   **A.**    No.

16   **Q.**    Okay.  And you told Mr. Hussain that you can't control the

17   consensus numbers, and he agreed with that; right?

18   **A.**    Correct.

19          **THE COURT:**  It may be useful to have the witness

20   explain what a closed period is.

21   **BY MS. LITTLE:**

22   **Q.**    Why don't you explain it?

23   **A.**    So the closed period is a period normally two to three

24   weeks before the end of the quarter where a management team --

25   a company's management team should not be in communication with

1    the financial markets, whether it's investors or analysts, for

2    the risk of giving inside information or giving an indication

3    because they know how well the quarter has gone.  So it's just

4    better not to talk to the investment community.

5    **Q.**    Thank you.

6          And again, in this meeting, you spoke to Mr. Hussain

7    first, and he agreed with you that you can't control the

8    consensus numbers; right?

9    **A.**    Correct.

10   **Q.**    And in the meeting involving Dr. Lynch, Mr. Hussain was

11   quiet.  That was just between you and had Dr. Lynch; correct?

12   **A.**    Correct.

13   **Q.**    Okay.  Let's talk a different topic now.  You've testified

14   about Frank Quattrone and Catalyst.  Do you recall that

15   subject?

16   **A.**    I do, yes.

17   **Q.**    And we had Exhibit 247.  Maybe we can just put that up on

18   the screen quickly to refresh your memory.  This was an October

19   6th email from Mr. MacLeod at Catalyst.

20         If we go down, Jeff, to the -- there we go.

21         Mr. MacLeod is reaching out to Sushovan saying, "I don't

22   know if you recall, but we met when I was at Goldman," and he

23   talks about the fact that Mr. Quattrone would really like to

24   get together with people at Autonomy.  Correct?

25   **A.**    Correct.

1   **Q.**   And that was a -- that outreach came from Catalyst to

2   Autonomy, not the other way around; right?

3   **A.**   Correct, yes.

4   **Q.**   So Catalyst was reaching out to Autonomy, not anyone at

5   Autonomy reaching out to Catalyst?

6   **A.**   Correct.

7   **Q.**   Okay.  And that was in October of 2009.

8        I'd like you also to take a look at Exhibit 5802 in your

9   binder.

10        Is that an email from you to Dr. Lynch on April 2nd, 2009?

11   **A.**   It is, correct.

12            **MR. DOOLEY:**  Move it in.

13            **THE COURT:**  5802 admitted.

14        (Trial Exhibit 5802 received in evidence)

15   **BY MS. LITTLE:**

16   **Q.**   So this is actually six months earlier -- right? -- in

17   April of 2009, and you write to Dr. Lynch:

18            "Frank Quattrone is over in London.  He's very keen

19        to meet with you."  Is that right?

20   **A.**   Correct, yes.

21   **Q.**   So, again, this is an approach from Mr. Quattrone to

22   Dr. Lynch, not the other way around?

23   **A.**   Correct.

24   **Q.**   And actually, let's go back, if you would, to -- I'm sorry

25   to make you flip back -- back to 247 for a minute.

1      Up at the top, you write "they" -- that means Catalyst;

2   right?  Mr. Quattrone?  That is who you are referring to?

3   **A.**   Correct.

4   **Q.**   "They continue to want to act as our defense."  And I

5   think you explained on direct that -- well, I don't want to put

6   words in your mouth.  What did you mean by that?

7   **A.**   I meant that they were keen to work on behalf of Autonomy,

8   and if there was an active or a hostile takeover bid for

9   Autonomy, would want to defend Autonomy in that bid.

10  **Q.**   You talk about a hostile takeover.  Explain to the jury

11  what that means.

12  **A.**   So sometimes companies want to acquire another business

13  and do that in a hostile way.  They don't have communications

14  with the management team.  They basically put an offer onto the

15  table and then, you know, discussions may start.  Often then

16  you want somebody to represent you that ensures that they get

17  the best price for the business.

18  **Q.**   And the rules on takeovers are different in the UK than

19  they are in the U.S.; correct?

20  **A.**   Correct.

21  **Q.**   And in the U.S., there's something available called a

22  poison pill; right?

23  **A.**   Correct.

