Volume 12

Pages 2002 - 2242

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                )
   VS.                          )      NO. CR 16-00462 CRB
                                )
SUSHOVAN TAREQUE HUSSAIN,       )
                                )
          Defendant.            )
_____)
                          San Francisco, California
                          Tuesday, March 20, 2018

### TRANSCRIPT OF PROCEEDINGS

APPEARANCES:
For Plaintiff:
                     ALEX G. TSE
                     Acting United States Attorney
                     450 Golden Gate Avenue
                     San Francisco, California  94102
              BY:  ROBERT S. LEACH
                     ADAM A. REEVES
                     WILLIAM FRENTZEN
                     ASSISTANT UNITED STATES ATTORNEYS


For Defendant:
                     KEKER & VAN NEST
                     633 Battery Street
                     San Francisco  CA  94111
              BY:  JOHN W. KEKER
                     JAN NIELSEN LITTLE
                     BROOK DOOLEY
                     KATE LAZARUS
                     NIC MARAIS
                     ATTORNEYS AT LAW


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Pamela Batalo, CSR No. 3593, FCRR
              Official Reporters

# I N D E X

Tuesday, March 20, 2018 - Volume 12

**GOVERNMENT'S WITNESSES**                              **PAGE**  **VOL.**

**EGAN, CHRISTOPHER (RECALLED)**
(PREVIOUSLY SWORN)                                      2007    12
Direct Examination resumed by Mr. Reeves               2007    12
Cross-Examination by Mr. Keker                         2148    12

# E X H I B I T S

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 42 | | 2010 | 12 |
| 53 | | 2015 | 12 |
| 74 | | 2019 | 12 |
| 107 | | 2023 | 12 |
| 127 | | 2020 | 12 |
| 212 | | 2016 | 12 |
| 314 | | 2042 | 12 |
| 333 | | 2044 | 12 |
| 344 | | 2056 | 12 |
| 364 | | 2026 | 12 |
| 382 | | 2029 | 12 |
| 412 | | 2047 | 12 |
| 454 | | 2050 | 12 |
| 459 | | 2033 | 12 |
| 494 | | 2065 | 12 |
| 507 | | 2051 | 12 |
| 509 | | 2058 | 12 |

## I N D E X

### E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 514 | | 2150 | 12 |
| 537 | | 2069 | 12 |
| 583 | | 2070 | 12 |
| 645 | | 2088 | 12 |
| 646 | | 2091 | 12 |
| 654 | | 2074 | 12 |
| 680 | | 2092 | 12 |
| 714 | | 2094 | 12 |
| 719 | | 2080 | 12 |
| 720 | | 2073 | 12 |
| 780 | | 2082 | 12 |
| 979 | | 2084 | 12 |
| 1038 | | 2096 | 12 |
| 1056 | | 2098 | 12 |
| 1076 | | 2100 | 12 |
| 1085 | | 2101 | 12 |
| 1104 | | 2104 | 12 |
| 1115 | | 2105 | 12 |
| 1120 | | 2154 | 12 |
| 1127 | | 2156 | 12 |
| 1149 | | 2152 | 12 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1162 | | 2155 | 12 |
| 1209 | | 2107 | 12 |
| 1274 | | 2109 | 12 |
| 1291 | | 2117 | 12 |
| 1295 | | 2119 | 12 |
| 1384 | | 2111 | 12 |
| 1549 | | 2113 | 12 |
| 1833 | | 2127 | 12 |
| 1850 | | 2143 | 12 |
| 1880 | | 2130 | 12 |
| 1912 | | 2130 | 12 |
| 2199 | | 2133 | 12 |
| 2758 | | 2014 | 12 |
| 2928 | | 2059 | 12 |
| 2929 | | 2064 | 12 |
| 2932 | | 2137 | 12 |
| 2949 | | 2040 | 12 |
| 2950 | | 2067 | 12 |
| 2951 | | 2087 | 12 |
| 6104 | | 2227 | 12 |
| 6113 | | 2228 | 12 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 6116 | | 2236 | 12 |
| 6118 | | 2166 | 12 |
| 6125 | | 2196 | 12 |
| 6128 | | 2170 | 12 |
| 6129 | | 2171 | 12 |
| 6132 | | 2170 | 12 |
| 6139 | | 2176 | 12 |
| 6141 | | 2175 | 12 |
| 6145 | | 2188 | 12 |
| 6146 | | 2173 | 12 |
| 6147 | | 2167 | 12 |
| 6161 | | 2242 | 12 |
| 6176 | | 2184 | 12 |

| | |
|---|---|
| 1 | **Tuesday - March 20, 2018**                          **9:19 a.m.** |
| 2 | P R O C E E D I N G S |
| 3 | ---000--- |
| 4 | (Proceedings were heard in the presence of the jury:) |
| 5 | **THE COURT:**  Let the record reflect all jurors are |
| 6 | present, the parties are present. |
| 7 | Good morning, ladies and gentlemen of the jury.  I would |
| 8 | like to congratulate those people who embarked on BART this |
| 9 | morning with great inconvenience to them, but you all |
| 10 | persevered and you are to be congratulated.  Thank you so much. |
| 11 | And of course we're all understanding of the sacrifice, the |
| 12 | additional sacrifices, jurors make in serving.  Thank you. |
| 13 | It's appreciated. |
| 14 | You may proceed, Mr. Reeves. |
| 15 | **MR. REEVES:**  Thank you, Your Honor.  Good morning. |
| 16 | Good morning, ladies and gentlemen. |
| 17 | **CHRISTOPHER EGAN**, **GOVERNMENT WITNESS, PREVIOUSLY SWORN** |
| 18 | **DIRECT EXAMINATION**  (resumed) |
| 19 | **BY MR. REEVES:** |
| 20 | **Q.**  Good morning, Mr. Egan. |
| 21 | **A.**  Good morning. |
| 22 | **Q.**  In your work at Autonomy, Mr. Egan, were you familiar with |
| 23 | the term "quid pro quo deal"? |
| 24 | **A.**  I was. |
| 25 | **Q.**  Okay.  Is that a term they used while you worked at |

1  Autonomy?

2  A.   I did.

3  Q.   Did you discuss so-called quid pro quo deals with Sushovan

4  Hussain?

5  A.   I did.

6  Q.   What is a quid pro quo deal?

7  A.   A deal where there are two components to the deal:  One

8  where we would sell something to the customer and one where we

9  would buy something -- do a reciprocal or opposite transaction,

10  usually buying something from them.

11  Q.   You would sell something to a customer and at or around

12  the same time, buy something from the customer?

13  A.   Correct.

14  Q.   Are you familiar with the term "round-trip"?

15  A.   Yes.

16  Q.   Is a quid pro quo deal a form of round-trip?

17  A.   Yes.

18  Q.   What's the point of these type of deals, a quid pro quo

19  deal?

20  A.   It was an easier way to get revenue from a deal.

21  Q.   Why was it easier?

22  A.   Because in addition to any desire that the customer would

23  have to buy a product from you, they also were going to benefit

24  by making a sale of their own.

25  Q.   Did you discuss with Mr. Hussain whether these

1  quid pro quo deals should be linked in terms of the relevant

2  paperwork?

3  **A.**   I did.

4  **Q.**   What did you and he discuss on that topic?

5  **A.**   That they should not be linked in paperwork; otherwise,

6  they would not be recognizable.

7  **Q.**   I would like to show you what is in evidence as Exhibit

8  32, please.

9       If I could have that displayed, please, Your Honor.

10      If we could enlarge the top portion of this and highlight

11  the date.  Thank you very much, Ms. Margen.

12      Mr. Egan, in or around March 2009, were you involved in a

13  deal with Capax?

14  **A.**   I was.

15  **Q.**   Okay.  And what did you do in this deal in or around March

16  2009 relating to Capax?  What was your role?

17  **A.**   In this deal that the document is discussing, it was a

18  deal for Capax to buy Autonomy's software to become a service

19  provider of EDD processing services, and I discussed the

20  construct of the deal, whether they were interested, the value

21  of the deal, the products involved, the business.

22  **Q.**   Okay.

23  **A.**   Everything about it.

24  **Q.**   Did you negotiate with Mr. John Baiocco to do this?

25  **A.**   I did.

1   **Q.**   Did you discuss the details of the deal with Mr. Hussain?

2   **A.**   I did.

3   **Q.**   Was this a quid pro quo deal?

4   **A.**   It was.

5   **Q.**   Why was this a quid pro quo deal?

6   **A.**   Because we agreed to have Capax buy the software and they

7   would become a provider in the market of this service.  And we

8   agreed to buy -- well, effectively to fund it or underwrite it,

9   was a term that I had used, by buying EDD services --

10   ultimately by buying EDD services from them.

11       We discussed some other approaches first, but that was the

12   one we ended on.

13   **Q.**   Did you discuss those details with Mr. Hussain?

14   **A.**   I did.

15   **Q.**   I'd like to show you, please, what has been marked for

16   identification as Exhibit 42.  Do you have that in the binder?

17       **THE COURT:**  Admitted.

18       **MR. REEVES:**  Thank you, Your Honor.

19   (Trial Exhibit 42 received in evidence)

20       **MR. REEVES:**  Thank you, Your Honor.

21       If I could please display Exhibit 42.  If we could enlarge

22   just the top portion.  Perfect, Ms. Margen.  Thank you very

23   much.

24       If you would highlight, please, the very first line, 134M

25   to 135M and then also down below -- right there is fine.

1    Great.  Down below here where it begins "Mooney, Stouff and I

2    were all over the big deals."  Thank you very much.  Okay.

3    Q.    Mr. Egan, let me ask you about this email that Mr. Hussain

4    wrote to MRL.  Do you know who that is?

5    A.    I do.

6    Q.    Who is that?

7    A.    Mike Lynch.

8    Q.    So this is Mr. Hussain writing on or about April 1, 2009,

9    is that correct, according to the email?

10    A.    Yes.

11    Q.    Is that the day after the close of the quarter in which

12    you negotiated this Capax EDD deal?

13    A.    Yes.

14    Q.    All right.

15          There's a reference in here to "134M to 135M closed."  Do

16    you see that?

17    A.    I do.

18    Q.    Do you have an understanding, based on your work at

19    Autonomy, what that refers to?

20    A.    I think so.

21    Q.    What is that?

22    A.    A revenue number.  Aggregated.

23    Q.    Quarterly revenue number?

24    A.    Yeah.

25    Q.    Okay.  And then there's a reference, according to

1  Mr. Hussain, "Good things from my perspective.  Mooney,

2  Stouff" -- is that a reference to you, sir?

3  **A.**   It is.

4  **Q.**   "Mooney, Stouff and I were all over the big deals, 12

5  one-million-plus deals."  Do you see that?

6  **A.**   I do.

7  **Q.**   Would that include the Capax EDD deal that you described?

8  **A.**   I assume so.

9  **Q.**   Now, in negotiating this deal with Capax and discussing it

10  with Mr. Hussain, did you negotiate an oral side agreement to

11  underwrite the cost to Capax of the Autonomy software,

12  regardless of whether Capax performed any services?

13  **A.**   I did.

14  **Q.**   And did you discuss that with Mr. Hussain?

15  **A.**   I did.

16  **Q.**   What did you and he discuss about paying Capax regardless

17  of whether they were able to perform the outsourcing services?

18  **A.**   I -- it was my idea.  I suggested that we could pay them

19  like a retainer, for two reasons.  One, we had, as a company,

20  outsourced EDD to prior -- to other vendors in the past, so I

21  looked at that as a precedent, and I looked at the concept of a

22  retainer as a concept where you could pay, even if the service

23  wasn't being fulfilled.

24  **Q.**   In your discussions with Mr. Hussain, did you and he

25  discuss not putting the agreement to pay Capax in writing?

1   **A.**   We did.

2   **Q.**   What did you and he discuss?

3   **A.**   Just that.  Specifically, that he didn't want it in

4   writing, and it was something that we would do month to month

5   at our will.

6   **Q.**   Whose idea was it to not put it in writing?

7   **A.**   That was Sushovan's.

8   **Q.**   And did he explain why he did not want the commitment to

9   Capax to be in writing?

10  **A.**   Not specifically.

11  **Q.**   I'd like to show you, if I could, please, what is marked

12  as Exhibit 2758 for identification, please.  It's probably

13  binder No. 2 toward the end.

14  **A.**   What was the number again?

15  **Q.**   2758.  This is an email from you to Mr. Baiocco on or

16  about April 6th, 2009.

17         **THE COURT:**  Admitted.

18         **MR. REEVES:**  Thank you, Your Honor.

19         **MR. KEKER:**  Your Honor, could I find it?

20         **THE WITNESS:**  I don't think I have it.

21         **MR. KEKER:**  I don't have it either.

22         **THE COURT:**  April 6th.

23         **MR. REEVES:**  April 6th, 2009, Exhibit 2758.

24         **THE COURT:**  Would you see if you have some copies.

25  Mr. Keker doesn't have it.  It's 2759 -- I'm sorry.  What

1    number is it again?

2              **MR. REEVES:**  2758, please.

3              **THE COURT:**  58.  Okay.  2758.

4              **MR. KEKER:**  I'm good.  I'm fine.

5              **THE COURT:**  Okay.  It's admitted.

6         (Trial Exhibit 2758 received in evidence)

7              **MR. REEVES:**  Thank you, Your Honor.

8    **Q.**   Is this an email, Mr. Egan, from you to Mr. Baiocco at

9    Capax on or about April 6th, 2009, approximately six days after

10   the quarter, talking about this quid pro quo deal or aspects of

11   it?

12   **A.**   It is.

13   **Q.**   And you write to Mr. Baiocco, "John, Sushovan, Mike

14   Sullivan and I identified 250,000 of business we would like

15   Capax to handle for us last week," etc.

16        Do you see that?

17   **A.**   I do.

18   **Q.**   What did you mean by that?

19   **A.**   It's a misleading email.  I was letting John know I was

20   starting to make good on doing the 250K monthly EDD outsource

21   arrangement.

22   **Q.**   How is it misleading?

23   **A.**   Because it doesn't say what I just said.  It says we've

24   identified 250K of business we would like Capax to handle.

25   **Q.**   Why were you writing a misleading email?

1  **A.**  Because I wasn't writing it the other way.  I was

2  consciously avoiding that.

3  **Q.**  Was this part of the strategy to pay Capax so Capax could

4  pay for the license?

5  **A.**  Yes.

6  **Q.**  I'd like to show you, please, what has been marked for --

7  I think what may be in evidence as Exhibit 53.

8          **THE COURT:**  53, admitted.

9          **MR. REEVES:**  Thank you, Your Honor.

10     (Trial Exhibit 53 received in evidence)

11  **BY MR. REEVES:**

12  **Q.**  If I could have that displayed.

13     Mr. Egan, if you wish, you can use the screen.

14  **A.**  Sure.

15  **Q.**  Are you comfortable doing that?

16  **A.**  Yeah.  It's just a little bit blurry.  I can see it,

17  though.

18  **Q.**  You can also look at the hard copy, if you want.

19     Is this one of the purchase orders that was used to funnel

20  money to Capax?

21  **A.**  It looks like it.

22  **Q.**  Are you familiar with these documents?

23  **A.**  Yes.  I saw them on occasion.

24  **Q.**  Is this type of purchase order to Capax a false document?

25  **A.**  It is.

1    **Q.**    How is it false?

2    **A.**    It implies that specialized EDD processing was done or

3    being done.

4    **Q.**    Were there other false purchase orders issued by Autonomy

5    to Capax?

6    **A.**    Yes.

7    **Q.**    And are they for the purpose of paying money to Capax for

8    services that Capax did not perform?

9    **A.**    Correct.

10    **Q.**    Did you discuss this false purchase order with

11    Mr. Hussain?

12    **A.**    I don't think so.  Not this one specifically.

13    **Q.**    Did you discuss this strategy of using purchase orders

14    like this to fund Capax in order for Capax to pay Autonomy for

15    the license?

16    **A.**    I did.

17    **Q.**    I'd like to show you, if I could, please, what has been

18    marked for identification as Exhibit 212.  This is an email

19    from you to Mr. Hussain dated September 25th, 2009.

20        I offer it in evidence.

21            **THE COURT:**  Admitted.

22            **MR. REEVES:**  Thank you, Your Honor.

23        (Trial Exhibit 212 received in evidence)

24            **MR. REEVES:**  If we could please display it, and if you

25    would highlight, Ms. Margen -- yes.  That sentence that begins

1   "need paperwork for Capax.  Suggest 750,000 or so."

2   **Q.**   Do you see that?

3   **A.**   I do see that.

4   **Q.**   Okay.  So let's set this up.

5        This is an email from Mr. Hussain to you, Mr. Egan,

6   roughly six months after the arrangement with Capax has been

7   arrived at.  Would you agree?

8   **A.**   Yes.

9   **Q.**   And Mr. Hussain is saying to you "need paperwork for

10  Capax.  Suggest 750K or so."  Do you see that?

11  **A.**   I do.

12  **Q.**   Do you have an understanding as to what Mr. Hussain means

13  by this or what he's accomplishing?

14  **A.**   I do.

15  **Q.**   What is your understanding, please.

16  **A.**   That he needs POs from -- or -- sorry -- invoices or POs

17  raised to pay Capax, and he's suggesting 750K.

18  **Q.**   Why is it necessary to raise the POs, the amount of money

19  that Autonomy is paying Capax for the services Capax is not

20  performing?

21  **A.**   A PO is required before they could be paid by Autonomy.

22  **Q.**   Why do you want to pay them in this context, if you know?

23  **A.**   I think the next statement speaks to that.  They -- I

24  don't remember in that time whether they owed money, but they

25  often owed money.

**EGAN - DIRECT / REEVES**

1  Q.  "They have to pay the O/S."  Is that outstanding amounts?

2  A.  Yes.

3  Q.  Okay.  "We may have to use Capax for the K deal."  Do you

4  understand what that's a reference to?

5  A.  I do.

6  Q.  What is that a reference to, if you recall?

7  A.  I think it refers to a Kraft deal, a reseller deal.

8  Q.  Why would it be necessary for Capax to pay outstanding

9  amounts in order for Capax to be able to take on another

10  reseller deal relating to Kraft?

11  A.   In order for a deal where the reseller is going at risk

12  and buying the software before the end user deal had closed,

13  the reseller had to be in good standing with respect to

14  their -- the amounts that they owed the company.

15  Q.  Did you sometimes use the word "load" or maybe "reload" in

16  relation to ensuring that value-added resellers had the

17  capacity to actually buy new reselling licenses?

18  A.  I used the term "load."

19  Q.  What did you mean by "load"?

20  A.  Meaning how much inventory they were holding that had not

21  sold through or how much outstanding money they owed Autonomy.

22  Q.  I'd like to move forward, if I could, to the summer of

23  2009.  Let me show you, if I can, please, what has been marked

24  for identification as Exhibit 74.  This is an email from

25  Mr. Hussain to you on or around June 18th, 2009.

1      I offer it in evidence, please.

2           **THE COURT:**  Admitted.

3      (Trial Exhibit 74 received in evidence)

4           **MR. REEVES:**  If we could please display that and

5  enlarge it.  Great.

6  **Q.**   Mr. Egan, do you see this email?

7  **A.**   I do.

8  **Q.**   Are you familiar with this email?

9  **A.**   I am.

10 **Q.**   In or around this time, were you working on a sale of

11 hardware to Morgan Stanley in or around the end of the second

12 quarter of 2009?

13 **A.**   I was.

14 **Q.**   In this email, Mr. Hussain writes to you, "Bad news.

15 Really do need to pull MS hardware this Q or Spook hardware or

16 VMS hardware."  Do you see that?

17 **A.**   I do.

18 **Q.**   Do you have an understanding as to what Mr. Hussain is

19 talking about here?

20 **A.**   I do.

21 **Q.**   What is he talking about?

22 **A.**   The deal in the subject, Huron, had failed.  We lost

23 our -- that deal wasn't going to happen in the quarter, and

24 he's pointing out that we'll need one or two or three different

25 deals that we were working on, one with Morgan Stanley, one

1  with the intelligence community.  That's a slang for -- and one

2  with a company called VMS.

3  **Q.**  "Spook" means intelligence community?

4  **A.**  Yeah.

5  **Q.**  And he needs these deals to what?  End in or around mid to

6  late June, 2009?

7  **A.**  For revenue performance.

8  **Q.**  In or around this time, did you begin to negotiate a sale

9  of hardware to Morgan Stanley?

10  **A.**  I believe I was already negotiating that.

11  **Q.**  All right.  And let me show you what has been marked for

12  identification as Exhibit 127, please.

13      **THE COURT:**  Admitted.

14      **MR. REEVES:**  Thank you, Your Honor.

15  (Trial Exhibit 127 received in evidence)

16  **BY MR. REEVES:**

17  **Q.**  Is this an email from you, Mr. Egan, to others within

18  Autonomy, subject "Morgan PO"?  Do you see that?

19  **A.**  I do.

20  **Q.**  Does this relate to the Morgan Stanley purchase order of

21  hardware?

22  **A.**  I believe so.

23  **Q.**  If we could please go to page 3 of Exhibit 127.  All

24  right.  Let's just pause -- and if we could highlight the terms

25  "bulk premium MASS storage devices."  That line is great.

1    Thank you very much.  Okay.

2         So in your negotiation with Morgan Stanley, what type of

3    hardware components, as you understood it, did Morgan Stanley

4    want?

5    **A.**    Servers and storage, data center computers.

6    **Q.**    From what manufacturer?

7    **A.**    Hitachi Data Systems.

8    **Q.**    Now, in this time period, do you recall having any

9    problems getting enough of the Hitachi hardware to deliver it

10   all to Morgan Stanley to complete the purchase order?

11   **A.**    I do.

12   **Q.**    What problems did you encounter?

13   **A.**    We didn't think we were going to have enough of the

14   Hitachi hardware in a status called deliverable or delivery in

15   order to be able to recognize the full potential of the PO, the

16   order that they had placed.

17   **Q.**    Was delivery of the hardware necessary for revenue

18   recognition?

19   **A.**    It was.

20   **Q.**    Did you discuss this problem of not having enough Hitachi

21   hardware to fulfill the order and deliver it in time with

22   Mr. Hussain?

23   **A.**    I more so discussed the remedy as opposed to the problem.

24   The problem was self-evident.

25   **Q.**    Okay.  What did you discuss about the remedy?

**A.**    I could get Morgan Stanley to agree to include a -- a

different kind of hardware, as well as an option for delivery,

and that would increase the amount of available hardware

Autonomy had for delivery; therefore, increase the amount of

revenue that could be recognized.

**Q.**    What other type of hardware are you talking about?

**A.**    EMC hardware, specifically.

**Q.**    Where did Autonomy have the EMC hardware, if you know?

**A.**    I don't know.

**Q.**    Do you see the term "bulk premium MASS storage device" in

the purchase order?

**A.**    I do.

**Q.**    Why did you say "bulk" -- withdrawn.

    Do you have an understanding as to how those terms got to

be used in this document?

**A.**    I think I may have asked them to use something generic.  I

don't think I suggested the actual terms.

**Q.**    Why did you ask them to use something generic?

**A.**    Because I wanted for them to be able to order and for us

to be able to fulfill from a larger list, a list that included

Hitachi and EMC.

**Q.**    So even though Morgan Stanley was interested in acquiring

Hitachi components or hardware, what type of hardware did you

intend, on behalf of Autonomy, to deliver to Morgan Stanley?

Was it both Hitachi and EMC?

1  **A.**   To my knowledge, I believe so, yes.  I just -- I have to

2  clarify, we didn't intend to deliver it to them, but we

3  intended for it to satisfy delivery.  There's a difference.

4  **Q.**   What do you mean by that difference?

5  **A.**   At the time that Morgan Stanley places the order and

6  issues this PO, delivery is satisfied if effectively Autonomy

7  has that available to deliver to them.

8     It's just different from the concept of what's going to be

9  sent over to Morgan Stanley, and I didn't want that to be

10  misunderstood.

11  **Q.**   I'd like to show you what has been marked for

12  identification as Exhibit 107, please.  This is an email from

13  Mr. Steve Chamberlain with a copy to Mr. Hussain that is

14  eventually forwarded by Mr. Hussain to you, Mr. Egan.

15         **THE COURT:**  Admitted.

16         **MR. REEVES:**  Thank you, Your Honor.

17      (Trial Exhibit 107 received in evidence)

18         **MR. REEVES:**  If we could highlight the portion that

19  reads "just need the email," etc.

20  **Q.**   So it looks like Mr. Chamberlain is writing to Joel Scott,

21  with a copy to Mr. Hussain, "Just need the email from them to

22  confirm delivery of the 6 million PO that I have not yet seen."

23     Do you see that?

24  **A.**   I do.

25  **Q.**   Do you have an understanding, Mr. Egan, as to what

1  Mr. Chamberlain means by this email?

2          **THE COURT:**  "Do you have an understanding" -- sorry.

3  Do you want to restate the question?

4  **BY MR. REEVES:**

5  **Q.**   Was this email forwarded to you eventually?

6  **A.**   It looks like it, yep.

7  **Q.**   And when you got the email and reviewed it, did you have

8  an understanding as to what Mr. Chamberlain was asking here?

9  **A.**   I think so.

10  **Q.**   What is your understanding?

11  **A.**   I think he wanted some email or document that indicated

12  that we were covered if we had inventory of both Hitachi and

13  EMC.

14  **Q.**   Okay.  And let's go to the page 3 of Exhibit 107.  And if

15  we can drop down a little bit and highlight the HDS and EMC

16  entries under the model.

17      Do you have an understanding as to what is meant by HDS in

18  the reference there?

19  **A.**   I do.

20  **Q.**   What is that?

21  **A.**   Hitachi Data Systems.

22  **Q.**   And EMC is what?

23  **A.**   EMC, the company.

24  **Q.**   Is that the EMC hardware?

25  **A.**   Yes.

1   **Q.**   All right.  And this is an inventory of the supply as

2   reflected in the document; would you agree?

3   **A.**   No.  It's an inventory like a menu of things that they

4   could order or take delivery of.

5   **Q.**   How often did you and Mr. Hussain discuss the details of

6   this deal in late June 2009, early July 2009?

7   **A.**   Oh, I don't recall.

8   **Q.**   Was it many times?

9   **A.**   Yes.

10   **Q.**   Do you recall saying that you talked about this deal

11   ad nauseam?

12   **A.**   I would say that.  We did talk about it ad nauseam.

13   **Q.**   You did talk about it ad nauseam with Mr. Hussain?

14   **A.**   Yes.

15   **Q.**   Was he all over the details of this deal?

16   **A.**   He was very familiar with the details of the deal.

17   **Q.**   Do you have an understanding as to why he cared so much

18   about this deal?  What was it accomplishing, as you understood

19   it?

20   **A.**   It was a very large deal.  It was accomplishing capturing

21   a lot of revenue.

22   **Q.**   Top-line revenue?

23   **A.**   Yes.

24   **Q.**   I'd like to show you, if I could, please -- withdrawn.

25        I'd like to move forward in time to in or around December

1    2009 and show you, if I could, please, what is marked for

2    identification as Exhibit 364.  This is an email from

3    Mr. Hussain to you and Christian Lucas dated December 23, 2009.

4            **THE COURT:**  Admitted.

5            **MR. REEVES:**  Thank you, Your Honor.

6        (Trial Exhibit 364 received in evidence)

7            **MR. REEVES:**  And if we could please -- that's

8    fantastic.  Thank you, Ms. Margen.  If we could please

9    highlight the paragraph that begins, "Hi, Christian."

10   **Q.**   Mr. Egan, in or around December 2009, were you involved in

11   a deal to restructure Morgan Stanley's existing Digital Safe

12   deal with Autonomy?

13   **A.**   I was.

14   **Q.**   What did you do?

15   **A.**   I pitched it.  I represented it.  I did a lot of work to

16   work out the proposition.  It was a very complex deal.

17   **Q.**   Did you discuss the details of this restructured Morgan

18   Stanley deal with Sushovan Hussain?

19   **A.**   I did.

20   **Q.**   And what did you and he discuss in the context of this

21   deal?

22   **A.**   Many, many things.  The overall goal.

23   **Q.**   What was the overall goal?

24   **A.**   To have them restructure, meaning to take an arrangement

25   that was long term and quite expensive to them, on a

1   pay-per-use kind of megabyte basis and re-propose it to them in

2   a way that would create savings for them over time.  That would

3   be what they would get out of the equation.

4        And from our perspective, it would peel the software off

5   of the combined service and software offering and make the

6   software recognizable up front.

7        So it would be a very good software deal for Autonomy and

8   a good economic deal for Morgan Stanley.

9   **Q.**   It's a good deal for Autonomy because of the upfront

10  revenue?

11  **A.**   Yes.

12  **Q.**   And it's a good deal for Morgan Stanley because of the

13  long-term savings?

14  **A.**   Yes.

15  **Q.**   Did you discuss those concepts in detail with Mr. Hussain

16  during this period?

17  **A.**   I did.

18  **Q.**   Are you familiar with the term "accelerated hosting deal"?

19  **A.**   It rings a bell, but it's not, I wouldn't say, terribly

20  familiar.

21  **Q.**   Is this a deal in which you're accelerating revenue that

22  would otherwise be due over time on a Digital Safe deal in a

23  way that allows you to recognize more upfront revenue?

24  **A.**   That's true.

25  **Q.**   In this email, Mr. Hussain is writing to you and Christian

1    Lucas.  Who is Mr. Lucas?

2    **A.**   He was an investment banker at Morgan Stanley.

3    **Q.**   Mr. Hussain writes, "Hi, Christian.  To clarify, we

4    require no payment up front at all.  The savings start the

5    moment Morgan Stanley signs an amendment to the existing

6    agreement that simply puts lower rates into effect coupled with

7    a software license fee.  In this sense, it is not even an offer

8    that requires a legal review as it is purely financial and

9    causes savings.  It's quite simply 'sign and save'."

10       Do you have an understanding of the point that Mr. Hussain

11   is making to Mr. Lucas at Morgan Stanley in this email?

12   **A.**   I do.

13   **Q.**   What is your understanding?

14   **A.**   Well, it's -- it appears to be a very complicated deal

15   when you send it over to someone, but what's written here is

16   correct in terms of if you distill it down, it's -- they don't

17   need to make an evaluation decision about the product or the

18   service or the offering.  They need to make an economic

19   decision.

20   **Q.**   It's just sign and save; right?

21   **A.**   It's not quite that simple, but you have to understand it

22   and then ...

23   **Q.**   Okay.  Fine.

24       Let me show you what has been marked for identification as

25   Exhibit 382, please.  This is an email from Mr. Crumbacher to

EGAN - DIRECT / REEVES

1  you and Mr. Scott, attaching versions of the contracts relating

2  to the Morgan Stanley amendment.

3          **THE COURT:**  Admitted.

4          **MR. REEVES:**  Dated --

5          **THE COURT:**  Go ahead.

6          **MR. REEVES:**  Dated December 28, 2009.

7          **THE COURT:**  Admitted.

8          **MR. REEVES:**  Thank you, Your Honor.

9      (Trial Exhibit 382 received in evidence)

10  **BY MR. REEVES:**

11  **Q.**   Is Mr. Crumbacher circulating versions of the relevant

12  amendments and contracts associated with this restructuring in

13  this time period, Mr. Egan?

14  **A.**   Yes.

15  **Q.**   That's what it appears to you to be?

16      Let's go to page 3, please.  Exhibit 382, page 3.  And if

17  we can drop down a little bit further -- great.  Right there.

18  And let's just highlight some of the software that's involved,

19  the portion that says "Digital Safe."  Just -- that's perfect.

20  Thank you very much, Ms. Margen.

21      So according to this version of the contract, is there any

22  of the new product, SPE, included in the contract at this point

23  in time, Mr. Egan?  Do you see any reference to it?

24  **A.**   Not in this document, no.

25  **Q.**   And do you recall any -- through this point in time,

1   through December 28, 2009, and the circulation of these forms

2   of the contract for the restructuring, do you remember any

3   discussion with Morgan Stanley about SPE?

4   **A.**   No.

5   **Q.**   I'd like to show you, if I could, please, what has been

6   marked for identification as Exhibit 2947.

7       Your Honor, this is another demonstrative I'd like to use.

8   I don't intend to ask it be received in evidence.

9           **THE COURT:**  Has Mr. Keker looked at it?

10          **MR. REEVES:**  We gave it to him.

11          **THE COURT:**  Well, okay.

12          **MR. REEVES:**  I'll ask some foundational questions.

13          **THE COURT:**  Do you have an objection or not?

14          **MR. KEKER:**  No.

15          **THE COURT:**  2947 is admitted for demonstrative

16  purposes only.  It itself is not evidence, but it is used by

17  the Government here to illustrate some point they want to make.

18          **MR. REEVES:**  Thank you, Your Honor.

19  **Q.**   You said earlier, Mr. Egan, that the Morgan Stanley

20  restructuring deal was a complex deal; is that correct?

21  **A.**   I did.

22  **Q.**   Are you familiar Exhibit 2947?

23  **A.**   I am.

24  **Q.**   Is this a summary that you prepared to simplify some of

25  the concepts at work in this negotiation?

EGAN - DIRECT / REEVES

1   **A.**   I drew this in paper.  This is just a reproduction of it.

2   **Q.**   And will it assist you in describing some of the

3   differences between the existing deal and the new deal that you

4   were negotiating in this time period?

5   **A.**   Yes, it would.

6   **Q.**   All right.  So let's walk through -- there's a column in

7   here that says "Existing Deal."  What is that a reference to?

8   **A.**   That's the -- we had a deal in place with Morgan Stanley

9   with regards to Digital Safe, so I drew a column to express

10  that this is -- this would be the situation if we did nothing.

11  **Q.**   If you did nothing --

12  **A.**   Existing deals stayed in place.

13  **Q.**   And what's the total cost to Morgan Stanley of the Digital

14  Safe archiving and hosting services that you were providing

15  according to the existing deal?  What's the total cost?

16  **A.**   Over the course of five years, the total cost would be

17  estimated to be $34 million.

18  **Q.**   Now, could you recognize, if Morgan Stanley did nothing,

19  any of that revenue up front immediately?

20  **A.**   There was a constant -- you know, some part of it was

21  being recognized.

22  **Q.**   A small part?

23  **A.**   A smaller part, yes.

24  **Q.**   It --

25  **A.**   It was a big deal so it was literally over time.  So you'd

1   take the 34 million and kind of spread it equally over five

2   years.  That's how it would be recognized --

3   Q.   Thank you very much.

4        And the new proposed deal changed that, did it not?

5   A.   As proposed, it would have and did, yeah.

6   Q.   And what would be the total value of the new proposed

7   deal, the total value to -- of money that Morgan Stanley would

8   be paying for these hosting services to Autonomy over five

9   years under the new deal?

10  A.   In exactly the same scenario over the same five years, it

11  would be $29.6 million.

12  Q.   So big cost savings to Morgan Stanley, is there not?

13  A.   Yes.

14  Q.   Let's go to the "new license fee" row under the "new deal"

15  column.  There is an inclusion there of 12 million upfront.  Do

16  you see that?

17  A.   I do.

18  Q.   What is that a reference to?

19  A.   That's a reference to part of the 29.6 I was proposing

20  would be in the form of a $12 million license.  A license is

21  not something that you pay over time so that would be an

22  upfront commitment and cost to Morgan Stanley.

23  Q.   Okay.  And did they eventually agree to that?

24  A.   They did.

25  Q.   This was the upside for Autonomy, so to speak, was it not?

**EGAN - DIRECT / REEVES**

1   **A.**   Yes.

