Volume 14

Pages 2466 - 2704

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )
                                 )
  VS.                            )        NO. CR 16-00462 CRB
                                 )
SUSHOVAN TAREQUE HUSSAIN,        )
                                 )
            Defendant.           )
_____)
                         San Francisco, California
                         Thursday, March 22, 2018

                    TRANSCRIPT OF PROCEEDINGS
APPEARANCES:
For Plaintiff:
                    ALEX G. TSE
                    Acting United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
            BY:  ROBERT S. LEACH
                 ADAM A. REEVES
                 WILLIAM FRENTZEN
                 ASSISTANT UNITED STATES ATTORNEYS


For Defendant:
                    KEKER & VAN NEST
                    633 Battery Street
                    San Francisco  CA  94111
            BY:  JOHN W. KEKER
                 JAN NIELSEN LITTLE
                 BROOK DOOLEY
                 KATE LAZARUS
                 NIC MARAIS
                 ATTORNEYS AT LAW


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Pamela Batalo, CSR No. 3593, FCRR
              Official Reporters

<u>**I N D E X**</u>

Thursday, March 22, 2018 - Volume 14

| **GOVERNMENT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **LOOMIS, WILLIAM  (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 2472 | 14 |
| Direct Examination resumed by Mr. Reeves | 2473 | 14 |
| Cross-Examination by Mr. Keker | 2480 | 14 |
| | | |
| **CAMDEN, DOMINIC** | | |
| (SWORN) | 2490 | 14 |
| Direct Examination by Mr. Frentzen | 2490 | 14 |
| Cross-Examination by Mr. Marais | 2526 | 14 |
| Redirect Examination by Mr. Frentzen | 2555 | 14 |
| | | |
| **SCOTT, JOEL** | | |
| (SWORN) | 2558 | 14 |
| Direct Examination by Mr. Leach | 2558 | 14 |

<u>**E X H I B I T S**</u>

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 306 | | 2574 | 14 |
| 310 | | 2580 | 14 |
| 313 | | 2578 | 14 |
| 324 | | 2583 | 14 |
| 365 | | 2588 | 14 |
| 366 | | 2590 | 14 |
| 374 | | 2607 | 14 |
| 381 | | 2594 | 14 |
| 383 | | 2592 | 14 |
| 384 | | 2592 | 14 |
| 395 | | 2586 | 14 |
| 397 | | 2611 | 14 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 409 | | 2609 | 14 |
| 417 | | 2596 | 14 |
| 505 | | 2616 | 14 |
| 511 | | 2615 | 14 |
| 818 | | 2498 | 14 |
| 818 | | 2551 | 14 |
| 848 | | 2500 | 14 |
| 860 | | 2501 | 14 |
| 863 | | 2502 | 14 |
| 865 | | 2502 | 14 |
| 915 | | 2621 | 14 |
| 916 | | 2624 | 14 |
| 947 | | 2543 | 14 |
| 958 | | 2503 | 14 |
| 960 | | 2505 | 14 |
| 963 | | 2544 | 14 |
| 971 | | 2507 | 14 |
| 973 | | 2508 | 14 |
| 977 | | 2626 | 14 |
| 985 | | 2630 | 14 |
| 986 | | 2633 | 14 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 988 | | 2509 | 14 |
| 1004 | | 2524 | 14 |
| 1018 | | 2635 | 14 |
| 1036 | | 2524 | 14 |
| 1055 | | 2645 | 14 |
| 1168 | | 2484 | 14 |
| 1197 | | 2648 | 14 |
| 1210 | | 2510 | 14 |
| 1213 | | 2513 | 14 |
| 1215 | | 2515 | 14 |
| 1216 | | 2535 | 14 |
| 1217 | | 2517 | 14 |
| 1226 | | 2647 | 14 |
| 1228 | | 2518 | 14 |
| 1262 | | 2519 | 14 |
| 1264 | | 2519 | 14 |
| 1266 | | 2519 | 14 |
| 1270 | | 2672 | 14 |
| 1298 | | 2651 | 14 |
| 1318 | | 2653 | 14 |
| 1334 | | 2657 | 14 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 1335 | | 2660 | 14 |
| 1355 | | 2666 | 14 |
| 1358 | | 2668 | 14 |
| 1365 | | 2665 | 14 |
| 1368 | | 2673 | 14 |
| 1393 | | 2669 | 14 |
| 1420 | | 2661 | 14 |
| 1425 | | 2674 | 14 |
| 1452 | | 2677 | 14 |
| 1512 | | 2685 | 14 |
| 1533 | | 2486 | 14 |
| 1575 | | 2687 | 14 |
| 1668 | | 2484 | 14 |
| 1682 | | 2688 | 14 |
| 1685 | | 2695 | 14 |
| 1686 | | 2695 | 14 |
| 1694 | | 2690 | 14 |
| 1720 | | 2696 | 14 |
| 1899 | | 2698 | 14 |
| 1900 | | 2699 | 14 |
| 1919 | | 2699 | 14 |

## I N D E X

### E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2695 | | 2567 | 14 |
| 2696 | | 2568 | 14 |
| 2698 | | 2568 | 14 |
| 2702 | | 2570 | 14 |
| 2703 | | 2570 | 14 |
| 2705 | | 2571 | 14 |
| 2706 | | 2571 | 14 |
| 2755 | | 2522 | 14 |
| 2756 | | 2522 | 14 |
| 2757 | | 2522 | 14 |
| 2792 | | 2614 | 14 |
| 2948 | | 2675 | 14 |
| 5531 | | 2539 | 14 |
| 5532 | | 2547 | 14 |
| 5533 | | 2533 | 14 |
| 5923 | | 2488 | 14 |
| 5925 | | 2489 | 14 |

PROCEEDINGS

```
 1   Thursday - March 22, 2018                        9:01 a.m.

 2                    P R O C E E D I N G S

 3                        ---000---

 4       (Proceedings were heard out of the presence of the jury:)

 5              THE COURT:  Okay.  Sit down.

 6              MR. REEVES:  Good morning, Your Honor.

 7              THE COURT:  Good morning.

 8       Is Mr. Loomis here?

 9              MR. REEVES:  Yes.  He was in the hallway.  I think

10   we're ready to go.

11              THE COURT:  Bring him in.

12                        (Pause in proceedings.)

13       (Proceedings were heard in the presence of the jury:)

14              THE COURT:  Please be seated.

15       Let the record reflect all jurors are present, the parties

16   are present.

17       Good morning, ladies and gentlemen.  Thank you for being

18   so prompt even in inclement weather and fighting the traffic in

19   San Francisco, which in my lifetime has gotten so much worse,

20   so much worse.  I can't believe it, but there we are.

21       Okay.  Let's begin.

22              MR. REEVES:  Thank you, Your Honor.

23                        WILLIAM LOOMIS,

24   called as a witness for the Government, having been previously

25   duly sworn, testified further as follows:
```

1          **MR. REEVES:**  Good morning, Mr. Loomis.

2      Good morning, ladies and gentlemen.

3      Could I please have displayed what was received in

4  evidence as Exhibit 2279, please, the spreadsheet we looked at

5  at the end of yesterday, the second page.  Great.

6                  __DIRECT EXAMINATION__  (resumed)

7  BY MR. REEVES:

8  **Q.**  Mr. Loomis, do you remember this document?

9  **A.**  Yes.

10 **Q.**  Actually, the spreadsheet on the second page.

11     All right.  Are you familiar with this spreadsheet?

12 **A.**  At a high level, yes.

13 **Q.**  We'll only be talking, I think, this morning at a high

14 level.

15     I just have a few more questions for you before I'm done,

16 but I want to focus on the time period.  Okay?

17     Yesterday when we concluded your testimony for the day, do

18 you recall testifying about some degree of frustration that you

19 felt with regard to the status of the closing of the VA deal by

20 in or around June 2011?

21 **A.**  Approximately that date, yes.

22 **Q.**  Yeah.  So there was a growing sense of frustration, lack

23 of communication, uncertainty about the status of the closing

24 of the VA deal that you had entered into as a reseller back in

25 September 2010?

1          MR. KEKER:  Leading, Your Honor.

2    BY MR. REEVES:

3    Q.   Is that fair?  I'm just setting up.

4          MR. KEKER:  I'm objecting to it being a leading

5    question.

6          THE COURT:  Okay.  Overruled.

7          THE WITNESS:  Yes.

8    BY MR. REEVES:

9    Q.   Okay.  I want to go through, if I could, some of the

10   transactions that are on this spreadsheet and talk about how

11   they fit into what happened.

12        Let us go to -- withdrawn.

13        As part of that frustration as you've described it, was

14   FileTek reluctant in any way to pay Autonomy for the reseller

15   license that you had acquired until the VA deal closed and sold

16   through to the VA?

17   A.   There was an initial payment that we did pay with no

18   reluctance.  Following that, yes, there was reluctance absent

19   any status updates.

20   Q.   Okay.  And --

21        Okay.  Let's look, if we could, please, at the March 30th,

22   2011, entry here on the spreadsheet.  It looks like there are

23   two March 30th, 2011, entries.  Do you see those?

24   A.   Yes.

25   Q.   What do those reflect?

**LOOMIS - DIRECT / REEVES**

1   A.   Those were StorHouse license arrangements to Autonomy.

2   Q.   Sales to Autonomy of more StorHouse?

3   A.   Of licenses of software for certain of Autonomy's

4   customers.

5   Q.   I'll try to fix that, licensing of your software.

6        For which Autonomy is paying how much money approximately

7   in or around March 30th, 2011?

8   A.   The one was almost 1.8 million.  The other was about

9   700,000.  So about 2 and a half million.

10  Q.   So in this time period in those transactions, you're

11  licensing even more StorHouse software to Autonomy, are you

12  not?

13  A.   Yes.

14  Q.   All right.  And did you use -- did FileTek use any of the

15  money it received in exchange for those licenses to Autonomy to

16  repay Autonomy for the amounts due on the reseller deal that

17  you had with Autonomy relating to VA?

18  A.   As I recall, yes.

19  Q.   Okay.  As we go forward to June 2011, there's another

20  transaction on or around June 30th, 2011.  Is that another

21  similar said licensing of more StorHouse to Autonomy?

22  A.   Yes.

23  Q.   Okay.  For approximately how much?

24  A.   Almost 1.6 million, which includes maintenance by the way.

25  The other numbers also included maintenance.

**LOOMIS - DIRECT / REEVES**

1  **Q.**   Thank you very much.   License and maintenance.

2        Did you use any of the money that Autonomy paid you for

3  this additional StorHouse license and maintenance in or around

4  June 30th, 2011, to pay down the amount that FileTek owed to

5  Autonomy for the reseller license?

6  **A.**   Yes.

7  **Q.**   Did you have any discussions with anyone at Autonomy about

8  these two sales in March and June of 2011 and how they may or

9  may not be used with regard to the debt that FileTek owed to

10 Autonomy?

11 **A.**   I don't recall if I personally had those conversations.   I

12 may or may not have, but someone had those conversations, yes,

13 that they would appreciate it if we would use the proceeds to

14 pay down the VA debt.

15 **Q.**   So but for these additional sale of licenses sold to

16 Autonomy in the manner you've described in March and June of

17 2011, would FileTek have paid down any of its debt due on the

18 reseller license?

19         **MR. KEKER:**   Objection.   Calls for speculation,

20 Your Honor.

21         **MR. REEVES:**   I don't think so.

22         **THE COURT:**   Let's see...

23         **MR. REEVES:**   I'll ask a different question.

24 **Q.**   Did you have discussions within FileTek about the

25 relationship between these transactions and the payment of

LOOMIS - DIRECT / REEVES

1   money due by FileTek to Autonomy?

2          **MR. KEKER:**  That calls for hearsay and there's no

3   foundation.

4          **THE COURT:**  Sustained.

5          **MR. REEVES:**  Okay.

6   **Q.**  Do you have an understanding, based on your involvement in

7   this transaction, about whether there is a relationship between

8   these licenses and the payment of money due by FileTek to

9   Autonomy?

10  **A.**  I'm not sure if I understand the question.

11  **Q.**  The question is --

12  **A.**  We used the proceeds to pay down the VA debt.

13  **Q.**  That's your understanding?

14  **A.**  That we did use the proceeds to pay down the VA debt.

15  **Q.**  Okay.  But for those proceeds that you got from those

16  licenses sold to Autonomy, would you have used any of the money

17  that FileTek had to pay down the debt?

18         **MR. KEKER:**  Calls for speculation.  Objection.

19         **THE COURT:**  Overruled.

20         **THE WITNESS:**  That's what we did, yes.

21  BY MR. REEVES:

22  **Q.**  And if you did not get those proceeds from those license

23  sales to Autonomy, would you have paid -- would FileTek have

24  paid Autonomy any of the money that FileTek owed to Autonomy?

25  **A.**  It was legally owed, but we were holding payment.

**LOOMIS - DIRECT / REEVES**

1   **Q.**   You were holding payment?

2   **A.**   Yes.

3   **Q.**   Okay.  In or around this time period --

4           **THE COURT:**  I'm sorry.  I don't understand the term

5   "holding payment."  What is that?

6           **THE WITNESS:**  We legally owed the money, but we were

7   not going to pay it.

8   **BY MR. REEVES:**

9   **Q.**   In or around this time period, did you receive any type of

10  audit confirmation from Autonomy's auditors about the debts

11  that FileTek owed to Autonomy as a result of the reseller

12  license in or around this late June, early July 2011 time

13  period, if you recall?

14  **A.**   I don't recall the specific time, but around that period

15  of time, yes, I do recall receiving audit confirmations.

16  **Q.**   And what did FileTek do with those audit confirmations?

17  **A.**   We were using it to suggest that we needed to get an

18  update from Autonomy; and then once we got that update, it was

19  signed.

20  **Q.**   All right.  Let's go to the last sale, please.

21          There is a larger sale, is there not, a licensing

22  transaction involving StorHouse, on or about August 17, 2011?

23  **A.**   Larger than the March and June, yes.

24  **Q.**   Okay.  And on or around August 17, 2011, what is the

25  amount of additional StorHouse license and maintenance that

**LOOMIS - DIRECT / REEVES**

1    FileTek is selling to Autonomy?

2    **A.**   Approximately 7 and a half million.

3    **Q.**   Okay.  Were you surprised in any way at or around the time

4    Autonomy sought to obtain these additional StorHouse licenses

5    in this amount in or around this August 17, 2011, time period?

6    **A.**   Was I surprised?  It's very similar to the March and June

7    transactions.

8    **Q.**   Did the request for this StorHouse license in this amount

9    at this time come out of the blue in any sense?

10   **A.**   I do not recall.

11   **Q.**   Okay.  Let's move forward one day later.  On or around

12   August 18th, 2011, at or about that time, did you learn about

13   HP's announcement to acquire Autonomy?

14   **A.**   I don't recall the date, but it was shortly thereafter

15   that we learned about it.  It was public information.

16   **Q.**   Okay.  So shortly after the $7.5 million transaction

17   involving Autonomy, you learned that Autonomy is to be acquired

18   by HP?

19   **A.**   Yes.

20   **Q.**   Okay.  In your own mind, did you see any relationship

21   between Autonomy's purchase of additional license and

22   maintenance in the amount of $7.5 million and the announcement

23   of HP's intention to acquire Autonomy?

24   **A.**   Yes, in my opinion.

25   **Q.**   What relationship did you see between those two events?

LOOMIS - CROSS / KEKER

1    **A.**   Cleaning up their receivables from FileTek.  That was my

2    opinion.

3                        (Pause in proceedings.)

4            **MR. REEVES:**  Thank you.  No further questions.

5            **THE COURT:**  Okay.  Cross.

6            **MR. KEKER:**  Thank you, Your Honor.

7                        <u>**CROSS-EXAMINATION**</u>

8    **BY MR. KEKER:**

9    **Q.**   Good morning, Mr. Loomis.

10   **A.**   Good morning.

11   **Q.**   Good morning, ladies and gentlemen.

12       I have some questions for you but only a few.

13       You've only spoken to Mr. Hussain, Sushovan Hussain, that

14   one time that you told us about when you talked about the VA

15   deal before you went into it?

16   **A.**   That's all I recall, yes.

17   **Q.**   All right.  And basically FileTek was working with

18   Stouffer Egan on these transactions?

19   **A.**   Primarily, yes.

20   **Q.**   Do you remember a man named Joel Scott being involved too?

21   **A.**   I remember that name.

22   **Q.**   All the sales of StorHouse software were made at at least

23   a 45 percent discount, weren't they?

24   **A.**   Yes.

25   **Q.**   Okay.  And the last one was made at a 55 percent discount?

**LOOMIS - CROSS / KEKER**

1   **A.**   I do not recall.

2   **Q.**   Okay.  Well, I'll show you that in a second.

3       All of these are below list price, the StorHouse list

4   price?

5   **A.**   Yes.

6   **Q.**   Okay.  Can we put up 668?  It's in evidence.

7       And this is the e-mail where you're reporting on the

8   coaching that you got from Mr. Egan, and it's where he had

9   suggested quoting 15 or 20 percent higher so that the people --

10   I think you called them people in procurement -- could beat the

11   price down, which was their habit, that's what they do?

12   **A.**   Yes.

13   **Q.**   Okay.  When you say "procurement," did you know who

14   negotiated prices or decided what prices were permissible at

15   Autonomy?

16   **A.**   No.

17   **Q.**   Do you know if it was the Finance Department?

18   **A.**   I do not know.

19   **Q.**   Do you know if Mr. -- and so Mr. Egan was talking

20   behind -- whoever it was that was going to decide what was a

21   fair price to pay, Mr. Egan was advising to go through this

22   routine in order for them to be able to do their job and get

23   their pound of flesh?  Is that basically what he was advising?

24   **A.**   That was my understanding.

25   **Q.**   All right.  The deals you have described as barter

**LOOMIS - CROSS / KEKER**

1   transactions, there's nothing illegal about a barter

2   transaction, is there?

3   **A.**   Not that I know of, no.

4   **Q.**   It's simply a question of how you account for it; right?

5   **A.**   That's my view.

6   **Q.**   Right.  And you at FileTek being an American company, a

7   U.S. company, used something called GAAP, U.S. GAAP accounting

8   rules?

9   **A.**   Yes.

10  **Q.**   And that required you to amortize the software that you

11  purchased from Autonomy?

12  **A.**   Given our specific fact pattern, yes.

13  **Q.**   Okay.  And you recognized that Autonomy was operating

14  under a different set of rules, the IFRS?

15  **A.**   That's not my understanding.  I mean, that is my

16  understanding today, but at that time I had no idea.

17  **Q.**   I see.  Okay.  But today you know that they operate under

18  a different set of rules?

19  **A.**   Yes.

20  **Q.**   And basically the point is that the IFRS is not U.S. GAAP

21  and U.S. GAAP is not IFRS.  They're different, aren't they?

22  **A.**   That's correct.

23  **Q.**   Okay.  Now, the agreements that we've been talking about,

24  and we can go through them if you want to, but all the

25  agreements had what lawyers call an integration clause in them,

**LOOMIS - CROSS / KEKER**

1  didn't it?  Something that said "This is the entire agreement"?

2  **A.**   I do not recall.  Our contracts person would focus on

3  that.

4  **Q.**   Okay.  Well, I'm not going to take the time.

5       Do you know what -- have you seen in agreements that

6  language that says "This is the entire agreement, can't be

7  changed except in writing by mutual agreement of the parties"?

8  **A.**   I've seen that in a lot of different agreements, yes.

9  **Q.**   And what that clause -- do you understand that that clause

10  is saying that this agreement stands on its own two feet, this

11  is the whole agreement?

12  **A.**   Yes.

13  **Q.**   And if somebody -- and if everybody that's involved in

14  making that agreement gets hit by a truck, the heirs can come

15  in and see what the deal was; it's all written down?

16  **A.**   Yes.

17  **Q.**   All right.  The VA purchase you talked about, that one was

18  a purchase that you understood was at full risk to FileTek;

19  FileTek owed the money once they agreed to do it?

20  **A.**   Yes.

21  **Q.**   And there was -- the contract had a no return policy?  You

22  couldn't just say, "Okay.  Forget it.  We want out or we want

23  to return the software"?

24  **A.**   That's correct.

25  **Q.**   All right.  And you paid some money on that early on and

1    then you got frustrated?

2    **A.**    Yes.

3    **Q.**    And you confirmed that debt to Autonomy's auditors several

4    times, didn't you?

5    **A.**    Yes.  I don't recall if there were several times or one

6    time, but I know we confirmed it.

7    **Q.**    Okay.  I can show -- well, let's look -- let's put in

8    1668.

9            **MR. KEKER:**  I think is in evidence, Your Honor.

10   That's an October confirmation.  Can we?

11           **THE COURT:**  Oh, sure.  I mean, if it's in evidence,

12   you don't have to ask me.

13           **MR. KEKER:**  It's not in evidence?

14           **THE CLERK:**  No.

15           **MR. KEKER:**  Okay.  Jeff thinks it's not in evidence.

16   I move it in, the October confirmation.

17           **THE COURT:**  Admitted, 1668.

18       (Trial Exhibit 1668 received in evidence)

19           **MR. KEKER:**  Mr. Dahm knows more about this evidence

20   than I do.

21       Can we see -- this is 1168?

22           **THE COURT:**  I'm sorry.  Which one is it?

23           **MR. KEKER:**  1168.

24           **THE COURT:**  Okay.  1168 in evidence.

25       (Trial Exhibit 1168 received in evidence)

1          THE CLERK:  That's not in.

2          MR. KEKER:  Well, it is -- I think it is now.  1168 is

3    in evidence; right?

4          THE COURT:  Yes.  Right.

5          MR. KEKER:  Okay.  Let's put it up.

6    Q.   And this is the confirmation request.  Look at the second

7    page, please.  I guess the third page.

8          MR. KEKER:  Wait a minute.  Sorry.

9                    (Pause in proceedings.)

10         MR. KEKER:  Yeah.  Here we go.

11   Q.   This is October 2010 and it's affirming a $10 million debt

12   that you described yesterday, June 30, '10, and September 30,

13   '10.

14        And can we go down and see the signature page?  I mean the

15   audit confirm -- yeah.  Down here.

16        And that, Mr. Levy, who was your controller, said, "Yes,

17   that debt is correct, we owe that"?

18   A.   Ms. Levy.

19   Q.   Ms. Levy.  I beg your pardon.

20        And can we see 1533?  Same thing.  I think that is in

21   evidence.  The Government put it in.

22        And go to the audit confirmation page.

23        This is that same debt in February '11 being affirmed;

24   right?

25   A.   Yes.

1        **MR. REEVES:**  Your Honor, I'm sorry for the

2    interruption.  For the record, I'm not certain 1533 is in

3    evidence.  We do not object.

4        **THE CLERK:**  It's not.

5        **MR. KEKER:**  I beg your pardon.

6        **THE COURT:**  Now we're looking at which one?  Sorry.

7        **MR. KEKER:**  1533.  I thought they put it in yesterday,

8    but I move it in.

9        **THE COURT:**  Let me just take a look at it.

10       **MR. KEKER:**  It's the audit confirmation that we just

11   saw.

12       **THE COURT:**  Okay.  Admitted.

13       (Trial Exhibit 1533 received in evidence)

14       **MR. KEKER:**  All right.  We've seen it.

15   **Q.**   In June and August of 2011, you've told us about purchases

16   of StorHouse software by Autonomy?

17   **A.**   Yes.

18   **Q.**   Did you know that Autonomy purchased a company called

19   Iron -- or at least the digital portion of a company called

20   Iron Mountain at around -- in the summer of 2011?

21   **A.**   I do not recall the time frame, but I was aware that they

22   purchased --

23   **Q.**   And -- I'm sorry.

24   **A.**   -- yes.

25   **Q.**   And Iron Mountain had a product called LiveVault, didn't

1    it?

2    **A.**    That's how I recall it, yes.

3    **Q.**    And what Autonomy wanted to do is to use StorHouse

4    software, which makes things faster, use it with LiveVault, its

5    new product from Iron Mountain; right?

6              **MR. REEVES:**  Objection.

7              **THE WITNESS:**  That was --

8              **MR. REEVES:**  Foundation, please.

9              **THE COURT:**  He answered the question -- I'm sorry?

10             **THE WITNESS:**  Yes.

11             **THE COURT:**  Well, wait.  Let's stop.

12        Okay.  Let me look at the question.

13                        (Pause in proceedings.)

14             **THE COURT:**  Okay.  Would you lay a foundation, please,

15   for that response?

16   **BY MR. KEKER:**

17   **Q.**    Do you know that Autonomy purchased StorHouse in June of

18   2011 in the amount of about 1.8 or $1.6 million?  We looked at

19   that yesterday.

20   **A.**    And this morning.

21   **Q.**    No, not this morning.  Actually, let me -- would you look

22   in the book that's in front of you, Mr. Loomis, at 5923, which

23   would be towards the back of that book.

24   **A.**    The big book?

25   **Q.**    The big black -- yes, the one you've got in your hand.

 1    5923.  It's third from the back.

 2    **A.**  (Witness examines document.)

 3    **Q.**  And is that an invoice from FileTek to Autonomy dated

 4    June 30, 2011?

 5    **A.**  Yes.

 6            **MR. KEKER:**  I move it in.

 7            **THE COURT:**  Admitted.

 8    (Trial Exhibit 5923 received in evidence)

 9            **MR. KEKER:**  Admitted?  Okay.

10    Can we put that up.  And go down to the bottom and see the

11    amount, Jeff.

12    This is the million -- close to 1.6 million purchase, and

13    let's see what it's for.  Could we highlight "Limited to use

14    for data"?  Highlight that and maybe blow it up so the jury can

15    read it.

16    **Q.**  Okay.  So this was a license -- this $1.6 million license

17    was limited to the use for Barclays Capital, Bank of America

18    and Morgan Stanley.  Were those LiveVault customers?

19    **A.**  As I recall, that was my understanding.

20    **Q.**  And what Autonomy needed was StorHouse they could use with

21    these three customers, and they needed a license to do that?

22    **A.**  That's my understanding.

23    **Q.**  All right.  And then later in August there was another

24    purchase, which was larger, and that was to allow Autonomy to

25    use StorHouse in all the LiveVault locations, not just the

1   three?

2   **A.**   That's what I recall, yes.

3   **Q.**   And that was the one -- I think that was at a 55 percent

4   discount.  Let's look at 5925.

5           **THE COURT:**  Admitted.

6       (Trial Exhibit 5925 received in evidence)

7           **MR. KEKER:**  Put it up.  And just the first one.

8   **Q.**   This is Mr. Szukalski to Joel Scott.  It's dated

9   August 16th, 2011, and he's correcting discount off of license

10  portion was 55 percent versus 45 percent as previously stated.

11      The earlier deals were at 45 percent discount and this one

12  was at 55, wasn't it?

13  **A.**   That's what I recall.

14          **MR. KEKER:**  All right.  Thank you.  I have nothing

15  further.  Thank you, Mr. Loomis.

16          **MR. REEVES:**  No questions, Your Honor.

17          **THE COURT:**  Thank you.  You are excused, Mr. Loomis.

18  Thank you very much for coming.

19          **THE WITNESS:**  Thank you.

20                          (Witness excused.)

21          **THE COURT:**  Okay.  Call your next witness.

22          **MR. FRENTZEN:**  Your Honor, the Government calls

23  Dominic Camden.

24          **THE CLERK:**  Please raise your right hand.

25  \\\

1        <u>**DOMINIC CAMDEN**</u>,

2   called as a witness for the Government, having been duly sworn,

3   testified as follows:

4              **THE WITNESS:**  I do.

5              **THE CLERK:**  Thank you.  Please be seated.

6        Please state your full name for the record and spell your

7   last name.

8              **THE WITNESS:**  Sure.  Dominic Camden, C-A-M-D-E-N.

9              **MR. FRENTZEN:**  May I proceed, Your Honor?

10             **THE COURT:**  Yes.

11             **MR. FRENTZEN:**  Thank you.

12                     <u>**DIRECT EXAMINATION**</u>

13  BY MR. FRENTZEN:

14  **Q.**   Good morning, Mr. Camden.

15  **A.**   Good morning.

16  **Q.**   Where do you live currently?

17  **A.**   Hinsdale, Illinois.

18  **Q.**   Where is that?

19  **A.**   A suburb of Chicago.

20  **Q.**   All right.  What do you do for a living?

21  **A.**   I run the sales organization for an IT solutions provider.

22  **Q.**   What's the name of the IT solutions provider?

23  **A.**   Zones.

24  **Q.**   Can you spell that for the court reporter?

25  **A.**   Sure.  Z-O-N-E-S.

CAMDEN - DIRECT / FRENTZEN

1   Q.   Tell us, what does Zones do?

2   A.   Zones provides information technology solutions, hardware,

3   software services, to customers small, medium, and large,

4   public sector, healthcare, all around the world.

5   Q.   And could you just tell us a little bit about your

6   background?  Tell us about your education, please, sir.

7   A.   Sure.  Undergraduate Marquette University.  I graduated in

8   1989.  The day after I graduated, I started my job with IBM.  I

9   spent about six years with IBM.

10  Q.   What were you doing for IBM when you worked there?

11  A.   I represented the desktop and client line for IBM

12  technologies at that time.  At the time it was PS2 Micro

13  Channel computers, ThinkPad computers, et cetera.  My

14  responsibility initially was to go to customers, like Miller

15  Brewing Company, and try to gain their approval as IBM

16  technology for their standard use within the corporation.

17  Q.   I think you said you worked for IBM for about six years?

18  A.   Yes.

19  Q.   And what did you do when you left IBM?

20  A.   A few of the colleagues that I met at IBM encouraged me to

21  come join them in a business that we call a reseller, and I

22  chose to join them in a reselling business at the time; spent a

23  couple years with them in that fashion until that business was

24  sold to GE Capital IT Solutions.

25  Q.   What did you do next?

**CAMDEN - DIRECT / FRENTZEN**

1   **A.**   At that point in time I followed my team over to

2   GE Capital and assessed where I was at at that point.  One of

3   my colleagues that also was part of that business at IBM

4   encouraged me to go join her at a small memory module

5   manufacturer that I did for a couple years until we got back in

6   and formed our own business, Corporate PC Source, our own

7   information technology reseller, and I joined them

8   approximately year 2000.

9   **Q.**   And at some point did you go to work for Zones?

10  **A.**   Yes.  In 2003 Zones acquired that business that I was part

11  of, Corporate PC Source, wholesale acquisition, and I've been

12  with the business ever since.

13  **Q.**   All right.  And could you give us some idea of the size of

14  Zones?

15  **A.**   Yes.  We closed our fiscal year/calendar year 2017 with

16  just over 2 billion in global sales.

17  **Q.**   Safe to say you spent your whole professional career in

18  selling IT:  Hardware, software, things like that?

19  **A.**   Yes.

20  **Q.**   All right.  And generally in terms of working with a

21  reseller or working at a reseller, can you tell us, you know,

22  how the reselling business generally works?

23  **A.**   Yes.  Customers small, medium, and large, state/local

24  healthcare, need technology to help them solve their business

25  problems.  Typically each of those businesses has unique

CAMDEN - DIRECT / FRENTZEN

1   interest requirements in the technology that they have.  They

2   may want technology to be loaded with software that's custom to

3   their company environment.  They may want specific delivery

4   dates to match project rollouts, a lot of -- a lot of custom

5   features that typically manufacturers directly cannot provide

6   due to the custom nature of the interest and the manufacturer's

7   requirement to address scale.

8       So -- so manufacturers reached out and built what they

9   called authorized channel programs and said, "In development of

10  that over the years, you know, we would like for you to

11  represent our brand.  We're going to authorize you to represent

12  our brand to provide those custom-level features that our

13  mutual end customers desire."

14  Q.    All right.  And in terms of your ordinary reseller

15  arrangement for Zones, can you describe who do you get the

16  product from; and what, if anything, do you do to deliver it to

17  the end user?

18  A.    Yes.  So our responsibility is to work directly with the

19  customer to understand what their particular business problems

20  are, and then we will make some recommendations for hardware

21  and software and service solutions for them.

22      And in that process we will make a recommendation of a

23  particular OEM, a particular software package, a particular

24  security solution, and then provide a quote to the customer for

25  that solution.  And if the customer agrees with that solution

CAMDEN - DIRECT / FRENTZEN

1   that we provided, we then would source from the OEM or the

2   publisher and ship directly or provide some predelivery

3   customized services to the customer.

4        So the customer receives a quote from Zones.  Zones

5   places -- upon customer approval, customer provides PO to

6   Zones.  Zones would then provide a PO to all of the publishers,

7   OEM folks involved in that quote, source it for the customer

8   and deliver the final solution to the customer, and invoice the

9   customer.

10  Q.   All right.  And so sometimes when Zones does this, acts as

11  a reseller, is it just straight-up hardware?

12  A.   Yes.

13  Q.   And sometimes, then, there's software mixed in?

14  A.   Yes.

15  Q.   And sometimes additional services or installation or

16  things like that?

17  A.   Yes.

18  Q.   Okay.  I want to direct your attention, if I could, to

19  mid-2010.  In or around the mid-2010 time period, did it come

20  to your attention that you had an invitation to make a -- get

21  involved in a reseller arrangement that involved Dell and then

22  another third party?

23  A.   Yes.

24  Q.   Who was that other third party, if you recall?

25  A.   Autonomy.

CAMDEN - DIRECT / FRENTZEN

1   Q.   Prior to that, did you have any dealings with Autonomy at
2   Zones yourself?
3   A.   No.
4   Q.   Were you aware of sort of what Autonomy was or what their
5   business was?
6   A.   No.
7   Q.   Okay.  Can you explain to us, as this opportunity came to
8   you, was the first potential end user H&R Block?
9   A.   Yes.
10  Q.   What's H&R Block?
11  A.   A tax preparation firm.
12  Q.   Was that a customer of Zones?
13  A.   Yes.
14  Q.   In terms of this proposed setup, what was the proposal, in
15  terms of from Dell to Zones to H&R Block, where was Autonomy
16  going to get in the mix?
17  A.   The proposed arrangement would be that if Zones would
18  procure the Dell product through Autonomy instead of through
19  Zones, that there would be a buy side or a discount provided.
20  Q.   All right.  So the hardware, at least in terms of the
21  paperwork, would go from who to who to who to who?
22  A.   It would go purchase order Zones to Autonomy, and at --
23  I'm not sure what happened after that, but product would ship
24  from Dell to Zones.
25  Q.   Okay.  So Autonomy was coming in as a seller to Zones?

CAMDEN - DIRECT / FRENTZEN

1   A.    I suppose you could characterize it as that.

2   Q.    Okay.  Was it -- as you understood this arrangement, was

3   Autonomy going to touch the hardware physically?

4   A.    No.

5   Q.    Was Autonomy going to do anything to the hardware, install

6   software, configure anything, or do anything at all with the

7   hardware?

