**Volume 15**

**Pages 2705 - 2970**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
  VS.                          )      **NO. CR 16-00462 CRB**
                               )
SUSHOVAN TAREQUE HUSSAIN,      )
                               )
            Defendant.         )
_____)
                          San Francisco, California
                          Monday, March 26, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

                    ALEX G. TSE
                    Acting United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
            BY:  **ROBERT S. LEACH**
                 **ADAM A. REEVES**
                 **WILLIAM FRENTZEN**
                 **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:

                    KEKER & VAN NEST
                    633 Battery Street
                    San Francisco  CA  94111
            BY:  **JOHN W. KEKER**
                 **JAN NIELSEN LITTLE**
                 **BROOK DOOLEY**
                 **KATE LAZARUS**
                 **NIC MARAIS**
                 **ATTORNEYS AT LAW**


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Pamela Batalo, CSR No. 3593, FCRR
              Official Reporters

## **I N D E X**

Monday, March 26, 2018 - Volume 15

**GOVERNMENT'S WITNESSES**                                  **PAGE**  **VOL.**

**SCOTT, JOEL (RECALLED)**
(PREVIOUSLY SWORN)                                          2712    15
Direct Examination resumed by Mr. Leach                     2713    15
Cross-Examination by Mr. Keker                              2745    15
Redirect Examination by Mr. Leach                           2873    15
Recross-Examination by Mr. Keker                            2894    15
Further Redirect Examination by Mr. Leach                   2896    15
Further Recross-Examination by Mr. Keker                    2897    15

**ANDERSON, ANTONIA**
(SWORN)                                                     2900    15
Direct Examination by Mr. Leach                             2900    15

## **E X H I B I T S**

**TRIAL EXHIBITS**                                 **IDEN**  **EVID**  **VOL.**

 37                                                         2929    15

 51                                                         2920    15

 158                                                        2941    15

 159                                                        2945    15

 271                                                        2951    15

 311                                                        2823    15

 373                                                        2798    15

 531                                                        2963    15

 553                                                        2961    15

 574                                                        2966    15

 766                                                        2868    15

 795                                                        2861    15

 796                                                        2861    15

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 812 | | 2861 | 15 |
| 979 | | 2885 | 15 |
| 1049 | | 2739 | 15 |
| 1443 | | 2851 | 15 |
| 1696 | | 2862 | 15 |
| 1921 | | 2717 | 15 |
| 1923 | | 2714 | 15 |
| 2188 | | 2737 | 15 |
| 2213 | | 2719 | 15 |
| 2224 | | 2721 | 15 |
| 2233 | | 2723 | 15 |
| 2234 | | 2724 | 15 |
| 2244 | | 2724 | 15 |
| 2274 | | 2728 | 15 |
| 2275 | | 2729 | 15 |
| 2276 | | 2718 | 15 |
| 2298 | | 2731 | 15 |
| 2299 | | 2730 | 15 |
| 2356 | | 2736 | 15 |
| 2362 | | 2736 | 15 |
| 2380 | | 2742 | 15 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2402 | | 2738 | 15 |
| 2582 | | 2948 | 15 |
| 2960 | | 2889 | 15 |
| 2964 | | 2893 | 15 |
| 2978 | | 2890 | 15 |
| 2980 | | 2890 | 15 |
| 2981 | | 2892 | 15 |
| 5349 | | 2821 | 15 |
| 5354 | | 2822 | 15 |
| 5630 | | 2867 | 15 |
| 5788 | | 2955 | 15 |
| 6030 | | 2867 | 15 |
| 6119 | | 2834 | 15 |
| 6154 | | 2871 | 15 |
| 6157 | | 2871 | 15 |
| 6191 | | 2842 | 15 |
| 6192 | | 2872 | 15 |
| 6222 | | 2769 | 15 |
| 6226 | | 2747 | 15 |
| 6229 | | 2746 | 15 |
| 6231 | 2745 | | 15 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 6242 | | 2792 | 15 |
| 6245 | | 2766 | 15 |
| 6246 | | 2788 | 15 |
| 6247 | | 2770 | 15 |
| 6252 | | 2779 | 15 |
| 6253 | | 2779 | 15 |
| 6254 | | 2779 | 15 |
| 6255 | | 2779 | 15 |
| 6259 | | 2856 | 15 |
| 6261 | | 2795 | 15 |
| 6265 | | 2747 | 15 |
| 6280 | | 2764 | 15 |
| 6282 | | 2800 | 15 |
| 6283 | | 2883 | 15 |
| 6290 | | 2841 | 15 |
| 6291 | | 2837 | 15 |
| 6292 | | 2847 | 15 |
| 6294 | | 2852 | 15 |
| 6298 | | 2870 | 15 |
| 6336 | | 2789 | 15 |
| 6340 | | 2787 | 15 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 6348 | | 2835 | 15 |
| 6349 | | 2817 | 15 |
| 6350 | | 2802 | 15 |
| 6351 | | 2782 | 15 |
| 6352 | | 2782 | 15 |
| 6353 | | 2789 | 15 |
| 6357 | | 2841 | 15 |

1    __Monday - March 26, 2018__                              __9:00 a.m.__

2                         P R O C E E D I N G S

3                            ---oOo---

4    (Proceedings were heard in the presence of the jury:)

5          THE COURT:  Please be seated.

6    Let the record reflect all jurors are present.

7    Good morning, ladies and gentlemen of the jury.  Thank you

8    again for being so prompt.

9    I met with the counsel for the parties on Friday in an

10   effort to see how this is moving.  We've had a lot of testimony

11   to date.  The parties have been extremely cooperative in

12   bringing witnesses, getting them on and off, but still there

13   are a lot of witnesses; and the witnesses are, you know,

14   testifying to what they know, what their involvement was, and

15   so forth, and trying to explain to you from the points of view

16   of the parties what the evidence is and that does take some

17   time.

18         However, I am concerned that it is taking too much time.

19   Not the parties' fault, but the fact of the matter is that I

20   promised you certain dates and I want to terminate or to

21   complete your deliberations or at least initiate them, and I

22   wanted to make sure that we try to keep as close as we can to

23   those dates.

24         So what we have agreed to do is to ask for a further

25   sacrifice from you, which is not this Friday because we're

1     closed this Friday, but the following Fridays to meet, even

2     though the week may be just a couple of days of meetings in the

3     week, but we want to bring back the Fridays and use them for

4     testimony.  I know that's an inconvenience to some of you, but

5     it will move the case much faster towards a conclusion.

6          The other thing we're doing is we have several witnesses

7     in the next two days -- because, you know, we're meeting today

8     and tomorrow, but that's all we're meeting this week -- from

9     the United Kingdom, and we've agreed to go to 4:30 on Monday

10    and Tuesday, today and tomorrow, in an effort to complete their

11    testimony.

12         So with that, I want to thank you.  We're going to, I

13    think, proceed to conclude the direct examination, then put on

14    the other witnesses; is that right?

15              **MR. KEKER:**  And cross.

16              **THE COURT:**  Or are we doing cross?

17              **MR. KEKER:**  Yeah.

18              **THE COURT:**  We are doing cross.

19              **MR. LEACH:**  That's right, Your Honor.

20              **THE COURT:**  Okay.  All right.  Go ahead, Mr. Leach.

21              **MR. LEACH:**  Thank you, Your Honor.

22                              **JOEL SCOTT**,

23    called as a witness for the Government, having been previously

24    duly sworn, testified further as follows:

25    \\\

1    **DIRECT EXAMINATION**   (resumed)

2    **BY MR. LEACH:**

3    **Q.**   Good morning, Mr. Scott.

4         Good morning, ladies and gentlemen of the jury.

5         Mr. Scott, I have just a few more topics for you.  The

6    first one relates to your compensation.

7         In 2009, 2010, and 2011, how were you compensated at

8    Autonomy?

9    **A.**   Through my salary, bonus, and stock options.

10   **Q.**   And what factors went into your bonus?

11   **A.**   I don't know.

12   **Q.**   Was your compensation in any way dependent on you meeting

13   particular sales calls?

14   **A.**   No.

15   **Q.**   Why do you say that?

16   **A.**   Because I didn't have any metrics given to me in terms of

17   numbers that I had to achieve or any sales that I had to

18   complete.  I didn't even have a quota.

19   **Q.**   So, for example, if Autonomy sold software to a reseller

20   as opposed to an end user, would that in any way financially

21   benefit you?

22   **A.**   No.

23   **Q.**   When we broke last time, Mr. Scott, we were in the second

24   quarter of 2011, a few months -- a month or two before the HP

25   acquisition.  Do you have that time period in mind?

SCOTT - DIRECT / LEACH

1    **A.**    I do.

2    **Q.**    And would you please look at what has been marked as

3    Exhibit 912 -- or, excuse me, 1912.  It should be in front of

4    you.

5    **A.**    I see 1923...  (Witness examines document.)

6    **Q.**    Excuse me.  1923.

7    **A.**    Okay.  I got that one.

8    **Q.**    Is this a true and correct copy of an e-mail you received

9    from Steve Truitt of MicroTech on or about June 30th, 2011?

10   **A.**    I think we're -- I'm looking at a different exhibit.  1923

11   is an e-mail with Stouffer Egan and myself.

12   **Q.**    And does this relate to the MicroTech acquisition -- or a

13   possible transaction with MicroTech?

14   **A.**    Yes.

15            **MR. LEACH:**  Your Honor, I offer Exhibit 1923.

16            **THE COURT:**  Admitted.

17       (Trial Exhibit 1923 received in evidence)

18   **BY MR. LEACH:**

19   **Q.**    Let me draw your attention, Mr. Scott, to the bottom

20   portion of this e-mail, the one from you to Mr. Egan.  Do you

21   see that?

22   **A.**    I do.

23   **Q.**    And the subject is "HP"?

24   **A.**    Yes.

25   **Q.**    What is being described here?

SCOTT - DIRECT / LEACH

1   **A.**   I am outlining the terms that I believe are intended to

2   apply to a MicroTech purchase order with HP as the end user.

3   **Q.**   And I draw your attention to the fourth bullet where you

4   say (reading):

5           "I have a call in to SH re payment terms."

6       Do you see that?

7   **A.**   I do.

8   **Q.**   Is the "SH" Sushovan Hussain?

9   **A.**   It is.

10  **Q.**   Okay.  And if we could please scroll further to the top.

11  A little bit more.

12      Do you see where you wrote, "I cannot get through to

13  Sushovan"?

14  **A.**   I do.

15  **Q.**   Where were you trying to get through to Sushovan?

16  **A.**   To know what payment terms to include in the purchase

17  order.

18  **Q.**   Why did you need that from him?

19  **A.**   All payment terms came from our Finance Department, and I

20  needed to get the info from the Finance Department.

21  **Q.**   Now would you please look at what is in -- or if we could

22  please display what is in evidence as Exhibit 1912.

23      Do you recognize this document, Mr. Scott?

24  **A.**   I do.

25  **Q.**   What is it?

SCOTT - DIRECT / LEACH

**A.**   This is an e-mail from Steve Truitt sending me the

executed MicroTech PO for HP.

**Q.**   Can we please look at page 2?

What is the amount of the order?

**A.**   $7 million.

**Q.**   And if we could look at paragraph 9, the payment terms.

Are those the payment terms you got from Mr. Hussain?

**A.**   They are.

**Q.**   I draw your attention to the bottom paragraph in the

fourth line -- third line towards the right where it says

(reading):

"End user and VAR currently anticipate entering into

such a license transaction."

Do you see that?

**A.**   I do.

**Q.**   And is that language similar from orders you had

prepared -- or you and the legal team had prepared for

MicroTech and Discover Tech beginning at the end of 2010?

**A.**   Yes.

**Q.**   Okay.  And to your knowledge, on June 30th, 2011, was that

statement true, that "End user and VAR currently anticipate

entering into such a license transaction"?

**A.**   No.

**Q.**   Let me move forward in time briefly, Mr. Scott, to after

the close of the second quarter of 2011, and I ask that you

1  please look at what has been marked for identification purposes

2  as Exhibit 1921.

3  **A.**   (Witness examines document.)

4  **Q.**   Do you recognize this agreement?

5  **A.**   I do.

6  **Q.**   Is this a transaction between Autonomy and a company known

7  as Bank of Montreal?

8  **A.**   (Witness examines document.)   It is.

9         **THE COURT:**   Admitted.

10     (Trial Exhibit 1921 received in evidence)

11  **BY MR. LEACH:**

12  **Q.**   I draw your attention to the top portion of the document,

13  Mr. Scott.  Do you see the fax header June 30th, 2011?

14  **A.**   I do.

15  **Q.**   And this is a contract between Autonomy and Bank of

16  Montreal relating to certain Autonomy software?

17  **A.**   Correct.

18  **Q.**   Now, was there a transaction with MicroTech in a prior

19  quarter where MicroTech was going to sell software to Bank of

20  Montreal?

21  **A.**   To the best of my recollection, yes.

22  **Q.**   Okay.  Would you please now look at what has been marked

23  as 2276?

24  **A.**   (Witness examines document.)

25  **Q.**   Is this a true and correct copy of an e-mail between you

SCOTT - DIRECT / LEACH

1    and Steve Truitt in August 2011 relating to the MicroTech

2    transaction with Bank of Montreal as the end user?

3    **A.**   It is.

4             **THE COURT:**   Admitted.

5        (Trial Exhibit 2276 received in evidence)

6    **BY MR. LEACH:**

7    **Q.**   Let me draw your attention, Mr. Scott, to the second page

8    of the e-mail, the first thread in the chain from Steve Truitt

9    where he wrote (reading):

10           "Just got these three credit memos from Chris Chu for

11       Bank of Montreal invoices."

12       What is the backstory on those?  What did you understand

13   Mr. Truitt to be asking of you?

14   **A.**   For clarification on why he had received these credit

15   memos.

16   **Q.**   What is a credit memo?

17   **A.**   To the -- my best understanding is that it is a document

18   that would credit back fees paid for a particular order.

19   **Q.**   Essentially a refund for what MicroTech had agreed to pay?

20   **A.**   Correct.

21   **Q.**   Okay.  And please look back at page 1, the e-mail from

22   Mr. Chamberlain roughly in the middle of the page.  Do you see

23   where he wrote (reading):

24           "We had to bill direct as the BMO deal closed

25       directly.  Deal credited from MT's books."

1            Do you see that?

2    **A.**    I do.

3    **Q.**    What did you understand that to mean?

4    **A.**    That Autonomy had booked the deal itself and as revenue

5    directly with Bank of Montreal and so was crediting back

6    revenue that it had previously taken through MicroTech for the

7    Bank of Montreal as an end user.

8    **Q.**    And did you get any information from Mr. Chamberlain about

9    why Autonomy was doing this?

10   **A.**    No.

11   **Q.**    Let me switch topics briefly, Mr. Scott, to another

12   transaction in August of 2011.  And if you could please look at

13   what has been marked as Exhibit 2213.

14   **A.**    (Witness examines document.)

15   **Q.**    Is this a true and correct copy of an e-mail exchange

16   between you, Steve Truitt, Dave Truitt, and Tony Jimenez on

17   August 10th, 2011?

18   **A.**    It is.

19            **MR. LEACH:**  Your Honor, I offer Exhibit 2213.

20            **THE COURT:**  Admitted.

21       (Trial Exhibit 2213 received in evidence)

22   **BY MR. LEACH:**

23   **Q.**    I draw your attention, Mr. Scott, to the bottom portion of

24   this e-mail.  Do you see where Steve Truitt is e-mailing you

25   with something called "Revised" -- and I think he meant --

SCOTT - DIRECT / LEACH

1    "Autonomy/FISMA Hosting Proposal"?

2    **A.**   I do.

3    **Q.**   What is FISMA?

4    **A.**   I don't know.

5    **Q.**   What is -- and is there an attachment to this?

6    **A.**   Yes.

7    **Q.**   As a general matter, what was Mr. Truitt e-mailing to you

8    on or about August 10th, 2011?

9    **A.**   A proposal for MicroLink to license to Autonomy a

10   FISMA-compliant hosted solution.

11   **Q.**   Is this the first time you had heard of this?

12   **A.**   Yes.

13   **Q.**   Would you please look at page 7?

14   **A.**   (Witness examines document.)

15   **Q.**   And if we could go further down to the bottom, please.

16   Actually, page 8.   Perfect.   There you go.

17        I draw your attention under the third paragraph under

18   "Proposed Business Arrangement."   Do you see that?

19   **A.**   I do.

20   **Q.**   And do you see the reference to the one-time fixed payment

21   of 8.2M?

22   **A.**   (Witness examines document.)   I do.

23   **Q.**   Is that your understanding of the amount of money

24   MicroTech was proposing Autonomy pay for this FISMA hosting

25   proposal?

1   A.   Yes.

2   Q.   Prior to this time, had you done anything to negotiate an

3   $8.2 million figure?

4   A.   No.

5   Q.   Please look at what has been marked as Exhibit 2224.

6   A.   (Witness examines document.)

7   Q.   Is this a true and correct copy of an e-mail you received

8   from Sushovan Hussain on August 10th, 2011, relating to the

9   same proposal?

10  A.   Yes.

11          MR. LEACH:   Your Honor, I offer Exhibit 2224.

12          THE COURT:   Admitted.

13       (Trial Exhibit 2224 received in evidence)

14  BY MR. LEACH:

15  Q.   Mr. Scott, I draw your attention to the "From" line.  Do

16  you see Mr. Hussain's name there?

17  A.   I do.

18  Q.   And the recipients here are you, Stouffer Egan,

19  Mr. Menell, and Andy Kanter?

20  A.   Correct.

21  Q.   Those are the folks you perceived as the core team within

22  Autonomy?

23  A.   Correct.

24  Q.   Okay.  And Mr. Hussain is writing (reading):

25          "Gents - We have negotiated what I believe to be a

1          good deal with our partner at 8.2M for five years."

2          Do you see that?

3     A.   I do.

4     Q.   And is that the same amount we observed in the proposal

5     you received earlier that day?

6     A.   It is.

7     Q.   Okay.  Do you have any idea how that $8.2 million number

8     was arrived at?

9     A.   No.

10    Q.   Further down Mr. Hussain writes (reading):

11              "Joel - Please confirm FISMA certification."

12         What is FISMA there?

13    A.   Again, I don't know.

14    Q.   Okay.  What did you do to confirm FISMA certification?

15    A.   Very little.  I -- the only -- because I didn't know what

16    FISMA was and I didn't have loads of time to go research it,

17    the only thing that I did and I shared was that I looked at the

18    proposal.  The proposal indicated that the solution was FISMA

19    compliant, and that's what I shared back with our team.

20    Q.   So the date here is August 10th, 2011.  Does Autonomy

21    ultimately sign up to this proposal?

22    A.   Yes.

23    Q.   Would you please look at what has been marked as

24    Exhibit 2233?

25    A.   (Witness examines document.)

1          **THE COURT:**  Admitted.  It's already in; right?

2          **MR. LEACH:**  I don't believe it's in; but if not, I

3   offer it, Your Honor.

4          **THE COURT:**  It's in.

5      (Trial Exhibit 2233 received in evidence)

6          **MR. LEACH:**  Okay.  Thank you.

7   **Q.**   There's no body to this e-mail, Mr. Scott, but the subject

8   line says "FT Sorted?  And MT?"  Do you see that?

9   **A.**   I do.

10  **Q.**   Is "FT" an abbreviation for FileTek?

11  **A.**   It is.

12  **Q.**   And is "MT" an abbreviation for MicroTech?

13  **A.**   It is.

14  **Q.**   What did you understand Mr. Hussain to be asking of you

15  here?

16  **A.**   Whether each of these deals have been done, finalized and

17  signed.

18  **Q.**   Please look at 2244.

19      And "these deals" meaning sale of software -- a purchase

20  of software from FileTek and the FISMA proposal from MicroTech;

21  is that right?

22  **A.**   With respect to MicroTech, yes.  With respect to FileTek,

23  I don't recall specifically.

24  **Q.**   Please look at 2244.

25          **MR. LEACH:**  And I offer it, Your Honor.

 1            **THE COURT:**  Admitted.

 2       (Trial Exhibit 2244 received in evidence)

 3   **BY MR. LEACH:**

 4   **Q.**   What is the date here, Mr. Scott?

 5   **A.**   August 14, 2011.

 6   **Q.**   Two days after the e-mail we just saw?

 7   **A.**   Correct.

 8   **Q.**   Okay.  And Mr. Hussain is writing with the "Subject:

 9   MicroTech" (reading):

10            "Expecting Joel to finalize paperwork today.  Please

11       make sure paid ASAP."

12       Do you see that?

13   **A.**   I do.

14   **Q.**   What did you understand Mr. Hussain to be saying here?

15   **A.**   I understood him to be directing Steve to pay MicroTech as

16   soon as the contract was signed with them.

17   **Q.**   Pay MicroTech the $8.2 million?

18   **A.**   Correct.

19   **Q.**   Please look at 2234.  Is this the legal document by which

20   Autonomy signed up for the FISMA hosting proposal?

21   **A.**   (Witness examines document.)  It is.

22            **THE COURT:**  Admitted.

23       (Trial Exhibit 2234 received in evidence)

24   **BY MR. LEACH:**

25   **Q.**   The title up at the top is "Independent Contractor

SCOTT - DIRECT / LEACH

1   Agreement."  Do you see that, Mr. Scott?

2   **A.**   I do.

3   **Q.**   And is this something you had a hand in drafting?

4   **A.**   I did.

5   **Q.**   Okay.  Please look at page 2.

6   **A.**   (Witness examines document.)

7   **Q.**   And I draw your attention to the signature lines.  Is that

8   your signature?

9   **A.**   It is.

10  **Q.**   And is that Mr. Steve Truitt's signature?

11  **A.**   It is.

12  **Q.**   Okay.  Let me draw your attention to paragraph 10,

13  "Assignment."

14       And if we could please blow up that language or highlight

15  it.  Wonderful.  Thank you, Ms. Margen.

16       This says (reading):

17            "Neither party may transfer or assign to any

18       affiliate, subsidiary, successor in interest, or any other

19       assignee, by operation of law or otherwise, any of its

20       rights or obligations without the written consent of both

21       parties."

22       Do you recall some dialogue about this contract or

23  provision in the contract, Mr. Scott?

24  **A.**   I do.

25  **Q.**   Tell us about that.

SCOTT - DIRECT / LEACH

**A.**   At the time that I was asked to prepare this agreement, there were two changes that MicroTech said it wanted made to our template consultant agreement, which this is.  One of them had to do with ownership of intellectual property and the other one had to do with assignment.  And our standard agreement says that the service provider, whoever it is that's providing Autonomy services, cannot assign the agreement without Autonomy's consent.

In this case MicroTech told me that they wanted the assignment to be mutual, meaning Autonomy can't assign it without MicroTech's consent, which I had a major issue with. Actually, I had a major issue with both points.

So I spoke to Andy Kanter to ask for his direction, and he told me to agree to both of those changes, and so I amended the language to reflect both of the changes that MicroTech had asked for.

**Q.**   Why did you have major issues with both of those changes?

**A.**   Because in this case there was an upfront payment fee and Autonomy would be without the benefit of the solution in the event that Autonomy ever got acquired or looked to assign this license that it just paid $8.2 million for.

**Q.**   At this point in time, August 15th, 2011, were you aware that Autonomy was -- or that HP was contemplating acquiring Autonomy?

**A.**   No.

SCOTT - DIRECT / LEACH

1  Q.   And at some point after the -- and how did you learn about

2  the HP acquisition of Autonomy?

3  A.   I learned about it when it was publicly announced.

4  Q.   At some point after the public announcements, did you

5  reflect on this assignment clause and what it might mean?

6  A.   No.

7  Q.   At any point did you develop concerns with respect to this

8  assignment clause vis-a-vis MicroTech and the HP acquisition?

9  A.   The only time that I had the concerns was at the front end

10 when they were asked of me, and then I don't think I thought

11 about it again.

12 Q.   And the concern was what?

13 A.   That we would be signing up to an agreement and severely

14 limiting our -- severely limiting ourselves in the event that

15 we were to get acquired because we would not be able to get the

16 benefit of this -- of this agreement.

17 Q.   Which is what happened three days later?

18 A.   Correct.

19 Q.   Okay.  To your knowledge, at any point in time did

20 MicroTech deliver this federal cloud hosting?

21 A.   I'm not aware.

22 Q.   Would you please look at what has been marked as 2274?

23 A.   (Witness examines document.)

24 Q.   Is this an e-mail exchange between you and Dave Truitt

25 relating to payment on the MicroTech/HP reseller deal we

1  started the morning with?

2  **A.**   It is.

3         **THE COURT:**  Admitted.

4     (Trial Exhibit 2274 received in evidence)

5  **BY MR. LEACH:**

6  **Q.**   Let me draw your attention to the bottom portion of this

7  e-mail, Mr. Scott.  Do you see where you wrote, "Can you please

8  make sure we get paid on USPS by tomorrow?"

9      Now, the date -- this is after Autonomy has signed up for

10  the FISMA cloud proposal?

11  **A.**   Correct.

12  **Q.**   And what did you mean by "please make sure we get paid on

13  USPS by tomorrow?"

14  **A.**   I meant that please make sure that MicroTech issues us --

15  issues Autonomy payment for the USPS order that it had

16  submitted.

17  **Q.**   That's the $7.35 million order we looked at earlier today?

18  **A.**   Correct.

19  **Q.**   Going up, Mr. Truitt writes (reading):

20         "Hey, if we got wire, can you turn around cash

21      tomorrow for HP/U.S. Postal tomorrow?"

22      Do you see that?

23  **A.**   Yes.

24  **Q.**   What did you understand that to mean?

25  **A.**   I understood Dave to be asking Steve Truitt to issue

SCOTT - DIRECT / LEACH

1    payment.

2    **Q.**   What did you understand "if we got wire" to mean?

3    **A.**   I don't know what I understood.  What I do understand

4    sitting here is if we have been paid --

5              **MR. KEKER:**  Excuse me.  I'll object, Your Honor.  He's

6    talking about something that he's --

7              **THE COURT:**  I think you can testify as to what this

8    means to you.

9              **MR. LEACH:**  And he gets the e-mail at the top, so this

10   is what he got.

11             **THE COURT:**  What does it mean?

12             **THE WITNESS:**  What it means to me is:  If Autonomy has

13   paid MicroTech the $8.2 million for the FISMA proposal, can you

14   please pay Autonomy for the purchase order?

15   **BY MR. LEACH:**

16   **Q.**   Thank you.

17        Can you please look at what is marked as Exhibit 2275?  Is

18   this another e-mail exchange between you and Mr. Truitt at or

19   around this time, Mr. Dave Truitt?

20   **A.**   (Witness examines document.)  Oh, yes.

21             **THE COURT:**  Admitted.

22        (Trial Exhibit 2275 received in evidence)

23   **BY MR. LEACH:**

24   **Q.**   If we could please look at the middle of the page, the

25   e-mail at 1:03 p.m., where you write (reading):

1              "Sorry, Steve.  Change of plans."

2       Do you see that, Mr. Scott?

3  **A.**   I do.

4  **Q.**   Roughly halfway through the second line you write

5  (reading):

6              "Can we get wire today of the 700K and payment of the

7       USPS order?  Getting lots of pressure."

8       Do you see that?

9  **A.**   I do.

10 **Q.**   And what was meant by "payment of the USPS order"?

11 **A.**   The order that we've been talking about, the HP order of a

12 large sum, 7.3 million.

13 **Q.**   And you wrote, "Getting lots of pressure."  What did you

14 mean by that.

15 **A.**   I meant that Sushovan was saying, "I want to get paid and

16 where's the money?  Make sure that we get paid."

17 **Q.**   Please look at 2299.  Is this another e-mail among you,

18 Steve Truitt, and Dave Truitt on this topic?

19 **A.**   (Witness examines document.)  Yes, it is.

20              **THE COURT:**  Admitted.

21      (Trial Exhibit 2299 received in evidence)

22 **BY MR. LEACH:**

23 **Q.**   What is reflected here, Mr. Scott?

24 **A.**   Steve Truitt is sharing information with me to show that

25 MicroTech has initiated a wire and that it won't arrive until

SCOTT - DIRECT / LEACH

```
 1  several days later.
 2  Q.   Okay.  And the wire is in what amount?
 3  A.   7.35 million.
 4  Q.   And that's for the order that was placed at the end of the
 5  second quarter of 2011?
 6  A.   Correct.
 7  Q.   Okay.  The last one in this chain, please look at what has
 8  been marked as Exhibit 2298.
 9  A.   (Witness examines document.)
10  Q.   Is this an e-mail you received from Sushovan Hussain on
11  August 18th, 2011?
12  A.   It is.
13          THE COURT:  Admitted.
14      (Trial Exhibit 2298 received in evidence)
15  BY MR. LEACH:
16  Q.   That date, Mr. Scott, August 18th, 2011, is that
17  consistent with your memory of the date when HP announced an
18  offer to acquire Autonomy?
19  A.   The 17th or 18th of August is what's in my memory.
20  Q.   Okay.  Would you please look at the bottom portion of this
21  e-mail from Mr. Chamberlain?  He's writing with the subject
22  "Capax, MT, and FileTek."  Do you see that?
23  A.   I do.
24  Q.   "MT" is MicroTech?
25  A.   Correct.
```

SCOTT - DIRECT / LEACH

1   Q.   And he wrote (reading):

2            "No cash received today.  Still expecting MT circa

3        8M."

4        Is that 8 million?

5   A.   Yes.

6   Q.   What did you understand that to mean?

7   A.   That we were expecting MicroTech to pay us $8 million.

8   Q.   On what account?  On account of what?

9   A.   Oh, I don't recall.  I assumed USPS.

10  Q.   Above someone named Helen Ku writes (reading):

11           "FileTek of 6M and MT of 7.35M for HP deal are both

12       in today."

13       Do you see that?

14  A.   I do.

15  Q.   Who is Helen Ku?

16  A.   Helen Ku worked in the U.S. Finance Department for

17  Autonomy.

18  Q.   And the 7.35M for HP deal, what did you understand that to

19  be a reference to?

20  A.   The same PO that we've been talking about, the HP/USPS

21  purchase order.

22  Q.   What is Mr. Hussain's response at the top?

23  A.   "Well done.  Capax?"

24  Q.   Sometime around August 18th, 2011, Mr. Scott, did you have

25  occasion to meet with Mr. Hussain in San Francisco about some

SCOTT - DIRECT / LEACH

1  of the resellers?

2  **A.**   I did.

3  **Q.**   Where did you meet him?

4  **A.**   In our offices in San Francisco.

5  **Q.**   Take a moment for us and describe what happened.

6  **A.**   The HP acquisition had just been announced that day or the

7  day before, very close in time.  Sushovan was in the

8  San Francisco office.  He asked me what -- he just pulled me

9  into a conference room and I believe also called Steve

10  Chamberlain, and walked through with both of us the outstanding

11  balances that were owed to Autonomy by our various resellers --

12  like Capax, MicroTech, FileTek -- and really tallied up the

13  amounts that were outstanding.

14      And he -- Mr. Hussain said that he wanted to make our

15  resellers whole.  He didn't explain how he would make the

16  resellers whole, but he said that he wanted to make the

17  resellers whole.  And that's the gist of the conversation that

18  I can recall.

19  **Q.**   Did Mr. Hussain explain why he wanted to make the

20  resellers whole?

21  **A.**   He did not.

22  **Q.**   Okay.  At or around this time did you also receive phone

23  calls from some of the resellers -- Capax, MicroTech,

24  Discover Tech?

25  **A.**   I did.

1   **Q.**   And what did they say to you?

2   **A.**   I remember that John Baiocco at Capax was concerned that

3   he had outstanding balances and wanted to know what we were

4   going to do about it.  I recall that Dave Truitt also had

5   similar concerns.

6   **Q.**   What was the concern that was voiced with respect to the

7   outstanding balances?

8   **A.**   The concern was, "Hey, we're on the hook to pay you all

9   this money.  What are we going to do about that?"

10  **Q.**   What did you understand that to mean?

11  **A.**   "We don't want to pay you this money."

12  **Q.**   Was the concern that HP might actually collect on these

13  balances?

14          **MR. KEKER:**  Objection.  Leading, Your Honor.

15          **THE COURT:**  Overruled.

16          **THE WITNESS:**  I believe so.

17          **MR. KEKER:**  Well, Your Honor, I move to strike.  It's

18  pure speculation.

19          **THE COURT:**  Overruled.

20  **BY MR. LEACH:**

21  **Q.**   Did you report any of this to Mr. Hussain?

22  **A.**   Sorry.  Can you ask the question again?

23  **Q.**   Did you report to Mr. Hussain that the resellers were

24  calling you with concerns about what the HP acquisition meant

25  for them?

SCOTT - DIRECT / LEACH

1  **A.**   Yes.

2  **Q.**   What did you say to him?

3  **A.**   I said that they're calling me and they want to know, you

4  know, what we're going to do.  And Sushovan had told me to tell

5  all the resellers that we will be making them whole, and so I

6  shared that message and then I waited for further direction

7  from Sushovan.

8  **Q.**   In your conversation with Mr. Hussain in San Francisco,

9  was there a dialogue about letting any other counterparties off

10 the hook for their debts?

11 **A.**   No.

12 **Q.**   Did Mr. Hussain ever articulate to you "I want to make

13 somebody other than one of these resellers whole" in your

14 words?

15 **A.**   No.

16 **Q.**   Did any of the resellers express to you that they couldn't

17 afford to pay some of the balances that they had on their

18 account?

19 **A.**   I don't recall anybody specifically saying that.  What I

20 recall is them asking essentially "How are we going to deal

21 with these large debts?"

22 **Q.**   What do you mean "How are we going to deal with these

23 large debts?"

24 **A.**   In other words, "Am I going to be responsible for paying

25 you, or are you -- or am I not going to be responsible for

 1  paying you?"  That's generally what I understood.

 2  **Q.**   Would you please look at what has been marked as

 3  Exhibit 2356?

 4  **A.**   (Witness examines document.)

 5  **Q.**   Is this a true and correct copy of an e-mail exchange

 6  between you and Steve Chamberlain on September 1st, 2011,

 7  relating to Capax?

 8  **A.**   It is.

 9           **THE COURT:**  Admitted.

10     (Trial Exhibit 2356 received in evidence)

11  **BY MR. LEACH:**

12  **Q.**   What is this document, Mr. Scott?

13  **A.**   It is an e-mail from me to Steve Chamberlain attaching a

14  couple of letters that we've prepared for Capax that they've

15  signed.

16  **Q.**   Okay.  And is this part of the effort to make Capax whole

17  after the HP acquisition?

18  **A.**   It is.

19  **Q.**   Could you please look at what has been marked as 2362?

20  **A.**   (Witness examines document.)

21           **THE COURT:**  Admitted.

22     (Trial Exhibit 2362 received in evidence)

23  **BY MR. LEACH:**

24  **Q.**   What is this document, Mr. Scott?

25  **A.**   This is an e-mail from Steve Truitt to me including an

1  attached document that cancels an agreement that we've done

2  with MicroTech.

3  **Q.**   And is it canceling two agreements done in March of 2011

4  relating to MicroTech performing back-office support for

5  Bank of America?

6  **A.**   I'm just going to look.

7  **Q.**   Please.

8  **A.**   (Witness examines document.)  It is.

9  **Q.**   Why were these agreements canceled?

10  **A.**   Because Sushovan directed us to.

11  **Q.**   Please look at 2188.

12  **A.**   (Witness examines document.)

13  **Q.**   Is this a true and correct copy of an e-mail to -- from

14  you to Steve Chamberlain relating to the Department of

15  Interior?

16  **A.**   It is.

17        **MR. LEACH:**  I offer 2188, Your Honor.

18        **THE COURT:**  Admitted.

19     (Trial Exhibit 2188 received in evidence)

20  **BY MR. LEACH:**

21  **Q.**   Mr. Scott, up at the heading there's the acronym "DOI."

22  Do you see that?

23  **A.**   I do.

24  **Q.**   And do you recall a reseller transaction relating to DOI?

25  You testified about that earlier in your examination?

SCOTT - DIRECT / LEACH

1    **A.**    I do.

2    **Q.**    Okay.  What happened with Autonomy and the Department of

3    Interior?

4    **A.**    The best of my recollection is that the agreement that was

5    in place with the Department of Interior in 2010 remained in

6    place, that it -- that we never did a restructure, and that we

7    continued to operate under the existing DOI service agreement

8    where they paid us monthly through to this point in time.

9    **Q.**    Did that monthly arrangement generate any license fee

10   revenue for Autonomy?

11   **A.**    No.

12   **Q.**    And is it your understanding that Autonomy ultimately

13   canceled the agreement between MicroTech relating to the

14   Department of Interior?

15   **A.**    Yes.

16   **Q.**    Would you please look at Exhibit 2402?

17   **A.**    (Witness examines document.)

18   **Q.**    Does this appear to be an e-mail relating to the reversal

19   of the deal between MicroTech and Autonomy relating to the

20   Department of Interior?

21   **A.**    It does.

22              **THE COURT:**  Admitted.

23       (Trial Exhibit 2402 received in evidence)

24   **BY MR. LEACH:**

25   **Q.**    I draw your attention to the initial e-mail in the chain,

1   Mr. Scott.  Do you see where it says (reading):

2           "DOI - We need to credit the 4.2M (4 invoices).  Have

3       we not invoiced the DOI directly?"

4       Do you see that?

5   **A.**   I do.

6   **Q.**   And the 4.2M is the amount of the agreement between

7   Autonomy and MicroTech?

8   **A.**   Correct.

9   **Q.**   Please look at what has been marked as Exhibit 1049.  Is

10  this a true and correct copy of an e-mail exchange between you

11  and Mr. Hussain?

12  **A.**   It is.

13          **THE COURT:**  Admitted.

14      (Trial Exhibit 1049 received in evidence)

15  **BY MR. LEACH:**

16  **Q.**   What is the date of this exchange, Mr. Scott?

17  **A.**   August 22nd, 2011.

18  **Q.**   Okay.  Is that roughly the same time period where you met

19  with Mr. Hussain in San Francisco?

20  **A.**   It is.

