Volume 16

Pages 2971 - 3243

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )      NO. CR 16-00462 CRB
                               )
SUSHOVAN TAREQUE HUSSAIN,      )
                               )
          Defendant.           )
_____)
                               San Francisco, California
                               Tuesday, March 27, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

                    ALEX G. TSE
                    Acting United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
          BY:  **ROBERT S. LEACH**
               **ADAM A. REEVES**
               **WILLIAM FRENTZEN**
               **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:

                    KEKER & VAN NEST
                    633 Battery Street
                    San Francisco  CA  94111
          BY:  **JOHN W. KEKER**
               **JAN NIELSEN LITTLE**
               **BROOK DOOLEY**
               **KATE LAZARUS**
               **NIC MARAIS**
               **ATTORNEYS AT LAW**


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
             Pamela Batalo, CSR No. 3593, FCRR
             Official Reporters

<u>**I N D E X**</u>

Tuesday, March 27, 2018 - Volume 16

<u>**GOVERNMENT'S WITNESSES**</u>                          <u>**PAGE**</u>  <u>**VOL.**</u>

<u>**KHAN, HAFEEZ BUX DAUD**</u>
(SWORN)                                           2978   16
Cross-Examination by Ms. Little                   3022   16
Redirect Examination by Mr. Frentzen              3070   16
Recross-Examination by Ms. Little                 3077   16
Further Redirect Examination by Mr. Frentzen      3078   16

<u>**ANDERSON, ANTONIA (RECALLED)**</u>
(PREVIOUSLY SWORN)                                3079   16
Direct Examination resumed by Mr. Leach           3079   16
Cross-Examination by Mr. Dooley                   3144   16
Redirect Examination by Mr. Leach                 3235   16

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 130 | | 3185 | 16 |
| 135 | | 3183 | 16 |
| 174 | | 2996 | 16 |
| 219 | | 2996 | 16 |
| 244 | | 3172 | 16 |
| 351 | | 3203 | 16 |
| 482M | | 3195 | 16 |
| 482C | | 3202 | 16 |
| 484 | | 3085 | 16 |
| 528 | | 3079 | 16 |
| 541 | | 3084 | 16 |
| 558 | | 3215 | 16 |
| 611 | | 3104 | 16 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 769 | | 3105 | 16 |
| 873, page 2 | | 3066 | 16 |
| 901 | | 2996 | 16 |
| 922 | | 3190 | 16 |
| 946 | | 2996 | 16 |
| 946 | | 3068 | 16 |
| 1058 | | 2996 | 16 |
| 1123 | | 3119 | 16 |
| 1166 | | 2996 | 16 |
| 1183 | | 3117 | 16 |
| 1290 | | 3218 | 16 |
| 1352 | | 3053 | 16 |
| 1439 | | 3124 | 16 |
| 1493 | | 3121 | 16 |
| 1509 | | 3126 | 16 |
| 1530 | | 3129 | 16 |
| 1649 | | 2996 | 16 |
| 1872 | | 3209 | 16 |
| 2445 | | 3133 | 16 |
| 2539 | | 3122 | 16 |
| 2605 | | 3217 | 16 |

## I N D E X

### E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2651 | | 3072 | 16 |
| 2652 | | 3072 | 16 |
| 2655 | | 3033 | 16 |
| 2656 | | 3035 | 16 |
| 2658 | | 3039 | 16 |
| 2660 | | 3042 | 16 |
| 2688 | | 3009 | 16 |
| 2711 | | 3138 | 16 |
| 2712 | | 3138 | 16 |
| 2713 | | 3138 | 16 |
| 2714 | | 3138 | 16 |
| 2982 | | 2996 | 16 |
| 2982 | | 3022 | 16 |
| 6192 | | 3182 | 16 |
| 6304 | | 3043 | 16 |
| 6316 | | 3061 | 16 |
| 6326 | | 3031 | 16 |
| 6371 | | 3167 | 16 |
| 6371 | | 3213 | 16 |
| 6419 | | 3157 | 16 |
| 6421 | | 3166 | 16 |

## **I N D E X**

### **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 6422 | | 3166 | 16 |
| 6423 | | 3166 | 16 |
| 6424 | | 3166 | 16 |
| 6425 | | 3154 | 16 |
| 6425 | | 3166 | 16 |
| 6426 | | 3166 | 16 |
| 6427 | | 3167 | 16 |
| 6428 | | 3167 | 16 |
| 6429 | | 3159 | 16 |
| 6430 | | 3159 | 16 |
| 6431 | | 3160 | 16 |
| 6433 | | 3161 | 16 |
| 6435 | | 3162 | 16 |
| 6436 | | 3163 | 16 |
| 6437 | | 3168 | 16 |
| 6439 | | 3164 | 16 |
| 6440 | | 3164 | 16 |
| 6441 | | 3163 | 16 |
| 6449 | | 3147 | 16 |
| 6462 | | 3220 | 16 |
| 6464 | | 3196 | 16 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 6465 | | 3197 | 16 |
| 6466 | | 3199 | 16 |
| 6471 | | 3178 | 16 |
| 6472 | | 3179 | 16 |
| 6473 | | 3179 | 16 |
| 6481 | | 3175 | 16 |

| | |
|---|---|
| 1 | <u>**Tuesday - March 27, 2018**</u>                    <u>**9:01 a.m.**</u> |
| 2 | P R O C E E D I N G S |
| 3 | ---oOo--- |
| 4 | (Proceedings were heard out of presence of the jury:) |
| 5 | **MR. FRENTZEN:**  Your Honor, we had talked about |
| 6 | possibly calling the other witness out of order. |
| 7 | **THE COURT:**  You want to rearrange something.  That's |
| 8 | fine.  Bring them in. |
| 9 | (Proceedings were heard in the presence of the jury:) |
| 10 | **THE COURT:**  Let the record reflect all jurors are |
| 11 | present; parties are present. |
| 12 | You may realize that this is not Antonia Anderson because |
| 13 | we are trying to rearrange witnesses to accommodate travel |
| 14 | schedules.  So from time to time, even if the witness is in the |
| 15 | middle of an examination, we'll interrupt that witness, put on |
| 16 | a different witness. |
| 17 | You're able to multitask; right?  Okay.  So there is that |
| 18 | slight rearrangement. |
| 19 | I also wanted to tell you that we are definitely on for |
| 20 | Friday -- afraid to say it, Friday the 13th.  We've worked out |
| 21 | and we'll work out any of the conflicts.  The 20th may present |
| 22 | other issues, so I'll have to give some further thought to it, |
| 23 | but please plan on being here on Friday the 13th -- is it the |
| 24 | 16th? |
| 25 | **THE CLERK:**  No.  The 13th is good and the 6th as well. |

PROCEEDINGS

1      **THE COURT:**  Yes.  The 6th -- we had no problems on the

2   6th, I mean, other than everybody being inconvenienced.  We had

3   no problems on the 6th.  So the 6th and the 13th.  We'll

4   discuss the 20th in due course.  I think that's -- I think

5   we're okay.

6       Go ahead, Mr. Frentzen.  Call a new witness.

7      **MR. FRENTZEN:**  Thank you, Your Honor.  The Government

8   calls Daud Khan.

9      **THE CLERK:**  Please stand to be sworn.

10                  **HAFEEZ BUX DAUD KHAN**,

11  called as a witness for the Government, having been duly sworn,

12  testified as follows:

13     **THE CLERK:**  Please be seated.  Please state your full

14  name for the record and spell your last name.

15     **THE WITNESS:**  Full name is had fees bucks Daud can and

16  can is spelled KHAN.

17  **BY MR. FRENTZEN:**

18  **Q.**   For the court reporter, can you spell your --

19  **A.**   HAFEEZ.  Bux is B-U-X.  Daud, D-A-U-D.

20  **Q.**   Mr. Khan, where do you live?

21  **A.**   I live in the UK in London.

22  **Q.**   And what do you currently do for a living?

23  **A.**   I currently work for a technology company called WANdisco,

24  which is based in -- headquartered in San Ramon on the East

25  Bay.  I joined February the 19th of this year.

1  **Q.**    And do you -- you work for that company, but you

2  nonetheless you live in the UK?

3  **A.**    Yes.  They have another headquarter in the UK as well.

4  **Q.**    And I think you said you've been doing that for a short

5  time?

6  **A.**    Yes.  That's right.

7  **Q.**    Can you tell us a little bit about your education, please,

8  sir.

9  **A.**    Yes.  So I graduated from Cambridge University in computer

10  science and management.  Following that, I qualified as a

11  chartered accountant with Price Waterhouse Coopers in the UK,

12  and following that qualification, I joined the financial

13  services industry working first for Merrill Lynch back in 1999.

14  Worked for a number of organizations, financial institutions

15  since then, including JPMorgan, JPMorgan Cazenove, Berenberg,

16  and most recently Canaccord Genuity.

17  **Q.**    And during a chunk of that time, did you function as an

18  analyst?

19  **A.**    Yes.  So from 1999, I was a technology analyst up until

20  the time that I left Canaccord Genuity in February of this

21  year.

22  **Q.**    So what do you do -- what did you do as an analyst?

23  **A.**    As an analyst, my role was to provide stock

24  recommendations for institutional investors, and that

25  recommendation was based on conversations with the management

PROCEEDINGS

1    of companies, technology companies, use of financial data which

2    was publicly available, and any other type of data that I may

3    have through conversations of industry-related participants.

4    **Q.**    And so in terms of the -- the data that you get to analyze

5    as an analyst, is that largely what's publicly available?

6    **A.**    Yes.    It's all publicly-available information.

7    **Q.**    All right.    Publicly-available information or information

8    if you can get people to talk to you?

9    **A.**    Information that is not insider related, so anything the

10   management gleans that they want to discuss with the analyst

11   community, the investor community, and other participants

12   outside of the company that work in the same industry that may

13   be customers of technology company.

14   **Q.**    And then when you take that information, what's your goal

15   in taking that information?    What are you trying to produce for

16   your customers?

17   **A.**    So ultimately it's a provision of advice, and that advice

18   comes in the form of research notes, conversations with

19   investors around how they view that technology company, both

20   from a strategic perspective and also from an evaluation

21   perspective; i.e., does the strategy qualify the valuation that

22   is currently in the stock market, in which case are we a buyer

23   of the stock, do we believe that the -- the share price is up

24   with events and therefore we're in neutral, or do we believe

25   that the share price reflects an over-inflated valuation, in

1  which case it would be a sell or underperform or underweight

2  recommendation.

3  **Q.**    In terms of your career -- and let's talk from the time

4  you started up through about 2011 -- did you have a particular

5  sort of specialty or focus?

6  **A.**    My focus was on software companies based in the UK and

7  based within Europe.  That was my focus area of research

8  reports.

9  **Q.**    Approximately how many different companies would you cover

10  at any given time?

11  **A.**    It could range -- through my career, it's ranged up to

12  sort of through 15 companies, but it can be as low as 8, 6 to 8

13  companies.

14  **Q.**    I want to direct your attention, if I could, to a company

15  called Autonomy.  Are you familiar with Autonomy?

16  **A.**    Yes.

17  **Q.**    Was Autonomy one of the companies that for a period of

18  time you covered?

19  **A.**    Yes.  I knew Autonomy from the time that they IPO'd in the

20  UK market back in 2001.  I was an analyst off and on on the

21  stock until around 2006 where I took up full-time coverage of

22  the stock from 2006 -- end of 2006 until the beginning of 2011.

23  **Q.**    And during that period, can you just tell us what entities

24  were you working for over that period of time?

25  **A.**    So in 2006, I was working for Cazenove, which had a joint

1  venture with JPMorgan.  That then became JPMorgan Cazenove in

2  2010.

3  **Q.**  Can you spell that for us?

4  **A.**  So Cazenove is C-A-Z-E-N-O-V-E.

5  **Q.**  Thank you.

6      And in terms of covering Autonomy and other companies,

7  what's -- what's your compensation?  In other words, how does

8  that work?

9  **A.**  Compensation is normally a base salary.  And then on

10  performance, which is ranked in various metrics such as I

11  sit -- I sat on the research side.  There would be a sales

12  desk, so the sales desk would have some input into what a

13  year-end bonus might be.

14      The management at JPMorgan Cazenove would have input on

15  that annual bonus and that would come down to things like

16  recommendations, it would come down to what clients, our

17  institutional investors, were saying about me as an analyst in

18  terms of they would have quarterly voting systems.

19  **Q.**  Okay.  All right.  When you first started covering

20  Autonomy, did you get to know some of the managers at Autonomy?

21  **A.**  Yes.  Even from sort of 2001, 2002, I knew Michael Lynch,

22  the CEO, and Sushovan Hussain, the CFO.

23  **Q.**  And at some point in time in 2005, did you have a meeting

24  with Mr. Lynch or Dr. Lynch to discuss your job prospects?

25  **A.**  Yes.  So at the time, I was -- I was working for a company

**PROCEEDINGS**

1  called Man Group, m-A-N, and Autonomy had acquired a company

2  called Verity, and I had got in touch with Dr. Lynch explaining

3  that I was looking at other possibilities of work outside of

4  the technology analyst industry, so looking at private equity,

5  etc.

6       So he invited me for lunch.  We had a lunch together where

7  he discussed his connections with the private equity industry

8  and that he would see what opportunities were out there.

9  **Q.**  Friendly meeting?

10 **A.**  Yes.  I mean, we'd always be on very good terms since sort

11 of 2002.

12 **Q.**  In around 2000 -- the 2007 to 2008 time period, did you

13 start to take a different view of Autonomy as an analyst?

14 **A.**  Yes.

15 **Q.**  Can you describe briefly for us sort of what was the

16 underpinning of that?

17 **A.**  So the starting point was as an analyst, you have to take

18 into account both what happens in the company and what is

19 happening in the economy.  So post, kind of, financial crisis

20 time, my view was that this would impact the technology

21 industry from the ability for technology companies to be able

22 to sell into -- into their customers.

23      And hence I took a macroeconomic view that while Autonomy

24 had, until that point, delivered results either meeting or

25 beating expectations of the analyst community, I felt that it

1   was going to become harder for them to continue to grow at the

2   rate that they had grown at historically, and hence I moved the

3   recommendation, which was a positive recommendation, into a

4   neutral recommendation.

5   **Q.**   What does a neutral recommendation mean?

6   **A.**   A neutral recommendation ultimately means that the stock

7   price is up with events.  We don't expect the stock price to

8   appreciate relative to the market anymore.  So, in fact, to an

9   investor, that would mean that if they had other opportunities

10  for stocks where they felt the stock would out-perform the

11  market, that they should switch from one into the other.

12  **Q.**   In or around 2008, did you start to take a look into

13  Autonomy's acquisitions of other companies?

14  **A.**   Yes.

15  **Q.**   Can you describe that, please.

16  **A.**   So as a explained, I initially took a neutral view on the

17  stock recommendation, but given that the stock price continued

18  to rise, I moved that recommendation to a negative

19  recommendation which is -- at the time would have been an

20  under-performer, an underweight recommendation meaning that I

21  was advising investors that they should sell the stock.

22      The reason behind this was again starting point was

23  that -- the macroeconomic environment, that I felt that that

24  was deepening and that that would have an effect on the share

25  price.

**PROCEEDINGS**

1     But secondly, I started to investigate the reported

2  organic growths at Autonomy and started to suspect that the

3  organic growth rates that the company was reporting was

4  actually overstating the underlying growth within the business.

5         **MS. LITTLE:**  I'm going to object and move to strike.

6         **THE COURT:**  Okay.  Wait a minute.

7         **MS. LITTLE:**  This man's opinion about organic growth

8  in 2008 is not part of the charges in this case, and his just

9  general view about Autonomy back in 2008 is not relevant.  And

10  I move object and move to strike.

11        **MR. FRENTZEN:**  It is, Your Honor, if I can get into

12  it.  This is sort of the first time that the rating of Autonomy

13  moved to underweight or a recommendation against their stock

14  and there were reactions by the company that informed the

15  continuing sort of back and forth between this witness and the

16  defendant and his colleagues at Autonomy.

17        **THE COURT:**  I will let it, in subject to a motion to

18  strike.

19        **MR. FRENTZEN:**  Thank you, Your Honor.

20  **Q.**   In terms of your moving to an underweight -- in other

21  words, a negative note about Autonomy in 2008, did you do

22  anything to reach out to the managers at Autonomy before

23  publishing that note?

24  **A.**   Yes.  So the first thing I'd like to clarify is that when

25  I first moved to an underweight recommendation, there was no

1    objection from the company, which was based on a purely

2    macroeconomic standpoint.

3         When I then provided a draft piece of research, which was

4    part of Cazenove policy at the time for longer pieces of note,

5    that -- that note discussed the organic growth and the stated

6    organic growth of the company.

7         Having provided that draft piece of research, I received

8    communication from Dr. Lynch on the same evening that that

9    draft note was sent and many objections to publishing of that

10   note was made at that time.

11        I also became aware on the following Monday that Andrew

12   Kanter, the COO at Autonomy, had contacted my head of research

13   at Cazenove to again object to the publication of this research

14   until a face-to-face meeting was held by Dr. Lynch,

15   Mr. Hussain, and the Cazenove head of research.

16   **Q.**   Did you, in fact, have a face-to-face meeting with those

17   individuals?

18   **A.**   Yes, I did.  In that same following week.

19   **Q.**   Where did that meeting take place?

20   **A.**   It took place in the offices of Cazenove in London.

21   **Q.**   Who attended that meeting?

22   **A.**   That was myself, David Knox, who is the head of research

23   at Cazenove; Sushovan Hussain, the CFO; and Dr. Lynch, the CEO.

24   **Q.**   In the course of that meeting, could you tell us about --

25   what was the conversation?

**PROCEEDINGS**

1  **A.**    The conversation generally talked about how my

2  calculations were inaccurate, that they -- that they had

3  published organic growth rates, that they claimed these growth

4  rates had been audited, and that my challenging those growth

5  rates was in fact me challenging their professional advisers.

6  **Q.**    Was anything more said during the course of that meeting

7  about you going forward with your note?

8  **A.**    So the end conclusion of that meeting was that there would

9  be a dialogue between the company -- that would be Mr. Hussain,

10  Dr. Lynch and myself -- to try and address some of the

11  company's concerns around my assumptions and my research note

12  before publication.

13  **Q.**    During the course of the meeting, did Mr. Lynch make any

14  statements about what would happen if you went forward with the

15  note?

16  **A.**    Yes.   There was a moment in the meeting where Mr. Lynch

17  explained to both myself and Mr. Knox that if we were to

18  persist and publish our note without consultation with the

19  company, they would see that as us having -- having a go at

20  their professional advisers, at which point David Knox sort of

21  interrupted and asked whether that was a threat to either

22  myself or the company, to which Dr. Lynch said it's not a

23  threat, but we're a public company and we need to defend

24  ourselves.

25  **Q.**    In connection with this note or publishing of this note,

1  did you then have a conversation directly with Mr. Hussain?

2  **A.**   So once -- so the -- I don't recollect post that meeting

3  whether there was a direct conversation around the publication

4  of that note.   The last conversation I had with Mr. Hussain was

5  post the Quarter 1/2008 results, which involved the speculation

6  around the reported revenue from a recent acquisition called

7  Meridio.

8  **Q.**   What was the issue, as you saw it, with Meridio?

9  **A.**   So from my investigation, I had -- I had pulled out the

10  accounts for Meridio.   It was an Irish private company and --

11        **MS. LITTLE:**   I'm going to make the same objection

12  here.   Meridio is not part of this case and his opinions about

13  Meridio are not relevant.

14        **MR. FRENTZEN:**   It's the background to his views on

15  Autonomy, Your Honor.

16        **THE COURT:**   Overruled, subject to a motion to strike.

17        **MR. FRENTZEN:**   Thank you, Your Honor.

18        **THE WITNESS:**   So having pulled out the accounts, what

19  I realized was that Autonomy was presenting that Meridio would

20  contribute revenue of a fairly small amount of a few million

21  dollars to their -- their consolidated accounts.

22        What I pulled out from the accounts of Meridio was that

23  Meridio was actually -- already had much higher revenue and it

24  had gross margins of over -- over 90 percent.

25        Now, what that normally means is that Merido is a

1    technology company, a software company.  Mr. Hussain and

2    Dr. Lynch presented the idea that the reason why the revenue

3    had dropped was that they were discontinuing parts of the

4    business, which was low margin services business.

5        What I knew from Merido from articles which had been

6    published in trade magazines was that Merido was actually a

7    technology product spinout from a services business and had

8    very little services as part of the mix, and therefore there

9    was a disconnect between what Dr. Lynch and Mr. Hussain were

10   saying about Merido versus what I had uncovered around Merido.

11           **MS. LITTLE:**  Same objection and move to strike.

12           **THE COURT:**  Well, it's overruled, subject to a motion

13   to strike.

14       I assume you're going -- this is part of the history of

15   the testimony that this person is giving with respect to the --

16   with respect to the -- how the stock is viewed and his

17   opinions.

18           **MR. FRENTZEN:**  It is, Your Honor.  If I could just

19   move forward into it --

20           **THE COURT:**  Okay.  So it's come in subject to a motion

21   to strike.

22           **MR. FRENTZEN:**  Thank you, Your Honor.

23   **Q.**   Could you describe for us, what were your concerns about

24   Autonomy related to organic growth and cash conversion?  And if

25   you could explain that in sort of a high level.

**A.**    Yeah.  Sure.

So my thesis around Autonomy became deeper in the sense that I began to investigate issues that I felt were at the company, and this was driven mainly by the reaction to the company to my publishing of research.

I had already spoken about the issues around organic growth and I then investigated the issues around cash conversion.

So very simply put at a very high level, I questioned the organic growth at the company and whether they were overstating profits in the company because profits were not matching cash. And this would have a huge implication to valuation and therefore the stock price that the market should be perceiving.

**Q.**    Can you give us a very brief -- what do you mean by organic growth, to start with?

**A.**    So companies that make no acquisitions from one period, say, from a Q1 in one year to a Q1, Quarter 1, in another year, if there is no acquisitions, that's pure organic growth, so there is no implications of other -- other acquisitions or anything else that can disrupt the calculated amount of growth. So a company grows from a hundred million one year to 120 million another year, that's 20 percent growth.

However, when a company grows from 100 million to 120 million and there was an acquisition in that intervening period and let's say that acquisition contributed $10 million of

1    revenue, then organic growth would be the 120 less the 10 to

2    110, which would be a 10 percent organic growth.

3    **Q.**    So you were concerned about whether there was organic

4    growth or if it was coming from these acquisitions?

5    **A.**    Yes.    And ultimately, it was driven by what was the

6    correct valuation for Autonomy.    If, in fact, organic growth

7    been overstated, that would impact valuation.    If, in fact,

8    profitability had been overstated, that would have an impact on

9    valuation as well.

10   **Q.**    And cash conversion, can you describe for us what you

11   observed and what your concerns were about cash conversion?

12   **A.**    So most software companies have a -- at that time

13   particularly, have a model where they sold licenses which

14   essentially was an upfront fee for the use of the product, and

15   there would be a maintenance and support contract that the

16   company would have.

17        That maintenance and support contract usually is paid one

18   year in advance but is recognized as revenue over the period of

19   the contract, which was usually one year.

20        When -- so for most technology companies or software

21   companies, the cash conversion, which is how much cash do you

22   generate from the profit that you report, is usually close to a

23   hundred percent, and the reason for that is that before you've

24   even recognized revenue from maintenance and support contracts,

25   you've already collected the cash.

PROCEEDINGS

1    So there's cash in your bank balance, but you haven't yet

2  reported the revenue.  Now, there's obviously areas where

3  you've provided software to companies that you need to get paid

4  for, but if you balance these things out and you look across

5  the industry, most software companies report cash conversion of

6  over 90 percent.

7  **Q.**  And the issues that you saw with -- are issues with cash

8  conversion -- can they sometimes relate to accelerated revenue

9  recognition?

10 **A.**  They can sometimes, and it was one of the things that I

11 had speculated was that -- that --

12    **MS. LITTLE:**  Objection.  Calls for speculation.

13    **THE COURT:**  He used the word "speculation," so

14 sustained.

15    **MR. FRENTZEN:**  Maybe I can ask a clarifying question.

16    **THE COURT:**  Reframe the question.

17 **BY MR. FRENTZEN:**

18 **Q.**  When you're saying "speculated," is this something that

19 you concluded in -- and actually wrote in some of your notes?

20    **MS. LITTLE:**  Objection.  Leading.

21    **THE COURT:**  Overruled.

22    **THE WITNESS:**  Yes.  So I -- so I wrote that this was

23 my -- my thesis, that revenue was being aggressively recognized

24 or accelerated in order to -- which would lead to cash

25 conversion being much lower than the peer group.

**BY MR. FRENTZEN:**

**Q.**   When you -- when you were first moving to underweight and in this 2008 time period, as a result, did you come to learn that Mr. Kanter had made any contact with your boss, David Knox?

**A.**   Yes.  So --

**Q.**   How was that brought to your attention?

**A.**   So prior to the publication of this note, which involved organic growth, I was called into the office of David Knox, and I was -- who is the head of research at Cazenove, and he informed me that he had been contacted by Mr. Kanter at Autonomy and had been told that Autonomy was in possession of some audiotapes which they felt breached FSA, which is the UK regulator -- FSA regulations and that I was in breach of them.

In response to that, David Knox and the compliance department at Cazenove had gone through all my audio recordings for the past month, concluded that there wasn't an issue, and David Knox informed me that they would publish the note as they felt that this was a baseless claim.

**Q.**   After the publication of your note, were you -- let me start with this.

What are earnings calls, Mr. Khan?

**A.**   Earnings calls are events where public companies report their financials on a quarterly or half yearly basis, and this is a point where analysts and investors can attend a -- an

1  earnings call, either through an audio conference or actually

2  physically present within a meeting room where management of a

3  company would present their results for the quarter.

4  **Q.**    Following this -- the call from Mr. Kanter, were you also

5  excluded from earnings calls for Autonomy for a period of a

6  little over a year?

7  **A.**    Yes.  So usually what happens is that you get invited to

8  an earnings call or an earnings event, so these were physical

9  meetings at the time.

10      Q1 or Quarter 1/2008 was the last time that I was invited

11  to a meeting until Q1/2010.  I was allowed to listen to the

12  conference calls but was unable to ask questions on those

13  conference calls.

14  **Q.**    Did you eventually reach out to Autonomy to ask to be

15  brought back into those earnings calls?

16  **A.**    I had heard from an investor that had a meeting with the

17  investor relations officer at the time, which was a Mr. Geall,

18  and he had asked why -- why I had been excluded from these

19  events, and Mr. Geall responded that they weren't aware of any

20  reason why I should be excluded.

21      At that point, I contacted Mr. Geall and said, "Am I

22  invited to the next earnings call," and he said, "Yes."

23  **Q.**    So in early 2010, Mr. Geall invited you back into the

24  earnings calls?

25  **A.**    Yes.

1  **Q.**  All right.  Just in terms of your own -- I mean, was the

2  complaint made by Autonomy to your supervisors -- was that

3  fully vetted?

4  **A.**  When you say "vetted" --

5  **Q.**  By them.

6  **A.**  Yes.

7  **Q.**  To your knowledge or understanding, was there ever any

8  action taken by the FSA or any other entity with respect to any

9  of the things you had done?

10  **A.**  No.

11  **Q.**  I'd like to now show you a series of documents.  This is

12  going to be Exhibit 174, 219, 901, 946, 1058, 1166, 1649, and

13  2982, and I don't plan on going through all of these.

14      Could you take a look at these, please, Mr. Khan and just

15  see if you recognize what each of those documents is, please.

16  **A.**  (Witness reviews documents.)

17          **THE COURT:**  Is it your intention to offer those

18  exhibits?

19          **MR. FRENTZEN:**  It is, Your Honor.

20          **MS. LITTLE:**  May I look at them, please?

21          **THE COURT:**  Oh, of course.  Sure.  Do it one at a

22  time.

23          **MS. LITTLE:**  Are these just his analyst notes?

24          **MR. FRENTZEN:**  Yes.

25          **MS. LITTLE:**  No objection.

1    **THE COURT:**  Okay.  These may be admitted.

2    174, 219, 901, 946, 1058, 1166, 1649, 2982, admitted.

3    (Trial Exhibits 174, 219, 901, 946, 1058, 1166, 1649

4     and 2982 received in evidence)

5    **MR. FRENTZEN:**  Thank you, Your Honor.

6    Can we pull up Exhibit 174, please.

7    (Exhibit published to jury.)

8    BY MR. FRENTZEN:

9    **Q.**  All right.  Mr. Khan, can you describe for us what this

10   is?

11   **A.**  This is one of my research reports written while I was at

12   Cazenove on Autonomy.

13   **Q.**  I would like to focus your attention to the date here.

14   When was this note from?

15   **A.**  This is 28th of July, 2009.

16   **Q.**  All right.  And then right below where it says "Autonomy,"

17   it says "stock recommendation."  What does that mean?

18   **A.**  So the stock recommendation is essentially my advice to

19   the investment community as to what -- how the stock will

20   perform in a period of usually sort of 9 to 12 months post the

21   publication of the note.

22   What this is saying is that I believe that at that time,

23   Autonomy would underperform the market, the market being the --

24   the technology sector, and how that -- how that would perform

25   in that period.

1    Q.    Incidentally, around this time, are you aware of how many

2    other analysts were covering Autonomy, approximately?

3    A.    Around 15.

4    Q.    And with respect to, let's say, most of those, did they

5    see things the same way you did?

6    A.    No.  Most of them were positive.

7    Q.    If we could go, scroll up just a little bit to the second

8    paragraph here.  All right.

9         And, Mr. Khan, the second paragraph here, does that sort

10   of summarize some of the things that you've already talked

11   about in terms of cash conversion?

12   A.    Yes.  It talks about cash conversion and revenue

13   recognition.

14   Q.    All right.  And that's -- up here in the first sentence

15   here, "cash conversion within Autonomy is poor."  And down here

16   in the middle, "continuing lack of organic deferred revenue

17   growth in our view may be a function of revenue recognition."

18        What did you mean by that?

19   A.    So, again, through my research, most companies, when

20   they're selling, as I've described, licensed-based products and

21   there is an associated maintenance contract with it, if the

22   license stream is growing at a particular rate, you would

23   expect that the maintenance stream was also growing at a

24   similar -- a similar rate.

25        The way to monitor that was through a line in the balance

1   sheet called "deferred revenue," and deferred revenue was this

2   bucket of cash that the company had collected for the

3   maintenance contracts but yet to recognize as revenue.

4       Now, in my research what I showed was that the deferred

5   revenue was not growing organically in the same -- at the same

6   rate that the company was reporting overall organic growth.

7   Q.  I'd like to move now --

8           MS. LITTLE:  I renew my motion to strike.  Deferred

9   revenue is also not an issue in this case.  This is not

10  relevant, and for this gentleman to give a general referendum

11  on his views --

12          THE COURT:  I think revenue is very much an issue in

13  this case.

14          MR. FRENTZEN:  I believe that's right.

15          THE COURT:  Overruled.

16          MR. FRENTZEN:  Thank you, Your Honor.

17      Could we go to Exhibit 219, please, briefly.

18              (Exhibit published to jury.)

19  BY MR. FRENTZEN:

20  Q.  Exhibit 219, this is a note.  What date, Mr. Khan?

21  A.  29th of September, 2009.

22  Q.  Was your recommendation the same here?

23  A.  Yes.

24  Q.  I'd just like to go to the second paragraph of this.  If

25  we could just scroll up a little bit.

1          Does this mention IDOL SPE, Mr. Khan?

2   **A.**    Yes.

3   **Q.**    And did you -- do you have a recollection of IDOL SPE

4   being kind of a big issue for Autonomy around this time period?

5   **A.**    Yes.  It was a major product launch for Autonomy.  It was

6   a product that would combine what Autonomy's historic strength

7   had been, which was being able to process unstructured data

8   like social media, emails, Word documents, and combining that

9   with analysis of structured data which sits in databases such

10  as airline ticketing information or human resources information

11  on employees, etc.

12  **Q.**    If we could, could we go to page 7, please, and scroll

13  down.  All right.

14         Is there further discussion here about IDOL SPE, Mr. Khan?

15  **A.**    Yes.

16  **Q.**    And to your view, was IDOL SPE something new or inventive

17  that you thought would change the course for Autonomy?

18  **A.**    It was not something that I believed would be a major

19  contributor to Autonomy's revenue, but Autonomy, Dr. Lynch,

20  Mr. Hussain, believed that it would be a material contributor

21  going forward.

22         There was a lot of discussion around how much the launch

23  event in terms of marketing would cost and how much was spent

24  on the marketing for the initial launch.

25  **Q.**    Did you continue to have concerns -- I'm at the bottom

1  here -- about potential aggressive revenue recognition?

2  **A.**   Yes.   So underlying all my research over that time period

3  was the same underlying thesis that the poor cash conversion,

4  the -- led me to believe that organic growth was overstated,

5  that profitability was overstated, and thus the valuation was

6  too high.

7  **Q.**   I'd like to go now to 2010, Mr. Khan, and in 2010, were

8  you invited back to the earnings calls after your year and a

9  half or so of being excluded from them?

10 **A.**   Yes.   So Q1, Quarter 1/2010, was the first call that I was

11 invited back to and the first opportunity that I had to ask

12 questions directly of Dr. Lynch and Mr. Hussain.

13        **MR. FRENTZEN:**   Your Honor, at this time, if I could

14 approach, I'd like to offer a series of exhibits that are the

15 transcripts of earnings calls.

16        **MS. LITTLE:**   What are the numbers?

17        **MR. FRENTZEN:**   58, 167, 291, 776, 1006, 1189, 1539 --

18 **THE COURT:**   1539.

19        **MR. FRENTZEN:**   Sorry, Your Honor.   1539, 1794, and

20 2032.

21        **THE COURT:**   Any objection?

22        **MS. LITTLE:**   Your Honor, as we've discussed, the

23 transcripts are to be used simply as aids to the jury.   They're

24 not accurate.   They haven't been certified as accurate.

25      I know that Mr. Frentzen plans to play some tapes of the

1  transcripts generally, but as aids, they're not admissible.

2        MR. FRENTZEN:  We can do this the slow way --

3        THE COURT:  I can play all the tapes.  Maybe that

4  would be five, seven hours.  I don't know what it would be.

5        MR. FRENTZEN:  We plan --

6        THE COURT:  Well --

7        MR. FRENTZEN:  If I could just inform the Court, I

8  plan on directing his attention to a few spots on a couple of

9  these.  I plan on playing a few excerpts from one particular

10 call.

11    Maybe if I can just display them without playing the audio

12 for one of them, and we can argue about their admission later.

13       THE COURT:  Well, I don't think the rules are going to

14 change about admission.  I think defense is correct that the

15 tapes come in -- well, let's start at the beginning.

16    Do you have any objection to the tapes coming in?

17       MS. LITTLE:  It depends on which tapes --

18       THE COURT:  He has identified 1, 2, 3, 4, 5, 6, 7, 8,

19 9 -- 9 tapes -- he has identified 9 transcripts, but they are

20 transcripts of tapes.

21    My first question is do you have any objection to the

22 tapes coming in, because that's the best evidence?

23       MS. LITTLE:  He only told me about two of them.  I

24 have listened to those.  I haven't listened to the others.

25       THE COURT:  Well, they've been provided to you in

1   advance of trial.  Let's leave it at that.

2       So is there any -- you know, let me ask the question

3   again.  Any objection to the tapes coming in?

4           MS. LITTLE:  I guess what I object to is the tapes

5   coming in untethered to any testimony.

6           THE COURT:  Well, okay.  We can -- I don't know that

7   that's necessarily -- okay.  As to that objection, overruled.

8       So do you have any other objection as to the tapes coming

9   in?

10          MS. LITTLE:  I guess not.

11          THE COURT:  Okay.  All right.  So the tapes are in

12  evidence.

13      The question is about the transcripts.  What I'm going to

14  do is allow the Government and allow the defense to play any

15  portion of the tapes that they want and to show simultaneously

16  the transcript in aid of the jury's determination, with the

17  understanding to the jury that it is the tape that is the

18  evidence, not the transcript.

19      So it is what you hear that's important, not necessarily

20  what is written down because there is no stipulation that the

21  transcripts are accurate reproductions of the tapes.  So --

22          MR. FRENTZEN:  Understood, Your Honor.

23      Go ahead.  I'm sorry.

24          THE COURT:  Well, no.  So I just want to sort of round

25  it out by saying I'm not going to allow anything that hasn't

**PROCEEDINGS**

1  been played to the jury or cited in the transcript -- and we'll

2  have a session outside the presence of the jury -- to come in.

3  So, in other words, I don't want anybody to be surprised in

4  argument, is really what I'm concerned about.

5          **MS. LITTLE:**  That's what I'm concerned about, too.

6          **THE COURT:**  I understand that.  That's a genuine

7  concern.  So I'm going to -- I'll try to do a lot of this

8  outside the presence of the jury because it just takes time.

9          But you may go ahead and do any of the following:  One,

10  you may play any of the tape; two, you may play -- you may show

11  them the transcript of that, and I will then have a session

12  outside the presence of the jury to determine whether or not

13  there is any basis for a difference between the transcript and

14  the tape.

15          **MR. FRENTZEN:**  I want to show them one -- parts of one

16  transcript, Your Honor, and then play and show parts of one

17  other transcript, and I'll be done with this, and we can talk

18  about it later.

19          **THE COURT:**  Okay.

20          **MS. LITTLE:**  Your Honor, just one other minor point.

21  In going through the last set of exhibits, the last one

22  Mr. Frentzen mentioned was 2982.  That was not on the

23  disclosure list.  I don't have it.

24          **THE COURT:**  Okay.  We'll give it to you -- we'll make

25  sure you do have it and then you've reserved an objection as to

 1  that and we'll deal with that outside the presence of the jury.

 2      **MS. LITTLE:**  Thank you.

 3      **THE COURT:**  Okay.  Well -- okay.  Are we all caught

 4  up, in a manner of speaking?  Okay.

 5      **MR. FRENTZEN:**  All right.  If I can -- if we could

 6  bring up 5 -- I'm sorry.  592 to start with.

 7              (Exhibit published to jury.)

 8  **BY MR. FRENTZEN:**

 9  **Q.**   Mr. Khan, do you see what this is, sir?

10  **A.**   Yes.  It's a transcript from the Q4/2009 Autonomy results.

11  **Q.**   Okay.  And what does that mean when it's Q4/2009?

12  **A.**   So that is the period which refers to the 1st of October

13  to the 31st of December, 2009.  This is a transcript of the

14  company -- company management talking about their results over

15  that period.

16  **Q.**   And to your recollection, was the phrase "pure software

17  model" or "pure software company" something that you heard

18  frequently coming from folks at Autonomy?

19  **A.**   Yes.  Very frequently.

20  **Q.**   What do you mean by that?