24  **Q.**   Can you explain to the jury what a poison pill is.

25  **A.**   A poison pill is normally an equity structure that is

1    basically put in place to make it unattractive for a company to

2    acquire another one, because it triggers basically the option

3    value of the shares, and it dilutes down, makes the business

4    much more expensive.

5    **Q.**    So just to try to simplify that.  In the U.S., if someone

6    tries to take over your company and you don't want to be taken

7    over, there is this poison pill that you can employ to stop the

8    company from taking you over; is that a fair --

9    **A.**    Potentially.  Not all companies would have a poison pill

10    in place, but, yes, the opportunity is there.

11    **Q.**    That's a remedy that can be available at a U.S. company?

12    **A.**    It can be, yes.

13    **Q.**    And the UK does not have such a remedy; correct?

14    **A.**    Correct, yes.

15    **Q.**    So in the UK if someone is trying to take you over and you

16    don't want to be taken over, or you think the price is too low,

17    there is nothing you can do; correct?

18    **A.**    Well, you would rely then on shareholders to make sure

19    that the appropriate price was ultimately gotten.  The

20    shareholders would have to sell their shares, so it's down to

21    them whether they want to tender their shares or not tender

22    their shares.

23    **Q.**    But one way to protect against that happening is to try to

24    elicit other interests from other bidders to try to get the

25    price up; right?

1   **A.**   Correct, yes.

2   **Q.**   And is that what you are talking about here where you are

3   talking about a company like Catalyst "acting as our defense,"

4   in other words, trying to stimulate interest of a number of

5   bidders?

6   **A.**   No.  In this specific -- this specific point is if I was

7   in Mike's shoes, I would rather have Catalyst acting for me

8   rather than acting for another business acquiring me.

9   **Q.**   Okay.  And it's your testimony that Mr. Quattrone was not

10  going to be helping with trying to elicit interest in a number

11  of bidders?

12  **A.**   No.

13  **Q.**   And you were gone from Autonomy by the time Catalyst was

14  doing its work; correct?

15  **A.**   Correct, yes.

16  **Q.**   Let's talk about hardware for a minute.

17       You've testified on direct that you learned in September

18  of 2009 about a contract that someone left on the printer that

19  indicated that there were hardware sales; correct?

20  **A.**   Correct.

21  **Q.**   And you've testified that that raised red flags and raised

22  grave concerns, and you thought it was too much coincidence, I

23  think was your testimony; correct?

24  **A.**   Correct.

25  **Q.**   Did you tell anybody at Autonomy about these concerns,

1  these grave red flag concerns that you had in September 2009?

2  **A.**  Later on I did, yes.

3  **Q.**  Later on, and this is Mr. Webb; right?

4  **A.**  Correct.

5  **Q.**  But I'm talking about in September of 2009, did you tell

6  anybody about your concerns?

7  **A.**  No.

8  **Q.**  How about in Q4 of '09, did you tell anybody about your

9  concerns?

10 **A.**  Which concerns?  On Q3 or Q4?

11 **Q.**  These concerns about hardware.

12 **A.**  In Q4, it was a different discussion.  It was a -- it was

13 a change in the business structure relating to these Arcpliance

14 sales and now a higher proportion of revenues, so this was now

15 a change in the business model.

16 **Q.**  Did you tell anyone in Q4 of 2009 about this $45 million

17 hardware contract that you were so concerned about?

18 **A.**  In Q4, no.

19 **Q.**  How about in Q1, did you tell anybody about it in Q1?

20 **A.**  Other than discussion with Rob Webb.

21 **Q.**  Okay.  And by April of 2010, you had already tendered your

22 resignation; right?

23 **A.**  Correct, yes.

24 **Q.**  And when you were preparing for the analyst call in Q1 of

25 2010, you didn't tell anybody, other than Mr. Webb, that we'll

1   talk about, but you didn't tell Dr. Lynch, you didn't tell

2   Mr. Hussain, you didn't tell Mr. Kanter, you told none of them

3   about these concerns that were supposedly so distressing to

4   you?

5   **A.**    No, I didn't.

6   **Q.**    And do you know who Mike Sullivan is, sir?

7   **A.**    I do, yes.