2   **Q.**   You recognized revenue in this quarter of approximately

3   $12 million?

4   **A.**   I believe so.

5   **Q.**   All right.  And there are other adjustments to the values

6   for the maintenance and the fees and things, are there not,

7   between the existing deal and new deal?

8   **A.**   There were.

9   **Q.**   Can you explain those, please.

10  **A.**   Effectively, other aspects of the deal, the services, the

11  per megabyte charge, those would go down, so that was the

12  offset.

13  **Q.**   I'd like to show you, if I could, please, what has been

14  marked for identification as Exhibit 459.  I believe this is

15  the executed final contract that we've been discussing.

16       Do you recognize Exhibit 459?

17  **A.**   I'm not seeing it, I'm sorry.

18            **THE COURT:**  Admitted.

19           **MR. REEVES:**  Thank you, Your Honor.

20       (Trial Exhibit 459 received in evidence)

21  **BY MR. REEVES:**

22  **Q.**   And if we -- does this appear to be the final contract --

23  withdrawn.

24       Let's take a look, please, at page 8 of the exhibit.  Does

25  this appear to be the executed version of the contract with

1   Morgan Stanley?

2   **A.**   It's an executed signature page.  I assume it's related to

3   the document.

4   **Q.**   Okay.  It's in the binder, if you want to double check,

5   but let's take a look at the first page again, please.

6        And let's go down to the products, if we could, please.

7   And let's highlight this -- the very last three words in the

8   underlined portion there that says "including SPE Basic."

9        Do you see that, Mr. Egan?

10  **A.**   I do.

11  **Q.**   Did these words come into this deal at the very, very end?

12  **A.**   They did.

13  **Q.**   Do you have an understanding as to how that happened?

14  **A.**   I do.

15  **Q.**   What happened?

16  **A.**   I needed to distinguish the software package from the

17  prior package that they had licensed for it to be recognizable,

18  so this was the -- the distinguishing factor that we chose.  We

19  had to add software or have a different version of the software

20  in order to distinguish this licensed software package from

21  that which they had previously established an agreement for.

22  **Q.**   Okay.  Did you discuss that need with Mr. Hussain?

23  **A.**   I did.

24  **Q.**   And what did you and he discuss about including SPE Basic?

25  **A.**   We discussed what would satisfy the appropriate level of

**EGAN - DIRECT / REEVES**

1  distinction, what products they would accept or what we had,

2  frankly, that would -- wasn't in the original license that

3  would be additive enough to satisfy that criteria.

4  **Q.**   What is accomplished by throwing in this software at the

5  very end?  How did that, as you understood it, affect the

6  ability of Autonomy to recognize revenue on the $12 million?

7  **A.**   The aspect of it being at the end is of no significance.

8  It's the fact that it is additive and distinct from the prior

9  package that makes the difference.  It has to be a new or

10  distinguished -- sufficiently distinguished package in order to

11  enable revenue recognition.

12  **Q.**   And if you hadn't thrown in this software, so to speak, at

13  the end and the contract would simply be restructured, as it

14  was being negotiated originally, what effect would that have on

15  the revenue?

16  **A.**   My understanding was that that would threaten revenue

17  recognition.

18  **Q.**   To your knowledge based on the involvement with the

19  negotiation with Morgan Stanley, was SPE part of the commercial

20  justification for Morgan Stanley's decision to restructure the

21  Digital Safe deal?

22  **A.**   It was not.

23  **Q.**   To your knowledge, based on your discussions with Morgan

24  Stanley, would Morgan Stanley have done the deal anyway without

25  any SPE?

1    **A.**   They would have.

2    **Q.**   I'd like to show you, if I could, please, what is marked

3    for identification as Exhibit 592.

4        Your Honor, this is a transcript of the earnings

5    conference call for Autonomy's earnings call to analysts

6    following the announcement of its 2009 financial performance

7    dated February 3rd, 2010.  There will be further testimony, and

8    I offer this subject to connection.

9        **MR. KEKER:**  There is no connection, Your Honor.  The

10   best evidence is the tape, not the transcript.  This transcript

11   says on page 25 that it's not -- it could be materially wrong.

12       **MR. REEVES:**  We are going to play the tape with

13   another witness, Your Honor.

14       **MR. KEKER:**  We would ask that if they want to do

15   something with this witness without this, they play the tape

16   with this witness; otherwise, they shouldn't use the

17   transcript.

18       **MR. REEVES:**  I would like to use this just as a

19   demonstrative.  It will only --

20       **THE COURT:**  It's not a demonstrative.

21       **MR. REEVES:**  I'm not asking to put it in evidence.

22       **THE COURT:**  It may be -- okay.  Let's do this.  Let's

23   just take --

24       **MR. REEVES:**  We have the audio.

25       **THE COURT:**  Oh, this is like unfolding reality.  Fine.

1    Okay.  Play the audio.

2         Now, ladies and gentlemen, do you have copies -- they can

3    follow along.

4              **MR. REEVES:**  They have the audio.

5              **THE COURT:**  Well, not them.  I'm looking at you.

6    You're the Government.

7         So this is what we're going to do.  We're not taking a

8    recess.  We're going to play an audio recording.  You are going

9    to see on the screen before you a transcript.

10        Now, there is no agreement between the parties that the

11   transcript is an accurate transcript of the recording.  Okay?

12   So you should use your own ears aided by your eyes and

13   understand that it is the audio that is the -- what you're

14   listening to that is really in evidence and the transcript is

15   to aid you, but it itself is not evidence, absent some

16   agreement of the parties.  Okay.

17        So if the transcript seems to be not consistent with what

18   you hear, it's what you hear that's important, not the

19   transcript.  Everybody got that?  Okay.  With that, you may

20   proceed.

21             **MR. REEVES:**  Okay.  I'd like --

22             **THE COURT:**  What exhibit is it?

23             **MR. REEVES:**  I'd like to display, for the purposes the

24   Court has just indicated, to the jury the transcript that is

25   marked as Exhibit 592 at page 7.

1          **THE COURT:**  Okay.  592 at page 7.  Okay.

2          **MR. REEVES:**  And then we will play the portion of the

3    recording that pertains to that.

4          **THE COURT:**  Okay.

5       By the way, was this witness -- was he -- did he

6    participate in the call or was he -- did he hear the call or

7    what?

8          **MR. REEVES:**  I don't believe so, but I'll ask.

9    **Q.**   Mr. Egan, did you?

10   **A.**   No.

11         **THE COURT:**  Still proceed.  Go ahead.

12         **MR. REEVES:**  If we could enlarge the very top

13   sentence.  Okay.  That's great.  I think we're ready to play

14   the tape.

15         **MR. KEKER:**  Can we find out who is talking,

16   Your Honor?

17         **MR. REEVES:**  According to the document, it is

18   Dr. Mike -- Michael Lynch.  On page 592, page 3, there is an

19   indication this is Dr. Lynch.  Let's go ahead.

20       Well, this seems to be a bit of a challenge.  I'll come

21   back.  I would like to keep going, Your Honor.

22         **THE COURT:**  Okay.  Then we will come back and play

23   this when we figure out how our technology works here.

24         **MR. REEVES:**  Thank you, Your Honor.

25   **Q.**   Mr. Egan, if Dr. Lynch --

1          **MR. KEKER:**  Can this be taken down, Your Honor?

2          **MR. REEVES:**  Yes.  That would be fine.

3    **Q.**    If Dr. Lynch, on February 3rd, 2010, in the analyst call

4    said the following, quote, "one interesting aspect of SPE is

5    that it was the key winning differentiator in a $12 million

6    deal," end quote -- based on that statement, do you have a

7    reason to believe in this time period that was a reference to

8    the $12 million restructured deal with Morgan Stanley?

9          **MR. KEKER:**  Objection, Your Honor.  It's speculation

10   about hearsay.

11         **THE COURT:**  Overruled.

12         **THE WITNESS:**  It's the same dollar amount.

13   **BY MR. REEVES:**

14   **Q.**    Okay.  Was SPE, based on your involvement in the

15   negotiations with Morgan Stanley, quote, "the key winning

16   differentiator" in closing your $12 million deal with Morgan

17   Stanley?

18   **A.**    No.

19   **Q.**    I'd like to move forward to the subject of MicroLink.  I'd

20   like to show you what has been marked for identification as

21   Exhibit 2949, please.  This is an email from Mr. Hussain to you

22   on or around September 18th, 2008.  I offer it in evidence,

23   please.

24         **THE COURT:**  Admitted.

25         **MR. REEVES:**  Thank you, Your Honor.

1          (Trial Exhibit 2949 received in evidence)

2          **MR. REEVES:**  If we could please display 2949.

3  **Q.**   In or around 2008 -- you don't have to highlight anything

4  just yet.

5          In 2008, Mr. Egan, did you have any difficulties

6  collecting monies owed by MicroLink to Autonomy from Dave

7  Truitt and others at MicroLink?

8  **A.**   I did.

9  **Q.**   Okay.  Were there debts that were accumulating as a result

10 of the deals you had?

11 **A.**   Yes, there were.

12 **Q.**   All right.  Is this an email from Mr. Hussain that is

13 talking about the status of ML discussions, MicroLink

14 discussions, as you read it?

15 **A.**   It is.

16 **Q.**   Okay.  So it looks like Mr. Hussain is writing in

17 September 2008, "Brant won't return my calls which tells me

18 things are in bad shape for Q3.  I need you to be all over them

19 and also start the ML discussions.  We need the cash that's due

20 this Q."

21         Do you see that?

22 **A.**   I do.

23 **Q.**   Do you have an understanding, based on your discussions

24 with MicroLink in this time period and your discussions with

25 Mr. Hussain, as to what Mr. Hussain is talking about?

1    **A.**    I know what my understanding was at the time.

2    **Q.**    Go ahead.  Tell us.

3    **A.**    The fellow who was in charge of our federal sales team,

4    Brant, was not returning Sushovan's calls.  Sushovan inferred

5    that that meant that federal would underperform in the quarter.

6        He's asking me to be all over them, meaning try and make

7    sure people are doing their deals or we get whatever deals we

8    can get.  And start the ML discussions, which at the time I

9    understood to mean get them in shape to be able to take other

10   deals that may not have closed with an end user.

11   **Q.**    What do you mean?  Get MicroLink in shape to take an

12   at-risk deal, if that's what you meant?

13   **A.**    Make sure that they had made any outstanding payments.

14   They would not be able to take new deals if they were owing or

15   delinquent on old deals.

16   **Q.**    Is that what Mr. Hussain means by "we need the cash that's

17   due this quarter"?

18   **A.**    That's what I understood him to mean.

19   **Q.**    I'd like to move forward approximately a year to in or

20   around November 2009.  And let me show you, if I could, what

21   has been marked for identification as Exhibit 314.  This is an

22   email from Mr. Hussain to Dr. Lynch and to you, Mr. Egan, on or

23   about November 3rd, 2009, subject "Project DC."

24       I offer it in evidence.

25           **THE COURT:**  Admitted.

1           (Trial Exhibit 314 received in evidence)

2   **BY MR. REEVES:**

3   **Q.**   What is Project DC, Mr. Egan, in this November 2009 time

4   period?

5   **A.**   Looking at acquiring MicroLink, the company.

6   **Q.**   Were you involved in Autonomy's consideration of acquiring

7   MicroLink in or around this November 2009 time period?

8   **A.**   I was.

9   **Q.**   What did you do?

10  **A.**   I gave an opinion about whether we could make value out of

11  that, like whether we could absorb them, continue to make it a

12  valuable partner or -- not partner, we would own it, but a

13  force for selling into federal government.

14          I broached the idea, I believe, with Dave.  Like I think I

15  was the person who maybe first brought it up.

16          And then I played a role at the very end in communicating

17  to Dave that Autonomy was done negotiating the price.

18  **Q.**   All right.  Did you discuss the details of this -- of this

19  deal with Mr. Hussain?

20  **A.**   The details?

21  **Q.**   Did you discuss aspects of the deal?  Maybe the beginning

22  and the end?

23  **A.**   I discussed aspects of it, just -- yeah.

24  **Q.**   What can you say with confidence about Autonomy's

25  acquisition of MicroLink that you discussed with Mr. Hussain?

**A.**    I discussed whether we could effectively assimilate it and

have that be a positive thing.  I discussed whether Dave was

interested and willing.  I discussed what it would mean to the

overhang of business that -- where they owed us money.  And I

discussed, again, at the end the fact that Autonomy was at its

end of negotiations.

**Q.**    Okay.  What did you discuss with Mr. Hussain about the

overhang of money that MicroLink owed Autonomy?

**A.**    My understanding was that if we acquired them, that would

be effectively forgiven or worked out in the transaction in a

way that would mean I would not have to keep finding fixes or

new deals or basically it relieved me of the sales obligations

that were accruing there for me.

**Q.**    Was that outcome one of the considerations that you and

Mr. Hussain discussed for favoring an acquisition of MicroLink?

**A.**    It certainly was for me.  And I believe it was for

everybody discussing it.

**Q.**    I'd like to show you the second page of Exhibit 314,

please.

    And if we could drop down, there is an email from

Mr. Hussain to Dr. Lynch on or around November 2nd, 2009,

subject, "Project DC."

    Do you see that?

**A.**    I do.

**Q.**    It begins -- Mr. Hussain writes, "As you know, Stouffer

1  and I spent Friday with DC's CEO and CFO to discuss the

2  possibility of a transaction that would make our federal

3  business material," etc.

4      Do you see that?

5  **A.**   I do.

6  **Q.**   In this time period, do you recall a meeting with

7  MicroLink's CEO and CFO to discuss this possible acquisition?

8  **A.**   I do not.

9  **Q.**   Do you recall participating in phone conversations, even

10  if you don't remember a face-to-face?

11  **A.**   With these parties?

12  **Q.**   Yes.

13  **A.**   I do not.

14  **Q.**   Okay.  Are you saying it didn't happen or you just don't

15  remember it?

16  **A.**   I don't remember it.

17  **Q.**   All right.

18      I'd like to show you what has been marked for

19  identification as Exhibit 333, please.  This is an email from

20  Mr. Hussain to Mr. Egan dated November 20th, 2009, subject

21  "MicroTech."  I offer it into evidence, please.

22          **THE COURT:**  Admitted.

23      (Trial Exhibit 333 received in evidence)

24          **MR. REEVES:**  If we could highlight the text.

25  **Q.**   In or around this November time period, Mr. Egan, did you

1  have any discussions with Mr. Hussain about a possibly related

2  deal for $10 million involving one of Dave Truitt's other

3  businesses, MicroTech?

4  **A.**   I do.

5  **Q.**   In this email, Mr. Hussain is writing to you, "I know we

6  discussed this earlier this quarter, but it's important that

7  you get a proposal to MicroTech for the 10 million prepaid

8  OEM."

9       Do you have an understanding as to what that refers to?

10 **A.**   I think so, yes.

11 **Q.**   What is your understanding?

12 **A.**   I recall doing a deal where Dave Truitt from MicroLink was

13 interested in having a broad license for a new entity called

14 Discover Tech that would be separate from and last after the

15 fact that MicroLink would be acquired by Autonomy.

16 **Q.**   Do you think that's part of what's going on here?

17 **A.**   I think it is.

18 **Q.**   Is this transaction related to the overall acquisition

19 strategy and set of deals that are being negotiated in this

20 time period involving MicroLink?

21 **A.**   It's separate but related in a way because MicroLink could

22 have been who -- you know, who bought it and applied it to do

23 what he was going to do with it, but we were about to acquire

24 MicroLink so he was setting up to have a separate company that

25 in the future could do what he was interested in doing with

1    this license.

2    Q.    Earlier in your testimony you indicated that you might

3    have been involved in the MicroLink acquisition discussions at

4    the beginning?

5    A.    Uh-huh.

6    Q.    And then also at the end.  What did you mean by that?

7    A.    At the beginning, as I say, whether I was the original

8    broacher of the idea, I know I participated in a discussion

9    with Dave about the idea at the beginning and I know I

10   participated in the end of the process with a message to Dave

11   about they're done negotiating, meaning our -- Autonomy is done

12   negotiating.

13   Q.    Are those the only two pieces of this transaction that you

14   recall at this point being involved in in any depth?

15   A.    The only ones that I recall?

16   Q.    Yes.

17   A.    No.  I recall having this conversation, if you consider it

18   part of the MicroLink.

19   Q.    Do you consider it part of the overall set of discussions

20   that are going on relating to MicroLink here?

21   A.    I consider it related and, you know, contemporary,

22   happening at the same time, simultaneous.

23   Q.    I would like to show you what is marked for identification

24   as Exhibit 412, please.  This is an email from you to Dave

25   Truitt, subject "upside deal list" on or about December 30th,

1    2009.

2        I offer it into evidence.

3            **THE COURT:**  Admitted.

4        (Trial Exhibit 412 received in evidence)

5    **BY MR. REEVES:**

6    **Q.**  Are you familiar with this type of upside deal list,

7    Mr. Egan?

8    **A.**  I am.

9    **Q.**  And what is an upside deal list?  What does this mean?

10   **A.**  "Upside" is a term that was used to represent -- to

11   identify deals that may or may not happen in the quarter.

12   **Q.**  If we could go to the second page of Exhibit 412 and

13   enlarge this.

14       Is this a set of options that you are raising with

15   Mr. Truitt at the end of the quarter?

16   **A.**  It is.

17   **Q.**  Okay.  And did you discuss reaching out to Mr. Truitt

18   about these types of possible deals with Mr. Hussain?

19   **A.**  I did.

20   **Q.**  So what is this -- is this a menu of some type or a set of

21   choices?

22   **A.**  Exactly.  It's -- it's an upside list, so it's a list of

23   deals that were close for the quarter, may or may not happen,

24   and I was sharing that with Dave Truitt to give him some

25   advance warning about deals we may or may not ask him to do at

1    risk.

2    **Q.**   Are these deals in a future quarter that are nearing

3    completion but not yet done that you're asking Mr. Truitt to

4    consider taking as a reseller in the current quarter for

5    revenue purposes?

6    **A.**   Some may be actually eligible for the current quarter, so

7    I can't state which were closer than others.

8    **Q.**   All right.

9           **THE COURT:**  Looking at this document, though, do I

10   understand that it's in thousands of dollars, that is, it

11   doesn't -- it says 773.

12          **THE WITNESS:**  No.  It's in hundreds of thousands or

13   millions.

14          **THE COURT:**  What is it?  What's missing?  If you wrote

15   out the whole --

16          **THE WITNESS:**  I didn't write the document.

17          **THE COURT:**  No.  No.  If one were, what would -- it

18   says $773.  Okay.  I don't think that's what the amount is.

19          **THE WITNESS:**  No.  It means 773K, thousand dollars.

20          **THE COURT:**  So all of these figures are assuming that

21   three zeros have been omitted?

22          **THE WITNESS:**  That's correct.

23          **THE COURT:**  Okay.

24   **BY MR. REEVES:**

25   **Q.**   Honeywell is a $2 million deal?

1  **A.**   Correct.

2  **Q.**   Manufacturers Life is a $1.2 million deal?

3  **A.**   If that's the long form of ManuLife, yes.

4  **Q.**   Total revenue here as indicated is 4.4 million,

5  approximately?

6  **A.**   Correct.

7  **Q.**   Did you do this on a -- sort of recurrent basis with

8  Mr. Truitt as you got close to the end of the quarter, offer a

9  list like this for him to choose from to see what deals the

10  resellers could -- he might be interested in as a reseller?

11  **A.**   Sometimes I would give him the options or choice.

12  Sometimes I would just specifically ask if he would take this

13  deal or that deal.

14  **Q.**   Did you do that after discussing that strategy or that

15  approach with Mr. Hussain?

16  **A.**   Yes.

17  **Q.**   Did he encourage you in any way to do that?

18  **A.**   He would effectively let you know which ones were okay to

19  do or which ones he wanted through the resellers and which

20  resellers were eligible or preferred.

21  **Q.**   What purpose is served by going to Mr. Truitt at the very

22  end of the quarter, December 30th, 2009, for this reason?

23  **A.**   What purpose?

24  **Q.**   Yes.

25  **A.**   The main purpose is to get that revenue inside of the

1    quarter.

2    **Q.**   Let me show you what is marked as Exhibit 454, please.

3    This is an email from Mr. Hussain to you and Mr. Mooney on or

4    about December 31, 2009.

5              **THE COURT:**  Admitted.

6       (Plaintiff's Exhibit 454 received in evidence)

7    **BY MR. REEVES:**

8    **Q.**   It looks like in this email, Mr. Hussain is saying, "I was

9    expecting 5 million, not 4.4 million.  Any chance of increasing

10   that?"

11       Do you have an understanding, Mr. Egan, of what he's

12   talking about?

13   **A.**   I did at the time.

14   **Q.**   What is your understanding?

15   **A.**   He had interpreted the 4.9 million that you saw on the

16   prior sheet to be 5 million; was counting on that number.

17   We're getting to the absolute end of the quarter.  The actual

18   number was 4.4 because someone in communicating to Sushovan

19   didn't net out the margin, probably Mike Mooney by phone, so it

20   gets into his forecast sheet and he sees it's 4.4.  That's 600K

21   short, so he's asking us if there is any way to find another

22   600K.

23   **Q.**   He needs more revenue; fair?

24   **A.**   Yeah.

25   **Q.**   And he's asking for more revenue from the resellers like

1   MicroTech?

2   **A.**   You could --

3   **Q.**   Asking you --

4   **A.**   Possibly.  But I understood it to be it could be from

5   anywhere.  This was a normal -- we were almost always short in

6   some way or being pressured or looking to provision extra at

7   the end of a quarter, so it was not an unusual ...

8   **Q.**   Let's talk more about that.

9         I would like to show you what has been marked for

10   identification as Exhibit 507.  This is an email from

11   Mr. Hussain to Mr. Chamberlain on or about January 4th, 2010,

12   approximately four to five days later.

13         **THE COURT:**  Admitted.

14         **MR. REEVES:**  Thank you, Your Honor.

15   (Trial Exhibit 507 received in evidence)

16   **BY MR. REEVES:**

17   **Q.**   You're not on this email, are you, Mr. Egan?

18   **A.**   No.

19   **Q.**   Okay.  It looks like Mr. Hussain is saying to

20   Mr. Chamberlain on Monday, January 4th, 2010, "We need to get

21   to 223."

22         Do you have an understanding, based on your dialogue with

23   Mr. Hussain, what he's referring to?

24   **A.**   I saw statements like that reasonably frequently, and

25   that's a logical number that would mean a revenue number.

1    Q.    A revenue number for the prior quarter?

2    A.    Yes.  Probably.

3    Q.    I'd like to show you what is attached to Exhibit 507.  Do

4    you recognize this as another version of the spreadsheets that

5    Mr. Hussain maintained that you testified about yesterday?

6    A.    I recognize in particular the lower right-hand corner, the

7    purple cells and the highlighted green cells and the deal list.

8    Q.    So this looks like a piece of Mr. Hussain's spreadsheets,

9    does it not, in that way?

10   A.    It looks like a piece or a variation on the ones that I

11   was used to.

12   Q.    It looks like total closed revenue, according to the time

13   sheet on, or around April 4th, 2010, is 221 million, does it

14   not?

15   A.    I can't even see the --

16   Q.    Can you back out, just one second, of the doc and slide

17   over.

18         Total closed is what amount highlighted there, Mr. Egan?

19   A.    221,065.

20   Q.    And what was the amount that Mr. Hussain said on January

21   4th he needed to get to?

22   A.    Oh, I was not paying terribly close attention.  I think it

23   was 223.

24   Q.    Very good.  Thank you.

25         That's on the first page of that document?

1    **A.**    I didn't mean I wasn't paying close attention.  I just

2    mean I didn't memorize it.

3    **Q.**    Does this help you?

4    **A.**    It does, yeah.

5    **Q.**    Is it 223 he is trying to get to?

6    **A.**    Yes.

7    **Q.**    According to his spreadsheet, he is at 221.  That's what

8    the document says?

9    **A.**    That's what the document says.

10   **Q.**    Thank you.  I'm done with that.

11          I would like to show you what has been received in

12   evidence as Exhibit 420.

13          If I could please have that displayed, Your Honor.

14          Now, Mr. Egan, in this time period, in this December 2009,

15   January 2010 time period, were you involved, to your

16   recollection, in any additional deal in which Autonomy sold

17   software to MicroLink in the amount of approximately

18   $2.3 million?

19   **A.**    I don't remember.

20   **Q.**    Okay.  Thank you.  I'm done with that.

21          I'd like to show you what's in evidence as Exhibit 427,

22   please.  If I could have that displayed.

23          And if I could highlight, please, the date of December 31,

24   2009.  That's great.  Thank you, very much.  And maybe the

25   dollar figure of $4 million at the very bottom.  Okay.  Good.

1          Mr. Egan, in or around this same time period in or about

2     December 2009, do you recall negotiating a second sale of EDD

3     software to Capax with Mr. Baiocco?

4     **A.**    I do.

5     **Q.**    What was your involvement in that?

6     **A.**    I believe I may have conceived of the idea or at least was

7     very close to that.   I broached it with John and executed it.

8     **Q.**    Okay.  Did you discuss it with Mr. Hussain?

9     **A.**    I did.

10    **Q.**    Okay.  And what did you and he discuss?

11    **A.**    Whether he wanted to do it or not.  It was a -- kind of a

12    fix, so it wasn't something organic.

13    **Q.**    Okay.  When you say you conceived of the idea, is that in

14    the context of discussing sort of where Autonomy is in the

15    quarter and what needs it may have for revenue with

16    Mr. Hussain?

17    **A.**    No.  In that case, I simply recognized the opportunity to

18    do this.  We had been winning a lot of EDD deals.  We had

19    delays in our ability to satisfy contracts.  In my mind, that

20    registered as a rationale for effectively doing another

21    transaction giving more volume and more rights to a partner

22    like Capax that was going to, in the future, be a source of

23    extra capacity in that sense.

24    **Q.**    Did you discuss that strategy or those -- those reasons

25    for pursuing this deal with Mr. Hussain?

1  **A.**    I did.

2  **Q.**    Are you confident that he knew and approved of what you

3  were doing?

4  **A.**    He -- I am confident that he knew because I discussed it

5  with him.  He was the person who ultimately could decide

6  whether my idea for the rationale was good enough to be -- good

7  enough reason to do the deal.

8  **Q.**    All right.  Now, was this another quid pro quo deal?

9  **A.**    It was.

10 **Q.**    At this point, was Capax loaded with debt that already

11 existed that made its ability to pay for a new license deal

12 more difficult?

13 **A.**    I can't say whether they were loaded with debt.  They did

14 have the -- at least the obligation from the prior EDD deal,

15 but we had an agreement as to how that was being underwritten,

16 so I don't put that in the category of being loaded with debt

17 per se.

18 **Q.**    All right.  And so what, if any, agreement did you have

19 with Mr. Baiocco about how Capax would pay for another EDD

20 license?

21 **A.**    I believe I agreed that we would increase the amount of

22 EDD that we were ostensibly outsourcing to them, the retainer.

23 **Q.**    The retainer concept that you talked about earlier?

24 **A.**    Yeah.

25 **Q.**    Ostensible because they're not really performing the

1    services?

2    **A.**    Correct.

3    **Q.**    You're just paying them anyway?

4    **A.**    Correct.

5    **Q.**    You are going to increase that amount so they can buy

6    another license?

7    **A.**    Correct.

8    **Q.**    What did you mean when you said that there was a fix?  As

9    you used that term "fix," what did you mean?

10   **A.**    Can you remind me of exactly how I said it?

11   **Q.**    Great question.

12        (Government counsel confer off the record.)

13   **BY MR. REEVES:**

14   **Q.**    I think your testimony was that this deal was a fix, and

15   the question is it's a fix to what?  What problem?

16   **A.**    I generally used that term to be a fix.  I don't know that

17   this deal was a fix per se.

18   **Q.**    So what type -- all right.  Withdrawn.

19        Thank you.  I'm done with that.

20        I'd like to show you what is marked as Exhibit 344 for

21   identification.  This is an email from Mr. Egan to Mr. Kanter

22   discussing conversations with Mr. Hussain dated December 3rd,

23   2009, subject "Capax revenue summary project."

24        **THE COURT:**  Admitted.

25        (Trial Exhibit 344 received in evidence)

1          **MR. REEVES:**  We've jumped helpfully to the -- this

2     is -- let's go to the third page of Exhibit 344, which may be

3     the cover email.  The exhibit numbering may be out of order

4     here.

5     **Q.**   Is this an email that you sent, Mr. Egan, to Mr. Kanter

6     about Capax revenue summary sometime in or around early

7     December, 2009?

8     **A.**   Yes, it is.

9     **Q.**   Okay.  And what's -- let's now go to the revenue summary

10    that's attached and marked as Exhibit 344, page 1.  And if we

11    could just enlarge the table as much as possible.  That's

12    great.  Thank you, Ms. Margen.  And highlight the totals at the

13    bottom.

14         What is the purpose of this document, Mr. Egan?  What is

15    your understanding of it?

16    **A.**   I think it was a document that Jim Crumbacher kept that

17    tallied various ins and outs of Capax business arrangements.

18    **Q.**   Okay.  And it looks like there are payments from Capax due

19    to Autonomy on the Introspect license.  There are a series of

20    payments that are not paid, according to the document; is that

21    right?

22    **A.**   That's the left column?

23    **Q.**   The left column.

24    **A.**   Yes.

25    **Q.**   Is that consistent with your understanding about Capax not

1  being able to pay unless you had paid Capax in the manner

2  you've described?

3  **A.**    Yes.    They had long-term payment terms on that license.

4  **Q.**    I'd like to show you what is marked as Exhibit 509.    This

5  is an email from Mr. Chamberlain to you, Mr. Egan, with a copy

6  to Mr. Hussain dated January 4th, 2010.

7              **THE COURT:**    Admitted.

8              **MR. REEVES:**    Thank you, Your Honor.

9      (Trial Exhibit 509 received in evidence)

10  **BY MR. REEVES:**

11  **Q.**    And it looks like Mr. Chamberlain is writing about Capax

12  history and collectability, is he not?

13  **A.**    That's right.

14  **Q.**    Okay.    Mr. Chamberlain writes, "This helps illustrate what

15  I need.    Need to show that Capax can pay 8 million next

16  quarter, even if they don't get paid by Eli Lilly."

17      Do you have an understanding as to what he is referring

18  to?

19  **A.**    I do.

20  **Q.**    What's your understanding?

21  **A.**    He's saying he needs something to show that Capax can pay

22  $8 million in the next quarter, even if they don't get paid by

23  Eli Lilly.    I'm sorry.    I'm just reading it back.    That's

24  exactly what I understood it to mean.

25  **Q.**    All right.    Let's go to page 3 of the exhibit.    There's a

1  calculation on page 3 of the outstanding amount due from Capax

2  with the total of approximately $16.9 million.  Do you see

3  that?

4  **A.**   Yes.

5  **Q.**   Okay.  Is that consistent with your understanding about

6  what Capax owes as a result of the transactions through this

7  point in time?

8  **A.**   Kind of surprises me to the large size.

9  **Q.**   Okay.

10      I propose doing one more deal and then we could stop for

11  our break, if that's all right, Your Honor?

12          **THE COURT:**  Sure.

13          **MR. REEVES:**  Another few minutes.

14  **Q.**   I'd like to show you what has been marked for

15  identification as Exhibit 2928, please.  This is an email from

16  you, Mr. Egan, to Mr. Hussain, subject "FileTek," dated

17  December 29, 2009.

18      I offer it in evidence.

19          **THE COURT:**  Admitted.

20      (Plaintiff's Exhibit 2928 received in evidence)

21          **MR. REEVES:**  If we could go down the email chain --

22  whoops.  Fantastic.  Right there.  And let's highlight

23  "pricing," please, and "collectability."  That's just the terms

24  "pricing" and the term "collectability."  Okay.  Great.

25  **Q.**   Now, Mr. Egan, in or around December, 2009, were you

 1  familiar with an approximately $8 million EDD deal with

 2  FileTek?

 3  **A.**   In that time frame, I was very familiar with a deal with

 4  them.  I don't think of it as an EDD deal.

 5  **Q.**   What type of deal do you think of it as?

 6  **A.**   A quid pro quo deal and a deal where FileTek got

 7  enhanced -- big OEM license from Autonomy and Autonomy bought a

 8  big chunk of FileTek's software to use in Digital Safe

 9  products.

10  **Q.**   Did you discuss this deal with Mr. Hussain in this time

11  period, late December, 2009?

12  **A.**   I did.

13  **Q.**   What did you and Mr. Hussain discuss about this

14  quid pro quo deal involving FileTek?

15  **A.**   I thought I had found a great opportunity to do a large

16  quid pro quo deal that made perfect sense.

17  **Q.**   All right.  And did you talk that through with

18  Mr. Hussain?

19  **A.**   I did.  I only had the idea towards the very end of the

20  quarter, so it was a very rushed, one-shot kind of situation.

21  **Q.**   What was his reaction when you raised the idea?

22  **A.**   Positive.  You know, as long as everything kept meeting

23  criteria, he was encouraging.

24  **Q.**   All right.  Good.

25       Let's go down to the email from Mr. Chamberlain -- nope.

1   Sorry.  Thank you very much, Ms. Margen.

2       From Mr. Chamberlain to Mr. Hussain, with a copy to you.

3   **A.**   Uh-huh.

4   **Q.**   Are the two deals, the two quid pro quo deals, being

5   discussed in this email, if you know, Mr. Egan?

6   **A.**   They are.

7   **Q.**   Okay.  Let's go through the first one.  There is a subject

8   here, "Pricing."

9       "Pricing:  Don't have GSA price list, but do have standard

10  pricing."

11      What is that a reference to, if you know?

12  **A.**   Steve Chamberlain had talked to the CEO and CFO at

13  FileTek, specifically to understand their pricing.  We were

14  trying to make the deal big, so when you do that, your

15  pricing -- the pricing you get when you buy something from them

16  has to be in line with their normal pricing.

17      So Steve needed a reference point for pricing.  In this

18  mail he makes the point they do have standard pricing.  That

19  would be a good thing.  They don't have GSA, which is like a

20  formal published government price list so that can't be relied

21  on, and then he says a few more things.

22  **Q.**   Is this paragraph and the pricing questions here -- does

23  that relate to the price at which Autonomy will pay FileTek for

24  its software?

25  **A.**   It does.

1  Q.   Why, in your last answer, did you say you were trying to

2  make this deal as big as possible?

3  A.   Because I was optimizing -- the thing that I wanted most

4  or that we at Autonomy wanted most was as much revenue as we

5  could recognize.  So as much software as could be sold to

6  FileTek was the primary goal, and my sort of pitch for why you

7  would be interested in doing that is because we were willing to

8  buy equal -- actually more of their software.  So the net

9  financial benefit would be to FileTek.

10  Q.   Okay.  Is that why you want to drive the price of what

11  they're selling you up?

12  A.   I wanted both deals to be as big as possible, and after

13  that, you have to start to rationalize it.  You can't just make

14  the number up and make them as big as possible.

15  Q.   Okay.  This paragraph is talking about the price at which

16  Autonomy will buy FileTek's software in the manner you've

17  described?

18  A.   That paragraph is, yes.

19  Q.   Let's go to the second paragraph, the subject of

20  collectability.  It says, "Collectability.  He is checking with

21  his lawyer to make sure he can send me information.  May need

22  to sign an NDA" -- is that nondisclosure agreement?

23  A.   Yes.

24  Q.   -- "in the morning," etc.

25       What is your understanding of what that paragraph is

1  discussing?