8   A.    No.

9            MR. MARAIS:  Objection.  Foundation.

10           MR. FRENTZEN:  It's based on his understanding of the

11   setup of the deal, Your Honor.

12           THE COURT:  Overruled.

13           THE WITNESS:  No.

14   BY MR. FRENTZEN:

15   Q.    Can you describe for us whether or not in your time as a

16   reseller or just in the business generally, had you ever heard

17   of this occurring before?

18   A.    No.

19   Q.    In terms of this deal getting setup, did Zones have

20   concerns about its relationship with H&R Block?

21   A.    Yes.

22   Q.    Could you describe those for us, please?

23   A.    Yes.  H&R Block is a -- was at that point in time still a

24   long-time customer of the company, and it was critical that if

25   we were going to introduce another party to this relationship,

1    that it didn't jeopardize our status and our value to the

2    customer at H&R Block.  So that was of concern to us.

3    **Q.**   All right.  I'd like to show you something that's been

4    marked as Government's 818.  Would you take a look at that,

5    please, Mr. Camden?

6              **THE COURT:**  Admitted.

7              **MR. MARAIS:**  Your Honor, objection.

8              **THE COURT:**  Oh, sorry.

9              **MR. MARAIS:**  Hearsay.

10             **THE COURT:**  Let me take a look at it.  Okay?  Let him

11   identify it and lay a foundation.

12   **BY MR. FRENTZEN:**

13   **Q.**   Mr. Camden, could you take a look at that document,

14   please, and tell us, do you recognize what that is?

15   **A.**   Yes.

16   **Q.**   All right.  It's an e-mail?

17   **A.**   Yes.

18   **Q.**   And is that e-mail -- do you recognize who that e-mail is

19   coming from?

20   **A.**   Yes.

21   **Q.**   Who is that?

22   **A.**   Dean Bordeaux from Dell.

23   **Q.**   All right.  Is that an individual that you have worked

24   with?

25   **A.**   Yes.

CAMDEN - DIRECT / FRENTZEN

1    Q.   For how many years?

2    A.   I'm going to estimate five years.

3    Q.   Was -- and is this e-mail -- was this to you?

4    A.   Yes, and to -- also to my executive that is assigned the

5    H&R Block account at Zones.

6    Q.   Was this an e-mail that was written in the course of you

7    doing the deal with Dell and Autonomy and H&R Block?

8    A.   Yes.

9         THE COURT:  Objection overruled.  Admitted.

10   (Trial Exhibit 818 received in evidence)

11        MR. FRENTZEN:  Can we blow up 818?

12   Q.   And, again, Mr. Bordeaux is who?

13   A.   He is the Dell account executive that is assigned to the

14   H&R Block opportunity for Dell.

15   Q.   Okay.  And the date?

16   A.   May 20th, 2010.

17   Q.   Okay.  Does that sound about right as to when you were

18   negotiating sort of this first hardware deal that involved

19   Autonomy?

20   A.   Yes.

21   Q.   And I'd like to ask you, does it sort of describe down

22   below an understanding of the terms of the agreement?

23   A.   Yes, it does.

24   Q.   And I want to ask you about the line right here

25   (indicating) (reading):

1              "Autonomy has and will have no direct contact with

2        Block but does need the attached simple agreement executed

3        with Zones.  Can you get this executed?"

4        Was that part of your understanding of how this

5    relationship was going to work?

6    **A.**   Yes.

7    **Q.**   And, again, what was the concern at Zones about H&R Block

8    learning that Autonomy was a part of this deal?

9    **A.**   You know, protecting the business relationship that we've

10   had with a valued client over the years and losing that to

11   Autonomy.

12   **Q.**   In terms of the overall arrangement, did you at Zones --

13   did you care if Autonomy sold software to H&R Block?

14   **A.**   No.

15   **Q.**   Did you care if Autonomy promoted its role in this

16   hardware deal in order to get a deal for software?

17   **A.**   Yes.

18   **Q.**   Why?

19   **A.**   This is a very large purchase and many customers are very,

20   very price conscious.  If the customer in this case were to

21   find that they were able to secure the solution for less money

22   from Autonomy, that would jeopardize our role and in all

23   likelihood we would lose the purchase order.

24   **Q.**   So was it your understanding, in terms of this arrangement

25   and this deal as indicated by the Dell folks, that Autonomy

1    will not have contact with Block?

2    **A.**   Yes.

3    **Q.**   Was that important to you in the course of this deal?

4    **A.**   Very much so.

5    **Q.**   Could we go to Government's 848.

6         If I can approach.

7         Take a look at that, please, Mr. Camden.  Do you recognize

8    what that is?

9    **A.**   (Witness examines document.)

10        **THE COURT:**  Admitted.

11        (Trial Exhibit 848 received in evidence)

12        **THE WITNESS:**  Yes.

13   **BY MR. FRENTZEN:**

14   **Q.**   What is that?

15   **A.**   This is a quote from Zones to Oracle in response to a

16   request for quote and a RFP from Oracle.  So Oracle would go

17   out and, like many customers, submit and request from a number

18   of partners like us to provide a response to an RFP.  They were

19   looking to make a purchase of some technology, and this is our

20   response to that RFP.

21   **Q.**   And do you have a recollection around this same period of

22   time that you were negotiating to do the H&R Block another

23   hardware opportunity with Oracle?

24   **A.**   Yes.

25   **Q.**   All right.  And is that reflected in this request for

1    quote?

2    **A.**   It is.

3    **Q.**   And, incidentally, in any of the paperwork that went

4    between Zones and the end user -- whether it was H&R Block,

5    Oracle, and I think as we'll see in the future Target -- was

6    any of the paperwork between Zones and the end user -- did it

7    reflect any participation at all by Autonomy in the

8    transaction?

9    **A.**   It did not.

10   **Q.**   I'd like to move now to Government's 860.  Take a quick

11   look at that, please, Mr. Camden.

12   **A.**   (Witness examines document.)

13          **THE COURT:**  860 admitted.

14   (Trial Exhibit 860 received in evidence)

15          **MR. FRENTZEN:**  Can we go down just to the bottom, the

16   very bottom?

17   **Q.**   Who's Annette O'Neill?

18   **A.**   She was legal counsel for Zones.

19   **Q.**   And this is an e-mail June 8, 2010.  Did that go to you?

20   **A.**   Correct.

21   **Q.**   And is there indication there that she's talking about

22   providing a section on "nonsolicitation of our customer"?

23   **A.**   Yes.

24   **Q.**   Is that, again, reflecting the concern about Autonomy not

25   being known to sort of the end user?

CAMDEN - DIRECT / FRENTZEN

1    **A.**    Yes.

2    **Q.**    I'd like to show you now Government's 863.

3          **THE COURT:**  Admitted.

4          (Trial Exhibit 863 received in evidence)

5    **BY MR. FRENTZEN:**

6    **Q.**   Mr. Camden, what is Government's -- I'm sorry --

7    Exhibit 863?

8    **A.**   This is a statement of work between H&R Block and Zones

9    for the project that we performed for them on an annual basis.

10   **Q.**   Okay.  This is -- and does this sort of generically cover

11   transactions between Zones and H&R Block?

12   **A.**   Yes.

13   **Q.**   And, again, would there be any mention of Autonomy in this

14   particular document?

15   **A.**   No.

16   **Q.**   I'd like to go now to Exhibit 865.

17          **THE COURT:**  Admitted.

18          (Trial Exhibit 865 received in evidence)

19          **THE WITNESS:**  (Witness examines document.)

20          **MR. FRENTZEN:**  And if we could just blow up the top

21   part.

22   **Q.**   All right.  Is this, again, Mr. Bordeaux at Dell?

23   **A.**   It is.

24   **Q.**   Okay.  He's e-mailing you on June 16, 2010?

25   **A.**   Yes.

**CAMDEN - DIRECT / FRENTZEN**

1  **Q.**   All right.  And if we could, could you just focus on the

2  last sentence here that Mr. Bordeaux from Dell is telling you?

3  Is he saying (reading):

4         "Autonomy has no interest whatsoever in speaking with

5      Block"?

6  **A.**   Yes.

7  **Q.**   Was that your understanding of this deal?

8  **A.**   Yes.

9  **Q.**   Skipping ahead, I'd like to show you Exhibit 958.

10        **THE COURT:**  Admitted.

11     (Trial Exhibit 958 received in evidence)

12        **MR. FRENTZEN:**  Could you just pull it up, then?

13  **Q.**   All right.  Now, 958, does this -- Mr. Camden, did this

14  come to you in July of 2010?

15  **A.**   Yes, it did.

16  **Q.**   Okay.  And if we could go to some of the attachments,

17  please.  958, page 6.  Scroll down a little.

18     Okay.  Does this appear to be sort of a working copy of an

19  agreement between Autonomy and Zones for the sale of Dell

20  hardware?

21  **A.**   Yes.

22  **Q.**   Could we go to the next page, page 7, and go down to

23  paragraph number 10?

24     All right.  So, Mr. Camden, paragraph 10 here, does that

25  indicate that the terms will be confidential?

CAMDEN - DIRECT / FRENTZEN

1   **A.**   Yes.

2   **Q.**   Okay.  No party shall disclose the terms without the prior

3   written consent of the other party, meaning Zones would have to

4   give its permission to disclose the arrangement --

5   **A.**   Yes.

6   **Q.**   -- effectively?

7       Okay.  And then if you go down, this bars Autonomy from

8   selling the products -- or the products, the hardware

9   essentially?

10  **A.**   Yes, it does.

11  **Q.**   And then it provides that it shall not preclude Autonomy

12  from selling Autonomy products?

13  **A.**   Correct.

14  **Q.**   You didn't care if Autonomy sold software to H&R Block?

15  **A.**   We did not.

16  **Q.**   All right.  So does that seem to capture the agreement as

17  you understood it and had been discussing it in the e-mails?

18  **A.**   Yes.

19  **Q.**   All right.  If we could, was a deal eventually struck with

20  H&R Block by Zones?

21  **A.**   Yes.

22  **Q.**   -- to sell the hardware?

23      Okay.  Incidentally, can you give us some idea of, if you

24  recall, what does Zones make off of a deal like this?

25  **A.**   Typically a couple margin points, two points.

1    **Q.**   What does that mean?

2    **A.**   So a 100-dollar item we typically would make $2, so we

3    would buy for 100 and sell for 102.

4    **Q.**   I'd like to now show you Government's 960 -- I'm sorry --

5    Exhibit 960.

6            **THE COURT:**  960.  Admitted.

7        (Trial Exhibit 960 received in evidence)

8            **MR. FRENTZEN:**  Can we put up page 2?

9    **Q.**   Mr. Camden, is this an e-mail between you and Linda

10   Marbena and Chris Corley?

11   **A.**   Yes.

12   **Q.**   Who are they?

13   **A.**   At that point in time Linda was in charge of our

14   procurement, so she would cut all the purchase orders; and

15   Chris Corley at the time was our president and chief operating

16   officer.

17   **Q.**   And they're talking about basically what is Autonomy doing

18   here?

19   **A.**   Yes.

20   **Q.**   The comment is made (reading):

21           "Interesting.  I think this will go in the books of

22       unresolved mysteries."

23       And you said (reading):

24           "Right after the Chapter called *The Italian Job*."

25       Can you describe for us what you're talking about here?

1   **A.**    Yes.  We had -- we'd often talked about our progression

2   through the businesses that we were at together.  Chris is one

3   of the friends that I knew from my IBM days that I followed

4   along the way, and we always said, you know, over the years

5   that we worked together, "We're going to write a book someday,"

6   because we keep running into, you know, stories and events that

7   are book-worthy.

8        This -- the reference to "*Italian Job*" was in reference to

9   an event that happened at our business where over a Fourth of

10  July weekend -- it might have been the prior year, 2009 -- our

11  warehouse was broken into and several million dollars worth of

12  computer technology was stolen and taken away, and they cut

13  holes in the roof and cut our security and came down on ropes;

14  and it just reminded me of the movie, *The Italian Job*.  So

15  that's what we called it.

16  **Q.**    All right.  But in terms of this deal with Autonomy, is

17  this something basically you couldn't figure out what Autonomy

18  was doing?  Is that fair?

19  **A.**    It is fair.

20  **Q.**    In all your years of being in the hardware business, being

21  in the reselling business, had you seen an entity sort of

22  insert itself in a hardware deal like this?

23  **A.**    I have not.

24  **Q.**    Okay.  Could we go to Exhibit 971?

25       **THE COURT:**  971 admitted.

CAMDEN - DIRECT / FRENTZEN

1           (Trial Exhibit 971 received in evidence)

2   BY MR. FRENTZEN:

3   Q.   What is -- could we blow that up?  Sorry.

4        What is 971, Mr. Camden?

5   A.   It's an invoice from Autonomy to Zones.

6   Q.   All right.  Does this cover the deal for H&R Block?

7   A.   It does.

8   Q.   Can we scroll down a little bit?

9        Actually, what was the invoice date?

10  A.   July 13th, 2010.

11  Q.   Does that square with your memory of around when this deal

12  was cut?

13  A.   Yes.

14  Q.   And what was the total dollar figure?

15  A.   $7,003,595.55.

16  Q.   What was this for?

17  A.   It was for Dell hardware that H&R Block uses to refresh

18  the franchise locations that do all the tax processing.  They

19  wait until after tax season to upgrade the technology in all of

20  their franchise locations across the United States.

21  Q.   Okay.  And in terms of the actual hardware, what was going

22  to go to H&R Block?

23  A.   Desktops, mini-towers, and displays.

24  Q.   Okay.  That's the OptiPlex mini-tower?

25  A.   Yes.

CAMDEN - DIRECT / FRENTZEN

1   **Q.**   And then what else?

2   **A.**   19-inch displays.

3   **Q.**   Monitors?

4   **A.**   Yes, monitors.

5   **Q.**   In terms of how this was going to go from Dell to Zones or

6   to H&R Block, did you have an understanding of whether or not

7   Autonomy was ever physically going to touch or handle the

8   hardware at all?

9   **A.**   My understanding is that they would not.

10  **Q.**   So it would go from Dell to who?

11  **A.**   Dell to Zones in this case.

12  **Q.**   If we could take a look at Exhibit 973.

13          **THE COURT:**   973 admitted.

14          (Trial Exhibit 973 received in evidence)

15  **BY MR. FRENTZEN:**

16  **Q.**   973, is this the purchase order from Zones on the

17  H&R Block deal?

18  **A.**   It is.

19  **Q.**   So in terms of how this works, you were selling it to

20  H&R Block; you were purchasing it technically from Autonomy?

21  **A.**   Correct.

22  **Q.**   All right.  We talked a little bit about the Oracle part

23  of -- or the potential Oracle arrangement.  Did that end up

24  happening?

25  **A.**   It did.

**CAMDEN - DIRECT / FRENTZEN**

1    **Q.**   I show you Exhibit 988, please, Mr. Camden.  Do you

2    recognize what 988 is, sir?

3    **A.**   (Witness examines document.)

4              **THE COURT:**  988 admitted.

5         (Trial Exhibit 988 received in evidence)

6              **THE WITNESS:**  It's a purchase order from Oracle to

7    Zones for Dell equipment.

8    **BY MR. FRENTZEN:**

9    **Q.**   All right.  And was this deal set up in the same way as

10   the H&R Block deal?

11   **A.**   Yes.

12   **Q.**   In terms of the nonsolicitation of business from Oracle?

13   **A.**   Yes.

14   **Q.**   Okay.  And then could we scroll up some?

15        What type of items are being purchased here?

16   **A.**   These are -- excuse me -- these are Dell laptops.

17   **Q.**   Could we go to the next page and the bottom line?  Yeah,

18   right there.  Great.

19        What was the total amount of the Oracle deal, Mr. Camden?

20   **A.**   $3,253,470.

21   **Q.**   And, again, in terms of this, was Oracle to be notified of

22   Autonomy's involvement in the deal?

23   **A.**   No.

24   **Q.**   To your recollection, was there then also another deal

25   with an end user of Target?

CAMDEN - DIRECT / FRENTZEN

1   **A.**   Yes.

2   **Q.**   Is that Target like the Target stores?

3   **A.**   (Nods head.)

4   **Q.**   Was that a customer of Zones?

5   **A.**   Yes.

6   **Q.**   Did you have the same concerns in terms of keeping

7   Autonomy out of the view of the end user?

8   **A.**   Yes.

9   **Q.**   Take a look, please, sir, at Exhibit 1210.

10          **THE COURT:**   1210 admitted.

11          (Trial Exhibit 1210 received in evidence)

12          **THE WITNESS:**   (Witness examines document.)

13          **MR. FRENTZEN:**   Could we go down to page -- let's go to

14   page 2 first, if we could.  Oh, that is page 2.  Sorry.

15   **Q.**   Do you see the beginning of this e-mail, Mr. Camden?

16   **A.**   Yes.

17   **Q.**   Do you recognize who that's from?

18   **A.**   I do.

19   **Q.**   Who is Randall Johnsen?

20   **A.**   He was a Dell account executive on Target.

21   **Q.**   Do you see the date there of September of 2010?

22   **A.**   Yes.

23   **Q.**   Does that square with your recollection around when the

24   Target end user deal was getting worked out?

25   **A.**   It does.

CAMDEN - DIRECT / FRENTZEN

1   **Q.**   All right.  And are you one of the recipients?

2   **A.**   Yes.

3   **Q.**   And, incidentally, do you know who this is, Mike Sullivan?

4   **A.**   I saw his name on some e-mails, but that's the extent of

5   our relationship.

6   **Q.**   Okay.  Do you know who he worked for?

7   **A.**   Yes.  He worked for Autonomy.

8   **Q.**   Autonomy?

9   **A.**   Yes.

10   **Q.**   Could we go -- and is this basically trying to summarize

11   the terms of the deal?

12   **A.**   Yes.

13   **Q.**   Could we go to page 3 of this document and the bottom of

14   page 3?  Great.  Thanks.

15   Do you see the ground rules here, Mr. Camden?

16   **A.**   Yes, I do.

17   **Q.**   All right.  And so what are the ground rules here coming

18   from Randall Johnson at Dell?

19   **A.**   He will manage all direct communication with the customer

20   until we have green lights on this partnership approach with

21   the customer.

22   **Q.**   It says -- oh, go ahead.

23   **A.**   And we are not to reach out directly to Target.  He'll

24   bring the partner contacts into the deal as appropriate.

25   **Q.**   Was that something that was part of your understanding in

**CAMDEN - DIRECT / FRENTZEN**

1    how you wanted it to work?

2    **A.**    Yes.

3    **Q.**    If we could just go back up to page 1, please, and the

4    bottom part.

5         Okay.  Do you see "From:  Mr. Sullivan" at Autonomy?

6    **A.**    Yes.

7    **Q.**    And he's saying, basically, okay?

8    **A.**    Yes.

9    **Q.**    I'd like to show you Exhibit 1213, Mr. Camden, see if you

10   recognize what that is.

11   **A.**    (Witness examines document.)

12        **THE COURT:**  1213 admitted.

13        **MR. MARAIS:**  Your Honor, 1213 appears to be a two-page

14   agreement with a random e-mail appended to it.

15        **THE COURT:**  Sorry.  My 1213, yeah, is a letter from

16   Autonomy.

17        **MR. MARAIS:**  It's a letter agreement, Your Honor,

18   correct; and then the third page is --

19        **THE COURT:**  Okay.  Let me look at the third page.  You

20   object to the third page?

21        **MR. MARAIS:**  Yes, Your Honor.  What I was going to get

22   is 1214 appears to be simply the two-page agreement without the

23   additional e-mail.

24        **THE COURT:**  Well, do you want the e-mail?  Are you

25   offering the e-mail or not?

1    **MR. FRENTZEN:**  I am.  I didn't realize it was stuck in

2    there like that, so I apologize for that, but I do want the

3    e-mail and I think it's admissible.

4    **MR. MARAIS:**  Well, I object to the e-mail.

5    **THE COURT:**  Now let me look at the e-mail -- okay? --

6    so I know what everybody's talking about.

7    (Pause in proceedings.)

8    **MR. MARAIS:**  Actually, Your Honor, I have no objection

9    to the e-mail.  I just think it's confusing the way it's been

10   numbered.

11   **THE COURT:**  All right.  So it's all in.

12   (Trial Exhibit 1213 received in evidence)

13   **MR. FRENTZEN:**  I apologize for our numbering, but I

14   think it's admissible.

15   **THE COURT:**  Okay.  No one's offended.

16   **BY MR. FRENTZEN:**

17   **Q.**   All right.  So, Mr. Camden, does this look like the letter

18   agreement between Autonomy and Zones for the deal to Target?

19   **A.**   Yes.

20   **Q.**   And if we could, let's go to page 2, please.  And do you

21   see item 10?

22   **A.**   (Witness examines document.)  Yes.

23   **Q.**   Okay.  And what does that say?

24   **A.**   (reading)

25          "The terms of this letter shall be confidential.  No

CAMDEN - DIRECT / FRENTZEN

1              party hereto shall disclose the terms hereof without the

2              prior written consent of the other party."

3    **Q.**   So similar deal in terms of not disclosing -- Autonomy not

4    disclosing their involvement in this deal to Target?

5    **A.**   Yes.

6    **Q.**   All right.  So let's go to the third page, which is the

7    random e-mail.

8    **A.**   (Witness examines document.)

9    **Q.**   Great.  Who's Tom Corley?

10   **A.**   Tom was an inside sales associate for Zones.

11   **Q.**   Do you see a date here on this e-mail?

12   **A.**   Yes.  November 30th, 2010.

13   **Q.**   Okay.  All right.  And is this about the Target/Autonomy

14   deal?

15   **A.**   It is.

16   **Q.**   And could you tell us, what was Tom telling you?

17   **A.**   Our first test order is in process.

18   **Q.**   What does that mean?

19   **A.**   We wanted to -- in preparation for ensuing a larger order,

20   we wanted to do a test order with Target to ensure that their

21   process of getting us a purchase order electronically, which

22   was their preferred pattern, would be received, that we could

23   fill it and invoice out.  It's just a common practice we like

24   to do with our larger customers as large orders are pending.

25   **Q.**   Okay.  And similar, as we talked about before, did

1    Mr. Corley indicate anything about a so-called blind drop ship?

2    **A.**   He did.

3    **Q.**   Okay.  He also confirmed (reading):

4            "This will blind drop ship from Dell directly to

5        Target."

6        What does that mean?

7    **A.**   What that means is for this particular order we were not

8    at Zones going to take possession of it.  While we would place

9    it on order with Autonomy, Dell would ship it directly to

10   Target.

11   **Q.**   Okay.  And the effect of that he's saying here is there

12   should be nothing that says Autonomy on any packing slip?

13   **A.**   Yes.

14   **Q.**   That yet, again, relate to your guys' interest?

15   **A.**   Correct.

16   **Q.**   Okay.  I'd like you to take a look at Exhibit 1215.

17           **THE COURT:**  Admitted.

18       (Trial Exhibit 1215 received in evidence)

19           **MR. FRENTZEN:**  Put that up, please.

20   **Q.**   All right.  Is this -- if we could go down to the bottom.

21       Does this appear to be a series of e-mails -- actually,

22   let's -- sorry -- series of e-mails related to this

23   transaction?

24   **A.**   Yes.

25   **Q.**   All right.  And then is there reference here that -- and,

CAMDEN - DIRECT / FRENTZEN

1    I'm sorry, we've got a little bit of the end cut off there.

2    Could we either just slide it over.  Now I lost the one that --

3    could you just go down a little bit?  Okay.  Great.

4        In terms of this discussion here, first of all, is

5    Mr. Sullivan from Autonomy included on this string?

6    **A.**    Yes.

7    **Q.**    Were you included on the string?

8    **A.**    Yes.

9    **Q.**    All right.  Is there discussion here about how sort of the

10   quotes and the POs -- what the communication line is going to

11   be?

12   **A.**    Yes.

13   **Q.**    All right.  Was this effectively -- let's go up just a

14   little bit.

15       Okay.  And then is Mr. Johnsen from Dell saying -- I

16   switched colors here.  That's a terrible color.  Let's go with

17   red -- that Zones is the only entity that should provide Target

18   a quote for the transactions?

19   **A.**    Yes.

20   **Q.**    Go up to the very top.

21       All right.  And then is this Mr. Sullivan basically

22   agreeing with the chain of communication, that Autonomy is not

23   going to touch Target?

24   **A.**    Yes.

25   **Q.**    Exhibit 1217.

1          **THE COURT:**  Admitted.

2          (Trial Exhibit 1217 received in evidence)

3    **BY MR. FRENTZEN:**

4    **Q.**   Take a look at page 2, please.  Is this a -- if you could

5    scroll down just a little bit.

6          Who's John Niemeier?

7    **A.**   John is our -- the Zones account executive on Target.

8    **Q.**   All right.  And scroll down a little more to the bottom.

9          Okay.  All right.  And is this about the Autonomy

10   agreement related to the Target deal?

11   **A.**   It is.

12   **Q.**   Okay.  What's he asking you?

13   **A.**   He's trying to understand the agreement.

14   **Q.**   Meaning sort of where does Autonomy fit in?

15   **A.**   Yes.

16   **Q.**   All right.  Okay.  And he says he's not worried but

17   confused?

18   **A.**   Yes.

19   **Q.**   All right.  And what was your response to him?

20   **A.**   (reading)

21          "Zones places PO with Autonomy, yes.  Autonomy places

22          order with Dell.  Autonomy and Target don't touch."

23   **Q.**   And, again, Autonomy and Target --

24   **A.**   Yes -- sorry.  (reading)

25          "Zones places PO with Autonomy, yes.  Autonomy places

1          order with Dell.  Autonomy and Target don't touch."

2     Q.   And he asks (reading):

3               "Who quotes Target?"

4          And what was -- can we scroll down a little bit?

5          What was your response to him?

6     A.   I said(reading):

7               "Zones, same as H&R Block.  H&R Block never knew

8          about Autonomy and neither should Target."

9     Q.   And that reflects your understanding how these deals were

10    set up?

11    A.   Yes.

12    Q.   Can you scroll down just a little bit?

13         Okay.  All right.  And then he says he's going to the barn

14    for a beer?

15    A.   Yes.

16    Q.   Okay.  Exhibit 1228.

17             THE COURT:  Admitted.

18         (Trial Exhibit 1228 received in evidence)

19    BY MR. FRENTZEN:

20    Q.   Just at the very top, is this again related to the target

21    deal?

22    A.   Yes.

23    Q.   Mr. Johnsen at Dell to you?

24    A.   Yes.

25    Q.   Okay.  (reading)

```
 1              "Remember not to use Autonomy name in messaging"?
 2   A.   Yes.
 3   Q.   All right.  I'd like to now put in a series of purchase
 4   orders in a big group.
 5        MR. FRENTZEN:  Give me one second, Your Honor.  I just
 6   want to put them all in at once.
 7        This would be Exhibit 1262, 1264, 1266, and 1272.
 8        THE COURT:  1272 is in evidence.
 9        MR. FRENTZEN:  Oh.  I'm sorry, Your Honor?
10        THE COURT:  I think 1272 is already in evidence.
11        MR. FRENTZEN:  Oh, it is?  Okay.  Great.
12        Well, okay.  I'm just going --
13        THE COURT:  Okay.  Without objection --
14        MR. MARAIS:  No objection to the others.
15        THE COURT:  Okay.  Those exhibits are received in
16   evidence.
17        (Trial Exhibits 1262, 1264, and 1266 received in
18         evidence)
19        MR. FRENTZEN:  Great.  Thank you, Your Honor.
20   Q.   Now, the way that this deal was done with Target, was it
21   sort of -- were there a lot of individual purchase orders?
22   A.   Yes.
23   Q.   Okay.  Why is that?
24   A.   If my recollection is right, we wanted to do that first
25   pilot order, so that was a small amount.  And then we wanted to
```

1    ensure we were ordering the right models at the right price

2    point, and there was some administrative work that had to be

3    done over time.  So it wasn't -- it wasn't as prepared as some

4    prior transactions.  It was just a matter of Target deciding

5    finally on the form factors and the exact equipment that they

6    wanted and us getting updated quotes and being able to stage it

7    in that fashion.

8    Q.   So effectively for sort of this one larger deal, are there

9    a whole lot of different purchase orders; some of them small,

10   some of them large?

11   A.   Yes.

12   Q.   And if we could just put -- could we put up 1266, please,

13   just to show what we're talking about?  And blow that up.

14        All right.  So this is a purchase order from Zones to

15   Autonomy?

16   A.   Yes.

17   Q.   All right.  What's it for?

18   A.   It's for a Dell desktop.

19   Q.   114 of them?

20   A.   Yes.

21   Q.   If we could scroll down.

22        So on this particular one, for example, about 89,000?

23   A.   Yes.

24   Q.   Could we show just the next page?

25        All right.  Is the next page additional hardware sort of

CAMDEN - DIRECT / FRENTZEN

1   broken up -- and if he could with scroll down -- this time for

2   392,000?

3   A.   Yes.

4   Q.   Are there a whole bunch of these?

5   A.   There are.

6   Q.   Have you done us the favor of trying to add them up to get

7   an approximate amount for the overall deal?

8   A.   I have.  It's approximately 7 and a half million dollars.

9   Q.   And, again, in terms of how these -- the Oracle deal, the

10  Target deal -- in terms of how these shipped, was Autonomy ever

11  in physical possession of these?

12  A.   No.

13  Q.   Do you know what an appliance is in the business?

14  A.   I do.

15  Q.   What's an appliance?

16  A.   It's a -- it's a piece of hardware that customers use to

17  help manage their network connectivity.

18  Q.   In order -- in terms of setting up an appliance, is an

19  appliance sort of a joining of hardware and software in some

20  regard?

21  A.   Yes.

22  Q.   Was any of that done with any of these hardware purchases

23  that we've talked about?

24       MR. MARAIS:  Objection.  Foundation.

25       THE WITNESS:  No, not to my knowledge.

CAMDEN - DIRECT / FRENTZEN

1   BY MR. FRENTZEN:

2   Q.   Did Autonomy have the opportunity -- based on your

3   understanding of the deal, did Autonomy ever have the

4   opportunity to physically install any software on any of these?

5   A.   Not to my knowledge.

6          MR. FRENTZEN:   Your Honor, may I have one moment?

7                  (Pause in proceedings.)

8   BY MR. FRENTZEN:

9   Q.   One last thing, Mr. Camden.  I'd like to show you

10  Exhibits 2755, 2756, and 2757.

11         THE COURT:   I'm sorry.  27?

12         MR. FRENTZEN:   '55, '56, and '57, Your Honor.

13  Q.   Mr. Camden, see if you recognize what those are.

14  A.   (Witness examines documents.)  Yes, they're Dell -- Dell

15  desktops, Dell monitors --

16         THE COURT:   Admitted.

17     (Trial Exhibits 2755, 2756, and 2757 received in

18      evidence)

19         THE WITNESS:   -- Dell workstations, yes.

20         MR. FRENTZEN:   Please show 2755.

21         THE WITNESS:   A Dell workstation.

22  BY MR. FRENTZEN:

23  Q.   That would be a fair and accurate representation, an

24  example, of the hardware that's being sold in these

25  transactions?

CAMDEN - DIRECT / FRENTZEN

1   **A.**   It would.

2   **Q.**   2756.  Are those 19-inch monitors?

3   **A.**   Yes.

4   **Q.**   And 2757, what's that?

5   **A.**   A desktop personal computer.

6                    (Pause in proceedings.)

7   **BY MR. FRENTZEN:**

8   **Q.**   In addition, were there also -- I showed you the Oracle, I

9   think, invoice.  Were there also purchase orders from Zones

10   related to those invoices?

11   **A.**   Yes.

12        **MR. FRENTZEN:**  Your Honor, I don't know which exhibits

13   they are right now, so I'll try to find those.  So subject to

14   admission of that particular document, I have no further

15   questions for Mr. Camden.

16        Thank you, sir.

17        **THE COURT:**  Okay.  Do you want to take a recess, or do

18   you want to start?

19        **MR. MARAIS:**  I'm happy to take a recess, Your Honor.

20        **THE COURT:**  All right.  Ladies and gentlemen, we will

21   recess now until 10:30.

22        Remember the admonition given to you:  Don't discuss the

23   case, allow anyone to discuss it with you, form or express any

24   opinion.

25                    (Recess taken at 10:15 a.m.)

CAMDEN - DIRECT / FRENTZEN

1                    (Proceedings resumed at 10:32 a.m.)

2           (Proceedings were heard in the presence of the jury:)

3               THE COURT:  Okay.  Let the record reflect all jurors

4      are present; parties are present.

5           You had some exhibits.

6               MR. FRENTZEN:  I did, Your Honor.  I wanted to offer

7      into evidence Exhibit 1004.

8               THE COURT:  1 --

9               MR. FRENTZEN:  004.

10              THE COURT:  1004.

11              MR. FRENTZEN:  And 1036.

12              THE COURT:  1036.  Admitted.

13          (Trial Exhibits 1004 and 1036 received in evidence)

14                    (Exhibit published to jury.)

15              MR. FRENTZEN:  If we could put up very briefly

16     these --

17     Q.   And does this appear to be the purchase order from Zones

18     to Autonomy related to the Oracle World transaction,

19     Mr. Camden?

20     A.   Yes.

21     Q.   And what are these -- what type of items are purchased

22     here on this page?

23     A.   Dell laptops.

24     Q.   Can we scroll down to the bottom, please.  I'm sorry.  The

25     bottom of the first page.  Great.

CAMDEN - DIRECT / FRENTZEN

1        So this is about how much?

2   A.   $2,970,900.

3   Q.   Can we go to the next page, please.

4        What is being sold here?

5   A.   External keyboard, mouse, port replicators for the

6   laptops.

7   Q.   You are in the business.  When you sell more than one

8   mouse, what is that?  Is that "mouses" or "mice"?

9   A.   "Meese," I believe.

10  Q.   "Meese"?

11  A.   That's the industry term.

12          THE COURT:  "Meese"?

13  BY MR. FRENTZEN:

14  Q.   Can you spell that for the court reporter?

15  A.   Or "meeses."

16          THE COURT:  "Meeses"?

17  BY MR. FRENTZEN:

18  Q.   You're under oath, Mr. Camden.

19       All right.  So that's about 267,000?

20  A.   Yeah.  Yes, sir.

21          MR. FRENTZEN:  Could we show 1036 briefly.

22                  (Exhibit published to jury.)

23  BY MR. FRENTZEN:

24  Q.   More of the purchase order related to the Oracle deal?

25  A.   Yes.

**CAMDEN - CROSS / MARAIS**

1  **Q.**   And the amount there?

2  **A.**   $171,276.