21  **Q.**   I draw your attention to your initial e-mail.  You wrote

22  (reading):

23          "Abbott have agreed.  Getting things set up with

24      their third-party invoicing agency.  That said, got a call

25      from Dave today and he has concerns this doesn't work for

1          him given there could be an issue post-acquisition (Abbott

2          terminates the contract, you disappear, et cetera,) and he

3          is out of pocket and has nowhere to go."

4          What were you expressing here, Mr. Scott?

5     **A.**   One of the things that Sushovan had asked us to look into

6     was whether or not we could assign an ongoing payment stream

7     from Abbott Labs to MicroTech.  So instead of being paid

8     directly for services rendered by Autonomy, Abbott would pay

9     MicroTech in place of Autonomy.  And Sushovan asked us to see

10    if this was possible.

11         We -- Livius Guiao on the U.S. legal team had discussions

12    with Abbott, and they agreed that we could modify things so

13    that Abbott would start paying MicroTech instead of Autonomy.

14    **Q.**   You mean MicroTech or Discover Tech?

15    **A.**   Discover Tech.  Sorry.

16    **Q.**   And did you report that to Mr. Truitt?

17    **A.**   I did.

18    **Q.**   And what did he say to you?

19    **A.**   Dave Truitt said that he was concerned that this -- that

20    merely receiving the payment stream from Abbott Labs might not

21    make him whole because Abbott Labs could be free to terminate

22    its agreement at any time.  If it did terminate its agreement

23    and if Sushovan weren't around, then there would be nobody

24    there to help him collect the revenue stream that Sushovan had

25    intended to assign to him.

1  Q.   When you say Sushovan wouldn't be around, why wouldn't he

2  be around?

3  A.   If he left -- if he left HP.

4  Q.   And when you write "he is out of pocket and has nowhere to

5  go," what did you mean by that?

6  A.   I meant so this was Dave's message to me, and Dave's

7  concern was that if Sushovan left HP and Dave was still

8  counting on a revenue stream of $2 million to make him whole

9  and that revenue stream stopped, Dave wouldn't have anybody

10 that he could talk with.

11 Q.   Mr. Hussain writes to you (reading):

12        "Tell him he gets comp on the Abbott amount since

13        reseller arrangement is a corporate arrangement."

14       Do you understand what that meant?

15 A.   No.

16 Q.   (reading)

17        "If Abbott terminates all activities, that is his

18        problem and our problem.  Unlikely.  Tell him his comp is

19        transparent to Abbott."

20       What did that mean?

21 A.   I believe it means that if Abbott stops paying for -- if

22 Abbott quits the contract, then it's our loss; and, yeah, it's

23 a problem for Dave as well, and that Abbott knows that we are

24 assigning the payment stream to Discover Tech.

25 Q.   Did Autonomy ultimately assign the payment stream to

SCOTT - DIRECT / LEACH

1   Discover Tech?

2   **A.**   No.

3   **Q.**   Would you please look at what has been marked as 2380?

4   **A.**   (Witness examines document.)

5           **THE COURT:**  Admitted.

6   (Trial Exhibit 2380 received in evidence)

7   **BY MR. LEACH:**

8   **Q.**   What is this document, Mr. Scott?

9   **A.**   This is an e-mail exchange initially between Dave Truitt

10  and myself and then between myself and Steve Chamberlain.

11  **Q.**   And what's the subject?

12  **A.**   "Cancellation of VAR Agreements."

13  **Q.**   And does this relate to the Abbott Labs agreement and

14  another agreement relating to Dell/Hyatt?

15  **A.**   It does.

16  **Q.**   You wrote (reading):

17          "Dave having checked internally and spoken with

18      Stouffer, I think you misunderstood.  However, given that

19      you haven't closed the deals and there is no prospect of

20      us getting paid, we are prepared to write these off."

21      Why did you write that?

22  **A.**   Because after Dave sent me his original e-mail, I shared

23  it with Steve Chamberlain.  Steve Chamberlain called me and

24  asked what Stouffer had communicated to Dave.  So I called

25  Stouffer and asked what he had communicated, and he affirmed

1   that he told Dave that he could just write us and cancel the

2   invoices, which I shared with Steve.

3       And Steve said, "Well, that's not possible."  And Steve

4   essentially gave me the wording that I ought to go back to Dave

5   with while I was on the phone with him.

6   **Q.**   I want to move forward in time, Mr. Scott, to

7   approximately May of 2012.  Did you stay with HP after the

8   acquisition?

9   **A.**   I did.

10  **Q.**   And at some point did Dr. Lynch and Sushovan Hussain leave

11  the company?

12  **A.**   They did.

13  **Q.**   After that point in time, did you have a conversation with

14  HP's general counsel?

15  **A.**   I did.

16  **Q.**   Why?

17  **A.**   HP's general counsel, John Schultz, called me the day -- I

18  think it was the day or the day after Autonomy's core

19  management team had left, and Mr. Schultz said to me that this

20  team had improperly entered into severance agreements among

21  themselves right before leaving and that HP had no knowledge of

22  this and he needed to get in touch with them, and he wanted to

23  know if I had their personal contact information.  And I told

24  Mr. Schultz that I would look and see if I could find personal

25  contact information for the folks that had left.

1    And when Mr. Schultz said this to me, it shook me and it

2    also made me wonder about all the things that I had wondered

3    about during my time at Autonomy, and I decided to ask John

4    Schultz if he was familiar with the fact that Autonomy had

5    resold hardware, which I expected him to say yes to because

6    Autonomy had been reselling tens of millions of dollars of

7    hardware for at least a couple of years and, yet, I was always

8    curious about why the hardware was never really broken out or

9    discussed, as far as I could tell, by analysts or outside of

10    Autonomy.

11    And Mr. Schultz surprised me when he said, no, he had no

12    idea what I was talking about.  And as a result of that

13    response, I asked if I could come in and share anything and

14    everything that I'd seen and been curious about during my

15    tenure at Autonomy because I didn't believe that he had the

16    full picture.

17    **Q.**   Are you still with HP today?

18    **A.**   I'm not.

19    **Q.**   What are you doing now?

20    **A.**   I'm trying to build a company.

21                        (Pause in proceedings.)

22          **MR. LEACH:**  Thank you, Mr. Scott.

23    Thank you, Your Honor.  I have nothing further.

24          **THE COURT:**  Cross.

25          **MR. KEKER:**  I've got a board that I'd like to use with

1    Mr. Scott, Your Honor.  It's marked as 6231 as a demonstrative.

2    It's another thing like we did with Mr. Egan.

3              THE COURT:  Is 6231 demonstrative?

4              MR. KEKER:  Yes, sir.  Did I say -- yeah, 6231.

5         (Trial Exhibit 6231 marked for identification)

6                        **CROSS-EXAMINATION**

7    BY MR. KEKER:

8    Q.  Mr. Scott, we're going to get you some binders, but I have

9    some questions about how you got here.

10        I'm John Keker.  We haven't met before.  I represent

11   Mr. Hussain.

12        Good morning, ladies and gentlemen.

13        You are testifying pursuant to an immunity order; is that

14   right?

15   A.  Correct.

16   Q.  And you originally talked to HP lawyers five times back in

17   2012 and 2013 -- that's what's depicted on the demonstrative --

18   is that right?

19   A.  That's right.

20   Q.  And then since then you have talked to the prosecutors 13

21   times, including two Grand Jury appearances.  That's the

22   asterisk or Grand Jury appearances; is that right?

23   A.  I believe that's correct.

24   Q.  And since March 20th, have you testified -- yeah, it's

25   hard to see.  I'm sorry.

1          Since March 20th, have you met with the prosecutors?

2   A.    I don't believe so.

3   Q.    Excuse me?

4   A.    I said I don't believe so.

5   Q.    Okay.  All of these meetings with the prosecutors were

6   pursuant to something called a Proffer Agreement; right?

7   A.    Correct.

8   Q.    Tell the jury what a Proffer Agreement means to you.

9   A.    To me a Proffer Agreement means that anything I share with

10  the prosecution in meeting with them cannot be used against me

11  subject to a host of exceptions.

12  Q.    And is 6226 --

13          MS. BRINGOLA:  In the second volume.

14  BY MR. KEKER:

15  Q.    Is 6229 in the binder, the second binder, a copy of one of

16  your Proffer Agreements?

17          THE COURT:  Do you want that admitted?

18          MR. KEKER:  Excuse me?

19          THE COURT:  Are you asking that it be admitted?

20          MR. KEKER:  Yes, I move it in, Your Honor.

21          THE COURT:  Admitted.

22      (Trial Exhibit 6229 received in evidence)

23          MR. KEKER:  Okay.  We don't need to look at it.  The

24  jury has seen it before.

25          And then your immunity order is 6226 in that book --

 1           **THE COURT:**  Admitted.

 2        (Trial Exhibit 6226 received in evidence)

 3           **MR. KEKER:**  -- for the Grand Jury; and your immunity

 4    for this testimony, that order is 6265.  And I move all of

 5    those in.

 6           **THE COURT:**  Admitted.

 7        (Trial Exhibit 6265 received in evidence)

 8    **BY MR. KEKER:**

 9    **Q.**   Let's talk about how you got here.  The third interview

10    you had with the Morgan Lewis lawyers representing HP, you were

11    with a woman -- an HP lawyer named Leslie Caldwell; right?

12    **A.**   Correct.

13    **Q.**   And after the third interview on January 7, do you

14    remember her -- excuse me, January 17 -- do you remember her

15    sort of unloading on you?

16    **A.**   I do.

17    **Q.**   Okay.  And she said you weren't being candid?

18    **A.**   Correct.

19    **Q.**   She said you'll be approached by the Government?

20           **MR. LEACH:**  Objection.  Hearsay.

21           **THE COURT:**  Overruled.

22           **THE WITNESS:**  Correct.

23    **BY MR. KEKER:**

24    **Q.**   She said that your current story is inconsistent with the

25    documents?

1   **A.**   That sounds correct.

2   **Q.**   She said that the documents and testimony showed you

3   played a key role in Autonomy's accounting?

4   **A.**   I believe that's correct.

5   **Q.**   She said that the SEC and the DOJ -- the Securities and

6   Exchange Commission and the Department of Justice -- hold

7   lawyers to a higher standard?

8   **A.**   I don't recall, but I don't have any reason to --

9   **Q.**   Well, if you need to recall, you can -- we've got the

10  notes of the interview up there.  You can look at them.

11       But do you remember you telling her, "Look, I worked from

12  5:00 a.m. to 11:00 p.m."?

13  **A.**   Yes.

14  **Q.**   And you asked her what crime she thought you might have

15  committed, and she said mail or wire fraud?

16  **A.**   That sounds correct.

17  **Q.**   And she said the Government is going to contact you, and

18  making a false statement to the Government is a crime too;

19  right?

20  **A.**   She said that, yes.

21  **Q.**   And then she said that -- you were without a lawyer;

22  right?

23  **A.**   I was not with a lawyer when I met with her, no.

24  **Q.**   Right.

25       And then she said that Hewlett Packard -- she and Hewlett

1    Packard would recommend counsel for you; right?

2    **A.**   What I recall is that when I -- what I recall is that I

3    said to her -- let's see, I believe I was the one that

4    initiated the conversation that said that I wanted to get my

5    own lawyer.

6    **Q.**   And did she say they would recommend lawyers for you?

7    **A.**   She did.

8    **Q.**   And did she?

9    **A.**   She did.

10   **Q.**   And did she recommend the lawyer that you ended up hiring?

11   **A.**   She did.

12   **Q.**   And is that lawyer a former colleague of hers in the

13   U.S. Attorney's Office in the Eastern District of New York,

14   which is Brooklyn?

15           **MR. LEACH:**   Objection.  Foundation.

16           **THE COURT:**   Overruled.

17           **THE WITNESS:**   I believe so.

18   **BY MR. KEKER:**

19   **Q.**   Okay.  And you told her, "Look, I have no loyalty to my

20   former bosses.  I want to help HP"; right?

21   **A.**   Correct.

22   **Q.**   And then the lawyer that she recommended and that you

23   hired attended all of the interviews after that; right?

24   **A.**   Interviews with whom?

25   **Q.**   Excuse me?

1  **A.**   Interviews with whom?

2  **Q.**   All the interviews that you had with -- the October 3rd,

3  2013, was with the Proskauer law firm representing HP and then

4  all the meetings with the prosecutors?

5  **A.**   I believe that the lawyer that you're referring to, Jerry

6  Roth, was at some of those meetings but not all of them.

7  **Q.**   But he has colleagues -- how many -- is he here today?

8  **A.**   He is.

9  **Q.**   And does he have colleagues that have been working with

10  you?

11  **A.**   He does.

12  **Q.**   How many of your lawyers are here today?

13  **A.**   Two.

14  **Q.**   Okay.  And so some combination of lawyers that work with

15  Mr. Roth or Mr. Roth were at all these meetings; right?

16  **A.**   Correct.

17  **Q.**   Why did you need immunity?

18  **A.**   It's something that my lawyer advised me on, and I can't

19  get into anything further than my discussions -- you know, I

20  had discussions with my lawyer.

21  **Q.**   You had discussions with your lawyer, and those are

22  protected by the attorney-client privilege so the jury can't

23  hear about those of course.

24       But for some reason those discussions led to you demanding

25  immunity?  You wouldn't talk without immunity; right?

1   **A.**   Well, I talked the whole way through, so I talked the

2   whole way through before I was given an immunity order.

3   **Q.**   Well, you talked pursuant -- with Proffer Agreements;

4   right?

5   **A.**   Right.

6   **Q.**   The Proffer Agreement said nobody can use your talking

7   against you?

8   **A.**   My understanding is subject to a wide berth -- a wide

9   breadth of exceptions --

10  **Q.**   Okay.

11  **A.**   -- like client --

12  **Q.**   I'm sorry.  Excuse me.

13       And then when it came to giving Grand Jury testimony under

14  oath, you demanded immunity?

15  **A.**   Correct.

16  **Q.**   And when it came to giving testimony under oath in this

17  case, you demanded immunity?

18  **A.**   Correct.

19  **Q.**   Okay.  Were you aware of the penalties for wire fraud

20  being up to 20 years in prison for just one count?

21  **A.**   No.

22  **Q.**   Are you aware of what the penalties for wire mail fraud

23  are?

24  **A.**   No.

25  **Q.**   Okay.  Are you aware of any danger of forfeiture of your

 1   assets, of your money, if you're convicted of a serious felony?

 2   A.    Not specifically.

 3   Q.    You weren't worried about either of those things?

 4   A.    I was worried about a lot of things and, yeah, I was

 5   worried about those as well, sure.

 6   Q.    Okay.  You were worried about going to jail?  You were

 7   worrying about losing your money?

 8   A.    Yes.

 9   Q.    At the time you were a Canadian citizen?

10   A.    Correct.

11   Q.    You were very worried about if you got convicted of a

12   felony, you'd lose your citizenship?

13   A.    Yes.

14   Q.    You had a wife and children here and if you lost your

15   citizenship, you understood you could be deported?

16   A.    Yes.

17   Q.    Okay.  Now, when you fired Brent Hogenson on July 28,

18   2010, you knew that he had made claims about improper

19   accounting, didn't you?

20   A.    Yes.

21   Q.    All right.  And when you fired him, that was an

22   independent decision that you were firing him because he had

23   committed financial irregularities in his position as CFO of

24   the Americas; right?

25   A.    No.

1  **Q.**   No?

2  **A.**   No.

3  **Q.**   All right.  Could we --

4        **MR. KEKER:**  Your Honor, we have a tape -- a copy of

5  the tape that Mr. Scott made, and I'd like to play a brief

6  excerpt of it.  We've got a transcript -- it's 6130.  And we've

7  got a brief -- we've got a transcript that the jury can read

8  along with, and that's -- so it's 6130 is the tape, 6130B is

9  the transcript, and we'd like to show the transcript and play

10  it.

11       **THE COURT:**  Well, let me look at 61 -- the transcript.

12  Which one is it?

13       **MR. KEKER:**  6130, Your Honor, in the book.

14       **THE COURT:**  Which volume?

15       **MR. KEKER:**  In Volume 2.

16       **MS. BRINGOLA:**  Isn't it 6320?

17       **MR. KEKER:**  I'm sorry, Your Honor.  It's 6230.

18  Ms. Bringola is correct again.  6230, not six one.

19       **THE COURT:**  6230?

20       **MR. KEKER:**  Yes.  I'm sorry.  And the transcript is

21  the conversation I want to play.  It's an hour-long

22  conversation.  Well, let me ask Mr. Scott.

23  **Q.**   The conversation you had with Mr. Hogenson that day was

24  about an hour; right?

25  **A.**   That's right.

1          **MR. KEKER:**  So we're just playing this part.

2                         (Pause in proceedings.)

3          **THE COURT:**  I'm looking at 6230B.

4          **MR. KEKER:**  Yes, Your Honor.

5          **THE COURT:**  And the question was:  Was your decision

6    to fire Brent Hogenson -- I don't know whether that's his last

7    name.

8          **MR. KEKER:**  Based on financial irregularities.

9          **THE COURT:**  No.  I thought your question was:  Was it

10   an independent decision?

11         **MR. KEKER:**  Okay.  I thought I'd gone on to the next

12   one.

13         **THE COURT:**  Let me have...

14                         (Pause in proceedings.)

15         **THE COURT:**  You said (reading):

16          "And when you fired him, that was an independent

17       decision that you were firing him because he had committed

18       financial irregularities in his position as CFO of the

19       Americas; right?"

20       And he said, "No."

21         **MR. KEKER:**  And that's why I'm offering --

22         **THE COURT:**  Well, but the question is -- I know it's

23   actually a compound question, but it's not that compound.  But

24   he said "no," so did he say, no, that he didn't fire, that it

25   wasn't independent?  That he said -- that's why I listened to

1   him, and I thought that the issue between you was whether it

2   was independent, not whether it involved financial

3   irregularities.

4   **BY MR. KEKER:**

5   **Q.**   Did you fire him based on financial irregularities?

6           **THE COURT:**  Question.

7           **THE WITNESS:**  In part, yes.

8           **THE COURT:**  Okay.  So I'm not going to let you play

9   it.

10  **BY MR. KEKER:**

11  **Q.**   Did you fire him based on his mismanagement of the U.S.

12  Finance Department?

13  **A.**   I fired him for a couple of reasons.  The -- at the time

14  it was clear to me that my management team wanted Brent gone

15  and believed that Brent was intentionally trying to sabotage

16  Autonomy.

17          And while I didn't have a clear picture of what Brent was

18  doing and was made -- and it was made clear to me that I did

19  not have insight into whatever was going on with Brent, what

20  was clear to me is that my management team wanted him gone.

21          What was also clear to me was that there were multiple

22  things that Brent had done over the course of his time at

23  Autonomy that did not comply with Autonomy practices, such as

24  paying out referral fees without getting the permission from

25  the U.K.

1       And what also really confounded me at this time was that

2   there was this trip that Brent had took from the U.K. to

3   Chicago ostensibly to meet other members of Autonomy's

4   management in Chicago, and they said that they had no idea why

5   he was in town or what he was doing there, and Brent refused to

6   answer that question.

7       And collectively all of this information is what I was

8   processing when I fired Brent.

9   Q.   Did he ask you if any part of this decision was based on

10  his allegations about accounting that he'd made to Deloitte?

11  A.   He did.

12  Q.   And what did you say to him?

13  A.   I said no.

14  Q.   Okay.

15          MR. KEKER:   Your Honor, I would offer again this

16  excerpt, and would like to get a clear picture of what was said

17  at the time about why he was fired.

18          THE COURT:   Denied.

19          MR. LEACH:   Objection.   Hearsay.

20  BY MR. KEKER:

21  Q.   All right.   At the time you had this conversation, you

22  knew that he'd made allegations and Deloitte had investigated

23  them and the Audit Committee had investigated them, and both

24  Deloitte and the Audit Committee had found them wrong; right?

25  A.   The sum total of what I knew was captured in an e-mail

**SCOTT - CROSS / KEKER**

1    exchange between Brent, Sushovan, and Andy that I was added to;

2    and to the extent that it said in that exchange what you just

3    shared with me, then, yes, that's what I knew.

4    **Q.**   Okay.  And then sometime later, not very long later,

5    Mr. Kanter sent you his allegations in writing, the Deloitte

6    report, the Audit Committee report?  He gave you all of that to

7    read; right?

8    **A.**   Correct.

9    **Q.**   And you told us on Thursday that after reading all that,

10   your concerns were heightened that Autonomy could be doing

11   illegal transactions?

12   **A.**   Correct.

13   **Q.**   Okay.  At the time you were -- I mean, you were certainly

14   a lawyer at the time; right?

15   **A.**   Right.

16   **Q.**   You didn't want to do anything illegal?

17   **A.**   Correct.

18   **Q.**   And you made sure that you didn't do anything illegal

19   after that?

20   **A.**   I did the best I could consistently from the day I was at

21   Autonomy till the day I left.

22   **Q.**   Did you tell Proskauer, when you talked to lawyers on

23   October 3rd, 2013, that you didn't have any concerns about the

24   work you were doing?

25   **A.**   I don't recall.

1  Q.   Would you look in the book of your statements that should

2  be up there?  Would you look at the exhibit that's marked 5159

3  on page 1?

4           THE COURT:  Page 1?

5           MR. KEKER:  Page 1.

6           THE WITNESS:  (Witness examines document.)

7  BY MR. KEKER:

8  Q.   In the next-to-last paragraph -- the next-to-last sentence

9  of the next-to-last paragraph, did you say to those Hewlett

10  Packard lawyers on October 3rd, 2013, that you did not have any

11  concerns about the work you were doing?

12  A.   I don't recall.

13  Q.   Okay.  Have you seen that?  Have you looked at these

14  notes?

15  A.   This is the first time I'm seeing this note.

16  Q.   Okay.  Well, take a look at the note and see if it

17  refreshes your recollection about what you said to them.

18  A.   (Witness examines document.)

19  Q.   Do you see where I'm talking about, the second --

20  A.   I do.

21  Q.   And you don't recall telling them you didn't have any

22  concerns?

23  A.   I don't recall.

24  Q.   So after getting this information about Hogenson's

25  allegations, your concerns were heightened.  That's what you

1   said yesterday; right?

2   **A.**   Thursday, correct.

3   **Q.**   Thursday.  I'm sorry.

4        You submitted something called a white paper to the

5   Securities and Exchange Commission trying to keep them from

6   charging you; right?

7   **A.**   Correct.

8   **Q.**   Did you read -- your lawyers signed it, but you reviewed

9   it, didn't you?

10  **A.**   Correct.

11  **Q.**   And did you tell the Securities and Exchange Commission

12  back in 2015 exactly the opposite of what you're saying to the

13  jury?

14  **A.**   Can you repeat the question?

15  **Q.**   Did you tell the Securities and Exchange Commission back

16  in 2015 exactly the opposite of what you're telling this jury?

17            **MR. LEACH:**  Objection.  Vague.

18            **THE COURT:**  Sustained.  I mean, the opposite of what

19  he's testified for hours.  So the question is:  What do you

20  mean by "the opposite"?

21  **BY MR. KEKER:**

22  **Q.**   What I mean by "the opposite" is that did you tell them

23  that the investigation of the Hogenson materials and reading

24  the Deloitte report and the Audit Committee report is something

25  that you relied on and allayed your concerns?

SCOTT - CROSS / KEKER

1   **A.**   I'm not sure what I've specifically said at any point in

2   time; but what I can say is that --

3   **Q.**   No, that's okay.

4   **A.**   Okay.

5   **Q.**   That's an answer.  You can't say at any point in time what

6   you said, so let's look at what you said.

7        6225, is that your white paper?

8             **MR. KEKER:**  I'd move it in, Your Honor.

9             **THE COURT:**  Well, wait, wait, wait.  62 --

10            **MR. KEKER:**  6225.

11            **MR. LEACH:**  Objection.  Hearsay.

12            **THE COURT:**  Well, I don't know whether it is or not,

13   but I don't have it.  Why do I not have it?

14            **MR. KEKER:**  6225?

15            **THE COURT:**  I have 62 --

16            **MR. KEKER:**  62 --

17            **THE COURT:**  -- 24, and then it goes to 6232.  Is it

18   somewhere else?

19            **MR. KEKER:**  I don't know.  Let's see.

20                      (Pause in proceedings.)

21            **THE COURT:**  What volume is it in?

22            **MR. KEKER:**  Volume 2.  And here's an extra copy.

23            **THE COURT:**  Well, I may not need it.  It wasn't in the

24   witness folder.  It wasn't in my white Joel Scott witness

25   binder.

1          **MR. KEKER:**  Oh, I'm sorry.  It should be -- it's in

2    the -- it's in these binders.

3          **THE COURT:**  Okay.  So it's 62?

4          **MR. KEKER:**  6225 in Volume 2 --

5          **THE COURT:**  Okay.  I have that.

6          **MR. KEKER:**  -- of the exhibits.

7          **THE COURT:**  I have it.  I have it.

8          **MR. KEKER:**  Okay.

9          **THE COURT:**  Now let me look at it because you're

10   offering it in, the whole thing?

11         **MR. KEKER:**  Sure.

12         **THE COURT:**  47 pages.  Any objection?

13         **MR. LEACH:**  Objection.  Hearsay.

14         **THE COURT:**  Sustained.

15         **MR. KEKER:**  Okay.

16   **Q.**   Did you submit a white paper to the Securities and

17   Exchange Commission, and is that paper that you submitted on

18   March 3rd, 2015, 6225 in front of you?

19   **A.**   It is.

20   **Q.**   And was the purpose to show why no charge -- to show why

21   you didn't -- the SEC shouldn't bring charges against you?

22   **A.**   Yes.

23   **Q.**   Okay.  And if you look at page 11 -- now I'm confusing

24   myself -- page 11 of the white paper, did you say that

25   (reading):

1           "Mr. Scott reasonably believed that the reseller

2      transactions were accounted for properly based on his own

3      inquiries and issues raised by Mr. Hogenson"?

4  **A.**   (Witness examines document.)   Can you please just point

5  me?  I'm looking -- I believe I'm looking at page 11.

6  **Q.**   Read the big bold title.

7  **A.**   Ah.

8  **Q.**   Did you tell them that (reading):

9           "Mr. Scott reasonably believed that reseller

10     transactions were accounted for properly based on his own

11     inquiries and issues raised by Mr. Hogenson"?

12 **A.**   Did I tell the jury that?

13 **Q.**   No.  Did you tell --

14         **THE COURT:**  No.  Did you tell the SEC that?

15 **BY MR. KEKER:**

16 **Q.**   No.  You told the jury the opposite.  Did you tell the SEC

17 that?

18         **MR. LEACH:**  Objection.  Argumentative.

19         **THE COURT:**  Overruled.

20     Go ahead.

21         **THE WITNESS:**  My lawyers wrote that.

22 **BY MR. KEKER:**

23 **Q.**   And did you approve it to submit it to a federal agency to

24 try to get out of being charged?

25 **A.**    I believe that this statement is true.

Q.    Okay.  Look at page 15, please, sir.  Did you tell the SEC

that (reading):

        "The rejection of Mr. Hogenson's allegations

    reinforced Mr. Scott's reasonable belief that Autonomy's

    accounting treatment of the reseller transactions was

    proper"?

A.    I did.

Q.    Okay.  Did you -- okay.  That's good enough.

      Now, during this period of heightened concern, did you

meet with the Deloitte audit partner?  Did you personally meet

with the Deloitte audit partner?

      THE COURT:  I'm sorry, what?  You say the period of

heightened concern.  Is that --

      MR. KEKER:  Well, the period of heightened concern is

apparently after he found out about Mr. Hogenson's allegations.

That's when he had this heightened concern he told us.

Q.    And after that, during the period of what you say is

heightened concern, did you meet with Mr. Nigel Mercer, who was

in charge of the -- who was the audit partner in charge of

Autonomy audits?

A.    I believe I met with Nigel Mercer in the San Francisco

office in January of 2011.

Q.    Okay.  And was that meeting set up in advance?

A.    It was.

Q.    Look at 6279, please.

1  **A.**    (Witness examines document.)

2  **Q.**    Let's go straight to 6280.  Let's go to 6280.

3      This is a calendar invitation "Joel meet with Nigel Mercer

4  from Deloitte."

5            **MR. KEKER:**  Move it in, Your Honor.

6            **THE COURT:**  Admitted.

7      (Trial Exhibit 6280 received in evidence)

8  **BY MR. KEKER:**

9  **Q.**   And so on January 19 -- this is a calendar invitation for

10  January 19, and if we could see the agenda for the meeting on

11  the next page.

12      The agenda included item 3 (reading):

13           "Impact of fraud, update on legal process, U.S.

14      management response."

15      Do you remember part of the agenda being having some

16  update on the fraud that had occurred in Mr. Hogenson's

17  division that had led him to be fired?

18  **A.**   I don't recall the agenda.

19  **Q.**   Well, you knew the agenda ahead of time, didn't you?

20  **A.**   I don't recall seeing the agenda until right now.

21  **Q.**   Are you saying you never saw the agenda?  This is a

22  calendar invite to you.

23  **A.**   I don't recall it.

24  **Q.**   Okay.  Do you remember thinking ahead of time that it

25  would be a good idea if you had concerns to talk to the

1   Deloitte -- you've got the horse's -- you've got them right

2   there, talk to the Deloitte audit partner about any concerns

3   you might have?

4   **A.**   What I do recall specifically about my discussion with

5   Nigel Mercer was that the way the conversation opened, as he

6   was walking with me in the hallway, was that Brent Hogenson was

7   a lunatic and that his allegations were completely off base and

8   that he was a troublemaker.

9   **Q.**   You knew that the Deloitte investigation had been carried

10  out by some independent team away from the people who did the

11  regular audit; right?

12  **A.**   That's what was communicated to me.

13         **MR. LEACH:**  Objection.  Foundation.

14  **BY MR. KEKER:**

15  **Q.**   So this -- you knew that?

16  **A.**   That's what was communicated to me.

17  **Q.**   Okay.  And so Mr. Mercer was not part of the investigation

18  of Hogenson?

19  **A.**   To the best of my knowledge, that's correct.

20  **Q.**   Okay.  So Mr. Hogenson -- I mean, excuse me, Mr. Mercer,

21  who was the regular audit partner, was going to meet with you

22  and you were both a recipient of an independent investigation

23  by Deloitte into Hogenson's allegations; right?

24  **A.**   I don't know what role, if any, Mr. Mercer played because

25  I was never personally involved in the investigation; however,

1    the way you described what you said about me I would agree

2    with.

3    **Q.**   Mr. Scott, did you express your heightened concerns to

4    Mr. Mercer when you had the audit partner sitting in front of

5    you in January 2011?

6    **A.**   I don't specifically recall.

7    **Q.**   Do you remember you didn't?

8    **A.**   No.

9    **Q.**   Okay.  During this period of heightened concerns, did you

10   teach the sales staff about what the rules were for reseller

11   transactions?  You personally.

12   **A.**   Can you be more specific?

13   **Q.**   Look at 6245, please, sir.

14   **A.**   (Witness examines document.)

15   **Q.**   It's in Volume 2.  That's an e-mail that you sent to

16   Robert Pearson dated August 4, 2010, attaching a slide deck

17   called "Revenue Recognition, Legal Resources and SMS

18   Expectations" with your name on it.

19            **MR. KEKER:**  Move it in.

20            **THE COURT:**  Admitted.

21       (Trial Exhibit 6245 received in evidence)

22            **MR. KEKER:**  Okay.  So can we see the first --

23   **Q.**   So the date of this is August 2010.  This is after the

24   Hogenson allegations when you supposedly have heightened

25   concerns; right?

1   **A.**   I wouldn't describe it the way that you're describing it.

2   **Q.**   Okay.  Let's look at what you're -- do you recognize the

3   deck that appears?

4   **A.**   I do.

5   **Q.**   Is that a deck that you use to teach revenue recognition

6   principles?

7   **A.**   Yes.

8   **Q.**   Okay.  Would you look at 6245A at page 6 of this exhibit?

9   **A.**   (Witness examines document.)

10  **Q.**   And is this the slide that you would put up as you're

11  teaching people about revenue recognition for reseller

12  transactions?

13  **A.**   Correct.

14  **Q.**   And did you tell them that there were four elements to

15  achieving recognizable revenue?

16  **A.**   I believe so.

17  **Q.**   One is persuasive evidence that an arrangement exists;

18  right?

19  **A.**   Correct.

20  **Q.**   Second is delivery has occurred?

21  **A.**   Correct.

22  **Q.**   Third is collectibility is probable?

23  **A.**   Correct.

24  **Q.**   And the fourth is fee is fixed and determinable?

25  **A.**   Correct.

1  Q.   What we need for a direct deal -- or for direct proof you

2  need the contract, you need proof of delivery, you need proof

3  we'll get paid.  PO is generally not required, a purchase

4  order.

5       Indirect:  A VAR agreement, a VAR PO, proof we'll get

6  paid.  Evidence of sell-through is not required.

7       That's what you were teaching?

8  A.   Yes.

9  Q.   During this period of heightened concern about reseller

10 transactions; right?

11 A.   Yes.

12 Q.   And there's nothing here that says you can't continue to

13 have relations with the customer, you can't continue to work

14 with the end user?  None of that is in here; right?

15 A.   Correct.

16 Q.   Okay.  These concerns that you had, the heightened

17 concerns, you didn't express those to Mike Lynch or to Andy

18 Kanter or to Sushovan Hussain, did you?

19 A.   I did.

20 Q.   Okay.  Let's look at some e-mails.  Let's start with some

21 e-mails between you and people in upper management.  Let's

22 start with 6222.

23 A.   (Witness examines document.)

24 Q.   Is that an e-mail from you to Sushovan Hussain and Andy

25 Kanter in July of 2011?

 1              **THE COURT:**  Admitted.

 2         (Trial Exhibit 6222 received in evidence)

 3              **MR. KEKER:**  Could we put it up?

 4    **Q.**   And you're telling -- this is during the period of

 5    heightened concern?

 6    **A.**   (Witness examines document.)  That is the period of time

 7    in which the financial investigations were going on, yes.

 8    **Q.**   The what?

 9    **A.**   That's when the investigations into the Finance

10    Department -- oh, no.  That was in June -- July --

11    **Q.**   That's completely false; isn't it?

12    **A.**   Yeah.

13    **Q.**   I mean, that was a year earlier.

14    **A.**   I apologize.  I was looking at the month and day, not the

15    year.

16    **Q.**   In July of 2011, did you write to Mr. Hussain and

17    Mr. Kanter, this is a year after Hogenson (reading):

18              "Keep doing what you're doing.  From here it is going

19         great"?

20    **A.**   I did.

21    **Q.**   And what was that about?

22    **A.**   I have no recollection.

23    **Q.**   Okay.  Look at 6247.

24    **A.**   (Witness examines document.)

25    **Q.**   This is a memo from Joel Scott to Mike Lynch dated

1    July 18, 2010?

2          **THE COURT:**  Admitted.

3          (Trial Exhibit 6247 received in evidence)

4    **BY MR. KEKER:**

5    **Q.**   Let's look at that one (reading):

6          "Mike -

7          "Thank you, once again, for the opportunity to

8    participate in this month's management meeting.  I think

9    that the time we spent together was very productive.  And

10   while there is obviously a lot of work to be done, I think

11   that the year ahead should prove to be a very exciting one

12   indeed.  Thank you also for your kind words and for the

13   opportunity to do more.  I am proud to give my all to

14   Autonomy and it is always nice to have your support.

15          "Regards, Joel."

16   Did you write that to Mr. Lynch in 2010?

17   **A.**   I did.

18   **Q.**   Pardon?

19   **A.**   I did.

20   **Q.**   This is at a time that you hated the culture and you

21   didn't like your job and so on?

22   **A.**   Yes.

23   **Q.**   Okay.  Did you also take the opportunity to tell Mr. Lynch

24   how he ought to be running his business?

25   **A.**   I did.

PROCEEDINGS

1    **Q.**    Okay.  Let's look at 6361.

2    **A.**    (Witness examines document.)

3            **THE COURT:**  63 what?

4            **MR. KEKER:**  61.  And I may --

5            **THE COURT:**  I don't have it.

6            **MR. KEKER:**  I've got it in a folder.  I'm sorry,

7    Your Honor.

8            **THE COURT:**  6361...

9                        (Pause in proceedings.)

10           **THE COURT:**  Well, can we take a break?

11           **MR. KEKER:**  Sure.

12           **THE COURT:**  Okay.  Ladies and gentlemen, we're going

13   to take our recess now.

14       Remember the admonition given to you:  Don't discuss the

15   case, allow anyone to discuss it with you, form or express any

16   opinion.

17       We'll resume at 10:45.

18       (Proceedings were heard out of the presence of the jury:)

19           **THE COURT:**  Okay.  Let the record reflect the jurors

20   have retired.

21       So after this witness, who is the next witness?

22       You can step down if you'd like.

23           **MR. LEACH:**  Antonia Anderson, Your Honor.

24           **THE COURT:**  Okay.  So there's an issue as to her

25   testimony because I've received a brief or a motion from the

PROCEEDINGS

1    Defense.  I don't know when that was filed.  Obviously

2    recently.

3          MR. LEACH:  Yesterday afternoon and around

4    9:00 o'clock last night.  The Government hasn't prepared a

5    written response, but we're happy to --

6          THE COURT:  Pardon?

7          MR. LEACH:  We've not prepared a written response yet,

8    Your Honor, but we're happy to deal with it whenever the

9    Court --

10         THE COURT:  I think it has to be dealt with before the

11   witness testifies.  I mean, I don't know how long this witness

12   is going to be.

13      Mr. Keker, how long do you expect?

14         MR. KEKER:  I would think an hour and a half to two.

15         THE COURT:  Okay.  So maybe what we'll have to do is

16   discuss this during the noon hour.  I mean, obviously if you

17   file something, I'll look at it, but I'm not requiring you to

18   file anything.

19         MR. LEACH:  Your Honor, we're not going to have time

20   to file a written response.

21         THE COURT:  No, I appreciate that.

22         MR. LEACH:  Yeah.

23         THE COURT:  But, anyway, they raise issues that can be

24   raised orally.  I mean, they're not --

25         MR. LEACH:  I think one of the motions was previously

 1    denied in a *motion in limine*, and the other one we're happy to

 2    address at any point, Your Honor.