21  **A.**   It was a -- it was a term that was used by Autonomy from

22  the early days of its IPO within the UK market, so back from

23  2001 all the way through to 2011.  It was a -- it was something

24  that they used to differentiate themselves between other

25  software companies.

1  **Q.**  All right.  And "pure software model," what is that a

2  reference to?

3  **A.**  Pure software, as I understood it, meant that the company

4  did very little professional services and that the business was

5  mainly made up of software licenses, maintenance and support,

6  and royalty revenues from their OEM business.

7  **Q.**  Did you have any indication from Autonomy -- well, we'll

8  get into that in a second.  Sorry.

9        All right.  Can we go to page 4 of this document, please.

10        I want to direct your attention to the very top paragraph

11  there, Mr. Khan.  And is that -- actually -- and I apologize.

12  Can we go just to the page before so we can see the speaker.

13  Page -- yeah.  Okay.  Great.

14        All right.  So this is supposed to be -- this is Michael

15  Lynch speaking here?

16  **A.**  Yes.  According to the transcript, yes.

17  **Q.**  Let's go to the next page.  All right.

18        And in the course of this earnings call -- first of all,

19  can you describe for us one of these earnings calls -- what's

20  it look like?  What's going on here?

21  **A.**  So usually when -- and I can't recollect whether this was

22  a -- just an audio conference or whether it was a physical --

23  physical meeting, but generally in a physical meeting, you

24  would have -- you would have a -- let's say, a high table where

25  the Autonomy management, which was usually Dr. Lynch,

1   Mr. Hussain, and Mr. Kanter, would sit, and they would stand at

2   a podium or -- and talk about their financial results for that

3   period, and then they would open it up to Q and A to both the

4   floor, so the people in the room and also people on the audio

5   conference call.

6   **Q.**   All right.  And if we could, just quickly in this first

7   paragraph here, is there discussion of the introduction of IDOL

8   SPE by Dr. Lynch?

9   **A.**   Yes.

10  **Q.**   And could you scroll down to just a little bit more.  All

11  right.

12       And right here, do we see Dr. Lynch talking about "the

13  pure software model working very well and very strong

14  profitability growth"?

15  **A.**   Yes.

16  **Q.**   Could we go to the next page, please.

17       On the next page, is Dr. Lynch discussing that "it's a

18  pure software company and there's very little at our size or

19  scale"?

20  **A.**   Yes.

21  **Q.**   Next page.  And on the next page -- could we just scroll

22  up just a little bit.  All right.  Great.

23       Is there here discussion here about introduction of an

24  appliance?

25  **A.**   Yes.

**PROCEEDINGS**

1   Q.   Could you discuss for us what is an appliance?  Is an

2   appliance a term of art in the industry?

3   A.   Yes.  So generally speaking, you know, in the technology

4   industry when people talk about software, software can be

5   delivered in a number of ways.  You can either deliver it in a

6   packaged CD as someone like Microsoft would do and you load it

7   up onto your PC, or, you know, there is this talk of appliance,

8   and appliance is essentially an embedding of a software

9   company's software into a hardware device, so a physical box,

10  but it's a physical box that's finely tuned with the software.

11  So there is some integration work that the software company

12  would do to call it an appliance.

13        Examples of this -- and Dr. Lynch used those as examples,

14  I think, in this call -- would be the Google appliance, which

15  is a way for companies to search for things or the Barracuda

16  appliance, which was a firewall appliance or box.

17  Q.   And is this a discussion of doing appliances so that

18  consumers can get it really quickly?

19  A.   Yes.

20  Q.   All right.  And what was the gist of that, that there

21  might be a crisis and so people might want an appliance ready

22  to go?

23  A.   Yes.  So there was a regulatory backdrop which Dr. Lynch

24  explained caused companies to want to -- to be able to deploy

25  the software as quickly as possible.  And when sold as an

**PROCEEDINGS**

1  appliance, you know, the box can be plugged into an information

2  repository and the various analytical search work that needed

3  to be done could be done very quickly.

4  **Q.**    So if the feds are banging down your door, you can get up

5  to search quickly?

6  **A.**    Exactly.

7  **Q.**    Can we go to the next page, please, and the very top

8  paragraph.

9      I just want to ask you, does this paragraph indicate "one

10  interesting aspect of SPE is that it was the key winning

11  differentiator in a $12 million deal, so although the deal was

12  many other" -- well, this says "over things" -- "it was one of

13  the key differentiators."

14      Do you see that?

15  **A.**    Yes.

16  **Q.**    Was that a plug for IDOL SPE, basically?

17  **A.**    I think it was an idea that IDOL SPE was opening up

18  potentially new markets or opportunities or business

19  opportunities for Autonomy.

20  **Q.**    Can we go to page 13, please.  All right.

21      And this, again, is Dr. Lynch.

22      And can you scroll up just a little bit.  Great.  Thank

23  you.

24      I just want to point out this paragraph right here.

25  Mr. Khan.  Is this indicating "So in 2009, we saw 66 deals over

1    $1 million, which is significantly up from 2008.  And those

2    $1 million deals in the current climate and also in general,

3    most software companies don't have deals for pure software in

4    those numbers at those levels, so that's very much an Autonomy

5    thing."

6        Do you see that?

7    A.   Yes.

8    Q.   Okay.  Great.  All right.

9        I want to move now to another earnings call, if I could,

10   and we've got a couple of audio clips.

11       Your Honor, this is going to be -- the audio recording

12   itself is 2688.  And we've got a transcript for the -- to go

13   with the -- with a couple of clips that I was planning on

14   playing.

15           THE COURT:  2688 admitted.

16       (Trial Exhibit 2688 received in evidence)

17           MR. FRENTZEN:  Your Honor, this is a clip from

18   Q1/2010, Autonomy earnings calls, and the date of that was

19   April 21st, 2010.

20   Q.   Mr. Khan, do you recall attending that particular earnings

21   call or --

22   A.   Yes.

23   Q.   -- participating?

24   A.   Yes.

25           MR. FRENTZEN:  And if we could, please, could we start

1    off --

2    **Q.**    And have you listened to this audio?

3    **A.**    Yes.

4    **Q.**    Does this appear to be a -- a fair and accurate depiction

5    of the conversation that you heard and were a participant in?

6    **A.**    Yes.

7         **MR. FRENTZEN:**    Could we play clip No. 3, please.

8    Start with 3.

9    **Q.**    First of all, Mr. Khan, who is speaking here in this first

10    clip?

11    **A.**    Well, according to the transcript, it's Mr. Hussain.

12    **Q.**    All right.  Well, we'll play it, and if you think it's

13    somebody different, you can tell us.

14         (Whereupon, the audio was played for the jury.)

15    **BY MR. FRENTZEN:**

16    **Q.**    Do you recognize that as Mr. Hussain?

17    **A.**    Yes.

18    **Q.**    All right.  Was Mr. Hussain there going through and trying

19    to detail list the -- what the earnings were for that -- what

20    the revenue streams were for that quarter?

21    **A.**    Yes.

22    **Q.**    And in that, did you hear him make any reference at all to

23    selling hardware?

24    **A.**    No.

25    **Q.**    During this Q1/2010 conference call, do you recall there

1  being an issue raised about there being $10 million in

2  inventory on Autonomy's balance sheet?

3  **A.**   Yes.

4  **Q.**   And what issues, if any, did that $10 million in inventory

5  raise for you and perhaps for other analysts at that call?

6  **A.**   So it was a exceptional number, $10 million.  We'd never

7  seen in any quarterly results an inventory level that high.

8  Generally speaking, any inventory on the balance sheet was half

9  a million dollars or less, so seeing something of a magnitude

10  of 20 times what we normally saw resulted in a number of

11  people, including myself, asking questions as to what it

12  related to.

13  **Q.**   All right.  And what concerns, if any, would you have

14  about there being inventory on the balance sheets at Autonomy?

15  **A.**   It wasn't really a concern.  It was a case of trying to

16  understand what it related to.

17      If it was hardware that was sitting on the balance sheet

18  at the end of the quarter, there were a number of questions,

19  which was if that -- when we talk about the balance sheet, we

20  talk about a snapshot at a particular period.  So at that

21  particular moment in time, there was $10 million of hardware on

22  the balance sheet.

23      So a number of questions arose from that, which is well,

24  was there any hardware that was sold during the period or was

25  this just a -- a one-off number that appeared at the end of the

PROCEEDINGS

1    period.

2        And the second question was if there was a -- what was the

3    hardware related to, and our understanding and my understanding

4    from that call was it related to the Arcpliance product, which

5    meant that it was software embedded into some hardware.  There

6    would be some clever integration work done and that was being

7    provided to customers.

8    Q.   And in general, if it's -- if the 10 million in inventory

9    is hardware for an Arcpliance, what does that mean in terms of

10   the revenues that that sort of inventory could generate?

11   A.   So, again, Autonomy -- and I believe also as mentioned on

12   this same quarterly earnings call, Autonomy -- I think it was

13   Dr. Lynch focused on the idea that it wasn't really about the

14   hardware.  That the value of the product they were selling, the

15   Arcpliance, was all in the software.

16       And what that meant was that if there was $10 million of

17   hardware being sold in Arcpliance, my assumption was that the

18   overall sales value of that Arcpliance would be between 50 and

19   maybe even a hundred million dollars of Arcpliance product.

20   This would mean all the value was in the software and very

21   little -- very little in -- or very little value in the

22   hardware being sold.

23   Q.   Was that, in fact, something that the folks from Autonomy

24   were telling you during this earnings call?

25   A.   As far as I remember, they -- they weren't specific about

1  how much the sales would be, but they were very specific that

2  there would be no particular impact on gross margin.  And by

3  that I mean that, you know, Autonomy reported gross margins of

4  90 percent-ish and that meant that there would be a significant

5  amount of software associated with that hardware, with that

6  Arcpliance product.

7          MR. FRENTZEN:  Can we play the first clip.

8  Q.  Does this appear to be a question from you?

9  A.  Yes, it does.

10     (Whereupon, the audio was played for the jury.)

11 BY MR. FRENTZEN:

12 Q.  So, Mr. Khan, what did you understand Dr. Lynch was

13 telling you there about this hardware and hardware sales?

14 A.  That the ten million dollars of inventory was all related

15 to Arcpliance.

16     Secondly, he was pointing out that the value of the

17 Arcpliance product was all in the software and not in the

18 hardware.

19     And that most -- and thirdly, that the majority of that

20 hardware or that appliance that was related to that hardware

21 would be sold in Q2.

22         MR. FRENTZEN:  Can we go to the last clip, please.

23 Q.  Just before we get started, do you know who David Toms is?

24 A.  Yes.

25 Q.  Who is David Toms?

PROCEEDINGS

1  **A.**   David Toms is another analyst that works for Newman

2  Securities.

3          **MR. FRENTZEN:**  Go ahead.

4      (Whereupon, the audio was played for the jury.)

5  **BY MR. FRENTZEN:**

6  **Q.**   Mr. Khan, there again -- well, first of all, let me ask,

7  what is Morse?

8  **A.**   Morse was a UK-listed technology company that was a

9  reseller of hardware and other things.

10 **Q.**   What does that mean, a reseller of hardware?

11 **A.**    It would provide a service to its end customers where it

12 would buy hardware from a third party, maybe it's a Dell, maybe

13 it's, you know, Sun Microsystems at the time, and then they

14 would sell that on to its customers.

15 **Q.**   And in what way or what was Dr. Lynch there describing

16 that -- distinguishing Autonomy from Morse and saying that they

17 did not do?

18 **A.**    What I interpreted from that at the time was that Autonomy

19 did not resell any hardware.  It was not interested in

20 hardware.  This was a -- as you described it, a pure software

21 company.

22 **Q.**   All right.  And in terms of the hardware that was being

23 dealt with, did he reiterate that was the Arcpliance, which in

24 a rush when people really need it fast, they can get it ready

25 to go?

1    **A.**    Exactly.

2             **MR. FRENTZEN:**    I would like to show Exhibit 901, if we

3    could.    901, which I believe we've admitted.

4                     (Exhibit published to jury.)

5    **BY MR. FRENTZEN:**

6    **Q.**    Is this following that call, Mr. Khan?

7    **A.**    Yes.

8    **Q.**    And here it says "JPMorgan Cazenove."  Can you describe,

9    was there some soft of a shift or change in terms of --

10   **A.**    So when I joined Cazenove in 2006, they had a joint

11   venture with JPMorgan which gave JPMorgan the option to acquire

12   Cazenove in its entirety, which then occurred in 2010.  So the

13   firm was re-branded as JPMorgan Cazenove for the purposes of

14   equity research.

15   **Q.**    Here it says "underweight.  Is that basically the same as

16   underperform?

17   **A.**    It's exactly the same as underperform.

18   **Q.**    All right.  And in terms of this note, did you continue to

19   express concerns about Autonomy's sort of organic growth and

20   profitability?

21   **A.**    Yes.  So the underlying thesis again had been unchanged

22   from -- from the -- from 2008 onwards.

23   **Q.**    Could we just go to page 3 briefly.

24        And on page 3, did you also make reference to a purchase

25   of 10 million of hardware related to Arcpliance inventory and

PROCEEDINGS

1  so on?

2  **A.**  Yes.

3  **Q.**  In 2010, effectively, did you continue to have concerns

4  about Autonomy and continue to publish underweight

5  recommendations?

6  **A.**  Yes.

7  **Q.**  Did something happen in terms of Autonomy creating issues

8  with your management again?

9  **A.**  Yes.  So in -- I can't remember the exact time frame, but

10  post the publication of this note, I was contacted by the

11  JPMorgan compliance team and informed that --

12            **MS. LITTLE:**  Objection.  Hearsay.

13            **MR. FRENTZEN:**  It's not for the truth, Your Honor.

14            **THE COURT:**  Okay.

15      Ladies and gentlemen, what the witness is about to state

16  is that he was given certain information.  The information that

17  he was given -- or certain statements were made.

18      The information or the statements made are not offered for

19  the truth of the matter; that is, they're not in evidence for

20  you to consider is that statement correct or is that statement

21  not correct.  Rather, it's being introduced to show what this

22  witness' state of mind was who had heard these various -- these

23  various statements, and then it's for you to accept or reject

24  whatever the witness says with respect to his state of mind and

25  his conduct.

1          **MS. LITTLE:**  And I would submit that his state of mind

2     about this incident is not relevant.

3          **THE COURT:**  Okay.  Overruled.

4     Go ahead.

5  **BY MR. FRENTZEN:**

6  **Q.**   Go ahead, Mr. Khan.

7  **A.**   So I was contacted by the compliance team at JPMorgan with

8     reference to the fact that someone at Autonomy, which I believe

9     was Andrew Kanter, had contacted JPMorgan compliance and had

10    informed them that they believed that I was using social media

11    to gain access to ex-employees of Autonomy to gain insider

12    information about the company.

13  **Q.**   Did that result in actions being taken by your employer?

14  **A.**   Yes.  There was -- again it stimulated an investigation of

15    my social media accounts and my communications, etc., and again

16    I was cleared.

17  **Q.**   In the interim before you were cleared, did you

18    effectively have to take on a ghostwriter?

19  **A.**   Yes.  So in order to protect JPMorgan, what they decided

20    was that any research note that I published on Autonomy should

21    be reviewed by at least two people.  One of those was the head

22    of accounting research at JPMorgan and the other would be one

23    of the heads of research at JPMorgan.

24  **Q.**   And along with that ghostwriter, did you nonetheless

25    remain recommendation of underweight in terms of Autonomy?

PROCEEDINGS

1    A.    Yes.

2    Q.    I'd like to just jump ahead now to 2011.  Did you remain

3    skeptical about Autonomy up to -- and this is -- if we could

4    bring up 1649.

5                    (Exhibit published to jury.)

6    BY MR. FRENTZEN:

7    Q.    -- skeptical about Autonomy up to, here we are, March 25,

8    2011?

9    A.    Yes.

10   Q.    Remaining underweight?

11   A.    Yes.

12   Q.    All right.  And -- one moment.

13        Can we go to page 3 of this note, please, and scroll up a

14   little bit.  Okay.

15        And in here, did you continue to have concerns about

16   accelerated revenue recognition into 2011, Mr. Khan?

17   A.    Yes.

18   Q.    Mr. Khan, when -- can you give us some idea of what

19   happens when a company misses consensus in a quarter?

20   A.    So the market, in every quarter for any company, has an

21   expectation about what the revenue results will be, what their

22   profitability will be.

23        When a company misses those expectations, there is

24   generally a very negative reaction from investors.  The stock

25   price generally falls anywhere from 10 to 50 percent sometimes,

**PROCEEDINGS**

1  based on the fact that there is a perception that the company

2  hasn't been able to manage expectations correctly, and then

3  there is a concern that expectations for the future will also

4  be challenged in terms of not being able to meet those

5  expectations.

6  **Q.**   Mr. Khan, because of your job, did you spend an excessive

7  amount of time studying Autonomy with the resources that you

8  had publicly available?

9  **A.**   Yes.

10 **Q.**   And during the course of your analyzing Autonomy, did you

11 have any idea, for example, in 2009 that Autonomy sold

12 approximately $53 million in hardware?

13 **A.**   I had no idea.

14 **Q.**   What effect, if any, would that have had on your view of

15 Autonomy in 2009?

16 **A.**   Well, it was very clear that, from my perspective, I had

17 no idea that Autonomy was -- was selling hardware in that way.

18 It would have had a negative impact on valuation because

19 selling hardware has -- doesn't have the same value as selling

20 software.

21      And lastly, without having sold that hardware, Autonomy

22 would have missed market expectations, and, in my opinion,

23 there would have been a negative reaction on the share price.

24 **Q.**   How negative?

25      **MS. LITTLE:**  Objection.  Calls for speculation.  Also

**PROCEEDINGS**

1  this is starting to sound like expert testimony, so I would

2  move to strike.

3              **THE COURT:**  Well, I think he can --

4              **MR. FRENTZEN:**  Professional analyst.

5              **THE COURT:**  I think he can give his opinion in this

6  area.  Overruled.

7              **THE WITNESS:**  Given the way that Autonomy had built up

8  its reputation in the market, 50 million of revenue that --

9  that wouldn't have been there, then I would have guessed that

10 there would have been at least a 30 -- 30 percent negative hit

11 to the share price.

12 **BY MR. FRENTZEN:**

13 **Q.**   In 2010, did you have any idea that Autonomy had sold

14 approximately 100 million in hardware?

15 **A.**   No.  My only realization of any type of hardware was

16 through the Arcpliance product.

17 **Q.**   And, again, the Arcpliance product, the profit, the --

18 most of the revenue comes from the software?

19 **A.**   From the software, yes.

20 **Q.**   In 2011, Quarters 1 And Quarters 2, did you have any idea

21 they sold approximately 50 million in hardware?

22 **A.**   No idea.

23 **Q.**   And do you have the same view in terms of 2010 and 2011 in

24 terms of what the hardware sales -- knowing what that would

25 have done to the valuation of Autonomy?

1          **MS. LITTLE:**  Same objection.

2          **THE COURT:**  Overruled.

3          **THE WITNESS:**  Yes.  If the market had become aware

4    that there was reselling of hardware, there would have been a

5    re-definition of what the correct valuation for Autonomy would

6    have been, and in my opinion, it would have been significantly

7    lower.

8          **MR. FRENTZEN:**  May I have one moment, Your Honor?

9       (Government counsel confer off the record.)

10         **MR. FRENTZEN:**  That's all I have for now.  Thank you.

11         **THE COURT:**  Ladies and gentlemen, we are going to take

12   our recess now.  We will be in recess until 10:25.

13      Remember the admonition given to you:  Don't discuss the

14   case, allow anyone to discuss it with you, form or express any

15   opinion.

16                  (Recess taken at 10:12 a.m.)

17                  (Proceedings resumed at 10:29 a.m.)

18      (Proceedings were heard in the presence of the jury:)

19         **THE COURT:**  Please be seated.

20      Let the record reflect all jurors are present, the parties

21   are present.

22      Cross-examination.

23         **MS. LITTLE:**  Thank you, Your Honor.

24      And I did have a chance over the break to look at that

25   Exhibit 2982, I think it was, and I'm fine with it.

1        **THE COURT:**  It's all right?

2        **MS. LITTLE:**  Yeah.

3        **THE COURT:**  Okay.  Thank you.  It will be admitted as

4    well.

5        (Trial Exhibit 2982 received in evidence)

6        **THE COURT:**  Okay.  Thank you.

7                        **CROSS-EXAMINATION**

8    BY MS. LITTLE:

9    **Q.**   Good morning, Mr. Khan.

10   **A.**   Good morning.

11   **Q.**   My name is Jan Little, and I am one of Mr. Hussain's

12   attorneys; and we haven't met before, so good morning.

13       And good morning, members of the jury.

14       Mr. Khan, in the last 20 years since 1999 that you've been

15   an analyst, you've changed jobs a number of times, haven't you?

16   **A.**   Yes.

17   **Q.**   You told us that you started at Merrill Lynch in 1999; is

18   that right?

19   **A.**   Yes, that's right.

20   **Q.**   And you left there about three and a half years later?

21   **A.**   Yes.

22   **Q.**   And you went to a firm called Clear Capital; right?

23   **A.**   Yes.

24   **Q.**   And you were there for about a year?

25   **A.**   Yes.

1  **Q.**   What happened to Clear Capital?

2  **A.**   Clear Capital, I was one of the founding partners.  It

3  was -- we set up the company to try and take advantage of

4  various changes in financial regulations.  After a year within

5  the firm, it was the realization that we were too early in our

6  business proposition, and I received an offer from

7  Commerce Bank at the time to join them.

8  **Q.**   So basically Clear Capital failed; right?

9  **A.**   Clear Capital was ultimately acquired, but I left before

10  the acquisition.

11  **Q.**   Okay.  And then you were briefly with a firm called New

12  Street Research?

13  **A.**   No.  New Street was our umbrella company for Clear

14  Capital, the umbrella regulatory company.

15  **Q.**   Okay.  So your next job, then, was in 2005.  You were an

16  analyst for The Mann Group?

17  **A.**   Well, as I said, there was a brief period with

18  Commerce Bank before they closed down their Equity Research

19  Department.  I then joined Mann Group.

20  **Q.**   Okay.  So we go from Merrill Lynch to Clear Capital to --

21  what was the other one?

22  **A.**   Commerce Bank.

23  **Q.**   -- Commerce Bank, and then to The Mann Group?

24  **A.**   Yes.

25  **Q.**   That's the group that eventually became MF Global?

KHAN - CROSS / LITTLE

1    **A.**    Yes.

2    **Q.**    Okay.  And you were there for a year; right?

3    **A.**    Slightly longer than a year.

4    **Q.**    Okay.  What happened to that job?

5    **A.**    To be honest, I didn't enjoy the job very much in terms of

6    the way it was panning out.  Again, I received a call from a

7    headhunter about a job at Cazenove.  I attended that interview

8    and got the job and left Mann Group.

9    **Q.**    So, then, for five years you were at Cazenove, which then

10   was acquired by JP Morgan; correct?

11   **A.**    That's right.

12   **Q.**    That was from 2006 to 2011?

13   **A.**    That's right.

14   **Q.**    Okay.  Why did you leave JP Morgan?

15   **A.**    Again, I was approached by another bank to take up a role

16   as an analyst, a bank called Berenberg.  It's a German bank.

17   And it was a job that was a larger remit to the one I had.  It

18   was global software coverage, so covering both U.S. and

19   European software companies.

20   **Q.**    Were you asked to leave JP Morgan?

21   **A.**    No.

22   **Q.**    So, then, for four years you were at Berenberg?

23   **A.**    Yes.

24   **Q.**    And you were fired from Berenberg; right?

25   **A.**    In fact, the terminology they use is they -- "we mutually

1    agreed to terminate the contract."

2    **Q.**    You were fired; right?

3    **A.**    Yeah.

4    **Q.**    And then you were an analyst -- by the way, you were fired

5    in part because you and another gentleman, Mr. Ahmed, were

6    really wrong in your predictions about Apple; right?

7    **A.**    I wasn't the analyst covering Apple.

8    **Q.**    Mr. Ahmed was?

9    **A.**    Mr. Ahmed was.

10   **Q.**    And he gave really bad predictions about Apple?

11   **A.**    He was incorrect in his opinion about Apple, yes.

12   **Q.**    And you were both fired?

13   **A.**    We were, yeah, fired at the same time.

14   **Q.**    And then you were an analyst with Canaccord Genuity?

15   **A.**    That's right.

16   **Q.**    And you were there for two years?

17   **A.**    Just under, yes.

18   **Q.**    What happened to that job?

19   **A.**    Again, through that period of covering being an analyst at

20   Canaccord Genuity, I was approached by one of the companies

21   that I was looking at, and they offered me an opportunity to

22   join them as part of the senior management team.  I decided to

23   accept that offer.

24   **Q.**    And so, then, you went to WANdisco?

25   **A.**    That's right.

1   **Q.**   And that's your eighth job in the last 20 years?

2   **A.**   Yes.

3   **Q.**   And you're not an analyst anymore?

4   **A.**   No.

5   **Q.**   And, in fact, your license with the Financial Conduct

6   Authority is inactive; correct?

7   **A.**   Currently, yes.

8   **Q.**   Let's talk about -- well, first of all, you have received

9   relatively poor ratings as a financial analyst over the years,

10  haven't you?

11  **A.**   You'd have to refresh me on what that -- what you mean by

12  that.

13  **Q.**   Okay.  Well, let's take a look in your book, please, at

14  Exhibit 6302.  Can you describe to me --

15  **A.**   Do you want me to look?

16  **Q.**   Yes, please.  It's near the back of your book.  6302.

17         Are you familiar with the rating service TipRanks?

18  **A.**   No.

19         **MR. FRENTZEN:**  I'm going to object to this.

20         **THE COURT:**  Let me look at it first.

21                   (Pause in proceedings.)

22  **BY MS. LITTLE:**

23  **Q.**   Are you aware, sir, that there are Internet --

24         **THE COURT:**  No.  Wait, wait, wait.  Let me look at it.

25  You're saying 6302?

1          **MS. LITTLE:**  It's an analyst profile from a service

2    called TipRanks, which rates analysts.

3          **MR. FRENTZEN:**  It's like Yelp.

4          **THE COURT:**  Objection sustained.

5    BY MS. LITTLE:

6    **Q.**   Are you aware, sir, that there have been rating services

7    that have given you negative ratings for your conduct as an

8    analyst?

9    **A.**   No, I'm not aware of it.  We -- as analysts, we follow

10   certain external polls.  So while I was at Merrill Lynch, I was

11   ranked number two as the European software analyst across all

12   analysts for two years in a row.

13        When I was at Berenberg, I was ranked top 10 of analysts

14   within Europe.

15        And within Canaccord Genuity I was ranked as top 10 as

16   U.K. analysts.

17        And back in 2006, I was picked as the number one U.K.

18   stock picker across all analysts in technology.

19        Those are the ones I'm aware of.

20   **Q.**   And you're not aware of any negative ratings of you at

21   all?

22   **A.**   I'm sure there must have been negative ratings, but I've

23   never read them.

24   **Q.**   Okay.  You never read this one?

25   **A.**   I never heard of TipRanks.

1   Q.   Okay.  Sir, you're generally what's called a bear analyst;

2   correct?

3   A.   I'm sorry?

4   Q.   Do you consider yourself a bear analyst, B-E-A-R?

5   A.   No, not particularly.

6   Q.   Is it the case that most of the time you take the negative

7   view of companies?

8   A.   I think across my career there's probably a balance

9   between positives and negatives if you looked at every single

10  stock I had coverage of over the 20-year period.

11  Q.   Isn't it more like about 49 percent negative?

12  A.   You would have to show me the evidence because I would

13  suggest that it's actually probably less than that.

14  Q.   Well, if you could take a look at that rating sheet right

15  in front of you, which indicates --

16        THE COURT:  Well, wait, wait.  He said it's balanced

17  and apparently your questions are is:  It around 50-50?  I

18  mean, it's about 50-50.

19        MS. LITTLE:  Okay.  I'll move on.

20        THE COURT:  Okay.

21  BY MS. LITTLE:

22  Q.   I think you testified that you had kind of a rocky

23  relationship with Dr. Lynch and Mr. Kanter since around 2008?

24  A.   Yes.

25  Q.   You had a disagreement with Dr. Lynch, that you testified

1    about, and Mr. Kanter concerning your May 2008 note?

2    **A.**   Yes.  And Mr. Hussain.

3    **Q.**   We'll talk about that.

4         You were unhappy that Autonomy didn't invite you to

5    analyst meetings in 2009?

6    **A.**   I was shocked rather than angry.

7    **Q.**   You were unhappy about it?

8    **A.**   I guess I was unhappy, yes.

9    **Q.**   And you were unhappy about this incident in 2010

10   concerning your allegedly trying to get inside information?

11   You were unhappy about that too; right?

12   **A.**   It didn't trouble me because it only made me more

13   confident that I was on the right track.

14   **Q.**   You weren't bothered about it?  You weren't unhappy about

15   it?

16   **A.**   The investigation was made.  I was cleared.  I knew I had

17   done nothing wrong, so I had nothing to be upset about.

18   **Q.**   But you're not really happy with your relationship with

19   Dr. Lynch and Mr. Kanter; right?

20   **A.**   I've not had a relationship with Dr. Lynch or Mr. Kanter

21   of any real format since 2008, so I have no -- I have no

22   negative or positive feelings.  We have no relationship.

23   **Q.**   You have no negative feelings about Mr. Kanter?

24   **A.**   No.

25   **Q.**   Okay.  Is it fair to say that in your career of covering

KHAN - CROSS / LITTLE

1    Autonomy, you were pretty consistently saying negative things

2    about Autonomy?

3    **A.**    From 2000 -- end of 2006 to somewhere mid-2007, I actually

4    had a positive rating on Autonomy; but from then on, it was

5    either neutral or negative.

6    **Q.**    From 2008 and on it was always negative; right?

7    **A.**    No.  There was a period where it went back to neutral.

8    **Q.**    But it was never positive?

9    **A.**    No.

10   **Q.**    And you published -- what? -- something like 30 notes that

11   were either neutral or negative?

12   **A.**    If you say so, yes.

13   **Q.**    Let's talk about this incident in May of 2008 that you

14   testified about where you had a draft note that you were about

15   to publish.  Do you recall that testimony?

16   **A.**    Yes.

17   **Q.**    And you sent that draft note to Dr. Lynch on April 11th,

18   right, 2008?

19   **A.**    I believe it was sent to Dr. Lynch and Mr. Hussain.

20   **Q.**    And you were saying that you wanted -- you were inviting

21   Dr. Lynch to comment on it; right?

22   **A.**    Yes.

23   **Q.**    Let's take a look at Exhibit 6326 in your binder there,

24   which is an e-mail from you to Dr. Lynch.

25          **MS. LITTLE:**  I'd like to move its admission.

1              THE COURT:  6326?

2              MS. LITTLE:  Correct.

3              THE COURT:  Admitted.

4         (Trial Exhibit 6326 received in evidence)

5    BY MS. LITTLE:

6    Q.   And you can look at it on the screen, sir, if that's

7    easier.

8         So starting at the bottom of this e-mail, you've got on

9    April 4th -- it says "11/4/2008."  In England that's

10   April 11th; right?

11   A.   That's right.

12   Q.   Okay.  So on April 11th you write to Dr. Lynch (reading):

13             "Mike, I'm attaching a draft of a note that I'm

14        looking to publish that covers a number of areas on which

15        you may wish to comment.  For compliance purposes, the

16        recommendation is removed along with any fair value

17        calculations."

18        So you were inviting Dr. Lynch to comment; right?

19   A.   Yes, as was policy.

20   Q.   Okay.  And Dr. Lynch responded to you.  This is the next

21   e-mail up.  Dr. Lynch says he's surprised that the note

22   contains a significant number of factual inaccuracies.  He goes

23   on to say that some of the calculations are inaccurate, and he

24   says (reading):

25             "While we in no way have any issue with opinions or

1      conclusions you may draw from the fact of your note,

2      knowing it contains inaccurate information is deeply

3      troubling."

4      Right?

5  A.   Yes.

6  Q.   And at the last sentence he says (reading):

7           "All we ask is accurate on the facts.  The conclusion

8      you draw on these is obviously your own."

9      Correct?

10 A.   Yes.

11 Q.   So he's wanting you to be factually accurate; right?

12 A.   Absolutely.

13 Q.   He's not telling you to change your opinion or change your

14 conclusions, but he wants you to be factually accurate?

15 A.   Yes.

16 Q.   There's nothing wrong with that; right?

17 A.   No.

18 Q.   In fact, you invited it; right?

19 A.   Exactly.

20 Q.   Okay.  And if an analyst is about to publish something

21 about a company that the CEO thinks is inaccurate, it's his

22 duty to try to correct that, isn't it?

23 A.   Absolutely.

24 Q.   And let's take a look at the response.  This is

25 Exhibit 2655, which is earlier in your book.

 1           MS. LITTLE:  It's another e-mail that concerns this

 2     that Mr. Khan is on.  I would move its admission.

 3           THE COURT:  Admitted.

 4        (Trial Exhibit 2655 received in evidence)

 5           MR. FRENTZEN:  Can I just get the number again?

 6           MS. LITTLE:  2655.

 7           MR. FRENTZEN:  Thank you.

 8     BY MS. LITTLE:

 9     Q.   So, again, let's start at the bottom here.

10          Oh, by the way, that last e-mail, Mr. Hussain was not on

11     that e-mail.

12     A.   Okay.

13     Q.   Okay.  So it's in evidence.  The jury can look at it.

14          All right.  Let's now look at this response, 2655,

15     starting at the bottom.  This is from Andrew Kanter to

16     Mr. Knox.  Mr. Knox is your boss; right?

17     A.   Yes.

18     Q.   Okay.  And Mr. Kanter, he says (reading):

19              "I've been provided your name by the Cazenove

20          reception."

21          And in the second paragraph he says (reading):

22              "With this e-mail, we are informing you that a draft

23          note prepared by Daud Khan, Equity Analyst, blah, blah,

24          blah, contains material and misleading inaccuracies."

25          Correct?

1    **A.**    Correct.

2    **Q.**    And he goes on to say that you've been informed there are

3    material issues related to the note and that, among other

4    things, it contains factual inaccuracies, misquotations of the

5    company, the calculations are inaccurate, misleading, and

6    inconsistent.  Do you see that?

7    **A.**    I see that.

8    **Q.**    And, again, Mr. Kanter is perfectly in his rights, indeed

9    his duties, to point out if there's inaccurate information

10   that's going to be published; correct?

11   **A.**    Absolutely.

12   **Q.**    All right.  And this gets forwarded on to you, and then

13   you respond to your boss that you've responded -- this is the

14   first line -- you've responded to the CEO, you're not trying to

15   squeeze the note out on Monday, and then you discuss having a

16   meeting; correct?

17   **A.**    Exactly, yes.

18   **Q.**    And that's what led to the meeting with Dr. Lynch; right?

19   **A.**    Yes.

20   **Q.**    And, again, Mr. Hussain is not copied anywhere on these

21   e-mails?

22   **A.**    That appears so.

23   **Q.**    And so you did meet, then, with Dr. Lynch; right?

24   **A.**    Yes.

25   **Q.**    All right.  If we could take a look at Exhibit 2656, which

1    should be the next one in your binder.

2            MS. LITTLE:  Now, this is -- Mr. Khan is not copied on

3    this e-mail, but this is part of the same set of

4    communications, and I would move its admission.

5            THE COURT:  Admitted.

6        (Trial Exhibit 2656 received in evidence)

7    BY MS. LITTLE:

8    Q.    So we take a look at this e-mail, sir.  This is from

9    Dr. Lynch to your boss again, Mr. Knox; correct?

10   A.    Yes.

11   Q.    And Dr. Lynch explains (reading):

12           "Andy has had to go overseas, so I would" --

13       That's Andy Kanter; right?

14   A.    Yes.

15   Q.    (reading)

16       -- "so I would propose a meeting with myself, our CFO,

17       yourself, and Daud."

18       Correct?

19   A.    Yes.

20   Q.    It says "yourelf" but I assume it means "yourself."

21       So the reason Mr. Hussain was attending this meeting is

22   because Mr. Kanter was out of town?

23   A.    It appears so.

24   Q.    Okay.  And then again Dr. Lynch states in the second

25   paragraph (reading):

1              "Once again, let me stress we have no issue with a
2        negative view of the company or its prospects and, in
3        fact, we've seen a well-written note published along those
4        lines recently.  However, the current note contains a
5        number of factual inaccuracies, incorrect assumed
6        numbers," et cetera.
7        Correct?
8   A.   That's what it says.
9   Q.   So, again, Dr. Lynch is saying "You can draw whatever
10  conclusions you want, but the facts had better be right"?
11  A.   Yes.
12  Q.   And when you had this meeting with Dr. Lynch, he claimed
13  your note was factually inaccurate; right?
14  A.   Yes.
15  Q.   And he objected to your calculations of organic growth
16  rates?
17  A.   Yes.
18  Q.   And at this meeting Dr. Lynch drove the meeting.  He did
19  most of the talking; right?
20  A.   A majority of the talking, yes.
21  Q.   And then eventually you did make some edits before
22  publishing the note; right?
23  A.   Yes.
24  Q.   To try to make it more accurate?
25  A.   Yes.

 1   Q.   All right.  And then sometime after that Mr. Hussain --

 2   you said you didn't talk to Mr. Hussain about this, but

 3   actually Mr. Hussain did call you after you published the note;

 4   right?

 5   A.   Yes.

 6   Q.   And he said that Autonomy was okay with the note; right?

 7   A.   I don't recollect that.

 8   Q.   Okay.  Well, let me refresh your recollection.  If you

 9   could look at a report of a statement that you gave to the

10   Government.  This is Exhibit 5268 --

11        THE COURT:  52 --

12   BY MS. LITTLE:

13   Q.   -- and it would be at page 2.

14   A.   (Witness examines document.)

15   Q.   So if we could take a look, sir, at page 2 -- let me find

16   it -- excuse me, page 3, the second paragraph from the bottom,

17   the paragraph that begins "After the meeting sometime in

18   April."  If you just read that to yourself.

19   A.   (Witness examines document.)  I've read it.

20   Q.   Okay.  Did you tell the Government that sometime after

21   April or May 2008, Mr. Hussain called you and told you that

22   Autonomy was okay with the draft note?

23   A.   I don't recollect saying those exact words.  What I

24   believe I said to whoever was recording this was that

25   Mr. Hussain had called me post the quarter one 2008 results,

1    and he reiterated much of what you've shown as evidence in

2    terms of e-mail conversation, that he has no issue with any

3    negative opinion on the company but wants to ensure that the

4    facts are accurate.

5    **Q.**   Okay.  And he did tell you that Autonomy was okay with it

6    at this point; right?

7    **A.**   I don't recollect him saying that because there was

8    concern -- there was ongoing issues, as I'd explained to the

9    other attorney, that the -- the reason why Andrew Kanter had

10   contacted Mr. Knox was in order to try and prevent the

11   publication of the note as it was; and that what happened was a

12   decision was made by my boss that we were going to publish

13   because we'd done everything possible to address the concerns

14   of the company.  And that now that they were being obstructive,

15   we should ignore further comments and we should publish.  That

16   was a decision made not by me but by my boss.