8   **Q.**    And he's the Autonomy executive in charge of Autonomy's

9   hardware sales; correct?

10  **A.**    No.  He was in charge of Zantaz.

11  **Q.**    And in that capacity, he worked on hardware sales;

12  correct?

13  **A.**    No.  Because Zantaz was a cloud-based business that was

14  selling capacity in a data center.

15  **Q.**    So you have no knowledge of Mr. Sullivan's involvement

16  with hardware sales?

17  **A.**    No.

18  **Q.**    Okay.  Are you aware that -- okay.

19       Are you aware that Autonomy made hardware sales to its

20  major software customers?

21  **A.**    No.

22  **Q.**    Are you aware that the hardware sales that were made were

23  known within Autonomy?

24  **A.**    No.

25  **Q.**    Are you aware of any analysis that was done by Deloitte,

1  the auditors, about hardware sales?

2  **A.**   No.

3  **Q.**   Are you aware of any analysis that Deloitte did with

4  respect to the cost accounting for hardware sales?

5  **A.**   No.

6  **Q.**   Are you aware of any analysis that Deloitte did concerning

7  whether or not hardware sales needed to be disclosed as a

8  separate revenue line?

9  **A.**   No.

10 **Q.**   You've testified on direct about the purity model, you

11 called it, or the pure software model.  I'd like you to take a

12 look at Exhibit 428, which is in evidence.  It's in the -- I

13 think it's in your black book.  Actually, it might not be in

14 your black book.  Maybe we can put it up on the screen.  It's

15 in evidence.  I'm looking for page 11 of Exhibit 428.

16      And I'll point you to the place on the right-hand column

17 at the bottom called "financial model."  And it says, "Autonomy

18 is one of the rare examples of a pure software model," and then

19 it goes on to explain -- right? -- "Many software companies

20 have a large percentage of revenue that stems from professional

21 services, because they have a lot of customization work on the

22 product," dah, dah, dah.  "In contrast, Autonomy ships a

23 standard product that requires little tailoring with the

24 necessary implementation work carried out by approved

25 partners."

1    So the point of calling it "pure software" is to contrast

2    it with companies that do services work; correct?

3    **A.**    The point of calling it a pure software model was that the

4    revenue contribution or the breakdown in revenues for the

5    business was primarily software.

6    **Q.**    Right.  And that's to contrast against businesses that

7    have more of a services component, which is a higher margin --

8    or lower margin business; right?

9    **A.**    As I mentioned, yes.  A normal software company would

10    probably have between 30 and 35 percent of its revenues as

11    services.  Autonomy had less than 10.

12    **Q.**    While you have that exhibit, let's also look at page 37 of

13    528.

14        Up at the top paragraph -- first of all, let's look down

15    at the bottom right and see who is signing off on this page 37.

16        Do you see that Richard Knights -- do you know who Richard

17    Knights is?

18    **A.**    He was the partner in charge of the accounts.

19    **Q.**    And that's Deloitte; right?

20    **A.**    Correct.

21    **Q.**    So this page 37 is Deloitte's sort of blessing of this

22    report; correct?

23    **A.**    Correct, yes.

24        **MR. LEACH:**  Objection.  Argumentative, foundation.

25

GEALL - CROSS / LITTLE

1    BY MS. LITTLE:

2    Q.    Approval --

3            MR. LEACH:  Which portion of the report, Your Honor?

4            THE COURT:  Okay.  Could you lay a foundation for your

5    question?

6    BY MS. LITTLE:

7    Q.    Does Deloitte review the numerical part, the back part, I

8    guess it is, of an annual report, and give their approval of

9    it?

10   A.    It should do, yes.

11   Q.    And is that what page 37 is?

12   A.    Yes.

13   Q.    And up at the top left-hand column, Mr. Knight writes:

14           "We have audited the financial statements of Autonomy

15        Corporation for the year ended 31 December 2009;" correct?

16   A.    Correct.

17   Q.    And then the statement goes on to approve what they have

18   audited.