2  **A.**   Steve's referring to he, being either Bill or the CFO,

3  checking with their lawyer to make sure that that person can

4  send Steve financial information about FileTek, like their

5  balance sheet or their P&L, something that would indicate that

6  they have the ability to pay their bills.

7  **Q.**   And this is an evaluation of whether Autonomy can rely and

8  collect the amount of money FileTek is paying to Autonomy for

9  the license that you're going to sell to FileTek, is it not?

10 **A.**   Correct.

11 **Q.**   All right.  That's what collectability means.  Whether you

12 can collect the debt owed to Autonomy from FileTek?

13 **A.**   Whether you can reasonably assume that you can collect the

14 debt, I think.

15 **Q.**   This is the other half of the quid pro quo?

16 **A.**   Yes.

17 **Q.**   Now, did you discuss this concept of the differential or

18 the net or the delta between the cost of what you're selling to

19 FileTek and what you're buying from FileTek with Mr. Hussain?

20 **A.**   I did.

21 **Q.**   What did you and he discuss about how much more you're

22 going to pay FileTek than you will receive from FileTek in this

23 deal?

24 **A.**   We discussed trying to keep that as low as possible.

25 **Q.**   The delta as low as possible?

1  **A.**   That difference, yeah.  The delta or the difference as low

2  as possible because that's -- that's the loss to Autonomy, if

3  you will, spending more than you're selling.  So we discussed

4  trying to keep that as low as possible, but at the same time,

5  high enough to be the incentive that they do the deal.

6  **Q.**   Okay.  Would -- and you negotiated this deal with FileTek,

7  did you not?

8  **A.**   I did not.

9  **Q.**   And would one deal have happened without the other, do you

10 think?

11 **A.**   No.

12 **Q.**   The deals were related?

13 **A.**   In effect, yeah.

14 **Q.**   Were they linked, one was dependent on the other?

15 **A.**   Yes.

16 **Q.**   I'd like to show you what is marked as Exhibit 2929,

17 please.  This is an email from Mr. Hussain to Mr. Egan on

18 December 30th, 2009.

19         **THE COURT:**  Admitted.

20         **MR. REEVES:**  Thank you, Your Honor.

21     (Trial Exhibit 2929 received in evidence)

22 **BY MR. REEVES:**

23 **Q.**   And, Mr. Egan, Mr. Hussain writes to you, subject,

24 "FileTek," on December 30th, 2009, "We will need to see the

25 detailed proposals for the 8 million sale to them.  This is v

**EGAN - DIRECT / REEVES**

1  v" -- is that "very, very important"?  Is that how you read

2  this?

3  **A.**   Yes.

4  **Q.**   "Why we are selling them the software for the price that

5  you've agreed to."

6      What is your understanding of this email?  What is

7  Mr. Hussain asking you here?

8  **A.**   He's asking me for the same sort of thing Steve was asking

9  for on the opposite side of the transaction, a document that

10  details the proposition of our software to FileTek and the

11  price and why that's valuable.

12  **Q.**   Okay.  Why is it very, very important to explain why

13  Autonomy is selling its product for $8 million?  Why is that

14  very important?

15  **A.**   Again, my understanding is because there are two

16  transactions happening.  The auditors would look at each

17  transaction and have to understand why they are at the values

18  that they are.  Have comparables or support for the value that

19  each party is getting from the software.

20  **Q.**   I'd like to show you what is marked as Exhibit 494,

21  please.  This is an email from Mr. Hussain to you dated

22  January 3rd, 2010.

23          **THE COURT:**  Admitted.

24          **MR. REEVES:**  Thank you, Your Honor.

25      (Plaintiff's Exhibit 494 received in evidence)

BY MR. REEVES:

Q.   The subject here "Need help urgently re FileTek."  Do you
see that?

A.   I do.

Q.   Are you familiar with this email?

A.   I am.

Q.   It looks like Mr. Hussain is indicating that, quote, "need
to contact at least one company tomorrow," end quote.  Do you
see that?

A.   I do.

Q.   What is going on here?  What's your understanding of what
he's asking you to do?

A.   I recall being asked to get a quote for a competitive or
similar package of software.

Q.   Okay.  Why would you do that -- withdrawn.

     By this point in time, by Sunday, January 3rd, 2010, had
you consummated the quid pro quo deal with FileTek that you've
been describing?

A.   We had.

Q.   The deal is closed?

A.   Correct.

Q.   Now Mr. Hussain is asking for your urgent help regarding
FileTek to contact at least one company.  What company are you
supposed to contact?

A.   It wasn't specific, but I think we were discussing a

1    couple of different companies that had comparable products.

2    **Q.**   Why would you be looking at comparable products after

3    you've already agreed to buy FileTek's product?

4    **A.**   Because they needed to know that the price list or price

5    quote from those companies would be in the same ballpark as the

6    price paid by Autonomy.

7    **Q.**   Why was this urgent, if you know?

8    **A.**   Because it was going to be part of recognizing the revenue

9    which was always extremely quickly after the end of a quarter.

10   **Q.**   All right.  Let me show you what has been marked for

11   identification as Exhibit 2950.  This is an email from

12   Mr. Hussain to Dr. Menell and to you, Mr. Egan, on or about

13   January 4th, 2010, subject "Bullet Points."

14           **THE COURT:**  Admitted.

15       (Trial Exhibit 2950 received in evidence)

16   **BY MR. REEVES:**

17   **Q.**   Now, Mr. Hussain is writing on January 4th -- withdrawn.

18       This email pertains to the FileTek deal, does it not,

19   Mr. Egan?

20   **A.**   It does.

21   **Q.**   Okay.  And Mr. Hussain writes, "We want is" -- maybe as --

22   "what we want is unlimited access to software, say five-year

23   term, with a buyout to integrate into our DS and SPE platform.

24   We want an initial quote," etc.

25       What is your understanding of this email, Mr. Egan?

1  **A.**  I understood it to be coaching about how and what type of

2  license I was to get a comparable or quote for.

3  **Q.**  What do you mean by the term "coaching"?

4  **A.**  This was a new domain.  We had not bought software, sought

5  to pay a big price for it and then had to rationalize that that

6  was fair value or a good price, so how to go about getting a

7  comparable was new, so this is help in knowing exactly what to

8  do.

9  **Q.**  Okay.  And when he writes "we want an initial quote," what

10 is your understanding of why he would want an initial quote as

11 versus maybe some other quote?

12 **A.**  At the time, I don't think I understood that to be

13 anything other than get a quote.  Sitting here today, I read it

14 as a way to ensure that it's bigger.

15 **Q.**  Why would you want a bigger comparable quote?

16 **A.**  Because we were -- the mission we were on was trying to

17 substantiate the large amount that we paid for the FileTek

18 software, so if you get an initial quote from a competitive

19 vendor, it's always higher than the subsequent quote.

20 **Q.**  The email continues, "Given that our Z business deals with

21 10PB of data, the quote is likely to be above 10 million.  Need

22 very, very quickly, of course."

23      What is your understanding of what Mr. Hussain's point is

24 here?

25 **A.**  The "very quickly" is self-evident; needs it as fast as

1  possible.

2      The "given our Z," Z is Zantaz business.  We do deal with

3  an incredible -- large amount of data.  I think he is just

4  positing or stating that it's likely to be a very big quote.

5  Can't say if that's a reminder to me that we are trying to make

6  it as large as possible, but I already knew that.

7          **MR. REEVES:**  Two more quick exhibits, Your Honor.

8      I would like to show you what has been marked for

9  identification as Exhibit 537.  This is a part of the work

10 papers for Deloitte dated January 11, 2010.

11         **THE COURT:**  Admitted.

12     (Trial Exhibit 537 received in evidence)

13         **MR. REEVES:**  Thank you, Your Honor.

14 **Q.**   I'd like to display page 5 of Exhibit 537 and enlarge, if

15 we could, the portion about FileTek.  If we drop down a little

16 bit.  That's great.  And if you'd please highlight the

17 portion -- the paragraph that begins "following."

18     Did you have an opportunity to look at this Deloitte work

19 paper in advance of your testimony, Mr. Egan?

20 **A.**   I did.

21 **Q.**   And you did not see this in or around 2011 when -- 2010

22 when it was being prepared, did you?

23 **A.**   I did not.

24 **Q.**   All right.  So according to this work paper with Deloitte,

25 this reflects the following understanding relating to FileTek,

1    and I'm going to read it through and ask if it's consistent

2    with your recollection of the FileTek deal.  Is that clear?

3    **A.**    Okay.

4    **Q.**    "Following the technical analysis performed by Dr. Pete

5    Menell, CTO, and his team, and the competitive price quotations

6    obtained, management chose to go with FileTek as it formed the

7    most commercially-viable option based on price and technology."

8         Mr. Egan, which happened first, closing the deal or

9    analyzing the price quotations?

10   **A.**    I had agreement on the deal before any analysis, and the

11   analysis that was done, if you want to call it analysis, was

12   pretty cursory.  So I can't tell you exactly whether Pete

13   started looking into it before the signatures were done, but

14   they were done at about the same time, and I effectively had

15   the deal.

16   **Q.**    Did management choose FileTek before or after management,

17   including yourself, evaluated the competitive pricing?

18   **A.**    The deal was closed before competitive pricing was

19   obtained or evaluated.

20   **Q.**    Finally, I'd like to show you, please, what is marked for

21   identification as Exhibit 583, please.  This is a copy of the

22   report to the audit committee on the 2009 audit.

23         **THE COURT:**  Admitted.

24         **MR. REEVES:**  Thank you, Your Honor.

25         (Trial Exhibit 583 received in evidence)

1        **MR. REEVES:**  And I'd like to go to the portion of the

2    report to the audit committee that reflects Deloitte's response

3    concerning the FileTek deal on page 6 of Exhibit 583.  If we

4    could enlarge the bottom paragraph, "sale to FileTek," etc.

5    Great.  And if you could highlight, please, the portion that

6    says "was not linked to the sale of Autonomy," etc.  Do you see

7    that?  If you could highlight that middle part, "was not

8    linked."

9    **Q.**   I'm going to read this to you and ask you, Mr. Egan, if

10   this is consistent with your understanding of the FileTek deal.

11        According to the audit committee report, it says, "We have

12   reviewed" -- I think this is Deloitte speaking -- "Deloitte has

13   reviewed the accounting for sale to and the purchase from

14   FileTek.  In addition to our standard procedures, when auditing

15   revenues, we involved a member of our IT specialists to ensure

16   that the software purchased made commercial sense and was not

17   linked in any" -- I'm sorry -- "and was not in any way linked

18   to the sale of Autonomy product to FileTek."

19        Do you see that?

20   **A.**   I do.

21   **Q.**   In your view, was the sale of the software to FileTek

22   linked to the purchase of the software by Autonomy from

23   FileTek?

24   **A.**   It was.  I pitched them as linked.

25   **Q.**   Okay.  In this way, is this -- does this statement appear

1  to be untrue?

2  **A.**    It does.

3            **MR. REEVES:**  Now would be a good time, Your Honor.

4            **THE COURT:**  Okay.  Ladies and gentlemen, we are going

5  to take our recess now.  We will be in recess until 5 after

6  11:00, according to that clock, which, of course, is not even

7  accurate.

8       Remember the admonition given to you:  Don't discuss the

9  case, allow anyone to discuss it with you, form or express any

10  opinion.

11                  (Recess taken at 10:50 a.m.)

12              (Proceedings resumed at 11:07 a.m.)

13     (Proceedings were heard in the presence of the jury:)

14            **THE COURT:**  Okay.  Please be seated.

15       Okay.  Let the record reflect all parties are present, the

16  jury is present.

17       You may proceed.

18            **MR. REEVES:**  Thank you, Your Honor.

19  **Q.**    Mr. Egan, I'd like to push forward into the next quarter

20  in or around March 2010.  Is that time period clear to you?

21  **A.**    Yes.

22  **Q.**    I'd like to show you, please, what has been marked for

23  identification as Exhibit 720.  This is the Second Amendment to

24  Autonomy OEM Agreement between Autonomy and FileTek dated

25  March 31, 2010.

1              **THE COURT:**  Admitted.

2         (Trial Exhibit 720 received in evidence)

3              **MR. REEVES:**  Thank you, Your Honor.

4         And if we could just highlight the date there, March 31,

5    2010, and the dollar figure of $8.5 million.

6         Thank you very much, Ms. Margen.

7    **Q.**   In or around March 2010, Mr. Egan, did you negotiate a

8    second *quid pro quo* deal with FileTek?

9    **A.**   I did.

10   **Q.**   What did you do?

11   **A.**   I recognized the opportunity to buy more software, so one

12   side of the transaction was the sort of first idea that I had.

13   We had won a large archiving deal with Merrill Lynch and it in

14   effect was dramatically increasing the amount of storage that

15   we had in the product that we were putting the FileTek software

16   into for the first deal.  So when I looked at that, I thought,

17   "Okay, there's the opportunity to buy more."

18        We were short on revenue again, according to Sushovan, so

19   that I was looking for this kind of deal.  There weren't many

20   places I could look for this kind of deal, so with that

21   Merrill Lynch win, I thought, "Ah, there's least one side of

22   the rationale.  We could see if we can do it again and make

23   it -- increase the amounts on both sides of the deal."

24   **Q.**   Do you have the authority to close an $8.5 million deal on

25   your own?

1    **A.**    Without approval or --

2    **Q.**    Without approval.

3    **A.**    No.  No.

4    **Q.**    Why do you laugh?

5    **A.**    It's a lot of money and -- actually, I could close a deal

6    where we only sold for that amount of money; but even on that,

7    I would get approval for payment terms, the amount of software

8    given, the term, multiple aspects.

9    **Q.**    From whom would you get approval?

10   **A.**    Generally Sushovan.

11   **Q.**    All right.  Let me show you what is marked for

12   identification as Exhibit 654, please.  This is an e-mail from

13   Mr. Egan to Mr. Hussain, "Subject:  FileTek" dated March 30th,

14   2010.

15            **THE COURT:**  Admitted.

16       (Trial Exhibit 654 received in evidence)

17            **MR. REEVES:**  Thank you, Your Honor.

18       Let's go to the bottom of the e-mail, please, and let's

19   work our way through -- oh, I'm so sorry.  I misspoke.  The

20   bottom of the e-mail on the first page.  So it's the e-mail

21   from Mr. Egan to Mr. Hussain.

22       Right there.  That's great.  Thank you very much.

23       And maybe we could just enlarge this e-mail so we can all

24   see it.

25   **Q.**    So it looks like you're writing -- Mr. Egan, you're

1  writing Mr. Hussain, "Subject:  FileTek," on March 30th

2  (reading):

3          "Sush, B of A has granted us the Merrill business.

4      We will have to buy more FileTek to satisfy that contract

5      at lower hardware costs.  We may wish to pitch a deal at

6      FileTek on the last day of the quarter to get best

7      pricing.

8          "SE."

9      What did you mean by that?

10 A.   It's a misleading e-mail written by me.  I was -- I'd

11 already told Sushovan that we'd won Merrill, but I was

12 communicating the fact that we could use that and use it to

13 rationalize buying more FileTek; and, therefore, asking them to

14 buy more Autonomy as long as, again, there was a difference to

15 incentivize them.

16 Q.   You had already discussed this deal with Mr. Hussain?

17 A.   I had.

18 Q.   And what had you already discussed before you wrote this

19 e-mail?

20 A.   That it was a desirable thing to go pursue.  We needed the

21 revenue.

22 Q.   And what did Mr. Hussain say?

23 A.   He -- he said I could go do it.  I think he wanted it to

24 be less -- you know, it was a moving, fluid situation.  So at

25 this exact point all I really had was the go-ahead to go

**EGAN - DIRECT / REEVES**

1    structure it and see what could be done.

2    **Q.**    Okay.

3    **A.**    At this point I didn't know whether FileTek would want to

4    do it.

5    **Q.**    All right.  So you say that this is a misleading e-mail.

6    **A.**    It is.

7    **Q.**    What do you mean by that?

8    **A.**    Meaning for you to read it, it would be misleading.

9    **Q.**    Do you think Mr. Hussain was misled, if you know, based on

10   your conversations with him?

11   **A.**    No, I don't think he was misled.

12   **Q.**    What is the purpose of writing a misleading e-mail of this

13   type?

14   **A.**    Because I couldn't write "Hey, I want to go pitch a

15   *quid pro quo* deal" in an e-mail.

16   **Q.**    Why go through this artifice, Mr. Egan?

17   **A.**    I don't know.  It was stupid.

18   **Q.**    Okay.  (reading)

19            "B of A has granted us the Merrill business."

20       And that's the new business that you were describing

21   before?

22   **A.**    Yes.

23   **Q.**    Okay.  And was that part of the rationalization, I think

24   was the word you used to describe possibly going to FileTek to

25   acquire more StorHouse software?

1   **A.**   Correct.  In my mind, that was a good rationalization.

2   **Q.**   All right.  And this -- and you could justify another

3   *quid pro quo* deal based on this development relating to Merrill

4   Lynch?

5   **A.**   Well, to be clear, the Merrill Lynch would allow us -- it

6   was my belief that it might allow us to justify at least just

7   the side where Autonomy bought more from FileTek; and since

8   that would be a core ingredient, that was a starting point.

9   **Q.**   Okay.  Let's go to Mr. Hussain's response.  If we could go

10  up a little bit to the next e-mail.

11        Mr. Hussain writes (reading):

12             "Excellent news on the Merrill business - I know it's

13             initially about 10 million, but that it many more $M,"

14             dollar sign millions, "in subsequent data.  I am OK with

15             you pitching the deal - please keep us informed so that we

16             can do the paperwork quickly."

17        What is your understanding of Mr. Hussain's response to

18  you, Mr. Egan?

19  **A.**   My understanding was he was giving me the go-ahead to

20  pitch the deal.

21  **Q.**   Okay.  And when he writes (reading):

22             "I am OK with you pitching the deal."

23        What piece of this *quid pro quo* deal is he okay with you

24  pitching?

25  **A.**   Both parts is my understanding.

**EGAN - DIRECT / REEVES**

1  **Q.**   Both parts.  When you say "both parts," what do you mean?

2  **A.**   Meaning I've written -- I've communicated solely about

3  buying software, and that I wouldn't expect him to just say,

4  "Yeah, let's go buy a bunch more software and let's hurry up

5  and do it."

6  **Q.**   So both pitching a sale of a license and buying more

7  software from FileTek?

8  **A.**   Correct.

9  **Q.**   All right.  And right down here it says and continuing the

10  e-mail (reading):

11          "Please keep us informed so that we can do the

12      paperwork quickly."

13      Do you see that?

14  **A.**   I do.

15  **Q.**   What is that a reference to?

16  **A.**   Time is of the essence.  It's very close to the end of the

17  quarter.  So if I'm doing this, we have to do it quickly.

18  **Q.**   Here the paperwork pertains to the sale of an Autonomy

19  license to FileTek within the quarter so it can be recognized

20  as revenue?

21  **A.**   I'm sorry.  Say that again.

22  **Q.**   What does the reference "Please keep us informed so that

23  we can do the paperwork quickly," what's the paperwork that

24  needs to be done quickly on March 30th, 2010?

25  **A.**   Well, as the e-mail reads, I'm saying we may wish to --

1  this is a -- not intentionally misleading, but it's easy to

2  misunderstand what I mean by "pitch a deal at FileTek."  I'm

3  referring to let them know we want to buy software, do it at

4  the end of the quarter to get better pricing in the buy.  So

5  what's implicit in my e-mail is we wouldn't buy software if we

6  were not also selling some, so I don't mention the selling side

7  of it.

8      When Sushovan writes back, he writes "Please keep us

9  informed so that we can do the paperwork quickly," he is still

10  referring to -- he's carrying on my end-of-quarter point.  He's

11  not being specific about the selling side of the equation from

12  Autonomy to FileTek.  It's not mentioned anywhere.  It's still

13  implicit.

14  **Q.**  Okay.  All right.  In your e-mail down below you write

15  (reading):

16          "We will have to buy more FileTek to satisfy the

17      contract at lower hardware costs."

18      At this point in time was it, in fact, necessary to buy

19  more StorHouse software?

20  **A.**  No.  That was -- my original rationalization for why

21  Autonomy could and should buy StorHouse software is that it

22  would lower our hardware costs.  I fundamentally believed that

23  that was something worth pursuing and was an excellent

24  rationale for initiating one side of a *quid pro quo* deal.

25  **Q.**  Okay.  Thank you very much.

1    I'd like to show you what is marked as Exhibit 719,

2    please.  This is an e-mail from Mr. Hussain to Mr. Egan on

3    April 1st, 2010.

4         **THE COURT:**  Admitted.

5         (Trial Exhibit 719 received in evidence)

6         **MR. REEVES:**  Thank you, Your Honor.

7    If we could please display that.

8    **Q.**   So by April 1st, 2010, Mr. Egan, had you negotiated a deal

9    with FileTek?

10   **A.**   I had.

11   **Q.**   And what was the -- what had you agreed to with FileTek?

12   **A.**   I had agreed that FileTek would buy additional Autonomy

13   software and that approximately a month later Autonomy would

14   buy additional FileTek software.

15   **Q.**   And did you discuss those deal terms with Mr. Hussain?

16   **A.**   I did.

17   **Q.**   All right.  And did you discuss again this concept of

18   margin or Delta or net between the amount of money that

19   Autonomy is spending and paying to FileTek and the amount of

20   money that FileTek is making or selling to Autonomy?

21   **A.**   I did.  I discussed the difference between what each party

22   was spending and, therefore, that difference; I discussed the

23   differences in the payment terms; and I discussed the

24   differences in the timing.

25   **Q.**   What did Mr. Hussain say about those differences?

1  **A.**    Each of those things were his directive.  He was the

2  person who could decide, you know, what was okay, what was

3  desirable, what was authorized.

4  **Q.**    So the final deal terms were approved by him in this way?

5  **A.**    Correct.

6  **Q.**    Okay.  Did you discuss with Mr. Hussain in this time

7  period not putting your promise to buy more StorHouse in

8  writing?

9  **A.**    Correct.  Yes, I did.

10  **Q.**    Okay.  What did Mr. Hussain say on the topic of not

11  putting your promise to buy more StorHouse software from

12  FileTek in writing?

13  **A.**    He said we would agree to do it but not until later into

14  the next quarter.

15  **Q.**    Was it somehow important not to put that agreement in

16  writing, Mr. Egan?

17  **A.**    It was important not to put anything to do with linking

18  the agreements in writing.

19  **Q.**    Why?

20  **A.**    Because that would have sabotaged or made it possible --

21  made it that the revenue wouldn't be recognized.

22  **Q.**    Let me show you what has been marked, please, as

23  Exhibit 780.  This is an e-mail from Gary Szukalski to Mr. Egan

24  on or around April 26, 2010, with a copy to Bill Loomis.

25         **THE COURT:**  Admitted.

```
 1          (Trial Exhibit 780 received in evidence)

 2          MR. REEVES:  Thank you, Your Honor.

 3   Q.   And are you familiar with this e-mail, Mr. Egan, this

 4   proposal coming back from FileTek to Autonomy on or around

 5   April 26, 2010?

 6   A.   I am.

 7   Q.   What is this?

 8   A.   It's an e-mail from Gary Szukalski to myself copying Bill

 9   Loomis.

10   Q.   With a proposal?

11   A.   I believe it has a proposal attached.

12   Q.   Okay.  Let's go to -- okay.

13          And this is a proposal for what?

14   A.   For more of the StorHouse software.  For more of what we

15   had purchased the first time, I believe.

16   Q.   Is this the other part of the deal?

17   A.   It is.

18   Q.   All right.  I'd like to show you, please, what's marked

19   for identification as Exhibit 809.  This is, I believe, the

20   signed contracts selling more StorHouse to Autonomy in or

21   around May 11, 2010.  Are you familiar with those contracts?

22   A.   I'm not seeing it yet.

23   Q.   Are you familiar with the fact that the deal got closed in

24   or around May?

25   A.   The buy from Autonomy to FileTek?
```

**EGAN - DIRECT / REEVES**

1    **Q.**    Correct.

2    **A.**    I'm familiar it was closed.  I don't remember the specific

3    month.

4    **Q.**    All right.

5         **MR. REEVES:**  With the Court's permission, I'd like to

6    move this into evidence.

7         **THE COURT:**  809?

8         **MR. REEVES:**  809.

9         **THE COURT:**  Isn't it in?

10         **THE CLERK:**  It's already in.

11         **MR. REEVES:**  Then I'd like to please -- thank you very

12    much, Your Honor.

13    **Q.**    I'd like to show you, please, Exhibit 809 and specifically

14    page 3.

15         Is this the agreement between Autonomy and FileTek for

16    Autonomy to buy more StorHouse software in the amounts of

17    3.2 million as is reflected here?  Does that make sense to you,

18    Mr. Egan?

19    **A.**    That number seems low to me, but...

20    **Q.**    Does it seem correct when you add it to the number on

21    page 5 of $8.2 million?

22    **A.**    It does.

23    **Q.**    Okay.  And this is happening in or around May 11th, 2010?

24    **A.**    Yes.

25    **Q.**    Is this the follow-through on the verbal assurance you

1  gave to FileTek that Autonomy would buy more StorHouse from

2  FileTek?

3  **A.**    It is.

4  **Q.**    Okay.  This is the second piece of the *quid pro quo*?

5  **A.**    It is.

6  **Q.**    Now, those two deals were related in your judgment; is

7  that fair?

8  **A.**    They were.

9  **Q.**    I'd like to show you what has been marked for

10  identification as Exhibit 979.

11         **MR. REEVES:**  This is the report to the Audit Committee

12  by Autonomy Corporation on the 2010 interim review happening on

13  or around July 20th, 2010, Your Honor.

14         **THE COURT:**  Admitted.

15     (Trial Exhibit 979 received in evidence)

16         **MR. REEVES:**  Thank you.

17  **Q.**    I'd like to show you the portion of Exhibit 972 [sic], the

18  report to the Audit Committee.  It's at page 12.  Page 12 --

19         **THE COURT:**  I'm sorry.  You said -- you mean 979?

20         **MR. REEVES:**  I meant 979.  Thank you.  Sorry.

21  Exhibit 979, page 12.

22     And if we could enlarge the portion of Deloitte's response

23  relating to FileTek.  Right here (indicating).  Great.

24     And highlight the last sentence, please.  The last

25  sentence starts "We note."  Thank you very much.

1  **Q.**   Mr. Egan, did you have a chance to read this in your

2  preparation for your testimony?  Are you familiar with this

3  document?

4  **A.**   I did.  I am.

5  **Q.**   Okay.  So I'm going to read this to you and ask you if

6  this is consistent with your understanding.  Okay?

7  **A.**   Okay.

8  **Q.**   In Deloitte's response to the Audit Committee, they write

9  (reading):

10        "We note that the initial software purchased from

11     FileTek in Q4 2009 is already generating revenues."

12     Do you have an understanding of whether that is a

13  reference to the Q4 2009 purchase of StorHouse by Autonomy that

14  you've talked about today?

15  **A.**   I assume it is.

16  **Q.**   All right.  Was it, in fact, true that by this point in

17  time, in or around July 2010, the StorHouse was generating

18  revenues?

19          **MR. KEKER:**  Objection, Your Honor.  No foundation.

20          **THE COURT:**  Sorry.  Wait.

21          **MR. REEVES:**  I'll ask a different question.  I

22  withdraw the question.

23  **Q.**   Were you familiar with whether or not StorHouse in this

24  time period was, in fact, generating any revenues?

25          **MR. KEKER:**  That's irrelevant and there's no

1   foundation for his knowledge about whether or not it was

2   generating revenues.

3          THE COURT:  Well, I think -- sustained as to his

4   knowledge of the revenues of this other company.

5          MR. REEVES:  No.  This would be Autonomy's revenues

6   from StorHouse.

7          THE COURT:  Maybe I don't understand the question.

8   Let me take a look at it.

9                    (Pause in proceedings.)

10          THE COURT:  Oh, StorHouse.  You're asking the revenues

11   of StorHouse?

12          MR. REEVES:  I'm asking whether Autonomy was earning

13   revenues as a result of its purchase of StorHouse.

14          THE COURT:  Okay.  Objection overruled.

15   BY MR. REEVES:

16   Q.   Okay.  Mr. Egan, do you know whether Autonomy was earning

17   revenues as a result of its acquisition of the StorHouse

18   software in Q4 2009?

19   A.   None to my knowledge.

20   Q.   Okay.  And the sentence continues (reading):

21          "We note that the initial software purchased from

22          FileTek in Q4 2009 is already generating revenues, namely

23          through the deal signed with Kraft in December 2009."

24          Do you see that?

25   A.   I do.

1    **Q.**   Are you familiar with the deal with Kraft?  Does this make

2    any sense to you?

3    **A.**   I am familiar with the deal.  It does not make sense to

4    me.

5    **Q.**   Okay.  Do you have any reason to believe -- withdrawn.

6        Based on what your involvement was with StorHouse and the

7    acquisition of the StorHouse software and the Kraft deal, do

8    you believe that this is a true statement?

9    **A.**   I -- which statement?  The statement about Kraft?

10   **Q.**   The statement that (reading):

11           "We note that the initial software purchased from

12       FileTek in Q4 2009 is already generating revenues, namely

13       through the deal signed with Kraft in December 2009."

14   **A.**   With regards to the "namely through the deal signed with

15   Kraft in December 2009," I know that not to be true.  I --

16   **Q.**   Go ahead.

17   **A.**   To the best of my knowledge, Autonomy was not generating

18   revenue through FileTek -- through the FileTek purchase, but I

19   don't have complete knowledge.  So I'm saying I don't know if

20   there was any revenue generating -- generated due to that

21   purchase.  I do know that it didn't factor into Kraft.

22   **Q.**   Let me show you the Kraft deal, if I can, marked for

23   identification as Exhibit 2951.

24           **THE COURT:**  2951 admitted.

25       (Trial Exhibit 2951 received in evidence)

1          **MR. REEVES:**  Thank you, Your Honor.

2      So this is a deal involving Autonomy and Kraft.  If we

3  could highlight those terms in the first paragraph, please.

4  And highlight, if you would, please, the date of the deal.

5  **Q.**   Are you familiar with this deal, Mr. Egan?

6  **A.**   I am.

7  **Q.**   Okay.  What's the date of this deal?

8  **A.**   Do you want me to read that?

9  **Q.**   Is that December 18th, 2009?

10 **A.**   Correct.

11 **Q.**   Is that before or after you closed the deal to acquire the

12 StorHouse license at the end of December 2009?

13 **A.**   It's before.

14 **Q.**   I'd like to show you what has been marked for

15 identification as Exhibit 654 -- excuse me -- 650 -- 645,

16 please.  645.  This is an e-mail from Mr. Hussain to Dr. Lynch

17 on or about March 28, 2010.

18         **MR. REEVES:**  I offer it in evidence, please.

19         **THE COURT:**  Admitted.

20     (Trial Exhibit 645 received in evidence)

21         **MR. REEVES:**  If we could enlarge it, and -- I think

22 that's fine.  Thank you.

23 **Q.**   So this is not an e-mail that you're on, Mr. Hussain --

24 I'm sorry -- Mr. Egan?

25 **A.**   Yeah, it is not.

1   Q.   Okay.  Let's focus on this time period March 28, 2010.  It

2   looks like Mr. Hussain is providing Dr. Lynch a quick update

3   saying (reading):

4        "Stouff and I spoke.  He understands now.  Left

5        message for Corrado.  It's late so no response.  To get to

6        195 and 25c we need VAT and Stouffer's deal."

7   Do you have an understanding, based on your communications

8   with Mr. Hussain in this time period, what he's talking about?

9   A.   I have a general understanding of a couple of the things.

10  Q.   Go ahead.

11  A.   "Stouff and I spoke.  He understands now," I don't know

12  specifically what that relates to except for "Left message for

13  Corrado.  It's late so no response."  Corrado is an Italian

14  sales rep for Autonomy who was working on a Vatican deal.

15       The next statement, "To get to 195 and 25C" I understand

16  to mean a revenue target and an earnings-per-share target.

17       "We will need VAT," which I understand to be the Vatican

18  because of the point about Corrado.

19       And I'm not sure what "Stouffer's deal is."  I was always

20  working on multiple deals.

21  Q.   Okay.  Now, through this time period, did you have any

22  involvement in the sales process relating to the Vatican

23  Library?

24  A.   I had one -- one involvement that I recall.

25  Q.   Okay.  We'll talk about that in a moment, but was that a

1  deal that you were heavily involved in, in your view?

2  **A.**    No.

3  **Q.**    Why not?

4  **A.**    It was in Italy.

5  **Q.**    And was that part of your territory or the regions that

6  you managed the sales for?

7  **A.**    No.

8  **Q.**    Okay.  So who was -- withdrawn.

9         Did you know that the Vatican Library deal was a larger

10  sale that Autonomy was pursuing with the Vatican Library?

11  **A.**    I did.

12  **Q.**    Okay.  And how did you know that?

13  **A.**    It was talked about a lot inside the company.

14  **Q.**    All right.

15  **A.**    I knew it from Pete.  I knew it from Sushovan.  I knew it

16  from Mike.

17  **Q.**    Okay.  What did you and Mr. Hussain talk about with regard

18  to Autonomy's efforts to sell software to the Vatican Library?

19  **A.**    I knew it was ongoing.  I knew it was intense,

20  frustrating, but also very interesting.

21  **Q.**    Okay.  That's information that you got from Mr. Hussain?

22  **A.**    Yep.

23  **Q.**    I'd like to show you, if I could, please, Exhibit 646.

24  This is an e-mail from Dr. Lynch to you and Mr. Hussain dated

25  March 28th, 2010.

1          **THE COURT:**  Admitted.

2      (Trial Exhibit 646 received in evidence)

3          **MR. REEVES:**  Thank you, Your Honor.

4  **Q.**  From time to time would Dr. Lynch circulate his own sort

5  of spreadsheet or calculations about how Autonomy was doing in

6  terms of hitting its revenue objectives for a quarter?

7  **A.**  Yes.

8  **Q.**  If we go to page 2, is this an example of Dr. Lynch

9  circulating his own calculations about where you are in the

10  quarter.  Is that how you read this document?

11  **A.**  That looks to be an example of one of Mike's sheets, yeah.

12  **Q.**  Did you see that from time to time?

13  **A.**  From time to time.

14  **Q.**  All right.  Is that consistent with your recollection

15  about Dr. Lynch's involvement in the revenue for the quarter?

16  **A.**  It is.

17  **Q.**  Did he pay attention to those issues within Autonomy?

18  **A.**  Yes, he did.

19  **Q.**  How closely?

20  **A.**  Very closely.

21  **Q.**  Again, you're almost laughing a little bit.  I know you're

22  not really laughing, but --

23  **A.**  I don't mean to.

24  **Q.**  Are you suggesting that he paid very close attention?

25  **A.**  Yes.

1   Q.   There's an indication here of "15 VAT."  What's that a

2   reference to, if you know, as you read this document?

3   A.   As I read the document and given the time period, I

4   interpret it to be a reference to the Vatican deal.

5   Q.   15 million in revenue from the Vatican deal?

6   A.   The 15 I interpret to be a reference to million, yes.

7   Q.   That's what Dr. Lynch is hoping for in this calculation,

8   so to speak?

9   A.   Planning on or considering eligible at this moment.  I

10  don't remember the date exactly.

11  Q.   Let's go back.  The date is March 28th, 2010.

12  A.   Okay.

13  Q.   Does that help you?

14  A.   Yeah.

15  Q.   Let's take another look at another example of that.

16       Now, three days later on March 31st.  This is Exhibit 680.

17  It's another e-mail from Dr. Lynch to Mr. Hussain and to you,

18  Mr. Egan.

19       **THE COURT:**  Admitted.