3  **Q.**   And, Mr. Camden, total in 2010 in terms of what Zones paid

4  to Autonomy then, if there's 7 million on the H&R Block deal,

5  about 3.2 on the Oracle deal, and about 7 point -- I think you

6  said approximately 7.5 on the Target deal, how much total

7  hardware in terms of what Zones paid to Autonomy --

8  **A.**   Approximately 18 million.

9          **MR. FRENTZEN:**  That's all I have.  Thank you.

10         **THE COURT:**  Cross.

11                      <u>**CROSS-EXAMINATION**</u>

12 **BY MR. MARAIS:**

13 **Q.**   Ladies and gentlemen, good morning.

14         Mr. Camden, good morning.

15 **A.**   Good morning.

16 **Q.**   I know we've never met.  My name is Nic Marais.  I am one

17 of the lawyers representing Mr. Hussain.

18         You have never met Mr. Hussain; right?

19 **A.**   I have not.

20 **Q.**   Never had any conversations with him?

21 **A.**   No.

22 **Q.**   You've worked at Zones for approximately 20 years?

23 **A.**   Yes.

24 **Q.**   As Mr. Frentzen pointed out, fair to say that you've been

25 in the software and hardware resale or sales industry for most

**CAMDEN - CROSS / MARAIS**

1    of your professional career?

2    **A.**    Yes.

3    **Q.**    Right now, you are the chief sales officer at Zones?

4    **A.**    Yes.

5    **Q.**    How many salespeople report up to you?

6    **A.**    Approximately 600.

7    **Q.**    Do you set targets for them?

8    **A.**    We do.

9    **Q.**    And are they quarterly targets?

10   **A.**    Annual targets.

11   **Q.**    Annual targets.

12           Do you compensate them according to whether they meet

13   those targets or not?

14   **A.**    We do.

15   **Q.**    And would it be your standard practice to follow up, to

16   track to see whether they're meeting their targets?

17   **A.**    Yes.

18   **Q.**    In your experience, is that a standard business practice

19   in your industry?

20   **A.**    Yes.

21   **Q.**    Is it also standard business practice in your industry for

22   there to be increased sales activity as you get closer to the

23   end of a target period?

24   **A.**    Yes.

25   **Q.**    Now, Zones is a reseller of all sorts of hardware and

**CAMDEN - CROSS / MARAIS**

1   software; correct?

2   **A.**   Yes.

3   **Q.**   As a reseller, you act as a middleman?

4   **A.**   Can you define "middleman"?

5   **Q.**   You buy software from one company and you sell it to

6   another company?

7   **A.**   Yes.

8   **Q.**   Or you buy hardware from one company and you sell that to

9   another company?

10   **A.**   Yes.

11   **Q.**   And I assume your view is that reselling software and

12   hardware is a perfectly legitimate business practice?

13   **A.**   Yes.

14   **Q.**   The idea is that Zones has the ability to help a customer

15   like H&R Block who might come to you and say, "We need this

16   much hardware, we need that much software," and you would go

17   out and help them meet those needs; right?

18   **A.**   Yes.

19   **Q.**   It's a selling point for your company that you provide

20   complete solutions?

21   **A.**   Yes.

22   **Q.**   You have customers who want a one-stop shop so they can

23   come to get everything?

24   **A.**   Yes.

25   **Q.**   And there are companies who would prefer to get their

1  software from the same place as they get their hardware, if

2  it's possible to do that?

3  **A.**   Some, yes.

4  **Q.**   And so if one of Autonomy's customers wanted a package

5  solution, it would presumably make sense for Autonomy to be

6  able to provide the hardware that those customers need?

7  **A.**   That would make sense, yes.

8  **Q.**   Are you familiar with the word "refresh" or "technology

9  refresh"?

10  **A.**   Yes.

11  **Q.**   Could you explain to us what that is?

12  **A.**   There are several connotations to it.  Typically a

13  technology refresh would be, in the situation of H&R Block,

14  where the equipment that they're using in their franchise

15  locations that prepare tax returns is dated and they want to

16  get faster-performing equipment that utilizes some of the newer

17  technologies in hardware and software to better perform their

18  business practice and to, you know, be a better provider to

19  their clients.

20  **Q.**   And when a company like H&R Block comes to Zones for a

21  technology refresh, fair to say that they're looking for

22  computers, but monitors and "meese" as well?

23  **A.**   Yes.   That's fair.

24  **Q.**   If a customer came to you and asked for a full-scale

25  refresh, presumably that's what you would provide for them?

**CAMDEN - CROSS / MARAIS**

1    **A.**   It's customer-dependent, and in relationships like H&R

2    Block at that point in time, while we would be interested in

3    the software, that wasn't a line of business that they extended

4    to us at the time, so for -- for our purposes in the matter of

5    H&R Block, if we're going to use that as the example, software

6    wasn't in scope in their refresh.  It was purely hardware.

7    **Q.**   Focusing just on the hardware, the jury has seen pictures

8    of computers.  I'm not going to call them up.  I think

9    everybody knows what a computer looks like.

10        But presumably if H&R Block came to you, they would order

11   not just the boxes, but also the monitors at the same time;

12   right?

13   **A.**   Sometimes.

14   **Q.**   And that would be a package solution that you would

15   provide to them?

16   **A.**   Yes.  If that was what their interest was at that point in

17   time.

18   **Q.**   You talked a little bit today about other odds and ends

19   like keyboards and mice and something known as a docking

20   station?

21   **A.**   True.

22   **Q.**   Would you refer to those sometimes as a bundle?

23   **A.**   Yes.

24   **Q.**   They idea is that they are all bundled together and those

25   are the pieces of the computer that your customer would want

1   and need?

2   **A.**   Yes.

3   **Q.**   And you would provide them to the customer as a bundle.

4       Most of the transactions that you did with Autonomy were

5   for computers; right?

6   **A.**   Yes.

7   **Q.**   That was by far the majority of the dollar value on the

8   invoices that we've looked at today?

9   **A.**   Yes.

10  **Q.**   Let's take a look at Exhibit 971, which is in evidence,

11  just as an example.

12      If we can focus in on the -- thanks, Jeff.  Perfect.

13                    (Exhibit published to jury.)

14  **BY MR. MARAIS:**

15  **Q.**   So this is a $7 million transaction; right?

16  **A.**   Yes.

17  **Q.**   And the bulk of this order is for the Optiplex 780 server.

18  Do you see that?

19  **A.**   Yes.

20  **Q.**   So the majority of this order is for computers and the

21  entirety of this order is for computers and monitors; correct?

22  **A.**   Correct.

23  **Q.**   This is the single biggest transaction you did with

24  Autonomy; right?

25  **A.**   As far as single PO value, yes.  I believe.

1  Q.   Is there a reference here to any of the keyboards or mice

2  or docking stations?

3  A.   There isn't.

4  Q.   Are you familiar with the term "upsell"?

5  A.   I am.

6  Q.   Can you explain what "upsell" means?

7  A.   Probably better to use a McDonald's reference.  "Do you

8  want fries with that?"

9  Q.   So a customer comes to you and says, "I would like to buy

10 some hardware," and you use that opportunity to try to sell

11 them software as well?

12 A.   It depends on the customer.

13 Q.   Well, that's just a hypothetical but the idea of upselling

14 is if Customer A had come to you and said, "This is the

15 hardware I would like," you would provide them with that

16 hardware and then leverage the relationship to sell them

17 software as well; right?

18 A.   Sure, yes.

19 Q.   That would be a normal business practice in your industry?

20 A.   Yes.

21 Q.   In fact, that was your plan with Target; right?

22 A.   I don't know.

23 Q.   Why don't we take a look at Exhibit 5533.

24      THE COURT:  5533?

25      MR. MARAIS:  33.  It will be in the smaller binder,

1    Mr. Camden.

2              **THE COURT:**  Admitted.  Admitted.

3         (Trial Exhibit 5533 received in evidence)

4                        (Exhibit published to jury.)

5    **BY MR. MARAIS:**

6    **Q.**   All right.  We can display 5533.  Can we focus in on the

7    bottom half of the page.  Thanks, Jeff.

8         This is an email from you, Mr. Camden; correct?

9    **A.**   Yes, it is.

10   **Q.**   To some of your colleagues at Zones?

11   **A.**   Yes.

12   **Q.**   And you're describing your relationship with Target in

13   November of 2010?

14   **A.**   Yes.

15   **Q.**   And you write, "We've earned our way into their supply

16   chain by providing value-added logistical services in support

17   of their Dell products.  Our initial business relationship will

18   only be Dell."

19        That's a reference to hardware; right?

20   **A.**   Yes.

21   **Q.**   "But obviously we want to expand in other notable

22   categories over time.  Software, Cisco storage," etc.?

23   **A.**   Sure.

24   **Q.**   Those are your words?

25   **A.**   Yes, they are.

**CAMDEN - CROSS / MARAIS**

1  Q.   So initially your relationship with Target was just

2  selling them Dell hardware, but your plan ultimately was to try

3  to use that relationship to get in with Target to sell them

4  other products like software; right?

5  A.   Sure.

6  Q.   Perfectly standard business practice?

7  A.   Yes.

8  Q.   So presumably it makes sense to you that Autonomy would

9  try to do exactly the same thing; right?  Sell hardware to a

10 customer and then use that relationship to introduce them to

11 their software products as well?

12 A.   I don't know what their strategy was.

13 Q.   Just asking you as a businessman if that makes sense?

14 A.   Yes.

15        MR. FRENTZEN:  Well, objection.  And not based on this

16 transaction.

17        THE COURT:  I will --

18        MR. FRENTZEN:  It calls for speculation.

19        THE COURT:  I will sustain the objection.  I will

20 sustain the objection.

21        MR. MARAIS:  That's fine.  That's fine.

22 Q.   Can you explain to us what blind drop shipping is?

23 A.   Yes.  That's when a customer orders technology from us and

24 we put the order up directly with the manufacturer and the

25 manufacturer ships it directly to the customer and we don't

**CAMDEN - CROSS / MARAIS**

1   have the product shipped to us for any value-added services

2   prior to shipping it to the client.

3   **Q.**   So you're still acting as the middleman in the

4   transaction, but you don't, to use Mr. Frentzen's words -- you

5   wouldn't touch or handle the product at all; right?

6   **A.**   Correct.

7   **Q.**   There was some discussion earlier today that Autonomy, in

8   the transactions we've been talking about, didn't touch or

9   handle the hardware; right?

10  **A.**   Yes.

11  **Q.**   But that was true of Zones' involvement for at least some

12  of these transactions as well; right?

13  **A.**   Yes.

14  **Q.**   Let's take a look at Exhibit 1216, which will be in your

15  bigger binder.

16          **THE COURT:**  Is it in evidence?

17          **MR. MARAIS:**  Your Honor, it is not in evidence.

18          **THE COURT:**  Let me look at it.  Just a minute.  1216?

19          **MR. MARAIS:**  Yes, sir.  It's an email exchange between

20  Mr. Camden and one of his colleagues at Zones.

21          **THE COURT:**  Admitted.

22      (Trial Exhibit 1216 received in evidence)

23              (Exhibit published to jury.)

24  **BY MR. MARAIS:**

25  **Q.**   This is dated November 2010.  Do you see that, sir?

**CAMDEN - CROSS / MARAIS**

1    **A.**   Yes.

2    **Q.**   All right.  And presumably this is related to the Target

3    deal that we've been discussing?

4    **A.**   Yes.

5    **Q.**   And one of your colleagues writes, "This is a great win.

6    Nice job."  Do you see that?

7    **A.**   Yes.

8    **Q.**   Just to indicate that he's happy with how this transaction

9    shaped up?

10   **A.**   Yes.

11   **Q.**   If you look at the second bullet, do you see that you

12   wrote that, "One million of this will be straight paper

13   pass-through."  Can you explain what that means?

14   **A.**   Yes.  We're not going to take possession of the product.

15   **Q.**   So for that $1 million worth of hardware, Zones wouldn't

16   touch the hardware at all?

17   **A.**   Correct.

18   **Q.**   It would be shipped directly from Dell to the customer?

19   **A.**   Correct.

20   **Q.**   You didn't think there was anything wrong with that;

21   right?

22   **A.**   No.

23   **Q.**   In fact, didn't you tell the Government that Zones never

24   even opened the boxes containing the hardware?

25   **A.**   Yes.

**CAMDEN - CROSS / MARAIS**

1    Q.   And so there wouldn't be anything wrong with Autonomy

2    doing the same thing, dropping shipping from the supplier to

3    the end user?

4         **MR. FRENTZEN:**   Objection --

5         **THE COURT:**   Objection sustained.

6         **MR. MARAIS:**   I will withdraw the question.

7         **THE COURT:**   You don't have to.

8    **BY MR. MARAIS:**

9    Q.   There was a lot of discussion earlier today about emails

10   suggesting that people shouldn't mention to H&R Block that

11   Autonomy was involved in the transaction.   Do you remember

12   that?

13   A.   Yes.

14   Q.   And you've testified that your concern was that Autonomy

15   might swoop in and steal the business, steal a customer from

16   you; right?

17   A.   Yes.

18   Q.   And I think you testified earlier today that your view was

19   that there was an agreement between you and Autonomy that

20   prevented Autonomy from talking to the customer; is that right?

21   A.   Yes.

22   Q.   And the concern you have here is about Autonomy cutting

23   you out of the business?

24   A.   Yes.

25   Q.   In fact, you told the Government that Zones didn't want

**CAMDEN - CROSS / MARAIS**

1   Autonomy to steal Zones' future business from Target.  That was

2   the issue?

3   **A.**   Yes.

4   **Q.**   So when you tell people "don't mention Autonomy to

5   Target," that's because you're worried about losing Target;

6   right?

7   **A.**   Correct.

8   **Q.**   Do you remember earlier the Government showed you the

9   final agreement that you entered into with H&R Block?

10   **A.**   Yes.

11   **Q.**   Okay.  But before that final agreement, there was some

12   back and forth between Zones and Autonomy to negotiate the

13   terms; right?

14   **A.**   Yes.

15   **Q.**   And do you remember receiving redlines of the agreements?

16   Are you familiar with the term "redlines"?

17   **A.**   Yes.

18   **Q.**   Could you tell us what redlined agreements are?

19   **A.**   It's -- it's a document at which attorneys would look over

20   and strike out with a red marker verbiage that was not

21   acceptable.

22   **Q.**   Party A might try to insert a particular clause.  Party B

23   might delete it because they're not happy with those terms;

24   right?

25   **A.**   Yes.

**CAMDEN - CROSS / MARAIS**

1   Q.   Let's take a look at Exhibit 5531.  This is an email from

2   Annette O'Neil to you and others at Zones.

3            THE COURT:  55 --

4            MR. MARAIS:  31.

5            MR. FRENTZEN:  No objection.

6            THE COURT:  Admitted.

7        (Trial Exhibit 5531 received in evidence)

8                    (Exhibit published to jury.)

9   BY MR. MARAIS:

10   Q.   Who is Annette O'Neil?

11   A.   She was legal counsel for Zones.

12   Q.   And in the second from the top email, she writes, "I

13   forgot to provide a section on non-solicitation of our

14   customer."  Do you see that?

15   A.   Yes.

16   Q.   And then she amends the agreement and sends you a version

17   that includes the non-solicitation provision.

18   A.   Correct.

19   Q.   And that's just a fancy way of saying language in the

20   agreement to try to keep Autonomy away from a customer you're

21   worried that they might steal; right?

22   A.   Yes.

23   Q.   And if you look at page -- this is the attachment, Jeff.

24   We can call it up.

25        Do you see that this is a redlined version of the

**CAMDEN - CROSS / MARAIS**

1  agreement?  And do you understand, based on the email that we

2  just looked at, that these redlined edits are Zones' proposals?

3  **A.**   I don't know.

4  **Q.**   Well, let's take a look back at the cover email.

5  Ms. O'Neil is sending an attachment to you, and she writes,

6  "Non-solicitation is included in this version."  Do you see

7  that?

8  **A.**   Yes.

9  **Q.**   So does that make clear that these are edits that

10  Ms. O'Neil is proposing in this agreement?

11  **A.**   It -- that's a possibility.  I don't know how many edits

12  were in that document before it got to Ms. O'Neil.  I don't

13  know.

14  **Q.**   Well, the edits will make it clear.

15       Let's look at the last page and focus in on paragraph 10.

16  Do you see that the redlined edits here are trying to add in a

17  provision that would prohibit Autonomy from interacting with

18  the end user for a period of 10 years?  Do you see that?

19  **A.**   I do.

20  **Q.**   And does that seem like an edit that Autonomy proposed or

21  an edit that Zones proposed?

22  **A.**   That Zones would propose.

23  **Q.**   This is an agreement that was originally drafted by

24  Autonomy; correct?

25  **A.**   I don't know.

1    **Q.**   On the second page, you will see it has Autonomy's logo,

2    which I assume is not how Zones would typically draft its

3    agreements?

4    **A.**   Okay.

5    **Q.**   Okay.  So this is an agreement that came from Autonomy;

6    correct?

7    **A.**   Yes.

8    **Q.**   And in paragraph 10, which we were just looking at, Zones

9    has added a couple of restrictions that they're negotiating for

10   in this process; correct?

11   **A.**   Yes.

12   **Q.**   And one of them is that you also want the terms of

13   Addendum A to be confidential.  Do you see that?

14   **A.**   Yes.

15   **Q.**   What was in Addendum A.  Do you know?

16   **A.**   I don't.

17   **Q.**   Could it have been the details of the hardware that was

18   being bought and sold?

19   **A.**   I don't know.

20   **Q.**   And Zones has also added language that reads, "During the

21   term of this letter agreement and for a period of 10 years

22   following the letter agreement's termination, Autonomy agrees

23   not to interfere with Zones' business relationships in any

24   manner."

25        Do you see that?

1   A.   Yes.

2   Q.   You were trying to keep Autonomy away from H&R Block for a

3   period of 10 years?

4   A.   Yes.

5          THE COURT:   The agreement that I see on my screen, the

6   paragraph that you referenced, has an underlining.   It's

7   underscored.   And is that what is meant by a redline version?

8   Is that the redline?   Because it's not in color on my screen.

9   Maybe it is in the original.   I think it is, isn't it?   If it's

10  underscored, is that the reference?

11         MR. MARAIS:   Yes.

12  Q.   We are talking about the text which is underlined which is

13  a redline indication that somebody has added that language to

14  the agreement?

15  A.   It's added language.   I would say a redline would be

16  language that was struck from an agreement.

17  Q.   Okay.   But this is language that Zones is proposing to add

18  into the agreement --

19  A.   Yes.

20  Q.   -- correct?

21  A.   Yes.

22  Q.   Let's take a look at Exhibit 947.   I'm not sure if this is

23  in evidence.

24         THE CLERK:   No.

25         MR. MARAIS:   It isn't?

```
 1              THE COURT:  Okay.  Admitted.

 2              MR. MARAIS:  Thank you, Your Honor.

 3         (Trial Exhibit 947 received in evidence)

 4                   (Exhibit published to jury.)

 5    BY MR. MARAIS:

 6    Q.   If we focus on the top email, do you see that it's

 7    addressed to you, Mr. Camden?

 8    A.   Yes.

 9    Q.   It's coming to you from someone at Dell?

10    A.   Yes.

11    Q.   Because Dell is managing the entire deal and the

12    relationship with Autonomy; correct?

13    A.   Yes.

14    Q.   And Mr. Bordeaux writes, "Just received the updated ATT

15    Zones' letter from Autonomy."  Do you see that?

16    A.   Yes.

17    Q.   And he's attached a letter agreement?  Do you see that?

18    A.   Yes.

19    Q.   Okay.  And so if we look at page 3 of this exhibit, is it

20    fair to say that these edits now are edits that Autonomy is

21    proposing to make to the agreement?

22    A.   I think it's fair to say.  I just don't know.  I

23    haven't -- I haven't reviewed it.

24    Q.   If we go back to paragraph 10, which we were just looking

25    at, you will see that some of the language about 10 years has
```

1    been deleted.  Do you see that?  It's a little hard to follow,

2    but --

3    **A.**    Yes, I -- yes, I do.

4    **Q.**    And Autonomy has in place added language that says "For a

5    period of one year from the date Autonomy receives the most

6    recent customer PO, Autonomy shall not actively solicit H&R

7    Block for purposes of reselling the product."  Do you see that?

8    **A.**    Yes.

9    **Q.**    Is it your understanding that "products" here is hardware?

10   **A.**    Yes.

11   **Q.**    Okay.  And then it goes on "For avoidance of doubt,

12   nothing herein shall preclude Autonomy from selling to H&R

13   Block any Autonomy products in any manner whatsoever."

14       Do you see that?

15   **A.**    I do.

16   **Q.**    Now, let's take a look at the final agreement, which is

17   Exhibit 963.  This is in evidence.

18       If we can go to page 2 -- I'm sorry.  My mistake.  It's

19   not in evidence.

20       But I would move it in, Your Honor.

21          **MR. FRENTZEN:**  No objection.

22          **THE COURT:**  Admitted.

23       (Trial Exhibit 963 received in evidence)

24                  (Exhibit published to jury.)

25   \\\

CAMDEN - CROSS / MARAIS

1    BY MR. MARAIS:

2    Q.   Mr. Camden, who is Linda Marbena?

3    A.   At the time, she was our vice-president of purchasing.

4    Q.   And do you understand from this email that she is sending

5    you the final agreement for the Block/Zones/Autonomy/Dell deal?

6    A.   Yes.

7    Q.   All right.  If we go to page 5 of this exhibit and focus

8    on paragraph 10, do you see that the language that's here is

9    the language that Autonomy wanted, not the language that Zones

10   wanted?

11   A.   Yes.

12   Q.   And, in fact, even the reference to Addendum A that Zones

13   had inserted is nowhere to be found?

14   A.   Correct.

15   Q.   And the only provision here in paragraph 10 that we've

16   discussed today is that "the terms of this letter shall be

17   confidential."  Do you see that?

18   A.   Yes.

19   Q.   And that refers only to this two-page letter agreement;

20   right?

21   A.   I don't know.  That's fair to assume.

22   Q.   Okay.  And there is no discussion in this two-page letter

23   agreement of the products, of the terms that -- the price of

24   the hardware, the fact that Autonomy was selling the hardware?

25        MR. FRENTZEN:  Objection.

1    BY MR. MARAIS:

2    Q.   There is nothing in the provision in paragraph 10 that

3    we've just discussed that would prevent Autonomy from talking

4    to H&R Block about the hardware that it had sold; right?

5         MR. FRENTZEN:  Objection.  Calls for a legal

6    conclusion and it's actually inconsistent with testimony.

7         THE COURT:  Well, I'm going to sustain the objection.

8    You can ask him what is his understanding of it.

9    BY MR. MARAIS:

10   Q.   Fair to say, though, Mr. Camden that where you ultimately

11   landed on this deal was with the terms from paragraph 10 that

12   Autonomy had wanted, not the terms that Zones had wanted?

13        MR. FRENTZEN:  Well, objection to the

14   characterization, but not where they -- we can all see the

15   language.

16        THE COURT:  I have a hard time -- two people signed

17   the agreement.  The agreement is -- unless the testimony is to

18   the contrary, the agreement is what both parties agreed to.

19        MR. FRENTZEN:  Thank you, Your Honor.

20        MR. MARAIS:  Well, fair enough.

21   Q.   We can all, as Mr. Frentzen points out, see what the terms

22   say.

23        But was it your understanding from the paragraph that

24   we've just looked at that Autonomy was free to go to H&R Block

25   and to try to sell them Autonomy software?

CAMDEN - CROSS / MARAIS

1   A.   The software, yes.

2   Q.   Autonomy's software?

3   A.   Yes.

4   Q.   And as we've discussed, in your business experience, that

5   would be a sensible thing for them to do?

6   A.   Yes.

7   Q.   Let's take a quick look at Exhibit 5532.  Do you see that

8   this is an email from Ms. Marbena to you and others at Zones?

9   A.   Yes.

10          THE COURT:  Admitted.

11          MR. MARAIS:  Thank you, Your Honor.

12      (Trial Exhibit 5532 received in evidence)

13              (Exhibit published to jury.)

14  BY MR. MARAIS:

15  Q.   And in the second email from the top, Ms. O'Neil writes,

16  "Is this different from a previous letter?  If so, could you

17  please send me a redlined version so I can see the changes."

18      Do you see that?

19  A.   Yes.

20  Q.   And then Ms. Marbena attaches a document, which is also in

21  this exhibit, with those redlined edits.  So if you take a look

22  at paragraph 10, same paragraph we've been discussing, but this

23  is in relation to the Target deal, do you see that Autonomy has

24  struck that language altogether?

25  A.   Yes.

**CAMDEN - CROSS / MARAIS**

1   **Q.**   If we take a quick look at Exhibit 1214 -- actually, let

2   me use 1213, since that's the version of this agreement with

3   the random email that's already been admitted.   1213.

4                   (Exhibit published to jury.)

5   **BY MR. MARAIS:**

6   **Q.**   Do you see on page 2 that this is signed by Chris Corley?

7   **A.**   Yes.

8   **Q.**   She was the president and COO at Zones?

9   **A.**   Yes.

10  **Q.**   Would you agree this is the final agreement related to the

11  deal that you and Autonomy did with Target?

12  **A.**   It appears to be, yes.

13  **Q.**   If we focus in on paragraph 10, do you see that the final

14  agreement also removes any of the non-solicitation language

15  that we've been talking about?

16  **A.**   Yes.

17  **Q.**   And so, again, there is nothing in this agreement that

18  would prevent anyone at Autonomy from going to Target to try to

19  sell them Autonomy software; correct?

20          **MR. FRENTZEN:**   Objection.   I think it again calls for

21  a legal conclusion, which I think is wrong, but --

22  **BY MR. MARAIS:**

23  **Q.**   Was it your understanding, Mr. Camden, that this agreement

24  left Autonomy free to go to Target to try to sell them any

25  Autonomy software they wanted?

CAMDEN - CROSS / MARAIS

1    **A.**    Yes.

2    **Q.**    There is nothing in this agreement, as you understand it,

3    that would prevent Autonomy from talking about the POs or the

4    hardware transactions they'd done?

5    **A.**    In my opinion, the discussion about their involvement in

6    the hardware was to be confidential.  It is agreed upon for a

7    period of one year.

8    **Q.**    Let's take a look at Exhibit 1215, which Mr. Frentzen

9    showed you earlier today.

10                    (Exhibit published to jury.)

11   **BY MR. MARAIS:**

12   **Q.**    I just want to focus on the top email.  Mr. Frentzen

13   pulled this up and asked you to agree that Mike Sullivan was

14   basically agreeing not to talk to Target.  Do you remember

15   that?

16   **A.**    I do remember answering questions about it.  I don't -- if

17   that's what I said, that's what I said.

18   **Q.**    Was it your understanding that this email was Mike

19   Sullivan agreeing that Autonomy would not talk to Target?

20           **MR. FRENTZEN:**  That actually mischaracterizes --

21           **MR. MARAIS:**  I'm asking a question.

22           **THE COURT:**  He is asking a different question now.

23   His question is -- go ahead.

24   **BY MR. MARAIS:**

25   **Q.**    Was it your understanding that in this email, Mr. Sullivan

**CAMDEN - CROSS / MARAIS**

1    was agreeing that Autonomy would not talk to Target?

2    **A.**   It just -- it references the agreement, and that agreement

3    carried the understanding that there would be no discussion

4    between Autonomy and our customers for a period of 12 months.

5    That's just my understanding.

6    **Q.**   But is there anything in this email that would suggest to

7    you that Mr. Sullivan was agreeing not to talk to Target?

8    **A.**   Not that I can see, no.

9    **Q.**   I take it you've never discussed these deals with anyone

10   at hardware -- let me start that again.

11       I take it you have not discussed these hardware sales with

12   anyone at Autonomy?

13   **A.**   Not to my recollection.

14   **Q.**   And you don't know whether Autonomy was trying to make

15   inroads at companies like Target, H&R Block, Oracle?

16   **A.**   I don't know.

17   **Q.**   You don't know what work Autonomy was doing with Dell;

18   correct?

19   **A.**   That is correct.

20   **Q.**   You're not aware, for instance, that Autonomy and Dell

21   were working together on appliances?

22   **A.**   Not aware.

23   **Q.**   Let's take a quick look at Exhibit 818, which is in

24   evidence.  This is an email from Mr. Bordeaux at Dell and the

25   Government focused you in on -- I keep getting the numbers

```
 1    wrong.  Is this 818?
 2              THE CLERK:  818 is not in evidence.
 3              MR. MARAIS:  818 is not in evidence?
 4              THE COURT:  Well, let me look.  818 -- 818, are you
 5    offering it?
 6              MR. MARAIS:  I'm not offering it, but I think it is in
 7    evidence because I remember objecting to it.
 8              THE COURT:  I actually don't think it is in evidence.
 9              MR. FRENTZEN:  I think --
10              MR. MARAIS:  I'm fine if it's not.
11              MR. FRENTZEN:  I believe I offered it.  He objected.
12    You overruled the objection.  It came in.
13              THE COURT:  Okay.  818 admitted.
14          (Trial Exhibit 818 received in evidence)
15                    (Exhibit published to jury.)
16    BY MR. MARAIS:
17    Q.   The Government focused you in on the sentence in the
18    middle of this email, "Autonomy has and will have no direct
19    contact with Block."  Do you see that?
20    A.   Yes.
21    Q.   Now, this is dated May 20th; correct?
22    A.   Yes.
23    Q.   That's a couple of months before the H&R Block
24    transaction?
25    A.   Yes.
```

1  Q.   And many, many months before the Target transaction?

2  A.   Correct.

3  Q.   And you have no idea what discussions were happening

4  between Dell and Autonomy; right?

5  A.   I don't.

6  Q.   This may just have been Dell's way of managing the

7  relationship at the beginning; they wanted to retain control

8  over the whole setup?

9         MR. FRENTZEN:   I'm sorry.   Objection.   Calls for

10  speculation.

11         MR. MARAIS:   Well --

12         THE COURT:   Sustained.

13  BY MR. MARAIS:

14  Q.   Let's take a look at 1210.

15         THE COURT:   All right.   1210.   We are looking at 1210.

16         MR. MARAIS:   Which is in evidence.

17                (Exhibit published to jury.)

18  BY MR. MARAIS:

19  Q.   Let's start at page 2.   This is an email from Dell to

20  various people at Zones and to Mike Sullivan at Autonomy.   Do

21  you see that?

22  A.   Yes.

23  Q.   Okay.   And Mr. Johnsen, from Dell, begins by saying, "Let

24  me summarize for all."   Do you see that?

25  A.   I do.

CAMDEN - CROSS / MARAIS

1  Q.   And do you take "all" to include not just Autonomy, but

2  also Zones?

3  A.   Yes.  Everybody on the email.

4  Q.   And at the bottom of page 3, he includes a set of ground

5  rules -- a little further down, Jeff.

6       And he says, "I will manage all direct communication with

7  the customer"; right?

8  A.   Yes.

9  Q.   And goes on to say, "Do not reach directly into Target."

10 Do you see that?

11 A.   Yes.

12 Q.   And that was an instruction both to Autonomy and to you at

13 Zones; correct?

14 A.   For this transaction, yes.

15 Q.   At this point, he wants to handle the communications with

16 the end user?

17 A.   Yes.  On this particular transaction.

18 Q.   But ultimately it changed and obviously Zones had contact

19 with the end user in this transaction?

20 A.   Yes.  Absolutely.

21 Q.   You don't know whether Autonomy ultimately had contact

22 with the end user on this deal; right?

23 A.   I don't.

24 Q.   Are you familiar with Autonomy's software products at all?

25 A.   No.

**CAMDEN - REDIRECT / FRENTZEN**

1   Q.   You have never heard of something called Autonomy Legal

2   Hold?

3   A.   No.

4   Q.   You have no idea whether that's a product that could run

5   on laptops and desktop computers?

6   A.   I don't know.

7   Q.   You don't know whether there were interactions between

8   Autonomy and, say, H&R Block; right?

9   A.   I don't know.

10  Q.   You don't know whether Autonomy software was ever

11  installed on these computers after they were delivered?

12  A.   No, I don't.

13  Q.   You've never met Mr. Hussain?

14  A.   No.

15  Q.   You've never meant Dr. Lynch?

16  A.   No.

17  Q.   And so safe to say that you've never talked with them

18  about what their strategy was here?

19  A.   No.

20  Q.   You didn't think you were doing anything wrong or illegal

21  in buying hardware from Autonomy and selling it on to H&R Block

22  and Target; right?

23  A.   Correct.

24          **MR. MARAIS:**  Nothing further.  Thank you.

25  \\\

1

<u>**REDIRECT EXAMINATION**</u>

2  **BY MR. FRENTZEN:**

3  Q.   Mr. Camden, very briefly, the question was asked of you

4  about whether -- what the understanding was months before the

5  deal.

6       Let's take a look -- if we could pull up 1217, which is in

7  evidence again.

8                    (Exhibit published to jury.)

9  **BY MR. FRENTZEN:**

10  Q.   Could we blow up the very top part of that.

11       What's the date here, Mr. Camden?

12  A.   November 12th, 2010.

13  Q.   All right.  And so in -- well after the deal has been

14  struck, was it your understanding that the Target deal would be

15  the same as H&R Block?  H&R Block never knew about Autonomy and

16  neither should Target?

17  A.   Yes.

18  Q.   Was that your understanding of how this deal was set up?

19  A.   Yes.

20  Q.   You were asked some questions about 1215.  If we could

21  bring up 1215 briefly.

22                    (Exhibit published to jury.)

23  **BY MR. FRENTZEN:**

24  Q.   And I -- if I can -- the question was something along the

25  lines of did I ask you this meant that they could -- Sullivan

1    was agreeing they could never talk to the end user.

2        In fact, wasn't the question and wasn't your response with

3    respect to how the invoicing and purchase order was going to be

4    set up that as Mr. Johnsen was agreeing or was discussing

5    below, Zones would be the only entity that should provide

6    Target a quote for this transaction?

7    **A.**   Correct.

8    **Q.**   And the --

9        **MR. MARAIS:**  Objection.   That statement is hearsay.

10   That's my objection.

11       **THE COURT:**  That's all right.

12       **MR. FRENTZEN:**  It's in evidence.   He said "hearsay,"

13   but it's in evidence, Your Honor.

14       **THE COURT:**  Go ahead.

15       **MR. FRENTZEN:**   Thank you.

16   **Q.**   And Mr. Sullivan, what he's agreeing to here is that that,

17   in fact -- that the structure is going to be set up in a way

18   that the interactions with the end user are going to be Dell

19   and Zones and not Autonomy?

20   **A.**   Yes.

21   **Q.**   Was that consistent with this whole slew of emails that

22   we've seen about all three of these transactions?

23   **A.**   It is.