 3         **THE COURT:**  Okay.  Let me take a look.

 4         What I need to know is the scope of the witness'

 5    testimony.  I need to get some idea of the witness' testimony

 6    because the major objection, as I understand it, is that this

 7    witness is -- she's not an expert witness and she is going to

 8    be asked to give some conclusions based upon some information

 9    that she is now being furnished by the Government with respect

10    to a series of transactions.  And as I understand, the

11    objection is that she shouldn't be permitted to do it.

12         So the question is:  What is she going to do?

13         **MR. LEACH:**  There are two issues, Your Honor, and I

14    just want to make sure they're clear.

15         The first one is, during the due diligence, Mr. Hussain

16    provided to Hewlett Packard lists that purported to be a list

17    of their top 40 contracts by revenue and a list of their top 40

18    customers by revenue.

19         **THE COURT:**  Okay.

20         **MR. LEACH:**  This witness, Antonia Anderson, was an

21    auditor at Deloitte.  Then she worked for Autonomy.  Then she

22    worked at HP.  And she has intimate familiarity with the books

23    and records of Autonomy.

24         During the course of the investigation, the Government

25    requested that Ms. Anderson look at the books and records of

1    Autonomy and prepare a -- her -- based on the books and records

2    of Autonomy, Autonomy's top 40 contracts by revenue and

3    Autonomy's top 40 customers by revenue.

4         We asked her to compare those lists to lists that she

5    doesn't know about.  And we do not intend to ask her what she

6    knows about those lists or why they're prepared or any context,

7    but she knows the books and records and she can tell us better

8    than anybody in the world what the top 40 contracts were.

9         That's not expert testimony.  I don't intend to solicit

10   the reasons.  They can argue with that, but this is taking

11   business records and summarizing them and nothing more, and we

12   think that's perfectly appropriate.

13        The second issue, Your Honor, we can take them in order or

14   however you like, but the second issue is the ASL restatement.

15   Now, Ms. Anderson was a Deloitte auditor, then she worked for

16   Autonomy, and then she learns of issues relating to some of the

17   very transactions that she had worked on when she was at

18   Deloitte.

19        She's part of Chrissy Ellen's team who reevaluates those

20   transactions and decides that they need to be restated.  She

21   helps prepare the restatements, and she is intimately familiar

22   with it.  She is trained in IFRS.  She's done audits under

23   IFRS.

24        And all the Government seeks to solicit is that the

25   restatement is a business record, that she's familiar with it.

1    It's clearly relevant, and we see no barrier to admission.

2         I would also remind the Court this was fully briefed in a

3    *motion in limine*.  The Court granted the Government's motion to

4    admit the restatement subject to a motion to strike.  It's

5    highly probative of the falsity of Autonomy Corporation's

6    financial statements, and it's highly relevant to materiality.

7         And to the extent there are intercompany issues between

8    ASL and Zantaz, Ms. Anderson is fully capable of explaining

9    them, and we think it's highly, highly relevant.

10        **MS. LITTLE:**  Your Honor, with respect to the --

11   Mr. Leach is right, there are two separate issues.

12        With respect to the first one, the top 40 list, this

13   witness has no personal knowledge of these lists and how they

14   were made and what they're based on.  So under 602, she has no

15   personal knowledge.  It doesn't come in.

16        **THE COURT:**  Why can't she be shown -- I understand

17   that, and that -- if that was -- if she was going to discuss

18   how this top 40 list was prepared, I could understand the

19   objection; but what she is being asked, as I understand it, is:

20   Based upon your experience, your familiarity, your personal

21   familiarity with the company, if you were asked to prepare a

22   top 40 list, what would be on it?  And I don't see why she

23   can't do that.  She'd say, "Here is my top 40."  And, by the

24   way, they either coincide or they do not coincide with the

25   other list.

1       So, I mean, she's a percipient witness to the top 40 items

2   on -- as I understand it, you have to lay a foundation -- the

3   top 40 revenue generators, if that's it, or the top 40

4   customers.

5       Of course, it's an opinion, I understand that, but it's an

6   opinion based upon her personal experience as distinct from

7   reviewing the records and everything else, "I would say X, Y,

8   Z," or any expert could say.

9       MS. LITTLE:  She's not a percipient witness.  She's

10  gone back five years after the fact and tried to sort of

11  reconstruct working backwards what this list might have been,

12  should have been.  She has no firsthand knowledge.  She's not a

13  percipient witness.

14      THE COURT:  Any of them?  I mean, she has no firsthand

15  knowledge of any of the items?

16      MS. LITTLE:  It's five years later.

17      THE COURT:  Well, you can -- that's right, and if you

18  say, "Oh, well, what did you do to prepare this list?" and she

19  said, "Well, I then sat in the U.S. Attorney's Office and I was

20  given 1,000 documents or 1 million documents, and I prepared a

21  list from it," I think that falls in a separate category.

22      I thought that what she is saying is, "I was there.  I

23  experienced the operation of the company, and here is who I

24  would put on the list and here is who I would not put on the

25  list.  If asked the question what are the top 40, I would say

1    based not upon my review of records subsequent to the" -- and

2    that may be a question of -- that could be excluded or that

3    would be a question of cross-examination and so forth, but

4    she's only saying, "I was there.  These are the things that I

5    would put on the list based upon my experience."

6        I mean, no different from I'm selling a grocery store and

7    I say, "My best customer is Jones," and she comes in and she

8    says, "I was there every day and Jones never showed up."  She

9    could say that.  She could say that.  So, I mean, maybe Jones

10   was the best customer, maybe he wasn't, but that's no

11   different.

12       If she were to come in and say, "You know, I looked at all

13   the receipts, and five years later I don't see a single one

14   with Jones," I'd sustain the objection as to that.

15       So, anyway, that comes in.

16       I am more concerned about the, quote, "restatement" and

17   I'm now looking at that issue trying to get a real handle on

18   that issue.  I know whatever I said in the past, I said in the

19   past, but I'm trying to look at the restatement.

20       I don't think -- this is all just off the top of my head

21   subject to possible change -- I don't think it's a question of

22   its relevance.  I think -- or that it's a question of the

23   falsity of the statement.  I think it's a question of

24   materiality.

25       In other words, I think that they could come in and they

PROCEEDINGS

1    say, "Look, this made a big, big difference to us.  It was a

2    material misrepresentation."  So that's the sort of thing --

3    because, number one, it's an element; isn't that right?

4              MR. LEACH:  It is, Your Honor, one they opened on.

5              THE COURT:  Okay.  It's an element.  Was this

6    important?  Were these -- you've got a company that deals with

7    billions of dollars.  I don't even know what the annual -- I

8    mean, I guess that's the case; right?  What are the revenues?

9         But it's a big, big company and we've -- "we" -- the

10   Government has identified, you know, 20 transactions, 15

11   transactions, a million here, a million there.  But, as I say,

12   sometimes it adds up.

13        And so the question is:  Well, when you're dealing with

14   all these big numbers, what is the big number?  What is the

15   total number, and how is the total number arrived at?  That all

16   goes to materiality because it seems to me that that would be

17   relevant.

18        So I'm looking at it from that point of view.  I don't

19   think I have to rule right now, but I think -- and especially

20   I'm going into everybody's recess.

21        So anyway those are the issues, and I'll be glad to have a

22   further discussion at noon if we're going to get into that in

23   the afternoon.  Okay?  Thanks.

24             MR. LEACH:  Thank you, Your Honor.

25                  (Recess taken at 10:35 a.m.)

1           (Proceedings resumed at 10:49 a.m.)

2        (Proceedings were heard in the presence of the jury:)

3           THE COURT:  Let the record reflect all jurors are

4    present.  The parties are present.

5        You may proceed.

6    BY MR. KEKER:

7    Q.   We ended when I was talking mistakenly about 6361.  I

8    meant 51.

9        Before that let me show you a few emails.  Before the

10   middle of 2010, had you developed a personal relationship with

11   Dr. Lynch, the head of the company?

12   A.   Yes.

13   Q.   And did you -- is that a period that you hated the job?

14   A.   Yes.

15   Q.   Did you tell him you hated the job?

16   A.   No.

17   Q.   Pardon?

18   A.   No.

19   Q.   Could we -- look at 6252, 6253, 6254, 6255.

20       They're all emails that Mr. Scott sent to Dr. Lynch,

21   Your Honor, and I move them all in.

22           THE COURT:  Admitted.

23       (Trial Exhibits 6252, 6253, 6254 and 6255 received in

24        evidence)

25   \\\

1    BY MR. KEKER:

2    Q.    Could we see 6252.

3                    (Exhibit published to jury.)

4    BY MR. KEKER:

5    Q.    This is you writing to Dr. Lynch:

6          "Mike, this email is a little late in coming, but I wanted

7    to let you know how much I enjoyed working on the Zango

8    acquisition.  This is exactly the kind of strategic business

9    experience and the level of responsibility that I've been

10   asking for, so I sincerely appreciate you giving me the

11   opportunity," and so on.

12         6253.

13                    (Exhibit published to jury.)

14   BY MR. KEKER:

15   Q.    At the bottom you say:

16         "Mike, I just wanted to thank you again for including me

17   in the Thursday dinner, Saturday dinner and Sunday meetings

18   this weekend.  It's always appreciated.  I look forward to

19   seeing you again soon.  Stepping up in '09 in every way I can

20   on Milan/Revenue/OPS/HR/Legal," and so on.

21         Can we see 6254.

22                    (Exhibit published to jury.)

23   BY MR. KEKER:

24   Q.    "Mike, thank you for the invitation.  It's always an honor

25   to be invited and to have the opportunity to participate.  I

1   also appreciated our conversation Wednesday night and look

2   forward to discussing further."

3        And then finally 6255.

4                    (Exhibit published to jury.)

5   BY MR. KEKER:

6   Q.   "Thanks for the invitation to the management meeting.  I

7   thought it was a great meeting.  Very informative and we

8   accomplished a lot.  I appreciate the opportunity to

9   participate."

10        That's the way you talked to Mr. Lynch while you hated

11   your job and -- right?  And hated the culture?

12             MR. LEACH:  Objection.  Vague as to time.

13             THE COURT:  Well, let's see.  2008?

14   BY MR. KEKER:

15   Q.   Well, 2008, 2009, and we looked at 2010.  Let's look at

16   another one.  6352.

17             THE COURT:  Okay.  6352?

18             MR. KEKER:  62 --

19             THE COURT:  52.

20             MR. KEKER:  This is 2010, after Hogenson.

21             THE COURT:  Wait a minute.

22             MR. KEKER:  I move it in, Your Honor.

23             THE COURT:  6 --

24             MR. KEKER:  6352.

25             THE COURT:  6352, admitted.

1          (Trial Exhibit 6352 received in evidence)

2                    (Exhibit published to jury.)

3    BY MR. KEKER:

4    Q.    "Dear Mike, any chance that the request below" -- they are

5    asking you for a headshot -- "involves including me as part of

6    the management team on our website.  I am guessing not, but I

7    thought I would ask.  Assuming the answer is no, is this

8    something we could do.  Thanks for the consideration."

9          You were asking, after Hogenson in October of 2010, to be

10   included as part of the management team on the website?

11   A.    Yes.

12   Q.    At a time you say you hated your job?

13   A.    Yes.

14   Q.    And had heightened concerns?

15   A.    Yes.

16   Q.    And then in -- in January of 2011 at a time you say you

17   hated your job and had heightened concerns, you and Mr. Lynch

18   had an exchange, a private exchange, about what was wrong with

19   the U.S. team run by Stouffer Egan; right?

20   A.    Yes.

21   Q.    Could we see 6351.  That's --

22              THE COURT:  Admitted.

23        (Trial Exhibit 6351 received in evidence)

24              MR. KEKER:  All right.  Good.

25                    (Exhibit published to jury.)

1    BY MR. KEKER:

2    Q.   First is an email from you to Dr. Lynch dated January 2,

3    2011.  This is about three weeks before the Deloitte partner

4    came over to meet with you, right, on January 19?

5    A.   Correct.

6    Q.   And "the same PW" means the same password.  Was this a

7    password-protected exchange you were having with Dr. Lynch?

8    A.   Yes.

9    Q.   Okay.  And then the next page, if you would turn to the

10   next page, this is Dr. Lynch saying that, in the first two

11   lines -- let's highlight those.  "U.S. promote and iManage

12   performance was excellent, as was Asia, on all areas in Europe.

13   However, Stouffer's direct group was dire."

14       Is that Dr. Lynch writing to you?

15   A.   I believe that this is a -- the contents of a file that

16   Dr. Lynch shared with me.  I don't know if it was directed

17   solely to me or to others.

18   Q.   Look at the second page, next page.  And the last line

19   right before "Mike," it says, "Please send back strictly

20   personal and confidential comments to me only, encrypted.  Use

21   your own key and ring me with it.  Need comments by EOP Sunday,

22   Mike."

23       Was he asking you for comments to come back to him in an

24   encrypted, protected fashion?

25   A.   Yes.

1  **Q.**   In response to what he was talking about, which was

2  Stouffer's group performance was dire?

3  **A.**   Correct.

4  **Q.**   Now, the next several pages are your response; right?

5  What you wrote him and sent him with this password-protected

6  memo in January of 2011?

7  **A.**   Correct.

8  **Q.**   Okay.  Let's look at that briefly.  We won't go through

9  the whole thing, but at page 4, it says, "Mike" -- yeah.  At

10  the top, "As you have noted, Stouffer's sales team, i.e., U.S.

11  IDOL sales, is underperforming in terms of both total revenue

12  production and individual production."

13      Under 1(a) you talk about Stouffer, Mike have been

14  unavailable for IDOL SMS calls for -- far more than other

15  people.  Further down, you talk about Stouffer vetoing some

16  decisions.

17      Was this you throwing Stouffer under the bus?

18  **A.**   No.  This was me providing the feedback that Mike asked

19  for.

20  **Q.**   If we read through this many pages -- and if you need to

21  sit up there and do it -- is there any word in here about your

22  concerns, your heightened concerns, your concerns about

23  reseller deals or anything that's going on at Autonomy except

24  poor performance by salespeople?

25  **A.**   I don't believe so.

SCOTT - CROSS / KEKER

Q.   Now, in the direct examination that you just had, Mr. Egan

was pretty absent from it, wasn't he?

         **MR. LEACH:**  Objection.  Argumentative.

         **THE COURT:**  Sustained.

         **MR. KEKER:**  I'll withdraw it.

Q.   You said you had intermittent contact with Sushovan

Hussain?

A.   That's correct.

Q.   And you had daily contact with Mr. Egan, didn't you?

A.   No.

Q.   Did you share the same office?

A.   Yes.

Q.   Was there a wall between -- or were your desks in the same

office?

A.   For most of my tenure, I was in a different office.  For a

portion of my tenure, we shared an office.

Q.   What portion of your tenure did you share an office?

A.   I believe somewhere around the last six to nine months, I

believe.

Q.   Six to nine months of what?  What year?

A.   Like the last six to nine months at Autonomy, somewhere

starting in 2000 -- beginning of 2011.

Q.   Okay.  So during the period that you had heightened

concerns because of Hogenson, you were sharing an office for

six to nine months with Egan?

SCOTT - CROSS / KEKER

1    **A.**   Correct.

2    **Q.**   And Egan was the one who would go out to sell to these

3    resellers.  He would tell them the deal is about to close and

4    here's the terms and so on.  He would do the selling; right?

5    **A.**   I don't know, but to the best of my knowledge, that's

6    correct.

7    **Q.**   You don't know?

8    **A.**   I don't know.

9    **Q.**   But -- and then you would do the deal?  You would write up

10   the paperwork?  You would get everything together; right?

11   **A.**   Myself or someone on the U.S. legal team, yes.

12   **Q.**   Okay.  Somebody under your direction?

13   **A.**   Yes.

14   **Q.**   And they would get the information from Stouffer Egan

15   about what to put into the deal?

16   **A.**   Most of the time, yes.

17   **Q.**   And you don't know who did the selling?

18   **A.**   No, because I wasn't part of the conversations.

19   **Q.**   Okay.  Sometimes you did the selling, didn't you?

20   **A.**   There were a couple of occasions when I spoke directly

21   with resellers about transactions.

22   **Q.**   About transactions about the close, "here are the terms,

23   do you want it," that kind of thing?

24   **A.**   I communicated to our resellers what was shared with me to

25   communicate.

1  Q.   During this period of heightened concern?

2  A.   Yes.

3  Q.   Okay.  Now, you said that you were not social friends with

4  Stouffer Egan.  Do you remember saying that?

5  A.   I believe the question was am I friends with Stouffer Egan

6  and I'm not.

7  Q.   And you were asked, "Do you see him socially?"

8  A.   If -- if I did the -- I don't recall if I did or didn't,

9  but I do not see him socially.

10 Q.   Well, did you have any fun dinners at his house?

11 A.   I recall one dinner when he invited me and a half dozen

12 other Autonomy employees to his house.

13 Q.   And you sent him a thank-you email.  Look at 6340, please.

14         **THE COURT:**  Admitted.

15     (Trial Exhibit 6340 received in evidence)

16                 (Exhibit published to jury.)

17 **BY MR. KEKER:**

18 Q.   This is in October 2010, during the period of heightened

19 concern; right?

20 A.   That's correct.

21 Q.   It said, "Hi, Stouffer, thank you very much for dinner

22 last night.  I had a great time.  The food was delicious, the

23 company was great, and if you're interested in my aesthetic,

24 the remodel is really beautiful.  Talk to you soon, Joel."

25     Did you joke around in emails with Mr. Egan as friends,

1    too?

2    **A.**   To the best of my recollection, not as a pattern or

3    practice, but potentially -- potentially on occasion.

4    **Q.**   Look at 6246.  This is an email from Joel Scott to

5    Stouffer Egan and others.

6         I move it in, Your Honor.

7              **THE COURT:**  Admitted.

8         (Trial Exhibit 6246 received in evidence)

9                   (Exhibit published to jury.)

10             **MR. KEKER:**  Can we blow that up.

11   **Q.**   Who is this cute little baby?

12   **A.**   I believe it's Stouffer's child.

13   **Q.**   Okay.  And he is sending you and others, you see,

14   without -- it's called "chick in a box."  He is sending a

15   picture of his child in a box, and you write back, "Great pic,

16   though admittedly not what I was expecting."

17        That was the level of communication you had with him?  You

18   weren't friends, but you would joke around like that?

19   **A.**   Yes.

20   **Q.**   Let's look at another one, 6353.

21             **THE COURT:**  Admitted.  It's in already.  6353, I think

22   it's in.

23             **MR. KEKER:**  6353 is at the back of Volume 3.

24   September 9, 2010, during the period of heightened concern.

25             **THE COURT:**  Admitted if it wasn't.

1          (Trial Exhibit 6353 received in evidence)

2                    (Exhibit published to jury.)

3   BY MR. KEKER:

4   Q.   Can we go down to the last email.  Stouffer Egan is

5   writing to you and others, "Beth's birthday.  I will wait until

6   we are all together in person to describe in detail the

7   painfully boring events at Beth's actual birthday spent with

8   Deloitte EDD wonks.  In light of these facts, I would like to

9   suggest that we all have a great lunch together tomorrow and

10  roast Beth.  Is everyone in the office tomorrow?"  And then you

11  write at the top, "I am there."

12         Is that the kind of relationship you had with Stouffer

13  Egan?

14  A.   Yes.

15  Q.   Look at 6336.

16            THE COURT:  Admitted.

17         (Trial Exhibit 6336 received in evidence)

18                    (Exhibit published to jury.)

19  BY MR. KEKER:

20  Q.   This is an email dated August 24, 2011 from you, and

21  you're saying to -- Mr. Egan is trying to get you to do some

22  work.  And you're writing back, "You're half right.  I was

23  drunk in the gutter and thus the delay.  However, I was woken

24  by a guy -- by a bum trying to steal my bottle of Jack

25  Daniels," and so on.

SCOTT - CROSS / KEKER

1          You had kind of a joking-around relationship with

2    Mr. Egan; right?

3    **A.**    That's fair.

4    **Q.**    Now -- and Mr. Egan was the one that would tell you the

5    deal terms, and after you got this level of heightened concern,

6    you did more than 15 reseller deals, didn't you?

7    **A.**    That sounds about right.

8    **Q.**    You did in -- right at the end of 2010 when you had this

9    heightened concern, you did the MicroTech/BofA transactions;

10   right?

11   **A.**    Correct.

12   **Q.**    Capax/Bank of America transaction?

13   **A.**    Yes.

14   **Q.**    Discover Tech/Bank of America?

15   **A.**    Correct.

16   **Q.**    You did the Department of Interior?

17   **A.**    Well, to clarify, when you say "you did," I assume --

18   **Q.**    Prepared the paperwork?

19   **A.**    Then I will change my answer to the prior ones because I

20   didn't prepare the paperwork for all of the transactions that

21   you're referencing.

22   **Q.**    Who did?

23   **A.**    Other people on my team.

24   **Q.**    Other people working for you?

25   **A.**    Yes.

1   **Q.**   You got heightened concern, but the people working for you

2   were doing these deals?

3   **A.**   I'm just answering your question as to whether I did all

4   15 of them myself or not.

5   **Q.**   Let's keep going.

6       How about Prisa?  Who did Prisa?

7   **A.**   I don't know.

8   **Q.**   Who did FINRA and ThinkTech?

9   **A.**   I don't specifically recall.

10   **Q.**   Who did Xerox, Bank of Montreal, National Reconnaissance

11   Office?

12   **A.**   I don't recall would did those deals, but I do recall

13   sending those deals to the reseller.

14   **Q.**   Your name is on the paperwork of all these transactions,

15   isn't it, either cc'd or someplace?  If your people did it,

16   they cc'd you?

17          **MR. LEACH:**  Objection.  Vague as to "all of."

18          **THE COURT:**  Overruled.

19     Go ahead.

20          **THE WITNESS:**  As a matter of course, I believe so.

21   **BY MR. KEKER:**

22   **Q.**   Then you did Capax/McAfee, you did Capax/UBS, you did

23   Dell/Hyatt.  You did the HP deal that we've talked about.  You

24   or your people, with copies to you, were involved in all those

25   deals?

1   **A.**   Correct.

2   **Q.**   During this period where you said you had some heightened

3   concern about what you were doing?

4   **A.**   Okay.

5   **Q.**   You were at the time proudly claiming responsibility for

6   all the U.S. sales, weren't you?

7   **A.**   I don't specifically recall that.

8   **Q.**   Look at 6242, please.  Whoops.  Or 62 -- 6242.

9          **THE COURT:**  Admitted.

10   (Trial Exhibit 6242 received in evidence)

11  **BY MR. KEKER:**

12  **Q.**   Is that a resume you prepared for yourself?

13  **A.**   That looks like a resume that I prepared.

14  **Q.**   And at the back of it, there is metadata showing it was

15  last touched on January 5th, 2011.  So it was a resume that you

16  had in early 2011?

17  **A.**   Okay.

18  **Q.**   That's right around the time that you're writing to

19  Dr. Lynch, it's right around the time you're about to see the

20  Deloitte partner; right?

21  **A.**   Correct.

22  **Q.**   Could we blow up "In my current role as chief operating

23  officer," which is -- is the second paragraph down under

24  "professional experience."

25       "In my current role as chief operating officer, U.S., I

1  manage and oversee multiple branches of Autonomy's U.S.

2  business, including legal, HR, sales and sales operations.  I'm

3  also responsible for managing Autonomy's wholly-owned services

4  business, MicroLink."

5       And then you take credit for Autonomy's growth.  "I have

6  been instrumental" -- the next paragraph.  "I've been

7  instrumental in growing the revenues," and so on.

8       On the next page -- this is your resume.  You wrote it;

9  right?

10  **A.**   Correct.

11  **Q.**   On the next page, the second full paragraph, "My

12  responsibilities for U.S. sales include management of sales

13  forecasting and deal qualifications, deal structuring, product

14  pricing, lead generation, recruitment and hiring, sales

15  performance, compensation and operations.  In 2010, I was

16  responsible for creating a new sales hiring plan, reorganizing

17  the U.S. sales organization, which had been instrumental in

18  increasing retention, driving revenue growth and expanding the

19  average deal size."

20       You were taking credit for sales at Autonomy during this

21  period of heightened concern; right?

22  **A.**   Correct.

23  **Q.**   Mr. Scott, in fact, you didn't raise your concerns about

24  reseller transactions or anything else until Mike Lynch and Meg

25  Whitman parted ways, did you?

1    **A.**    That's incorrect.

2    **Q.**    Okay.  Do you remember when Mike Lynch and Meg Whitman

3    parted ways?

4    **A.**    I do.

5    **Q.**    When?

6    **A.**    Around May of 2012.

7    **Q.**    And she fired him?

8    **A.**    That's right.

9    **Q.**    Okay.  And he thought that Hewlett-Packard was hurting

10   Autonomy and not integrating it properly and she fired him;

11   right?

12            **MR. LEACH:**  Objection.  Foundation.

13            **THE COURT:**  Sustained.

14   **BY MR. KEKER:**

15   **Q.**    Well, what did you know about why she fired him?

16            **MR. LEACH:**  Objection.  Relevance.

17            **THE COURT:**  Sustained.

18   **BY MR. KEKER:**

19   **Q.**    Well, at that point, you decided to curry favor with

20   Hewlett-Packard; right?

21   **A.**    No.

22   **Q.**    Did you write to Bill Veghte, the head of software at

23   Hewlett-Packard, at 12:30 a.m. in the morning on Sunday,

24   May 27, so Saturday night, and you're writing at 12:30 Saturday

25   night or just into Sunday morning, May 27, 2012?

1   **A.**   I don't specifically recall.

2   **Q.**   Was Veghte the head of HP software?

3   **A.**   I believe that Veghte was the head of HP software.

4   **Q.**   And he was thinking about making Stouffer Egan the head

5   of -- now that Lynch was gone and Sushovan Hussain was gone and

6   all of those people were gone, he was thinking about making

7   Stouffer Egan the head of software sales; right?

8   **A.**   To the best of my recollection, yes.

9   **Q.**   Okay.  Look at 6261.  And that's an email that you wrote

10  to Mr. Veghte at 12:31 a.m. on Sunday, May 27, 2012; right?

11  **A.**   Correct.

12          **MR. KEKER:**  I move it in, Your Honor.

13          **THE COURT:**  Admitted.

14      (Trial Exhibit 6261 received in evidence)

15              (Exhibit published to jury.)

16  **BY MR. KEKER:**

17  **Q.**   In the -- well, let's look at what you said to him.  You

18  said, "Autonomy is a dynamic organization.  I think you're

19  starting to see as an organization that has a lot of talent at

20  Autonomy would describe as -- that -- that a lot of the talent

21  at Autonomy would describe as autocratic, ruthless, secretive

22  and often exclusionary, loose on ethics, resistent to

23  constructive input, and focused on short-term gain at the

24  expense of long-term growth.  Most of the old guard responsible

25  for this culture is now gone.  However, Stouffer was the key

1   person in the Americas responsible for implementing Mike's

2   vision and is perceived to be emblematic of the old regime.

3   Stouffer is great at what he does.  He's smart, engaging, and

4   an excellent evangelist.  However, I think that the emotion

5   that you see in Rafiq's email is emblematic of how many,

6   including many other senior leaders, will react if Stouffer is

7   put at the top of Autonomy.  Right or wrong, there are a lot of

8   people who feel that he is unethical, that he will put his

9   personal agenda above what is best for the company, and that he

10  is not who they want as their leader."

11       You wrote that?

12  **A.**   Correct.

13  **Q.**   What did you think was unethical -- so you got your new

14  bosses, Hewlett-Packard, and you are telling them you think the

15  person you've been sharing an office with is unethical?

16           **THE COURT:**  What's the question?

17  **BY MR. KEKER:**

18  **Q.**   The question is why did you write that?

19  **A.**   Because I believed it.

20  **Q.**   Okay.  What did you believe was unethical about Mr. Egan?

21  **A.**   I don't know what I specifically believed at the time was

22  unethical about Stouffer in particular.

23  **Q.**   Okay.  Two days later, you started talking to

24  Hewlett-Packard's lawyers, May 29, 2012?

25  **A.**   Correct.

SCOTT - CROSS / KEKER

1   Q.   Told them you wanted to be on their team?

2   A.   Correct.

3   Q.   In -- and when you started talking to the lawyers, that

4   very first meeting, you told them that Stouffer Egan was

5   responsible for the reseller deals, didn't you?

6   A.   I don't specifically recall.

7   Q.   Okay.  Would you look at your book.  No.  It's not there.

8   It's not there.

9        I'll have to come back to that.

10       All right.  Well, let's talk about some of those reseller

11  deals.  And the first one I'd like to talk to you about is the

12  last quarter of 2009, MicroLink/Discover Tech transaction for

13  $2.3 million.  Do you remember that one?

14  A.   I do.

15  Q.   Okay.  There had been a $10 million sale of software from

16  MicroTech to Discover Tech; right?

17  A.   There had been a $10 million sale from Autonomy to

18  MicroTech with Discover Tech as the end user.

19  Q.   Okay.  And Dave Truitt wanted full-blown IDOL for his new

20  company, Discover Tech; right?

21  A.   Correct.

22  Q.   And Andy Kanter -- we've looked at the exhibit.  Andy

23  Kanter said no, don't give him --

24  A.   Correct.

25  Q.   And look at 373, please.

 1          And I'd move that in, Your Honor.

 2              **THE COURT:**  What number?

 3              **MR. KEKER:**  373.

 4              **THE COURT:**  373?  Okay.  One moment.

 5              **MR. LEACH:**  No objection.

 6              **THE COURT:**  Admitted.

 7          (Trial Exhibit 373 received in evidence)

 8                      (Exhibit published to jury.)

 9  **BY MR. KEKER:**

10  **Q.**   That's an email from Andy Kanter to you and Mr. Egan;

11  right?

12  **A.**   Correct.

13  **Q.**   And it's dated December 28, 2009.  And this is right

14  before the sale by Autonomy to MicroLink of the $10 million

15  worth of software.  And it says --

16              **MR. LEACH:**  Objection.  Misstates the evidence.

17  **BY MR. KEKER:**

18  **Q.**   Well, isn't that right before the sale by Autonomy to

19  MicroLink of $10 million worth of software?  Or -- excuse me.

20  Sale of -- by Autonomy to MicroTech, and MicroTech was going to

21  sell it on to Discover Tech, which it did; right?

22  **A.**   I believe that's correct.

23  **Q.**   Okay.  So it's right before that?

24  **A.**   Correct.

25  **Q.**   "Stouffer and Dave may need to speak before it goes out.

1   Dave mentioned that he was hoping for something different.  His

2   expectations are high."

3        What's that about?

4   A.   I believe that what Andy was communicating there was that

5   Dave wanted more license rights, as you just alluded to, for a

6   full-blown IDOL license, and Andy was saying that Stouffer

7   would need to talk to Dave about what he would get.

8   Q.   And Dave's expectations were high; right?

9   A.   Correct.

10  Q.   And then we've seen emails.  Truitt asked, "Does

11  ControlPoint come with full-blown IDOL?"  You tell him no.  And

12  you tell him "that's the best we can do."

13       Let's put up 410, which is in evidence.

14                  (Exhibit published to jury.)

15  BY MR. KEKER:

16  Q.   I think down at the bottom is where we're looking.  This

17  is from you to David Truitt on December 30th, and you say,

18  "Updated PO is attached.  This is the best we can do on M and S

19  renewal terms.  Thanks.  Joel"; right?

20  A.   Yes.

21  Q.   You knew that Truitt was very unhappy about that, didn't

22  you?

23  A.   My recollection is that Dave was not happy with the

24  restrictions on the license.

25  Q.   And you were in touch with his colleague, John Cronin,

 1   about that, weren't you?

 2   **A.**   I don't specifically recall.

 3   **Q.**   Do you remember talking to Mr. Cronin on the last day of

 4   2009?

 5   **A.**   I don't.

 6   **Q.**   Look at 6282, please.

 7         Move that in.

 8              **THE COURT:**   Admitted.

 9         (Trial Exhibit 6282 received in evidence)

10                   (Exhibit published to jury.)

11   **BY MR. KEKER:**

12   **Q.**   So Dave is unhappy.  He's talking to Stouffer.  You say,

13   "Mike and John, Stouffer asked me to put the two of you in

14   touch."  And the two are John Cronin -- go up to the top.

15   Excuse me.  It's Mike Mooney and John Cronin; right?

16   **A.**   Correct.

17   **Q.**   What were you putting them in touch about?

18   **A.**   I don't recall.

19   **Q.**   Was Truitt trying to get more software?

20   **A.**   I believe he was.

21   **Q.**   Okay.  And then if we could see 511, which is in evidence.

22   Let's put that back up.

23                   (Exhibit published to jury.)

24   **BY MR. KEKER:**

25   **Q.**   This is the purchase order -- can we see the second page.

**SCOTT - CROSS / KEKER**

1   The purchase order for the $2.3 million sale by Autonomy to

2   MicroLink that the jury has heard a lot about; right?

3   **A.**   Yes.

4   **Q.**   And then the next page is the -- describes it, and the

5   jury has seen that about a thousand times.

6        Let's go back to the first page.  Who prepared this?  Do

7   you know?  Who prepared that purchase order?

8   **A.**   I don't know.

9   **Q.**   Okay.  But somebody from SF scanner sent it to Cynthia

10  Watkins.

11       Who is Cynthia Watkins?

12  **A.**   She was the U.S. controller for Autonomy.

13  **Q.**   So somebody sent it to the U.S. controller from SF

14  scanner, which is simply a copying machine in the office, your

15  office, right, where you and others worked?

16  **A.**   Correct.

17  **Q.**   So was it you that sent it to her?

18  **A.**   I don't believe so.

19  **Q.**   Okay.  And then she -- then CRF, what's that?

20  **A.**   That is an alias that everyone uses for the U.S. legal

21  department.

22  **Q.**   So somebody from the U.S. legal department, or at least

23  using their alias, sent this image on to you with a message

24  saying, "Please make sure this gets processed Q4/'09."

25  **A.**   Correct.

1   **Q.**   Okay.  Now, was that you?  Did you send it to yourself?

2   **A.**   To the best of my recollection, no.

3   **Q.**   Who sent it?

4   **A.**   I don't know.  I believe actually it was Cynthia Watkins.

5   **Q.**   Okay.  And did it cause you -- you're a lawyer.  Did it

6   cause you concern to be getting this purchase order after the

7   quarter had closed and somebody is saying "please make sure

8   this gets processed in Q4/'09"?

9   **A.**   I don't recall.

10  **Q.**   You don't recall if you were concerned?

11  **A.**   Correct.

12  **Q.**   Did you investigate to say, "What in the heck is this?

13  Why are we getting it late?"

14  **A.**   I don't recall.

15  **Q.**   Okay.  You tried to avoid making this an order and putting

16  it in the books, didn't you?

17  **A.**   No.

18  **Q.**   Look at 6350, please, sir.

19          **THE COURT:**  Admitted.

20       (Trial Exhibit 6350 received in evidence)

21                (Exhibit published to jury.)

22  **BY MR. KEKER:**

23  **Q.**   So the bottom email -- well, I think we had it -- that was

24  good.

25       So this is the scanning in.  The SF scanner sends it and

1    then it goes from CRF to you.  "Please make sure this gets

2    processed," and now let's go up.

3         When you get it, you write to Cynthia Watkins, the

4    controller, and say, "Does it need to go to orders also or is

5    that unnecessary, given they have the software?"

6         Now, all they were buying was this profiling function;

7    right?

8    **A.**   Correct.

9    **Q.**   Discover Tech already had the software and this was

10   simply -- the 2.3 million was to give them the profiling

11   function of that software?

12   **A.**   My question was and is still today is there anything else

13   that needs to ship in order for them to get that function and I

14   don't know the answer to that.

15   **Q.**   Well, you're asking "Does it need to go to orders also" --

16   first of all, you know that they have the software; right?

17   That's what it says, "or is it unnecessary, given that they had

18   the software."  You knew that they had the software?

19   **A.**   I knew that they had some Autonomy software.  I didn't

20   know if they had the profiling functionality, which they may

21   have.  I just didn't know.  That's why I was asking the

22   question.

23   **Q.**   Why were you asking "Does it need to go to orders also?"

24   What does "going to orders" mean?

25   **A.**   The orders alias is where -- the people who ship the

1  software are on the orders alias.  So I was asking if it needs

2  to go to the people who would ship the software.

3  **Q.**   And then Cynthia Watkins replies to you -- the controller

4  replies to you, "Yes, it needs to go through orders"; right?

5  **A.**   Correct.

6  **Q.**   Let's look at 421, which is in evidence.

7                    (Exhibit published to jury.)

8  **BY MR. KEKER:**

9  **Q.**   And if we could -- this is the invoice for that

10  $2.3 million.  Again, the jury has seen this a lot of times.

11  It's for Discover Technologies from MicroLink.  And the date on

12  it is 12/31/09; right?

13  **A.**   Correct.

14  **Q.**   Who prepared -- so here we have an invoice for

15  $2.3 million -- for this profiling software that Mr. Truitt was

16  very unhappy that he didn't get at the end of the year and now

17  we've got a purchase order saying he did get it; right?

18  **A.**   Correct.

19  **Q.**   Excuse me.  An invoice saying it's been invoiced and it's

20  invoiced as of the end of the year; right?

21  **A.**   Yes.

22  **Q.**   Who prepared that?

23  **A.**   I don't know.

24  **Q.**   That's -- that usually is your job.  You prepare these

25  invoices, don't you?

**SCOTT - CROSS / KEKER**

1  **A.**   That is not correct.  I have never prepared an invoice.

2  **Q.**   Who prepared that invoice?

3  **A.**   I don't know.

4  **Q.**   Is it your job or that of your department to review these

5  invoices to make sure they're proper?

6  **A.**   No.

7  **Q.**   Okay.  Let me just ask directly, Mr. Scott, did you and

8  Mr. Egan help Mr. Truitt get the software that Andy Kanter

9  wouldn't include in the $10 million deal?

10  **A.**   I have no recollection of helping Dave Truitt get the

11  profiling software that wasn't included initially.

12  **Q.**   When you learned that there was another transaction for

13  $2.3 million, were you surprised?