17   **Q.**   And you did publish it?

18   **A.**   We did publish it.

19   **Q.**   All right.  And then you testified that at some point you

20   got a call from Mr. Kanter saying that he had a recording of

21   you speaking to investors?

22   **A.**   I didn't get the call.  The call was made to Mr. Knox.

23   Mr. Knox, after having reviewed all my tapes and recordings, he

24   called me into his office to discuss what he had received and

25   the work that he and the Compliance Department had done to

1    ensure that I hadn't breached any regulations.  They were happy

2    that I hadn't, and that we should publish the note.

3    **Q.**   Okay.  That's actually not what happened, is it?

4    Mr. Kanter didn't say that he had a recording, did he?

5    **A.**   Again, I'm only testifying to what Mr. Knox told me.  I

6    didn't get a call from Mr. Kanter.

7    **Q.**   Okay.  I'd like you to take a look, if you would, at

8    Exhibit 2658.

9           **MS. LITTLE:**  This is an e-mail between Mr. Kanter and

10   Mr. Khan's boss.  Again, Mr. Khan is not on this e-mail but it

11   relates to these subject matters that he's testified about and

12   I would move its admission?

13          **THE COURT:**  Admitted.

14     (Trial Exhibit 2658 received in evidence)

15   **BY MS. LITTLE:**

16   **Q.**   So, Mr. Khan, going to the second page, the bottom of this

17   e-mail.  This is on May 1st, 2008, from Mr. Kanter to your

18   boss, Mr. Knox; right?

19   **A.**   Yes.

20   **Q.**   And Mr. Kanter says (reading):

21          "It has come to our attention that there may have

22          been highly questionable activities going on on behalf of

23          your analyst Daud Khan.  We feel it's probably not

24          appropriate for us to continue to speak directly with

25          Daud."

1          Do you see that?

2   A.    Yes.

3   Q.    So this is something that was brought to Mr. Kanter's

4   attention?

5   A.    According to the e-mail, yes.

6          MR. FRENTZEN:  Your Honor, I object at this point.  We

7   let this in as probably hearsay, but now this is double

8   speculation, asking him what Kanter did or didn't know based on

9   an e-mail that he never got.

10         THE COURT:  Sustained.  It speaks for itself.

11  Whatever it is, it is, but I don't know that you can ask him to

12  interpret this particular document.

13         MS. LITTLE:  Fair enough.

14  Q.    Were you aware, sir, that Mr. Kanter had been made aware

15  that a number of fund managers had recordings?  Not that he had

16  them but that fund managers had recordings?

17         MR. FRENTZEN:  Objection.  Foundation.  Speculation.

18         THE COURT:  Sustained.

19  BY MS. LITTLE:

20  Q.    Did you have discussions with your boss about this?

21  A.    About these recordings?

22  Q.    Uh-huh.

23  A.    It wasn't really a discussion.  He told me that he'd

24  reviewed all the tapes, and these tapes are between myself and

25  fund managers, and he felt that there was no breach of

1  regulation and that we should publish.

2  **Q.**   And so your boss and Cazenove did an investigation into

3  this?

4  **A.**   They pulled my tapes with fund managers and they listened

5  to the tapes, yes.  So if you want to call that an

6  investigation.

7  **Q.**   And while that investigation was going on, it was

8  Mr. Kanter's view that he shouldn't have direct contact with

9  you and that Autonomy shouldn't have direct contact with you?

10       **MR. FRENTZEN:**  Objection as to Kanter's view unless it

11  was expressed to him directly.

12       **THE COURT:**  Sustained.

13  **BY MS. LITTLE:**

14  **Q.**   What was your understanding?

15  **A.**   My understanding was that based on this FSA/FCA potential

16  investigation where I was told that Autonomy would provide

17  these tapes to the FCA, that they shouldn't be in direct

18  contact with me.

19  **Q.**   And then in June of 2008, you reached out to Mr. Hussain,

20  did you not, and asked to reestablish a line of communication?

21  **A.**   Yes, on the advice of Mr. Knox.

22  **Q.**   Okay.  And if you could take a look, sir, at Exhibit 2660.

23       **MS. LITTLE:**  And this is a communication from Mr. Khan

24  to Mr. Hussain.  I would move its admission.

25       **MR. FRENTZEN:**  No objection.

1           **THE COURT:**  Admitted.

2       (Trial Exhibit 2660 received in evidence)

3   **BY MS. LITTLE:**

4   **Q.**   So starting at the bottom, sir, you communicate to

5   Mr. Hussain (reading):

6           "Dear Sushovan,

7           "I'm writing to attempt to reestablish a line of

8       communication."

9       Do you see that?

10  **A.**   (Witness examines document.)

11  **Q.**   Yes?

12  **A.**   Yes.

13  **Q.**   All right.  And you say you'd like very much to help

14  reinstitute an open dialogue; right?

15  **A.**   Yes.

16  **Q.**   And then going up the e-mail chain to the response, you

17  get a response from Mr. Kanter.  So apparently Mr. Hussain had

18  forwarded it on to Mr. Kanter for response.  He says (reading):

19          "Sushovan has forwarded your e-mail to me."

20      And Mr. Kanter again says (reading):

21          "We have again last week been approached by the

22      FSA" --

23      That's the securities regulators; right?

24  **A.**   That's right.

25  **Q.**   (reading)

1          -- "who are, as I believe you're aware, conducting an

2          investigation as to matters raised by a third party."

3          Correct?

4    A.    That's what it says.

5    Q.    And so Mr. Kanter says (reading):

6               "From this we must conclude that the matter is

7          ongoing and so until resolved, I think it not appropriate

8          for us to communicate directly."

9          Correct?

10   A.    Correct.

11   Q.    So all he's doing is saying while this investigation is

12   pending, they think it's best not to have direct communication

13   with you?

14   A.    That's what they're saying.

15   Q.    And nobody from Autonomy was threatening you at this

16   point; right?

17   A.    No.

18   Q.    Certainly Mr. Hussain wasn't?

19   A.    No.

20   Q.    You talked about this May 2018 note, and I have it marked

21   as Exhibit 6304.  I don't know if you have it marked as a

22   different number, but maybe just for now for expedience we

23   could use Exhibit 6304, which is the May 13th, 2008, note.

24          **THE COURT:**  Admitted.

25          (Trial Exhibit 6304 received in evidence)

1    **BY MS. LITTLE:**

2    **Q.**   Is this the note, sir, that we've been talking about, the

3    May 2018 note?

4    **A.**   Yes.  It looks like it.

5    **Q.**   And I just want to direct your attention to the third page

6    of the note.  Up at the top you say -- let's highlight that --

7    it's the very first sentence up there (reading):

8          "Standing is the minority negative voice in a torrent

9          of positive opinion warrants some clarification."

10   **A.**   Yes.

11   **Q.**   So you were proud of the fact that you were the minority

12   negative voice here; right?

13   **A.**   I'm not sure pride had anything to do with it.

14   **Q.**   Well, how many analysts -- you said about 15 analysts were

15   covering Autonomy in 2009 and 2011?

16   **A.**   Approximately.

17   **Q.**   So it's fair to say there was a torrent or a chorus of

18   analysts saying positive things about Autonomy; right?

19   **A.**   Yes.

20   **Q.**   So an individual voice saying negative things would really

21   stand out; right?

22   **A.**   Yes.

23   **Q.**   And if the chorus of positive voices ends up being right,

24   it's kind of not a big deal; but if the one lone voice ends up

25   being right, it is a big deal; right?

1    **A.**    I guess so, yes.

2    **Q.**    And you talked about how your bonuses could be based on

3    recommendations by the sales desk.  If you had ended up as the

4    lone voice being right, that would have affected your

5    compensation; right?

6    **A.**    It may have done.

7    **Q.**    And, conversely, if you're wrong, it can be devastating;

8    right?

9    **A.**    I wouldn't use the word "devastating."

10    **Q.**    Well, it was devastating for Mr. Ahmed, right, at

11    Berenberg?

12    **A.**    You know, why Mr. Ahmed was made redundant from Berenberg

13    I don't think has -- you know, has bearing on his

14    recommendations because a bunch of his recommendations were

15    correct.  Apple was actually the only one he had wrong.

16    **Q.**    Would you agree with me, sir, that if you're wrong, it can

17    be very detrimental to your reputation?

18    **A.**    In aggregate, yes, not for a single stock, though.

19    **Q.**    And in 2009 to 2011, when you were covering Autonomy, it

20    was trading at between 10 and 20 pounds per share

21    approximately?

22    **A.**    Yes.

23    **Q.**    And then when Autonomy was acquired in 2011, it was

24    acquired at 25 pounds a share; correct?

25    **A.**    Yes.

**KHAN - CROSS / LITTLE**

1  Q.   So you were wrong in your predictions, weren't you?

2  A.   In terms of the stock price, yes.

3  Q.   And that hurt your reputation?

4  A.   I don't think it had any material impact on my pay or my

5  reputation.

6  Q.   Being right -- being wrong doesn't hurt your reputation?

7  A.   Again, you know, you're focusing on one company.  In

8  aggregate of all the companies I covered, I can't honestly say

9  it had an impact on what I got paid or my job prospects.

10  Q.   One way to help restore your reputation is for you to come

11  in here and say, "Hey, guess what?  I was right all along";

12  right?

13  A.   Again, I think the outcome of this trial has no

14  implication to my job prospects or reputation.

15  Q.   You've testified that you were excluded from analyst

16  presentations during the 2009 time period.  You were always

17  welcome to dial in, weren't you?

18  A.   Yes, but unable to ask questions.

19  Q.   But you did dial in; right?

20  A.   I did dial in.

21  Q.   And there was another representative from Cazenove,

22  Ms. Pollard, who was allowed to participate?

23  A.   Yes.  She went to the meetings to collect the

24  presentations.

25  Q.   And I think you testified that in January of 2010, you

1  approached Mr. Geall to ask if you could attend; and he said,

2  "Of course.  You're welcome to attend," at that point?

3  **A.**  Exactly, yes.

4  **Q.**  Let's talk about the Q3 '09 call that you talked about.

5      Well, first of all, you were asked about your note in

6  September of 2009 when you were talking about the SPE marketing

7  spend.

8  **A.**  Uh-huh.

9  **Q.**  You didn't have any insight into what sort of marketing

10  Autonomy was doing; right?

11  **A.**  In the approach to the quarter, what I usually did as an

12  analyst would be to look through trade press, look at the

13  normal areas where I'd see advertising from companies like

14  Autonomy, and I hadn't noted any specific increase in activity

15  or any particular mention or increased mention of IDOL SPE.

16      I think post -- post the call itself, it was clear from --

17  I'm not sure whether it occurred within the --

18  **Q.**  Let me ask you about the call.  Did you listen in to

19  the --

20      **MR. FRENTZEN:**  I object to that, Your Honor.  I think

21  the witness wasn't finished answering the question.

22      **THE COURT:**  Let him finish.  Go ahead.

23  BY MS. LITTLE:

24  **Q.**  Go ahead.

25  **A.**  Whether it happened in the call or post the call, so

1    usually after a meeting, then we have a discussion as everyone

2    come moves to the head table and asks questions of Dr. Lynch or

3    Mr. Hussain.

4         And I think it was at that time there was a discussion

5    which said that the IDOL SPE marketing expenses revolved around

6    flying in industry analysts, flying in customers, paying for

7    their hotel bills, et cetera, so a big kind of launch event of

8    getting people to the event, which would -- which would partly

9    explain why, then, I wouldn't see print advertising or any

10   particular increase in advertising if all the spend went in

11   bringing people to the event.

12   Q.   And Dr. Lynch talked about that on the call; right?

13   A.   As I said, I can't recollect whether it was on the call or

14   it was -- there was a post-meeting kind of offline discussion.

15   Q.   Did you listen in to the call?

16   A.   I did, yes.

17   Q.   And the tape is in evidence and we're not going to burden

18   the jury with it, but do you recall that Dr. Lynch spent about

19   15 minutes talking about SPE and about the advertising and the

20   positioning with analysts and the positioning with customers,

21   these various things you've described?

22   A.   Yes, but I think post the meeting he discussed things in

23   terms of, you know, flying people in, paying for hotels, which

24   wasn't part of the call.

25   Q.   Okay.  But the positioning with the customers, that was

1  discussed on the call; right?

2  **A.**    Yes.  The Quik Stop program, I believe.

3  **Q.**    And the beta program; right?

4  **A.**    Yes.

5  **Q.**    And then for the Q -- the next earnings call, the Q4

6  earnings call, you participated in that call?  That's the one

7  when you were invited back; right?

8  **A.**    Yes.

9  **Q.**    January of 2010?

10  **A.**    Yes.

11  **Q.**    And during that call, which again is in evidence, you

12  asked a question but you didn't ask any questions about SPE,

13  did you?

14  **A.**    No, because the biggest factor in that quarter was the

15  inventory, which was -- in fact, if you look through all the

16  questions, that was one of the biggest topics of that call.

17  **Q.**    Okay.  So you had a chance to ask questions about SPE, but

18  you chose not to?

19  **A.**    What normally happened in these calls is that you get one

20  question.  You don't get a redirect or -- you know, so you ask

21  the question that is the most pressing at the time.

22  **Q.**    Okay.  And Mr. Frentzen asked you about a statement in

23  that call about SPE as being a key differential.  You have no

24  understanding of what sort of discussions Autonomy might have

25  been having with its customers about SPE; right?

 1   **A.**    No, other than what Dr. Lynch talked about.

 2   **Q.**    In connection with that Q4 call, we heard various snippets

 3   where you're talking about -- or where Dr. Lynch was talking

 4   about pure software.  Do you recall that?

 5   **A.**    Yes.

 6   **Q.**    And one of the references to pure software that

 7   Mr. Frentzen didn't play, I'd like to just show you -- the tape

 8   is in evidence, but I'd like to just show you on the screen the

 9   transcript.

10        **MS. LITTLE:**  It's page -- it's Exhibit 592, Jeff, at

11   page 14.

12        We can play it.  I guess maybe we should play it,

13   actually, to get it into evidence or --

14        **THE COURT:**  Well, if you want to go through just the

15   transcript, that's okay because the transcript, that portion,

16   would be in evidence by virtue of question and answer.

17        **MS. LITTLE:**  Okay.  Good.

18   **Q.**    So if you would take --

19        **THE COURT:**  You should read that portion into the

20   record.  Okay?

21        **MS. LITTLE:**  Okay.

22   **Q.**    So this is Exhibit 92 at page 14 -- yep, we've got it --

23   and I'll just read it into the record (reading):

24             "Revenue to net cash conversion at 34 percent.

25        Because it is basically at the top of the industry

1          numbers, we don't think that's going to go any higher.  We

2          think that's reasonable there."

3     And then Dr. Lynch says (reading):

4          "The pure software model means that we do not think

5          that revenue employees should keep ticking up and

6          consequently profit for employees should keep ticking up."

7     And then he says (reading):

8          "Immediately the other number that we have here, one

9          of these new numbers -- and we'll talk about that in a

10         minute -- which is committed if you like, now it's

11         important to say we're not Capgemini, we're not a services

12         business."

13    Do you see that, sir?

14    **A.**    Yes.

15    **Q.**    So in this portion of the call, which was not played,

16    Dr. Lynch is contrasting the pure software model with companies

17    that have a services business.  And you've testified that that

18    was a distinction in your mind; right?

19    **A.**    Yes.

20    **Q.**    And that's also the way it was described in Autonomy's

21    annual report; right?

22    **A.**    You would have to show me that, but I think that's

23    correct.

24    **Q.**    Well, let's take a look at Exhibit 428, which is in

25    evidence -- we can put it on the screen -- page 9 of

1    Exhibit 428.

2         And let me find the spot.  So the bottom right-hand corner

3    where it says "Financial Model."  Can you blow that up?  Thank

4    you, Jeff.  (reading)

5              "Autonomy is one of the very rare examples of a pure

6         software model.  Many software companies have a large

7         percentage of revenues that stems from professional

8         services."

9         Do you see that?

10   A.   Yes.

11   Q.   So that's the distinction that's being drawn when they

12   talk about a pure software model; right?

13   A.   My perception as an analyst and in my opinion when someone

14   talks about a pure software company, they talk about it being

15   software and maintenance and very little services.  When a

16   normal software company talks about being a software company,

17   they talk about software, maintenance, and services.  In either

18   case, there is no real discussion that hardware should be a

19   material part of the conversation.

20        So I think on many occasions, and I think even in the

21   snippet that we saw about the breakdown of revenue, that all

22   pointed to it being software or a little bit of services, some

23   OEM revenues, some cloud revenues.  That's how I understood it.

24   Q.   Okay.  We're going to talk about that in a minute.

25        Let's take a look at Exhibit 1352, which is the 2010

1    annual report.

2              **MS. LITTLE:**  I don't think that's in evidence yet, but

3    if it's not, I'd move its admission.

4              **MR. FRENTZEN:**  No objection.

5              **THE COURT:**  Admitted.

6         (Trial Exhibit 1352 received in evidence)

7              **MS. LITTLE:**  So we can take a look at page 15 of that

8    report on the screen, Jeff.  Up at the -- oh, page 15 of the

9    exhibit.  Keep going.  There we go.

10   **Q.**   Up at the top, "Financial Model," we have the same

11   language here (reading):

12            "Autonomy is one of the very rare examples of a pure

13        software model.  Many software companies have a large

14        percentage of revenues that stem from professional

15        services."

16        Do you see that?

17   **A.**   Yes.

18   **Q.**   Okay.  And then if we look at page 18 of this report, up

19   at the top left-hand corner under "Services," and again the

20   last sentence of that paragraph (reading):

21            "Autonomy operates on a pure software model under

22        which our goal is that most implementation work is carried

23        out by approved partners."

24        So, again, it's drawing the distinction between software

25   and services; right?

1   **A.**   Yes.

2   **Q.**   And while we're on this page, let's just move down to the

3   revenue descriptions.

4       So you see there it says "Revenue," Core IDOL reported

5   revenues 574 million for 2010; right?

6   **A.**   Yes.

7   **Q.**   And then there's a little Footnote 1, and the Footnote 1

8   beneath there says (reading):

9           "Core IDOL," which is the reported revenues, "is made

10          up of IDOL Product, IDOL Cloud, and IDOL OEM categories,

11          described above.

12      Right?

13  **A.**   Yes.

14  **Q.**   And that's the same categories that Mr. Hussain talked

15  about in the tape that was played; right?   IDOL Product --

16  **A.**   Yes.

17  **Q.**   -- IDOL Cloud, IDOL OEM?

18  **A.**   Yes.

19  **Q.**   That's how Autonomy defined its revenue; right?

20  **A.**   Yes.

21  **Q.**   And are you aware, sir, of the notion of one operating

22  segment under the IFRS rules, IFRS Rule 8?

23  **A.**   Yes.

24  **Q.**   And under IFRS 8, it is determined whether you have to

25  break out your revenue streams into different categories in

KHAN - CROSS / LITTLE

1   your financial statements; right?

2   A.   That's right.

3   Q.   And are you aware that this is an issue that was discussed

4   between Autonomy and its auditors to determine whether they

5   needed to break out revenues into different categories?

6   A.   I imagine they had that conversation as every auditor

7   would with their company.

8   Q.   And if we can take a look in this particular exhibit at

9   page 60.

10   A.   (Witness examines document.)

11   Q.   This is a section called "Segmental Analysis."  That's

12   what we're talking about -- right? -- where you have to report

13   different segments of your revenue?

14   A.   Yes.

15   Q.   And this portion of the annual report -- by the way, this

16   was part of the consolidated financial statements -- that's the

17   portion of the report that's audited by Deloitte; right?

18   A.   Yes.

19   Q.   Generally the back end of the annual report, that's what

20   Deloitte audits and certifies as accurate; right?

21   A.   They audit financial statements and the notes that relate

22   to those financial statements.

23   Q.   Okay.  And if we can take a look at the paragraph

24   beginning -- it's the third paragraph -- "The group is a

25   software business."

1      And what that says is (reading):

2           "The group is a software business that utilizes its

3      single technology in a set of standard products to address

4      unique business problems."

5      Do you see that?

6  A.   Yes.

7  Q.   And then it goes on in the third sentence (reading):

8           "Each customer selects from a list of options but

9      underneath from a single unit of the proprietary core

10     technology platform.  As a result, no analysis of revenues

11     by product type can be provided."

12     Do you see that?

13 A.   Yes.

14 Q.   And then it says (reading):

15          "The delivery of Autonomy's core technology is done

16     via a number of methods depending on the demands of the

17     customers."

18     Correct?

19 A.   Yes.

20 Q.   And this was all approved by Deloitte; right?

21 A.   Yes.

22 Q.   You can take that down.

23     And many software companies do sell some hardware; right?

24 A.   Yes, generally.

25 Q.   Most do; right?

1    **A.**    It depends in what form, but I would imagine that the

2    amounts of hardware sold is relatively small compared to the

3    size of the company if it's a software company.

4    **Q.**    Okay.  Let's talk about the April 2010 earnings call that

5    you testified about on direct.  You participated in that call

6    by phone; right?

7    **A.**    This is, sorry, which quarter?

8    **Q.**    So it would be the Q1 2010 call.  It was in April of 2010.

9    Mr. Frentzen played certain segments for you.

10   **A.**    Okay.  It was either by phone or in person.  I think maybe

11   it was on the phone.  I can't remember.

12   **Q.**    Actually, if you look at the transcript, it's pretty clear

13   that no one was physically present at that call.

14   **A.**    So I think there were a few calls where they didn't do a

15   physical meeting.  In general, for most U.K. companies listed

16   in the U.K. there's usually a physical meeting.  And if you

17   look through all of the quarters that Autonomy reported, I

18   would say that 90 percent were probably done physically.

19   **Q.**    Do you recall a sort of natural event in April of 2010

20   when there was a volcanic eruption in Iceland?

21   **A.**    Yes, I do now.

22   **Q.**    And do you recall that when that happened, there was an

23   ash cloud and British airspace was closed for a week?

24   **A.**    Yes.

25   **Q.**    And was that at the time of this call?

1  A.    Yeah, I believe so.

2  Q.    So everybody was on the phone; right?  Nobody could get

3  there physically.

4  A.    Yes.

5  Q.    And were you aware that Dr. Lynch was actually in the

6  United States?  He was in California for that call?

7  A.    I believe that was mentioned in the call maybe, or I knew

8  that they weren't all in the same place.

9  Q.    And so if a call happened at 8:30 in the morning Greenwich

10  Mean Time, it would have been the middle of the night in

11  California for Dr. Lynch; right?

12  A.    Yes.

13  Q.    Okay.  And during that call, you asked about the inventory

14  numbers.

15       And let's just put the transcript piece on the display

16  here.  It's page 11 of Exhibit 776.  This is what Mr. Frentzen

17  played.

18       And what Dr. Lynch says to you is -- the first thing he

19  says in response to your question is (reading):

20            "I'm afraid I'm not going to give you an exact number

21       because that's rather commercially sensitive."

22       Do you see that?

23  A.    Yes.

24  Q.    So right off the bat he's telling you that there's some

25  information that's sensitive that he's not going to disclose to

1    you?

2    **A.**    Yes.

3    **Q.**    And then he goes on to say that the software component of

4    the revenue is far higher than the hardware component; right?

5    **A.**    Yes.

6    **Q.**    And you understood that, that there were small amount of

7    hardware sales that accompany a larger amount of software

8    sales?

9    **A.**    For the Arcpliance, that the component or the hardware

10    component of the appliance was a small part of the overall

11    sales value of that product.  That's what I understood.

12    **Q.**    And then he goes on to say the software is the bit that

13    dominates; right?

14    **A.**    Yes.

15    **Q.**    And then later in the call we heard the section that

16    Mr. Toms spoke about.  It's on page 14 of the transcript.

17         If you pull that up down at the bottom, Dr. Lynch's

18    response.  There we go.

19         And this is what Mr. Frentzen played here.  And the second

20    line there, what Dr. Lynch says (reading):

21              "We have very little interest in just selling

22         hardware."

23         Correct?  Do you see that?

24    **A.**    Yes.

25    **Q.**    And that was true; right?

1   **A.**   As I understood it, yes.

2   **Q.**   Now, you've written notes about the fact that Autonomy

3   sold some hardware; right?

4   **A.**   On the -- post the Arcpliance, post that quarter talking

5   about the 10 million of inventory, yes.

6   **Q.**   And Mr. Frentzen asked you about Exhibit 901, which is in

7   evidence.  Maybe we can just pull that up quickly.  Page 3 of

8   that note.

9        Let's see if I can find it.

10       Okay.  So, yeah, the sentence that begins -- the paragraph

11  (reading):

12            "With the purchase of 10 million in hardware," you

13       say "we expected guidance to increase and that the cost of

14       the hardware would be passed through to the end customer."

15            **MR. FRENTZEN:**  She just skipped over the middle part

16  of that, Your Honor.

17            **MS. LITTLE:**  Okay.  I can read the whole thing.

18  (reading)

19            "We would expect guidance to increase by at least

20       10 million as the cost of the hardware would be passed

21       through to the end customer."

22  **Q.**   Right?

23  **A.**   Yes.

24  **Q.**   And it was -- what I skipped is "expected to be sold in

25  Q2"; right?

```
 1    A.    Yes.

 2    Q.    And so you're --

 3          MR. FRENTZEN:  Skipped as it was related to the

 4    Arcpliance?

 5          MS. LITTLE:  Okay.  (reading)

 6           "10 million of hardware related to the Arcpliance

 7      inventory, which is expected to be sold in Q2, we would

 8      have expected guidance to be increased by 10 million as

 9      the cost of the hardware would be passed through to the

10      end customer."

11          THE WITNESS:  So for any appliance sale -- Google

12    appliance, Barracuda appliance -- the cost of the hardware you

13    normally sell with a very small margin; whereas, the real value

14    of the value of the appliance is in the software.  So the

15    conservative assumption is that 10 million of inventory will

16    lead to at least 10 million of sales.

17    BY MS. LITTLE:

18    Q.    Okay.  And this is what we would call a pass-through of

19    hardware; right?

20    A.    Yes.

21    Q.    Okay.  And you've written other times about this.  If you

22    would take a look in your binder, sir, Exhibit 6316, which is a

23    note that you wrote in July of 2010.

24          THE COURT:  Admitted.

25          (Trial Exhibit 6316 received in evidence)
```

1          **MS. LITTLE:**  Let me find the reference.

2    **Q.**   The third bullet point, again you say "assuming around

3    $10 million of hardware pass-through revenue"; right?

4    **A.**   Yes.

5    **Q.**   Okay.  And other analysts have written about -- oh, wait.

6    There's one more that you wrote.  I'm sorry.

7          Exhibit 1649.  I'm not sure if that's in evidence, but

8    it's another one of your reports.

9          **THE COURT:**  Admitted.

10          **MS. LITTLE:**  Let me find the page.

11          **THE COURT:**  It is in evidence.

12          **MS. LITTLE:**  It's in evidence, and I'm not -- I

13    apparently forgot to highlight the part, but I'll represent

14    that there's a reference to hardware in here too.  I'll have to

15    find it.

16          **MR. FRENTZEN:**  Again, related to Arcpliance?

17          **MS. LITTLE:**  I'll have to find it.  I didn't mark it.

18    I'm sorry.

19    **Q.**   Are you aware that other analysts have also talked about

20    hardware in relation to Autonomy?

21    **A.**   I believe so, but I wasn't -- I didn't have access to

22    other people's research notes.  It's generally not provided to

23    the analyst community.

24    **Q.**   Okay.  Well, there's Exhibit 5804 in evidence, which is a

25    report written by Marc Geall.  If we can just bring that up

1    quickly.

2             THE COURT:  Admitted -- well --

3             MS. LITTLE:  This is already in evidence.

4    Q.   And in here it talks about "Gross margins of 86 percent

5    was below the 88 to 89 percent guidance due to additional costs

6    associated with hardware sales"; right?

7    A.   Yes.

8    Q.   And then if we could also take a look at another report.

9    This is not yet in evidence, but it's Exhibit 1535.  It's a

10   report by Mr. Toms who was on that other analyst call.

11            MR. FRENTZEN:  Your Honor, I'm going to object at this

12   point.  I don't know why we're showing this stuff he's never

13   seen.

14            THE COURT:  Sustained.

15   BY MS. LITTLE:

16   Q.   Now, you've testified, sir, that if analysts knew that

17   Autonomy was selling hardware at a loss, the valuation of the

18   company would be changed in your view?

19   A.   Yes.

20   Q.   Would you agree with me, sir, that selling hardware

21   actually lowers a company's profits; right?

22   A.   Yes.

23   Q.   So it doesn't make the company look better.  It makes it

24   look worse; right?

25   A.   I'm not quite sure what you're trying to --

1  Q.   Well, it would drive the gross margins down and drive the

2  profits down; right?

3  A.   Yes.  So selling hardware should impact the gross margin,

4  yes.

5  Q.   And when you were valuing Autonomy, you did it based on

6  earnings per share; right?  Based on profit?

7  A.   I used multiple methods but one of them was earnings per

8  share, yes.

9  Q.   And so, again, you would agree with me if Autonomy was

10 selling hardware at a loss, this would make the reported

11 profits worse, not better?

12 A.   Yes.

13 Q.   You testified about an incident where there was an

14 accusation that you were using social media to get inside

15 information.  Do you recall that testimony?

16 A.   Yes.

17 Q.   Did that relate to a contact that you had with

18 Mr. Calonico?

19 A.   Yes.

20 Q.   Mr. Calonico is someone that used to work at Interwoven;

21 right?

22 A.   Yes.

23 Q.   And Autonomy acquired Interwoven in January of 2009?

24 A.   Yes.

25 Q.   And then you contacted Mr. -- well, Mr. Calonico left

1  Interwoven shortly after the acquisition?

2  **A.**   Yes.

3  **Q.**   And then you contacted Mr. Calonico when he was at a new

4  company, AstroData; right?

5  **A.**   Yes.

6  **Q.**   And you were trying to get information kind of outside of

7  regular channels; right?

8  **A.**   I was asking information about the ex-financial director

9  or CFO of Interwoven about historic financials.  So I didn't

10  feel that what I was asking was inside.  It was a clarification

11  on accounting principles at Interwoven.

12  **Q.**   You recognized that what you were doing was sort of

13  outside of regular channels; right?

14  **A.**   No, because it's something that I would do and I had done

15  for Autonomy on other acquisitions as well.

16  **Q.**   Let's take a look, if we could, sir, at Exhibit 873, which

17  should be in your binder.

18       **MS. LITTLE:**  And I'd move its admission.

19       **THE COURT:**  Admitted.

20       **MR. FRENTZEN:**  I'm sorry, Your Honor.  873?

21       **MS. LITTLE:**  873.

22       **MR. FRENTZEN:**  I don't have that.

23       **MS. LITTLE:**  It should be in your book.

24       **THE COURT:**  E-mail from Lynch to Kanter.

25       **MR. FRENTZEN:**  I don't have it.  Based on that, I'd

```
 1   object.  I mean, I haven't seen it.  I don't want to slow this

 2   down, but I don't have it here.

 3            THE COURT:  Well, why don't you show it to him.

 4            MR. FRENTZEN:  And if it's between those two, it

 5   sounds like hearsay to this witness.

 6            THE COURT:  Why don't you look at it and tell me if

 7   there's an objection.  It's not this person's document, so...

 8                       (Pause in proceedings.)

 9            MR. FRENTZEN:  I don't object to the e-mail from this

10   witness, Your Honor, which we have, without the rest of this.

11            THE COURT:  I'm sorry?

12            MS. LITTLE:  There's a portion of 873, page 2 of the

13   exhibit can come in.

14            THE COURT:  Okay.

15         (Trial Exhibit 873, page 2, received in evidence)

16            MS. LITTLE:  So if we can put page 2 on the screen,

17   please.

18   Q.   This is your e-mail, sir, to Mr. Calonico; right?

19   A.   Yes.

20   Q.   And you say (reading):

21            "Apologies for the intrusion, but I was passed your

22         details by an investor.  I am an analyst at JP Morgan and

23         the coverage analyst on Autonomy."

24         And you say (reading):

25            "I appreciate this is slightly unusual."
```

1      Correct?

2    **A.**    Yes.

3    **Q.**    So you were going a little bit outside of channels; right?

4    **A.**    I was doing my job.  It's not normal to do that, but it's

5    within my remit.

6    **Q.**    It's not normal; is it?

7    **A.**    I've done it a few times but, yes, if you want to say it's

8    not normal.

9    **Q.**    Okay.  Well, those are your words; right?

10   **A.**    Yeah.  Mr. Calonico would have been surprised to have

11   received an e-mail about a company that he has left about

12   historical financials which he signed off on previously.  So,

13   yes, in that way it's unusual.

14   **Q.**    Okay.  And then going down to the one, two, three, four,

15   five, sixth paragraph, you say (reading):

16          "I appreciate you're very busy but having exhausted

17       all other avenues of getting a reasonable answer, I felt

18       you would be the one person who could clear up any

19       confusion."

20       Do you see that?

21   **A.**    Yes.

22   **Q.**    So you tried the regular avenues, the proper avenues

23   first, and that didn't work; right?

24   **A.**    I tried -- well, as -- the avenues would be conversation

25   with management.  My conversation with Dr. Lynch and

1    Mr. Hussain was very limited at that point.  I'd gone through

2    the official filings for Interwoven.  Those are the official

3    routes, but I couldn't get clarification to my question.

4    Q.    So you were trying to kind of sneak in the backdoor, huh?

5           MR. FRENTZEN:  Objection.  Argument.  Relevance.

6           THE COURT:  Sustained.

7    BY MS. LITTLE:

8    Q.    I'd like to also show you what's been marked as

9    Exhibit 946, which I hope is in your book this time.

10          MS. LITTLE:  Again, this is an e-mail from Mr. Khan to

11   Mr. Calonico -- two e-mails from Mr. Khan to Mr. Calonico, and

12   I would move their admission?

13          THE COURT:  946 is admitted.

14          MR. FRENTZEN:  No objection.

15      (Trial Exhibit 946 received in evidence)

16   BY MS. LITTLE:

17   Q.    So going down again to the bottom, we have that same

18   e-mail, "Apologies for the intrusion."  That's the one we just

19   talked about; right?

20   A.    Yes.

21   Q.    And then the next e-mail up you communicate again to

22   Mr. Calonico.  Apparently he didn't answer you and so you

23   communicate to him again (reading):

24          "I just want to follow up on the request below.  I

25       appreciate that you might be slightly reluctant to address

1          some or all these questions."

2          Do you see that?

3    **A.**    Yes.

4    **Q.**    So you recognized that this was an unusual and

5    uncomfortable request that you were making; right?

6    **A.**    I was pointing out that it would be difficult.  He may not

7    want to answer these questions.

8    **Q.**    Because it would be improper; right?

9    **A.**    I don't think the questions were improper, but he may have

10   felt that he didn't want to answer them.

11   **Q.**    If you were asking for inside information, it would be

12   improper for him to answer those questions; right?

13   **A.**    Yes, but I don't believe it was inside information.

14   **Q.**    And then JP Morgan instituted an investigation of you

15   because of this; right?  You testified to that?

16   **A.**    Yes.

17   **Q.**    So with respect to a number of the things you've talked

18   about today -- about hardware disclosure, organic growth and

19   cash conversion -- those are all issues that would be discussed

20   between Autonomy and its auditors; right?

21   **A.**    I'm sorry?

22          **MR. FRENTZEN:**  Objection, Your Honor.  Objection.

23          **THE COURT:**  Sustained.

24   BY MS. LITTLE:

25   **Q.**    Generally speaking, does a company like Autonomy discuss

1  the types of issues you've talked about today with their

2  auditors?

3          **MR. FRENTZEN:**  Same objection, and also vague.

4          **THE COURT:**  Sustained.

5  **BY MS. LITTLE:**

6  **Q.**  Do you have any idea of what review and analysis Deloitte

7  did of any of Autonomy's financials?

8  **A.**  I'm not aware of specifics of testing.

9  **Q.**  And you have no idea of what accounting judgments Deloitte

10  might have made on any of the transactions you've talked about?

11  **A.**  No.

12  **Q.**  And you have no idea what testing or research Deloitte

13  did?

14  **A.**  No.

15  **Q.**  And you have no idea what review Autonomy's Audit

16  Committee did?

17  **A.**  No.

18          **MS. LITTLE:**  I've got nothing further.  Oh, wait.

19          **THE COURT:**  Well, one minute, Mr. Frentzen.

20                  (Pause in proceedings.)

21          **MS. LITTLE:**  Nothing further.

22          **THE COURT:**  Okay.  Any redirect?

23          **MR. FRENTZEN:**  Yes, Your Honor.

24                  <u>**REDIRECT EXAMINATION**</u>

25  \\\

1  BY MR. FRENTZEN:

2  **Q.**   When you were publishing these notes about Autonomy,

3  Mr. Khan, was your license active then?

4  **A.**   Yes.

5  **Q.**   And would you generally say that your views on Autonomy in

6  terms of your reputation ended up sort of bearing you out or

7  being a problem for you?

8  **A.**   It ultimately had a positive impact on my reputation.

9  **Q.**   Did any of these issues that Autonomy brought to the

10  attention of your bosses, JP Morgan -- were you cleared by your

11  bosses?

12  **A.**   Yes.

13  **Q.**   And did the FSA ever come knocking on your door and say

14  that you had done anything wrong?

15  **A.**   No.

16        **MR. FRENTZEN:**  And very briefly, Your Honor, I'd like

17  to offer Government's 26 -- I'm sorry, Exhibits 2651 and 2652.

18        **MS. LITTLE:**  I'd object as beyond the scope,

19  Your Honor.

20        **THE COURT:**  Well, let me see.  26 --

21        **MR. FRENTZEN:**  '51, and 2652, Your Honor.

22        **THE COURT:**  Okay.  Just a moment.

23              (Pause in proceedings.)

24        **MR. FRENTZEN:**  They just evidence the vetting of what

25  Mr. Khan was reporting, Your Honor.

1          **THE COURT:**  Admitted.

2          (Trial Exhibits 2651 and 2652 received in evidence)

3          **MR. FRENTZEN:**  Thank you, Your Honor.

4   **Q.**   2651, Mr. Khan, with respect to this e-mail, were there --

5   does this evidence the in-house vetting of the facts that

6   Autonomy was saying you had gotten incorrect?

7   **A.**   I'm just reading the e-mail.

8          (Witness examines document.)

9   **Q.**   "I've read Daud's note in detail.  I'm happy with his

10  analysis," et cetera, et cetera?

11  **A.**   Yes.  Pete Elwin was the head of accounting research at

12  Cazenove.

13         **MS. LITTLE:**  Objection.  I think this was in 2009.  I

14  don't think this has to do with the 2008 note.