19        And I would also want to point you to the last couple

20   sentences in the first paragraph, where they write:

21           "The financial reporting framework that has been

22        applied in their preparation is applicable law.  The

23        International Financial Reporting Standards, IFRS."

24        And we talked about that a few minutes ago; right?

25   A.    Correct.

GEALL - CROSS / LITTLE

1  **Q.**   So it's clear that the standards that apply to Autonomy

2  are IFRS, not a U.S. GAAP system; correct?

3  **A.**   Correct, yes.

4  **Q.**   And you testified about some statements that were in one

5  of the drafts about SOP 97-2.

6       Do you remember that testimony?

7  **A.**   Correct.

8  **Q.**   That's a U.S. standard; right?

9  **A.**   Correct.

10 **Q.**   Not a UK standard?

11 **A.**   Correct.

12 **Q.**   Okay.  Let's talk about SPE.

13      We've seen evidence that the SPE launch was announced in

14 September of 2009; right?

15 **A.**   Correct.

16 **Q.**   And that launch was well received by the market, was it

17 not?

18 **A.**   Correct, yes.

19 **Q.**   If you would take a look in your binder at Exhibit 237.

20      Is Exhibit 237 an example of one of the responses of the

21 market to the launch of SPE?

22 **A.**   It appears to be, yes.

23 **Q.**   Is that the sort of thing you would have reviewed in your

24 role as head of investor relations?

25 **A.**   Not necessarily.  This is a journalist writing a piece of

1   journalist.

2   **Q.**   Do you recall reviewing this?

3   **A.**   No.

4   **Q.**   Okay.  We'll skip it.

5       You testified about a company called NCorp.  Do you recall

6   that?

7   **A.**   I do.

8   **Q.**   That was a company that was set up, founded a while ago by

9   Dr. Lynch; correct?

10  **A.**   Correct.

11  **Q.**   And it was acquired by Autonomy in 2005?

12  **A.**   Correct.

13  **Q.**   And NCorp's technology was a precedent for what eventually

14  became SPE; correct?

15  **A.**   Correct.

16  **Q.**   And the NCorp technology was called IGEN; is that right?

17  **A.**   Correct.

18  **Q.**   And SPE was sometimes referred to within Autonomy as the

19  next generation of NCorp -- right? -- next gen of NCorp?

20  **A.**   Don't know.

21  **Q.**   Never heard that?

22  **A.**   No.

23  **Q.**   NCorp's technology and SPE were aimed at addressing the

24  same issue, were they not, what's called the zero hit issue?

25  **A.**   Uh-huh, correct.

1  **Q.**    What's the zero hit issue?

2  **A.**    This is where you basically get a null return if you are

3  querying a database.

4  **Q.**    So we've all had that experience where you ask a question

5  and it comes back no hits.

6  **A.**    Correct.

7  **Q.**    But there were significant advancements in what SPE could

8  do versus what NCorp's technology could do; right?

9  **A.**    Absolutely.

10  **Q.**    And for one thing, most significantly, NCorp could only

11  deal with data that you loaded into it, but SPE could work on

12  its own on a database; right?  Or do you even know the

13  technology of these products?

14  **A.**    Yes.  So NCorp was a structured database, so it was

15  querying against a structured database, as I mentioned before,

16  where IDOL had always been querying against unstructured data.

17  So IDOL SPE was a set of functions within IDOL relating to

18  structured data.

19  **Q.**    And SPE could work directly on a database rather than have

20  to have material loaded into it the way NCorp did; right?

21  **A.**    Well, you could basically pull data in from different

22  repositories.

23  **Q.**    Do you know whether -- I'm going to have to get a little

24  technical here -- but do you know whether SPE could accept

25  instructions in what is called SQL, structured query language?

1   **A.**   Well, structured data tends to be a query using SQL, so,

2   yes.

3   **Q.**   And are you aware that NCorp's technology could not accept

4   SQL instructions?

5   **A.**   I wasn't, no.

6   **Q.**   So there are things about the technology here that you

7   don't know; right?

8   **A.**   I was not in development; correct.

9        **MS. LITTLE:**   Is 270 in evidence?  Did you admit 270?

10  I think you did.  No?  Okay.

11       **MR. LEACH:**   I don't believe so, but no objection.

12       **MS. LITTLE:**   Okay.  I would like to move in Exhibit

13  270.  There is no objection.