20       (Trial Exhibit 680 received in evidence)

21       **MR. REEVES:**  Thank you, Your Honor.

22       Exhibit 680.  Great.  And if you could highlight, please,

23  Ms. Margen, the attachment "SH route to 25c."

24  Q.   Do you see that?

25  A.   I do.

**EGAN - DIRECT / REEVES**

1  Q.   Do you have an understanding what Dr. Lynch means by that

2  terminology there?

3  A.   I think I do.

4  Q.   What is it?

5  A.   Sushovan route to 25 cents in EPS.

6  Q.   EPS.  EPS is again?  What is that?

7  A.   Earnings per share.

8  Q.   Is that a major market metric for public companies like

9  Autonomy?

10  A.   It is.

11  Q.   Would that be a type of financial performance metric that

12  is announced publicly to -- at the conclusion of the quarter to

13  the market?

14  A.   It is.

15  Q.   Let's take a look at Dr. Lynch's calculation now on

16  March 31st.  The numbers for the Vatican have changed, have

17  they not?

18  A.   They have.

19  Q.   They are now up to what?

20  A.   22.5.

21  Q.   Thank you very much.

22       I'd like to show you what is marked as Exhibit 714.  This

23  is an e-mail from Mr. Egan to John Cronin dated April 1st,

24  2010, attachment "Vatican for Support Document."

25       **THE COURT:**  Admitted.

1          (Trial Exhibit 714 received in evidence)

2              **MR. REEVES:**  Thank you, Your Honor.

3   **Q.**   All right.  Mr. Egan, do you recall this e-mail, this

4   document?

5   **A.**   I do.

6   **Q.**   Okay.  What is this?  What's going on here?

7   **A.**   It was me sending John Cronin the products that

8   MicroLink -- I think it was MicroLink or MicroTech -- needed to

9   support for the Vatican deal.

10  **Q.**   All right.  Let's take a look at the attachment to

11  Exhibit 714.  Are these the products that you're referring to?

12  **A.**   I believe they were.

13  **Q.**   And this pertains to the Vatican?

14  **A.**   I believe they do.

15  **Q.**   If we go down to the second page, we go up a little bit to

16  Number 10, there's a reference to Vatican in here.  And the

17  dollar amounts are what?

18  **A.**   11.550 million.

19  **Q.**   Okay.  Did you speak to Sushovan Hussain about this deal

20  in this time period?

21  **A.**   I did.

22  **Q.**   Okay.  What did you and he discuss?

23  **A.**   Taking it through a reseller.  Taking a portion of it

24  through a reseller.  The actual deal was worth more than this.

25  **Q.**   Okay.  And why would you take a portion of the deal

1   through a reseller?  Why would you do that?

2   **A.**   Because we needed the revenue.

3   **Q.**   What did Mr. Hussain ask you to do?

4   **A.**   To take it through a reseller and he gave me the amount.

5   **Q.**   Is that where you got the $11.5 million figure?

6   **A.**   Yes.

7   **Q.**   Okay.  And is that what you're doing here?

8   **A.**   At this point I think I'm just sending the details to --

9   of the products to MicroTech or to John Cronin for MicroTech.

10  **Q.**   All right.  Do you recall anything else -- doing anything

11  else with regard to this Vatican deal at this point?

12  **A.**   At this point, no.

13  **Q.**   Okay.  In or around this time period do you recall

14  speaking with Dave Truitt about the possibility of doing this

15  deal?

16  **A.**   Oh, yes.

17  **Q.**   Okay.  What do you recall speaking with Dave Truitt about?

18  **A.**   I asked him if he thought that Steve would take the

19  MicroTech deal through -- or the Vatican deal through

20  MicroTech.

21  **Q.**   All right.  What's the purpose of having -- reaching out

22  to Dave Truitt and asking them to take this deal?

23  **A.**   For revenue.  If they go at risk and buy the deal, then

24  Autonomy can recognize the revenue.

25  **Q.**   Was the Vatican deal discussed internally at Autonomy in

**EGAN - DIRECT / REEVES**

1    this time period?

2    **A.**    Yes.

3    **Q.**    And from your view from what you could tell, who was

4    really running the deal or in charge of the deal?

5    **A.**    Corrado and Sushovan.

6    **Q.**    Okay.  And why are you asked to become involved in this

7    manner?

8    **A.**    Because I'm the person who had the relationship with the

9    reseller.

10    **Q.**    All right.  And -- okay.  Thank you very much.

11                        (Pause in proceedings.)

12    **BY MR. REEVES:**

13    **Q.**    Whose idea was it to reach out to a U.S. reseller

14    regarding this Vatican deal, Mr. Egan?

15    **A.**    Sushovan's.

16    **Q.**    I'd like to move forward in time, if I could, please, to

17    in or around the summer of 2010 and show you, if I could,

18    please, what is marked for identification as Exhibit 1038.

19        This is an e-mail from Dr. Lynch to Mr. Hussain and you on

20    the subject of the VA.

21            **MR. REEVES:**  I offer it in evidence, please.

22            **THE COURT:**  Admitted.

23        (Trial Exhibit 1038 received in evidence)

24    **BY MR. REEVES:**

25    **Q.**    Mr. Egan, it looks like on or around August 7th, 2010,

1  Dr. Lynch is reaching out to you and to Mr. Hussain, "Weekly

2  Status Report on VA."  Is that a reference to the Veterans

3  Administration?

4  **A.**   It is.

5  **Q.**   All right.  Were you involved in work in trying to sell

6  software to the VA in this time period?

7  **A.**   I was.

8  **Q.**   What were you doing?

9  **A.**   In this time period I think I was just starting to get

10  involved.

11  **Q.**   All right.  And did you talk about this deal with

12  Mr. Hussain?

13  **A.**   I'm sure.

14  **Q.**   Okay.  And it looks like Dr. Lynch is writing down below,

15  and let's highlight the second or the second-to-the-last

16  sentence.  It begins "We cannot."  (reading)

17        "We cannot act like muppets on a deal of this size...

18    Break the rules and do it right."

19    Do you have an understanding of what Dr. Lynch is talking

20  about here?

21  **A.**   I do.

22  **Q.**   What is your understanding?

23  **A.**   "Muppets" is a very derogatory term akin to "idiots."  So

24  he had heard of or I think maybe participated in a call and

25  understood us to be not doing everything exactly right or the

1    way that we like to think we would do things in terms of

2    winning and selling this deal.  So he was very upset by that

3    and wrote this e-mail.

4    **Q.**   How typical is this as some of the direction you received

5    from Dr. Lynch about closing deals?

6    **A.**   This kind of reprimand, you know, fire-and-fury-type

7    e-mail would be occasional.  You know, a way to keep everybody

8    on their toes every so often.  If he got wind of something that

9    was being mishandled, he would come in hard like this.

10   **Q.**   Okay.  I'd like to show you what's marked for

11   identification as Exhibit 1056, please.  This is an e-mail from

12   Mr. Hussain to you on or around September 8th, 2010, "Subject:

13   VA."

14              **THE COURT:**  Admitted.

15        (Trial Exhibit 1056 received in evidence)

16   **BY MR. REEVES:**

17   **Q.**   In this e-mail, Mr. Egan, it looks like Mr. Hussain is

18   saying (reading):

19              "Which partner - would be through a SEWP partner -

20        other than MT and ML?  Immix?"

21        Do you have an understanding of what Mr. Hussain is asking

22   or discussing with you here?

23   **A.**   I do.

24   **Q.**   What is your understanding?

25   **A.**   At this point we're contemplating taking VA or part of VA

1    through a partner.  There was a particular kind of partner,

2    this acronym SEWP, that would be better.  He states -- he's

3    asking about which partner we could do this through other than

4    MicroTech and MicroLink, and he suggests or questions whether

5    we could use a partner called Immix.

6    **Q.**    Why not use MicroTech or MicroLink?

7    **A.**    I understood it to be that there was too much already with

8    them, so the concept --

9    **Q.**    Like what?

10   **A.**    The concept I mentioned earlier called load, or whether it

11   was just they had too much that they had bought at risk or

12   whether they owed too much money or whether we were doing too

13   much business from them.  It didn't really matter.  It was up

14   to Sushovan which reseller could take a deal or not.  He was

15   letting me know he doesn't want to consider those two.

16   **Q.**    In your discussions with Mr. Hussain about the deals with

17   the resellers, did he select, in the way you're describing

18   here, the resellers?

19   **A.**    It was a collaborative process but he ultimately had to

20   approve which one you took because it would either be

21   recognizable or not based on the status or the condition, so...

22   **Q.**    Now, here the subject is VA.  Is that Veterans Affairs?

23   **A.**    It is.

24   **Q.**    Not to be confused with VAT?

25   **A.**    Veterans Administration I think, yeah.

1   **Q.**   Veterans Administration.  Thank you.  That's the federal

2   agency; is it not?

3   **A.**   Yes.

4   **Q.**   It's not to be confused with VAT, short for the Vatican?

5   **A.**   Correct.

6   **Q.**   I'd like to show you, if I could, Exhibit 1076.  This is

7   an e-mail from Mr. Hussain to you, Mr. Egan, closer to the end

8   of the quarter on or about September 27, 2010.

9            **THE COURT:**  Admitted.

10   (Trial Exhibit 1076 received in evidence)

11            **MR. REEVES:**  Thank you, Your Honor.

12   **Q.**   It looks like Mr. Hussain is writing to you "Subject:

13   Really do need DB, B of A, VA and one other (EMC)!!"

14        Do you have an understanding, Mr. Egan, as to what

15   Mr. Hussain is raising with you here?

16   **A.**   Reading just the subject, because this is a reply, but if

17   I were interpreting just the subject, he's saying, "I really

18   need the Deutsche Bank deal, B of A deal, VA deal, and one

19   other," and he's asking -- I interpret the parens to mean maybe

20   EMC.

21   **Q.**   Okay.  And really need these deals to what end?

22   **A.**   To hit the number for the quarter.

23   **Q.**   So that includes the VA deal?

24   **A.**   That's the way I interpret that, yes.

25   **Q.**   What was the status of the VA deal by the end of

1    September 2010?

2    **A.**    With the end customer it was not closed yet.

3    **Q.**    Okay.  So what did you do?

4    **A.**    I believe in that quarter we did end up taking it through

5    a reseller.

6    **Q.**    I'd like to show you what has been marked for

7    identification as Exhibit 1085.  This is a reseller agreement

8    signed by you, Mr. Egan, on or about September 30th, 2010, with

9    William Loomis from FileTek with the end user Veterans

10   Administration.

11             **THE COURT:**  Admitted.

12        (Trial Exhibit 1085 received in evidence)

13             **MR. REEVES:**  Thank you, Your Honor.

14        If we could go to page 2 of Exhibit 1085.

15   **Q.**    Is this the reseller agreement that Autonomy entered into

16   with FileTek regarding VA?

17   **A.**    It is.

18   **Q.**    And what is your recollection about how this came to be?

19   **A.**    I ultimately pursued and asked FileTek if they would be

20   interested in being a one-time reseller of the VA deal, or a

21   portion of the VA deal I think it was.

22   **Q.**    Okay.  And in or around this time period, did you have a

23   call or any type of -- set of calls with FileTek that involved

24   Mr. Hussain?

25   **A.**    I believe I did.

**EGAN - DIRECT / REEVES**

1  **Q.**   Okay.  What do you recall with regard to negotiating with

2  FileTek being a reseller and your conversations that included

3  Mr. Hussain?  What happened, please?

4  **A.**   I approached FileTek about being a reseller.  They had

5  either a close partner or a related party that they suggested

6  could be that reseller.  Sushovan and I pursued that reseller.

7  That reseller ultimately didn't pass the test to be eligible to

8  be a reseller and take the -- take the deal.

9       We came back to FileTek and asked them if they would do

10  it, and ultimately they said they would be interested.

11  **Q.**   What's FileTek's upside or incentive for taking this deal?

12  **A.**   A margin.

13  **Q.**   Did you discuss in your conversations, including

14  Mr. Hussain and the representatives of FileTek, the extent of

15  the status of the sales process to the VA and how close the

16  deal was to closing?

17  **A.**   We did.

18  **Q.**   What did you say?

19  **A.**   We let them know how close it was to closing.  It was a

20  very -- very solid deal in that -- this is kind of complex, but

21  Autonomy was -- our products were included in the proposal from

22  each of the competitors for the deal.  In other words, no

23  matter who won the deal, Autonomy would win the deal because

24  there was another -- there was a primary -- prime contractor

25  it's called -- four of them selling to the VA.  Our software

1   was included in each of those bids.

2   **Q.**   So at the time --

3   **A.**   It doesn't mean it's 100 percent guaranteed, but relative

4   to the way this whole world and selling process would work,

5   it's a very, very high probability that you're going to win.

6   **Q.**   That's what you thought in or around September 30th, 2010?

7   **A.**   Correct.

8   **Q.**   All right.  And that's what you conveyed to FileTek?

9   **A.**   Correct.

10  **Q.**   All right.  And that's what was conveyed in the

11  conversation that included Mr. Hussain with FileTek?

12  **A.**   Correct.

13  **Q.**   Okay.  Is that the way it worked out?

14  **A.**   It's not.

15  **Q.**   What happened?

16  **A.**   The deal just dragged on forever.  They just kept not

17  making a decision or choosing a winner one way or the other.

18  **Q.**   Is that a common on the federal government?

19  **A.**   It's not uncommon.

20  **Q.**   Okay.  Thank you very much.

21       Let's shift to another deal in Q3 2010.  I'd like to show

22  you, please, Exhibit 1104, please.

23       This is a purchase order from Capax to Autonomy, end user

24  Amgen, signed by Mr. Egan, dated September 30th, 2010?

25            **THE COURT:**  Admitted.

1          (Trial Exhibit 1104 received in evidence)

2          **MR. REEVES:**  Thank you, Your Honor.

3     **Q.**   Mr. Egan, are you familiar with a reseller deal with Capax

4     in or around late September 2010 with an end user Amgen?

5     **A.**   I am.

6     **Q.**   What is your understanding of this deal?  What was your

7     involvement?

8     **A.**   I was working on the deal with Amgen.  I got news it was

9     not going to happen in that period but was going to happen very

10    shortly thereafter.  I propositioned Capax whether they would

11    take it before the end of the quarter and resell it after when

12    it closes.

13    **Q.**   Did you discuss that with Mr. Hussain at or about the time

14    that you're doing it?

15    **A.**   I did.

16    **Q.**   And what did you and he decide?

17    **A.**   He accepted that Capax would be eligible for that, that

18    we'd be able to recognize it, and I pursued selling it to them.

19    **Q.**   All right.  At this point where was Capax in terms of its

20    load or its ability to pay for this license?

21    **A.**   I don't recall.

22    **Q.**   Do you recall whether, whatever the status was, they were

23    in a position where they could pay for the license and have the

24    collectibility to pay for the license?

25    **A.**   They were judged to.

1   **Q.**   They were judged by whom?

2   **A.**   By Sushovan.

3   **Q.**   Is that because of the --

4   **A.**   Or could be Steve Chamberlain.  Sometimes he would have

5   Steve do that.

6   **Q.**   Okay.  Is that because of the payment of the EDD

7   outsourcing fees that you've described?

8   **A.**   In part that would be the case, yes.  I mean, they had

9   amounts owing to Autonomy still at this point through that

10   obligation, and they were still receiving Autonomy POs and

11   payments.

12   **Q.**   Is that -- let me show you what has been marked for

13   identification as 1115, please.  This is an e-mail, a portion

14   of it, it gets -- this is an e-mail from Mr. Hussain to Matt

15   Stephan and a copy to Steve Chamberlain that is then circulated

16   among Mr. Stephan and Mr. Egan in or around September 30th,

17   2010, "Subject:  Capax."

18            **THE COURT:**  Admitted.

19       (Trial Exhibit 1115 received in evidence)

20            **MR. REEVES:**  Thank you, Your Honor.

21   **Q.**   So let's go through this.  There's an e-mail chain here

22   that starts with Jim Crumbacher on September 30th on page 3.

23       If we keep going down a little bit.  That's great.

24       So Mr. Crumbacher is writing in this e-mail at the very

25   bottom -- and let's go to the next page, if we could -- and

1    he's setting forth -- all the way down -- (reading)

2            "Please have POs issued to Capax for the following

3        amounts..."

4        Do you see that?

5    **A.**    I do.

6    **Q.**    Do you have an understanding as to what is going on in

7    this late September 2010 time period, Mr. Egan?

8    **A.**    I do.  This is late September?

9    **Q.**    September 30th, 2010.

10   **A.**    Okay.

11   **Q.**    At or about the time of the reseller deal with Capax.

12   **A.**    Okay.

13   **Q.**    And there is a discussion about the purchase orders issued

14   to Capax for the following amounts.  Do you see that?

15   **A.**    I do.

16   **Q.**    Okay.  Is there any correlation between the need to issue

17   purchase orders to Capax in order for Capax to be in a position

18   to be a reseller on the Amgen license?

19   **A.**    There's an inherent correlation because issuing POs to

20   Capax and paying them as a result gives them cash that I would

21   then generally ask them to pay down debts that they had.

22   **Q.**    Okay.  Good.

23       Let's go up the e-mail and, let's see, Mr. Hussain

24   responds in this e-mail chain.  If we keep going up a little

25   bit.

1      It looks like Mr. Hussain is eventually approving these

2 payments.  Would you agree?

3 **A.**   Yes.

4 **Q.**   All right.  That's what is meant by "OK"?

5 **A.**   Correct.

6 **Q.**   Okay.  Now, I'd like to show you what's marked for

7 identification as Exhibit 1209.  This is an e-mail from

8 Mr. Hussain to you and Dr. Lynch dated November 10, 2010.

9           **THE COURT:**  Admitted.

10      (Trial Exhibit 1209 received in evidence)

11           **MR. REEVES:**  And let's enlarge the top half.  I'm

12 sorry.  Let's just slide the e-mail up a little bit, please, so

13 that we can see the top part.  I'm multitasking now.

14      All right.  Let's just highlight the Amgen piece right

15 here at the bottom.  That's great.

16 **Q.**   So according to the e-mail, Mr. Hussain is writing to you

17 and Dr. Lynch, "Subject:  Big Deals Update."  Do you see that?

18 **A.**   I do.

19 **Q.**   And this is in November 2010.  This is approximately --

20 what? -- almost six weeks after the close of the third quarter

21 and the reseller deal with Capax and Amgen, is it not?

22 **A.**   Yes, it is.

23 **Q.**   In or around this time period, does Autonomy continue to

24 try to sell to Amgen and try to close the deal directly with

25 Amgen?

1    **A.**    Yes.

2    **Q.**    Okay.  Are you devoting time and sales resources to that

3    process?

4    **A.**    I am.  Recall I tend to feel even more obligated if

5    someone has spoken up for it.

6    **Q.**    That's the point that you made yesterday afternoon?

7    **A.**    Correct.

8    **Q.**    Well, that's the point I'd like to ask you about.

9        Is this an example of you having to continue to sell after

10   you've already taken the revenue from the reseller deal in the

11   manner you described yesterday?

12   **A.**    Yes, myself and others.

13   **Q.**    This is an example of the hole that you described?

14   **A.**    Yes.  I would be -- in trying to get Amgen closed, I would

15   be trying to come out of the hole -- that hole.  I may be

16   technically out of the hole by November 10th --

17   **Q.**    This is --

18   **A.**    -- but it depends on how you count things, so...

19   **Q.**    All right.  This is reflective of that concept that you

20   were describing yesterday, is it not?

21   **A.**    It is.

22   **Q.**    Thank you very much.

23       I'd like to move forward, if I could, to in or around

24   December 2010.  I'd like to show you, please, Exhibit 1274 for

25   identification, an e-mail from Mr. Hussain to Dr. Lynch on or

1  about December 10th, 2010.

2          **THE COURT:**  Admitted.

3      (Trial Exhibit 1274 received in evidence)

4          **MR. REEVES:**  Thank you, Your Honor.

5  **Q.**  And let's read through this carefully.  So this is an

6  e-mail that you're not on, Mr. Egan, but I think I'm going to

7  ask you about whether you were doing any of the work on any of

8  the deals that are in it.  Is that clear?

9  **A.**  Okay.

10  **Q.**  All right.  It looks like Mr. Hussain is writing to

11  Dr. Lynch (reading):

12          "Really don't know what to do, Mike.  As I guessed,

13      revenue fell away completely, yet SMS report shows massive

14      activity.  But I speak with the VPs who are far more

15      accurate.  Also, Stouff, Joel, and Mike I think keep

16      separate sheets and unless I am very wrong, don't discuss

17      the sheets; hence, plane crashes and they don't know.

18      We've covered up with B of A and hopefully DB and DOI, but

19      if latter two don't happen, it's totally bad.  There are

20      swaths of reps with nothing to do, maybe chase imaginary

21      deals.

22          "So radical action is required, really radical.  We

23      can't wait anymore.

24          "Everywhere I look at us IDOL.  It's bad."

25          **MR. KEKER:**  "U.S."  "Everywhere I look at U.S. IDOL"

1  it says.

2  **THE WITNESS:**  That's correct.

3  **MR. REEVES:**  "Everywhere I look at U.S. IDOL, it's

4  bad."

5  **Q.**  Okay.  Is this consistent -- these difficulties that are

6  described by Mr. Hussain, is this consistent with your

7  understanding of difficulties you were having with the sales

8  process in this period December 2010?

9  **A.**  It is.

10  **Q.**  Okay.  And there's a reference in here to B of A.  Do you

11  see that?

12  **A.**  I do.

13  **Q.**  In this time period were you working on a major deal

14  involving B of A?

15  **A.**  I was.

16  **Q.**  What was your involvement in this deal involving B of A?

17  **A.**  Very heavy involvement.

18  **Q.**  Tell us what you did, please.

19  **A.**  I conceived of it, initiated the pitch, and then just

20  started methodically working on it.

21  **Q.**  How big a deal was it?

22  **A.**  It ended up being very large.

23  **Q.**  Okay.  One of the biggest you've ever done?

24  **A.**  Yes.

25  **Q.**  Okay.  Did you discuss the B of A deal with Sushovan

1    Hussain?

2    **A.**    Yes.  He worked on it with me a lot.  It was -- he was

3    instrumental.

4    **Q.**    There's a portion of Mr. Hussain that says, "We've covered

5    up with B of A," et cetera.  In the context of this e-mail, as

6    you read it, what is your understanding of the point

7    Mr. Hussain is making?

8    **A.**    At this point on December 10th we think we're going to get

9    that 21- or $22 million deal with B of A done inside of Q4.  So

10   it's a huge chunk of revenue.

11   **Q.**    Okay.  For this quarter Q4 2010?

12   **A.**    Correct.

13   **Q.**    All right.  Do you, in fact, close the B of A deal

14   directly with B of A in Q4 2010?

15   **A.**    Unfortunately, not.

16   **Q.**    Was that a source of disappointment?

17   **A.**    Yes.

18   **Q.**    I'd like to show you what is marked as Exhibit 1384,

19   please.  This is an e-mail from Mr. Hussain to persons at

20   B of A and with a copy to you on or around December 31, 2010,

21   that then is responded to by people from Bank of America to

22   Mr. Hussain with a copy to you.

23          **THE COURT:**  Admitted.

24          (Trial Exhibit 1384 received in evidence)

25          **MR. REEVES:**  Thank you, Your Honor.

1        If we could, please, let's go down to the lower e-mail

2   from Mr. Hussain.  And if we could, please, highlight -- if we

3   can just highlight the first sentence, please.  That's great.

4   **Q.**   So it looks like Mr. Hussain is writing on December 31,

5   2010, to people at -- Reagan Smith.  Do you know who Reagan

6   Smith is?

7   **A.**   I do.

8   **Q.**   Who was Mr. Smith?

9   **A.**   He was our point of contact in procurement at B of A.

10  **Q.**   All right.  And at this point what's the status of

11  Autonomy's ability to close the B of A deal directly with

12  B of A in December 2010?

13  **A.**   At this point what's the status?

14  **Q.**   Yes.

15  **A.**   We had been informed that they couldn't get the final

16  signatures on it at this point.

17  **Q.**   All right.  And it looks like Mr. Hussain is writing

18  (reading):

19          "Vince & Reagan, thanks for your message (even though

20      it was bad news)."

21      What's the bad news here?

22  **A.**   That it wouldn't get done in the quarter.

23  **Q.**   All right.  Thank you very much.

24      I'd like to show you what is marked as Exhibit 1549.  This

25  is the Fourth Amendment to Application Service Provider

1  Agreement between Autonomy and B of A dated February 8, 2011.

2         **THE COURT:**  Admitted.

3         (Trial Exhibit 1549 received in evidence)

4         **MR. REEVES:**  Thank you, Your Honor.

5  **Q.**  Are you familiar with this deal, Mr. Egan?

6  **A.**  Is this the end B of A deal?

7  **Q.**  Well, let's take a look.  I show you the dollar amounts on

8  page 6.

9  **A.**  Yeah, I don't recognize the number of the amendment but,

10 yeah.

11 **Q.**  Do you recognize that dollar figure?

12 **A.**  I do.

13 **Q.**  $19.5 million plus?

14 **A.**  I do.

15 **Q.**  Is this the major deal you were working so hard on?

16 **A.**  It is.

17 **Q.**  When does it finally close?

18 **A.**  I think you just said February 8th.

19 **Q.**  Okay.  Were you proud of this accomplishment?

20 **A.**  Very.

21 **Q.**  One of the biggest deals you did at Autonomy?

22 **A.**  Yep.

23 **Q.**  All right.  And how much work did you put into the sales

24 process around B of A?

25 **A.**  I don't know.

**Q.**   Is it hard to calculate?

**A.**   Yeah.

**Q.**   Was it a great deal of time?

**A.**   Yes, a lot of time.

**Q.**   Let me ask you a question.  Are you familiar with a
company known as SHI?

**A.**   No.

**Q.**   Are you familiar with whether B of A acquired its hardware
from a computer supplier known as SHI?

**A.**   I don't know.

**Q.**   Okay.  Were you aware -- at the time that you were working
hard in the manner you've described on the B of A sales
process, were you aware of sales of hardware -- no margin,
negative margin -- sales of hardware by Autonomy to SHI, the
technical supplier for B of A?  Were you aware of that?

**A.**   I was not.

**Q.**   If in the time period of 2010 Autonomy had sold
approximately $34.5 million worth of hardware at a loss to
Autonomy to SHI, the computer supplier for B of A, would that
be a useful fact for you to know in engaging in your sales
practice with regard to selling software to B of A?

**A.**   Did B of A know -- would B of A have known they were being
sold to at a discount?

**Q.**   Assume that the idea is that they know.  Would you, as the
person within Autonomy who's trying to sell software to B of A,

1  want to know about any sales by Autonomy effectively directly

2  to B of A at a loss of hardware components?  Would that be

3  helpful to you as a salesperson?

4  **A.**   If it was -- if it was like the deal that I did with and

5  for Morgan Stanley where they got benefit from their hardware

6  purchase that was substantial, then, yes, I would want to know.

7  I would probably use that in the overall exchange of good will

8  and negotiation of doing the large software deal.

9  **Q.**   If Autonomy had incurred major loss-leading expenses in

10  order to gain entree to B of A by selling hardware at a loss,

11  the purpose of which is intended to promote software sales,

12  would you as a software salesperson want to know that?

13  **A.**   Yes.

14  **Q.**   Okay.  Did you know that?

15  **A.**   I did not.

16  **Q.**   Did you know that Autonomy in this time period had sold

17  approximately $34.5 million worth of hardware at a loss to the

18  computer supplier known as SHI for B of A?

19  **A.**   I did not.

20  **Q.**   Okay.  Wouldn't that be of value in trying to close a deal

21  with B of A, Mr. Egan?

22  **A.**   I would -- yes, I would think.

23      **THE COURT:**  Is this an appropriate time for a recess?

24      **MR. REEVES:**  Any time you say is an appropriate time,

25  Your Honor.

1          **THE COURT:**  Well, I got that part because somebody has

2     to be in charge.  Well, let's do it now.

3          Okay, ladies and gentlemen, we're going to take our

4     recess.  We'll resume at 1:00 o'clock.

5          Remember the admonition given to you:  Do not discuss the

6     case, allow anyone to discuss it with you, form or express any

7     opinion.

8          We'll resume at 1:00 p.m.

9               (Luncheon recess taken at 12:08 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    <u>Afternoon Session</u>                                    <u>1:06 p.m.</u>

2         (Proceedings were heard in the presence of the jury:)

3         **THE COURT:**  Let the record reflect all jurors are

4    present; parties are present.

5         You may proceed.

6         **MR. REEVES:**  Thank you, Your Honor.

7    **Q.**   I'd like to, please, show you, Mr. Egan, what has been

8    marked as Exhibit 1291.  This is an email from Mr. Hussain to

9    you on or around December 15, 2010, subject "about buying VMS."

10        **THE COURT:**  Admitted.

11        (Trial Exhibit 1291 received in evidence)

12   **BY MR. REEVES:**

13   **Q.**   In or around December 2010, Mr. Egan, did you -- were you

14   involved in a sale with VMS?

15   **A.**   I was.

16   **Q.**   And what was your involvement?

17   **A.**   Very involved; communicating, pitching.

18   **Q.**   Was this another quid pro quo deal?

19   **A.**   I believe it was.

20   **Q.**   Did you discuss the details of this deal with Mr. Hussain?

21   **A.**   I did.

22   **Q.**   What did you and Mr. Hussain talk about with regard to

23   this quid pro quo deal involving VMS?

24   **A.**   We collaborated on a bunch of the parameters as they moved

25   around:  How much they would buy, how much we could buy, what

1   we would buy, how we would structure the payment terms, the

2   difference.

3   **Q.**   Is that being discussed in parts of this email from

4   Mr. Hussain on December 15th?

5   **A.**   Parts of that, yes.

6   **Q.**   Mr. Hussain writes "Ideas:  We sell hardware for 5

7   million.  We provide financing, say one year to pay.  This has

8   value.  We sell the connectors, extensions, etc., for

9   5 million, inc," including, "5 percent maintenance.  We prebuy

10  their services at list, etc., for $4 million."

11       Do you see that?

12  **A.**   I do.

13  **Q.**   What is your understanding, based on your involvement in

14  this deal, about what Mr. Hussain is talking about?

15  **A.**   We're in the stage of formulating the deal, and he's

16  submitting ideas.  Autonomy is selling the hardware.  By

17  providing financing, he means -- he makes two points, really.

18  One, that they wouldn't have to pay the whole finance or the

19  whole fee for the hardware up front which technically has

20  interest value to them.

21       We, meaning Autonomy, would sell the connectors,

22  extensions, etc.  That is a reference to software products,

23  Autonomy software products.  That would be for 5 million,

24  inclusive of maintenance.  The maintenance is in the 5 million.

25       We prebuy their services, that means we would up front buy

1  their services for some period of time, period of years, I

2  think.

3      "At list" is a reference to buying them at their full

4  value.  Gives a dollar amount.

5      And then "there has to be a strong branding of VMS and

6  cross-selling opportunities."  I'm not entirely clear of what

7  the branding point was, but the cross-selling is, I believe, a

8  reference to the fact that once we had their services inside of

9  our product, we would sell extended aspects of their services

10 into our customer, if I remember correctly.

11 **Q.**   In the manner you've described, is this a deal in which

12 Autonomy is both selling hardware and software to VMS and

13 buying products from VMS at the same time?

14 **A.**   It is.

15 **Q.**   I'd like to show you what has been marked as Exhibit 1295,

16 please.  This is an email chain, a portion of which includes an

17 email from you, Mr. Egan, to Mr. Hussain on or around

18 December 16, 2010, subject "VMS actions."

19         **THE COURT:**  Admitted.

20         **MR. REEVES:**  Thank you, Your Honor.

21     (Trial Exhibit 1295 received in evidence)

22 **BY MR. REEVES:**

23 **Q.**   If we go down -- let's go down to the email below in the

24 chain.  Yeah.  Right here is good.  Thank you very much,

25 Ms. Margen.  A little bit further down.  Sorry.  Okay.  Right

1    here.  And if you would highlight -- there is a $10 million

2    deal here.  And the next sentence below that, please.

3           Mr. Egan, in this time period, are you writing to

4    Mr. Hussain about aspects of this VMS transaction?

5    **A.**   I'm writing to Nicole, Sushovan, Jim and Pete Menell, yes.

6    **Q.**   You say, "Good meeting today.  Here is summary in actions.

7    There is a $10 million deal here."  What do you mean by that?

8    **A.**   That's a reference to the amount of potential revenue to

9    Autonomy, what could be in the deal that we're discussing.

10   **Q.**   Is this the same quarter in which we looked before the

11   break that there seemed to be a real need for revenue as

12   expressed by Mr. Hussain in his email to Dr. Lynch?

13   **A.**   I believe so.  The one about BofA --

14   **Q.**   Yes.  This is the same quarter as BofA; right?

15   **A.**   Same quarter as we hoped BofA would close in.

16   **Q.**   Thank you very much.

17          You also write, "We need to verify we can supply

18   approximately 5 to $6 million in hardware through bonded

19   warehouse."  What did you mean by that?

20   **A.**   The $10 million deal that I'm talking about has -- 5 to $6

21   million of that is in hardware, and at this point, I'm now

22   aware of the fact that you have to have that hardware available

23   or in bonded warehouse, basically satisfying delivery to

24   recognize the revenue.  So without that, my 10 might not be

25   true or it might be lesser.

1    **Q.**    All right.  Thank you very much.

2        Let's move forward in time, please, to in or around April

3    2011, sometime in the time period immediately after the close

4    of the first quarter of 2011 on or about March 31st, 2011.  Is

5    that time period clear to you?

6    **A.**    It is.

7    **Q.**    I would like to show you what has been marked for

8    identification as Exhibit 1727.  This is an email from Malcolm

9    Hyson to you, Mr. Egan, subject, "Prisa VAR" dated April 4,

10   2011.

11       I offer it in evidence, Your Honor.

12           **THE COURT:**  Admitted.

13           **THE CLERK:**  It's already admitted.

14           **MR. REEVES:**  It's already in.  Thank you.

15   **Q.**    All right.  Are you familiar with this email, Mr. Egan?

16   **A.**    I am.

17   **Q.**    All right.  In or around early April, 2011, after the

18   cutoff of the first quarter of 2011, were you involved in a

19   deal involving a sale to Discover Tech with the end user Prisa?

20   **A.**    I was.

21   **Q.**    What happened?

22   **A.**    I asked -- I was -- I asked Discover Tech to backdate a

23   deal, a reseller deal, for end user Prisa and do so and send it

24   to me for acceptance into the prior quarter, into the March

25   ending quarter.

**EGAN - DIRECT / REEVES**

1   Q.   Prior to doing that and reaching out to Discover Tech, did

2   you discuss this deal with Mr. Hussain?

3   A.   I did.

4   Q.   What happened?

5   A.   He called me shortly after the quarter ended and said he

6   had to ask me to do something that we didn't really want to do,

7   which was to ask one of the resellers if they would take

8   another deal.

9   Q.   To backdate a deal?

10  A.   That was implicit, yeah.  Take a deal for the quarter.

11  Q.   Did that request come to you from Mr. Hussain?

12  A.   It did.

13  Q.   In April 2011?

14  A.   Yes.

15  Q.   So after you got the request, did you reach out to

16  Discover Tech?

17  A.   I did.

18  Q.   Who did you call?

19  A.   Dave Truitt.

20  Q.   Do you have a recollection of your conversation with

21  Mr. Dave Truitt about this so-called Prisa deal?

22  A.   I do.

23  Q.   Take your time and tell us what you remember discussing

24  with Mr. Dave Truitt.