24   **Q.**   And was that the understanding?

25   **A.**   Yes.

1   **Q.**   You were asked questions about that end contract.  Was it

2   your understanding that if the agreement is confidential, that

3   in line with all these various emails, that Autonomy's role in

4   the transactions was to be confidential, unless Zones gave

5   their permission?

6   **A.**   Yes.  That's my opinion.

7   **Q.**   To your knowledge, did Autonomy ever reach out to Zones

8   for Zones' permission to disclose its role in these deals with

9   any end user?

10   **A.**   To my knowledge, no.

11          **MR. FRENTZEN:**  One moment, Your Honor.

12   **Q.**   You were asked a lot of questions about sort of what's

13   usual business.  In terms of your, again -- your 30 years in

14   the business, have you ever seen somebody -- an entity do what

15   Autonomy did in this deal ever before?

16   **A.**   I have not.

17   **Q.**   Ever since?

18   **A.**   No.

19   **Q.**   Was it, as we've seen in reference to the Italian job

20   and -- was it kind of a mystery around Zones what the business

21   model was here for Autonomy?

22   **A.**   Yes.

23   **Q.**   Did that have something to do with the confidentiality

24   provisions?

25   **A.**   Yes.

1    **Q.**    Among other things.

2        May I have a moment, Your Honor?

3        (Government counsel confer off the record.)

4           **MR. FRENTZEN:**  That's all I have.  Thank you very

5    much.

6           **MR. MARAIS:**  Thanks, Your Honor.

7           **THE COURT:**  You are excused.  Thank you very much.

8        Call your next witness.

9        Ladies and gentlemen, if you want to stand up, stretch, go

10   ahead.

11        (Sidebar conference heard but not reported.)

12         **MR. LEACH:**  Thank you, Your Honor.  The United States

13   calls Joel Scott.

14         **THE COURT:**  Okay.

15         **THE CLERK:**  Please stand to be sworn.

16                   **JOEL SCOTT**,

17   called as a witness for the Government, having been duly sworn,

18   testified as follows:

19         **THE CLERK:**  Please be seated.  Please state your full

20   name for the record and spell your last name.

21         **THE WITNESS:**  Joel Scott, S-C-O-T-T.

22                **DIRECT EXAMINATION**

23   BY MR. LEACH:

24   **Q.**   Good morning, Mr. Scott.

25   **A.**   Good morning.

SCOTT - DIRECT / LEACH

1          THE COURT:  You are going to have to --

2          THE WITNESS:  Good morning.

3          THE COURT:  You can also pull the microphone closer to

4   you.

5   BY MR. LEACH:

6   Q.   Let's try that again.

7        Good morning, Mr. Scott?

8   A.   Good morning.

9   Q.   Did you testify before a grand jury in connection with a

10  grand jury investigation that preceded this matter?

11  A.   I did.

12  Q.   And at that time, did you indicate to the Government that

13  if called as a witness, you would assert your Fifth Amendment

14  right against self-incrimination?

15  A.   I did.

16  Q.   Did you understand that the Court entered an order

17  compelling you to testify, despite your Fifth Amendment

18  privilege?

19  A.   I did.

20  Q.   Prior to testifying here today, did you also indicate to

21  the Government that you would invoke your Fifth Amendment

22  privilege against self-incrimination?

23  A.   I did.

24  Q.   Do you understand the Court has entered an order

25  compelling you to testify, despite your Fifth Amendment

SCOTT - DIRECT / LEACH

1  assertion?

2  **A.**    I do.

3  **Q.**    Do you understand that the testimony compelled from you

4  and any information directly or indirectly derived from your

5  testimony may not be used against you in a criminal case?

6  **A.**    I do.

7  **Q.**    Where were you born, sir?

8  **A.**    Montreal, Canada.

9  **Q.**    Are you a United States citizen?

10  **A.**    I am.

11  **Q.**    When did you become a United States citizen?

12  **A.**    About a month ago.

13  **Q.**    Congratulations.

14  **A.**    Thank you.

15  **Q.**    When did you immigrate to the United States?

16  **A.**    In 1995, I believe.

17  **Q.**    Would you please briefly describe your educational and

18  professional background.

19  **A.**    Yes.  I went to undergrad at McGill University in

20  Montreal.  I studied philosophy and English.

21      After that, I got into Stanford Law School and moved out

22  here to go to Stanford and graduated from there in '98.

23      Was it just my education that you were asking about?

24  **Q.**    That will do.

25      After you graduated from Stanford, what did you do?

**SCOTT - DIRECT / LEACH**

1   **A.**   I began my career working as a litigator at a law firm

2   called Gibson, Dunn & Crutcher.  I spent about two years there.

3        After that, I moved into the tech industry, first at a

4   fledgling startup called Real Names.  And I spent six months

5   there trying to rebrand myself from a litigator to a

6   transactional lawyer, so a lawyer that works on deals.

7        After Real Names, I moved to Brocade where I spent, I

8   think, three and a half years there.  I came in as a junior

9   transactional attorney and eventually evolved to become the

10  director of legal affairs.

11       I left Brocade to join another startup called Snow Cap,

12  where I spent a short period of time as their director of legal

13  affairs as well, reporting to an outsource general counsel.

14       And after a few months there, I saw this opportunity for

15  Autonomy on Craigslist and I applied for an associate general

16  counsel position at Autonomy, where my primary responsibilities

17  were to work on transactions for the Americas Group.

18       Would you like me to keep going through Autonomy?

19  **Q.**   That's fine.  Thank you.

20       What was the business of Brocade?

21  **A.**   Storage area networks.

22  **Q.**   You were the director of legal affairs?

23  **A.**   Yes.

24  **Q.**   What were your responsibilities?

25  **A.**   Primarily sales transactions.  Over time, they grew to

SCOTT - DIRECT / LEACH

1   include some business operations work, some litigation work,

2   some employment matters, and servicing the different

3   departments for their legal needs.

4   **Q.**   How did you find the job opportunity at Autonomy?

5   **A.**   I found it on a Craigslist posting.

6   **Q.**   What was the opportunity, as you understood it?

7   **A.**   Assistant general counsel for the Americas was the title,

8   and the primary responsibilities were to negotiate sales

9   transactions with customers in the United States.

10  **Q.**   Who hired you?

11  **A.**   Frank Pall.

12  **Q.**   And what year did you join Autonomy?

13  **A.**   I joined Autonomy in, I believe, November 2005.

14  **Q.**   Will you walk me through your progression within Autonomy

15  up until roughly 2011, when it was acquired by HP?

16  **A.**   Sure.  Responsibility-wise, my progression looked like

17  this.  I started, as I mentioned to you, working on

18  transactions, reporting to Frank Pall.  I worked very closely

19  with Frank.  He reviewed everything that I did.

20       Shortly after I joined Autonomy, we acquired another

21  company called Verity, which was our biggest competitor which

22  meant for me that there was a lot more -- a lot more

23  transactions, and as a result, the team started to grow, and

24  over time, the -- the Autonomy legal team grew and they -- I

25  oversaw the team, although everybody officially reported to

1    Frank.

2         After Frank left, at the end of 2007, I got a call from

3    Andy Kanter and he told me that he was promoting me to general

4    counsel and that the team at that point would all start

5    reporting to me.  So I then had the reporting relationship with

6    the entire Autonomy legal team.

7         Over my time at Autonomy, I was thrown myriad projects

8    that were unrelated to my legal transactional work, so things

9    like sales hiring, sales operations, certain investigations,

10   just a wide variety of things.  And that continued through

11   to -- through the remainder of my time.

12        In 2008, I believe -- 2008 or '9 -- I promoted to the

13   title of chief operating officer of Americas.  And in 2011, my

14   title was changed to chief administrative officer of Americas,

15   but with both of those title changes, there was not a

16   corresponding change in responsibilities.  Those

17   responsibilities happened over time independent of the specific

18   title changes.  And that takes me to 2011.

19   Q.   Before you were the COO of the Americas, was your title

20   general counsel for the Americas?

21   A.   Yes.

22   Q.   And describe for us how these titles -- general counsel of

23   the Americas, COO of the Americas, CAO of the Americas -- how

24   did that equate to your day-to-day responsibilities?

25   A.   I would say that there was a -- a clear -- that the titles

SCOTT - DIRECT / LEACH

1    did not correspond with what my general impressions were of any

2    of these given titles, chief operating officer, general

3    counsel.

4    **Q.**    Why do you say that?

5    **A.**    Well, as the general counsel of the Americas -- well, as

6    the general counsel generally, I would expect that I would be

7    responsible for any securities work, making decisions on which

8    counsel to retain, making decisions on my team's salaries or

9    their bonuses or their stock grants and really like

10   establishing legal policy.

11          But in this case, I didn't have any involvement with the

12   securities work, and although I was responsible for the work of

13   our team, I really didn't have any decision-making authority,

14   and so all of my -- any decision that I needed to make required

15   the approval of the general counsel of our parent company, Andy

16   Kanter.

17   **Q.**    Where physically did you work, Mr. Scott?

18   **A.**    In the Bay Area with my primary office in San Francisco.

19   **Q.**    Where was the office in San Francisco?

20   **A.**    Spear Tower down at Market and Spear.

21   **Q.**    Who did you report to?

22   **A.**    Initially I reported to Frank Pall, and then when Frank

23   left, I reported to Andy Kanter through to the acquisition.

24   **Q.**    Did you also have interactions with Mike Lynch?

25   **A.**    I did.

1   **Q.**   Describe, at a high level, what your interactions with

2   Mr. Lynch were, Dr. Lynch?

3   **A.**   I saw Dr. Lynch from time to time.  I saw Dr. Lynch or

4   spoke to Dr. Lynch periodically.  Most of my communication went

5   through Andy Kanter.

6        I saw him at management events that happened anywhere from

7   a couple to -- two to four times a year, let's say, and when he

8   made his visits to the U.S., I saw him in the San Francisco

9   office.

10  **Q.**   Do you know Sushovan Hussain?

11  **A.**   I do.

12  **Q.**   What was your level of interaction with Mr. Hussain while

13  you were at Autonomy?

14  **A.**   It was intermittent.  There were times when I wouldn't

15  have any interaction with Sushovan and then there were other

16  times when I would have a lot of interaction with Sushovan, and

17  that interaction primarily took place through phone or email.

18  **Q.**   Do you know someone named Stouffer Egan?

19  **A.**   I do.

20  **Q.**   Who is he?

21  **A.**   Stouffer Egan is the COO -- sorry, CEO of the Americas for

22  Autonomy.

23  **Q.**   And did you have interactions with Mr. Egan?

24  **A.**   I did.

25  **Q.**   On what level?

SCOTT - DIRECT / LEACH

1   **A.**   Similar to what I described with Sushovan.  I guess the --

2   in general, my relationship with Stouffer was one where

3   Stouffer would ask me to execute on a given request and I would

4   do so.

5   **Q.**   Are you friends with Mr. Egan?

6   **A.**   No.

7   **Q.**   Do you socialize with him?

8   **A.**   No.

9   **Q.**   I'd like to draw your attention, Mr. Scott, to the time

10  period of the third quarter of 2009 while you were at Autonomy.

11  Do you have that time period in mind?

12  **A.**   I do.

13  **Q.**   This is when you were the general counsel of the Americas

14  and the COO?

15  **A.**   I believe that's correct.

16  **Q.**   In or around that time, did Autonomy start to buy and sell

17  a significant amount of stand-alone hardware?

18  **A.**   Yes.

19  **Q.**   What do you remember?

20  **A.**   I remember the topic of hardware sales coming up at a

21  management meeting.  And Mike -- I believe that the topic came

22  up through Mike Sullivan, and I recall Mike -- Dr. Lynch and

23  Sushovan Hussain being both in favor of doing hardware sales.

24  And then I recall Autonomy negotiating reseller arrangements

25  with a couple of hardware vendors, including EMC, Hitachi Data

1    Systems, and Dell.

2    **Q.**   What was your role with respect to Autonomy transactions

3    with EMC, Hitachi, and Dell?

4    **A.**   Very little.   I was involved, primarily indirectly -- was

5    with the reseller agreements that were negotiated with EMC and

6    Dell.   And with respect to Hitachi, I believe I negotiated that

7    one myself with my counterpart at Hitachi.

8              **MR. LEACH:**   May I approach, Your Honor?

9    **Q.**   I've placed before you, Mr. Scott, a document that has

10   been marked for identification as 2695.   Would you please look

11   at that.

12             **THE COURT:**   Admitted.

13             **MR. LEACH:**   Thank you, Your Honor.

14        (Trial Exhibit 2695 received in evidence)

15                  (Exhibit published to jury.)

16   **BY MR. LEACH:**

17   **Q.**   Mr. Scott, what is this document?

18   **A.**   The document is a reseller agreement with EMC.

19   **Q.**   Is that your signature in the -- one of the last pages of

20   the document?

21   **A.**   I see my signature on the second page of the document.

22   **Q.**   What is the purpose of this agreement?

23   **A.**   To enable Autonomy to buy and resell EMC hardware to

24   Autonomy customers.

25   **Q.**   Okay.   And I've also placed before you Exhibits 2696 and

SCOTT - DIRECT / LEACH

```
 1   2698.  Are these additional purchase orders relating to EMC

 2   equipment for Citigroup?

 3              THE COURT:  Admitted.

 4       (Trial Exhibits 2696 and 2698 received in evidence)

 5                 (Exhibit published to jury.)

 6              THE WITNESS:  I'm just going to look at the document.

 7   Give me one moment.

 8              MR. LEACH:  Sure, please.

 9              THE COURT:  They're on the screen.

10              MR. LEACH:  If we could please display 2696.  If we

11   could go down to the signature page.

12   Q.   Is that your signature, Mr. Scott?

13   A.   Yes.

14   Q.   If we could please look at 2698, and if we could rotate

15   the document just a little bit.

16       Mr. Scott, is this a purchase order from Autonomy to EMC

17   and something called Affiliated Computer Services for

18   approximately $21 million in hardware?

19   A.   Yes.

20   Q.   And is that your signature down at the bottom?

21   A.   Yes.

22   Q.   Can we please look at page 2.  And if we could rotate it

23   to the left, please, Ms. Margen.  Perfect.

24       Is this a summary of Autonomy's sales of EMC hardware to

25   Citigroup?
```

SCOTT - DIRECT / LEACH

1    **A.**    It appears to be so, yes.

2    **Q.**    And what is the amount down at the bottom portion of the

3    summary?

4    **A.**    $23,283,988.39.

5    **Q.**    So Autonomy is selling this hardware at a loss to

6    Citigroup?

7    **A.**    Correct.

8    **Q.**    Do these two documents include any sale of Autonomy

9    software?

10   **A.**    No.

11   **Q.**    Do they include any sale of a software product known as

12   SPE?

13   **A.**    No.

14   **Q.**    Are you familiar with something called SPE?

15   **A.**    Yes.

16   **Q.**    What is it?

17   **A.**    To the best of my knowledge, SPE is a tool -- a search

18   tool for structured search.  So it would enable somebody to

19   search structured data such as in an Excel sheet, as opposed to

20   unstructured data, such as a Word document.  That's my

21   understanding of what SPE is.

22          **MR. LEACH:**  Your Honor, I now offer Exhibits 2702 and

23   2703, some contracts and purchase orders relating to Bloomberg.

24          **THE COURT:**  Admitted.

25          **MR. KEKER:**  Your Honor --

1          **THE COURT:**  Wait a minute.

2          **MR. KEKER:**  These things showed up and the other ones

3   didn't show up.  I've never seen those.  But we got these this

4   morning.  I would ask that they not be admitted until we've had

5   a chance to review them.

6          I don't mind him asking about them but I would like to --

7          **THE COURT:**  Okay.  They will be admitted subject to a

8   motion to strike.

9          **MR. LEACH:**  They are contracts, Your Honor.

10          **THE COURT:**  They are in subject to a motion to strike

11   so Mr. Keker has an opportunity to look at it.  Okay.  But I

12   want them to be in evidence now because you're going to ask

13   this witness questions and the jury won't be able to follow it

14   if they can't see the exhibit.

15          **MR. LEACH:**  Thank you, Your Honor.

16          (Trial Exhibits 2702 and 2073 received in evidence)

17                    (Exhibit published to jury.)

18   **BY MR. LEACH:**

19   **Q.**   Mr. Scott, does this appear to be a purchase order from

20   Autonomy to EMC for certain hardware products to go to

21   Bloomberg?

22   **A.**   Yes.

23   **Q.**   Would you please look at page 2.  And if we could rotate

24   the document, please.

25          What is the total value of the purchase?

SCOTT - DIRECT / LEACH

```
 1   A.   $10,089,396.

 2   Q.   Is it your belief that Autonomy sold this hardware to

 3   Bloomberg at a loss?

 4   A.   Yes.

 5   Q.   Did the transaction with Bloomberg from Autonomy include

 6   any Autonomy software?

 7   A.   No.

 8   Q.   Did it include a software product known as SPE?

 9   A.   No.

10   Q.   Would you please look at what has been marked as 2705 and

11   2706.

12        And I offer these, subject to a motion to strike,

13   Your Honor.

14            THE COURT:  Admitted, subject to a motion to strike.

15        (Trial Exhibits 2705 and 2705 received in evidence).

16                  (Exhibit published to jury.)

17   BY MR. LEACH:

18   Q.   Mr. Scott, are these -- is this a contract and a PO

19   relating to the sale of EMC hardware to JPMC?

20            THE COURT:  It may be easier just to look at the

21   screen.

22            THE WITNESS:  Yes, it is.

23   BY MR. LEACH:

24   Q.   What is the amount of the purchase order in Exhibit 2705?

25   A.   $13,632,716.
```

SCOTT - DIRECT / LEACH

1   **Q.**   And did Autonomy resell this hardware to JPMC at a loss?

2   **A.**   Yes.

3   **Q.**   Did the sale of hardware to JPMC include any Autonomy

4   software in this time period?

5   **A.**   No.

6   **Q.**   Did it include any software known as SPE?

7   **A.**   No.

8   **Q.**   Would you please look at what -- if we could please

9   display what is in evidence as Exhibit 2730.

10              (Exhibit published to jury.)

11  **BY MR. LEACH:**

12  **Q.**   Is this a true and correct copy of an email that you

13  received, Mr. Scott, relating to Autonomy's resale of EMC

14  hardware in the third quarter of 2009?

15  **A.**   Yes.

16  **Q.**   And there's an attachment entitled "EMC summary, Q3/2009."

17  Do you see that?

18  **A.**   I do.

19          **MR. LEACH:**   Could we please look at the attachment.

20              (Exhibit published to jury.)

21  **BY MR. LEACH:**

22  **Q.**   There's some rows at the top, Mr. Scott:  "Citi,"

23  "Bloomberg," "JPMC," "CSFB."  Do you see that?

24  **A.**   I do.

25  **Q.**   Who are they?

SCOTT - DIRECT / LEACH

1    **A.**   Those are customers of Autonomy.

2    **Q.**   And the total amount reflected in row -- Column E,

3    52,316,830, what did you understand that to represent?

4    **A.**   The value of the transaction to EMC.

5    **Q.**   So that's the amount that Autonomy was paying?

6    **A.**   Correct.

7    **Q.**   And if we could move forward to the right, "Autonomy

8    value," "product," "maintenance," "services," and "total."  Do

9    you see that?

10   **A.**   I do.

11   **Q.**   What is represented in these columns?

12   **A.**   The total revenue that Autonomy would receive for the same

13   products that it was buying from EMC and reselling to its

14   customers.

15   **Q.**   These transactions to Citi, Bloomberg, JPMC, and CSFB, did

16   these transactions include any Autonomy software?

17   **A.**   To the best of my knowledge, no.

18   **Q.**   And did it include something called SPE?

19   **A.**   No.

20        **MR. LEACH:**  Thank you.  We can take that down, please.

21   **Q.**   Are you familiar with a company known as Capax?

22   **A.**   I am.

23   **Q.**   What is Capax?

24   **A.**   Capax was a reseller of Autonomy.

25   **Q.**   And I've placed before you what has been marked as Exhibit

1   306.   Is this a true and correct copy of an email from Phil

2   Smolek to Sushovan Hussain and yourself?

3   **A.**   Yes.

4              **MR. LEACH:**   I offer Exhibit 306, Your Honor.

5              **THE COURT:**   Admitted.

6        (Trial Exhibit 306 received in evidence)

7                    (Exhibit published to jury.)

8   **BY MR. LEACH:**

9   **Q.**   Let me please draw your attention to the bottom portion of

10  this email, Mr. Scott, on page 1.  Do you see the name Phil

11  Smolek in the "from" line?

12  **A.**   I do.

13  **Q.**   Who is Phil Smolek?

14  **A.**   Phil Smolek was a member of the finance department in the

15  Americas.

16  **Q.**   Did he work out of Pleasanton?

17  **A.**   He did work out of Pleasanton and came to us through, I

18  believe -- through our acquisition of Zantaz, which had offices

19  in Pleasanton.

20  **Q.**   And the subject of this is "Forward CFO authorization

21  needed, PO request, Capax Discovery."  Do you see that?

22  **A.**   I do.

23  **Q.**   And Mr. Smolek is writing, "Hi, Sushovan, following up on

24  the two below-listed Capax PO requests, Stouffer indicated that

25  Capax is going to be providing even more EDD processing this

1    quarter, so it would be good to clear these two requests from

2    the log."

3         Do you see that?

4    **A.**    I do.

5    **Q.**    What did you understand Mr. Smolek to be talking about

6    here?

7    **A.**    What I understood was that Capax -- well, I had understood

8    that Capax was providing some type of -- well, was providing

9    electronic discovery services, specifically those types of

10   services that Autonomy would do, really on Autonomy's behalf,

11   and Autonomy was paying Capax to do those services, and the

12   request here was for purchase orders to pay Capax for doing

13   those services.

14   **Q.**    Where did you get the understanding that Capax was

15   performing EDD processing services?

16   **A.**    To the best of my recollection, Stouffer Egan, Andy

17   Kanter, and/or Sushovan Hussain.

18   **Q.**    And what is Mr. Smolek requesting here --

19        **MR. KEKER:**   I object and move to strike the answer.

20   It's "and/or"?  Can he answer the question?  I move to strike

21   the answer as unresponsive.

22        **THE COURT:**   Okay.  Let me just look at it.

23        Motion granted.  So do you want to reask the question

24   without the --

25        **MR. LEACH:**   I will reask, Your Honor.

SCOTT - DIRECT / LEACH

1   **Q.**   Mr. Scott, your best memory, where did you get that

2   understanding?

3   **A.**   It could have -- my best recollection is that it was from

4   one of Stouffer Egan, Sushovan Hussain or Andy Kanter.

5           **MR. KEKER:**  Well, then I move to strike --

6   **BY MR. LEACH:**

7   **Q.**   Sitting here today --

8           **MR. KEKER:**  I move to strike that answer.  That is not

9   the best recollection.  That is speculation.

10          **THE COURT:**  I don't know that it is speculation.  He

11  is saying "I don't know which one, but it's one of these three

12  people."  That's an answer.

13          **MR. LEACH:**  I think that's where it lands, Your Honor.

14          **MR. KEKER:**  He could say "I heard it on the radio."

15          **THE COURT:**  But I don't think he did hear it on the

16  radio.  I think the answer is that he was told, he says, by one

17  of three people and he doesn't know which one told him.  That's

18  what he is saying.  So it's probative, if it is, as to one of

19  three people.  It could be the first, could be the second,

20  could be the third.

21      Is that -- that's my understanding of his testimony.

22          **MR. LEACH:**  That's mine.

23          **THE COURT:**  Ladies and gentlemen, by the way, my

24  understanding of the testimony isn't important.  What's

25  important is your understanding of the testimony.  You can

1    arrive at your own conclusions.  I'm not trying to advise you

2    as to what I think of the testimony.  It's just what I heard.

3        But it's up to you to decide what weight, if any, to give

4    to any of the testimony, and you should not be influenced by

5    the Court's observations.

6        Okay.  Let's proceed.

7            **MR. LEACH:**  Thank you, Your Honor.

8    **Q.**   If we could move forward up to the -- Mr. Hussain's

9    response.

10       How did Mr. Hussain respond to Mr. Smolek on October 24,

11   2009?

12   **A.**   He said, "I'm going to speak to Stouffer on Monday here in

13   SF."

14   **Q.**   SF, that's San Francisco here in the Bay Area?

15   **A.**   Correct.

16   **Q.**   Let's go to the top.  What is the date of Mr. Smolek's

17   response?

18   **A.**   October 27th, 2009.

19   **Q.**   Okay.  And what did you understand Mr. Smolek to be doing

20   in this email?

21   **A.**   I understood Smolek to be following up with Sushovan

22   Hussain on getting the approvals necessary to pay the POs to

23   Capax.

24   **Q.**   For EDD, outsourced EDD processing?

25   **A.**   For outsourced EDD processing.

SCOTT - DIRECT / LEACH

1   Q.   Please look at what has been marked as Exhibit 313.   Is

2   this a true and correct copy of an email you sent to Phil

3   Smolek and Cynthia Watkins on or about November 3rd, 2009,

4   forwarding an exchange by -- including Mr. Kanter and

5   Mr. Hussain?

6   A.   It is.

7            THE COURT:   Admitted.

8        (Trial Exhibit 313 received in evidence)

9                    (Exhibit published to jury.)

10  BY MR. LEACH:

11  Q.   If I could draw your attention, please, to the bottom

12  portion of this email, Mr. Scott.

13       Do you see Mr. Hussain's name just above October 27th,

14  2009?

15  A.   I do.

16  Q.   And who is the email to?

17  A.   Pete Menell and Andy Kanter.

18  Q.   What is the subject?

19  A.   Capax EDD processing.

20  Q.   If we could please scroll down, please.   I draw your

21  attention to the first paragraph where it says, "As you know,

22  Capax gave us a contract for software for them to kickstart

23  their EDD processing business in Q1 for 7.45M plus two years

24  maintenance."

25       Do you see that?

SCOTT - DIRECT / LEACH

1    **A.**    I do.

2    **Q.**    The "M" there, is that for "million"?

3    **A.**    It is.

4    **Q.**    Were you involved in negotiating that transaction?

5    **A.**    I generally recall the transaction, and to the best of my

6    recollection, I wasn't the one negotiating the transaction.

7    **Q.**    Okay.  Further below in the second paragraph in the last

8    line, Mr. Hussain wrote, "In addition, we are subcontracting

9    EDD processing to Capax and have paid them 1.75M already for

10   the subcontract."  Do you see that?

11   **A.**    Yes, I do.

12   **Q.**    You can also look on the screen.  It's in evidence.

13        What did you understand subcontracting EDD processing to

14   Capax to mean?

15   **A.**    What I had described a moment ago, which is us taking work

16   that customers wanted us to perform and redirecting that work

17   to Capax to perform on our behalf.

18   **Q.**    If we could please go back to the first page of the email.

19   And Mr. Kanter responds to Mr. Hussain, "I'm okay with the

20   subcontracting on the EDD side as we have volume issues.

21   However, I'm asking Joel to make sure he looks after each one

22   to keep an eye on, like any subcontracting."

23        Do you see that?

24   **A.**    I do.

25   **Q.**    What did you understand Mr. Kanter to be asking of you?

1    **A.**    To keep track of the expenses.

2    **Q.**    Was it your job to keep track of what work was being done?

3    **A.**    No.

4    **Q.**    Why do you say that?

5    **A.**    Because I was never asked.

6    **Q.**    Please look at what has been marked as Exhibit 310.

7              **THE CLERK:**  That's not in evidence.

8              **MR. LEACH:**  I'm sorry?

9              **THE CLERK:**  That's not in evidence.

10             **MR. LEACH:**  It's not in evidence yet.

11   **Q.**    Is this a true and correct copy of an email from Sushovan

12   Hussain to you and others relating to Capax?

13   **A.**    It is.

14             **THE COURT:**  Admitted.

15        (Trial Exhibit 310 received in evidence)

16                   (Exhibit published to jury.)

17   **BY MR. LEACH:**

18   **Q.**    And if we could please start with the second page, the

19   email from Mr. Hussain to Andrew Kanter on October 28th, 2009.

20   Do you have that in front of you, Mr. Scott?

21   **A.**    I do.

22   **Q.**    Mr. Hussain starts here, "In order to process, I need

23   separate approval to the 2 items below.  Background is that

24   Capax and AUTN" -- what is AUTN?

25   **A.**    Autonomy.

1   Q.   -- "have established a very fruitful strategic

2   relationship whereby we have received nearly 412M of revenue

3   from Capax this year alone."

4        Do you think that "412M" is a typo?

5   A.   I don't know if it was a typo or not.

6   Q.   How would 412 million in revenue compare to Autonomy's

7   numbers in this time period?

8   A.   It would be a ridiculously large portion of Autonomy's

9   revenues.

10  Q.   So that may be a mistake.

11       Below that there is something called EAS.   What is EAS?

12  A.   EAS was a product that Autonomy acquired.   That's what it

13  was.

14  Q.   How did it differ from EDD?

15  A.   I can't tell you because I -- I don't know the product

16  well enough.

17  Q.   You're not the technical guy?

18  A.   No.

19  Q.   Further below there is a paragraph, "EDD this is more

20  straightforward."   Do you see that?

21  A.   I do.

22  Q.   Mr. Hussain wrote, "We have been subcontracting EDD

23  services to Capax and a further 250K is to be subcontracted.

24  Again, I am okay, but our internal process requires one more

25  approval."

SCOTT - DIRECT / LEACH

1         Do you see that language?

2    A.   I do.

3    Q.   And what did you understand subcontracting EDD services to

4    Capax to mean?

5    A.   What I had described before, which is essentially

6    providing -- directing Capax to perform services on our behalf.

7    Q.   Further down below, Mr. Hussain wrote, "Overall, I need

8    PM, AK, and SE to be involved in the negotiation, OND approval

9    of deals like this and involve MRL where necessary."

10         Do you see that?

11   A.   I do.

12   Q.   What do you understand PM to be an abbreviation for?

13   A.   Pete Menell.

14   Q.   And AK?

15   A.   Andy Kanter.

16   Q.   And SE?

17   A.   Stouffer Egan.

18   Q.   And the MRL, is that Mike Lynch?

19   A.   Dr. Lynch.

20   Q.   What did you understand Mr. Hussain to be saying here?

21   A.   I understood him to be saying that he wants the core team

22   involved in deals like this, which I guess means EDD

23   subcontracting and EAS maintenance subcontracting, and to

24   involve himself and Dr. Lynch as needed.

25   Q.   You used that term, "the core team."  What did you mean by

1    that?

2    **A.**    I meant Sushovan Hussain, Pete Menell, Andy Kanter,

3    Stouffer Egan, and Mike Lynch.

4    **Q.**    Why do you describe those individuals as the core team?

5    **A.**    It was my perception during my time at Autonomy that all

6    decision-making happened by this group of five members of

7    management.

8    **Q.**    Would you please look at what has been placed before you

9    as Exhibit 324.  Is this a true and correct copy of an email

10   from James Crumbacher to you relating to EDD process?

11   **A.**    It is.

12              **THE COURT:**  Admitted.

13        (Trial Exhibit 324 received in evidence)

14                   (Exhibit published to jury.)

15   **BY MR. LEACH:**

16   **Q.**    First, Mr. Scott, this is from someone named James

17   Crumbacher.  Who is he?

18   **A.**    Jim Crumbacher was another member of the legal team in the

19   Americas.

20   **Q.**    Is he somebody that you managed?

21   **A.**    Yes.

22   **Q.**    And the subject is EDD Process" in quotes.  Do you see

23   that?

24   **A.**    I do.

25   **Q.**    How do you interpret the quotes there?

SCOTT - DIRECT / LEACH

1    **A.**   I interpret the quotes to mean non-process.

2    **Q.**   And this is November of 2009 after some of the emails we

3    saw from Phil Smolek earlier?

4    **A.**   Correct.

5    **Q.**   Mr. Crumbacher wrote, "I talked to Phil about the EDD

6    subcontracting 'process'," again in quotes.  Do you see that?

7    **A.**   I do.

8    **Q.**   "Long story short, there really isn't one.  Sullivan and

9    Stouffer approve sending EDD processing to work to Capax at a

10   processing rate of 200GB."  Do you see that?

11   **A.**   I do.

12   **Q.**   Who is the "Sullivan"?

13   **A.**   Mike Sullivan.

14   **Q.**   And a processing rate of 200GB, what does that mean?

15   **A.**   I believe it's $200 per gigabyte.

16   **Q.**   What is a gigabyte?

17   **A.**   Measure of volume of data.

18   **Q.**   So actual -- an amount of data?

19   **A.**   An amount of data.

20   **Q.**   Okay.  Mr. Crumbacher then wrote, "There is no statement

21   of work, order form, contract, or other ordering document or

22   agreement to evidence the outsourcing of these services, other

23   than a PO."

24        What was meant by statement of work?

25   **A.**   A legal document that spells out what the terms of work

1    are.

2    **Q.**    Was it usual within Autonomy to have a statement of work

3    when a subcontractor was performing services?

4    **A.**    Yes.

5    **Q.**    An order form, what is that?

6    **A.**    Some -- effectively another -- another form of

7    communicating the terms of the transaction.  So whether it was

8    a statement of work or an order form, the being a document that

9    captures the work to be performed.

10   **Q.**    Why did Autonomy ordinarily require statements of work and

11   order forms?

12   **A.**    To be able to track progress and be -- have clarity around

13   respective rights and responsibilities.

14   **Q.**    Why is that important with respect to EDD?

15   **A.**    Well, for example, if -- if Autonomy subcontracted the

16   work to Capax on an eDiscovery matter and Capax just really

17   botched it, that's a liability that Autonomy has, and so it --

18   absent -- absent some sort of documentation to define the

19   parties' respective rights and responsibilities.

20        So a document outlining our rights and responsibilities

21   would be a best practice to just have clarity over who is

22   liable for what.

23   **Q.**    In the second paragraph, Mr. Crumbacher wrote, "Going

24   forward, Andy Kanter is to be involved in approving the EDD

25   outsourcing POs."

1          What did you understand that to mean?

2    **A.**    I understood that Andy needed to sign off on every new

3    EDD -- outsourced EDD services, purchase order for Capax.

4    **Q.**    Going back to the first paragraph in the last sentence,

5    Mr. Crumbacher wrote, "There is no specific outsourcing

6    agreement under which we would outsource the EDD processing

7    work in this manner."

8          Do you see that?

9    **A.**    I do.

10   **Q.**    What was he getting at there?

11   **A.**    The same point that he was making with no statement of

12   work, order form, contract or other document.  That there was

13   no documentation that captured the -- the purported business

14   transaction.

15   **Q.**    Was that common?

16   **A.**    No.