14  **A.**   I don't recall.

15  **Q.**   Okay.  Let's shift to another reseller deal, the 3.675

16  deal in -- at the end of Q4/'10, at the end of the year in

17  2010.

18      That, you remember, is the Discover Tech/Bank of America

19  transaction; right?

20  **A.**   That sounds correct.

21  **Q.**   And this is at a time at the end of 2010 -- this is at the

22  time you had heightened concerns because Hogenson had happened

23  right in the middle of 2010.  This is at the end of that year?

24  **A.**   Well, I know that you've said that a few times, so to

25  clarify --

1  Q.   I actually didn't ask you to clarify.  Just using your

2  words.

3       This is six months after Hogenson; right?

4  A.   I think it's inaccurate to say that I had heightened

5  concerns without letting me explain the rest of my thoughts.

6  Q.   Your -- well, not your lawyer, but the Government can do

7  that.

8       As of January --

9            THE COURT:  Well, let's try to move this ahead.

10      What do you mean by "heightened concerns"?

11           THE WITNESS:  I mean that after I read that Deloitte

12  report, I was very concerned about whether Autonomy was in

13  compliance with IFRS, and I asked Andy Kanter about it, and he

14  told me that the facts looked bad, but the law is on our side.

15  And I had been told multiple times by Andy Kanter, Sushovan,

16  Steve Chamberlain, Mike Lynch, Stouffer Egan, that the reseller

17  transactions that we do are totally legitimate under IFRS.

18      And more generally with respect to the allegations that

19  were made by Brent Hogenson, that none of them held water and

20  that everything was vetted with Autonomy's audit committee, its

21  outside auditors, Deloitte, its management team.

22      And then eventually I saw this same information shared

23  with the SEC and UK authorities.  And the consistent message I

24  got back from my management, Deloitte, and what I saw from the

25  regulators suggested to me or provided me with evidence that

1  suggested that what Brent had alleged really was off-base.

2      And so while I had the heightened concerns, I also was

3  sitting with these reassurances in my head, taking them as

4  support for the fact that although I had these questions, I

5  never dealt with the audit committee, I never dealt with the

6  auditors, I never figured out which revenue was recognized and

7  wasn't recognized.

8      And given the chorus of support for how Autonomy was

9  operating its finances, I took that as enough support for me to

10 feel like it was more likely okay than not, given this course

11 of people that I saw support the allegations.

12     And those are the -- those are the two thoughts that are

13 kind of sitting side by side.

14          MR. KEKER:  I move to strike the speech.  He just

15 tried to repeat his direct --

16          THE COURT:  Overruled.

17 BY MR. KEKER:

18 Q.  All right.  Did you tell -- when the prosecutors were

19 asking questions, did you talk about having heightened concerns

20 during the period after you learned about the allegations and

21 the Deloitte report and the audit committee report?

22 A.  I don't specifically recall.

23 Q.  So let's go back to the 3.675.  We're at the end of 2010

24 and -- actually we're in the beginning of 2011.  As of

25 January 18 -- we looked at this before, last Thursday -- Mr.--

 1    is it "Guiao"?  Did I pronounce that correctly?

 2    **A.**    Guiao.

 3    **Q.**    Who worked for you.  He didn't know whether Capax had

 4    bought 3.675 million or 3,675,000 or thirteen thousand

 5    one-hundred-and-twenty-five thousand back in -- when they made

 6    the deal in December of 2010; right?

 7              **MR. LEACH:**  Objection.  Misstates the evidence.

 8              **THE COURT:**  Sorry.  I'm sorry.  I was looking at the

 9    transcript.  Where are we?

10    **BY MR. KEKER:**

11    **Q.**    I'm asking him on January 18th, Mr. Guiao didn't know

12    whether the Capax purchase back in -- at the end of 2010 was

13    for 3,675,000 or for 13,125,000.  He didn't know?

14    **A.**    I believe that's correct.

15    **Q.**    And then he created a purchase order for 3.675 thousand --

16    3,675,000 and he dated it December 31, 2010; right?

17    **A.**    I believe that's correct.

18    **Q.**    That's 1452 and it's in evidence.

19              And you sent that purchase order to Dave Truitt on

20    January 25th, 2011 --

21    **A.**    Okay.

22    **Q.**    -- right?

23    **A.**    I don't specifically recall, but I --

24    **Q.**    Let's look at 1499, please.  That's in evidence.

25                      (Exhibit published to jury.)

1   BY MR. KEKER:

2   Q.   This is you sending on the 26th -- let's see the next

3   page, please.  Mr. Truitt.  And that's an agreement between

4   Autonomy and Discover Technologies for -- paragraph 2, the --

5   the deal is for 3.675 thousand; right?

6   A.   Correct.

7   Q.   And you were asked on your direct examination why were you

8   sending this to Mr. Truitt, and you said to have him sign it,

9   and then the question was asked, "Okay.  Who asked you to do

10  that?"  And you said, "I don't recall."

11       Do you remember?

12  A.   That sounds very plausible.

13  Q.   Okay.  And then you were asked, "If we could please pull

14  up page 2.  We may have to go old school on this, Mr. Scott."

15  And you said, "Can I actually change my answer?  I said I don't

16  recall, but in looking at the date, I recall that Sushovan and

17  Steve had asked us to prepare these docs and get them signed so

18  the 'asked to get signed' was from Sushovan or Steve."

19       Do you remember giving that testimony, changing your

20  answer?

21  A.   That sounds right.

22  Q.   Okay.  And was that something you -- you've been trained

23  to do, whatever -- when people ask you who told you to do that,

24  you're supposed to say Sushovan or Steve?

25  A.   No.  The Government has been very clear with me that I

 1   should just tell the truth.

 2   **Q.**   Absolutely.

 3   **A.**   That's all I've been asked for --

 4   **Q.**   And Truitt sent it back signed January 25th.  Mr. Hyson

 5   wrote and put the January 25th date; right?

 6   **A.**   Correct.

 7   **Q.**   And you called Mr. Truitt and told him he had to change

 8   it?

 9   **A.**   I believe that's correct, but I don't specifically

10   remember the call.

11   **Q.**   Let's -- let's look at the phone records.  5744 is a

12   demonstrative of the phone records that day.  And if we could

13   put that up.

14            **THE COURT:**  50 --

15            **MR. KEKER:**  5744 is in, Your Honor.

16            **THE COURT:**  Okay.

17            **MR. KEKER:**  As a demonstrative.

18               (Demonstrative exhibit published to jury.)

19   **BY MR. KEKER:**

20   **Q.**   On the 25th, you had a couple of conversations with

21   Mr. Truitt and Mr. Egan had a couple of conversations with

22   Mr. Truitt, right, or at least one.  Maybe the one-minute call

23   was just a message.

24   **A.**   That's -- yes.  That's --

25   **Q.**   Let's look at the next day, the 26th.  So starting in the

1   morning, you and Mr. Truitt are exchanging calls, and then

2   Mr. Egan calls him, and then he's called back.  And then let's

3   go to the next page.

4         Then we get all this text messaging between Egan and

5   Truitt and Scott and Truitt.  Do you see that?

6   **A.**   I do.

7   **Q.**   What was going on there?

8   **A.**   I don't recall.

9   **Q.**   Okay.  But as a result of whatever was going on there,

10  Truitt sent back a version of the agreement that was dated

11  December 31st?

12  **A.**   Correct.

13  **Q.**   Okay.  And that's 5626 in evidence.

14        Now, you're a lawyer responsible for getting things right

15  at this company; right?

16  **A.**   The way my responsibilities were articulated to me -- so

17  what I am responsible for is documenting what my management

18  tells me to and understand that I don't have the full picture

19  and --

20  **Q.**   You're just a flunky?

21  **A.**   I wouldn't say that, but I would say that my management

22  made very clear to me that I didn't have the full picture on a

23  lot of things and that I should be executing on what they ask

24  of me.

25  **Q.**   Is -- is that what you put in your resume, "I just execute

1   on what people tell me to do"?

2   **A.**   I don't think I used that term, no.

3   **Q.**   Okay.  And now you say that all of these -- this thing

4   that happened around this deal was that you had discussed it

5   with Steve Chamberlain or Sushovan Hussain or both; right?

6   **A.**   Correct.

7   **Q.**   Have you ever seen an email indicating that you're

8   discussing it with them?

9   **A.**   No.

10  **Q.**   Is there any record of you discussing it with them?

11  **A.**   Not that I'm aware of.

12  **Q.**   Are there any witnesses to you discussing it with them?

13  **A.**   Well, I did chat with Livius Guiao or Guiao, so I did

14  share with him the substance of my conversations.

15  **Q.**   Was Stouffer Egan concerned about sales targets?  You say

16  you weren't, but was he?

17  **A.**   Yes.

18  **Q.**   How do you know that?

19  **A.**   Based on his behavior, demeanor, and what he said.

20  **Q.**   Tell us about his behavior, demeanor and what he said

21  about his sales targets.

22  **A.**   Stouffer was, you know, a -- Stouffer worked -- Stouffer

23  was laser-focused on revenue and Stouffer spent, as far as I

24  can tell, almost all of his time on revenue and it was always

25  about getting the deal done, so based on that, you know, I can

1    conclude that Stouffer was very interested in meeting the

2    targets.

3    **Q.**   And what did you know about the targets?  You knew he had

4    targets?

5    **A.**   I didn't know what the targets were.

6    **Q.**   But you knew he had targets?

7    **A.**   I assumed he had targets.

8    **Q.**   Did he talk about his targets?

9    **A.**   I don't recall him talking about his targets.

10   **Q.**   Did you know his revenue, his compensation, depended on

11   his meeting his targets?

12           **MR. LEACH:**  Objection.  Foundation.

13   **BY MR. KEKER:**

14   **Q.**   I'm asking, do you know?

15   **A.**   I don't specifically know.

16   **Q.**   Okay.  Now, you said that this -- this 3.675 deal was not

17   an amendment.  You said that on direct examination; right?

18   **A.**   Correct.

19   **Q.**   Okay.  But what it was was the original Capax deal was for

20   the exact same software that this 3.675 piece was for; right?

21           **MR. LEACH:**  Objection.

22   **BY MR. KEKER:**

23   **Q.**   It was the same software --

24           **MR. LEACH:**  Misstates the evidence.

25           **THE COURT:**  Well, go ahead.

1   BY MR. KEKER:

2   Q.    We can go through it, but it will take some time.

3         You know it was the same software?

4   A.    You said Capax.   I think you meant Discover Tech.

5   Q.    Discover Tech.   I beg your pardon.

6   A.    The way I understand your question is with that document

7   that you showed me, did the software at the end of the document

8   change as a result of --

9   Q.    Right.

10  A.    -- the number?   To the best of my knowledge, no, it did

11  not change.

12  Q.    So it's the same software, and the change was it went from

13  a license for 25,000 users to an unlimited number of users?

14  A.    That sounds correct.

15  Q.    And Egan described that as an amendment, didn't he?

16  A.    I don't specifically recall.

17  Q.    Did Egan ever say that the original number that he put in,

18  the way he had done the deal, was a mistake; it was supposed to

19  be more?   It was supposed to be 10.5?

20  A.    I don't recall.

21  Q.    Okay.   Let's talk about -- oh, by the way, while we're

22  here, a few months -- in -- in November of 2010, during this --

23  after Hogenson, you asked Dave Truitt for a job, didn't you?

24  A.    I believe that's right.

25  Q.    You were going on a trip to Washington, D.C. and you asked

1   him for a job?

2   **A.**   I don't know that -- I believe I told him I was looking.

3   I believe I told him I was looking.  I don't believe that I

4   asked him specifically to hire me, no.

5   **Q.**   Okay.  Would you look at -- would you look at 5160,

6   Exhibit 5160, at page 12.

7              **THE COURT:**  Wait.  51 --

8              **MR. KEKER:**  5160 is a February 5, 2014 meeting with

9   the prosecutors, notes of that.  At page 12.

10             **MR. LEACH:**  I'm sorry, Counsel.  What page?

11             **MR. KEKER:**  Page 12.

12             **MR. LEACH:**  Of what exhibit?

13             **MR. KEKER:**  Of 5160, which are the notes of the first

14  meeting you had with him.

15             **THE COURT:**  Okay.  Would you read that --

16             **THE WITNESS:**  (Witness reviews document.)

17      I've read it.

18             **THE COURT:**  Okay.  You're talking about the third

19  paragraph?

20             **MR. KEKER:**  Yes.

21             **THE COURT:**  All right.

22  **BY MR. KEKER:**

23  **Q.**   Did you -- did you ask Dave Truitt if there was any way

24  you could work for Discover Technologies?

25  **A.**   I don't specifically recall, but reading -- reading this

1    makes me -- makes me believe that I asked him that.  I remember

2    talking to him about the fact that I wanted to leave Autonomy.

3    I don't specifically recall asking him for the -- for a job.

4    **Q.**   So can you remember telling them, the prosecutors, in

5    February of 2014, which is a mere four years ago, that you had

6    asked him for a job at Discover Technologies?

7    **A.**   Can I remember that?

8    **Q.**   Yes.

9    **A.**   I don't specifically remember that.

10   **Q.**   Let's -- let's talk about Prisa.

11        Now, that's the one where Mr. Hyson emailed the purchase

12   order to Mr. Egan's home account, as Mr. Egan said, to hide the

13   date.  5592 is in evidence.  We don't need to show it.  The

14   jury will remember it.

15        Did -- did you know that Mr. Egan had done that, had had

16   Hyson send him the Prisa purchase order at home so that he

17   could hide the date?

18   **A.**   No.

19   **Q.**   Did Egan do that sometimes, to your knowledge?

20   **A.**   I have no knowledge of that.

21   **Q.**   Did you know that he had done things to hide the date on

22   other occasions?

23   **A.**   No.

24   **Q.**   Okay.  Do you know if he used his personal account at home

25   on other occasions for business?

1    **A.**    No.

2    **Q.**    When did you first see the paperwork for Prisa?

3    **A.**    I have no idea.

4    **Q.**    Do you remember you were working on a, quote, "slate of

5    deals" in late March, 2011?

6    **A.**    No.

7    **Q.**    Do you remember ThinkTech?

8    **A.**    I do.

9    **Q.**    Do you remember FINRA?

10   **A.**    I do.

11   **Q.**    And do you remember Prisa?

12   **A.**    I don't.

13   **Q.**    Okay.  What was the slate of deals?

14   **A.**    I believe what you're referring to is the reseller deals

15   that we sent to MicroTech, Capax, Discover Tech.

16   **Q.**    Okay.  And what deals were they?

17   **A.**    You've mentioned ThinkTech and FINRA.  Off of -- I think

18   we talked earlier about Xerox, maybe Bloomberg, Bank of

19   Montreal.  I'm guessing here.

20   **Q.**    Do you remember seeing the agreement, the first time you

21   saw the agreement with Prisa?

22   **A.**    No.

23   **Q.**    Could we see 6349, please.

24          **THE COURT:**  Admitted.

25          (Trial Exhibit 6349 received in evidence)

1                    (Exhibit published to jury.)

2    **BY MR. KEKER:**

3    **Q.**   Okay.  That's a -- let's start at the back, the third page

4    or -- it's the letter agreement.  Yeah.  That one.

5         This is a letter to Discover Technologies dated March 31,

6    2001, and it's about a -- an agreement between Autonomy and

7    Discover Technologies for the end user Prisa; right?

8    **A.**   Correct.

9    **Q.**   And if you turn the page, it's dated -- signed by

10   Christopher Egan, CEO, on March 31, 2011, and it's signed by

11   Malcolm Hyson, CTO, on March 31, 2011.

12        When is the first time you saw this?

13   **A.**   I don't know.

14   **Q.**   Well, let's turn back to the first page.  And that's --

15   Steve Chamberlain is writing -- I'm sorry.  The first page of

16   the exhibit.

17        Steve Chamberlain is enclosing that Prisa agreement on

18   April 5th, and he's writing to Joel Scott saying "delivery,"

19   question mark.  "Was this delivered?"

20   **A.**   Correct.

21   **Q.**   Do you remember getting that email?

22   **A.**   No.

23   **Q.**   Do you remember him asking you about delivery?

24   **A.**   No.

25   **Q.**   Do you know why he would ask you about delivery?

1   **A.**   To see if we delivered the software.

2   **Q.**   Yeah.  I mean, they wanted to make sure it had been

3   delivered timely for revenue recognition purposes; right?

4   **A.**   That sounds -- that sounds reasonable.

5   **Q.**   Trying to follow the rules; right?

6   **A.**   I don't know.  I can't speak to Steve's frame of mind.

7   **Q.**   Did you talk to Egan about this?

8   **A.**   About Prisa?

9   **Q.**   Yeah.  I mean, here -- you're a lawyer.  You've got

10  concerns.  It's 2011.  You're being asked about delivery of a

11  deal that you say you didn't know about.  Did you talk to Egan

12  about it?

13  **A.**   I don't recall.

14  **Q.**   Did you talk to anybody about it?

15  **A.**   I don't recall.

16  **Q.**   All right.  Let's shift to Capax.

17       You worked on the original Capax agreement, didn't you?  I

18  mean, putting together the original eDiscovery agreement that

19  was back in March of 2009?

20  **A.**   I believe that's correct.

21  **Q.**   All right.  And what were you told by Mr. Egan about why

22  Capax was buying or was licensing eDiscovery software from

23  Autonomy?

24  **A.**   To the best of my recollection, what I was told was that

25  we, Autonomy, had more eDiscovery work than we could process

 1   and that Capax would be subcontracting eDiscovery work to do on

 2   our behalf.

 3   **Q.**   Okay.  And did you ever learn that that wasn't true?

 4   **A.**   No.

 5   **Q.**   Did Mr. Egan tell you that Capax wasn't doing any

 6   eDiscovery work?

 7   **A.**   No.

 8   **Q.**   Would it surprise you to learn Mr. Egan told them that you

 9   knew that Capax wasn't doing any eDiscovery work?

10   **A.**   Yes.

11   **Q.**   Let's talk about what you did know.  Could we see 5506.

12   That's in evidence.

13                     (Exhibit published to jury.)

14   **BY MR. KEKER:**

15   **Q.**   This is a few days after -- it's from you to Crumbacher,

16   and if you go down to the bottom, this is about the Iovate

17   deal.

18       Did you know that Autonomy was trying to get Capax in

19   to -- helping Iovate with eDiscovery?

20   **A.**   I don't recall.

21   **Q.**   Okay.  Let's look at 53 -- excuse me.  5349 is not in

22   evidence.  It's an email from -- that refers to you.  Just a

23   second.  Let me look at it.

24       5349.

25            **THE COURT:**  Admitted.

1          (Trial Exhibit 5349 received in evidence)

2                    (Exhibit published to jury.)

3    BY MR. KEKER:

4    Q.   Okay.  Yeah.  It's from Joel Scott.  I'm sorry.

5         Did you -- it is an email in August of 2009, and you're

6    writing to Smolek saying, "I'm not very familiar with the

7    arrangement to use Capax services, but I wanted to pass this

8    along.  I spoke to Mike S this morning and he explained to me

9    that there are several Capax employees who are providing

10   consulting services in our Boston facility while also getting

11   their arms around our systems."

12        What did you understand was going on in August of 2009

13   with respect Capax and eDiscovery?

14   A.   That Capax had a set of employees working in our offices

15   processing the eDiscovery work.

16   Q.   And now let's look at Exhibit 310, which is in evidence.

17                    (Exhibit published to jury.)

18   BY MR. KEKER:

19   Q.   Showing what Mr. Hussain thought.

20        Let's go down to the bottom, if we can, Andrew Kanter

21   email.  This is -- Andy Kanter is talking about the EAS and

22   saying he has reviewed the legal terms with Joel and saying,

23   "I'm fine."  Do you remember having those conversations with

24   Mr. Kanter?

25   A.   Not specifically.

1    **Q.**   Let's go up to the top.  Mr. Hussain weighs in and says,

2    "EAS is approved."  He says, "I need Phil to send the list to

3    Stouffer and pass it to Capax," and then the "re EDD:  Stouff

4    please get AK's and PM's approval and then they can be

5    processed."  That's something you were copied on; right?

6    **A.**   Correct.

7    **Q.**   Did you understand what he was saying he wanted Mr. Kanter

8    and Mr. Menell to approve the eDiscovery work or whatever

9    invoices there were?

10   **A.**   Yes.

11   **Q.**   Okay.  And then 5354 is not in evidence.  I would move it

12   in.

13          **THE COURT:**  Admitted.

14      (Trial Exhibit 5354 received in evidence)

15                  (Exhibit published to jury.)

16   **BY MR. KEKER:**

17   **Q.**   And let's look at the bottom.  Mr. Hussain, on October

18   28th, 2009, is talking about EDD.  Here's what he says to

19   everybody.

20      "This is more straightforward.  We have been

21   subcontracting EDD services to Capax and a further 250K is to

22   be subcontracted.  Again, I am okay, but our internal process

23   requires one more approval.  In addition, back in June, we

24   agreed to help Capax launch their processing facilities by

25   buying the hardware for them.  The total cost of the hardware

1    was 816K.  We bought half of it at that time.  The remaining

2    400K is OS," outstanding, I think.  "Again, I am okay, but

3    process requires another approval.  Overall, I need PM, AK, and

4    SE to be involved in the negotiation and approval of deals like

5    this and involve me where necessary.  The above has not been

6    handled well."

7         And then that was sent on to you; right?

8    A.   I believe that's right.

9    Q.   Okay.  So -- and then the next one is 311.  I'd move 311

10   in, Your Honor.

11            THE COURT:  Admitted.

12       (Trial Exhibit 311 received in evidence)

13                (Exhibit published to jury.)

14   BY MR. KEKER:

15   Q.   And then at the bottom -- let's start at the bottom.  This

16   is Mr. Hussain saying -- around the same time saying, "This is

17   the second of my two emails to you re Capax.  As you know,

18   Capax gave us a contract for software for them to kickstart

19   their EDD processing business in Q1 for 7.45 million plus two

20   years maintenance, payable over two years.  They are up-to-date

21   with their payments.  Subsequently we agreed to reimburse for

22   the hardware that they bought to build out their facility.  We

23   received the bill for materials for 821,000," and so on.

24        And "we are subcontracting EDD processing to Capax and

25   have paid them 1.75 million already."

1         And let's go up to the next email.  And this is your boss,

2    Andy Kanter, responding:  "I'm okay with the subcontracting on

3    the EDD side, but we have volume issues -- as we have volume

4    issues.  However, I'm asking Joel to make sure he looks after

5    each one to keep an eye on, like any subcontracting."

6         So you were assigned at that point to make sure that there

7    was no hanky-panky in this EDD subcontracting business; right?

8    **A.**   What I understood Andy to be asking was that we track the

9    expenses that we were incurring with the EDD invoicing, and

10   that's what I asked Jim Crumbacher to do as he was closest to

11   Capax, was to keep a record of all of the expenses.

12   **Q.**   You're working out of the same office as Stouffer Egan at

13   this time, and you think that the Capax expenses are proper and

14   right; is that correct?

15   **A.**   I am working out of the same office as Stouffer Egan at

16   the time, and I don't have -- I won't say that I thought that

17   they were right and I won't say that I thought that they were

18   wrong.  I was not very familiar with the EDD processing and I

19   didn't spend a lot of time trying to get familiar with the EDD

20   processing.

21   **Q.**   You didn't or did?

22   **A.**   Did not.

23   **Q.**   Let's look at 388, which is in evidence.  388.

24                  (Exhibit published to jury.)

25   \\\

PROCEEDINGS

1   BY MR. KEKER:

2   Q.   This is at the end of 2009.   And this is an agreement

3   between Capax and Autonomy -- now I'm looking at the fourth

4   amendment.   Excuse me.   I'm sorry.   Let me just check

5   something.

6        That's not what I was looking for?

7            THE COURT:   Maybe we should take a recess.

8        Ladies and gentlemen, we will recess, noon recess.

9   Remember the admonition given to you:   Don't discuss the case,

10  allow anyone to discuss it with you, form or express any

11  opinion.   We'll resume at 1:00.

12       (Proceedings were heard out of presence of the jury:)

13           THE COURT:   You can step down.

14       All right.   So let the record reflect the jury has left.

15       Do we want to have any further discussion on this

16  restatement?   I actually am asking the defense.

17           MR. DOOLEY:   Yes, Your Honor.   Brook Dooley for the

18  defense.

19           THE COURT:   Have a seat, everybody.

20           MR. DOOLEY:   And I wasn't here for the discussion

21  earlier this morning, Your Honor, but I --

22           THE COURT:   It probably wasn't too illuminating, but

23  what I said -- okay.   I have initially ruled that it would be

24  admissible.   Okay.   And then I received the memorandum this

25  morning questioning that ruling in the context of -- that I

1  guess that I've seen more of the case and asking me to revisit

2  it, think about it.

3       I don't know how -- I don't know how much I said at the

4  time when I permitted the restatement into evidence -- how much

5  I said.  I'm prepared to say more about it.  But it seemed to

6  me focused on -- it seemed to me, number one, a business

7  record.  Maybe I can sort of recap where I am.

8       It's a business record.  That means from an authentication

9  point of view, it also means it was in the course -- in the way

10 the Court looks at it, a restatement, under these

11 circumstances, can come in as a regularly-maintained business

12 record, even though I would acknowledge the fact that the

13 restatement was caused in part by the underperformance of the

14 acquired company over some period of time.  I don't know that

15 that's relevant or not, except that companies constantly have

16 to look at their figures.  They have an ongoing duty to look at

17 their revenue and their reports and so forth because if

18 something comes to their attention that there may be an issue

19 as to whether or not it's accurate, they have an ongoing duty

20 to disclose it.

21      Now, as it was sort of put in my face that I had this

22 issue years ago in the *Reyes*.  Are you familiar with that case?

23           **MR. DOOLEY:**  I am, Your Honor, yes.

24           **THE COURT:**  You are slightly familiar.

25           **MR. DOOLEY:**  Not as familiar as some in the courtroom.

1          **THE COURT:**  Pardon?

2          **MR. DOOLEY:**  Not as familiar as others in the

3    courtroom.

4          **THE COURT:**  You are referring to your partner

5    Ms. Little.  I appreciate that.

6          But that was -- that came up in the context of some

7    outside law firms, I think, or maybe they were accounting, I

8    forget which, but they came in and looked at it and prepared a

9    report and so forth.  Anyway, I ruled it inadmissible.

10         So the specter is, "What's wrong with you, Judge?  Are you

11   just trying -- you are being a little inconsistent here."  I

12   actually don't think I am, and I can give reasons why I think

13   I'm not.  But it comes in.

14         Now, what does it come in for; that is to say, why is it

15   relevant?  Because not every business is relevant.  And you

16   raised the issue.  You say, "Look, the restatement is filled

17   with errors."  And responsible further reflection, I think your

18   figure is that somehow there is 75 percent of the questioned

19   transactions -- I don't know how that is added up and so

20   forth -- are simply wrong, to which I would say you might be

21   right.  But that's called cross-examination.  Because that goes

22   to weight, not to the event itself.

23         Next I moved on -- and I know you want to respond to a

24   number of these things.

25         I moved on to the fact that it seemed to me that it --

1    there are two issues that would -- that merit jury

2    consideration.  Of course, the first is are these figures that

3    were -- I'll call them the Deloitte figures, the original

4    figures.  Are they accurate or are they inaccurate?

5        And to which you say -- I think you are saying, defense,

6    they were accurate, and not only were they accurate, they were

7    accurate from the standpoint of the standards that were

8    required at that time, specifically whatever it's called, IF --

9            **MR. DOOLEY:**  IFRS.

10           **THE COURT:**  IFRS.  There it is.  That they were

11   accurate.

12       And again I say in a sense, we're not even there yet

13   because I haven't heard the accounting evidence.  All of this

14   comes in, if it does, subject to a motion to strike because if

15   in fact the defense is able to demonstrate -- or put it another

16   way because the defense has no burden -- if the Government is

17   unable to demonstrate that the standard that was employed is

18   essentially the same as the standard that would be employed in

19   the United States and so forth, that is -- and that it's

20   different in material respects, then it would be stricken and

21   there may be other remedies as well.  Okay.  But that, again,

22   is what's the first step in the -- there has to come in some

23   evidence, especially in a case this complicated and this

24   lengthy.  Okay.

25       So if you are able to successfully attack the restatement

1    because -- I would -- I'll certainly listen to the cross and I

2    think it goes to weight, but eventually it could go, if it's so

3    flawed -- it could go to the issue of admissibility as well.

4    But we're obviously not at that point yet.

5         So it is offered in some manner to demonstrate the falsity

6    of the statements that were in the original disclosures or the

7    disclosures at or about the time of sale.

8         Secondly, it is being offered to show the materiality of

9    what was failed.  We have a company's -- you know, we have

10   Hewlett-Packard and I don't even know what their revenues are.

11   I think they're in the hundreds of billions of dollars or at

12   least it's a lot of money.

13            **MR. DOOLEY:**  130 billion.

14            **THE COURT:**  Okay.  I exaggerate.  $130 billion.  So

15   what is this transaction?  How is this material.  Because a

16   company who has 130 billion in revenues, a hundred million here

17   and there, ten million here and there, that's hardly material.

18        Now, you say well, what is the test of materiality?  Well

19   it's an objective standard, number one.  However, it's an

20   objective standard, and I'm going to paraphrase it because I

21   think the answer is that a reasonable juror knowing what a true

22   set of facts would be, given all the information it would have,

23   would find that this is material.  And that's further defined.

24   But it is a standard that the jury has to employ.

25        So is it relevant what Hewlett-Packard thought?  And I

 1    think it has some relevance.  Because let's assume, as an

 2    example -- let's say that Autonomy was just a label.  I mean,

 3    it was Rolls Royce, it was Bentley, it was, Tesla, It was -- it

 4    was just a brand out there.  It may be argued, you know, hey,

 5    they overpaid for it because they didn't care what the revenues

 6    were; they cared about the brand.  Okay.

 7         So, therefore, to a, quote, "victim" who cares about the

 8    brand doesn't make any difference.  Is it material?  The answer

 9    would be no, if that's what they did.

10         So the evidence that they are offering is actually to show

11    that to them, it did make a difference.

12         Now, it may have made a difference and I don't know to

13    what degree it made a difference, but it made a difference

14    enough that they issued a restatement of it.  Why did they do

15    so?  Well, again, number one, they have an ongoing obligation

16    to -- I assume this is true -- to make sure the figures are

17    true and correct as they discovered them to be.  And, secondly,

18    they cared enough about the transaction or transactions that

19    they thought that they -- that it merited a restatement, which

20    is another way of my saying had they not done that, I know that

21    the defense would come in and they'd say "Look, Judge, they

22    didn't care.  We want to bring in evidence that they didn't

23    care."  And I think that that has some validity.  That has some

24    admissibility.

25         So I'm just trying to give you a big picture of what I was

PROCEEDINGS

```
 1   thinking pretty much at the time, and I see no reason to change
 2   my thinking.  Now, it might be that if this comes in, I have to
 3   give some cautionary or continuing or, you know -- I guess
 4   cautionary instructions as to how it would be viewed.  Because
 5   I certainly don't want a situation where the Government argues
 6   or the jury thinks, "You know what?  They said that there were
 7   X millions of dollars of overstatements, incorrect statements.
 8   That's it.  That's it.  Proven.  QED," or whatever they say.
 9   Okay.
10       So that's my present thinking.  Now, if you want to
11   address it now, I'll be glad to listen to you, Mr. Dooley.
12       MR. DOOLEY:  I would like to address it, and I think
13   the place to start is -- and I think you have correctly
14   identified that the main issue in the case is the truth or
15   falsity of the original figures.  The question is the original
16   figures of what?
17       In the entire case, all the evidence that we have heard,
18   all the press releases we've seen, all the accounts that we
19   have talked about or the witnesses have talked about are the
20   accounts of the Autonomy Group, the Autonomy Corporation, the
21   parent company, which reports their financials publicly.  It's
22   a publicly-traded company, and they report their financials
23   under IFRS.  That's how they calculate their financials.
24   Publicly-traded company, so they're required to issue press
25   releases and hold earnings calls.  That's all the evidence that
```

1    you've seen in the case.

2         And that's all the evidence that HP considered when they

3    bought the company.

4         The restatement, Your Honor, is a restatement of a

5    completely different entity.  It is a restatement of the

6    accounts of a subsidiary of the Autonomy Group, not a

7    publicly-traded company, not a company that --

8              THE COURT:  Yes.  But isn't what happened -- am I

9    missing something here?  I looked at that argument, and --

10   which I think is a very formalistic, legal, technical argument.

11   And I was thinking in my mind all right, does it make a

12   difference because there may be separate legal structures.

13   There are all the time, but the question always is what's the

14   diff; right?  What's the diff?

15        And here you have Hewlett-Packard, a publicly-traded

16   company, acquiring X, whatever you -- whatever they're called.

17   I don't know what they're called.

18             MR. DOOLEY:  Autonomy Corporation.

19             THE COURT:  Thank you.

20        They're acquiring X.  And what are they basing it on?

21   They're basing it they say on audited statements of X.  They

22   get X into their company as a subsidiary.  I guess that's what

23   happened there.  They merged it.  I don't know exactly what

24   happened.  God, I don't want to hear evidence of it.

25        And then they believed, correctly or so or wrongly, it was

**PROCEEDINGS**

1    underperforming.  It wasn't performing as they anticipated it

2    would be on the basis of what was audited financials of

3    Deloitte.

4         So at that point, the legal structure had totally changed.

5    We all know that.  A acquires B, different legal structures for

6    B, and they now report B as part of A.

7         So, again, you know, I -- I don't want you not to be able

8    to make your legal argument, but that is such a highly

9    technical and -- argument, which actually I don't subscribe to.

10        So do you have another one?

11            MR. DOOLEY:  Well, just to -- I guess, Your Honor, it

12   also goes to the risk of the confusion -- you identified the

13   risk of prejudice that the jury is going to think well, look,

14   they restated it; therefore, the accounts must be wrong.  And I

15   think the risk here is, of that kind of prejudice and

16   confusion -- is --

17            THE COURT:  Then give me a limiting instruction.

18   Propose a limiting instruction, but I'm going to let it in.

19        Okay.  Everybody have a nice lunch.

20            MR. LEACH:  Thank you, Your Honor.

21            THE COURT:  I am going to let it in.  I certainly

22   would consider a limiting instruction.  Thank you.

23            (Luncheon recess was taken at 12:10 p.m.)

24

25

```
 1    Afternoon Session                                    1:01 p.m.

 2         (Proceedings were heard in the presence of the jury:)

 3              THE CLERK:  You may be seated.

 4              MR. KEKER:  Ready?

 5              THE COURT:  Ready.

 6    BY MR. KEKER:

 7    Q.   Good afternoon, Mr. Scott and ladies and gentlemen.

 8         Back to Capax, a couple more exhibits.  6113 is an

 9    e-mail -- 6119.  I'm sorry.  6119 is an e-mail from you to

10    others -- I'd move it in, Your Honor -- November 3rd, 2009.

11              THE COURT:  Admitted.

12         (Trial Exhibit 6119 received in evidence)

13    BY MR. KEKER:

14    Q.   And the middle e-mail -- the second e-mail down -- no,

15    next one.  I'm sorry.  That one, yeah.

16         This is from you to Mr. Smolek and Cynthia Watkins --

17    Watkins is the controller -- and the subject is "Capax EDD

18    Processing."  Do you see that?

19    A.   I do.

20    Q.   And you say (reading):

21              "Phil -

22              "Please" -- this is in November of 2009 -- "Please

23         confirm that you are tracking all expenses at Capax.

24         Important that we have a closed-loop process."

25         What did you mean by that?
```

1   **A.**   That Andy wanted to ensure that we had our eyes on it and

2   were tracking all of the EDD orders.

3   **Q.**   Mr. Hussain wanted Andy to follow this, Andy wanted you to

4   follow this, and you were now telling Mr. Smolek, "Let's make

5   sure that we're following this closely"?

6   **A.**   Correct.

7   **Q.**   Okay.  And then, finally, 6348 is an e-mail you're on.

8              **MR. KEKER:**  I move it in, Your Honor.

9              **THE COURT:**  Admitted.

10   (Trial Exhibit 6348 received in evidence)

11  **BY MR. KEKER:**

12  **Q.**   And it's an e-mail -- let's look at the second e-mail

13  down, and this is Ms. Lara.  Who's Ms. Lara?

14  **A.**   I believe she was in the U.S. Finance Department, but I'm

15  not certain.

16  **Q.**   Okay.  Can you keep your voice up so that everybody can

17  hear you, Mr. Scott?

18  **A.**   Sure.

19  **Q.**   And in February of 2010, she says (reading):

20              "Hi, Sushovan.

21              "I wanted to follow-up regarding the below as John

22         Baiocco pinged me yesterday requesting payment status.

23         Kindly reply with your approvals," and so on.

24         And let's go on up to what Mr. Hussain had to say.  He

25  wrote back to her and to Andy Kanter and to you and to

1    Mr. Tejada saying (reading):

2            "I really need Andy to sign off on Capax invoices - I

3        don't have enough time to investigate accuracy."

4        Correct?

5    A.    Correct.

6    Q.    All right.  Let's move to a different subject, which is

7    hardware.

8        You said on direct examination that hardware sales were

9    made at a discount to Citibank, JPMorgan Chase, Bloomberg, and

10   Credit Suisse First Boston.  Do you remember that testimony?

11   A.    I do.

12   Q.    All right.  Those are all long-time software customers of

13   Autonomy, aren't they?

14   A.    I believe they are.

15   Q.    As an example, JPMorgan Chase bought in Q -- in the second

16   quarter of 2009, they bought about $600,000 worth of hardware

17   from Autonomy?

18   A.    I don't specifically recall that.

19   Q.    Okay.  Look at 6291.  Those are various invoices to

20   JPMorgan Chase for hardware; right?  And they add to about

21   $600,000.

22   A.    Should I look in here?  I was waiting for the screen.

23   Q.    Yes, please.

24   A.    What was the exhibit number?

25   Q.    Volume 3.

1              THE COURT:  6291?

2              MR. KEKER:  6291, yes, sir.

3              THE COURT:  Admitted.

4         (Trial Exhibit 6291 received in evidence)

5    BY MR. KEKER:

6    Q.   Okay.  But go through --

7    A.   Yes.

8    Q.   Never mind.  It's in evidence.  The jury can look at it

9    later.