15         **MR. FRENTZEN:**  Well, I'm talking about throughout,

16  Your Honor.

17         **MS. LITTLE:**  So it's beyond the scope.

18         **THE COURT:**  No, I think the question was related to

19  2008.  That was my recollection.  But is that wrong?  Is that

20  my recollection?

21         **MR. FRENTZEN:**  Well, I --

22         **MS. LITTLE:**  The testimony was about 2008.  This is

23  about some problem in 2009, which I think is beyond the scope.

24         **THE COURT:**  Well, was --

25         **MR. FRENTZEN:**  I'll --

1              THE COURT:  Was this inquired into by the Defense?  I

2    don't think so.

3              MR. FRENTZEN:  I thought it was, Your Honor.  If I'm

4    mistaken, that's fine, I can withdraw it.  It will make it

5    quicker.

6              THE COURT:  Okay.  Withdrawn.

7    BY MR. FRENTZEN:

8    Q.   Did Peter Elwin and others, did they check your work when

9    Autonomy raised questions?

10   A.   Yes.  On many occasions, yes.

11   Q.   And when they checked your work, were they okay with your

12   analysis and allow you to proceed with your notes?

13   A.   Yes.

14   Q.   And that's after they satisfied themselves that they had

15   checked whatever facts it was you were reporting?

16   A.   They themselves wouldn't check the facts, but any input

17   from the company was taken into account.

18   Q.   The fact that you were excluded from analyst calls, in

19   your experience was that abnormal?

20   A.   Yes.  It never happened to me before.

21   Q.   In terms of the discussion of hardware sales by Autonomy,

22   in terms of your notes when you were describing the hardware

23   sales that you were shown by Defense counsel, were those all

24   related to this Arcpliance?

25   A.   Yes.

1  Q.   All right.  And that was different than hardware sales

2  that were not appliances in your view?

3  A.   Yes.  I was unaware of other -- or any other material

4  hardware sales other than appliance-based sales.

5  Q.   And I think what you were describing to us, if you were,

6  did you feel that in terms of the pure software model, when

7  you're a software company, describing that you don't sell

8  hardware in and of itself, would you expect that in the annual

9  report, for example?

10 A.   No.

11 Q.   What were you explaining to us?  Can you describe that?

12 A.   So as a software company or the description that Autonomy

13 used as a pure software company was trying to differentiate

14 itself from other software companies; and, again, other

15 software companies would report three -- three revenue lines.

16 One was license revenue, which is the sale of software;

17 maintenance and support, which is the support contracts around

18 the license revenue; and services revenue.

19      So the idea of the pure software model was to -- that

20 Autonomy described was to differentiate between those companies

21 by saying that we don't do as much of the services portion of

22 it, but equally all those other software companies would do

23 very little hardware as well.

24 Q.   All right.  And, again, the numbers that I described for

25 you in terms of hardware sales, despite the question about

1  earnings per share, would that have had an impact on the

2  analysts view of Autonomy?

3  **A.**    Yes, in my opinion.

4  **Q.**    Why?

5  **A.**    As I said, that, you know, my issues with Autonomy were

6  the valuation of Autonomy was built around its organic growth,

7  which was somewhere between 10 and 20 percent.  It was driven

8  by the idea that profitability would continue to increase

9  because of this pure software model.

10      And if I can just explain what that means is that Autonomy

11  described the ability to sell software without having to hire

12  any new people.  So every time you sold new software, you

13  didn't have to hire additional people and, therefore, the sales

14  you got from that software would fall to your profit line.

15      The issue around valuation would have been, from my

16  perspective, that I didn't believe the growth, the organic

17  growth, was stated accurately.

18      And, secondly, the profitability was overstated because

19  if -- you know, as an example, if company X reports 100 million

20  of profit and in their cash flow statement I can only see

21  60 million of profit, I see there's a problem because all

22  valuation ultimately stems from the ability to generate cash.

23  **Q.**    In the various earnings calls with Autonomy, did they ever

24  describe their marketing as selling 50 million, 100 million

25  worth of hardware at a loss in order to engender some sort of

1   appreciation from potential customers?

2   **A.**   Never.

3   **Q.**   Would that have shocked you or had an impact on your

4   analysis?

5   **A.**   It would have a huge impact.

6   **Q.**   Why?

7   **A.**   Because it would redefine what the company was.  I mean,

8   if I can take an example of, you know, a company that sells

9   coffee beans.  If I were to find out -- and they said they were

10  a pure coffee company and they only sold coffee beans and then

11  I found out they were actually selling coffee machines, that

12  would change my opinion of what the company did.

13      And I think any revelation around hardware sales would

14  have impacted my view of what Autonomy was.  I would certainly

15  redefine it as not a pure software company.

16  **Q.**   At a certain point did you have questions about marketing

17  expenses by Autonomy?

18  **A.**   Yes.

19  **Q.**   And when you had questions about marketing expenses, did

20  they tell you "We're selling dozens of millions of hardware" or

21  did they talk about a couple of sports teams?

22  **A.**   There was no -- the sales and marketing was all revolved

23  around their product launches or sports marketing sort of being

24  on the shirts of a football club or on the side of a Formula

25  One racing car.

KAHN - RECROSS / LITTLE

1   Q.    Is that the Tottenham Hotspurs?

2   A.    Yes.

3            MR. FRENTZEN:  May I have a moment, Your Honor?

4                    (Pause in proceedings.)

5            MR. FRENTZEN:  That's all I have.  Thank you very

6   much, Mr. Khan.

7            THE COURT:  Yes, Ms. Little.

8                    **RECROSS-EXAMINATION**

9   BY MS. LITTLE:

10  Q.    Sir, if the coffee company sells coffee cups at a loss to

11  bring people into its store, there's nothing wrong with that;

12  right?

13  A.    If the coffee company told me they were doing that,

14  there's nothing wrong doing that.

15  Q.    It's still a coffee company; right?

16  A.    Yes.

17  Q.    Okay.  And you testified that it was abnormal to be

18  excluded from these calls in your experience.  In your

19  experience, is it abnormal for an analyst who's under active

20  investigation to be kept away from analyst calls?

21  A.    Again, it's a situation I've never seen before where a

22  potential accusation that no one was aware of, other than it

23  seems Autonomy, would have an effect.  I don't know.  It's

24  never happened to me before either.

25  Q.    Only when you're under investigation?

1    **A.**    I guess so.  I've never been under investigation.  I've

2    never been proven I've been under investigation.

3           **MS. LITTLE:**  Okay.  That's all I have.

4                  **FURTHER REDIRECT EXAMINATION**

5    **BY MR. FRENTZEN:**

6    **Q.**    The investigation was brought to the attention of your

7    employers by who on both occasions?

8    **A.**    Andrew Kanter.

9    **Q.**    And you were asked questions about a bad relationship with

10   Mr. Kanter and Dr. Lynch.  There was a question about no

11   threats from Mr. Hussain.

12          **MS. LITTLE:**  This is beyond the scope, sir.

13          **THE COURT:**  Sustained.

14          **MR. FRENTZEN:**  That's all I have then.  Thank you,

15   Mr. Khan.

16          **THE WITNESS:**  Thank you.

17          **THE COURT:**  Thank you very much, Mr. Khan.

18                       (Witness excused.)

19          **THE COURT:**  Okay.  Let's bring back Ms. Anderson.

20          **MR. LEACH:**  Thank you, Your Honor.

21          **THE COURT:**  Do you want to stretch, everybody?  We'll

22   take a break around noon, but we've got 20 minutes here, let's

23   fill it.

24   \\\

25   \\\

1          **ANTONIA ANDERSON**,

2    called as a witness for the Government, having been previously

3    duly sworn, testified further as follows:

4                        (Pause in proceedings.)

5              **MR. LEACH:**  May I inquire, Your Honor?

6              **THE COURT:**  Yes.

7              **MR. LEACH:**  Thank you.

8                   **DIRECT EXAMINATION**  (resumed)

9    BY MR. LEACH:

10   **Q.**   Good morning, Ms. Anderson.

11        Good morning, ladies and gentlemen.

12        Ms. Anderson, when we broke yesterday, we were talking

13   about MicroTech, MicroLink, and Discover Tech.  Do you recall

14   that topic?

15   **A.**   Yes.

16   **Q.**   Would you please look at what I have placed before you as

17   Exhibit 528?

18   **A.**   (Witness examines document.)

19              **MR. LEACH:**  And I move this into evidence, Your Honor.

20              **THE COURT:**  Admitted.

21        (Trial Exhibit 528 received in evidence)

22   BY MR. LEACH:

23   **Q.**   Is this an example of an e-mail between Autonomy and

24   Deloitte with an outstanding list from Deloitte requesting

25   particular information relating to its audit review?

1    **A.**    Yes.

2    **Q.**    Would you please look at page 2?

3    **A.**    (Witness examines document.)

4    **Q.**    I draw your attention to the middle of the page, Deal

5    Number 170, with the name "Tom" to the left.  Do you see that?

6    **A.**    Yes.

7    **Q.**    Who is that a reference to?

8    **A.**    That's Tom Murray.

9    **Q.**    Okay.  And the deal number, what does that mean?

10    And if we could blow this up a little bit, too, so we can

11    all read it.

12    **A.**    That's a listing that Autonomy provide -- provided

13    Deloitte with, and then it's an index to the deal number.

14    **Q.**    Okay.  And to the right it says "Discovery Tech/

15    MicroLink."  Do you see that?

16    **A.**    Yes.

17    **Q.**    Is that consistent with your memory that Autonomy sold

18    software to MicroLink with Discovery Tech as the end user?

19    **A.**    Yes.  Discover Tech.  I think it's a typo where it says

20    "Discovery."

21    **Q.**    Thank you.

22    And in the information request, it says (reading):

23    "The e-mail exchange behind the contract would appear

24    to suggest that this was not signed until post year-end."

25    Do you see that?

ANDERSON - DIRECT / LEACH

1    **A.**    Yes.

2    **Q.**    Can we enlarge this just a little bit so we can read it a

3    little better?  A little better.  We'll make due with that.

4    Thank you so much.

5         What's the issue that Deloitte is getting at here?

6    **A.**    That's inapposite.  To meet the rev rec criteria, that the

7    contract needs to have been signed within the quarter.

8    **Q.**    Under IFRS, what -- I guess explain the concept that

9    you're talking about, the notion of this quarter end and when

10   revenue is recorded.

11   **A.**    So the five revenue recognition criteria have to be

12   satisfied by the quarter end for revenue to be recognized

13   within that quarter.  If it's later, it's not revenue within

14   that quarter.

15   **Q.**    Have you heard the term "backdating"?

16   **A.**    Yes.

17   **Q.**    What is backdating?

18   **A.**    Where you take a document at a point in time and date it

19   as if it were signed at an earlier date.

20   **Q.**    And under IFRS, if you reach a deal in the second quarter,

21   are you able to take that revenue in the first quarter?

22   **A.**    No.

23   **Q.**    Explain that for us.

24   **A.**    So if the deal is agreed in the second quarter, then the

25   revenue recognition criteria haven't been met until the second

1    quarter.  So the revenue can't be taken sooner.

2    **Q.**    And in the course of reviewing contracts and purchase

3    orders in the course of your reviews, did you pay attention to

4    the dates of agreements as part of your testing?

5    **A.**    Yes.

6    **Q.**    Why did you do that?

7    **A.**    To ensure that they were signed within the quarter.

8    **Q.**    Would you please look at what has been marked as

9    Exhibit 583?

10   **A.**    (Witness examines document.)

11   **Q.**    Is this a true and correct copy of Deloitte's report to

12   the Audit Committee for the 2009 audit?

13   **A.**    I don't seem to have it in this pile.

14   **Q.**    I think it was admitted yesterday.  I apologize,

15   Ms. Anderson.

16            **THE COURT:**  It's on the screen.

17   **BY MR. LEACH:**

18   **Q.**    I direct your attention to page 9.  Excuse me, it's page 9

19   of the report but page 11 of the exhibit, please.

20        And if we could blow up the last paragraph above the

21   "Deloitte Response."

22        There's a line at the end that says (reading):

23            "A second deal for 2.3 million was sold to Discover

24        via MicroLink shortly before year-end."

25        Do you see that?

1    **A.**   Yes.

2    **Q.**   And is that what Autonomy management told Deloitte with

3    respect to this $2.3 million transaction?

4    **A.**   Yes.

5    **Q.**   If the deal was reached after year-end, would that make a

6    difference to revenue recognition?

7    **A.**   Yes.

8    **Q.**   Why is that?

9    **A.**   The revenue criteria wouldn't have been met during that

10   period, so the revenue wouldn't be possible to be recognized in

11   that period.

12   **Q.**   Okay.  Further above, we were touching on this yesterday,

13   there's a discussion of how management highlighted that the

14   brother of David Truitt is an employee of Autonomy.  Do you see

15   that?

16        If we could exit out and... In the paragraph just above --

17   no.  Excuse me.  The two paragraphs above "Deloitte Response."

18   Wonderful.  Thank you, Ms. Margen.

19        Do you see the reference to David Truitt in the paragraph

20   "Management highlighted the brother of David Truitt, CEO of

21   MicroLink"?

22   **A.**   Yes.

23   **Q.**   And do you see in the following paragraph a reference to

24   David Truitt's association with Discover Technologies?

25   **A.**   Yes.

ANDERSON - DIRECT / LEACH

1  Q.   At any point did anybody from Autonomy tell you that Dave

2  Truitt was an owner of MicroTech?

3  A.   No.

4  Q.   Was that relevant to you?

5  A.   Yes.

6  Q.   Why is that?

7  A.   Because if there was common ownership, the circumstances

8  around the deals were different to those we understood.

9  Q.   Thank you.

10       Would you please look at what I have placed before you as

11  Exhibit 541?

12  A.   (Witness examines document.)

13       THE COURT:   Admitted.

14  (Trial Exhibit 541 received in evidence)

15  BY MR. LEACH:

16  Q.   Is this another example of Deloitte's outstanding list

17  requesting information of Autonomy in connection with the

18  audit?

19  A.   Yes.

20  Q.   Okay.  Let's, please, look at page 4 and focus on another

21  deal in this time period.

22       Down at the bottom for deal 45, it says "Capax Discovery."

23  Do you see that?  Do you see that, Ms. Anderson?

24  A.   Yes.

25  Q.   And to the right it says (reading):

1           "Payment history and cash collection sheet showing

2       receipts in Q4."

3       What is Deloitte asking for there?

4  **A.**    For details of Capax making payments to Autonomy to

5  demonstrate a good payment history.

6  **Q.**    Why does Deloitte ask for that?

7  **A.**    One of the rev rec criteria is about being able to collect

8  the amount from the customer.

9           **MR. LEACH:**  Okay.  I now offer into evidence

10 Exhibit 484, the revenue testing related to the Capax

11 transaction.

12          **THE COURT:**  Admitted.

13      (Trial Exhibit 484 received in evidence)

14          **MR. LEACH:**  And if we could please highlight the -- or

15 blow up the first page, the writing up near the top, so we can

16 get the format.  Excuse me, page 2.

17      Wonderful, thank you.

18 **Q.**    Ms. Anderson, can you explain this general format of this

19 work paper for us?

20 **A.**    Yes.  This is a document Deloitte prepared and would

21 prepare a similar document each quarter to record the deals

22 over 1 million that we reviewed as part of our review or audit.

23 **Q.**    Okay.  And I draw your attention to Number 5 on the far

24 left, Sample Number 5.  Do you see the reference to

25 "Capax Global"?

ANDERSON - DIRECT / LEACH

1    **A.**    Yes.

2    **Q.**    And do you see the amount of $4 million?

3    **A.**    Yes.

4    **Q.**    And will the testing for this particular transaction be

5    found on other sheets within this work paper?

6    **A.**    Yes.

7    **Q.**    Okay.  If we could, please, look at page 10.

8          Is this the revenue testing for the -- I think that's a

9    different one.  We're on page 10, please.  Perfect.  Thank you.

10         Is this the revenue testing for this $4 million Capax

11   transaction?

12   **A.**    Yes.

13   **Q.**    And if we scroll down, please.

14         Does this appear to relate to an amendment to a prior

15   arrangement relating to EDD software?

16   **A.**    Yes.

17   **Q.**    If we could scroll down, please, and maybe zoom out just a

18   little bit.

19         I draw your attention to the lines beginning "The

20   commercial rationale behind the purchase," right beneath the

21   numbers.

22         And if we could go a few paragraphs down, too, please.

23   That will do.  Thank you.

24         Do you see where -- thank you, Ms. Margen.

25         Do you see where it says (reading):

1           "The commercial rationale behind the purchase is that

2       Capax Discovery is part of a wider group that sells

3       Autonomy software and additionally services.  They started

4       this license of business in Q4 2008 when they purchased a

5       significant license for IDOL and associated products"?

6       Do you see that?

7  A.   Yes.

8  Q.   Why does Deloitte inquire about the commercial rationale

9  for particular transactions?

10 A.   To understand the substance of the arrangement as it could

11 differ from the way it's described in the contract.  So to make

12 sure we have the full understanding of the commercial

13 substance.

14 Q.   And during this time period of 2009 through 2011, who did

15 Deloitte make inquiries of?

16 A.   Of the finance team.

17 Q.   Who do you mean by the finance team?

18 A.   Steve Chamberlain and Sushovan Hussain were the primary

19 contacts.

20 Q.   Okay.  It goes on to say (reading):

21           "The Capax" --

22       And was it Deloitte's practice to record what Mr. Hussain

23 or Mr. Chamberlain, or others within finance, would tell you in

24 connection with its work.

25 A.   Yes.

1    Q.    Okay.  This goes on to say (reading):

2              "The Capax Discovery arm specializes in eDiscovery

3         solutions for businesses."

4         Do you see that language?

5    A.    Yes.

6    Q.    And then it says (reading):

7              "This allows them to sell to customers the ability to

8         integrate IDOL with Microsoft SharePoint."

9         Do you see that?

10   A.    Yes.

11   Q.    What was Deloitte getting at there?

12   A.    That the -- the way in which Capax would be using the

13   software, so the way in which it had value to them.

14   Q.    Okay.  Further down below there's a section on

15   "Collectibility."  Do you see that?

16   A.    Yes.

17   Q.    And do you see where it says (reading):

18              "Given that Capax are up to date with their

19         significant payment obligations"?

20   A.    Yes.

21   Q.    What is Deloitte getting at there?

22   A.    Confirming that the payment history from Capax doesn't

23   show any risk that they may not be able to pay for this deal.

24   Q.    Why is Deloitte getting at the -- interested in the

25   payment history?

ANDERSON - DIRECT / LEACH

1    **A.**    To confirm the revenue recognition criteria around

2    collectibility is satisfied.

3    **Q.**    Okay.  And then further down below there are -- there's a

4    line that says "Revenue Recognition" and some criteria that are

5    listed.  Do you see that?

6    **A.**    Yes.

7    **Q.**    What is this describing?

8    **A.**    These are the criteria from IAS 18.

9    **Q.**    Okay.  At the time -- and what are those criteria, please?

10   Can you describe them for us.  We talked generally about that

11   yesterday.

12   **A.**    Yeah.  So risks and rewards of ownership are transferred

13   to the buyer.  Autonomy don't retain any ongoing managerial

14   involvement, that the amount is collectible so economic

15   benefits will flow, and that revenue and costs can be measured

16   reliably.

17   **Q.**    Okay.  At the time -- thank you.  We can put that to the

18   side.

19        And I'd like to display to you what is in evidence as

20   Exhibit 622.

21        Do you see I've placed before you, Ms. Anderson, an e-mail

22   between John Baiocco and Andrew Kanter?  Do you see that?

23   **A.**    Yes.

24   **Q.**    Were you familiar with Mr. Kanter?

25   **A.**    Yes.

1    Q.   Who was he?

2    A.   He was the head of Legal at Autonomy.

3    Q.   And Mr. Baiocco appears to be writing to Andrew Kanter

4    (reading):

5            "Just wanted to reiterate that we were promised more

6        than dollar-for-dollar on this.  We were promised a profit

7        as well."

8        Do you see that?

9    A.   Yes.

10   Q.   At the time you were doing the year-end audit for 2009,

11   were you aware of any side agreements between Capax and

12   Autonomy?

13   A.   No.

14   Q.   If there was a side agreement in respect of the subject

15   matter of that $4 million deal, would that be relevant to you?

16   A.   Yes.

17   Q.   Why is that?

18   A.   Because it would have changed the substance of the

19   agreement as we understood it.

20   Q.   Does it have a bearing on the transfer of risk and

21   rewards?

22   A.   Yes.

23   Q.   Does it have a bearing on collectibility?

24   A.   Yes.

25   Q.   How is that?

**A.**    So if -- well, it would depend on the nature of the side

agreement, but potentially it could mean that risks and rewards

haven't been transferred so that rev rec criteria would be

failed and collection might also be failed.

**Q.**    Well, if there was a handshake agreement from Autonomy

that Autonomy was going to make sure Capax got the $4 million

to make the software payments, would that be relevant to your

assessment of whether revenue was recognized?

**A.**    Yes.

**Q.**    Let's look at a different transaction, please, and go back

to Exhibit 484.  And if we could, please, look at page 4.

I draw your attention to the top portion, Ms. Anderson.

Up at the top do you see where it says "Morgan Stanley"?

**A.**    Yes.

**Q.**    And there is a $12 million transaction recorded here?

**A.**    Yes.

**Q.**    And does this appear to relate to an amendment to a

Digital Safe agreement?

**A.**    Yes.

**Q.**    If we could please scroll down to the paragraph in the

middle of the page beneath the line "Consideration of the

license fee for the software purchased."

The two paragraphs right beneath this bold language.

Thank you, Ms. Margen.  I think we can read that.

Ms. Anderson, do you see where it says (reading):

1          "The current agreement requires the payment of a

2      one-time license fee of 12 million"?

3  **A.**    Yes.

4  **Q.**    Okay.  And what's the difference between a license fee and

5  other aspects of some of these hosting arrangements?

6  **A.**    So the license fee is in -- is in return for the rights to

7  use the software.  Other fees would include services, fees to

8  host the data.

9  **Q.**    And this says (reading):

10         "The software provided to MS under this agreement is

11      the same as under the original agreement with the key

12      exception that the new version of Digital Safe provided to

13      MS is integrated with SPE."

14      Were you familiar with SPE?

15  **A.**    Yes.

16  **Q.**    What was SPE?

17  **A.**    So SPE was described to us as a product that had been

18  developed by the Autonomy team that added functionality.

19  **Q.**    Further down it says (reading):

20         "In order to understand the commercial rationale for

21      this purchase by MS and to establish how significant the

22      addition of SPE in order to justify the 12M price tag,

23      we've had discussions with Pete Menell."

24      Do you see that?

25  **A.**    Yes.

ANDERSON - DIRECT / LEACH

1   Q.   Why does Deloitte inquire about the commercial rationale

2   for purchases like this?

3   A.   To understand whether the -- how there was value in the

4   software license element.

5   Q.   And why is it necessary to justify the 12M price tag?

6   A.   So if there wasn't any value in the -- in the license fee,

7   then the arrangement is likely to just be related to the

8   services.  The value is really in the services the customer is

9   getting rather than the license.

10  Q.   And what are the consequences of that?

11  A.   The timing of the revenue recognition.

12  Q.   How would the timing of the revenue recognition be

13  different?

14  A.   So the timing of revenue on licenses is upfront; and if

15  it's services, it's over time as those services are delivered.

16  Q.   If we could, please, display what is in evidence as

17  Exhibit 381.  And if we could please look at page 2.  And

18  scroll down a little bit more, please.  Keep this but let's get

19  a little bit more there.  Perfect.

20       Do you see where Mr. Crumbacher is writing, Ms. Anderson

21  (reading):

22            "For IDOL deals over 250K in license fee, regardless

23       of whether the rep asks for it in the request or not,

24       please include SPE basic"?

25       Do you see that?

ANDERSON - DIRECT / LEACH

1   **A.**   Yes.

2   **Q.**   And do you see below at the bottom where Mr. Crumbacher

3   says (reading):

4           "You can tell them that it's something we include at

5           no additional cost on any IDOL deal of that size"?

6   Do you see that down at the bottom?

7   **A.**   Yes.  Yes, I do.

8   **Q.**   Okay.  Was this information that was made available to you

9   during the course of the audit?

10  **A.**   No.

11  **Q.**   Is this information relevant to whether it's appropriate

12  to recognize license revenue on this Morgan Stanley deal?

13  **A.**   Yes.

14  **Q.**   Why is that?

15  **A.**   So in the Morgan Stanley deal, it was described to us that

16  the value of the software is in the SPE product, but this

17  e-mail indicates that it's being included in contracts even

18  though the customer doesn't want it or know about it.

19  **Q.**   If Autonomy is injecting SPE into a contract gratuitously,

20  why does that matter?

21  **A.**   So it wasn't our understanding that that was the way the

22  contracts were being structured.

23  **Q.**   Okay.  And what was your understanding?

24  **A.**   That SPE was a product that customers were valuing and

25  paying for.

1    **MR. LEACH:**  Your Honor, I'm ready to move to a

2   different topic if this is a good time to break.

3        **THE COURT:**  Okay, ladies and gentlemen, we'll take our

4   recess now.  We'll be in recess until 1:00 o'clock.

5     Remember the admonition given to you:  Don't discuss the

6   case, allow anyone to discuss it with you, form or express any

7   opinion.

8       We're in recess.

9       (Proceedings were heard out of the presence of the jury:)

10       **THE COURT:**  Let the record reflect the jurors have

11   left.

12      **MR. FRENTZEN:**  Your Honor, two very -- well, one very

13   quick thing, one thing we could defer until later but I wanted

14   to raise it while it was fresh in my mind.

15       Number one, Mr. Khan had asked whether or not he could sit

16   in on the further testimony.  I asked him to leave until I got

17   Court's permission.  I asked the Defense.  My understanding is

18   they object.  I'm not quite sure why, but I think he's done

19   with this trial.

20       **THE COURT:**  Is he going to be re-called?  Is there

21   any --

22      **MR. FRENTZEN:**  I'm not planning on it, and he's

23   planning on flying back to the U.K. in the morning so if anyone

24   wants to re-call him, they better hurry up.

25       **THE COURT:**  Well, it's not quite their turn.  Well,

1  unless there's some reason you want to articulate, I'll let him

2  sit in.

3          MR. KEKER:  Fine.

4          THE COURT:  Okay.

5          MR. FRENTZEN:  The second thing, Your Honor, was the

6  questioning by Ms. Little on one issue with Mr. Khan was, in my

7  view, misleading and took advantage of the Court's prior

8  ruling.  I went to get back into it.  I got cutoff.

9      We don't need to take this up now, but the video that the

10  Court excluded -- and I'm not arguing with the Court's pretrial

11  ruling as a terrible -- the sales video with the *Mafioso*, which

12  the Court is right is a relatively poor piece of work;

13  nonetheless --

14          THE COURT:  Well, I wasn't trying to give an artistic

15  critique of the -- though I did.

16          MR. FRENTZEN:  You did anyway, Your Honor.  I recall

17  that.  It was a very memorable order.

18          THE COURT:  Probably the most memorable order I made

19  so far in this case.

20          MR. FRENTZEN:  The point is, Your Honor, and I knew it

21  might not grab the Court's attention at the time of watching

22  it, but it's actually Mr. Hussain in the course of that video

23  joking about "whacking the guy from Cazenove."  Mr. Khan is the

24  guy from Cazenove.

25      That video was, in fact, brought to his attention, and so

1    Ms. Little's inquiry about Hussain having nothing to do with

2    nothing I think was misleading.

3        I don't know if we're asking to play the video, but we'd

4    like the Court to consider us being allowed to at least get out

5    that, you know -- I think given what had happened

6    professionally to Mr. Khan in the course of his interactions

7    with Autonomy, although it was joking, joking about having real

8    issues with that guy takes on a slightly different tenor in

9    light of what the Court's now heard is the relationship, and

10   what I took to be a misleading question that we could not take

11   advantage of on account of the ruling.

12       **THE COURT:**  Well, number one, I don't think I'm going

13   to change my decision on the quality of the --

14       **MR. FRENTZEN:**  Understood.

15       **THE COURT:**  -- tape, but I'm not going to permit it in

16   at this point.

17       Now, I don't know -- I have no idea what the Defense --

18   well, wait.  Let me qualify.

19       I haven't heard what the Defense is going to present, if

20   anything, if they wish.  I don't know whether it will become

21   relevant at that point or not.

22       **MR. FRENTZEN:**  Understood.

23       **THE COURT:**  Okay.  So that's the argument -- I mean,

24   that's the ruling, and there we are and we're going to lunch.

25       **MR. FRENTZEN:**  Thank you, Your Honor.

**PROCEEDINGS**

```
 1              THE COURT:  Oh, just one question, if I might.  How
 2   long do you expect the direct to be?
 3              MR. LEACH:  I am determined to get Ms. Anderson off
 4   the stand today, so my direct will be 45 minutes to an hour.
 5              THE COURT:  Okay.  And, Mr. Dooley, you're the -- can
 6   you wrap it up?
 7              MR. DOOLEY:  We'll see.  We'll see.  There's a lot to
 8   cover, Your Honor.
 9              THE COURT:  Well, okay.  But if he takes 45 minutes or
10   so --
11              MR. DOOLEY:  That should be enough.
12              THE COURT:  That should be enough, don't you think?
13   Oh, okay.  45 minutes or an hour.  Okay.
14              MR. REEVES:  Your Honor, I have one last thing.
15              THE COURT:  Mr. Reeves.
16              MR. FRENTZEN:  Thank you, Your Honor.  This will only
17   take a second.
18       I think the parties have agreed that the photograph of
19   Mr. Egan's child that was displayed yesterday should be
20   stricken from the record and redacted from the exhibit.
21              MS. LITTLE:  That's fine.
22              THE COURT:  Fine.  Okay.
23              MR. REEVES:  That's Exhibit 6246.  Thank you,
24   Your Honor.
25              THE COURT:  Very cute.
```

 1          **MR. REEVES:**  Thank you, Your Honor.

 2              (Luncheon recess taken at 12:02 p.m.)

 3  **Afternoon Session**                                    **1:05 p.m.**

 4      (Proceedings were heard in the presence of the jury:)

 5          **THE COURT:**  Please be seated.

 6      Let the record reflect all jurors are present, parties are

 7  present.

 8      You may proceed.

 9          **MR. LEACH:**  Thank you, Your Honor.

10  **Q.**   Good afternoon, Ms. Anderson.

11      Good afternoon, ladies and gentlemen.

12      If we could please display what is in evidence as Exhibit

13  537.

14              (Exhibit published to jury.)

15  **BY MR. LEACH:**

16  **Q.**   Ms. Anderson, is this one of the Deloitte work papers

17  relating to two transactions involving FileTek at the end of

18  2009?

19  **A.**   Yes.

20  **Q.**   And did you perform audit procedures with respect to these

21  transactions?

22  **A.**   Yes.

23  **Q.**   Please look at page 2.  Down at the bottom in the

24  description of the audit challenge, it's written here, "We have

25  reviewed whether there is any linkage between the two

1  transactions which would impact the accounting treatment."

2      What were you looking for, Ms. Anderson?

3  A.   To understand whether the sale and the purchase were

4  independent arms' length transactions.

5  Q.   What do you mean by "independent arms' length

6  transactions"?

7  A.   That they were not -- one wasn't influenced by the other,

8  and had one of those -- only one transaction happened, it would

9  have been conducted at those terms and those fees if that had

10 been sold to a -- a third party that wasn't engaged in a

11 purchase.

12 Q.   Were you told by management that these two transactions

13 were not linked?

14 A.   Yes.

15 Q.   Please look at page 4.  The bottom of the second paragraph

16 says, "We will obtain a representation from management to

17 evidence that this transaction was carried out at arms'

18 length."

19      Do you see that word again?

20 A.   Yes.

21 Q.   Is that a term of art in your profession?

22 A.   Yes.

23 Q.   What does that mean again?

24 A.   Arms' length means that they're performed at terms that

25 they would have been performed at had the other transaction not

1  happened, so if you were dealing with a third party that was

2  only engaged with the sale or the other side of the

3  transaction, it would be the same terms and conditions.

4  **Q.**   So if Autonomy did not buy software from FileTek at one

5  amount, FileTek would still buy software from Autonomy at the

6  same amount?

7  **A.**   Yes.

8  **Q.**   Further down below -- and you were assured that that was

9  the case by management?

10  **A.**   Yes.

11  **Q.**   Further down below, there is a paragraph beginning "fair

12  value."

13  **A.**   Yes.

14  **Q.**   It says, "Management contacted a number of companies with

15  regards to potential software applications that could be

16  purchased for integration with SPE."

17      Do you see that language?

18  **A.**   Yes.

19  **Q.**   Do you see where it says, "Management obtained a

20  competitive quote off each company and these are summarized

21  below."  Do you see that?

22  **A.**   Yes.

23  **Q.**   If we continue on to page 5, there's a paragraph beginning

24  "following."  Do you see where it says, "Following the

25  technical analysis performed by Dr. Pete Menell, CTO, and his

1  team, the competitive price quotations obtained, management

2  chose to go with FileTek as it formed the most commercially

3  viable option based on price and technology."

4      Was this information relevant to your assessment of

5  whether these transactions were at arms' length?

6  **A.**    Yes.

7  **Q.**    If this is not true, would that have been relevant to you?

8  **A.**    Yes.

9  **Q.**    Why is that?

10 **A.**    So this was our understanding of the process Autonomy had

11 gone through to assess the purchase, and the quotes received

12 demonstrated the value associated to the purchase.  If -- if --

13 if there were different circumstances, then we would have had

14 to review those and conclude on the accounting.

15 **Q.**    Were you also relying in some way in the process that

16 Autonomy had gone through?

17 **A.**    Yes.

18 **Q.**    Please look at page 6.  I draw your attention to the

19 bottom portion of this page where it says, "We have confirmed

20 that there are no linkages within this data licensing agreement

21 to the software sale from FileTek to Autonomy."

22      Do you see that?  The last sentence of the second

23 paragraph from the bottom.

24 **A.**    Yes, I do.  Yep.

25 **Q.**    Is that information that management has told you?

1    **A.**    Yes.

2    **Q.**    Finally on page 7 up at the top where it's describing the

3    purchase of FileTek software, it says, "The contract was

4    negotiated on a stand-alone arms' length basis."

5         What does that mean?

6    **A.**    It means that it was negotiated independent of the other

7    contract.

8    **Q.**    And was that what management represented to you?

9    **A.**    Yes.

10   **Q.**    Would you please look at what has been marked as Exhibit

11   61, another management representation letter which I offer into

12   evidence.

13            **THE COURT:**  Admitted.

14        (Trial Exhibit 611 received in evidence)

15                 (Exhibit published to jury.)

16   **BY MR. LEACH:**

17   **Q.**    611, please.

18            **THE CLERK:**  61 or 611?

19            **MR. LEACH:**  611.  611.

20   **Q.**    Ms. Anderson, is this the management representation letter

21   for the year-end audit?

22   **A.**    Yes.

23   **Q.**    I direct your attention to page 4.  Is that Mr. Hussain's

24   signature?

25   **A.**    Yes.

ANDERSON - DIRECT / LEACH

1    Q.    And we can scroll up, please, to paragraph 24.

2         Do you see where it says, "We are satisfied that the

3    purchase of software from FileTek was an arms' length

4    transaction."

5         Do you see that?

6    A.    Yes.

7    Q.    Why did Deloitte require this representation?

8    A.    To confirm our understanding that had been explained to us

9    that the -- to substantiate the value of the transactions and

10   the fair value and that they -- the values in the contracts

11   represented the value of the deal.

12         MR. LEACH:    I now offer into evidence Exhibit 769,

13   the -- Deloitte's report for the audit committee for the first

14   quarter of 2010.

15         THE COURT:    Admitted.

16         (Trial Exhibit 769 received in evidence)

17              (Exhibit published to jury.)

18   BY MR. LEACH:

19   Q.    I would like to move forward in time, Ms. Anderson.  Are

20   you familiar with this document?

21   A.    Yes.

22   Q.    Please look at page 4.  There's a reference -- is this a

23   description of some of the significant revenue-generating

24   transactions for the first quarter of 2010?

25   A.    Yes.

**ANDERSON - DIRECT / LEACH**

1  Q.   And I draw your attention to the description for FileTek.

2  Do you see that?

3  A.   Yes.

4  Q.   Is that consistent with your memory that Autonomy sold

5  approximately $8.5 million of software to FileTek in the first

6  quarter of 2010?

7  A.   Yes.

8  Q.   At the time of your review, were you aware of any other

9  agreements between FileTek and Autonomy, other than the two

10  contracts we saw before?

11  A.   No.

12  Q.   Were you aware of any agreement by Autonomy to purchase

13  approximately $11.5 million worth of software from FileTek?

14  A.   No.

15  Q.   Would that have been relevant to your assessment of

16  whether revenue was appropriately recognized in this quarter?

17  A.   Yes.

18  Q.   Why is that?

19  A.   So if there had been a purchase, we would have needed to

20  understand the value of the -- both sides of the arrangement to

21  conclude on the accounting.

22  Q.   Up above, there's a description of Microtechnologies.  Do

23  you see that?

24  A.   Yes.

25  Q.   If we could please enlarge the paragraph beginning

1    "Management alerted us."

2         This says, "Management alerted us to the fact that two

3    deals sold to Microtech in Q4/2009 have been credited in this

4    quarter and resold directly to end users."

5         It goes on, "This was a result of the end users not

6    want -- this is a result of the end users wanting to transact

7    directly with Autonomy.  This reduced the profit in the period

8    of approximately 4 million.  As there was no significant

9    history of deals being reversed in this way, management has

10   recognized revenue at the point of sale to the reseller.

11   Management has confirmed that these were isolated incidents

12   which are not expected to be repeated in future periods."

13        Do you see that language?

14   **A.**   Yes.

15   **Q.**   Do you see Deloitte's response on the next page of the

16   audit committee report, page 5, down at the bottom, last

17   paragraph?

18   **A.**   Yes.

19   **Q.**   It says, "Any further evidence of revenue reversals may

20   jeopardize management's ability to recognize revenue at the

21   point of sale to the end reseller."

22        What was the issue here and what were you getting at?

23   **A.**   So Autonomy recognized revenue on deals with the reseller

24   at point of sale to the reseller, and the contracts used

25   supported the fact that that was the point at which the risks

1    and rewards transferred and therefore that's the appropriate

2    point of revenue recognition.

3         If there was a practice, however, though of risks and

4    rewards not transferring so allowing returns and therefore the

5    reseller not taking on the risk of getting payment from an end

6    user for the deal, that would indicate that the risk -- the

7    risks and reward criteria hadn't been met and that the

8    revenue -- that that's not the right point for revenue

9    recognition.

10   Q.   That's a discussion Deloitte had with Mr. Hussain in the

11   first quarter of 2010?

12   A.   Yes.

13   Q.   And was Deloitte assured that this would not be a

14   practice?