14       **THE COURT:**   270 admitted.

15       (Trial Exhibit 270 received in evidence)

16  **BY MS. LITTLE:**

17  **Q.**   Mr. Geall, Exhibit 270 is another example of one of these

18  drafts in preparation for an analyst call; correct?

19  **A.**   Correct.

20  **Q.**   If you take a look at page 13, down at the bottom

21  right-hand column, these are some of these sample questions and

22  answers that you prepare; right?

23  **A.**   Correct.

24  **Q.**   And you prepare these -- right? -- you or Mr. Goodman?

25  **A.**   Some of these were taken from prior quarters, so these

1    were prepared by a number of people within Autonomy and

2    Financial Dynamics.

3    **Q.**    Okay.  And you'll see the question number 100:  "What

4    about NCorp?"

5    **A.**    Sorry.  Which question?

6    **Q.**    So it's on page question 100:  "What about NCorp?"  And

7    it's is written:

8             "NCorp was five years ahead of its time.  The concept

9        is similar, but the application has benefited from five

10       years of further R&D in IDOL;" correct?

11   **A.**    That's what it states, yes.

12   **Q.**    And that's in this document that you were putting together

13   and proposing as a draft Q and A; correct?

14   **A.**    Correct.

15   **Q.**    And then in the question before, number 99, you write:

16            "IDOL SPE uses a far superior probabilistic

17       approach;" correct?

18   **A.**    Correct, yeah.

19   **Q.**    So you were prepared to discuss NCorp with analysts;

20   right?

21   **A.**    Correct.

22   **Q.**    It was no secret?

23   **A.**    Correct.

24   **Q.**    It didn't take detective work on Google to find out about

25   it, did it?

1    A.    Well, it did, because this was being positioned as a new

2    product and the second biggest product in the launch of

3    Autonomy's history, so it was seen as a big thing.

4         And as I mentioned, my concern was the use cases that were

5    being utilized were exactly the same as they were from five

6    years prior.

7    Q.    NCorp was known within Autonomy, it was discussed within

8    Autonomy, it was going to be discussed with analysts.  It was

9    not a secret, was it?

10   A.    NCorp, no.  It wasn't a secret.

11   Q.    And the move into structured data was a project that was

12   in the works for a while; correct?

13   A.    I do not know.

14   Q.    Are you familiar with project X?

15   A.    Yes.

16   Q.    What's project X?

17   A.    Project X was the code name Mike used when talking to

18   investors about a product that was going to be launched that

19   became IDOL SPE.

20   Q.    And project X is something that was being discussed all

21   the way back in as early as 2008; correct?

22   A.    I don't believe as far back as 2008, but certainly one or

23   two quarters before Q3/2009.

24   Q.    Take a look in your binder, if you would, at Exhibit 5803.

25         5803 is an email from Charles Lytle to you and others?

1    **A.**    Correct.

2              **MS. LITTLE:**    I will move it in, Your Honor.

3              **THE COURT:**    Admitted.

4        (Trial Exhibit 5803 received in evidence)

5    **BY MS. LITTLE:**

6    **Q.**    Who is Charles Lytle?

7    **A.**    Charles Lytle was the corporate broker at Citigroup.

8    **Q.**    Is that your former boss?

9    **A.**    No.

10   **Q.**    But you worked with him at Citi?

11   **A.**    I worked with him at Citi, yes.

12   **Q.**    Okay.    In this email, Mr. Lytle writes to Dr. Lynch,

13   Mr. Hussain, you and others.    And if we go down to the bottom

14   to the section that says, "Richard Green" -- well, first of

15   all, what does this document represent, called road show

16   feedback.    What is this document?

17   **A.**    So Citigroup would have organized a road show for

18   Autonomy, a meeting with number of investors.    So the

19   investors are here:    Phil Pierson at GLG, Ed Meyer at

20   Schroders.

21        The common practice after a roadshow is for the corporate

22   brokering team at the investment bank to phone around those

23   investors and get feedback on how the meeting was, any

24   questions they had, any concerns.

25   **Q.**    So this is kind of a summary of what was discussed among

**PROCEEDINGS.**

1    the analysts; right?