25  A.   I told him I was unfortunately asking him for this favor.

1    We both knew it wasn't something that we could or should do.  I

2    told him it would be a one-time thing.  I told him we really

3    needed it.  Explained the deal.  That's about it.  Used more

4    words, but that's the gist of it.

5    **Q.**  And what did Mr. Truitt say, if you recall?

6    **A.**  He expressed discomfort with it, but ultimately said he

7    would do that for us, but would never do it again.

8    **Q.**  All right.  This -- let's highlight your email address

9    please, here.

10       Is that your personal email address, Mr. Egan?

11   **A.**  It was at the time.

12   **Q.**  Okay.  And did you intentionally use your personal email

13   address to get this contract back?

14   **A.**  I did.

15   **Q.**  Why did you do that?

16   **A.**  So as not to have that email that was late come into my

17   Autonomy address.

18   **Q.**  What would happen if the contract had come into your

19   Autonomy address late, as you put it, after the cutoff for the

20   first quarter of 2011?

21   **A.**  That would have been documented and, you know, overt and

22   right there for anyone to see.

23   **Q.**  Create a problem for the possible revenue recognition?

24   **A.**  Could have, yes.

25   **Q.**  All right.  And in your conversation with Mr. Truitt, did

1  you discuss the manner in which Discover Tech would return the

2  executed contract to you?

3  **A.**   I did.

4  **Q.**   What did you say to Mr. Truitt about how the executed

5  contract should be delivered to you in early April, 2011?

6  **A.**   We discussed that I didn't want it faxed to me or anything

7  else that would put an April date on the actual paperwork.  I

8  asked him if he would execute the pdf and just mail it to my

9  personal email and I would take it into the offices.

10  **Q.**   And that's what wound up happening?

11  **A.**   Correct.

12  **Q.**   Why did you do this, Mr. Egan?

13  **A.**   Because I knew it was wrong.

14  **Q.**   That's why you arranged to have it sent to you in that

15  way?

16  **A.**   Yep.

17  **Q.**   Why did you agree to do this backdated contract in the

18  manner you've just described?

19  **A.**   I did it because I was asked and because I wanted the

20  quarter to end and because I didn't think about it enough and

21  really kind of absorb the wrongness of it.  I definitely knew

22  it was wrong.  It was uncomfortable.  Sushovan and I discussed

23  that.  Neither of us wanted to do it, frankly.  It was more

24  like something that kind of had to be done.

25  **Q.**   Why did it have to be done?

1    **A.**    Well, it didn't -- I'm just trying to expresso --

2    **Q.**    What did you and Mr. Hussain discuss about why it had to

3    be done?

4    **A.**    Just -- it was more we discussed that we needed it.  He

5    needed it.  I took on that sense of need.  I agreed to make the

6    request of Dave, and I followed through on it.

7    **Q.**    You needed it to what end?

8    **A.**    For the revenue number.

9    **Q.**    For the first quarter of 2011?

10   **A.**    Correct.

11   **Q.**    I'd like to show you, if I could, please, what may already

12   be in evidence as Exhibit 1769.

13        With the Court's permission, I would like to please

14   display that.

15            **THE COURT:**  Go ahead.

16   **BY MR. REEVES:**

17   **Q.**    This is an email from Mr. Truitt to you and Mr. Hussain on

18   or around April 14, 2011, subject "today's meeting."  Do you

19   see that?

20   **A.**    I do.

21   **Q.**    Are you familiar with this email?

22   **A.**    I am.

23   **Q.**    On or about April 14, 2011, did you have a meeting with

24   Dave Truitt and Sushovan Hussain?

25   **A.**    I definitely had a meeting very shortly after the

1  backdating.  I don't recall if it was specifically that day,

2  but this email would tell me it was that day.

3  **Q.**  So do you think, as you read the email, this is Mr. Truitt

4  following up on that meeting?

5  **A.**  I do.

6  **Q.**  All right.  Today do you have a recollection of the

7  meeting amongst yourself, Mr. Dave Truitt and Mr. Sushovan

8  Hussain?

9  **A.**  I do.

10 **Q.**  Where did that meeting happen?

11 **A.**  It happened in a conference room in Autonomy's offices in

12 San Francisco.

13 **Q.**  Was anyone else present?

14 **A.**  Myself, Dave, and Sushovan.

15 **Q.**  All right.  And take your time and tell us what was

16 discussed in that meeting.

17 **A.**  The part I remember best, because it was a chapter in my

18 life that I regret -- it was very significant to me -- was the

19 discussion of backdating the PO.

20 **Q.**  Tell us what was said in the meeting with Mr. Hussain,

21 Mr. Truitt, and yourself about the backdating of the PO.

22 **A.**  Mr. Truitt requested the meeting specifically because of

23 the backdating.  He asked to talk about it.  He wanted

24 assurances that it would not happen again.  That was why we set

25 up the meeting.  That's why we all walked into the meeting.

1        He expressed his discomfort multiple times.  Cited the

2   positive relationship and effectively asked for assurances that

3   that would never happen again.

4   **Q.**   What, if anything, did Mr. Hussain say?

5   **A.**   He acknowledged, understood that it was not comfortable or

6   fair to have asked Dave to do it and that we asked Dave to do

7   it and he assured him that we would not ask ever again and it

8   would not happen again.

9   **Q.**   I'd like to move forward, please, to in or around June

10  2011 and show you what has been marked for identification as

11  Exhibit 1833.

12       This is an email from Mr. Hussain to you, Mr. Egan,

13  subject, "USPS and HP."

14       I offer it in evidence, please.

15            **THE COURT:**  Admitted.

16       (Trial Exhibit 1833 received in evidence)

17  **BY MR. REEVES:**

18  **Q.**   Are you familiar with this email, Mr. Egan?

19  **A.**   I am.

20  **Q.**   Okay.  In or around June 2011, were you working on another

21  deal involving a possible sale relating to the United States

22  Postal Service and HP?

23  **A.**   I was.

24  **Q.**   Okay.  Tell us what you were doing.

25  **A.**   I was at this time -- well, I was, at a minimum at this

1  time, in dialogue trying to help a sale to the United States

2  Postal Service.

3  **Q.**   Explain what you mean by that.

4  **A.**   I was -- went on sales calls to the United States Postal

5  Service, was involved with our direct reps who were selling to

6  the United States Postal Service, was trying to package an

7  appeal to them to buy the software.

8  **Q.**   Did you discuss that sales process and this possible deal

9  with Mr. Hussain in this time period?

10 **A.**   I'm not sure.

11 **Q.**   Okay.  Does this email refresh your recollection that

12 there were discussions between you about this possible deal?

13 **A.**   Yes.

14 **Q.**   All right.  It looks like Mr. Hussain is writing, "I hear

15 from Mike S that we are in redlines at USPS and any change you

16 might propose re HP might derail our $5 million deal."

17      Do you have an understanding of what Mr. Hussain is saying

18 here?

19 **A.**   I do.

20 **Q.**   What is that understanding, please.

21 **A.**   We were selling a package to United States Postal Service

22 that was effectively going to relieve them of troubles they

23 were having with a product that they had purchased from HP, so

24 at one point, I was involved in trying to decide whether we

25 would be better off trying to sell the package to HP and let

1  them fix the problem and preserve their relationship with USPS

2  or whether we were better off selling directly to USPS and

3  having HP be thrown out effectively and have a -- take a

4  reputational hit for that situation.

5      And it was a situation where you were kind of straddling

6  and didn't know which was which, and Sushovan is advising me or

7  asking me about the sensitivity.  There comes a point when you

8  have to choose one path or the other.

9  **Q.**   All right.  And with regard to HP, did you have an

10 understanding at this point about their level of interest in a

11 possible purchase of your software?

12 **A.**   Throughout there was not much interest.

13 **Q.**   Not much interest?

14 **A.**   No.

15 **Q.**   Okay.  There has been a lot of discussion about HP in this

16 case.  At this point in time, June 2011, did you have any

17 understanding that there was a negotiation going on between HP

18 and Autonomy about a possible acquisition of Autonomy?

19 **A.**   No.

20 **Q.**   So you're just -- you're engaged in a normal sales process

21 in the context of this deal?

22 **A.**   Correct.

23 **Q.**   All right.  I'd like to show you now, please, what's

24 marked as Exhibit 1880.  This is an email from Mr. Hussain to

25 Mike Sullivan, with a copy to Stouffer Egan, on or around

1   June 24, 2011, subject, "Changes to existing forecast."

2          **THE COURT:**  Admitted.

3          **MR. REEVES:**  Thank you, Your Honor.

4      (Trial Exhibit 1880 received in evidence)

5          **MR. REEVES:**  If we could just enlarge the top email,

6   please.

7   **Q.**   It looks like Mr. Hussain is writing to you or certainly

8   with a copy to you, Mr. Egan, about need to find 1 million from

9   somewhere else.  Do you see that?

10  **A.**   I do.

11  **Q.**   Is this a -- what is your understanding of this -- of

12  Mr. Hussain's request here?

13  **A.**   It's a common email type towards the end of a quarter.

14  Something changed and he needs to find another million dollars.

15  **Q.**   In revenue?

16  **A.**   In revenue, yes.

17  **Q.**   For this quarter?

18  **A.**   Correct.

19  **Q.**   All right.  I'd like to show you what has been marked for

20  identification as Exhibit 1912.  This is a purchase order to

21  MicroTech for an end user HP on or around June 30th, 2011,

22  software license fee $7 million.

23          **THE COURT:**  Admitted.

24          **MR. REEVES:**  Thank you, Your Honor.

25      (Trial Exhibit 1912 received in evidence)

1    BY MR. REEVES:

2    Q.    Let's go to the second page of Exhibit 1912, please.  And

3    if we could highlight MicroTech up in the front area and HP as

4    the end user, and perhaps the dollar -- that's great.  Thank

5    you.  And the dollar sign, 7 million.

6         Toward the end of the second quarter of 2011, did you work

7    out a sale to MicroTech as a reseller of the software with the

8    end user Hewlett-Packard?

9    A.    I worked out the sale to the reseller.

10   Q.    Okay.  What did you do?

11   A.    I asked either Dave or Steve, I don't recall specifically,

12   if they would take this large deal at risk.

13   Q.    Did you discuss that strategy with Mr. Hussain?

14   A.    I did.

15   Q.    What did you and he discuss?

16   A.    He asked me to take it to one of the resellers.

17   Q.    Okay.  Now, at this point, what was the status of the sale

18   to -- of the software to Hewlett-Packard?

19   A.    Not in good shape.

20   Q.    What do you mean by that?

21   A.    It was a -- in theory, they should buy it and I had tried

22   many times to call their attention to that and was not really

23   getting anywhere.

24   Q.    Okay.  So what's the likelihood of actually being able to

25   close this sale through MicroTech to Hewlett-Packard, as you

1   saw it, at the end of June 2011?

2   **A.**   Much lower than most of the times that we took a deal to a

3   reseller like this.

4   **Q.**   Is this different in some sense from some of the other

5   deals you've described in your testimony?

6   **A.**   It is.  It was less likely and I ended up effectively

7   pitching the reseller that there might be more than one path to

8   their recovering their portion.  So I provided to them if we're

9   successful in selling it to HP, that would be the route, that

10  would be the preferred route.  That's one transaction.

11       But I let them know that we might also have to go pick off

12  the customers that were -- like United States Postal Service

13  that needed this product one by one, without HP's help, which

14  would be more work and more risky, I suppose.  It's debatable

15  which is more risky, but it's two different paths to them

16  getting their end sale.

17  **Q.**   Did you discuss that, sort of that negotiating that you

18  were having with the resellers, with Mr. Hussain?

19  **A.**   I wouldn't call it negotiating.  It's me helping them

20  understand what risk they're taking and what the paths were to

21  get them paid on the deal, and I did discuss it with both

22  Sushovan and the reseller.

23  **Q.**   Did you -- what -- what, if anything, did Mr. Hussain have

24  to say about the possibility of actually selling to

25  Hewlett-Packard in this reseller deal?

1    **A.**   He agreed it was risky enough and helped me use the right

2    language to provide for three different end user customers.

3    **Q.**   Okay.  What do you mean by the right language?

4    **A.**   Things like in the authorized use, you'll see that the

5    software could be used for up to three end users.  It's a way

6    of providing for that concept of going to the end customers one

7    by one as opposed to through HP.

8    **Q.**   If this deal was so risky with regards to the prospects of

9    the sale to the end user, why do it?  Why were you doing this?

10   **A.**   Again, for the revenue.

11   **Q.**   The revenue in the second quarter of 2011?

12   **A.**   Correct.

13   **Q.**   Is this another example of bringing future revenue into a

14   current quarter in a way you described yesterday?

15   **A.**   It is.

16   **Q.**   I'd like to show you, please, what has been marked for

17   identification as Exhibit 2199.  This is an email from

18   Mr. Hussain to you, Mr. Egan, on or about August 9, 2011,

19   subject, "SSA and MicroTech."

20       I offer it in evidence, Your Honor.

21       **THE COURT:**  Admitted.

22       (Trial Exhibit 2199 received in evidence)

23       **MR. REEVES:**  I think it's an email chain.

24   **Q.**   Let's start with your -- the lower emails, Mr. Egan.  It

25   looks like from the bottom, Mr. Hussain is writing to you,

1  subject "SSA and MicroTech.  Can we get the paperwork sorted,"

2  is the question he's asking.

3       Do you have a recollection of this transaction or the work

4  that you're doing in this time period relating to SSA and

5  MicroTech?

6  **A.**    I don't recall what SSA is.

7  **Q.**    Okay.  Let's go to your response and see if -- how you

8  respond.

9       You write back to Mr. Hussain, "Sush, I did not know I was

10 in charge of the paperwork on this one.  I thought you wanted

11 me to have the talk with Dave, which I did.  Do you want me to

12 do the paper," question mark, etc.  Do you see that?

13 **A.**    I do.

14 **Q.**    Does that refresh your recollection at all about this

15 transaction and what you're doing?

16 **A.**    It refreshes my recollection that I was involved and had a

17 question about whether I should be the one pursuing it, but SSA

18 I think of Social Security Administration and I'm not having a

19 memory of that.

20 **Q.**    Okay.  Thank you.  I'm done with that.

21       On or around August 18th, 2011, HP announced its intention

22 to acquire Autonomy.  When did you first become aware of that

23 acquisition?

24 **A.**    I got a phone call from Mike Lynch.

25 **Q.**    Approximately when in relation to the public announcement

**EGAN - DIRECT / REEVES**

1   by HP?

2   **A.**   I got the phone call approximately 30 minutes before it

3   leaked into the news, so I think the official announcement was

4   subsequent to that, maybe by a day or two, but the phone call

5   was whatever day it appeared in the media.

6   **Q.**   Were you surprised by the news?

7   **A.**   Yes.  Very.

8   **Q.**   Why were you surprised?

9   **A.**   Huge news to me.  I had worked for a company for ten years

10   and we were being acquired.

11   **Q.**   Was it good news in any sense or --

12   **A.**   Very good news to me.

13   **Q.**   Why was it very good news?

14   **A.**   The biggest reason being it was relief in some way.

15   **Q.**   Why was that?

16   **A.**   I was tired of working in the same way that I was working.

17   **Q.**   Would this transition create an opportunity, did you hope,

18   for change in some sense?

19   **A.**   I thought it represented for sure an opportunity for

20   change.  Probably for me to leave.

21   **Q.**   Okay.  So after the acquisition was announced and

22   completed, what happened to you?

23   **A.**   After it was announced and completed?

24   **Q.**   Yeah.  As we move into 2011, did you remain at HP after it

25   acquired Autonomy?

1    **A.**    I did for a period.

2    **Q.**    For how long did you remain at HP after HP had acquired

3    Autonomy?

4    **A.**    A little more than a year.  I think about 14 months.

5    **Q.**    And what did you do while you were there?

6    **A.**    Mostly I ran around to big HP customers telling them about

7    Autonomy.

8    **Q.**    All right.  And why did you eventually leave -- withdrawn.

9          You left sometime in 2012, the next year?

10   **A.**    Yes.  I left, I think, December 1st or something like

11   that.  End of November, beginning of December.

12   **Q.**    2012?

13   **A.**    Yes.

14   **Q.**    Why did you leave HP?

15   **A.**    I wanted to do something else.

16   **Q.**    Two more documents.

17         Let me show you what has been marked for identification as

18   Exhibit 2932.  This is an email from Mr. Hussain to you,

19   Mr. Egan -- I'm sorry.

20   **A.**    Could you repeat the date?  I kind of ...

21   **Q.**    The date of the exhibit?

22   **A.**    Yeah, yeah.  I just wasn't listening to the date.

23   **Q.**    Okay.  I was getting to the date.

24   **A.**    Oh, I'm sorry.

25   **Q.**    That's okay.

1          This is an email from Mr. Hussain to Lisa Harris with a

2    copy to you dated April 26, 2011.  So now I've gone back a

3    little bit in time before the reseller deal to MicroTech

4    involving HP, slightly earlier than that.

5               **THE COURT:**  Admitted.

6               **MR. REEVES:**  Thank you, Your Honor.

7          (Trial Exhibit 2932 received in evidence)

8               **MR. REEVES:**  If I could please have Exhibit 2932

9    displayed.

10   **Q.**   And Mr. Hussain is writing to Lisa Harris with a copy to

11   you, Mr. Egan, about "Please pay Stouffer his commission per

12   the attached schedule."  Do you see that?

13   **A.**   I do.

14   **Q.**   In this time period, were you working with Mr. Hussain

15   with regard to your compensation and bonus?

16   **A.**   I had been, yes.

17   **Q.**   Why don't you tell us what was going on in or around this

18   April 2011 time period with regard to your compensation and

19   bonus.

20   **A.**    In and around that time period, I had not been paid for

21   quite a while my bonus.  I had been paid my salary, but I was

22   eligible for a quarterly bonus and I hadn't been paid for quite

23   a while, and I was chasing a combination of Mike and Sushovan

24   to actually discuss that and work it out and pay me a bonus.

25        At this point, Sushovan and I had already discussed and

1  worked out what I would be paid for the period that I had not

2  been paid for, and I think this email is -- after that

3  discussion, I still wasn't paid.  I think I chased somebody to

4  get that to happen and this is Sushovan instructing someone to

5  pay.

6  Q.  All right.  Why did you have to chase for your bonus?

7  A.  That's a great question.  It was just something that, over

8  the course of a few years, how I was paid was not specific

9  enough.  It certainly wasn't on someone's radar to process it

10 on a quarterly basis, and to be honest, I felt like I was

11 underperforming or you had a sheepishness to not ask to be paid

12 on quarters when you didn't feel as though you had done

13 something exceptional.

14 Q.  Let's take a -- were you finished?

15 A.  I was just going to say after Q1 and BofA, I felt very

16 entitled to say this is time to think about this and I care

17 about it.  And it had been a long time.

18 Q.  All right.  Let's take a look at the attachment, please.

19 And let's start in the upper right -- withdrawn.  Why don't we

20 just leave it right like this.

21     Why don't you walk us through your understanding of this

22 attachment as it relates to your compensation, Mr. Egan.  Have

23 you had a chance to look at this carefully and think about it?

24 A.  I have seen it.

25 Q.  Why don't you tell us what you feel comfortable describing

1  with regard to some of the compensation issues in this

2  document.  Go ahead.

3  **A.**   It's a pretty confusing document.  I guess --

4  **Q.**   Why don't we start with Q3/2010 in the upper right-hand

5  corner.

6  **A.**   Okay.  Why don't I start by telling you that the

7  discussion that led to this spreadsheet was to compensate me

8  for Q3/2010, Q4/2010, and Q1/2011.  That was the period --

9  those were the three quarters in which I had not been paid a

10 bonus.

11 **Q.**   Those are reflected in the three boxes for Q3, Q4 and Q1

12 on the right-hand side, are they not?

13 **A.**   They are, yeah.

14 **Q.**   So what is the compensation for your bonus calculation as

15 reflected in that upper right-hand box for Q3/2010?  Walk us

16 through that, please.

17 **A.**   Sure.  The -- the way this -- to explain this to someone

18 who has never seen it before, there are three boxes to come up

19 with what Sushovan felt, and I ultimately agreed -- we edited

20 this together, I believe, to some level, but it was his sheet

21 that he formulated.

22     This shows how he came or we came to a number for each

23 quarter that I should be paid.

24 **Q.**   Let's use Q3 as an example.

25 **A.**   Sure.

**EGAN - DIRECT / REEVES**

1   **Q.**   We start -- there appears to be this figure 44,674.  Is

2   that $44,674?

3   **A.**   It does refer to that, yes.

4   **Q.**   Okay.  And there's a reference, "includes Amgen.  VA, TV

5   Azteca, Vivident," does it not?

6   **A.**   Yes.

7   **Q.**   Do you recognize those deals?

8   **A.**   I do.

9   **Q.**   Is that -- what is that?  What is that figure in relation

10  to those deals, Mr. Egan?

11  **A.**   So the 44 million -- and I'm going to have to say

12  probably -- it's probably the U.S. IDOL revenue number for

13  Q3/2010.  Some things may be in it, some things maybe not, but

14  there's note noting that it does include, at a minimum Amgen,

15  VA, TV Azteca and Vivident.

16  **Q.**   Then there is a minus 9,000 Amgen, minus 10,000 VA.  What

17  is your understanding about those two figures there?

18  **A.**   First of all, all of this is in millions, so minus 9

19  million is to subtract the $9 million Amgen deal out of that

20  $44 million number.

21      Similarly, the negative 10 million VA is to subtract 10

22  million of the VA deal out of the $44 million number.

23      Same with the TV Azteca.

24  **Q.**   Let's pause.  Is your bonus in the millions or is it in

25  the thousands, Mr. Egan?

1    **A.**    It's in the thousands.  These are the revenue numbers.

2    **Q.**    These are the revenue numbers.

3    **A.**    This is a way to decide what bonus I should get.

4    **Q.**    Okay.  Good.

5          And so why is the Amgen deal being backed out of the

6    revenue for Q3/2010 as it relates to your bonus, Mr. Egan?

7    **A.**    Because this is an exercise to credit me with things that

8    I did that were appropriate to compensate me for.

9    **Q.**    But we went through how you sold the Amgen software to

10   Capax in the reseller deal in Q3/2010.

11   **A.**    But it was not sold through to Amgen at that time.  So if

12   we sold software to a reseller, that was not a good thing

13   per se.  It -- it got us the revenue, but it wasn't celebrated

14   or credited or posited from a credit perspective.

15   **Q.**    Did you get paid a commission or a bonus on reseller

16   deals?

17   **A.**    If they were sold to the reseller but not to the end user?

18   **Q.**    Exactly that.

19   **A.**    Not until they sold through to the reseller, at which

20   point -- I want to be clear, I was not on a commission plan.

21          Traditionally for anybody who is very familiar with what a

22   commission is, it's generally a formula that says you get a

23   piece of everything you sell.  That's not how I was paid.

24          I had an approximate targeted earnings number if I was

25   successful or judged to be doing a good job and that would be

1  kind of made up of all the deals that you worked on.

2  Q.   We've talked a lot about a number of reseller deals in the

3  course of your testimony, have we not?

4  A.   We have.

5  Q.   Okay.  Where those reseller deals do not yet sell through

6  to the end user, do you get any type of compensation or bonus

7  for the reseller deals that have not yet sold all the way

8  through to the end user?

9  A.   No, I do not, nor does the rep on the deal.  No one does.

10 Q.   Is that one of the reasons that sales personnel continue

11 to sell after the close of the quarter in order to close a sale

12 to the end user?

13 A.   Yes.

14 Q.   Are they financially motivated in that way to do that?

15 A.   Yes, they are.

16 Q.   And were you financially motivated to continue that sales

17 process?

18 A.   Financially and sort of on the basis of my word, yes.

19 Q.   And the way you've described in the course of your

20 testimony?

21 A.   Correct.

22 Q.   All right.  And if we go down to Q4, is there a similar

23 adjustment in Q4 for the VMS hardware deal?

24 A.   It looks like it, yes.

25 Q.   Okay.  Is that consistent with your recollection?

1  **A.**    Yes.

2  **Q.**    So in this April 2011 time period, you're getting your

3  bonus compensation for the preceding three quarters.  What does

4  that work out to be?  What did you and Mr. Hussain arrive at?

5  **A.**    As a total, I believe it's that 631,185 number.

6  **Q.**    And then you add in your salary and you got your

7  compensation at the bottom?

8  **A.**    I believe that is plus Q2/2010.  At that point, I had been

9  on a more fixed eligible number and that had been paid.  So if

10  you add it all up, yes, it comes out to that.

11  **Q.**    What does it come out to?

12  **A.**    976,185.

13  **Q.**    Last document.  Let me show you what has been marked for

14  identification as Exhibit 1850, please.  This is an email from

15  Dr. Lynch to you, Mr. Egan, interspersing answers to an email

16  that you sent to Dr. Lynch in or around June 15, 2011.

17      I offer it in evidence, Your Honor.

18          **THE COURT:**  Admitted.

19      (Trial Exhibit 1850 received in evidence)

20  **BY MR. REEVES:**

21  **Q.**    Are you familiar with this email, Mr. Egan?

22  **A.**    I am.

23  **Q.**    Why don't you set this up for us and explain what this

24  email is, please.

25  **A.**    I -- at this point, I was very emotionally tired and

1    wanted to leave the company and I --

2    **Q.**   At what point?  Where are we here?

3    **A.**   We are in early June, 2011.

4    **Q.**   Okay.  Explain -- are you effectively suggesting that you

5    want to resign from Autonomy in this email, to summarize it?

6    **A.**   That -- sometime before that date, I sent the majority of

7    this text in the form of an email to Mike, yes, resigning.

8    **Q.**   All right.  So why -- tell us why you came to this

9    decision, that you wanted to resign from Autonomy in or around

10   the middle of June, 2011.

11   **A.**   I was exhausted.  I didn't like my priorities or the way

12   my life was going.  I just was completely done.

13   **Q.**   All right.  And you seem to reflect that in a portion of

14   your email in the second paragraph that reads "The enormity of

15   it all is way up."  What did you mean by that?

16   **A.**   The company had gotten bigger, the pressure was higher,

17   the numbers were higher.  I was, I'm sure, in my mind referring

18   even to the size of the overhang or the hangover or the

19   obligation that was being created every quarter.  Everything.

20       It was a very general, broad statement about everything to

21   do with working at the company.

22   **Q.**   Let's just parse this email a little bit.

23       You write -- I want to go through the asterisks and

24   identify what portions you're writing and what portions in the

25   document represent Dr. Lynch's responses.  Will you do that for

EGAN - DIRECT / REEVES

1    us?

2    **A.**    Sure.

3    **Q.**    Using the first sentence as an example, what part did you

4    write and what part did he respond to?

5    **A.**    Well, Mike writes comments after double asterisks.  So

6    it's my email, but he has placed his comments to me in the

7    email always preceded by double asterisks.

8        So do you want me to read it --

9    **Q.**    I'll read it.

10        So you write, "Mike, I'll preface this by saying I'll kill

11    myself to get all your deals through June."

12        And what is Mike Lynch's response?

13    **A.**    "Thanks for being clear.  That is reassuring."

14    **Q.**    And then you -- so his comments are interspersed in your

15    earlier email, are they not?

16    **A.**    They are.

17    **Q.**    Let's go down to the bottom, if we can, please, to the

18    paragraph that begins, "For these reasons."  Great.  That's

19    great.  Right down there.

20    **A.**    Yep.

21    **Q.**    And if -- perhaps we could enlarge that, Ms. Margen.

22    Great.  Okay.

23        "For these reasons and more, which I can't justify the

24    time to communicate now, I need to let you know I want to

25    exercise whatever notification is expected of me to leave."

1          Are you resigning here?

2  **A.**    I am.

3  **Q.**    All right.  You go on down below to say, "I'm

4  communicating this, despite considering yourself" -- that's a

5  reference to Mike Lynch; right?

6  **A.**    It is.

7  **Q.**    -- "Sushovan and even Pete, whom I don't talk to much

8  anymore, to be my best friends in the world.  It's been family,

9  and that fact has probably caused me to go on too long to where

10  now I'm getting angry and resentful and I don't want that to

11  continue."

12          What did you mean by that?

13  **A.**    Pretty much what I say.  I'm -- it's been all I've known

14  for 10 years.  I'm deeply, deeply into the company and the

15  people, but I'm exhausted and I'm -- I hate the quarterly cycle

16  aspect of it and I'm missing everything to do with life, and

17  I'm getting resentful.

18  **Q.**    At the time that you wrote this, did you have any idea

19  that within a matter of two months, HP would acquire Autonomy?

20  **A.**    No.

21  **Q.**    Did you have any idea that at this very time, negotiations

22  had begun between Autonomy and HP about a possible acquisition?

23  **A.**    No.

24  **Q.**    Let's go to the very end of the email, please.  It's on

25  the next page.  Drop down a little bit, please.  Great.  Okay.

1  And let's just enlarge the last two paragraphs and the

2  signature from Stouffer.

3       You write, "This is not how I wanted to communicate this

4  to you, but there will never be a good way.  Let's get together

5  in July."

6       Is that after the quarter's closed?

7  **A.**   Yes.

8  **Q.**   "And I can lie on a couch and give you the whole story, if

9  you'd like."

10      That's how you sign off in your letter to Dr. Lynch?

11 **A.**   It is.

12 **Q.**   And does Dr. Lynch respond after the double asterisk,

13 "Let's park it until July and sort it out then.  I have more

14 information than you do ..... Mike."  Okay.

15      That's his contribution to this dialogue, is it not?

16 **A.**   That's his comment after mine.

17 **Q.**   Okay.  At the time that you got this response from

18 Dr. Lynch, did you have an understanding as to what information

19 he had that you didn't have?  Did you know what he was talking

20 about?

21 **A.**   No.

22 **Q.**   Today looking back at this comment, given the context of

23 the acquisition that unfolded approximately two months later,

24 do you have reason to believe that that was a reference to the

25 upcoming acquisition?

EGAN - CROSS / KEKER

1    A.    Could have been, yes.

2          (Government counsel confer off the record.)

3              **MR. REEVES:**  Thank you.  No further questions.

4          **THE COURT:**  Cross.

5              **MR. KEKER:**  We will get the folders out in a second,

6    but let me begin.

7                         **CROSS-EXAMINATION**

8    BY MR. KEKER:

9    Q.    Good afternoon, Mr. Egan.  We don't know each other, do

10   we?

11   A.    We do not.

12   Q.    You talked about a lot of phone calls, but there's no

13   record of what was said in the phone calls that you and

14   Mr. Hussain or anybody else had; right?

15   A.    That's correct.

16   Q.    What we do have is what was written down and what was

17   saved in email.

18         Did you make it something of a habit to lie to your

19   co-workers while you worked at the company?

20   A.    I did not.

21   Q.    Let's take the example -- start with the example of Capax

22   eDiscovery.

23         Did you tell Mike Sullivan that Capax was doing eDiscovery

24   work and he should approve invoices?

25   A.    I may have, yeah.

EGAN - CROSS / KEKER

1    **Q.**   You may have or you did?

2    **A.**   I don't recall.

3    **Q.**   We'll look at that in a minute.

4          Do you know Mr. Smolek, finance guy?

5    **A.**   I do know.

6    **Q.**   Did you tell Smolek to increase Capax's rate of payment

7    for eDiscovery work?

8    **A.**   I believe I did.

9    **Q.**   Did you tell Joel Scott -- did Joel Scott -- who is Joel

10   Scott?

11   **A.**   Joel Scott was counsel in the United States.

12   **Q.**   And he was the one who worked -- you'd tell him to do the

13   paperwork and so on in these deals; right?

14   **A.**   I worked with him to do paperwork, yes.

15   **Q.**   Did he know that Mr. Baiocco -- that you were authorizing

16   payment to Mr. Baiocco and Capax and they weren't doing

17   eDiscovery work?

18   **A.**   He did.

19   **Q.**   He did?  Joel Scott did?

20   **A.**   I believe so.

21   **Q.**   When did you tell him?

22   **A.**   I'm not sure I told him.

23   **Q.**   When did he tell you that he knew that there was no

24   eDiscovery work being done?

25   **A.**   I don't know.

EGAN - CROSS / KEKER

1  Q.   If he comes in here and says he had no idea that you were

2  paying -- that these payments for eDiscovery work was not

3  payments for work that was actually being done, would he be not

4  telling the truth?

5  A.   I believe so.

6  Q.   You -- could we put up 514 -- excuse me.  Five -- I guess

7  we better get these exhibits out here.

8       Look at 514, if you would, sir, in the first volume.

9  That's an email from you.

10      Move it in, Your Honor.

11          THE COURT:  Admitted.

12      (Trial Exhibit 514 received in evidence)

13  BY MR. KEKER:

14  Q.   In the bottom, there's an email from you to Mr. Hussain in

15  January of 2010.  You can see it on the screen here.

16      Let's look at the bottom, Jeff.  You got that?  Yeah.

17      And in January of 2010, you're telling Mr. Hussain --

18  Mr. Hussain -- "Sush, can we please wire them" -- this is

19  Capax -- "support January cash.  Our arrangement is that this

20  is a prepaid but we keep paying in arrears.  This would be nice

21  for me to do, given I asked a lot from them in Q and he has

22  asked me for this."

23      What were you referring to?

24  A.   So I'm asking for Sushovan to please wire them January

25  support cash.  That's the first statement.

**EGAN - CROSS / KEKER**

1        I point out that our arrangement is that this is a prepay.

2   **Q.**   What did you mean by that?

3   **A.**   Meaning that for January, we're supposed to pay it before

4   January.  For February, we're supposed to pay it before

5   February, so it's just a timing --

6   **Q.**   I'm sorry.  This is a prepay for work that isn't being

7   done?

8   **A.**   No.

9   **Q.**   No, it's not -- I'm sorry.

10       Is it -- is there work being done that you're prepaying

11  for?

12  **A.**   Yes.

13  **Q.**   What's the work that's being done that you're prepaying

14  for?

15  **A.**   Support for a software product called EAS.

16  **Q.**   Okay.  And then, "It would be nice for me to do, given I

17  asked a lot of them in Q and he has asked me for this."

18       What did you ask of Capax in the quarter?

19  **A.**   So in Q4 of 2009, I believe I asked them to take the Amgen

20  deal at risk.

21  **Q.**   Okay.  And can we go up.

22       Mr. Hussain replies, "I don't have anything to approve."

23       And then you write to Andy Kanter above that, "Andy, can

24  you please raise January support PO ASAP so we can approve and

25  send cash."

1         That's a reference to EAS?  It's a reference to work that

2    Capax was actually doing?

3    **A.**    Yes, it is.

4    **Q.**    Okay.  You -- when you talked to the Government about this

5    email, you referred to it as nauseating; right?

6    **A.**    Not that I remember.

7    **Q.**    Look at the next one.  1149 I believe is in evidence.  If

8    it's not, I move it in?

9              **THE COURT:**  Which one is this?

10             **MR. KEKER:**  1149, Your Honor.

11             **THE COURT:**  One moment.

12             **MR. KEKER:**  The bottom email is from Mr. Egan to Andy

13   Kanter and Sushovan Hussain.  1149.

14             **MR. REEVES:**  I'm sure I don't have an objection, but

15   it helps to just have a record about what document --

16             **THE COURT:**  Okay.  Admitted -- pardon me?

17             **MR. KEKER:**  1149, the top email is from Andy Kanter to

18   himself and Stouffer Egan regarding Capax EDD PO.