17   **Q.**    One more document on EDD.  Could you please look at what

18   has been placed before you as Exhibit 395.  Is this a true and

19   correct copy of an email from you to Mr. Hussain and others

20   dated December 29th, 2009?

21   **A.**    I don't have that.  I don't believe.

22            **THE COURT:**  Well, it's admitted.

23         (Trial Exhibit 395 received in evidence)

24                    (Exhibit published to jury.)

25            **MR. LEACH:**  Thank you, Your Honor.  It's displayed.

1    Q.   Do you have that now in front of you, Mr. Scott?

2    A.   I do.

3    Q.   Could we go, please, to the first email in the chain on

4    page 3.  Who starts this email thread, Mr. Scott?

5    A.   Sushovan Hussain.

6    Q.   And this is to you and someone named Cynthia Watkins.  Who

7    is she?

8    A.   Cynthia Watkins was the controller for Autonomy's U.S.

9    subsidiary.

10   Q.   And in the subject, it says "Capax."  Do you see that?

11   A.   I do.

12   Q.   And Mr. Hussain writes, "I am okay with paying the 500K

13   EDD invoice with immediate effect.  Please also add 250K for a

14   further EDD invoice, not to" -- maybe that's "be paid but

15   authorized."  Do you see that?

16   A.   I do.

17   Q.   What did you understand that to mean?

18   A.   I understood that to mean first an authorization to issue

19   payment of $500,000 immediately and to also issue another

20   invoice or request for services for $250,000 but to not

21   actually render payment on that invoice just yet.

22   Q.   Do you know why that was?

23   A.   No.

24   Q.   Okay.  Do you know what work, if any, Capax was

25   performing?

SCOTT - DIRECT / LEACH

 1   **A.**   No.

 2   **Q.**   I would like to move forward in time and shift focus,

 3   Mr. Scott, to the end of 2009 and a transaction involving

 4   Morgan Stanley.

 5       Do you recall having some involvement with a transaction

 6   involving Morgan Stanley at the end of that quarter?

 7   **A.**   I do.

 8   **Q.**   Okay.  What was Autonomy trying to accomplish, generally?

 9   **A.**   To the best of my recollection, a license restructure deal

10   where Autonomy would be able to recognize a lot of revenue in

11   this quarter and sacrifice -- you know what?  Can I actually

12   see the contract or -- that's my general recollection, but it

13   would be better off if I saw the contract.

14   **Q.**   Okay.  We can go that way.

15       Would you please look at what has been marked as Exhibit

16   365.

17           **THE COURT:**  365 admitted.

18       (Trial Exhibit 365 received in evidence)

19               (Exhibit published to jury.)

20           **THE WITNESS:**  Okay.  So this refreshes --

21   BY MR. LEACH:

22   **Q.**   Let me ask questions, Mr. Scott.  That's my job.

23       Down at the bottom, there is an email from Stouffer Egan

24   to Troy Huber and Frank Cooke dated December 22, 2009.  Do you

25   see that?

SCOTT - DIRECT / LEACH

1    **A.**    I do.

2    **Q.**    Who are Troy Huber and Frank Cooke?

3    **A.**    I believe that they both worked for Morgan Stanley.

4    **Q.**    And does this email refresh your recollection that you

5    worked on a restructured licensing transaction -- I think those

6    were your words -- at the end of 2009 relating to Morgan

7    Stanley?

8    **A.**    Yes.

9    **Q.**    And what was your memory of what you were trying to

10   accomplish?

11   **A.**    My memory of what we were trying to accomplish was to

12   recognize a lot of revenue in this quarter.

13   **Q.**    Okay.  Mr. Egan forwards this to you and Jim Crumbacher on

14   December 23rd, 2009.  Why was he doing that?

15   **A.**    For -- I believe that it was to create a reseller purchase

16   order, but I'm not sure.

17   **Q.**    Okay.  Is it fair to say that you're generally responsible

18   for forming the contracts that are going to memorialize the

19   terms of the arrangement?

20   **A.**    It is.

21   **Q.**    And is it important for you to get the deal concept and

22   the deal terms from Mr. Egan?

23   **A.**    Yes; otherwise, we couldn't create the deal.

24   **Q.**    Okay.  Is that what Mr. Egan is doing here?

25   **A.**    Yes.  The reason for my hesitation is I wasn't sure -- I'm

```
 1   not sure what the output looks like, but what I am very

 2   familiar with is Stouffer Egan sending me deal terms to then

 3   capture into an agreement.

 4   Q.   What is the date of the email here?

 5   A.   December 23rd, 2009.

 6   Q.   Will you please look at what has been marked as Exhibit

 7   366.

 8           THE COURT:  Admitted.

 9        (Trial Exhibit 366 received in evidence)

10                    (Exhibit published to jury.)

11   BY MR. LEACH:

12   Q.   Is this an email from Mr. Crumbacher to you on

13   December 23rd, 2009, relating to the potential Morgan Stanley

14   transaction that we just looked at?

15   A.   Yes.

16   Q.   Is this Mr. Crumbacher sending you the existing

17   arrangement with Morgan Stanley?

18   A.   It is.

19   Q.   Why was Mr. Crumbacher sending this to you?

20   A.   Because Mr. Crumbacher prepared the draft agreement based

21   on the terms that Stouffer had provided, and it was common

22   practice to send it to finance for review, and I believe that

23   Jim was keeping me up-to-date on where things were at with this

24   transaction.

25   Q.   Would you please look at page 55 of the agreement that
```

SCOTT - DIRECT / LEACH

1    Mr. Crumbacher is sending you.  We've actually got it displayed

2    on the screen, Mr. Scott, so you can look there.

3         Do you see the heading "Zantaz software"?

4    A.   I do.

5    Q.   What is Zantaz?

6    A.   Zantaz is a company that we purchased out in Pleasanton.

7    Q.   Okay.  And down below, there are some -- well, first it

8    says, "Zantaz software means the software components and

9    related documentation forming part of the Digital Archive

10   System."  What's that?

11   A.   The Digital Archive System is Zantaz's archiving product.

12   And the way that product works is a customer can archive all of

13   their data in a repository owned and controlled by Zantaz that

14   would protect that data from ever getting destroyed.

15   Q.   "And this includes all updates, modifications,

16   enhancements, and replacements thereto," and then further

17   below, there's six bullets:  Digital Safe Version 8, Digital

18   Safe Version 7 and some more.  Do you see those?

19   A.   I do.

20   Q.   Is that the definition of the Zantaz software in the

21   existing arrangement with Morgan Stanley at this time period?

22   A.   I -- yes.  Yes.

23   Q.   Will you please look at what has been marked as Exhibit

24   383.

25            THE COURT:  Admitted.

1          (Trial Exhibit 383 received in evidence)

2                    (Exhibit published to jury.)

3     BY MR. LEACH:

4     Q.    Mr. Scott, is this another email exchange relating to this

5     Morgan Stanley -- Digital Safe renegotiation with Morgan

6     Stanley at the end of December, 2009?

7     A.    It is.

8     Q.    Okay.  Up at the top, it's December 28th, 2009, roughly

9     five days later, and Mr.-- you're writing to Jim Crumbacher,

10    "He confirmed 12M."  Do you see that?

11    A.    I do.

12    Q.    What does "12M" mean here?

13    A.    $12 million.

14    Q.    Okay.  And what did that mean in connection with this

15    proposed transaction with Morgan Stanley?

16    A.    To the best of my recollection, it was the license value

17    of the deal.

18    Q.    Further down below, Mr. Crumbacher wrote -- strike that.

19          Would you please look at what has been marked as Exhibit

20    384.

21              THE COURT:  Admitted.

22          (Trial Exhibit 384 received in evidence)

23                    (Exhibit published to jury.)

24    BY MR. LEACH:

25    Q.    Is this another email exchange relating to the proposed

1    Morgan Stanley transaction, Mr. Scott?

2    **A.**    It is.

3    **Q.**    Okay.  And this is from you to Stephen Chamberlain.  Who

4    is Mr. Chamberlain?

5    **A.**    Steve Chamberlain was the VP of finance in the UK.

6    **Q.**    Why were you sending these draft documents to

7    Mr. Chamberlain?

8    **A.**    Because every single agreement that was created had to be

9    approved by the UK finance department, so -- or Cynthia

10   Watkins.  So in this case, Cynthia wasn't around and we needed

11   to get this document out, and I sent it to Steve Chamberlain.

12   **Q.**    Okay.

13          Would you please look at page 4.  And do you see the email

14   at the top from Mr. Egan to Mr. Cooke five days earlier on the

15   23rd?

16   **A.**    I do.

17   **Q.**    If we could now go to page 5, the beginning of the email.

18   Do you see where it says, "With that said, there is also the

19   point you made about the 12M"?

20   **A.**    I do.

21   **Q.**    Do you interpret that to be a reference to the proposed

22   license fee for this renegotiated software deal?

23   **A.**    I do.

24   **Q.**    If we could please display what I believe is in evidence

25   as Exhibit 382.

SCOTT - DIRECT / LEACH

1                 (Exhibit published to jury.)

2   BY MR. LEACH:

3   Q.   Is this another email exchange, Mr. Scott, in the -- your

4   work on this Morgan Stanley transaction?

5   A.   It is.

6   Q.   And is Mr. Crumbacher sending you a draft of the proposal

7   to send to Morgan Stanley on or about December 28th, 2009?

8   A.   Correct.

9   Q.   Would you please look at page 3 of the draft agreement.

10  And I draw your attention to the definition of first amendment

11  Zantaz software, roughly in the middle of the page.

12  A.   Okay.

13  Q.   Is this the same software that was the subject of the

14  original agreement that we looked at in Exhibit 366?

15  A.   I believe it looks the same.

16  Q.   Okay.  Would you now please look at what has been marked

17  as Exhibit 381.

18           THE COURT:  Admitted.

19       (Trial Exhibit 381 received in evidence)

20                 (Exhibit published to jury.)

21  BY MR. LEACH:

22  Q.   What is the subject of this email thread, Mr. Scott?

23  A.   SPE Basic.

24  Q.   And what is the date up at the top?

25  A.   December 28th, 2009.

1    Q.   Would you please look at page 2.  Do you see where

2    Mr. Crumbacher writes, "Folks, for IDOL deals over 250K in

3    license fee, regardless of whether the rep asks for it in the

4    request or not, please include SPE Basic as part of the

5    software product description.  There are two ways to do this.

6    A preferred method and an alternate method."

7         Do you see that?

8    A.   I do.

9    Q.   What is he talking about here?

10   A.   Jim is talking about -- Jim's direction here is to the

11   rest of the legal team, that for any deals that we were doing

12   in the quarter that were worth at least $250,000, have SPE

13   Basic included in the software that was being purchased by the

14   customer, regardless of whether or not the customer ever asked

15   for that software.

16   Q.   And did you also get a similar direction?

17   A.   Yes.

18   Q.   Who did you get that from?

19   A.   Sushovan Hussain.

20            THE COURT:  I think maybe we should take our recess.

21            MR. LEACH:  One more document, and I think we will be

22   ready, Your Honor.

23            THE COURT:  Sure.

24   BY MR. LEACH:

25   Q.   Would you please look at what has been marked as Exhibit

1    417.

2              THE COURT:  417 admitted.

3         (Trial Exhibit 417 received in evidence)

4                   (Exhibit published to jury.)

5    BY MR. LEACH:

6    Q.   Is this an email you received, Mr. Scott, from Jim

7    Crumbacher attaching a revised -- a response to some of Morgan

8    Stanley's suggestions for the proposed re-licensing agreement?

9    A.   Yes.

10   Q.   Please look at page 5.  What was the comment from the

11   Morgan Stanley lawyer down at the bottom in Footnote 1?

12   A.   Would you like me to read the comment?

13   Q.   Yes, please.

14   A.   The comment says, "This definition is identical to the

15   existing definition of Zantaz software.  Are these two

16   definitions supposed to be different?  Why is this here?  To be

17   discussed."

18   Q.   Okay.  And in response to this comment, did Mr. Crumbacher

19   and others at Autonomy insert SPE Basic into Digital Safe

20   Version 8.0?

21   A.   Yes.

22              MR. LEACH:  Now is a good time, Your Honor.

23              THE COURT:  Okay.  Ladies and gentlemen, we are going

24   to take our noon recess.  Remember the admonition given to you:

25   Don't discuss the case, allow anyone to discuss it with you,

1   form or express any opinion.

2       We will resume at 10 minutes after 1:00.

3       (Proceedings were heard out of presence of the jury:)

4       **THE COURT:**  Let the record reflect the jurors have

5   retired.

6       So what is this dispute -- when are we going to get into

7   it?

8       **MR. LEACH:**  I expect we are getting into it fairly

9   soon, Your Honor.

10      **THE COURT:**  Okay.  All right.  So what is the dispute?

11      **MR. LEACH:**  I think it might be best if the witness is

12  not here for this part, Your Honor.

13      **THE COURT:**  Okay.

14      (Mr. Scott leaves the courtroom.)

15      **MR. KEKER:**  Perhaps I should remind the Court, because

16  it was our motion in limine.

17      With respect to a couple of witnesses and now we're with

18  this one, we made a motion to exclude certain evidence as not

19  properly within 404(b) and in connection -- other acts

20  evidence, which is why they're offering it.

21      And the -- this particular incident is Brent Hogenson, who

22  was in the finance department in the U.S., became a

23  whistleblower at some point, and there was this very

24  complicated story and lots of documentation, but basically

25  he -- his group was accused of a $5 million embezzlement which

**PROCEEDINGS**

1   went on for a long time.  There is huge numbers of police

2   reports and it's established and a couple people went to jail.

3        Hogenson said it wasn't his problem, he just happened to

4   be at the head of it.  That's all fine.

5        But there was an investigation by Kroll, by other agencies

6   about what was happening here, and before it -- and he

7   started -- right around the same time he started being a

8   whistleblower saying "we want to look -- that there is

9   transactions that I'm suspicious about."

10       Deloitte was asked to come in and do an audit.  Deloitte

11   worked with Hogenson, with the materials that they had, and

12   eventually reported that there was nothing to it to the audit

13   committee and so on.

14       At some point, Mr. Hogenson was fired.  Mr. Hussain was

15   not the one who fired him.  The person who fired him was

16   Mr. Scott.  Mr. Scott was given the authority by Dr. Lynch to

17   handle this Hogenson situation, handle the embezzlement

18   situation, decide who was responsible for this $5 million theft

19   and other matters, and Mr. Scott went about his business, as I

20   say, hiring Kroll and other folks and eventually decided to

21   fire Mr. Hogenson.

22       After he fired Mr. Hogenson, Mr. Hogenson sued and

23   eventually Mr. Hogenson settled with the company for $75,000, I

24   think.  And what we're saying is that this is not a proper

25   detour in a case against Sushovan Hussain, who did not fire

1    Mr. Hogenson, who didn't investigate him.  I think Mr. Scott's

2    testimony would be Dr. Lynch told him to investigate it and

3    make a decision because he didn't want anything about

4    Mr. Hogenson to be affected by the accounting side of Autonomy,

5    which he was accusing.

6         So it's a frolic and detour and it's improper 404(b)

7    evidence, and legally, because they can't tie the firing to

8    Mr. Hussain because Mr. Hussain didn't fire him, it's not

9    404(b) anyway.

10             MR. LEACH:  First of all, Your Honor, it's not 404(b).

11   It's alleged in the indictment that part of the scheme was

12   firing Brent Hogenson.

13        Even if it were 404(b), I expect Mr. Scott to testify he

14   fired Brent Hogenson in part because of issues that were

15   uncovered in an investigation and in part because of pressure

16   he received from Lynch, Hussain, and Kanter.  He will -- he

17   will testify to emails that he received from Mr. Hussain that

18   he interpreted as encouragement to fire Brent Hogenson.

19        He will also testify that he fired two people related to

20   Mr. Hogenson, Percy Tejada and Reema Prasad, because Sushovan

21   Hussain called him and said "I wanted them fired because of

22   their association with Brent."

23        We are going to prove through this witness that the firing

24   of Brent Hogenson was a pretext because he had raised issues

25   with the audit committee, that Deloitte was lied to in

1    connection with that investigation, and that when the UK

2    regulatory authority, the FRRP, started asking questions about

3    what Mr. Hogenson had raised, Mr. Hussain lied to them.

4        This is a very important part of the case.  It's not

5    404(b), and this witness is going to say "I fired Brent

6    Hogenson in part because of what Sushovan Hussain wanted."

7              THE COURT:  Okay.  Thank you.  I will -- do you want

8    to respond?

9              MR. KEKER:  I -- go ahead.

10             THE COURT:  Well, I mean, I was going to think about

11   it.

12             MR. KEKER:  Fine.  I guess --

13             THE COURT:  I don't think it's 404(b).  I mean, I

14   don't think it's 404(b).  It is -- it is intended, if --

15   whatever the inferences that can be drawn, to be part and

16   parcel of the concealment or the reaction to the allegations

17   that occurred with respect to the disclosures.

18       Now, it may be more complicated than that, but I don't

19   think it's 404(b).  I think it's either appropriately in or

20   appropriately out, but not as 404(b) material.

21       So I really think it's a weighing factor that I have to do

22   as to whether or not -- whether or not even though it would be

23   admissible, relevant, as I think it would be, it's -- it's

24   under 40 -- I'm sorry.

25             MR. LEACH:  I would just add, Your Honor -- I would

1   just add, Your Honor, Mr. Hogenson is complaining about many of

2   the transactions the Court has been hearing about:  FileTek,

3   Capax, EDD.  These are all related --

4          THE COURT:  As I understand it, Mr. Keker's point is

5   that he was actually fired for something else.

6          MR. KEKER:  And my point also is that Mr. Hussain had

7   nothing -- he says -- I mean, this is how they do it.  Lynch

8   says, "You decide.  Scott, you decide.  You make the decision,"

9   and Mr. Scott says --

10         THE COURT:  I don't know.

11         MR. KEKER:  The reason that he did that is that he

12  didn't want the accounting -- the finance people to have

13  anything to do with it, given the allegations that Hogenson is

14  making.  So Scott investigates.  Scott hires Kroll -- Scott

15  hires another group called Discovery.

16     They look into this thoroughly, and Scott makes the

17  decision to fire the man.

18     The idea that Sushovan Hussain is involved in that firing

19  because this witness thought he --

20         THE COURT:  Let me ask you this question.  Let me ask

21  you this question.  Accepting all that, accepting all that,

22  what is alleged here -- I have to go back and look at the

23  indictment, but I have to believe what is alleged here is a

24  conspiracy in which Mr.-- I guess he is called Dr. Lynch.  I

25  don't know why.  Is he a doctor?

1          **MR. KEKER:**  He is a Ph.D.  Mathematics.

2          **THE COURT:**  Oh, well.  So are you.

3          **MR. KEKER:**  Not me.  I'm an LLB.

4          **THE COURT:**  No.  They converted all our degrees to JD.

5          **MR. KEKER:**  I never paid my $35.  I refused.

6          **THE COURT:**  Your refused to pay?

7          **MR. KEKER:**  I'm happy to pay.

8          **THE COURT:**  I did pay.  And therein, I'm on the bench

9     and you are trying cases.

10          Quite seriously, I'm trying to figure out if it were

11    Dr. Lynch, why it wouldn't come in anyway as to part and parcel

12    of a conspiracy.  I mean, it seems to me -- and this is the

13    argument that I would like you to address -- that if a --

14    alleged co-conspirator takes an act -- and I have to, I guess,

15    look at the indictment again and find out the period and so

16    forth and so on, but it's either in or out of that period, but

17    I don't know the answer to that.  I don't know whether that's

18    relevant.

19          But if, in fact, a co-conspirator takes an action against

20    somebody who has done certain things, which -- which are

21    things -- to disclose wrongdoing and then is terminated, why

22    that's not part and parcel an act in furtherance of a

23    conspiracy.

24          Concealment are acts in furtherance of the conspiracy.  So

25    that's what I sort of have to address, and I'm accepting your

**PROCEEDINGS**

```
1    facts as being true.

2          MR. KEKER:  But that -- we're not looking at

3    Dr. Lynch.  We are looking at Joel Scott as a member of the

4    conspiracy.

5          THE COURT:  No, no, no.  We are saying that Joel

6    Scott -- I understand we are looking at both of them.  I mean,

7    I agree.  Let me think about it some more.

8          MR. LEACH:  Just to be clear, Your Honor, a conspiracy

9    is alleged.  This is right in the middle of the time period,

10   and Dr. Lynch is a co-conspirator.

11         THE COURT:  Well, has Dr. Lynch been here?  No.  He is

12   not here, is he?  In the courtroom.

13         MR. KEKER:  No.  We moved for defense witness immunity

14   and you denied it.

15         THE COURT:  I did.

16         MR. FRENTZEN:  His lawyer has been here every day,

17   Your Honor.  His lawyer is here right now.

18         THE COURT:  Who is his lawyer?

19         MR. LEACH:  Mr. Morvillo in the second row back there.

20         THE COURT:  I just like to keep my eyes on everybody.

21   I'm going to take a recess.  Thank you.

22               (Luncheon recess was taken at 12:18 p.m.)

23

24

25
```

PROCEEDINGS

```
 1    Afternoon Session                                    1:06 p.m.

 2         (Proceedings were heard out of the presence of the jury:)

 3         THE COURT:  Let the record reflect the parties are

 4    present, the jury is not present.

 5         With respect to the motion in limine, I'm going to deny

 6    the motion in limine.  It's my view that this evidence would

 7    come in, and I don't know whether it's appropriate to give a

 8    limiting instruction or not.  I hadn't thought about that.

 9         Obviously it's over objection, strong objection, of the

10    Defense, but I don't know that it's -- and I don't want to get

11    into a discussion at all in front of the jury, because it's

12    almost impossible to have a discussion that doesn't look like I

13    think it actually happened.  You understand?

14         Though, I think it's fair game for -- I think it's totally

15    fair game for the Defense to explore other reasons and so

16    forth.  Since I think it is a serious piece of evidence, I

17    will -- if there are witnesses that need to be called in order

18    to respond to the allegation, I would give the Defense latitude

19    in that regard.

20         Because as I understand the argument of the Defense is,

21    among other things, that this person was terminated for other

22    things, other reasons, and I would certainly permit the Defense

23    to explore that in cross-examination of this witness or other

24    witnesses.

25         Okay?  So that's the ruling.
```

 1          **MR. KEKER:**  Understood, yes, sir.

 2          **THE COURT:**  There we are, and you don't have to -- if

 3   you don't want to object in front of the jury, you don't have

 4   to.  I leave that up to you.

 5          **MR. KEKER:**  I'd like not to.

 6          **THE COURT:**  Pardon?

 7          **MR. KEKER:**  I'd like not to.

 8          **THE COURT:**  You don't have to, and I deem that it's

 9   objected and I've overruled the objection.

10          **MR. KEKER:**  Thank you, Your Honor.

11          **MR. LEACH:**  Thank you, Your Honor.

12          **THE COURT:**  So I think we're ready when the jury is

13   back.

14          **THE CLERK:**  Okay.

15                    (Pause in proceedings.)

16          **THE COURT:**  Okay.  Bring in the jury.

17      (Proceedings were heard in the presence of the jury:)

18          **THE COURT:**  Please be seated.

19      Let the record reflect all jurors are present, the parties

20   are present, the witness is on the stand.

21      You may proceed.

22          **MR. LEACH:**  Thank you, Your Honor.

23   **Q.**  Good afternoon, Mr. Scott.

24      Good afternoon, ladies and gentlemen.

25      I want to shift topics slightly, Mr. Scott, to a company

SCOTT - DIRECT / LEACH

1  called MicroLink, MicroTech, and Discover Tech.  Do you have

2  those entities in mind?

3  **A.**  I do.

4  **Q.**  What is MicroLink?

5  **A.**  MicroLink is a Government -- it's a company that provides

6  services and resells software to the Government that Autonomy

7  acquired around January 2010.

8  **Q.**  In the fourth quarter of 2009, did you learn that Autonomy

9  was contemplating buying MicroLink?

10  **A.**  I did.

11  **Q.**  How did you learn that?

12  **A.**  I learned about it both through Sushovan asking me to

13  print up a dec. in the San Francisco office that related to it,

14  as well as through a conversation with Andy Kanter when he told

15  me that I need to be doing some work post-acquisition.

16  **Q.**  And did Mr. Kanter give you any type of instructions about

17  transactions with MicroLink in the fourth quarter of 2009?

18  **A.**  Andy Kanter asked that he and Sushovan be made aware of

19  all deals taking place in the last quarter of 2009.

20  **Q.**  When did that happen?

21  **A.**  Can you -- when did what happen?

22  **Q.**  Can you quantify somewhere in the fourth quarter of 2009

23  when you got that direction?

24  **A.**  It -- it may have been in the third quarter.  If anywhere,

25  it was, like, near the front of -- near the beginning of the

1    fourth quarter or at some point in the third quarter.

2    **Q.**   Why does that direction stand out in your mind?

3    **A.**   Because it wasn't a typical direction to -- it wasn't

4    common for -- in fact, I can't -- I can't think of another --

5    well, it wasn't common for Andy to ask to be made aware of all

6    transactions related to a specific entity.

7    **Q.**   At some point in time did you learn that Autonomy was

8    contemplating selling software through MicroTech to Dave

9    Truitt's new company Discover Tech?

10   **A.**   Yes.

11   **Q.**   Would you please look at what has been marked as

12   Exhibit 374?

13   **A.**   (Witness examines document.)

14   **Q.**   Is this an e-mail between you and Stouffer Egan relating

15   to MicroTech?

16   **A.**   Yes.

17          **THE COURT:**  Admitted.

18       (Trial Exhibit 374 received in evidence)

19   **BY MR. LEACH:**

20   **Q.**   Let me direct your attention to the bottom portion of the

21   page, Mr. Scott.  There's an e-mail on December 28th, 2009,

22   with no subject from Andy Kanter where it says (reading):

23          "MT?  How is it going?"

24       Do you see that?

25   **A.**   Yes.

SCOTT - DIRECT / LEACH

1    **Q.**    What is the "MT" an abbreviation for?

2    **A.**    MicroTech.

3    **Q.**    What did you understand Mr. Kanter to be inquiring about

4    here?

5    **A.**    I understood Andy Kanter to be inquiring about the status

6    of the MicroTech $10 million deal that we were asked to

7    prepare.

8    **Q.**    What do you mean by "the MicroTech $10 million deal"?

9    Explain that.

10   **A.**    In the fourth quarter of 2009 -- in the fourth quarter of

11   2009, as with all other -- as with all deals, we were asked --

12   I was asked to prepare a reseller agreement with MicroTech for

13   $10 million for delivery of, I believe it was, 40,000 seats of

14   ControlPoint software, and that's the deal that I'm referring

15   to.

16   **Q.**    Okay.  Further up in this e-mail you reply (reading):

17           "That was drafted and out last week."

18          And then Mr. Kanter wrote (reading):

19           "Need to chase.  Dave was asking me about some

20          changes that he wanted but I had no info on.  Don't give

21          away anything substantive."

22          Do you see that?

23   **A.**    I do.

24   **Q.**    "Need to chase," what does that mean?

25   **A.**    Andy meant "You need to get this deal done."

SCOTT - DIRECT / LEACH

1   Q.   "Dave was asking me about some changes."  Is the "Dave"

2   there a reference to Dave Truitt?

3   A.   Yes.

4   Q.   And you knew him to be associated with MicroTech?

5   A.   Yes.

6   Q.   "Don't give away anything substantive," what was that

7   direction from Mr. Kanter?

8   A.   The message that I took away from Andy's e-mail was that

9   there was some software or terms or rights that Dave Truitt had

10  said that he wanted included in this deal, and Andy was telling

11  me, "It doesn't -- anything substantial that he wants, don't

12  agree to it."

13  Q.   Would you please look at what has been marked as

14  Exhibit 409?

15  A.   (Witness examines document.)

16  Q.   Is this an e-mail exchange between you and Livius Guiao

17  related to the MicroTech transaction?

18  A.   It is.

19       THE COURT:  Admitted.

20       (Trial Exhibit 409 received in evidence)

21  BY MR. LEACH:

22  Q.   Let me first draw your attention to page 3, the draft

23  purchase order.

24  A.   (Witness examines document.)

25  Q.   Is this consistent with your memory that you were working

1  on a $10 million licensing transaction for 40,000 client seats

2  with Dave Truitt's new company Discover Tech as the end user?

3  A.  Yes.

4  Q.  Okay.  Now, if we could go back to page 1, and I draw your

5  attention to the top portion of the e-mail with the paragraph

6  beginning "Updated docs attached."  Do you see that?

7  A.  I do.

8  Q.  And Mr. Guiao wrote to you (reading):

9       "Both Eloy and Al Marsella confirmed minimum IDOL

10      functionality requirements.  However, Eloy (see attached

11      e-mail) questioned if we should just reference IDOL

12      generically and deliver the minimum required

13      functionality."

14      Do you see that?

15  A.  I do.

16  Q.  What was Mr. Guiao getting at here?

17  A.  He was trying to get the Autonomy IDOL license as narrow

18  as possible in line with Andy Kanter's request.

19  Q.  Okay.  Please now look at what is in -- if we could please

20  display what is in evidence as Exhibit 410.

21      Mr. Scott, do you recognize this e-mail exchange between

22  you and Mr. Truitt on December 30th, 2009?

23  A.  Yes.

24  Q.  If we could, please, look at page 2.

25      You wrote to Mr. Truitt on the 30th (reading):

1              "Hi, Dave.

2              "Attached please find an updated document.  As to

3      your question about IDOL providing Categorization,

4      Clustering, and Retrieval Lite is the best we can do."

5      Do you see that?

6  **A.**   I do.

7  **Q.**   What were you getting at there?

8  **A.**   That that was all -- that was all the software that we

9  could include in response to his request for, you know, an IDOL

10 license.

11 **Q.**   Is that consistent with the direction that you got from

12 Andy Kanter?

13 **A.**   Yes.

14 **Q.**   Please look at what has been marked as Exhibit 397.

15 **A.**   (Witness examines document.)

16 **Q.**   Is this an e-mail from Jorge Salazar to you attaching an

17 executed version of the MicroTech order?

18 **A.**   It is.

19         **THE COURT:**  Admitted.

20     (Trial Exhibit 397 received in evidence)

21 **BY MR. LEACH:**

22 **Q.**   Who is Jorge Salazar?

23 **A.**   Jorge Salazar was a paralegal and contracts administrator

24 at Autonomy.

25 **Q.**   And why is he sending this to you?

SCOTT - DIRECT / LEACH

1    A.   He -- actually, he wasn't sending it to me I don't

2    believe.   Where he was sending it was to the orders alias, and

3    that was an alias that I was on.

4    Q.   Why were you on that?

5    A.   I don't know how I got added to it in the first place.

6    There wasn't a lot that I -- well, what I had to make sure of

7    is that for the deals that we closed at the end of the quarter,

8    that the software got shipped; but this doesn't really even

9    give me that vantage point, so I don't know how my name got

10   added to the alias.

11   Q.   Okay.   And if we could please look at page 2.

12        And in paragraphs 1 and 2, do you see a reference to

13   "Discover Technologies ControlPoint module, IDOL server

14   software with certain specified functionalities"?

15   A.   I do.

16   Q.   And was that consistent with the direction that you got

17   from Andy Kanter not to give away anything substantive?

18   A.   It is.

19   Q.   I'd like to display for you, Mr. Scott, what is in

20   evidence as Exhibit 2791.

21        Mr. Scott, this appears to be an e-mail from Sushovan

22   Hussain to Andy Kanter and Stephen Chamberlain with a copy to

23   you on January 1st, 2010.   Do you see that?

24   A.   I do.

25   Q.   And do you see the subject MicroLink?

SCOTT - DIRECT / LEACH

1    **A.**   I do.

2    **Q.**   This reads (reading):

3              "We received an order from them last Q which will be

4         transferred to Discover - speak to Joel for more info

5         tomorrow re acquisition impact.  Shouldn't be any."

6         Did this e-mail come as a surprise to you?

7    **A.**   Yes.

8    **Q.**   Why is that?

9    **A.**   Because I didn't know about another order and I didn't

10   know about acquisition impact.

11   **Q.**   Did you tell Sushovan Hussain "We received an order from

12   them last Q which will be transferred to Discover"?

13   **A.**   No.

14   **Q.**   As far as you knew, on December 31st, 2010, had there been

15   any changes or modifications to the transaction you had

16   negotiated with Dave Truitt relating to ControlPoint?

17   **A.**   No.

18   **Q.**   Do you know what Mr. Hussain meant by "speak to Joel for

19   more info tomorrow re acquisition impact.  Shouldn't be any"?

20   **A.**   No.

21   **Q.**   Please look at what has been marked as Exhibit 2792.  Is

22   this another e-mail you received from Mr. Hussain on

23   January 1st, 2010?

24   **A.**   (Witness examines document.)  Yes.

25              **THE COURT:**  Admitted.

1              (Trial Exhibit 2792 received in evidence)

2    **BY MR. LEACH:**

3    **Q.**   Who are the recipients of this e-mail, Mr. Scott?

4    **A.**   Andy Kanter and Steve Chamberlain.

5    **Q.**   Okay.  And in the subject it says (reading):

6              "Need to talk re working capital adjustment on ML."

7         Do you see that?

8    **A.**   I do.

9    **Q.**   Do you understand "ML" to be an abbreviation for MicroLink

10   in this context?

11   **A.**   I do.

12   **Q.**   Okay.  Did you know what Mr. Hussain was talking about

13   "need to talk re working capital adjustment"?

14   **A.**   No.

15   **Q.**   Did you have any conversations with John Cronin or Alan

16   Rizek about an additional order from MicroLink to be recognized

17   in the fourth quarter of 2009?

18   **A.**   Not that I recall.

19   **Q.**   Please look at what has been marked as Exhibit 511.

20   **A.**   (Witness examines document.)

21   **Q.**   Is this a true and correct copy of an e-mail you received

22   attaching what appears to be a purchase order from MicroLink on

23   or about January 4th, 2010?

24   **A.**   Yes.

25              **THE COURT:**  Admitted.

1          (Trial Exhibit 511 received in evidence)

2    **BY MR. LEACH:**

3    **Q.**   Let me draw your attention to the bottom portion of the

4    e-mail, Mr. Scott.   It appears like it's coming from something

5    called sfscanner@autonomy.com.   Do you know what that is?

6    **A.**   I do.   It was our photocopy machine.   It was also a

7    scanner and you could scan a document and e-mail it to someone

8    or yourself.

9    **Q.**   Okay.   And does this appear that somebody from a scanner

10   e-mailed this to cynthiaw@autonomy.com on January 4th, 2010?

11   **A.**   It does.

12   **Q.**   Okay.   And can you make out who is replying to this e-mail

13   in the "From" line?