10        But that same quarter, JPMorgan Chase bought $9 million

11   worth of software from Autonomy; right?

12   A.   I believe that's correct.

13   Q.   Was there a connection between the two?

14   A.   Not that I'm aware of.

15   Q.   The hardware -- the software is, like, pure profit.  I

16   mean, once you have the software, if somebody else buys it,

17   there's no cost of reproducing it?  There's nothing; right?

18   A.   I think that's generally accurate.

19   Q.   So if you sell one extra load of software, it's pure

20   profit, 100 percent profit?

21   A.   Yes.

22   Q.   And if you lose a little bit on the relationship -- if you

23   lose a little bit on selling them some hardware, you more than

24   make up for that with software; right?

25   A.   I -- can you ask the question again?

1  Q.   Well, look at 2730.  You were shown that on direct

2  examination showing these discounted hardware sales.  That's in

3  evidence.  We can put it up.

4       And if we can blow up this column over here "Discount."

5  And you come across, the third one down is "JPMC," and if we

6  get over to "Discount" -- which is the next column over,

7  Jeff -- there, JPMC, the discount that they're getting is a

8  $2,700,000 discount on all the hardware that they bought;

9  right?

10 A.   Correct.

11 Q.   And this one software sale is $9 million?

12 A.   Correct.

13        MR. LEACH:  Objection.  Vague as to time.  Are we

14 looking at something in 2010?

15        MR. KEKER:  We're looking at the software sales --

16 Q.   In 2010 all the hardware they'd been sold was -- the

17 discount for that, the amount of loss that was taken to sell

18 them all that hardware and build that relationship, or whatever

19 happened, was $2.7 million?

20        MR. LEACH:  Objection.  Foundation.

21        MR. KEKER:  I thought you testified about this when he

22 was asking you questions.

23        THE COURT:  Well, okay.  Ask the question.

24 BY MR. KEKER:

25 Q.   The total discount for JPMorgan Chase hardware was

1    $2.7 million?

2    **A.**    That's the way I read it, yes.

3    **Q.**    And back in 2009, one sale had gained $9 million worth of

4    software; right?

5            **MR. LEACH:**   Objection.   That misstates the evidence,

6    your document.

7            **THE COURT:**   Well, listen, I can't remember.

8        Ladies and gentlemen, if it's a misstatement of the

9    evidence, you may be aware of it, if you remember it; but the

10   question is, I suppose:   Is this your recollection of what

11   happened?

12       Is that the question, Mr. Keker?   I don't -- I mean, you

13   assume certain things, and I know you do it in good faith, but

14   the problem is that nobody can remember it.

15           **MR. KEKER:**   Well, I'm just trying not to go so slowly,

16   Your Honor.

17           **THE COURT:**   Pardon?

18           **MR. KEKER:**   I'm trying not to go so slowly.

19   **Q.**    Let's look at 6290 very carefully, and if you'd look at it

20   in your book.   It's a bunch of invoices for software; and if

21   you add them all up, it comes to more than $9 million.   That's

22   my question.   Don't they come to more than $9 million --

23   **A.**    They do.

24   **Q.**    -- software sales?

25       All right.   And that was in the second quarter of 2009;

1    right?

2    **A.**    I'm just looking at the date.

3         (Witness examines document.)  This document that I'm

4    looking at is the second quarter of 2010.

5    **Q.**    I beg your pardon.  Second quarter of 2010.

6         Okay.  So $9 million in the second quarter of 2010, and

7    the JPMorgan Chase had been buying hardware at a discount

8    through Autonomy for some time; right?

9    **A.**    Correct.

10   **Q.**    And the exhibit we just looked at showed that the total

11   discount they got was $2.7 million?

12   **A.**    Correct.

13   **Q.**    So the difference between those two numbers is

14   $6.4 million; right?

15   **A.**    Correct.

16   **Q.**    And how much other software did JPMorgan Chase buy in

17   2010, '11, and going on?

18   **A.**    I don't know specifically, but JP Morgan was a big

19   customer of Autonomy's.

20   **Q.**    You sold lots of software -- Autonomy sold lots of

21   software to Citibank?

22   **A.**    That's correct.

23   **Q.**    They sold a lot of software to Bloomberg?

24   **A.**    I believe that's correct.

25   **Q.**    Let's look at 6357, please, towards the end of Volume 3 of

```
 1   your binder -- no.  I beg your pardon.  It's over here.

 2           MR. KEKER:  Your Honor, I move in 6290.  That was

 3   the --

 4           THE COURT:  Okay.  62 --

 5           MR. KEKER:  6290.  I guess I forgot to move it in.

 6           THE COURT:  6290 admitted.

 7        (Trial Exhibit 6290 received in evidence)

 8           MR. KEKER:  Now I'm looking for 6357.

 9                       (Pause in proceedings.)

10           THE COURT:  Well, 5290 is a witness statement of --

11           MR. KEKER:  No.  6290, Your Honor, is what I moved.

12           THE COURT:  Oh, I was looking at 5290.  I'm sorry.

13           MR. KEKER:  If I said it wrong, I'm sorry.

14           THE COURT:  No.  I said it wrong.  6290 admitted.

15        Now you have another one.

16           MR. KEKER:  And now I'm showing him 6357.

17           THE COURT:  Admitted.

18        (Trial Exhibit 6357 received in evidence)

19   BY MR. KEKER:

20   Q.  And look down at the bottom of that exhibit where it's

21   Mr. Guiao to Mr. Raygoza.  Mr. Raygoza is at Bloomberg; right?

22   A.  Correct.

23   Q.  And this is an agreement to sell software to Bloomberg?

24   A.  Correct.

25   Q.  And it comes about two months after what Mr. Leach showed
```

 1   you as selling hardware to Bloomberg?

 2   **A.**   Okay.

 3   **Q.**   All right.  Did you hear Mr. Egan or Mr. Sullivan talk

 4   about this hardware sales as relationship building?

 5   **A.**   I did hear that said, though I'm not certain on who said

 6   it.

 7   **Q.**   Okay.  Did you understand that the goal of these hardware

 8   sales was to sell more software?

 9   **A.**   I understood that the goal of the hardware sales was to

10   increase revenue and contain our margins.

11   **Q.**   Okay.  You didn't think that the goal of hardware sales

12   was to sell more software?

13   **A.**   I didn't think that it was or wasn't.

14   **Q.**   Okay.  Let's look at the Morgan Stanley transaction, 6191,

15   in June of 2009.  That was the biggest, $20 million worth of

16   software -- or, excuse me -- $20 million worth of hardware.

17            **MR. KEKER:**  6191, I move it in, Your Honor.

18            **THE COURT:**  Admitted.

19       (Trial Exhibit 6191 received in evidence)

20   **BY MR. KEKER:**

21   **Q.**   And that is an agreement to sell to Morgan Stanley in June

22   of 2009 hardware with an aggregate value of $20 million; right?

23   **A.**   Correct.

24   **Q.**   You remember that deal?

25   **A.**   I do.

1   Q.   And if you look at the second page, fourth paragraph down,

2   the first line of the fourth paragraph down, the one just above

3   where the arrow -- yeah, that one -- and do you remember that

4   Morgan Stanley is entering into this letter agreement in

5   connection with a series of transactions being entered into

6   between the parties, and it goes on to talk?  But do you

7   remember that the series of transactions were software

8   purchases?

9   A.   I do.

10  Q.   Okay.  So Morgan Stanley was buying a lot of hardware and

11  they were also buying a lot of software; right?

12  A.   Right.

13  Q.   Morgan Stanley, for example, bought $18.5 million worth of

14  software in 2008.  Do you remember that?

15  A.   I remember generally that Morgan Stanley bought a lot of

16  software.  I'm not as fresh on the dates.

17  Q.   Do you remember a deal that the jury has heard about where

18  they bought another $12 million worth of software at the end of

19  the 2009?

20  A.   Yes.

21  Q.   How much profit did Autonomy make selling software to

22  Morgan Stanley?

23  A.   I don't know.

24  Q.   It was a huge customer, though, wasn't it?

25  A.   Yes.

1  Q.   Did it dwarf the amount of money that they -- the discount

2  on hardware sales?

3  A.   Did the amount of -- just to clarify, did the amount of

4  revenue that Autonomy got from software dwarf the discount that

5  Autonomy gave on hardware?

6  Q.   With respect to Morgan Stanley.

7  A.   Yes.

8  Q.   You were asked about sales through Zones, a company called

9  Zones, to H&R Block and Target.  Do you remember that?

10 A.   I do.

11 Q.   H&R Block and Target were software customers of Autonomy,

12 weren't they?

13 A.   I believe that's right.

14 Q.   In -- well, let's look at 6292.

15 A.   (Witness examines document.)

16 Q.   Is this a September 30 -- you're copied on it -- a

17 September 30 order to you for $2 million worth -- from

18 H&R Block for $2 million worth of software?

19 A.   Yes.

20 Q.   And that's just two months after selling hardware through

21 Zones to H&R Block?

22 A.   Again, I don't have the dates fresh in my mind, but I have

23 no reason to doubt what you're saying.

24 Q.   Well, then -- okay.

25      Without -- and it's the same with Target.  Target bought

1    hardware through Zones but they also bought software both

2    before and after they bought this hardware; right?

3    A.    I believe that's correct.

4    Q.    Okay.  Did you understand that there were efforts to

5    develop appliances with EMC and Dell, joint efforts between

6    Autonomy and EMC and Autonomy and Dell?

7    A.    I heard that talked about.  I remember Andy Kanter telling

8    me about it, and I remember discussions of appliances coming up

9    at management meetings, however, my familiarity with it was

10   relatively cursory.  I wasn't involved in any discussions

11   beyond hearing about that.

12   Q.    Did you hear about the development with either of those

13   companies of something -- the marketing term was "Arcpliance"?

14   A.    Yes.

15   Q.    What's Arcpliance?

16   A.    I'm not sure.

17   Q.    Was it a hardware and software together product?

18   A.    Yes.

19   Q.    Did you hear about Project Dynamo?

20   A.    Yes.

21   Q.    What was that?

22   A.    Project Dynamo was the potential acquisition of Documentum

23   from EMC.

24   Q.    Documentum was EMC's software division?

25   A.    Correct.

**SCOTT - CROSS / KEKER**

1  Q.    And they were out in Pleasanton?

2  A.    Correct.

3  Q.    You told us about a trip that you and Mr. Hussain took out

4  there?

5  A.    Correct.

6  Q.    And you knew that there was -- well, did you know that

7  Deloitte sent over auditors to do due diligence on that deal?

8  A.    No.

9  Q.    Pardon?

10  A.    No.

11  Q.    Okay.  Did you know how much that deal was going to be

12  for?

13  A.    No.

14  Q.    Did you know that EMC was thinking about taking a stake in

15  Autonomy?

16  A.    I believe I heard that mentioned.  I believe I heard that

17  mentioned.

18  Q.    Okay.  So did you ever hear the number $2.4 billion in

19  connection with that deal?

20  A.    I believe that it was around $2 billion.

21  Q.    Billion?

22  A.    Billion.

23  Q.    Billion.  And what was going to happen is that EMC was

24  going to buy a stake in Autonomy and Autonomy was going to get

25  the software division of EMC?

 1   **A.**   I'm -- again, I'm not certain on the -- I'm not certain

 2   of -- what I recall is that there was negotiations with EMC and

 3   that ultimately the deal didn't happen and, as you mentioned,

 4   that there was some discussion about EMC potentially investing

 5   in Autonomy, but I don't recall any sort of detail beyond that

 6   general recollection.

 7            **MR. KEKER:**   Your Honor, Ms. Scott reminds me I have

 8   not moved in 6292, and I would like to.

 9            **THE COURT:**   Admitted.

10       (Trial Exhibit 6292 received in evidence)

11            **MR. KEKER:**   Thank you very much.

12   **Q.**   What about Project Blue Jay with Dell, a project to

13   develop appliances with Dell?

14   **A.**   I remember hearing that name, Blue Jay.

15   **Q.**   But you weren't involved in it?

16   **A.**   No.

17   **Q.**   Some very brief questions about you said on direct

18   examination you didn't know what 8(a) is.  Do you remember

19   giving that testimony?

20   **A.**   I do.

21   **Q.**   You knew it was a designation for a minority-owned

22   business, didn't you?

23   **A.**   I knew that there -- what I -- what I recall is that it

24   was a designation of minority or women or some other type of

25   designation of a select -- of a reseller that has met a

1  certain -- yeah, a certain set of requirements for designation.

2  It wasn't -- it's not immediately clear to me that it was

3  minority-owned.

4  **Q.**   Okay.  Can we put up 2276?  And go to the last page.

5       This is a MicroTech e-mail.  The jury saw it this morning,

6  but the last page where they identify MicroTech blow up up at

7  the top -- no.  The very last page, I think.  Yeah, that.

8       Yeah.  I mean, when MicroTech would send e-mails, they'd

9  have on the last page this logo -- right? -- "A

10  Service-Disabled Veteran-Owned and 8(a) Small Business"?

11  **A.**   Correct.

12  **Q.**   Okay.  So you knew about that?

13  **A.**   Yes.

14  **Q.**   Why did you say you didn't know what 8(a) is?

15  **A.**   Because I am not -- I wasn't -- when I was asked, I'm not

16  exactly sure of what the -- I was aware that 8(a) designated

17  something.  I wasn't recalling what the something was that the

18  8(a) referred to.

19  **Q.**   It was Mr. Egan's idea to use the reseller's 8(a) status

20  as an incentive for the end users to use the reseller, wasn't

21  it?

22            **MR. LEACH:**  Objection.  Vague.

23            **THE COURT:**  Well, if he knows.

24            **THE WITNESS:**  I don't know.

25  \\\

1    BY MR. KEKER:

2    Q.    Did you tell the Government that?

3    A.    I don't recall.

4    Q.    Would you look at --

5              THE COURT:  What number?

6    BY MR. KEKER:

7    Q.    -- it is 5167, which is your interview of August 3rd,

8    2015, which would be your seventh interview with the

9    Government.

10             THE COURT:  I'm sorry.  What --

11   BY MR. KEKER:

12   Q.    -- and look at page --

13             THE COURT:  No, no.  Excuse me.  I'm looking at --

14   maybe I'm looking at the wrong one.  5167?

15             MR. KEKER:  5167.

16             THE COURT:  5167?

17             MR. KEKER:  Yes, sir.

18             THE COURT:  In my book it's an interview with -- I beg

19   your pardon.  It was transcribed on January 20th.

20             MR. KEKER:  Right.

21             THE COURT:  The interview took place on August 3rd,

22   which is what you said.

23             MR. KEKER:  Right.

24             THE COURT:  Okay.

25             MR. KEKER:  I'm looking down at the bottom.

1              THE COURT:  Well, maybe that's where I should look.

2    What page?

3              MR. KEKER:  Page 4.

4              THE COURT:  Okay.

5                        (Pause in proceedings.)

6    BY MR. KEKER:

7    Q.   Look under where it says "GJ Exhibit 180," look at the

8    sentence right below that down at the bottom of page 4?

9    A.   I see it.

10   Q.   Did you tell the Government back in August of 2015 that it

11   was Stouffer Egan's idea to use a reseller's 8(a) status as an

12   incentive for end users to include the reseller in the deal?

13   A.   Based on reviewing this document, I believe so.

14   Q.   And did you tell them that Scott stated that 8(a) was a

15   designation for a minority-owned business?

16   A.   Based on this document, yes.

17   Q.   But now between 2015 and now, you've forgotten what 8(a)

18   is?

19   A.   Well, again, to be clear, I don't recall saying that

20   specifically to the Government.  I'm reading this document that

21   you put in front of me, and I can't speak to what specifically

22   I've forgotten between 2015 and today.

23   Q.   Mr. Scott, you used 8(a) in trying to get business from

24   the Bank of America, didn't you?

25   A.   We did.

SCOTT - CROSS / KEKER

```
 1   Q.   Okay.  Look at 1443, please.  That's in the first binder.

 2              THE COURT:  1443?

 3              MR. KEKER:  1443.

 4                    (Pause in proceedings.)

 5              MR. KEKER:  Move that in, Your Honor.  It's an e-mail

 6   from Joel Scott to Reagan Smith.

 7              THE COURT:  Admitted.

 8       (Trial Exhibit 1443 received in evidence)

 9   BY MR. KEKER:

10   Q.   And Reagan Smith is the man at Bank of America that you

11   were dealing with in getting these transactions done in 2011

12   closing that big deal?

13   A.   Correct.

14   Q.   And you're saying (reading):

15              "Hi, Reagan.

16              "Following up on my voice mail from yesterday, please

17        give me a call when you have a moment so that we can talk

18        through the 8(a) concept in more detail."

19        Right?

20   A.   Yes.

21   Q.   So then you knew what an 8(a) was?

22   A.   I believe so.

23   Q.   Look at 6294, please.

24   A.   (Witness examines document.)

25              MR. KEKER:  I move it in, Your Honor.
```

1              **THE COURT:**  Admitted.

2        (Trial Exhibit 6294 received in evidence)

3              **MR. KEKER:**  Okay.  Let's put it up.

4   **Q.**  Mr. Reagan writes back and says (reading):

5              "Stouffer, Joel, the e-mail confirms the use of

6        MicroTech as an 8(a) will be fine.  I've confirmed it

7        through our diversity council chair," and so on.

8        So back then you knew what 8(a) was?

9   **A.**  That sounds reasonable.  I don't specifically recall

10  what -- I don't specifically recall when I knew that 8(a) meant

11  minority owned.

12  **Q.**  Okay.  Let's talk about Mr. Hogenson.

13       Mr. Hogenson was the chief financial officer for the

14  Americas; right?

15  **A.**  Correct.

16  **Q.**  Stouffer Egan was CEO, you were general counsel and then

17  chief operating officer, and Hogenson was chief financial

18  officer?

19  **A.**  Correct.

20  **Q.**  And he'd been at the company about a year when significant

21  problems arose in his department?

22  **A.**  That sounds correct.

23  **Q.**  And the problems -- well, look at 827, an e-mail that

24  Mr. Hogenson wrote to you, I think.

25  **A.**  (Witness examines document.)

1   Q.   Did you know that in May of 2010 Mr. Hogenson was writing

2   to Mr. Hussain and Mr. Chamberlain about problems in his

3   department?

4   A.   I believe so.

5   Q.   Have you seen this e-mail, the one that he wrote, before

6   today?

7   A.   I don't recall.

8   Q.   Okay.  Did you learn -- all right.

9        Did you learn that he was reporting that people in the

10  Finance Department were getting paid after they were terminated

11  from employment?

12  A.   I don't recall knowing that or hearing that.

13  Q.   Well, look at this e-mail and see if that refreshes your

14  recollection of four employees continuing to get paid

15  post-termination.

16  A.   (Witness examines document.)  I don't recall discussing

17  this or -- sorry.  I'm just going to read the whole thing

18  because I'm not as familiar with this.

19  Q.   Sure.

20  A.   (Witness examines document.)  I recall generally having a

21  conversation with Brent around Lourdes' performance.

22  Q.   Who's Lourdes?

23  A.   Lourdes is one of the finance people that he is suggesting

24  gets terminated here and the person who was involved in the

25  payroll fraud.

1   **Q.**   Okay.  Before you knew about the problems with Lourdes and

2   the payroll fraud, you personally already had problems with

3   Hogenson, didn't you?

4   **A.**   I did.

5   **Q.**   Okay.  You didn't trust him?

6   **A.**   Correct.

7   **Q.**   And you'd been told by a couple of people who had worked

8   with him that he was bad news?

9   **A.**   Correct.

10  **Q.**   And you'd had some personal run-ins with him?

11  **A.**   Correct.

12  **Q.**   He tried to make end runs around the Legal Department?

13  **A.**   Correct.

14  **Q.**   And he had told people he worked with to bypass you?

15  **A.**   I believe that's true.

16  **Q.**   All right.  And you've described your relationship with

17  Hogenson as the most difficult one you had at Autonomy; right?

18  **A.**   That's correct.

19  **Q.**   You complained to Andy Kanter about him?

20  **A.**   I did.

21  **Q.**   And Andy Kanter said that you can't fire -- he can't be

22  fired because Sushovan Hussain loves him?

23  **A.**   That's correct.

24  **Q.**   Okay.  Then in June evidence of a payroll fraud in the

25  San Francisco office came to light; right?

**SCOTT - CROSS / KEKER**

1   **A.**   Correct.

2   **Q.**   And Andy Kanter asked you to investigate it?

3   **A.**   Correct.

4   **Q.**   You were completely in charge of that investigation?

5   **A.**   He told me that I was completely in charge of that

6   investigation.

7   **Q.**   Okay.  And you made the decision to hire investigators

8   from Kroll?

9   **A.**   Correct.

10  **Q.**   Which is a private investigation agency; right?

11  **A.**   Correct.

12  **Q.**   And you supervised them?

13  **A.**   Yes.

14  **Q.**   They reported to you?

15  **A.**   Yes.

16  **Q.**   Mr. Hussain had absolutely nothing to do with that

17  investigation, did he?

18  **A.**   I didn't deal with him directly on this investigation.

19  **Q.**   And Kroll's report showed problems that went beyond the

20  payroll fraud; right?

21  **A.**   I don't recall Kroll's findings beyond the payroll fraud.

22  **Q.**   Look at 6259, please.

23  **A.**   (Witness examines document.)

24  **Q.**   That's an e-mail from you to Andy Kanter and then Kanter

25  back to you.

 1           **MR. KEKER:**  I move it in, Your Honor.

 2           **THE COURT:**  Admitted.

 3       (Trial Exhibit 6259 received in evidence)

 4   **BY MR. KEKER:**

 5   **Q.**   And the bottom e-mail is from you to Mr. Kanter dated

 6   July 9, 2010, and you're reporting on what Kroll is finding;

 7   right?

 8   **A.**   Correct.

 9   **Q.**   Look under "Interwoven Finance" on the second page, and it

10   says (reading):

11           "As you know, we just uncovered another significant

12       problem yesterday, which indicates that the Interwoven

13       Finance team has been requesting and issuing payments

14       without obtaining requisite approvals."

15       So did Kroll's investigation lead to things beyond --

16   problems beyond the payroll fraud?

17   **A.**   I believe that the way I -- that I learned about the other

18   problems was through e-mails, notifications that I got from

19   Andy Kanter, Steve Chamberlain, and Sushovan.

20   **Q.**   Well, when you say, "We just uncovered another significant

21   problem yesterday," who uncovered it?

22   **A.**   I believe that I meant "we" as in we, Autonomy.

23   **Q.**   (reading)

24           "From the documentation reviewed, it looks like

25       Brent, Percy, and Cindy Johnson have been intentionally

1          bypassing a standard company policy and making payments

2          solely on Brent's or Percy's direction."

3          Who told you that?

4    **A.**   I don't recall.

5    **Q.**   Okay.  That came from Kroll, didn't it?

6    **A.**   I'm not sure that it did.

7    **Q.**   Okay.  Anyway, as a result of this new problem that you're

8    learning about, you hired -- you decided to hire Discovery

9    Economics?

10   **A.**   No.

11   **Q.**   Who hired Discovery Economics?

12   **A.**   Andy Kanter instructed me to hire Discovery Economics.

13   **Q.**   Okay.  Who worked out the deal with Discovery Economics?

14   **A.**   Our outside counsel.

15   **Q.**   The investigation of the U.S. Finance Department revealed

16   that Mr. Hogenson had violated a lot of rules; right?

17   **A.**   Yes.

18   **Q.**   He paid reseller fees without approval?

19   **A.**   Correct.

20   **Q.**   He signed off on things, like settlements, for which he

21   didn't have any proper authority?

22   **A.**   Correct.

23   **Q.**   He submitted false expense reports?

24   **A.**   I believe that's correct.

25   **Q.**   He engaged in questionable travel and expense things?  I

1    think you mentioned Chicago earlier.

2    **A.**   Right.

3    **Q.**   He approved expenditures for amounts greater than his

4    approval authority?

5    **A.**   I don't specifically recall.

6    **Q.**   Do you remember the sum of the unauthorized payments to

7    third parties he made?  How much money was involved?

8    **A.**   I don't recall.

9    **Q.**   Okay.  And then you learned later that after the problems

10   with U.S. Finance surfaced and as the embezzlement of payroll

11   fraud was coming to light, that Mr. Hogenson, claiming to be a

12   whistleblower, made these allegations about accounting; right?

13   **A.**   I'm sorry.  Would you mind --

14   **Q.**   Well, you learned later -- while the payroll investigation

15   was coming to a head and the embezzlement was being

16   investigated and acted on, you learned that he started making

17   these allegations about accounting?

18   **A.**   Correct.

19   **Q.**   And we've been through what led up to the firing.  You

20   knew about that Deloitte and the Audit Committee had looked at

21   the allegations.  You knew that before you made the decision to

22   fire him on July 28?

23   **A.**   I believe that's correct.

24   **Q.**   Okay.  You didn't talk to Mr. Hussain about that decision,

25   did you?

**SCOTT - CROSS / KEKER**

1    **A.**    No.

2    **Q.**    You never asked him if you should fire Mr. Hogenson?

3    **A.**    No.

4    **Q.**    He never told you to fire Mr. Hogenson?

5    **A.**    No.

6    **Q.**    Did you know that Hewlett Packard at the time of the due

7    diligence about the merger was told about Mr. Hogenson's

8    complaints?

9    **A.**    No.

10   **Q.**    You still don't know that?

11   **A.**    I believe that to be true today.

12            **MR. LEACH:**  Objection.  Hearsay.

13            **THE COURT:**  Sustained.

14   **BY MR. KEKER:**

15   **Q.**    Do you know how thoroughly Hewlett Packard looked into

16   Mr. Hogenson's accusations before they made a decision to buy

17   Autonomy?

18            **MR. LEACH:**  Objection.  Foundation.

19            **THE COURT:**  Sustained.

20   **BY MR. KEKER:**

21   **Q.**    Let's talk about StorHouse.  StorHouse is the FileTek data

22   compression program software; right?

23   **A.**    Correct.

24   **Q.**    And you were involved in purchases of StorHouse from

25   FileTek?

1    **A.**    Correct.

2    **Q.**    People in the United Kingdom thought that StorHouse was

3    great technology which could compress storage for Digital Safe?

4         **MR. LEACH:**  Objection.  Foundation.  Calls for

5    speculation.

6         **THE COURT:**  Sustained.

7    **BY MR. KEKER:**

8    **Q.**    The first time you talked to Hewlett Packard lawyers -- I

9    guess the second time, on November 15th, 2012, did you tell

10   them that people in the United Kingdom thought StorHouse was

11   great technology which could compress storage for Digital Safe?

12        **MR. LEACH:**  Objection.  Hearsay.

13        **THE COURT:**  Sustained.

14   **BY MR. KEKER:**

15   **Q.**    Do you recall saying that to the Hewlett Packard lawyers?

16        **MR. LEACH:**  Objection.  Hearsay.

17        **THE COURT:**  Sustained.  I think this is cumulative --

18   I mean, I don't know that it's cumulative.  I don't think he's

19   the witness on that subject.  Okay?  So I'm going to -- I'm

20   going to sustain objections to this line of questions.

21        **MR. KEKER:**  All right.

22   **Q.**    You were involved in negotiating these purchases, though;

23   right?

24   **A.**    Yes.

25   **Q.**    And you bought the StorHouse for a good discount?

1    A.   I believe that's correct.

2    Q.   And the first one was at the end of 2009, and that was for

3    $8 million; and then in May 2010, there was another purchase of

4    an unlimited license for internal use for StorHouse being --

5    for Digital Safe hosting at Autonomy; right?

6    A.   Correct.

7    Q.   Look at 812.

8          MR. KEKER:  I'd like to move in 812, Your Honor.

9          THE COURT:  Okay.

10                    (Pause in proceedings.)

11         MR. KEKER:  That's the May 2010 purchase.

12         THE COURT:  Admitted.

13    (Trial Exhibit 812 received in evidence)

14   BY MR. KEKER:

15   Q.   And look at 795, please.

16   A.   (Witness examines document.)

17         THE COURT:  Admitted.

18    (Trial Exhibit 795 received in evidence)

19   BY MR. KEKER:

20   Q.   And 796.

21   A.   (Witness examines document.)

22         THE COURT:  Admitted.

23    (Trial Exhibit 796 received in evidence)

24         MR. KEKER:  Okay.

25   Q.   And then in March 2011, there was another license for

1    Morgan Stanley -- for StorHouse to be used for Morgan Stanley

2    and Hewlett Packard; right?

3    **A.**    Correct.

4    **Q.**    And that was a sublicense for those customers to use

5    internally?

6    **A.**    Correct.

7    **Q.**    Now, you said on direct examination that that was

8    gratuitous because you already had the right to do that?

9    **A.**    I believe that's correct.

10   **Q.**    All right.  Well, the first license was for internal use

11   by Autonomy in its Digital Safe hosted environment; right?

12   **A.**    I believe you're correct.

13   **Q.**    And the license in March of 2011 was a sublicense for

14   customers, Morgan Stanley and Hewlett Packard, to use at their

15   facility?

16   **A.**    I believe what you're saying is likely true.  I can't

17   specifically recall what the terms of the license were.

18   **Q.**    Look at 1696.

19   **A.**    (Witness examines document.)

20          **MR. KEKER:**  And I'd move that in, Your Honor.

21          **THE COURT:**  Admitted.

22          (Trial Exhibit 1696 received in evidence)

23   BY MR. KEKER:

24   **Q.**    Those are -- Hewlett Packard and Morgan Stanley StorHouse

25   purchases were for enterprise licenses for use by Morgan

1    Stanley and Hewlett Packard at their facilities; right?

2    **A.**   (Witness examines document.)  I don't recall the location;

3    but in reviewing this, it does stipulate that the license is

4    for the customers.

5    **Q.**   Okay.  And the license to use StorHouse at Autonomy

6    wouldn't cover a license to let Morgan Stanley and HP use it at

7    their place, would it?

8    **A.**   My one hesitation is without looking at and reading

9    through all of the agreements and trying to understand exactly

10   how they fit together, I can't be certain; but based on the way

11   that you've presented the facts, if Autonomy has a license

12   where only Autonomy can use it internally and we want to give a

13   customer the right to use this software on their own outside of

14   the Autonomy environment, I believe that wouldn't be covered by

15   the first license.

16   **Q.**   All right.  And so you'd be wrong when you said it was

17   gratuitous?

18   **A.**   I would be wrong in that case.

19   **Q.**   Do we need -- I mean, we've got the documents in front of

20   us.  Do you need to go through that to figure that out?

21   **A.**   I likely would, and it might take me awhile.

22   **Q.**   Well, look at 1696.  Tell me whether or not that is what I

23   said was an enterprise software license.  Look at

24   page 1696-16 -- no, not 16.  Wait.  1696-0008.

25       And blow up the grant of the license there in the middle.

1            "Grant of License to Sublicense."  It grants to you, a

2      nonexclusive, nontransferable license for the sole purpose of

3      sublicensing the software to Morgan Stanley.  That's different

4      than the license to Autonomy to host it; right?

5      **A.**   Correct.

6      **Q.**   Okay.  So we've -- it's not gratuitous?

7      **A.**   It's a different license, yes.

8      **Q.**   Okay.  And then in June 2011, you negotiated a limited

9      license of StorHouse for Barclays, Morgan Stanley, B of A, to

10     use with the Iron Mountain products; right?

11     **A.**   That sounds correct.

12     **Q.**   And then in August you negotiated an unlimited license as

13     opposed to the first one, which was only for Barclays, Morgan

14     Stanley, and B of A?  In August you negotiated one for all

15     Iron Mountain locations?

16     **A.**   That sounds correct.

17     **Q.**   Did you think you were doing anything illegal when you

18     were making those purchases?

19     **A.**   No.

20     **Q.**   Quickly, with MicroLink, you weren't involved in the

21     acquisition, you weren't involved in the discussions that led

22     up to the acquisition, were you?

23     **A.**   No.

24     **Q.**   All right.  And you'd learned of the acquisition when it

25     happened in January of 2010?

**SCOTT - CROSS / KEKER**

1  **A.**   Correct.

2  **Q.**   Since MicroLink did classified deals with the Government,

3  they required what you called a Proxy Agreement.  Would you

4  tell the jury what that was and how it worked?

5  **A.**   Sure.  The Proxy Agreement was an agreement that was

6  entered into among Autonomy, the U.K. company, MicroLink, the

7  U.S. company that Autonomy acquired, and the Government; and

8  the intention of the agreement was to effectively contain

9  MicroLink, the entity, from foreign influence.  So that, I

10 guess, a foreign entity, a non-American entity was limited in

11 terms of what influence it had over MicroLink and what

12 information it could collect from MicroLink, generally

13 speaking.

14 **Q.**   And as a result of this Proxy Agreement, have you

15 described MicroLink as completely independent of the rest of

16 Autonomy?

17 **A.**   Yes.

18 **Q.**   Do you know that its debts were transferred to the

19 Autonomy books?

20 **A.**   I did not.

21 **Q.**   Well, you were the person, according to your résumé, in

22 charge of MicroLink for Autonomy?

23 **A.**   Correct.

24 **Q.**   And you didn't know what debts of MicroLink were on the

25 books?

SCOTT - CROSS / KEKER

1    **A.**    Correct.

2    **Q.**    Okay.  Do you know how much of those debts were collected,

3    if any?

4    **A.**    No.

5    **Q.**    Okay.  Do you know whether or not MicroLink continued to

6    be successful, once it joined Autonomy, in the federal sales

7    marketplace?

8    **A.**    I believe that MicroLink sales continued to grow

9    post-acquisition after Autonomy acquired them.

10   **Q.**    A few questions about the Vatican.

11         Let me show you what's in a folder.  You said you had no

12   involvement in the Vatican transaction?

13   **A.**    I believe that's correct.

14   **Q.**    You had some, didn't you?

15   **A.**    I don't specifically recall, but I have a feeling you'll

16   refresh my recollection.

17   **Q.**    Do you know whether or not you were involved in the issue

18   of delivery of the software to the Vatican -- or, excuse me --

19   to MicroTech for resale to the Vatican?

20   **A.**    I believe that I was asked -- or I was asked by Steve

21   Chamberlain to confirm that -- or to check with MicroTech to

22   confirm that they had received the software.

23   **Q.**    All right.  Let's look at 5630.  Is that an e-mail that

24   shows Mr. McCarthy sending to Steve Truitt the software for the

25   Vatican?

 1    A.    That's -- yes.

 2           MR. KEKER:  Move it in, Your Honor.

 3           THE COURT:  Admitted.

 4    (Trial Exhibit 5630 received in evidence)

 5    BY MR. KEKER:

 6    Q.    It's dated March 31, 2010.  Is Mr. McCarthy saying that on

 7    March 31, 2010, before the end of the quarter, MicroTech is

 8    getting this software?

 9    A.    I believe so.

10    Q.    Okay.  And look at 6030.  Excuse me -- yeah, 6030.

11           THE COURT:  Admitted.

12    (Trial Exhibit 6030 received in evidence)

13           MR. KEKER:  If you can put 6030 up.

14    Q.    What is that?

15    A.    This appears to be another Autonomy invoice.

16           MR. KEKER:  Okay.  I'd move it in.  You said

17    "Admitted" so this is in.

18    Q.    This is an invoice to MicroTech for the company -- for the

19    Vatican Library.  This is the Vatican Library deal?

20    A.    Correct.

21    Q.    And the date of the invoice is what?  Up there, SO date?

22    A.    March 31st, 2010.

23    Q.    Who prepared this?

24    A.    I don't know.

25    Q.    Okay.  And then you said you were asked to confirm

1   delivery of the software.  Let's look at 766.

2          MR. KEKER:  I move in 766, Your Honor, and I've got it

3   here in a folder.

4          THE COURT:  Admitted.

5      (Trial Exhibit 766 received in evidence)

6   BY MR. KEKER:

7   Q.   And, Mr. Scott, is 766 what you were referring to when you

8   said you were asked by Steve Chamberlain to get proof of

9   delivery of the -- timely delivery of the software?

10  A.   Correct.

11  Q.   And here Mr. Truitt writes back to you (reading):

12          "Joel, please be advised that MicroTech received the

13       software on March 31."

14      And you sent it on to Mr. Chamberlain -- or, excuse me --

15  you just said, "Thanks, Steve."

16  A.   Correct.

17  Q.   And then you sent this on to Mr. Chamberlain so that he'd

18  know?

19  A.   I believe so.

20  Q.   A little bit more.

21      ATIC, the A-T-I-C, how would you describe it?  What's

22  ATIC?

23  A.   ATIC is an infrastructure or set of infrastructures that

24  were to be designed by MicroLink so that federal customers

25  could evaluate software in a protected environment that

1   replicated their internal -- their own internal environments.

2   Q.   You said "MicroLink."  Did you mean MicroTech?

3   A.   I did.

4   Q.   All right.  It was MicroTech that was going to build this

5   technology center to show off the software to the federal

6   customers?

7   A.   Correct.

8   Q.   And the federal customers were -- many, many of them --

9   were cleared agencies?

10  A.   Correct.

11  Q.   So this had to be able to be done in a classified manner?

12  A.   I believe that's correct.

13  Q.   All right.  And Mr. Truitt sent you the proposal and you

14  sent it on to Mr. Hussain; right?

15  A.   Correct.

16  Q.   And when you met Mr. Hussain and Mr. Truitt in New York

17  for dinner, you told us that Mr. Truitt was leaving MicroLink

18  and Mr. Hussain was trying to talk him out of it, somebody

19  brought up the ATIC; right?

20  A.   Correct.

21  Q.   And there was no mention of using the ATIC, this

22  technology center, to pay off MicroLink debt, was there, at

23  that dinner?

24  A.   To the best of my recollection, no, there wasn't.

25  Q.   And what Mr. Hussain said was he said, "It sounds

1    interesting.  Talk to Joel"?

2    **A.**   He said, "It sounds interesting.  Work through Joel."

3    **Q.**   Okay.  And eventually you negotiated a deal for three

4    years at the largest discount of the various alternatives?