15   A.   Yes.

16   Q.   Let's move forward in time, Ms. Anderson, to the second

17   quarter of 2010, and I'd like to display what is in evidence as

18   Exhibit 979.

19        Please look at page 7 of the exhibit.

20                   (Exhibit published to jury.)

21   BY MR. LEACH:

22   Q.   I draw your attention to the top paragraph of the report

23   to the audit committee.  Do you see where it begins in Q1/2010?

24   A.   Yes.

25   Q.   This says, "In our Q1/2010 report, we highlighted that

1   significant evidence of such further revenue reversals may

2   jeopardize management's ability to recognize revenue at the

3   point of the sale to the reseller.  One deal has been signed

4   with the reseller MicroTech during Q2, and the overall level of

5   software deals done during this quarter through resellers is

6   significantly reduced."

7        Do you see that?

8   **A.**   Yes.

9   **Q.**   What issue is being discussed there?

10  **A.**   The same issue as in the previous document; that if there

11  is a practice of -- of reversals of deals where a -- that were

12  sold to resellers, that practice may lead to not being able to

13  recognize revenue at the point of sale to the reseller.

14  **Q.**   In the Deloitte response, Deloitte wrote, "If Autonomy is

15  required to maintain ongoing managerial duties in respect of

16  reseller deals or if the reseller cannot demonstrate its

17  ability to pay for goods received, it would not -- then it

18  would not be appropriate to recognize revenue on the delivery

19  of the product."

20       Do you see that language?

21  **A.**   Yes.

22  **Q.**   And then it says, "Management acknowledged this position

23  and further highlight that there have been no significant

24  software sales to reseller in Q2/2010."

25       What were you conveying there?

1   **A.**   That if the revenue recognition criteria haven't been met

2   by the -- by -- even though there has been a contract signed

3   with a reseller that Autonomy continues to negotiate a deal

4   directly or if the other revenue recognition criteria aren't

5   met and the -- that would mean that the point of revenue

6   recognition is not at the point of -- the point that the

7   contract is signed with the reseller.

8   **Q.**   Would you please look at page 12.  Or if we can please

9   display for you page 12.

10      In the second quarter of 2010, did you become aware of a

11  software purchase from -- an additional software purchase from

12  FileTek?

13  **A.**   Yes.

14  **Q.**   And as part of your review, did you conduct procedures

15  around that software purchase?

16  **A.**   Yes.

17  **Q.**   I draw your attention to the paragraph "Deloitte

18  responds."  In the last paragraph, it says, "We note that the

19  initial software purchased from FileTek in Q4/2009 is already

20  generating revenues, namely, through the deal signed with Kraft

21  in December 2009."

22      Was that information relevant to you?

23  **A.**   Yes.

24  **Q.**   Is that what management told you?

25  **A.**   Yes.

1  **Q.**   And when you're looking at this purchase, what are you

2  trying to assess?

3  **A.**   To understand why Autonomy is making the purchase and the

4  value that -- that has to them to -- to understand the

5  rationale of the transaction.

6  **Q.**   Are you looking at whether Autonomy would still buy the

7  FileTek software at that price if FileTek had not bought

8  software from FileTek?

9  **A.**   Yeah.

10  **Q.**   And were you assured that's not what was happening?

11  **A.**   Yes.

12  **Q.**   Are you familiar with someone named Brent Hogenson?

13  **A.**   Yes.

14  **Q.**   Who is Mr. Hogenson?

15  **A.**   He was the head of finance in America for Autonomy.

16  **Q.**   Please look at page 21 of the report to the audit

17  committee.  Is this a portion of the audit committee report

18  summarizing management's response to Mr. Hogenson's

19  allegations?

20  **A.**   Yes.

21  **Q.**   And is this something that you reviewed and relied on in

22  the course of your review?

23  **A.**   Yes.

24  **Q.**   And was it important to you that these matters be

25  truthful?

ANDERSON - DIRECT / LEACH

1  **A.**   Yes.

2  **Q.**   I draw your attention to the second paragraph where it

3  says, "The sale to Capax Discovery."

4       And is this responding to an issue relating to a sale to

5  Capax with Eli Lilly as the end user?

6  **A.**   Yes.

7  **Q.**   In that first bullet, it says, "Evidence of previous

8  trading relationship with" -- or it says, "Among the things

9  that management considered in evaluating whether revenue

10 recognition was appropriate was evidence of a previous trading

11 relationship with Capax.  This indicated that it was probable

12 that economic benefits with the transaction would flow to

13 Autonomy."

14      Do you see that?

15 **A.**   Yes.

16 **Q.**   Was that information that you relied on in the course of

17 your review?

18 **A.**   Yes.

19 **Q.**   How about the third bullet, the fact that Capax had been a

20 regular payor of previous deals undertaken with Autonomy, was

21 that relevant?

22 **A.**   Yes.

23 **Q.**   At this point in time, were you aware of any side

24 agreements between Capax and Autonomy relating to the Capax

25 transactions?

ANDERSON - DIRECT / LEACH

1    **A.**    No.

2    **Q.**    Would that have been relevant in your assessment of

3    management's response here?

4    **A.**    Yes.

5    **Q.**    In the last bullet, it says, "The fact that no continuing

6    managerial involvement in the transactions was contractually

7    required or forecast."

8         Do you see that?

9    **A.**    Yes.

10   **Q.**    What did you understand that to mean?

11   **A.**    That as per the terms of the contract, it was Capax's

12   responsibility to close the deal with the end user, and beyond

13   what was in the contract, the Autonomy management team did not

14   expect to have to be involved in that process.

15   **Q.**    Is that relevant information to you?

16   **A.**    Yes.

17   **Q.**    If that were not the case, would that have been important

18   to you?

19   **A.**    Yes.

20   **Q.**    Let's look at page 23.  Is this a further response by

21   management to allegations that Mr. Hogenson raised about EAS

22   support revenues?

23   **A.**    Yes.

24   **Q.**    At any point in your dialogue with Mr. Hussain, did he

25   reference the fact that Autonomy was paying millions of dollars

1  for EDD outsourced services?

2  **A.**   I don't remember that being mentioned, no.

3  **Q.**   Okay.  Would that have been relevant in assessing

4  Mr. Hogenson's allegations?

5  **A.**   Yes.

6  **Q.**   Why is that?

7  **A.**   So some of the -- the information we looked at to

8  understand had the revenue criteria been met was the evidence

9  of payment -- that Capax was making payments on its purchases

10  from Autonomy.  If it had only been able -- or if it was making

11  those payments because payments were being made to Autonomy --

12  to Capax, sorry, that would have been relevant.

13  **Q.**   Please look at page 24.  Is this management's response to

14  allegations Mr. Hogenson had raised about the MicroLink

15  acquisition?

16  **A.**   Yes.

17  **Q.**   I draw your attention to the first paragraph where it

18  says, "At no stage whatsoever was the rationale for the

19  acquisition to provide a vehicle to write off outstanding

20  invoices as speculated by Brent Hogenson."

21       Do you see that?

22  **A.**   Yes.

23  **Q.**   Was that relevant to your assessment of these allegations?

24  **A.**   Yes.

25  **Q.**   Why was that?

**A.**    Because our understanding was not that the acquisition was

done to -- to write off outstanding invoices, so that -- that

was not our understanding of the reason Autonomy acquired

MicroLink.

**Q.**    In the second paragraph, it says -- or I guess it's the

third paragraph -- "Management confirm that the acquisition

process included legal transaction advice from its normal U.S.

lawyers and that there were no side letters or arrangements in

respect of this sale or use of any of its proceeds."

What did you understand that last clause to mean, the use

of any proceeds?

**A.**    So the -- the amounts paid to the -- MicroLink ownership

was not being used.  There were no arrangements about how those

funds would be used.

**Q.**    So if MicroLink or if Dave Truitt and Tim Wharton used the

proceeds from the MicroLink acquisition to purchase Autonomy

software, would that have been relevant to you?

**A.**    Yes.

**Q.**    Is that something you expected Mr. Hussain and others to

bring to your attention?

**A.**    Yes.

**Q.**    Down in the second paragraph from the bottom, the second

to the last sentence, it says, "Management are not aware of any

related party in the accounting sense connection between this

business," and it appears to refer to Microtechnologies and

1    MicroLink.

2        Is that information that you relied on?

3    **A.**    Yes.

4    **Q.**    If that is not correct, would it have been relevant to

5    your assessment of these allegations?

6    **A.**    Yes.

7    **Q.**    Why is that?

8    **A.**    To understand whether the -- the acquisition and sales to

9    MicroTech were connected in some way, whether they were

10   independent, arms' length, which had the -- had they been

11   related parties, that would indicate that they weren't.  But as

12   they weren't related parties, then they were considered to be

13   independent of each other.

14   **Q.**    One more piece on Mr. Hogenson.  If you could please look

15   at page 26.  And is this management's response to what

16   Mr. Hogenson was saying about FileTek?

17   **A.**    Yes.

18   **Q.**    Can we please blow up the first two paragraphs.

19       Do you see where it says, "FileTek products are OEM'd into

20   the Autonomy SPE product, launch Q3/'09.  Subsequent sales have

21   been very strong.  The first OEM purchase of StorHouse was

22   limited by data volume.  In Q2/'10 our CTO confirmed that the

23   data volumes were going to be exceeded so we negotiated an

24   unlimited by data volume OEM."

25       Do you see that?

ANDERSON - DIRECT / LEACH

1   **A.**   Yes.

2   **Q.**   Was this information relevant to you?

3   **A.**   Yes.

4   **Q.**   Okay.  And is this information relevant in assessing fair

5   value?

6   **A.**   Yes.

7   **Q.**   Why is that?

8   **A.**   So in order to understand the rationale for the purchase

9   and how that had value to the Autonomy business, it was a key

10  part of establishing fair value.

11  **Q.**   So if the data volumes were not going to be exceeded, as

12  suggested here, or FileTek's offer was not really needed, was

13  that relevant to you?

14  **A.**   Yes.

15  **Q.**   Let's move forward in time, please, to the third quarter

16  of 2010, and I draw your -- offer into evidence Exhibit 1183,

17  the report for Q3.

18          **THE COURT:**  Admitted.

19      (Trial Exhibit 1183 received in evidence)

20                  (Exhibit published to jury.)

21  **BY MR. LEACH:**

22  **Q.**   If we could please go to page 5, Ms. Anderson.  Do you see

23  in the middle of the page where it says "Amgen"?

24  **A.**   Yes.

25  **Q.**   And is that consistent with your memory that Autonomy sold

1    approximately $9 million of Digital Safe software to Capax with

2    Amgen as the end user?

3    **A.**    Yes.

4    **Q.**    Further up above, there is a paragraph that says,

5    "Management has confirmed that no revenue deals contain side

6    letters or ongoing Autonomy performance requirements that were

7    excluded from the signed sales contracts."

8         Is that what -- what is meant by "management" there?

9    **A.**    The directors of Autonomy.

10   **Q.**    And was that important information to you?

11   **A.**    Yes.

12   **Q.**    Is that an inquiry you regularly made of Mr. Hussain

13   throughout the time period you did reviews?

14   **A.**    Yes.

15   **Q.**    Please look at page 6.  I draw your attention to the

16   second paragraph from the bottom.  It says, "We note no

17   value-added reseller deals have been reversed this quarter and

18   re-signed directly with the end user, and this supports

19   management's policy of revenue recognition at the point of sale

20   to the value-added reseller."

21        Is that getting at the language that we saw in the prior

22   two audit committee reports about potential issues with

23   reversals of reseller deals?

24   **A.**    Yes.

25   **Q.**    Why were you bringing that to the attention of the audit

1    committee in this report?

2    **A.**   Well, as we mentioned in previous reports, if we were to

3    see further instances of deals being reversed that had been

4    sold to resellers, that would -- could impact the point of rev

5    rec, so we are making the point in this document that we

6    haven't seen -- or that we were aware that that hadn't happened

7    in this quarter.

8    **Q.**   Please look at what is in evidence as Exhibit 1123.

9                        (Exhibit published to jury.)

10   **BY MR. LEACH:**

11   **Q.**   Are you familiar with this document, Ms. Anderson?

12   **A.**   Yes.

13   **Q.**   What is this?

14   **A.**   This is a confirmation letter sent to Capax to us, sent to

15   confirm that the amounts due to Autonomy on these invoices are

16   due and this is a complete list.

17           **MR. LEACH:**  I'm reliably informed by Ms. Scott that

18   this is not in evidence, Your Honor.  I move it in.

19           **THE COURT:**  Admitted.

20       (Trial Exhibit 1123 received in evidence)

21                        (Exhibit published to jury.)

22   **BY MR. LEACH:**

23   **Q.**   If we could please look at page 2.  Do you see the

24   language, "The items listed above were properly charged to our

25   account and there are no side letters or other agreements in

1    respect of the subject matter of this request"?  Do you see

2    that?

3    **A.**    Yes.

4    **Q.**    Was the absence of a side agreement listed here relevant

5    to your review in this period?

6    **A.**    Yes.

7    **Q.**    Beneath that, it says, "We acknowledge that Autonomy

8    Corporation PLC retains no continuing managerial involvement in

9    the delivery of this product or service, other than stipulated

10   in the license agreement."

11        Do you see that?

12   **A.**    Yes.

13   **Q.**    Why was this language added to the management rep -- or

14   the audit confirmations?

15   **A.**    So it's around the revenue recognition criteria, and it's

16   another procedure to ensure that there were no agreements that

17   Autonomy will continue managerial involvement after the date of

18   the contract.  I don't remember why it was added at this point.

19   **Q.**    If that representation were not true, would that be

20   relevant to you?

21   **A.**    Yes.

22   **Q.**    Why is that?

23   **A.**    Because to be able to assess whether the revenue

24   recognition criteria had been met, we need to understand the --

25   you know, the full -- the agreement with the customer in its

 1  entirety, which is through the main contract or handled through

 2  side agreements.

 3  **Q.**   Let's move forward in time, Ms. Anderson, to the fourth

 4  quarter of 2010.

 5       And I move into evidence Exhibit 1493, an email from

 6  Ms. Anderson to Steve Chamberlain.

 7            **THE COURT:**  Admitted.

 8       (Trial Exhibit 1493 received in evidence)

 9                 (Exhibit published to jury.)

10  **BY MR. LEACH:**

11  **Q.**   This is another example of one of your outstanding lists,

12  Ms. Anderson?

13  **A.**   Yes, it is.

14  **Q.**   Where you're requesting information from Autonomy?

15  **A.**   Yes.

16  **Q.**   Let me draw your attention to page 5, and there are two

17  transactions I want to focus on here.

18       Down towards the bottom in yellow, No. 20, there's a

19  reference "Supporting documentation for 3.5M revenue

20  consolidation adjustment."

21       Do you see that?

22  **A.**   Yes.

23  **Q.**   What was Deloitte asking for there?

24  **A.**   For evidence to support an adjustment that had been made

25  to record three and a half million dollars of revenue.

ANDERSON - DIRECT / LEACH

1   Q.   Further up above, next to line 6, beneath "memo on VMS,"

2   it says, "hardware shipping documents."

3        Do you see that?

4   A.   Yes.

5   Q.   What was being requested there?

6   A.   Documents to confirm the date of -- that hardware had been

7   shipped.

8   Q.   In connection with a VMS transaction?

9   A.   I don't remember whether it was VMS.

10  Q.   Okay.

11       I move into evidence Exhibit 2539, one of the Deloitte

12  work papers.

13            THE COURT:  2 -- sorry.  2539?

14            MR. LEACH:  Yes, Your Honor.

15            THE COURT:  Admitted.

16       (Trial Exhibit 2539 received in evidence)

17                 (Exhibit published to jury.)

18  BY MR. LEACH:

19  Q.   Are you familiar with this work paper, Ms. Anderson?

20  A.   Yes.

21  Q.   Up at the top in "objective," it says, "To summarize and

22  test the consolidation adjustments."

23       What's a consolidation adjustment?

24  A.   So in this context, it's adjustments that -- sort of late

25  adjustments that are being made to the Autonomy group results.

1    Q.    And I draw your attention to page 2 of the exhibit.  The

2    second row from the bottom, there's a $3.5 million revenue

3    adjustment relating to a transaction with Discover Tech.  Do

4    you see that?

5    A.    Yes.

6    Q.    What's being summarized here?

7    A.    So this is an adjustment that has been made to record

8    revenue, three and a half million, and this is our summary of

9    the information we've seen to substantiate why that entry was

10   appropriate.

11   Q.    And is that information included in this work paper at

12   pages 6 through 9?

13   A.    Sorry.  Could you repeat the question?

14   Q.    Is the supporting documentation relating to this

15   $3.5 million in revenue included in this exhibit at pages 6

16   through 9?

17   A.    Yes.

18   Q.    If we could please look at page 6, please.

19         Do you see the date at the top, December 31st, 2010?

20   A.    Yes.

21   Q.    And do you see the amount in page 2, 3.675 million?

22   A.    Yes.

23   Q.    Paragraph 2.  Excuse me.

24   A.    Paragraph 2, yes.

25   Q.    We should get it on the screen, though.

1    If this were agreed to after December 31st, 2010, would

2    that be relevant to your assessment of whether revenue was

3    appropriately recognized on this transaction?

4    **A.**    Yes.  It needed to be agreed on 31st of December or before

5    that to be recognized as revenue.

6    **Q.**    Why is that?

7    **A.**    Because without that agreement, the revenue criteria

8    haven't been met.

9    **Q.**    Please look at what has been marked as Exhibit 1439.

10    Is this a copy of another Deloitte work paper?

11    **A.**    Yes.

12    **MR. LEACH:**  I offer 1439.

13    **THE COURT:**  Admitted.

14    (Trial Exhibit 1439 received in evidence)

15    (Exhibit published to jury.)

16    **BY MR. LEACH:**

17    **Q.**    Ms. Anderson, are you aware that in the fourth quarter of

18    2010, Autonomy changed the language of some of its reseller

19    agreements to include different language that's summarized here

20    in this work paper?

21    **A.**    Yes.

22    **Q.**    And are you aware that Autonomy recognized $4 million of

23    revenue on a sale to MicroTech with the Department of Interior

24    as the end user?

25    **A.**    Yes.

1    **Q.**    What was the purpose of this work paper?

2    **A.**    This was the Deloitte work paper to review that change in

3    the language used in the contract and conclude whether that had

4    any impact on the point of revenue recognition.

5    **Q.**    I draw your attention to the paragraph under "summary and

6    background."  Do you see where it says, "End user and VAR

7    currently anticipate entering into such a license transaction"?

8    **A.**    Yes.

9    **Q.**    And at this time period, were you trying to understand

10   that language and the possible revenue recognition

11   implications?

12   **A.**    Yes.

13   **Q.**    If that language were included in sales contracts but

14   wasn't true, would that be relevant to your assessment of

15   revenue?

16   **A.**    Yes.

17   **Q.**    Why is that?

18   **A.**    Because it would impact our understanding of the

19   circumstances.

20   **Q.**    Would you please look at what's in evidence as Exhibit

21   1282 or if we could please display it.

22                    (Exhibit published to jury.)

23   **BY MR. LEACH:**

24   **Q.**    With respect to the MicroTech/Department of Interior

25   transaction at the end of December 2010, were you aware that

1    DOI had declined to do a deal with Autonomy?

2    **A.**    No.

3    **Q.**    This was information that wasn't known to you at the time?

4    **A.**    It wasn't known.

5    **Q.**    And when you're talking about the commercial rationale

6    regarding certain revenue transactions with Mr. Hussain and

7    others, is this information that you would expect to be brought

8    to your attention?

9    **A.**    Yes.

10    **Q.**    Why is that?

11    **A.**    So that we have an understanding of the circumstances

12    around the deal and the -- the language around contemplating a

13    deal with the end user.

14    **Q.**    I draw your attention to what is marked as Exhibit 1509,

15    Deloitte's report to the audit committee for the year end 2010.

16        And I offer it into evidence.

17            **THE COURT:**    Admitted.

18        (Trial Exhibit 1509 received in evidence)

19                    (Exhibit published to jury.)

20    **BY MR. LEACH:**

21    **Q.**    Please look at page 4, Ms. Anderson -- excuse me -- page

22    6.  I'm sorry.

23        If we could go further down to the reference to "Tikit."

24    Do you see where it says "Tikit Limited"?

25    **A.**    Yes.

ANDERSON - DIRECT / LEACH

1   Q.   And is this a transaction that Deloitte reviewed in

2   connection with the year-end audit?

3   A.   Yes.

4   Q.   And further below in the last paragraph -- if we could

5   scroll down a little -- it says, "In addition to us receiving

6   third-party confirmations, management has confirmed that no

7   revenue deals contain side letters or ongoing Autonomy

8   performance requirements that were excluded from the signed

9   sales contracts."

10      Do you see that?

11  A.   Yes.

12  Q.   Is that something Mr. Hussain said to you?

13  A.   Yes.

14  Q.   Was that relevant to you?

15  A.   Yes.

16  Q.   If we could please display what is in evidence as Exhibit

17  1361.

18                  (Exhibit published to jury.)

19  BY MR. LEACH:

20  Q.   At the time of your audit, Ms. Anderson, or Deloitte's

21  audit, were you aware of this letter agreement between Tikit

22  and Autonomy?

23  A.   No.

24  Q.   Was this responsive to your request for all information

25  relating to the contracts?  Is this something that was

1  responsive to what Deloitte asked for?

2  **A.**  Yes.

3  **Q.**  Explain that.

4  **A.**  So we asked for -- we asked management to confirm that if

5  there were side agreements, to -- to share those side

6  agreements with us.

7  **Q.**  So that you could evaluate them?

8  **A.**  Yes.

9  **Q.**  And does this side agreement implicate whether Autonomy

10  appropriately recognized revenue on the Tikit transaction at

11  the end of 2010?

12  **A.**  I'm sorry.  Can you --

13  **Q.**  Is this relevant to your assessment of whether revenue was

14  recognized?

15  **A.**  Yes.

16  **Q.**  Why is that?

17  **A.**  Because in order to assess the revenue criteria, we need

18  to assess the full terms of what has been agreed with the

19  customer.

20  **Q.**  What is it about this side agreement that causes you to

21  think revenue was inappropriately recognized?

22          **MR. DOOLEY:**  Objection.  Leading.

23          **THE COURT:**  Overruled.

24          **THE WITNESS:**  So it includes language that if

25  circumstances -- that if Tikit doesn't close the deal with the

```
 1   end user, how they will not be taking the full risk of the deal

 2   in those circumstances.

 3              MR. LEACH:  If we could please go back to Exhibit

 4   1509, page 6.

 5                   (Exhibit published to jury.)

 6   BY MR. LEACH:

 7   Q.   Down at the bottom, there's also a reference to a

 8   transaction with VMS.  Do you see that?

 9   A.   Yes.

10   Q.   And do you see where it says, "In conjunction with this

11   deal, Autonomy has also sold 6 million of infrastructure

12   hardware to this customer."

13        Do you see that?

14   A.   Yes.

15   Q.   Are you aware in the course of the audit exactly how

16   Autonomy delivered this $6 million in hardware became an issue?

17   A.   I don't remember.

18   Q.   Okay.  Well, please look at what has been marked as

19   Exhibit 1530.

20              THE COURT:  Admitted.

21        (Trial Exhibit 1530 received in evidence)

22                   (Exhibit published to jury.)

23   BY MR. LEACH:

24   Q.   Please look at page 2, Ms. Anderson.

25   A.   Yes.
```

1  **Q.**   Do you see the reference to "Steve Chamberlain" at the

2  top?

3  **A.**   Yes.

4  **Q.**   And do you see the subject "VMS, Amgen and BofA"?

5  **A.**   Yes.

6  **Q.**   And Mr. Chamberlain writes, "Apparently auditors still

7  need confirmation from you or one of team that assets had been

8  assigned to the above customers as at 31 December 2010."

9       Do you see that?

10 **A.**   Yes.

11 **Q.**   What did you understand Mr. Chamberlain to be saying

12 there?

13 **A.**   That the Deloitte team were asking for evidence that

14 the -- the hardware associated with the sales had been

15 assigned -- satisfied and assigned for these customers as of

16 that date.

17 **Q.**   Why does that matter from a revenue recognition

18 perspective?

19 **A.**   To ensure that the criteria are met and that that hardware

20 had been made available.

21 **Q.**   Let me draw your attention to the first page.  Do you see

22 where Mr. Menell writes, "Yes.  I can confirm that the assets

23 were assigned as described below.  The logistics of the

24 assignment were also covered in audit review with myself and DT

25 staff a week or so back.  On ferry, but any issues give me a

1   bell."

2        Do you see that?

3   A.   Yes.

4   Q.   Did you interpret this as confirmation that the hardware

5   from VMS had been assigned and segregated within Autonomy?

6   A.   Yes.

7   Q.   If Autonomy were still using this hardware, would that be

8   relevant to your assessment of whether the delivery criteria

9   was met?

10  A.   Yes.

11  Q.   Why is that?

12  A.   As it wouldn't have been available for the customer.

13  Q.   You joined Autonomy at some point in 2011?

14  A.   Yes.  May, 2011.

15  Q.   And you stayed with Autonomy after the HP acquisition?

16  A.   Yes.

17  Q.   Would you please -- are you familiar with a company called

18  ASL?

19  A.   Yes.

20  Q.   What is that?

21  A.   It stands for "Autonomy Systems Limited" and it's the main

22  trading entity of the Autonomy group in the UK.

23  Q.   When you say the main trading entity, are there trading

24  entities outside of the UK?

25  A.   Yes.

ANDERSON - DIRECT / LEACH

1  **Q.**    What were those?

2  **A.**    So the most significant ones are in the U.S.:   Autonomy,

3  Inc; Zantaz, Inc;, Interwoven, Inc.

4  **Q.**    Between 2009 and 2011, did the financial results of these

5  other trading companies affect Autonomy Systems Limited's

6  financial statements?

7  **A.**    Yes.

8  **Q.**    How is that?

9  **A.**    So as the IP owner for the group's IP, when those

10  entities, such as Autonomy, Inc., made a sale, the profits on

11  that sale are transferred back to Autonomy Systems Limited, and

12  Autonomy Systems Limited would reflect the profits in their

13  results.

14  **Q.**    So we've heard a lot about a transaction between MicroTech

15  and Autonomy relating to the Vatican.  Can you describe how

16  that transaction would affect ASL -- how that transaction would

17  be reflected in the books of Autonomy Corporation, ASL, and the

18  trading entity?

19  **A.**    Yes.  So a sale would be recorded by Autonomy, Inc., as

20  the entity that sold the deal.  And in the Autonomy group

21  results, that revenue would feature in the group revenue.

22       In the ASL accounts, the ASL would reflect a -- an amount,

23  a portion of that profit on that deal in their account, too.

24  **Q.**    Why was this profit going to ASL?

25  **A.**    Because of the transfer pricing mechanism within the group

1  that transferred profits back from sales entities back to

2  the -- to ASL.

3  Q.  I have placed before you what has been marked as Exhibit

4  2445.  Do you recognize this document?

5  A.  Yes.

6  Q.  Is this a true and correct copy of Autonomy Systems

7  Limited's report and financial statements for the 10 months

8  ended October 31st, 2011?

9  A.  Yes.

10       THE COURT:  Admitted.

11       (Trial Exhibit 2445 received in evidence)

12       MR. LEACH:  We can display it, please.

13       MR. DOOLEY:  Your Honor, as discussed with counsel,

14  there are redactions.  As long as those are not going to be

15  displayed.

16       MR. LEACH:  I'm going to focus on stuff I don't think

17  will draw an objection.

18            (Exhibit published to jury.)

19  BY MR. LEACH:

20  Q.  What is this document, Ms. Anderson?

21  A.  This is a copy of the statutory financial statements for

22  Autonomy Systems Limited.

23  Q.  Okay.  Are you familiar with the term "restatement"?

24  A.  Yes.

25  Q.  What is a restatement?

1    **A.**    So this is where -- a period where the -- the financial

2    statements have been filed, released previously, are adjusted

3    and -- and restated, refiled.

4    **Q.**    Okay.  And on or about January 31st, 2014, did ASL file a

5    restatement of its accounts for December 31st, 2010, the time

6    period ending then?

7    **A.**    Yes.

8    **Q.**    And did you participate in that restatement process?

9    **A.**    Yes.

10   **Q.**    How did that come about?

11   **A.**    So as part of my role within the finance team, I was

12   responsible for reviewing transactions, revenue transactions,

13   for the period that are reflected in these accounts and to

14   ensure that they -- they showed an accurate view.

15   **Q.**    You had been an auditor at Deloitte.  Did there come a

16   point in time in the course you just described where you

17   realized issues were not what you thought they were during the

18   course of your audits?

19   **A.**    Yes.  So I -- so I left Deloitte in May '11 to join

20   Autonomy and stayed with HP through the acquisition.  Later in

21   that year in 2011 and then sort of nearly 12 months later in

22   the summer of 2012, I was tasked with understanding some of the

23   balance sheet items that were on the balance sheet from the

24   acquisition date, so sort of going back and looking at those

25   amounts to understand what they were, how they were supported,

ANDERSON - DIRECT / LEACH

1   and whilst doing that and trying to understand these items, I

2   came across the contract with Bank of America, a direct

3   contract with Bank of America, and discovered that there had

4   been a series of reseller contracts that -- well, the series of

5   reseller contracts had been replaced with a deal signed

6   directly with Autonomy, and it -- it made me question what was

7   going on, really, because from my time as an auditor at

8   Deloitte, I was aware that there were very few instances of

9   that type of occurrence.  So very few instances where deals had

10  been signed with resellers that had ended up going direct with

11  Autonomy because that would have such an important consequence

12  on the point of revenue recognition.  So I was very shocked to

13  find such a large contract where that had happened,

14  incorporating a number of reseller transactions.

15  Q.   And in time, did you continue to participate in the

16  restatement of ASL's financial statements?

17  A.   Yes.

18  Q.   Now, when you're restating ASL's financial statements

19  for -- well, first of all, was the MicroTech/Vatican

20  transaction part of the restatement?

21  A.   Yes.

22  Q.   Explain how that worked.  How was that restated in ASL's

23  financial statements?

24  A.   The -- the -- with the MicroTech/Vatican transaction,

25  the -- in terms of the restatement, the revenue was reversed so

ANDERSON - DIRECT / LEACH

1  the -- when it was originally recognized, that revenue was

2  reversed, and that has a corresponding impact on the transfer

3  pricing revenue in ASL.

4  Q.   When the revenue was initially reversed, was that under

5  IFRS?

6  A.   Yes.

7  Q.   And was that true for any other transactions in the

8  Autonomy, Inc., or the other trading companies?

9  A.   Yes.

10  Q.   Please look at page 36 of the restatement, and I draw your

11  attention to the bottom portion of this page.

12      Do you see to the left where it says, "Profit for the

13  year, 105 million pounds"?  What is represented there?

14  A.   So that is the profit for the year that was shown in the

15  accounts that were originally filed for the -- for the year

16  ending 31st of December, 20106789.

17  Q.   Further down below, it says "correction of fundamental

18  errors."  Do you see that?

19  A.   Yes.

20  Q.   What is meant by "fundamental errors"?

21  A.   So these were the adjustments required to correct the

22  accounts so that they are inaccuracies in that original profit

23  number initially reported.

24  Q.   Further down below, it says, "Impact via direct sales,

25  impact via transfer pricing revenue."  And the amounts are

ANDERSON - DIRECT / LEACH

1    19.6 million and 50.9 million.  What is represented there?

2    **A.**   So the direct sales line is where the sales were sales

3    that Autonomy Systems Limited had made to customers.  The

4    transfer pricing line represents sales made by other group

5    companies.

6    **Q.**   The other group companies including Zantaz, Autonomy,

7    Inc., those types --

8    **A.**   Yes.  Yes.

9    **Q.**   Okay.  And does this reflect that profit for the year for

10   ASL was reduced to -- by 72.668 million on account of

11   correction of fundamental errors?

12   **A.**   Yes.

13   **Q.**   And would that also have an impact on Autonomy

14   Corporations' financial statements?

15   **A.**   Yes.

16   **Q.**   Why is that?

17   **A.**   So these reflect transactions made by the -- the -- by

18   entities within the group.

19   **Q.**   Beneath that, there is an item for "change in research and

20   development accounting policy."  What is meant by "change in

21   accounting policy"?

22   **A.**   So this -- this is around a -- the policy chosen to

23   account for research and development costs, so it -- it doesn't

24   relate -- it's an adjustment because the company's chosen to

25   change it's policy.  It's not an adjustment because of errors.

1          **MR. LEACH:**  I have three additional documents,

2     Your Honor.  They're large Excel files, and so I would like to

3     offer them into evidence and display them for the jury.

4     They're Exhibits 2711, 2712, 2713, and 2714.

5          **THE COURT:**  Admitted.

6        (Trial Exhibits 2711, 2712, 2713, and 2714 received in

7         evidence)

8                    (Exhibit published to jury.)

9          **MR. LEACH:**  If we could start with 2711 and the tab --

10    let's start -- if we could scroll up, please, and move to the

11    right.  Over to the right.  There you go.

12    **Q.**  Ms. Anderson, during the course of the Government's

13    investigation, were you asked to prepare lists of Autonomy's

14    top 40 contracts by revenue for a particular period?

15    **A.**  Yes.

16    **Q.**  Would you describe for us what you did.

17    **A.**  Yes.  So I was given a list of -- a list of top 40 revenue

18    by contract, and I took reports from the underlying Autonomy

19    accounting -- from the Autonomy accounting system, which is --

20    there is a number of different systems that feed into that.

21         So I took the data from the four systems involved and

22    pulled the largest revenue -- contracts by revenue to collate a

23    list of the top 40.

24    **Q.**  And those systems that you were pulling from, those were

25    maintained in the ordinary course of Autonomy's business?

ANDERSON - DIRECT / LEACH

1    A.    Yes.

2    Q.    And they included ERP, NIBS and Softrax?

3    A.    Yes.

4    Q.    Any others?

5    A.    NetSuite.

6    Q.    Okay.

7          If we could please move a little bit to the left perfect.

8          There is a column for ERP numbers on this spreadsheet.

9    What is that?

10   A.    So in Column H, that's the -- the revenue contract that

11   went through the ERP system.

12   Q.    And in Column I, what is represented there?

13   A.    That's the -- the contracts that were recorded through the

14   NIBS system.

15   Q.    In Columns J and K, what is represented there?

16   A.    J is the same the same through the NetSuite system and K

17   is the total of the three.

18   Q.    Now, the list that the Government provided you to compare

19   to, you don't know anything about those; is that correct?

20   A.    Correct.

21   Q.    You don't know where they came from or any circumstances

22   behind them; is that right?

23   A.    That's correct.

24   Q.    If we could please -- there is a tab here titled

25   "revenue."  What is that tab?

ANDERSON - DIRECT / LEACH

1  **A.**    So that has the raw data from the ERP system.

2  **Q.**    And then if we could move to the right of the tabs, could

3  we go to "ERP order by value."

4          What is conveyed here, Ms. Anderson?

5  **A.**    So this is a summary table I prepared of the raw data from

6  ERP organizing the data by the -- the order number and the

7  customer name.

8          The highlighting I used was the -- the green -- the green

9  lines are those line items that were on that -- the list that

10  had been given to me, and the yellow highlighting is just me

11  highlighting ones from the ERP list that have revenue over

12  3 million.

13  **Q.**    And what do the white rows represent?

14  **A.**    They're ones that were not on the original list that was

15  given to me.

16  **Q.**    Okay.  So if we could scroll down a little bit, there is

17  an entry for Hewlett-Packard, MicroTech LLC, 7.35 million.  Do

18  you see that?

19  **A.**    Yes.

20  **Q.**    The white signifies it was not on the list that was

21  provided to you?

22  **A.**    Yes.

23  **Q.**    But among the orders that you found over $3 million?

24  **A.**    Yes.

25  **Q.**    Then there is one for Tikit Limited, KPMG.  Do you see

ANDERSON - DIRECT / LEACH

1    that?

2    **A.**    Yes.

3    **Q.**    For approximately $6 million?

4    **A.**    Yes.

5    **Q.**    That's another ERP order that you found through Autonomy's

6    books and records that was not on the list that were provided

7    to you?

8    **A.**    Yes.

9    **Q.**    Further down below, there is one for MicroTech, 4 million,

10   and Morgan Stanley.  Do you see that?

11   **A.**    Yes.

12   **Q.**    And the white means those also were not on the list?

13   **A.**    Yes.

14   **Q.**    And if we could scroll down further, there are three

15   entries for Zones.  Do you see that?

16   **A.**    Yes.

17   **Q.**    And those were also not on the list that you compared your

18   work to?

19   **A.**    Yes.

20   **Q.**    You wrote to the right "hardware."  What did you mean by

21   that?

22   **A.**    Just a note to myself that they were hardware orders.

23   **Q.**    Did the Government also ask you to prepare a list of

24   Autonomy's top 40 customers by revenue for particular periods?

25   **A.**    Yes.

ANDERSON - DIRECT / LEACH

1  **Q.**   Could we please look at 2712.

2                  (Exhibit published to jury.)

3  **BY MR. LEACH:**

4  **Q.**   If we could use -- to the left, do you see where it says

5  "Bank of America, SHI International"?

6  **A.**   Yes.

7  **Q.**   Okay.  Those are names that the Government gave you?  You

8  have no idea why or where that came from?

9  **A.**   That's right.

10  **Q.**   Using Bank of America and SHI International as an example,

11  Ms. Anderson, can you walk us to the right and explain what

12  these different numbers are.

13  **A.**   Yes.  So the first five columns there that are in that

14  yellow color, that's the original list that was given to me.

15  So my data is from Column G onwards.

16      So I took the same systems we talked about just now, so

17  ERP, I recorded from an ERP report.  The revenue for Bank of

18  America from ERP was 43 million for this period, so 2009 to

19  Q2/2011.

20      And then as you scroll over to the right, it lists the

21  other systems, NIBS and Softrax.

22  **Q.**   If we could move to the left a little bit.  And a little

23  bit more to the right.  Perfect.

24      You are saying in the -- in Columns H and K, you didn't

25  find differences in the systems between what you were able to

1  observe and what was on the list that the Government provided

2  you?

3  **A.**   Yes.

4  **Q.**   Okay.  If we could scroll to the right.

5      If you could please keep explaining what this means,

6  Ms. Anderson.

7  **A.**   So then there is a total of those columns, and, again,

8  there is no difference between the total from the data I had

9  taken from the systems compared to the report that had been

10  given to me.

11  **Q.**   Okay.  So you observed $63.9 million in revenue from Bank

12  of America for this time period and you observed $57 million in

13  revenue from SHI; is that right?

14  **A.**   Yes.

15  **Q.**   Okay.  And did you break that down into other periods

16  elsewhere on this spreadsheet?

17      If we could move to the right even more.

18  **A.**   Yes.  So I had been given two lists of revenue, the top

19  revenue for customers, and they covered different time periods,

20  so the next time period I looked at was 2010 to Q2 at 2011.