2    **A.**    Exactly.

3    **Q.**    And if we go down to Richard Green, who is Richard Green

4    towards the bottom?

5    **A.**    Richard Green is a fund manager.

6    **Q.**    And in the middle there you see Richard Green's question

7    is:

8         "I'm wondering what the next story is.  OEM seems to

9         be fizzling out.  Perhaps it is Open V or Project X."

10        Do you see that?

11   **A.**    Yes.

12   **Q.**    Do you want to correct your testimony about whether

13   project X was being discussed in 2008?

14   **A.**    Okay.  Yes.

15   **Q.**    Let's take a look at Exhibit 289, which is in evidence.

16        **THE COURT:**  Is this an appropriate time to take a

17   recess?

18        **MS. LITTLE:**  Sure.

19        **THE COURT:**  Okay.  Ladies and gentlemen, we are going

20   to take our recess for the day.  Remember the admonition given

21   to you:  Don't discuss the case, allow anyone to discuss it

22   with you, form or express any opinions.

23        See you at 9:00 tomorrow morning.  Thank you.

24        (Proceedings were heard out of presence of the jury:)

25        **THE COURT:**  Let the record reflect the jurors have

1    left.

2        Ms. Little, about how much longer do you have?

3        **MS. LITTLE:**  I will take a look tonight.  Let me just

4    take a quick look here.  I'd say half hour.

5        **THE COURT:**  Okay.  All right.  Thank you very much.

6        I don't have -- you have from time to time given me

7    exhibit lists from time to time.

8        **MS. LITTLE:**  What we are doing with --

9        **THE COURT:**  Right now we're out of time.

10       **MS. LITTLE:**  My understanding is that with

11   cross-examination exhibits, since they're coming in sort of on

12   the fly, is that each morning or evening our paralegal,

13   Ms. Bringola, is sending things to Ms. Scott.

14       **THE COURT:**  Oh, okay.  Well, make sure I get a copy,

15   so I can -- I mean, I write them down as numbers, just because

16   that's what I'm supposed to do.  But that's fine.  That's fine.

17   Just as long as we don't get into some situation where nobody

18   knows if something is admitted or thinks it's admitted and it's

19   not been admitted, that sort of thing.

20       **MR. KEKER:**  I've got them all in my head, Your Honor.

21       **THE COURT:**  Yeah, exactly.  That's where they belong.

22       **MR. KEKER:**  Just check with me.

23       **THE COURT:**  Okay.  Well, we'll do that.  Or maybe you

24   would like to go into the jury room during the course of

25   deliberations in the event they have a question as to whether

**PROCEEDINGS.**

1    or not Exhibit -- what?

2              **MR. KEKER:**  I said I will be available.

3         **THE COURT:**  You will be available for that.  Okay.

4    All right.

5         **MS. LITTLE:**  I think you expressed earlier the

6    cross-examination brings the unexpected, and so we're just

7    trying to be in line with that.

8         **THE COURT:**  No.  I mean, that's fine.  I'm not being

9    critical.  I'm just trying to get a handle.

10        Yes, Mr. Leach.

11        **MR. LEACH:**  Thank you, Your Honor.

12        I was paying close attention to the estimate of the

13   remaining cross-examination, because Mr. Geall has come a long

14   way to be here with us.  He has a commitment tomorrow afternoon

15   in the South Bay, and I would just ask --

16        **THE COURT:**  Let's try to wrap him up.  That may depend

17   on you, Mr. Leach, as much as Ms. Little.

18        **MR. LEACH:**  I am very incentivized, Your Honor.

19        **THE COURT:**  Let's try to wrap him up tomorrow morning,

20   if we can.  If we can.

21        **MS. LITTLE:**  I will take a harsh look tonight and see

22   what I can cut.  Thank you.

23        **MR. LEACH:**  Thank you, Your Honor.

24              (Proceedings adjourned at 4:01 p.m.)

25

**PROCEEDINGS.**

1

2

3                     CERTIFICATE OF REPORTER

4           I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Tuesday, March 6, 2018

8

9    *Pamela A. Batalo*

10   _____
     Pamela A. Batalo, CSR No. 3593, RMR, FCRR
     U.S. Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25