19             **MR. REEVES:**  No objection.

20             **THE COURT:**  Admitted.

21        (Trial Exhibit 1149 received in evidence)

22   **BY MR. KEKER:**

23   **Q.**    Can we look at the bottom email.  Well, actually let's

24   look at Mr. Kanter's email first, the back page.  Yeah.

25        This is October of 2010 and Mr. Kanter -- who is

EGAN - CROSS / KEKER

1    Mr. Kanter again?

2    **A.**    He was general counsel.

3    **Q.**    In England?  He's in England?

4    **A.**    Yes.  He lived in England.

5    **Q.**    And he is saying, "One other item on Capax.  As discussed,

6    we are experiencing bandwidth constraints on EDD processing.

7    For example, there are concerns about bandwidth for one of

8    recent major transactions which have been discussed internally.

9    Because of this, to ensure availability of service for

10   customers, I recommend an increase in European EDD processing

11   availability from Capax of 500 gigabytes per month for the next

12   seven months," and it goes on.

13       Could we see the email above that.

14       And you -- your response to that email is, "Yes.  Finally

15   the BP backlog has been causing me grief in market and much

16   worse the internal sales force hears about our capacity limits

17   and it gives them an excuse."

18       What were you saying there, sir?

19   **A.**    First of all, it's a misleading email.  I --

20   **Q.**    Stop for a second.  It's a misleading email?

21   **A.**    Yes.

22   **Q.**    Who are you misleading?  You are misleading Mr. Kanter and

23   Mr. Hussain?

24   **A.**    I am not.  It would be misleading for anybody reading it

25   who didn't know what the three of us knew.

1  **Q.**    And did Mr. Kanter or Mr. Hussain ask you to send them a

2  misleading email?

3  **A.**    No.

4  **Q.**    You decided to send them a misleading email on your own?

5  **A.**    I did.

6  **Q.**    Six thousand miles away?

7  **A.**    Approximately.

8  **Q.**    Yeah.

9        And it's misleading because the BP backlog was not causing

10  you grief in the market?

11  **A.**    No, not explicitly.

12  **Q.**    And it's misleading because "the internal sales force

13  hears about our capacity limits" -- is it -- were you saying

14  that there were no capacity limits?

15  **A.**    There were capacity limits.  That's minorly true.  I'm

16  recruiting it to make a true statement, but that makes the

17  intent of the email come across differently than it is.

18  **Q.**    Is this another one of the emails that when you were

19  talking to the Government, you referred to as nauseating?

20  **A.**    I don't recall.

21  **Q.**    Can we look at 1120.

22        I move it in, Your Honor.  It's from Stouffer Egan to

23  Sushovan Hussain in October of 2010.

24            **THE COURT:**  Admitted.

25        (Trial Exhibit 1120 received in evidence)

EGAN - CROSS / KEKER

1    BY MR. KEKER:

2    **Q.**   Here you say, "Sush, there is -- this is about Amgen.

3    There is more detail coming tomorrow so please wait for that,

4    but here is high level.  Capax are an approved supplier of

5    Amgen.  Capax have specific and unique knowledge of Amgen's

6    mail environments as they are the" -- something -- "vendor

7    charged with migrations.  Capax are an 8(a) and large U.S.

8    Pharma.  Have diligent ethics and community programs and like

9    for a certain amount of business to go to suppliers who were

10   8(a) status.  Amgen are extremely concerned for certain project

11   deadlines in the quarter."

12       And then last, "Capax took references from Lilly, whom

13   I've told spoke highly of Capax."

14       Was that a misleading email that you sent to Mr. Hussain?

15   **A.**   No.  That's a straight email.

16   **Q.**   Okay.  You referred to that when you were talking to the

17   Government as farcical?

18   **A.**   I don't know as I did.  Not -- the email itself, not just

19   the actual words.

20   **Q.**   Okay.  Let's look at 1162, and that's an email at the

21   bottom from you to Mr. Hussain on October 20, 2010.

22       Can we get that up.

23       Move it in, Your Honor.  I'm sorry.  1162.

24           **THE COURT:**  Admitted.

25       (Trial Exhibit 1162 received in evidence)

1          **MR. KEKER:**  The bottom email.

2    **Q.**   You're writing to Mr. Hussain about Amgen; right?

3    **A.**   Yes.  It looks right.

4    **Q.**   And you say, "Adding to what was written earlier, Capax

5    has also done a great deal of SQL work at Amgen which we would

6    like to leverage to get an introduction of SPE into Amgen.

7    Capax have done database optimization.  Capax have done

8    numerous database parts and migrations."

9          The jury can read it.

10         Is this a misleading email or true email?

11   **A.**   When read at face -- I haven't read the whole thing yet,

12   but most of the points you have gone through so far are not

13   misleading when read at face.

14         The reason I was asked for them --

15   **Q.**   Pardon?

16   **A.**   The reason I was asked for them would be more misleading.

17   **Q.**   Did you refer to this email when you talked to the

18   Government lawyers as farcical?

19   **A.**   I really don't recall using specific words with respect to

20   specific mails when talking to the Government.  I can't.

21   **Q.**   Let's look at 1127.  That's an email from you to Andy

22   Kanter and Sushovan Hussain.

23         I move it in, Your Honor.

24         **THE COURT:**  Admitted.

25         (Trial Exhibit 1127 received in evidence)

1  BY MR. KEKER:

2  Q.   You write, "Agreed."  What you are agreeing to is Andy

3  Kanter saying, "Sushovan and Stouffer having been impressed

4  with Capax's contributions to the FSA transaction, I am

5  comfortable that they have earned a marketing assistance fee in

6  line with our standard terms and so on," and you say "agreed."

7       Was that a misleading email?

8  A.   I agreed with the -- paying them the assistance fee.

9  Q.   Did you think that they had made a substantial

10 contribution to the FSA transaction?

11 A.   I thought they had done the FSA transaction for us.

12 Q.   Okay.  How about the BofA, did they make a substantial

13 contribution to the BofA transaction?

14 A.   It depends on if you are talking about the transaction.

15 When they are the ones buying the software from Autonomy, it is

16 their transaction, so that is the value that I see in them

17 doing that kind of a transaction.

18 Q.   Okay.  You were shown on direct examination an Exhibit

19 654.  Let's put that back up.  That's a FileTek email.

20      And you were asked -- you said that -- you were asked why

21 you used -- you said this was a misleading email; right?

22 A.   Yes.

23 Q.   And you were asked why you used "artifice."

24 A.   Could you define "artifice" for me?

25 Q.   You were asked by the prosecutor why you used "artifice"

EGAN - CROSS / KEKER

1    and you said, "I was stupid"?

2    A.   I don't recall the specific word "artifice."   Meaning

3    like artificial?

4    Q.   Well, misleading.  Was this a misleading email?  I thought

5    you described it as a misleading email.

6    A.   I did describe it as a misleading email.

7    Q.   Okay.  But there was a point -- this misleading email

8    served a purpose, didn't it?

9    A.   It didn't really serve much purpose.

10   Q.   The purpose was to get -- your purpose in wanting to do a

11   deal with FileTek is to get the sales numbers up; right?

12   A.   That was the purpose of doing the FileTek transaction,

13   yes.

14   Q.   Okay.  You told us that you were CEO -- we can take that

15   down, Jeff -- CEO of the Americas.

16        How many deals were done between 2008 and 2011 in the

17   United States?

18   A.   For Autonomy in general?

19   Q.   Yes.

20   A.   I don't know.

21   Q.   Thousands?

22   A.   Yes.

23   Q.   Tens of thousands?

24   A.   I don't know about that.

25   Q.   What was the amount of sales in the United States that you

1    were involved in?

2    **A.**    I don't know.

3    **Q.**    What was the size of the sales force?

4    **A.**    A different -- it was different at different times.

5    **Q.**    What was the largest it was?

6    **A.**    The largest total quoted sales headcount was probably in

7    the 120 range.

8    **Q.**    And every deal you've talked about to the jury during your

9    examination is a deal -- except maybe the Vatican -- is a deal

10   that was yours; right?

11   **A.**    That's a good question.  No, not necessarily.

12   **Q.**    What wasn't yours besides the Vatican?

13   **A.**    Well, we looked at, for instance, a menu sheet, we

14   referred to it as, of deals that came from Mike Mooney's

15   upside, so in each of those cases, that was -- those were Mike

16   Mooney's deals.

17   **Q.**    Mike Mooney reported to you, didn't he?

18   **A.**    At times he did.

19   **Q.**    But you initiated the MicroLink deals, didn't you?

20   **A.**    Yes.

21   **Q.**    You initiated the Capax deals, didn't you?

22   **A.**    Most of them, yeah.  In both cases, most of them.

23   **Q.**    You initiated the Morgan Stanley deal?

24   **A.**    I did, yeah.

25   **Q.**    The Discover Tech deals?

**EGAN - CROSS / KEKER**

1    **A.**    Most, yep.

2    **Q.**    The FileTek deals?

3    **A.**    Yep.

4    **Q.**    Bank of America deals?

5    **A.**    Yep.

6    **Q.**    Bank of -- the Prisa deal?

7    **A.**    The reseller deal; not Prisa itself.

8    **Q.**    You were -- you discuss -- you were the one who

9    recommended these eDiscovery deals with Capax; right?

10   **A.**    Meaning the way to pay Capax?

11   **Q.**    Yeah.

12   **A.**    Correct.  It was my idea.

13   **Q.**    And you would find these deals on your own?  For example,

14   you found FileTek on your own?

15   **A.**    I did.

16   **Q.**    And you would suggest them to London?

17   **A.**    I did.

18   **Q.**    And then you would sell the deals to the resellers?

19   **A.**    Most times, yep.

20   **Q.**    You were the -- Baiocco was your good friend at Capax and

21   you would persuade him to take reseller deals?

22   **A.**    I would offer him the reseller deals.

23   **Q.**    You wouldn't persuade him?

24   **A.**    I would spell it out for him.  I wouldn't necessarily

25   persuade him.

1  **Q.**   You would tell him it was 99 percent certain to close?

2  **A.**   If it was 99 percent certain to close, I would, yes.

3  **Q.**   He has testified that that's what you told him.  Did you

4  tell him that generally that these were 99 percent certain to

5  close?

6  **A.**   Not generally, no.  But I'm sure there were deals that I

7  did sell to him that were that close, yeah.

8  **Q.**   You persuaded Dave Truitt to take deals?

9  **A.**   I did talk to Dave Truitt about taking deals.

10  **Q.**   You will persuaded Steve Truitt at MicroTech to take

11  deals?

12  **A.**   Again, the use of the term "persuaded" is not how I would

13  characterize it.  I offered the deals to them and I was very

14  thorough in explaining to them the state of various deals.

15  **Q.**   And you described yourself as a relationship manager for

16  Capax, Discover Tech, and MicroTech didn't you?

17  **A.**   I would.

18  **Q.**   You instructed Joel Scott to paper these deals; right?

19  **A.**   Some of them.  Joel did the paperwork for some of them.

20  **Q.**   You said that the UK guys weren't going to fly over to the

21  United States for sales?

22  **A.**   Did I say that?

23  **Q.**   Yeah.

24  **A.**   I probably said that, something like that before.

25  **Q.**   Okay.  And in the United States, you were in charge of

1  these deals, weren't you?

2  **A.**  Most of the deals we've talked about, yes.

3  **Q.**  And at the time you were doing them, did you think you

4  were committing a crime?

5  **A.**  In at least one case, I knew I was doing something very

6  wrong.  I did not think about it as a crime.

7  **Q.**  Did you think ever that you were committing a crime in

8  working with resellers or selling as you were doing?

9  **A.**  I didn't think of it that way, no.

10  **Q.**  Did you think what you were doing was wrong?

11  **A.**  In at least one case, I thought what I was doing was wrong

12  right in the moment, yes.

13  **Q.**  The wrong -- the one you're talking about is Prisa?

14  **A.**  Correct.

15  **Q.**  We're going to get to that separately.

16      But other than that, you didn't think these transactions

17  at the end of the month, the VAR -- or selling to resellers and

18  so on, you didn't think you were doing anything wrong at the

19  time?

20  **A.**  I didn't think it explicitly at the time, no.

21  **Q.**  As far as you knew, Mr. Scott, who was working with you as

22  a lawyer, didn't think he was doing anything wrong at the time?

23  **A.**  As far as I knew, no.

24  **Q.**  You thought that the sales through resellers was perfectly

25  legal?

1  **A.**   I did think that.

2  **Q.**   And you thought that hardware sales were perfectly legal?

3  **A.**   I did think that.

4  **Q.**   You thought that the goal of getting more revenue in a

5  quarter was completely proper and common?

6  **A.**   To have the goal, of course, yeah.

7  **Q.**   You thought that selling to -- selling products to your

8  own customers, people who were buying from you, was perfectly

9  legal, didn't you?

10 **A.**   Can you say that again?

11 **Q.**   You thought that the -- this idea of selling to people who

12 were also your customers was perfectly legal?

13 **A.**   I did.

14 **Q.**   And, in fact, when you got to Hewlett-Packard and worked

15 there for a year, you found out that Hewlett-Packard was having

16 these reciprocal transactions with some of its customers.  They

17 would sell them product and the customers would pay money back

18 to Hewlett-Packard for something else; right?

19 **A.**   I did.

20 **Q.**   All right.  For example, one of the things you've talked

21 about is the DreamWorks deal.  Tell the jury what the

22 DreamWorks deal at Hewlett-Packard was.

23        **THE COURT:**  When is this?

24        **MR. KEKER:**  This is after the acquisition, after he's

25 working at Hewlett-Packard, and after he's learning about what

1  the Government calls reciprocal transactions, he's learning

2  about the same thing happening at Hewlett-Packard.

3        THE COURT:  Okay.  Well, any objection?  I mean, I'm

4  just trying to figure out to what extent are we getting into

5  what occurred after.

6        MR. KEKER:  Well, I'll withdraw it, Your Honor.  I

7  don't want to waste any time.

8  Q.  The point of these back-and-forth deals, as you understood

9  it, was that you had to establish that what you were buying and

10  selling was done at fair value; right?

11  A.  Amongst other things, yes.

12  Q.  Okay.  But fair value -- there's nothing illegal about

13  even a barter transaction -- "I'll do this for you, if you do

14  this for me" -- as long as it's done at fair value?  That's the

15  accounting revenue recognition issue; right?

16  A.  I can't speak to the specific revenue recognition, but I

17  understood that you had to establish fair value for it to be.

18  Q.  Mr. Hussain spent a lot of time trying to make sure that

19  fair value was established in these transactions, didn't he?

20  A.  Yes.

21  Q.  And he got you to help him?

22  A.  Yes.  At times.

23  Q.  To make sure that you were playing by the rules with

24  respect to these reciprocal transactions?

25  A.  Is that a question?

EGAN - CROSS / KEKER

1   **Q.**   Yes.

2   **A.**   Yes.

3   **Q.**   All right.  And your compensation depended on whether or

4   not -- on how many sales you made, didn't it?

5   **A.**   Generally, yes.

6   **Q.**   You had sales targets?

7   **A.**   Generally, yes.

8   **Q.**   And the sales targets were your share of the overall sales

9   target for Autonomy; right?

10  **A.**   Yeah.

11  **Q.**   And you knew each quarter what your sales target was?

12  **A.**   No.

13  **Q.**   You didn't?

14  **A.**   Nope.

15  **Q.**   Let's look at 6118, which is an email between Sushovan

16  Hussain and Stouffer Egan and it's a compilation.

17      I would move them all in.

18          **THE COURT:**  Okay.  Sorry.  What -- will you give me

19  the number again?

20          **MR. KEKER:**  6118, Your Honor.

21          **THE COURT:**  6118?

22          **MR. KEKER:**  6118, yes.  And that would be in -- does

23  he have three binders up there?

24          **THE WITNESS:**  Oh, I have a bunch of binders.

25          **MR. KEKER:**  I think it would be in your -- the last of

1  the binders, if you want to look.

2          **THE WITNESS:**  What was the number again?  Sorry.

3          **MR. KEKER:**  6118.  It's a compilation of emails.

4          **THE COURT:**  I see no reason not to let them in.

5          **MR. REEVES:**  Agreed, Your Honor.  No objection.

6          **THE COURT:**  Okay.  So 61 -- so we get the record, 6118

7  goes A through F, and they're all admitted.

8          (Trial Exhibit 6118 received in evidence)

9  **BY MR. KEKER:**

10  **Q.**   And you could look through them, but these are emails in

11  which Mr. Hussain is telling you what your target is for the

12  quarters that are referenced; right?

13  **A.**   It looks so, yep.

14  **Q.**   So, for example, in this quarter, the first one in 2008 is

15  a $26 million target; right?

16  **A.**   That looks right, yep.

17  **Q.**   In the second page -- in the second paragraph, the target

18  is 45 million?

19  **A.**   Where are you looking?

20  **Q.**   I'm looking at the next page.  I mean, we can -- the jury

21  can go through this.

22         You had targets, and these exhibits show what the targets

23  were; right?

24  **A.**   Each of these is examples of communicating a target, yes.

25  **Q.**   And those targets were communicated to you each quarter,

1   weren't they?

2   **A.**   No.  I already answered that.

3   **Q.**   You had a base salary of, I think, $345,000; right?

4   **A.**   I believe that's correct at the end.

5   **Q.**   And you were eligible for quarterly bonuses that depended

6   on how you did meeting these targets?

7   **A.**   Among other things, yes.

8   **Q.**   And you were also eligible for stock options.  Tell the --

9   well, let me tell the jury what the stock options are.

10      Stock options are the right to buy a company's stock;

11  right?

12  **A.**   Correct.

13  **Q.**   And you could be issued the stock option and often they

14  vest sometime in the future?

15  **A.**   That's correct.

16  **Q.**   And the stock options that you were entitled to only

17  vested if you met certain sales goals; right?

18  **A.**   No.  That's not true.

19  **Q.**   Look at 6147, please, in that same binder.

20  **A.**   60 what?

21  **Q.**   6147.  This is an email from Mr. Egan to Mr. Kanter dated

22  March 2, 2011.

23      I move it in.

24          **THE COURT:**  Admitted.

25      (Trial Exhibit 6147 received in evidence)

BY MR. KEKER:

**Q.**   Let's look at the last email in the string, and it's Mr. Kanter writing to you saying, "I'm pleased to inform you that Autonomy's board of directors has recently approved a share option grant for you."  It's 50,000 options.  At a certain price.

And then he goes on to say, "No.  These are performance share options, i.e., the vesting is dependent on achieving pre-agreed performance targets," and so on.  "Should recognizable U.S. IDOL license revenue be at least 45 million in the fourth quarter of 2010, then these options shall vest."

Let me ask you again, was the option vesting dependent on your sales targets, reaching your sales targets?

**A.**   My memory is that these options were not granted to me until much later, and my interpretation was that I had to perform to be granted the options in the first place and that there was no performance requirement to the vesting, and that, I believe, is also what turned out to be the case, not what's written here.

**Q.**   So what Mr. Kanter says here about performance share options depending on your living up to the targets is wrong?

**A.**   I'm seeing this for what feels to me to be the very first time.  I don't have any memory of there being any vesting-based performance requirement.

But I am familiar with one grant of options that I chased

1    a combination of Mike, Sushovan, and Andy to give to me where I

2    was under the understanding that performance would get me the

3    actual grant.  Difference being grant, you know.

4    **Q.**    Look above on the same -- let's go up to the top of this

5    email.

6         In the middle, it says, "Andy, can you" -- you write to

7    Mr. Kanter, "can you confirm the status of the grant," and then

8    he writes back in the top?

9    **A.**    Uh-huh.

10   **Q.**    Oh, excuse me.  You write to him, "Andy, just curious, do

11   these vaporize or commence vesting?"  You responded to this

12   email where he said options depend on performance and the

13   targets?

14   **A.**    I did.

15   **Q.**    Okay.  How much did you make in options during the time

16   you worked there at Autonomy?

17   **A.**    I don't know exactly, but a lot of money.

18   **Q.**    16 million?

19   **A.**    Probably as close to that, grossed, yeah.

20   **Q.**    You were very focused, when you were at Autonomy, on

21   getting this -- these bonuses and the options, weren't you?

22   **A.**    On getting?  I was very interested in getting options and

23   bonuses.

24   **Q.**    And so you were very interested in meeting the targets

25   that had been set for you; right?

1  **A.**   I was generally very interested in meeting targets, yes.

2  **Q.**   You told -- I think you told the jury that you didn't

3  discuss or you rarely discussed the bonus with Mike Lynch or

4  Sushovan Hussain?

5  **A.**   I described that it was not done every quarter.  That

6  there was a sheepishness about doing it unless you had

7  performed exceptionally.

8  **Q.**   You chased them all the time about bonuses, didn't you?

9  **A.**   I had to, yes, or I wouldn't have been paid a bonus.

10  **Q.**   Let's look at some of this.  In that same volume, 6132 --

11        **THE COURT:**  Admitted.

12    (Trial Exhibit 6132 received in evidence)

13  **BY MR. KEKER:**

14  **Q.**   This is an email in which you were -- back in 2008, you're

15  after them for bonuses; right?

16  **A.**   It looks like that, yes.

17  **Q.**   6128, please.

18    Move that in, Your Honor.

19        **THE COURT:**  Admitted.

20    (Trial Exhibit 6128 received in evidence)

21  **BY MR. KEKER:**

22  **Q.**   And look at the bottom email from you.  This is you

23  chasing the bonus, making recommendations about what it should

24  be; right?

25  **A.**   I find this pretty hard to follow, but it looks as though

1  I'm trying to chase six quarters worth of bonuses, or am I just

2  summarizing them and chasing a portion?

3  **Q.**   I don't want to waste a lot of time on it.

4      You weren't shy about urging them to pay you a bonus, were

5  you?

6  **A.**   No.

7  **Q.**   Okay.  And you would take credit -- part of the pitch

8  would be that you would take credit for some of these reseller

9  deals that we've been hearing about; for example, Kraft, Lilly

10  and so on?

11  **A.**   Part of the pitch was I would take credit on a deal like

12  Kraft or Lilly.  If I was involved with the actual sale to the

13  end user, I would claim that as part of the rationale for a

14  bonus, yes.

15  **Q.**   Exhibit 6129 can we put that up -- or I move that in,

16  Your Honor.

17      **THE COURT:**  Admitted.

18      (Trial Exhibit 6129 received in evidence)

19  **BY MR. KEKER:**

20  **Q.**   6129.  If you look at the page that's marked 6129-A001,

21  it's about 5 pages in, and this is an example of you taking

22  credit here --

23  **A.**   Sorry.  I think I only have two pages on this.  This is

24  6129?

25  **Q.**   A.

1  **A.**  Oh, sorry.  I have three pages.

2  **Q.**  Go past the blue page.

3  **A.**  Oh.

4  **Q.**  Or you can look at it on the screen, sir.

5      You're taking credit for Kraft, Lilly, Morgan Stanley, and

6  so on, as relevant to your bonus; right?

7  **A.**  I think I am, yep.

8  **Q.**  And in -- you've talked about the BofA deal that you were

9  very proud of.  You negotiated -- on that deal, you had

10 negotiated a $460,000 bonus, didn't you?

11 **A.**  I think that's right, yep.

12 **Q.**  And in Q -- in the first quarter of 2011, you needed the

13 Prisa deal to make your target, didn't you?

14 **A.**  I don't know.

15 **Q.**  Okay.  Were all of these deals that you have been talking

16 about on direct examination important to your income?

17 **A.**  No.

18 **Q.**  You pushed hard to get bonuses, didn't you, though, sir?

19 **A.**  I pushed hard to get them paid.

20 **Q.**  Okay.  And they were very important to you?

21 **A.**  Yes.

22 **Q.**  Look at 6146.

23     And I move that into evidence.

24         **THE COURT:**  It's in evidence.

25         **MR. KEKER:**  Okay.  That's even better.

1    Q.   This is an email that you wrote to Mr. Hussain --

2         THE COURT:  I'm sorry.  I'm sorry.  My mistake.  6146?

3         MR. KEKER:  We move it in if it's not in.

4         THE COURT:  It is now.

5         (Trial Exhibit 6146 received in evidence)

6    BY MR. KEKER:

7    Q.   This is an email that you wrote on April 14, 2011, to

8    Mr. Hussain, and it says "Bonus and options.  Sush, reminder

9    that I really want this dealt with today.  Three quarters

10   behind on bonus, normalization required to do that, conditional

11   options, further options.  Thanks.  SE," Stouffer Egan.

12        This was pushing Mr. Hussain to get you paid this big

13   bonus that eventually you were paid in May?

14   A.   That's right.

15   Q.   Okay.  Now, this just happens to be the day that

16   Mr. Truitt -- you say you and Mr. Truitt went to a meeting with

17   Mr. Hussain for the sole purpose of upbraiding him about

18   backdating the Prisa deal; right?

19   A.   What was the word?  I'm sorry.

20   Q.   On April 14, 2011, that's the day you said you and

21   Mr. Truitt went to a meeting with Mr. Hussain for the sole

22   purpose of upbraiding him about the Prisa --

23   A.   I'm sorry still not following the term, "upbraiding."

24   Q.   Criticizing him, saying "We are never going to do this

25   again.  This is terrible."

1    **A.**    That's your characterization.  I'm clear about what we

2    were doing the meeting for.

3    **Q.**    Say it again.  So you went to a meeting.  You had one

4    purpose and that was to tell Mr. Hussain what?

5    **A.**    The main purpose.

6    **Q.**    You said one purpose before.

7    **A.**    I believe I said the main purpose.  If I said one purpose,

8    I mean the main purpose.

9    **Q.**    Okay.  The main purpose was to tell Mr. Hussain what?

10        Let's leave that up, Jeff.

11   **A.**    Dave requested that he wanted to have an audience with

12   myself and Sushovan specifically to discuss backdating and how

13   he didn't want to ever do it again and he wanted assurances

14   that we would never do it again.

15   **Q.**    And so that meeting happened on April 14 and this is the

16   email that you wrote after the meeting?

17   **A.**    I don't know if it's before or after the meeting.

18   **Q.**    Okay.  Could -- okay.

19        And the jury has seen the email that Mr. Truitt wrote.

20   Mr. Truitt was there to sell software, wasn't he?

21   **A.**    Was he there to sell software?

22   **Q.**    Yeah.  He was pushing his software and wrote an email

23   afterwards saying what a great meeting, "I loved getting

24   together about selling my software"?

25   **A.**    I don't remember if that's what he was writing in the

1  email.  I know we looked at the email.  I just don't recall

2  specifically what it said.

3  **Q.**  You cared a lot about money, as everybody does, but you

4  cared -- you also weren't at all shy about letting Mr. Lynch

5  and Mr. Hussain know when you were unhappy about something,

6  were you?

7  **A.**  I would characterize that I was very shy about letting

8  them know when I was unhappy about something.

9  **Q.**  Let's look at -- do you remember a time when you were

10  trying to get a loan on the house that you wanted in Seadrift

11  out at Stinson Beach?

12      You have a beach house out there; right?

13  **A.**  I do.

14  **Q.**  You went to the bank to get a loan and you asked Andy

15  Kanter to write a letter to the bank saying what your income

16  was so that you could get a loan?

17  **A.**  That sounds familiar.

18  **Q.**  And Mr. Kanter wrote -- let's look at 6141.

19          **THE COURT:**  Admitted.

20      (Trial Exhibit 6141 received in evidence)

21  **BY MR. KEKER:**

22  **Q.**  Mr. Kanter sent the letter and you criticized him for it.

23  You were mad that he didn't write a more expansive letter.

24      Let's look at the letter.  It's the second page.  Here is

25  the letter he wrote to the bank.  And at the end, it says,

1    "Mr. Egan's current base pay is 345,000 per annum.  He is

2    eligible for a quarterly bonus of up to $50,000."

3         And go back to the email, please.  First page.

4    **A.**   Oh.

5    **Q.**   And you called him up and were angry because he hadn't --

6    the letter was too soft and you weren't going to be able to get

7    the loan; right?

8    **A.**   I don't recall calling him up or being angry at all.

9    **Q.**   "Not really sure what more can be said about bonuses.  We

10   can't stretch the truth," is what he says to you.

11        Did you ask him to stretch the truth?

12   **A.**   I did not, to my recollection.

13   **Q.**   Look at 6139, please, sir.

14        **THE COURT:**  Admitted.

15        (Trial Exhibit 6139 received in evidence)

16   **BY MR. KEKER:**

17   **Q.**   At the bottom, it's the Andy Kanter, "We can't stretch the

18   truth," and you then send that on to Mike Lynch and Sushovan

19   Hussain, with whom you were very shy, and you say, "I am" --

20   blank -- "pissed.  Sush, you ask why I don't go to him for this

21   sort of thing and it's precisely this," whatever.  "Insecurity

22   complex, fueling, misinterpretation and then insulting

23   inference.  I don't know whether you guys let him have it when

24   he pisses you off in the office, but I am close to letting

25   loose on him."

1            This is shy Stouffer Egan responding to Mr. Lynch and

2    Mr. Hussain?

3    **A.**   Not at this moment, no.

4    **Q.**   About a matter that has to do with your pocketbook, money?

5    **A.**   More so a matter that has to do with trying to close a

6    real estate transaction.

7    **Q.**   Now, after -- okay.  That can come down.

8            After the acquisition, you said you stayed with

9    Hewlett-Packard, and in July, before Hewlett-Packard cried

10   fraud or started this beef with Dr. Lynch and Mr. Hussain, you

11   were interviewed by Hewlett-Packard lawyers?

12   **A.**   Can you clarify.  July of --

13   **Q.**   July of 2012.  You were interviewed by a lawyer named

14   Mr. Erikson -- or Schweiker, I think.  Eric Schweiker.  Do you

15   remember that?

16   **A.**   That sounds familiar.

17   **Q.**   And you told -- he asked you about Autonomy and you told

18   him that in general, that hardware sales were made in aid of

19   selling more software; right?

20   **A.**   I may have said that, yep.

21   **Q.**   And you told him that the -- any change from hosting to

22   licensing was real and it was perfectly legitimate; right?

23   **A.**   I do not have a good recollection.  This was eight years

24   ago, so I don't remember exactly what I said to him.

25   **Q.**   Do you have a binder up there?  Do you have --

1    **A.**   This separate binder?

2    **Q.**   Yes.  And would you look at -- I think it's 5283.  And if

3    you need to look at that to refresh your recollection of what

4    you told him back in July of 2012 before Hewlett-Packard cried

5    fraud, feel free to look at it.

6         But let me just ask you.  You told him that the reseller

7    deals were all at risk, they were real transactions, ownership

8    passed to the VAR; right?

9    **A.**   Again, I don't recall specifically what I told him.  This

10   was one meeting, I believe, a very long time ago.

11   **Q.**   But didn't you tell him -- did you say that there was

12   anything wrong with these reseller deals?

13   **A.**   Not that I remember.

14   **Q.**   And you didn't remember much about Capax in that July 2012

15   interview, did you?

16   **A.**   I don't know -- I don't remember -- I remember literally

17   having the interview, but that's not -- none of it is something

18   that I've reviewed since or spent any time revisiting.

19   **Q.**   You certainly didn't tell him anything about backdating or

20   side letters or side agreements, did you?

21   **A.**   I don't believe I did.

22   **Q.**   All right.  So then that was in July of 2012.  Then you

23   were interviewed by Hewlett-Packard lawyers.

24        And we've got a chart to try to keep these things

25   straight, Your Honor, to use as a demonstrative, and I think

 1    the number is 6220.  Can we put it up on an easel back here?

 2            THE COURT:  Show it to the Government.  6220?  Is that

 3    it?

 4            MR. KEKER:  6220 is the number we put on this

 5    demonstrative.

 6            THE COURT:  Sorry?

 7            MR. KEKER:  6220 is the number we put on the

 8    demonstrative.  It's simply a listing of his known interviews.

 9            THE COURT:  Any problem?

10            MR. REEVES:  Is there a reason why we couldn't have a

11    demonstrative the same size as the other demonstratives?

12            THE COURT:  Yes, there is a reason.  And the reason is

13    that you picked the size for yours and Mr. Keker picked the

14    size for his, and that's the reason.

15            MR. REEVES:  No objection, Your Honor.

16            THE COURT:  Okay.  There we go.

17        Ladies and gentlemen, this is for demonstrative purposes.

18    Again, it's not evidence, but it is used to assist in the

19    witness' testimony.

20        I'm sorry.  It's 6220?

21            MR. KEKER:  6220, yes, sir.

22    Q.  Can you see that, Mr. Egan?

23    A.  I can.

24    Q.  Okay.  Now, at the top -- we'll get to the bottom in a

25    minute.  Those are government interviews.

EGAN - CROSS / KEKER

1          But the top interviews are interviews that you had with

2   Hewlett-Packard lawyers before you got a lawyer; right?

3   A.   I don't know, but it looks right.

4   Q.   Do you remember being interviewed by lawyers representing

5   Hewlett-Packard in -- we've talked about July 2012, but then

6   once Meg Whitman came out and said, "Oh, we've been defrauded,"

7   you were interviewed four times within the next -- right around

8   the time you were leaving the company; right?

9   A.   I think it was all after.  No.  I -- I remember

10  approximately four meetings, yeah.  I don't remember whether it

11  was before or after.

12  Q.   Okay.  And in those meetings up above -- the ones with

13  Hewlett-Packard lawyers back there in 2012, 2013, which I grant

14  you is a long time ago -- you told the Hewlett-Packard lawyers

15  that Sushovan Hussain was a highly ethical person; right?

16  A.   I believe I did make that statement.

17  Q.   And you told them that he didn't make much money?

18  A.   I don't know if I said that specifically.  That doesn't

19  sound --

20  Q.   You told them that he would never do anything

21  self-beneficial?

22  A.   I probably expressed that sentiment.

23  Q.   Okay.  And you know Mr. Hussain fairly well, don't you?

24  A.   I did and I do, I think.

25  Q.   And you know his family?

1    **A.**    I do.  Well, I know his wife.

2    **Q.**    You recognize her in the courtroom here?

3    **A.**    I do.

4          **MR. REEVES:**  I object, Your Honor.

5    **BY MR. KEKER:**

6    **Q.**    And you know he has children?

7    **A.**    I do know that.

8    **Q.**    And you know his background?

9    **A.**    I do know much of his background.

10   **Q.**    Okay.  And you told the Hewlett-Packard lawyers there

11   before you got a lawyer that hardware -- Autonomy sold hardware

12   in order to sell software.  They were strategic, they were

13   tactical, but you were trying to sell more -- using hardware to

14   sell more software; right?

15   **A.**    Generally I believe I did express that.

16   **Q.**    Okay.  And you said that Mr. Hussain wanted to make

17   Autonomy more like a typical software company of its size,

18   which -- by selling some hardware?

19   **A.**    Again, I don't remember if -- the specifics of these

20   conversations.

21   **Q.**    Well, but --

22   **A.**    It was a long time ago.

23   **Q.**    Did you say words to that effect to the Hewlett-Packard

24   lawyers back then?

25   **A.**    It sounds reasonable, but I -- you know, you say it like I

1    said this, and I'm uncomfortable confirming it as a specific

2    statement.

3    **Q.**    If you need to refresh your recollection, you can open

4    that book and I can direct you to the page and the -- where you

5    could look, if you want to check any of this.

6    **A.**    I'll follow your lead.

7    **Q.**    You told them that the resellers took 100 percent of the

8    risk.  They were on the hook; right?

9    **A.**    Yes.

10    **Q.**    You told them that resellers had to sign paperwork to

11    make -- and they had to pay?