14   **A.**   That is the legal alias.

15          (Witness examines document.)   Hmm, I forget how the alias

16   system works, but somebody has to send an e-mail.   It has to be

17   a person.   And so the best I can make out from this is that

18   Cynthia Watkins sent this document via the CRF alias.

19   **Q.**   Okay.   Please look at the attached order.

20   **A.**   (Witness examines document.)

21   **Q.**   Page 2, please.   Thank you, Ms. Margen.

22          I draw your attention to the top portion of the purported

23   purchase order, Mr. Scott.   Do you see the date 12/31/09 at the

24   top?

25   **A.**   I do.

SCOTT - DIRECT / LEACH

1    **Q.**    And do you see the amount of $2.3 million?

2    **A.**    I do.

3    **Q.**    Okay.  Prior to January 4th, did you know anything about

4    this order?

5    **A.**    To the best of my recollection, no.

6    **Q.**    Okay.  Did you agree to this order or ask for this order

7    in any way?

8    **A.**    No.

9    **Q.**    Thank you.  You can put that to the side, and please look

10   at what has been marked as Exhibit 505.

11   **A.**    (Witness examines document.)

12   **Q.**    Are you aware, Mr. Scott, that Autonomy purchased

13   MicroLink on or about January 4th, 2010?

14   **A.**    Yes.

15   **Q.**    And do you recognize this as an e-mail between you and

16   Mr. Kanter on the same date?

17   **A.**    Yes.

18             **THE COURT:**  Admitted.

19        (Trial Exhibit 505 received in evidence)

20   **BY MR. LEACH:**

21   **Q.**    Let me please draw your attention to the bottom portion of

22   this e-mail, Mr. Scott.  Do you see where it says "MT" -- where

23   Andrew Kanter on January 4th, 2010, the date of the MicroLink

24   acquisition, wrote, "MT cash?"

25   **A.**    I do.

SCOTT - DIRECT / LEACH

1    **Q.**   What did you understand that to mean?

2    **A.**   That Andy Kanter was asking if MicroTech had paid us on

3    the ControlPoint transaction that we looked at.

4    **Q.**   The $10 million software transaction?

5    **A.**   Correct.

6    **Q.**   Okay.  Above that you wrote (reading):

7              "No."  I think you mean "Payment terms were 30 days."

8         What did that mean?

9    **A.**   What I meant was MicroLink wasn't due to pay us for

10   30 days.

11   **Q.**   And why were you highlighting that fact to Mr. Kanter?

12   **A.**   Because Andy had asked if we were paid.  We just signed

13   this agreement four days ago, and it wasn't 30 days yet.  So

14   we -- you know, I was telling Andy, "Don't expect to get paid

15   for -- you know, for the rest of the month."

16   **Q.**   Why were you telling Andy "Don't expect to get paid for

17   the rest of the month"?

18   **A.**   Because the contract had a 30-day payment term.

19   **Q.**   And ordinarily customers wait till the end?

20   **A.**   Correct.

21   **Q.**   Okay.  Above that Mr. Kanter wrote (reading):

22             "Call Dave and tell him we would like a wire

23        tomorrow."

24        Who did you understand the "Dave" to be?

25   **A.**   Dave Truitt.

SCOTT - DIRECT / LEACH

1   **Q.**   And he was an investor in MicroTech?

2   **A.**   I believe so.

3   **Q.**   Okay.  And you write (reading):

4           "Spoke to Dave.  He will do his best to get us money

5        tomorrow.  Needs to go through three wires.  I'm getting

6        wiring details from Finance for him."

7        What did you mean by that?

8   **A.**   What I meant was that I'd spoken to Dave Truitt as Andy

9   had asked and asked Dave if he could wire the money to us

10  today, and Dave said that he would do his best but that it

11  would have to go through three wires, which I assume means

12  three accounts.  Essentially it would take a little bit of time

13  for him to get the money wired to us, but he would initiate it

14  right away.

15  **Q.**   Thank you.

16       I'd like to move forward in time, Mr. Scott, to the end of

17  the second quarter of 2010, June of 2010.  Do you have that

18  time period in mind?

19  **A.**   I do.

20  **Q.**   Are you familiar with someone named Brent Hogenson?

21  **A.**   I am.

22  **Q.**   Who was he?

23  **A.**   Brent Hogenson was the CFO of the Americas for Autonomy.

24  **Q.**   How did he come to Autonomy?

25  **A.**   Brent came to Autonomy through our acquisition of

1   Interwoven.

2   **Q.**   Was that roughly in early 2009?

3   **A.**   I believe that's correct.

4   **Q.**   Okay.  And between that time period, early 2009 through

5   June of 2010, did you observe Mr. Hogenson to be moving up the

6   ranks within Autonomy?

7   **A.**   Yes.

8   **Q.**   How so?

9   **A.**   Initially I believe he came in responsible for the Finance

10  Department at Interwoven.  I forget the exact timing, but he

11  was promoted to CFO of Americas to oversee all of the U.S.; and

12  what -- while I don't remember the exact span of time, I

13  remember that it was very rapid relative to anything that I'd

14  seen in terms of other -- in terms of employees from other

15  companies that had been acquired by Autonomy kind of being

16  given a lot more responsibility as quickly as he got it.  And

17  then at some point after, Brent was given the title of

18  president of Interwoven.

19  **Q.**   And what did that signify?

20  **A.**   I don't know what it signified to others, but for myself

21  it signified that Brent was the guy in charge of the Interwoven

22  business.

23  **Q.**   At sometime in late June 2010, were you asked to supervise

24  an investigation relating to a possible fraud within Autonomy

25  in the United States?

SCOTT - DIRECT / LEACH

1    **A.**   I was.

2    **Q.**   What were you asked to do?

3    **A.**   I was asked to run an investigation into a payroll fraud

4    at Autonomy -- within Autonomy Americas' Finance Department and

5    to run this investigation completely independent of everyone

6    else at Autonomy.   Essentially that I should own this

7    investigation full stop.

8    **Q.**   Who told you that?

9    **A.**   Andy Kanter.

10   **Q.**   Okay.   And did that end up being the case?

11   **A.**   No.

12   **Q.**   How so?

13   **A.**   There were -- the investigation started down the path of

14   trying to understand what happened with a couple of payroll

15   people in our department.   It appeared that approximately

16   $3 million had been embezzled from the company over maybe a

17   half dozen years, and that was the investigation that I was

18   tasked with embarking on, which I did.

19        Over time -- or as that investigation, I think, was coming

20   to a conclusion where we were able to figure out what had

21   happened, Andy Kanter called me and told me that he would like

22   us to hire a second outside firm to help us with our

23   investigation.   We had one firm initially -- it was called

24   Kroll -- and Andy asked for a second one to investigate the

25   practices of the financial -- the U.S. Finance Department

1    generally, and very quickly honed in on Brent Hogenson.

2        Andy, Sushovan, Steve Chamberlain all highlighted to me a

3    series of activities and asked me to look into them as

4    violations of Autonomy's financial practices.  And so it wasn't

5    independent in the sense -- inasmuch as I was -- I was being

6    directed by my boss to create this other investigation, and

7    then I was being provided with information by my boss and

8    Sushovan Hussain and Steve Chamberlain in the U.K. to go

9    investigate.

10   Q.   Okay.  Let's start with the initial request you received.

11   And if you could please look at what has been marked as

12   Exhibit 915.

13   A.   (Witness examines document.)

14   Q.   Is this a true and correct copy of an e-mail you sent to

15   Andy Kanter on June 28th, 2010?

16   A.   It is.

17        THE COURT:  Admitted.

18        (Trial Exhibit 915 received in evidence)

19   BY MR. LEACH:

20   Q.   What is this document, Mr. Scott?

21   A.   This is a timeline prepared by the U.S. HR team that

22   outlined every step of the way in the payroll fraud detection,

23   from when we learned about the payroll fraud through to I think

24   the then current day.

25   Q.   And was Mr. Kanter asking for a summary of the timeline

SCOTT - DIRECT / LEACH

1   relating to the suspected payroll fraud?

2   **A.**   Yes.

3   **Q.**   Okay.  The e-mail you forward is from someone named Susan

4   Solat.  Who is she?

5   **A.**   Susan Solat headed up our HR Department at the time.

6   **Q.**   And the first entry is 06/15.  Do you see that?

7   **A.**   I do.

8   **Q.**   And Ms. Solat is writing (reading):

9           "Lynn received in the mail the unemployment letter

10          relating to" -- "letter stating Lourdes had filed a

11          claim."

12      Is Lourdes one of the individuals who became suspected of

13  the payroll fraud?

14  **A.**   Yes.

15  **Q.**   Okay.  I draw your attention further down to the second

16  entry for 6/23 -- it's roughly halfway down the page -- and to

17  the right there's a sentence beginning "Susan showed the letter

18  to Joel."  Do you see that?

19  **A.**   Ah, yes.

20  **Q.**   Okay.  Are you the "Joel" that she's referring to?

21  **A.**   I am.

22  **Q.**   And is June 23rd, 2010, the first time you became involved

23  in this, the circumstances to investigate the payroll issue?

24  **A.**   Yes.

25  **Q.**   Please look at the next page.  Roughly halfway down

**SCOTT - DIRECT / LEACH**

1    there's an entry for 6/25 at 11:00 approximately, and it says

2    (reading):

3             "I talked to Joel about the situation."

4        Do you see that?

5    A.   I do.

6    Q.   Is that consistent with your memory that Ms. Solat came to

7    you on or about June 25th, 2010, about this payroll situation?

8    A.   Yes.

9    Q.   What did you do with that information?

10   A.   The first thing I did was I called my boss and told Andy

11   Kanter about what we discovered and asked for his direction on

12   what we ought to do.

13   Q.   And that's on June 25th, 2010?

14   A.   Correct.

15   Q.   Okay.  Prior to June 25th, 2010, had you in any way drawn

16   issues relating to this payroll fraud to the attention of folks

17   in the U.K.?

18   A.   No.

19   Q.   To your knowledge had anybody else?

20   A.   No.

21   Q.   Please look at what has been marked as Exhibit 916.

22   A.   (Witness examines document.)

23   Q.   Is this a true and correct copy of an e-mail you sent to

24   Mike Lynch on June 28th, 2010?

25   A.   It is.

```
 1              THE COURT:  Admitted.

 2         (Trial Exhibit 916 received in evidence)

 3   BY MR. LEACH:

 4   Q.   Mr. Scott, let me focus on the date June 28th, 2010.  Is

 5   that roughly the same date you were e-mailing Mr. Kanter about

 6   the timeline relating to the payroll fraud?

 7   A.   Yes.

 8   Q.   And is this reflective of your efforts to retain

 9   investigators to look into this embezzlement?

10   A.   It is.

11   Q.   Let's look at the first e-mail in the chain.  Who did you

12   send this to?

13   A.   Sushovan Hussain, Andy Kanter.

14   Q.   You wrote (reading):

15           "We've spoken with a handful of third-party fraud and

16       embezzlement investigators - both small shops and large

17       players, but excluding the financial auditor firms.  They

18       gave us a cost estimate of 30 to 35K for an initial

19       investigation."

20       Do you see that?

21   A.   I do.

22   Q.   (reading)

23           "And then on the high end they gave us an estimate

24       for 60 to 70K."

25       Why were you bringing that to the attention of Mr. Hussain
```

SCOTT - DIRECT / LEACH

1   and Mr. Kanter?

2   **A.**   I needed to get approval on any purchases, and practice

3   was to get Sushovan, and I believe Mike's approval, on all

4   deals over 20K.  So as part of the regular course of practice

5   of getting approvals on expenses, what I was doing was

6   providing, you know, my summary to Sushovan and Andy to get

7   their okay to proceed.

8   **Q.**   So when did you have to go to Mr. Hussain for approval to

9   spend money?

10  **A.**   I believe that all deals -- I believe that all purchases

11  over 20,000 required both Sushovan Hussain and Mike Lynch's

12  approval.

13  **Q.**   Okay.  And were they the types of managers who would pay

14  money for services that were not performed?

15  **A.**   Can you ask that again?

16  **Q.**   Were they the type of managers who would pay for services

17  that were not actually performed?

18  **A.**   Not as a matter of course.

19  **Q.**   Did you ultimately hire Kroll to look into this payroll

20  issue?

21  **A.**   Yes.

22  **Q.**   At whose direction did you do that?

23  **A.**   Well, I believe that I got Mike Lynch's approval to -- I

24  believe that in response to this, Andy Kanter reiterated,

25  "There's a wall.  You go directly to Mike to get your

SCOTT - DIRECT / LEACH

1   approval."  I got Mike's approval, and then we engaged with

2   Kroll.

3   **Q.**   Okay.  Did he use the word "buffer"?

4   **A.**   I generally recollect him using that word.

5   **Q.**   Okay.  What did you understand that to mean?

6   **A.**   Well, what I understood from Andy was that he wanted a

7   wall, and that's what he reiterated several times; that

8   essentially I was walled off from anybody in the U.K.

9   conducting this investigation.

10  **Q.**   And did that end up being the case?

11  **A.**   No.

12  **Q.**   Please look at what has been marked as Exhibit 977.

13  **A.**   (Witness examines document.)

14  **Q.**   Do you recognize this?

15  **A.**   I do.

16  **Q.**   Is this a true and correct copy of an invoice from a firm

17  called Discovery Economics for services in the period

18  July 19th, 2010, through August 5th, 2010?

19  **A.**   It is.

20          **THE COURT:**  Admitted.

21      (Trial Exhibit 977 received in evidence)

22  **BY MR. LEACH:**

23  **Q.**   Let me draw your attention to the line right beneath

24  "Autonomy Investigation."  It says (reading):

25          "For services rendered from July 19, 2010, through

1        August 5, 2010."

2        Do you see that?

3   A.   I do.

4   Q.   Okay.  Prior to Discovery Economics being engaged, what

5   was the result of the Kroll investigation into the payroll

6   fraud?

7   A.   Kroll had determined that two employees from Autonomy --

8   two payroll employees from Autonomy had been issuing themselves

9   improper payments over the course of five or six years; and

10  Kroll also found that they had issued payments to two other

11  people in the U.S. Finance Department, but I believe that those

12  payments had been reversed.  And that was -- that was Kroll's

13  set of findings.

14  Q.   And as a result, were some folks fired?

15  A.   As a result, yes.  As a result, some folks were fired.

16  Q.   Okay.  And was the Lourdes we saw prosecuted for

17  embezzling?

18  A.   She was.

19  Q.   And did all of this go back many, many years?  I think you

20  said four or five years?

21  A.   I believe it was five or six years.

22  Q.   Okay.  Did the Kroll investigation reveal any evidence

23  that Brent Hogenson was involved in this payroll scheme?

24  A.   No.

25  Q.   Did you have discussions with Andy Kanter about that?

1    A.    I don't believe that I had a conversation with him about

2    the fact that Kroll didn't identify Hogenson as involved.

3    Q.    Okay.  At some point after Kroll reached its findings,

4    were you asked to retain Discovery Economics to conduct a

5    further investigation?

6    A.    Yes.

7    Q.    Okay.  How did that come about?

8    A.    Andy Kanter asked me to engage a second firm.  I asked

9    Andy why we would do that.  We already had a firm that was

10   investigating it.  He said that he would just like it that way,

11   so please do it.

12        And at that point I reached out to our outside counsel and

13   asked them for recommendations on other firms, and that was how

14   we got to Discovery Economics.

15   Q.    Okay.  Going back to the invoice, first of all, this is

16   directed to someone named Greg Doll, Esquire.  Who was he?

17   A.    Greg Doll was one of our outside counsel.

18   Q.    What was he doing?

19   A.    Well, he -- he -- he was outside counsel, and I asked him

20   if he had recommendations on any -- anyone like Discovery

21   Economics.  I don't recall if he was doing anything else beyond

22   that at this point.

23   Q.    In the summary of services, the first line is (reading):

24            "Review Kroll report and supporting documents."

25        Do you see that?

SCOTT - DIRECT / LEACH

1   **A.**   I do.

2   **Q.**   And beneath it says (reading):

3              "Consult with Andrew Kanter, Joel Scott, Stephen

4        Chamberlain, and Greg Doll."

5        Do you see that?

6   **A.**   I do.

7   **Q.**   What did you understand Discovery Economics to be billing

8   for here?

9   **A.**   Time spent talking to us.

10  **Q.**   Talking to you and folks in the U.K.?

11  **A.**   Correct.

12  **Q.**   Okay.  And if we could please look at page 2.

13  **A.**   (Witness examines document.)

14  **Q.**   Do you see the first time entry for July 19th, 2010?

15  **A.**   I do.

16  **Q.**   Is that consistent with your memory about when this second

17  investigation into the Finance Department as a whole started?

18  **A.**   Yes.

19  **Q.**   Okay.  Did you ask Andy questions about why he wanted

20  this?

21  **A.**   Yes.  Well, I -- I don't know if I asked questions as much

22  as -- well, I questioned "Why do we need this?"  And Andy told

23  me, "I just want it that way.  Do it."

24  **Q.**   The first entry is (reading):

25              "Call with Andy Kanter, Joel Scott.  Plan project."

1      Is that consistent with your memory that Andy Kanter was

2    involved in the planning of this project?

3    **A.**   Yes.

4    **Q.**   Further down on July 22nd, 2010 (reading):

5            "Conference calls with Joel Scott, Steve Chamberlain,

6        John Sboto, Chris McLaughlin."

7      Is that consistent with your memory that Steve Chamberlain

8    was involved in this second investigation?

9    **A.**   Yes.

10   **Q.**   Okay.  Please look at what has been marked as Exhibit 985.

11   **A.**   (Witness examines document.)

12   **Q.**   Is this a true and correct copy of an e-mail you sent to

13   Mr. Doll on or about July 21st, 2010, forwarding information

14   from Steve Chamberlain?

15   **A.**   Yes.

16          **THE COURT:**  Admitted.

17     (Trial Exhibit 985 received in evidence)

18   **BY MR. LEACH:**

19   **Q.**   Let me draw your attention, Mr. Scott, to the bottom

20   portion of this e-mail from Mr. Chamberlain.  He's writing to

21   Joel (reading):

22          "I have added an Excel into the data room showing all

23      partner fees."

24      Further on he says (reading):

25          "The person leading SMS is rewarding the sales

1          organization without proper approval; whereas, he also

2          should be acting as the finance person making sure we are

3          only paying out authorized amounts."

4          Do you see that?

5   A.    I do.

6   Q.    Who did you understand the "person leading SMS is

7   rewarding the sales organization" to be?

8   A.    Brent Hogenson.

9   Q.    And why was Steve Chamberlain sending this to you?

10  A.    To investigate in terms of violations of Autonomy finance

11  practices -- rules -- rules and procedures.

12  Q.    Did you receive additional e-mails from Steve Chamberlain

13  and Sushovan Hussain in this time period bringing your

14  attention to issues relating to Brent Hogenson?

15  A.    I did.

16  Q.    What did you make of those?

17  A.    Can you clarify?

18  Q.    Why were they sending that information to you?

19        MR. KEKER:  Objection, Your Honor.  No foundation.

20  Without the document, he can't possibly answer that.

21        THE COURT:  Well, the question is -- restate the

22  question.

23  BY MR. LEACH:

24  Q.    In this time period July 19th, 2010, to July 28th, 2010,

25  did Steve Chamberlain and Sushovan Hussain bring to your

SCOTT - DIRECT / LEACH

```
 1   attention additional issues relating to Brent Hogenson?
 2           MR. KEKER:  That's a compound question and --
 3           THE COURT:  Okay.  It's compound.  Sustained.
 4   BY MR. LEACH:
 5   Q.   Did Steve Chamberlain do that?
 6   A.   Yes.
 7   Q.   Did Sushovan Hussain do that?
 8   A.   Yes.
 9           MR. KEKER:  Objection.  Best evidence.
10           THE COURT:  Okay.  Overruled.
11       Go ahead.
12   BY MR. LEACH:
13   Q.   And what was your understanding of why Mr. Hussain was
14   doing this?
15           MR. KEKER:  Doing what?  Is this an e-mail?  What is
16   he talking about?  No foundation.
17           THE COURT:  Well, I don't know.
18       Okay.  Lay a foundation as to -- yes, sustained.
19       Okay.  So lay a foundation as to what is the basis for his
20   opinion -- what is the basis for his testimony that Mr. Hussain
21   and Mr. Chamberlain did something.
22   BY MR. LEACH:
23   Q.   What is the --
24           THE COURT:  Yeah.  Okay.
25   \\\
```

1    BY MR. LEACH:

2    Q.   Let me ask it this way, Mr. Scott:  What is the basis for

3    your testimony that Mr. Chamberlain and Mr. Hussain were

4    bringing issues relating to Mr. Hogenson to your attention in

5    this time period July 19th, 2010, to July 28th, 2010?

6    A.   I received multiple e-mails identifying violations of

7    Autonomy rules of engagement by Brent Hogenson, by Sushovan and

8    Steve and Andy.

9    Q.   Did you have an understanding of why you were receiving

10   this information?

11   A.   Yes.

12   Q.   What is that?

13   A.   That Sushovan and Steve and Andy wanted me to investigate

14   these acts that they had flagged and to see if Brent had

15   violated Autonomy's finance policies.

16   Q.   Would you please look at what has been marked as

17   Exhibit 986?

18   A.   (Witness examines document.)

19   Q.   Is this a true and correct copy of an e-mail you sent to

20   Mr. Doll during the course of this investigation of Autonomy's

21   Finance Department in the U.S.?

22   A.   It is.

23        THE COURT:  Admitted.

24        (Trial Exhibit 986 received in evidence)

25   \\\

1  BY MR. LEACH:

2  Q.   Let me draw your attention to the bottom portion of the

3  e-mail, Mr. Scott.   Who's this from?

4  A.   From Sushovan.

5  Q.   What is the date?

6  A.   July 21st, 2010.

7  Q.   What is the subject?

8  A.   "U.S. Finance Concerns."

9  Q.   And Mr. Hussain wrote (reading):

10        "It came to light this morning that we had

11     underinvoiced extended storage on Digital Safe customers

12     for long time amounting to $488,000 at least.   U.S.

13     Finance headed by Brent did not review the list of

14     customers of Digital Safe and I see no evidence that he

15     has any oversight in this area."

16     Do you see that?

17  A.   I do.

18  Q.   Who is the "Brent" being referred to there?

19  A.   Brent Hogenson.

20  Q.   Please look at what has been marked as Exhibit 1018.

21  A.   (Witness examines document.)

22  Q.   Is this a true and correct copy of an e-mail among you,

23  Andy Kanter, Brent Hogenson, and Sushovan Hussain on or about

24  July 28th, 2010?

25  A.   It is.

1              **THE COURT:**  Admitted.

2          (Trial Exhibit 1018 received in evidence)

3      **BY MR. LEACH:**

4      **Q.**   Let's start, Mr. Scott, with the first e-mail in the chain

5      beginning on page 11.

6      **A.**   (Witness examines document.)

7      **Q.**   Do you see the e-mail -- further down, page 11 down at the

8      bottom.   There we go.   Perfect.   Thank you, Ms. Margen.

9          Do you recognize Brent Hogenson's e-mail address up at the

10     top?

11     **A.**   Yes.

12     **Q.**   Okay.   And the subject is "Schedule."  Do you see that?

13     **A.**   Yes.

14     **Q.**   And he wrote to you (reading):

15             "Hi, Joel.

16             "As you know, I have a dual role with Autonomy 1) CFO

17         of Americas and 2) president of Interwoven."

18         Do you see that?

19     **A.**   I do.

20     **Q.**   What's the general subject matter of this schedule e-mail

21     that starts off this chain?

22     **A.**   The subject matter was Brent being in the San Francisco

23     office of Autonomy instead of the San Jose office where he had

24     been working.   Sushovan had directed that all of the U.S.

25     finance team, including folks in our San Jose office where

SCOTT - DIRECT / LEACH

```
 1    Brent worked, would all have to start reporting into the
 2    San Francisco office; and Andy Kanter asked me to make sure
 3    that Brent showed up and to follow-up if he didn't.  So that
 4    was my e-mail.
 5    Q.   Would you please look at page 7?
 6    A.   (Witness examines document.)
 7    Q.   Is this Mr. Hogenson's -- an additional e-mail from
 8    Mr. Hogenson with some comments interlineated by Mr. Hussain?
 9    A.   Yes.
10    Q.   Okay.  Now, if we could please go back to page 9, which I
11    think is the last part of the e-mail down at the bottom.
12    Bottom of page 9, please.  Perfect.  Thank you.
13         Do you see where Mr. Hogenson wrote (reading):
14            "In summary, I believe that you are unhappy with the
15         questions that I have raised to the Audit Committee and
16         Deloitte."
17         Do you see that?
18    A.   I do.
19    Q.   Prior to July 27th, 2010, did you know that Mr. Hogenson
20    had raised questions to Autonomy's Audit Committee and auditors
21    about Autonomy's accounting practices?
22    A.   No.
23    Q.   This is the first you're learning about it?
24    A.   Yes.
25    Q.   Okay.  And if we could continue on to page 10.
```

1    Do you see where it says (reading):

2         "As such, I have sent my questions and supporting

3    detail directly to the FSA at whistle@fsa.gov.uk."

4    Do you see that?

5  **A.**   I do.

6  **Q.**   What is the FSA?

7  **A.**   I don't know.

8  **Q.**   What does the term "whistle" mean to you?

9  **A.**   Whistleblower.  So, you know, whistleblower.

10  **Q.**   Okay.  On July 28th, 2010, did you fire Brent Hogenson?

11  **A.**   Yes.

12  **Q.**   Did you fire him in person or on a phone call?

13  **A.**   On a phone call.

14  **Q.**   Before that call, did you have a conversation with Mike

15  Lynch?

16  **A.**   I did.

17  **Q.**   Take a moment and describe what Mr. Lynch said to you.

18  **A.**   The purpose of the call with Brent was to go through a

19  series of allegations about his actions and to get his feedback

20  to those allegations.

21      And at this point in time right before going in -- right

22  before reaching out to Brent, I -- actually, right before

23  reaching out to Brent -- and I believe that I thought Brent was

24  in the office but he wasn't -- I called Mike Lynch to let him

25  know that I would be speaking to Brent and going through the

1  allegations and getting his -- his responses, and that I would
2  decide what to do after hearing his responses.
3      This was a very unusual circumstance for me because I'd
4  never been authorized to terminate anybody else before at
5  Autonomy; and it was made abundantly clear to me that it was my
6  decision whether to terminate Brent or not, and I wanted to let
7  Mike know what my plan was before calling Brent.
8      So I spoke to Mike and his direction to me was, "This is
9  your decision; but if it were me and there was somebody that
10 was really trying to destroy the company, I sure wouldn't want
11 them around."
12     And then Mike asked me to record the call.  And then Mike
13 asked -- or told me that when speaking with Brent, I ought to
14 let him know that if he's planning to go public with his
15 allegations, that the -- that the -- the U.K. rules around
16 slander -- I'm forgetting the term -- but the U.K. rules that
17 are applicable are far more, I guess, robust than U.S. rules.
18 That was the substance of the conversation.
19 Q.  Based on this call with Dr. Lynch, was it clear to you
20 that Dr. Lynch wanted Mr. Hogenson fired?
21 A.  Yes.
22 Q.  Based on your interaction with Sushovan Hussain and Steve
23 Chamberlain -- based on your interactions with Sushovan
24 Hussain, was it clear to you that Mr. Hussain wanted
25 Mr. Hogenson fired?

 1              MR. KEKER:  Objection.  Argumentative.  No foundation

 2   and leading.

 3              THE COURT:  Okay.  Sustained as to foundation.

 4   BY MR. LEACH:

 5   Q.   Did you meet with Mr. Hogenson later that day on the 28th?

 6   A.   I believe I spoke with him on the phone.

 7   Q.   Okay.  And did you terminate his employment?

 8   A.   Yes.

 9   Q.   Why did you do that?

10   A.   I had two -- I had two competing things going on in my

11   head.  One was very clearly I understood that my management

12   wanted Brent gone and that there was -- there was -- there was

13   no other option.  At the same time I felt like I had an

14   independent -- my own independent reason, which I can describe.

15   Q.   Well, you said my management wanted this.  What did you

16   mean?

17   A.   I meant Mike Lynch, Sushovan Hussain, Steve Chamberlain.

18   Q.   And what did you mean they wanted it?

19   A.   I meant that -- I mean that they wanted Brent terminated.

20   Q.   Okay.  And you broke the news to Mr. Hogenson on the call?

21   A.   I did.

22   Q.   Okay.  Did you record the call?

23   A.   I did.

24              MR. KEKER:  Object.  Your Honor, he didn't get to

25   finish his answer about his independent reason.

```
 1                THE COURT:  I'm sorry.  What?

 2                MR. KEKER:  He didn't get to finish his answer about

 3    his independent reason.  The prosecutor just shut him off.

 4                THE COURT:  Well, I don't think the prosecutor shut

 5    him off.

 6                MR. LEACH:  I was laying a foundation, Your Honor.

 7                THE COURT:  Okay.

 8    BY MR. LEACH:

 9    Q.   And what were some of the other reasons you let

10    Mr. Hogenson go, Mr. Scott?

11    A.   Well, I -- I never got along with Brent to just, you know,

12    to be candid.  We did not see eye to eye on a lot of things,

13    and I didn't trust Brent and I didn't trust him because two

14    lawyers from two companies both told me independently to watch

15    out for Brent.  And that was very early on when I got to know

16    him.

17         And at this time when the investigation was happening,

18    Brent took a trip to Chicago and had submitted an expense

19    report, and we asked him about the expense report and he

20    wouldn't give any answer.

21         And I think between seeing what my management was -- what

22    Sushovan, Steve, and Andy were sharing with me, knowing that

23    Mike was saying, "Look, this guy's a bad apple," and having my

24    own independent experience, I felt like there's a basis here

25    for not having this person around if they can't even -- you
```

SCOTT - DIRECT / LEACH

1   know, just won't even tell us about an expense report.

2       So that's what I meant by my -- you know, my own

3   independent reasons.

4   Q.  Thank you for that.

5       After you recorded the call with Mr. Hogenson, did you

6   develop concerns you had done something wrong?

7   A.  Yes.

8   Q.  Why?

9   A.  Because it's illegal to record a call in California

10  without the other person being aware.

11  Q.  Was Mr. Hogenson aware?

12  A.  No.

13  Q.  Did you bring that information to Dr. Lynch's attention?

14  A.  I did.

15  Q.  And what did he say?

16  A.  He was initially very dismissive.  He told me it was cute

17  how I was worried about something like a mouse, something that

18  they would have been concerned about 10 years earlier at the

19  company.

20      And I explained -- and then -- and he also said, "Look,

21  there's nothing to worry about.  Autonomy, of course, will, you

22  know, cover any -- if anything ever comes of this, like,

23  Autonomy will cover you."

24      But that didn't really make me feel comfortable because

25  that wasn't addressing my concern of the fact that, look, I'd

1    just done this thing and it's illegal; and, you know, where do

2    I go?  What am I -- what ought I to do right now?

3         And that, I think, got Mike a little uncertain about me,

4    and so he started probing about my relationship with Brent.  He

5    thought that perhaps Brent and I had some deeper relationship.

6    And I said, "No, that's not the case.  This is what's

7    concerning me."

8         And Mike then shared with me, "Listen, you have nothing to

9    worry about.  Sushovan shares absolutely everything with the

10   auditors.  We are on the right side of this," and gave me these

11   general reassurances but didn't -- you know, that was sort of

12   where we left it on the phone recording.

13   Q.   After you fired Mr. Hogenson, did you learn additional

14   information about what Mr. Hogenson was raising to the U.K.

15   authorities?

16   A.   Yes.

17   Q.   How did you learn that?

18   A.   Andy Kanter sent me several documents, including Brent's

19   allegations, as well as a report prepared by, I believe,

20   Autonomy's Audit Committee and outside auditors addressing the

21   specific allegations that Brent made.

22   Q.   Did that alleviate your concerns?

23   A.   No.

24   Q.   Why?

25   A.   It heightened them because when I read the details of the

**SCOTT - DIRECT / LEACH**

1  allegations and just the precise details of the allegations, it

2  made me more concerned.

3  **Q.**   Concerned why, Mr. Scott?

4  **A.**   Concerned that Autonomy could potentially be doing

5  something -- be doing illegal transactions.

6  **Q.**   Were you also concerned that you had fired the person who

7  had brought that to the company's attention?

8  **A.**   I don't think that is where my -- I don't think that was

9  my reaction to seeing the memo.  I was -- I was concerned about

10  it just as I mentioned to you, like, before, right after I'd

11  recorded it; but I don't think reading the report made me more

12  concerned about the fact that I recorded that.

13  **Q.**   You were already concerned about that?

14  **A.**   Yes.

15  **Q.**   Okay.  After you fired Mr. Hogenson, did you fire any

16  additional people within Autonomy's Finance Department related

17  to Mr. Hogenson?

18  **A.**   Yes.

19  **Q.**   Who?

20  **A.**   Percy Tejada and Reema Prasad.

21  **Q.**   Why did you do that?

22  **A.**   Sushovan did not want them at the company anymore.

23  **Q.**   How do you know that?

24  **A.**   Because he said so.

25  **Q.**   As best you can recall, what were his words?

SCOTT - DIRECT / LEACH

1    **A.**    I recall his words with respect to -- with respect to

2    Reema that she had raised her head above the parapet and that

3    he wanted her gone.

4    **Q.**    Gone because of some affiliation with Mr. Hogenson?

5    **A.**    Yes.

6    **Q.**    Let me move forward in time, Mr. Scott, to a transaction

7    in the third quarter of 2010.  Are you familiar with a company

8    called Zones?

9    **A.**    Yes.

10   **Q.**    What is Zones?

11   **A.**    I believe Zones is a reseller of one of the hardware

12   partners that we worked with.

13   **Q.**    Would you please look at what is in evidence as

14   Exhibit 963?

15   **A.**    (Witness examines document.)

16   **Q.**    Before I ask questions about this document, Mr. Scott,

17   what transactions relating to Mr. Hogenson were you concerned

18   were illegal?

19   **A.**    I -- the whole thing.  Like, the entire set of allegations

20   made me very concerned.  I don't think that I'd zeroed in on

21   one versus another; but Brent had, you know, gone into a lot of

22   detail with multiple transactions and each -- like, each and

23   all of them made me ask questions.

24   **Q.**    Okay.  I draw your attention to what has been marked as

25   Exhibit 963, and if we could please look at the second and

SCOTT - DIRECT / LEACH

1    third page of this.

2        If you could go to the next page, please.  Thank you.

3        What is this, Mr. Scott?

4    A.   This is a -- looks like a purchase letter that is executed

5    between Autonomy and Zones that would allow Autonomy to

6    purchase and resell Dell hardware.