5    **A.**   Correct.

6    **Q.**   Okay.  And you prepared a memo explaining it?

7    **A.**   Correct.

8    **Q.**   That's 6298.

9          **MR. KEKER:**  I move that in, Your Honor.

10         **THE COURT:**  Admitted.

11   (Trial Exhibit 6298 received in evidence)

12         **MR. KEKER:**  Okay.  Well, we don't need to look at it

13   now, but it's in.

14   **Q.**   Just a few more questions jumping around.

15         This is the Morgan Stanley middle of 2009.  Let's --

16   you've seen this exhibit.  I think it's in.  6191 was the

17   hardware/software deal, $20 million worth of hardware and then

18   software was going to be sold; right?

19   **A.**   Correct.

20   **Q.**   And you were worried -- one of the things in here is that

21   they wanted Hitachi HDS hardware, and you were worried about

22   delivery -- whether or not you could get delivery on time of

23   Hitachi hardware?

24   **A.**   I believe that's correct given where we were at at the end

25   of the quarter.

1   Q.   And at some point you shifted the order to make the

2   description of the hardware you were going to buy more generic

3   so that it didn't have to be Hitachi; it could be anything that

4   did the same thing?

5   A.   I believe that's correct.

6   Q.   Look at 6154.

7           THE COURT:  Admitted.

8       (Trial Exhibit 6154 received in evidence)

9           MR. KEKER:  Okay.  Let's put that up, and look at the

10  middle e-mail from Joel Scott.  Yeah, that one.

11  Q.   Okay.  And that's you to Steve Chamberlain in July saying

12  (reading):

13          "The Morgan Stanley docs do not include the chart.

14      We need flexibility in light of HDS shipping requirements

15      and MS instead gave us a PO for three times PB of mass

16      storage."

17      What does that mean?

18  A.   I believe the -- well, what it means is that we received a

19  purchase order from Morgan Stanley that was generic with

20  respect to the storage.

21  Q.   And Mr. Hussain gave instructions about delivery in 6157?

22  Can we see that?  That's to you.

23          MR. KEKER:  Move it in, Your Honor.

24          THE COURT:  Admitted.

25      (Trial Exhibit 6157 received in evidence)

1    BY MR. KEKER:

2    Q.    So this is an e-mail to you and others from Mr. Hussain at

3    the end of the quarter saying (reading):

4              "FYI.   We need acceptance letter and locations of the

5         'bonded warehouse.'"

6         What's he referring to?

7    A.    I'm not sure what he's referring to with respect to the

8    acceptance letter; and with respect to the locations of the

9    bonded warehouse, I believe he's referring to where the

10   hardware resides.

11   Q.    But, in fact, this hardware was delivered, was deemed

12   delivered, title passed, when it left the EMC warehouse, didn't

13   it?

14   A.    I believe that's the way the EMC contract is written.

15   Q.    Look at 6192, please.

16             MR. KEKER:   And I move that in, Your Honor.

17             THE COURT:   Admitted.

18        (Trial Exhibit 6192 received in evidence)

19   BY MR. KEKER:

20   Q.    And go down to the bottom about five lines up (reading):

21             "Title and risk of loss for the product shall

22        transfer to Morgan Stanley upon shipment from the

23        product's manufacturer provided, however, seller shall

24        indemnify," and so on.

25        But what this means is that delivery occurs when the

SCOTT - REDIRECT / LEACH

1   product leaves the EMC warehouse; right?

2   A.   Correct.

3   Q.   Okay.  And your understanding in this deal was the

4   delivery was proper?

5   A.   Correct.

6         MR. KEKER:  That's all I have.  Thank you, Your Honor.

7   Thank you, Mr. Scott.

8                 (Pause in proceedings.)

9         THE COURT:  Do you want to stand up, ladies and

10  gentlemen, and stretch?

11                (Pause in proceedings.)

12        MR. LEACH:  Thank you, Your Honor.  May I inquire?

13        THE COURT:  Yes.

14        MR. LEACH:  Good afternoon, ladies and gentlemen.

15  Could we please display what has been marked as

16  Exhibit 6351?

17                 **REDIRECT EXAMINATION**

18  BY MR. LEACH:

19  Q.   Do you recall some examination about this

20  password-protected e-mail you sent to Mike Lynch early in

21  January 2011, Mr. Scott?

22  A.   I do.

23  Q.   And if we could please look at the first page of -- or the

24  next page with Dr. Lynch's initial outreach.  And if we could

25  go to the top, please.

1          I draw your attention, Mr. Scott, to what Dr. Lynch is

2     saying in that first paragraph (reading):

3               "U.S. Promote and iManage performance was

4          excellent.  As was Asia on all areas in Europe.  However,

5          Stouffer's direct group is dire.  Excluding the management

6          deals, we are selling less than a couple years ago despite

7          having more reps."

8          Do you see that?

9     **A.**   I do.

10    **Q.**   What did you understand "management deals" to mean?

11    **A.**   The large transactions, many of weren't -- some of which

12    we've talked about here.  So that includes reseller deals and

13    some of the large bank deals.

14    **Q.**   Why were they referred to as "management deals"?

15    **A.**   I don't know.

16    **Q.**   Who did you understand "the management" to be?

17    **A.**   I generally understood Stouffer to be driving management

18    deals.

19    **Q.**   Okay.  On his own or with others?

20    **A.**   Primarily -- Stouffer negotiating the commercials what I

21    saw was primarily on his own.

22    **Q.**   Okay.  Could we please look at what has been marked as

23    6261?

24         And I draw your attention, Mr. Scott, to -- do you recall

25    some dialogue with Mr. Keker about this e-mail between you and

1    Bill Veghte in May of 2012?

2    **A.**    I do.

3    **Q.**    This is around the time you went to Mr. Schultz about some

4    of the concerns that you had?

5    **A.**    Yes.

6    **Q.**    Okay.  And you wrote (reading):

7               "I think what you are starting to see is an

8         organization that a lot of talent at Autonomy would

9         describe as autocratic."

10        What did you mean by that?

11   **A.**    I meant that the direction came from the top and that

12   there was not a lot of -- that the strategy came from the top

13   and that everything below was all execution.

14   **Q.**    What do you mean "the top"?

15   **A.**    I mean the core group of people that I mentioned at the

16   beginning:  Andy Kanter, Sushovan Hussain, Stouffer Egan, Pete

17   Menell, Mike Lynch.

18   **Q.**    "Ruthless," what did you mean by that?

19   **A.**    I meant that it was a really tough environment.  People

20   would get yelled at.  People would get fired on the spot.

21   People would get accused of lying or cheating, and that wasn't

22   always the case.

23   **Q.**    Getting fired on the spot, did you ever observe that on

24   SMS calls?

25   **A.**    I did.

1   **Q.**   Tell us what you observed.

2   **A.**   SMS calls are the weekly sales calls that we go through

3   with all of our sales reps, and there were times when a sales

4   rep would not have any good deals or just come unprepared or

5   not really provide the update that the company was looking for,

6   and on occasion people would get fired on the spot.

7   **Q.**   By whom?

8   **A.**   By Stouffer -- typically by Stouffer -- well, I won't say

9   "typically" because this didn't happen all the time; but when

10  it did happen, what I recall is Stouffer or Sushovan or Mike

11  Lynch.

12  **Q.**   You also wrote "secretive and often exclusionary."  What

13  did you mean by that?

14  **A.**   Well, I meant that the -- well, a couple things that had

15  been drilled into my head were that I don't have all the facts,

16  that I shouldn't question direction, and that was a theme that

17  I experienced a lot.  And it was also echoed sometimes in

18  directions given to me where I would be asked to, you know,

19  investigate something but, you know, not share it more broadly.

20       And I guess I also -- you know, another thing that comes

21  to mind is we had different representatives working on

22  different deals, and sometimes we'd just -- we didn't connect

23  dots internally and communicate with one rep or one part of our

24  organization that maybe another rep or another part of our

25  organization was working with the same company.

1    So things like that is what I'm referring to when I say

2    "secretive and exclusionary."

3    **Q.**   You also wrote "loose on ethics."  What did you mean by

4    that?

5    **A.**   So the -- notwithstanding the debate I had internally

6    about propriety/impropriety of transactions, what I saw was, in

7    my view, an effort to comply with the letter more than the

8    spirit or to even push things a little farther.

9        One example that comes into my mind was a relatively

10   senior employee that was terminated and had some sort of

11   severance payment associated with his termination, and I

12   remember arguing with Andy Kanter that this severance payment

13   is due and payable and Andy took a different interpretation.

14   And to me, it felt like the right thing to do was to pay this

15   amount, and Andy had said no.  So that type of behavior is what

16   I was referring to when I say "loose on ethics."

17   **Q.**   And you said the "letter more than the spirit."  What did

18   you mean by that?

19   **A.**   Well, you know, I guess -- I'm trying -- for example, when

20   I chatted with Andy Kanter after Brent Hogenson was terminated

21   or after I terminated Brent Hogenson and I told Andy about my

22   concerns, he said, "The facts look bad but the law is on your

23   side" or "on our side."

24       And what I'm talking about there are like the bad facts.

25   So, you know, we've amassed all these reseller orders at the

1  end of the quarter before an end user had signed, that could be

2  an example of a fact looking bad and yet the law on our side as

3  I understood it.

4        So is that helpful?  I mean, I'm looking at the language

5  and I'm now forgetting what part of the -- what part of the

6  sentence you were asking me to speak to.

7  **Q.**   I'm trying to understand what you meant by "loose on

8  ethics," and it sounds like I've exhausted your memory on that

9  point.

10 **A.**   Correct.

11 **Q.**   Do you have anything more to add?

12 **A.**   No.

13 **Q.**   Could we please look briefly at 6282?

14       You were asked some questions about this by Mr. Keker in

15 connection with the MicroTech/Discover Tech order and the

16 $2.3 million MicroLink/Discover Tech order.  Do you recall some

17 questions along those lines?

18 **A.**   I do.

19 **Q.**   And the first e-mail in this chain is from someone named

20 Mike -- or involved someone named Michael Mooney.  Who is he?

21 **A.**   Mike Mooney headed up U.S. sales.

22 **Q.**   Do you know why he's involved in this e-mail chain?

23 **A.**   I believe, as I look at this right now, that Stouffer had

24 asked me to introduce Mike to John, and I don't believe that I

25 knew why; but I also recall that Mike Mooney -- that after John

**SCOTT - REDIRECT / LEACH**

1    and Mike Mooney -- Mike Mooney gave me a list of reseller deals

2    for us to draft and have executed by, I believe, MicroTech.

3    **Q.**    So you had other reasons to engage with Mr. Cronin and

4    Mr. Truitt, Dave Truitt, and possibly Steve Truitt at the end

5    of 2009; is that fair?

6    **A.**    Yes.

7    **Q.**    Was it exclusively limited to the $10 million sale and the

8    $2.3 million sale?

9    **A.**    No.

10   **Q.**    You testified at one point you approached Discover Tech

11   about working there at some point in 2010?

12   **A.**    Correct.

13   **Q.**    Okay.  Did that ever happen?

14   **A.**    No.

15   **Q.**    What are you doing today?

16   **A.**    I'm trying to build a company.

17   **Q.**    What type of company?

18   **A.**    An education services company.

19   **Q.**    What do you mean by that?

20   **A.**    I'm trying to build a -- well, the mission of my company

21   is to serve underrepresented, underresourced college graduates

22   and provide them with the training, the relationships, the

23   skill development to allow them to break into entry-level

24   business development jobs in the tech industry and do it at no

25   charge to the student and have employers fund their training.

**SCOTT - REDIRECT / LEACH**

1  Q.   And what happened with the -- was there ever a real

2  opportunity at Discover Tech for you to work?

3  A.   I never pursued any real opportunity at Discover Tech.

4  Q.   Could we look briefly, please, at what was marked as

5  Exhibit 6349?

6       You were asked some questions, Mr. Scott, about a company

7  called Prisa.  Do you remember?

8  A.   I do.

9  Q.   Okay.  And prior to April 5th, 2011, were you aware of any

10 transaction involving Autonomy, Discover Tech, or Prisa?

11 A.   Sorry, prior to?

12 Q.   Prior to this e-mail.

13 A.   Oh, I don't believe so.

14 Q.   Okay.  And Mr. Chamberlain's question to you is one word

15 "Delivery?"  Do you see that?

16 A.   I do.

17 Q.   Do you know whether he's asking you if delivery of the

18 software in this transaction happened, or is he asking you for

19 evidence of the delivery?

20 A.   I don't know.

21 Q.   Okay.  And what's the distinction between those two

22 things?

23 A.   Well, either the delivery did or did not happen; and then

24 even if the delivery did happen, do we have evidence of it or

25 do we not have evidence of it?

**SCOTT - REDIRECT / LEACH**

1  Q.   And were there occasions where Mr. Chamberlain would come

2  to you asking for the evidence of delivery?

3  A.   Yes.

4  Q.   And is that part of what we saw in what was marked as

5  Exhibit 766?

6       Could we please put that up?

7  A.   Yes.

8  Q.   This is an example of Mr. Chamberlain coming to you asking

9  for evidence of delivery?

10  A.   Correct.

11  Q.   Because whatever you had at this point in time, April 20th

12  of 2010, was somehow not sufficient?

13  A.   I'm sorry.  I think I may have misunderstood you.  So can

14  you ask that question again?

15  Q.   Is this an example of you being asked to secure evidence

16  of delivery in April -- on or around April 20th, 2010?

17  A.   Yes.

18  Q.   And is it fair for us to assume that whatever evidence

19  there was prior to this was, for whatever reason, not

20  satisfactory?

21  A.   Yes.

22  Q.   You were asked some questions about the sale of FileTek

23  software to Morgan Stanley at the end of the first quarter of

24  2011.  Do you recall that testimony?

25  A.   I do.

SCOTT - REDIRECT / LEACH

1    **Q.**   And Mr. Keker showed you Exhibit 1696.  Could we please

2    look at that?

3          What are the documents that are attached here, Mr. Scott?

4    **A.**   I believe that they are purchase agreements related to

5    Morgan Stanley and HP.

6    **Q.**   Are they purchase agreements between Autonomy and FileTek?

7    **A.**   Yes.

8    **Q.**   Okay.  So this is -- and are these drafts?

9          Could we go to the signature pages, please.  One more,

10   please.  There you go.  One more.

11   **A.**   Yes.

12   **Q.**   And these are the documents by which Autonomy was

13   acquiring something from FileTek; is that fair?

14   **A.**   Yes.

15   **Q.**   Okay.  I'd like to show you the agreement between Morgan

16   Stanley and Autonomy.

17         **MR. LEACH:**  May I approach, Your Honor?

18   **Q.**   What's the exhibit number I've placed before you,

19   Mr. Scott?

20   **A.**   6283.

21   **Q.**   And do you recognize this as the agreement between Morgan

22   Stanley and Autonomy?

23   **A.**   (Witness examines document.)  I do.

24         **MR. LEACH:**  I offer the exhibit, Your Honor.

25         **THE COURT:**  Admitted.

1           (Trial Exhibit 6283 received in evidence)

2               **MR. LEACH:**  And may we please display it?  Thank you

3    so much.

4    **Q.**   Let's focus at the top portion of this, Mr. Scott.  What

5    is this document?

6    **A.**   It is an amendment to, I think, a couple of different

7    agreements.

8    **Q.**   Okay.  Is it an amendment to a hosting agreement?

9    **A.**   It is.

10   **Q.**   And does this reinforce your belief that -- and prior to

11   this amendment, did Autonomy have the right to license FileTek

12   in hosting agreements?

13   **A.**   Well, the distinction that was borne out for me here that

14   I'm grappling with is Autonomy did get a license to use the

15   StorHouse software in Autonomy's environment that customers had

16   their data in, and what I'd understood from looking at that

17   license agreement that Mr. Keker showed me was that the

18   agreement that we're talking about at this time in March 2011

19   when Autonomy acquired FileTek software, that Autonomy had an

20   additional right to sublicense the software for customers to

21   use on their own.

22   **Q.**   At any point did Morgan Stanley ask for this from your

23   perspective?

24   **A.**   No.

25   **Q.**   Okay.  And is that what you meant by "gratuitous"?

**SCOTT - REDIRECT / LEACH**

1  **A.**    Yes.

2  **Q.**    Explain that.

3  **A.**    Well, the customer did not ask for the software.  We gave

4  the customer the software.  We bought the software apparently

5  because the customer needed the software; but to my knowledge,

6  the customer never specifically asked for the software.

7  **Q.**    Let me ask you a few more questions about Brent Hogenson.

8      You were asked whether it was an independent decision to

9  fire him.  Do you recall that testimony?

10  **A.**    I do.

11  **Q.**    And your answer was no; right?

12  **A.**    Correct.

13  **Q.**    What did you mean by that?

14  **A.**    Well, I think I've -- what I meant was that while it was

15  made explicit to me by Mike Lynch that it was my responsibility

16  to decide whether or not to terminate Brent, I also understood

17  that my management team wanted Brent gone.

18      Andy had mentioned to me several times that he thought

19  Brent was up to no good and creating trouble.  And then I had a

20  series of e-mails shared with me about -- about violating

21  various Autonomy procedures, and that definitely influenced me.

22  That definitely influenced my thinking.

23      And the way I processed the decision was that I saw enough

24  things that made me uncomfortable to feel like I could

25  legitimately fire Brent on a -- you know, with a reasonable

1    basis, but I also clearly understood, very clearly understood

2    that my management team wanted Brent gone.

3    **Q.**   Who do you mean by "management team"?

4    **A.**   Andy Kanter, Steve Chamberlain, Sushovan Hussain, Mike

5    Lynch.  That's who I mean.

6    **Q.**   And you mentioned that at some point you saw a copy of a

7    summary prepared by Deloitte relating to this; is that correct?

8    **A.**   Correct.

9            **MR. LEACH:**  I offer into evidence what has been marked

10   as Exhibit 979.

11           **THE COURT:**  Admitted.

12   (Trial Exhibit 979 received in evidence)

13   **BY MR. LEACH:**

14   **Q.**   I want to get a few things straight on the timing,

15   Mr. Scott.

16   Could you please look at -- if we could please display

17   page 28 of this exhibit.

18   Do you understand this to be a copy of the complaints that

19   Mr. Hogenson sent to the Audit Committee, Mr. Scott?

20   **A.**   I do.

21   **Q.**   Could we please look at the third paragraph where

22   Mr. Hogenson wrote (reading):

23           "I identified a few questions and have reported these

24           to Mike Lynch, the CEO of Autonomy, and have had further

25           discussions with Mike Lynch and Andy Kanter, the COO of

SCOTT - REDIRECT / LEACH

1          Autonomy, over the last week beginning June 22, 2010."

2          Do you see that?

3    **A.**   I do.

4    **Q.**   And do you understand that the first time Mr. Hogenson

5    raised complaints about Autonomy's accounting was June 22nd,

6    2010?

7    **A.**   I do.

8    **Q.**   And was that before you brought to Mr. Kanter's attention

9    the payroll issues in the United States?

10   **A.**   It is.

11   **Q.**   And if you look at page 29 of the exhibit, I draw your

12   attention to question 1.  Did you understand Mr. Hogenson to be

13   raising issues about transactions with Capax with a particular

14   end user?

15   **A.**   (Witness examines document.)  I do.

16   **Q.**   And if we could please look at page 30.

17         I draw your attention to question 2 down at the bottom.

18   Did you understand Mr. Hogenson to be raising about services

19   payments that Autonomy had been making to Capax?

20   **A.**   Yes.

21   **Q.**   And you're aware sitting here today that Autonomy paid

22   millions of dollars to Capax on account of EDD -- outsourced

23   EDD services?

24   **A.**   That's my understanding.

25   **Q.**   Work that you have no idea if that was done or not done?

**SCOTT - REDIRECT / LEACH**

1    **A.**    Correct.

2    **Q.**    Would you please look at question 3 on page 79?  Did you

3    understand one of the issues Mr. Hogenson to be raising was

4    questions around transactions involving MicroTech, MicroLink,

5    and Discover Technologies?

6    **A.**    Yes.

7    **Q.**    And when you say reseller deals that were causing you

8    concern, that's a reference to some of those; is that fair?

9    **A.**    Yes.

10   **Q.**    And to the best of your knowledge, the first time

11   Mr. Hogenson raises this is June 22nd, 2010?

12   **A.**    Yes.

13   **Q.**    And then you start the payroll fraud investigation?

14   **A.**    Yes.

15   **Q.**    How many years back did the payroll fraud issues go?

16   **A.**    I believe it was five or six years.

17                       (Pause in proceedings.)

18   **BY MR. LEACH:**

19   **Q.**    You said four or five years back?

20   **A.**    I said I believe it was five or six years.

21   **Q.**    Okay.  And is it fair to say that that predated

22   Mr. Hogenson's tenure?

23   **A.**    Yes.

24   **Q.**    And did Kroll develop any evidence that Mr. Hogenson was

25   involved in the payroll fraud?

 1   **A.**   Not that I recollect.

 2                       (Pause in proceedings.)

 3   **BY MR. LEACH:**

 4   **Q.**   Just so I'm clear, Mr. Scott, Mr. Hogenson raises the

 5   allegations on the 22nd, then you start the payroll fraud

 6   investigation.  Do I have that timing right?

 7   **A.**   Yes.

 8   **Q.**   And I believe you testified that Mr. Hussain never asked

 9   you to fire Mr. Hogenson?

10   **A.**   I believe that's correct.

11   **Q.**   He did ask you to fire Reema Prasad; is that right?

12   **A.**   Yes.

13   **Q.**   Who was she again?

14   **A.**   She was a finance person who worked for Brent Hogenson.

15   **Q.**   And the reason expressed was mere association with

16   somebody who had raised allegations to the Audit Committee?

17   **A.**   I believe that's right.

18   **Q.**   And Mr. Hussain also asked you to fire Percy Tejada?

19   **A.**   Correct.

20   **Q.**   Who was Mr. Tejada?

21   **A.**   He also worked with Brent Hogenson in San Jose.

22   **Q.**   And that was because of mere association with somebody who

23   had raised allegations to the Audit Committee?

24   **A.**   I believe so.

25   **Q.**   And I believe you testified that prior to firing

1    Mr. Hogenson, Mr. Hussain and others within Autonomy management

2    made it clear to you that you wanted him gone -- or that they

3    wanted him gone?

4    A.    Yes.

5    Q.    I've placed before you, Mr. Scott, what we've marked as

6    Exhibit 2960.  Do you recognize this?

7    A.    I do.

8    Q.    Is this a true and correct copy of an e-mail you received

9    from Mr. Hussain on July 26, 2010?

10   A.    It is.

11         **THE COURT:**  Admitted.

12         (Trial Exhibit 2960 received in evidence)

13   **BY MR. LEACH:**

14   Q.    Mr. Scott, the subject of this e-mail is "Add to Your

15   List."  Do you see that?

16   A.    I do.

17   Q.    And it says (reading):

18             "Brent has been in charge of revenues for a year but

19        has failed to investigate and invoice $488,000 of revenues

20        associated with extended storage compliance."

21        Do you see that?

22   A.    Yes.

23   Q.    Is this one of the e-mails you were referring to when you

24   said Mr. Hussain made it clear that he wanted Mr. Hogenson

25   gone?

1    **A.**    Yes.

2    **Q.**    I've placed before you what has been marked as

3    Exhibit 2978.  Is this another e-mail you received from

4    Mr. Hussain on Monday, July 26, 2010, relating to Mr. Hogenson?

5    **A.**    Yes.

6              **MR. LEACH:**  I offer 2978, Your Honor.

7              **THE COURT:**  Admitted.

8         (Trial Exhibit 2978 received in evidence)

9    **BY MR. LEACH:**

10   **Q.**    What is this document, Mr. Scott?

11   **A.**    This is an e-mail from Sushovan to myself and Stouffer

12   indicating that the U.S. Finance team should not be on our

13   sales call.

14   **Q.**    Is this another example of an e-mail from Mr. Hussain

15   where you concluded that Mr. Hussain wanted Brent gone?

16   **A.**    Yes.

17   **Q.**    I've placed before you, Mr. Scott, what has been marked as

18   Exhibit 2980.  Is this another e-mail from Mr. Hussain on

19   July 26, 2010, relating to Mr. Hogenson?

20   **A.**    It is.

21             **THE COURT:**  Admitted.

22        (Trial Exhibit 2980 received in evidence)

23   **BY MR. LEACH:**

24   **Q.**    And the subject of this is U.S. -- first of all, July 26,

25   2010, that's two days before you fired Mr. Hogenson; correct?

**SCOTT - REDIRECT / LEACH**

1    **A.**    Correct.

2    **Q.**    And the subject is "U.S. Cash Collections."  What is that

3    a reference to?

4    **A.**    I believe outstanding receivables and our collecting on

5    those receivables.

6    **Q.**    And is this another example of Mr. Hussain e-mailing you

7    in or around this time from which you concluded that he wanted

8    Mr. Hogenson gone?

9    **A.**    Yes.

10    **Q.**    You were asked questions about being completely in charge

11    of the Discovery Economics investigation, and your answer was

12    "Andy Kanter told me that."  Did you believe that to be true?

13    **A.**    Can you repeat the question?  Did I believe?

14    **Q.**    You were asked the question were you in complete -- were

15    you completely in charge of the Discovery Economics

16    investigation.  Your answer was "Andy Kanter told me that."  My

17    question is:  Did you feel completely in charge?

18    **A.**    No.

19    **Q.**    Why is that?

20    **A.**    I really see this as two investigations.  So the first

21    investigation around the payroll fraud Andy made very clear to

22    me that I was in charge of this, which was the first time that

23    I'd ever actually had a buffer created -- an explicit buffer.

24    And, you know, when I went back to Andy for permission to

25    engage Kroll and so forth, that was how I always operated and

```
 1   Andy said, "No, there's a wall."
 2        However, as that Kroll investigation was coming to a close
 3   and we kind of put our arms around the payroll fraud, that's
 4   when Andy reached out to me and said that he wanted us to
 5   engage another investigator.  And I told him that that didn't
 6   make a lot of sense to me; we already had Kroll here.  And he
 7   said, "I would just like it done that way.  Please do that."
 8        And at that point Andy and Stouffer -- Andy and Sushovan
 9   and Steve started to send me the various documents about
10   noncompliance in the U.S. Finance organization.  So I didn't
11   feel like I was independent of my management.
12   Q.   One more exhibit, Mr. Scott.  Do you recognize
13   Exhibit 2981 as an e-mail from Mr. Hussain to you, Mike Lynch,
14   and Andy Kanter on July 27th, 2010?
15   A.   I do.
16            THE COURT:  Admitted.
17        (Trial Exhibit 2981 received in evidence)
18   BY MR. LEACH:
19   Q.   And I believe you testified on direct, at least today, you
20   didn't recall who the FSA is?  Do you see that here?
21   A.   I do.
22   Q.   Okay.  Is this another e-mail from Mr. Hussain in the
23   July 26, 27, 28 time period from which you concluded that he
24   wanted Mr. Hogenson gone?
25   A.   I don't think I concluded from this e-mail that he wanted
```

SCOTT - REDIRECT / LEACH

1    Hogenson gone because I believe that this e-mail happened after

2    Hogenson was gone.

3    **Q.**   I thought you testified you fired him on July 28th.

4    **A.**   Oh.  Huh.  Okay.  Well, I'm not sure the exact date.  If

5    this came before my terminating Brent, then, yes, I would

6    believe that this evidence supported my belief that Sushovan

7    wanted Brent gone.  If it came after my decision, then the

8    answer is what I said, no.

9    **Q.**   Well, let me ask this:  Does this refresh your memory that

10   the FSA is a Government organization in the U.K. that regulates

11   the securities markets?

12   **A.**   It does.  What I'm -- what I'm not sure about is the day

13   that I fired him.  And if it was -- can you tell me which day

14   or show me a document to confirm which day that I fired him,

15   and then I can give you a more concrete answer?

16   **Q.**   Let me show you what has been marked as Exhibit 2964.

17           **THE COURT:**  Admitted.

18       (Trial Exhibit 2964 received in evidence)

19   **BY MR. LEACH:**

20   **Q.**   The date of this is July 28th, 2010, Mr. Scott.  Does this

21   at all help with your memory?

22   **A.**   It does.

23   **Q.**   What is the date you fired Mr. Hogenson?

24   **A.**   The 28th of July.

25   **Q.**   And is it your belief that all of these issues that

1  Mr. Hussain and Mr. Kanter and Mr. Chamberlain were bringing to

2  your attention providing a basis to fire Brent were a pretext

3  because Mr. Hogenson had raised allegations to the Audit

4  Committee?

5  A.   Yes.

6        MR. LEACH:   Thank you, Your Honor.   I have nothing

7  further.

8                    **RECROSS-EXAMINATION**

9  BY MR. KEKER:

10  Q.   When did the payroll fraud investigation first -- or when

11  did the payroll fraud first come to light?

12  A.   I believe it was the 25th of June.

13  Q.   And how did it come to light?

14  A.   Lourdes, the person in the U.S. Finance Department, had

15  submitted forms for her unemployment and Autonomy HR, I

16  believe -- Finance or HR -- received a letter from EDD, I'm not

17  sure what that stands for, but the Government asking Autonomy

18  to confirm the salary that Lourdes had listed.   The salary was

19  very large and didn't make sense, and that was the point at

20  which we started to look into the fraud.   I believe that was on

21  the 25th of June.

22  Q.   Okay.   That's when you began to look into the fraud, but

23  Mr. Hogenson wanted to fire Lourdes well before that, didn't

24  he?

25  A.   He did.

SCOTT - RECROSS / KEKER

1    Q.   What did Mr. Hogenson know that was about to come down on

2    the U.S. Finance Department before June 22?  Did he know that

3    this payroll fraud investigation was going to come down?

4    A.   I don't know.

5    Q.   Okay.  What happened was that Lourdes -- he wanted to fire

6    Lourdes.  Lourdes was fired.  You found out about it when EDD

7    sent you something that said she's claiming a huge salary,

8    which is much more than she should have.  But pointed Mr. --

9    but you don't know when Mr. Hogenson found out about it?

10   A.   Correct.

11   Q.   But sometime around June 22 is when he began complaining

12   about the accounting?

13   A.   That's my understanding.

14   Q.   Do you know if the two things are related?

15   A.   I don't.

16   Q.   He found out that he was going to get in trouble for the

17   payroll fraud and a lot of other things, and he then started

18   complaining about the accounting?

19   A.   I don't know.

20   Q.   You were shown 979.  The jury will have a chance to look

21   at it, but there were allegations -- they list the allegations

22   in the Deloitte report, and then the independent group of

23   auditors investigate -- I mean, tell their conclusions about

24   those allegations; right?

25   A.   Correct.

SCOTT - FURTHER REDIRECT / LEACH

1  **Q.**    And they concluded that they were unworthy and that

2  Mr. Hogenson was wrong?

3  **A.**    Correct.

4  **Q.**    And the Audit Committee got that report and studied it and

5  affirmed them; right?

6  **A.**    To the best of my knowledge, yes.

7          **MR. KEKER:**  That's all I have.  Thank you.

8          **THE COURT:**  Thank you.  You're excused.

9       Ladies and gentlemen --

10         **MR. LEACH:**  I have one question.

11         **THE COURT:**  One question.

12         **MR. LEACH:**  That's a lot of pressure, Your Honor.

13         **THE COURT:**  Let's go, one question.

14               **FURTHER REDIRECT EXAMINATION**

15  BY MR. LEACH:

16  **Q.**    Why do you believe it was a pretext, Mr. Scott?

17         **MR. KEKER:**  Objection, Your Honor.  This is

18  argumentative and without foundation.  I haven't been

19  objecting, but this is like the 18th time he said it.

20         **THE COURT:**  Overruled.  He can answer that question.

21         **THE WITNESS:**  I believe it was -- why -- sorry.  Can

22  you ask me the question again when you say "it"?

23  BY MR. LEACH:

24  **Q.**    The investigation into Mr. Hogenson and the U.S. Finance

25  Department.

1    A.    I believe it was a pretext because all of the

2    allegations -- or all of the examples of wrongdoing were shared

3    with me kind of in rapid fire right around July; and up until

4    that point, the only thing I'd heard was praise for Brent.

5              MR. LEACH:   Thank you, Your Honor.

6              MR. KEKER:   I have some questions about that --

7              THE COURT:   Go right ahead.

8              MR. KEKER:   -- since we're going over it and over it

9    and over it.

10                   **FURTHER RECROSS-EXAMINATION**

11   BY MR. KEKER:

12   Q.    Mr. Hussain -- what you heard, is that Mr. Hussain liked

13   Brent Hogenson; right?

14   A.    Correct.

15   Q.    And then you started hearing from Brent Hogenson about

16   problems in the Finance Department; right?

17   A.    Correct.

18   Q.    And then you began hearing about a payroll fraud of how

19   much?  $5 million?

20   A.    I believe the payroll fraud was around $3 million.

21   Q.    Okay.  3 million -- just $3 million.  And so people had

22   been stealing from the company $3 million, and these were

23   people in the U.S. Finance that Mr. Hogenson was in charge of?

24   A.    Yes.

25   Q.    And was that a pretext?

1    **A.**   Was what a pretext.

2    **Q.**   The fact that there was embezzlement going on here in his

3    department, was that a pretext?

4    **A.**   A pretext for?

5              **THE COURT:**  Is that a pretext for firing him?  Was

6    that a pretext for firing him?

7              **THE WITNESS:**  Oh, was the fact that there was a U.S.

8    payroll fraud a pretext for firing Brent?

9    **BY MR. KEKER:**

10   **Q.**   Yeah.

11   **A.**   I don't believe so.

12   **Q.**   Okay.  People went to jail for the payroll fraud; right?

13   **A.**   Right.

14   **Q.**   In his department?

15   **A.**   Correct.

16   **Q.**   And then the Kroll investigation led to the Discovery

17   investigation where you found out that he was doing things that

18   were hundreds of thousands of dollars that were unauthorized?

19   **A.**   Correct.

20   **Q.**   All right.

21              **MR. KEKER:**  Your Honor, I would ask --

22              **THE COURT:**  Anyway, anyway, do you have any questions?

23              **MR. KEKER:**  Yes, I do.  I want --

24              **THE COURT:**  Ask a question.

25              **MR. KEKER:**  Okay.

 1         **THE COURT:**  I actually think you've now covered it,

 2    so -- didn't you cover it?

 3         **MR. KEKER:**  I can take a hint, Your Honor.

 4      Okay.   Thank you.

 5                          (Laughter)

 6         **THE COURT:**  Well, okay.   Ladies and gentlemen, we're

 7    going to take our recess now.

 8      Remember the admonition given to you:   Don't discuss the

 9    case, allow anyone to discuss it with you.

10      We will return at five to 3:00.

11      (Proceedings were heard out of the presence of the jury:)

12         **THE COURT:**  Okay.   The jury has retired.

13      So, let's see, what do we have?   I'm trying to figure out.

14    It's now 20 to 3:00.   We have an hour more, roughly, an hour

15    and a half more today.

16         **MR. LEACH:**  We intend to begin the direct of Antonia

17    Anderson, one of the Deloitte auditors who --

18         **THE COURT:**  And how long do you expect her

19    testimony -- we're off the record.

20                  (Discussion held off the record.)

21                   (Recess taken at 2:43 p.m.)

22                  (Proceedings resumed at 2:57 p.m.)

23      (Proceedings were heard in the presence of the jury:)

24         **THE COURT:**  Let the record reflect all jurors are

25    present.   Parties are present.

ANDERSON - DIRECT / LEACH

1        You may call your next witness.

2            **MR. LEACH:**  Thank you, Your Honor.  The United States

3    calls Antonia Anderson.

4            **THE CLERK:**  Please stand to be sworn.  Please raise

5    your right hand.

6                            **ANTONIA ANDERSON**,

7    called as a witness for the Government, having been duly sworn,

8    testified as follows:

9            **THE CLERK:**  Please be seated.  Please state your full

10   name for the record and spell your last name.

11           **THE WITNESS:**  Antonia Anderson, A-N-D-E-R-S-O-N.

12           **MR. LEACH:**  May I inquire?

13                        **DIRECT EXAMINATION**

14   BY MR. LEACH:

15   **Q.**   Good afternoon, Ms. Anderson.  Where are you from?

16   **A.**   I'm from the UK.

17   **Q.**   Would you please look at what I've placed before you as

18   Exhibit 2515.

19   **A.**   Yes.

20   **Q.**   Is this an agreement between you and the United States

21   Attorney's office?

22   **A.**   Yes, it is.

23           **THE COURT:**  Admitted.

24           **MR. LEACH:**  Your Honor, I'm offering this only for

25   identification purposes.  I don't intend to offer the exhibit.

ANDERSON - DIRECT / LEACH

1  Q.    Is that your signature on page 2?

2  A.    Yes, it is.

3  Q.    And I draw your attention to the first page of the

4  document.  There is a line that begins, "Your client agrees to

5  cooperate completely and truthfully with federal law

6  enforcement agencies."

7        Do you see that?

8  A.    Yes.

9  Q.    Are you the client referred to there?

10  A.    Yes.

11  Q.    What does that word "cooperate" mean to you?

12  A.    It means that I turn up and answer the questions

13  truthfully.

14  Q.    And would you please look at the second paragraph of the

15  agreement, and I draw your attention to the line where it says,

16  "In return for your client's full and truthful cooperation as

17  set forth above, the United States Attorney's Office agrees not

18  to use any statements or other information made by your client

19  to the Government or in testimony before any court or other

20  tribunal or any information derived directly or indirectly

21  therefrom against her in a criminal proceeding."

22        And you are the client that's referred to there?

23  A.    Yes.

24  Q.    Your understanding is that the statements that you make in

25  connection with this agreement can't be used to prosecute you

1  or derive information from those statements?

2  **A.**   Yes.

3  **Q.**   And other than this agreement, Exhibit 2515, are there any

4  other agreements between you and my office?

5  **A.**   No.

6  **Q.**   You said you're from the United Kingdom?

7  **A.**   Yes.

8  **Q.**   Where in the United Kingdom?

9  **A.**   I live in Cambridge.

10  **Q.**   Where did you go to school?

11  **A.**   I went to Oxford University.