21  And the same exercise.

22  **Q.**   Okay.  So for Bank of America, it says 33.279 in Column S.

23  What does that mean?

24  **A.**   That's the revenue that the ERP report showed.

25  **Q.**   And the 57 million for SHI, what does that represent?

1    **A.**    It's the revenue that the ERP system was showing.

2    **Q.**    And that's for a different time period, 2010 to 2011?

3    **A.**    Yes.

4    **Q.**    And if we can move further to the right, there is a column

5    "difference."  What does that mean?

6    **A.**    So that's reflecting the difference between the second

7    listing that I had been given and the values that I was seeing

8    in the reports from the Autonomy Systems.

9    **Q.**    So for the second listing you had been given, there was no

10   revenue listed for SHI, but you were observing that in the ERP

11   system?

12   **A.**    Yes.

13          **MR. LEACH:**  Thank you, Ms. Anderson.

14      Thank you, Your Honor.  I have nothing further.

15          **THE COURT:**  Cross.

16                    <u>CROSS-EXAMINATION</u>

17   BY MR. DOOLEY:

18   **Q.**    Good afternoon, Ms. Anderson.

19   **A.**    Good afternoon.

20   **Q.**    My name is Brook Dooley.  I represent Mr. Hussain.

21      Ms. Anderson, you worked at Deloitte until the spring of

22   2011; correct?

23   **A.**    Yes.

24   **Q.**    And one of your clients was Autonomy?

25   **A.**    Yes.

1  Q.   And in your role as an auditor at Deloitte, you worked

2  closely with people at Autonomy?

3  A.   Yes.

4  Q.   And then you moved over to work for Autonomy in the spring

5  of 2011; right?

6  A.   Yes.

7  Q.   And you stayed with the Autonomy group after Autonomy was

8  acquired by Hewlett-Packard; right?

9  A.   Yes.

10  Q.   And you continued to work closely with the legacy Autonomy

11  management once you were employed by HP; correct?

12  A.   Yes.

13  Q.   And that included Mr. Hussain?

14  A.   Yes.

15  Q.   And you stayed at HP after Dr. Lynch and Mr. Hussain left

16  in May of 2012; right?

17  A.   Yes.

18  Q.   And in November 2012, you were still working at

19  Hewlett-Packard when Hewlett-Packard announced its writedown,

20  its $8.8 billion writedown of Autonomy; correct?

21  A.   Yes.

22  Q.   That happened on November 20th?  Do you remember that?

23  A.   I don't remember the exact date, but I know it was around

24  that time, yes.

25  Q.   In it's announcement, Hewlett-Packard publicly blamed the

 1  writedown on fraud by Autonomy executives; correct?

 2  **A.**   Yes.

 3  **Q.**   And, Ms. Anderson, you were concerned that you were going

 4  to get blamed as someone who had advised Autonomy; isn't that

 5  right?

 6  **A.**   No.

 7  **Q.**   Everyone at HP knew you had worked at Deloitte and you

 8  were one of the folks who had audited Autonomy; right?

 9  **A.**   Yes.

10  **Q.**   And everyone you worked with knew you had -- you had

11  stayed on and worked at Autonomy; right?

12  **A.**   Well, I wouldn't say everyone would have known that, but

13  it -- it was known by colleagues that I had worked at Deloitte,

14  yes.

15  **Q.**   And you felt like they were looking at you and blaming

16  you, didn't you?

17  **A.**   No, I didn't feel like that.

18  **Q.**   You've got a bunch of binders, and I hope I'll be able to

19  direct you.  But let's look at what is marked as 6449, please.

20       I will move it into evidence.  This is --

21          **THE COURT:**  6449?

22          **MR. LEACH:**  Objection.  Hearsay.

23          **THE COURT:**  Wait.  Now I have to get it.

24          **MR. DOOLEY:**  I think it's in a binder that is labeled

25  2 of 3, Ms. Anderson.  There is a bunch of them.

1          THE WITNESS:  Which exhibit number?

2          MR. DOOLEY:  6449.

3          THE COURT:  Let me look at it.

4          THE WITNESS:  Yes.

5          THE COURT:  What is the --

6   BY MR. DOOLEY:

7   Q.   Do you recognize this as an email encapsulation of an

8   internet message exchange with you and Paul Curtis?

9   A.   Yes.

10  Q.   Who is Paul Curtis?  You worked with him at HP; correct?

11  A.   I did, yes.

12  Q.   And he's in finance?

13  A.   Yes.

14  Q.   And if you turn over to the second page -- and you notice

15  the date.  This is dated November 21st.

16  A.   November 21st, yes.

17  Q.   Does this appear to be a true and correct copy of an

18  Instant Message exchange between you and Mr. Curtis?

19  A.   Yes.

20  Q.   All right.

21       Your Honor, I would move it in.

22          MR. LEACH:  No objection, Your Honor.

23          THE COURT:  Admitted.

24       (Trial Exhibit 6449 received in evidence)

25                (Exhibit published to jury.)

1    BY MR. DOOLEY:

2    Q.   If you look at the second page at the top, Mr. Curtis

3    writes, "In answer to your email, I think the chapter is closed

4    and we can all move forward.  Just buy some popcorn and now

5    watch the HP execs and former AU," Autonomy, "execs argue in

6    the press"; right?

7    A.   I see that, yes.

8    Q.   You write, "It's just so frustrating, though, reading

9    things in the press that I know aren't true."

10        Do you see that?

11   A.   Yes.

12   Q.   And down below where the timestamp says 18:55 -- I guess

13   that's a timestamp -- you wrote, "I hate it.  Everyone knows I

14   came from Deloitte.  We had a meeting with Robert Youngjohns."

15        Who is Robert Youngjohns?

16   A.   He was the -- tasked with managing the Autonomy business.

17   Q.   Okay.  Another senior person at HP?

18   A.   Yes.

19   Q.   "And everyone was saying what were the auditors doing."

20   That's what you wrote; right?

21   A.   Yes.

22   Q.   You were concerned that folks were looking at you and

23   blaming you?

24   A.   I think I more felt frustrated that given the

25   circumstances, it wasn't appropriate for me to comment in the

 1  sort of chatter that was happening.

 2  **Q.**   Ms. Anderson, it's important to you personally to convince

 3  people that Autonomy misled you during your time at Deloitte,

 4  isn't it?

 5  **A.**   No, I wouldn't say it's personally important to me.

 6  **Q.**   And it's also been important to you to show people you

 7  work with at Hewlett-Packard that you're on their side now,

 8  right, you're on Hewlett-Packard's team?

 9  **A.**   No.

10  **Q.**   Okay.  Well, in any event, you have spent a lot of time

11  working on this case since 2012, haven't you?

12  **A.**   Yes.

13  **Q.**   Just to start with, you have had eight, as I count them,

14  meetings with Hewlett-Packard's lawyers.  Does this sound

15  right, or too few?

16  **A.**   I don't remember the exact number.  There has been

17  several.  It sounds about right.

18  **Q.**   You've met with Hewlett-Packard's lawyers from Morgan,

19  Lewis & Bockius; right?

20  **A.**   Yes.

21  **Q.**   You know one of the Hewlett-Packard lawyers who is here in

22  the courtroom, right, Ms. Resley?

23  **A.**   Yes.

24  **Q.**   You've met with Hewlett-Packard's lawyers from the

25  Proskauer Rose firm; right?

**ANDERSON - CROSS / DOOLEY**

1  **A.**    I believe -- I can't quite remember, but I think so, yes.

2  **Q.**    You have met with Hewlett-Packard lawyers from the Choate

3  Hall firm?

4  **A.**    Yes.

5  **Q.**    You have also met with Price Waterhouse Coopers; right?

6  **A.**    Yes.

7  **Q.**    And they're the accounting firm that was hired by

8  Hewlett-Packard to do its internal investigation; right?

9  **A.**    Yes.

10  **Q.**    And they also worked on the restatement that you talked

11  about; right?

12  **A.**    Yes.

13  **Q.**    And they're also working on the civil case that HP has

14  going against Mr. Hussain; right?

15  **A.**    Yes.

16  **Q.**    You know that, right, HP has sued Mr. Hussain for billions

17  of dollars in London; right?

18  **A.**    Yes.

19  **Q.**    You've also met with the prosecutors a number of times, in

20  fact, five times before your testimony started yesterday;

21  right?

22  **A.**    That sounds about the right number, yes.

23  **Q.**    And then you met with the prosecutors again last night?

24  **A.**    Yes.

25  **Q.**    And did you practice your testimony with them?

1  **A.**  They had some questions that they wanted to ask me, yes.

2  **Q.**  Were they similar to the questions that they asked you

3  here today?

4  **A.**  Yes.  On the top 40 list.

5  **Q.**  Does that sound -- that sounds like practicing your

6  testimony, doesn't it?

7  **A.**  I would say they had questions to ask me.

8  **Q.**  Did they make suggestions about how you should answer the

9  questions?

10  **A.**  No.

11  **Q.**  Did they ask the same question over and over until you got

12  it right?

13  **A.**  No.

14  **Q.**  You've also testified to the grand jury in this matter;

15  right?

16  **A.**  Yes.

17  **Q.**  And you said you knew that HP was suing Mr. Hussain.

18  You've actively participated in preparing that civil case,

19  haven't you?

20  **A.**  No.  So I've worked on the statutory restatement work.

21  **Q.**  Well, you've met with -- you did an interview with PWC and

22  Choate Hall.  You helped interview Mr. Lucini and

23  Mr. Goodfellow; right?

24  **A.**  I --

25  **Q.**  Do you remember that?

1  A.    I was present in some discussions with Mr. Lucini, yes,

2  and that was for the purposes of the work I was doing on the

3  statutory accounts.

4  Q.    But the law firm that was there was Choate Hall; right?

5  That's an American law firm?

6  A.    Yes.

7  Q.    And they're working on the civil case; right?

8  A.    I believe so, yes.

9  Q.    So they weren't -- the American law firm that's working on

10  suing Mr. Hussain, they weren't there for the restatement, were

11  they, Ms. Anderson?

12  A.    No.

13  Q.    They were there to build HP's case against Mr. Hussain and

14  Dr. Lynch?

15          MR. LEACH:  Objection.  Foundation.

16          THE COURT:  Sustained.

17  BY MR. DOOLEY:

18  Q.    And you report to or work with Mr. Chris Yelland; correct?

19  A.    Yes.

20  Q.    Is he your boss?

21  A.    Not currently, but he was over the previous years, yes.

22  Q.    During your time that you were working together, you knew

23  he was helping to prepare the claim that HP filed in the civil

24  case; right?

25  A.    I'm not too sure what work he was involved in in preparing

1  a claim.  My work was focused on the statutory accounts

2  restatement.

3  **Q.**  You know that HP filed a very voluminous Complaint against

4  Mr. Hussain.  Did you work on that at all?

5        **MR. LEACH:**  Objection.  Foundation.

6        **MR. DOOLEY:**  I'm asking if she worked on it.

7        **THE COURT:**  Did you work on the Complaint that was

8  filed against Mr. Hussain?  That's the question.

9        **THE WITNESS:**  Not that I can remember.

10      As I said, I worked on the statutory accounts restatement,

11  information -- I think information I shared information with

12  the lawyers who were working on the claim from the work I was

13  doing for the statutory accounts restatement.  So I -- it may

14  have been used for those purposes.  I don't know.

15  **BY MR. DOOLEY:**

16  **Q.**  So the statutory -- the work on the restatement was being

17  shared with the people working on the civil case?

18  **A.**  So I'm afraid I don't have --

19        **THE COURT:**  Wasn't the restatement public?

20        **MR. DOOLEY:**  Sorry?

21        **THE COURT:**  Wasn't the restatement public?

22        **MR. DOOLEY:**  The restatement was filed publicly.

23        **THE COURT:**  Then of course anybody had access to it.

24      Okay.  We are going to take a recess now, ladies and

25  gentlemen.  We will be in recess until 2:35.

1      Remember the admonition given to you:  Don't discuss the

2  case, allow anyone to discuss it with you, form or express any

3  opinion.

4      (Proceedings were heard out of presence of the jury:)

5          THE COURT:  Yes?

6          MS. LITTLE:  I have one matter that does not relate to

7  this witness.  It relates to discovery issues.  I could do it

8  now or later.

9          THE COURT:  Later.

10          MS. LITTLE:  Okay.

11                (Recess taken at 2:18 p.m.)

12                (Proceedings resumed at 2:38 p.m.)

13      (Proceedings were heard in the presence of the jury:)

14          THE COURT:  You may continue.  Thank you.

15          MR. DOOLEY:  Thank you, Your Honor.

16  Q.  Ms. Anderson, I want to ask you some additional questions

17  about the audit process, give the jury a sense of what all was

18  involved.

19      Could you look at 6425 in Volume 2.

20          THE COURT:  Admitted.  Are you offering it?

21          MR. DOOLEY:  I offer it, yes.

22          THE COURT:  Admitted.

23      (Trial Exhibit 6425 received in evidence)

24                (Exhibit published to jury.)

25  \\\

1    BY MR. DOOLEY:

2    Q.    Ms. Anderson, do you recognize Exhibit 6425 as the report

3    to the audit committee on the 2009 audit?  It's a planning

4    report?

5    A.    Yes.

6    Q.    Just briefly, what is the planning report?

7    A.    So it sets out to the audit committee some of the details

8    that -- that Deloitte -- of how they were going to approach the

9    audit.

10   Q.    Okay.  And if you look at page 12, there is an org chart

11   of sorts.

12         If we could call that up, Jeff.

13         It's pretty hard to read, but do you recognize that,

14   Ms. Anderson, as an organizational chart of the Autonomy team

15   at Deloitte at the end of 2009?

16   A.    Yes.

17   Q.    And we've seen -- some of the names on here are familiar.

18   Richard Knights, he is the audit partner; right?

19   A.    Yes.

20   Q.    And we have Rob Knight.  He's a director?

21   A.    Yes.

22   Q.    Next to Mr. Knight, there is someone named Stuart

23   Henderson, who is the engagement quality assurance partner.

24   What is the engagement quality assurance partner?

25   A.    Their role is to review certain parts of the audit file as

 1   an extra set of eyes and, to some extent, an independent review

 2   of the work.

 3   **Q.**   So a second partner reviewing the work?

 4   **A.**   Yes.

 5   **Q.**   And then to the right on this org chart, it says,

 6   "Independent review partner (not known to client)."  What is

 7   that person or who is that person?

 8   **A.**   So again, it's similar to the engagement quality assurance

 9   partner review.  It's another partner involved to perform an

10   independent review.

11   **Q.**   And then in the middle, we see Lee Welham, whose name we

12   have seen before, and beneath that, we see your name.

13        There is also a Ben Moore, valuations director.  Who is

14   that?

15   **A.**   I -- I'm struggling to remember how Ben fitted into it.  I

16   mean, it says valuations director, so he would have been

17   involved in some aspects of the audit.

18   **Q.**   Okay.  And then further to the right, there is a Ben

19   Johnson, technological assurance senior manager.  What did he

20   do?

21   **A.**   So Ben was often involved to assess some of the technical

22   aspects of the software products, Autonomy software products.

23   **Q.**   And then below you on the chart, there is Mr. Murray, who

24   we've seen before, and then there are additional people below

25   Mr. Murray.

1      Are there other people who were involved in the audit that

2  aren't on here, Ms. Anderson?

3  **A.**    So there would have been the audit field team, so the more

4  junior members of the audit team, yeah.

5  **Q.**    So this is just the -- this doesn't include those folks?

6  **A.**    Correct.

7  **Q.**    Could I ask you to look at Exhibit 6419 just very briefly.

8          **THE COURT:**    Admitted.

9          (Trial Exhibit 6419 received in evidence)

10                    (Exhibit published to jury.)

11 **BY MR. DOOLEY:**

12 **Q.**    Is that the 2010 version of the same document, the

13 planning document?

14 **A.**    Yes.

15 **Q.**    Okay.  On your direct examination, you talked about the

16 difference between the quarterly reviews and the annual audit.

17 Do you remember that testimony?

18 **A.**    Yes.

19 **Q.**    It's true that Autonomy Corporation was not required to

20 issue financial statements every quarter, was it?

21 **A.**    Yes, that's true.

22 **Q.**    But they did it anyway?  They voluntarily issued financial

23 statements every quarter; right?

24 **A.**    Yes.

25 **Q.**    They were only required to do it at the end of the year

1  and in the middle of the year, but they chose to do two

2  additional financial statements; right?

3  **A.**    Correct.

4  **Q.**    And Deloitte performed a lot more testing in its quarterly

5  reviews of Autonomy than it did when compared to other clients'

6  quarterly reviews; is that a fair statement?

7  **A.**    Compared to the reviews from my other clients, yes.

8  **Q.**    Deloitte performed, I think you've said, detailed testing

9  on Autonomy's interim quarter sales transactions?

10  **A.**    Yes.

11  **Q.**    And Deloitte reviewed sales contracts as part of its

12  quarterly reviews; right?

13  **A.**    Yes.

14  **Q.**    When you did these quarterly reviews, there was a planning

15  process ahead of the audit; correct?

16  **A.**    Yes.

17  **Q.**    Before the audit got started?

18  **A.**    Yes.

19  **Q.**    And just so the jury understands, the audit -- you're

20  actually physically in Autonomy's offices after the end of the

21  quarter; correct?

22  **A.**    Yes.

23  **Q.**    For a period of one to two weeks; is that fair?

24  **A.**    Yes.  Around that time.

25  **Q.**    You're literally sitting in the finance office with

1    Mr. Hussain and Mr. Chamberlain and the other names that we've

2    become familiar with; right?

3    **A.**    So we wouldn't sit in the finance office for that period

4    of time.  We'd have a meeting room.

5    **Q.**    Okay.  But in the building?

6    **A.**    Yes.

7    **Q.**    And as part of the planning process, you'd have a planning

8    meeting and then you'd prepare an interim review work program;

9    is that right?

10   **A.**    Yes.

11   **Q.**    Okay.  Would you look at Exhibit 6429 and 6430.

12            **MR. LEACH:**  No objection.

13            **THE COURT:**  Admitted.

14       (Trial Exhibits 6429 and 6430 received in evidence)

15                 (Exhibit published to jury.)

16   **BY MR. DOOLEY:**

17   **Q.**    Just very briefly for the jury, this is an agenda for your

18   planning meeting in advance of the Q3/2009 audit or, I'm sorry,

19   review?

20   **A.**    Yes.

21   **Q.**    And then 6430 is the interim review work program; right?

22   **A.**    Yes.

23   **Q.**    Okay.  And just briefly, what's the purpose of the interim

24   review work program?

25   **A.**    It sets out steps that need to be performed as part of the

ANDERSON - CROSS / DOOLEY

1   review procedures, and within that document, we'd record the

2   work we'd done.

3   **Q.**   So a detailed set of steps and procedures that you would

4   then carry out during the audit?

5   **A.**   Yes.

6   **Q.**   And then you had a series of steps that you were -- that

7   you followed to actually complete the audit; correct?

8   **A.**   Yes.

9   **Q.**   And part of that was completing the interim review summary

10  memorandum; is that right?

11  **A.**   Yes.

12  **Q.**   So if you look at Exhibit 6431.

13          **MR. LEACH:**  No objection.

14          **THE COURT:**  Admitted.

15      (Trial Exhibit 6431 received in evidence)

16              (Exhibit published to jury.)

17  **BY MR. DOOLEY:**

18  **Q.**   That's the interim review summary memorandum for Q3/2009?

19  **A.**   Yes.

20  **Q.**   And briefly for the jury, what is the purpose of that

21  document?

22  **A.**   To summarize the work that's been performed for the review

23  from the planning activities through to any procedures

24  performed and conclusions.

25  **Q.**   Sort of summarizes the work that you did during the

1    review --

2    **A.**    Yes.

3    **Q.**    -- correct?  Okay.

4         And then that would lead to the audit committee report

5    that we've seen already in evidence.  I think it's Exhibit 279.

6         After you've done the audit work, you prepared the audit

7    committee report?

8    **A.**    Yes.

9    **Q.**    Okay.  And the audit committee report has to be signed off

10   by the -- one of the independent partners; right?

11   **A.**    Yes.

12   **Q.**    So if you look at Exhibit 6433.

13        **THE COURT:**  Admitted.

14        (Trial Exhibit 6433 received in evidence)

15             (Exhibit published to jury.)

16   **BY MR. DOOLEY:**

17   **Q.**    Is that the independent partner review form?

18   **A.**    Yes.

19   **Q.**    Indicating that the independent -- one of these

20   independent partners has signed off on the review?

21   **A.**    Yes.

22   **Q.**    And the engagement quality assurance partner who we saw on

23   the org chart also has to sign off; right?

24   **A.**    Yes.

25   **Q.**    So this is multiple layers of independent sign-off on

1  the -- on the review; correct?

2  **A.**   Correct.

3  **Q.**   There is also something called a PSR report docket.  If

4  you look at Exhibit 6435.

5          **THE COURT:**  Admitted.

6      (Trial Exhibit 6435 received in evidence)

7              (Exhibit published to jury.)

8  **BY MR. DOOLEY:**

9  **Q.**   Do you recognize that?

10 **A.**   Yes.

11 **Q.**   What is that document?

12 **A.**   It's another review procedure within Deloitte of the audit

13 or the review file.

14 **Q.**   Okay.  And here it shows Mr. Welham, Mr. Knights,

15 Mr. Henderson and Mr. -- I think it's all "misters" --

16 Robertson signing off on the review?

17 **A.**   Yes.

18 **Q.**   And then the other thing that you did as part of the audit

19 was actually go through -- well, just backing up, for the

20 quarterly and the midyear results, Autonomy released their

21 results in the form of a press release; correct?

22 **A.**   Yes.

23 **Q.**   Not an annual -- the annual report is at the end of the

24 year, but for Q1, Q2, and Q3, it's a press release; right?

25 **A.**   Yes.

1    Q.    And Deloitte would actually go through and check all the

2    numbers in the press release; right?

3    A.    Yes.

4    Q.    If you look at Exhibit 6436.

5            **THE COURT:**  Admitted.

6            **MR. LEACH:**  No objection.

7        (Trial Exhibit 6436 received in evidence)

8                    (Exhibit published to jury.)

9    **BY MR. DOOLEY:**

10   Q.    Blow that up.

11       That's -- it's a little hard to see, but those are --

12   they're actually little checkmarks against every number on the

13   page.  Those are handwritten checkmarks?

14   A.    Yes.

15   Q.    So somebody went through and reviewed all of this -- every

16   number in this document?

17   A.    And checked that they matched the reports that the

18   Autonomy finance team had prepared, yes.

19   Q.    And sometimes at the end of the -- the end of the quarter,

20   the audit partner would send a note to the management team just

21   sort of summarizing his view.

22       Can we look at 6441, please.

23            **THE COURT:**  Admitted.

24       (Trial Exhibit 6441 received in evidence)

25                    (Exhibit published to jury.)

1    BY MR. DOOLEY:

2    Q.    That's an email from Richard Knights, who we talked about

3    before.  He was the audit partner in April 2009?

4    A.    Yes.

5    Q.    And he's writing to Mike Lynch, who you understand to be

6    the CEO; right?

7    A.    Yes.

8    Q.    And he writes, "Results and financial processes as

9    reported to the audit committee are in good shape."

10          And then there is some bullet point highlights; right?

11   A.    Yes.

12   Q.    Did you know that Mr. Knights was doing this, writing

13   these emails?

14   A.    I don't remember seeing it.  I may have known at the time,

15   but I don't remember.

16   Q.    If you look at 6440, there is another one.

17         Move that in from Richard Knights to Dr. Lynch and

18   Mr. Hussain.

19              THE COURT:  Admitted.

20         (Trial Exhibit 6440 received in evidence)

21                   (Exhibit published to jury.)

22   BY MR. DOOLEY:

23   Q.    "Numbers and results are fine from a review perspective.

24   Bumpy landing but a landing."

25         And then look at 6439.

ANDERSON - CROSS / DOOLEY

1        **THE COURT:**  Admitted.

2        (Trial Exhibit 6439 received in evidence)

3                    (Exhibit published to jury.)

4    **BY MR. DOOLEY:**

5    **Q.**   Mr. Knights writes, "We are total" -- this is Q3/2009.

6        "We are totally comfortable with the numbers as reported

7    to the audit committee and in the release."

8        Do you see that?

9    **A.**   Yes.

10   **Q.**   And just in the interests of moving this along, I'm going

11   to ask you to look at a whole bunch of documents related to the

12   planning process for the end of the year.

13       The end-of-the-year audit was even more rigorous than the

14   review; correct?

15   **A.**   Yes.

16   **Q.**   So if you could look at Exhibit 6421.

17           **THE COURT:**  Go ahead.  I'm sorry.  Go ahead.  6421.

18   **BY MR. DOOLEY:**

19   **Q.**   21.  Is that --

20           **THE COURT:**  It's a whole collection.

21   **BY MR. DOOLEY:**

22   **Q.**   6422?

23   **A.**   (Witness reviews document.)

24       6422, yes.

25   **Q.**   6423.

```
 1   A.    (Witness reviews document.)

 2         Yes.

 3   Q.    6424.

 4   A.    (Witness reviews document.)

 5   Q.    6425.

 6   A.    (Witness reviews document.)

 7         Yes.

 8   Q.    Are those all copies of documents related to the planning

 9   for the year-end 2009 audit of Autonomy?

10   A.    Yes.

11              THE COURT:  Admitted.

12         (Trial Exhibits 6421, 6422, 6423, 6424, and 6425

13          received in evidence)

14   BY MR. DOOLEY:

15   Q.    Agenda for a meeting, minutes for the planning meeting,

16   the audit planning memo and so forth; correct?

17   A.    Yes.

18   Q.    And then there was a whole process to complete the end of

19   the year audit.

20         If you look at 6426, is that the audit summary memorandum?

21              THE COURT:  Admitted.

22         (Trial Exhibit 6426 received in evidence)

23                    (Exhibit published to jury.)

24              THE WITNESS:  It's been a while since I looked at

25   documents like this from Deloitte, but it -- it does look like
```

1  a summary of the audit, yeah.

2  BY MR. DOOLEY:

3  Q.   Okay.  And then 6428?

4        MR. LEACH:  No objection.

5        THE COURT:  Admitted.

6     (Trial Exhibit 6428 received in evidence)

7             (Exhibit published to jury.)

8  BY MR. DOOLEY:

9  Q.   That's the independent partner review?

10 A.   Yes.

11 Q.   And then 6427, that's the engagement quality assurance

12 review?

13       THE COURT:  Admitted.

14    (Trial Exhibit 6427 received in evidence)

15       THE WITNESS:  Yes.

16 BY MR. DOOLEY:

17 Q.   And then 6371, that's the PSR document where everybody

18 signs off?

19       THE COURT:  Admitted.

20    (Trial Exhibit 6371 received in evidence)

21       THE WITNESS:  I'm sorry.  I didn't hear the number.

22 BY MR. DOOLEY:

23 Q.   64 -- I'm sorry.  6371.

24 A.   What was the question?  Sorry.

25 Q.   I was --

1    **THE COURT:**  All these are documents that are used in

2    connection with the audit and the review, and it demonstrates

3    how robust, rigorous, complete these audits were and how they

4    were planned.  I'm not saying don't have them in evidence.  I'm

5    just saying they all --

6    **MR. DOOLEY:**  I agree, Your Honor.

7    **THE COURT:**  -- seem to demonstrate the point you're

8    making.

9    **MR. DOOLEY:**  I agree.

10   Q.   If we could look at one more, 6437.  This is the review of

11   the Autonomy annual report and accounts with handwritten

12   checkmarks and signatures on each page.  Do you see that?

13   **THE COURT:**  Admitted.

14   (Trial Exhibit 6437 received in evidence)

15                (Exhibit published to jury.)

16   **THE WITNESS:**  Yes.

17   BY MR. DOOLEY:

18   Q.   Do you recognize whose signature that is in the upper

19   right-hand corner or whose initials?  I don't know if that's

20   even a signature.  Is that Mr. Knights'?

21   A.   I think it is, yeah.

22   Q.   It's on the screen.

23   A.   I think so.  I couldn't say for certain, but I think it

24   is.

25   Q.   Okay.  So he's gone through and checked each page?

1   **A.**   Yes.

2   **Q.**   And I believe you've described the relationship between

3   Autonomy and Deloitte as a healthy working relationship?

4   **A.**   Yes.  That was my opinion, yes.

5   **Q.**   And Deloitte pushed Autonomy management?

6   **A.**   Yes.

7   **Q.**   The audit team raised issues and they got answers to their

8   questions?

9   **A.**   Yes.

10  **Q.**   And, in turn, the Autonomy finance people would identify

11  issues where they thought maybe they were being aggressive and

12  they wanted you to look at?

13  **A.**   Yes.  That was my experience during the audit.

14  **Q.**   And, in fact, I think you have previously said that

15  Autonomy finance would identify issues where they thought that

16  they might be pushing the envelope; right?

17  **A.**   Sorry.  Could you repeat that?

18  **Q.**   Pushing the envelope?  Do you know that expression?

19  **A.**   I know the expression.  It was the first part of the

20  question I didn't hear.

21  **Q.**   Autonomy finance would identify issues where they thought

22  they were pushing the envelope; is that correct?

23  **A.**   Yes.  That's correct.

24  **Q.**   Looking for guidance from Deloitte?

25  **A.**   Yes.  So they would, on occasion, bring topics to our

1  attention and ask for discussion on the appropriate way to

2  handle.

3  **Q.**  Okay.  The audit team at Deloitte checked the applicable

4  revenue recognition criteria.  You were satisfied and you had

5  assured yourselves that you had addressed your concerns through

6  your discussions with Autonomy?

7  **A.**  Yes.

8  **Q.**  And Mr. Knights and then Mr. Mercer, who was the audit

9  partner later, they wouldn't have signed off if they were not

10 happy with the explanation provided by management; right?

11 **A.**  No.  I don't think they would have signed off.

12 **Q.**  And you had no reason to question the work of Mr. Knights

13 or Mr. Mercer?

14 **A.**  No.

15 **Q.**  We looked at the org chart and the partners.  They were

16 the ones who made the final judgmental calls.  I mean, they had

17 the kind of final say on the audit; correct?

18 **A.**  Correct.

19 **Q.**  It wasn't you, it wasn't Mr. Knight or Mr. Welham.  It was

20 Mr. Knights and then later Mr. Mercer, the partners?

21 **A.**  Yes.

22 **Q.**  The jury has heard about hardware sales, and I want to

23 just -- I want to ask you some questions about that.

24      In 2009 and 2010, the time that you were at Deloitte,

25 Deloitte knew full well that Autonomy was reselling EMC and

1   Dell hardware; right?

2   **A.**   Yes.

3   **Q.**   And Deloitte knew exactly how much EMC and Dell hardware

4   Autonomy was buying and selling; right?

5   **A.**   Yes.

6   **Q.**   And Deloitte knew that Autonomy was reselling the hardware

7   at a loss; right?

8   **A.**   Yes.

9   **Q.**   Can you call up Exhibit 271.

10          This is the third quarter, 2009 audit committee report.

11  We won't look at all of them, but just as an example.

12                    (Exhibit published to jury.)

13  **BY MR. DOOLEY:**

14  **Q.**   Page 5.  Page 5 of the report.  I apologize.

15          And this is an example of discussing the EMC hardware

16  sales.

17          And then down at the bottom, it says, "The purchase price

18  of the hardware marketing and development services was

19  45.4 million, with the hardware subsequently sold to Autonomy

20  customers for 36 million"; correct?

21  **A.**   Correct.

22  **Q.**   And like I said, we won't look at all of them, but

23  information about the amount of hardware that Autonomy was

24  buying and reselling was reported to Deloitte every quarter and

25  then reported to the audit committee every quarter, right, that

1    you were there?

2    **A.**   Yes.   In the audit committee document, yeah.

3    **Q.**   And Deloitte knew that Autonomy was reselling this

4    hardware without adding any software to it before it went out

5    the door; right?

6    **A.**   Yes.

7    **Q.**   If we could call up Exhibit 244.

8         I don't know if it's in evidence.   If it's not, I offer

9    it.

10             **THE COURT:**   Admitted.

11        (Trial Exhibit 244 received in evidence)

12                  (Exhibit published to jury.)

13   **BY MR. DOOLEY:**

14   **Q.**   Ms. Anderson, do you recognize this as a memo that you

15   wrote about the EMC hardware sales in October of 2009?

16   **A.**   Yes.

17   **Q.**   And if you could -- if we could go to page 5 and zoom in.

18        There is a reference here to Autonomy not modifying the

19   hardware product before selling it.

20        It's right there, Jeff, underneath "changes the products

21   or performs part of the service."

22        Do you see that?

23   **A.**   Yes.

24   **Q.**   And this was also reported in the audit committee reports,

25   that the hardware sales did not include any IDOL software

1    component; right?

2    **A.**    Yes.

3    **Q.**    That was all -- that was all known.

4        It was also known that -- you can keep that up for a

5    second -- that in selling its hardware, Autonomy was sometimes

6    stepping in -- stepping in between existing buyers and sellers

7    of the hardware; right?

8    **A.**    Yes.

9    **Q.**    So, for example, in Q3/2009, Autonomy sold EMC hardware to

10   Bloomberg, and EMC and Bloomberg had an existing relationship;

11   right?

12   **A.**    Yes.

13   **Q.**    And Autonomy kind of stepped in to act as a reseller;

14   right?

15   **A.**    Yes.

16   **Q.**    And that was known and it's disclosed.  It's right here in

17   the line below.  It says, "They're becoming part of an existing

18   agreement in place between Bloomberg and EMC."

19       Again, all of that was well-known?

20   **A.**    Yes.

21   **Q.**    And Deloitte knew that Autonomy was selling its hardware

22   through resellers; correct?

23   **A.**    Yes.

24   **Q.**    So if we could look at Exhibit 979.  This is the Q2 audit

25   committee report at page 6.

1    In the second paragraph -- if we can blow that up.  The

2    first paragraph talks about hardware sales.  And the next

3    paragraph says, "The majority of this, 26.3 million is made up

4    of sales of Dell hardware to SHI International (end user Bank

5    of America), Metro Business Systems and Insight," with other

6    end users identified.

7    So you knew that Autonomy was selling this hardware

8    sometimes not directly to the customer that was going to use

9    it, the end user, but to a middle person, a reseller?

10   **A.**    Yes.

11   **Q.**    And if you -- if we quickly look at 1183, that's the

12   Q3/2010 audit committee report.  If we could look at page 7.

13   There should be a reference to selling Dell hardware to Zones

14   for the end user H&R Block.  Do you see that?

15   **A.**    Yes.

16   **Q.**    So, again, nothing secret or hidden about selling through

17   resellers --

18   **A.**    Yes.

19   **Q.**    -- correct?

20   Deloitte also knew that Autonomy -- that some of the

21   hardware that Autonomy was selling included laptops, desktops,

22   and accessories; right?

23   **A.**    Sorry.  Could you repeat that?

24   **Q.**    Deloitte also knew that Autonomy -- that some of the

25   hardware that Autonomy resold was made up of laptop computers,

1  desktop computers, and accessories?

2  **A.**   I don't remember.

3  **Q.**   Okay.  Well, let's look at Exhibit 583.  It's the 2009

4  year-end audit committee report.  And page 6.  Blow that up.

5       I believe there is a reference to a sale.

6       If you could blow up the last sentence of the top

7  paragraph.

8       A sale of a thousand laptops to Bank of America via SHI.

9  Do you see that?

10 **A.**   Yes.

11 **Q.**   If we could also put up Exhibit 6481.  I ask you to look

12 at that.

13      It's not in evidence.

14         **THE COURT:**  Admitted.

15      (Trial Exhibit 6481 received in evidence)

16              (Exhibit published to jury.)

17 **BY MR. DOOLEY:**

18 **Q.**   This is an email from Matt Stephan.  You know Matt

19 Stephan.  He worked at Autonomy finance?

20 **A.**   Yes.

21 **Q.**   To Peter Christophi at Deloitte.  Do you know

22 Mr. Christophi?

23 **A.**   Yes.

24 **Q.**   Mr. Stephan is forwarding some purchase orders that look

25 like they are connected to Zones, a reseller that the jury is

1  familiar with.  Do you see that?

2  **A.**    Yes.

3         **MR. DOOLEY:**  If we could look at the second

4  attachment, Jeff.  These are invoices, and if you blow it up.

5  Just blow up the hardware there.  That's the descriptions.

6  **Q.**    Those are Dell latitude computers.  Do you see that?

7  **A.**    Yes.

8  **Q.**    Do you recognize those are laptops?  Does that sound

9  right?

10  **A.**    It sounds like it could be right.  I don't know whether

11  it's a laptop or not, but, yes.  It does not sound

12  unreasonable.

13  **Q.**    After you -- as the jury has heard, you worked at Deloitte

14  and then you joined Autonomy in 2011.  And it was your

15  conclusion after you joined Autonomy that everything that you

16  saw was consistent with what Autonomy had previously disclosed

17  to Deloitte about the hardware sales.

18  **A.**    So when I joined Autonomy, I wasn't involved in anything

19  around hardware sales in that initial few months that I joined

20  Autonomy.

21  **Q.**    Okay.  But my question is it was your conclusion that

22  everything that you saw when you got to Autonomy was consistent

23  with what Autonomy had previously disclosed to Deloitte about

24  the hardware sales?

25         **THE COURT:**  At what point of time?

1   BY MR. DOOLEY:

2   **Q.**   After you joined Deloitte.  After you joined Autonomy in

3   2011 --

4             **THE COURT:**  When she arrived at Autonomy, that point.

5             **MR. DOOLEY:**  Sure.  Start there.

6   **Q.**   When you arrived at Autonomy, everything you saw at

7   Autonomy was consistent with what Autonomy had been telling

8   Deloitte about the hardware sales?

9   **A.**   So I wasn't working in an area that involved the hardware

10  sales until post the HP acquisition.  So I wouldn't have come

11  across anything consistent -- inconsistent or, you know -- or

12  otherwise.

13  **Q.**   At a point in time, did you begin having responsibility

14  for revenue at Autonomy after you joined Autonomy?

15  **A.**   Yes.

16  **Q.**   And when you took on the responsibility for having

17  revenue, you didn't see any reason to change anything that

18  Autonomy was doing with respect to hardware because everything

19  you saw was consistent with what Autonomy had previously

20  disclosed to Deloitte; is that correct?

21  **A.**   Yes.  After I took on that responsibility for revenue,

22  there were probably two, maybe three quarters where the -- the

23  orders similar to what you were just showing me, those orders

24  continued, so they were consistent with the order documentation

25  and information that I had seen while I was at Deloitte.

1  Q.  And your conclusion after you were at Autonomy was nothing

2  was hidden between Autonomy and Deloitte regarding hardware.

3  That was your conclusion?

4  A.  Yes.

5  Q.  Autonomy and Deloitte both knew how much hardware was

6  being sold and how it was reported?