12    **A.**    Again, I generally expressed that sentiment, yes.

13    **Q.**    And you said that the resellers were real and viable

14    companies?

15    **A.**    I probably expressed that sentiment.

16    **Q.**    And you said that Sushovan Hussain was constantly giving

17    parameter adjustments to stay within the accounting rules for

18    resellers; right?

19    **A.**    Yes.

20    **Q.**    And you said he was greatly concerned about -- one of them

21    was concerned about collectability, trying to find out what the

22    balance sheet looked like and so on?

23    **A.**    That sounds right.

24    **Q.**    Okay.  And you said that there were no -- that there were

25    no side agreements.  You didn't know of any.  It was a firing

1    offense or it was a way to lose your job if you did a side

2    agreement?

3    **A.**    Two separate issues.  One, I may have expressed that it

4    was discussed as a firing offense in the company, that a side

5    letter or side arrangement -- that's the case.

6        I personally did the side arrangement of Capax, so if I

7    didn't express that at the time that I was interviewed, I

8    regret it and should have.

9    **Q.**    Okay.  There's no question you didn't express that at the

10   time you were interviewed by the Hewlett-Packard lawyers, is

11   there?

12   **A.**    I don't know.  You could direct me to it, but I don't

13   think I did.

14   **Q.**    You said you didn't know of any side agreements?

15   **A.**    I probably did.

16   **Q.**    And you said that -- to the Hewlett-Packard lawyers before

17   you got a lawyer, you said that Autonomy historically farmed

18   out a lot of EDD processing work because it was a surge and

19   shortage business where the customer demanded that a lot of

20   data be processed quickly; right?

21   **A.**    I did say that.

22   **Q.**    And then you got another chance to talk about this when

23   the Air Force raised questions about the allegations

24   Hewlett-Packard was making and asked you to respond to them;

25   right?

1   **A.**   I did not get a chance to -- I forget how you just termed

2   it, but I did not express myself -- how did you say it?

3   **Q.**   By that time, did you have a lawyer?

4   **A.**   I did.  At the time of the Air Force letter, I had a

5   lawyer.

6   **Q.**   Did you have your lawyer write a letter to the Air Force

7   for you?

8   **A.**   I did.

9   **Q.**   Did you review the letter that your lawyer wrote to the

10  Air Force before it went out?

11  **A.**   I did.

12  **Q.**   Did it express your sentiments and your views at the time

13  it was sent?

14  **A.**   I approved the letter.  I thought it read correctly.

15  **Q.**   Look at 6176, please, sir.

16          And I move it in, Your Honor.

17          **THE COURT:**  Admitted.

18          **MR. KEKER:**  This is the Air Force letter.

19          **THE COURT:**  Admitted.

20      (Trial Exhibit 6176 received in evidence)

21          **THE WITNESS:**  Which book is that?

22          **MR. KEKER:**  It's in the same book we've been looking

23  at.  6176.

24          **THE WITNESS:**  I think we switched.

25          **THE COURT:**  Well --

1          MR. KEKER:  It would probably be in the last binder.

2          THE COURT:  But it's on the screen.  I mean, I'm

3    admitting it.

4          MR. KEKER:  Okay.  It's admitted.

5          THE COURT:  So just take a look at it.  It's right

6    there.

7    BY MR. KEKER:

8    Q.  What I want to direct your attention -- this was

9    written --

10          THE COURT:  Wait, wait, wait.

11          THE WITNESS:  It will be all right.  They have been

12    making it bigger.  Right now I can't read it well, but all

13    right.

14          THE COURT:  Okay.  There.

15    BY MR. KEKER:

16    Q.  Can we look at page 3 at the paragraphs that say "Egan

17    acted with honesty and transparency."

18          And did you tell, through your lawyer -- tell the

19    Air Force that "At no time did Mr. Egan make any

20    misrepresentations to Autonomy's independent auditors, to the

21    audit committee, or to any members of the finance department,

22    nor was Mr. Egan ever made aware that material facts were being

23    concealed from or misrepresented to any audience, whether they

24    be the company's auditors, the audit committee, HP, or members

25    of the investing public."  Did you say that to the Air Force?

1   **A.**   My lawyers wrote this to the Air Force in response to

2   something that they had written to me.  I reviewed the letter.

3   I believe that statement "at no time did Mr. Egan make any

4   misrepresentations to Autonomy's independent auditors, to the

5   audit committee, or to any members of the finance department"

6   to be true.

7   **Q.**   "Nor was Mr. Egan ever made aware that material facts were

8   being concealed from or misrepresented to any audience"?

9   **A.**   "Aware that material facts were being concealed" -- yeah.

10   I was comfortable with that being written.  I reviewed it.

11   **Q.**   The next paragraph says, "Mr. Egan at all times tried to

12   ensure that the finance team was fully aware of all the details

13   of transactions in which he was involved precisely to ensure

14   that the company's accountants, the auditors, and the audit

15   committee were all well-equipped to make the appropriate

16   accounting judgments and disclosure decisions."  You had your

17   lawyer -- you approved that; right?

18   **A.**   I felt that that generally expressed the level to which I

19   was constantly sharing every aspect of a deal, yes.

20   **Q.**   And then the last paragraph of that for -- the fourth

21   paragraph, beginning "indeed," next one down, "Indeed, before

22   the present allegations surfaced publicly" -- and that's a

23   reference to HP's accusations?

24   **A.**   Is that a question to me?

25   **Q.**   Yes.

1  **A.**  Can you repeat it?  Sorry.

2  **Q.**  Is the present allegations -- "Before the present

3  allegations surfaced publicly," is that a reference to HP's,

4  Hewlett-Packard's allegations?

5  **A.**  I believe so.

6  **Q.**  "Mr. Egan had no reason to suspect that the company's

7  accounting practices were in any way controversial, much less

8  improper."  That's what you said; right?  That's what you

9  approved?

10  **A.**  I did approve that.

11      **THE COURT:**  Can we -- I don't -- I am interrupting

12  because I want to take a recess.

13      **MR. KEKER:**  That's fine.

14      **THE COURT:**  Okay.

15  Ladies and gentlemen, we are going to take a recess now.

16  We will be in recess until 5 after 3:00.

17      Remember the admonition given to you:  Don't discuss the

18  case, allow anyone to discuss it with you, form or express any

19  opinion.

20              (Recess taken at 2:46 p.m.)

21          (Proceedings resumed at 3:04 p.m.)

22  (Proceedings were heard in the presence of the jury:)

23      **THE COURT:**  Please be seated.

24  Let the record reflect all parties are present, the jury

25  is present.

EGAN - CROSS / KEKER

 1          You may proceed.

 2          **MR. KEKER:**  Thank you, Your Honor.

 3   **Q.**   Mr. Egan, I want to go back to one matter.

 4          You were shown right at the end of your direct examination

 5   an Exhibit 2932.  We don't need to go there again, but it

 6   showed a calculation of your bonus for --

 7   **A.**   The big spreadsheet?

 8   **Q.**   Yeah.  You said it was confusing.

 9   **A.**   Yes.

10   **Q.**   All right.  Well, there's nothing -- that didn't indicate

11   your income at Autonomy for the years that we've been talking

12   about, did it?

13   **A.**   I think the document related only to four quarters.

14   **Q.**   Okay.  Look at 6145, please, which are your W-2s.

15          **THE COURT:**  Wait.  60 --

16          **MR. KEKER:**  6145, Your Honor.  I move them into

17   evidence, W-2s for 2008, '9, and '10 for Mr. Egan.

18          **THE COURT:**  Admitted.

19          (Trial Exhibit 6145 received in evidence)

20          **MR. KEKER:**  Can we put up the first one, 2008, and the

21   second page, Jeff, please?  And can you blow up in the upper

22   left-hand corner the total wages?

23   **Q.**   Your total wages in 2008 was $1,732,274.39; right?

24          **MR. REEVES:**  Your Honor, I'm sorry for the

25   interruption.  Could we please approach and could we please

1  take this exhibit down in its current form?

2          THE COURT:  Okay.  Well, ladies and gentlemen, just

3  have a conversation.  This will be brief.

4              (Sidebar conference heard but not reported.)

5          THE COURT:  As to the last exhibit, I'm removing it

6  from evidence because there's a different way of approaching

7  it --

8          MR. KEKER:  Right.

9          THE COURT:  -- though it can be in front of the

10 witness if you'd like.

11         MR. KEKER:  That's what I would like, Your Honor, and

12 I don't want to put any of this personal information or other

13 personal information in.

14         THE COURT:  Okay.

15 BY MR. KEKER:

16 Q.  So I'll just ask you the question.  Looking at your W-2s

17 for 2008, were your wages from Autonomy $1,732,274.39.

18 A.  I'm seeing a slightly different number, so just from a --

19 oh, sorry.

20 Q.  Number 1, b1, wages, tips, other comp.

21 A.  Yeah, the bolded number is 1,732,247.39.  Is that what you

22 said?

23 Q.  Okay.  That's a lot more than a 50,000-dollar a quarter

24 bonus and 345,000.  What does that -- where did all that money

25 come to you from?

1    **A.**    A number that large would be a combination of salary,

2    bonus, and exercising some options.

3    **Q.**    Okay.  And the way options -- just to make sure everybody

4    understands it, the way options -- when you exercise an option,

5    you have the right to buy that piece of -- that stock

6    certificate for an amount of money that was set in the past and

7    now the stock has risen in value so that when you exercise the

8    option, you get the difference between what you agreed -- what

9    they agreed to sell it to you for and what the price is now;

10   right?

11   **A.**    Correct.

12   **Q.**    And you make money that way?

13   **A.**    Correct.

14   **Q.**    And if the stock doesn't go up, your options are

15   worthless; right?

16   **A.**    Depending on where they were granted, yes.

17   **Q.**    Yeah.  But, I mean, so if you hold stock options in a

18   company, you have a vested interest in the stock going up?

19   **A.**    Yes.

20   **Q.**    So you had -- in terms of your targets and your

21   compensation being tied to your targets, you had an interest

22   both in the bonus and the stock options in making sure that the

23   stock went up; right?

24   **A.**    Yes.

25   **Q.**    Okay.  Look at 2009.  Let's get the number for 2009, which

1    is the next page.

2         And, again, I'm just going to ask you, from what's written

3    there, was your wages, tips, and other compensation in 2009 at

4    Autonomy $4,437,236.98?

5    **A.**   It was.

6    **Q.**   Okay.  And then in 2010, was it $963,508.27?

7    **A.**   It was.

8    **Q.**   All right.  Thank you.

9         So let's go back.  We talked about the Air Force letter.

10   We talked about the interviews you had with the Hewlett Packard

11   in-house counsel.

12        And sometime later in July of -- or, excuse me -- in May

13   of 2014 or before that, you learned that the prosecutors in

14   this case and the FBI wanted to talk to you?

15   **A.**   I did.

16   **Q.**   Okay.  And you had left Hewlett Packard about a year and a

17   half before that first interview?

18   **A.**   That looks right.

19   **Q.**   And you knew that Hewlett Packard was pushing hard to get

20   a criminal investigation and prosecution going, didn't you?

21   **A.**   I think I inferred that.

22   **Q.**   Okay.  And you knew that Hewlett Packard had this case

23   pending against Dr. Lynch and Mr. Hussain in London seeking

24   civil damages because they'd been defrauded; right?

25        **MR. REEVES:**  Objection.  Relevance.

1          **THE COURT:**  Overruled.

2          **THE WITNESS:**  I remember finding out that there was a

3    civil suit brought by HP.  I don't remember the date of whether

4    it was before or after when I was asked through my lawyers to

5    meet with prosecutors.

6    **BY MR. KEKER:**

7    **Q.**   And you had -- in meeting with the Hewlett Packard

8    lawyers, they had recommended to you a lawyer for you to hire,

9    hadn't they?

10   **A.**   They recommended that I get a lawyer and they gave me a

11   list of names, yes.

12   **Q.**   Okay.  And did you hire one of the people that they

13   recommended?

14   **A.**   I did ultimately.

15   **Q.**   And were the Hewlett Packard lawyers, as you understood

16   it, people who used to be in this U.S. Attorney's Office when

17   they were -- some years ago, no longer in the office but used

18   to be U.S. Attorneys here?

19          **MR. REEVES:**  Objection.  Foundation.

20          **THE COURT:**  Well, the question is did he learn that,

21   did he know that.  That's the question.

22          **THE WITNESS:**  I did not know that at the time.

23          **THE COURT:**  Okay.

24   **BY MR. KEKER:**

25   **Q.**   Did you know Leslie -- did you meet Leslie Caldwell when

**EGAN - CROSS / KEKER**

1    you were being interviewed?

2    **A.**    I did.

3    **Q.**    Did you know that Ms. Caldwell had been a lawyer in this

4    office?

5    **A.**    I did not at the time.

6    **Q.**    Do you know it now?

7    **A.**    I do.

8    **Q.**    Okay.  She was a lawyer in this office; right?

9    **A.**    I do know that at the time.

10    **Q.**    And she recommended to you to hire one of her former

11    colleagues from this office as your lawyer; right?

12    **A.**    No.  She gave me a list -- well, she and others gave me, I

13    believe, four names.

14    **Q.**    Okay.  Was your lawyer, the lawyer you eventually hired,

15    one of the names?

16    **A.**    He was.

17    **Q.**    And did you learn that he had been a former prosecutor in

18    this office?

19    **A.**    I believe that that was part of his telling me his

20    experience, and so forth.

21    **Q.**    And he'd been a colleague of the Hewlett Packard lawyer,

22    Ms. Caldwell?

23    **A.**    I don't know if he told me that.

24    **Q.**    Did you have any reason that you wanted to help Hewlett

25    Packard when you started to talking to the prosecutors?

1    **A.**    No.    I mean, I wanted to be cooperative, but I didn't have

2    an agenda to help Hewlett Packard.

3    **Q.**    When you first met the Hewlett Packard lawyers, did you

4    tell them that you could have chosen Lynch or Hewlett Packard

5    and you're choosing Hewlett Packard?

6    **A.**    I may have referred to that in terms of my employment

7    where I stayed.

8    **Q.**    But about the dispute, did you tell them that "In this

9    dispute I could have chosen Lynch or I could have chosen

10   Hewlett Packard, and I'm choosing you guys"?

11   **A.**    I don't recall saying that.

12   **Q.**    Look at that book that's in front of you, please, and

13   Exhibit 5235.

14   **A.**    5235?

15   **Q.**    5235.    It's the very first interview.    And on page 2 in

16   the third full paragraph, read that to yourself, please, the

17   second sentence.

18   **A.**    Can you just tell me what this is?    These are notes or

19   something?

20   **Q.**    Well, you look at it.    This, as I understand it, is a

21   Memorandum of Interview with Stouffer Egan on November 21,

22   2012, prepared by the lawyers that you were talking to.

23   **A.**    Okay.    And where did you want me to read?

24   **Q.**    I'd like you to look at the second page, the third

25   paragraph down, and the second sentence that begins "Egan

1   added."

2   **A.**   (Witness examines document.)

3   **Q.**   And my question, sir, is:  Did you say that when Lynch

4   left, Egan could have taken Lynch's side or HP's side and Egan

5   chose HP?  Did you tell that to the Hewlett Packard lawyers?

6   **A.**   I believe what that's referring to is I expressed the fact

7   that when Lynch left, he tried very hard to have me leave with

8   them, and I didn't do that.  I stayed at HP, and I do remember

9   expressing that.

10  **Q.**   Did you have any -- when you started meeting with the

11  prosecutors, did you have any reason to want to help Hewlett

12  Packard?

13  **A.**   Other than just to be candid?

14  **Q.**   Yes or no?  Did you have any reason to want to help

15  Hewlett Packard when you started talking to these prosecutors?

16  **A.**   I wanted to be truthful and transparent and provide

17  information.

18  **Q.**   Okay.  And have you been with Hewlett Packard lawyers?

19  **A.**   At what point?

20  **Q.**   When you talked to them.

21  **A.**   Had I been with them when I --

22  **Q.**   Have you been truthful and candid with the Hewlett Packard

23  lawyers who you talked to five times?

24  **A.**   Oh.  Generally, yes.

25  **Q.**   Okay.  Your lawyer arranged that your interview with the

 1   United States Attorney's Office and the FBI would be under

 2   something called a Proffer Agreement; right?

 3   **A.**   I believe that's correct.

 4   **Q.**   And 6125 is your Proffer Agreement.

 5          **MR. KEKER:**  We'd offer that into evidence, Your Honor.

 6          **THE COURT:**  Okay.  Wait a minute.  61 --

 7          **MR. KEKER:**  6125.

 8          **THE COURT:**  6125.

 9                     (Pause in proceedings.)

10          **THE COURT:**  Any objection?

11          **MR. REEVES:**  I don't think so, Your Honor.

12          **THE WITNESS:**  Is that in the fourth book?

13          **THE COURT:**  Sorry?

14          **MR. REEVES:**  No, no objection.

15          **THE COURT:**  Admitted.

16      (Trial Exhibit 6125 received in evidence)

17   **BY MR. KEKER:**

18   **Q.**   Okay.  The Proffer Agreement -- what did you understand

19   the Proffer Agreement was?

20   **A.**   My understanding was it was an agreement that effectively

21   governed the conversation between myself and the Government.

22   **Q.**   Okay.  In paragraph 2 here it says (reading):

23          "Except as set forth in paragraph (3), the Office" --

24      That's the U.S. Attorney's Office?

25   **A.**   I haven't looked at this in a very long time, so maybe I

1    should review it if you want to ask me some specific questions.

2    **Q.**    Well, I just want to kind of get through it.

3    **A.**    Okay.

4    **Q.**    (reading)

5          -- "the Office will not offer in evidence any

6          statements made by Client at the meeting in a

7          Grand Jury proceeding to indict Client, in the

8          case-in-chief at a trial against Client, or at

9          Client's sentencing."

10         And it goes on.  Were you somewhat taken aback to have an

11   agreement that started talking about you being indicted and

12   sentenced and going to trial in a criminal case?

13   **A.**    I was taken aback by the whole circumstance at this time,

14   yes.

15   **Q.**    I'm sure.

16         And did you learn the consequences of what would happen to

17   you if there was a criminal proceeding brought against you?

18   Did you learn about it at the time of this Proffer Agreement?

19   **A.**    I don't remember when I learned about that, but I did

20   discuss with my lawyers that it would be a negative event

21   obviously if I was prosecuted.

22   **Q.**    Negative event in what way?

23   **A.**    I didn't have the details.

24   **Q.**    Well, did you have -- did you know you could go to jail if

25   you were convicted?

1   **A.**   Of certain things, I probably did, yeah.

2   **Q.**   For how long?  Did you have any sense of how long you

3   could go to jail for?

4   **A.**   I did not.  We didn't talk about that.

5   **Q.**   Did you have any sense that you could lose all your money,

6   they'd forfeit all your money?

7   **A.**   Again, we didn't talk about specifics.

8           **MR. REEVES:**   Your Honor, I just object on the basis of

9   questions that may intrude on attorney-client privilege.  If

10  they can be re-formed, I have no objection to the line of

11  inquiry.

12  **BY MR. KEKER:**

13  **Q.**   Without saying what your lawyer told you, what did you

14  understand when you went home and talked to your wife, and so

15  on, about why you needed a Proffer Agreement and why anybody

16  was talking about indicting you, a case-in-chief against you,

17  or a sentencing against you?  What did you understand you were

18  facing?

19  **A.**   At this point I had very little understanding of how

20  things would unfold.  I was discussing with my lawyers that I

21  wanted to be cooperative.  I thought that was the best path

22  first and foremost.

23      I had no expectations or beliefs about what would happen.

24  I just walked forward into being willing to talk.  I'd done it

25  without lawyers.  Now it was recommended to me that I should

1  have lawyers.  I hired them and I was following their advice.

2  **Q.**  Were you scared?

3  **A.**  Not really, no.

4  **Q.**  Did it occur to you that you had done some things that

5  might get you in trouble?

6  **A.**  It occurred to me that I'd done some things that were

7  wrong and that they could get me in trouble.

8  **Q.**  Okay.  For example, the Prisa backdating that you did with

9  Truitt?

10  **A.**  Yes.

11  **Q.**  All of that, all the paperwork there is between you and

12  Truitt and his people; right?  It's just your word, "Oh,

13  Sushovan told me to do it"?

14  **A.**  Correct.

15  **Q.**  Yeah.  And then selling resellers too hard, you said

16  yesterday that you misrepresented some of these deals to the

17  resellers?

18  **A.**  That I misrepresented them to the resellers?

19  **Q.**  Yeah.  I thought -- when you first testified, I thought

20  you were saying that among the crimes that you committed were

21  that you oversold these deals to resellers.  You told them they

22  were going to close when really they weren't.

23  **A.**  No.  I said I sold deals to resellers when they were not

24  closed with the end user.

25  **Q.**  Did you think that was a crime?

1    A.    I did not.

2    Q.    How about making side agreements with Baiocco?  Did you

3    think that would be a little problem?

4    A.    If I thought about that specific agreement, I would have

5    thought that was a problem.

6    Q.    And did you recognize that whatever agreement you and

7    Baiocco had, you didn't -- you hadn't written it down or nobody

8    else at Autonomy was going to -- knew about it?

9    A.    Did I recognize that?

10   Q.    Yeah.

11   A.    I did.

12   Q.    So did you think about what you had to lose at that point?

13   A.    At which point?

14   Q.    The point you started talking to the prosecutors.

15   A.    Not much, no.

16   Q.    You didn't want to be prosecuted, did you?

17   A.    Of course not.

18   Q.    And you didn't want to go to jail?

19   A.    Of course not.

20   Q.    You didn't want to lose your money?

21   A.    Of course not.

22   Q.    You didn't want to lose the house that you live in in

23   Sea Cliff?

24   A.    I did not.

25   Q.    You didn't want to lose the house at the beach in Stinson

1    Beach?

2    **A.**   I did not.

3    **Q.**   And did you understand that the only way you could make a

4    deal with the prosecutors is if you gave them somebody?

5    **A.**   Did I understand what?

6    **Q.**   The only way you could make a deal with the prosecutors is

7    if you gave them somebody that was above you.

8    **A.**   I didn't understand that at all.

9    **Q.**   You met with the prosecutors, that we know of, 11 times.

10   Have you met with them more than 11 times?

11   **A.**   I've not kept track, but I take this to be the truth.

12   **Q.**   Have you practiced your testimony with them?

13   **A.**   No.

14   **Q.**   Have they told you what they were going to ask you?

15   **A.**   They've asked me questions.  They did not tell me

16   specifically what they would ask me.

17   **Q.**   Have you met with them since March 13th, 2018, which is

18   the last date we know of?  Today is the 20th.  A week ago.

19   **A.**   Yes.

20   **Q.**   When did you meet with them?

21   **A.**   I can give you the days of the week.  I can't give you the

22   dates.  I met with them on Tuesday of last week, I believe, and

23   Wednesday of last week, and then Saturday and Sunday.

24   **Q.**   Okay.  And for how long did you meet with them Tuesday,

25   Wednesday, Saturday, and Sunday?

EGAN - CROSS / KEKER

1  **A.**   Tuesday was the majority of the day -- yeah, majority of

2  the day -- Wednesday was the majority of the day, and Saturday

3  and Sunday were half days.  Like 1:00 o'clock till

4  5:00 o'clock.

5  **Q.**   You didn't practice your testimony with them?

6  **A.**   I did not practice my testimony.

7  **Q.**   Did you go over your testimony?

8  **A.**   I answered questions.

9  **Q.**   Did they ask you questions and you answer?  Is that how it

10  worked?

11  **A.**   Yes.

12  **Q.**   And did people make suggestions about ways you could

13  change your answer to make it a little better?

14  **A.**   No.

15  **Q.**   Nobody did?

16  **A.**   No.

17  **Q.**   Okay.  The whole time you met with them -- so we're

18  missing four more.  There's 13 there and there's four more

19  meetings.  So 17 meetings.  And all of them were under a

20  Proffer Agreement; right?

21  **A.**   I don't think so.

22  **Q.**   What wasn't?

23  **A.**   I don't think that the -- I think the Proffer Agreement, I

24  recall, is being when we would initial like this (indicating),

25  and the last few meetings were not initialed.  So I -- I'm not

1    an expert, but I --

2    Q.    That's because after 11 meetings, you finally got your

3    deal?

4    A.    I did do a deal.  I don't know where it falls in the

5    meeting.

6    Q.    Well, the date that we got from Mr. Reeves was, as I

7    remember, November 28 -- or November of last year,

8    November 2017; right?

9    A.    That's correct.

10    Q.    So you can count down.  It's after that September 1

11    meeting.  There were 11 meetings and then you finally got your

12    deal; right?

13    A.    Correct.

14    Q.    And you didn't get your deal after the first meeting?

15    A.    No.

16    Q.    Or the second; right?

17    A.    No.

18    Q.    Or your third?

19    A.    No.

20    Q.    Or your fourth?

21    A.    No.

22    Q.    All right.  And you understood that they were looking for

23    more; they wanted -- you understood that they wanted more and

24    different testimony than you'd given before?

25    A.    I understood they had questions, and I was there to answer

 1    them.

 2    **Q.**   When did you first remember that you'd backdated the Prisa

 3    deal?

 4    **A.**   When did I first remember that?

 5    **Q.**   Yeah.  Yeah.

 6    **A.**   I don't know how to answer that question.

 7    **Q.**   You don't know how?

 8    **A.**   Well, I don't have a -- it's not -- there's no date in my

 9    mind about when I first remembered that I did that.

10    **Q.**   Okay.

11    **A.**   I've generally known I did it.

12    **Q.**   You generally knew.  You didn't tell the Hewlett Packard

13    lawyers and it took six interviews.  You didn't know about

14    Prisa until November 7, 2014.  That's when you popped that in.

15    That made them happy; right?

16         **THE COURT:**  I'm sorry.  Wait.  Wait.  What's the

17    question?

18    **BY MR. KEKER:**

19    **Q.**   The question is:  You didn't remember that Sushovan

20    Hussain had told you to backdate the Prisa deal?  You didn't

21    even tell them that the Prisa deal was backdated?

22         **THE COURT:**  Wait.  There's two questions.

23         **MR. KEKER:**  I'm sorry, Your Honor.

24         **THE COURT:**  Ask him did he remember.

25         Go ahead.  You phrase it the way you want to phrase it,

1   but one question.

2   **BY MR. KEKER:**

3   Q.   When did you -- or I'll put it this way:  Did you first

4   tell them that the Prisa deal was backdated on November 7,

5   2014?

6   A.   I don't remember when I first discussed the Prisa deal and

7   the backdating.

8   Q.   Okay.  Do you have a set of your statements?  Has that

9   been provided to you by the prosecutors?

10  A.   Not that I'm in possession of.

11  Q.   But does your lawyer have them?

12  A.   I think so.  I assume so.

13  Q.   Can I give you a homework assignment tonight?

14  A.   What's that?

15  Q.   Can I give you a homework assignment?

16  A.   Sure.

17  Q.   Find out when you first told them about the Prisa deal.

18  A.   Okay.

19  Q.   Okay.  And see if it's November 7, 2014; right?

20  A.   Okay.

21  Q.   This event that you've told us you felt terrible about at

22  the time and you had a big meeting with Mr. Hussain, you didn't

23  tell them about it until well into your interviews with them;

24  right?

25  A.   It could be.  I don't know.

1  Q.   And, in fact, you told them about it one month after David

2  Truitt told them about it?

3  A.   I don't know.

4  Q.   Did you and Mr. Truitt talk during that month about what

5  your stories were, get things -- get your ducks in a row?

6  A.   No.

7  Q.   Okay.  All right.  In any event, by the time you were done

8  talking to them so many times, your story had changed fairly

9  radically, hadn't it?

10  A.   I don't think of it has having changed radically at all.

11  Q.   But early on you said that Capax was EDD processing surge,

12  and so on, and now you're saying Capax was wrong and you really

13  wish you hadn't done it; right?

14  A.   I'm not sure what you're referring to in the first

15  statement.

16  Q.   When you talked to the Hewlett Packard lawyers, you barely

17  mentioned Capax.

18  A.   That may be true.

19  Q.   You went from FileTek being completely appropriate to

20  FileTek deals making you nauseous?  Do you remember that?

21  A.   I don't remember that, no.

22  Q.   You don't remember using the words "I feel nauseous about

23  the FileTek deals"?

24  A.   I don't, no.

25  Q.   Mr. Hussain went from being a highly ethical person to a

1  person who made you, quote, "succumb to his will."  Do you

2  remember telling them that?

3  **A.**    As I said, I don't remember specific statements that I've

4  made in these interviews.  I've not reviewed any of the

5  transcripts.  I can give you characterizations of things that I

6  think were consistent with what I've said.

7  **Q.**    Let's just stick with Mr. Hussain.

8  **A.**    All right.

9  **Q.**    Do you remember he was a highly ethical person when you

10  were talking to the Hewlett Packard lawyers?

11  **A.**    I remember multiple times characterizing Sushovan as a

12  highly ethical person.

13  **Q.**    Okay.  And by the time you got finished with the

14  Government, you were saying that you had succumbed to his will

15  to do the nasty things that you were telling them you had done?

16  **A.**    There are times in general when I would express that, yes,

17  I succumbed to his will.

18  **Q.**    All right.  And, anyway, it worked.  You finally got the

19  deal that you'd been looking for; right?

20  **A.**    I was hoping for a deal.  I was not -- I was effectively

21  okay with whatever outcome.

22  **Q.**    You were okay with going to jail?

23  **A.**    If that's where it went, I had mentally gotten to where if

24  I learned that this is that, then, that's where this is going.

25  **Q.**    All right.  Well, the deal that you got is called a

1    Deferred Prosecution Agreement.  It was mentioned at the

2    beginning of your testimony.

3    **A.**   Yes.

4    **Q.**   And what it means is that as long as you abide by your

5    side of the Deferred Prosecution Agreement with the

6    U.S. Attorney's Office, you will go free?

7    **A.**   Correct.

8    **Q.**   You'll keep your money, you'll keep your houses, you'll

9    keep the beach house, and so on?

10   **A.**   Yes.

11   **Q.**   Okay.  Let's look at that agreement, and that is 6161 in

12   your book.  It was signed November --

13            **THE COURT:**  Admitted.

14            **MR. KEKER:**  And, Your Honor, I'm only moving the

15   two -- it's A and B and I'm only moving in the agreement and

16   not the attachments.  The attachments are hearsay and I would

17   object to them, but the agreement itself I'm moving in.

18            **MR. REEVES:**  Is he objecting to his own exhibit?

19            **THE COURT:**  He's objecting to a portion of the

20   exhibit.  He's introducing a portion of the exhibit, so the

21   question is:  Does the whole exhibit come in or not?  I don't

22   know the answer to that, but right now I think you can bring in

23   the portion that --

24            **MR. REEVES:**  We'd like the whole thing in, otherwise

25   we'd like to know what part he's offering, please, Your Honor.

 1          **THE COURT:**  He just told you.

 2          **MR. KEKER:**  Yeah.  I'm offering the agreement and

 3    there's some Attachment A and an Attachment B.  I'm objecting

 4    to both of those.

 5          **THE COURT:**  Okay.  Is there any objection -- well,

 6    what's your position?  What's the Government's position?

 7          **MR. REEVES:**  Our position is the whole document should

 8    come in as a whole.

 9          **THE COURT:**  Well, this is what I'm going to do:  I'm

10    going to allow in the portion that the Defense wants in and I'm

11    going to consider whether the whole document should come in as

12    well.  Okay?  But I'm not going to rule on it now.  I'll rule

13    on it after the jury leaves and we'll take this matter up.

14        Okay.  So, anyway, 6161?

15          **MR. KEKER:**  I can use it --

16          **THE COURT:**  What pages?

17          **MR. KEKER:**  That's what I'm going to do.  I can use it

18    just to refresh his recollection to the extent -- just put

19    61 -- I won't move anything in at this point, Your Honor.

20          **THE COURT:**  Oh, okay.

21    **BY MR. LEACH:**

22    **Q.**  Would you put 6161 in front of you?  Is that the -- do you

23    have the Deferred Prosecution Agreement in front of you?

24    **A.**  I do.

25    **Q.**  And in that agreement did you admit -- did you say that

1  you participated in a conspiracy to commit wire fraud?

2  **A.**   I did.

3  **Q.**   And did you admit the facts that are in Attachment B?

4  Look at paragraph 2.  You just have to look at paragraph 2 of

5  the agreement.

6  **A.**   I did.

7  **Q.**   And paragraph B is a Statement of Facts that the

8  prosecutors wrote for you; right?

9  **A.**   Can I see paragraph B?  There's a portion that I wrote.

10  **Q.**   You edited paragraph B but they wrote it for you, didn't

11  they?  I mean, Attachment B.  This is you saying what you did.

12  **A.**   No.  Were you talking about Attachment B?

13  **Q.**   Yeah.

14  **A.**   Statement of Facts?  I wrote that.

15  **Q.**   Okay.  You wrote it?

16  **A.**   I did.

17  **Q.**   And did they have anything to do with that Statement of

18  Facts?  Did they edit it or tell you to change this or that or

19  tell you what should be in it?

20  **A.**   "They" being?

21  **Q.**   The prosecutors.

22  **A.**   No.

23  **Q.**   Not at all?

24  **A.**   No.

25  **Q.**   Did you show them what you had written and then they --

1  and then your lawyer told you you had to change things?

2  **A.**   I shared it with my lawyers.

3  **Q.**   And did the prosecutors have some part in what that

4  Statement of Facts says?

5  **A.**   I believe they discussed it.

6  **Q.**   And said to your lawyer what needed to be in it?

7  **A.**   I don't know.

8  **Q.**   No clue?

9  **A.**   No.

10  **Q.**   Okay.  Statement B -- I mean, Attachment B, which I'm

11  calling hearsay, is something that if you don't say it on the

12  stand, then you break the agreement; right?

13  **A.**   I'm not sure I followed that.

14  **Q.**   It's your script.  It's what you have to say in order to

15  keep the agreement.

16          **MR. REEVES:**  Object.  That's argument now.  Objection.

17          **THE COURT:**  Well, I'm trying to figure out why the

18  whole agreement doesn't come in.

19          **MR. KEKER:**  Because --

20          **THE COURT:**  Now it's been referred to.  It's been

21  questioned about.  It seems to me that the document comes in.

22          **MR. KEKER:**  For the same reason that an Indictment

23  doesn't come in.

24          **THE COURT:**  If you ask questions about the Indictment,

25  it may very well come in.

EGAN - CROSS / KEKER

1           Anyway, you know what?  We'll deal with this during a

2   recess -- okay? -- because I think maybe -- you can ask some

3   more questions about this, Mr. Keker --

4           **MR. KEKER:**  I will.  Go ahead.

5           **THE COURT:**  -- but my ruling will depend on -- I want

6   to hear some argument about it after the jury has left.

7           **MR. KEKER:**  Okay.  Yes, sir.

8           **THE COURT:**  Okay.

9   **BY MR. KEKER:**

10  **Q.**  Did you accept criminal responsibility in paragraph 2 of

11  the agreement?  Look at that.

12  **A.**  (Witness examines document.)

13  **Q.**  You don't know if you accepted responsibility?

14  **A.**  I'd just like to look at the agreement.  I'm not a lawyer.

15      So you're asking me to look in --

16  **Q.**  Paragraph 2 --

17  **A.**  -- paragraph 2?

18  **Q.**  -- acceptance of responsibility.

19  **A.**  I did accept and admit responsibility.

20  **Q.**  Okay.  And did you promise to cooperate with the

21  prosecutors?

22  **A.**  I did promise to cooperate fully and in good faith.