7    Q.   Okay.  And is that your signature on the second page of

8    the agreement?

9    A.   It is.

10   Q.   And what was the purpose of this agreement?

11   A.   (Witness examines document.)  Beyond what I said, the fact

12   that it allows Autonomy to resell Dell hardware?

13   Q.   Yes.  Nothing beyond that?

14   A.   Not to my knowledge, no.

15   Q.   Okay.  Let me move forward in time, please, Mr. Scott, to

16   the fourth quarter of 2010.  We're just before the start of the

17   fourth quarter of 2010.

18       Will you please look at what has been marked as

19   Exhibit 1005?  Excuse me, 1055.

20   A.   (Witness examines document.)

21   Q.   Is this a true and correct copy of an e-mail you sent to a

22   colleague attaching your résumé?

23   A.   Yes.

24           THE COURT:  Admitted.

25       (Trial Exhibit 1055 received in evidence)

SCOTT - DIRECT / LEACH

```
 1   BY MR. LEACH:

 2   Q.   Were you looking to leave Autonomy in or around this time

 3   period?

 4   A.   Yes.

 5   Q.   Why were you looking to leave?

 6   A.   Autonomy was a very challenging environment for me to work

 7   in.  On the one hand, I was looking for professional

 8   development that I wasn't able to get; and on the other hand,

 9   it was a very ruthless environment and, you know, a lot of the

10   things that Autonomy did made me feel uncomfortable.

11   Q.   What do you mean?

12   A.   I mean there's the transactions that we're talking about,

13   like, end-of-quarter reseller transactions that I'd been

14   assured were legal under IFRS, but it still was a very strange

15   thing to me.  There was -- so that and other transactions.

16        There was the way that management treated its employees,

17   and I guess there was also just management's vision of how the

18   company ought to be operated.

19   Q.   Would you please look at what has been marked as

20   Exhibit 1226?

21   A.   (Witness examines document.)

22   Q.   Is this a true and correct copy of an e-mail between you

23   and Andy Kanter relating Brent Hogenson?

24   A.   Yes.

25             THE COURT:  Admitted.
```

1              (Trial Exhibit 1226 received in evidence)

2    BY MR. LEACH:

3    Q.   At some point in time, Mr. Hogenson, did you learn that --

4    excuse me -- Mr. Scott, did you learn that Brent Hogenson was

5    contemplating bringing a lawsuit against Autonomy?

6    A.   Yes.

7    Q.   And what did you understand was the claim that

8    Mr. Hogenson intended to assert?

9    A.   That he was wrongfully terminated.

10   Q.   And ultimately did Autonomy enter into a settlement

11   agreement with Mr. Hogenson?

12   A.   Yes.

13   Q.   Would you please look at page 6?

14   A.   (Witness examines document.)

15   Q.   Is this the copy of the settlement agreement with

16   Mr. Hogenson?

17   A.   It is.

18   Q.   What was the amount of the payment by Interwoven to

19   Mr. Hogenson in paragraph 1(a)?

20   A.   $750,000.

21   Q.   Does that figure stand out in your mind for some reason?

22   A.   Yes.

23   Q.   How so?

24   A.   It's a very large settlement amount that is unlike any

25   other settlement amount I've seen us enter into at Autonomy

SCOTT - DIRECT / LEACH

1    with an employee.

2    **Q.**   Let me draw your attention to the time period November of

3    2010, and if you could please look at what has been marked as

4    Exhibit 1197.

5    **A.**   (Witness examines document.)

6    **Q.**   Is this a true and correct copy of an e-mail exchange

7    between you and Mr. Hussain?

8    **A.**   Yes.

9            **THE COURT:**  Admitted.

10       (Trial Exhibit 1197 received in evidence)

11   **BY MR. LEACH:**

12   **Q.**   I draw your attention to the top portion of the e-mail,

13   Mr. Hussain -- Mr. Scott, from Mr. Hussain (reading):

14           "Call me and we can decide re tomorrow.  I am in

15       Pleasanton with EMC."

16       Do you remember that?

17   **A.**   Yes.

18   **Q.**   Okay.  And do you recall a conversation you had with

19   Mr. Hussain in the car around the time he was here in

20   California visiting with EMC?

21   **A.**   I do.

22   **Q.**   Take a moment and describe what you remember from that

23   conversation.

24   **A.**   I recall driving with Sushovan between San Francisco and

25   Pleasanton to go to EMC's Documentum office where Autonomy was

1    discussing with EMC a percentage of it's Documentum business;

2    and on our ride -- I didn't have a lot of one-on-one time with

3    Sushovan, so on our ride I took the time to ask him a couple of

4    questions.

5         One was how he decides which companies he wants to

6    acquire.  And I also asked him if he thought that there was any

7    value in planning because at Autonomy, there wasn't -- I didn't

8    experience a lot of planning.  I didn't experience a lot of,

9    like, "Here's what our goal is for this quarter, next quarter,

10   and the year."  I was always -- I was focused and everybody was

11   focused only on the then current quarter.  And I thought that

12   was not a smart way to run a business.

13        So I asked Sushovan, "Do you really -- don't you think

14   that there's any value in long-term planning even if we -- even

15   if we deviate from that plan?"  And his response to me was to

16   not be stupid, and that he was only focused on the next

17   90 days, meaning this -- the then current quarter, and that

18   there's no point in planning beyond this quarter.

19   Q.   Let me move forward in time, Mr. Scott, to the end of --

20   later in the fourth quarter of 2010.  Would you please look at

21   what is in evidence as Exhibit 1204?

22   A.   (Witness examines document.)

23   Q.   Do you recall this document?

24   A.   I do.

25   Q.   What is it?

1   A.    This document is an e-mail from Dave Truitt to me which

2   includes a proposal for a solution that he had described to me

3   when I saw Dave in Washington, D. C.

4   Q.    What did Mr. Truitt tell you in Washington, D. C.?

5   A.    He told me that MicroTech was building a new center to

6   host products -- to host products and demonstrate products to

7   its government customers, and that this could be something that

8   Autonomy could invest in and participate in, have its software

9   demonstrated in the MicroTech environment -- in the environment

10  that MicroTech was creating, and that MicroTech could also use

11  some of the cash that it got from this transaction to pay down

12  or pay back Autonomy some of what it owed Autonomy.

13  Q.    Did you send this proposal to Mr. Sushovan Hussain?

14  A.    I did.

15  Q.    And did you meet with Mr. Truitt and Mr. Hussain at some

16  point on or around November 5th?

17  A.    I did.

18  Q.    What happened?

19  A.    I met with Dave Truitt and Sushovan Hussain in New York.

20  It was a dinner meeting.  Dave had asked to meet Sushovan and

21  Sushovan said, "I'm going to New York.  I'll be in New York.  I

22  can meet Dave there," whichever day it was.  And he said, "Why

23  don't you join too, Joel?"  And I was going to be in New York

24  for other reasons, so the three of us ended up meeting for

25  dinner.

1          And Sushovan told me that his objective at the dinner was

2    to get Dave Truitt to stay longer at Autonomy because prior to

3    the dinner in D.C., Dave Truitt had told me that he was

4    planning on leaving MicroLink at the end of the year.

5          And then we went and had our meeting.  Sushovan did make

6    the pitch for Dave to stick around maybe one day a week, maybe

7    two days a week.  Dave said, "No, thank you.  I'm going to go

8    focus on Discover Tech."

9          Dave brought up the proposal, I believe, and said, "Hey,

10   have you had a chance to look at this?  Here's what it is."  I

11   believe he described it at a high level.

12         Sushovan said he was -- "Sounds interesting.  Work through

13   Joel."  And I don't think that there was anything more

14   discussed about the proposal at that dinner.

15   **Q.**   Would you please look at what has been marked as

16   Exhibit 1298.

17   **A.**   (Witness examines document.)

18   **Q.**   Is this a true and correct copy of an e-mail between you

19   and Steve Chamberlain relating to the MicroTech proposal you

20   just described?

21   **A.**   Yes.

22             **THE COURT:**  Admitted.

23        (Trial Exhibit 1298 received in evidence)

24   **BY MR. LEACH:**

25   **Q.**   And if we could, please, go to the third page of the

SCOTT - DIRECT / LEACH

1    document.

2        By the way, Mr. Scott, at the time Mr. Truitt was bringing

3    this proposal to your attention, he was the CEO of MicroLink?

4    **A.**    Yes, he was.

5    **Q.**    Which was owned by Autonomy at the time?

6    **A.**    Correct.

7    **Q.**    Okay.  Down at the bottom portion of page 3, is that a

8    reference to you sending the MicroTech proposal to Mr. Hussain?

9    **A.**    Yes.

10   **Q.**    Above that you wrote to Mr. Hussain 10 days later

11   (reading):

12           "Do we have an" -- further down, please.  Thank

13       you -- "Do we have an update for Dave?"

14       That's a reference to Dave Truitt?

15   **A.**    Correct.

16   **Q.**    And why were you sending that to Mr. Hussain?

17   **A.**    Because I was getting pinged by Dave saying, "Hey, are you

18   guys interested in our proposal?"  And it was a question for

19   Sushovan, so I was asking Sushovan if he had any updates that I

20   could share with Dave.

21   **Q.**    And just above that it says on December 13th, this time to

22   you, Mr. Hussain and Mr. Chamberlain (reading):

23           "Got another ping from MT."

24       Do you see that?

25   **A.**    I do.

SCOTT - DIRECT / LEACH

1   Q.   "MT" is MicroTech?

2   A.   It is.

3   Q.   And between September 13th and November 15th, had there

4   been any movement on this MicroTech proposal?

5   A.   No.

6   Q.   Please look at Exhibit 1318.

7   A.   (Witness examines document.)

8   Q.   Is this another e-mail -- is this an e-mail between you,

9   Mr. Hussain, Pete Menell, Steve Chamberlain relating to this

10  MicroTech proposal?

11  A.   Yes.

12        MR. LEACH:  Your Honor, I --

13        THE COURT:  Admitted.

14   (Trial Exhibit 1318 received in evidence)

15  BY MR. LEACH:

16  Q.   And if we could please look at page 2.

17  A.   (Witness examines document.)

18  Q.   Let me draw your attention, Mr. Chamberlain, to the first

19  e-mail in this exchange from Stephen Chamberlain to you and

20  Mr. Hussain regarding MT.  Do you see that?

21  A.   I do.

22  Q.   Mr. Chamberlain wrote (reading):

23        "How close are we to agreeing?  Need to collect their

24        overdue balances."

25        What did you understand that to mean?

1  **A.**   Well, I understand it to mean that how close are we to

2  agreeing to this ATIC transaction so that they can pay us -- so

3  that we can pay them and then they -- then in turn we can

4  collect our overdue balances.

5  **Q.**   Overdue balances from what?

6  **A.**   From MicroTech that they would have owed Autonomy for

7  purchase -- for software purchases.

8       **MR. LEACH:**   Your Honor, this may be a convenient spot

9  for a break.

10      **THE COURT:**   Okay.

11      Ladies and gentlemen, we're going to take a recess now.

12 We'll be in recess until 20 to 3:00.

13      Remember the admonition given to you:   Don't discuss the

14 case, allow anyone to discuss it with you, form or express any

15 opinion.

16      (Proceedings were heard out of the presence of the jury:)

17      **THE COURT:**   About how much longer do you have?

18      **MR. LEACH:**   I estimate about an hour and a half.   I

19 may be able to finish today.

20      **THE COURT:**   Okay.  All right.  Thank you.

21           (Recess taken at 2:23 p.m.)

22          (Proceedings resumed at 2:44 p.m.)

23      (Proceedings were heard in the presence of the jury:)

24      **THE COURT:**   Let the record reflect all jurors are

25 present; parties are present.

**PROCEEDINGS**

1          So what I'd like to do is every 15 minutes or so, we will

2    just stand up and stretch.  It's the afternoon.  This material

3    is -- while it's fascinating, it sometimes is --

4          **MR. LEACH:**  Dense.

5          **THE COURT:**  -- soporific is the word, I think.  I

6    looked that up.

7          **MR. LEACH:**  I'm embarrassed to say, I'm not sure I

8    know what that means.

9          **THE COURT:**  Well, they all do, so that may be more to

10   the point.

11         We'll just take these 15-minute stretch breaks and

12   continue.

13         Okay.  Go ahead.

14         **MR. LEACH:**  Thank you, Your Honor.

15   **Q.**   Mr. Scott, we were talking about this ATIC proposal that

16   Mr. Truitt mentioned to you in Washington, D.C., and then we

17   were going through many of the emails.

18         Do you recall that testimony?

19   **A.**   Yes.

20   **Q.**   And in your initial conversation with Mr. Truitt, I think

21   you said he made reference to this would give MicroTech an

22   opportunity to pay its overdue balances.  Do you recall that

23   testimony?

24   **A.**   Yes.

25   **Q.**   Did you communicate that to Mr. Hussain?

PROCEEDINGS

1    **A.**    Yes.

2    **Q.**    Would you please look at -- would you please look at what

3    is in evidence as Exhibit 1314.

4                        (Exhibit published to jury.)

5    **BY MR. LEACH:**

6    **Q.**    This is an email from you, Mr. Scott, to Dave Truitt on

7    December 22, 2010.  Do you see that?

8    **A.**    I do.

9    **Q.**    Do you recall this dialogue with Mr. Truitt?

10   **A.**    I do.

11   **Q.**    You wrote, "Hi, Dave, we've been hashing out the proposal

12   internally, and while there is a compelling opportunity here,

13   we need to work on the pricing to get the total costs down

14   further in line with our discussion.  Can you please provide us

15   an updated proposal with best and final."

16        Do you see that?

17   **A.**    I do.

18   **Q.**    And between this time period and the initial date -- you

19   got this back in November -- had there been any back and forth

20   with MicroTech about the merits of the proposal?

21   **A.**    No.

22   **Q.**    To your knowledge, was anybody else interacting with

23   Mr. Truitt besides yourself?

24   **A.**    No.

25   **Q.**    Please look at what has been marked as Exhibit 1334.

**PROCEEDINGS**

```
1        Is this a true and correct copy not an email exchange
2   among you, Andy Kanter, and Steve Chamberlain?
3   A.   Yes.
4            THE COURT:  Admitted.
5        (Plaintiff's Exhibit 1334 received in evidence)
6                  (Exhibit published to jury.)
7   BY MR. LEACH:
8   Q.   Please look at page 4.  Down at the bottom, Mr. Scott,
9   there is an email from you to Sushovan Hussain and Pete Menell.
10  And you wrote, "Sushovan and Pete Andy asked that I run the
11  attached PO by you for approval.  It references back to the
12  ATIC proposal and notes the PO sum 8.6M."
13       Do you see that?
14  A.   9.6.
15  Q.   9.6.  Excuse me.
16  A.   Yes.
17  Q.   And that's millions?
18  A.   Correct.
19  Q.   How did the proposal go up to 9.6 mill?
20  A.   The initial proposal was in the $3 million range, and when
21  I went back to Sushovan with updated pricing somewhere in the
22  $3 million range, Sushovan said to me that he would like to do
23  a larger deal with MicroTech in the 9 to 10 million-dollar
24  range and asked me to take that back to Dave Truitt, at which
25  point I did, and this reflects the larger deal that Sushovan
```

**PROCEEDINGS**

1    had asked for.

2    **Q.**   Would you please look at the first email in the chain on

3    page 1.  Up at the top, "PO attached.  When circulating for

4    payment and filing, make sure to attach the three approvals."

5        Do you see that?

6    **A.**   Yes.

7    **Q.**   And is the purchase order for the MicroTech proposal

8    attached as page 5?

9    **A.**   It is.

10   **Q.**   Do you recognize the signature on this?

11   **A.**   I do.

12   **Q.**   Whose signature is it?

13   **A.**   Andy Kanter's.

14   **Q.**   And what is the amount of this purchase order?

15   **A.**   9,600,000.

16   **Q.**   Okay.  Is this all the paperwork to memorialize the

17   purchase of the ATIC?

18   **A.**   It is.

19   **Q.**   Is that usual, in your experience?

20   **A.**   No.

21   **Q.**   Explain that.

22   **A.**   Typically when you make an investment of $10 million,

23   there will be -- in my experience, there will be terms and

24   conditions governing that purchase, such as each parties'

25   rights and responsibilities, so that it's very clear what

**PROCEEDINGS**

1   somebody is buying and what they get for it.

2   **Q.**   Why is it important for those things to be very clear?

3   **A.**   If an issue comes up or even if an issue doesn't come up,

4   just so it's very explicit as to what the -- it's important to

5   have it in there so that the parties know what to do if and as

6   things come up.

7   **Q.**   You testified earlier that you were involved in sales

8   negotiations throughout your tenure in Autonomy.  How did the

9   dialogue relating to this ATIC proposal compare to the

10  negotiations you had experienced?

11  **A.**   Very different.

12  **Q.**   How so?

13  **A.**   Most of the sales negotiations or most of the negotiations

14  with our customers were a lot more involved.  There was back

15  and forth and -- it was just a lot more involved in terms of

16  negotiating contracts.

17       And my focus was typically on negotiating the terms of the

18  deal and looking to our -- to our sales team or our management

19  to understand the commercials.

20  **Q.**   Would you please look at what has been marked as

21  Exhibit -- before I go there -- so the amount of this PO is

22  $9.6 million?

23  **A.**   Correct.

24  **Q.**   And it was Mr. Hussain who urged you to go up from

25  3 million to 9.6?

**PROCEEDINGS**

1   **A.**   Correct.

2   **Q.**   Would you please look at what has been marked as Exhibit

3   1335.

4        Is this a true and correct copy of an email thread

5   involving you and at first Mr. Hussain and then

6   Mr. Chamberlain?

7   **A.**   Yes.

8             **THE COURT:**   Admitted.

9        (Trial Exhibit 1335 received in evidence)

10                 (Exhibit published to jury.)

11  **BY MR. LEACH:**

12  **Q.**   Let me draw your attention to the first email in the chain

13  from Mr. Hussain, December 30th, 2010.  Do you see that?

14  **A.**   I do.

15  **Q.**   And is that the date the $9.6 million purchase order was

16  executed or around that date?

17  **A.**   Yes.

18  **Q.**   Okay.  And the subject is "important we get at least 6M

19  from MT on their O/S debtor this quarter."

20       What did you understand that to mean?

21  **A.**   I understand it to mean that we needed to collect or --

22  that Sushovan said that it was important that we collect

23  $6 million from MicroTech to pay down their outstanding

24  balances that were due to Autonomy.

25  **Q.**   Did you understand that that 6 million would be coming

PROCEEDINGS

1   from the 9.6 from the ATIC?

2   **A.**   I don't know what I understood at the time.  As I sit here

3   today and I look at ATIC and I look at this email, it seems

4   very obvious to me that the 6 million is coming from the ATIC

5   transaction.

6   **Q.**   Would you please look at what has been marked as Exhibit

7   1420.

8        Is this an email exchange on January 1st among Mr. Egan,

9   Sushovan Hussain, and yourself?

10  **A.**   Yes.

11             **MR. LEACH:**   I offer Exhibit 1420, Your Honor.

12             **THE COURT:**   Admitted.

13       (Trial Exhibit 1420 received in evidence)

14                 (Exhibit published to jury.)

15  **BY MR. LEACH:**

16  **Q.**   Mr. Hussain writes in this exchange, Mr. Scott, "Please

17  make sure we get the checks from DT, MT, and Capax dated

18  appropriately.  Also MT should pay us 6M against Vatican."

19       Do you see that?

20  **A.**   I do.

21  **Q.**   "DT" is a reference to Discover Tech?

22  **A.**   It is.

23  **Q.**   "MT" is that a reference to MicroTech?

24  **A.**   It is.

25  **Q.**   And then "also MT should pay us 6M against Vatican."

**PROCEEDINGS**

1      What do you understand that to mean?

2  **A.**    I understand it to mean that Sushovan is expecting

3  MicroTech to pay $6 million against the outstanding balance

4  that it had on a purchase order for the Vatican.

5  **Q.**    Let me shift focus within the fourth quarter of 2010,

6  Mr. Scott, to a transaction relating to the Department of the

7  Interior.  Do you have that in mind?

8  **A.**    I do.

9          **MR. LEACH:**  If we could please display what is in

10  evidence as Exhibit 1237.

11                   (Exhibit published to jury.)

12          **MR. LEACH:**  If we could highlight the top portion.

13  Great.

14  **Q.**    What is the date of this email, Mr. Scott?

15  **A.**    November 28th, 2010.

16  **Q.**    And do you see your email or your name in the CC line?

17  **A.**    I do.

18  **Q.**    The subject is "DOI price proposal."  What is that?

19  **A.**    This was a proposal that the Autonomy federal sales team

20  was working on to go to the Department of Interior to

21  restructure their hosted services agreement into a license

22  agreement with an upfront license fee.

23  **Q.**    What do you mean restructure their hosted services?

24  **A.**    Well, right now at the time of this email, DOI is paying

25  Autonomy on an ongoing basis for services that -- hosting

**PROCEEDINGS**

1  services that it's getting from Autonomy.

2       And what this proposal was attempting to do was to

3  restructure the deal so that rather than charging DOI for an

4  ongoing service, Autonomy would charge DOI a lump sum for its

5  software up front and then not charge the same amounts for the

6  service fees going forward.

7  **Q.**   So pay up front versus pay month-to-month?

8  **A.**   Correct.

9  **Q.**   And what did Mr. Hussain write in the first line of this

10  email?  Could you please read that for us?

11  **A.**   "This deal is big enough for us to focus a lot of

12  energies, so please work on this hard.  The timing is crucial."

13  **Q.**   And DOI, that's the U.S. Department of Interior?

14  **A.**   Correct.

15       **MR. LEACH:**  If we could please display what is in

16  evidence as Exhibit 1274.

17            (Exhibit published to jury.)

18  **BY MR. LEACH:**

19  **Q.**   If I could direct your attention to the screen, Mr. Scott,

20  I'm showing you what's in evidence as an email from Mr. Hussain

21  to Mike Lynch.  Do you see that up at the top?

22  **A.**   I do.

23  **Q.**   Do you see the date, December 10th, 2010?

24  **A.**   I do.

25  **Q.**   I draw your attention to the last sentence of the first

1    paragraph:  "We've covered up with BofA and hopefully DB and

2    DOI, but if the latter two don't happen, it's totally bad."

3         Do you see that language?

4    A.   I do.

5    Q.   And in the context of this -- well, those initials DOI, is

6    that the same initials you were -- on the email you received

7    relating to a restructured hosted services agreement?

8    A.   Yes.

9    Q.   Would you please look at what is in evidence as Exhibit

10   1282.

11                   (Exhibit published to jury.)

12   BY MR. LEACH:

13   Q.   Do you see the date, December 13th, 2010?

14   A.   I do.

15   Q.   And what is the subject line here?

16   A.   "DOI said no."

17   Q.   What did you understand that to mean?

18   A.   I understand that to mean that DOI was not interested in

19   doing the restructured deal that we had put together in the

20   proposal.

21   Q.   Would you please look at what I have placed before you as

22   Exhibit 1365.

23        Is this a true and correct copy of an email that you

24   received from Mike Sullivan on or about December 31st, 2011 --

25   A.   It is.

1      **MR. LEACH:**  Your Honor, I offer Exhibit 1365.

2      **THE COURT:**  I have it in evidence.

3      **MR. LEACH:**  Oh, wonderful.  Thank you.

4      **THE COURT:**  Anyway, it's admitted if it hasn't been.

5      **MR. LEACH:**  Thank you.

6      (Trial Exhibit 1365 received in evidence)

7                    (Exhibit published to jury.)

8  **BY MR. LEACH:**

9  **Q.**   Mr. Sullivan, do you see the subject matter of this email,

10  "Autonomy proposal for restructuring EEAS contract"?

11  **A.**   I do.

12  **Q.**   Okay.  Is that a reference to the restructuring proposal

13  that we had seen in some of the earlier exhibits?

14  **A.**   It is.

15  **Q.**   Why was Mike Sullivan sending this to you on

16  December 31st, 2010?

17  **A.**   Because he was asked to, I believe, by Stouffer in order

18  for the legal team to put together a reseller purchase order

19  for DOI.

20  **Q.**   Between early December and the 31st, to your knowledge,

21  had anything changed vis-à-vis the DOI transaction that

22  Autonomy was pursuing?

23  **A.**   No.

24  **Q.**   Will you please now look at what has been marked as

25  Exhibit 1355.

1    Is this an email exchange between you and Mr. Crumbacher

2    on the 31st of December, 2010?

3            **THE COURT:**  Admitted.

4        (Trial Exhibit 1355 received in evidence)

5                (Exhibit published to jury.)

6            **THE WITNESS:**  Sorry?

7    **BY MR. LEACH:**

8    **Q.**   Do you recognize this?

9    **A.**   I do.

10   **Q.**   What is this email dialogue?

11   **A.**   So this is -- well, it's primarily an email between Jim

12   Crumbacher on our legal team and -- who reported to me, and

13   Steve Chamberlain, the VP of finance in the UK, where Steve had

14   asked Jim directly to adjust the wording in our templates, and

15   so the string is Steve and Jim going back, and then I believe

16   that this is Jim forwarding the agreed-upon language to me.

17   **Q.**   Let me please draw your attention to the middle part of

18   the email, the message from Mr. Chamberlain.  The subject is

19   "VAR POs proposed language."  Do you see that?

20   **A.**   I do.

21   **Q.**   And this is proposing language to go into the template for

22   some of Autonomy's reseller agreements?

23   **A.**   Correct.

24   **Q.**   Do you know why Mr. Chamberlain was proposing this?

25   **A.**   No.

1    Q.    In the second paragraph, he writes, "Alternative is

2    something like this.  Whilst end user is currently anticipating

3    closing transaction with VAR, in event they close direct with

4    Autonomy, then ..."

5          He goes on, "We can then add some of the wording you've

6    added.  If it looks like a speculative order, then we will have

7    problems with rev rec."

8          What did you understand rev rec to refer to?

9    A.    Revenue recognition.

10   Q.    What is VAR in this context?

11   A.    VAR is value-added reseller or reseller in this context.

12   Q.    What did you understand Mr. Chamberlain to be getting at,

13   "if this looks like a speculative order, then we will have

14   problems with rev rec"?

15   A.    I believe his point was if the order does not seem to be a

16   real commitment, if it seems to be a half commitment or a

17   commitment with an out, then it will create challenges to

18   recognize the revenue.

19   Q.    And let's look at the language that Mr. Crumbacher

20   proposes above that.  Do you see the second line where it says,

21   "Although end user and VAR currently anticipate entering into

22   such a license transaction."  Do you see that?

23   A.    I do.

24   Q.    What does that mean?

25   A.    It means that, generally speaking, an end user of

PROCEEDINGS

1    Autonomy's products and a reseller of Autonomy's products are

2    intending to enter into a transaction together.

3    **Q.**   And this is language that Mr. Crumbacher is proposing to

4    avoid the problem of having a speculative order; is that fair?

5    **A.**   I believe so.

6    **Q.**   Would you please look at what is marked as Exhibit 1358.

7        Is this an email from you to John Cronin, attaching a

8    draft order for MicroTech with reference to the Department of

9    the Interior?

10   **A.**   I don't have it, so I'm just waiting for it to come --

11           **THE COURT:**  Admitted.

12   (Trial Exhibit 1358 received in evidence)

13                   (Exhibit published to jury.)

14           **THE WITNESS:**  Yes.

15   **BY MR. LEACH:**

16   **Q.**   Okay.  Can we please look at page 2.

17       What is the amount of this draft order, Mr. Scott?

18   **A.**   $4 million.

19   **Q.**   What is the software being licensed?

20   **A.**   Digital Safe and Audit Center.

21   **Q.**   If we could please scroll down to the bottom, has Autonomy

22   added that language that Mr. Crumbacher, Mr. Chamberlain, and

23   yourself were discussing in the prior exhibit?

24   **A.**   Yes.

25   **Q.**   Please look at what has been marked as Exhibit 1393.

PROCEEDINGS

1          And I believe this may be in evidence.

2               **THE CLERK:**  No.

3               **MR. LEACH:**  In that case, I offer it.

4               **THE COURT:**  1393, admitted.

5          (Trial Exhibit 1393 received in evidence)

6                    (Exhibit published to jury.)

7    **BY MR. LEACH:**

8    **Q.**   Is this an executed version of the purchase order by

9    MicroTech, Mr. Scott?

10   **A.**   Yes, it is.

11   **Q.**   What is the amount?

12   **A.**   $4 million.

13   **Q.**   And does it include that language "end user and VAR

14   currently anticipate entering into such a license transaction"?

15   **A.**   It does.

16   **Q.**   Was that true?

17   **A.**   I don't believe so.

18   **Q.**   Why do you not believe so?

19   **A.**   Because I'm not aware of any discussions or negotiations

20   between DOI and MicroTech.

21   **Q.**   You testified earlier, Mr. Scott, with respect to why you

22   wanted to leave Autonomy in or around the September 2010 time

23   period, and I believe you mentioned one of your concerns was

24   issues relating to resellers.  Do you recall that?

25   **A.**   I do.

**PROCEEDINGS**

1    Q.   What were your concerns?

2    A.   That notwithstanding all the assurances that I got, that

3    perhaps those assurances were not trustworthy and that when I

4    was told that it's okay to recognize revenue under IFRS and

5    that the rules are different from U.S. GAAP and that let the UK

6    handle that, that was -- that was that sense of discomfort.

7    Q.   You also said --

8              THE COURT:   I think maybe we ought to stretch just a

9    minute.

10             (Pause in proceedings.)

11             THE COURT:   You may proceed.

12   BY MR. LEACH:

13   Q.   Is this an example, Mr. Scott, of one of the

14   end-of-quarter reseller transactions that would cause you

15   concern?

16   A.   Yes.

17   Q.   And explain more about your discomfort with them?

18   A.   Well, I -- I'd never experienced before a situation where

19   my management had come to me on the last day of the quarter and

20   asked us to prepare a series of reseller orders, really just on

21   the fly, and that happened quarter after quarter after quarter

22   after quarter, and I knew that -- or at least strongly believed

23   that all of this material was shared with our auditors, was,

24   you know, fully vetted.

25        I'd been told that U.S. GAAP rules are very different from

1  IFRS rules, and so that's a common theme that I heard over and

2  over again, and yet it also felt very weird, very strange to

3  have my CEO -- I'm thinking of my U.S. CEO, Stouffer Egan --

4  just come and say "okay, here is a bunch of purchase orders,

5  they are going through resellers," and sometimes like going

6  through Reseller A and then a half later, "no, make it through

7  reseller B," and then maybe "no, make it back through reseller

8  A."  Having that kind of experience was just a really

9  uncomfortable experience.

10 **Q.**   You also said you wanted to leave because of the way

11 Autonomy treated employees.  What did you mean by that?

12 **A.**   It was a really hard environment.  There was a fair amount

13 of yelling, people being fired over things that didn't always

14 make sense to me.  It was, I felt, very reactive, actually, a

15 lot of the time, so high intensity, highly reactive,

16 contradictory instructions, and no humanity.  It was just a

17 really tough environment.

18 **Q.**   Let me draw your attention, Mr. Scott, to another

19 transaction at the -- around the end of the fourth quarter of

20 2010.  Would you please look at what has been marked as Exhibit

21 1270.

22     Is this an email from you to Mike Lynch and Sushovan

23 Hussain on December 9th, 2010, relating to a trans --

24 contemplated transaction with Bank of America?

25 **A.**   Yes.

1          **THE COURT:**  Admitted.

2          (Trial Exhibit 1270 received in evidence)

3                    (Exhibit published to jury.)

4   BY MR. LEACH:

5   **Q.**   Why were you sending this to Dr. Lynch, Mr. Scott?

6   **A.**   I was at a meeting with Sushovan and Steve Chamberlain and

7   several others in New York in December with Bank of America,

8   working on this Bank of America deal that -- that Autonomy was

9   doing, and my understanding is that there's a practice that

10  Steve has of sharing deal summaries with Mike Lynch, and Steve

11  was trying to send this document to Mike but his internet

12  wasn't working on his computer, so he put the file on a thumb

13  drive, gave it to me, had me upload it and email it to Mike.

14  **Q.**   Was this an important transaction for Autonomy in the

15  fourth quarter of 2010?

16  **A.**   Yes.

17  **Q.**   How do you know that?

18  **A.**   It was a very large transaction.

19  **Q.**   And did it end up closing at the end of December?

20  **A.**   No.

21  **Q.**   Would you please look at what has been marked as Exhibit

22  1368.

23       Is this a true and correct copy of an email that you

24  received with draft purchase orders relating to selling

25  software to Bank of America at the end of 2010?

 1   **A.**   It is.

 2          **THE COURT:**  Admitted.

 3      (Trial Exhibit 1368 received in evidence)

 4          **MR. LEACH:**  If we could please display that.

 5              (Exhibit published to jury.)

 6          **MR. LEACH:**  Thank you.

 7   **Q.**   There is an email from Livius Guiao to you, Mr. Scott.

 8      Who was Livius Guiao?

 9   **A.**   Livius Guiao was an associate general counsel at Autonomy

10   who reported to me.

11   **Q.**   He is attaching two draft purchase orders, one for Capax

12   and one for Discover Tech.  Do you see that?

13   **A.**   I do.

14   **Q.**   Could you please look at page 2.

15      Is this the draft Capax agreement?

16   **A.**   It is.

17   **Q.**   What is the amount of the license fee in paragraph 7?

18   **A.**   1.8 -- $1,830,600.

19   **Q.**   If you could please look at page 4.  Is this the draft

20   agreement with Discover Technologies?

21   **A.**   It is.

22   **Q.**   What is the amount?

23   **A.**   $7 million.

24   **Q.**   After the end of 2010, did Autonomy continue to pursue a

25   direct transaction with Bank of America?

PROCEEDINGS

1    **A.**   It did.

2    **Q.**   And were you involved in some of those efforts?

3    **A.**   Yes.

4    **Q.**   Why were you attempting to sell software to Bank of

5    America after the close of the quarter?

6    **A.**   Why was I personally?

7    **Q.**   Yeah.

8    **A.**   Because I was part of the Autonomy team that was still

9    trying to close that deal with Bank of America.

10   **Q.**   Why was Autonomy still pursuing it?

11   **A.**   Because the deal hadn't closed and Autonomy was working

12   that deal directly with Bank of America.

13   **Q.**   Would you please look at what has been marked as Exhibit

14   1425.

15       Is this an email between you and someone named Reagan

16   Smith on January 4th, 2011, relating to your efforts to sell

17   software to Bank of America?

18   **A.**   Yes.

19           **THE COURT:**  Admitted.

20       (Trial Exhibit 1425 received in evidence)

21               (Exhibit published to jury.)