12  **Q.**   Did you get a degree from Oxford?

13  **A.**   Yes, I did.  A chemistry degree.

14  **Q.**   After getting a chemistry degree from Oxford, what did you

15  do?

16  **A.**   I worked for the National Health Service for a few months

17  while I decided what I wanted to pursue as a career and decided

18  to train to be a chartered accountant, so I applied for a

19  graduate training scheme at Deloitte and I started that scheme

20  in approximately a year after I had graduated.

21  **Q.**   What is Deloitte?

22  **A.**   It's an audit and professional services firm.

23  **Q.**   And what office of Deloitte did you work out of?

24  **A.**   Cambridge.

25  **Q.**   Did you join the audit practice?

ANDERSON - DIRECT / LEACH

1   **A.**   Yes.

2   **Q.**   What is meant by the audit practice?

3   **A.**   So Deloitte has a number of departments, audit being the

4   one I joined, where we -- as part of being in that department,

5   we perform audits for clients and to express an opinion on the

6   validity of a client's financial statements.

7   **Q.**   So you joined Deloitte in approximately 2004?

8   **A.**   Yes.

9   **Q.**   How long were you there for?

10   **A.**   About seven years.  I left in 2011.

11   **Q.**   Can you walk us through your progression within the

12   Deloitte firm?  What were some of the positions that you had?

13   **A.**   Yeah.  I joined on the graduate training scheme as an

14   associate, and as I progressed through that training, I was

15   promoted to senior associate, assistant manager, qualified as a

16   chartered accountant in 2007, and I was promoted to manager

17   around 2008.  And I was a manager at the time when I left

18   Deloitte.

19   **Q.**   What were your duties as a manager within the Deloitte

20   firm?

21   **A.**   So I had responsibility for a number of clients, and that

22   involved being a point of contact for those clients, scheduling

23   their audits, any other types of work we were performing for

24   that client, and managing the work of the team assigned to

25   perform the audit.

1  Q.   So as the manager, did you have assistant managers and

2  senior associates and associates reporting to you?

3  A.   Yes.

4  Q.   Were there folks above you?

5  A.   Yes, there were.

6  Q.   Who were some of the folks?

7  A.   There would be a senior manager, director, partners

8  involved.

9  Q.   Who were some of your significant clients while you were

10  at Deloitte?

11  A.   So Autonomy was a significant client.  I had a number of

12  technology clients, venture capital clients, some of the

13  Cambridge colleges and education institutions, so a mixture of

14  different clients.

15  Q.   You said Autonomy was one of your clients?

16  A.   Yes.

17  Q.   We will get to that in one second, but first you said you

18  left Deloitte in 2011.  Where did you go after that?

19  A.   Autonomy.

20  Q.   Who hired you?

21  A.   Steve Chamberlain.

22  Q.   And what was your title when you joined Autonomy in or

23  around 2011?

24  A.   Group financial accountant.

25  Q.   What were your responsibilities as a group financial

1    accountant?

2    **A.**   So Steve Chamberlain hired me, but I actually reported in

3    to Lisa Harris, who was the group financial controller, and the

4    role I took was more of a role to add extra resource into the

5    finance team, so it wasn't very clearly specified, but the

6    first project I worked on when I started at Autonomy was around

7    an acquisition they had just done, an acquisition of part of

8    the business of Iron Mountain.

9    **Q.**   In or around August of 2011, did Autonomy announce that it

10   was being acquired by HP?

11   **A.**   Yes.

12   **Q.**   And after that, did you continue to stay at HP?

13   **A.**   Yes.

14   **Q.**   What different roles did you hold at HP?

15   **A.**   So shortly after the acquisition, I held the role of

16   revenue director for the Autonomy business.  I was in that role

17   for a couple of years.  I worked on the accounts restatement

18   for the Autonomy statutory accounts, and since then, I've held

19   a couple of roles in the business finance teams and more

20   recently now in a revenue director role.

21   **Q.**   At some point in time, did you leave HP?

22   **A.**   So HP broke up into different groups, and so as part of

23   the first spinoff, HP split out HPE, so I transitioned to HPE,

24   and then since then, the software business within HPE was

25   merged with a UK company, Micro Focus, so I now work for Micro

ANDERSON - DIRECT / LEACH

1    Focus.

2    **Q.**   So you worked initially at Deloitte, then Autonomy?

3    **A.**   Yes.

4    **Q.**   Then HP?

5    **A.**   Yes.

6    **Q.**   Then Micro Focus?

7    **A.**   Yes.

8    **Q.**   And you said for a time you were the revenue director of

9    the Autonomy business?

10   **A.**   Yes.

11   **Q.**   In the time period late 2011 to approximately May of 2012,

12   who did you report to?

13   **A.**   Steve Chamberlain.

14   **Q.**   At some point in time, did you report or have interactions

15   with Mr. Hussain in that role?

16   **A.**   I didn't report to him, but I did interact with him, yes.

17   **Q.**   I believe you said earlier you were studying to become a

18   chartered accountant.  Are you a chartered accountant today?

19   **A.**   I am, yes.

20   **Q.**   What is a chartered accountant?

21   **A.**   It's one of the accountancy qualifications in the UK.

22   **Q.**   And how does that compare to a certified public accountant

23   in the United States, if at all?

24   **A.**   It's broadly equivalent.

25   **Q.**   Would you describe for us the training you went through to

1  become a chartered accountant?

2  **A.**   Yes.  So as a mentioned, I joined the Deloitte graduate

3  training scheme, which involved training as a chartered

4  accountant.  The training is a combination of exams and of work

5  experience, so whilst I was working at Deloitte, the work I was

6  doing with Deloitte clients was building up the work experience

7  I needed, and Deloitte released me to go to financial training

8  college periodically to study the material for the exams.

9  **Q.**   As a chartered accountant, are you required to go through

10  certain continuing education requirements?

11  **A.**   Yes.  We are required to keep ourselves up to date with

12  changes in -- in financial standards and rules, yes.

13  **Q.**   Are you familiar with something called IFRS?

14  **A.**   Yes.

15  **Q.**   What is that?

16  **A.**   It's International Financial Reporting Standards.  It's

17  the financial reporting framework that listed companies in the

18  UK are required to follow.

19  **Q.**   Describe your experience working with IFRS.

20  **A.**   So when I trained as an accountant, the training that I

21  did was under the IFRS rules.

22  **Q.**   And putting aside Autonomy, did you conduct audits or

23  reviews of companies in the IFRS framework?

24  **A.**   Yes, I did.  Yes.

25  **Q.**   Describe that for us.

1    **A.**   So as I said, I had a mix of clients, and then probably

2    around half of those were IFRS reporters.   Another one of my

3    clients was a listed company in the UK, so it followed the same

4    IFRS rules.

5    **Q.**   What do you mean by "a listed company in the UK"?

6    **A.**   Their shares are publicly traded, their stocks are

7    publicly traded.

8    **Q.**   Do you have experience with other accounting standards

9    besides IFRS?

10   **A.**   Yes.   UK GAAP and U.S. GAAP.

11   **Q.**   What is UK GAAP and what is U.S. GAAP?

12   **A.**   So U.S. GAAP is the financial framework that U.S.

13   companies follow.   UK GAAP is the UK accounting standards that

14   smaller companies in the UK follow.

15   **Q.**   I'd like to focus, if I could, Ms. Anderson, on your role

16   as an auditor at Deloitte during the time period 2004 to 2011.

17   Do you have that broad time frame in mind?

18   **A.**   Yeah.

19   **Q.**   And you said Autonomy was one of your clients?

20   **A.**   Yes.

21   **Q.**   How did you join the Autonomy engagement?

22   **A.**   I started working on the Autonomy engagement around the

23   time they acquired a company called Zantaz.   It was sort of a

24   slightly different type of business that Autonomy had

25   previously -- from an audit perspective, the audit team needed

ANDERSON - DIRECT / LEACH

1  expanding to cover the bigger size of the business, so that's

2  the point I joined the audit team.

3  Q.   This was in or around late 2007?

4  A.   Yes.

5  Q.   Would you please introduce us to some of the members of

6  the Deloitte audit team at or around this time?

7  A.   Yes.  Richard Knights was the audit partner.  Rob Knight

8  the director.  Lee Welham was either a manager or senior

9  manager at that time.  Myself, Poppy Prentis and Matt Stephan

10 were assistant managers.  And I'm not -- not too sure beneath

11 the assistant managers who the associates and senior associates

12 were.

13 Q.   You mentioned someone named Richard Knights?

14 A.   Yes.

15 Q.   He was the partner on the engagement?

16 A.   Yes.

17 Q.   And then Rob Knight.  Did I hear that correctly?

18 A.   Yes.

19 Q.   What was his role?

20 A.   Rob was the director.

21 Q.   Were they related or just names designed to confuse us?

22 A.   Just unfortunately confusing names, yeah.

23 Q.   And then Lee Welham, who was he?

24 A.   So Lee was more senior than I was and he was either a

25 manager or senior manager on the audit at that time.

ANDERSON - DIRECT / LEACH

1  **Q.**   You also mentioned someone named Poppy Prentis.  She was

2  on the Deloitte audit team at that point time?

3  **A.**   Yes.

4  **Q.**   Did she go to Autonomy at some time?

5  **A.**   She did, yes.

6  **Q.**   Were there a number of auditors that eventually progressed

7  to Autonomy?

8  **A.**   Yes.  Both Poppy and Matt had left Deloitte for other

9  companies and then moved to Automomy.

10 **Q.**   How about Steve Chamberlain?  Do you know if he had that

11 same progression?

12 **A.**   Yes.  He did, yeah.

13 **Q.**   We've talked a little bit about you were in the audit

14 practice of Deloitte.  What is an audit?

15 **A.**   So an audit is designed so that the audit partner can

16 express an opinion on the company's financial performance and

17 position on the balance sheet, and so it involves a number

18 of -- various work.  Sample -- picking samples of items of the

19 profit and loss or the balance sheet and testing those by

20 confirming them to evidence to support that they are accurate.

21 **Q.**   You say "testing."  What do you mean by that?

22 **A.**   So Deloitte wouldn't pick every sale or every item in a

23 balance sheet account.  It would pick a sample of those, and

24 then by testing them, confirm them to evidence, and depending

25 on what type of balance was being tested, that would depend on

ANDERSON - DIRECT / LEACH

1    what information it would compared to, but sort of third-party

2    evidence, contracts, various procedures.

3    **Q.**    Okay.  You said Deloitte doesn't look at every

4    transaction.  It looks at samples.  What does that mean?

5    **A.**    So typically look at larger value items, but it would be a

6    sample to make sure that the procedures had covered a selection

7    of the numbers being audited which would then be taken to

8    represent the items that hadn't been tested.

9    **Q.**    How regularly would Deloitte conduct an audit of

10   Autonomy's financial statements?

11   **A.**    It was an annual audit and then quarterly reviews.

12   **Q.**    What do you mean by "quarterly review"?

13   **A.**    So Autonomy announced its results, shared its results with

14   the stock market on a quarterly basis, and Deloitte would

15   review the -- those results, which was as a review, the level

16   of work involved is slightly lower than an audit, but much of

17   the work we did for the Autonomy reviews each quarter was a

18   level of an audit so that it supported the year-end audit once

19   we got to that point.

20   **Q.**    And what is the end work of the audit and the reviews that

21   you are describing?

22   **A.**    So the opinion.  So the review opinion or the audit

23   opinion that the partner issues.

24   **Q.**    How does a review opinion differ from an audit opinion?

25   **A.**    It's -- it's pretty similar, so the -- a clean opinion.

If a clean opinion was issued on either review or audit, it
would be very similar.  Both types of opinion have the scope
to, if the partner is unable to express a clean opinion, to
disclaim or say otherwise.

**Q.**   Now, was Deloitte responsible for the fair presentation of
the financial information in Autonomy's financial statements?

**A.**   No.

**Q.**   What do you mean by that?

**A.**   So the responsibility for the preparation and presentation
of the financial statements is with the directors of the
company, with the directors of Autonomy.

**Q.**   When you say Deloitte is not responsible for the fair
presentation of the financial statements, what is Deloitte's
responsibility?

**A.**   To perform the procedures required to be able to express
an opinion on the accounts.

**Q.**   And you've used that word "procedures."  What do you mean
by procedures?

**A.**   So the audit testing that I described.

**Q.**   And is one of those procedures oral and written inquiries
of management?

**A.**   Yes.

**Q.**   Why do you go through that?

**A.**   To confirm a common understanding of the matters we've
looked into to set out in writing the responsibilities of

1   management, and if there are any matters that we -- maybe more

2   judgmental, that we want to set out in writing, we would ask

3   the management to confirm those.

4   Q.   When you say "management," who do you mean?

5   A.   The director of the company.

6   Q.   I'd like to explore a little bit more about the difference

7   between an audit and a review and the responsibility of

8   Deloitte.

9        If we could please display what is in evidence as Exhibit

10  165, page 14.

11                  (Exhibit published to jury.)

12  BY MR. LEACH:

13  Q.   It's not in front of you.  It's already in evidence so if

14  I could direct your attention to the screen.

15  A.   Yes.

16  Q.   Does this form of document look familiar to you?

17  A.   Yes.

18  Q.   Is this an example of a review opinion that Autonomy would

19  give on -- that Deloitte would give on Autonomy's financial

20  statements?

21  A.   Yes.

22  Q.   Let me draw your attention to the bold heading "Directors'

23  Responsibilities."  Do you see that?

24  A.   Yes.

25  Q.   And it says, The interim financial report is the

1  responsibility of and is approved by the directors."

2      Do you see that?

3  A.   Yes.

4  Q.   What does that mean?

5  A.   So it means the -- the content of the interim report,

6  which is the six-month report, the content -- the

7  responsibility for the preparation and presentation of that is

8  that of the directors and it has been approved by the

9  directors.

10 Q.   And in 2009-2010, was Mr. Hussain one of the directors of

11 Autonomy?

12 A.   Yes.

13 Q.   So this was his responsibility, the fair presentation of

14 the financial statements, him and the other directors?

15 A.   Yes.

16 Q.   In the next line, it says, "The directors are responsible

17 for preparing the interim financial report in accordance with

18 the disclosure and transparency rules of the United Kingdom's

19 Financial Services Authority."

20      Do you see that?

21 A.   Yes.

22 Q.   Is the Financial Services Authority the FSA?

23 A.   Yes.

24 Q.   And what does this sentence mean?

25 A.   It means there are further rules -- well, rules set out by

 1    the FSA that have to be followed in the way the accounts are

 2    presented.

 3    **Q.**   Further below, there is a bold heading, "Our

 4    Responsibilities."  Do you that?

 5    **A.**   Yes.

 6    **Q.**   This says, "Our responsibility is to express to the

 7    company a conclusion on the condensed set of financial

 8    statements in the interim financial report based on our

 9    review."

10         Do you see that?

11    **A.**   Yes.

12    **Q.**   What is meant by "review"?  Is that a reference to the

13    procedures and the testing that you described?

14    **A.**   That's correct, yes.

15    **Q.**   Further below, there is a bold heading, "Scope of Review."

16    Do you see that?

17    **A.**   Yes.

18    **Q.**   And I draw your attention to the second sentence where it

19    says, "A review of interim financial information."  Do you see

20    that line?

21    **A.**   Yes.

22    **Q.**   And this says, "A review of interim financial information

23    consists of making inquiries, primarily of persons responsible

24    for financial and accounting matters, and applying analytical

25    or other review procedures."

1          Do you see that?

2    A.    Yes.

3    Q.    What does that mean, "making inquiries primarily of

4    persons responsible for financial and accounting matters"?

5    A.    So it means discussing with management, the finance team,

6    the information that the financial accounts express.

7    Q.    The finance team being the CFO?

8    A.    Yes.

9    Q.    Mr. Hussain?

10   A.    Yes.

11   Q.    The VP of finance, Mr. Chamberlain?

12   A.    Yes.

13   Q.    And others within the finance group working for him?

14   A.    Yes.

15   Q.    It then says, "A review is substantially less in scope

16   than an audit conducted in accordance with international

17   standards on auditing."

18         Do you see that?

19   A.    Yes.

20   Q.    What does that mean?

21   A.    So the -- the procedures performed for review are less

22   than those that would be performed for an audit.

23   Q.    Okay.  And then if I could focus your attention in the

24   conclusion paragraph, is this the opinion that Deloitte renders

25   as part of its reviews?

ANDERSON - DIRECT / LEACH

1  A.   Yes.

2  Q.   And this says, "Based on our review, nothing has come to

3  our attention that causes us to believe that the condensed set

4  of financial statements in the interim financial report for the

5  three and six months ended June 30th, 2009 is not prepared in

6  all material respects."

7       That's a mouthful, Ms. Anderson.  Can you describe what

8  that means?

9  A.   Yes.  So this is the opinion that Deloitte are expressing

10  on the accounts that there is -- there is nothing we're aware

11  of -- that the accounts are prepared properly under IFRS.

12  Q.   Have you heard the term "negative assurance"?

13  A.   Yes.

14  Q.   Is this an example of a negative assurance opinion?

15  A.   Yes.

16  Q.   Explain what that means.

17  A.   So nothing has come to our attention through our scope of

18  our review.  We're certainly not looking at everything, but

19  from the procedures we have done, nothing has come to our

20  review.  If it had, we would be saying something otherwise

21  there.

22  Q.   Let me now show you an example of the opinion you render

23  for an audit, and if I could please draw your attention to what

24  is in evidence at Exhibit 428, page 42.  Excuse me.  Page 49.

25                 (Exhibit published to jury.)

1          **MR. LEACH:**  I'm sorry.  Could we scroll down a little

2    more, please.

3          And I'm sorry.  I need you to go up a few pages.  A little

4    bit more, please.  A little more.  Perfect.  Thank you.

5    **Q.**    What is this, Ms. Anderson?

6    **A.**    This is the audit -- audit report on the annual accounts

7    for 2009.

8    **Q.**    Okay.  And if I could please draw your attention to the

9    first bold on the left side.  There is a paragraph, "Respective

10   responsibilities of directors and auditors."

11         Do you see that?

12   **A.**    Yes.

13   **Q.**    What's the meaning of this language here?

14   **A.**    So it's setting out the directors' responsibilities as

15   being responsible for preparing the financial statements and

16   ensuring that they give a true and fair view and that the

17   responsibilities of the auditor is to audit them following the

18   international standards.

19   **Q.**    So even for an audit, it's still management's

20   responsibility to prepare true and fair financial statements?

21   **A.**    Yes.

22   **Q.**    Further below, there is a paragraph that says, "Scope of

23   the audit of the financial statements."  Do you see that?

24   **A.**    Yes.

25   **Q.**    It says, "An audit involves obtaining evidence about the

1    amounts and disclosures in the financial statements sufficient

2    to give reasonable assurance that the financial statements are

3    free from material misstatement."

4         Do you see that?

5    **A.**   I -- yes, I do.  Yeah.

6    **Q.**   Thank you.

7         And what does that mean?

8    **A.**   So it -- it's summarizing that the work involved in the

9    audit is designed to express an opinion on whether the accounts

10   are materially misstated.

11   **Q.**   Thank you.  We can take that down, please.

12        I would like to draw your attention to the first quarter

13   of Autonomy's financial year, 2009.

14        Do you have that time period in mind?

15   **A.**   Yes.

16   **Q.**   You were a manager on the Deloitte engagement at this

17   period in time?

18   **A.**   Yes.

19   **Q.**   And are you familiar -- if you could please look at what

20   has been marked for identification purposes as Exhibit 51.

21        Is this a true and correct copy of Deloitte's report to

22   Autonomy's audit committee on or about April 21st, 2009?

23   **A.**   Yes.

24             **MR. LEACH:**  I offer Exhibit 51.

25             **THE COURT:**  Admitted.

1            (Trial Exhibit 51 received in evidence)

2    **BY MR. LEACH:**

3    **Q.**   What is this document, Ms. Anderson?

4    **A.**   This is the audit committee report that Deloitte prepared

5    for the Q1/2009 review that they had done.  The type of

6    document was prepared for every quarterly review or annual

7    audit to report to the audit committee on the work Deloitte had

8    done in its findings.

9    **Q.**   What is the audit committee?

10   **A.**   So it's a group made up of Autonomy directors, non-exec

11   directors.

12   **Q.**   Who attend audit committee meetings?

13   **A.**   The Deloitte partner and the audit committee members.

14   **Q.**   Others from finance?

15   **A.**   I believe so, yes.  I never attended myself.

16   **Q.**   Okay.  Are you familiar with this form of document?  Did

17   you have a hand in preparing this?

18   **A.**   Yes.  I -- during my time on the Autonomy audit, I either

19   drafted or reviewed the work that other people had prepared.

20   **Q.**   Could we please look at page 3 of the report to the audit

21   committee.

22        And I draw your attention to the middle -- the -- roughly

23   the third row.  It says,"Identified Misstatements" to the left.

24   Do you see that?

25   **A.**   Yes.

1    Q.   And we're on the introduction page of the audit committee

2    report.

3         To the right, it says, "For the quarterly report, our

4    materiality was 3.7 million."

5         Do you see that?

6    A.   Yes.

7    Q.   What is meant by "materiality"?

8    A.   So it's a quantity that's calculated based on the

9    company's profit before tax, and in the opinion that's

10   expressed on the accounts, it's around -- the accounts being

11   free from material errors, so that's the threshold that would

12   be termed or is deemed to be material for this quarter.

13   Q.   So in the course of it's review, if Deloitte were to

14   identify errors in the financial statements above $3.7 million,

15   what are the consequences?

16   A.   So they would -- if they exceeded that $3.7 million, there

17   would by a discussion with the Autonomy team to correct some of

18   those errors, and otherwise the audit opinion would not be a

19   clean audit opinion.  It would have to call out some of the

20   errors.

21   Q.   What do you mean it wouldn't be a clean audit opinion?

22   A.   It wouldn't say "free from material misstatements."

23   Q.   And how is this $3.7 million number used in connection

24   with the review that you were conducting in this time period,

25   April 2009?

 1    **A.**   So it drives the amount of samples we would look at and

 2    the sort of size of items we would look at.

 3    **Q.**   Let me draw your attention to page 6, please.

 4           **THE COURT:**  Before you leave, let me just ask the

 5    question about this.

 6       The "identified misstatements," you see it there?

 7           **THE WITNESS:**  Yes.

 8           **THE COURT:**  Okay.  The first two amounts are listed in

 9    dollars, 3.7 million, 1.8 million.  And then the full year is

10    listed in pounds.

11       Is there --

12           **THE WITNESS:**  I think that may be a typo; that it

13    should be in dollars.

14           **THE COURT:**  Which is the typo?

15           **THE WITNESS:**  The pound sign.

16           **THE COURT:**  You think it should be dollars?

17           **THE WITNESS:**  Yes.

18           **THE COURT:**  Thank you.

19           **THE WITNESS:**  I think so, yes.

20           **MR. LEACH:**  Thank you, Your Honor.  That raises an

21    excellent question.

22    **Q.**   Why is materiality here being expressed in dollars for a

23    UK company?

24    **A.**   That is a good question.

25           **THE COURT:**  Don't guess.  If you don't know the

 1   answer --

 2   **BY MR. LEACH:**

 3   **Q.**   If you don't know, you don't know, Ms. Anderson.   Thank

 4   you.

 5         Could we please go to page 6.

 6         And we're going to be focusing on the top part of this

 7   page.   First at the top under No. 1, it says "key risk."   Do

 8   you see that?

 9   **A.**   Yes.

10   **Q.**   And beneath that, it says "revenue recognition."

11         Why is revenue recognition being listed here as a key

12   risk?

13   **A.**   So auditing standards require that revenue recognition is

14   considered as a key risk, and particularly for a listed company

15   and a software company, there is risks associated there.

16   **Q.**   When you say "particularly for a listed company and a

17   software company," what do you mean by that?

18   **A.**   Listed from the perspective that the -- there's pressure

19   on the company to meet shareholder -- yeah, analyst

20   expectations and software -- software revenue is susceptible to

21   manipulation.

22   **Q.**   What do you mean "susceptible to manipulation"?

23   **A.**   Because you're not delivering tangible goods, it requires

24   some judgment in how you allocate contract values against the

25   different elements of a contract.   So where judgment is

1   involved, the -- the scope for judgments to be manipulated.

2   **Q.**   Now, the form of the -- the audit committee report that

3   we're looking at, before Deloitte delivers it to the audit

4   committee, was it your practice to provide a copy to

5   Mr. Hussain and Mr. Chamberlain?

6   **A.**   Yes.   So once we had drafted a near final version, we

7   shared it with Mr. Chamberlain and Mr. Hussain for their

8   comments on the document.

9   **Q.**   Why did you do that?

10  **A.**   To ensure that we had captured things accurately, so each

11  topic has a risk and views of management, as well as a Deloitte

12  response, so we were capturing our understanding of what

13  management had told us and sharing the document with the

14  management team, gave them an opportunity to say whether we had

15  done that accurately or not.

16  **Q.**   And are there examples within the reports to the audit

17  committee where you're describing what management has told you

18  and then providing a Deloitte response?

19  **A.**   Yes.

20  **Q.**   And your expectation was Mr. Hussain and Mr. Chamberlain

21  would comment on both of those?

22  **A.**   Yes.

23  **Q.**   Up at the top on this page 6, it says, "Revenues for the

24  quarter were 129.5 million."  Do you see that?

25  **A.**   Yes.

ANDERSON - DIRECT / LEACH

1  **Q.**   And then beneath that, it says, "We have performed a

2  detailed review of a sample of signed contracts for the

3  quarter.   Our review of revenue contracts was designed to

4  select large contracts.   Those contain nonstandard terms, as

5  well as a sample of all other contracts."

6      Do you see that?

7  **A.**   Yes.

8  **Q.**   And is this a fair description of the contracts review

9  that Deloitte would ordinarily perform in the course of its

10  reviews?

11  **A.**   Yes.

12  **Q.**   Why do you select large contracts, those containing

13  non-standard terms, and a sample of other contracts?

14  **A.**   So we're addressing where the risk of misstatement is.   So

15  the -- if a single large contract is misstated, that could have

16  a material consequence.   Non-standard terms drive a different

17  accounting result, so we're focusing in on those areas that

18  could have a material misstatement, if incorrect.

19  **Q.**   When you're reviewing the contracts, what are you

20  reviewing them for?

21  **A.**   We're reviewing them to ensure that all of the revenue

22  recognition criteria in IFRS have been met.

23  **Q.**   You say the revenue recognition criteria for IFRS.   What

24  is the standard you're referring to?

25  **A.**   So it's IAS-18, the revenue standard.

1   **Q.**   And at a high level -- I won't quote you on this -- as a

2   general matter, what are the elements of IAS-18?

3   **A.**   So there is five criteria to be able to recognize revenue:

4   That the risks and rewards have passed to the buyer; that there

5   is no ongoing managerial involvement or control over what has

6   been sold; that the -- the wording is around probable economic

7   benefits will flow, which means it's probable that you'll be

8   able to collect the money off the customer; and that revenue

9   and costs can be measured.

10   **Q.**   Okay.  You mentioned something about the risks and rewards

11   being transferred.  What did you mean by that?

12   **A.**   So in the case of a software contract, it would be that

13   the software has been delivered to the customer.  They -- once

14   delivery has happened, they have the rewards, they have the

15   software.  There is no further risk that Autonomy would have

16   surrounding those goods.

17   **Q.**   Okay.  We'll get to the standards in more detail, but I

18   want to have the basic framework before I ask my next question,

19   which is in the middle of the page, there's a reference to Bank

20   of America, Capax Global LLC, Verdasys, Inc., and Ministry of

21   Defense.  Do you see that?

22   **A.**   Yes.

23   **Q.**   Is it your understanding these are among the largest deals

24   Autonomy has reached for the first quarter of 2009?

25   **A.**   Yes.

ANDERSON - DIRECT / LEACH

1    Q.   Beneath Capax Global, LLC -- first of all, were you

2    familiar with a company called Capax in or around this time

3    period?

4    A.   Yes.

5    Q.   This says, "Autonomy has granted Capax an Introspect EDD

6    software license for $7.5 million."  Do you see that?

7    A.   Yes.

8    Q.   Is that one of the transactions that Deloitte tested in

9    the course of its review for the first quarter of 2009?

10   A.   Yes.

11   Q.   And is this a fair summary of what Deloitte understood the

12   significant terms of the deal to be?

13   A.   Yes.

14   Q.   Let's look at the next page, please, Exhibit 7 -- before

15   we get there, this deal was for $7.5 million?

16   A.   Yes.

17   Q.   How did that compare to the materiality threshold that

18   Deloitte had set for the first quarter of 2009?

19   A.   It was higher than that threshold.

20   Q.   Please look at page 7.  And if we could blow up the top

21   portion of this.

22       We talked earlier, Ms. Anderson, about how these audit

23   committee records would have a format, a management

24   description, and a Deloitte response.  Is this an example of

25   the Deloitte response?

**ANDERSON - DIRECT / LEACH**

1  **A.**   Yes.

2  **Q.**   It's written here, "For each contract selected, we

3  examined the terms and conditions of the contract to ensure

4  that no factors exist which might impact the recognition of

5  revenue."

6      Do you see that language?

7  **A.**   Yes.

8  **Q.**   Is that a fair summary of what Deloitte did?

9  **A.**   Yes.

10 **Q.**   Why is it important to examine the terms and conditions of

11 the contract?

12 **A.**   To understand what -- what commitments or deliverables

13 there were in the contract and then assess those against the

14 revenue recognition criteria under IAS-18, the five criteria I

15 testified.

16 **Q.**   And then it says, "to ensure that no factors exist which

17 might impact the recognition of revenue."  What are those?

18 **A.**   So if delivery hadn't been made by the end of the quarter

19 in question or if the customer wasn't deemed to be

20 creditworthy, then the collectability criteria wouldn't be met

21 and any clauses that allowed refunds.

22 **Q.**   Let me draw your attention to Exhibit 37.  Is this a true

23 and correct copy of a letter from Sushovan Hussain to Deloitte

24 in connection with the first quarter of 2009 review?

25 **A.**   Yes.

1              THE COURT:  Admitted.

2         (Trial Exhibit 37 received in evidence)

3                   (Exhibit published to jury.)

4    BY MR. LEACH:

5    Q.   Does this document have a particular name in your line of

6    work, Ms. Anderson?

7    A.   Yes.  Management rep letter.

8    Q.   What is a management rep letter?

9    A.   It's the letter that Deloitte asks the directors of the

10   company to sign to confirm their responsibilities in respect to

11   preparing the accounts and making available the information to

12   us.

13   Q.   Is this one of the audit procedures that Deloitte and

14   other audit firms go through?

15   A.   Yes.

16   Q.   Let me draw your attention to the -- strike that.

17        Without this management representation letter, will

18   Deloitte render a review or audit opinion?

19   A.   No.

20   Q.   Why not?

21   A.   It needs management to agree and confirm in writing their

22   responsibilities.

23   Q.   I draw your attention to the bottom portion of the first

24   paragraph.  Do you see where it says, "We acknowledge our

25   responsibility for the preparation and presentation of the

 1  interim financial information in accordance with recognition

 2  and measurement criteria of IFRS."

 3       Do you see that language?

 4  A.   Yes.

 5  Q.   What does that mean?

 6  A.   This means by signing this letter, the directors are

 7  confirming they're responsible for the preparation and

 8  presentation of the financial reports.

 9  Q.   And then it reads, "We confirm, to the best of our

10  knowledge and belief, the following representations."  First

11  bullet, "The interim financial information referred to above

12  has been prepared and presented in accordance with the

13  recognition and measurement criteria of IFRS."

14       Do you see that?

15  A.   Yes.

16  Q.   What does that mean?

17  A.   It means that the IFRS rules have been followed.

18  Q.   So we meet the standards.  This is -- these results are

19  right?

20  A.   Yes.

21  Q.   Then it says, "We have" -- why do you require that

22  representation?

23  A.   Again, to ensure that the directors are confirming that

24  they have prepared the financial statements following the IFRS

25  rules.

**ANDERSON - DIRECT / LEACH**

1   Q.   The next bullet, "We have made available to you all books

2   of account and supporting documentation and all minutes of

3   meetings of shareholders and the board of directors."  Do you

4   see that language?

5   A.   Yes.

6   Q.   What does that mean?

7   A.   It means the directors have made -- made available all the

8   information for the purposes of our audit so we wouldn't -- you

9   know, we're only testing or reviewing a sample of items, but

10  for us to be able to pick that sample, all information must be

11  made available.

12  Q.   Why is it important to have all available information?

13  A.   So the -- all information needs to be made available so

14  that we can perform our review work and express that opinion.

15  Q.   And then in the third bullet it says, "There are no

16  material transactions that have not been properly recorded in

17  the accounting records underlying the interim financial

18  information."

19       Do you see that language?

20  A.   Yes.

21  Q.   What does that mean?

22  A.   It means that bearing in mind the materiality threshold we

23  spoke of earlier -- bearing in mind that threshold, all

24  transactions -- sales, purchases, everything that requires

25  accounting -- has been recorded in the accounting records

ANDERSON - DIRECT / LEACH

1    accurately following the IFRS rules.

2    **Q.**    So this would recover -- this would cover all of the

3    transactions in the Deloitte report that we saw:  Bank of

4    America, Capax, Verdasys, and any others above the materiality

5    threshold?

6    **A.**    Yes.

7    **Q.**    Let's look at page 2.  First of all, if we could scroll

8    down a little bit, who signed this document on behalf of

9    Autonomy Corporation?

10   **A.**    This is signed by Mr. Hussain.

11   **Q.**    Is he signing in his capacity as a director of the

12   company?

13   **A.**    Yes.

14   **Q.**    Above that, it says, "We confirm that the above

15   representations are made on the basis of adequate inquiries of

16   management and staff and where appropriate, inspection of

17   evidence sufficient to satisfy ourselves that we can properly

18   make each of the above representations to you."

19        Do you see that language?

20   **A.**    Yes.

21   **Q.**    Why does Deloitte require the directors to make that

22   representation?

23   **A.**    To acknowledge the directors' responsibilities to -- to be

24   that they've put themselves in a position that they're able to

25   sign this letter.  You know, whatever is needed to require them

1    to -- for them to be able to sign it, whether it's inquiries

2    with management or review of reports, etc.  But it -- yeah.

3    Making sure that they are able to make that confirmation.

4    Q.   Are you familiar with the term "side agreement,"

5    Ms. Anderson?

6    A.   Yes.

7    Q.   What is a side agreement?

8    A.   So I would describe a side agreement as being any type of

9    agreement that isn't captured in the main contract.

10   Q.   Can a side agreement be oral?

11   A.   Yes.

12   Q.   What do you mean by that?

13   A.   So it can be a spoken agreement between parties.  It's --

14   that may reflect terms that differ from the written contract.

15   I would consider that to be a side agreement.

16   Q.   Is that something you're on the lookout for in your

17   profession back then?

18   A.   So as part of the directors disclosing all information to

19   us, that would also include any side agreements of that nature,

20   whether written or verbal.

21   Q.   If there was a side agreement in respect of the subject

22   matter of the Capax transaction that we just looked at, would

23   that be relevant to your work at this time?

24   A.   Yes.

25   Q.   How so?

ANDERSON - DIRECT / LEACH

1  A.   So we weren't aware of side agreements, so had there been

2  a side agreement, that would have changed our understanding of

3  the contract.

4  Q.   How would it change your understanding of the contract?

5  A.   There would be -- if there was a side agreement, there

6  would be other -- other clauses or other agreements that we

7  weren't aware of that we would have to assess the revenue

8  recognition criteria against those to confirm whether the

9  transaction met the rev. rec. criteria or not.

10 Q.   You would have to evaluate whether the risks and rewards

11 had transferred?

12 A.   Yes.

13 Q.   Would you have to evaluate whether management retained

14 effective control of the goods?

15 A.   Yes.

16 Q.   You would have to evaluate whether collectability was

17 probable?

18 A.   Yes.

19 Q.   If Capax had a handshake agreement from Autonomy that

20 Autonomy was going to make sure Capax got the money to make the

21 EDD software payments to Autonomy, would that be relevant to

22 your assessment of whether revenue was appropriately

23 recognized?

24 A.   Yes.

25 Q.   Why is that?

1   **A.**   Because if there was such an arrangement, it would mean

2   that the risks and rewards haven't transferred to Capax.

3   **Q.**   Let me show for you what has been marked and in evidence

4   as Exhibit 50.

5                   (Exhibit published to jury.)

6           **MR. LEACH:**   And if we could please look at page 2.

7   Further down.

8   **Q.**   There is an email from Mr. Hussain (reading):

9           "Create a PO for outsourcing EDD processing as we did

10          last year."

11          If Capax had an agreement from Autonomy that Autonomy was

12   going to make sure Capax got the money to pay for these EDD

13   software payments, would that have been relevant to you?

14  **A.**   Yes.

15  **Q.**   Did you see this email at the time of your review of

16  Autonomy's financial statements?

17  **A.**   No.

18  **Q.**   Could we please look at what is in evidence as

19  Exhibit 2559?

20          I'm showing you what is in evidence as an invoice dated

21  April 23rd, 2009, for specialized EDD processing,

22  "1250 gigabytes@200 gigabytes in the total amount of 250,000."

23  Do you see that?

24  **A.**   Yes.

25  **Q.**   Were you aware of this at the time of your review of the

1    Capax transaction in the audit committee report?

2    **A.**    No.

3    **Q.**    Does this have relevance to whether revenue was

4    appropriately recognized?

5    **A.**    Yes.

6    **Q.**    Why is that?

7    **A.**    Because the -- if a sale and purchase are happening, then

8    we would need to understand both sides, both of those

9    transactions, and the -- we would need to look at both

10   transactions to determine whether the revenue recognition

11   criteria had been passed on the sale.

12   **Q.**    Could have implications for the transfer of risk and

13   rewards?

14   **A.**    Yes.

15   **Q.**    And it could have implications for collectability and

16   effective control of the goods?

17   **A.**    Yes.

18   **Q.**    You can take that down, please.

19        I would like to move forward in time to the second quarter

20   of 2009.  Do you have that time period in mind, Ms. Anderson?

21   **A.**    Yes.

22   **Q.**    And I believe this is in evidence.  If we could please

23   display Exhibit 157.