7  A.  Yes.

8  Q.  You mentioned that there was a period of time after you

9  took on your revenue responsibility at Autonomy and after --

10  let me start that again.

11      After HP acquired Autonomy in 2011, Autonomy continued to

12  sell hardware at a loss; right?

13  A.  Yes.

14  Q.  And it was exactly the same way that it had done before;

15  right?

16  A.  Yes.

17  Q.  Can we call up Exhibit 6471.

18          THE COURT:  Admitted.

19      (Trial Exhibit 6471 received in evidence)

20                  (Exhibit published to jury.)

21  BY MR. DOOLEY:

22  Q.  This is in February of 2012, and this is a memo from

23  Jeffrey Guido to you, Ms. Anderson, correct, and others?

24  A.  Yes.

25  Q.  And this is the -- it's "Antonia's hardware update with

1    summary."  Do you see that?

2    **A.**    Yes.

3            **MR. DOOLEY:**  And, Jeff, could we look at just the

4    first page of the attachment.  Is that easy to do?  Do you have

5    the Excel attachment?  It sounds like we don't.  It sounds like

6    we'll come back to it.

7    **Q.**    If I could just ask you to look at 6472 and 6473.  Can you

8    tell me if those are also examples of the weekly hardware

9    report being sent around?

10           **MR. LEACH:**  No objection.

11           **THE COURT:**  Admitted.

12       (Trial Exhibits 6472 and 6473 received in evidence)

13               (Exhibit published to jury.)

14   **BY MR. DOOLEY:**

15   **Q.**    And it was -- it was no secret within HP that Autonomy was

16   selling -- continuing to sell this hardware; correct?

17           **MR. LEACH:**  Objection.  Vague, foundation.  Within HP?

18   Within Autonomy?

19           **THE COURT:**  Sustained.

20   **BY MR. DOOLEY:**

21   **Q.**    HP owned -- starting October 4th, 2011, HP acquired

22   Autonomy Corporation; right?

23   **A.**    Yes.

24   **Q.**    And after October 4th, 2011, Autonomy Corporation

25   continued as a business unit within HP; is that fair?

1   A.    Yes.

2   Q.    And during that time, after the acquisition, Autonomy, the

3   Autonomy business unit, continued to sell hardware at a loss;

4   correct?

5   A.    Yes.

6   Q.    Okay.  And that information was shared within the Autonomy

7   business unit and within HP; correct?

8   A.    It was shared within the Autonomy business unit.  I don't

9   recall whether it was shared within HP.

10  Q.    You don't remember Mr. Hussain ever telling you not to

11  give HP the full picture regarding hardware, do you?

12  A.    I don't recall.

13  Q.    You don't recall that ever happening?

14  A.    No.

15  Q.    I want to switch gears slightly, Ms. Anderson, and direct

16  your attention to June of 2009.

17       You were asked some questions on direct about the delivery

18  of certain hardware to Morgan Stanley at the end of Q2 2009.

19  Do you remember those questions?

20  A.    Yes.

21  Q.    And Autonomy was reselling hardware, storage hardware, to

22  Morgan Stanley; correct?

23  A.    I don't remember the type of hardware but, yes, hardware

24  to Morgan Stanley.

25  Q.    Okay.  And do you recall whether the purchase order from

1    Morgan Stanley to Autonomy did not specify the specific kind of

2    hardware that Morgan Stanley was buying from Autonomy?

3         Let me ask it in a different way.  Do you recall whether

4    the purchase order from Morgan Stanley to Autonomy for the

5    hardware specified the brand of hardware, whether it was going

6    to be EMC or Hitachi or something else?

7    A.   I don't recall.

8    Q.   Could we look at 5164, which I think is in evidence?

9              MR. DOOLEY:  And if it's not, I move it in.

10             THE CLERK:  It's in.

11             MR. DOOLEY:  Is that in?

12             THE CLERK:  Yes.

13             MR. LEACH:  No objection, Your Honor.  I think it's

14   in.

15             THE COURT:  Admitted.

16             MR. DOOLEY:  I'm sorry.  I think that's the wrong

17   exhibit.  I'll move on.

18   Q.   The terms of the agreement between Morgan Stanley and

19   Autonomy were such that the hardware -- Morgan Stanley was

20   buying hardware from Autonomy; correct?

21   A.   Yes.

22   Q.   And the terms of the agreement were such that the hardware

23   could be considered delivered to Morgan Stanley as soon as it

24   left the supplier of the hardware, whether that was Hitachi or

25   EMC or somebody else; do you recall that?

1   **A.**   I don't recall exactly, no.

2   **Q.**   Okay.  Well, let's look at Exhibit 6192.  The jury has

3   seen this before.  Look at paragraph 5 on shipping.

4        **THE COURT:**  Admitted.

5        (Trial Exhibit 6192 received in evidence)

6   **BY MR. DOOLEY:**

7   **Q.**   (reading)

8        "Title and risk of loss for the product shall

9        transfer to Morgan Stanley upon shipment from the

10       products' manufacturer."

11       Do you see that?  Do you see that language?

12  **A.**   Yes.  Yes, I do.

13  **Q.**   Okay.  And it's fair to say that in your experience as an

14  accountant, you've seen transactions and deals where legal

15  delivery, delivery for revenue recognition purposes and for

16  legal purposes, doesn't necessarily mean physical delivery at

17  the final destination; correct?

18  **A.**   Yes.

19  **Q.**   You can have delivery on shipment; right?

20  **A.**   Yeah.  It depends on the nature of the agreement.

21  **Q.**   Okay.  And you can have delivery something called FOB?  Do

22  you know what that means?

23  **A.**   It stands for free on board.

24  **Q.**   Okay.  And what does FOB delivery mean?

25  **A.**   I'm not very good with the shipping terms, so I couldn't

1    tell you but I know what it stands for.

2    **Q.**   Does FOB mean that if I'm buying hardware from you and you

3    have the hardware in your warehouse, if we have an FOB deal, as

4    soon as we sign the paperwork, even if the computer is sitting

5    in your warehouse, it's considered delivered to me?  Does that

6    sound familiar?

7           **MR. LEACH:**  Objection:  Foundation.

8    **BY MR. DOOLEY:**

9    **Q.**   Does that sound right?

10          **THE COURT:**  Sustained.

11          **MR. DOOLEY:**  Well, let's look at Exhibit 135.  If it's

12   not in evidence, I move it in.

13          **THE COURT:**  Admitted.

14      (Trial Exhibit 135 received in evidence)

15   **BY MR. DOOLEY:**

16   **Q.**   And I'll represent to you that this is -- well, if you

17   flip to the back, page 5 of the exhibit, there's a letter

18   agreement between EMC and Autonomy signed by Mr. Hussain.  Do

19   you see that on page 5 and 6?

20   **A.**   (Witness examines document.)  Yes.

21   **Q.**   And if you see on the second page, it says (reading):

22          "Delivery of equipment and software shall be FOB.

23       EMC's shipping location."

24       Do you see that?

25   **A.**   Yes.

ANDERSON - CROSS / DOOLEY

1    **Q.**    Okay.  Do you know one way or the other whether that means

2    that the delivery is accomplished when the agreement is

3    finalized even if the hardware is actually at EMC?

4    **A.**    Like I said, I don't remember what FOB means.  I know what

5    it stands for.  I don't know what it means.

6    **Q.**    And you see on the first page there's a line that says

7    (reading):

8         "EMC shall ship the products on or about June 29th,

9         2009."

10   Do you see that?

11   **A.**    Yes.

12   **Q.**    And we looked at Exhibit -- you were shown Exhibit 158 by

13   the Government on your direct exam.

14   Could we call that up, Jeff?

15   Do you remember testifying about this exhibit,

16   Ms. Anderson?

17   **A.**    Yes.

18   **Q.**    And this is from Mr. Welham to Mr. Murray, and the gist of

19   it is that Mr. Welham is trying to figure out whether this EMC

20   hardware has been delivered -- correct? -- for purposes of

21   revenue recognition?

22   **A.**    Whether it's been dispatched.

23   **Q.**    Whether it's been dispatched, okay.

24   And the issue that's here being discussed by everybody is

25   that there's -- they don't have solid -- they don't have the

1  right paperwork, EMC are unable to supply any fully approved

2  documentation; right?

3  A.  Yes.

4  Q.  And so they're looking at other evidence of delivery in

5  the absence of this EMC documentation; right?

6  A.  Yes.

7  Q.  And what Mr. Welham says is that (reading):

8        "Morgan Stanley have accepted the goods on June 30th

9     as per e-mail chains forwarded by Steve."

10  Do you see that?

11  A.  Yes.

12  Q.  Okay.  Could I ask you to look at Exhibit 130, please?

13        MR. DOOLEY:  If it's not in evidence, I move it in.

14        THE COURT:  Admitted.

15  (Trial Exhibit 130 received in evidence)

16  BY MR. DOOLEY:

17  Q.  And this is an e-mail at the top between Kathy Macedonio

18  at Morgan Stanley to Cynthia Watkins.  Cynthia Watkins, do you

19  recognize that name?

20  A.  Yeah.  She was a member of the finance -- the Autonomy

21  finance team in the U.S.

22  Q.  Okay.  And attached at page 3 of the exhibit there's a

23  Morgan Stanley order on the back there?

24  A.  Yeah.

25  Q.  And actually this is the order that I was looking for

1    earlier.  The description is "Bulk Mass Storage."  It doesn't

2    specify a brand there.  Do you see that?

3    **A.**    Yes.

4    **Q.**    And Ms. Macedonio writes (reading):

5              "Hi, Cynthia.

6              "The order has been received in so payment can be

7         released.  Any payment questions, please e-mail," blah

8         blah blah.

9         Do you see that?

10   **A.**    Yes.

11   **Q.**    And does that look like -- can you tell, is that the

12   e-mail that's being referenced?  If we go back to Exhibit 158,

13   Mr. Welham writes (reading):

14             "Autonomy's point is that Morgan Stanley have

15        accepted the goods on June 30th as per e-mail chains

16        forwarded by Steve and then approved for payment at the

17        amount."

18        Does it look like this is the e-mail that's being referred

19   to?  Can you tell?

20   **A.**    I can't tell.  It looks like it could be, yeah.

21   **Q.**    Okay.

22   **A.**    But I certainly can't remember whether it is or not.

23   **Q.**    Okay.  So the audit -- what is the -- have you heard of

24   the phrase "audit evidence"?

25   **A.**    Yes.

1    Q.    What is "audit evidence"?

2    A.    It can be any number of things, but it's documentation,

3    information, discussions, letters, representations.

4    Q.    The evidence that you look at to do your job of verifying

5    the accounting; right?

6    A.    Yes.

7    Q.    Okay.  And it's true that third-party evidence, evidence

8    from third parties, not the company you're auditing, is kind of

9    better evidence --

10   A.    Yes.

11   Q.    -- right?

12         Sort of from disinterested folks I guess is the idea;

13   right?

14   A.    Yes.

15   Q.    Okay.  And so here the audit evidence with respect to this

16   question that you guys at Deloitte were trying to figure out,

17   whether the software -- or the hardware had been delivered, the

18   audit evidence is that Morgan Stanley has an agreement that

19   says its delivery is effective when it ships; right?  We looked

20   at that; is that right?

21   A.    Yeah.

22   Q.    And we looked at this FOB agreement between -- that was

23   the agreement between Morgan Stanley and Autonomy.  And then

24   the agreement between Autonomy and EMC talks about the FOB

25   shipping; right?

1    **A.**    Yeah.

2    **Q.**    And then we have this e-mail from the customer that we

3    just looked at.  That's more audit evidence -- right? -- that

4    the order has been received in so payment can be released?

5    **A.**    So my recollection of the audit evidence was that we

6    needed confirmation from EMC that the dispatch had happened.

7    The e-mail that you refer to, I can't remember how that ties

8    in.

9    **Q.**    Okay.  Just going back, can we put up Exhibit 130, please?

10    And could we just zoom in on the Bates Number down at the

11    bottom?

12        What is AS2?

13    **A.**    That's Deloitte's software for recording all the documents

14    from the audit.

15    **Q.**    Okay.  So that's like the proprietary software package

16    that Deloitte uses to keep track of all the audit evidence?

17    **A.**    Yes.

18    **Q.**    And I'm not suggesting that you put this number on this

19    piece of electronic paper, but does this Bates stamp suggest

20    that this document was contained in Deloitte's working papers?

21    **A.**    Yes, it does.  Yeah.

22    **Q.**    Okay.  So this is a piece of audit evidence that Deloitte

23    had to consider?

24    **A.**    Yes.

25    **Q.**    And the other document we looked at here, is that the

1  letter agreement between Autonomy and EMC, which indicated that

2  the EMC hardware was expected to ship on I think it was

3  June 29th, 2009?  Right?

4  **A.**    Yes.

5  **Q.**    Okay.  And just one last thing.  You were asked about the

6  management representation letter and language.  Could we put up

7  158 one more time?

8      That language that shows up in the management

9  representation letter, that's not written by Mr. Hussain;

10  right?  That's suggested by Mr. Welham?  It's right there in

11  the middle of --

12  **A.**    So in this e-mail, yes, it's a suggestion from Lee of

13  language to include in the management representation letter,

14  yes.

15  **Q.**    Okay.  And you don't personally have any basis to know one

16  way or the other whether Mr. Hussain knew that statement to be

17  true or false as of the time he signed the letter, do you?

18  **A.**    Well, the assumption is that he would sign the letter if

19  it were true; and if it weren't true, he wouldn't be signing

20  the letter.

21  **Q.**    Okay.  I want to talk about some of these transactions

22  that Deloitte audited where Autonomy was both buying from and

23  selling to the same entity or potentially related entities.

24  Sometimes these get called barter transactions; fair?

25  **A.**    Yes.

1   **Q.**   Or roundtrip or something like that?

2   **A.**   Yes.

3   **Q.**   Reciprocal?

4   **A.**   Yes.

5   **Q.**   Okay.  There's nothing wrong -- I mean, roundtrip,

6   reciprocal, that sounds pejorative, but there's nothing wrong

7   with doing that -- right? -- with buying and selling to your

8   same entity; right?

9   **A.**   No.

10  **Q.**   Okay.  Could we -- and, in fact, it's common in the

11  software industry for companies to buy from companies that are

12  also your customers; right?

13  **A.**   Yes.  It does happen, yes.

14  **Q.**   Okay.  Can we call up Exhibit 922, please?

15          **MR. LEACH:**  No objection.

16          **THE COURT:**  Admitted.

17       (Trial Exhibit 922 received in evidence)

18  **BY MR. DOOLEY:**

19  **Q.**   Do you see this is an e-mail from you to Mr. Knights in

20  June of 2010 --

21  **A.**   Yes.

22  **Q.**   -- regarding MicroLink transaction history?

23  **A.**   Yes.

24  **Q.**   And attached to it -- if we could flip a few pages back --

25  there's a memorandum from you.  Do you see that?  It's a

1  six-page memorandum called "Acquisition of MicroLink."

2  **A.**   Yes.

3  **Q.**   Is that a memorandum you prepared?

4  **A.**   Yes.

5  **Q.**   So we're going to go come on to that transaction, but you

6  were asked about that transaction on your direct.  You were

7  quite involved in evaluating Autonomy's acquisition of

8  MicroLink?

9  **A.**   So, yeah, from the Deloitte audit team, yes, I was

10  involved in reviewing the information on the acquisition.

11  **Q.**   And if we could flip to page 3 of the memo, two pages

12  back, just at the top, you write (reading):

13        "It is not uncommon for companies within the software

14     sector to purchase software off their major customers as

15     well as selling to them and, therefore, for transactions

16     to flow both ways."

17        And when you have one of these call it a barter, call it a

18  roundtrip, call it what you will, there's an accounting test to

19  determine whether you can recognize the full revenue on the

20  sale component; correct?

21  **A.**   Yes.

22  **Q.**   And the test -- well, let's look at Exhibit 583 at page 5.

23  That's the Audit Committee report for year-end 2009.

24  **A.**   (Witness examines document.)

25  **Q.**   Is that page 5 of the -- well, I apologize.  I've got the

1  page wrong, but let me see if I can -- let me see if I can get

2  it right.

3      The evaluation is whether there's a clear commercial

4  rationale, whether there are separate contractual arrangements,

5  and evidence that both transactions have been made at fair

6  value.  Is that the test?

7  **A.**   Yes.

8  **Q.**   Okay.  And if you can meet those requirements, then you

9  can recognize the full value of the sale; right?

10 **A.**   Yes.

11 **Q.**   If I buy something from you for $10 and then you sell me

12 something -- I'm not going to go there.  I'm going to get

13 myself turned around.  We'll leave it at that.  That's the

14 test.

15     You testified about the FileTek transactions in Q4 -- the

16 purchase and sale from -- to and from FileTek in Q4 2009.  Do

17 you remember that testimony?

18 **A.**   Yes.

19 **Q.**   And this --

20     **THE COURT:**  I'm sorry.  I'm confused.

21     My understanding of your testimony is that each of the two

22 transactions, while they are between the same parties, have to

23 be independently justified in terms of a commercial purpose.

24     **THE WITNESS:**  Yes.

25     **THE COURT:**  And that is if you have -- taking

1    counsel's question, you have two transactions, a $10

2    transaction and a $5 transaction between two parties.  Okay?

3    And the question is:  Look, if you didn't have the $5

4    transaction, would the $10 transaction be commercially viable?

5              THE WITNESS:  Yes.

6              THE COURT:  If you didn't have the $10 transaction,

7    would the $5 -- maybe I said it the same way twice.  Did I?

8    Okay.  Vice versa.

9         In other words, the two transactions independently are

10   commercially viable, which means even though they are the same

11   parties, one doesn't depend on the other?

12             THE WITNESS:  Yes.

13             THE COURT:  Okay.  There, we did it.  That's your

14   example.  Well done.

15        Okay.  Go ahead.

16             MR. DOOLEY:  That's why I stayed away from my

17   hypothetical.

18             THE COURT:  Please.  Yeah, I even got it wrong.  Okay.

19   But that's okay.

20             MR. DOOLEY:  I feel better now.

21   Q.   The two transactions with FileTek in the fourth quarter of

22   2009, Deloitte looked at those transactions in a lot of detail;

23   is that fair to say?

24   A.   Yes.

25   Q.   Okay.  And just I want to make sure the jury appreciates

1    that.

2        Could we look at the fourth quarter 2009 Audit Committee

3    report at page 3?  There's a discussion there.  It's in

4    evidence.  It should be Exhibit 583.

5        Can we put that up?  It should be page 3.

6        Maybe next page.  I do want to show this.

7                    (Pause in proceedings.)

8        **MR. DOOLEY:**  Give me a second.  I apologize.

9                    (Pause in proceedings.)

10       **MR. DOOLEY:**  I was right all along.  It is page 3.  If

11   we could look at -- it's page 5 of the exhibit, Jeff, but

12   page 3 of the report.  Just blow up the top.  Yeah, blow up the

13   whole text.

14   **Q.**   And there's a reference to significant revenue from

15   FileTek and then Autonomy has separately purchased 10.4 million

16   of software and associated services from FileTek in the

17   quarter; and it talks about the clear commercial rationale for

18   the separate transactions, the separate contractual

19   arrangements and evidence that both transactions have been made

20   at fair value.  Management has confirmed and concluded there

21   are no links between the contracts that would impact the

22   accounting.

23       Do you see that?

24   **A.**   Yes.

25   **Q.**   All right.  But that wasn't the only analysis that

ANDERSON - CROSS / DOOLEY

1    Deloitte did.

2        If we could look at Exhibit 537.  I think that's also in

3    evidence.

4        Do you recognize that as a whole memorandum evaluating

5    this transaction, an eight-page memorandum?

6    A.    Yes.

7    Q.    All right.  Could we look at Exhibit 482M?  482M.  This is

8    an excerpt from Exhibit 482, which is a larger Excel

9    spreadsheet.

10            MR. LEACH:  No objection.

11            THE COURT:  Admitted.

12        (Trial Exhibit 482M received in evidence)

13            MR. DOOLEY:  Just blow up the top there.

14    Q.    We've seen some of these documents before, but just to

15    remind the jury, Ms. Anderson, this is the revenue testing

16    document that Deloitte prepared for deals over $1 million?

17    A.    Yes.

18    Q.    Okay.  Tell the jury a little bit about why these

19    documents were prepared and how they were prepared.

20    A.    They were prepared to document the work Deloitte did.

21    They captured some of the details from the contract, the dates,

22    the values, walked through the Deloitte team's understanding of

23    why the contract had been entered into, and our conclusions on

24    how the revenue recognition criteria had been met.

25    Q.    And is it the case that for every sale over $1 million

1    during the time that you were at Deloitte, Autonomy would

2    prepare one of these work papers?

3    **A.**   Yes.  That's my memory, yes.

4    **Q.**   Certainly for license deals over a million dollars?

5    **A.**   Uh-huh.  Uh-huh.  Yes.

6    **Q.**   And if we can zoom in a little on the text, I believe

7    there's a reference to a technical presentation.

8         Do you recall that there was a presentation given and

9    Mr. Ben Johnson evaluated the commercial rationale for both the

10   purchase of the FileTek software and the sale to FileTek?

11   **A.**   Yeah.  I don't remember whether I was present at a

12   presentation like that, but I do recall Ben Johnson or

13   colleagues being involved to assess that, yeah.

14   **Q.**   Okay.  And we saw Ben Johnson on the org. chart before.

15   He's like the technical guy?

16   **A.**   Yes.

17   **Q.**   And he went to Autonomy and got a presentation on the

18   commercial rationale for Autonomy's purchase of this StorHouse

19   software; right?

20   **A.**   Yes.

21   **Q.**   And then he also got a presentation on why Autonomy

22   software would make commercial sense for FileTek; correct?

23   **A.**   Yes.

24   **Q.**   Could we look at Exhibit 6464?

25        **MR. DOOLEY:**  I don't know if it's in evidence, but if

 1    it's not, I move it in.

 2            **THE COURT:**  Admitted.

 3        (Trial Exhibit 6464 received in evidence)

 4    **BY MR. DOOLEY:**

 5    **Q.**   Here's Mr. Johnson right now e-mailing Lee Welham

 6    (reading):

 7              "Autonomy Integration of FileTek.

 8              "As promised, here's the slide on how Autonomy are

 9        using the technology acquired from FileTek."

10        And could we just flip to the next page?

11        And it's a description of what Autonomy intended to do

12    with the FileTek software.  Is that what that appears to be?

13    **A.**   Yes.

14            **MR. DOOLEY:**  Okay.  And then if we could look at

15    Exhibit 6465, Jeff.

16        I move this into evidence.

17            **THE COURT:**  Admitted.

18        (Trial Exhibit 6465 received in evidence)

19    **BY MR. DOOLEY:**

20    **Q.**   And here's Mr. Johnson e-mailing Mr. Welham (reading):

21              "Here's the second slide on what the Autonomy

22        products will add to FileTek's products.  It's enhanced

23        functionality that give them a competitive advantage."

24        And go to the next page and show the slide.

25        Did you see these slides at the time?  Do you recall?

1   **A.**    They don't look familiar, but I expect I would have done,

2   yes.

3   **Q.**    If we could go back to Exhibit 537, which is the

4   eight-page memorandum evaluating this transaction.

5        And there have been some questions about the -- as part of

6   the process to provide audit evidence around the commercial

7   value of the software that Autonomy was purchasing, they got

8   some quotes from other companies for the same software.  Do you

9   recall that?  Or similar software.  Do you recall that?

10  **A.**    Yes.

11  **Q.**    Okay.  And that's not uncommon -- is that uncommon in your

12  experience, that you would go out and get quotes to demonstrate

13  fair value?

14  **A.**    So I think in this case it was quotes to assess the

15  purchase.  You know, buying off one provider makes sense for us

16  as another provider.  So, yeah, that would -- I mean, I would

17  say I had seen, you know, not huge numbers of these types of

18  deals because whilst it isn't necessarily unusual for a company

19  to buy and sell things with its customers, it's not normally

20  routine business.  So it's a bit tricky to answer whether

21  that's -- that's typical in the ones I've seen.

22  **Q.**    Okay.  If we could flip to page 5.

23        And there are the quotes we've seen before from CommVault,

24  HP, and Informatica.  And the HP quote is dated January 2010.

25  Do you see that?

1    **A.**    Yeah.

2    **Q.**    And this is a sale that went through on the 31st of

3    December, right --

4    **A.**    Yeah.

5    **Q.**    -- 2009?

6        And nothing wrong getting a quote the next week to show

7    that what you paid was fair value for purposes of the audit, is

8    there?

9    **A.**    No.

10   **Q.**    And then there was another sale to FileTek in the first

11   quarter of 2010.  I think you were asked about that on your

12   direct examination.  Do you recall that?

13   **A.**    Yes.

14   **Q.**    And that is -- and then there was a purchase from FileTek

15   in the second quarter.  So a sale in the first quarter and a

16   then a purchase in the second quarter.  Do you recall that line

17   of questioning?

18   **A.**    Yes.

19   **Q.**    And can we look at Exhibit 6466?

20        **THE COURT:**  Admitted.

21    (Trial Exhibit 6466 received in evidence)

22        **MR. DOOLEY:**  Could we just blow up that?

23   **Q.**    This is another Deloitte audit memo, and it says

24    (reading):

25            "The objective is to document the commercial

1      rationale for the purchase made from FileTek during Q2 to

2      assess whether it has any impact on the revenue

3      recognition on the license deal transacted in Q1 2010."

4      Do you see that?

5  **A.**  Yes.

6  **Q.**  All right.  And so the purpose of this memorandum is to do

7  that analysis that we talked about, when you have -- when

8  you're buying and selling from the same entity to make sure

9  there's commercial rationale and fair value, and so forth;

10  right?

11  **A.**  Yes.

12  **Q.**  Okay.  And so Deloitte knew that there had been a purchase

13  and a sale.  Even though they were separated, they were doing

14  the same evaluation that they would have done if they had been

15  bought at the same time; right?

16  **A.**  Yes.

17  **Q.**  Okay.  You talked a little -- you testified on direct

18  about this gentleman that the jury has heard about, Brent

19  Hogenson, and the letter that he sent to Deloitte in June time

20  period 2010.  Do you remember that?

21  **A.**  Yes.

22  **Q.**  Okay.  And we won't go through it, but -- I mean, we can

23  if you'd like to see it -- but Mr. Hogenson raised issues about

24  whether the purchase and sale from FileTek in Q4 2009 and then

25  the Q1 and Q2 transactions with FileTek, he raised issues as to

1  whether those were properly accounted for; correct?

2  A.   Yes.

3  Q.   Essentially the same allegations that we're hearing in

4  this case; right?  Would that be fair?

5  A.   Yes.

6  Q.   And Deloitte -- were you part of the team that

7  investigated Mr. Hogenson's allegations?

8  A.   I was aware of them.  I think I must have been involved.

9  I don't remember exactly what I did.

10  Q.   Okay.  But, I mean, needless to say, it's not every day

11  that a letter like this comes in so you all took it pretty

12  seriously; right?

13  A.   Yes.

14  Q.   You had an independent team look at his allegations?

15  A.   Like I said, I don't remember the procedures.

16  Q.   Okay.  But you recall that it was taken seriously?

17  A.   Yes.

18  Q.   Okay.  And the determination was made that Mr. Hogenson's

19  allegations regarding the accounting for the FileTek

20  transactions didn't hold up; correct?

21  A.   Yeah.  Our understanding was that the purchase from

22  FileTek had value to Autonomy.

23  Q.   You were also asked questions about transactions in the

24  fourth quarter of 2009 and right at the beginning of the first

25  quarter of 2010 involving MicroTech, MicroLink, and

1  Discover Tech.  Do you remember that line of questioning?

2  **A.**    Yes.

3  **Q.**    And just to remind the jury, I'm sure they have it all

4  down now, but at the end of 2009, rolling into the beginning of

5  2010, Autonomy purchased MicroLink for $55 million; correct?

6  **A.**    Yes.

7  **Q.**    Okay.  And at the same time MicroTech bought a license to

8  resell to this new company Discover Tech for $10 million?

9  **A.**    Yes.

10  **Q.**    And Deloitte and you, you reviewed these transactions at

11  the time; correct?

12  **A.**    Yes.

13  **Q.**    And similar to the FileTek transactions in Q4 2009, this

14  series of transactions got a lot of close scrutiny from

15  Deloitte; correct?

16  **A.**    Yes.

17  **Q.**    So we don't need to call it up, but it was certainly --

18  the transactions were certainly discussed in the Audit

19  Committee report; right?

20  **A.**    Yes.

21  **Q.**    And if we can look at Exhibit 482C.  This is another work

22  paper.

23             **MR. DOOLEY:**  I'd move it in.

24             **MR. LEACH:**  No objection.

25             **THE COURT:**  Admitted.

1          (Trial Exhibit 482C received in evidence)

2      **BY MR. DOOLEY:**

3      **Q.**   This is evaluating the sale -- this is a work paper

4      evaluating the sale to MicroTech for Discover Tech; correct?

5      **A.**   Yes.

6      **Q.**   And then we've already looked at your memorandum,

7      Exhibit 922, where you evaluated the purchase of MicroLink;

8      correct?

9      **A.**   Yes.

10     **Q.**   And Deloitte also had sight of a memorandum that had been

11     prepared for the Autonomy Board of Directors discussing the

12     rationale for buying MicroLink; right?  That's Exhibit 351.

13         Can we call that up?

14             **MR. DOOLEY:**  I would move that in.

15             **THE COURT:**  Admitted.

16         (Trial Exhibit 351 received in evidence)

17     **BY MR. DOOLEY:**

18     **Q.**   That's a document -- did you review that at the time that

19     you prepared your -- I believe it's referenced in your memo.

20     **A.**   Yes, I did.  Yes.

21     **Q.**   And this Exhibit 351 sets out the commercial rationale for

22     why Autonomy was buying MicroLink?

23     **A.**   Yes.

24     **Q.**   And you understood that Autonomy was purchasing MicroLink

25     for a number of reasons, but including that MicroLink was a

1  cleared reseller to federal businesses?  They could sell into

2  the United States federal government to top secret agencies;

3  correct?

4  A.   Yes.

5  Q.   And you understood that Autonomy had had previously the

6  ability to do that and lost that ability, so they needed to

7  acquire MicroLink to be able to do that business?  That was

8  explained to you?

9  A.   Yes, that was my understanding of the main reasons for

10 acquiring them.

11 Q.   And that explanation made sense to you at the time, that

12 that was the commercial rationale for doing the agreement --

13 for doing that purchase?

14 A.   Yes.

15 Q.   And Autonomy paid $55 million for MicroLink; right?

16 A.   Yes.

17 Q.   And you also understood -- I mean, none of this -- this

18 was all discussed.  I mean, you also understood that as part of

19 the purchase of MicroLink, Dave Truitt, who was one of the

20 individuals at MicroLink, he was going to spin out this

21 Discover Tech business; right?

22 A.   Yes.

23 Q.   He was going to take the parts of MicroLink that Autonomy

24 didn't want as much and he was going to set up his own

25 business?

1   **A.**   Yes.

2   **Q.**   Okay.  And in order to do that, he needed to buy this

3   $10 million of software to get the business up and running, and

4   he bought it through MicroTech.  You understood all that?  That

5   was all disclosed and made sense to you at the time?

6   **A.**   Yes.

7   **Q.**   You were asked some questions with respect to these

8   transactions about related parties and wanting to know about

9   the ownership of MicroTech.  Do you recall that line of

10  questioning?

11  **A.**   Yes.

12  **Q.**   And in your memo there's a lot of related-party issues

13  discussed, but the related-party issue that I think you were

14  being asked about is whether there's a relationship between

15  MicroLink and MicroTech.  Is that the related-party

16  relationship that you're looking at?

17  **A.**   Yes.

18  **Q.**   Okay.  And the possible concern is if they're related,

19  then maybe this is one of these barter transactions where

20  you're buying and selling.  Even though they're not technically

21  the same entity, if they're related, maybe they're -- they

22  might as well be; is that the idea?

23  **A.**   Yeah, and it's being negotiated -- it's effectively one

24  arrangement that's being negotiated even though you've got two

25  separate contracts.

1    **Q.**   Okay.  And in order to determine whether there's a --

2    parties are related for accounting purposes, there's a whole

3    set of rules about that; right?

4    **A.**   Yes.

5    **Q.**   And it kind of boils down, though, to whether there's one

6    person who has a control responsibility at both entities; is

7    that the idea?

8    **A.**   Yes.

9    **Q.**   I mean, if I'm the boss at Company A and I'm the boss at

10   Company B, then they're related even if they're technically

11   different companies?

12   **A.**   Yeah.

13   **Q.**   Okay.  In assessing the relationship between MicroLink and

14   MicroTech, would it be relevant to you to know that -- you've

15   never met -- well, I'll ask.

16       Have you ever met Dave Truitt?

17   **A.**   No.

18   **Q.**   Okay.  Would it be relevant to you to know that he's

19   testified here that he owned just 32 percent of MicroTech?

20   Would that be relevant to assessing the related-party issue?

21   **A.**   So it would be relevant information to know and assess

22   that information, yes.

23   **Q.**   Okay.  And would it be relevant for you to know that he

24   testified that a gentleman --

25       **THE COURT:**  Well, how he testified isn't significant.

1          **MR. DOOLEY:**  Okay.  Sure.  I'll just state the fact

2     then.

3     **Q.**  Would it be relevant that a gentleman named Tony Jimenez

4     was the majority owner of MicroTech, not Mr. Truitt?  Would

5     that be relevant to the related-party analysis?

6     **A.**  It would be relevant to the assessment, yeah.

7     **Q.**  Okay.  And would it be relevant that Mr. Truitt had no

8     responsibilities for running operations at MicroTech?

9     **A.**  Yes.

10    **Q.**  Okay.  And all of those facts suggest that he's not in

11    control of MicroTech; is that fair to say?

12    **A.**  Yes.  I mean, I -- if you take all the facts and review

13    them together, so it's --

14          **MR. LEACH:**  Your Honor, I object on foundation.

15          **THE COURT:**  Sustained.

16          **MR. DOOLEY:**  Okay.

17    **Q.**  And even if there had been a related -- even if MicroLink

18    and MicroTech were related so that we get back into this barter

19    situation or potential barter situation, that doesn't mean,

20    like, the deal is illegal; right?  Or you can't do it; right?

21    **A.**  No, not necessarily, no.

22    **Q.**  You're just back to looking at the rules that we talked

23    about before, whether there's commercial rationale, separate

24    contracts, and evidence that both transactions have been made

25    at fair value; right?

1   **A.**   Yes.

2   **Q.**   So even if -- let's just assume MicroLink and MicroTech

3   are related parties.  If you've got commercial rationale,

4   separate contracts, and fair value for the purchase of

5   MicroLink and the sale of the software to MicroTech, then

6   there's no problem from an accounting perspective; correct?

7   **A.**   Yeah.

8           **THE COURT:**  Ladies and gentlemen, do you want to stand

9   up, stretch?

10      Can I see counsel at sidebar?

11          (Sidebar conference heard but not reported.)

12  **BY MR. DOOLEY:**

13  **Q.**   Ms. Anderson, you were asked some questions about side

14  letters and a supposed side letter with a reseller called

15  Tikit.  Do you remember that?

16      Can we get up 1361?  It's in evidence.

17      Do you know -- you don't know one way or the other,

18  Ms. Anderson, do you, whether Mr. Hussain intended that that

19  side letter would be disclosed to Deloitte?

20          **THE COURT:**  I guarantee you she doesn't know what the

21  defendant intended by the letter.

22          **MR. DOOLEY:**  Okay.

23          **THE COURT:**  So next question.

24  **BY MR. DOOLEY:**

25  **Q.**   Ms. Anderson, well, let's -- Tikit disclosed the side

 1  letter to Deloitte; isn't that right?

 2  **A.**   I don't remember.

 3  **Q.**   Okay.  Let's get up Exhibit 1874, please.

 4          **MR. LEACH:**  I'm sorry.  What exhibit, Counsel?

 5          **MR. DOOLEY:**  I'm sorry.  1872.

 6          **THE COURT:**  Admitted.

 7      (Trial Exhibit 1872 received in evidence)

 8  **BY MR. DOOLEY:**

 9  **Q.**   Do you see that this is a letter -- this is an audit

10  confirmation letter from Tikit dated June 22nd, 2011?  Do you

11  see that?

12  **A.**   Yes.

13  **Q.**   Okay.  And down at the bottom it's signed -- let's see if

14  we can see who it's signed by.  I can't read the name, but

15  there's -- underneath where it says (reading):

16          "There are no side letters or other agreements in

17      respect of the subject matter of this request, except as

18      noted below."

19      Do you see that?  Then it says "Letter dated 31/12/2010."

20  **A.**   Yep, I see that.

21  **Q.**   So fair to say, Ms. Anderson, that Tikit, in fact, did

22  disclose the side letter in one of these audit confirmations to

23  Deloitte?

24          **MR. LEACH:**  Objection.  Vague as to time.

25          **MR. DOOLEY:**  Well, on June 7th or July 7th or July

 1   whatever the date of the letter is.

 2          THE COURT:  I'm sorry.  There are two dates.

 3          MR. DOOLEY:  Scroll up to the top of the --

 4          THE COURT:  No, no, no.  It was signed, though, on

 5   July -- it was signed on July 6; is that right?

 6          MR. DOOLEY:  That's correct.

 7          THE COURT:  So on July 6th the letter was disclosed.

 8          MR. DOOLEY:  That's correct.

 9          THE COURT:  Okay.

10          MR. DOOLEY:  Could we look at Exhibit -- I'll move on.

11   Q.   You were asked some questions about so-called backdated

12   contracts, Ms. Anderson.  Do you remember those questions?

13   A.   Yes.

14   Q.   And I think you testified that the revenue is to be

15   recognized on the date of the agreement, when the agreement was

16   reached.  Was that your testimony?

17   A.   Well, the revenue can't be recognized before an agreement

18   has been reached.

19   Q.   Okay.  So it's the date of the -- when the parties reach

20   an agreement, that's what's key for determining revenue

21   recognition; correct?  Not what's written on the piece of paper

22   but what the date of the agreement is?

23   A.   That's one of the factors.

24   Q.   Okay.  And there's no requirement in IFRS that -- well,

25   let me phrase it this way:  IAS18 does not -- IAS18 is the

1  accounting standard that governs revenue recognition?

2  A.  Yes.

3  Q.  And IAS18 does not require a written sales agreement as a

4  condition for revenue recognition; is that true?

5  A.  It doesn't specify that, no.

6  Q.  Okay.  So you can have an oral agreement that supports

7  revenue recognition; correct?

8  A.  As long as you can confirm that that meets the revenue

9  recognition criteria so on the basis of that agreement, risks

10  and rewards have transferred, it's not typical for it to be a

11  written agreement.