23  **Q.**  And in return did the prosecutors promise to dismiss the

24  case -- an Indictment or an Information that had been filed

25  against you?

EGAN - CROSS / KEKER

1   **A.**    My understanding is they are promises to defer that.

2   **Q.**    And to not prosecute you?

3   **A.**    Correct.

4   **Q.**    Okay.  As long as you live up to your side of the

5   agreement?

6   **A.**    Correct.

7   **Q.**    Your side of the agreement is that you testify a certain

8   way?

9   **A.**    No.

10          **MR. REEVES:**  Objection.

11          **THE COURT:**  I'm sorry.  What?

12          **MR. REEVES:**  The question was that he testify a

13   certain way.  The agreement --

14          **THE COURT:**  That's the question.  Is that the

15   agreement, that he testify a certain way?

16          **MR. REEVES:**  I object to the form of the question.  It

17   should cite the agreement as reflected in the DPA.  We object.

18          **THE COURT:**  Fine.  Objection overruled.

19      The question is -- say it again, the question.

20   **BY MR. KEKER:**

21   **Q.**    Did you -- I've forgotten the question.

22          **THE COURT:**  Well, actually I have too.  Hold on.

23          **MR. KEKER:**  I overrule it.  Let me start again.

24   **Q.**    If you breach the agreement, if you break the agreement,

25   you can be prosecuted for any crime, including that charged in

**EGAN - CROSS / KEKER**

 1  the information, which is Attachment A; right?

 2  **A.**   I think that's my understanding.

 3  **Q.**   And the people who decide whether or not you have breached

 4  the agreement is the prosecutor in its sole discretion; right?

 5  **A.**   I believe that's correct.

 6  **Q.**   And you've agreed with the prosecutors that you will

 7  testify according to Exhibit B -- right? -- your Statement of

 8  Facts?

 9  **A.**   No.

10       **MR. REEVES:**  I object to that, Your Honor.  This is an

11  important area.  The question should be based on the document.

12  The document should be in evidence.  We object.

13       **THE COURT:**  Well, that's fine.  As I said, I'm going

14  to discuss it at 4:00 o'clock.

15  **BY MR. KEKER:**

16  **Q.**   If you don't stick to the script, they will prosecute you?

17  That's your understanding, isn't it, sir?

18  **A.**   It is not.

19  **Q.**   And did you waive the statute of limitations in

20  paragraph 11 so that they can prosecute you whenever?

21  **A.**   I remember waiving some statutes of limitations in this

22  whole process.  I don't -- I'm not familiar with paragraph 11.

23  **Q.**   Well, look at it and see if you waived -- paragraph 11B --

24  you waived the statute of limitations.

25  **A.**   (Witness examines document.)

1    **Q.**    Right?

2    **A.**    This is a very legal document.  I want to be exceptionally

3    truthful.  I'm not comfortable reading all that language and

4    answering the question.  That sounds right to me.

5    **Q.**    What are the penalties for the crimes that you've admitted

6    to?

7    **A.**    I don't know.

8    **Q.**    You don't have a clue?

9    **A.**    No, I don't.

10   **Q.**    Can you go to jail?

11   **A.**    I think you probably could.

12   **Q.**    For how long?

13   **A.**    I don't know.

14   **Q.**    You understand that if the prosecutors are dissatisfied

15   with your testimony, they in their sole discretion can decide

16   that you have breached the deal, broken the deal?

17   **A.**    It's not my understanding that they can do that if they're

18   dissatisfied, no.

19   **Q.**    If they prosecute you, they can prosecute you for crimes

20   that aren't even in the Information; right?  They can prosecute

21   you for anything they want to?

22   **A.**    I believe that is my understanding.

23        **THE COURT:**  So you're saying the Government can

24   prosecute you for anything that they want to prosecute you for?

25   That's the question?

1          **MR. KEKER:**  Well --

2          **THE COURT:**  Do you believe that to be the case, the

3    Government can prosecute you for anything they want to

4    prosecute you?  Is that your understanding?

5          **THE WITNESS:**  Are you asking me?

6          **THE COURT:**  Yeah.  Your state of mind.

7          **THE WITNESS:**  No, no, no.  I interpreted that to mean

8    that they could prosecute me for things that were not just in

9    the agreement, if there were things to prosecute me for, other

10   wrongdoing.

11   **BY MR. KEKER:**

12   **Q.**   They've charged Mr. Hussain with a whole laundry list of

13   wire fraud charges.  They could do the same thing to you,

14   couldn't they?

15   **A.**   I don't know.

16   **Q.**   Okay.  Let's talk about -- I asked you before whether or

17   not you had changed your testimony in order to get this deal

18   and as a result of all these meetings.  Let's take Capax as an

19   example.

20         When you talked to the Hewlett Packard lawyers without a

21   lawyer, you said that Capax was involved in EDD processing and

22   had invested in Autonomy.  Do you remember that?

23   **A.**   I don't remember that specifically.

24   **Q.**   Look at the very first statement in your book, the one

25   on --

1    A.    This one (indicating)?  Oh, no.  Sorry.  The white book?

2    Q.    The one 5235, and it's November 21, 2012, meeting with the

3    Hewlett Packard lawyers, and please look at page 7.

4    A.    (Witness examines document.)

5    Q.    And look at under Capax in the second paragraph, and tell

6    me whether or not you told them Capax was involved in

7    Autonomy's EDD processing.

8    A.    (Witness examines document.)  I've read that, and that

9    generally does convey a sentiment that I would have expressed

10   and recall expressing.

11   Q.    And then did you say Autonomy had a program where they

12   wanted other companies to incorporate EDD software processing

13   on their platform?

14   A.    Do I see that?  Yes.

15   Q.    Did you say that?

16   A.    I recall saying something to that effect and expressing

17   that sentiment, yes.

18   Q.    And did you say that Capax participated in this program

19   and invested in Autonomy in this way?

20   A.    Again, I don't know if I used those words, but the

21   sentiment I agree with.

22   Q.    Was Capax involved in Autonomy's EDD processing?

23   A.    They purchased software to process and invested in trying

24   to get that ability up.

25   Q.    And that's what you told the people in London, isn't it,

EGAN - CROSS / KEKER

1    at Autonomy?

2    **A.**    The people in London knew that.

3    **Q.**    Knew that they had purchased software in order to get a --

4    eventually get the capacity --

5    **A.**    Uh-huh.

6    **Q.**    -- to be able to handle overload; right?

7    **A.**    To be able to handle the EDD processing.

8    **Q.**    Whose idea was it to use POs that said "EDD processing,"

9    purchase orders?  That was your idea, wasn't it?

10   **A.**    No, not to use any specific wording or PO.

11   **Q.**    Who prepared the purchase orders?

12   **A.**    I don't recall.

13   **Q.**    Did you tell -- did you instruct the person who prepared

14   the purchase orders to say "Pay for EDD processing"?

15   **A.**    I chased people to generate the POs at times.

16   **Q.**    Okay.  By chasing them you mean --

17   **A.**    They were routinely delinquent in getting POs.

18   **Q.**    -- getting people in the Finance Department to prepare a

19   purchase order that said "Pay for EDD processing, 250,000," or

20   whatever the number is?

21   **A.**    Yes.

22   **Q.**    Okay.  And did you -- and you believed that they were

23   participating in a program for helping with overcapacity?

24   **A.**    I believed they were pursuing that.

25   **Q.**    Okay.  And did you think there was anything wrong with

**EGAN - CROSS / KEKER**

1  giving them a retainer to get their platform up and running?

2  **A.**  At the time I did not.

3  **Q.**  Did you tell Mr. Hussain that you wanted to have the

4  company buy them hardware to use on their platform?

5  **A.**  I don't recall.

6  **Q.**  Did you tell Mr. Hussain that you wanted to buy them

7  hardware to use on their platform?

8  **A.**  I don't recall that.

9  **Q.**  But Mr. Hussain certainly understood that once the

10  software was sold and later hardware was sold, they were

11  working to get their platform up and running; right?

12  **A.**  I do believe he understood that for sure.

13  **Q.**  And you were telling him that they were doing EDD

14  processing; right?

15  **A.**  I did not.

16  **Q.**  You didn't tell him they were doing EDD processing --

17  **A.**  No.

18  **Q.**  -- when you'd approved these purchase orders to say "We

19  need more money for EDD processing"?

20  **A.**  Right.  It was a retainer.  Both of our understanding was

21  until they could do it, we were paying them as a retainer.

22  **Q.**  To do EDD processing?

23  **A.**  Correct.

24  **Q.**  And they were in Boston getting trained and working in

25  eDiscovery for Autonomy, weren't they?

EGAN - CROSS / KEKER

1   **A.**   I don't know as I would characterize it that way.

2   **Q.**   Were they working for Autonomy in eDiscovery?

3   **A.**   Were Capax working for Autonomy in eDiscovery?

4   **Q.**   Yes.

5   **A.**   At what time?

6   **Q.**   At the time that you say that they weren't doing anything.

7   **A.**   For times -- for large portions of time when I was

8   involved in issuing them POs, they were not working for

9   Autonomy processing EDD, if that's the question.

10  **Q.**   They weren't helping with the Federal Reserve Board as a

11  partner of Autonomy's?

12  **A.**   Not to my knowledge.  I don't know that deal.

13  **Q.**   They weren't helping with McAfee?  The jury has seen all

14  of these.  They weren't helping with McAfee as a partner of

15  Autonomy's?

16  **A.**   I don't know.

17          **MR. REEVES:**  Your Honor, I object.  That misstates the

18  evidence and the testimony about services versus the

19  processing.

20  **BY MR. KEKER:**

21  **Q.**   "Services" is the word you used.  The reason for this

22  retainer was for services, getting EDD services; right?  That's

23  what you said.

24  **A.**   That -- again, can you ask your question?

25  **Q.**   Yeah.  What Capax was getting when they got money was

1    getting payments for EDD services; right?

2              MR. REEVES:  I object.  That misstates the evidence,

3    processing services.  We object.

4              THE COURT:  Well, I think the question is what is his

5    understanding of what they were -- what was occurring at this

6    time.

7         It's being characterized a particular way.  You can agree

8    with the characterization, you can disagree with the

9    characterization.

10             THE WITNESS:  I disagree with the characterization.

11             THE COURT:  Okay.  It's up to you.

12   BY MR. KEKER:

13   Q.   You what?

14   A.   I disagree with that characterization.  Capax was being

15   paid for POs on a retainer basis for EDD work that was not

16   being done.

17   Q.   A retainer basis to get them up and running; is that what

18   you're saying?

19   A.   No.  A retainer to fund them so that they could get up and

20   running through buying our software.

21   Q.   And this is an agreement that was in what contract?

22   A.   No contract.

23   Q.   This was an agreement that you and Mr. Baiocco had between

24   the two of you?

25   A.   That Autonomy and Mr. Baiocco had, not just me.

1   Q.   Well, okay.  Who did Mr. Baiocco -- Mr. Baiocco has

2   testified.  Who did Mr. Baiocco within Autonomy talk about

3   about what the agreement was?

4   A.   About this EDD processing?

5   Q.   Yeah.

6   A.   He talked to at least me.  I believe he talked to Joel

7   Scott.  I believe he talked to Sushovan Hussain.  I believe he

8   talked to Jim Crumbacher.  But, you know, I can't vouch for

9   that.

10   Q.   When he talked to them, he was hustling money; right?  He

11   said, "Pay me.  Pay me."

12   A.   At a minimum, yes.  He was often doing that.

13   Q.   And people would come to you and say, "Should we pay him?"

14   And you'd say, "Yes"?

15   A.   Sometimes, yes.  Oftentimes.

16   Q.   Did you tell Mike Sullivan to approve payments to him?

17   A.   I bet I did.

18   Q.   Did you tell Mike Sullivan that they weren't doing any

19   work and you were approving payments for nothing?

20   A.   I don't think I did.  I don't recall if Mike knew that.

21   He may have known it towards the end of the agreement.

22   Q.   Well, let's run through -- these are all in evidence.

23       Exhibit 5340.  Can we put this up?  The jury has seen

24   this.  This goes way back.

25       This is Mr. Sullivan -- if we can get the bottom e-mail,

1    please.

2        Mr. Sullivan is writing to --

3            **THE COURT:**  It will be shown on the screen.  It's

4    easier to see.

5    **BY MR. KEKER:**

6    **Q.**   Yeah.  You can look at it on the screen.  It's in

7    evidence.

8        Sullivan writing to Pete Menell and Sushovan Hussain with

9    a copy to you talking about EDD capacity (reading):

10           "It's likely that the new expanded sales force

11       selling our EDD and hosted services that we will need the

12       ability to add capacity."

13       And then in the second paragraph (reading):

14           "We have some strong partners with EDD capabilities,

15       such as Deloitte, MicroLink, and Capax Global."

16       Was that a misleading e-mail?

17   **A.**   I don't know.

18   **Q.**   Did you tell Mr. Sullivan that Capax Global was not a

19   strong partner with EDD capabilities?

20   **A.**   I don't think I did.

21   **Q.**   Did you tell him he was wrong about anything in this?

22   **A.**   I don't think so.

23   **Q.**   Okay.  And then we just looked yesterday at 5317, an

24   e-mail from you.  The top e-mail talks about -- this is an

25   e-mail from you to Baiocco (reading):

1                "Sushovan, Mike Sullivan, and I identified 250,000 of
2        business."
3        Was that a misleading e-mail or true e-mail?
4    A.    That's a misleading e-mail.
5    Q.    Do you remember a company called Iovate?
6    A.    Called what?
7    Q.    Iovate, I-O-V-A-T-E.
8    A.    That does not ring a bell, no.
9    Q.    Okay.  Do you know whether or not Mr. Sullivan tried to
10   get Capax hooked up with Iovate in a deal that the jury has
11   seen?
12   A.    I don't.
13   Q.    So your belief is that this is a misleading e-mail that
14   you wrote?
15   A.    Yes.
16   Q.    And who are you trying to fool here?  Are you trying to
17   fool Mr. Baiocco?
18   A.    I'm not really trying to fool anyone.  I'm just letting
19   Mr. Baiocco know that we would be making good on the
20   retainer-based 250K agreement that we had discussed.
21   Q.    Are you trying to fool Mr. Sass?
22   A.    I didn't notice Mr. Sass was on.  No, not -- I'm not
23   trying to fool Mr. Sass.
24   Q.    Does Mr. Sass know that this is a misleading e-mail that
25   he's getting?

1    **A.**    I don't think so.

2    **Q.**    Are you trying to fool Mr. Sullivan?

3    **A.**    Potentially trying -- I don't know if I'd characterize it

4    as trying to fool him, but I'm not writing the reality of it;

5    that I'm sending -- that I'm raising and recommending that we

6    initiate a 250K-a-month retainer-based agreement with Capax.

7    **Q.**    And look at 5343, which is in evidence, please, sir.

8         Put that on the screen.

9         And in the bottom one, Mike Sullivan is writing to Phil

10    Smolek, who's in finance; right?

11    **A.**    Phil Smolek, I believe was technically in finance.

12    **Q.**    And it says (reading):

13         "Stouffer asked that we issue another PO to Capax."

14    That's true?

15    **A.**    I would think, yeah.

16    **Q.**    And did you tell Mike Sullivan that the 270,000 of the PO

17    was for nothing?

18    **A.**    I don't think so.

19    **Q.**    Why not?

20    **A.**    Because Sushovan did not want me to tell Mike Sullivan

21    about the arrangement --

22    **Q.**    Okay.

23    **A.**    -- nor did I want to tell Mike Sullivan about the

24    arrangement.

25    **Q.**    Did Mr. Hussain send you an e-mail saying, "Don't let

1    Sullivan in on this little scheme we got going here"?

2    **A.**    Not that I remember.

3    **Q.**    Right.  Actually, let's look at -- well, let me look at a

4    couple more.

5         In 5346, that's in evidence, and the second page -- the

6    first is from Cynthia Watkins to Mike Sullivan.

7         And look at the second page, please, Jeff.

8         This is $770,000 worth of purchase orders for Capax and

9    MicroLink together, and at the top it says (reading):

10             "I spoke with Stouffer on Thursday last week in

11        regards to the EDD invoices from MicroLink and Capax, and

12        he believes that you will be able to sign off and confirm

13        work has been completed in order for us to process."

14        Now can we go back to the first page?

15        That was an e-mail from Cynthia Watkins in Finance to Mike

16    Sullivan.  And what does Mike Sullivan say?   (reading)

17             "Yes, work has been completed. "

18        So what's he talking about?

19    **A.**    I don't know.

20    **Q.**    Was there work -- Capax doing work in the Boston Data

21    Center?

22    **A.**    Not to my knowledge.

23        **MR. KEKER:**  6104, please, is not in evidence and I

24    move it in.  This is an e-mail from Mr. Egan dated July 7, '09.

25        **THE COURT:**  Admitted.

1          (Trial Exhibit 6104 received in evidence)

2               **THE COURT:**  6104?

3               **MR. KEKER:**  Yes, sir.

4               **THE COURT:**  Admitted.

5               **MR. KEKER:**  And can we blow up -- let me see.  Let me

6     find it.

7                         (Pause in proceedings.)

8               **MR. KEKER:**  Can we blow up the bottom e-mail from

9     Mr. Egan to Mr. Smolek in July of 2009?

10    **Q.**   And you're writing to Mr. Smolek (reading):

11              "Phil -

12              "We have a large volume of EDD processing at the

13         moment and will be subbing quite a bit to them."

14         The subject is "Capax PO."  (reading)

15              "I am with Mike Sullivan and Pete this evening.  Will

16         get you details quickly."

17         Was that a misleading e-mail?

18    **A.**   In my opinion, yes.

19    **Q.**   Because you weren't going to be subbing quite a bit of EDD

20    processing to Capax?

21    **A.**   No, because it's -- that is a hope for the future; but if

22    you read the e-mail from Phil Smolek's perspective, you would

23    have fairly assumed that it was imminently going to be subbed

24    to them as opposed to off in the future.

25    **Q.**   Okay.  So the intention was you were getting Capax ready

1  to handle overflow work; right?

2  **A.**   That was the -- that was the original premise upon which I

3  believed we could do the deal.

4  **Q.**   And that's because you were concerned about capacity

5  issues in your eDiscovery capabilities?

6  **A.**   I knew we had capacity issues, so I leveraged that fact as

7  part of the rationale for doing this deal this way.

8  **Q.**   Let's drop down and look at something different, which is

9  Mr. Hussain's reaction to all these e-mails.

10      Can we start with 6113?

11          **MR. KEKER:**   And I move it in.   It's Mr. Hussain asking

12  Mr. Egan a question in 2009.

13          **THE COURT:**   Admitted.

14      (Trial Exhibit 6113 received in evidence)

15          **MR. KEKER:**   6113.

16  **Q.**   So here's Mr. Hussain is saying (reading):

17          "Capax.

18          "What have we spent so far and have POs pending?   Can

19      you please give me the detail?   I have EDD processing for

20      250K this H/W" --

21      Is that hardware?

22  **A.**   Yes.   That's my understanding.

23  **Q.**   (reading)

24      -- "for 555K and Voxant for 155K.   This does seem a

25      lot.

1              "And what have we received?"

2        Did you understand that e-mail as Mr. Hussain not knowing

3   what was going on?

4   **A.**   Did I understand it as him not knowing what was going on?

5   **Q.**   Yeah.

6   **A.**   No.  I understood him -- I understood it to be questions

7   about these specific things.

8   **Q.**   Okay.  He was asking you, "What have we received for the

9   EDD processing for 250 and the hardware?"

10  **A.**   I'm sorry.  Can you say it again?

11  **Q.**   He's asking, "What have we received for this EDD

12  processing and for the hardware?"  I mean, he doesn't know that

13  nothing's going on, does he?

14  **A.**   I'm not sure what he's referring to about "And what have

15  we received?"

16  **Q.**   Okay.  Well, a month later Mr. -- let's look at 6116.

17          **MR. KEKER:**  I'd move it in, Your Honor.  This is

18  Mr. Smolek and Mr. Hussain.

19          **THE COURT:**  Admitted.

20  **BY MR. KEKER:**

21  **Q.**   Mr. Hussain is writing to -- first of all, Mr. Lepore,

22  who's district sales manager --

23          **MR. REEVES:**  Your Honor, I'm sorry.  I object.  If the

24  witness is not on this e-mail and it's from Mr. Hussain, I

25  believe it's hearsay.

1        **THE COURT:**  Okay.  Ladies and gentlemen, it's

2   4:00 o'clock so we're going to take our recess now.

3        Remember the admonition given to you:  Don't discuss the

4   case, allow anyone to discuss it with you, form or express any

5   opinion.

6        As you may recall, tomorrow we are meeting at 9:15 so I'm

7   sure BART will be running on time.  Thank you.

8        (Proceedings were heard out of the presence of the jury:)

9        **THE COURT:**  Okay.  Let the record reflect the jurors

10  have retired.

11       6116, let's deal with that first.  What's the issue there

12  with that document?

13       **MR. KEKER:**  6116?

14       **THE COURT:**  Yeah.  I mean, isn't that the last thing

15  that I let in, and now there's an objection to it?  So I want

16  to revisit it.

17       **MR. KEKER:**  I'll get it.

18       **THE COURT:**  I mean, is that what we're talking about?

19  6116?

20       **MR. KEKER:**  Oh, yeah.  This is an e-mail from

21  Mr. Hussain to others, not Mr. Egan, saying he has many

22  questions about the purchase order request for Capax, and we're

23  introducing it for his state of mind.  It's not hearsay.

24       **THE COURT:**  Well, I don't know whether it is or not.

25  I don't know whether it is or not.

1        **MR. REEVES:**  The objection is --

2        **THE COURT:**  I think -- why is it not hearsay?  You're

3    saying it's not introduced for the truth of the matter?

4        **MR. KEKER:**  It's introduced for his state of mind.

5    He's saying, "I have a lot of questions about these purchase

6    orders."

7        **THE COURT:**  Okay.  The Government's response?

8        **MR. REEVES:**  Well, at a minimum, it needs to be

9    offered for that purpose and the instruction needs to be given.

10       **THE COURT:**  He's now offering it for that purpose.

11       **MR. REEVES:**  Okay.

12       **THE COURT:**  For the purpose of showing what the

13   defendant's state of mind was at that time.

14       I mean, it's a contemporaneous document prepared at the

15   time, and whether -- how it's accepted by the jury is another

16   question, but the Defense is offering it to show this was what

17   the defendant said was what he was thinking at the time.

18                (Government counsel conferring.)

19       **MR. REEVES:**  Your Honor, I think on this record there

20   really is a question about whether this is, in fact, his state

21   of mind.  I think what we have is interesting evidence about --

22       **THE COURT:**  I better look at this document.  Anybody

23   have a copy of it?  Is it in some book somewhere?

24       **MR. REEVES:**  Right here.

25       **THE COURT:**  What?

1    **MR. REEVES:**  I have it.

2    **THE COURT:**  Let me just look at it.

3                    (Pause in proceedings.)

4    **THE COURT:**  Okay.  So do I have the whole thing here?

5    The bottom e-mail is addressed to the defendant and says

6    (reading):

7            "Sorry to bother.  Are you able to confirm in writing

8        that Phil can release the PO request to Capax?"

9    Response:  "No.  I have many questions."

10   So, okay, what's the objection to permitting this in

11   evidence?

12   **MR. REEVES:**  Well, it's -- first, it's hearsay.

13   Second, as to the state of mind, Your Honor, it would seem

14   to us that there's evidence in the record that this was, in

15   fact, not his state of mind.

16   **THE COURT:**  Okay.  That's fine.  We have a lot of

17   contradictory evidence in the record.

18   **MR. REEVES:**  Okay.  And I --

19   **THE COURT:**  Thank you.  It's in evidence.

20   Okay.  I'm permitting it.  I mean, unless there's some

21   other argument.

22   You're saying, you know, we shouldn't believe this.

23   **MR. KEKER:**  He's saying that.

24   **THE COURT:**  Yeah, I understand.  No, I understand

25   that's the Government's position.  That's the Government's

 1  position.

 2      What, Mr. Frentzen?

 3      **MR. FRENTZEN:**  Your Honor, I'm sorry, if I may be

 4  heard briefly.

 5      **THE COURT:**  Yes.

 6      **MR. FRENTZEN:**  The state-of-mind exception is not

 7  anything that goes to anybody's state of mind.  It is a

 8  statement of then existing mental state, 803, whichever it is,

 9  (3) or (4).

10      **THE COURT:**  Yeah.

11      **MR. FRENTZEN:**  That, in the Government's view, is

12  not -- in other words, it's not read so broadly as to allow any

13  statement which could be interpreted to go to state of mind.

14  It's only a statement of the declarant's then existing state of

15  mind.

16      **THE COURT:**  Yeah.  But isn't that what the Defense is

17  doing?  They're saying -- maybe I don't get this, but I think

18  they are saying, on Wednesday, June 24th, 2009, the defendant

19  said that he had many questions about whatever was proposed

20  here; and that reflects, at least in writing, a statement by

21  the defendant indicating his state of mind.

22      Maybe the argument is that was not true, he didn't have a

23  lot of questions, and it was put in as a cover, or whatever you

24  want to say about it.  I understand that.  I'm just trying to

25  figure out why it wouldn't be admissible.

1          **MR. FRENTZEN:**  I think the rationale, Your Honor, is

2     that it's a -- it doesn't fall under the actual state-of-mind

3     exception.  If the Court is seeing it as a statement of then

4     existing state of mind -- in other words, my point is simply

5     that it's not just that any statement comes in that then could

6     be read to reflect a certain state of mind but an actual then

7     existing state of mind, and I don't see that particular

8     statement in that light.

9          **MR. KEKER:**  I can't believe --

10         **THE COURT:**  The problem is we've had so many documents

11     like this, you know, I just --

12         **MR. FRENTZEN:**  Agreed.

13         **THE COURT:**  And, actually, actually they were both

14     inculpatory and exculpatory.  I mean, they would be -- you

15     know, they would be all over the lot.  I don't know if that's a

16     fair characterization, but they'd be not necessarily

17     incriminatory -- maybe I can put it that way -- for certain

18     purposes.

19         By the way, they may very well show that the defendant was

20     aware of the deal.  I mean, there's certain reasons why you may

21     want these in evidence, notwithstanding whatever they say

22     because they may evidence at least his involvement in the

23     transaction.

24         **MR. FRENTZEN:**  And I think the concern here,

25     Your Honor, is that we don't want the -- we filed something

PROCEEDINGS

 1   before trial.  The defendant's statements clearly are

 2   admissible when they're offered by the Government because

 3   they're not hearsay.  They fall outside the definition.

 4        THE COURT:  Well, no.  They may be -- they may be

 5   hearsay.  They have to -- the question is --

 6        MR. FRENTZEN:  No, no, no.  When they're offered by

 7   the Government, they fall outside the definition of hearsay.

 8   When they're offered by the Defense, they don't fall outside

 9   the definition of hearsay.  They are hearsay, however, there

10   may be an exception.

11        I think we're less concerned about this particular e-mail

12   and not that -- the notion that any e-mail that can be argued

13   to perhaps go to the defendant's state of mind when offered by

14   the defendant, and especially by a witness who is not a

15   recipient of the statement and doesn't get it subsequent to

16   that, then what are we doing there?

17        THE COURT:  Okay.  So this is what we're going to do:

18   We're going to let this one in one time only --

19        MR. FRENTZEN:  Great.

20        THE COURT:  -- because they don't care about it.  They

21   care about the principle involved, which is fair enough.

22        MR. FRENTZEN:  Agreed.

23        THE COURT:  And we'll deal with it when the next

24   document comes in.  Okay?

25        MR. FRENTZEN:  Understood.

**PROCEEDINGS**

1      **THE COURT:**  So we don't have to do it.

2      (Trial Exhibit 6116 received in evidence)

3      **THE COURT:**  Now, let me go back to the matter of the

4  Proffer Agreement.

5      **MR. FRENTZEN:**  The Plea Agreement, essentially, here.

6      **THE COURT:**  It's the Plea Agreement?

7      **MR. KEKER:**  No.

8      **THE COURT:**  I thought it was a proffer, isn't it?

9      **MR. KEKER:**  It's a Deferred Prosecution Agreement.

10     **THE COURT:**  The Deferred Prosecution Agreement.

11     Okay.  As I understand it, the Defense -- I mean, pardon

12  me -- the Prosecution says that the entire document should be

13  received in evidence under Evidence Code 106, that is for

14  completeness; is that correct?  Or is there many so other

15  provision or what?

16     That's the only one I see, but I'm doing my legal research

17  while I'm sitting up here, so it's as good as most of my legal

18  research.

19     Go ahead.

20                 (Government counsel conferring.)

21     **THE COURT:**  He's got his team to argue this.

22     Okay.  Go ahead.

23     **MR. REEVES:**  I'm getting wonderful advice, Your Honor.

24     That's one basis.  It's the rule of completeness.  And,

25  second, he's put the subject matter of the DPA at issue in the

1    questions.  I don't have any problem with the questions.  I

2    have a problem with the incompleteness of the record and

3    essentially sort of raising issues about the Statement of Facts

4    without actually allowing the jury to see the Statement of

5    Facts.

6         So this is -- as the witness himself as said, this is a

7    complicated document.  It all works together.  I think it is

8    improper to suggest that this is a script.  We are objecting on

9    that basis.

10        And once that door is open, fine, let's put the whole

11   document in for the reason the Court has stated and for the

12   basic fairness that's associated with introducing

13   Plea Agreements when credibility is attacked in the

14   cross-examination.  It's the same thing.

15             THE COURT:  So let me make sure I understand because I

16   think regardless of, like, feelings in some, you know, zen way,

17   there has to be a rule of evidence that lets it in or not.  And

18   the rule of evidence, I think after hearing the argument, is

19   106; is that right?

20             MR. REEVES:  Yes, Your Honor.

21             THE COURT:  Okay.  Now, the testimony in 106 is

22   whether or not in fairness the entire document should come in.

23   That's the question, as I look at all my research, and the

24   question is:  Is it fair to -- is the document -- for all

25   intents and purposes, the document has been received in

1    evidence.  It's been described.  It's been related to

2    provisions.  It's not in evidence, but there's a lot of

3    testimony about what it says.

4         So I don't distinguish between that the document was

5    formally introduced; I distinguish between whether or not in

6    light of the questions that were asked and the responses given,

7    fairness requires the entire document to come in.  Okay.

8    That's the way I'm looking at it.

9         Now I have to try to figure out why it would be either

10   fair or not fair to let it in.  And it is the Defense argument,

11   as I understand it to be, that all they're saying -- or what

12   they are saying is that a version of the facts were written.

13   They're suggesting that the Prosecution had something to do

14   with it, but the witness has said no.  I mean, the witness'

15   testimony is, "No.  I wrote it myself and I submitted it.  I

16   don't know what role the lawyer played in it and so forth."

17        Okay.  So then what the Defense is saying, "Well, that's a

18   script and you've got to follow that script because if you

19   don't, you could be prosecuted if, in the judgment of the

20   Government, you have deviated from the script in a -- deviated

21   from the Statement of Facts in a material way."

22        I mean, I've sort of dressed it up in legalese, but I

23   think that's the analysis.

24        Then the question is:  Okay.  That may be true, but for

25   that -- but for it to be admitted into evidence, don't you have

1   to show that somehow fairness would require the statement to be

2   introduced into evidence?

3       What is it about the statement that either supports or

4   detracts from the argument that the witness has to follow the

5   script or follow the statement?  That's what I don't see.

6   That's the missing connection.

7           MR. REEVES:  It is the --

8           THE COURT:  Just listen to me.

9           MR. REEVES:  I am.

10          THE COURT:  Because under most -- my understanding of

11  106, it is that fairness must require -- fairness requires the

12  whole thing to come in so that the first part isn't misleading,

13  the part that the Defense has offered is not misleading.  So

14  what I need you to tell me is why the questions that were asked

15  would be misleading but for the introduction of the statement.

16      Now, you want to talk to people before you answer, go talk

17  to people, but I need to get some answer to that particular

18  question.

19          MR. REEVES:  How can the jury assess whether the

20  witness is following the script without seeing and evaluating

21  the so-called script in comparison with the trial testimony?

22  They can't.  See --

23          THE COURT:  Okay.  That may be true, but -- that may

24  be true, but that's not his question.  That wasn't his

25  question.  His question was:  If you vary from the statement,

1  are you subject to prosecution; and, therefore, that's what

2  you're doing?

3      Counsel hasn't suggested how he's varying or if he's

4  varying.  To the contrary.  His argument is just the opposite.

5          MR. KEKER:  He didn't vary.

6          THE COURT:  That statement -- he's not saying, "That

7  statement, the things that you said you would say are different

8  from what you are now saying."  He's saying, "What you are now

9  saying, if it were inconsistent with what you previously said,

10 would lead to a possible prosecution."  That's the point.

11     And what I'm trying to figure out is how the introduction

12 of that statement is relevant to that particular determination.

13 Do you get it?  I mean, have I made it clear?  I tried to,

14 but -- okay.  Wait a minute.  Consultation.

15         MR. REEVES:  Yes.

16              (Government counsel conferring.)

17         THE COURT:  I've got plenty of time.

18         MR. KEKER:  I don't.

19         THE COURT:  Actually, none of us have plenty of time.

20 That's a sad situation, but there we are.

21         MR. REEVES:  Is the -- have you offered it, Counsel,

22 without the two attachments?

23         MR. KEKER:  Correct.

24         MR. REEVES:  That's what's been offered in evidence.

25 Okay.

PROCEEDINGS

1        **MR. KEKER:**  And, actually, we don't even need it in

2  evidence.  I asked him my questions about it.  At this point I

3  don't care about --

4        **THE COURT:**  Well, I think either -- let me tell you.

5  We've passed the point where the options are --

6        **MR. KEKER:**  Okay.  Then we offer the first part.

7        **THE COURT:**  You exercised -- in my view you have done

8  tantamount to introducing the statement -- not the statement --

9  not the attachment but the things that you asked about --

10        **MR. KEKER:**  Fair enough.

11        **THE COURT:**  -- in that sense, in that sense.  I know

12  you've asked about the statement too, but I don't think that's

13  what --

14        **MR. KEKER:**  Got it.

15        **THE COURT:**  So...

16        **MR. REEVES:**  Your Honor, thank you for that.

17    I think we can arrive at the introduction -- or the

18  Government would not object to the introduction of all of the

19  language of the agreement without the attached information and

20  without the attached Statement of Facts.

21        **THE COURT:**  Is that satisfactory?

22        **MR. KEKER:**  Fine.

23        **THE COURT:**  Okay.  Thank you.  We avoided that crisis.

24        **MR. KEKER:**  So that's A and B.  We're not going to

25  introduce A or B.  A is the information and B is the facts.

**PROCEEDINGS**

1          THE COURT:  I mean, it depends on what continues.  I

2   mean, I --

3          MR. REEVES:  Yes, I agree it's the agreement without

4   the two attachments.

5          MR. KEKER:  Thank you.

6          THE COURT:  There you go.

7      (Trial Exhibit 6161 received in evidence)

8          THE COURT:  See you tomorrow.

9          MR. KEKER:  Thank you, Your Honor.

10          (Proceedings adjourned at 4:14 p.m.)

11                      ---oOo---

12              **CERTIFICATE OF REPORTERS**

13      I certify that the foregoing is a correct transcript

14   from the record of proceedings in the above-entitled matter.

15

16   DATE:  Tuesday, March 20, 2018

17

18

19   _____

20       Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                  U.S. Court Reporter

21

22

23   _____

24       Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                  U.S. Court Reporter

25