22   **BY MR. LEACH:**

23   **Q.**   Who is Reagan Smith, Mr. Scott?

24   **A.**   He was a Bank of America employee, and I forget -- he was

25   a Bank of America employee.

1    **Q.**   And is he someone you had interaction with in trying to

2    consummate a software sale with Bank of America?

3    **A.**   Yes.

4    **Q.**   And did you do that up through January of 2011?

5    **A.**   Yes.

6    **Q.**   Please look now at 2948.

7              **MR. KEKER:**   Can we see what 2948 is, please?

8         (Mr. Leach shows Mr. Keker the document.)

9              **MR. LEACH:**   Your Honor, I offer 2948.

10             **THE COURT:**   Admitted.

11        (Trial Exhibit 2948 received in evidence)

12                   (Exhibit published to jury.)

13   **BY MR. LEACH:**

14   **Q.**   Let me draw your attention, Mr. Scott, to the bottom

15   portion of this email exchange.

16        First of all, Mr. Guiao is someone who works for you?

17   **A.**   Correct.

18   **Q.**   And the subject is -- what is the date of this email?

19   **A.**   January 18th, 2011.

20   **Q.**   And that's 18 days after the close of the quarter?

21   **A.**   Correct.

22   **Q.**   And Mr. Guiao is writing to Steve Chamberlain, "With

23   importance.  Hi, Steve, attached is a draft letter from Capax

24   to AUTN requesting that we approve replacement of the Amgen PO

25   with a PO to BofA."

PROCEEDINGS

1        Do you see that?

2  **A.**    I do.

3  **Q.**    What is he getting at there?

4  **A.**    This is the letter that he included was a draft letter

5  that Capax, a reseller, would -- was prepared for Capax to send

6  to us requesting cancellation of a prior deal that it had

7  submitted a PO for Amgen and replacing it with Bank of America

8  as an end user.

9  **Q.**    Okay.  Did Mr. Guiao also attach a draft agreement

10 relating to Discover Technologies?

11 **A.**    He did.

12 **Q.**    Would you please look at page 4.  And what is the date of

13 this draft agreement?

14 **A.**    January 18, 2010.

15 **Q.**    I draw your attention to paragraph 2 in the fee section

16 where it says "VAR shall pay to Autonomy a fee in the amount of

17 $3,675,000/$13,125,000."

18        What's being reflected there?

19 **A.**    What's being reflected is a lack of clarity around how

20 much this -- this agreement should be for.

21 **Q.**    Lack of clarity among whom?

22 **A.**    Well, Livius, as the drafter, in sending it to Steve.

23 **Q.**    Okay.  And does Mr. Chamberlain or Mr. Guiao ultimately

24 forward these to Steve Chamberlain, if we go back to page 1?

25 **A.**    Yes.

PROCEEDINGS

1    **Q.**   And the file names, do those file names mean anything to

2    you, that convention?

3    **A.**   I believe that the date convention is a convention that we

4    used:  Year, then month, then date.

5    **Q.**   So starting the file name with the date of the agreement

6    or the date it's prepared?

7    **A.**   I believe so.

8    **Q.**   Please look now at what -- so Mr. Guiao sends this to

9    Mr. Chamberlain at 11:55 a.m. on Tuesday.  Do you see that?

10   **A.**   I do.

11   **Q.**   And do you see where he writes, "I'll call you in a few

12   minutes to discuss"?

13   **A.**   Yes.

14   **Q.**   Would you please look at what has been marked as Exhibit

15   1452.

16       Is this another email in the chain we just saw relating to

17   these draft agreements for Capax and Discover Tech?

18   **A.**   It is.

19           **THE COURT:**  Admitted.

20       (Trial Exhibit 1452 received in evidence)

21               (Exhibit published to jury.)

22   **BY MR. LEACH:**

23   **Q.**   And if we look at the middle, do we see Mr. Guiao's

24   initial email to Steve Chamberlain?

25   **A.**   We do.

**PROCEEDINGS**

1    Q.    Okay.  And he's -- I draw your attention to the top

2    portion where he's following up:  "Steve, attached are updated

3    versions of both documents, revised per our discussion.  As we

4    discussed, since we're keeping the additional DT piece at

5    3.675, we will need to address the 9.45 from Capax."

6          What did that mean?

7    A.    I think what it means is looking back at that Discover

8    Tech PO -- and there were two different prices.  There was the

9    3.675 and the other one that was probably about 10 million

10   more.

11         I think what Livius is saying here is "since you've --

12   you've told me, Steve, that the number is 3.65 million that

13   we're going with Discover Tech, what are we doing with that

14   other document that I created, that Capax letter for 9.45?"

15   Q.    And does Mr. Guiao attach updated versions of the draft

16   agreements?

17   A.    He does.

18   Q.    Please look at page 3.  What is the date of this document?

19   A.    December 31st, 2010.

20   Q.    What is the amount in paragraph 2?

21   A.    $3,675,000.

22   Q.    And I draw your attention to the first paragraph where it

23   says, "This letter agreement."  What is this form of document?

24   A.    It's a letter.

25   Q.    Is this an amendment of some sort?

PROCEEDINGS

1    **A.**    No.

2    **Q.**    At some point in time, did you note the change in the date

3    from January to December 31st, 2010 as a result of the

4    conversation with Mr. Chamberlain?

5    **A.**    Yes.

6    **Q.**    Were you concerned about that?

7    **A.**    Yes.

8    **Q.**    Why?

9    **A.**    Because it was January 18th, 2011.

10   **Q.**    And what concern in your mind did that raise?

11   **A.**    The fact that this agreement would be signed and dated

12   December 31st, 2010, yet actually entered into in January 2011,

13   my concern was about revenue recognition and what the

14   intentions were in terms of taking this revenue.

15   **Q.**    What about revenue recognition would be implicated?

16   **A.**    Well, in my experience, a deal has to close within the

17   quarter -- a deal -- the revenue on a deal can only be

18   recognized when that deal actually closes, and so if this deal

19   purported to be closed on December 31st, 2010 but wasn't, in

20   fact, closed by December 31st, 2010, then would we, Autonomy,

21   be taking revenue improperly.

22   **Q.**    At the time of this email exchange on January 18th, 2011,

23   had the deal closed?

24   **A.**    No.

25   **Q.**    As a result of your concerns, did you have conversations

1   with Steve Chamberlain?

2   **A.**   I did.

3   **Q.**   Take a moment and describe what Mr. Chamberlain said to

4   you.

5   **A.**   Well, I raised -- after speaking with Livius about this, I

6   went to Steve to say essentially, "What's up?  Why are we doing

7   what we're doing here?  Can you help me understand?"

8       And Steve said to me that Sushovan would like to try to

9   recognize the entire Bank of America deal in the fourth quarter

10  of 2010.  And his intention was to take the POs that had been

11  executed in 2010 with the resellers that we went through

12  previously and combine those with these two new documents that

13  were prepared by Livius and if we could get these -- these new

14  reseller agreements that were dated December 31st, 2010 signed

15  and we could get the actual Bank of America deal to be signed

16  by the time that Sushovan was meeting with our outside auditors

17  to do a final audit review on the -- on the 2010 financials of

18  Autonomy, then he would make a pitch to be able to recognize

19  that entire transaction in the fourth quarter.  And that

20  Sushovan would share everything with the auditors and

21  ultimately would, you know, defer to the auditors on their

22  decision.

23  **Q.**   Was that explanation reassuring to you?

24  **A.**   It was -- it was reassuring, I guess, to the extent that,

25  you know -- to the same extent that other explanations were

1    reassuring.  So it was reassuring to hear an answer, but I

2    still had my doubts and concerns.

3    **Q.**   Did you also have a conversation with Sushovan Hussain?

4    **A.**   I did.

5    **Q.**   Take a moment and describe what happened.

6    **A.**   I had a subsequent conversation with Sushovan and

7    essentially what I shared with you about my conversation with

8    Steve is what I heard from Sushovan as well, which was, "Look,

9    I will be" -- you know, "I'm going to be completely transparent

10   with the auditors.  My goal is to take this very large deal.

11   If we can get this deal done before the final audit

12   committee -- you know, before the final meeting with our

13   auditors, this is my intention.  I want to take it."

14        And he gave an explanation both in 2010 and -- well,

15   really primarily in 2010 about having to take this deal in 2010

16   because of some UK disclosure rules, which I don't -- I don't

17   know what that is, but there was a big push around like this

18   needs to be in 2010 or it can't happen.

19   **Q.**   Did you express to Mr. Hussain your concerns about the

20   dating of the agreements?

21   **A.**   Yes.

22   **Q.**   And what did he say?

23   **A.**   That he would be very forthcoming with the auditors.  He's

24   going to explain everything, what his intention is, and make

25   the argument to them, and hopefully they would, you know --

**PROCEEDINGS**

1    hopefully they would go his way.  Maybe they wouldn't.  But he

2    would be totally transparent.

3    **Q.**   What did you understand that to mean, "totally

4    transparent"?

5    **A.**   That he would share with the auditors when each of these

6    transactions was entered into, each of these transactions,

7    meaning their reseller deals that we just went through that

8    were dated December 31st, 2010 but actually signed in January

9    2011, as well as the other deals.

10            **MR. LEACH:**  Is this a good moment to stretch,

11   Your Honor?

12            **THE COURT:**  Yes.  Always a good moment to stretch.

13            (Pause in proceedings.)

14   **BY MR. LEACH:**

15   **Q.**   Mr. Scott, would you please look at what has been marked

16   as Exhibit 1490.  This is in evidence.

17            **THE COURT:**  Yes.

18                 (Exhibit published to jury.)

19   **BY MR. LEACH:**

20   **Q.**   Is this an email you sent to Dave Truitt on January 25th,

21   2011, attaching a draft -- draft purchase order?

22   **A.**   It is.

23   **Q.**   Let's please look at page 2.

24        Why were you sending this to Mr. Truitt?

25   **A.**   To have him sign it.

**PROCEEDINGS**

1   **Q.**   Okay.  Who asked you to do that?

2   **A.**   I don't recall.

3   **Q.**   And if we could please pull up page 2.  We may have to go

4   old school on this, Mr. Scott.

5   **A.**   Can I actually change my answer?  I said I don't recall,

6   but in looking at the date, I recall that Sushovan and Steve

7   had asked us to prepare these docs and get them signed, so the

8   "ask to get signed" was from Sushovan or Steve.

9   **Q.**   Thank you.

10      Do you have 1490 before you?

11  **A.**   No.

12          **THE COURT:**  It is in evidence.

13          **MR. LEACH:**  I know, Your Honor.  We're looking for a

14  hard copy that we can display on the ELMO.  We don't have it on

15  the laptop.

16                  (Exhibit published to jury.)

17  **BY MR. LEACH:**

18  **Q.**   Mr. Scott, what is the date of this draft purchase

19  agreement?

20  **A.**   December --

21  **Q.**   Purchase order?

22  **A.**   December 31, 2010.

23  **Q.**   What is the amount?

24  **A.**   3,675,000.

25  **Q.**   Okay.  And is this your attempt to get Mr. Truitt to sign

PROCEEDINGS

1   up to the additional 3.67 million that you discussed with Steve

2   Chamberlain and Sushovan Hussain?

3   A.   Yes.

4   Q.   Please look at what is in evidence as Exhibit 1499.

5           THE COURT:   Okay.   1499 is in evidence.

6               (Exhibit published to jury.)

7   BY MR. LEACH:

8   Q.   What is this document, Mr. Scott?

9   A.   This is an email from Dave Truitt to me with a signed

10  agreement.

11  Q.   Could you please look at page 2.   What is the date?

12  A.   December 31st, 2010.

13  Q.   What is the amount?

14  A.   3,675,000.

15  Q.   And if we could please look at the signature page.   Do you

16  see the date 25 Jan 2011?

17  A.   I do.

18  Q.   Okay.   After receiving this, do you recall asking anybody

19  from Discover Technologies to re-execute this with a different

20  date?

21  A.   I believe that I had a conversation with -- a conversation

22  or an email -- I do recall asking them to re-sign or re-execute

23  the agreement.   I just don't recall the specifics around it.

24  Q.   Why did you do that?

25  A.   Because that's what Sushovan and Steve had asked for from

PROCEEDINGS

1  the beginning.

2  **Q.**   Could you now please look at what is marked as Exhibit

3  1512.

4       Is this an email exchange between you and Steve

5  Chamberlain relating to this transaction?   It should be in

6  front of you, Mr. Scott.

7            **THE COURT:**   Admitted.

8       (Trial Exhibit 1512 received in evidence)

9                 (Exhibit published to jury.)

10           **THE WITNESS:**   Yes.

11  BY MR. LEACH:

12  **Q.**   What is the date of this email?

13  **A.**   January 26th, 2011.

14  **Q.**   Where were you in late January of 2011?

15  **A.**   I believe in the Bay Area.

16  **Q.**   You worked out of the San Francisco office?

17  **A.**   Correct.

18  **Q.**   What is the attachment to this email to Mr. Chamberlain?

19  **A.**   This is the reseller letter that we saw before but signed

20  with a new date of December 10th -- December 31st, 2010.

21  **Q.**   Could we please look at the signature line.   And this is

22  something you asked Discover Technologies to do at

23  Mr. Hussain's and Mr. Chamberlain's direction?

24  **A.**   I believe so.

25  **Q.**   At some point in time, did you have another conversation

1    with Steve Chamberlain about these transactions?

2    **A.**    I did.

3    **Q.**    Take a moment and describe what Mr. Chamberlain said to

4    you.

5    **A.**    In February, I talked to Steve about the Bank of America

6    deal and wanted to understand what had happened because Bank of

7    America did not sign its agreement with us before that final

8    audit meeting that was taking place on January 25th or 26th.

9    But they did eventually close it in February.

10        And Steve told me that we actually took none of the

11   revenue, so none of the reseller orders that we had signed back

12   in December or anything else in Q4/2010, that all of the

13   revenue was going to be recognized in Q1, and that's the way

14   it -- you know, that's the way they handled it.

15   **Q.**    Was that reassuring to you?

16   **A.**    Yes.

17   **Q.**    Why?

18   **A.**    For the same reason that I was concerned previously about

19   changing the dates, right?  So when Steve told me that the

20   auditors -- well, when he said that we didn't recognize the

21   revenue, my understanding was that the auditors said no, and I

22   thought that was -- that we got to the right spot.

23   **Q.**    Would you please look at what we've placed before you as

24   Exhibit 1575.

25        Offer it in evidence, Your Honor.

1          **THE COURT:**  Admitted.

2          (Trial Exhibit 1575 received in evidence)

3                    (Exhibit published to jury.)

4    **BY MR. LEACH:**

5    **Q.**   This appears to be an email from Mr. Guiao to you,

6    Mr. Scott, on March 2nd, 2011, attaching various purchase

7    orders among MicroTech and Capax.  Do you see that?

8    **A.**   I do.

9    **Q.**   And if we could please look at page 2.

10         Does this appear to be a purchase order from MicroTech to

11   Discover Tech with Bank of America as the end user?

12   **A.**   Yes.

13   **Q.**   And is this signed or unsigned?

14   **A.**   Unsigned.

15   **Q.**   Okay.  Why was Autonomy preparing these?

16   **A.**   I -- I don't know.  We prepared them at Steve's request,

17   and we -- I guess we prepared them to provide them to MicroTech

18   and Discover Tech to execute.

19   **Q.**   Was that common?

20   **A.**   No.

21   **Q.**   How so?

22   **A.**   Well, I can't think of another example offhand where

23   Autonomy prepared documentation for two other parties

24   independent of Autonomy.

25   **Q.**   Let's move forward in time, Mr. Scott, to the end of the

1    first quarter of 2011.  Do you have that time period in mind?

2    A.   Yes.

3    Q.   And would you -- may I approach, Your Honor?

4         THE COURT:  Yes.

5    BY MR. LEACH:

6    Q.   Would you please look at what has been marked as Exhibit

7    1682.

8         Is this an email between you, Mr. Chamberlain,

9    Mr. Hussain, and Ganesh Vaidyanathan at the end of March, 2011?

10   A.   It is.

11        THE COURT:  Admitted.

12        (Trial Exhibit 1682 received in evidence)

13             (Exhibit published to jury.)

14   BY MR. LEACH:

15   Q.   What is the general subject matter of this email,

16   Mr. Scott?

17   A.   This email relates to Autonomy purchasing software from

18   another company called FileTek to resell that software to two

19   customers of Autonomy.

20   Q.   What was your role in connection with purchasing software

21   from FileTek and reselling it in this time period?

22   A.   On the purchasing side, I was involved in the FileTek

23   purchases.  I wasn't really directly involved in any reselling

24   of FileTek to any customers.

25   Q.   Mr. Chamberlain writes here, "Ganesh, as part of the deals

**PROCEEDINGS**

1    with Morgan Stanley and HP, we are reselling FileTek software.

2    Our own license is for internal use and so we are reluctantly

3    having to pay a resell fee."

4          Do you see that?

5    **A.**    I do.

6    **Q.**    Did you agree with that description, that Autonomy was

7    reluctantly doing this?

8    **A.**    I don't know what my reaction was at the time, but I don't

9    agree with that.

10   **Q.**    Why not?

11   **A.**    Because in looking through the -- well, for a couple

12   reasons.

13         One, Morgan Stanley and HP never asked for the FileTek

14   software, to the best of my knowledge.

15         Two, we'd already entered into a license with FileTek that

16   gave us rights that I've subsequently looked at, and I believe

17   that we would have had the rights already from the software

18   that we previously purchased.

19   **Q.**    So in your mind, this was gratuitous?

20   **A.**    Yes.

21   **Q.**    What do you mean by that?

22   **A.**    I mean that there was no need to buy the software.  There

23   was no need to resell the software.

24   **Q.**    Would you please look at what has been marked as Exhibit

25   1694.

1          Is this a true and correct copy of an email between you

2    and folks from MicroTech at the end of March 2011?

3    **A.**   It is.

4              **THE COURT:**  Admitted.

5          (Trial Exhibit 1694 received in evidence)

6                   (Exhibit published to jury.)

7    **BY MR. LEACH:**

8    **Q.**   What is the subject matter of this email, Mr. Scott?

9    **A.**   In this transaction, Sushovan had asked us to prepare two

10   separate documents.  Under one agreement, Autonomy would assign

11   its maintenance stream, so that means the annual payments that

12   Autonomy gets from its customer -- in this case, Bank of

13   America -- to MicroTech so that MicroTech would now collect

14   those fees instead of Autonomy.

15        And MicroTech would provide backline support to Autonomy

16   in the event of any Bank of America maintenance issues that

17   come up.  That was one document.

18        The other document -- and the -- and then the other

19   document was an agreement whereby MicroTech was licensing all

20   this the software that it would need in order to provide those

21   backline services in the first agreement that I mentioned.

22        And this was both of those -- this was both of those

23   agreements.

24   **Q.**   Where did the idea for these two transactions come from?

25   **A.**   I don't know.

**PROCEEDINGS**

1    **Q.**    Who told you to prepare these?

2    **A.**    Sushovan or Steve.

3    **Q.**    And were these transactions negotiated with MicroTech at

4    the same time?

5    **A.**    Yes.

6    **Q.**    Did you view them as related?

7    **A.**    Definitely.

8    **Q.**    Why do you say that?

9    **A.**    Because they were similar amounts of money and they were

10   related to the same set of -- well, the same set of

11   transactions, I guess, is the easiest way to say it.  You

12   know -- does that make sense?

13   **Q.**    Well, did you view them as linked?

14   **A.**    Yes.

15   **Q.**    Please look at the first page of the first agreement on

16   page 2.  This is titled "Autonomy Maintenance and Support

17   Services Agreement."  Do you see that?

18   **A.**    Yes.

19   **Q.**    And the date is March 30th, 2011?

20   **A.**    Yes.

21   **Q.**    And in paragraph 1, it says, "Assignment of right to

22   invoice."  Do you see that?

23   **A.**    I do.

24   **Q.**    And there are some renewal fees beneath that?

25   **A.**    Yes.

**PROCEEDINGS**

1   Q.   Explain again what the thrust of this agreement is.

2   A.   So this agreement is intended to -- I'll start it this

3   way.

4        As I mentioned, Bank of America has already licensed a

5   bunch of software from Autonomy.  If it wants to continue to

6   get support for that software, it pays a support fee or a

7   maintenance fee every year.  And these fees that we see here

8   are the fees that Bank of America would pay us for the support

9   in connection with the software.

10        And what this agreement does is assigns all those payments

11   that would otherwise be coming to Autonomy to MicroTech so that

12   MicroTech would then collect the fees.

13   Q.   Could we please look at page 2.

14        And you see the reference to backline support services in

15   2.2.  And what's the thrust of this paragraph?

16   A.   This paragraph says that essentially if Autonomy needs

17   support in providing its support to Bank of America, that it

18   will call on MicroTech to assist it with its -- with its

19   provision of support.

20   Q.   Had you done an agreement like this before?

21   A.   Not to my knowledge.

22   Q.   Does this stand out in your mind, for some reason?

23   A.   Yeah.

24   Q.   Why?

25   A.   For a couple reasons.

1       One, I can't think of a time that we've ever assigned

2  support on a particular deal to a particular transaction -- to

3  a particular -- to somebody outside of Autonomy.

4       The backline piece is weird in that frontline support

5  would still be provided by Autonomy and that's most of the

6  support that gets done.  It gets handled at the front line, and

7  if there was a real problem that you had to figure out, the

8  frontline people couldn't solve it, it would be very odd to

9  reach out to MicroTech, who didn't develop the software or

10  operate the software, and ask them to help us fix a problem

11  that we couldn't fix ourselves.

12  **Q.**   Did Autonomy ever ask MicroTech to provide these backline

13  support services?

14  **A.**   Not to my knowledge.

15  **Q.**   Can we please go back to page 1 -- I'm sorry.  Page 2.

16  Thank you, Ms. Margen.

17       I'm not going to make you do math in public, Mr. Scott,

18  but is this the amount of the assigned maintenance fees

19  somewhere north of $3.5 million?

20  **A.**   Yes.

21  **Q.**   And does this amount exceed the amount of the software

22  that Autonomy was selling to MicroTech in the related deal?

23  **A.**   It does.

24  **Q.**   And were the payment terms structured so that MicroTech

25  would receive the maintenance payments before it needed to pay

1    for the software?

2    **A.**    It was.

3    **Q.**    Were these two deals linked, in your mind?

4    **A.**    Yes.

5    **Q.**    Why is that?

6    **A.**    Well, as I mentioned, there would be no point in

7    assigning -- there would be no point in MicroTech licensing our

8    software to provide support unless they were supposed to

9    provide support to somebody.  This would be the people that

10   they're providing support to.

11        Likewise, there would be -- I can't understand why

12   Autonomy would just transfer its support to MicroTech, absent a

13   good reason to do so.

14        **THE COURT:**  One more stretch.

15        (Pause in proceedings.)

16        **MR. LEACH:**  Thank you, Your Honor.

17   **Q.**    Mr. Scott, I'd like to display for you what is marked as

18   Exhibit -- and in evidence as Exhibit 1684.

19              (Exhibit published to jury.)

20   **BY MR. LEACH:**

21   **Q.**    What is this document?

22   **A.**    This is an email from me to Dave Truitt at the end of the

23   quarter, the last day of the first quarter of 2011, attaching

24   two reseller agreements.

25   **Q.**    Who are the end users in these proposed reseller

**PROCEEDINGS**

1    agreements with Discover Technologies?

2    **A.**    FINRA and ThinkTech.

3          **MR. LEACH:**  And I offer into evidence Exhibits 1685

4    and 1686.

5          **THE COURT:**  Admitted.

6       (Trial Exhibits 1685 and 1686 received in evidence).

7          **MR. LEACH:**  Can we please display 1685.

8                  (Exhibit published to jury.)

9    **BY MR. LEACH:**

10   **Q.**    What is this, Mr. Scott?

11   **A.**    This is an email from me to Steve Truitt on the last day

12   of the quarter sending him three purchase orders for MicroTech

13   with Xerox, Bank of Montreal, and NRO.

14   **Q.**    Who are the end users for -- so Xerox, that's the copy

15   company that we've heard of?

16   **A.**    Yes.

17   **Q.**    Bank of Montreal, what is that?

18   **A.**    A bank.

19   **Q.**    In Canada?

20   **A.**    Canada.

21   **Q.**    Where you're from?

22   **A.**    Correct.

23   **Q.**    NRO, what's that?

24   **A.**    I don't recall.

25   **Q.**    Okay.

1          And if we could please display 1686.

2                      (Exhibit published to jury.)

3    BY MR. LEACH:

4    Q.    Is this you sending draft POs to John Baiocco at Capax?

5    A.    It is.

6    Q.    And are the proposed end users McAfee and UBS?

7    A.    They are.

8    Q.    Would you now please look at what has been marked as

9    Exhibit 1720, an email from you to Mr. Hussain, which I offer

10   in evidence.

11              THE COURT:   Admitted.

12        (Trial Exhibit 1720 received in evidence)

13                      (Exhibit published to jury.)

14   BY MR. LEACH:

15   Q.    What is the date of the top email, Mr. Scott?

16   A.    April 1st, 2011.

17   Q.    And the subject is "8(a) deals, could you please send a

18   list."  Do you see that?

19   A.    I do.

20   Q.    What did you understand Mr. Hussain to mean by "8(a)

21   deals, could you please send a list"?

22   A.    I understand -- I understood him to be asking for a list

23   of the reseller deals that we had executed the prior day.

24   Q.    Okay.  And at the bottom, it says "Plus did MS close?"  Is

25   that a reference to Morgan Stanley?

**PROCEEDINGS**

1    **A.**    It is.

2    **Q.**    In your response, there are three entries for MT.   Do you

3    see that?

4    **A.**    I do.

5    **Q.**    And do those end users match the draft purchase orders

6    that you sent out late on March 2011?

7    **A.**    They do.

8    **Q.**    Do those correspond to the amounts of the deals?

9    **A.**    They do.

10   **Q.**    And then there are two entries for DT.   Do you see that?

11   **A.**    I do.

12   **Q.**    Do those end users correspond to the draft purchase orders

13   that you sent out late in the evening on March 31st?

14   **A.**    They do.

15   **Q.**    And then the two for Capax, McAfee, UBS, do those match

16   the purchase orders that you sent out to Mr. Baiocco late in

17   the evening on March 31st?

18   **A.**    They do.

19   **Q.**    There is also something called "MT internal use license,

20   3.86M."   What does that refer to?

21   **A.**    That refers to the license agreement we were just

22   discussing before where MicroTech licensed Autonomy software to

23   provide the support services.

24   **Q.**    Were these all of the reseller arrangements that you were

25   aware of on April 1st, 2011?

PROCEEDINGS

1  **A.**    Yes.

2  **Q.**    Have you ever heard of a company called Prisa?

3  **A.**    I have.

4  **Q.**    To your knowledge, was there any reseller agreement

5  involving Prisa on or before April 1st, 2011?

6  **A.**    No.

7  **Q.**    Did you ever tell Sushovan Hussain that Discover Tech is

8  an 8(a)?

9  **A.**    No.

10  **Q.**    What is an 8(a)?

11  **A.**    I don't know.

12  **Q.**    Did you ever tell Sushovan Hussain that Capax was an 8(a)?

13  **A.**    No.

14  **Q.**    Let's move forward in time, please, to the second quarter

15  of 2011, the last quarter before the HP acquisition.  Do you

16  have that time period in mind?

17  **A.**    I do.

18  **Q.**    Okay.  Please look at what has been marked as Exhibit

19  1899.

20         **THE COURT:**  Admitted.

21      (Trial Exhibit 1899 received in evidence)

22                 (Exhibit published to jury.)

23  **BY MR. LEACH:**

24  **Q.**    What is this document, Mr. Scott?

25  **A.**    This is an email from me to Dave Truitt on the last day of

**PROCEEDINGS**

1    the quarter with reseller POs for Discover Tech and MicroTech.

2    **Q.**    Why were you sending draft MicroTech orders to Dave

3    Truitt?

4    **A.**    Dave was my primary point of contact for anything

5    MicroLink, MicroTech, Discover Tech.

6    **Q.**    Please look at what has been marked as Exhibit 1900.

7            **THE COURT:**  Admitted.

8        (Trial Exhibit 1900 received in evidence)

9                (Exhibit published to jury.)

10   **BY MR. LEACH:**

11   **Q.**    Mr. Scott, at the end of June, 2011, did Autonomy purchase

12   software from Dave Truitt's company, Discover Technologies?

13   **A.**    Yes.

14   **Q.**    And were you involved in drafting some of the contracts

15   relating -- or reviewing some of the contracts relating to

16   that?

17   **A.**    I believe so, yes.

18   **Q.**    And what is reflected in this email?

19   **A.**    What's reflected in this email is that we paid Discover

20   Tech $4.4 million for the software that was licensed.

21   **Q.**    Okay.  I now offer Exhibit 1919.

22           **THE COURT:**  Admitted.

23       (Trial Exhibit 1919 received in evidence)

24               (Exhibit published to jury.)

25   \\\

PROCEEDINGS

BY MR. LEACH:

**Q.**   And if we could please draw your attention to the bottom portion of this email, Mr. Scott.  There's an email from you to Steve Chamberlain and Andy Kanter with a copy to Mr. Egan with "Discover Technologies/Autonomy, importance high."  Do you see that?

**A.**   I do.

**Q.**   You wrote, "Steve, Dave's approval to the final draft attached, along with wiring instructions."  Is that a reference to the agreement to purchase Discover Tech software?

**A.**   Correct.

**Q.**   You then wrote, "Can you please secure MRL and SH approvals for payment today."  Is that Dr. Lynch and Sushovan Hussain?

**A.**   It is.

**Q.**   If we can please go to page 2.

     You wrote, "We need this done ASAP so we can get the software from Discover Technology ASAP and delivered to our customers today."

     Do you see that?

**A.**   I do.

**Q.**   Why did you write that?

**A.**   Because this was -- this was what I was laser focused on, was I knew that in order to recognize revenue by the end of the quarter, we would have to not only have a deal done, but ensure

1    that we've shipped all of the software that the customer

2    licensed from us.

3         And in a case like this where the intention was to

4    re-license the Discover Tech software to our customers in this

5    quarter, what I was indicating here was we really need to get

6    this software; otherwise, if we put it in deals and we don't

7    ship it, we're not going to be able to take any revenue.

8         So that's what I meant by that.

9    Q.   You say "delivered to our customers."  Was this software

10   needed to close transactions with your customers?

11   A.   It was only needed if it was listed in the license

12   agreement, but -- so for those agreements where we listed it,

13   it was needed in order to recognize the revenue.

14   Q.   But was the software needed to close the transactions in

15   the first place?

16   A.   The customers did not ask for the software, so, no.

17   Q.   Why do you say that?

18   A.   Because I'm not aware of us, you know, making a big push

19   or marketing Discover Tech software.  Maybe the -- I'm not

20   aware of the customers specifically asking for the software.

21   Q.   Is this another example where the software was inserted

22   gratuitously into a software license agreement?

23   A.   Yes.

24        MR. LEACH:  Your Honor, this might be a convenient

25   stopping point.

1    **THE COURT:**  Okay.  Ladies and gentlemen, we will take

2  our recess, actually for the week because we're not meeting

3  tomorrow, but we are meeting on Monday.

4    Remember the admonition given to you:  Don't discuss the

5  case, allow anyone to discuss it with you, form or express any

6  opinion.

7    Now, for scheduling purposes, we go Monday and Tuesday of

8  next week.  That's it.

9    The following week, we go Monday -- I guess we go the

10  whole week -- no.  We don't go Friday.

11    **MR. LEACH:**  Monday, Tuesday next week and then Monday

12  through Thursday the following week with a --

13    **THE COURT:**  Now, Tuesday, which is April 3rd, there is

14  a possibility that we will only go a half a day in the morning.

15  That will depend on the weather.  I'm not going to say anything

16  further, but that will depend on the weather.  Okay.

17    So remember the admonition.  I will see you on Monday.

18    (Proceedings were heard out of presence of the jury:)

19    **THE COURT:**  Anything?

20    **MR. FRENTZEN:**  Your Honor, if I could --

21    **THE COURT:**  Well, the witness should go out.

22    **MR. FRENTZEN:**  It's not about -- well --

23    **THE COURT:**  Go ahead.

24    **MR. FRENTZEN:**  Mostly scheduling.  I just want to

25  remind the Court that we do have a witness flying in from the

1   UK who we'd like to get on and off on Monday, if possible, and

2   we were wondering -- that was the one we talked about possibly

3   taking out of order on Monday.

4            THE COURT:  Why don't you put that witness on first on

5   Monday then.

6            MR. FRENTZEN:  With the --

7            THE COURT:  We will let this witness step down.  We

8   will do the UK witness, and then when the UK witness is

9   finished, we will put this witness back on.

10            MR. FRENTZEN:  With the Court and counsel's

11   permission, I just wanted to make sure we were clear on that.

12            THE COURT:  Any problem with that?

13            MR. KEKER:  That's fine.  But it would be better, I

14   think, to finish the direct.  Then we can postpone the cross --

15            THE COURT:  How much more direct do you have?

16            MR. LEACH:  One more transaction and a meeting, so I

17   estimate half an hour.  I think it would -- I mean, Mr. Scott

18   is here for half an hour and then has to go back, but --

19            MR. KEKER:  Well --

20            THE COURT:  How long is the UK witness going to take?

21            MR. FRENTZEN:  Interesting question, Your Honor.  I

22   haven't thought it through all the way.  He's not going to

23   be -- he's not going to take this long.  I'm thinking maybe a

24   little over an hour on -- the reason why I'm pausing is because

25   there are some recordings and transcripts that I'm going to

**PROCEEDINGS**

1   play with that witness and that can take a little longer than,

2   you know, not, but otherwise, I think maybe --

3          THE COURT:  I'm just trying to figure out -- it seems

4   to me not unreasonable for Mr. Keker to request that we finish

5   the direct of a witness, if we can, without any serious

6   problems.  So let's do it that way and then.

7          MR. KEKER:  Mr. Scott is --

8          THE COURT:  Mr. Scott will go upstairs or downstairs,

9   wherever people go.

10         MR. LEACH:  That's fine, Your Honor.

11         MR. FRENTZEN:  Thank you, Your Honor.  Appreciate

12  that.

13         THE COURT:  Okay.

14         MR. FRENTZEN:  Have a good weekend.

15         THE COURT:  Thank you.

16             (Proceedings adjourned at 3:59 p.m.)

17                      ---oOo---

1

2

3                   <u>**CERTIFICATE OF REPORTERS**</u>

4           I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Thursday, March 22, 2018

8

9

10

11    _____

12         Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                   U.S. Court Reporter

13

14

15    _____

16         Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                   U.S. Court Reporter

17

18

19

20

21

22

23

24

25