24                    (Exhibit published to jury.)

25   \\\

1    BY MR. LEACH:

2    **Q.**   Is this another example of a report to Deloitte's -- a

3    report by Deloitte to Autonomy's audit committee for the second

4    quarter of 2009?

5    **A.**   Yes, it is.

6    **Q.**   Did you have a hand in drafting this?

7    **A.**   Yes.

8         **MR. LEACH:**  I'm sorry, Your Honor.  I'm not sure if

9    this is in evidence; but if it's not, I offer it?

10        **THE COURT:**  It is.

11        **MR. LEACH:**  Okay.  Thank you.

12   **Q.**   I draw your attention to page 3.

13   **A.**   Yes.

14   **Q.**   Is this a similar introductory paragraph to the audit

15   committee report that we looked at previously?

16   **A.**   Yes.

17   **Q.**   I draw your attention to the row "Identified

18   Misstatements."  Do you see that?

19   **A.**   Yes.

20   **Q.**   First of all, what is an identified misstatement?

21   **A.**   So it's an error that was identified through the audit or

22   the review work.

23   **Q.**   Okay.  And here it says (reading):

24        "For the quarterly report, our materiality was

25        5.4 million."

ANDERSON - DIRECT / LEACH

1           Do you see that?

2    A.    Yes.

3    Q.    And it looks like the other amounts to the right, apropos

4    of the Court's questions, are in dollars.  Do you see that?

5    A.    Yes.

6    Q.    And what is meant by that $5.4 million number?

7    A.    That's the threshold for this quarter that anything above

8    that is considered material.

9    Q.    Now, is that a hard-and-fast rule if you have a number

10   5.3 million, or is Deloitte just going to ignore it?

11   A.    No.  So the -- the work is designed to identify smaller

12   misstatements.  If the aggregate misstatement exceeds that

13   number, that would be considered material, but also the nature

14   of what's caused the misstatement is important, too.

15   Q.    Is it fair to say the closer you get to that number, the

16   closer the call?

17   A.    Yes.

18   Q.    What do you mean by that?

19   A.    So the -- yeah.  There's an element of judgment in it.

20   Q.    Let's please look at page 15 of the report.  And if we

21   could please blow up the top portion, "Accounting for Morgan

22   Stanley."

23           Do you see that language?

24           And if we could capture the whole part so we can see the

25   left-hand side, too.  Wonderful, thank you.

ANDERSON - DIRECT / LEACH

1          Ms. Anderson, do you see in the first paragraph where it

2    says (reading):

3               "Shortly before the quarter end, Morgan Stanley

4          purchased 6 million of hardware from Autonomy, which

5          Autonomy source had through EMC"?

6          Do you see that language?

7    A.   Yes.

8    Q.   What does that mean to you?

9    A.   So Morgan Stanley purchased hardware from Autonomy to the

10   value of 6 million, and the Autonomy were purchasing that

11   hardware from EMC to be able to supply to Morgan Stanley.

12   Q.   Autonomy was telling you, Deloitte, that this hardware was

13   coming from EMC?

14   A.   Yes.

15   Q.   Further down below in the Deloitte response, it says

16   (reading):

17               "We have yet to have sight of the delivery of

18          hardware by EMC pre-quarter end and have listed this as an

19          outstanding."

20          Do you see that?

21   A.   Yes.

22   Q.   What is meant by "outstanding"?

23   A.   So as the audit or the review progressed, Deloitte would

24   start to collate a list of information that we needed to make

25   sure that it was clear and, you know, we could recap with the

1    finance team this is what we're still waiting for, and we call

2    that the outstanding list.

3        So an item on that that was outstanding, at this point

4    when the audit committee report was drafted and finalized,

5    there's still some time before Deloitte needs to express and

6    sign off that audit opinion.  So at this point in time, it was

7    an outstanding item that we still required, and we expected to

8    receive it before the opinion needed to be issued.

9    **Q.**   And when you -- when Deloitte wrote "We have yet to have

10   sight of the delivery of hardware by EMC pre-quarter," what's

11   the issue that Deloitte is getting at there?

12   **A.**   That -- to -- in order to recognize revenue on the sale to

13   Morgan Stanley for this hardware, there needs to be evidence

14   that it has been delivered to the customer and we're waiting to

15   see that evidence.

16   **Q.**   Please look at page 4 of the report.  I think we can show

17   it on the screen, Ms. Anderson, if that's convenient for you.

18   **A.**   Yes.

19   **Q.**   Do you see the row to the left where it says "Review

20   Status"?

21   **A.**   Yes.

22   **Q.**   (Reading:)

23           "Certain procedures are still outstanding and need to

24       be finalized before we can finalize our review opinion."

25       Do you see that?

ANDERSON - DIRECT / LEACH

1   **A.**   Yes.

2   **Q.**   And is this a summary of the outstanding items that still

3   require evidence before Deloitte is going to issue an opinion?

4   **A.**   Yes.

5   **Q.**   And the second bullet, "Evidence of Delivery of EMC

6   Hardware," do you see that?

7   **A.**   Yes.

8   **Q.**   What does that mean?

9   **A.**   That's the same item that we just described as being

10  outstanding, so it's the evidence that the hardware for the

11  sale to Morgan Stanley has been delivered to Morgan Stanley.

12  **Q.**   Thank you.  We can put that down, please.

13       Would you please look at what has been marked as

14  Exhibit 158.

15                   (Exhibit published to jury.)

16  **BY MR. LEACH:**

17  **Q.**   Is this a true and correct copy of an email dated July

18  15th, 2009, among you and other members of the review team?

19  **A.**   Yes.

20           **THE COURT:**  Admitted.

21       (Trial Exhibit 158 received in evidence)

22                   (Exhibit published to jury.)

23  **BY MR. LEACH:**

24  **Q.**   Ms. Anderson, at the top of this, there is some

25  individuals we haven't talked about:  Tom Murray and Matt

ANDERSON - DIRECT / LEACH

1   Bullivant.   Do you see them?

2   **A.**   Yes.

3   **Q.**   Who are they?

4   **A.**   They are members of the team from Deloitte that worked on

5   the Autonomy audit.   Tom was, I believe, an assistant manager

6   at this time and I think Matt Bullivant also.

7   **Q.**   So an assistant manager, that's somebody who would report

8   up to you?

9   **A.**   Yes.

10  **Q.**   And Mr. Murray was somebody you worked with?

11  **A.**   Yes.

12  **Q.**   Okay.   And Lee Welham, what was his role at the time?   I

13  think it says there down at the bottom.

14  **A.**   Unit manager.

15  **Q.**   Mr. Welham is writing (reading):

16          "I have talked to Steve re the EMC delivery point."

17      Do you see that?

18  **A.**   Yes.

19  **Q.**   And "Steve" is Steve Chamberlain?

20  **A.**   Yes.

21  **Q.**   Is "EMC delivery point" a reference to the outstanding

22  issue discussed in the audit committee report?

23  **A.**   Yes.

24  **Q.**   Mr. Welham then goes on (reading):

25          "As Sushovan suggested to Richard" --

1        Is "Richard" Richard Knights?

2   **A.**   Yes.

3   **Q.**   (Reading:)

4        -- "EMC are unable to supply fully approved

5        documentation."

6        What did you understand that to mean?

7   **A.**   So one form of evidence confirming delivery would be

8   documentation from EMC confirming that it happened, but we were

9   told that EMC weren't able to provide that.

10  **Q.**   And then in the last line of the paragraph, Mr. Welham

11  wrote (reading):

12           "As a result, we should document the facts we have

13       and add a rep letter point along the following lines."

14       Do you see that?

15  **A.**   Yes.

16  **Q.**   What is meant by "rep letter point"?

17  **A.**   That there would be a bullet included in the management

18  representation letter to ask the management team to confirm.

19  **Q.**   And the representation being contemplated here (reading):

20           "We confirm that the despatch of hardware with a

21       purchase price of 5 million was made from EMC on the 30 of

22       June 2009."

23       First of all, for those of us in America, what does

24  "despatch" mean?

25  **A.**   It means shipment of hardware.

ANDERSON - DIRECT / LEACH

1  Q.   Why was the date of the shipment of hardware from EMC

2  relevant?

3  A.   It was relevant.  It needed to be within the quarter for

4  it to be revenue within the quarter.

5  Q.   If it wasn't within the quarter, what were the

6  consequences?

7  A.   It would have been revenue in the following quarter.

8  Q.   And in the quarter and out of the quarter, what

9  significance does that have in the auditing in your world?

10 A.   So each audit or review we're doing is for a fixed period

11 of time, a fixed period of Autonomy's results.  So this one is

12 for the period that ends on 30th of June.  So in terms of

13 revenue recognition, all the revenue recognition criteria have

14 to be met by that date for it to be reported as revenue up to

15 that date.

16 Q.   And you testified previously in the software industry, one

17 of the reasons revenue recognition is a key risk is because of

18 consensus numbers.  Do you recall that general testimony?

19 A.   Yes.

20 Q.   What do you mean by that?

21          MR. DOOLEY:  Objection to leading, Your Honor.

22          THE COURT:  Overruled.

23          THE WITNESS:  Could you repeat the question?  Sorry.

24 BY MR. LEACH:

25 Q.   I guess in connection with a software company and this

1    cutoff for the quarterly numbers, what significance does that

2    have in the software world that you -- as you were working in

3    it?

4    **A.**    So in terms of expectations of the market and trying to

5    meet the expectations, accelerating revenue to be able to do

6    so.

7    **Q.**    Would you please look at what is marked as Exhibit 159,

8    which I offer into evidence as another management rep letter

9    signed by Mr. Hussain.

10            **THE COURT:**  Admitted.

11        (Trial Exhibit 159 received in evidence)

12                    (Exhibit published to jury.)

13   **BY MR. LEACH:**

14   **Q.**    Are you familiar with this document, Ms. Anderson?

15   **A.**    Yes.

16   **Q.**    Is this another example of a management representation

17   letter?

18   **A.**    Yes.

19   **Q.**    And how does this tie in to your review procedures?

20   **A.**    So this is the management representation letter for the

21   period of the 30th of June 2009 where we're requiring the

22   directors to confirm to us their responsibilities for preparing

23   the accounts and certain other points that -- that are relevant

24   to the period.

25   **Q.**    Will Deloitte render a review opinion without this?

**ANDERSON - DIRECT / LEACH**

1   **A.**   No.

2   **Q.**   Is this -- does this document follow a particular form or

3   are there occasions where you craft particular representations

4   according to issues that arise in the review?

5   **A.**   Yes.  So the first paragraph and the first few bullets are

6   a standard format that would be used each quarter, and then the

7   later bullets are added in sort of written to reflect certain

8   issues from that quarter or that period.

9   **Q.**   Let me draw your attention to page 2.  Do you recognize

10   the signature down at the bottom?

11   **A.**   Yes.

12   **Q.**   And do you recognize the language above that indicating

13   that the directors have made appropriate inquiries of

14   management and staff to sufficient -- sufficient to satisfy

15   themselves that they can properly make the representations in

16   this letter?

17   **A.**   Yes.

18   **Q.**   Let me draw your attention to the third bullet from the

19   top.  Do you see where it says (reading):

20         "We are satisfied that the acquisition of 9 million

21       of hardware from EMC corporation was an arm's length

22       commercial transaction"?

23       Do you see that?

24   **A.**   Yes.

25   **Q.**   And then there's another line (reading):

1    "Additionally, we confirm that the despatch of

2  hardware with a purchase price of 5 million was made from

3  EMC Corporation on the 30th June 2009."

4  Is that the representation that Mr. Welham was

5 recommending be added to the management representation letter?

6 **A.** Yes.

7 **Q.** Was this an important representation for Deloitte?

8 **A.** Yes.

9 **Q.** How so?

10 **A.** This was a significant transaction for the quarter.

11 Approximately the materiality level that we had not been able

12 to obtain the third-party evidence, such as a document from EMC

13 or from the customer confirming delivery had been made, so we

14 were relying on management representing that that dispatch had

15 happened.

16 **Q.** If EMC had not shipped hardware with a purchase price of

17 5 million on or before June 30th, 2009, would that be relevant

18 to your assessment of whether revenue was appropriately

19 recognized?

20 **A.** Yes.  It would have been relevant, yes.

21 **Q.** Why is that?

22 **A.** Because if the -- if that hardware hadn't been dispatched

23 by that date, the revenue criteria wouldn't have been that.  So

24 the revenue on the deal shouldn't have been in the quarter.

25 **Q.** Who signed this management representation letter on behalf

1    of the directors?

2    **A.**    Mr. Hussain.

3    **Q.**    Ms. Anderson, I've placed before you what has been marked

4    as Exhibit 2582, which appear to be a summary and invoices from

5    EMC.

6              **MR. LEACH:**  I offer this in evidence, Your Honor.

7              **THE COURT:**  Admitted.

8         (Trial Exhibit 2582 received in evidence)

9                   (Exhibit published to jury.)

10             **MR. LEACH:**  If we could rotate the document, please.

11   And if we could please look at page 21.

12   **Q.**    Are these documents that you saw, Ms. Anderson, during the

13   course of your 2009 review of Autonomy's financial statements?

14   **A.**    No.

15   **Q.**    Let me draw your attention to the top portion of the

16   document.  There is a row and a heading that says "Customer" --

17   first of all, do you see EMC's logo to the left?

18   **A.**    Yes.

19   **Q.**    And do you see "Customer PO, Order Letter No. 3" dated

20   6/29?  Do you see that?

21   **A.**    Yes.

22   **Q.**    And further below -- thank you.  We can pull out.

23        And beneath "Invoice," do you see the shipping information

24   in the first row to the right?

25   **A.**    Yes.

ANDERSON - DIRECT / LEACH

1   Q.   What is the date of shipment reflected by this invoice?

2   A.   28th of July 2009.

3   Q.   So after the cutoff for Autonomy's second quarter of 2009?

4   A.   Yes.

5   Q.   If that's when this hardware is shipped, is that relevant

6   to your assessment of revenue recognition?

7   A.   Yes.

8   Q.   How so?

9   A.   The -- our understanding was it had been shipped by the

10  30th of June 2009, and that's why it was appropriate to be in

11  revenue for that quarter.  So if it was later, the revenue

12  wasn't appropriate.

13  Q.   And could we look at the bottom of page 21?

14       The amount of this invoice is approximately 3,808,325 --

15  I'll say that again -- $3,808,325.62.

16  A.   Yes.

17  Q.   Could we please look at page 34?

18       And do you see the EMC logo to the left?

19  A.   Yes.

20  Q.   And does this appear to be an invoice for certain hardware

21  components from EMC?

22  A.   Yes.

23  Q.   And I draw your attention to the row at the top portion of

24  this page where it says "Customer PO."

25  A.   Yes.

ANDERSON - DIRECT / LEACH

1   **Q.**   Is there a reference to a June 29 order letter?

2   **A.**   Yes.

3   **Q.**   And do you interpret that to be an order letter by

4   Autonomy in connection with this invoice?

5   **A.**   Yes.

6   **Q.**   I draw your attention to the shipment language beneath

7   "invoice."  What is the "date shipped" listed on this invoice?

8   **A.**   3rd of August, 2009.

9   **Q.**   Is that after the cutoff for Autonomy's second quarter of

10  2009?

11  **A.**   Yes.

12  **Q.**   If that's the date of shipment, what impact does that have

13  on revenue recognition?

14  **A.**   Then it would not be revenue for the quarter.  It would be

15  revenue in the next quarter.

16  **Q.**   I draw your attention to the bottom portion of this.

17  There is a total.  What's the amount of this invoice?

18  **A.**   $2,830,575.06.

19  **Q.**   So between the two invoices that we just looked at,

20  approximately $6.5 million?

21  **A.**   Yes.

22  **Q.**   I'd like to move forward in time, Ms. Anderson, to the

23  third quarter of 2009.  Do you have that time period in mind?

24  **A.**   Yes.

25  **Q.**   Okay.  And you were still with the Deloitte review team at

1  that point?

2  **A.**   Yes.

3  **Q.**   Okay.  I've placed before you what has been marked and

4  what I offer into evidence as Exhibit 271.

5           **THE COURT:**  Admitted.

6       (Trial Exhibit 271 received in evidence)

7                   (Exhibit published to jury.)

8  **BY MR. LEACH:**

9  **Q.**   Is this a copy of an email from Mr. Welham to folks at

10 Autonomy and Deloitte attaching Deloitte's audit committee

11 report for the third quarter of 2009?

12 **A.**   Yes.

13 **Q.**   And was that audit committee report something you had a

14 hand in reviewing?

15 **A.**   Yes.

16 **Q.**   Let's look at page 3.  The final date of the report down

17 at the bottom left, what does that signify?

18 **A.**   So this is the -- the date the report is issued, the 16th

19 of October, 2009.

20 **Q.**   Okay.  And if we could please go to page 5 of the exhibit.

21 Do you see the row for "identified misstatements"?

22 **A.**   Yes.

23 **Q.**   What is the materiality threshold for this time period?

24 **A.**   $3.6 million.

25 **Q.**   And please look at page 7.  Is this a page describing key

1  review risk relating to revenue recognition?

2  **A.**   Yes.

3  **Q.**   Okay.  If we could please look at that first paragraph.

4  It says, "Revenues for the quarter were 191.6 million."  Do you

5  see that?

6  **A.**   Yes.

7  **Q.**   "Against market expectation of 182M."  Do you see that?

8  **A.**   Yes.

9  **Q.**   What is meant by "market expectation"?

10  **A.**   So that's the consensus of analysts where they expect

11  Autonomy's results to be for the quarter.

12  **Q.**   It then says, "Included in the revenues for the quarter is

13  36M of hardware sales to three key customers, which represent

14  19 percent of the total revenues for the period."

15      Was this a significant issue in the course of the review

16  for the third quarter of 2009?

17  **A.**   Yes.

18  **Q.**   And was this a change, as you understood it, from

19  Autonomy's revenue practices previously?

20  **A.**   Yes.

21  **Q.**   Explain that.

22  **A.**   So this was the first time I had seen Autonomy selling

23  hardware in this manner, and it was, you know, a significant

24  value at 36 million.

25  **Q.**   Why was that unusual?

1  **A.**   So typically there may be smaller amounts of hardware sold

2  alongside Autonomy's software deals, but this was a much larger

3  value and was associated with a collaboration with EMC.

4  **Q.**   And when Deloitte emphasized these hardware sales did not

5  include any IDOL software component, what were you getting at

6  there?

7  **A.**   That they -- that they weren't part of a software sale.

8  **Q.**   Now, did issues arise in the course of your review with

9  respect to how some of the costs associated with this hardware

10  would be accounted for?

11  **A.**   Yes.

12  **Q.**   Describe that for us, please.

13  **A.**   So the -- the costs associated with the hardware exceeded

14  the revenues, which was another unusual aspect to this, and the

15  costs were allocated between different cost categories.  Some

16  of the costs were recorded as cost of goods sold and some of

17  the cost was recorded in sales and marketing costs.

18  **Q.**   And explain what you mean by some were in costs of goods

19  sold and some were sales and marketing.  Explain that for the

20  non-accountants in the room.

21  **A.**   So the top line of the profit and loss for the period is

22  revenue and then some of the costs were recorded in costs of

23  goods sold which would then reflect the gross margin of

24  Autonomy's sales.

25       The -- the rest of the costs were recorded lower in the

1    profit and loss within sales and marketing and reflected in

2    operating profit.  So splitting them out in that way -- if they

3    had all been recorded in cost of goods sold, the gross margin

4    would have been lower.

5    **Q.**   Was gross margin an important metric for Autonomy?

6    **A.**   Yes.

7    **Q.**   How so?

8    **A.**   So as a -- a software company, the gross margin is

9    typically very high because the -- there are no incremental

10   costs associated with each software sale you make.  You have

11   already developed the software, so for the company to make a

12   software sale and deliver it, there is no incremental cost

13   there.

14   **Q.**   And was it your understanding at the time that analysts in

15   the investment community paid attention to gross margin?

16   **A.**   Yes.

17   **Q.**   Do you have before you what has been marked as Exhibit

18   5788?

19   **A.**   Yes.

20   **Q.**   Is this a true and correct copy of a work paper prepared

21   by Deloitte during the third quarter of 2009 review?

22   **A.**   Yes.

23            **MR. DOOLEY:**  Can I get a copy of that?

24   **BY MR. LEACH:**

25   **Q.**   You recognize this?

ANDERSON - DIRECT / LEACH

1  **A.**    Yes.

2  **Q.**    This is something you prepared or reviewing?

3  **A.**    Reviewed, yes.

4           **THE COURT:**  Admitted.

5           (Trial Exhibit 5788 received in evidence)

6                    (Exhibit published to jury.)

7           **MR. LEACH:**  Thank you, Your Honor.

8  **Q.**    What is a work paper?

9  **A.**    So this is a document that Deloitte would create as part

10 of performing their procedures, and it would be part of the

11 audit file for this client engagement.

12 **Q.**    An "interim review summary memorandum," what does that

13 mean?

14 **A.**    This is a document where we review -- sort of summarize

15 everything that has gone into the audit or into the review.  So

16 it sets out the planning activities, the procedures performed

17 and conclusions.

18 **Q.**    Up at the top, there is lines that say "preparer" and

19 there is some initials and then "reviewer" and some initials

20 and some dates.  What do those signify?

21 **A.**    So the initials reflect the person from the Deloitte team

22 involved.  So the preparer, THM, is Tom Murray, and the date is

23 the date he's signing that he has prepared this document.

24        And then the reviewers are those who have reviewed the

25 documents and equally the dates that they're signing off to say

1  they've reviewed it.  So AFA is me; LPW, Lee Welham; and RCK,

2  Richard Knights.

3  **Q.**  Thank you.

4      Could we please look at page 8 of Exhibit 5788.  And if we

5  could scroll down a little bit to the heading "Cost of

6  Revenue."  Perfect.

7      What's described here, Ms. Anderson generally?

8  **A.**  So this is the cost of goods sales or cost of revenue line

9  and setting out the amount of cost in this quarter compared to

10 the previous quarter.

11 **Q.**  In the second paragraph, Deloitte wrote, "There have been

12 an increasing number of hardware sales made in recent quarters

13 with a total of 36.6M recognized at Q3/2009."  Do you see that?

14 **A.**  Yes.

15 **Q.**  Is that consistent with your memory of the total volume of

16 hardware sales in this quarter?

17 **A.**  Yes.

18 **Q.**  In the next paragraph, it says, "This is highlighted by

19 the reduction in the gross margin percentage from 88.6 in

20 Q3/2008 to 78 percent in Q3/2009."

21     What does that mean?

22 **A.**  So the -- the costs associated with the hardware sales in

23 this quarter, that those costs have been recorded in "cost of

24 revenues" and that's had a corresponding effect of reducing the

25 gross margin the quarter.

1  Q.   And then beneath the bold line, it says, "The hardware

2  related element in the current quarter COGS balances" -- COGS

3  is an abbreviation for "cost of goods sold"?

4  A.   Yes.

5  Q.   "-- is 17.1 million."  Where did the rest of the costs go?

6  A.   Sales and marketing.

7  Q.   Is that the $28.4 million number below that?

8  A.   Yes.

9  Q.   So the hardware cost approximately $45 million more than

10 what Autonomy was selling it for?

11 A.   Yes.

12 Q.   Okay.  Please look at page 18.  If we could focus on the

13 paragraph beginning "other payables."  Do you see this portion

14 of the interim review summary memorandum?

15 A.   Yes.

16 Q.   Okay.  What are other payables?

17 A.   So this is amounts owed to third parties that aren't part

18 of the trade payables balance.

19 Q.   Okay.  And in the bold heading, it says "Q3/2009, 93,

20 150K."  Is that $93 million?

21 A.   Yes.

22 Q.   And then there's some numbers to the right.  What is it

23 comparing it to?

24 A.   To the -- well, it says Q4/2008, but I think it means to

25 say Q3/2008, to compare it to the same quarter in the previous

1    year.

2    **Q.**    So there is an approximately 70-million increase in the

3    other payables over the prior year?

4    **A.**    Yes.

5    **Q.**    Okay.  And does the interim review summary memorandum

6    explain the increase in other payables for this period?

7    **A.**    Yes, it does.

8    **Q.**    Let me draw your attention to the second paragraph, where

9    it says, "45.5 million of the increase is due to the

10   extraordinary amount due to EMC at quarter end."  Do you see

11   that language?

12   **A.**    Yes.

13   **Q.**    What does that mean?

14   **A.**    That means this relates to the hardware, which is a -- a

15   new type of cost for this quarter.  This was the first time

16   these hardware transactions were entered into, so the 45

17   million increase in payables is because of the amounts owed to

18   EMC for the hardware.

19   **Q.**    Let me please direct your attention to please what is in

20   evidence as Exhibit 2767.

21                     (Exhibit published to jury.)

22   **BY MR. LEACH:**

23   **Q.**    Do you see the name Sushovan Hussain and Marc Geall up at

24   the top?

25   **A.**    Yes.

1    Q.   And does Mr. Hussain further below appear to be responding

2    or interlineating an email with proposed responses relating to

3    certain questions by Derek Brown?

4    A.   Yes.

5    Q.   Do you know who Derek Brown is?

6    A.   I believe he's a -- was an analyst.

7    Q.   Let me draw your attention to Question No. 3, "Why was

8    there such a large jump in trade and other creditors from 80M

9    in Q2/'09 to 110M in Q3/'09."

10        Do you see that question?

11   A.   Yes.

12   Q.   What do you understand is being asked here?

13   A.   Why had --

14        MR. DOOLEY:   I'm sorry.   Objection.   Calls for

15   speculation.   This is an email this witness is not on.

16        THE COURT:   Overruled.

17   BY MR. LEACH:

18   Q.   You may answer.

19   A.   Sorry.   Would you mind repeating the question?

20   Q.   What do you understand the question to be that Mr. Brown

21   is asking?

22   A.   Why has the payable balance increased so much from Q2/'09

23   to Q3/'09.

24   Q.   And the entry in blue says, "To do with SPE costs incurred

25   late in the quarter accrued in Q3, paid in Q4."

ANDERSON - DIRECT / LEACH

1          Do you agree with that?

2    **A.**   My understanding was that it has to do with the amounts

3    owed to EMC for the hardware.

4    **Q.**   Not relating to SPE?

5    **A.**   Not relating to SPE.

6    **Q.**   So you don't agree with that?

7    **A.**   No.

8    **Q.**   Let's please look at what is in evidence as Exhibit 2769.

9               (Exhibit published to jury.)

10   **BY MR. LEACH:**

11   **Q.**   And does this appear to be a response from Mr. Geall to

12   Derek Brown?

13   **A.**   Yes.

14   **Q.**   Can we please look at Question 3.

15          Do you see that same question, "Why the large jump in

16   other payables?"

17   **A.**   Yes.

18   **Q.**   Or it says "trade creditors" -- "trade and other

19   creditors."  Do you understand that to be a reference to

20   payables?

21   **A.**   Yes.

22   **Q.**   And a payable is what?

23   **A.**   It's an amount -- well, it's an amount owed to someone,

24   and so trade -- trade payable is an amount owed to your

25   suppliers.

 1   **Q.**   And this says, "This was purely to do with SPE-related

 2   costs that were incurred late in the quarter."

 3        What did you understand the change in payables to be on

 4   account of, Ms. Anderson?

 5   **A.**   On account of the hardware costs due to EMC.

 6   **Q.**   Thank you.

 7        I'd like to move forward in time, Ms. Anderson, to the

 8   fourth quarter of 2009.  Do you have that time period in mind?

 9   **A.**   Yes.

10   **Q.**   And you were still a member of the Deloitte audit team at

11   that point?

12   **A.**   Yes.

13   **Q.**   Okay.  Please look at what has been marked as Exhibit 553.

14        **THE COURT:**  Admitted.

15        (Trial Exhibit 553 received in evidence)

16                  (Exhibit published to jury.)

17   **BY MR. LEACH:**

18   **Q.**   Is this an email you wrote to Steve Chamberlain with a

19   copy to Rob Knight on or about January 15, 2010?

20   **A.**   Yes.

21   **Q.**   Is that the UK convention for dating in the "sent" line?

22   **A.**   Yes.

23   **Q.**   The subject is "MicroLink."  Were you familiar with

24   MicroLink?

25   **A.**   Yes.

1  **Q.**   And what were some of the audit issues relating to

2  MicroLink in the fourth quarter of 2009?

3  **A.**   So MicroLink was a reseller that Autonomy had sold to, and

4  at the end or very early in January 2010, Autonomy had acquired

5  them.  So I was reviewing information around the acquisition.

6  **Q.**   So you were aware that Autonomy was acquiring MicroLink?

7  **A.**   Yes.

8  **Q.**   Were you also aware that Autonomy was selling software to

9  MicroTech with Discover Tech as the end user?

10 **A.**   Yes.

11 **Q.**   And does this email relate to the sale of MicroLink and

12 some corresponding purchases by MicroTech?

13 **A.**   Yes.

14 **Q.**   Okay.  Let me draw your attention to what you asked.  You

15 say, "As discussed with Rob and Sushovan" -- "Rob" is a

16 reference to Mr. Knight?

17 **A.**   Yes.

18 **Q.**   And "Sushovan" is a reference to Mr. Hussain?

19 **A.**   Yes.

20 **Q.**   "I just wanted to summarize what understand that you have

21 agreed to provide.  Due diligence schedules.  Evidence of

22 ownership of MicroTech.  Evidence of status with end users."

23      What were you asking for here, Ms. Anderson?

24 **A.**   So information from Autonomy, due diligence schedules to

25 understand the -- the rationale for acquiring MicroLink and the

1   review of MicroLink that Autonomy had performed, evidence of

2   ownership of -- of MicroTech to understand that the ownership

3   was -- whether or not it was different to the ownership of

4   MicroLink, and status on deals that had been sold to

5   MicroLink -- the status of those deals with the end user.

6   **Q.**   Why was it important to understand the ownership of

7   MicroTech?

8   **A.**   Because they -- a sale had been made to MicroTech with an

9   end user of Discover Tech.  Discover Tech was a spinout of

10  MicroLink, and the -- those transactions may have been

11  connected and would be -- would need to be considered how they

12  were accounted for, if there was a connection in ownership of

13  those entities.

14  **Q.**   Would you please look at what is marked as Exhibit 531.

15      I offer that in evidence.

16          **THE COURT:**  Admitted.

17      (Trial Exhibit 531 received in evidence)

18              (Exhibit published to jury.)

19  **BY MR. LEACH:**

20  **Q.**   Ms. Anderson, you're not on this email, but are you

21  familiar with the folks at the top in the "to," "cc," and

22  "from" line?

23  **A.**   Yes.

24  **Q.**   And the subject here is "MicroLink/MicroTech."  Do you see

25  that?

ANDERSON - DIRECT / LEACH

1    **A.**   Yep.

2    **Q.**   And Mr. Knight is writing, "Given the proximity of the

3    purchase of MicroLink post year end, we need to ensure that we

4    have performed sufficient work to understand the nature of the

5    recent transactions with them and importantly the

6    recoverability of amounts which MicroLink are due from their

7    end users."

8         What was Deloitte getting at here?

9    **A.**   So ensuring that we understood the commercial rationale

10   for the transactions and any connections between them.

11   **Q.**   And is -- are Deloitte's questions attached on page 4 of

12   this exhibit?

13   **A.**   Yes.

14   **Q.**   No. 1, "Please confirm the nature of the links between

15   MicroLink, MicroTech, and Discover Technologies."

16        Why was Deloitte asking that?

17   **A.**   As Autonomy had acquired MicroLink and Discover Tech was a

18   company that had -- had been spun out of MicroLink and Autonomy

19   had also made sales to MicroTech for Discover Tech as an end

20   user and we wanted to understand whether there was a -- a

21   connection, whether those were related companies or whether

22   they were independent of each other and could be -- you know,

23   were those sales independently negotiated and stand-alone or

24   was there a connection between those transactions.

25   **Q.**   Why did you need to know that?

1  **A.**   Because it would impact -- could potentially impact the

2  accounting as to whether they were independent transactions or

3  not.

4  **Q.**   In row 2, it says, "Understand MicroTech," and then in the

5  questions, it says, "2, what was the size and scale of

6  MicroTech.   What insight do you have into how they have

7  financed this 10M?"

8       What do you understand -- what did you understand that to

9  mean, "what insight do you have into how they financed this

10 10M"?

11 **A.**   So how was -- how would that amount be collectible from

12 MicroTech and did it have any connection to the amount paid to

13 MicroLink for the acquisition of MicroLink.

14 **Q.**   In No. 3, it says, "Discover Tech as above."  Do you

15 interpret that as asking what insight do you have into how

16 Discover Tech had financed this 10M?

17 **A.**   Yes.

18 **Q.**   And why was it important to understand that?

19 **A.**   To understand whether they were really stand-alone

20 transactions or whether Discover Tech were paying for this

21 amount with the monies from the acquisition.

22 **Q.**   Why would it matter if Discover Tech was paying for the

23 $10 million in software from the proceeds of the acquisition?

24 **A.**   So it would -- depending on the circumstances, the

25 accounting for the sale to MicroTech and the acquisition would

```
 1   be treated as separate transactions, or if they were connected

 2   and -- this would be treated as just the net -- the net amount.

 3   So the revenue wouldn't be recognized and the acquisition costs

 4   would be lower.

 5   Q.   Would you please look at what has been marked as Exhibit

 6   574.

 7            THE COURT:  Admitted.

 8        (Trial Exhibit 574 received in evidence)

 9                     (Exhibit published to jury.)

10   BY MR. LEACH:

11   Q.   Ms. Anderson, the subject of this email is something

12   called "outstanding list" and the date is Tuesday 1/26/2010.

13   Do you see that?

14   A.   Yes.

15   Q.   What is "outstanding list"?

16   A.   This is the list of all the pieces of information,

17   documents that Deloitte needs to complete its procedures.

18   Q.   Is it routine for Deloitte to send these outstanding lists

19   to Autonomy and other clients during the course of its audits

20   and reviews?

21   A.   Yes, it is.

22   Q.   Let's look at the list on page 6.  And if we could please

23   highlight the -- or blow up the row in the middle of the

24   page -- first of all, explain the format for us.  To the left,

25   there is "auditor name" and some names, "deal number,"
```

1    "customer name," "information requests."  What is being

2    displayed here?

3    **A.**   The first column is the person from the Deloitte audit

4    team who has requested this information from the Autonomy team.

5        The next column, deal number, was a listing we worked from

6    that listed out the large deals, so if that was a relevant

7    number from that just to identify the deal, that would be

8    included.

9        Customer name or if it doesn't relate to a customer deal,

10   the topic it relates to.  Summary of the information needed.

11       And then the "requested from" is the name of the person

12   from the Autonomy finance team who we have requested the

13   information from.

14   **Q.**   Okay.  And I draw your attention to the middle portion of

15   this outstanding list to where -- your name slash Rob,

16   MicroLink, and then "confirmation of ownership of MicroTech."

17   What were you asking for there?

18   **A.**   We were asking for documents or evidence to confirm who

19   owned MicroTech.

20   **Q.**   Would you please look at what is Exhibit 583.

21       This is a copy of Autonomy's audit committee report for

22   the -- is this a copy of Deloitte's report to the audit

23   committee for the year end 2009?

24   **A.**   I don't have it in front of me, I'm afraid.

25           **THE COURT:**  Do you have a few more questions on this?

 1            **MR. LEACH:**  Two or three more questions, Your Honor.

 2    Last document.

 3            **THE COURT:**  All right.

 4    **BY MR. LEACH:**

 5    **Q.**   This is in evidence, Ms. Anderson, so it's displayed on

 6    the screen.

 7    **A.**   Okay.

 8    **Q.**   And if we could please go to the portion of the report

 9    discussing the MicroLink acquisition.  I'm afraid you have my

10    copy so I don't have the number.

11    **A.**   Do you want it back then?  I can see it on the screen.

12    **Q.**   Page 11, please.

13          And I draw your attention to the last sentence in the --

14    above Deloitte response where it says, "Management is not aware

15    of any related party connection between Autonomy, MicroLink,

16    and MicroTech."

17          Do you see that language?

18    **A.**   Yes.

19    **Q.**   What did you understand was being expressed there?

20    **A.**   That there was no connection in the ownership or directors

21    of the entities listed.

22    **Q.**   Okay.  If there was a connection between MicroLink and

23    MicroTech, if they had a common owner named Dave Truitt, would

24    that be relevant to your assessment of revenue in this period?

25            **MR. DOOLEY:**  Objection.  Mischaracterizes the

PROCEEDINGS

```
 1    evidence.
 2              THE COURT:  Overruled.
 3              THE WITNESS:  Yes.
 4    BY MR. LEACH:
 5    Q.   Why is that?
 6    A.   Because it would have changed the circumstances that we
 7    were aware of.  We would have had to re-review the revenue
 8    criteria on the sale to MicroTech and understand more details
 9    about how they could be stand-alone transactions given the
10    common ownership and how they had been negotiated.
11    Q.   Thank you, Ms. Anderson.
12         Thank you, Your Honor.  This is a convenient stopping
13    place.
14              THE COURT:  Ladies and gentlemen, we are going to take
15    our recess.  Thank you for being so patient.
16         Do not form or express any opinion, and I will see you
17    tomorrow.  Thank you.
18         Thank you, Ms. Anderson.
19         (Proceedings were heard out of presence of the jury:)
20              MR. LEACH:  Your Honor, there is one other matter,
21    very brief.
22              THE COURT:  Yes.
23              MR. LEACH:  I just wanted to put --
24              THE COURT:  The jury has retired.
25              MR. LEACH:  -- on the record that the Government
```

**PROCEEDINGS**

1    intends to meet with Ms. Anderson tonight to continue her

2    preparation.   She flew in from London yesterday, and so the

3    Government intends to meet with her tonight.

4              **THE COURT:**   Thank you.

5                   (Proceedings adjourned at 4:35 p.m.)

6                        ---oOo---

7

8                   **CERTIFICATE OF REPORTERS**

9         I certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled matter.

11

12   DATE:   Monday, March 26, 2018

13

14

15

16   _____

17        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter

18

19

20   _____

21        Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                U.S. Court Reporter

22

23

24

25