12  Q.  But it's, again, not a requirement that it's written?

13  A.  I don't believe so, no.

14  Q.  Could we go back to Exhibit 922?  This is the memo on the

15  MicroLink acquisition.

16      You were asked a bunch -- you were asked a number of

17  questions about what -- Autonomy's role in closing transactions

18  with end users and what happens after Autonomy sells to the

19  reseller.  Do you remember those questions?

20  A.  Yes.

21  Q.  Continuing managerial involvement and so forth?

22  A.  (Nods head.)

23  Q.  Directing your attention to page 7 of this exhibit, which

24  is page 4 of the memo, you write here (reading):

25          "Sales to the MicroLink" -- it probably should just

1     be "Sales to MicroLink by Autonomy are not conditional in

2     any way on the reseller's onward sale."

3     Do you see that?

4  **A.**  (Witness examines document.)

5  **Q.**  And you go on (reading):

6          "As a result, the validity of the sale to the

7     reseller is not dependent on the reseller's onward sale."

8     Is that what you wrote?

9  **A.**  I'm struggling to see where it is written.  Sorry.

10 **Q.**  Sorry.  Could we go to -- at the bottom?

11 **A.**  (Witness examines document.)  Yeah, I can see that.

12 **Q.**  And that was how Deloitte evaluated Autonomy's sales to

13 the reseller; correct?  The evaluation was the revenue -- were

14 the revenue recognition criteria met on the sale to the

15 reseller; correct?

16 **A.**  Yeah.  Our understanding was because there wasn't a

17 practice of refunds or canceling or deals going direct, there

18 wasn't significant history of that, then the point of sale was

19 it direct -- was it at the point of sale to the reseller.

20 **Q.**  It's true that Deloitte never looked at a VAR customer

21 contract to analyze whether a genuine transaction with an end

22 user had taken place; right?

23 **A.**  Yeah, I don't remember that happening.

24 **Q.**  That analysis, in your words, would have been irrelevant

25 as the sale would have been completed by the contract between

1    Autonomy and the VAR; correct?

2    **A.**    Yes.

3    **Q.**    And Deloitte never did any follow-up to see whether the

4    deal with the end user -- between the VAR and the end user

5    closed; correct?

6    **A.**    Correct.

7    **Q.**    You've also said before, I think, that it's irrelevant to

8    revenue recognition whether the VAR actually added any value;

9    right?

10    **A.**    I don't remember saying that.

11                        (Pause in proceedings.)

12    **BY MR. DOOLEY:**

13    **Q.**    Well, certainly Deloitte never did anything to verify

14    whether the resellers were adding value?

15    **A.**    Yes.

16    **Q.**    And Deloitte knew that, in fact, that sometimes the

17    reseller was brought in for the purpose of -- for the express

18    purpose of recognizing revenue in one quarter rather than the

19    other; right?

20    **A.**    I don't remember explanations like that.

21    **Q.**    All right.  Well, let's -- could we get Exhibit 6371?

22            **MR. DOOLEY:**  I move that in.  It's a revenue testing

23    worksheet for the Capax/Kraft sale.

24            **MR. LEACH:**  No objection.

25            **THE COURT:**  Admitted.

1          (Trial Exhibit 6371 received in evidence)

2              **THE COURT:**  It's in; right -- already.

3              **MR. DOOLEY:**  You test my eyesight with these.

4    **Q.**   This is a revenue testing worksheet that you prepared in

5    connection with a sale to the reseller Capax for onward -- with

6    a designated end user Kraft; right?

7    **A.**   Yes.

8    **Q.**   And just if we could highlight the second full paragraph

9    that begins "The end user."  (reading)

10             "The end user is Kraft and the VAR involved is

11        Capax Discovery LLC.  Per discussions with Autonomy, it is

12        apparent that in-depth discussions were held between Kraft

13        and Autonomy prior to quarter end.  Kraft were unable to

14        finalize the deal until their board meeting on 15 October.

15        Hence, Autonomy decided to sign a deal with Capax whereby

16        Capax complete the deal with Kraft after the 15th October

17        but take on all the risk."

18    Do you see that?

19    **A.**   Yes.

20    **Q.**   If we could scroll down.

21    In the "Collectibility" paragraph it begins "Per

22    discussion with Steve Chamberlain"?

23    **A.**   Yes.

24    **Q.**   (reading)

25             "We noted that the background to this deal was that

1          Autonomy was initially dealing directly with Kraft to

2      secure the deal.  However, due to internal procedures at

3      Kraft, it meant that this deal could not be signed until

4      the October 2009 board meeting.  As such, in order to

5      secure the deal during Q3 2009, Autonomy used the VAR

6      Capax to sell the license to Kraft; thus, allowing

7      Autonomy to secure the deal with Capax and recognize the

8      revenue."

9          Do you see that?

10  A.   Yes.

11  Q.   All right.  You understood that the VAR was being used

12  there for the purpose of recognizing revenue?

13  A.   Yeah, as they were taking on all the risk.

14  Q.   And you've talked about these deals that sometimes we use

15  the phrase "went direct," meaning the original sale was to the

16  reseller and then subsequently the end user decided to contract

17  with Autonomy directly.  Do you remember that testimony?

18  A.   Yes.

19  Q.   And Deloitte knew that that happened on a number of

20  occasions throughout the time that you were there at Deloitte;

21  right?

22  A.   Yes.  I recall a handful of occasions when that happened.

23  Q.   All right.  Well, let's look at Exhibit 55 -- I'm sorry,

24  558.

25          MR. DOOLEY:  I move that in.

1          **THE COURT:**  Admitted.

2          (Trial Exhibit 558 received in evidence)

3    **BY MR. DOOLEY:**

4    **Q.**    And this is Mr. Welham writing to Mr. Knights.  I believe

5    it gets forwarded to you at the top (reading):

6              "Richard -

7              "I identified a case yesterday of where a deal was

8         done through Capax (a reseller) in Q3 with end user Kraft

9         which was then subsequently reversed in Q4 and done

10        directly with Kraft instead."

11        And then further down Mr. Welham writes in the third

12   paragraph, he says (reading):

13             "From talking to Steve, he admits that what I have

14        described above may well have happened but did say that

15        for whatever reason Eli Lilly or Morgan Stanley, they have

16        the legal obligation to pay Autonomy and they must find

17        another end user."

18        Do you see all that?

19   **A.**    Yes.

20   **Q.**    I'm sorry.  In the sentence above that he says that he

21   expects that both Eli Lilly and Morgan Stanley will go direct

22   to Autonomy during the course of Q1 2010.  Do you see that?

23   **A.**    Yes.

24   **Q.**    All right.  So that is an example of instances of these

25   deals going direct being called to your attention?

1   **A.**   Yes.

2   **Q.**   Okay.  And if we can look at Exhibit 2605.

3         **MR. LEACH:**  No objection.

4         **THE COURT:**  Admitted.

5         (Trial Exhibit 2605 received in evidence)

6   **BY MR. DOOLEY:**

7   **Q.**   This is a memorandum prepared in connection with certain

8   deals in Q1 2010, and in the background it says (reading):

9         "Q1 2010 we were informed by management the two deals

10        sold to MicroTechnologies have been credited and resold to

11        the end users directly."

12        Do you see that?

13  **A.**   Yes.

14  **Q.**   And we don't have to go through all the documents, but you

15  looked at it on your direct testimony in the Q1 2010 Audit

16  Committee report.  It was mentioned there.  And then it was

17  mentioned in the Q2 Audit Committee report; right?

18  **A.**   Yes.

19  **Q.**   And it was mentioned by Mr. Hogenson as something that he

20  thought might be an issue?

21  **A.**   Yes, I think so.  Yes.

22  **Q.**   Sales to resellers where the deal hadn't closed with the

23  end user?

24  **A.**   Yes.

25  **Q.**   Could we look at Exhibit 1290, please?

1        **MR. DOOLEY:**  I move that in.  This is a planning

2   meeting agenda.

3        **MR. LEACH:**  No objection.

4        **THE COURT:**  Admitted.

5        (Trial Exhibit 1290 received in evidence)

6        **MR. DOOLEY:**  And this is dated December 15th, 2010.

7   If we can scroll down to the next page, there are some

8   handwritten notes.

9        If we could just scroll down, please.  If we can blow up

10  the section where it says "MicroTech."

11  **Q.**  Do you recall, I don't know if you were asked about this

12  on direct, but in Q1 2010 there was a sale to MicroTech for the

13  end user Vatican?  The jury has heard a lot about it.  Do you

14  recall that sale?

15  **A.**  Yes.

16  **Q.**  Okay.  And here the notes of this meeting reflect

17  (reading):

18           "MicroTech - medieval library deal still ongoing.

19       Recent meeting with MRL, SH, and V."

20       Do you see that?

21  **A.**  Yes.

22  **Q.**  So there was a discussion at this meeting about how --

23  "MRL" is Dr. Lynch and "SH" is Mr. Hussain?

24  **A.**  Yes.

25  **Q.**  And so there was a discussion at this meeting about how

1  Dr. Lynch and Mr. Hussain were meeting with the Vatican at the

2  end of 2010?

3  **A.**    Yes.

4  **Q.**    So a sale had been made to MicroTech for the end user

5  Vatican, and Mr. Hussain and Dr. Lynch were still meeting with

6  the Vatican about the same deal.  That's something that

7  Deloitte knew in 2010?

8  **A.**    Yes.

9          **MR. LEACH:**  I'm going to object on foundation,

10 Your Honor.  I'm not sure these are her notes.

11         **THE COURT:**  Overruled.

12    Go ahead.

13 **BY MR. DOOLEY:**

14 **Q.**    And then it says (reading):

15         "Nothing's signed that will mean MicroTech gets

16    paid."

17    Right?

18 **A.**    Yes.

19 **Q.**    Okay.  So you knew there was no deal had been signed by

20 anybody as of the date of this meeting; right?

21 **A.**    Yes.

22 **Q.**    And if we could look at one more.  I won't show it to you,

23 but there's a memo about the purchase order language that was

24 prepared in connection with the year-end audit where Deloitte

25 talked again about this issue of deals going direct after

ANDERSON - CROSS / DOOLEY

 1  they'd been sold to the reseller; right?  All this was

 2  discussed with Deloitte; correct?

 3  **A.**   Yes.

 4  **Q.**   And then it continued.  Just if we could look at 6462.

 5           **MR. DOOLEY:**  I move that into evidence.  It's another

 6  Deloitte e-mail.

 7           **THE COURT:**  Admitted.

 8       (Trial Exhibit 6462 received in evidence)

 9  **BY MR. DOOLEY:**

10  **Q.**   This is from Livia Lu to Mr. Murray about the KPMG deal.

11  Do you see that?

12  **A.**   Yes.

13  **Q.**   And about the sale to -- a sale to KPMG, and she writes

14  (reading):

15           "This direct sale by Autonomy therefore replaces the

16       sale previously being made by Tikit to KPMG."

17       Do you see that?

18  **A.**   Yes.

19  **Q.**   Okay.  So, again, all of these transactions were disclosed

20  to Deloitte?

21           **MR. LEACH:**  Objection.  Vague.

22           **MR. DOOLEY:**  I'm sorry.

23  **Q.**   The transactions we've looked at, the direct transactions

24  we've looked at, were disclosed?

25  **A.**   Yeah.  This period of this e-mail is at a time when I'm

1   not on the audit; but, you know, I'm seeing the e-mail and it's

2   a Deloitte e-mail so, yes.

3   **Q.**   Okay.  And, you know, despite we've seen all this

4   correspondence about these deals going direct, but it was your

5   testimony, I believe, that Deloitte never looked at a VAR

6   customer contract to analyze whether a transaction with the end

7   user had taken place?

8   **A.**   Yes.

9   **Q.**   I want to talk about the testimony about the so-called top

10  40 lists you provided.  Now, I assume you recall that

11  testimony.

12      You said that you were provided by the Government with a

13  list of top 40 contracts and customers when you started this

14  project?

15  **A.**   Yes.

16  **Q.**   And was it explained to you that those were lists that

17  were exchanged in the due diligence process in this -- when HP

18  was acquiring Autonomy?

19  **A.**   I don't think so.  I think it was just the list was shared

20  with me and I was asked to create using the Autonomy records to

21  create those lists.

22  **Q.**   Do you understand, whether it was from the Government or

23  otherwise, do you understand that that's what those lists --

24  those top 40 -- so-called top 40 lists are, the lists that were

25  provided in due diligence?

1  **A.**   I assumed myself that it must be something to do with

2  that, yes.

3  **Q.**   Okay.  But you yourself, you didn't know about the

4  acquisition until it was announced and you had no role in the

5  due diligence process; correct?

6  **A.**   Correct.

7  **Q.**   You weren't on any of the due diligence calls obviously;

8  right?

9  **A.**   Correct.

10  **Q.**   And you don't know, when you prepared this list -- or you

11  prepared your analysis of top 40 customers and contracts, you

12  don't actually know what information Hewlett Packard asked for

13  from Autonomy during the due diligence process, do you?

14  **A.**   No.

15  **Q.**   Are you aware that HP's requests for top customers and top

16  contracts changed significantly over time?

17          **MR. LEACH:**  Objection.  Foundation.

18          **THE COURT:**  Sustained.

19          **MR. DOOLEY:**  But, Your Honor, she's been asked to give

20  evidence --

21          **THE COURT:**  No.  You're asking her is she -- number

22  one, she said she had nothing to do with the due diligence.

23  Now you're asking:  Now, were you aware that during the due

24  diligence, X happened?

25      So clearly there isn't a foundation.  It may be relevant

 1   as to whether it's admissible but not from this witness.  This

 2   witness had nothing to do with the due diligence so you can't

 3   ask her what happened in the course of the due diligence.

 4   Okay?

 5        All right.  Let's move on.

 6        MR. DOOLEY:  Question withdrawn.  Fair.

 7   Q.   It would be relevant to your analysis of the top customer

 8   and top contract -- Autonomy's top customers and top contracts

 9   to know that at one point HP asked for not 40 but 80 of the

10   largest customers or contracts in the database; correct?

11        MR. LEACH:  Objection.

12        THE COURT:  Actually, let me just say it again.  She

13   cannot testify as to what occurred during the due diligence.

14   You can ask her questions about she said that she -- she said

15   she made this list; and you can ask her questions about the

16   list if you'd like or not, but there will be other witnesses.

17   I assume there will be other witnesses to whom these questions

18   may be entirely proper, but not this witness.

19        MR. DOOLEY:  Okay, Your Honor.  I withdraw that

20   question.

21                    (Pause in proceedings.)

22   BY MR. DOOLEY:

23   Q.   You reviewed various ledgers, Autonomy ledgers, to produce

24   your list of top 40 customers and contracts that you testified

25   about earlier; right?

1    **A.**    Yes.

2    **Q.**    And you don't know whether those ledgers you looked at

3    were identical to the ones that were used in preparing the

4    lists that were provided to you, do you?

5    **A.**    So it's the same systems but you're right, I don't know

6    where the information from the original lists came from.

7    **Q.**    Okay.  And obviously you didn't -- in doing your analysis,

8    you didn't talk to anybody -- well, not obviously.  I should

9    ask.

10        Did you talk to anybody who was involved in the actual due

11    diligence process when you prepared your lists of top 40

12    contracts and customers?

13    **A.**    No.

14    **Q.**    You just did what the Government asked you?  You didn't

15    talk to anybody who was actually involved?

16    **A.**    So I was requested to pull the reports from the Autonomy

17    systems and create a top 40 list.  I wasn't asked to do

18    anything else.

19    **Q.**    Okay.  And how much time did you spend preparing your

20    versions of the top 40 lists?

21    **A.**    A few days.

22    **Q.**    It took you a few days?  Okay.

23        And Autonomy generates revenue in a number of different

24    ways; right?  From licenses, services, maintenance, hosting --

25    right? -- hardware?

1  **A.**    Yes.

2  **Q.**    And which categories of revenue did you include in your

3  list that you generated?

4  **A.**    All categories.

5  **Q.**    Okay.

6  **A.**    In one of the lists, I split out hardware but the initial

7  data I was using included all categories.

8  **Q.**    And you don't know which categories were used when the

9  original top 40 lists were created, do you?

10  **A.**    No.

11  **Q.**    Okay.  And if different categories had been -- different

12  categories of revenue had been used to create the original top

13  40 lists --

14       **THE COURT:**  It's not a question of what -- she had

15  nothing to do with the original lists, and she -- nor is she

16  commenting on the original lists as I understand her testimony.

17       What she is doing is she went back, the Government said,

18  "Do a list of A, B, C, and D."  And she went and she pulled the

19  records and she did A, B, C, and D.

20       I don't know -- you can certainly ask her, but I don't

21  have a sense that what she did was look at them, the first

22  lists, and have any understanding of what's on the first lists.

23       **MR. DOOLEY:**  That's exactly what she testified to.

24  **Q.**   Didn't you prepare --

25       **THE COURT:**  I'm sorry.  I don't understand.  You made

 1  your list from the first list?

 2           THE WITNESS:  So I made my list from the Autonomy

 3  System -- Financial System data.

 4           THE COURT:  From the Autonomy records?

 5           THE WITNESS:  Yes.

 6           THE COURT:  Okay.  That's what she did.

 7  BY MR. DOOLEY:

 8  Q.   And didn't you use highlighting on the spreadsheet to show

 9  which items were on your list that were not on the original

10  list?

11  A.   Yeah.  I did do that comparison, yes.

12  Q.   Okay.  So you did compare the two lists?

13  A.   The way I presented it in my analysis was I took the line

14  items from the original list and brought in the figure that I

15  had for that customer or that contract.  So, yeah, my

16  highlighting was my working method of taking figures from one

17  report across to a summary sheet.

18  Q.   And when you prepared your list, you included all revenue

19  streams at Autonomy; correct?

20  A.   Correct.

21  Q.   Okay.  And you'd agree that if a list was prepared using

22  less than all revenue streams, it would produce a different

23  list?

24           MR. LEACH:  Objection.  Argumentative.  Assumes facts.

25           THE COURT:  I'll allow it.

1           THE WITNESS:  Correct.

2    BY MR. DOOLEY:

3    Q.    One more topic, and then hopefully we'll get you out of

4    here.

5          You were asked questions about this restatement of the

6    Autonomy Systems Limited accounts.  Do you recall that?

7    A.    Yes.

8    Q.    Okay.  I just want to be very clear.  Mr. Hussain, the

9    defendant, he was the finance director or the chief financial

10   officer of Autonomy Corporation PLC; correct?

11   A.    Correct.

12   Q.    And Autonomy Corporation PLC is the publicly traded -- or

13   was the publicly traded group level holding company in England;

14   correct?

15   A.    Correct.

16   Q.    Okay.  And its shares were traded on the London Stock

17   Exchange?

18   A.    Yes.

19   Q.    And all of the Audit Committee reports, for example, that

20   we've looked at today, those are for the Autonomy Corporation

21   accounts; correct?

22   A.    Yes.

23   Q.    Okay.  And the press releases that we saw with the tick

24   marks, those were for the Autonomy Corporation accounts;

25   correct?

1  **A.**    Yes, for the group.

2  **Q.**    And the annual report is for the group; right?

3  **A.**    Yes.

4  **Q.**    And the group held -- to your knowledge, did the group

5  hold earnings calls with investors and analysts?

6  **A.**    Yes.

7  **Q.**    As a publicly traded company?

8  **A.**    Yes.

9  **Q.**    Okay.  All of that stuff that we just talked about, that's

10  not Autonomy Systems Limited; is it?

11  **A.**    No.  Autonomy Systems Limited is a part of that group, so

12  it's within the group results, yes.

13  **Q.**    Okay.  But it's a distinct entity within

14  Autonomy Corporation; correct?

15  **A.**    Yes.

16  **Q.**    Okay.  And you didn't -- in this work that you described,

17  you didn't restate the accounts of Autonomy Corporation;

18  correct?

19  **A.**    For the individual entity or for the group?

20  **Q.**    For the group.

21  **A.**    No.  It wasn't required.

22  **Q.**    Okay.  So the accounts, the numbers that the jury has seen

23  in the press releases and in the Audit Committee reports and so

24  forth, those numbers weren't restated?  You restated the

25  numbers for this other company, Autonomy Systems Limited;

1   right?

2   **A.**    Yeah.   There was no legal or statutory requirement to

3   refile a group -- a set of group consolidated accounts.

4   **Q.**    And the Autonomy Systems Limited reported their financial

5   accounts under -- well, Autonomy Corporation, the publicly

6   traded company that the jury has heard about, they reported

7   their accounts under IFRS; correct?

8   **A.**    Correct.

9   **Q.**    And Autonomy Systems Limited that we've just heard about

10  today, they reported their accounts under U.K. GAAP; correct?

11  **A.**    Correct.

12  **Q.**    Those are two different sets of accounting rules; correct?

13  **A.**    Correct.

14  **Q.**    And Autonomy Systems Limited financial statements

15  historically were audited by Deloitte; right?

16  **A.**    Yes.

17  **Q.**    Deloitte audited the group level accounts and they audited

18  the subsidiary accounts; right?

19  **A.**    Yes.

20  **Q.**    At the outset of this restatement project, November --

21  around about October or November, Hewlett Packard fired

22  Deloitte, correct, as the auditors?

23  **A.**    So there was a change in auditor.  I don't know whether

24  they were fired or not.  I don't know that.

25  **Q.**    Isn't it true that HP was frustrated that Deloitte was not

1    finding significant issues and was resisting restating the

2    accounts?

3              **MR. LEACH:**  Objection.  Foundation.

4    **BY MR. DOOLEY:**

5    **Q.**    Do you know whether that's true?

6              **THE COURT:**  Sustained.

7    **BY MR. DOOLEY:**

8    **Q.**    After Deloitte was fired or let go, they were replaced by

9    Ernst & Young; correct?

10   **A.**    Correct.

11   **Q.**    And Ernst & Young has historically been HP's auditors;

12   right?

13   **A.**    Correct.

14   **Q.**    And Ernst & Young worked on the restatement for -- you

15   began the restatement project around the time of the

16   write-down, November 2012?

17   **A.**    Yes.

18   **Q.**    And Ernst & Young began their participation around about

19   then?

20   **A.**    Yes.  So we had some discussions with them about the work

21   I was carrying out and other members of the finance team.  I

22   don't think they actually reviewed any of what we were doing

23   until later.

24   **Q.**    Okay.  But they worked until January of 2014.  So at least

25   a year on these?

```
 1   A.    Yes.

 2   Q.    And do you know how much they racked up or how much they

 3   billed for that work?

 4            MR. LEACH:  Objection.  Relevance.

 5            THE COURT:  Sustained.

 6   BY MR. DOOLEY:

 7   Q.    Well, after a year and however much they billed on it,

 8   Ernst & Young refused to sign the restatement; correct?

 9   A.    They did sign an opinion.

10   Q.    Well, they didn't -- they disclaimed any opinion as to the

11   truth and fairness of the restatement; is that right?

12   A.    So they -- there were certain points that they said they

13   couldn't express an opinion on, things like intercompany

14   accounts, and they also made comment that there could be

15   further adjustments required.

16   Q.    Well, Ernst & Young wrote in the -- I mean, we can call it

17   up.

18            Can we get 2445 up, page 11?

19            THE COURT:  Sorry.  What is it?

20            MR. DOOLEY:  Exhibit 2445.  It's the --

21            THE COURT:  24 --

22            MR. DOOLEY:  It's the restatement.

23            THE COURT:  2445.

24                         (Pause in proceedings.)

25            MR. DOOLEY:  And could we zoom in on the bullets?
```

1           THE COURT:  2445 is in evidence.

2           MR. DOOLEY:  Yep.

3   Q.   And the second bullet point reads (reading):

4           "As disclosed in the Directors Report and Note 1 to

5       the financial statements, there are limitations over the

6       quality and completeness of the documentation available to

7       support intercompany balances reported in the financial

8       statement."

9       Right?

10          MR. LEACH:  Objection.  Asked and answered.

11          THE COURT:  Sustained.

12  BY MR. DOOLEY:

13  Q.   And if you turn to page 12, Ernst & Young writes

14  (reading):

15          "Because of the significance of the matters described

16      in the basis for disclaimer of opinion paragraph, we have

17      not been able to obtain sufficient appropriate audit

18      evidence to provide a basis for an audit opinion.  We do

19      not express an opinion on the financial statements."

20      That's what they wrote; right?

21  A.   That's what they wrote.

22          MR. LEACH:  Objection.

23          THE COURT:  Yeah, I don't know that you can

24  cross-examine her on a statement that she didn't even write.

25  She didn't write it.  She's not the author of this.

1  BY MR. DOOLEY:

2  Q.   It's fairly unusual for an auditor --

3       THE COURT:  No, no.  Then you can't bring it in.

4  Okay.  You're not -- you're asking her as the auditor at

5  Deloitte whether something's unusual, whether this is unusual?

6       MR. DOOLEY:  I'm asking a former auditor --

7       THE COURT:  She's not going to give an expert opinion

8  on that.  Okay?  Under 403, it's -- there are other witnesses.

9  If you call other witnesses and they have evidence that they

10  can give, you can question about that.

11  BY MR. DOOLEY:

12  Q.   The restatement of the ASL accounts adjusted revenue for

13  other reasons that had nothing to do with the accuracy of the

14  original accounting; correct?

15  A.   Sorry.  Could you repeat that?

16  BY MR. DOOLEY:

17  Q.   The restatement that we've just looked at adjusted ASL's

18  revenue for reasons that had nothing to do with the accuracy of

19  the original accounting; correct?

20  A.   So the restatement --

21       THE COURT:  I'm sorry.  When you say "accuracy," I

22  don't know what you mean.  Do you mean --

23       MR. DOOLEY:  Well, let me ask --

24       THE COURT:  -- that the figures were -- that the

25  numbers were accurate?  The timing was accurate?  The

1    information was accurate?  There are all sorts of things that

2    go into whether or not a statement is accurate, and it's not

3    just numbers.  It's a lot of other things.

4    **BY MR. DOOLEY:**

5    **Q.**  Part of the reason for the restatement --

6            **THE COURT:**  So are you asking are the numbers

7    accurate, or are you asking --

8    **BY MR. DOOLEY:**

9    **Q.**  I'm asking whether there are reasons other than accounting

10   issues with the original accounting that went into the

11   restatement.  That's what I'm asking for.  There were a number

12   of causes for the restatement, weren't there?

13   **A.**  So there were errors in the original filed statements and

14   then there was also a change in accounting policy.

15   **Q.**  Okay.  And HP retroactively applied certain accounting

16   policy changes related to research and development expenses,

17   for example, correct?

18   **A.**  Yes.

19   **Q.**  Okay.  There were other accounting policy changes as well;

20   right?  Classification of costs between cost of sales,

21   administration, distribution expenses; correct?

22   **A.**  I think so, yes.

23           **MR. DOOLEY:**  Give me a second, Your Honor.

24                   (Pause in proceedings.)

25           **MR. DOOLEY:**  No further questions.  Thank you,

 1    Ms. Anderson.

 2              **THE WITNESS:**  Okay.

 3              **THE COURT:**  Any redirect?  Briefly?

 4              **MR. LEACH:**  I'm mindful of the time, Your Honor.  I

 5    think I have three questions.

 6              **THE COURT:**  Three questions.

 7                        <u>**REDIRECT EXAMINATION**</u>

 8    **BY MR. LEACH:**

 9    **Q.**  Ms. Anderson, as part of the ASL restatements, did you

10    restate the FileTek transactions, the MicroTech transactions,

11    the MicroLink transactions, and the Capax transactions that

12    we've been discussing today?

13    **A.**  Yes.

14    **Q.**  And did you conclude that they were incorrectly accounted

15    for under IFRS?

16              **MR. DOOLEY:**  Objection, Your Honor.  That calls for

17    expert opinion testimony.

18              **THE COURT:**  No.  He's asking -- you may answer.

19              **THE WITNESS:**  Yes.

20    **BY MR. LEACH:**

21    **Q.**  Sitting here today, in light of your experience at

22    Deloitte, at Autonomy, and ultimately at HP, did Sushovan

23    Hussain mislead you during the course of your audits and

24    reviews?

25              **MR. DOOLEY:**  Objection.  Argumentative.

1    THE COURT:  Sustained.

2    Okay.  Those are your three.

3    Okay, ladies and gentlemen, we're going to take our recess

4    now.  Just let me tell you that -- you're excused.  Thank you

5    very much for coming.

6                    (Witness excused.)

7    THE COURT:  In terms of scheduling, we are, as you

8    know, meeting on -- we're not meeting this week -- anymore this

9    week.

10    Okay.  So we're meeting Monday and Tuesday.  I'm not quite

11    sure what time we'll break on Tuesday.  Okay?  We then are

12    resuming that Friday.

13    What is that Friday, Friday the --

14    MR. LEACH:  The 6th, April 6th, Your Honor.

15    THE COURT:  Pardon?

16    MR. LEACH:  April 6th.

17    THE COURT:  Okay.  Wait a minute.  Did I say we

18    weren't?

19    THE CLERK:  No.  We're on every day next week.

20    THE COURT:  No, we are meeting on Friday, April 6.

21    Okay.  Is that not what I said?  I thought I said that.  Okay.

22    THE CLERK:  You just said Monday, Tuesday.

23    THE COURT:  Oh, no, no, no.

24    Okay.  Sorry.  It's late.

25    Okay.  Monday, Tuesday, and that Friday, April 6.

| | |
|---|---|
| 1 | **THE CLERK:**  Wednesday and Thursday. |
| 2 | **THE COURT:**  Oh, Wednesday and Thursday.  We'll throw |
| 3 | those in too.  Okay. |
| 4 | (Laughter) |
| 5 | **THE COURT:**  All right.  We're going to work very hard |
| 6 | next week. |
| 7 | Okay.  Then comes the following week, and I better look at |
| 8 | my calendar because I want to try to get this right so you can |
| 9 | plan on it. |
| 10 | **MR. KEKER:**  Monday and Friday, Your Honor, is what you |
| 11 | said. |
| 12 | **THE COURT:**  Monday -- which is? |
| 13 | **THE CLERK:**  The 9th. |
| 14 | **MS. LITTLE:**  April 9th. |
| 15 | **THE COURT:**  -- the 9th and Friday the 13th. |
| 16 | **THE CLERK:**  Yes. |
| 17 | **THE COURT:**  And I've got to work out one thing, but I |
| 18 | can do that. |
| 19 | We are not going to meet on the 20th.  Okay?  Because |
| 20 | there are too many conflicts that the jury has, so we're not |
| 21 | going to meet there, but I am hopeful that we will accomplish a |
| 22 | great deal before the 20th.  Okay? |
| 23 | So with that and the admonition that you're not to discuss |
| 24 | the case, allow anyone to discuss it with you, form or express |
| 25 | any opinion, you are excused.  Have a good week. |

1    (Proceedings were heard out of the presence of the jury:)

2    **THE COURT:** Okay.  So the jury is gone.

3    Now, let me try to get a sort of forecast here as to where

4    we're going.

5    **MR. REEVES:** Would you like me to start, Your Honor?

6    **THE COURT:** Sure.

7    **MR. REEVES:** I think I remain very hopeful in the way

8    I described in our conference call last Friday that we are on

9    track, so much so that depending on where we wind up at the end

10   of the day on Monday, if the Court wants to revisit the need to

11   proceed on April 6th, that's something we'd be willing to do.

12   All which is to say --

13   **THE COURT:** No, no.  I want to meet on April 6th.

14   **MR. REEVES:** Okay.  Then our case could come in at the

15   end of the following week on the 13th, maybe the 16th.

16   **THE COURT:** All right.  Fine.  I like that.  Let's do

17   that.

18   **MR. REEVES:** I can't commit to that, but I'm

19   expressing optimism and hopefulness.

20   **THE COURT:** Good.  Optimism and hopefulness is good

21   enough for me because I'll put it in an order.

22   **MR. REEVES:** Oh, and --

23   **MR. KEKER:** The 9th and the 13th are the only two days

24   that second week, and so I just want to make sure I understand

25   what Mr. Reeves is saying.  He thinks with --

**PROCEEDINGS**

```
1            THE COURT:  I'm sorry.  What about April 10th?  What
2   happened to that?
3            MR. REEVES:  Let me be more specific.  I forgot one
4   thing.
5            THE COURT:  Am I leaving on April 10th?
6            THE CLERK:  Yes.
7            MR. KEKER:  We were only on for the 9th and the 13th.
8   We were on for the 9th and now we're on for the 13th.
9            MR. REEVES:  We have a witness that is flying in from
10  Australia on the 16th --
11           MS. BRYANT:  No.  The 9th.
12           MR. REEVES:  Oh.  On the 9th.
13           THE COURT:  The 16th?  Then how can you be optimistic
14  that we would finish on the 13th?
15           MR. FRENTZEN:  No.  We --
16           THE COURT:  Is he going to testify sort of *nunc pro*
17  *tunc*?  What is that?
18           MR. REEVES:  I don't have my notes about the --
19           THE COURT:  Well, then don't say anything.  If you
20  don't have your notes, don't say anything.
21       Does anybody in the Government know what's going to
22  happen?  Would you mind telling me?  You do?  Come on up.  Tell
23  me what's going to happen.  Somebody.
24           MR. REEVES:  We have -- go ahead.
25           MS. BRYANT:  We have one witness that can only get
```

 1    here on the 16th coming from the U.K., but we would expect that

 2    to be roughly the end of our witnesses.

 3            THE COURT:  Okay.  So you expect -- okay.  I

 4    appreciate that.  That's not wrong.  I'm just trying to figure

 5    out days so everybody can plan.

 6            MR. KEKER:  Could they tell us --

 7            THE COURT:  We'll get to you in a minute.

 8        Okay.  So the 16th you anticipate that even if you finish

 9    like 9:00 o'clock in the morning on the 13th, you would still

10    need the 16th?

11            MR. REEVES:  Yes, please, Your Honor.

12            THE COURT:  Okay.  And I'll have to figure that out

13    for motions and for a few other things.

14        Mr. Keker?

15            MR. KEKER:  Could we find out who that witness is,

16    Your Honor?

17            MR. REEVES:  We'll disclose it as we have been

18    disclosing it, Your Honor.

19            THE COURT:  Oh, tell them who it is.  You made all the

20    arrangements.  It's no big secret.

21            MR. REEVES:  It's Matt Stephan who's coming from

22    Australia on the 9th and --

23            MS. BRYANT:  David Lindsell.

24            MR. REEVES:  -- David Lindsell from F.R.C. on the

25    16th, Your Honor.

1    **THE COURT:**  Okay.  So now you know.  The suspense is

2    over.

3        Okay.  Now -- well, I'm trying to figure out -- then I

4    must assume, though I haven't gotten into any of this -- and

5    you've got a pretty good idea who all the rest of the witnesses

6    are; right?

7    **MR. KEKER:**  Yes.  I have a pretty good idea, yes, we

8    do.

9    **THE COURT:**  Any more suspense?

10    **MR. KEKER:**  I hope not.

11    **THE COURT:**  Okay.  So you now know basically who the

12    Government's case is at which point, though you can't commit --

13    you can't commit, you can't commit -- you've got a pretty good

14    idea of your case or what you're going to do in your case, and

15    I'm not asking you now.  I'm just trying to figure out where we

16    go because if we meet on the 16th, meet on the 16th --

17    **MR. KEKER:**  We'll be ready to make a motion and then

18    if you deny the motion, move on into our case.

19    **THE COURT:**  Yeah, but maybe I'll have you go in on the

20    13th if they finish earlier subject to motions.  I mean, I've

21    done that all the time.  If they finish earlier and we will

22    know on the 9th whether and to what extent they will need the

23    13th for their testimony -- okay? -- if they decide -- so I

24    just want you to -- I'm telling you in as much time as possible

25    so you can prepare.

1    So it may be that I would ask you to go on the 13th.

2         MR. KEKER:  Okay.

3         THE COURT:  Okay.  I can hear motions any time, 4:00,

4    5:00, 6:00 o'clock, 6:00 a.m., whenever.

5    Okay.  So I may ask you to go.  I won't ask you to go

6    before the 13th, but I may ask you to proceed on the 13th.

7    Okay?  All right.

8    And then subject to somebody on the 16th testifying, we'll

9    figure out what that --

10        MR. KEKER:  We may have problems too, Your Honor.

11        THE COURT:  Pardon?

12        MR. KEKER:  We have two Deloitte witnesses who are in

13   the U.K. and that we need to plan for, but we don't need to

14   talk about that now, but --

15        THE COURT:  Well, I'd like to talk about it now.

16        MR. KEKER:  -- we've got the same -- we've got the

17   kind of problems that they have.

18        THE COURT:  Yeah, both sides do, but I think I'd like

19   those witnesses here the week of the 16th.

20        MR. KEKER:  Okay.  That makes sense, sure.

21        THE COURT:  And we can't go the 20th --

22        MR. KEKER:  Got it.

23        THE COURT:  -- because they have 42 conflicts.

24   So that would mean that somebody may -- people may have to

25   testify on the 16th, on the 17th, on the 18th, on the 19th.

PROCEEDINGS

1  Bring in all those people that are inaccessible to testify that

2  week --

3         MR. KEKER:  Right.

4         THE COURT:  -- and then we'll see where we are.

5         MR. KEKER:  Got it.

6         MR. FRENTZEN:  And pursuant to the agreement on the

7  6th, we'll get notice of their prospective witnesses for the

8  13th?  That will be three trial days.

9         THE COURT:  Work it out yourselves.  I mean, have

10 another shouting match between the two sides --

11        MR. KEKER:  We're too tired.

12        THE COURT:  -- and then you will finally come to some

13 resolution and everybody will be happy or unhappy.

14        MR. REEVES:  It's been going great.  I'm confident

15 that we'll get the notice we need.

16        THE COURT:  Going just great.

17    Okay.  I don't know, is there anything else that I have to

18 deal with?

19        MR. REEVES:  Nothing for the Government.  Thank you,

20 Your Honor.

21        MR. KEKER:  And we had an issue that we wanted to

22 raise, but I think we're going to work it out, and Mr. Reeves

23 has promised that we'll get it straightened out tomorrow.

24        THE COURT:  But is he hopeful?

25        MR. REEVES:  I am hopeful on that too, Your Honor.

PROCEEDINGS

```
 1            MR. KEKER:  He's always hopeful.

 2            THE COURT:  Then that's good enough for me.  If he's

 3   hopeful, then that's good enough for me.  Thank you.

 4            MR. FRENTZEN:  Thank you, Your Honor.

 5            MR. LEACH:  Thank you, Your Honor.

 6            MR. REEVES:  Thank you, Your Honor.

 7            MR. KEKER:  Thank you, Your Honor.  Have a good trip.

 8            (Proceedings adjourned at 4:43 p.m.)

 9                         ---oOo---

10

11                    CERTIFICATE OF REPORTERS

12        I certify that the foregoing is a correct transcript

13   from the record of proceedings in the above-entitled matter.

14

15   DATE:  Tuesday, March 27, 2018

16

17

18

19   _____

20        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              U.S. Court Reporter

21

22

23   _____

24        Pamela A. Batalo, CSR No. 3593, RMR, FCRR
              U.S. Court Reporter

25
```