Volume 17

Pages 3244 - 3499

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )      NO. CR 16-00462 CRB
                               )
SUSHOVAN TAREQUE HUSSAIN,      )
                               )
          Defendant.           )
_____)
                               San Francisco, California
                               Monday, April 2, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:
                    ALEX G. TSE
                    Acting United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
              BY:   **ROBERT S. LEACH**
                    **ADAM A. REEVES**
                    **WILLIAM FRENTZEN**
                    **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:
                    KEKER & VAN NEST
                    633 Battery Street
                    San Francisco  CA  94111
              BY:   **JOHN W. KEKER**
                    **JAN NIELSEN LITTLE**
                    **BROOK DOOLEY**
                    **KATE LAZARUS**
                    **NIC MARAIS**
                    **ATTORNEYS AT LAW**


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
             Pamela Batalo, CSR No. 3593, FCRR
             Official Reporters

<u>**I N D E X**</u>

Monday, April 2, 2018 - Volume 17

| <u>**GOVERNMENT'S WITNESSES**</u> | <u>**PAGE**</u> | <u>**VOL.**</u> |
|---|---|---|
| <u>**TRUITT, STEVEN BRADLEY**</u> | | |
| (SWORN) | 3250 | 17 |
| Direct Examination by Mr. Frentzen | 3250 | 17 |
| Cross-Examination by Mr. Keker | 3326 | 17 |
| Redirect Examination by Mr. Frentzen | 3386 | 17 |
| Recross-Examination by Mr. Keker | 3401 | 17 |
| Further Redirect Examination by Mr. Frentzen | 3402 | 17 |
| | | |
| <u>**DARYANANI, AMIT**</u> | | |
| (SWORN) | 3403 | 17 |
| Direct Examination by Mr. Reeves | 3404 | 17 |
| Cross-Examination by Ms. Lazarus | 3431 | 17 |
| Redirect Examination by Mr. Reeves | 3463 | 17 |
| Recross-Examination by Ms. Lazarus | 3464 | 17 |
| | | |
| <u>**SARIN, MANISH**</u> | | |
| (SWORN) | 3466 | 17 |
| Direct Examination by Mr. Reeves | 3466 | 17 |

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 5 | | 3256 | 17 |
| 398 | | 3262 | 17 |
| 422 | | 3264 | 17 |
| 512 | | 3270 | 17 |
| 549 | | 3272 | 17 |
| 581 | | 3271 | 17 |
| 593 | | 3268 | 17 |
| 595 | | 3274 | 17 |
| 707 | | 3281 | 17 |
| 708 | | 3278 | 17 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 746 | | 3283 | 17 |
| 766 | | 3286 | 17 |
| 767 | | 3285 | 17 |
| 836 | | 3288 | 17 |
| 1174 | | 3290 | 17 |
| 1340 | | 3293 | 17 |
| 1357 | | 3294 | 17 |
| 1359 | | 3295 | 17 |
| 1501 | | 3296 | 17 |
| 1586 | | 3318 | 17 |
| 1591 | | 3470 | 17 |
| 1592 | | 3470 | 17 |
| 1593 | | 3470 | 17 |
| 1594 | | 3470 | 17 |
| 1621 | | 3482 | 17 |
| 1675 | | 3298 | 17 |
| 1689 | | 3301 | 17 |
| 1792 | | 3484 | 17 |
| 1796 | | 3475 | 17 |
| 1804 | | 3479 | 17 |
| 1912 | | 3303 | 17 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1985 | | 3305 | 17 |
| 2060 | | 3306 | 17 |
| 2068 | | 3309 | 17 |
| 2213 | | 3314 | 17 |
| 2214 | | 3311 | 17 |
| 2234 | | 3314 | 17 |
| 2248 | | 3380 | 17 |
| 2263 | | 3316 | 17 |
| 2297 | | 3412 | 17 |
| 2302 | | 3411 | 17 |
| 2318 | | 3424 | 17 |
| 2341 | | 3321 | 17 |
| 2985 | | 3325 | 17 |
| 5740 | | 3345 | 17 |
| 6038 | | 3327 | 17 |
| 6055 | | 3338 | 17 |
| 6056 | | 3358 | 17 |
| 6056 withdrawn | | 3366 | 17 |
| 6060 | | 3369 | 17 |
| 6066 | | 3373 | 17 |
| 6069 | | 3384 | 17 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 6073 | | 3381 | 17 |
| 6801 | | 3432 | 17 |
| 6802 | | 3433 | 17 |
| 6803 | | 3434 | 17 |
| 6809 | | 3435 | 17 |
| 6811 | | 3437 | 17 |
| 6813 | | 3439 | 17 |
| 6814 | | 3441 | 17 |
| 6815 | | 3449 | 17 |
| 6817 | | 3442 | 17 |

| | |
|---|---|
| 1 | <u>**Monday - April 2, 2018**</u>                          <u>**9:04 a.m.**</u> |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | ---oOo--- |
| 4 | (Proceedings were heard in the presence of the jury:) |
| 5 | **THE COURT:**  Please be seated. |
| 6 | So, ladies and gentlemen, welcome back.  Now I think I've |
| 7 | got the schedule straight, but let me just go over it with you. |
| 8 | We're meeting today, full day.  Tomorrow we'll meet till |
| 9 | about 1:00.  We won't take a luncheon break but we'll, of |
| 10 | course, take some breaks in the morning.  That's Tuesday. |
| 11 | Wednesday, Thursday, and Friday we're meeting this week. |
| 12 | The following week we meet Monday, Tuesday; right?  Or are |
| 13 | we off on Tuesday? |
| 14 | **MR. REEVES:**  Monday and Friday I thought, Your Honor. |
| 15 | **MR. FRENTZEN:**  And Friday. |
| 16 | **THE COURT:**  Only Monday and Friday. |
| 17 | **THE CLERK:**  Yes. |
| 18 | **THE COURT:**  That's right, because I have the |
| 19 | Sentencing Commission. |
| 20 | So we're meeting -- |
| 21 | **MR. REEVES:**  The 9th and the 13th. |
| 22 | **THE COURT:**  Pardon? |
| 23 | **MR. REEVES:**  The 9th and the 13th. |
| 24 | **THE COURT:**  We're meeting the 9th and the 13th, but we |
| 25 | are not meeting on the 20th.  Okay? |

1         All right.  Call your next witness.

2         Let the record reflect all jurors are present, the parties

3    are present.

4         Good morning, Mr. Frentzen.

5              MR. FRENTZEN:  Good morning, Your Honor.  The

6    Government calls Steve Truitt.

7              THE CLERK:  Please raise your right hand.

8                        **STEVEN BRADLEY TRUITT**,

9    called as a witness for the Government, having been duly sworn,

10   testified as follows:

11             THE WITNESS:  I do.

12             THE CLERK:  Thank you.  Please be seated.

13        Please state your full name for the record and spell your

14   last name.

15             THE WITNESS:  Steven Bradley Truitt, T-R-U-I-T-T.

16             MR. FRENTZEN:  All right.  May I proceed, Your Honor?

17             THE COURT:  Yes.

18                       **DIRECT EXAMINATION**

19   BY MR. FRENTZEN:

20   Q.   Good morning, Mr. Truitt.

21        Mr. Truitt, where do you live?

22   A.   Fancy Gap Virginia.

23   Q.   Where is that?

24   A.   That's in southwest Virginia.  Right on the North Carolina

25   border.

**S. TRUITT - DIRECT / FRENTZEN**

1   **Q.**   What do you currently do for a living?

2   **A.**   I'm the county administrator for Carroll County, Virginia,

3   which is the county that Fancy Gap is in.

4   **Q.**   And what does that entail being a county administrator?

5   **A.**   Basically providing most of the government services that

6   the county provides.  I do economic development for the county.

7   We do Parks & Recreation.  We work with the school system.  We

8   maintain the public buildings, animal control.  I mean, you

9   name it.

10  **Q.**   Okay.  I want to take you back in time.  Can you tell us,

11  please, a little bit about your education?

12  **A.**   I graduated from Wake Forest University in 1981 with a BA

13  in economics, and I got an MBA from the University of Chicago

14  in 1989.

15  **Q.**   And after you got your MBA, can you tell us -- just give

16  us a real quick trip through your career up until MicroTech?

17  **A.**   Well, I actually worked from right after I got out of Wake

18  until I went to night school to get my MBA, but I started out

19  with Booz Allen Hamilton in their Management Information

20  Systems Division doing systems integration work.

21      I left there to join a company called Teleaction, which we

22  were inventing the Internet before we knew there already was an

23  Internet, but ours was a little different.

24      I left there and while I was finishing my MBA, I joined

25  Policy Systems Management Corporation as a system developer.

1          And then I joined Price Waterhouse in Dallas, Texas, and I

2     specialized in large-scale multidisciplinary systems

3     integration work in a bunch of different industries.

4          I joined BSG in about 1994 after I left Price Waterhouse.

5     I was -- the highest level I attained there was director of the

6     western region and I ran the Dallas, San Francisco, Denver, and

7     Phoenix offices.

8          I left there to go to Origin Technology and Business,

9     which was the United States -- or the North American affiliate

10    of Origin Technology, which in turn was owned by Phillips

11    Electronics over in the Netherlands.  I was the president of

12    North America.

13         And after that, I joined a company called Corporate

14    Revitalization Partners, which was a turnaround firm that

15    eventually got acquired by Deloitte.

16         And then I joined MicroTech in 2006.

17    **Q.**   Okay.  And when you joined MicroTech -- first of all,

18    where was MicroTech based?

19    **A.**   Vienna, Virginia.

20    **Q.**   Where is that?  I mean, what's that close to?

21    **A.**   Washington, D. C.

22    **Q.**   That's northern Virginia?

23    **A.**   Yeah.  It's about 300 miles from where I live now.

24    **Q.**   When you first joined MicroTech, can you tell us a little

25    bit about what was MicroTech?  Give us an idea of the size and

1  what it was doing.

2  **A.**   MicroTech was a service-disabled veteran-owned business

3  that was founded by Tony Jimenez, and he was in partnership

4  with my brother Dave Truitt and Tim Wharton.  They provided him

5  with office space and other things in return for their

6  percentages of the ownership.

7      At the time I joined the company, there was maybe 12 or 14

8  people, and they were -- we were -- they were basically writing

9  a lot of proposals trying to get government technology work.

10  **Q.**   You had mentioned your brother.  Is that Dave Truitt?

11  **A.**   Yes.

12  **Q.**   Do you have another brother?

13  **A.**   Dan Truitt.

14  **Q.**   And at some point in time was Dan Truitt -- did Dan Truitt

15  work at Autonomy?

16  **A.**   He did.

17  **Q.**   MicroTech at that point in time, can you describe for us

18  what -- you know, with that number of employees, what exactly

19  were they doing when you joined?

20  **A.**   We had two or three small contracts where we were placing

21  people with particular skills on government sites to support

22  the government.  Mostly IT work.

23  **Q.**   What did you do at MicroTech?  In other words, what was

24  your role?

25  **A.**   When I first came on, it was going to be just a consulting

1  gig.  I was setting up their ability to properly account for

2  their time according to the Federal Acquisition Regulations,

3  and I was setting up their billing processes, their ability to

4  properly set their rates so that they were in compliance with

5  certain contractual requirements and things like that.

6       And that went pretty well, and I was also helping to write

7  proposals and things, and we won a few.  So we started to grow,

8  we started to grow very rapidly, and I ended up staying.

9  **Q.**   Okay.  Can you describe that for us just in terms of

10 MicroTech's growth between the time that you first got there

11 and take us into 2009?

12 **A.**   Well, it was literally exponential.  It's difficult to

13 remember now when we hit what marks, but I think in 2006 we

14 went from $1 million to I'm going to say something like,

15 because I don't remember the numbers well, but we probably

16 quintupled in size to 5 million; and then the next year

17 probably tripled; and then the year after that we were

18 approaching 100 million; and then a year or two after that, we

19 were over 250 million.  So we had -- we had explosive growth.

20 **Q.**   The growth, what was the nature of it?  What do you

21 attribute the growth to?

22 **A.**   Mostly -- well, one thing was we won a contract with

23 Microsoft to provide Microsoft software for the Veterans

24 Administration, and that was a very large contract; and the

25 proceeds from that contract and the profit margins were razor

S. TRUITT - DIRECT / FRENTZEN

1  thin but when the contract is that large, razor thin is quite a

2  bit of money.

3      We were able to invest that into our processes.  We were

4  able to hire recruiters and we were able to hire people to

5  write proposals, and we wrote a ton of proposals.  And we would

6  propose on anything that was set aside for service-disabled

7  small businesses, and we won a lot.

8      Our winning percentage wasn't that high.  It was probably

9  25 percent; but we bid on so many things, that we acquired a

10  great deal of business.  And it was spread out all over the

11  place, but it was generally IT business.

12  Q.   Can you describe for us by 2009 what your position was at

13  MicroTech?

14  A.   I was the COO by then.

15  Q.   What does that mean?

16  A.   Chief operating officer.

17  Q.   What were your responsibilities at MicroTech as chief

18  operating officer?

19  A.   Mostly it was to acquire new business and to successfully

20  deliver the services to the customers.

21  Q.   In terms of your work -- and let's just go through the

22  early part, from 2006 till, let's say, late 2009.  If you can,

23  can you give us some idea of the extent to which MicroTech did

24  any business with Autonomy?

25  A.   We did a contract in 2006 with them for a company called

1  Voxant, and that actually went pretty well.  We delivered

2  the -- we delivered and installed the software.  We worked with

3  them through the processes, did the configuration, worked with

4  them after the fact to do some changes and upgrades that they

5  wanted to do.  That was a, quote, "normal relationship."  I

6  think we also resold their software at least two or three times

7  to agencies of the federal government.

8  Q.   Okay.  Would you describe the relationship with

9  Autonomy -- and, again, I'm going from 2000 -- when you first

10  got to MicroTech up till the end of 2009 -- as a large share of

11  the business at MicroTech or a pretty small share?

12  A.   It was a small share of the business.

13  Q.   And I'm going to show you now what's been marked for

14  identification as Exhibit Number 5.  Can you just take a quick

15  look at that, please, sir, see if you recognize what Exhibit 5

16  is?

17  A.   (Witness examines document.)  This is a reseller agreement

18  that was in place between MicroTech and Autonomy that was

19  signed right around when I joined MicroTech in the middle of

20  2006, I believe.

21       Let's me see.

22           MR. FRENTZEN:  Offer 5 into evidence, Your Honor.

23           THE COURT:  Admitted.

24       (Trial Exhibit 5 received in evidence)

25           THE WITNESS:  Yeah.  June 30, 2006.

1  BY MR. FRENTZEN:

2  Q.  And in terms of -- there it is, the front page.  Do you

3  see that, June of 2006, Mr. Truitt?

4  A.  (Witness examines document.)  On the front page?

5  Q.  Right.  Well, it's when the fax was sent.

6  A.  Oh, here it is.  Effective date June 29th, yes, sir.

7  Q.  Okay.  All right.  And in terms of this deal with Voxant

8  and maybe the couple other deals until the tail end of 2009,

9  would you describe the relationship between MicroTech and

10  Autonomy as sort of a standard reseller agreement as --

11  A.  Yes, I would.

12  Q.  Mr. Truitt, do you have -- have you been granted

13  court-ordered immunity for your testimony here today?

14  A.  Yes.

15  Q.  Were you also granted immunity for your testimony

16  previously before a Grand Jury?

17  A.  Yes, I was.

18  Q.  And were you also -- did you also have what we refer to as

19  a proffer arrangement in terms of -- that covered your meetings

20  with the Government?

21  A.  Yes.

22  Q.  All right.  I want to move ahead now to late 2009.  In

23  late 2009 -- well, let me ask it this way:

24      Were you aware, while working at MicroTech -- and I think

25  you referred to this, but MicroTech and MicroLink were in the

**S. TRUITT - DIRECT / FRENTZEN**

1  same building?

2  **A.**    Yes.

3  **Q.**    Were you aware of an arrangement between MicroLink and

4  Autonomy in terms of MicroLink handling a fair amount of

5  business with Autonomy?  Were you just generally aware of that?

6  I'm sorry.

7  **A.**    I was aware that they did a lot of business with Autonomy,

8  yes.

9  **Q.**    And near the end of 2009, did it come to your attention

10  that Autonomy was going to acquire MicroLink?

11  **A.**    You know, yeah.  Yes, I did.

12  **Q.**    Can you just tell us a little bit about that, how you knew

13  that?

14  **A.**    Well, I basically just -- it was almost casually mentioned

15  to me by my brother Dave; and then I asked him about it again

16  several days later, and he told me that it was done, which was

17  shocking.  Actually, it was not several days later.  It was a

18  few days later.

19  **Q.**    Okay.

20  **A.**    So it was done and all for cash.

21  **Q.**    And did you know how much Autonomy acquired MicroLink for?

22  **A.**    I did know the total amount, I think, but that's really

23  all the details I knew.  The number I heard was 55 million.

24  **Q.**    All right.  In 2009 were you approached about the

25  potential to do more business with Autonomy; in other words,

S. TRUITT - DIRECT / FRENTZEN

1   MicroTech and Autonomy?

2   **A.**   Yes, I -- yes, we were.  Tony Jimenez and I were

3   approached by --

4   **Q.**   Who came to talk to you about it?

5   **A.**   My brother Dave and an associate of his, John Cronin.

6   **Q.**   Do you recall when this was in 2009?

7   **A.**   It was in mid-to-late December.

8   **Q.**   Near the time of the acquisition of MicroLink by Autonomy?

9   **A.**   Yes.

10  **Q.**   Can you tell us what the conversation was?  What was the

11  nature of the discussion about MicroTech developing a

12  relationship with Autonomy?

13  **A.**   Yeah.  The nature of the conversation was that Autonomy

14  wanted to make quarters on a fairly regular basis, and that

15  they had deals that were close to closing but that wouldn't

16  necessarily close by the end of the quarter.

17       So the proposal was that we would step in as a reseller,

18  close the deals with Autonomy; and then when the deals

19  ultimately closed, we would be rewarded with profit on the deal

20  for reselling the software.  And, in addition, we would acquire

21  new customers that we could provide services for at attractive

22  rates, similar to how MicroLink had done.

23       Now, when I say "similar to how MicroLink had done," I was

24  only referring to the services.  That's all I knew about at the

25  time.  And that was attractive to me having been in that

1  business most of my career.

2  **Q.**   Can you describe that for us as -- when it was initially

3  pitched to you, what was the -- what was your view of the

4  manner in which MicroTech could profit from this arrangement in

5  terms of obtaining any services -- services work?   Sorry.

6  **A.**   The big advantages to me for MicroTech were that we would

7  be acquiring commercial customers, which would be

8  diversification from our base, which was almost 100 percent

9  government work at that time; and that we would be able to

10  build up a cadre of very skilled technical people who could

11  provide services after the sale to these customers and the

12  margins on that would be a lot higher than what we were

13  experiencing in the businesses we were in at the time.

14      And I'm sure Tony at least was probably thinking that

15  maybe ultimately we could end up getting bought too.

16  **Q.**   Getting bought as MicroLink had?

17  **A.**   Yes, sir.

18  **Q.**   Just if you could, can you describe for us in what way

19  does being a reseller for Autonomy assist MicroTech in

20  obtaining these new customers?   In other words, how was that

21  going to work in your mind?

22  **A.**   Well, the way it was going to work was when the deals

23  closed, we would be introduced to the key people and the

24  customer and the technical contacts, and we would then go

25  actually install and configure the software and start building

1  relationships with the customer.

2      And as they started learning what the software could and

3  couldn't do, we would -- we would extend and modify and

4  reconfigure the software, sell them additional packages to

5  complement what they already bought.  I mean, we would put a

6  relationship in place.

7  Q.  You'd get some face time with the end user and be able to

8  try to develop a business relationship?

9  A.  Yes.

10  Q.  Did MicroTech agree to pursue this opportunity further?

11  A.  Yes, we did.

12  Q.  I want to ask you now about in the course of the

13  acquisition of MicroLink, was MicroTech asked to serve as a

14  reseller for Autonomy software from Autonomy to MicroLink --

15  I'm sorry -- to Discover Tech?  I apologize.

16  A.  Yes.  My brother Dave actually asked me directly if we

17  would acquire $10 million worth of Autonomy software for

18  immediate resale to Discover Tech.

19  Q.  Did you and MicroTech agree to do that?

20  A.  We did.

21  Q.  Why?

22  A.  Mostly the reason that I did it -- we did it for two

23  reasons.  One reason is we made $100,000 on it for doing

24  practically nothing, and the second reason is my brother asked

25  me to do it.  He said he had a customer.  He said he didn't

1  have the reseller agreement in place yet, and he wanted to do

2  this deal quickly.  So I helped him do it with Tony's

3  permission.

4  Q.   I'm going to show you what's been marked as Exhibit 398,

5  Mr. Truitt.  Take a quick look at that and see if you recognize

6  what it is.

7  A.   (Witness examines document.)  Yes, I do recognize it.

8  Q.   What is that?

9  A.   It's the purchase order for the transaction we were just

10  talking about between --

11       THE COURT:  Admitted.

12       THE WITNESS:  -- between MicroTech and Discover

13  Technologies.

14       THE COURT:  Admitted.

15    (Trial Exhibit 398 received in evidence)

16       MR. FRENTZEN:  Thank you, Your Honor.

17  Q.   Okay.  Does this show the date of December 29, 2009?  You

18  can also look on that screen in front of you, Mr. Truitt, if

19  that helps you.

20  A.   Yes.  Yes, sir, it does.

21  Q.   Can we scroll up a little bit?

22       All right.  Does that show the $10 million for a license

23  fee?

24  A.   Yes.

25  Q.   And on the next -- the second page, is that your

S. TRUITT - DIRECT / FRENTZEN

1  signature?

2  **A.**   It is.

3  **Q.**   Was the $10 million -- how did MicroTech get the

4  $10 million to purchase the software from Autonomy?

5  **A.**   We didn't have to front any cash for the transaction.

6  **Q.**   Okay.  But did $10 million go through MicroTech's bank

7  accounts?

8  **A.**   Yes.

9  **Q.**   Okay.  So --

10 **A.**   It came from Discover Technologies.

11 **Q.**   So Discover Tech paid MicroTech and MicroTech paid

12 Autonomy?

13 **A.**   Yes.

14 **Q.**   Around that same time, at the tail end of 2009, did you

15 also agree to begin to do a series of these end-of-the-quarter

16 reseller deals?

17 **A.**   Yes, we did.

18 **Q.**   I'd like to show you now what's been marked as exhibit --

19                    (Pause in proceedings.)

20 **BY MR. FRENTZEN:**

21 **Q.**   Mr. Truitt, did you speak with anyone directly at Autonomy

22 about the $10 million deal?

23 **A.**   No.

24 **Q.**   Who were your contacts on the $10 million deal?

25 **A.**   My brother Dave.

**S. TRUITT - DIRECT / FRENTZEN**

1   Q.   I'd like to show you now what's been marked as

2   Exhibit 422.  Take a look at that, Mr. Truitt, and see if you

3   recognize what that is.

4   A.   (Witness examines document.)

5           MR. KEKER:  442 or '22?

6           MR. FRENTZEN:  422.

7           MR. KEKER:  Sorry.

8           MR. FRENTZEN:  Sure.

9           THE COURT:  Admitted.

10      (Trial Exhibit 422 received in evidence)

11          THE WITNESS:  Are you talking about the top page here?

12  BY MR. FRENTZEN:

13  Q.   I'm talking about the whole thing.  Do you recognize what

14  it is?

15  A.   Okay.

16      (Witness examines document.)  Yes.  It's a package of

17  correspondence about the deals that we did at the end of the

18  quarter at the end of 2009.

19  Q.   All right.  And this is an e-mail from you to Mr. Cronin;

20  right?

21  A.   Uh-huh.

22  Q.   With a cc to Cynthia at Autonomy?

23  A.   Yes.

24  Q.   12/31/2009 at about 7:30 p.m.?

25  A.   Yes.

S. TRUITT - DIRECT / FRENTZEN

1  Q.   And one of the things you did here is to send e-mail

2  addresses.  Why were you sending e-mail addresses?

3  A.   Each of these e-mail addresses would be used to receive

4  the licenses for the software that we were purchasing, and I

5  just used the ones that I had already created for this one --

6  so they're all mine -- in case people were trying to get ahold

7  of me and they used the wrong e-mail address.

8       But I sent all these.  There's seven of them, I think.

9  Well, six of my own.  So those were to receive the license --

10 license information and keys.

11 Q.   All right.  So, in other words, you were trying to set up

12 to be able to receive the licenses in the event that you were

13 delivering the software to an end user?

14 A.   Yes, sir.

15 Q.   If we could go to page 2.

16 A.   Okay.

17 Q.   Blow that up.  Can we scroll up just a little bit?  Great.

18 That's great.

19      Okay.  So, for example, in this stack is there a purchase

20 order for an end user of KPMG?

21 A.   There is.

22 Q.   $153,000?

23 A.   Right.  It was the support fee.

24 Q.   Next page, please.

25      Purchase order for Morgan Stanley?

S. TRUITT - DIRECT / FRENTZEN

1    **A.**    Yes.

2    **Q.**    $4.8 million?

3    **A.**    Yeah.

4    **Q.**    Next page, please.

5          Asurion about 250,000 and change?

6    **A.**    Right.

7    **Q.**    Next page, please.

8          Do you see CenturyLink for the amount there?

9    **A.**    Yes, sir.

10   **Q.**    Can we see the next page, please?

11          All right.  On this page do you see Honeywell as an end

12   user?

13   **A.**    Yeah.  Honeywell Aerospace, yes.

14   **Q.**    Okay.  And if we could scroll down to that.

15          Do you see the amount there?

16   **A.**    Yes, sir.

17   **Q.**    Okay.  Next page, please.

18          Oh, I'm sorry.  The following page.  Thanks.

19          Manufacturers Life Insurance -- can you scroll up? -- a

20   little over a million?

21   **A.**    Yes.

22   **Q.**    And then the last one, Avaya, 360,000?

23   **A.**    Yes.

24   **Q.**    In terms of all of these reseller deals, did MicroTech go

25   out and try to sell to any of these end users?

1    **A.**    No.

2    **Q.**    Why not?

3    **A.**    We didn't know anybody at these end users, first of all.

4    Secondly, the circumstances about why these opportunities were

5    available was ostensibly that these were very late in the sales

6    cycle with the Autonomy sales team.  They were going to close

7    imminently so there would be no need for our involvement to

8    attempt to sell it.  We would just, if all worked out well,

9    service these accounts after they closed.

10    **Q.**    So what would have happened, incidentally, in terms of all

11    of these deals -- the $10 million, the almost $5 million,

12    several at 1 to $2 million -- I mean, what would have happened

13    at MicroTech if these deals didn't close and MicroTech was on

14    the hook for them?

15    **A.**    It would have been disastrous for MicroTech.

16    **Q.**    All right.  I'd like to move now to -- oh, I'm sorry.  I

17    want to show one other.

18        Was there also a deal related to Amazon?

19    **A.**    Yeah.  That came in just a little bit later than these,

20    and we went ahead and added that to the stack.

21    **Q.**    Okay.  Was that one that was particularly interesting to

22    you?

23    **A.**    Just because it was Amazon, although we actually already

24    had some relationships with Theresa Carlson and others at

25    Amazon; but, yeah, we wanted to do business with Amazon.

**S. TRUITT - DIRECT / FRENTZEN**

1  Q.   All right.  And as a result of any of these deals that did

2  close, did MicroTech wind up getting a relationship with the

3  end user as it played out?

4  A.   No.

5  Q.   Can you explain that for us, please?

6  A.   Well, the first several -- I can't remember how many,

7  three or four -- closed, and it was probably half the revenue,

8  6 and a half or $7 million.  And I got an e-mail from John

9  Cronin saying, "Hey, sorry.  These guys don't want to do

10 business with you directly.  Autonomy is going to keep these

11 customers, but you will get your 10 percent fee for assisting

12 with the transaction, and that's all you're going to get."

13 Q.   I'd like to show you now what's been marked as

14 Exhibit 593.  Would you take a quick look at that, please, sir?

15 A.   (Witness examines document.)

16     **THE COURT:**  Admitted.

17     (Trial Exhibit 593 received in evidence)

18     **MR. FRENTZEN:**  Thank you, Your Honor.

19     Blow up the top part.

20 Q.   Okay.  Mr. Truitt, is this the e-mail that you were just

21 referencing?

22 A.   I believe it is.  It only references Morgan Stanley, which

23 actually was the largest of them, but it's the same message,

24 "You're not getting the customer, but you will get the fee."

25 Q.   All right.  And this is in February of 2010.  Did this

1    start to dawn on you that it might not be working out the way

2    you thought it was going to work out?

3    **A.**    Not yet.

4    **Q.**    Okay.

5    **A.**    Not at this point.  What -- what I had at this point was I

6    was disappointed but, you know, I had $600,000 I didn't have

7    before and I had the hope that maybe some of the rest of these

8    would turn into customers, and it had only been not even two

9    weeks.

10    **Q.**    Two months?

11    **A.**    I mean, that's right, two months.  Sorry.  Did I say

12    "weeks"?

13    **Q.**    That's all right.  Or a month, a little over a month.

14        I guess just skipping to the end, as it played out, as you

15    continued to do these reseller deals at the ends of quarters,

16    did any of the end users wind up being -- in other words, did

17    it facilitate MicroTech in getting any of the end users as a

18    customer?

19    **A.**    Only in one case, and that is with a pretty large caveat.

20    We did get some customer relationships with Bank of America

21    that were very problematic and poorly managed when we received

22    them; but other than that, no.

23    **Q.**    When you say "problematic and poorly managed," what do you

24    mean?

25    **A.**    Well, I mean the list of people that were our contacts

1  were in just about every case were incorrect.  They didn't know

2  who we were when we called.  It was just a badly managed

3  handoff.

4  **Q.**  Handoff from who to who?

5  **A.**  From Autonomy to MicroTech.

6  **Q.**  All right.  Okay.  I want to briefly go back and just show

7  you a couple more exhibits.  Government's Exhibit 512, and I'm

8  going to show you 581.

9          **MR. FRENTZEN:**  Your Honor, I think 581 was a late add

10  on.  I don't know if it's in the Court's binder.  I've given a

11  copy to Defense counsel.

12          **THE COURT:**  512?

13          **MR. FRENTZEN:**  512 you have.  581 is an add on.

14          **THE COURT:**  512 admitted.

15     (Trial Exhibit 512 received in evidence)

16  **BY MR. FRENTZEN:**

17  **Q.**  Let's go to 512.  Mr. Truitt, what is 512?

18  **A.**  (Witness examines document.)  It's an e-mail from Shonda

19  Parham who worked at our Accounting Department at MicroTech to

20  Cathy Peterson, who was a vice president at Cardinal Bank, to

21  assure her that we wanted a wire transfer done and on my

22  authority.

23  **Q.**  Go to the next page, please, and scroll up.

24     This is the wire transfer?

25  **A.**  (Witness examines document.)  Well, it's the cover sheet.

1    Yeah.  Where's the -- oh, here it is.  Yes, it is.

2    **Q.**   All right.  $10 million to go to Autonomy?

3    **A.**   Yeah.

4    **Q.**   Is that the purchase of the software for Discover Tech?

5    **A.**   Yes.

6    **Q.**   And could you take a quick look at 581 and see if you

7    recognize what that appears to be?

8    **A.**   (Witness examines document.)

9          **THE COURT:**  Admitted.

10    (Trial Exhibit 581 received in evidence)

11          **THE WITNESS:**  It looks like a bank statement for

12    MicroTech's checking account with Cardinal Bank for January of

13    2010.

14    **BY MR. FRENTZEN:**

15    **Q.**   All right.  And if we could go to page 4 -- I'm sorry --

16    page 3.

17    **A.**   Okay.

18    **Q.**   On page 3 do you see the transaction I've actually

19    outlined on the screen in front of you?

20    **A.**   Yes.

21    **Q.**   Okay.  Is that the $10 million --

22    **A.**   It is.

23    **Q.**   -- coming in?

24          And if we could go to the next page and scroll down a

25    little bit.

**S. TRUITT - DIRECT / FRENTZEN**

1        Is this the $10 million going out?

2   **A.**   Yes.

3   **Q.**   And otherwise the account would be unable to handle

4   something like that it would appear?

5   **A.**   Yeah.  If we hadn't of put the 10 in, the 10 could not

6   have gone out.

7   **Q.**   All right.  I'd like to show you now what's been marked as

8   Government's -- or as Exhibit 549, Mr. Truitt.  Take a look at

9   that, please, sir, and see if you recognize what it is.

10  **A.**   (Witness examines document.)

11          **THE COURT:**  Admitted.

12  (Trial Exhibit 549 received in evidence)

13          **MR. FRENTZEN:**  Put 549 up, please, and scroll down a

14  little bit.

15  **Q.**   Mr. Truitt, do you recognize what this is?

16  **A.**   Yes.  This is an e-mail string where an Alex Jackson of

17  Deloitte in the U.K. is asking for us to verify that the

18  transactions that we had just entered into a few days before

19  were genuine transactions and real debts to the corporation,

20  and all that kind of thing.

21  **Q.**   All right.  And you see there's an individual by the name

22  of Lee Welham on there, also a Steve Chamberlain and a Matt

23  Stephan?

24  **A.**   Yes.  They're in the cc line.

25  **Q.**   Okay.  Could we go to page 3 of this document?

S. TRUITT - DIRECT / FRENTZEN

1    All right.  And do you see there certain debts listed,

2  Mr. Truitt?

3  **A.**   I do.

4  **Q.**   And you see Mr. Chamberlain's signature on the bottom?

5  **A.**   Yes.

6  **Q.**   Could we go to the next page, please?

7    All right.  And did you sign this, Mr. Truitt?

8  **A.**   I did, yes.

9  **Q.**   Okay.  To the extent that it says there are no side

10  letters or other agreements in respect to the subject matter of

11  this request except as noted below, was that accurate?

12  **A.**   I believed it to be at this time.

13  **Q.**   At what time?

14  **A.**   On the 13th of January 2009.

15  **Q.**   All right.  Well, did you think that you were going to be

16  on the hook for the $10 million and the $4.8 million, and so

17  on?

18  **A.**   At this time, yes, I did think I was going to be on the

19  hook for that.

20  **Q.**   Did you later have a different view of this?

21  **A.**   Well, later, as I continued to grow more and more agitated

22  and freaked out about this, we were able to work out some

23  arrangements with Autonomy that greatly reduced my agitation

24  about that issue.

25  **Q.**   What do you mean?

1   **A.**   Well, we were able to do some -- some business

2   arrangements with them for services on very favorable and

3   unusual payment terms.  They got some cash back to us so that

4   it -- we were able to take care of some of this stuff.

5   **Q.**   All right.  Well, in addition to that, I mean, Mr. Truitt,

6   were you -- was MicroTech trying to sell any of this software

7   that they were on the hook for?

8   **A.**   No.

9   **Q.**   Who was trying to sell it?

10  **A.**   Autonomy.

11  **Q.**   Okay.  And so were you on the hook for the software or was

12  Autonomy going to take care of it for you?

13  **A.**   As I said, ultimately I came to believe that Autonomy was

14  going to take care of it; but on this day, the very first one

15  that I signed a week into it, I thought, yeah, we were on the

16  hook for this.

17  **Q.**   All right.  Well, let's take a look, if we could, at

18  Exhibit 595.  See if you recognize this, Mr. Truitt.

19  **A.**   (Witness examines document.)

20          **THE COURT:**  Admitted.

21      (Trial Exhibit 595 received in evidence)

22          **THE WITNESS:**  Yes, I recognize these e-mails.

23  **BY MR. FRENTZEN:**

24  **Q.**   I'm sorry, Mr. Truitt, what's that?

25  **A.**   Oh, I was just saying -- I was saying, yes, I do recognize

1    these e-mails.

2    **Q.**   All right.  And so can you just tell us -- can we go to

3    the -- sorry -- the second page of this?

4        All right.  And do you see the e-mail that I've just put a

5    block around there; in other words, that part of the

6    communication, Mr. Truitt?

7    **A.**   Yes, sir.

8    **Q.**   Okay.  And can you describe for us, what are you asking

9    for here?

10   **A.**   Yeah.  I'm asking John Stanley -- excuse me -- John

11   Cronin:  When is the Morgan Stanley deal going to close.  You

12   said it's going to close any day now, and we still don't have

13   it.  And Autonomy's accounts department is -- Accounts

14   Receivable Department is dunning us.  And, you know, so in

15   addition to the fact that we don't have the money, they also

16   don't know that we had extra time to pay.  Why is that?

17   **Q.**   And you say (reading):

18           "Autonomy is starting to dun us for payment" --

19       What's "dun us for payment" mean?

20   **A.**   They were calling us up saying, "When are you going to

21   pay?"

22   **Q.**   All right.  (reading)

23       -- "on some of the contracts."

24       And then you said (reading):

25           "Apparently the special payment terms are not

1      communicated to the A/R" --

2      Is that accounts receivable?

3  **A.**  Yes.

4  **Q.**  (reading)

5      -- "accounts receivable section."

6      What were the special payment terms?

7  **A.**  I don't recall exactly, but instead of being due in

8  30 days, it was something longer, like 90 days.  It was a

9  longer period of time before we were due to pay the money.

10  **Q.**  Well, wasn't accounts receivable calling you when this

11  stuff was due and the special payment term was Autonomy is

12  going to take care of this and close the deal, and that's how

13  it's going to work out?

14  **A.**  I'm sorry.  I don't understand the question.

15  **Q.**  In other words, wasn't the special payment term --

16      **MR. KEKER:**  Objection to leading, Your Honor.

17      **THE COURT:**  Overruled.

18  **BY MR. FRENTZEN:**

19  **Q.**  Wasn't the special payment term that whether the stuff

20  came due or not, Autonomy is going to close the deal with

21  Morgan Stanley and that's how it's going to get taken care of?

22  **A.**  What I was referring to in this e-mail was the fact that

23  on the purchase order itself, the payment terms were

24  deliberately set up to be longer and they shouldn't be calling

25  us yet.

**S. TRUITT - DIRECT / FRENTZEN**

1    **Q.**    Well, they shouldn't be calling you because they were

2    going to sell it; right?

3    **A.**    Yes, they were going to sell it and we were going to get

4    the money and we didn't owe it yet.

5    **Q.**    Can we go to page 1?

6        And then is Mr. Cronin saying to you -- oh, sorry.

7        Can you scroll up a little bit, please?  Or is it at the

8    bottom?  No, no.  Great.  Great.  Great.

9        All right.  And Mr. Cronin is talking to you about this,

10   and then he's suggesting "no response be given to Autonomy on

11   any inquiries re orders or payments until you and I confer"?

12   **A.**    Yes.

13   **Q.**    Can you scroll down?

14       All right.  Then you said (reading):

15           "That was my plan.  The only issue to be managed was

16       they lobbed the initial call right into our AP clerk."

17       What's that?

18   **A.**    Our accounts payable person didn't know what these were

19   about because Tomas hadn't put them on the books yet.

20   **Q.**    And you said (reading):

21           "I have told her to bring them straight to me in the

22       future.  I expect they will probably refer them back to

23       Stouffer through you if required."

24   **A.**    Yes.

25   **Q.**    All right.  And then he's saying (reading):

1           "I have a call in to him.  Hopefully we'll hear back

2       on these opportunities soon.  They should not be hounding

3       you re any payments due other than Morgan Stanley.  And

4       that one should come off their list anyway."

5   **A.**   Apparently I was mistaken about Morgan Stanley having

6   special terms but the rest of them did so, yes.

7   **Q.**   All right.  Can we go to -- or, I'm sorry, I'll show you a

8   couple of things.

9       Exhibit --

10          **MR. FRENTZEN:**  Is 708 in evidence?

11          **THE CLERK:**  No.

12          **THE COURT:**  No.

13          **MR. FRENTZEN:**  I'm missing one hard copy, Your Honor.

14  I'll just do it like this:

15  **Q.**   Mr. Truitt, can you take --

16  **A.**   You can give that to the judge.  I can look at this one.

17  **Q.**   I think he's got it.  I just don't have a hard copy.

18  **A.**   Okay.

19          **MR. FRENTZEN:**  Your Honor, you have 708 in your

20  binder?

21          **THE COURT:**  Admitted.

22      (Trial Exhibit 708 received in evidence)

23          **THE COURT:**  I'm sure I do.

24          **MR. FRENTZEN:**  Well, that makes it easier.

25          **THE COURT:**  Do you need it?

1    **MR. FRENTZEN:**  Okay.  Great.  Could we -- thank you,

2    Your Honor.

3        Can we scroll down to the end of the e-mail chain?

4    **Q.**   All right.  Do you see the date of this particular e-mail,

5    Mr. Truitt?

6    **A.**   April 1st, 2010.

7    **Q.**   All right.  And that is from who at the beginning of the

8    chain, meaning at the bottom of the chain?

9    **A.**   John Cronin.

10   **Q.**   To who?

11   **A.**   To me.

12   **Q.**   All right.  And it says (reading):

13            "I just talked with Dave re most recent Autonomy

14       conversations.  I'm available to help with this.  Am

15       awaiting details from Autonomy," et cetera.

16       Can you take a look at the next page and see if you can

17   tell what this is in reference to?

18   **A.**   (Witness examines document.)  Well, I don't know that you

19   could tell that by looking at this, but this is what it's

20   about.  It's about the Vatican Library deal.

21   **Q.**   Okay.  Can you describe for us, what is the Vatican

22   Library deal and when did it come to your attention?

23   **A.**   The Vatican Library deal was a deal to sell a lot of

24   software to the Vatican, IDOL server and several other things I

25   think, for something like 11 and a half million dollars.  This

1    was a very large deal.

2        I first heard about it sometime that week towards the end

3    of the week, meaning 27th, 28th, 29th, in there.

4    **Q.**   All right.  Was --

5    **A.**   And -- go ahead.

6    **Q.**   No, no.  Go ahead.

7        **MR. KEKER:**  Can we get the month, Your Honor?  He said

8    27th, 28th, 29th.

9        **THE WITNESS:**  March of 2010, sir.

10       **MR. KEKER:**  Thank you.

11       **THE WITNESS:**  I was talking mostly with John about it.

12   Dave was gone that week, I believe, and John was mostly saying

13   things like sort of reverse psychology.  He was, like, "Hey,

14   this is probably going to close so don't get your hopes up; but

15   if it doesn't close, you can get in on this."

16       So I was excited about it because the services add on here

17   would be tremendous, both for technically and just I can't

18   imagine how much data the Vatican Library has in their basement

19   but I would have loved to have gotten a chance to go down

20   there.

21   **BY MR. FRENTZEN:**

22   **Q.**   Is this something you were excited about?

23   **A.**   Yes.

24   **Q.**   All right.  Isn't it a fact, sir, you didn't get this

25   notification of this Vatican deal until April 1st, 2010?

1    **A.**    It is true, I did not.

2    **Q.**    So April 1st, 2010, is when you learned about the Vatican?

3    **A.**    No.  That's when I signed the purchase order, and it's

4    when I first got something in writing about it.

5    **Q.**    Who did you get it in writing from?

6    **A.**    John Cronin.

7    **Q.**    All right.  Can we go to the following page, please?

8    Scroll down.

9          This is the Vatican deal for 11.5 million basically?

10   **A.**    Yes.

11   **Q.**    All right.  When was the deal -- when did MicroTech

12   actually enter into this deal, Mr. Truitt?

13   **A.**    April 1st, 2010.

14   **Q.**    All right.  Had MicroTech agreed to do this -- or

15   MicroTech had not agreed -- when did MicroTech agree to do

16   this?

17   **A.**    I had expressed a willingness to do it to John that week.

18   I put my signature on it April 1st.

19   **Q.**    Can we go to the -- well, let me show you -- actually, let

20   me show you this.  I don't have 707 either.

21           **MR. FRENTZEN:**  Is 707 in evidence?

22           **THE COURT:**  No.

23           **THE CLERK:**  No.

24           **THE COURT:**  Admitted.

25           (Trial Exhibit 707 received in evidence)

S. TRUITT - DIRECT / FRENTZEN

1          **MR. FRENTZEN:**  Thank you, Your Honor.

2      Can we just get 707 up here?

3  **Q.**  Mr. Truitt, take a look at the first page of 707.  What is

4  this?

5  **A.**  (Witness examines document.)  I'm thinking that it is --

6  I'm thinking it's me sending the signed purchase order back to

7  John to be relayed to Autonomy.

8  **Q.**  Okay.  Could we go to the second page, please?

9      What is this?  Can you see -- can you tell now?

10      Please scroll down.

11  **A.**  It's the signed purchase order.

12  **Q.**  Second page.  Sorry, the third page.  There you go.  There

13  you go.

14      This is the Vatican deal?

15  **A.**  Yes.

16  **Q.**  Can we go to the last page, please?

17      All right.  And you signed this it says on 3/31/2010?

18  **A.**  It does say that --

19  **Q.**  Okay.

20  **A.**  -- but I actually signed it on the 1st.

21  **Q.**  So this was backdated?

22  **A.**  Yes.

23  **Q.**  You knew you were backdating it when you signed it?

24  **A.**  I did, but I wasn't really -- I wasn't thinking about it

25  that much.  It had the date on it already.  But, yes, I did

1   know it was April 1st when I signed it.

2   **Q.**   I'd like to show you now Exhibit 746.

3        **THE COURT:**  Admitted.

4        (Trial Exhibit 746 received in evidence)

5        **MR. FRENTZEN:**  Thank you, Your Honor.

6   **Q.**   What is 746, Mr. Truitt?

7   **A.**   (Witness examines document.)  It's a memo from Steve

8   Chamberlain of Autonomy asking if we would confirm the

9   contracts or deals listed here directly with Deloitte, who is

10  their auditors.

11  **Q.**   In terms of the Vatican, was MicroTech making any effort

12  to sell to the Vatican?

13  **A.**   No.

14  **Q.**   Who was going to sell the software to the Vatican?

15  **A.**   Autonomy.

16  **Q.**   Did the Vatican deal, to your knowledge, ever close with

17  Autonomy?

18  **A.**   Not to my knowledge.

19  **Q.**   And so what ended up happening with the 11 million and

20  change in software that MicroTech had purchased from Autonomy?

21  **A.**   Are you asking what actually happened to the software

22  itself, or are you just asking what happened with this business

23  arrangement?

24  **Q.**   What happened with the debt and the business arrangement?

25  **A.**   We paid a great deal of it down using funds that we

1  obtained by doing additional business with Autonomy.  I don't

2  know if we ever completely paid it off, but we paid a large

3  percent of it -- percentage of it.

4  **Q.**  And so you paid it utilizing funds from Autonomy?

5  **A.**  Yes.

6  **Q.**  Could we go to the next page of this document, please?

7       Whose signature is here, Mr. Truitt?

8  **A.**  Tomas Esterrich.

9  **Q.**  Who was he?

10  **A.**  He was our chief financial officer.

11  **Q.**  At this point in time, by April of 2010 where it says

12  there are no side letters or other agreements, was that true?

13  **A.**  I can't remember the timing on the ATIC and the FISMA, but

14  very likely at this point.

15  **Q.**  What do you mean?

16  **A.**  I mean that I was no longer feeling like if these deals

17  didn't close, that provenance wasn't going to be made to make

18  it so that we could pay these debts.

19  **Q.**  All right.  Meaning that were you really on the hook for

20  the debts to Autonomy?

21  **A.**  No.

22  **Q.**  Why not?

23  **A.**  Because Autonomy was going to work with us to make

24  arrangements to pay these debts with money that we didn't have

25  to go make elsewhere.

1    Q.    I'd like to move to Exhibit 767.

2            THE COURT:  Admitted.

3        (Trial Exhibit 767 received in evidence)

4            MR. FRENTZEN:  Thank you, Your Honor.

5    Q.    Would you take a look at 767, Mr. Truitt?  What is 767?

6    And let's start with the bottom part.

7    A.    This is an e-mail from John Cronin to me asking that I

8    verify that we received the Vatican software on a disk on the

9    31st of March.

10   Q.    All right.  And do you see Mr. Cronin's included in here

11   and he's saying (reading):

12           "Could you please send the following e-mail to Joel

13       Watkinson of Autonomy"?

14   A.    Yeah.  Joel Watkinson actually worked for MicroLink, but

15   he meant Joel Scott I think.

16   Q.    Okay.  Well, we'll see.  We'll take a look at that in a

17   second.

18       But do you see where he what he asked you to send here?

19   (reading)

20           "Joel, please be advised that MicroTech received

21       the" --

22       Is "BAV" the Vatican?

23   A.    Yes.

24   Q.    (reading)

25       -- "BAV project-related software as per our order

1       number " such and such, "on March 312010.  If any

2       further information is needed, please let me know"?

3   A.   Yes, I see that.

4   Q.   And then Mr. Cronin also e-mailed and said (reading):

5           "I meant, of course, Joel Scott of Autonomy."

6       Right?

7   A.   Yes.

8   Q.   All right.  Can we now take a look -- I'd like to ask you

9   to take a look at Exhibit 766.  What is 766?

10  A.   (Witness examines document.)  Is there a question?  I'm

11  sorry.  Did you ask --

12  Q.   What is it?

13  A.   Oh.  It's an e-mail from myself to Joel Scott where I cut

14  and pasted these words into this e-mail and sent it to him.

15          MR. FRENTZEN:  I'd offer 766, Your Honor.

16          THE COURT:  I think it's already in, but --

17          MR. FRENTZEN:  Oh, 766 is in evidence?

18          THE CLERK:  (Shakes head.)

19          THE COURT:  Oh, no.  I'm wrong.  It's now in.

20       (Trial Exhibit 766 received in evidence)

21          MR. FRENTZEN:  Thank you, Your Honor.

22  Q.   All right.  And so at the bottom part this is from you,

23  Mr. Truitt?

24  A.   (Witness examines document.)  The bottom part?

25  Q.   Right.  The way these e-mails work, the bottom part is

1    from you.

2    **A.**    There's only one e-mail.  Yes, this is from me to Joel

3    Scott.

4    **Q.**    And you've cut and pasted this information about receiving

5    the software?

6    **A.**    I did.

7    **Q.**    Was that true or false?

8    **A.**    As it's stated here, it was false.  I mean, we didn't

9    receive it on a disk or anything like that, but --

10    **Q.**    And didn't receive it on March 31st of --

11            **MR. KEKER:**  He didn't finish his answer.  He

12    interrupted.

13    **BY MR. FRENTZEN:**

14    **Q.**    Did I interrupt you?

15    **A.**    No, sir.

16    **Q.**    If I did, go ahead.

17    **A.**    No.

18    **Q.**    I didn't mean to interrupt you.

19    **A.**    That's okay.  Please finish your question.

20    **Q.**    Was it received on March 31st, 2010?

21    **A.**    Probably not.  I don't know when it was received.  I mean,

22    we had it on our servers, but it wasn't received as described

23    in this e-mail.

24    **Q.**    So you just cut and paste and sent a confirm?

25    **A.**    I did because I wasn't actually concerned about it.  I

1    knew we could install it if we ever needed to.

2    **Q.**    All right.  But in terms of delivery of software, that was

3    false?

4    **A.**    Yes.

5    **Q.**    And further backdated?

6    **A.**    I don't know about that, but --

7    **Q.**    Well, you signed the purchase order on April 1st, 2010.

8    Are you telling us --

9    **A.**    Oh, yes.  The purchase order was backdated, yes, sir.

10   **Q.**    And you didn't sign the purchase order until a day after

11   March 31st, 2010.  Did you think you'd gotten the software a

12   day before?

13   **A.**    Boy, no.  No.  What I thought was is we had a copy of it

14   on our servers already and it didn't matter; but we didn't get

15   diskettes on the 31st, and I should not have answered this

16   e-mail the way I did.

17   **Q.**    Mr. Truitt, I'd like to go now to Exhibit 836.  Let me

18   show you Exhibit 836.  See if you recognize what that is, sir.

19           **THE COURT:**  Admitted.

20       (Trial Exhibit 836 received in evidence)

21           **MR. FRENTZEN:**  Scroll down to the bottom, please.

22   **Q.**    Mr. Truitt, what is the nature of this e-mail?

23   **A.**    Well, this started out with Reena Prasad of Autonomy

24   asking Tomas, "When are we going to get our money on one, two,

25   three, four, five, six of the open deals."

**S. TRUITT - DIRECT / FRENTZEN**

1     And then Tomas telling our accounts payable clerk that he

2   was going to ask me.

3     And then I'm turning around and asking John Cronin,

4   "What's the word on these things?  Are they going to close or

5   what?"

6   **Q.**   Okay.  So at this point in May of 2010, you're 13 and a

7   half million in the hole to Autonomy, at least on paper?

8   **A.**   That sounds right, yes.

9   **Q.**   Can we scroll to the top?

10    And, I mean, in response to this, did you go out and try

11  to sell the software to anybody?

12  **A.**   No.  I sent John Cronin to ask them when they were going

13  to sell it.

14  **Q.**   All right.  And then Mr. Cronin -- you're saying

15  (reading):

16        "Can you tell me about these?"

17    Then Mr. Cronin is saying (reading):

18        "I would not respond until I get more info on status

19        from Autonomy management."

20  **A.**   Yes.

21  **Q.**   (reading)

22        "I have calls in to them and e-mails."

23  **A.**   That's what he said.

24  **Q.**   All right.  I want to jump forward.  I'd like to show you

25  now what's been marked as Exhibit 1174.

1          **THE COURT:**  Admitted.

2      (Trial Exhibit 1174 received in evidence)

3          **MR. FRENTZEN:**  Let's put it up.

4  **Q.**  Mr. Truitt, is this another of these audit confirm letters

5  for Deloitte?

6  **A.**  Yeah.  It appears to be.  I can only see half of it but,

7  yes.

8  **Q.**  Can we go down -- can we go to page 3?

9      And if at any time you want me to back out, or anything

10 like that, please just let us know.

11     Does that appear to be October 6, 2010?

12 **A.**  Yes.

13 **Q.**  And the debts here, the Vatican is still on there?

14 **A.**  Yes.

15 **Q.**  Scroll down.

16     All right.  And is this signed by Mr. Esterrich?

17 **A.**  It is.

18 **Q.**  And is he making some specific requests in there?

19 **A.**  He's asking that one of the six deals on the original

20 request for confirmation be removed, which is the Veterans

21 Affairs order, because there's no order according to him.  He

22 doesn't have an order for it so he's not going to -- he's not

23 going to confirm that one.

24 **Q.**  Okay.  But otherwise he's confirming the other debts?

25 **A.**  Yes.

S. TRUITT - DIRECT / FRENTZEN

1   Q.   And, again, saying there are no side agreements?

2   A.   He is saying that.

3   Q.   Was that true?

4   A.   This is October 2010?  No.

5   Q.   I'd like to show you now Exhibit 12 -- actually, let's go

6   to Exhibit 1320.

7            MR. FRENTZEN:  Is that in evidence?

8            THE CLERK:  Yes.

9            MR. FRENTZEN:  Oh, it is?  Okay.  Great.

10       So if we could just put up 1320, please.

11  Q.   Do you have a recollection, Mr. Truitt, about this around

12  December of 2010, this ATIC?  What was ATIC?

13  A.   ATIC was the Advanced Technologies Innovation Center,

14  which was a facility that we built on the first floor of our

15  building, and created a proposal to use it to feature and

16  market Autonomy products.

17  Q.   And in terms of bringing Autonomy into this deal, who

18  first approached you about that?

19  A.   Dave Truitt.

20  Q.   Do you recall -- or were you involved in any of the

21  negotiations with Autonomy about this ATIC?

22  A.   No.

23  Q.   Who handled the negotiations as far as you're aware?

24  A.   As far as I'm aware, it was Dave directly.

25  Q.   Do you have a recollection about, let's say, numbers that

1    were getting talked about?

2    **A.**    The numbers went all over the place.  There was a version

3    that was in the $3 million range.  There was a version -- there

4    was a multiyear version that was in the $12 million range.  I

5    think we settled on something just under 10.

6    **Q.**    Can we go to page 29 of this exhibit, please?  And if we

7    could scroll up a little bit.  Keep going.  There we go.

8       All right.  And is that -- when you're talking about

9    different numbers, Mr. Truitt, is this a document that you're

10   referring to?

11   **A.**    Well, this document actually basically kind of

12   incorporated a wide range of discussions into a single

13   document; but, yes, this is showing the range of discussions

14   that occurred.

15   **Q.**    Were you a participant in any of those?

16   **A.**    No.  Only on the back end because what I would do is I

17   would hear what was going on, and then I would adjust the

18   proposal accordingly.

19   **Q.**    Can we go to -- or I'll show you 13 --

20         **MR. FRENTZEN:**  Is 1340 in evidence?

21         **THE CLERK:**  No.

22         **MR. FRENTZEN:**  No?  Okay.

23      I don't have 1340 for some reason, so let me just show it

24   to him.

25         **THE COURT:**  Which one?

1          **MR. FRENTZEN:**  1340, Your Honor.

2          **THE COURT:**  Admitted.

3      (Trial Exhibit 1340 received in evidence)

4          **MR. FRENTZEN:**  Thank you, Your Honor.

5  **Q.**   All right.  Mr. Truitt, do you see Exhibit 1340 there in

6  front of you on the screen?

7  **A.**   Yes.

8  **Q.**   Okay.  What is this?

9  **A.**   This is John Cronin letting me know that we had settled on

10  the number 9.6 million, and that I needed to generate an

11  invoice to that effect; and the 9.6 million was for some flavor

12  of the ATIC deal.

13  **Q.**   All right.  I mean, just as you looked at it -- or as you

14  look back on it, was the ATIC worth $9.6 million?

15  **A.**   It's hard to say.  It was worth more than zero but, no, it

16  probably wasn't worth $9.6 million.  They actually did get some

17  use out of it.  It had some pretty cool stuff in it, but

18  probably not worth that much.

19  **Q.**   All right.  Well, did you have an understanding that of

20  this 9.6 million, MicroTech was going to be able to make up

21  some of its back debts to Autonomy?

22  **A.**   Yes.

23  **Q.**   As it was described to you, was that part of the purpose

24  of doing this ATIC?

25  **A.**   Absolutely.  We were looking for ways to do business with

1   Autonomy to get some money in the door to get some of those

2   deals off the books that didn't close.

3   **Q.**   Can we go to the next page, please?

4        So is this a purchase order that was to MicroTech for the

5   9.6 million?

6   **A.**   Yes.

7   **Q.**   All right.  Did that deal go through?

8   **A.**   It did.

9   **Q.**   I'd like to show you 1357.

10       **THE COURT:**  Admitted.

11       (Trial Exhibit 1357 received in evidence)

12       **MR. FRENTZEN:**  If we could scroll to the third page.

13   All right.  Great.

14   **Q.**   Is this December 30, 2010, Mr. Truitt?

15   **A.**   Yes.

16   **Q.**   Okay.  And is this basically saying (reading):

17            "When the payment hits our account by tomorrow,

18        9.6 million from Autonomy, we need a wire transfer back to

19        Autonomy for 6.3 million"?

20   **A.**   Yes.  That's what it says.

21   **Q.**   All right.  And then to your recollection, was there kind

22   of a snafu in the wire that came in from Autonomy?

23   **A.**   Yeah.  The amount that came in at first was 6.9 million.

24   I guess they had transposed the first two digits.

25   **Q.**   All right.  Can we go to the first page of this e-mail

1    chain, please?  And scroll down.

2         All right.  So then -- and this is from you; right?

3    A.   The top one?

4    Q.   On the screen what I'm showing.

5    A.   Yes.  That's me telling Pedro, which was Tomas' right-hand

6    guy, "Don't worry," and also the bankers, "the money is

7    coming."

8    Q.   All right.  And then the additional -- to make up the

9    difference between the 9 point -- I mean, the 6.9 and the 9.6,

10   the additional wire came in, and then sending 6.3 back to

11   Autonomy?

12   A.   Correct.

13   Q.   So was that the payoff -- and, incidentally, had Honeywell

14   ever closed?

15   A.   I don't think so.

16   Q.   So this went to pay off Honeywell and to pay off part of

17   the Vatican?

18   A.   Yeah.  I don't know how they would have applied the funds.

19   That was something Tomas cared about and I didn't.  But it went

20   to pay off something out of our balance.

21   Q.   I'd like to show you now exhibit -- sorry, Your Honor.

22   I'm just trying to find the signed copy -- Exhibit 1359.  See

23   if you recognize that.

24        THE COURT:  Admitted.

25        (Trial Exhibit 1359 received in evidence)

S. TRUITT - DIRECT / FRENTZEN

1          **MR. FRENTZEN:**  Can you just bring it up?

2    **Q.**   Do you remember, then, doing another sort of

3    end-of-quarter deal that involved the Department of Interior,

4    Mr. Truitt?

5    **A.**   (Witness examines document.)  Yes.

6    **Q.**   Again, with respect to this deal, did you -- or did

7    MicroTech sell this to the Department of Interior?

8    **A.**   We did not.

9    **Q.**   Who was going to sell it to the Department of Interior?

10   **A.**   Autonomy.

11   **Q.**   And this was for $4 million?

12        If we could scroll up just a little bit.

13   **A.**   Yes.

14   **Q.**   For 4 million and change?

15   **A.**   Uh-huh.  Yes.  Sorry.

16   **Q.**   That's all right.

17        I'd like to show you now Exhibit 1501 and see if you

18   recognize what that is.

19   **A.**   (Witness examines document.)

20        **THE COURT:**  Admitted.

21        (Trial Exhibit 1501 received in evidence)

22        **MR. FRENTZEN:**  Thank you, Your Honor.

23   **Q.**   Mr. Truitt, is this another audit confirm for Deloitte?

24   **A.**   (Witness examines document.)  Well, page 1 is missing but,

25   yes, it looks like it is.

S. TRUITT - DIRECT / FRENTZEN

1   Q.   Oh, I'm sorry.

2        Okay.  Could we scroll down to page 4?

3        Mr. Truitt, do you see what's on your screen there on

4   page 4?

5   A.   Yes.

6   Q.   All right.  Does it appear the Vatican has gone from

7   11.5-something million to 6.7-something million?

8   A.   Correct.

9   Q.   Department of Interior is still on here?

10  A.   Right.

11  Q.   Could we go to the next page, please?

12       All right.  Now, Mr. Truitt, did you sign this confirm?

13  A.   I did.

14  Q.   All right.  With respect to where it says no side letters

15  or other agreements, was that true?

16  A.   No, because of, again, the fact that I was no longer

17  worried about somehow getting the money to pay them.

18  Q.   And in the bottom here they've added (reading):

19           "We acknowledge that Autonomy Corporation PLC retains

20       no continuing managerial involvement in the delivery of

21       this product or service other than stipulated in the

22       license agreement."

23       Was that true?

24  A.   It was not true and to my discredit, I didn't even notice

25  the language at the time.  But, no, it was not true.  That was

S. TRUITT - DIRECT / FRENTZEN

1   a new thing.

2   **Q.**   All right.   I'd like to show you Exhibit 1675.   Would you

3   look at that, please, sir?

4           **THE COURT:**   Admitted.

5       (Trial Exhibit 1675 received in evidence)

6   **BY MR. FRENTZEN:**

7   **Q.**   Do you recognize what that is, Mr. Truitt?

8   **A.**   Who it is?   Yeah, Joel Scott was the -- I believe he was

9   the COO of the United States organization for Autonomy.

10  **Q.**   Okay.   Around this time, or at whatever time you want to

11  tell us, did you move from dealing with John Cronin to dealing

12  with Mr. Scott primarily?

13  **A.**   Yes, I did.

14  **Q.**   Can you describe for us how that came about?

15  **A.**   Well, we had started having -- I say "we" -- Tony Jimenez

16  and I had started having conversations where I was saying, "You

17  know, if we can figure out a way to get out from under the ones

18  we're under, we could get out from under and call it good."

19      And originally -- initially it seemed like that would be

20  what was going to happen, so that the ones that we did at the

21  end of 2010 were going to be it and that we would go through

22  them, they'd either close or we'd get them off the books and

23  that would be done.

24      Ultimately, though, we decided -- and when I say "we," I

25  mean mostly Tony -- but we continued to do them, but we had

1   already told John Cronin we wouldn't be needing his services

2   anymore.  So from that point forward I started dealing with

3   Joel Scott directly, and he would bring me whatever was on the

4   menu himself.

5   Q.   All right.  Just in terms of your dealings with Autonomy,

6   was this kind of when you started dealing with somebody from

7   Autonomy directly?

8   A.   Yes.

9   Q.   And prior to that, had it primarily been Mr. Cronin?

10  A.   Yeah.  Either him or Dave.

11  Q.   Him or Dave Truitt?

12  A.   Yeah.  Primarily Mr. Cronin, though, yes.

13  Q.   Just if you could, could you describe for us before this

14  shift where you're dealing with Mr. Scott pretty regular, did

15  you have any kind of dealings with the folks from Autonomy

16  along the way other than when they wanted to get paid?

17  A.   Not really, no.  Just very occasional -- I may have had an

18  e-mail or two with Stouffer Egan but, no, generally I didn't

19  talk to them.

20  Q.   John Cronin or Dave Truitt was handling it?

21  A.   Yes.

22  Q.   All right.  This document, could we go to the second page,

23  please?

24       What was -- this end user software agreement between

25  MicroTech and Autonomy, what was this all about?

S. TRUITT - DIRECT / FRENTZEN

1    **A.**    (Witness examines document.)

2    **Q.**    Well, let's go to page 9, if we could.

3    **A.**    Oh, this is -- yeah, I know what this is.  This is

4    software that we bought to support -- to do back-end support

5    for Bank of America, I think.

6        (Witness examines document.)  Yeah.

7    **Q.**    What do you mean by that?

8    **A.**    Meaning Autonomy had several support arrangements -- I

9    don't know if they were contracts or what -- in place where

10   they were providing back-end technical support -- I'm guessing

11   probably help desk, all that sort of thing -- to bank of -- to

12   various parts of Bank of America, many different parts, and

13   they were going to transfer that over to us and allow them to

14   invoice those and then we were going to take a percentage of

15   that invoice as our fee for doing that work.  And then we

16   bought this software in order to be able to provide that

17   service.

18   **Q.**    All right.  And when you say you bought this software, to

19   your recollection did MicroTech ever pay Autonomy for this

20   software?

21   **A.**    No.  Or if we did, it was re -- I can't remember, but it

22   ended up being we didn't pay.

23   **Q.**    I want to show you some other deals from that same time

24   period.  1689.

25   **A.**    And we're in April of '11 now, give or take?

1    Q.    Tail end of March 2011 still, sir.

2          THE COURT:   1689 admitted.

3          (Trial Exhibit 1689 received in evidence)

4          MR. FRENTZEN:   Thank you, Your Honor.

5    Q.    Mr. Truitt, can you take a look at 1689 and tell us what

6    these are?

7    A.    (Witness examines document.)

8    Q.    And could we, actually, just go through these to page 2?

9          Is this a purchase order?

10   A.    These are the purchase orders for the software I was just

11   talking about.

12   Q.    This is for the software you were just talking about, or

13   these are new purchase orders for new deals for new end users

14   in addition?

15   A.    Oh, I'm sorry.  I misread it.  I saw "Bank."

16   Q.    That's all right.

17   A.    Now I see Bank of Montreal, NRO, and Xerox.  These are new

18   deals.

19   Q.    Okay.  And, I'm sorry.  Could we just show the date real

20   quick?

21         This is March 31st, 2011, Mr. Truitt?

22   A.    Yes, sir.

23   Q.    Okay.  Bank of Montreal -- and scroll -- or go to the

24   second page, please -- do you see this for 2.88 million plus?

25   A.    Right.

1  Q.   All right.  Could we go to the next one?

2       Xerox -- and just scroll up, okay -- 1.17 million?

3  A.   Yes.

4  Q.   Page 7, NRO.  What is NRO, if you know?

5  A.   I don't remember.

6  Q.   Okay.  Can you scroll up?

7       1.17 million.

8       With these deals did MicroTech make any effort to sell to

9  any of those end users?

10 A.   No.

11 Q.   At some point in time did Mr. Jimenez enact an in-house

12 policy regarding these types of deals?

13 A.   He did.  I don't -- I think -- I'm remembering it was a

14 little later than this in the year but, yeah, he put out a

15 policy.  It was -- I'm not sure what the motivating factor was

16 behind that.

17 Q.   What was the policy?

18 A.   The policy was is that we wouldn't take any more at-risk

19 software deals.

20 Q.   When you say at-risk deals, what are you referring to?

21 A.   Deals where we are agreeing to pay for the software before

22 we have an acceptable arrangement with the customer.

23 Q.   You mean where you're not going to sell it, somebody else

24 is going to sell it?

25 A.   Right.

**S. TRUITT - DIRECT / FRENTZEN**

1    **Q.**    Did that policy -- was that policy followed?

2    **A.**    I don't remember when it went into force but basically,

3    no.

4         And the other thing is, that may have only been really

5    directed at our Greensboro office, which was in the business of

6    reselling audiovisual equipment.  But, no, it wasn't followed

7    across the board, definitely not.

8    **Q.**    All right.  I'd like to show you now Exhibit 1912,

9    Mr. Truitt.  I'm skipping ahead again.  Take a look at that and

10   tell us what that is.

11   **A.**    (Witness examines document.)

12        **THE COURT:**  It's admitted.

13        (Trial Exhibit 1912 received in evidence)

14        **MR. FRENTZEN:**  Thank you, Your Honor.

15        Show it.

16   **Q.**    First of all, does this appear to be an e-mail from you to

17   Mr. Scott at Autonomy?

18   **A.**    It is.

19   **Q.**    All right.  Could we go to the next page, please?

20        And this is a purchase order for June 30, 2011; is that

21   right?

22   **A.**    Yes.

23   **Q.**    And it says Hewlett Packard, 7 million?

24   **A.**    Right.

25   **Q.**    What's your recollection of this particular purchase

S. TRUITT - DIRECT / FRENTZEN

1  order, Mr. Truitt?  Did you associate it with Hewlett Packard?

2  **A.**  I associated it with the U.S. Postal Service and would

3  refer to it that way.  I -- also, I don't remember exactly how

4  we decided to do this one, to be honest with you.  I think Tony

5  might have decided to do this himself, but that is my

6  electronic signature there on this document.

7  **Q.**  You're talking about at the bottom?

8  **A.**  Yeah.

9  **Q.**  If we could just scroll down briefly.

10  **A.**  That really is an electronic signature.  It's not a

11  picture.  It's not a stamp.  So somebody would have had to have

12  my password to do that.

13  **Q.**  All right.  But, in any event, this particular deal, when

14  you say you don't associate it with Hewlett Packard, you

15  associate it with the Postal Service, can you describe what you

16  mean by that?

17  **A.**  I mean I thought that the end customer was going to be the

18  Post Office and that's who we were going to be working with and

19  installing it for if we ever did.

20  **Q.**  Just do you understand why Hewlett Packard would be listed

21  rather than the Postal Service?

22  **A.**  No.

23  **Q.**  Okay.  All right.  Did you -- was that sale, to your

24  knowledge, ever made to the Postal Service?

25  **A.**  No, not to my knowledge.

1   **Q.**   Or to Hewlett Packard?

2   **A.**   No.

3   **Q.**   All right.  Was this one that MicroTech needed to work out

4   a way with Autonomy to get out from under the $7 million in

5   debt?

6   **A.**   Ultimately it turned into one of those.

7   **Q.**   I'd like to show you Exhibit 1985 if I could.

8         **THE COURT:**  Admitted.

9         (Trial Exhibit 1985 received in evidence)

10         **MR. KEKER:**  Nineteen five, Your Honor?

11         **THE COURT:**  1985.

12         **MR. KEKER:**  1985.  Sorry.

13         **MR. FRENTZEN:**  Can you pull that up, please?

14   **Q.**   Is this another audit confirm letter, Mr. Truitt?

15   **A.**   It is.

16   **Q.**   Could we go to -- and this is July of 2011?

17   **A.**   Yes.

18   **Q.**   Could we go to page 3, please?

19         Do you see here July 12, 2011, at the top?

20   **A.**   I do.

21   **Q.**   All right.  Can we scroll down a little bit?

22         All right.  Do you see a total sticker price there?

23   **A.**   25 million.

24   **Q.**   Does that fit your recollection that as of July of 2011,

25   there was $25 million in debt between MicroTech and Autonomy?

S. TRUITT - DIRECT / FRENTZEN

1   **A.**   Yeah.  I probably would have said 21 but, yes, it does.

2   **Q.**   Okay.  Could we go to the following page, please?

3   And who signed off on this one?

4   **A.**   Tomas Esterrich.

5   **Q.**   All right.  In terms of saying there are no side letters

6   or other agreements on that 25 million in debt, was that true

7   or false?

8   **A.**   False.

9   **Q.**   I'd like to take a look now, please, at two zero six zero,

10   2060.

11   Was there a discussion or something brought to your

12   attention about a possible deal between Autonomy and MicroTech

13   that related to something called FISMA?

14   **THE COURT:**  Admitted.

15   (Trial Exhibit 2060 received in evidence)

16   **THE WITNESS:**  Yes.

17   **BY MR. FRENTZEN:**

18   **Q.**   Could you tell us, before we get to this, what was --

19   Mr. Truitt, sorry.  Just -- yeah, let's put the document aside

20   just for a second.

21   Can you tell us what FISMA was about and how that came to

22   your attention?

23   **A.**   Well, FISMA is a government standard for cloud security,

24   and how it came to my attention was I was asked to develop a

25   proposal for -- to basically provide Autonomy products to

1  the -- I think it was the Social Security Administration in a

2  FISMA-compliant cloud that we would provide to them.

3  **Q.**   All right.   Who asked you to put that proposal together?

4  **A.**   Dave Truitt.

5  **Q.**   Did he tell you anything about -- anything more than that

6  in terms of what the nature of this arrangement was going to

7  be?

8  **A.**   Not -- no, not at first.   Basically I just -- what I did

9  was I went out and researched what kind of things Autonomy did

10  at Social Security that could possibly lend themselves to this

11  and, you know, what some of the advantages of outsourcing or,

12  rather, as the kids say, putting it in the cloud might be, you

13  know, because typically if you get Autonomy in and you're

14  really using it, you generate tremendous amounts of data and it

15  turns into an expense that needs to be managed.

16      So I went ahead and put together a draft; and then as

17  similar as we did with the other proposal -- although the other

18  proposal actually, by the way, was written primarily by Roger,

19  not by me but I helped with the pricing -- but this proposal I

20  did write the entire thing and continued to respond to the

21  results of the conversations by making changes to the proposal,

22  and we did it fairly quickly.

23  **Q.**   Okay.   And is this what you put together that you sent on

24  July 31st of 2011 to Tony Jimenez and Dave Truitt?

25  **A.**   Yes.

1    **Q.**    You said (reading):

2            "I don't think it will get the Pulitzer, but here's

3        something to look at."

4    **A.**    Right.

5    **Q.**    Can we go to the second page, please?

6        Is this the proposal that you wrote, Mr. Truitt?

7    **A.**    It is.

8    **Q.**    Could we go to page 7 of this?

9        And I'd like to ask you just -- could you scroll up just a

10   little bit, please?  Oh, I'm sorry.  The other way.  Thank you.

11   That's great.

12       All right.  There's a discussion here about potential

13   cost; right?

14   **A.**    Yes.

15   **Q.**    Payment of 8.2 million, where did you get that figure?

16   **A.**    From Dave.

17   **Q.**    So he told you to write it up and put that number in?

18   **A.**    Yeah.  He told me to basically try to match up to

19   something that could conceivably be worth $8.2 million if they

20   were to consume it all.

21   **Q.**    And $8.2 million, did that stand out to you as a

22   particular figure that you were otherwise dealing with?

23   **A.**    I don't recall but probably.

24   **Q.**    The Hewlett Packard $7 million plus maintenance and --

25           **MR. KEKER:**  Objection.  Leading, Your Honor.  He's

1  leading.

2         THE COURT:  Yes, he is, but I'm going to allow it.

3  BY MR. FRENTZEN:

4  Q.  Was there an outstanding debt to Autonomy related to the

5  Hewlett Packard deal at this time?

6  A.  Yes, sir.

7  Q.  And was that 7 million plus maintenance and fees plus the

8  10 percent that you were supposed -- that MicroTech was

9  supposed to get back from Autonomy?

10 A.  No.  The 7 million would have been inclusive unless there

11 were other fees, but that certainly was part of what this was

12 going towards.

13 Q.  I want to direct your attention to this part of the

14 document (indicating).  At this time when you created this

15 draft, was there any reference there to the proposal not being

16 assignable?

17 A.  No.

18 Q.  Was that something that even occurred to you at this point

19 in time, July of 2011?

20 A.  It had not.

21 Q.  I want to show you now Exhibit 2068.

22         THE COURT:  Admitted.

23         (Trial Exhibit 2068 received in evidence)

24         MR. FRENTZEN:  Can you blow up the top part?

25 Q.  All right.  Mr. Truitt, what's the date of this document?

1   A.   August 1st, 2011.

2   Q.   And this is an e-mail from you?

3   A.   Yes.

4   Q.   To who?

5   A.   Sushovan Hussain.

6   Q.   With cc to who?

7   A.   Dave Truitt and Tony Jimenez.

8   Q.   Okay.  Is this your proposal at that time, the FISMA

9   proposal or cloud proposal?

10  A.   Yes.

11  Q.   And we can scroll through to the attachment.  Well, sorry.

12  Can we go back?

13       All right.  And here it says (reading):

14            "Sushovan -

15            "Attached is a proposal," et cetera, et cetera.  "If

16       you have any questions, please contact me directly."

17       Why were you sending this directly to Sushovan Hussain?

18  A.   I think that's what Dave asked me to do.

19  Q.   At this point in time did you have any sort of -- did you

20  know Sushovan Hussain?

21  A.   I still don't.

22  Q.   All right.  But Dave Truitt asked you to send it directly

23  to Sushovan Hussain?

24  A.   Yes.

25  Q.   Could we go to the -- get into the next page in the

1    proposal?  Go back to the title page.  Thanks.

2        All right.  Is this the title page in your proposal?

3    **A.**  Yes.

4    **Q.**  All right.  I want to get into the proposal, and if we

5    could go, again, to the last page, what would be page 8 of this

6    document.

7        Again, was there any language in here about nonassignment

8    of the obligations under this deal when you sent it to

9    Mr. Hussain directly?

10   **A.**  It appears not.

11   **Q.**  I'd like to direct your attention to a little over a week

12   later in August, around August 10 of 2011.  Did you further

13   revise this proposal around that time?

14   **A.**  I did.

15   **Q.**  I show you now Exhibit 2214.

16       **THE COURT:**  Admitted.

17       (Trial Exhibit 2214 received in evidence)

18       **MR. FRENTZEN:**  Thank you, Your Honor.

19       Could we pull up 2214?

20   **Q.**  All right.  Do you see here, Mr. Truitt, on August 10,

21   2011, that you sent this proposal as revised to Mr. Scott,

22   Mr. Truitt, and Mr. Jimenez?

23   **A.**  Yes.

24   **Q.**  Could we go now to the first page of the proposal?  Does

25   it appear that this is a copy of the proposal with some changes

made, Mr. Truitt?

**A.** I can't tell from this page but, I mean, it has tracked changes on it so I'm going to say yes.

**Q.** All right. Could we go to page 8?

All right. And do you see this paragraph that's now here, Mr. Truitt?

**A.** I do.

**Q.** And that says (reading):

> "MicroTech requires that in the event that this proposal results in a contract agreement between Autonomy or one of its current affiliates or subsidiaries and MicroTech, that the resulting agreement stipulate that neither party may assign this agreement to affiliates, subsidiaries, successors, or any other assigns without the written consent of both parties."

To your recollection, do you know where that language came from?

**A.** My recollection is it came from my brother Dave orally over the telephone, and I typed it right into the document myself.

**Q.** Was that something that had occurred to you to include in this document?

**A.** No.

**Q.** Why not?

**A.** Frankly, it's not language I would accept if I was on the

1    other side of it.

2    **Q.**   Why not?

3    **A.**   Because basically if the contract was to be assigned in

4    some fashion, that the assignee would not get the benefit of

5    the service, and so it would lessen the value of whatever

6    transaction you were involved in.

7    **Q.**   At this point in time in around August 10 of 2011, did you

8    have any idea that Autonomy was in discussions with Hewlett

9    Packard for Hewlett Packard to acquire Autonomy?

10   **A.**   No.

11   **Q.**   What effect, if any, would this language have on

12   MicroTech's obligations following the acquisition of Autonomy

13   by Hewlett Packard?

14   **A.**   I'm not a lawyer, but the way I read it --

15          **MR. KEKER:**   Objection.  I object.  It calls for a

16   legal conclusion, Your Honor.

17          **THE COURT:**   Overruled.

18          **THE WITNESS:**   My understanding of these words is that

19   MicroTech would not have the obligation to deliver these

20   services if that were to happen.

21   **BY MR. FRENTZEN:**

22   **Q.**   To Hewlett Packard?

23   **A.**   Yes.

24   **Q.**   Could we -- I'd like to show you now 2213.

25          **THE COURT:**   In evidence.

1          (Trial Exhibit 2213 received in evidence)

2               **MR. FRENTZEN:**  Great.  Just pull it up.

3     **Q.**   And this has what appears to be the original e-mail,

4     Mr. Truitt, and then Dave Truitt has said here (reading):

5               "Appears tracked changes need to be accepted.  This

6          version shows markups."

7          Do you see that?

8     **A.**   Yes.

9     **Q.**   Then you re-sent it to Mr. Scott with (reading):

10              "Tracked changes accepted.  My apologize for any

11         inconvenience."

12    **A.**   Right.

13    **Q.**   And if we could go to page 8 briefly, the bottom.

14         Do you see that language is in there?

15    **A.**   It is.

16    **Q.**   2234.

17              **THE COURT:**  In evidence.

18         (Trial Exhibit 2234 received in evidence)

19              **MR. FRENTZEN:**  It's in evidence?  Great.

20         Can we just pull it up?

21    **Q.**   Mr. Truitt, do you see 2234?

22    **A.**   Yes.

23    **Q.**   And could we go first to the bottom of page 2?

24         Do you see a signature?  Is that by you?

25    **A.**   That's my signature.

**S. TRUITT - DIRECT / FRENTZEN**

1   **Q.**   August 15, 2011?

2   **A.**   Yes.

3   **Q.**   Countersigned by Mr. Scott August 15, 2011?

4   **A.**   Yes.

5   **Q.**   Okay.  Is this the agreement to do the FISMA cloud deal?

6   **A.**   I think it is.  Could I just see a little more of it?

7   **Q.**   Yeah, sure.  Let's go to the top of the first page.

8   **A.**   (Witness examines document.)  Yeah, this is it.

9   **Q.**   Okay.  Great.

10        And could we go now to page 3?  Yeah, there we go.  Great.

11        Okay.  And this is the settled-on price, 8.2 million from

12   Autonomy to MicroTech?

13   **A.**   Correct.

14   **Q.**   Could we go to paragraph -- or page 2 and show

15   paragraph 10, please?

16        Do you see this paragraph right here (indicating),

17   Mr. Truitt?

18   **A.**   I do.

19   **Q.**   And what does that say?

20   **A.**   It says (reading):

21             "Neither party may transfer or assign, to any

22        affiliate, subsidiary, successor in interest or any other

23        assignee, by operation of law or otherwise, any of its

24        rights or obligations without the written consent of both

25        parties."

S. TRUITT - DIRECT / FRENTZEN

1   Q.   So that is what we --

2   A.   That's language that's similar to the language that was in

3   our proposal.

4   Q.   Making this a nontransferable obligation.

5        And this was August 15 of 2011.  Again, did you have any

6   idea -- did you know at that time that Autonomy was having

7   discussions with Hewlett Packard to acquire Autonomy?

8   A.   No, I did not.

9   Q.   All right.  So did this deal go through?

10  A.   The FISMA-compliant data center deal?

11  Q.   Yes.

12  A.   Yes.

13  Q.   All right.  I'd like to show you now Exhibit 2263.

14           THE COURT:  Admitted.

15       (Trial Exhibit 2263 received in evidence)

16           MR. FRENTZEN:  Thank you, Your Honor.

17  Q.   All right.  Do you see here on August 16 from

18  Mr. Esterrich -- and he worked for you -- or he worked at

19  MicroTech?

20  A.   Yeah.  If he had -- never mind.  Yes, he worked at

21  MicroTech.

22  Q.   And you're on here as is Mr. Jimenez?

23  A.   Correct.

24  Q.   All right.  And this is for a wire transfer to pay

25  Autonomy $7.35 million?

1    **A.**   It is.

2    **Q.**   Okay.  Was that after Autonomy -- or in connection with

3    Autonomy paying MicroTech for the FISMA deal?

4    **A.**   Yes.

5    **Q.**   Could we just go to the second page?  All right.  And

6    scroll down -- or up.  Thanks.

7         This is a wire transfer, 7.3 to -- sorry -- to Autonomy?

8    **A.**   That's right.

9    **Q.**   Okay.  I'd like to show you now Exhibit 2276.

10        **THE COURT:**  About how much longer do you have?

11        **MR. FRENTZEN:**  I'm close to finishing, but if the

12   Court wants to take a break, I can -- it will be a little bit

13   longer -- well.

14        **THE COURT:**  Okay.  Ladies and gentlemen, we're going

15   to take a recess now.  We'll nobody recess until 11:00 o'clock.

16        Remember the admonition given to you:  Don't discuss the

17   case, allow anyone to discuss it with you, form or express any

18   opinion.

19              (Recess taken at 10:46 a.m.)

20            (Proceedings resumed at 11:04 a.m.)

21        **THE CLERK:**  Come to order.  Court is now in session.

22     (Proceedings were heard in the presence of the jury:)

23        **THE COURT:**  Please be seated.

24   You may proceed.

25        **MR. FRENTZEN:**  Thank you, Your Honor.

S. TRUITT - DIRECT / FRENTZEN

1   Q.   Mr. Truitt, just a couple of things I want to go back to.

2        Did you ever speak to anybody at Autonomy about the

3   Vatican deal before you signed the purchase order?

4   A.   No.

5   Q.   And I want to ask you a couple of questions about some of

6   these outstanding deals.  If I could show you Exhibit 1586, to

7   start with, on DOI --

8            THE COURT:  You said 1586?

9            MR. FRENTZEN:  Yes, Your Honor.

10           THE COURT:  Okay.  Admitted.

11               (Trial Exhibit 1586 received in evidence)

12                  (Exhibit published to jury.)

13  BY MR. FRENTZEN:

14  Q.   Can we scroll down -- or up.  Whatever.  Great.

15       On March 3, 2011 -- who is this from, Mr. Truitt?

16  A.   It's from John -- John Cronin to me.

17  Q.   And what is this list down here -- what is this list?

18  A.   Excuse me.  Well, it's to me and Dave.

19       Go ahead.  I'm sorry.

20  Q.   Sure.  What is the list that Mr. Cronin sent to you and

21  your brother, Dave Truitt?

22  A.   Well, what it says it is is a complete list of what's

23  owed, which is a little more than half of the original balance

24  of Vatican and the entire balance of Department of Interior.

25  Q.   Can we scroll up here.

1    And your response -- sorry about that.  Your response here

2  on March 3 to Mr. Cronin and Dave Truitt, what is that?

3  **A.**   I was commenting that the balance in the Vatican looked

4  right, but that I thought that they had agreed that we would be

5  let out of the Department of the Interior deal.

6  **Q.**   So what you're expressing there is that they forgot to

7  take care of DOI as promised?

8  **A.**   Yes.  That's what I said here, yes.

9  **Q.**   Who was the promise from?

10  **A.**   It was relayed by John Cronin, but whoever made those

11  decisions at Autonomy, I guess.

12  **Q.**   Did -- and if we could, Your Honor, I believe Exhibit 2402

13  is already in evidence.

14        **THE COURT:**  Okay.

15        **MR. FRENTZEN:**  Just pull that up.  Is that right?

16  It's in.  Great.

17        **MR. KEKER:**  I don't have it.

18        **MR. FRENTZEN:**  It's in evidence.

19             (Exhibit published to jury.)

20  **BY MR. FRENTZEN:**

21  **Q.**   And to your recollection, was DOI eventually credited and

22  written off of MicroTech's debts?

23  **A.**   Yes.  I -- I believe it was.

24  **Q.**   I want to ask you about a couple of other of these

25  transactions leading to -- or in August of 2011.

1    Mr. Truitt, with kind of the FISMA deal and everything

2    else going on, was there -- before you were aware that Autonomy

3    was being acquired by Hewlett-Packard, did you have a sense

4    from Autonomy from their activities that they were kind of

5    cleaning their books with you?

6    **A.**    Yes.    There was a period of time where it seemed like the

7    efforts to square us out were picking up that summer.

8    **Q.**    And if I could show you 2276.    Sorry.    I'll just go like

9    this.

10    Is it in?

11        **THE CLERK:**  Yes.

12        **MR. FRENTZEN:**  Great.    Thanks.    Can we just pull it up

13    then.

14                    (Exhibit published to jury.)

15    **BY MR. FRENTZEN:**

16    **Q.**    Mr. Truitt, do you see what Mr. Chamberlain is relaying to

17    Mr. Scott and then Mr. Scott sent to you on August 17th of

18    2011?

19    **A.**    I do.

20    **Q.**    What is that?

21    **A.**    It's Joel Scott notifying me by passing along

22    Chamberlain's email that Bank of Montreal closed directly and

23    that they credited it from our books.

24    **Q.**    And then how did you learn that Autonomy had been acquired

25    by Hewlett-Packard?

1    **A.**   I honestly don't remember.

2    **Q.**   You don't recall?

3    **A.**   No.

4    **Q.**   You learned it sometime in August of 2011?

5    **A.**   Yeah.

6    **Q.**   To your recollection, did you learn about it occurring

7    close in time to when it was announced?  Let's put it that way.

8    **A.**   Yeah.  It was within -- within a week, sure.

9    **Q.**   All right.  I'd like to show you Exhibit 2341.

10            **THE COURT:**  Admitted.

11            (Trial Exhibit 2341 received in evidence)

12                (Exhibit published to jury.)

13   **BY MR. FRENTZEN:**

14   **Q.**   All right.  Now, this is after -- do you recall whether or

15   not this is after the acquisition, Mr. Truitt?

16   **A.**   I actually don't recall exactly, but I think it is, it's

17   after, and I recall this -- this discussion that this email was

18   about.

19   **Q.**   Okay.  What is that?

20   **A.**   Well, basically the acquisition -- I'm talking to my

21   brother Dave about the stuff that's left outstanding with

22   Autonomy.  And basically Joel Scott had told me don't worry,

23   it's all going to get taken care of.

24        So I was going to Dave as somebody who had successfully

25   been through a similar process with Autonomy and saying "Hey,

S. TRUITT - DIRECT / FRENTZEN

1   is this really all going to get taken care of to our

2   satisfaction," and he basically reassured me that it would.

3   **Q.**   All right.  And that's what Mr. Scott from Autonomy was

4   telling you as well?

5   **A.**   Yes.

6   **Q.**   All right.  I'd like to show you now Exhibit 2362.

7        Is that already in evidence?

8        **THE CLERK:**  Yes.

9        **MR. FRENTZEN:**  Great.

10  **Q.**   Did the acquisition of Autonomy by Hewlett-Packard -- I

11  mean, did that cause you any concerns about any existing debts

12  that were outstanding?

13  **A.**   Well, it did because we still had a few, and we were going

14  through this process of getting rid of them various ways, and I

15  wanted to make sure that that process got finished.

16  **Q.**   All right.  And what is it about the acquisition that

17  caused you to have concerns about that?

18  **A.**   Well, I did not know if the new owners would be amenable

19  to that.

20  **Q.**   Amenable to what?

21  **A.**   Continuing to go through a process to get these books off

22  of MicroTech's -- excuse me -- these debts off of MicroTech's

23  books.

24  **Q.**   Meaning live up to the side agreements?

25  **A.**   Essentially.

1   Q.   So could -- I'm sorry -- 22 -- sorry -- 2362.  That's in

2   evidence?

3            THE CLERK:  Yes.

4            MR. FRENTZEN:  Great.  Can we pull that up.

5                    (Exhibit published to jury.)

6   BY MR. FRENTZEN:

7   Q.   Mr. Truitt, you see the email there that is September 7th,

8   2011?

9   A.   Yes.

10  Q.   And its subject is "Executed EULA Cancellation

11  Agreements"?

12  A.   Right.

13  Q.   Can we go to the following page.

14       Do you recognize what this is, Mr. Truitt?

15  A.   Yeah.  This is a document that basically canceled the end

16  user license agreements that we entered into to support the

17  Bank of America account, I guess, if you want to call it that.

18  Q.   Okay.  And so this is terminating the agreement?

19  A.   Yes.

20  Q.   Terminating any debts?

21  A.   Yes.

22  Q.   Can we go to the next page.

23       That's your signature?

24  A.   It is.

25  Q.   And the following page.

**S. TRUITT - DIRECT / FRENTZEN**

1          Is this the amount there, 3.86 million?

2     A.   Yes.

3     Q.   Plus some support?

4     A.   Right.

5     Q.   In terms of the FISMA proposal, Mr. Truitt, were -- was

6     MicroTech ever required to follow through on the $8.2 million

7     FISMA deal?

8     A.   We were not.

9     Q.   So that just went by the wayside?

10    A.   Yes.

11    Q.   Can you describe for us, just in terms of your involvement

12    with this -- these deals and the eventual resolution with

13    Autonomy -- is this what you thought you were getting into when

14    you first engaged with Autonomy to do these kinds of deals?

15    A.   Not at all.

16    Q.   Can you describe why?

17    A.   Well, it was almost diametrically opposed in every facet

18    that I cared about.  One thing that we were expecting to get

19    was new customers in short order.  We didn't get any new

20    customers.

21         We were supposed to be providing services directly to

22    customers for good rates.  We never did that.

23         These things were supposed to close at a very high rate.

24    This was supposed to be the cream of the cream -- it was going

25    to close in two days.  We just want to make a quarter.  They

 1  did not close in two days.  They didn't close in 200 days.

 2      So it left us in a -- in an awkward position that didn't

 3  get me any of the advantages that I was looking for as -- on

 4  the operational side of MicroTech.

 5      So I guess what you're left with is maybe the potential

 6  advantage of the relationship with Autonomy itself.

 7  **Q.**   And that -- was that of value?

 8  **A.**   Maybe the hope that you get purchased.  I don't know why

 9  else you would be in this.

10  **Q.**   And -- I'm sorry.  Could I get -- what's our last exhibit?

11      (Mr. Frentzen confers off the record.)

12          **MR. FRENTZEN:**  All right.  Your Honor, I understand

13  there is not an objection to admission of the immunity order

14  itself.

15          **THE COURT:**  Okay.

16          **MR. FRENTZEN:**  So I will mark that as 2985 and offer

17  that into evidence.

18          **THE COURT:**  2985 admitted.

19      (Trial Exhibit 2985 received in evidence)

20  **BY MR. FRENTZEN:**

21  **Q.**   Mr. Truitt, do you have an understanding of what you are

22  not protected from by this immunity order?

23  **A.**   Perjury.

24          **MR. FRENTZEN:**  May I have a moment, Your Honor?

25      (Government counsel confer off the record.)

1        **MR. FRENTZEN:**  That's all I have for now.

2      Thank you, Mr. Truitt.

3        **THE COURT:**  Okay.  Cross.

4                    **CROSS-EXAMINATION**

5    BY MR. KEKER:

6    **Q.**   Good morning, Mr. Truitt.

7      And good morning, ladies and gentlemen.

8      Mr. Truitt, I'm John Keker.  I represent Mr. Hussain.  I'm

9    one of the lawyers for Mr. Hussain.

10     Who told you that these deals were going to close in two

11   days?

12   **A.**   Dave Truitt and John Cronin led me to believe that these

13   deals had been -- they didn't say literally two days, but they

14   said that the closing was imminent and that they had had

15   similar experiences to that with deals in the past.

16   **Q.**   Did they say they were working with Mr. Stouffer Egan?

17   **A.**   Yes.

18   **Q.**   Let's go back to what MicroTech was.

19     MicroTech was a company that was growing very, very fast

20   between the time you became the COO and 2011; right?

21   **A.**   Yes.

22   **Q.**   All right.  And you went from a few employees to what?

23   350?

24   **A.**   Something like that.

25   **Q.**   And you went from -- well, I mean, you were honored -- you

1   were a Microsoft Gold Certified Partner?

2   **A.**   Yes, we were.

3   **Q.**   A Cisco Gold Partner?

4   **A.**   Correct.

5   **Q.**   A Hewlett-Packard Elite Partner?

6   **A.**   That's right.

7   **Q.**   A Symantec Manage Services Partner?

8   **A.**   Uh-huh.

9   **Q.**   Oracle Silver Partner?

10  **A.**   Yes.

11  **Q.**   Autonomy Value-Added Partner or Value Added Reseller, I

12  should say?

13  **A.**   That's not a title, but, yes, we were one of those.

14  **Q.**   Well, do you have -- look up there at your -- I'm looking

15  at your -- your ATIC announcement 638 -- 6038.  6038 in that

16  big book.  Six zero three eight.

17          **THE COURT:**  Admitted.  Admitted.

18              (Trial Exhibit 6038 received in evidence)

19          **MR. KEKER:**  I would move it in, Your Honor.

20          **THE COURT:**  It's admitted.

21                  (Exhibit published to jury.)

22  **BY MR. KEKER:**

23  **Q.**   This is the announcement for this ATIC Innovation Center,

24  right, July of 2011?

25  **A.**   Yes.

1    Q.    And then on the second page, it says "About MicroTech."

2    A.    Yes.

3    Q.    And that's what I'm reading from.  Down here, "Autonomy

4    Value-Added Reseller."  You've got that listed with all these

5    other folks; right?

6    A.    Right.

7    Q.    "VMware Enterprise Partner.  MicroTech is the *Hispanic*

8    *Business Magazine* number one fastest growing Hispanic-owned

9    business.  It's number one fastest growing private company in

10   the Washington, D.C. metropolitan area."

11         Right?

12   A.    Yes.

13   Q.    So under your -- you and Mr. Jimenez's leadership, this

14   company was growing pretty fast and becoming successful; right?

15   A.    It was growing very quickly.

16   Q.    Okay.  And you reported to Tony Jimenez?

17   A.    Yes.

18   Q.    And Mr. Jimenez was the CEO?

19   A.    Correct.

20   Q.    You handled business development and delivery of products

21   and services to the clients, I think you said?

22   A.    Mostly.  We got reorganized a lot, but that's right.

23   Q.    And in the latter part of 2009, this man, John Cronin,

24   became a consultant to MicroTech; is that right?

25   A.    Yes.

1  Q.    The -- your brother, Dave Truitt, was a minority

2  shareholder?

3  A.    Yes.

4  Q.    After you became the COO and after you hired Cronin and so

5  on, Dave Truitt didn't have any operational responsibilities at

6  MicroTech, did he?

7  A.    No.

8  Q.    The decisions were made by you and Tony Jimenez?

9  A.    Yes.

10  Q.    To decide whether or not to do a deal, you needed to check

11  with Tony Jimenez, not Dave Truitt; right?

12  A.    That's right.

13  Q.    And Tony Jimenez's word controlled what happened in that

14  company?

15  A.    Yes.

16  Q.    How was Cronin paid?  Was he paid by the deal?

17  A.    I don't remember.

18  Q.    Did he have some incentive to get more deals?

19  A.    He got paid a percentage.  I don't remember the exact --

20  Q.    Fair enough?

21  A.    -- nature of this arrangement.

22  Q.    But he got paid a percentage of the deals he brought in?

23  A.    Yes.

24  Q.    You testified that you did -- that MicroTech did reseller

25  deals with Autonomy; right?

 1   A.   What we've been talking about all morning?

 2   Q.   Absolutely.

 3   A.   Yes.

 4   Q.   Absolutely.

 5        And you testified that your brother Dave or John Cronin

 6   would bring these deals to you and say "do you want them?"

 7   A.   That's right.

 8   Q.   And these -- these deals you saw as a way to get the

 9   company to grow; right?

10   A.   Yes.

11   Q.   Meet new customers, you've talked about?

12   A.   Right.

13   Q.   And you knew that your brother had been very successful in

14   doing similar kind of work when he'd been at MicroLink?

15   A.   That's right.

16   Q.   And you wanted to try to repeat that for MicroTech?

17   A.   Yes.

18   Q.   You had, as I understand it, three objectives for

19   MicroTech being a reseller.  The first one was -- and the

20   primary reason was to get service business from the people that

21   would buy the Autonomy software?

22   A.   Yes.  That's correct.

23   Q.   And then another reason was to meet people -- meet

24   customers and grow your business, hire more technical people?

25   A.   Yes.  Particularly commercial customers.

1  Q.   And then a third reason was to get this -- you buy the

2  software at a discount so you would get a 10 percent premium;

3  right?

4  A.   Right.

5  Q.   But you wouldn't have done these deals just for the 10

6  percent premium.  It was these other reasons that predominated,

7  didn't it?

8  A.   Yes.  Those were the reasons that mattered to me.

9  Q.   And the deals that you did, you knew that MicroTech was at

10 risk when it agreed to buy Autonomy software, didn't you?

11 A.   The first set of deals in particular as I testified

12 earlier, yes, I considered us to be at risk.

13 Q.   You considered -- and I think you used the words that

14 MicroTech was on the hook for the debt?

15 A.   Yes.

16 Q.   Remember using that word to the grand jury when you

17 testified to the grand jury?

18 A.   I do remember using it in the grand jury but not here.

19 Q.   Yeah.  I mean to the grand jury, you talked about being on

20 the hook?

21 A.   Yes.  That's right.

22 Q.   And you also told the grand jury about you saw this as a

23 calculated gamble?

24        MR. FRENTZEN:  I'm going to object at this point.

25 This is hearsay --

1              THE COURT:  Sustained.

2    BY MR. KEKER:

3    Q.   Did you see this as a calculated gamble, these VAR deals?

4    A.   Yes.  And the calculation was very much in our favor at

5    that time because I was giving a lot of weight to the nature of

6    the relationship with my brother.

7    Q.   Okay.  Can --

8    A.   But, yes, a calculated gamble is a fair way to

9    characterize it.

10   Q.   Can we go back to Exhibit 5, which is in evidence.  That's

11   the VAR agreement.  And put up 5.1, please.  It is on the third

12   page.

13              THE COURT:  It will be on the screen.

14                   (Exhibit published to jury.)

15   BY MR. KEKER:

16   Q.   If you can look on the screen or you can look in your book

17   under -- 5.1 talks about "Once the Autonomy products on a

18   purchase order have been shipped by Autonomy, government

19   reseller may not cancel or amend the purchase order without the

20   prior written consent of Autonomy."

21        You knew that was there didn't you?

22   A.   I imagine I did, yeah.

23   Q.   Turn over to 5.5.

24   A.   I also knew it said "government reseller" even though we

25   were selling to non-government customers.

1    Q.   So you thought you could have -- you could amend the

2    purchase order without the consent of Autonomy?

3    A.   No.  Not -- not in so many words, but I felt like that

4    there was a certain amount of flexibility in place around this

5    agreement.

6    Q.   Okay.  We're going to get to that.

7         I just want to show you 5.5 where it says, "Government

8    reseller shall not be relieved."

9         "Government reseller shall not be relieved of its

10   obligations to pay fees owed to Autonomy hereunder by the

11   nonpayment of such fees by an end user."

12        Did you know that was in there?

13   A.   Yes.

14   Q.   And that's what led you to believe that you were on the

15   hook; right?

16   A.   Right.

17   Q.   And then you'd get these debt confirmations which you've

18   seen several of, the jury has seen a bunch of them; right?

19   A.   Right.

20   Q.   And it says there is no side agreements and we owe the

21   debt and you would sign them or Mr. Esterrich would sign them;

22   right?

23   A.   Right.

24   Q.   And at the time you were doing this, in terms of

25   collectability, the company had a $10 million line of credit

**S. TRUITT - CROSS / KEKER**

 1  with your bank, didn't it?

 2  **A.**   In 2009 that was the case.  It might have been higher

 3  later.

 4  **Q.**   Okay.  But at least 10,000 -- $10 million line of credit

 5  with the bank to pay debts if you need to?

 6  **A.**   Yes.  At some point in time it was 10 million.

 7  **Q.**   When you were doing this, did you think you were doing

 8  something wrong?

 9  **A.**   No.

10  **Q.**   Did you think you were committing a crime?

11  **A.**   I did not.

12  **Q.**   You have told -- well, did you think when you were doing

13  it -- did you think that you were doing something with side

14  letters back then?

15  **A.**   No.

16  **Q.**   Pardon?

17  **A.**   No.  The first deals, there was -- there was never a

18  literal side letter.

19  **Q.**   Well, that's what I'm getting at.  It took the Government

20  to persuade you that you had entered into side agreements,

21  didn't it?  You didn't think of it that way?

22  **A.**   That's -- that's true.

23  **Q.**   And certainly, as you've said, there is nothing in writing

24  that says forget about the contract -- there is no written side

25  letter; right?

1    **A.**    Right.

2    **Q.**    And the reason you were concerned all through this period

3    and you felt agitated and so on is that you knew you were on

4    the hook for this money; right?

5    **A.**    Right.

6    **Q.**    Did -- who told you that MicroTech wasn't going to have to

7    pay its debts, besides the Government?

8         **MR. FRENTZEN:**  Object to that last reference.

9         **THE COURT:**  Sustained.

10         **MR. FRENTZEN:**  Assumes facts not in evidence and it

11    misstates the truth.

12    **BY MR. KEKER:**

13    **Q.**    Who told that you MicroTech didn't have to pay its debts?

14    **A.**    Nobody told me in so many words that MicroTech didn't have

15    to pay its debts.

16    **Q.**    Let's -- okay.  But you -- okay.  Nobody told you that.

17    But you formed some understanding that MicroTech didn't have to

18    pay its debts?

19    **A.**    No, sir.

20    **Q.**    Did -- who negotiated the ATIC contract, the -- the I2C

21    contract, the $9.6 million one?

22    **A.**    Dave Truitt.

23    **Q.**    Who did he negotiate with on the Autonomy side?

24    **A.**    I don't know.

25    **Q.**    You don't know if Joel Scott negotiated that contract?

1    A.    No, I don't.

2    Q.    Who -- so you got involved later on with the federal cloud

3    contract; right?

4    A.    Much more so, yes.

5    Q.    Who negotiated that for Autonomy's side?

6    A.    I'm not sure on that either.

7    Q.    Who did you work with on that -- on the Autonomy side?

8    A.    Nobody.

9    Q.    Not Joel Scott?

10    A.    I didn't work with anybody on Autonomy on either of those

11    deals.

12    Q.    When you wrote the proposal, who did you send it to?   I

13    mean, we just looked at it.

14    A.    I sent it to Dave Truitt and Tony Jimenez.

15    Q.    And to Joel Scott?

16    A.    The second time I sent it to Joel Scott.   The first time I

17    sent it to your client, but that was only after it was

18    complete.   While I was working on it, I worked on it with Dave

19    responsively based on input he got from whomever.

20    Q.    And he told you to send it to a man named Sushovan Hussain

21    in England?

22    A.    That's right.

23    Q.    And you had never met that man; right?

24    A.    Right.

25    Q.    Still haven't?

1   **A.**   Still haven't.

2   **Q.**   He's sitting over here?

3   **A.**   Right.

4   **Q.**   And you've never talked to him?

5   **A.**   I don't think so.  I might have sent one email to him.

6   **Q.**   Why did you continue -- we've looked at a lot of these

7   confirmation slips.  Why did you continue to affirm that the

8   debt was the debt was the debt to Deloitte, auditors?

9   **A.**   Well, for several of them -- and there were many, as I

10   testified earlier, for quite the period of time until I got

11   some assurances -- which, by the way, never said we didn't have

12   to pay our debt.  What it said was -- is that we would have the

13   means to do so, maybe, is what I started to think and feel a

14   little better, which is not quite the same thing.

15        But I did it, frankly, mostly out of habit.  I mean, we

16   had been doing this.  We had been doing it the same exact way.

17   It was legitimate then.  It's legitimate now.

18   **Q.**   Fair enough.  Okay.

19        So what you came to have an understanding of was that if

20   you could come up with something that you could sell to

21   Autonomy that would get MicroTech money, Autonomy would be

22   interested in what you had to sell; right?

23   **A.**   That was -- that was -- that was something I had been told

24   might be the case by Dave, and I certainly hoped it was true.

25   **Q.**   And the two things that we've talked about here, to big

1    things, are this ATIC technology center, which was in the

2    basement of your building; right?

3    **A.**    First floor, yeah.

4    **Q.**    I'm sorry.  First floor.

5        And then the other one is this federal cloud proposal?

6    **A.**    That's right.

7    **Q.**    We are going to talk about those in a second.

8        But before we do, one of the reseller deals that MicroTech

9    bought into for $11.5 million was the Vatican Library; right?

10   **A.**    Right.

11   **Q.**    I want to talk to you about that.

12       Before I do, your immunity order for today is in evidence.

13       Your Honor, 6055 is the immunity order for the grand jury

14   and I'd offer that in evidence.

15           **MR. FRENTZEN:**  No objection.

16           **MR. KEKER:**  Six zero five five.

17           **THE COURT:**  Admitted.

18           (Trial Exhibit 6055 received in evidence)

19   **BY MR. KEKER:**

20   **Q.**    Okay.  Mr. Truitt, you said that Mr. Cronin began talking

21   to you about the Vatican opportunity sometime around the 27th,

22   28th or 29th of December, 2010.  Am I right about that?

23   **A.**    I think it was at the end of March.

24   **Q.**    I'm sorry.  I beg your pardon.  You're absolutely right.

25   March 27, 28, 29 -- March 2011?

**S. TRUITT - CROSS / KEKER**

1    **A.**    '11, yes.

2    **Q.**    Wait a minute.  I think I'm confusing myself.

3    **A.**    It wouldn't have been '11.  It would have been '10.  It

4    would have been March of '10.

5    **Q.**    It's the first quarter of 2010.  I should know by now.

6         So at the end of the first quarter of 2010, you began to

7    hear from Mr. Cronin about this Vatican opportunity?

8    **A.**    Yes.

9    **Q.**    And what you heard is that Autonomy was on the verge of

10   selling a lot of software to the Vatican Library to digitize

11   the Vatican Library?

12   **A.**    Yes.

13   **Q.**    And you said you were really excited about that because

14   you saw it as a services opportunity?

15   **A.**    Yes.  That's correct.

16   **Q.**    You didn't talk to Autonomy about that and you don't

17   remember talking to your brother about that.  You just talked

18   to Mr. Cronin about it; right?

19   **A.**    Right.

20   **Q.**    Okay.  And Mr. Cronin said that the Vatican was running a

21   pilot program using Autonomy's software at the time you all

22   were talking at the end of the quarter?

23   **A.**    Yes.

24   **Q.**    And he said that Autonomy already had some software

25   installed at the Vatican?

1    A.    That's -- that's correct.

2    Q.    And he said that the project was going well and that they

3    were going to buy a whole bunch of Autonomy software?

4    A.    Along those lines, yes.

5    Q.    And you saw it as a gigantic services opportunity because

6    it would be a combination of building technical staff and then

7    having all those digitizing services to provide?

8    A.    That's right.

9    Q.    Okay.  And you thought it could go on, the Vatican

10   project -- could go on for years?

11   A.    That's true.

12   Q.    With the services work going on for years?

13   A.    Right.

14   Q.    And Cronin said to you "Don't get your hopes too -- too

15   high because it may close with Autonomy and we won't have this

16   opportunity to be the reseller"?

17   A.    Yeah.  He said something like that.  That's right.

18   Q.    But he said, "If it doesn't, then we need to talk some

19   more," and around the end of the month, you and Mr. Cronin did

20   talk and he started structuring reseller deals; right?

21   A.    Right.

22          MR. FRENTZEN:  Objection.  Foundation as to the last

23   part.  Also compound.

24          THE COURT:  I'll allow it.

25   \\\

1  BY MR. KEKER:

2  Q.   Well, at some point when it was evident to John that it

3  wasn't going to close, did he start structuring what we were

4  going to do, what MicroTech was going to do?

5          MR. FRENTZEN:  Objection.  Foundation and that assumes

6  facts not in evidence.

7          THE COURT:  Sustained.

8  BY MR. KEKER:

9  Q.   Do you remember that at the end of the quarter, before the

10 end of the quarter, it became evident to John that -- Cronin

11 that the deal wasn't going to close with Autonomy before the

12 quarter ended?

13         MR. FRENTZEN:  Same objection.  There is a way to get

14 to this, but that's not it.

15         THE COURT:  Sustained.

16     You can ask him what his understanding was, if that was

17 his understanding.

18 BY MR. KEKER:

19 Q.   What was your understanding about what John thought about

20 this deal closing and what he was doing about it at the end of

21 the quarter?

22 A.   My understanding was that there was a pretty high

23 likelihood that it wouldn't close, and I was expecting

24 something from him to review before the end of the quarter.

25 Q.   Okay.  And was it your -- well, at that time, did Cronin

S. TRUITT - CROSS / KEKER

1  have the authority to make deals for MicroTech?

2  **A.**    As I said in my grand jury testimony, he had the authority

3  to negotiate, make suggestions, represent us in discussions.

4  At the end of the day, however, somebody from MicroTech would

5  have had to sign those deals before they were deals.

6  **Q.**    Was it your understanding that he had made a deal for the

7  Vatican transaction before the end of the quarter?  Was that

8  your understanding?

9  **A.**    That was my understanding, yes.

10        **MR. FRENTZEN:**    Objection.  Move to strike.

11  Foundation.

12        **THE COURT:**    Sustained.

13  **BY MR. KEKER:**

14  **Q.**    Let me start again.

15        Before the Government began to talk to you about this, was

16  it your understanding that John Cronin had made a deal -- had

17  made the Vatican deal before the end of the quarter?

18        **MR. FRENTZEN:**    That's actually worse than the one --

19        **THE COURT:**    Sustained.

20  **BY MR. KEKER:**

21  **Q.**    What was your understanding about --

22        **THE COURT:**    I think you have to lay a foundation.

23  **BY MR. KEKER:**

24  **Q.**    Did Cronin tell you what he was doing?

25  **A.**    My understanding was that -- that we were very close and

1  that we were going to get a deal by the end of the quarter for

2  me to -- for us to review and sign, and based on everything

3  that he had told me, I was excited about it and would have been

4  willing to do it.

5  **Q.**   And when the paperwork showed up the next day, you signed

6  it dated at the end of the quarter; right?

7  **A.**   Right.

8  **Q.**   And at the time that you signed it at the end of the

9  quarter, did you believe he had made that deal before the end

10  of the quarter?

11  **A.**   I didn't care.  It didn't matter to me what quarter it

12  went into.

13  **Q.**   Did you believe he had made the deal on or before the date

14  that's on the deal that you signed, March 31st?

15       **MR. FRENTZEN:**  Objection.  Same objection.

16       **THE COURT:**  Well, I think you have to lay a

17  foundation.  I think you have to lay a foundation of "what was

18  your understanding."  I don't want to suggest the question.

19       **MR. KEKER:**  I wish you would, Your Honor.  I will

20  ask --

21       **THE COURT:**  Well, I think what he wants to know is the

22  following, to tell you the truth.  I think he wants to know

23  when you got the paperwork on April 1st -- I think that's the

24  date, isn't it?

25       **MR. KEKER:**  Yes, sir.

1          **THE COURT:**  Did you actually think that the deal had

2     been agreed to before April 1st?  Was that your -- was that

3     your thought process?  Did you think that?  Or did you think

4     that the deal wasn't done until you signed off on April 1st?

5          Which of those two things?  If you had a thought.  Maybe

6     you didn't think about it.  I don't know.  I don't want to

7     recreate it for you.

8          If you can --

9          **THE WITNESS:**  To answer the question as you asked it,

10    Your Honor, I believe that we had a deal in principle, and I

11    was excited to get it and sign it, but, again, I didn't care

12    what quarter that deal went into.

13    **BY MR. KEKER:**

14    **Q.**  All right.  Do you remember when MicroTech received a

15    request from the Air Force to respond to certain questions

16    about the Vatican Library deal?

17    **A.**  I had very little to do with that.  I don't remember much

18    about it.

19    **Q.**  Okay.  Would you look at 5740, at the tab 5740.

20         And let me ask again, do you remember that the Air Force

21    inquired about the Vatican deal?

22    **A.**  Yes.

23    **Q.**  And do you remember that MicroTech prepared a response to

24    send to the Air Force?

25    **A.**  Yes.

1    Q.    And do you remember that it had its lawyers -- I'm sorry.

2    It's in the one that you were looking at, the big one,

3    Mr. Truitt.

4    A.    It doesn't seem to be --

5            THE COURT:    5740?

6            MR. KEKER:    5740.

7            THE COURT:    Admitted.

8              (Trial Exhibit 5740 received in evidence)

9                   (Exhibit published to jury.)

10   BY MR. KEKER:

11   Q.    Did you review the letter before it went to the Air Force?

12   Let's go down to the second page.

13   A.    To what page?

14   Q.    The one I'm looking at is starting with 4.  The one marked

15   4 down at the bottom that says "The Vatican Library

16   Transaction."

17        Did you review the letter before it went to the Air Force?

18   A.    Boy, I -- I must have.  I'm not sure if I did or not.

19   Q.    Fair enough.  Let me just ask some questions about.

20        In the second paragraph down here at the bottom, it says,

21   "Mr. Cronin approached MicroTech about participating in the

22   Vatican Library project in late 2009 or early 2010."

23        Was that true?

24   A.    No.  Not -- not -- not to my recollection.

25   Q.    Okay.  Do you remember -- do you think your recollection

1    today is better than -- this -- this letter was written

2    November 6, 2013, at least it's dated --

3            **MR. FRENTZEN:**  I'm going to object at this point.  The

4    witness has said he doesn't recall if he reviewed the letter.

5    To try to impeach through this letter is improper.

6            **THE COURT:**  Sustained.

7    **BY MR. KEKER:**

8    **Q.**   Do you think your memory is better today than it was in

9    November of 2013 about this event, about the Vatican?

10           **THE COURT:**  Well, are you asking about the Vatican or

11   are you asking about the --

12   **BY MR. KEKER:**

13   **Q.**   Well, I'm asking about generally.

14       I'm asking is your memory about the Vatican transaction

15   better today than it was in November of 2013 when this

16   letter --

17   **A.**   I have no way of knowing that.

18   **Q.**   Okay.  The letter goes on -- I won't go all the way

19   through it, but look at the last paragraph on the next page, on

20   page 5.  It says, "Steve Truitt approved MicroTech's software

21   purchase from Autonomy for 11.55 million on March 31, 2010.

22   After evaluating the considerable benefits and corresponding

23   risks of the opportunity and the existence of the Autonomy

24   testing platform at the Vatican and the representations of

25   Mr. Cronin about the impending nature of the transaction, Steve

1  Truitt and MicroTech reasonably believed the assurances of

2  Mr. Cronin, who had previously led MicroTech through

3  transactions with Autonomy without difficulty."

4       Was that a true statement?

5  **A.**   Not one hundred percent.  I would not say that at this

6  point in time we had ever had a transaction with Autonomy

7  without difficulty that John Cronin led, but it's not -- it's

8  also not true that I alone approved this transaction.  Tony

9  Jimenez certainly approved it as well, although I certainly

10  signed the purchase order.

11 **Q.**   Purchase order dated March 31st?

12 **A.**   That's right.  Dated March 31st every time.

13 **Q.**   And then the next paragraph -- next page, bottom

14  paragraph, it says "MicroTech" -- right there.  "MicroTech

15  entered into a legally binding commitment with Autonomy with

16  reasonable expectations that working on the digitization of

17  their Vatican Library collection was a legitimate business

18  opportunity."  Was that true?

19 **A.**   It was certainly true in -- in my mind at the time, which

20  was three months after we started doing this stuff, so at that

21  time, we'd had seven transactions that came through at the end

22  of 2009.  Half of them closed and we made money, although we

23  didn't get any customers.

24       So at this point between the monsignors raving about the

25  software on the internet, between the experience that I'd been

1    led to believe that MicroLink had had, at that point in time,

2    that's what I thought.

3        Now, if it was still true in 2013 in my mind, I don't

4    know.  I'd have to go back and think about things, but I didn't

5    write this letter and I'm not sure I've ever read it before.

6    **Q.**   What's this about -- tell us about the monsignors saying

7    things.  What are you talking about?

8    **A.**   There was a monsignor -- I don't remember the gentleman's

9    name -- who actually made some positive comments about the

10   Vatican software and the Vatican website.

11   **Q.**   So on the Vatican software, they were talking about this

12   Autonomy software project?

13   **A.**   Yes.

14   **Q.**   Let me give you this volume.  You've got one.  Okay.

15       Mr. Truitt, with respect to this Vatican program or

16   anything else, let me ask you again, could Mr. Cronin bind

17   MicroTech?

18           **MR. FRENTZEN:**  Objection.  Asked and answered.

19           **THE COURT:**  I'll allow it.

20           **THE WITNESS:**  Mr. Cronin had a lot of latitude and

21   leeway to propose terms, to review deals on our behalf, and,

22   yes, even -- even to create an expectation that we might take a

23   deal, but at the end of the day, if we did not take it and sign

24   the purchase orders, then the deal was not taken.

25           **MR. KEKER:**  Your Honor, I'd like to read from Exhibit

1    5202, grand jury transcript dated June 16 --

2             THE COURT:  5202 is not the grand jury.

3             MR. KEKER:  Oh, you're right.  Sorry.  5204.  Grand

4    jury transcript dated June 16, 2015.

5             THE COURT:  What page?

6             MR. KEKER:  Page 62, line 24, through 63, line 4.

7             THE COURT:  Okay.  One moment.

8         (The Court reviews the document.)

9             THE WITNESS:  Yes.

10            THE COURT:  Let me read it.  Let me read it to myself,

11   please.

12        (The Court reviews the document.

13            THE COURT:  Okay.  You may read that.

14   BY MR. KEKER:

15   Q.   Were you asked at the grand jury, referring to Mr. Cronin:

16        "Q.  Well, did he have the ability to bind MicroTech?

17        "A.  Yes, he did.

18        "Q.  What's your basis for saying that?

19        "A.  Because he did and we said that he could and it

20        happened repeatedly."

21   A.   Yes, sir.

22   Q.   That was your testimony before the grand jury?

23   A.   It was.  And a few paragraphs later, my testimony was, in

24   response to what Mr. Leach said, "Well, if he came in here with

25   a deal for a hundred million dollars that made no sense," or

1    something like that, "would you have honored that deal," and I

2    said "No, we would not have.  We would have reserved the right

3    to back away from it."

4        And that's -- so I'm saying essentially the same thing.

5    It's -- it's -- it's a word salad.  I mean, John was empowered

6    to work for us.  He had a lot of leeway and a lot of

7    responsibility.  But at the end of the day, even if he had

8    bound us and somebody had acted on that, we still could have

9    backed out.  That's my -- was my testimony then and now.

10   **Q.**   As part of your getting immunity in this case, do you feel

11   like you have to agree with the Government that this deal was

12   backdated?

13   **A.**   No, sir -- oh, wait.  Wait.  That the deal was backdated?

14   **Q.**   Yes.

15   **A.**   Which deal?  The Vatican deal?

16   **Q.**   The Vatican.  They say it's backdated by one day.

17   **A.**   I agree it was backdated because I signed it on April 1st

18   and it was dated March 31st.

19   **Q.**   When was the agreement made?

20   **A.**   The agreement in principle was in process that entire week

21   and I was waiting for the paperwork, and as soon as I got it, I

22   signed it.

23   **Q.**   Okay.  Would you look at 6030, please, which is in

24   evidence.

25           **THE COURT:**  6030.

1          **MR. KEKER:**  6030.  That's in your book.  And it's up

2    on the screen now.

3                    (Exhibit published to jury.)

4          **THE COURT:**  6030 admitted.

5          **MR. KEKER:**  Yeah.  It's in evidence.

6    **Q.**   Do you know what that is?  It says it's an Autonomy, Inc.,

7    sales order report.

8    **A.**   Yeah.  I don't know if I've ever seen one of these before.

9    **Q.**   Okay.  The company name up here is the Vatican Library.

10   **A.**   Where?

11   **Q.**   And the date, we've highlighted that.  And the date on it

12   is 3/31/10.

13   **A.**   Uh-huh.

14   **Q.**   Do you know how a sales order got prepared at Autonomy

15   before the end of the quarter?

16   **A.**   No.

17   **Q.**   All right.  Would you look at 5630, please, also in

18   evidence.

19                    (Exhibit published to jury.)

20   **BY MR. KEKER:**

21   **Q.**   And the second email down where it says "Michael McCarthy

22   to Steve T at MicroTech," is that delivery of the software?

23   Sending a key, sending users names and so on?

24   **A.**   It appears to be.

25   **Q.**   Okay.  And the date on that, it was sent March 31st, 2010

1    at 10:11; right?

2    **A.**    Right.  I was just double checking that it was for this

3    deal.  Yeah.  That appears to be true.

4    **Q.**    Now look at 852, please.  Is 852 -- can we put up the

5    attachment in -- it's a file, Excel file.  And the attachment

6    that appeals on the second page of the exhibit.

7        Can we go over to the -- is this a track sheet that you

8    used to keep track of transactions?

9    **A.**    It doesn't look like something I would do because I don't

10   like colors like that.  Is this one of Cronin's spreadsheets?

11   **Q.**    Well, up at the top left of the spreadsheet, it says

12   "MicroTech/Autonomy Purchases and Sales to Clients."

13   **A.**    Yeah.

14   **Q.**    That's not something you use?

15   **A.**    I don't -- I don't know what this spreadsheet is exactly.

16   **Q.**    Do you see down the line, down here next to the

17   $11 million where it -- it's about four lines from the bottom,

18   five lines from the bottom?  It should be Vatican -- from

19   the -- from the bottom of the print -- of the list of clients.

20   **A.**    Yes.  I see that line you're referring to.

21   **Q.**    I'm referring to something that says "March 31, '10,

22   $11,500,000," and then over on the side, it says "Vatican

23   Library."

24   **A.**    Yes.

25   **Q.**    Okay.  Is that an internal MicroTech tracking system?

1  **A.**   No.

2  **Q.**   You don't know what that is?

3  **A.**   It's a spreadsheet.

4  **Q.**   You don't know whose spreadsheet it is?

5  **A.**   No, I don't.  Obviously it's a list of these deals and it

6  looks like it has the same date the purchase order had on it,

7  so...

8  **Q.**   Let's go back to 766, which is in evidence.  You testified

9  about this.  This is you telling Joel Scott that the software

10  had been delivered before the end of the quarter.

11  **A.**   Yeah.

12  **Q.**   When you were asked about this, you said that you -- that

13  you thought that MicroTech already had the software.

14  **A.**   I did say that.

15  **Q.**   Can you explain what you meant by that?

16  **A.**   I meant that I felt like that we had the software loaded

17  on our servers.

18  **Q.**   From other -- other deals, that you have the software?

19  **A.**   Just -- yes.  Just like a demonstration copy, basically.

20  **Q.**   And if you got a key to use that software, that would be

21  the same as delivery of that software?

22  **A.**   As long as we updated it properly, yes.

23  **Q.**   So the software is sitting on your servers and what you

24  need is the key?

25  **A.**   That -- that's what I -- yes.  I've said that many times.

1    Q.    And you thought that once you got the key, that was -- the

2    software had been delivered?  That was the way you understood

3    it?

4    A.    Yes.  And I didn't -- what I -- what I was -- what I

5    understood was -- is that I didn't care if it had been

6    delivered or not.  We had it, and if our customer needed it, I

7    could call somebody, get it resolved on the same day and

8    deliver the software.

9    Q.    Okay.  So you thought that you had the software?

10   A.    I thought either we had it or I could get it real fast.  I

11   wasn't sure if we did or not, that -- that other email

12   notwithstanding.  I -- I don't remember that email at all.

13   Q.    And we've already looked at the confirmation to Deloitte.

14   That's Exhibit 746.  You confirmed that you had the software,

15   that the debt was incurred on March 31st, 2010; right?

16   A.    Right.

17   Q.    Now, after -- after making this deal at the end of the

18   first quarter, you continued to hope that the Vatican

19   transaction would close?

20   A.    Yeah.  Absolutely.

21   Q.    And other people, Cronin and others, kept hoping it would

22   close, kept getting delayed; right?

23   A.    Right.

24   Q.    And you were still -- you remained hopeful that it would

25   close and you would get services work all through 2010 and into

1   2011, didn't you?

2   **A.**   I remained hopeful.

3   **Q.**   Okay.  And you didn't -- it didn't close, but you paid the

4   debt; right?  MicroTech did?

5   **A.**   Eventually we started making payments on it.  I don't

6   remember exactly when.

7   **Q.**   And at some point, your brother, Dave Truitt, invested in

8   the Vatican deal, didn't he?

9   **A.**   Yes.

10  **Q.**   And he ended up taking 15 percent of any future profits

11  from the Vatican deal?

12  **A.**   Yeah.  I don't remember if it was profits.  Yeah.  It was

13  15 percent of something.  Yes.

14  **Q.**   Okay.  And for that, he paid $2.4 million from Discover

15  Tech to MicroTech?

16  **A.**   Yeah.

17  **Q.**   A few questions, Mr. Truitt, about this -- this ATIC, the

18  Advanced Technology Innovation Center on the first floor of

19  your building.  It eventually became the I2C Center?

20  **A.**   Yeah.  I don't know if -- they might have changed the name

21  after I left.  But, yes, it eventually became the I2C.

22  **Q.**   And this was something put together by a man named Roger

23  Channing?

24  **A.**   Yes.

25  **Q.**   Tell the jury about Roger Channing?

**S. TRUITT - CROSS / KEKER**

1    **A.**    Roger Channing was a -- a former Army officer and distance

2    learning expert who had a practice doing that kind of thing at

3    CSC, Computer Sciences Corporation, I think, and he and his

4    entire team were available to -- to do some of that kind of

5    work for somebody.

6         And we were introduced to him by Dave and ultimately ended

7    up hiring him.

8    **Q.**    When you say "that kind of work," what do you mean?

9    **A.**    I mean distance learning work and also some of this

10   telecommunication-based stuff and also big data stuff that fit

11   in well with what Autonomy was doing.

12   **Q.**    With what Autonomy was doing?

13   **A.**    Yeah.

14   **Q.**    And so MicroTech hired Dr. Channing and his team and they

15   were the ones who put together this ATIC proposal?

16   **A.**    Yes.

17   **Q.**    And you saw it as a way that you could do business with

18   Autonomy and get some money from Autonomy for something that

19   Autonomy would want, and you could use some of the money to pay

20   Autonomy down some of the debt; right?

21   **A.**    Right.

22        **MR. FRENTZEN:**    Well, I object.    It was compound in the

23   middle there.    Foundation.

24        **THE COURT:**    I'll allow it.

25   \\\

1    BY MR. KEKER:

2    Q.    The -- the first -- I don't need to go through them all,

3    but the first proposal for this was drafted by Dr. Channing for

4    the ATIC; right?

5    A.    I believe so.

6    Q.    And he's the one who came up with the cost estimates and

7    so on?

8    A.    Mostly.  I assisted with some of the cost estimates.

9    Q.    Okay.  And if you look at 1320, which we looked at before,

10   which is the proposal, and if you look at page 29 -- the jury

11   has just seen this.  Look at page 29.

12                     (Exhibit published to jury.)

13   BY MR. KEKER:

14   Q.    You were shown -- there are a bunch of alternatives for

15   one year, two years, three years, four years, and five years.

16   And if you go down to the bottom, the one with the biggest

17   discount is the three-year proposal; right?

18   A.    On a percentage basis, yes.

19   Q.    Yes.  On a percentage basis; right?

20   A.    Yes.

21   Q.    And that's the one that Autonomy ended up picking, the

22   $9.6 million, three-year deal?

23   A.    That's correct.

24   Q.    Okay.  And this ATIC was actually built, wasn't it?

25   A.    Yes.

1    Q.   And you said that it got some use?

2    A.   It did.

3    Q.   And you said that it was filled with cool stuff?

4    A.   I may have said that.  It had some cool stuff in it.

5    Q.   Okay.  At some point, MicroTech tried to figure out how

6    much it cost MicroTech to create it and run it; right?

7    A.   I'm not sure if they did or not.

8    Q.   Would you look at Exhibit 6056.

9             MR. FRENTZEN:  Is that six zero five six?

10   BY MR. KEKER:

11   Q.   Do you recall that the total cost of ATIC for labor and

12   everything else was more than $13 million?

13   A.   I -- I don't -- I have no knowledge of what it actually

14   ended up --

15             THE COURT:  Admitted.

16             THE WITNESS:  -- costing.

17         (Trial Exhibit 6056 received in evidence)

18             (Exhibit published to jury.)

19   BY MR. KEKER:

20   Q.   Do you remember Mr. Jimenez asking for a study to figure

21   out how much the company had put into ATIC?

22   A.   No.

23   Q.   Look at 6056.  The first page shows a total of $13 million

24   for the various components.

25   A.   Okay.

1  Q.   And look at -- the last page talks about personnel costs

2  which add up to more than $8 million.

3  A.   Yes.

4          MR. FRENTZEN:  Your Honor --

5          MR. KEKER:  Do you --

6          MR. FRENTZEN:  -- there is no foundation for this

7  document with this particular witness.

8          MR. KEKER:  I have one more question about it,

9  Your Honor.

10         MR. FRENTZEN:  I'm going to ask that it not even --

11 unless somebody is going -- he has never -- he has apparently

12 not seen it.

13         MR. KEKER:  This was produced by MicroTech.

14         THE COURT:  Yes.  But he has no knowledge of this

15 document.

16         THE WITNESS:  It looks like it was produced after I

17 left.  I don't even know some of these people.

18 BY MR. KEKER:

19 Q.   All right.  But you know a lot of these people --

20 A.   I do.

21 Q.   They are Dr. Channing's team, right, who built the --

22 A.   A few of them --

23         THE COURT:  If the document was created after he left,

24 I'm going to strike it, subject to a motion to strike.  I will

25 hear some discussion outside the presence of the jury.

1          Why don't you ask your question and then we'll take a

2    recess.

3    **BY MR. KEKER:**

4    **Q.**    Do you know when this document was created?

5    **A.**    I don't.

6              **MR. KEKER:**   Could I ask one more question?

7              **THE COURT:**   Go ahead.

8    **BY MR. KEKER:**

9    **Q.**    Do you know that a lot of work went into an open house for

10   government contractors and classified agencies and so on for

11   this ATIC system?

12   **A.**    Actually, no, I don't know that either.

13   **Q.**    Do you know -- okay.

14             **THE COURT:**   So should we take a recess?

15             **MR. KEKER:**   This is a good time for a recess.

16             **THE COURT:**   Ladies and gentlemen, we are going to be

17   in recess until 1:00.

18         Remember the admonition given:  Don't discuss the case,

19   allow anyone to discuss it with you, form or express any

20   opinion.

21         (Proceedings were heard out of presence of the jury:)

22             **THE COURT:**   The jury has left.

23         What do we want to do about 6056?  I know it's a document

24   coming out of the files of MicroTech, but this witness

25   apparently had no understanding of it, didn't create it,

 1   doesn't -- doesn't know about it.

 2        MR. KEKER:  We would move it in as a business record

 3   from MicroTech.  I mean, do we need to call a MicroTech witness

 4   to say --

 5        THE COURT:  Well, no, you don't need a MicroTech

 6   witness to authenticate it.  But on the other hand, just

 7   because it's a record of the company doesn't make it

 8   immediately admissible.

 9        MR. FRENTZEN:  Your Honor --

10        THE COURT:  It's admissible as a business record.  The

11   question is, is it admissible for any other purpose?  Is it

12   relevant?  Do we know anything about it?

13        MR. KEKER:  Well, it certainly is relevant to the fair

14   value issue.  I mean, what they're saying is that when Autonomy

15   would buy things from, in this case, MicroTech, that it was a

16   sham, a made-up transaction, there wasn't any value on the

17   other side.

18        What we are saying and what Deloitte, I think, would say

19   is that we analyzed these for fair value, and this is proof,

20   some proof, not dispositive, but some proof of fair value.

21   They bought this for $9.6 million.  It cost MicroTech more than

22   $13 million to get it up and running and to do it.  So it's a

23   fair trans -- it's a fair transaction.

24        And then you put the 6,000 miles away of Mr. Hussain

25   sitting over there and then like somebody -- Joel Scott tells

1   him "we've made a deal for $9.6 million and we've got the right

2   to use this ATIC" and so on.  Why isn't this evidence of --

3          MR. FRENTZEN:  That's not how that went down.  The

4   document itself -- I don't know if the Court has it in front of

5   it.

6          THE COURT:  I just saw it.

7          MR. FRENTZEN:  I can redirect on this, but it

8   concludes with "this is not accurate and we've thrown in

9   everybody's salary even though we don't know to what extent

10  they contributed to the ATIC."

11         THE COURT:  You say "we have thrown in."  Who has

12  thrown in?

13         MR. FRENTZEN:  Whoever the unknown individual who put

14  this together.

15         THE COURT:  I'm going to -- I'm going to strike it

16  subject to further discussion.

17         MR. KEKER:  All right.

18         MR. FRENTZEN:  And that's fine, Your Honor.  I would

19  ask when they come back out, that it is stricken.  They not

20  refer to it because otherwise, I got to read -- I should

21  redirect on --

22         THE COURT:  He didn't say anything probative about it

23  that I can -- that I heard, other than --

24         MR. FRENTZEN:  Well, he put in the bottom line.

25         THE COURT:  -- it looks like costs of MicroTech.  I

1    mean, it looked -- that's what it purports to be.  It looks

2    like what it purports to be, but he has no idea how it was

3    arrived at.

4         MR. FRENTZEN:  The reference that Mr. Keker made was

5    to the bottom line, Your Honor, which is 13-point-something

6    million and that is what I think should be stricken.

7         THE COURT:  And that what?

8         MR. FRENTZEN:  Is what should be stricken or what

9    needs to be stricken --

10        THE COURT:  I will strike the document and the

11   testimony concerning it.

12        MR. FRENTZEN:  Thank you, Your Honor.

13        THE COURT:  And then I will hear some further

14   discussion as to whether it comes in in some other way.

15        MR. FRENTZEN:  That's fine.

16        MR. KEKER:  Well, I would like to be heard on it more

17   before you do that in front of the jury, Your Honor.  There has

18   been so much that is -- of authentic records that are in

19   evidence with no protest -- I mean, that's the way the trial

20   has been going.

21        The idea that this one is not going to come in -- it says

22   it's a summary and it's current I2C inventory, non-personnel

23   I2C costs and personnel costs of people that he has identified

24   as being part of --

25        THE COURT:  But I don't know who did it and I don't

1    know -- what I'm hearing from the Government is they're saying

2    this document contains a lot of ingredients within it that were

3    based upon assumptions that these people worked full time doing

4    these sorts of things and therefore it's properly attributable

5    to the development of this project.

6         MR. KEKER:  It says --

7         THE COURT:  That's what I hear him say.  And the

8    argument is I don't know why this document -- number one, I

9    don't know why it was created.  Was it created to try to

10   justify something?

11        MR. KEKER:  As I understand it, it was created to try

12   to figure out what they'd spent on I2C --

13        THE COURT:  Yeah.  But what if the director said,

14   "Now, is what I want you to do.  Take everybody's salary who

15   had anything at all to do with it and put it all in this

16   calculation.  That's what I would like you to do."

17        MR. FRENTZEN:  I think that's what it says.

18        THE COURT:  Well, I don't know -- I haven't read the

19   darn thing, so I don't know.

20        But I'm going -- what we're all in agreement is this

21   witness doesn't know anything about it, about this document,

22   and therefore, his testimony, over objection perhaps, should be

23   stricken, but I'm not eliminating this document or its

24   relevance to some point in the future.

25        MR. KEKER:  And I am asking you not to -- you've said

PROCEEDINGS

```
1   it's stricken and so on.  I'm asking you not to do that in

2   front of the jury.

3           MR. FRENTZEN:  Well, we have to.

4           MR. KEKER:  We don't have to.  I'm not -- I won't

5   refer to it unless we --

6           THE COURT:  No.  I think actually in this sort of

7   thing, I have to do it.  I won't --

8           MR. KEKER:  Then we object --

9           THE COURT:  I won't say, "Do you remember the

10  questions that Mr. Keker asked?"  I won't do that.  I will just

11  say that we're going to pass on the admissibility of this

12  document at another date.  This witness had no knowledge of it

13  and therefore any responses he gave to any questions concerning

14  this subject should be not considered by the jury.

15      How is that for --

16          MR. FRENTZEN:  Great.

17          THE COURT:  -- diplomatic?

18          MR. KEKER:  We still object, but that's much better.

19          THE COURT:  That's better.  Over lunch it may even get

20  better.

21          MR. KEKER:  We object less.  It's a softer objection.

22          THE COURT:  A soft objection.  Well, there we go.

23      Let's have lunch.

24          MR. FRENTZEN:  Thank you, Your Honor.

25  \\\
```

```
 1                    (Trial Exhibit 6056 withdrawn)

 2              (Luncheon recess was taken at 12:14 p.m.)

 3   Afternoon Session                              1:04 p.m.

 4         (Proceedings were heard out of the presence of the jury:)

 5              THE COURT:  Hold the jury a minute.

 6         MR. REEVES:  Thank you, Your Honor.

 7        Very quickly, this afternoon the United States expects to

 8   call the first witness from HP, and I think there are --

 9   there's at least one question I wanted to raise with the Court

10   about the admissibility --

11              THE COURT:  Well, why don't we do it after this

12   witness is finished?

13         MR. REEVES:  Because I think it's going to go kind of

14   quickly.

15              THE COURT:  All right.  Go ahead.  Go ahead.

16         MR. REEVES:  The question I have is the admissibility

17   of evidence after the closing of the acquisition in or around

18   October 2011.

19        And certainly the Government intends to introduce evidence

20   about the restatement.  I view that as -- entirely as a

21   separate category that's already happened; but I think with

22   Mr. Sarin later on this afternoon, there would be an

23   opportunity to get into the reactions within HP after the fact,

24   what they did or didn't do, which we would view as irrelevant

25   and it touches on the issue that --
```

1      THE COURT:  Which you would view as relevant.

2      MR. REEVES:  Irrelevant.

3      THE COURT:  Irrelevant.

4      MR. REEVES:  Irrelevant.  Yes, irrelevant.

5      THE COURT:  You're talking about the cross-examination

6  of the witness?

7      MR. REEVES:  Yes.

8      THE COURT:  Fine.  We'll take it up a little bit

9  later.

10      MR. REEVES:  Okay.  I say that because there's -- if

11  we're going to go into it, I would prefer -- I don't want to

12  open the door ourselves; but if the door is going to be opened,

13  then there's certain things we would like to do.

14      THE COURT:  I think that's all right.

15      MR. KEKER:  There's another witness after him before

16  we get to Sarin.

17      MR. REEVES:  But he'll be short.  So we'll talk about

18  it later.  I just wanted to raise it with the Court.

19      THE COURT:  Great.

20      MR. REEVES:  Thank you.

21      THE COURT:  Thank you.

22      Bring in the jury.

23      (Proceedings were heard in the presence of the jury:)

24      THE COURT:  Okay.  Please be seated.  Thank you.

25      Let the record reflect all jurors are present, the parties

**S. TRUITT - CROSS / KEKER.**

1    are present.

2        Ladies and gentlemen, just before the recess there was a

3    document that the Court provisionally let into evidence.  It

4    was 6056.  It had some figures on it relating to costs

5    associated with a certain transaction, and the witness had

6    testified he had no knowledge of the creation of that

7    particular document.

8        So we're not going to admit it into evidence at this time,

9    and any evidence/testimony that he has given about that

10   particular document, just don't consider at this time.  There

11   may be a time that you do consider it, but not in connection

12   with this particular witness.

13       Okay.  Mr. Keker, go ahead.

14       **MR. KEKER:**  Thank you, Your Honor.

15   **Q.**  And good afternoon, Mr. Truitt, ladies and gentlemen of

16   the jury.

17       Some questions about the federal cloud project.  First of

18   all, what is a cloud, the cloud as we're using the term here?

19   **A.**  It's what we used to call outsourcing in the old days.

20   It's -- basically it's providing a data center and all the

21   required support in order to do whatever kind of data

22   processing that you're wanting to do somewhere else besides on

23   your own premises.

24   **Q.**  And when we talk about a FISMA-compliant federal cloud,

25   what are we talking about?

1  **A.**   FISMA is the federal requirements for security for certain

2  levels of secure transactions.  So we're talking about a

3  facility that meets those requirements.

4  **Q.**   All right.  And at MicroTech you were pitching Mr. Egan

5  about a partnership in working on cloud-computing capacity in

6  the spring of 2011, weren't you?

7  **A.**   I never pitched anything to Mr. Egan.

8  **Q.**   Okay.  Look at 6060, please, sir, six zero six zero, in

9  your book.

10          **THE COURT:**  Wait.  Six?  Hold on.

11          **MR. KEKER:**  6060.  I move it in.  It's from Steve --

12          **THE COURT:**  Well, I haven't seen it yet, so this is

13  the --

14          **MR. KEKER:**  The Steve Truitt cross --

15          **THE COURT:**  Well, is there any objection?

16          **MR. FRENTZEN:**  Your Honor, no objection to admission

17  of this document, but I'm not sure it relates --

18          **THE COURT:**  Okay.  Fine.  If there's no objection to

19  the document, it's coming in.

20       (Trial Exhibit 6060 received in evidence)

21  **BY MR. KEKER:**

22  **Q.**   This is an e-mail from you to Mr. Egan dated May 19, 2011.

23       If we could put it up on the screen.

24  **A.**   Yes.

25  **Q.**   Okay.  Do you see that?

1    **A.**    I do.

2    **Q.**    And in it you're talking -- the first paragraph talks

3    about the ATIC, which is being built -- the innovation center

4    being built on the first floor of your building; right?

5    **A.**    Yes.

6    **Q.**    And you're talking about "our gearheads have been having

7    great conversations with yours"; right?  That means technical

8    people?

9    **A.**    Yes.

10    **Q.**    And then in the second paragraph, the last sentence, it

11    says (reading):

12            "I think there is tremendous value to the creating by

13        incorporating Autonomy in some of our portable cloud-type

14        solutions."

15        What are you talking about there to Mr. Egan?

16    **A.**    I'm talking about we had a portable data center down in

17    the garage of our building that you could move around and put

18    in various locations for whatever purpose.

19        But the other thing I'm talking about in that paragraph is

20    I think I'm asking him permission to use their stuff.  I don't

21    think I'm pitching him anything.

22    **Q.**    Okay.  But when you say "I think there's tremendous value

23    to be created by incorporating Autonomy in some of our portable

24    cloud-type solutions," you're suggesting using Autonomy

25    software in MicroTech's cloud-type solutions?

1    **A.**    Yes.

2    **Q.**    And then you talk about -- you say, "We'll have dinner."

3    Did you ever have dinner with Mr. Egan?

4    **A.**    No.

5    **Q.**    In fact, the innovation center, what we've called ATIC and

6    then later was called I2C, featured -- showcased these cloud

7    solutions, didn't it?

8    **A.**    It did, but that wasn't the portable ones but, yes.

9    **Q.**    Look at 1320, page 6.  1320 is in evidence.  It's the

10    proposal.  The jury has seen it several times.  Let's go right

11    to page 6.  This is December 23rd, 2010.

12        And actually, Jeff, it's page 6 of the exhibit and page 2

13    of the proposal.  So it's 6 of the exhibit.  Yeah, there.  And

14    if you can blow up that top paragraph.

15        This is the ATIC proposal at the end of 2010.  You're

16    talking about the micro data center.  Is that the portable one?

17    What's the micro data center?

18    **A.**    The mobile data center you mean?

19    **Q.**    Okay.  Well, that's what I'm asking.  It says (reading):

20            "ATIC composition, the Advanced Technology Innovation

21        Center, will be comprised of the following major

22        components" --

23        And one is micro data center.

24    **A.**    Yeah.  Yes.

25    **Q.**    (reading)

1        -- "and it will feature Autonomy-based MicroTech

2        private cloud solutions."

3        What are you talking about?

4   A.   I'm not speaking here.

5   Q.   I'm sorry.  What is -- can you interpret the proposal for

6   us?  Dr. Channing did the proposal.  You were pitching it to

7   Autonomy, weren't you?

8   A.   No, I was not pitching it to Autonomy.

9   Q.   Do you understand what it --

10  A.   But, but to answer your other question, basically it

11  appears that we were going to put some of the Autonomy software

12  in the mobile data center and use it as a demonstration portal.

13  Q.   And you're talking about "MDC will highlight the

14  comprehensive cloud environment including," and it goes on and

15  it talks further on about "management of cloud assets" and so

16  on; right?

17  A.   Right.

18  Q.   Now, a little later in 2011 when you made this proposal to

19  Autonomy about a federal cloud system, Dr. Channing drafted the

20  options for you, didn't he?

21  A.   No.

22  Q.   Would you look at --

23  A.   You're talking about the FISMA-compliant data center?  Is

24  that the one?

25  Q.   Yeah.  Yeah.

1   **A.**   Okay.  What am I going to look at?

2   **Q.**   Can you remember if he --

3   **A.**   I don't believe he did.

4   **Q.**   6066, please.  Six zero six six.

5          **THE COURT:**  Any objection?

6          **MR. FRENTZEN:**  I'm sorry, Your Honor.  Give me just a

7   minute.

8          **THE COURT:**  6066.

9   **BY MR. KEKER:**

10  **Q.**   This is from Dr. Channing --

11         **MR. FRENTZEN:**  No objection.

12         **THE COURT:**  Admitted.

13     (Trial Exhibit 6066 received in evidence)

14  **BY MR. KEKER:**

15  **Q.**   -- to you dated July 31, 2011, at 4:38 p.m., and it's

16  about Autonomy cloud concept.  Is that -- was the Autonomy

17  cloud concept what you were going to pitch a few hours later to

18  Autonomy?

19  **A.**   (Witness examines document.)  There's some overlap here,

20  but I don't think so.

21  **Q.**   Well, look down, Dr. Channing's e-mail to you, the one

22  further down (reading):

23          "The MicroTech/Autonomy MicroKloud Solutions,

24      one-stop shopping for Autonomy cloud products and services

25      in the federal and health communities."

1      Isn't that exactly what the FISMA cloud-compliant project

2  was?

3  **A.**    At that level, yes, but the FISMA proposal had actual

4  hardware in it and it was a lot more concrete than this.  But,

5  yes, there are overlapping ideas here.

6  **Q.**    Okay.  But this is the afternoon of July 31, and he is

7  suggesting one possibility is a MicroTech/Autonomy FedKloud.

8  That's number one; right?

9  **A.**    Yeah.

10  **Q.**    And then number two further down is the

11  "MicroTech/Autonomy KnowledgeKloud on premise behind the wall."

12  What does that mean?

13  **A.**    It means having the equipment being at whatever location

14  where the customer is but being managed by presumably us and

15  being FISMA compliant.

16  **Q.**    Okay.  And about seven hours later, if my math is right,

17  you sent the proposal for the FISMA-compliant federal cloud to

18  Autonomy, didn't you?  Look at 2060.  It's in evidence.

19  **A.**    (Witness examines document.)

20  **Q.**    Excuse me.  You haven't sent it yet to Autonomy.  This is

21  the e-mail where you sent it to Tony Jimenez and Dave Truitt at

22  MicroLink, and it's sent that same day that we just looked at

23  Dr. Channing's memo but it's sent at 11:11 instead of 4:38;

24  right?

25  **A.**    Yes.  So, okay.

1   Q.   And this -- if we turn to the next page, this is the

2   proposal that you've testified about?

3   A.   Yes.

4   Q.   Okay.  Look at page 4, which is page 5 of the exhibit,

5   please -- or, excuse me, page 3, which is page 4 of the

6   exhibit.

7   A.   Okay.

8   Q.   And the last paragraph there says (reading):

9        "MicroTech can provide a FISMA-compliant platform to

10       quickly build and deploy any Autonomy-based solution as a

11       service either behind the government agency's firewall or

12       as a MicroTech or Autonomy-hosted service."

13       Can you explain that to us?  What does that mean?

14  A.   (Witness examines document.)  It means we can build a

15  FISMA-compliant cloud for a government client either at the

16  government client's site or somewhere else.

17  Q.   And you're telling us that doesn't relate to what

18  Dr. Channing was writing you about, the Autonomy federal cloud?

19  A.   It's similar to what -- you know, Dr. Channing had some

20  ideas.  So did I.

21  Q.   Okay.  Next page at the top, the top paragraph, blow that

22  up.

23       This is something you wrote; right?

24  A.   Yes.

25  Q.   (reading)

1               "The Social Security Administration is currently

2          deploying Autonomy's IDOL Server, Zantaz, Fetch Module,

3          and other software."

4          Did you know that the Social Security Administration was

5     using a lot of Autonomy software?

6     **A.**    I did know that, yes.

7     **Q.**    And how did you know that?

8     **A.**    I worked out there for a year on site.

9     **Q.**    Then can we drop down to the last paragraph of that

10    section, "Given this type of growth"?   (reading)

11               "Given this type of growth, the SSA" --

12         Is that Social Security Administration?

13    **A.**    It is.

14    **Q.**    (reading)

15         -- "could very easily decide that it makes sense to

16         move both its e-mail infrastructure and its e-mail

17         archiving solution to the cloud.  Should that occur,

18         MicroTech stands ready to assist Autonomy with the

19         move to help maintain and enhance its relationship

20         with a key Federal customer."

21         What are you pitching there?

22    **A.**    I'm pointing out that the SSA is doing lots of things that

23    would make it hungry for storage.  So if we could figure out a

24    way to make it convenient and cheap for them, they might bite

25    at it.

1   Q.    Okay.  The next paragraph, first sentence of the next

2   paragraph says (reading):

3            "MicroTech can quickly build a FISMA-compliant

4        hardware and software stack for virtually any Autonomy

5        solution through its close partnership with Autonomy's

6        fully owned subsidiary MicroLink, its own technical

7        expertise, and our family of MicroKloud data center

8        solutions."

9   A.    Now, there is where there is some relationship to what

10  Roger's talking about.

11  Q.    Some relationship or is it the same thing?

12  A.    It's -- yeah, it's similar.  I mean, we're saying we have

13  these capabilities.

14  Q.    Okay.  And then the business proposal on page 7 of the

15  exhibit, 6 of the -- or 6 of the exhibit, 7 of what's in

16  evidence, it says, "Proposed Business Arrangement," the first

17  sentence (reading):

18           "MicroTech proposes to deliver upon request a fully

19        functional Autonomy solution stack" -- you list what it

20        is -- "to meet the Social Security Administration business

21        requirements and service level agreements for an

22        immediate, one-time fixed payment of $8.2 million."

23       At the time you wrote that, did you think that that's

24  something that would be valuable to Autonomy?

25  A.    It was something I was told would be of value to Autonomy.

1   Q.   And Mr. Scott -- you told us before that Mr. Scott did not

2   negotiate this deal, Joel Scott?

3   A.   Not with me is what I told you.

4   Q.   Okay.  Look at 2213, please, sir.  Actually, look at 2213,

5   2214, 2234, 2248 --

6           THE COURT:  Well, wait.  Slow down.

7   BY MR. KEKER:

8   Q.   Okay.  2213.  One at a time.

9   A.   Yeah, these are the same e-mails we were just looking at

10  several minutes ago --

11  Q.   Yeah, and --

12  A.   -- and the way that this worked is Dave would speak with

13  them.  He would tell me what was said.  I'd go back, I'd adjust

14  the proposal, and we just kept going around and around until he

15  felt like they were done.  And then I sent it to Sushovan.

16  Then I sent another one about a week later to Joel Scott.

17  Q.   Okay.

18  A.   But I didn't speak to these people directly about money.

19  I did not negotiate.  I was basically the secretary in this

20  deal.  But, yes, that's what happened.

21  Q.   Okay.  This is on August 10 and you're making -- changes

22  are being tracked and accepted and so on --

23  A.   Uh-huh.

24  Q.   -- and the people that are talking about those changes are

25  you and Scott; right?

1   **A.**   No.

2   **Q.**   Well, I mean, look at it.  Steve Truitt to Joel Scott

3   (reading):

4            "With tracked changes accepted.  My apologies for any

5        inconvenience.

6        "Steve."

7        The one below is from Joel Scott to you; right?

8   **A.**   Yeah.  What's your point?

9   **Q.**   My point is that you and Mr. Scott negotiated this deal,

10  didn't you, negotiated the language?

11  **A.**   No.

12  **Q.**   Okay.  Look at the next one.  Look at 2214.  And you've

13  identified that earlier.

14          **MR. KEKER:**  I move these in evidence.

15          **THE COURT:**  They're in evidence.

16          **MR. FRENTZEN:**  They're in evidence.

17          **MR. KEKER:**  I think they are.  Okay.

18  **Q.**   This is a back and forth between you and Joel Scott with

19  copies to Dave Truitt and Tony Jimenez.

20  **A.**   It's a forth.  It's not a back and forth.  It's something

21  from me to Joel Scott where I sent him that revised language

22  that we spoke about earlier at Dave's request.

23  **Q.**   2234 is -- excuse me.  Let me get it.

24          2234 is the agreement, which is signed by you and

25  Mr. Scott -- right? -- and dated August 15th?  We saw that

1    before.

2        Move it in if it's not in.

3    A.    Yes.

4    Q.    And 2248 is a memorandum from you to Mr. Scott.

5        THE CLERK:  That's not in.

6        MR. KEKER:  I move in 2248.

7        THE COURT:  Admitted.

8        (Trial Exhibit 2248 received in evidence)

9    BY MR. KEKER:

10   Q.    You're saying, "Let me know if you need anything else,"

11   and so on.

12       So you're saying you're just the scrivener here?

13   A.    Yes.  I say (reading):

14           "Per my conversation with Dave, attached please find

15       an updated draft."

16       As a result of that conversation with Dave, here it is.

17   Q.    So after the acquisition by Hewlett Packard, did MicroTech

18   continue to work on this federal cloud project for Autonomy?

19   A.    No.

20   Q.    No?

21   A.    No.

22   Q.    Would you look at 6073, please.  Was Mr. Jimenez very

23   interested in this cloud project?

24       MR. FRENTZEN:  Objection to foundation.

25       THE WITNESS:  (Witness examines document.)

1          **THE COURT:**  What are we talking about?

2          **MR. KEKER:**  6073 is a memorandum there in the middle

3    from Mr. Jimenez to, among others, Steve Truitt dated

4    August 30, 2011.

5          **THE COURT:**  Admitted.

6      (Trial Exhibit 6073 received in evidence)

7    **BY MR. KEKER:**

8    **Q.**   And would you look at -- there's -- he's talking something

9    about a Data Center Consolidation Summit in Arlington.  That's

10   Arlington, Virginia?

11   **A.**   Yes.

12   **Q.**   October 3 through 5?

13   **A.**   That's what it says.

14   **Q.**   Do you remember it?

15   **A.**   No, but I'll tell you what this is about.  We were looking

16   at buying a data center for ourselves, not just for the purpose

17   of supporting this project if it ever came about but just in

18   general.  And, yes, he was very interested in that topic.

19   **Q.**   And he says (reading):

20          "I need to understand how our strategy of selling our

21      MicroKloud matches up with the government's plan to

22      consolidate data centers," and goes on.

23      Right?

24   **A.**   Yes.

25   **Q.**   At this point nobody had rejected the Autonomy cloud

1  concept, had they?

2  **A.**    No.

3  **Q.**    Nobody had said "We invoke this clause" that they spent so

4  much time talking about in case of an assignment?

5  **A.**    No, nobody had ever --

6  **Q.**    Nobody ever did that.

7  **A.**    -- asked for any data.

8  **Q.**    Excuse me?

9  **A.**    No one had ever asked for any support either.

10  **Q.**    Okay.  But MicroTech never invoked this clause that says

11  "If there's an assignment, we don't have to do it"?

12  **A.**    I think the clause says that "If there's an assignment, we

13  have to approve it"; and since nobody attempted to assign it or

14  do any work, I don't guess it ever came up.

15  **Q.**    Okay.  So it never came up that you weren't going to do

16  what you contracted to do?

17  **A.**    I'm sorry?

18  **Q.**    It never came up that you weren't -- that MicroTech wasn't

19  going to do what it had contracted to do with respect to this

20  federal cloud?

21  **A.**    That's true, it never did come up.  Nobody ever asked us

22  to do anything.

23  **Q.**    And do you remember that there was a rush to build a

24  demonstration of a cloud capacity in September of 2011?

25  **A.**    No, not really.

1  **Q.**   Look at 6063.

2  **A.**   (Witness examines document.)

3        **THE COURT:**  One moment, please.  6063?

4        **MR. KEKER:**  And look at -- 6063.  And I want to direct

5  his attention to see if it refreshes his recollection to --

6        **THE COURT:**  Okay.  Let me look at it first.

7        **MR. KEKER:**  -- the last e-mail, which is on the second

8  page, Your Honor, "Just talked to Tony."

9                    (Pause in proceedings.)

10        **THE WITNESS:**  I've never seen this e-mail before.

11 **BY MR. KEKER:**

12 **Q.**   Okay.  Do you know whether or not Roger -- Tony wanted

13 Roger to provide an Autonomy solution in September of 2011?

14 **A.**   No, I don't know that September was any more urgent than

15 any other month.  I mean, Roger was working on -- he was

16 working on what was going on in the I2C.

17 **Q.**   Fair enough.  In the I2C?

18 **A.**   Yeah.

19 **Q.**   This is in the ATIC?

20 **A.**   Yeah, the ATIC.

21 **Q.**   And was he working on an Autonomy cloud solution in the

22 ATIC after the acquisition?

23 **A.**   I don't know.

24 **Q.**   Do you remember people talking about the Autonomy cloud?

25 **A.**   Not really.

1    **Q.**    Look at 6074, please.

2    **A.**    (Witness examines document.)

3    **Q.**    Do you remember some kind of convention at CA World, a

4    demonstration at CA World?

5    **A.**    I didn't go to that and, no, I don't remember it.

6    **Q.**    What is CA World?

7    **A.**    It's Computer Associates big show, I guess.  I don't know

8    exactly.

9    **Q.**    Do you know whether or not the MicroPod Autonomy cloud was

10   shipped out to Computer Associates --

11   **A.**    No, I don't.

12   **Q.**    -- in November of 2011 after the acquisition?

13   **A.**    I do not know whether it was or not.

14   **Q.**    Look at 6069, please.  You're on this one.

15   **A.**    (Witness examines document.)

16   **Q.**    Is that an e-mail to you from Bill Fischer with copies to

17   Roger Channing and others?

18   **A.**    (Witness examines document.)

19          **THE COURT:**  This is dated?

20          **MR. KEKER:**  Dated February 9, 2012.

21          **THE COURT:**  Any objection?

22          **MR. FRENTZEN:**  No, Your Honor.

23          **THE COURT:**  Admitted.

24       (Trial Exhibit 6069 received in evidence)

25   \\\

1   BY MR. KEKER:

2   Q.   Look at the third paragraph, please.  It begins "Roger and

3   team."  If we can blow it up.  (reading)

4           "Roger and team continue their efforts with Autonomy

5       software for the 'behind the firewall' offering and

6       working through the challenges that presents.  They are on

7       schedule to have an initial operating capability of the

8       Autonomy product by March 1."

9       What does that refer to, Mr. Truitt?

10  A.   I don't know.

11  Q.   What's the "Autonomy software for the 'behind the

12  firewall' offering"?

13  A.   That's the -- that would be a cloud, some kind of cloud

14  offering, secure cloud offering of Autonomy.

15  Q.   Okay.  So Autonomy would be offering something that a

16  government agency, a classified agency or an agency that needs

17  to protect data, would be able to put behind a firewall and the

18  cloud would be FISMA compliant; right?

19  A.   Presumably.

20  Q.   Okay.  And this is being worked on in February 2012?

21  A.   That's what Bill Fischer says.

22  Q.   But you didn't know about it?

23  A.   No.

24      MR. KEKER:  I think that's all I have, Your Honor.

25  Thank you.

1    Thank you, Mr. Truitt.

2         **THE COURT:**  There's a few more questions.

3         **THE WITNESS:**  Oh.

4                    <u>**REDIRECT EXAMINATION**</u>

5    **BY MR. FRENTZEN:**

6    **Q.**   Sorry, you're not done yet.

7    **A.**   My apologies.

8    **Q.**   That's all right.

9         Mr. Truitt, Mr. Keker asked you about whether or not you

10   considered MicroTech to be on the hook.  Do you remember that

11   line of questioning?

12   **A.**   Yes, I do.

13   **Q.**   How does a normal VAR deal work in the software business?

14        **MR. KEKER:**  Objection.  Outside the scope, Your Honor.

15        **THE COURT:**  Overruled.

16        **THE WITNESS:**  Normally in a VAR deal the "R" in VAR

17   stands for reseller, and the company doing the reselling is

18   making an active effort to go out and get customers in order to

19   sell this software in question.

20        Typically there isn't any restriction on who that customer

21   is.  You know, whether or not you take ownership of the

22   software in advance or not can vary.

23   **BY MR. FRENTZEN:**

24   **Q.**   So when you were expressing that in the, would you agree,

25   somewhat different arrangement that MicroTech had with

**S. TRUITT - REDIRECT / FRENTZEN**

1  Autonomy?

2  **A.**    I'm sorry.  Am I expressing that the arrangement we had

3  was somewhat different?  Is that what you're asking.

4  **Q.**    That was a bad question but, yeah, that's what I'm asking.

5  **A.**    Yes, it was a little different --

6  **Q.**    Well --

7  **A.**    -- in these particular ones.  Now, we did some actual

8  reselling of Autonomy, but the ones we're talking about here

9  were a little different.

10  **Q.**    Right.  Back in 2006 or thereabouts with Voxant, you did a

11  regular VAR deal?

12  **A.**    Yeah.  We did other ones mostly with government agencies.

13  **Q.**    You did a few others that you can recall; right?

14  **A.**    Yeah.

15  **Q.**    But these, when you say -- or when you refer to being on

16  the hook, were you fully on the hook?

17  **A.**    Again, my beliefs about whether we were on the hook

18  evolved over time.

19  **Q.**    When did you realize you weren't on the hook?

20  **A.**    When we started being able to do deals like the ATIC and

21  the FISMA-compliant data center, I felt a lot more relaxed

22  about -- I felt, you know, we were going to have to pay the

23  bills, but I felt like we were going to get the money to do it.

24  **Q.**    All right.  Well, then, even in the original ones --

25  right? -- I mean, if you're on the being hook, you'd try to go

1  sell the software; right?

2  **A.**    Yeah.  I don't know that we were actually allowed to

3  resell that software under this agreement, which is another

4  unusual thing about it; but, yes, we would, absolutely.

5  **Q.**    I mean, you were communicating with John Cronin basically

6  saying, "We have to pay for this stuff.  When are they going to

7  go sell it so we can pay it?"

8  **A.**    Yes.

9  **Q.**    Is that on the hook like a normal VAR deal is on the hook?

10  **A.**    Well, it was -- I think it was demonstrating that I was

11  concerned about it and want to know when they were going to

12  close.  But is it normal?  No, it wasn't a normal arrangement.

13  **Q.**    Were you on the hook like you're on the hook on a normal

14  VAR deal?  Were you on the hook like --

15  **A.**    In a normal VAR deal it would have gone the other

16  direction.  We wouldn't have taken ownership of it at all until

17  after we had a customer.

18  **Q.**    Exactly.  Were you on the hook like the paragraphs that

19  Mr. Keker read from Exhibit 5?

20  **A.**    As a matter of practice, it turned out not so because we

21  were allowed to run very late on our payment terms and we were

22  eventually allowed to make arrangements to enter into business

23  arrangements so that we could come up with the money to make

24  the payments.

25  **Q.**    You didn't pay them unless they got you the money or the

1   deal had closed itself and then you got excused out of the

2   deal?

3   **A.**   With a few exceptions, that's true.

4   **Q.**   The check from Dave Truitt, your brother?

5   **A.**   Well, there was -- there was that -- there was one other,

6   I think, where we actually had to cough up some money early;

7   but as a percentage of what was owed, it was small.

8   **Q.**   And when you had to cough up some money, you got upset?

9   **A.**   I did, you bet.

10   **Q.**   You didn't say, "Why do I have to cough up money on this

11   debt I'm on the hook for?"

12   **A.**   Well, what I said was, "What are we going to do about

13   this?"

14   **Q.**   So in the course of this arrangement -- and I know you

15   were asked about side letters.  There were no side letters?

16   **A.**   Not on paper, no.

17   **Q.**   Okay.  Was there a side agreement?

18   **A.**   In effect there was a side agreement in my estimation

19   based on what I've come to understand is a side agreement.

20        I'll be honest, you know, I didn't think about it as a,

21   quote, "side agreement."  I thought about it as we're going to

22   go and figure out some way to get this money, and they're going

23   to work with us and they did.  But that in effect is a side

24   agreement in the sense that it allowed us to get out from under

25   these debts.

1   **Q.**   Okay.  You're going to get money to pay the people that

2   you owe the money to?

3   **A.**   Right.

4   **Q.**   You were asked about -- oh, I'm sorry.  I want to ask one

5   other thing.

6       1359 I believe is in evidence.  Can we pull up 1359

7   briefly?

8       Is that in evidence?  I believe it is in evidence.

9       Can you scroll up, please?

10      This is the DOI agreement.  Do you see that?

11  **A.**   Yes.

12  **Q.**   Could we scroll up?

13      I wanted to actually point out one portion of this order.

14  Can you take a look right where I've made a mark there?  Do you

15  see where it says, Mr. Truitt (reading):

16          "Although end user and VAR currently anticipate

17      entering into such a license transaction, in the unlikely

18      event end user instead enters into a direct agreement with

19      Autonomy or its affiliate to license the software, then

20      VAR shall distribute the software to end user upon

21      receipt," blah blah blah?

22          **MR. KEKER:**  It's outside the scope, Your Honor.  I

23  object on that basis.

24          **MR. FRENTZEN:**  That actually goes to the side

25  agreement, Your Honor.

1          THE COURT:  Overruled.

2     BY MR. FRENTZEN:

3     Q.   Was any of that true, that the end user and the VAR, which

4     is MicroTech, currently anticipated entering into a license

5     transaction?

6     A.   After awhile, it wasn't really true.  It was true at the

7     beginning.

8     Q.   All right.  Well --

9     A.   The first seven I did, it was true.  I'm talking about me

10    now.  In this -- I don't think this language was in there back

11    at the beginning.  I think this got added subsequently, if I

12    recall, and I didn't really notice it actually.

13    Q.   Right.  And I'm not saying -- you may not have noticed it;

14    but as you reflect and look at this, this is December 31st,

15    2010, did MicroTech have any contact with the Department of

16    Interior?

17    A.   No, not on this deal.

18    Q.   All right.  This was Autonomy's to take care of?

19    A.   Yeah.

20    Q.   The issue of immunity, briefly you were asked about

21    whether or not you also got immunity for the Grand Jury.  That

22    was put into evidence.

23         The immunity order for your Grand Jury appearance, were

24    there things that were not protected in terms of that immunity

25    order?

1  **A.**   Untruthful testimony.

2  **Q.**   Why did you need immunity, Mr. Truitt?

3  **A.**   Well, when I originally -- when I received my original

4  subpoena about this case, it wasn't clear to me exactly what

5  was going on so I went and I got an attorney, a very

6  accomplished and careful attorney, who actually before he was a

7  Defense attorney, he had your job and --

8  **Q.**   He had my job somewhere else?

9  **A.**   This job.

10 **Q.**   Yeah.  But somewhere else?

11 **A.**   Somewhere else, yes.

12 **Q.**   Okay.

13 **A.**   His recommendation to me was, is that he didn't put people

14 in front of Grand Juries when they were looking for things like

15 conspiracies and there were communications going back and

16 forth, and it's not entirely clear what your motives are or

17 things could be misconstrued.  He recommended that if he was

18 able to secure immunity for me, that I should allow him to do

19 so, and I took his advice.

20 **Q.**   What sort of conduct were you worried about that you

21 thought you needed immunity to protect against?

22 **A.**    I was worried that because we willfully engaged in these

23 end-of-quarter transactions, that I was not curious enough

24 about why they wanted to enter into, that that might be

25 construed as being knowing cooperation with whatever might be

1  happening on the other side that I didn't actually know about.

2  **Q.**    When you say "the other side," who are you referring to?

3  **A.**    Autonomy.

4  **Q.**    And so to be clear, was the issue MicroTech's accounting

5  or did you have concerns about Autonomy's accounting?

6  **A.**    No.  It was -- it was Autonomy's accounting.  It was --

7  you know, you see things like they're taking an $8 billion

8  write-down and all that kind of stuff, I had no idea what was

9  going on.

10 **Q.**    I'd like to show you, if I could -- if I could --

11        **MR. FRENTZEN:**  Can we switch over?  Do you mind if we

12 could because I don't have on the -- this Air Force letter

13 briefly.

14      This is Exhibit 5740, Your Honor.  I thought that was

15 admitted into evidence.

16        **THE COURT:**  5740?

17        **MR. FRENTZEN:**  Yeah.  If it wasn't admitted and I'm

18 wrong, then I'll take it down, but I thought it was admitted.

19        **THE CLERK:**  It was previously admitted.

20        **MR. FRENTZEN:**  It was?  Okay.

21 **Q.**    And, briefly, I want to -- Mr. Keker asked you whether or

22 not this is a letter from your lawyers.

23 **A.**    My lawyers or MicroTech's lawyers?

24 **Q.**    Yeah, okay.  So whose lawyers is this from?

25 **A.**    MicroTech's.

S. TRUITT - REDIRECT / FRENTZEN

1    **Q.**    Did you have your own lawyer?

2    **A.**    Yes.

3    **Q.**    So who represented you?  Your lawyer or these guys?

4    **A.**    In this case, my own lawyer represented me.

5    **Q.**    All right.  So what he showed you that you didn't know if

6    you reviewed, that's actually not your lawyers?

7    **A.**    No, it's not.  And, in fact, it looks like that this

8    happened maybe after I had left the D.C. area.  I don't

9    remember what day I actually left MicroTech, but I don't think

10    I was involved with this.

11    **Q.**    All right.  So what he's shown you is the corporation's

12    lawyers?

13    **A.**    Yes.

14    **Q.**    And in connection with this, could we go to, like, page 5

15    of this, please, and the bottom of the part that you were shown

16    before, that bottom paragraph down there?

17        Okay.  I mean, right here, that you approved it on

18    March 31st, 2010, was that true?

19    **A.**    I signed the purchase order and I approved it along with

20    our CEO.

21    **Q.**    On March 31, 2010?

22    **A.**    No.  I signed it on April 1st.

23    **Q.**    All right.  So this letter from somebody else's lawyers,

24    not from your lawyers, not from you, is it even accurate?

25    **A.**    That's true.  Well, it doesn't -- actually it says that I

1    approved it on March 31st.  That could be true, but I didn't

2    sign it.

3    **Q.**    Well, let's take a quick look at that.

4         Could we get Exhibit 708, please?

5         In terms of Mr. Cronin and the questions about

6    Mr. Cronin --

7    **A.**    Yeah.

8    **Q.**    -- let's go down to the bottom of 707 [sic].

9         Do you recognize this as -- this is in evidence, and this

10   is the document in which Cronin is sending you a copy of the

11   Vatican purchase order.  Do you remember that?

12   **A.**    Yes.

13   **Q.**    Do you need to see the next couple pages to see the --

14   **A.**    No.  I remember this.

15   **Q.**    Oh, I'm -- wait.  Did I say 707?  I mean 708.  This is

16   708; right?  Great.

17        Now, on April 1st, 2010, Mr. Cronin says to you about the

18   transaction (reading):

19             "I just talked with Dave re the most recent Autonomy

20        conversations.  I'm available to help with this.  Am

21        awaiting details from Autonomy."

22        Does that mean that Mr. Cronin has bound you to this

23   Vatican deal at this point or is he still asking you about it?

24   **A.**    I would say neither.  But, I mean, where I was on this at

25   this point was I already told them I wanted to do it based on

1    our conversations.  I told them that --

2    **Q.**    Did you know what "it" was yet?

3         **MR. KEKER:**  Could he finish, Your Honor?  Excuse me.

4         **THE WITNESS:**  I didn't know exactly what it was.  I

5    had some general outlines, okay, what it might be.  And I said,

6    "Hey, if it's anything like that, we're in."  But it didn't

7    come, it didn't come, it didn't come.  So, okay, fine.  It was

8    a -- it had been a distinct possibility that it wouldn't.  Then

9    it came on the 1st.  I was, like, okay, it came on the 1st.

10   **BY MR. FRENTZEN:**

11   **Q.**    And when it came on the first, Cronin had not bound you to

12   anything at that point, had he?

13   **A.**    As we have discussed before, until Tony or I would sign

14   it, we're not bound.

15   **Q.**    Well, let's go to the top, the very -- the last part of

16   the e-mail chain.  Keep going.  There you go.  Thank you.

17        All right.  So April 1st, 2010, still.

18   **A.**    Yeah.

19   **Q.**    And Mr. Cronin is saying (reading):

20            "Steve -

21            "Here is the order for...  It needs to be signed and

22        e-mailed back to me assuming it meets your expectation."

23        Right?

24   **A.**    Right.

25   **Q.**    The deal is not done yet; is that right?

1    A.    That's right.

2    Q.    In terms of -- in the sense of the terms of the deal, did

3    you know before this what the terms were going to be?

4    A.    Roughly.   I had an idea what they could be and they were

5    in the ballpark.

6    Q.    Did you know it was going to be $11.55 million?

7    A.    I knew it was going to be somewhere between 12 and

8    16 million, and I knew that it was going to be a whole bunch of

9    software, and I knew that there was going to be significant

10   potential for -- I mean, yeah, we had discussed it.   But, no, I

11   did not know it was going to be exactly 11.55 million and it

12   was going to be this.   I did not know that.

13   Q.    The deal wasn't done?   You hadn't gotten the order?

14   A.    Right.

15   Q.    In terms of delivery of software, do you know if MicroTech

16   ever delivered software to an end user?

17   A.    You mean one of these end users?

18   Q.    Right, the end-of-the-quarter, at-risk, whatever you want

19   to call it.

20   A.    I don't think so.   I mean, we did deliver Autonomy

21   software to end users at other times but, no, none of these.

22   Q.    Okay.   So when Autonomy goes out and, you know, they sell

23   it -- they say they're selling it to you and then they go out

24   and they close the deal, were they delivering the software?

25   A.    Presumably.   We weren't.

1  Q.   So in terms of having software even to deliver, I think

2  you were expressing before that you knew you could deliver the

3  software because you knew you had access to it somewhere; is

4  that right?

5  A.   Yes, that is right.

6  Q.   So is part of that because Autonomy keeps delivering you

7  software that you then never have to deliver to anybody?

8  A.   That's how it worked out, but I wanted the software around

9  so that as we grew our staff, that they could play with it and

10 practice on it, do things with it.

11       But, yeah, as a practical matter, at the beginning they

12 were delivering a lot of that software to us, and we never

13 actually had to turn around and do anything with it.

14 Q.   All right.  So you never delivered it to any end users?

15 A.   I can't think of any except Voxant.

16 Q.   I'd like to also, if we could, take a look at that ATIC

17 press release.  And, I'm sorry, I think it was Exhibit 6038.

18       Do you -- I'm sorry.  Do you mind helping me out?  6038.

19 Can you blow that up?

20       Okay.  Now, this is the new ATIC center, right, that you

21 guys -- that got built?

22 A.   Actually, yes.  You can see on the sign here it says

23 "Innovation and Integration Center."  So this would be the I2C

24 post-ATIC but, yes.

25 Q.   All right.  So this is the valuable commodity that

S. TRUITT - REDIRECT / FRENTZEN

1  Autonomy paid $9.6 million for?

2  **A.**    Yes, sir.

3  **Q.**    And this is the announcement?

4  **A.**    Yes.

5  **Q.**    Autonomy is not on this entire first page, are they?

6  **A.**    (Witness examines document.)  No, they're not.

7  **Q.**    Do you know what SGI Federal is?

8  **A.**    They're another -- they were basically a competitor of

9  MicroTech.  They were that kind of company.

10  **Q.**    All right.  They were excited about it.  They got some

11  press coverage on the first page of this press release?

12  **A.**    Yeah, I think.  I can't remember exactly.

13  **Q.**    Did they pay you $9.6 million?

14  **A.**    No, sir.

15  **Q.**    Can we go to the second page, please, and if we could blow

16  up the top part there?

17      Is there any reference to Autonomy, as you're discussing,

18  you know, how exciting this I2C is, that they paid $9.6 million

19  for?

20  **A.**    (Witness examines document.)  Not in this section.

21  **Q.**    Okay.  Could we scroll down "About MicroTech"?  Thank you.

22      And right here there is one mention of Autonomy because

23  MicroTech is an Autonomy-added value reseller; right?

24  **A.**    Right.

25  **Q.**    That's it for mentioning Autonomy in this press release

1  about the I2C; right?

2  **A.**  Right.

3  **Q.**  Let's see who got listed before Autonomy.  Microsoft,

4  Cisco, HP, Symantec, Oracle all came in order before Autonomy;

5  right?

6  **A.**  What's the date of this press release?

7  **Q.**  July -- I believe it was July of 2011.

8  **A.**  Yeah, they were all mentioned before Autonomy.

9  **Q.**  Any of them pay you $9.6 million for great press coverage?

10  **A.**  No.

11  **Q.**  In terms of the FISMA, you were asked or you were shown --

12  reshown documents that you sent to Joel Scott.  Do you recall

13  that?

14  **A.**  Yes.

15  **Q.**  Did Mr. Keker reshow you the document that you sent to

16  Sushovan Hussain?

17  **A.**  I don't remember if he did or not.

18  **Q.**  You sent a copy of --

19  **A.**  But I know what you're talking about, yes.

20  **Q.**  When you initially sent it to Autonomy, who did you send

21  it to?

22  **A.**  Sushovan.

23  **Q.**  And I know this is unlikely, but to your knowledge do you

24  have any information yourself about the extent to which

25  Mr. Hussain was involved on the Autonomy side in arranging,

1    carrying out, and concluding that particular deal?

2            MR. KEKER:  Objection.  No foundation, Your Honor.

3            MR. FRENTZEN:  If he has none, he can tell us that.

4            THE WITNESS:  I do not have any knowledge of his

5    involvement.

6            MR. FRENTZEN:  Great.

7        May I have one moment, Your Honor?

8                        (Pause in proceedings.)

9            MR. FRENTZEN:  That's all I have.  Thank you very

10   much, Mr. Truitt.

11                   <u>**RECROSS-EXAMINATION**</u>

12   BY MR. KEKER:

13   Q.   You spent a lot of time on the Vatican, and I'm not sure

14   where it's all ended up.  But the software was delivered on

15   March 31st; right?

16   A.   That's what that e-mail said.

17   Q.   And there's a sales order dated March 31st?

18   A.   That's right.

19   Q.   And when the confirmations came -- when you were asked

20   about delivery, you said it was delivered on March 31st?

21   A.   I did say that.

22   Q.   And when the confirmations came in, they showed a debt

23   arising on March 31st, and those were signed; right?

24   A.   No.  That was on a document that was an Autonomy document

25   that I don't know what that means, but --

1  Q.   I'm talking about the confirmations where they list the

2  debts and they have a date next to it, $11.5 million, March 31,

3  2000 --

4  A.   Are there dates next to those things?  I don't remember

5  that but if yes, okay.  I don't think there were dates on them

6  but there might be.

7  Q.   Do you want to see one?  You don't want to see one.  The

8  jury doesn't want to see one either.

9  A.   Okay.  Sure, there's a date next to it.

10 Q.   There's a date next to it.

11      Okay.  And you were asked a question about Mr. Hussain.

12 What did Mr. Hussain have to do with any of this

13 March 31st-April 1st stuff between you and Cronin?

14          MR. FRENTZEN:  Objection.  Foundation.

15          THE COURT:  Well, as far as he knows.

16          MR. KEKER:  As far as he knows.

17          THE COURT:  Do you know if he had anything to do with

18 it?

19          THE WITNESS:  I don't know anything about if he had

20 anything to do with it.

21          MR. KEKER:  That's all I have.  Thank you.

22                 **FURTHER REDIRECT EXAMINATION**

23 BY MR. FRENTZEN:

24 Q.   Who put the date on March 31st on that purchase order?

25 A.   It arrived from Cronin with that date on it, so I'm going

1   to presume that he did.

2           **MR. FRENTZEN:**  Nothing further.  Thank you,

3   Your Honor.

4           **THE COURT:**  Nothing further?

5           **MR. KEKER:**  Nothing further, Your Honor.

6           **THE COURT:**  Thank you.

7       Now you can get up and leave --

8           **THE WITNESS:**  Thank you, Your Honor.

9           **THE COURT:**  -- which I would recommend that you do.

10                      (Witness excused.)

11          **THE COURT:**  Okay.  Ladies and gentlemen, do you want

12  to stand up, just a little stretch, and we're calling our next

13  witness here?

14                      (Pause in proceedings.)

15          **THE CLERK:**  Please raise your right hand.

16                      **<u>AMIT DARYANANI</u>**,

17  called as a witness for the Government, having been duly sworn,

18  testified as follows:

19          **THE WITNESS:**  I do.

20          **THE CLERK:**  Thank you.  Please be seated.

21      Please state your full name for the record and spell your

22  last name.

23          **THE WITNESS:**  Sure.  It's Amit Daryanani.  The last

24  name is D-A-R-Y-A-N-A-N-I.

25          **MR. REEVES:**  For the record, the United States calls

1    Mr. Daryanani.  May I inquire, please?

2            **THE COURT:**  Yes.  Go ahead.

3                    <u>**DIRECT EXAMINATION**</u>

4    **BY MR. REEVES:**

5    **Q.**    Good afternoon, sir.  How are you?

6    **A.**    I'm good.  Thank you.

7    **Q.**    Where do you reside?

8    **A.**    San Francisco.

9    **Q.**    Okay.  San Francisco.

10        What's your educational background, please?

11   **A.**    So I have an undergrad in chemical engineering and a

12   master's in business administration, an MBA.

13   **Q.**    After you got your MBA, would you briefly describe your

14   career, please?

15   **A.**    Sure.  So after I got my MBA, I worked at an investment

16   bank called SG Cowen covering predominantly aerospace and

17   defense stocks.

18        After that, I moved to the West Coast, and I worked for a

19   buy-side investment management shop for three years largely

20   covering tech companies.

21        And from 2004 onwards I've been at Royal Bank of Canada

22   covering IT hardware stocks.

23   **Q.**    What is your position at Royal Bank of Canada?

24   **A.**    I'm a managing director and a senior equity research

25   analyst.

1   **Q.**   And what is, say -- what are your duties and

2   responsibilities as a senior equity research analyst?

3   **A.**   Sure.  So my job is essentially to provide investment

4   recommendation on the public equity of IT hardware companies.

5   So our job essentially entails to analyze, assess, and provide

6   a recommendation on what would happen to public equities of the

7   IT hardware sector broadly.

8   **Q.**   And what is Royal Bank of Canada, also known as RBC?

9   **A.**   So Royal Bank of Canada is a big Canadian bank, and I work

10  for the Capital Markets Division, which is predominantly

11  responsible for -- or provides I would say, one, investment

12  banking services to corporate clients; and, secondly, sales and

13  trading services, which includes providing research services to

14  institutional investors.

15  **Q.**   I'd like to direct your attention, if I could, please, to

16  in or around 2011.  At or about that time, were you working as

17  an analyst at RBC?

18  **A.**   Yes, I was.

19  **Q.**   Okay.  And were your duties and responsibilities different

20  than the ones you just described?

21  **A.**   No.  They were fairly comparable.

22  **Q.**   Okay.  So in that time period, in 2011, what types of

23  public companies were you following as an analyst at RBC?

24  **A.**   Sure.  So the sector was broadly called IT hardware

25  stocks, and it included companies like IBM, Hewlett Packard,

1    Dell which is a public company at that point, Western Digital,

2    Seagate, about 12 to 15 companies that fell into the IT

3    hardware bucket broadly.

4    **Q.**    Was Hewlett Packard one of the companies that you followed

5    in 2011?

6    **A.**    Yes, it was.

7    **Q.**    Now, as part of your job as an analyst at RBC, did you

8    write research reports?

9    **A.**    Yes, we did.

10   **Q.**    What was the purpose of writing research reports?  Why did

11   you do that?

12   **A.**    You know, writing research reports is one of the ways we

13   communicated with institutional investors and provided our

14   recommendation and our perspective on what sort of events would

15   impact those public stocks.

16   **Q.**    Okay.  And did you have an understanding about what the

17   investors who got your research reports would do with them?

18   **A.**    Yes, I did.

19   **Q.**    Don't be bashful.  What was your understanding of what

20   your reports would be used for with the investors to whom you

21   gave them?

22   **A.**    You know, we would -- we think it's one of the inputs they

23   use in the decision-making to buy, sell, or hold a particular

24   equity asset.

25   **Q.**    All right.  Now, to prepare your research reports, what

1    type of information did you rely on?

2    A.    Predominantly -- we essentially relied on publicly

3    available information provided by the companies that were

4    involved.  So whatever public disclosures, public information

5    these companies provided is what we would typically rely on to

6    come up with our investment thesis and recommendation.

7    Q.    Like press releases, for example?

8    A.    That would be one example of it, yes.

9    Q.    Publicly filed financial statements?

10   A.    That would be very helpful and useful in our work.

11   Q.    Earnings calls in which you were allowed to attend?

12   A.    Yes.  Those would all be examples of things we would look

13   at to come up with recommendations.

14   Q.    Okay.  Well, let's zero in on HP in or around 2011.  At or

15   around that time, were you familiar with the arrival of a new

16   CEO at HP sometime in late 2010?

17   A.    Yes, we were.

18   Q.    Okay.  Was that Mr. Leo Apotheker?

19   A.    That's right.  That's his name.

20   Q.    All right.  So I'd like to create some context around your

21   following of HP after following the arrival of Mr. Apotheker,

22   and as you saw HP how it was doing from your viewpoint as an

23   equity analyst.

24   A.    Sure.  You know, when Mr. Apotheker had come on board, he

25   had, you know, provided a vision on how he wanted to change the

1    course and strategy that HP had been implementing up until

2    then, and a big part of that was essentially taking HP from

3    being -- you know, HP, maybe if I step backwards, was more of a

4    PC/printing company that generally commoditized products; and

5    his vision was always to take that business and make it higher

6    margin, higher value added, more software, more services

7    essentially.

8    **Q.**   Why would that type of transition be advantageous, if you

9    know, or why would you want to do something like that?

10   **A.**   The reason you'd want to go after the higher margin,

11   higher value added businesses is, you know, A, they're less

12   commoditized so the competition is *per se* less.  The customers

13   have a higher switching cost, so once you win these customers,

14   they typically don't leave very quickly so that's helpful.  The

15   margin profile is typically in software and so it's going to be

16   much richer than they are in PC and printing.

17   **Q.**   And do those margin profiles potentially impact the

18   profitability of a company like HP?

19   **A.**   Absolutely they would.

20   **Q.**   So what's the relationship between high-margin products

21   and the opportunity for higher profitability?

22   **A.**   You know, as you know, all companies run efficiently.  The

23   higher the gross margins are, the higher the profitability of

24   that company should be in theory over time; and, you know,

25   assets such as software would typically have 80 percent-plus

1  gross margins while HP at that point had 20, 25 percent gross

2  margins.

3  **Q.**   So with the arrival of Mr. Apotheker, as we move into

4  2011, what did you think of this new possible strategy, this

5  new course for HP?

6  **A.**   We thought the strategy made a lot of sense provided you

7  could execute on it clearly, but we thought there was a lot of

8  logic in going from lower value added lower margin business to

9  higher value added higher margin business.

10       And, you know, we've seen companies like IBM, as an

11  example, one of its peers successfully navigate this transition

12  and as they move towards this new or more optimized business,

13  those public -- the public assets, the public equity of that

14  company tends to be worth -- tends to appreciate very well as

15  you go through that transition.

16  **Q.**   Let me direct your attention to on or around August 18th,

17  2011.  At or about that time, did you learn about HP's

18  announcement of its intention to acquire a company known as

19  Autonomy?

20  **A.**   Yes, we did.

21  **Q.**   Okay.  Was that big news for you in a sense?

22  **A.**   Yes.  That was a fairly big material piece of information

23  in the news that day.

24  **Q.**   We're going to go through that day a little more

25  carefully, but in the build up to August 18, 2011, were you

1    waiting in any sense for some execution by Autonomy on the

2    strategy that Mr. Apotheker had indicated that he wanted to

3    follow?

4    **A.**    I'm sorry.  Do you mind repeating that for me?

5    **Q.**    Sure.  Were you waiting for some type of strategic action

6    like the type that arrived on or around August 18th, 2011, in

7    any sense?

8    **A.**    You know, yes, we were.  I mean, the discussion or the

9    communication Mr. Apotheker had the whole time was, "You know,

10   we wanted to take HP in a new direction.  It's going to be more

11   software and more better margins."

12        And, you know, to do that organically would always be a

13   long, uphill battle so the take was it was always going to be

14   more to get you there.  So I don't think anyone knew that was

15   the day it would happen, but there was an expectation that

16   there would be deals announced to drive that migration.

17   **Q.**    Great.  Let me show you what has been marked for

18   identification as Exhibit 2302.

19             **THE COURT:**  2302?

20                       (Pause in proceedings.)

21             **THE COURT:**  Admitted.

22             **MS. LAZARUS:**  I just object.  The copy I have on the

23   first page, it's cut off.

24             **THE COURT:**  Would you hand Ms. Lazarus the full

25   document?

DARYANANI - DIRECT / REEVES

```
 1                    (Pause in proceedings.)

 2          MR. REEVES:  Okay.

 3          THE COURT:  Admitted.

 4       (Trial Exhibit 2302 received in evidence)

 5          MR. REEVES:  Thank you, Your Honor.

 6       This is for the Court.  I'm handing this up, and we have a

 7   set for --

 8          THE COURT:  Well, I can just look at it here.

 9          MR. REEVES:  Do you want to do it on the screen?

10          THE COURT:  Yes.

11          MR. REEVES:  All right.  Good.

12       If we could please display Exhibit 2302.

13   Q.  Okay.  Do you recognize this document, Mr. Daryanani?

14   A.  (Witness examines document.)  I did not mean to draw that

15   red line there, so I apologize; but, yes, I do recognize that

16   document.

17   Q.  Okay.  Good.

18       Is this a press release that HP issued during the trading

19   day on or about August 18, 2011, relating to Autonomy and other

20   matters at HP?

21   A.  Yes, this was the press release they issued intraday.

22   Q.  Intraday.  What do you mean by that?

23   A.  Intraday in my head is during the trading hours between

24   6:30 and 1:00 o'clock West Coast time.

25   Q.  When this press release came out, did you read it with
```

1    interest?

2    **A.**    Yes, we did.

3    **Q.**    All right.  And what did you think of the announcement by

4    HP that it's confirming discussions with Autonomy regarding

5    possible business combination, et cetera?  What did you think?

6    **A.**    So that press release had three different things going on

7    in it.  Two of them were, you know, unusual and important; one

8    of them was the announcement that they were discussing or in

9    discussions with Autonomy.

10         The second was they would potentially look to sell their

11   PC assets; right?

12         The combination of those two things would have accelerated

13   the transition, the path, the road map that Mr. Apotheker had

14   laid out to shareholder investors before that.

15   **Q.**    All right.  Let me show you what has been marked for

16   identification as Exhibit 2297.  This is the SEC Form 8-K filed

17   by Hewlett Packard on or about August 18, 2011.

18              **THE COURT:**  Admitted.

19         (Trial Exhibit 2297 received in evidence)

20              **MR. REEVES:**  If I could please display that,

21   Your Honor.

22   **Q.**    Are you familiar with these types of documents,

23   Mr. Daryanani?

24   **A.**    Yes, I am.

25   **Q.**    All right.  And what is an SEC Form 8-K?

1    **A.**   SEC 8-K is essentially when public companies have a

2    material disclosure that they have to make, that's the

3    documentation they use to update investors in a uniform and

4    simultaneous manner.

5    **Q.**   All right.  And attached to the Form 8-K were there

6    certain press released also being issued publicly by HP on or

7    about August 18th, 2011?

8    **A.**   Yes.  So this would have something like an earnings

9    release, for example, attached to it.

10   **Q.**   All right.  Is this -- are these press releases in the

11   form of this SEC Form 8-K being issued after the close of

12   trading for the HP stock on the U.S. stock market?

13   **A.**   Yes, that's right.

14   **Q.**   Okay.  Let's take a look, if we could, at page 1 of 31.

15   It's Exhibit 99.1.

16   **A.**   (Witness examines document.)

17          **THE COURT:**  Exhibit -- do you mean --

18          **MR. REEVES:**  This --

19          **THE COURT:**  Which exhibit?

20          **MR. REEVES:**  This is part of Exhibit 2297.  I'm not

21   able to identify the specific page within the exhibit.  Okay?

22          **THE COURT:**  It's in evidence.

23          **MR. REEVES:**  It is in evidence.  Thank you,

24   Your Honor.

25   **Q.**   And this was an attached press release to the Form 8-K,

1    was it not, Mr. Daryanani?

2    **A.**    Yes, it was.

3    **Q.**    Okay.  And I think this touches on something you mentioned

4    before, that there were multiple forms of announcement or news

5    around HP that was being announced by HP on or around

6    August 18, 2011, were there not?

7    **A.**    Yes, there were.

8    **Q.**    According to the document, it says (reading):

9              "HP reports third quarter 2011 results and initiates

10        company transformation."

11        Do you have an understanding of the reference to results

12    there, third quarter 2011 results, and what that means?

13    **A.**    Yes.  That's -- that pertains to the July quarter -- the

14    quarter that ended July 31st, the earnings release related to

15    that quarter.

16    **Q.**    Okay.  And did you review this press release carefully

17    when it came out and read it with interest?

18    **A.**    Yes, we did.

19    **Q.**    Okay.  At a high level, what was your take-away and

20    understanding of how HP was doing with regard to its third

21    quarter 2011 results?

22    **A.**    So from a fundamental basis from how the business was

23    going, things were starting to slow down for the company so

24    there were challenges, if you may, in their day-to-day, you

25    know, operations.

DARYANANI - DIRECT / REEVES

1      They talked about the month of July, the end of the

2   quarter, seeing a notable slowdown; and as a result, they

3   actually revised their full-year expectations for prospects on

4   non-GAAP earnings per share lower during this release -- press

5   release.

6   **Q.**    They revised their earnings projections?

7   **A.**    That's right.

8   **Q.**    Okay.  What does that mean?

9   **A.**    So the earnings projections essentially is what the

10  company -- in this case HP -- expects to earn in net income per

11  share simplistically in that fiscal year in that 12-month

12  cadence.

13  **Q.**    So help us out.  Is that a good thing or a bad thing when

14  a company revises downward its earnings projections for the

15  year?

16  **A.**    Typically that's a negative when you're revising things

17  downwards.

18  **Q.**    Okay.  And as you understood it, what was the reason for

19  that revision?

20  **A.**    It was macro softness, it was IT budgets slowing down, and

21  business generally being more anemic than they intended it to

22  be.

23  **Q.**    Macro softening meaning the economy slowing down, or

24  something like that?

25  **A.**    Right.  You know, HP's business was essentially a

1   120 billion revenue company that sold PCs and printers; and,

2   you know, when the economy does well, you tend to buy some more

3   PCs and printers, and the reverse holds true as well.

4   **Q.**   All right.  Thank you.

5        And, in addition, I think you said there were other

6   announcements besides earnings for the quarter and the Autonomy

7   acquisition, which we'll get to, that were being announced at

8   this time.  What were those, other pieces of news that were

9   being announced by HP, please?

10  **A.**   The two other pieces of information on updates they had

11  that was fairly notable, one was they were going to look to or

12  explore to divest or shut down their PC business.  That in and

13  of itself was fairly material.  I think of that as almost Coke

14  saying "We don't want to make soda anymore."  It's a big deal

15  for HP.

16  **Q.**   It's almost Coke saying, "We don't want to make soda

17  anymore"?  What do you mean by that?

18  **A.**   Well, I think we all know HP as the PC/printing company,

19  so announcing "We do not want to make PCs anymore or walk in

20  the PC market" is a big deal.

21       And the other piece was obviously the Autonomy

22  acquisition.

23  **Q.**   Let's turn to the Autonomy acquisition.  Is there a

24  separate press release in the back of the 8-K that addresses

25  Autonomy?  The exhibit attached to the 8-K is Exhibit 99.3.

DARYANANI - DIRECT / REEVES

1      Thank you very much, Ms. Margen.

2      Do you have that?  It's on the screen there with you,

3  Mr. Daryanani.

4  **A.**  (Witness examines document.)  Yes.

5  **Q.**  You can use the document if you wish.  You can use the

6  screen as you wish.

7  **A.**  I do have it here.

8  **Q.**  You have it?  Okay.

9      All right.  I'm on Exhibit 99.3 to what's been received in

10  evidence as Exhibit 2297.  This is the portion of the 8-K

11  announcing the acquisition -- or HP's intention to acquire

12  Autonomy, is it not?

13  **A.**  Yes, it is.

14  **Q.**  Let's drill down on this a little bit, please.

15      What was your reaction -- withdrawn.

16      Did you consider this press release, this announcement of

17  the acquisition, important?

18  **A.**  Yes, we did.

19  **Q.**  Okay.  Did you review this press release carefully?

20  **A.**  Yes, we did.

21  **Q.**  At or about the time that it was issued?

22  **A.**  Yes.

23  **Q.**  Okay.  Why did you review it carefully?

24  **A.**  Two parts to that.  One, it was a huge capital commitment

25  from HP to spend the money to buy Autonomy.  So, you know, a

DARYANANI - DIRECT / REEVES

1    company spending $11 billion or so to acquire someone, so it

2    was a big amount of commitment they were making so it made it

3    material enough.

4        The other part we thought was this provided immense --

5    this provided a degree of structural certainty to the vision

6    that Mr. Apotheker had laid out for HP.

7    **Q.**    I'm going to come back to that in one second.

8        Did you rely on the accuracy of the information in this

9    press release issued by HP?

10   **A.**    Yes, we did.

11   **Q.**    Okay.  Did you use the information that was contained in

12   the press release to advise your investing clients?

13   **A.**    Yes.

14   **Q.**    All right.  Let's go to the first part of this -- or,

15   excuse me -- the second bullet point and highlight that.

16   Second bullet point, please.  Great.  Thank you.

17       The second bullet point reads (reading):

18           "Expected to be accretive to non-GAAP earnings per

19       share for HP shareholders in the first full year following

20       completion."

21       Was that portion of the press release important to you,

22   Mr. Daryanani?

23   **A.**    Yes.

24   **Q.**    What does the word "accretive" mean?

25   **A.**    So "accretive" simplistically I guess, for me at least,

1  means the net income or the profits that I get from an acquired

2  asset minus the cost to acquire that asset.  As long as that

3  number is positive, the deal should be accretive to your model.

4  **Q.**   Why was this announcement by HP that the Autonomy deal was

5  expected to be accretive in the first full year important to

6  you?

7  **A.**   Well, typically you want deals to be accretive.  Hopefully

8  you're not doing deals to reduce your corporate profits.  You

9  want to keep growing them.  So as a rule of thumb, it's always

10  good to have accretive deals.

11      Given the size of the cost of this deal, it was all the

12  more important that this is accretive.

13  **Q.**   What do you mean by that?

14  **A.**   The transaction price was $11 billion, so it was a big

15  transaction price and it would be severely negative for the --

16  for their operations, for their earnings, if an $11 billion

17  deal was going to be dilutive to them.

18  **Q.**   Was going to be what?

19  **A.**   Dilutive?

20  **Q.**   Dilutive as versus accretive?

21  **A.**   Right.

22  **Q.**   But here you're being told that the anticipation is that

23  it will be accretive within the first full year?

24  **A.**   That's right.

25  **Q.**   Now, as you're reviewing the press release and considering

1   this acquisition by HP of Autonomy, was Autonomy's history of

2   financial performance important to you in any way?

3   A.   Yes, it was.

4   Q.   Why was Autonomy's history of financial importance to you

5   in the context of your following HP and HP's acquisition of

6   Autonomy?   Why did that matter?

7   A.   So, you know, Autonomy or any asset that HP bought, it

8   would be relevant to know the growth rates, the margin profiles

9   of that asset, because if you truly want to implement this

10   transition strategy that HP had -- which is higher margins,

11   higher growth from software services kind of businesses -- then

12   whatever you're buying by the very definition of what they've

13   talked about needs to be a high-growth asset in the underlying

14   HP business and has to be a higher margin business versus the

15   underlying HP business.

16   Q.   Through this point in time, through in or around

17   August 18, 2011, the date of the announcement, how well did you

18   know Autonomy?   What did you know about Autonomy?

19   A.   We knew it was a public company in the software space, but

20   that's probably the extent of what we knew about Autonomy at

21   that point.

22   Q.   Fair to say you knew a lot less because it wasn't in your

23   sector?

24   A.   Yes.   It was in the software space versus IT hardware.

25   Q.   All right.   Let's go and look at the second page if we

1    could, please, of the press release.  That's great right there.

2         And if you could, please, in the top paragraph, the one

3    above that, please, the last two sentences, if you please

4    highlight that.  Great.

5         Did you have an opportunity to read this portion of the

6    press release when it was circulated on August 18th, 2011?

7    **A.**   Yes.

8    **Q.**   As you're considering the implications of this acquisition

9    by HP, what, if any, importance did you assign to Autonomy's

10   growth history over the last five years?

11   **A.**   You know, this growth metrics is really important.  The

12   fact that they were buying something that was going to grow

13   at -- or had been growing at 55 percent per annum consistently

14   and had a much higher margin growth rate was all going to

15   enable and provide you, we thought, a structural certainty to

16   this long-term margin mix tailwind that HP was going to enjoy.

17   **Q.**   When you use this term "structural certainty," what do you

18   mean?  What are you talking about?

19   **A.**   So I think up until that day, you know, we knew what

20   Mr. Apotheker wanted to do at HP but it was never clear what

21   exactly he would do or what the details of it looked like.

22        I think at this point the debate -- one needed to no

23   longer have a debate what would he buy.  You knew what he was

24   going to buy.  And he was almost going to accelerate the

25   contribution from Autonomy by looking to divest its PC

1  business.

2      So you had the structural certainty.  He is essentially

3  showing you what his cards were, what the business would look

4  like; and from there on, it became a matter do you believe they

5  could execute or not towards the strategy.

6  **Q.**  Let me read the highlighted portion of the press release,

7  and I'm going to ask whether this was relevant; and if so, why

8  it was relevant to you.  Okay?  (reading)

9          "Autonomy's recent operating and financial

10         performance has been strong, including its most recent

11         results for the quarter ending June 30th, 2011.  Over the

12         last five years, Autonomy has grown its revenues at a

13         compound annual growth rate of approximately 55 percent

14         and adjusted operating profit at a rate of approximately

15         83 percent."

16     Was that information important to you or relevant to your

17  consideration of this acquisition by HP?

18  **A.**  Yes, it was.

19  **Q.**  Why?

20  **A.**  Again, I go back to HP needed to add a higher growing,

21  higher margin business to their portfolio.  HP at that point

22  probably grows at 2, 3 percent a year, something where the U.S.

23  IT spend grows at, the global IT grows at.  So an asset growing

24  at 55 percent a year definitely contributes to the potential

25  for HP becoming faster growth over time.

1          And the higher profit growth tells you that there's a lot

2     of leverage and better margin profile at Autonomy versus what

3     HP has itself.

4     **Q.**   What effect would the acquisition of higher margin, higher

5     growth-type assets like this potentially have on HP's stock

6     performance in future quarters going forward?

7     **A.**   Once a deal like this is done, the belief would be that

8     what you do is set up the company for long-term multiquarter,

9     multiyear basis of faster revenue growth and sustained gross --

10    sustained margin expansion broadly.  And typically companies

11    that can do that tend to get rewarded rather well by

12    shareholders.

13    **Q.**   They get rewarded well by shareholders.  Is that a nice

14    way of saying their stock can go up?

15    **A.**   Yes.

16    **Q.**   All right.  Mr. Daryanani, if Autonomy's revenues had not

17    been growing at 55 percent a year but had been growing more

18    slowly than that and in some years had not been growing at all,

19    would that have been relevant to you as you assessed this

20    acquisition?

21    **A.**   That would be very relevant for us to know.

22    **Q.**   Why would that be relevant?

23    **A.**   Two parts.  One would be it would actually stall or not

24    enable this margin-expansion, faster-growth theory or

25    investment thesis that's out there.

DARYANANI - DIRECT / REEVES

1    Secondly, it would make you question if an asset is not

2    growing a whole lot faster than HP, why are we paying 11 times

3    sales for that asset?

4    **Q.**    I'd like to show you what has been marked for

5    identification as Exhibit 2318, please.

6         **MR. REEVES:**    This is an August 19, 2011, RBC Capital

7    Research Report by Mr. Daryanani.    I offer it in evidence.

8         **THE COURT:**    Admitted.

9         (Trial Exhibit 2318 received in evidence)

10   **BY MR. REEVES:**

11   **Q.**    Are you -- do you have that?

12   **A.**    I do.

13   **Q.**    Good.    You're familiar with this?

14   **A.**    Yes, I am.

15   **Q.**    Did you write it?

16   **A.**    Yes, I did.

17   **Q.**    All right.    And after you reviewed the press release and

18   the announcements by HP in the manner that we went through and

19   you described, did you begin to prepare this report?

20   **A.**    Yes.

21   **Q.**    Okay.    How quickly did you have to draft and complete this

22   report?

23   **A.**    So typically an earnings call like this would end around

24   3:00 o'clock West Coast time, Pacific time, and this report

25   would be released to our clients and institutional investors

1  somewhere between 9:00 o'clock our time to 3:00, 4:00, our

2  time, West Coast time again.  So somewhere between 3:00 to

3  9:00.  Six, seven hours is typically the time we have to

4  prepare this.

5  **Q.**  Why is it necessary to act so quickly and write something,

6  you know, as detailed as this as quickly as that?

7  **A.**  So this along with a host of other things are inputs that

8  institutional investors will use to decide what they want to do

9  with the stock the next trading day.  And trading day starts at

10  9:30 East Coast time, 6:30 West Coast time, so having this

11  published several hours ahead of that is important because it

12  gives investors an opportunity to use this as one of the inputs

13  in what to do.

14  **Q.**  Was there urgency to complete your report and disseminate

15  it to potential investors before the next trading day on

16  August 19th?

17  **A.**  Yes.

18  **Q.**  Okay.  All right.  Let's go through -- what's the title of

19  your report?  Let's highlight this interesting one-word title

20  here, please.  What was the title of your report?

21  **A.**  "Wow."

22  **Q.**  Okay.  Why don't you tell us what you meant by "Wow"?

23  **A.**  You know, "Wow" I think was really a reflection of the

24  amount of material information everyone had to digest the night

25  before essentially; right?  And it was three things.  Typically

1    on a day like this you only get to deal with the first one,

2    which is "Here's how we did in the quarter and here's what the

3    guidance looks like."

4         But on top of it you had two fairly notable updates; one

5    was the Autonomy transaction and then second was HP potentially

6    looking to sell or divest their PC business.  So it was really

7    a reflection on how much material and how much information

8    everyone had to digest the night before.

9    Q.   So all in as you're digesting and preparing this report,

10   what did you think about these announcements and what was your

11   reaction in terms of the prospects for HP's share price going

12   forward as a result of this corporate activity?

13   A.   Again, there were a few different things going on, but the

14   net summation of our take was, you know, to the extent HP had

15   provided us with structural certainty on what this business

16   would look like, how to execute going forward, to the extent

17   they could keep executing on the road map, we thought this was

18   a very attractive stock to own.

19        We had an outperform rating on it; and our take was

20   simplistically that, to the extent they were executing that, HP

21   at that point was trading at 7, 8 times forward earnings.  The

22   peers, IBM and others, were trading in the double digits, 12,

23   13 times.  We thought that delta was the opportunity for this

24   stock to outperform over the foreseeable future.

25   Q.   So I think you're referring to your rating.  Is that

DARYANANI - DIRECT / REEVES

 1  reflected here in the word "outperform"?

 2  **A.**    Yes, that's what I mean.

 3  **Q.**    What does an outperform rating mean?  Is that like a buy

 4  rating?

 5  **A.**    It's comparable to a buy rating.

 6  **Q.**    Okay.  And what are the alternative ratings other than

 7  outperform for RBC?

 8  **A.**    So we rate stocks in three buckets.  It's outperform,

 9  which is comparable to a buy; a sector perform, which is a

10  neutral; and an underperform, which would be comparable to a

11  sell.

12  **Q.**    But here you're saying outperform and you're recommending

13  buy essentially?

14  **A.**    That's right.

15  **Q.**    Okay.  Let's go to the target price.  Target price 35 down

16  arrow 46.  What does that mean?

17  **A.**    So 35 is the new price target that we had on the stock

18  after we factored in all the information from the night before,

19  the down arrow reflects that the price target revision was

20  downward, and 46 is the prior price target that we had.

21  **Q.**    If we could, please, enlarge the paragraph that is "Review

22  of July Quarter."  Maybe a little bit -- that's pretty good.

23  Thank you.

24        Let's just go through your first paragraph here and talk

25  about some of the points that you're making.  Is that clear?

1    **A.**    Yes.

2    **Q.**    You write at the beginning (reading):

3              "RBC Perspective:  HPQ posted a challenging quarter

4         but the seeds of a structural shift are being laid."

5         What do you mean by that?

6    **A.**    Two parts to this.  One it was a challenging quarter.

7    Business was slowing down.  Numbers, revenues, EPS was not as

8    great as people expected it to be, so that was a challenging

9    quarter statement.

10        Seeds of the structural shift being laid was really a

11   reflection of the Autonomy acquisition, the proposed

12   acquisition of Autonomy at that point, and the intent to

13   explore options to sell or divest the PC business.

14   **Q.**    You go on and say (reading):

15             "The most relevant announcements are the planned exit

16        from the PC business and acquisition of Autonomy.  Aside

17        from the acquisition's valuation concerns, we like the

18        deal from a strategic standpoint and are glad management

19        is finally adding some structural certainty to the secular

20        story."

21        What's the point you're making here?

22   **A.**    You know, so the price HP paid for Autonomy was a large

23   price.  They paid 11 times sales due to the transactions.  We

24   call that as one of our concerns is the valuation that HP paid

25   for Autonomy.

1    But stepping aside from that, I think, you know, from a

2  strategic perspective, he had -- you know, HP and Mr. Apotheker

3  had shown you his cards:  This is the company they want to bet

4  on; and that along with the PC business, the divest -- the

5  potential divestiture of the PC business, we're going to lay

6  the groundwork for this long-term revenue acceleration and

7  margin expansion story that HP had.

8  **Q.**  You go on (reading):

9        "After the dust settles, we expect sentiment to

10       become more positive on the name, setting the company up

11       for long-term margin tailwinds from mix."

12   For those of us who don't work on Wall Street, what do you

13  mean by that?

14  **A.**  That essentially means that, you know, once the dust

15  settles, which is -- in our perspective that means once the

16  Autonomy deal closes, once they figure out how to divest or

17  sell the PC business, i.e., you know, these things are more

18  finalized, you're setting the company up for long-term margin

19  tailwinds.

20    And essentially at that point the way we would think about

21  it is, you know, a part of HP, the core of HP is a business

22  that grows at 2 percent a year that has 25 percent gross

23  margins.  And you stack onto that this Autonomy piece that is

24  going to grow much, much faster at 50 percent with software

25  like margins at 80, 85 percent.  You sort of play that out over

1  multiple years, you start to see revenue that starts to

2  accelerate for HP and you see the long-term margins starting to

3  drift higher for the company.

4  **Q.**   And you conclude (reading):

5         "We acknowledge the bad macro environment but view

6         the valuation discount as extreme now that the outlines of

7         a total new HP are in view.  Maintain outperform."

8  What do you mean by that conclusion?

9  **A.**   You know, the bad macro environment was essentially the IT

10  budgets were starting to freeze up, business was slowing down,

11  and that was a challenge that HP had talked about.

12       But the valuation discount, the valuation that HP was

13  trading at at this point, which is 7, 8 times forward earnings,

14  versus their peers, which were trading in double digits -- 12,

15  13 times -- we thought that was fairly excessive, especially

16  now that the uncertainty around what HP could do was addressed.

17  **Q.**   So there was an opportunity for HP stock to grow in your

18  judgment?

19  **A.**   We thought over the next 12 months from that point the

20  stock would outperform its peers, yes.

21  **Q.**   And was the acquisition of Autonomy in the way you've

22  described an important factor in your outperform rating to your

23  clients?

24  **A.**   It was one of the factors that we looked at, absolutely.

25                      (Pause in proceedings.)

```
 1              MR. REEVES:  I think that's all.  Thank you,

 2   Your Honor.

 3              THE COURT:  Cross?

 4        Why don't we all stand up and stretch, and then finish

 5   with this witness and take a break.  We all should stand up.

 6                    (Pause in proceedings.)

 7              THE COURT:  Okay.  Ms. Lazarus, you may proceed.

 8              MS. LAZARUS:  Thank you.

 9                        CROSS-EXAMINATION

10   BY MS. LAZARUS:

11   Q.   Good afternoon, Mr. Daryanani.  My name is Kate Lazarus.

12   I represent Sushovan Hussain.

13   A.   Good afternoon.

14   Q.   The period leading up to the Autonomy acquisition was

15   pretty rough for HP, wasn't it?

16   A.   Yes, it was.

17   Q.   You mentioned that Mr. Apotheker joined as the CEO in the

18   fall of 2010; right?

19   A.   Yes.

20   Q.   And prior to that, their former CEO, Mark Hurd, had left

21   amidst a scandal involving some misconduct and expense report

22   issues; is that right?

23   A.   That is right.

24   Q.   And do you recall in September 2010 HP bought a company

25   called ArcSight?
```

1   A.    Yes, I do.

2   Q.    Could you take a look at Exhibit 6801 in your binder?  Is

3   this a note that you wrote on HP dated September 13th, 2010?

4   A.    (Witness examines document.)  Yes, it is.

5          MS. LAZARUS:  Move it in, Your Honor.

6          THE COURT:  Admitted.

7          (Trial Exhibit 6801 received in evidence)

8   BY MS. LAZARUS:

9   Q.    And this was about the ArcSight acquisition; correct?

10  A.    Yes, it was.

11  Q.    And do you see at the bottom of the first page of your

12  note, the paragraph that begins "Investor concerns around

13  strategy"?

14  A.    Yes, I do.

15  Q.    And you see that you wrote (reading):

16          "Investors are concerned that HP is losing its

17      financial discipline post-Hurd given the premiums paid for

18      3 par and now there is ArcSight.  In our view, this is a

19      key issue for management to address at its analyst day."

20      Do you see that?

21  A.    Yes.

22  Q.    So there was concern already that HP might not be

23  disciplined when it came to its acquisitions; is that right?

24  A.    So, yes, and this was a time when you would almost

25  transition between the two CEOs and the comment was:  Who's

 1   running the show and is there discipline at the company or not?

 2   Q.   There was a lot of questions about HP at this point?

 3   A.   Yes.

 4   Q.   And the price target that you list on this note is $55;

 5   correct?

 6   A.   Yes.

 7   Q.   And a price target means that you would recommend buying

 8   below 55 and selling above 55; is that how that works?

 9   A.   So the price target is essentially where we think the

10   stock can get to over the next 12 months.  So 55 is where we

11   see the stock will work its way towards over a 12-month period.

12   Q.   You thought HP could hit $55 a share within that 12-month

13   period?

14   A.   Yes.

15   Q.   Flipping to 6802, please.  Is this a note you wrote about

16   HP dated September 23rd, 2010, just a couple weeks later?

17   A.   (Witness examines document.)  Yes.

18   Q.   And do you see in this note that you lay out --

19           MS. LAZARUS:  I move it in, Your Honor.

20           THE COURT:  Admitted.

21       (Trial Exhibit 6802 received in evidence)

22   BY MS. LAZARUS:

23   Q.   And you see that you lay out a number of key issues that

24   HP was facing at this time?

25   A.   Yes.

1  Q.   Key issue number two is M & A discipline; right?

2  A.   Yes, that's issue number two.

3  Q.   Okay.  So, again, this M & A discipline concern was one of

4  the key issues facing the company from your perspective?

5  A.   Yes.  Among the six investment concerns we had, this was

6  actually one of the six or number two on that list.

7  Q.   Flip to 6803, please, sir.

8  A.   (Witness examines document.)

9  Q.   Moving to January 2011, is this your January 31st, 2011,

10 HP note?

11 A.   (Witness examines document.)  Yes, it is.

12       MS. LAZARUS:  Move it in, Your Honor.

13       THE COURT:  Admitted.

14 (Trial Exhibit 6803 received in evidence)

15 BY MS. LAZARUS:

16 Q.   And, again, here you lay out five concerns for HP;

17 correct?

18 A.   Yes.

19 Q.   And if you look at page 9 of the note, does this page

20 describe one of your concerns, which was software acquisitions?

21 A.   (Witness examines document.)  Yes, it does.

22 Q.   And you wrote here (reading):

23       "Given Mr. Apotheker's background in software,

24       there's an expectation that we could see a material uptick

25       in software deals.  Investors should look for clarity

1          around this."

2          And you listed a few factors about software acquisition?

3     A.   Yes, we did.

4     Q.   So even though there were concerns about discipline with

5     M & A, the market was expecting a software deal at this point;

6     right?

7     A.   Yes.  I mean, given his background, he had come from SAP

8     and he'd obviously run a big software company, and there was

9     consistent discussion that HP wanted to move into higher

10    margin, higher value added services, which would typically mean

11    software services with them.

12    Q.   And that's Mr. Apotheker you're talking about?

13    A.   Yes.

14    Q.   Take a look at Exhibit 6809, please.  Do you recognize

15    this as an e-mail that you received from a company called

16    Briefing.com?

17    A.   (Witness examines document.)  Yes, I do.

18    Q.   What's Briefing.com?

19         THE COURT:  Admitted.

20         (Trial Exhibit 6809 received in evidence)

21         MS. LAZARUS:  Thank you.

22         THE WITNESS:  So Briefing.com, it's a paid news

23    service that, you know, alerts -- alerts one via e-mail on

24    material public information that's been filed typically.

25    \\\

DARYANANI - CROSS / LAZARUS

1    BY MS. LAZARUS:

2    Q.    Was this alert the first you heard of the possible

3    Autonomy acquisition?

4    A.    (Witness examines document.)   I'm not sure on the

5    timeline.   The date is definitely the first time we heard about

6    it on August 18th.

7    Q.    This is midday on the 18th, I think.   Your response at the

8    top is 12:16 p.m.?

9    A.    I'm a little confused if it's East Coast or West Coast

10   time, but intraday this seems to have merely preceded the press

11   release they put out saying "We're potentially in talks with

12   Autonomy and doing a host of other things."

13   Q.    And you testified earlier that you heard of Autonomy as a

14   public software company but you didn't really know anything

15   about it at this point; correct?

16   A.    That's right.

17   Q.    But, nonetheless, you said "Doing a smart thing if right"?

18   A.    Yes.

19   Q.    And that's because, as you've testified earlier, you

20   thought it was a good thing for Autonomy -- for HP to be moving

21   into the software space?

22   A.    Yes.   I think to the extent they were providing certainty

23   on what exactly you were going to do, at least you're taking

24   the uncertainty of "what will I buy" away from the equation;

25   and so now all I have to do is focus on can you execute what

1    you bought on.  So from that perspective, it was taking away

2    the question mark of what is he really going to go out and buy.

3    Q.   As soon as word got out about this possible acquisition,

4    there was concern in the analyst community about the price that

5    HP was paying; correct?

6    A.   Yes.

7    Q.   Let's look at an example of that, Exhibit 6811 in your

8    book.

9            THE COURT:  Admitted.

10   (Trial Exhibit 6811 received in evidence)

11   BY MS. LAZARUS:

12   Q.   This is an e-mail chain.  You're forwarding the

13   Briefing.com e-mail to some of your colleagues; is that right?

14   A.   Yes.  That's our Canadian technology analysts at that

15   point.

16   Q.   That's a list for your Canadian technology analysts?

17   A.   I was referring to the name I see on the top, Michael

18   Abramsky.

19   Q.   Okay.

20   A.   At that point he was RBC's Canadian tech analyst.

21   Q.   I see.  And Mr. Abramsky wrote in the second paragraph

22   there (reading):

23           "Preliminary U.S. 10 billion preliminarily equates

24       using the FX calcs to 16x EBITDA and P/E of 30x for

25       Autonomy assuming debt/cash is a wash, which seems

1          outrageous.  Peers trading at 12x P/E and 9X EV/EBITDA."

2          Could you help us break that down, please, sir?

3    **A.**   Sure.  This is really a discussion on the valuation;

4    right?  And, you know, so the take was, or at least this

5    person's take, the way I would read that e-mail was HP at

6    $10 million was essentially paying 16 times EBITDA or 30 times

7    earning.

8          EBITDA is simplistically a conversion for what free cash

9    generation from this company could look like.  P/E is price

10   earnings.  It's the earnings cash stream of this company

11   going-forward sale.  The higher the number, the more expensive

12   the stock acquisition prices typically.

13         And the take Michael Abramsky had on this e-mail was 16

14   times EBITDA, 30 times earnings seems outrageous where its

15   peers were trading at, you know, 18 to 7 times lower valuation

16   than what the Autonomy deal was going to get transacted at.

17   **Q.**   So to put it simply, HP was paying a lot more than other

18   companies were being valued at that were in a similar space as

19   Autonomy?

20   **A.**   That's what that e-mail -- or that's what his

21   interpretation was.

22   **Q.**   Did you share that interpretation?

23   **A.**   You know, I don't remember at that point.

24   **Q.**   Could you look at Exhibit 6813, please?

25         **THE COURT:**  Admitted.

 1           (Trial Exhibit 6813 received in evidence)

 2    **BY MS. LAZARUS:**

 3    **Q.**   This is another e-mail from you on August 18th with some

 4    of your colleagues at RBC; correct?

 5    **A.**   (Witness examines document.)

 6              **THE COURT:**  Which e-mail are we looking at?

 7              **MS. LAZARUS:**  Well, this whole chain.  It looks like

 8    it's --

 9              **THE COURT:**  Well, some doesn't apply here.

10              **MS. LAZARUS:**  Let's see --

11              **THE COURT:**  Why don't you direct his attention to a

12    particular e-mail.

13    **BY MS. LAZARUS:**

14    **Q.**   Well, let's just look at the top e-mail.  Is Mr. Allen a

15    colleague of yours from RBC?

16    **A.**   Yes, he is.

17    **Q.**   And he writes to you (reading):

18              "I smell a big guidedown on core biz tonight with

19         this stuff as a smokescreen."

20         What did you interpret that to mean?

21    **A.**   So I think he might be the best person to answer this, but

22    his assertion is he thinks HPQ will miss numbers guide down and

23    this stuff -- presumably the Autonomy deal is a smokescreen.

24    **Q.**   And a smokescreen meaning a distraction from some of the

25    bad news with the financial numbers?

1   **A.**   Again, he would be the best person to give you his

2   perspective, but that's how I would read it.

3   **Q.**   And, in fact, HP did guide down that day; correct?

4   **A.**   Yes, they did.

5   **Q.**   We looked at the preannouncement earlier.  The Government

6   admitted it as 2302.  It's in your book as 2296, which I don't

7   need to readmit it.

8        This is the preannouncement intraday press release you

9   looked at earlier; correct?

10  **A.**   Yes, it is.

11  **Q.**   And there was a whole lot of news in this announcement;

12  right?

13  **A.**   For one piece of paper, it did have a lot of news in it,

14  yes.

15  **Q.**   They were confirming -- HP was confirming discussions with

16  Autonomy.  There was the possibility of spinning off the PC

17  business.  We haven't talked about this, but also discontinuing

18  webOS.  Do you see that in here?  It's the third paragraph

19  (reading):

20           "In addition, HP reported that it plans to announce

21        to that it will discontinue operations for webOS devices."

22        Do you see that?

23  **A.**   Yes, I do.

24  **Q.**   What was webOS?

25  **A.**   I don't know the answer exactly, but webOS was something

DARYANANI - CROSS / LAZARUS

```
1   they bought from Palm, you know, the company that you used to
2   do personal digital assistants way back in the day.  But webOS
3   touchpad, no one would probably remember this, but HP tried to
4   make tablets like iPads and this was their version of it.
5   Q.   And it didn't work out?  They were shutting it down?
6   A.   Yes.
7   Q.   And then in addition, you had the Q3 results and the
8   estimates for Q4 in full year '11 as well?
9   A.   (Witness examines document.)  Yes.
10  Q.   Take a look at Exhibit 6814, please.
11            THE COURT:  Admitted.
12       (Trial Exhibit 6814 received in evidence)
13            MS. LAZARUS:  Thank you.
14  Q.   Is this a note that -- a sort of quick short note that you
15  put out on August 18th?
16  A.   (Witness examines document.)  Yes, it is.
17  Q.   And you say (reading):
18            "HP is given a preliminary glance at today's earnings
19       release.  The outlook (see below) is generally a
20       disappointment."
21       Do you see that?
22  A.   Yes, I do.
23  Q.   And that just meant that the numbers were worse than
24  people were expecting; correct?
25  A.   Yes.
```

1    Q.    Okay.  And then later on the 18th you received the full

2    set of press releases from HP that you looked at with

3    Mr. Reeves earlier.  Do you recall?

4    A.    Yes.

5    Q.    And, again, a lot of news that you looked at.

6         I've got the press releases again but with a different

7    number, 6817 in your book.  These are attached to an e-mail

8    that you received.

9              THE COURT:  Admitted.

10        (Trial Exhibit 6817 received in evidence)

11             MS. LAZARUS:  Thank you.

12             THE COURT:  They're already in, aren't they?

13             MS. LAZARUS:  Well, they're in as a different --

14   Mr. Reeves admitted the version filed with the SEC.  This is an

15   e-mail that the witness received.

16             THE COURT:  Okay.

17   BY MS. LAZARUS:

18   Q.    So, again, there was the press release about Autonomy;

19   correct?  And then a press release about the possible spinoff

20   of the PC business?  That's at page 9 of this exhibit.

21   A.    (Witness examines document.)  I'm sorry.  You said page 9

22   of?

23   Q.    Of -- are you at 6817?

24   A.    Yes.

25   Q.    And there's page numbers at the bottom right corner.  It

1    should be page 9, "Strategic Alternatives for Personal Systems

2    Group."  It's also on your screen.

3    **A.**    I have it, yes.

4    **Q.**    You have it.  Okay.

5         And you recall testifying that this was very material news

6    as well, correct, the possible spinoff of the PC business?

7    **A.**    Yes.

8    **Q.**    And then, again, there was information about the earnings

9    results and the guidance for Q4 and full year?

10   **A.**    Yes.

11   **Q.**    So in short, anybody who was buying or selling HP around

12   this time had a whole lot of information to digest; correct?

13   **A.**    Yes, they did.

14   **Q.**    And the Autonomy announcement was just one piece of a

15   pretty complicated puzzle at that point?

16   **A.**    That's fair.

17   **Q.**    Now, as far as you know, all these press releases were

18   prepared by HP; right?

19   **A.**    I would assume they are, yes.

20   **Q.**    It would be unusual if HP let anybody else prepare its

21   press releases for it; correct?

22   **A.**    It would be highly unusual for any company to let these

23   press releases be prepared by someone else.

24   **Q.**    You also testified earlier about a statement in the press

25   release about Autonomy that HP expected the acquisition to be

 1    accretive.  Do you recall that?

 2    **A.**    Yes, I do.

 3    **Q.**    You understood that this was HP's expectation; correct?

 4    **A.**    Yes.

 5    **Q.**    And you also understand that for an acquisition to be

 6    accretive, there's a number of factors that go into it;

 7    correct?

 8    **A.**    Yes.

 9    **Q.**    One of those factors would be the price that the acquiring

10    company paid for the acquired company?

11    **A.**    Yes, but I would assume HP has that factored in because

12    they presumably knew what they were paying at that point.

13    **Q.**    HP had factored in a few different inputs when it made

14    that prediction about being accretive; right?

15    **A.**    I'm not HP, but I would assume you're right.

16    **Q.**    You understood that HP had factored in a few different

17    types of information in making that statement?

18    **A.**    Yes.  That was our understanding.

19    **Q.**    The price paid and also predictions about how well the

20    integration was going to go?

21    **A.**    Those would be among the other factors I would imagine a

22    company is going to look at when they say a deal's accretive.

23    **Q.**    And the success of the integration is a major factor in

24    determining whether a deal ultimately is accretive; right?

25            **MR. REEVES:**  I object.  Foundation, Your Honor.

1      **THE COURT:**  Sustained.

2  **BY MS. LAZARUS:**

3  **Q.**    Okay.  Let's take a look at your note from August 19th,

4  which Mr. Reeves previously introduced, 2318.

5          Turning back to the price target, you lowered your target

6  price from $46 to $35 on this date?

7  **A.**    That's right.

8  **Q.**    That's a 25 percent reduction in the target price?

9  **A.**    That seems fair, yes.

10  **Q.**    So you were expecting HP to do 25 percent worse in the

11  following 12 months in light of the news from August 18th?

12  **A.**    No.  I mean, our target price had shifted down by $11 call

13  it; but, you know, HP at that point was still in the high 20s

14  so we still thought HP stock would do well.  It's just the

15  ceiling had been lowered from 55 to -- 46 to -- from 46 to 35.

16  **Q.**    So the potential from the company from your perspective

17  had fallen 25 percent?

18  **A.**    Yes.

19  **Q.**    And take a look at the last paragraph here on the first

20  page (reading):

21          "Taking negative view of model, given several

22          quarters of very poor performance, we are taking estimates

23          down below guidance to add some conservatism."

24          Does that mean that your estimates were even lower than

25  HP's own estimates at this point?

1  **A.**  (Witness examines document.)  Yes, that's what that means.

2  Our estimates are below whatever the company had guided for

3  that point.

4  **Q.**  Turn to page 6 of your note, please.  This is your

5  discussion of the Autonomy acquisition?

6  **A.**  (Witness examines document.)  I'm on that page.

7  **Q.**  You wrote --

8       **THE CLERK:**  Can you read in the mic, please?

9       **MS. LAZARUS:**  Oh, I'm sorry.

10  **Q.**  In the second paragraph you wrote (reading):

11       "There are only two negatives in our opinion and one

12       was the valuation."

13  **A.**  Yes.

14  **Q.**  Then you wrote (reading):

15       "11 times LTM sales."

16       What does that mean?

17  **A.**  "11 times LTM sales" is essentially how much HP paid for

18  Autonomy at that point, and "LTM" stands to last 12 months.  So

19  HP paid 11 times trailing 12 months revenue of a company, and

20  that's high compared to what typical transactions happen at.

21  **Q.**  So, again, this is a valuation concern that you were

22  talking about earlier?

23  **A.**  Yes.

24  **Q.**  You'd agree at this price it looked like HP was expecting

25  significant synergies from the acquisition of Autonomy?

1    **A.**    (Witness examines document.)  I don't recall if they were

2    expecting significant synergies, but they had talked about the

3    deal being accretive in year one after closing.

4    **Q.**    Does that imply an expectation of synergies?

5    **A.**    I'll have to pull up it and look at it again; but the

6    trouble with Autonomy was a very high-margin business, so I'm

7    sure they had to make sure they don't mess up the transaction,

8    but I don't know if they required traditional synergies, which

9    is, you know, taking costs out of the model.  I don't know if

10   they needed that element to get there.

11   **Q.**    Well, HP was paying a lot more than the market was valuing

12   Autonomy; right?

13   **A.**    Yes.

14   **Q.**    So does that imply an expectation that HP is going to do

15   more with it than Autonomy was doing on its own?

16   **A.**    HP might be the best one to answer that; but if I'm paying

17   a lot more for an asset than everyone else is, then, yes, I

18   think I can do much better with this than they were doing on

19   their own.

20   **Q.**    In this note you didn't say anything about Autonomy's

21   growth rates, did you?

22   **A.**    (Witness examines document.)

23          **THE COURT:**  Well, it's either in there or not.  Is

24   there anything?

25          **MS. LAZARUS:**  I didn't see anything in here.

1          THE COURT:  Okay.  Then move on.

2    BY MS. LAZARUS:

3    Q.   Okay.  When you were preparing this note, you said that

4    you looked at the information that HP released on August 18th;

5    right?

6    A.   Yes.

7    Q.   You didn't look at any statements from Mr. Hussain, did

8    you?

9    A.   I don't recall this explicitly, but anytime a company does

10   a transaction, we look at it, we would pull up the historical

11   financial statements on a Bloomberg machine or Factset, which

12   gives us historical, you know, literally revenue and profit

13   margin numbers.  We would typically look at those absolute

14   numbers.

15   Q.   You didn't talk to Mr. Hussain, though, did you?

16   A.   No.

17   Q.   Did you know who Mr. Hussain was at the time that you

18   wrote your note?

19   A.   No, I did not.

20   Q.   Take a look at Exhibit 6815, please.

21   A.   (Witness examines document.)

22   Q.   Do you remember around this time there were some concerns

23   about HP's direction?

24   A.   Yes.

25   Q.   And this is an e-mail you received from Doug Friedman on

1    August 18th?

2            **THE CLERK:**  The mic.

3            **THE WITNESS:**  That's what it looks like.

4    **BY MS. LAZARUS:**

5    **Q.**   And Mr. Friedman wrote to you (reading):

6            "Wow.  HP's strategic direction is like a flag in the

7        wind."

8        Do you remember that?

9    **A.**   I don't.

10           **MS. LAZARUS:**  Move in the e-mail, Your Honor.

11           **THE COURT:**  Admitted.

12       (Trial Exhibit 6815 received in evidence)

13   **BY MS. LAZARUS:**

14   **Q.**   Would you look at Exhibit 6805, please?

15   **A.**   (Witness examines document.)

16   **Q.**   Is this your September 23rd, 2011, note?

17   **A.**   Yes, it is.

18           **MS. LAZARUS:**  Move it in, Your Honor.

19           **THE COURT:**  Admitted.

20           **MR. REEVES:**  Your Honor, we're getting beyond the

21   scope here.

22           **THE COURT:**  I'm not going to -- I'm not going to admit

23   it in at this point.  We're going to take a recess anyway.

24   We'll have a discussion during the recess, but you can ask

25   other questions.

1      **MS. LAZARUS:**  Do you want to take a break now,

2   Your Honor, and then we can discuss it?

3      **THE COURT:**  Sure.

4      Ladies and gentlemen, let's take our recess.  We'll be in

5   recess until 3:15.

6      Remember the admonition given to you:  Don't discuss the

7   case, allow anyone to discuss it with you, form or express any

8   opinion.

9      Thank you.

10      (Proceedings were heard out of the presence of the jury:)

11      **THE COURT:**  Okay.  Let the record reflect the jurors

12   have left.

13      So I think we're getting into the subject that we needed

14   to have some discussion about, which is to what extent, if any,

15   does the performance of Autonomy/Hewlett Packard, subsequent to

16   the acquisition of Autonomy, to what extent is that admissible.

17      **MR. REEVES:**  I agree, Your Honor.

18      **THE COURT:**  And that's the subject.  So I think

19   Ms. Lazarus has introduced the subject, and that's the

20   question.  Let's have a discussion.

21      I mean, this is something, by the way, I think it's clear

22   I highlighted it as a point that we needed to resolve since I

23   think it has some significant impact on the issues in the case,

24   the length of the trial, and everything else.

25      And starting out, I don't see why it's relevant.  The

**PROCEEDINGS**

1   question is:  Were false statements made -- were material false

2   statements made to Hewlett Packard?  And they were either --

3   the answer is yes or no as of September -- what was the date?

4   August 18th?  August -- I don't know, September.  Whatever.

5           **MR. REEVES:**  August 18th, 2011, is the date of the

6   announcement.  I think importantly the deal closed on or around

7   October 3rd, 2011; but the concept is once the deal is done,

8   there's a question about --

9           **THE COURT:**  Okay.  So we can stop at October.

10          **MR. REEVES:**  Yes.

11          **THE COURT:**  October we can stop.  I mean, let's say

12  does anything come in post-October, post-October 3rd?  This is

13  pre-October 3rd.

14          **MR. REEVES:**  We were getting close, so I thought --

15          **THE COURT:**  No, no, no.  That's fine.

16      So the question is:  Does it come in?  I don't see why it

17  would, but --

18          **MR. KEKER:**  I don't think you can make a blanket

19  statement like that, Your Honor.

20          **THE COURT:**  Well, it is -- first of all, I agree with

21  you.

22          **MR. KEKER:**  I mean --

23          **THE COURT:**  I agree.  Obviously it has to have -- as

24  with any purported transaction, if things happened after the

25  date of the transaction that relate to certain statements and

 1  so forth that were made at the transaction, that may or may not

 2  be relevant and it may -- even if relevant, it may or may not

 3  be admissible.  So you're right, it's too blanket, but --

 4      **MR. KEKER:**  And I think we need to take it a piece at

 5  a time.  There's two issues, two big-picture things.

 6      One is Mr. Hussain's intent and then, the way they've been

 7  trying the case, Autonomy's intent.  These are people who are

 8  accused of hiding things from Hewlett Packard during the due

 9  diligence knowing that they're going to go to work for Hewlett

10  Packard, be sitting right next to them when they hand over the

11  books and look at all this.  And there's evidence after

12  October 4th that once Hewlett Packard looks at this and says,

13  "Oh, here's $100 million in hardware sales," nobody blinks,

14  nobody says "We've been defrauded."  Nobody does anything.

15      So the failure of the integration, which takes awhile and

16  the -- well, let me back up.

17      The other part of it is materiality.  Mr. Apotheker is

18  going to testify tomorrow, and he's going to testify about why

19  he bought Autonomy.  And when you hear him testify, I believe

20  you will think that this idea that it matters whether or not

21  some revenue was reported in Q2 or Q3 is absurd because that's

22  not why he bought Autonomy.

23      And the reason he bought Autonomy is his vision.  He'll

24  talk about his vision, and we'll get into that.  And then he

25  will -- and then we will learn that before this deal even

1    closed, he's fired, thrown out the door, and his vision for

2    various very specific reasons is never implemented.  It fails.

3         So materiality goes to one thing.  They say it's a huge

4    deal to talk about hardware.  We say it doesn't make a bit of

5    difference to talk about hardware.

6         The second part of that --

7              THE COURT:  Well, finish that thought.  If

8    Mr. Apotheker came in and said "It didn't make any difference

9    to me whether it was hardware, software, or Tupperware," that's

10   fine.  I mean, if he's the person who makes -- I assume he

11   was -- if he's the decision-maker and the decision-maker says

12   "I didn't care about any of this" --

13             MR. KEKER:  He's not going to say that.  He's not --

14             THE COURT:  Well, but that's what -- what I hear you

15   say is they didn't care about these types of representations.

16             MR. KEKER:  And Mr. Apotheker will say, "Oh, I cared

17   deeply," but the evidence will show and the cross-examination

18   will establish that he didn't care, that that's not the way

19   they did it.  They didn't care about it.

20        So at the end there will be an argument -- I mean, they'll

21   argue that Mr. Apotheker cared deeply, we'll argue that he

22   didn't, and that will all go to materiality.

23        But another very important thing -- and, again, I think we

24   just need to take this piece by piece -- is Autonomy's intent,

25   Mr. Hussain's intent.  And to the extent that these people who

 1  were going to work at HP and having the Deloitte work papers

 2  spread out before them and having all this information provided

 3  to them, don't get any reaction or any push back or any

 4  problem.

 5          THE COURT:  That's the same point you're making --

 6  you're making, I think, the same point you made but in a

 7  slightly different way.

 8      You're making the point that it wasn't material and you're

 9  saying -- and you're saying it wasn't material because look at

10  the way they reacted.  And then you're saying, look at the way

11  Mr. Hussain reacted, which I've no evidence of at all.  I mean,

12  I don't know anything about that at all.  It hasn't been

13  presented.

14      I don't know that that's relevant.  It may or may not be.

15  It may or may not be.  But it's all -- everything you have said

16  that I've heard, and I cut you off, but everything I've heard

17  you say is it really goes to materiality.

18          MR. KEKER:  No, I don't think the intent does, but I

19  understand your point.  I mean, it sounds I'm saying the same

20  thing but I'm saying it goes to intent.  That's something the

21  jury --

22          THE COURT:  How does it go to intent?

23          MR. KEKER:  It goes to intent because a reasonable

24  jury can look at the evidence and think, why in the world would

25  somebody who intended to scheme to defraud and misrepresent

1    things about, for example, hardware or the books or whatever,

2    why would they, knowing that they're going to be at the

3    company, that they're going to be sitting beside these people,

4    knowing that the new company is going to have complete access

5    to the books, why would such a person think that they -- I

6    mean, isn't that evidence that they didn't intend to defraud

7    somebody, the fact that people are going to know --

8            **THE COURT:**  I think -- I'm not sure -- I would think

9    you might argue that, but I would think that -- you know,

10   that's -- in street language that's the type of argument that's

11   used about "Do you think the defendant was that stupid that he

12   would have confessed, or do you think the defendant was that

13   stupid that he would have left a gun in the desk?"  I mean, it

14   happens all the time that people who commit crimes -- and I'm

15   not suggesting he has.  Okay?  So no judgment on that.

16       But all the time defendants arguably make mistakes about

17   what they -- about their crime.  They fail to conceal or they

18   say things.  That happens all the time.

19       I think you can argue it.  I think that's probably a very

20   good argument.  Why would he go -- he's working there for

21   another year.  You know, he knows that all the chickens are

22   going to come home to roost if he intended them to be those

23   chickens and so, sure.

24       So obviously that's evidence -- it's evidence of a lack of

25   intent.  You can argue it's evidence of a lack of intent.  They

PROCEEDINGS

1    may have a different take on it.  I don't know.  But that I

2    would agree is an argument.

3        I don't know that that would then require the Court to

4    allow in reams of evidence as to how Hewlett Packard handled

5    this thing, what happened to it, how it was treated

6    post-acquisition or October 3rd.

7            MR. KEKER:  We are not intending to offer reams of

8    evidence.  We're intending --

9            THE COURT:  Or any.

10           MR. KEKER:  No, no.  I mean --

11           THE COURT:  Or any.

12           MR. KEKER:  It depends how you define -- within the

13   parameters of what I'm talking about, we intend to ask

14   questions of Mr. Apotheker and others.  I am not intending to

15   try -- we're not intending to offer reams of evidence.  I think

16   this is a much more limited --

17           THE COURT:  I overstated it.

18           MR. KEKER:  -- problem.

19           THE COURT:  You wouldn't offer reams.  You'd offer

20   some evidence.

21           MR. KEKER:  Okay.

22           THE COURT:  I don't know that any of it comes in.

23   That's my point.  I don't know any of it comes in.  It might

24   and maybe you're right.  Maybe I have to take a look at it

25   piece by piece.

1        But as a concept, the concept -- and I already had some

2   preliminary discussions about it and your co-counsel pointed

3   out that this is an argument for another day, which I thought

4   was a pretty good argument, but the day has come and at least

5   preliminarily.

6        And so I am not going to -- as a concept, I am not going

7   to let that in unless it is either tied to a particular

8   transaction.  We've got, I don't know, 26 or 20 or 15 or

9   whatever it is.  Certainly you can ask something about those

10  because they were characterized as suspect transactions.

11       **MR. KEKER:**  What about -- I mean, what about these

12  people who say -- I mean, what about the hardware?

13       **THE COURT:**  The hardware thing comes in in a sense.

14  What I understood the hardware thing to be is that the

15  projected growth for hardware is far smaller than the projected

16  growth for selling software; that if you sell a million dollars

17  of software and a million dollars of hardware, you get a

18  greater return out of the software than the hardware because

19  the software doesn't have to be recreated.

20       There are no what I would call variable costs, or maybe

21  they're fixed costs.  I don't know how it works.  But once you

22  design the software, it's there.  It's designed.  You don't

23  have the -- all you do is you say, "You want to buy my

24  software?  Here's the code.  Here are the numbers.  And, by the

25  way, look at your computer today, you have bought it.  You have

1    paid $10 million and what did I do?  I sent out some numbers to

2    you in an e-mail."  So that doesn't cost the company very much.

3        If you say, "I want 50 computers or 100 computers or

4    monitors, or this or that hardware," they have to go acquire

5    it, build it, test it, and send it.  That's a -- so their

6    profit margin on that is small.  Their profit margin on

7    software is large.  Okay.  I sort of follow that.

8        So they're saying that they concealed -- in some manner

9    they concealed that much of their revenues were generated from

10   hardware sales as distinct from software sales, at least it was

11   exaggerated in some manner.  Either it was or wasn't, that's up

12   to the jury to determine, but that's their argument.  As I

13   understand it, that's their argument.

14       So, I don't know.  I mean, I'm not going to foreclose you.

15           MR. KEKER:  I think we have to take it a step at a

16   time.

17       The other thing that Ms. Lazarus just reminded me, this

18   is -- one of the things you've got to remember is it's not just

19   a wire fraud case.  Count 16 is fraud on HP shareholders; and

20   if HP shareholders are not defrauded in any way, then Count 16

21   can't be sustained.  And so we get to show why HP shareholders

22   lost, got hurt, money and property, all of that business.

23       But, again, I think you really need to find out what the

24   issue --

25           THE COURT:  Well, that's an interesting argument.  The

1  argument is, well, look, the stock price went down not as a

2  result of the Autonomy acquisition but went down because the

3  company was poorly run or poorly managed or had all sorts of

4  problems, and so forth.

5      I don't know.  I'd have to have some discussion about

6  that.  I haven't thought about that.

7          **MR. KEKER:**  I think you should listen to Mr. Apotheker

8  tomorrow.

9          **THE COURT:**  I will.

10         **MR. KEKER:**  I'm sure you'll listen.

11         **THE COURT:**  I know I'll listen up to 1:00 o'clock.

12         **MR. KEKER:**  Yeah.

13         **THE COURT:**  Then I'll take a stretch, and then I'll

14  come back and we'll do the rest of them.  I don't think we'll

15  finish with Mr. Apotheker tomorrow morning, will we?

16         **MR. REEVES:**  I think we have another witness that will

17  take us well into the morning.

18         **THE COURT:**  Well, well into the morning means we won't

19  even get to Mr. Apotheker tomorrow.

20      You don't have too more, do you?

21         **MS. LAZARUS:**  I don't have much more, but what I have

22  depends on how I can explore the post-acquisition HP conduct.

23         **MR. KEKER:**  Five minutes.  Not reams.  Five minutes

24  she just said.

25         **THE COURT:**  Well, it either comes in or it doesn't.  I

1  mean, that's the stuff.

2      I mean, I will let you pursue it through October 3rd okay?

3  Then I will take as an objection an offer of proof that you

4  want to present these other things post-October 3rd, and you

5  don't need this gentleman for that.  I mean, maybe you do.  I

6  don't know.  He's subject -- anyway, he lives in San Francisco.

7  Okay?  Not a big deal.

8      No, sit down.

9          MR. KEKER:  He's got the next witness.  I took over --

10          THE COURT:  Well, but it's 3:15.

11          MR. MARAIS:  Your Honor, I'll be 60 seconds, but this

12  does relate to the next witness that Mr. Reeves is going to put

13  on and it's coming this afternoon.  So I'd rather do it now

14  than --

15          THE COURT:  Go.  You have 50 seconds left.

16          MR. MARAIS:  All right.  Over the weekend, the

17  Government sent us two new exhibits for this witness that

18  they've described as summary exhibits.  I have copies I'm happy

19  to pass up.

20          THE COURT:  And you're objecting to it?

21          MR. MARAIS:  I am, Your Honor.  He's not --

22          THE COURT:  Well, as we say in the business --

23          MR. MARAIS:  These are not summaries.  They are, in

24  fact, longer than the original top 40 lists.  They don't

25  summarize anything.  I also don't think that the top 40 lists,

1  which contain 40 items, need to be summarized.  That's not the

2  sort of voluminous data the Rule 1006 --

3          THE COURT:  I would let them do a summary.

4          MR. MARAIS:  These are argument, Your Honor.  These

5  are -- if they're summaries of anything, they're summaries of

6  the Government's allegations as to what may have been omitted

7  from the list.  This witness, as I understand it, will not know

8  what these documents are, and they should not come into

9  evidence, Your Honor.

10          THE COURT:  Well, he won't know what they are?

11          MR. REEVES:  Let me back up for a second.

12      Antonia Anderson introduced spreadsheets of her review of

13  the general ledgers --

14          THE COURT:  Right.

15          MR. REEVES:  -- which are of performance.

16          THE COURT:  She prepared this, didn't she?

17          MR. REEVES:  She prepared the spreadsheets, which are

18  still themselves complicated.

19          THE COURT:  Yeah.

20          MR. REEVES:  This is a summary of those spreadsheets

21  in comparison with the top 40 --

22          THE COURT:  That's fine.  But counsel is telling me he

23  won't even know what these are.

24          MR. MARAIS:  Well, and they're not --

25          THE COURT:  If he doesn't, he'll just say, "I don't

**PROCEEDINGS**

1   know what these are."

2         **MR. MARAIS:** They're not just summaries, Your Honor.

3   Some of them are --

4         **THE COURT:** If he doesn't know what they are, it

5   doesn't matter what they are. If he doesn't know what they

6   are, he doesn't know.

7         **MR. REEVES:** Okay. We intend to offer these summaries

8   through Special Agent Bryant, but I would like to show the

9   summaries --

10         **THE COURT:** How can you if he doesn't even know what

11   they are?

12         **MR. REEVES:** He was given a list. We believe it's

13   false. We believe the summary shows what the books and records

14   show.

15         **THE COURT:** He's going to say he doesn't know what

16   they are. I'm interested. I'll see how it works.

17         **MR. REEVES:** All right.

18         **THE COURT:** Thank you.

19         **MR. REEVES:** Thank you, Your Honor.

20         **MR. MARAIS:** Thanks.

21         **THE COURT:** Okay. Five minutes. We're going to

22   change reporters and so forth.

23                (Recess taken at 3:18 p.m.)

24            (Proceedings resumed at 3:24 p.m.)

25      (Proceedings were heard in the presence of the jury:)

 1          **THE COURT:**  Let the record reflect all jurors are

 2   present; parties are present.

 3      Ms. Lazarus.

 4          **MS. LAZARUS:**  Your Honor, subject to an offer of

 5   proof, no further questions.

 6          **THE COURT:**  Okay.  Thank you.

 7                    **REDIRECT EXAMINATION**

 8   **BY MR. REEVES:**

 9   **Q.**   Mr. Daryanai, you were asked in your cross-examination

10   some questions about HP's history of acquisitions, including

11   ArcSight.  Do you recall those questions?

12   **A.**   Yes, I do.

13   **Q.**   And whether or not HP was, prior to August 2011,

14   disciplined in its mergers and acquisition activity.  Do you

15   remember?

16   **A.**   Yes, I do.

17   **Q.**   Through the time that HP announced its intention to

18   acquire Autonomy on or about August 18, 2011, had you witnessed

19   and reviewed other acquisitions undertaken by HP in the course

20   of your work as an analyst following HP?

21   **A.**   Yes, we had.

22   **Q.**   Okay.  Roughly, what -- how many other acquisitions over

23   the maybe five years or so before 2011 had you followed, if you

24   can recall?

25   **A.**   Sizeable transactions.  Perhaps four or five of them.

1   Q.   And how did HP do in terms of its record of acquiring

2   companies in a manner that you had compared to Autonomy?

3   A.   You know, under different CEOs and management teams, the

4   record is different.

5        The CEO that was there prior, Mark Hurd, had a very

6   successful history actually of doing deals, and up until that

7   point, he was considered to be one of the better integrators of

8   assets and he bought assets like EDS and turned them around

9   fairly well.  So mark Hurd was considered to be a good

10  integrator, acquirer of assets like EDS.

11       Go back further in time, HP Compaq under Ms. Fiorina

12  wasn't considered to be a great deal.  So it was more a

13  reflection of, I think, the CEO at that point versus anything

14  else.

15           MR. REEVES:  No further questions.  Thank you,

16  Your Honor.

17                    **RECROSS-EXAMINATION**

18  BY MS. LAZARUS:

19  Q.   Mr. Daryanai, you just mentioned that HP acquired a

20  company called Compaq?

21  A.   Yes.

22  Q.   Do you remember if there was ultimately a writedown

23  associated with that acquisition?

24  A.   I don't, and that happened before I actually officially

25  covered the name.

**DARYANAI - RECROSS / LAZARUS**

1   **Q.**   Your understanding is the writedown happened before your

2   initiated coverage?

3   **A.**   No.  The transaction happened before we initiated

4   coverage, several years before we did.

5   **Q.**   Do you recall a writedown of about a billion point two

6   dollars for Compaq?

7   **A.**   I don't.

8   **Q.**   You also mentioned HP bought a company called EDS?

9   **A.**   Yes.

10  **Q.**   That was a services company?

11  **A.**   Yes.  It was a technology services company.

12  **Q.**   Do you recall if there was a writedown of that

13  acquisition?

14  **A.**   I don't recall that explicitly.

15  **Q.**   You don't recall an $8 billion writedown in connection

16  with an EDS acquisition?

17  **A.**   Not off the top of my head.  I can't recall it.

18  **Q.**   Should I show you --

19         **THE COURT:**  He says he can't recall it.  Was he there

20  at the time or what?

21  **BY MS. LAZARUS:**

22  **Q.**   You were covering the company in April of 2012; correct?

23  **A.**   Yes, we were.

24         **MR. REEVES:**  I'm sorry.  April 2012?  I object.

25         **THE COURT:**  Sustained.  Thank you.

```
 1          MS. LAZARUS:  Nothing further.

 2          THE COURT:  You're excused.

 3          THE WITNESS:  Thank you.

 4          THE COURT:  Thank you.

 5      Call your next witness.

 6          MR. REEVES:  Thank you, Your Honor.

 7          THE COURT:  We will go until 4:00.

 8          MR. REEVES:  That sounds good.  Thank you, Your Honor.

 9      At this time, the United States calls Mr. Manish Sarin,

10  please.

11          THE CLERK:  Please raise your right hand.

12                          MANISH SARIN,

13  called as a witness for the Government, having been duly sworn,

14  testified as follows:

15          THE CLERK:  Please be seated.

16          THE WITNESS:  Thank you.

17          THE CLERK:  Please state your full name for the record

18  and spell your last name.

19          THE WITNESS:  Full name Manish Sarin.  Last name

20  spelled S-A-R-I-N.

21          MR. REEVES:  May I inquire?

22                       DIRECT EXAMINATION

23  BY MR. REEVES:

24  Q.  Good afternoon, Mr. Sarin.  Where are you from, sir?

25  A.  I live in Los Altos.
```

SARIN - DIRECT / REEVES

1    Q.    What is your educational background, please?

2    A.    I trained as an engineer many years ago and then I did my

3    Master's in Business Administration before spending some time

4    in investment banking and then HP.

5    Q.    Okay.  And where did you get your MBA?

6    A.    At Columbia Business School.

7    Q.    All right.  And would you briefly describe your career

8    after business school?

9    A.    Sure.  So I spent ten years at three different investment

10   banks.  Coming out of business school, I worked at JPMorgan for

11   about four years and then spent a few years at Wells Fargo

12   before moving on to Merrill Lynch for another four years.  And

13   I left in the last financial crisis in 2009 and then joined HP

14   after taking some time off.

15   Q.    In or about what year did you join HP?

16   A.    2010, February.

17   Q.    And in what capacity did you join HP?  What was your job

18   there?

19   A.    So I was part of the strategy and corporate development

20   team.  I was part of the corporate development function,

21   working with HP software business unit.

22         The way the corporate development team was organized, the

23   teams were -- call it three or four individuals to a team that

24   were working with select HP business units.  So I had

25   colleagues, for example, that would work with the PC division

1    or the printer division or the services division, and I had a

2    small team working with HP software.

3        The role really was working with the business unit teams

4    to help define strategic direction and also work with the

5    corporate executives at the head office level as we thought

6    about larger or more strategic acquisitions that HP wanted to

7    do.

8    Q.   Let's break that down into strategic direction and

9    possible acquisitions.  Why don't you take a moment and

10   describe what you mean by those two points, please.

11   A.   Yeah.  What I mean by that is as the business unit thinks

12   through the evolution of the business, they're always thinking

13   about in addition to organic development, which is coding and

14   bringing to market new products, are there other technologies

15   that HP could acquire which would be synergistic with that

16   business unit's direction.

17       So we evaluate any number of public and private companies

18   on behalf of the business unit.  And then on the other side for

19   much larger deals, many of them, the sponsors, tend to be the

20   chairman or the CEO of HP.  We sort of work with the senior

21   executives in formulating a business plan for a particular

22   asset that senior executives might believe would -- would sort

23   of make sense in HP's portfolio.

24   Q.   All right.  You used the word "synergistic."  Is that a

25   form of synergy?

**SARIN - DIRECT / REEVES**

1   **A.**    It is.

2   **Q.**    Okay.  What do you mean by that?  What's a synergy?

3   **A.**    So what synergy means is when you acquire a particular

4   business, what can HP, in this case, do with that business?  So

5   if the business is selling a particular software, as an

6   example, HP could provide a number of other things that would

7   hasten the go-to-market of that product, would lead to faster

8   ramp in the sales, for example, could break new markets,

9   provide more distribution.

10       So it could be any number of things that would make that

11   product and that business that's acquired by HP grow at a

12   faster rate, get higher adoption in the market, things that

13   would be -- would accrue to HP as the acquirer.

14   **Q.**    In the time period 2010 to 2011, with whom were you

15   working as part of the corporate development team that you've

16   described?

17   **A.**    I -- I reported in to Andy Johnson and then I had two

18   individuals that worked for me, Varoon Bhaggat and Emily Hsiao.

19   **Q.**    Now, let me direct your attention to in or around March

20   2011.  At or around that time, were you involved in any work by

21   HP about the possible acquisition of a company known as

22   Autonomy?

23   **A.**    Around March of 2011, there were initial discussions

24   between the principals at Autonomy and the principals at HP.  I

25   was not part of those discussions, but I was sent materials

1    that Autonomy had shared with the HP team, so I was familiar

2    with -- that HP was looking at Autonomy, and then I and my team

3    did preliminary work around reading public filings and such to

4    acquaint ourselves with that business.

5    **Q.**   Okay.  Is that the beginning of your evaluation of a

6    possible acquisition by HP of Autonomy?

7    **A.**   Yes.

8    **Q.**   I'd like to show you what has been marked for

9    identification as Exhibits 1591, 1592, 1593, and 1594.  I think

10   these are four parts of a related document being sent to

11   Mr. Sarin on or around March 4, 2011, by Mr. Johnsen relating

12   to Autonomy.

13           **THE COURT:**  Admitted.

14       (Trial Exhibits 1591, 1592, 1593 and 1594 received in

15        evidence).

16           **MR. REEVES:**  If we could please display Exhibit 1591.

17               (Exhibit published to jury.)

18   **BY MR. REEVES:**

19   **Q.**   It looks like on or around March 4, 2011, Mr. Johnsen is

20   sending some stuff to you, Mr. Sarin; is that correct?

21   **A.**   That is correct.

22   **Q.**   What are these documents?

23   **A.**   So this is the fourth part of a fairly lengthy

24   presentation from Autonomy to HP.

25   **Q.**   And what was the -- did you review these materials?

1   **A.**   I did.

2   **Q.**   If we could go to the second page.

3        Are these presentations that had been prepared by

4   executives at Autonomy and had provided to HP?

5   **A.**   Yes.

6   **Q.**   All right.  And thereafter, they were being sent to you

7   for your, what, review and evaluation?

8   **A.**   Yeah.  I think the way Andy, my boss, liked to operate was

9   he would share all information that he would receive as we

10  would go around meeting various companies.  Given that he had

11  been part of these discussions, he just wanted to make sure

12  that I was fully up to speed on what was going on in HP, and so

13  he was sending these to me so I could read them, review them,

14  begging the former sense of the business.

15  **Q.**   And did you do that?

16  **A.**   I did.

17  **Q.**   And what type of sense of Autonomy's business did you

18  develop as a result of reviewing these presentation materials?

19  **A.**   I thought it was a very compelling business on multiple

20  levels.

21       So at that time, if I remember correctly, the things that

22  stuck out in my head was it was a scaled software business, and

23  that was very important to HP because there had been tremendous

24  consolidation in the software industry in the ten years before

25  that.

1          Companies like Oracle and IBM had acquired many

2     businesses, and HP was looking or interested in finding a

3     software company that had significant scale to make a

4     meaningful difference to HP as a combined entity.  And so

5     Autonomy at that time in 2010 had done about 870 million in

6     revenues which was a -- almost close to a billion dollars, was

7     fairly attractive to HP.

8          The other thing that was very interesting was even at a

9     business of that scale, Autonomy was growing between 15 and 20

10    percent, which was a fairly attractive growth rate for a

11    business of that size.

12         The third thing I remember was its operating margins were

13    the highest in the software industry, a little bit over 40

14    percent, which was very attractive to HP which sort of made us

15    feel that this was a business that had a unique market position

16    given that they were focused on the unstructured data market,

17    which was the fourth thing that I wanted to point out, because

18    as you look at the evolution of the software industry, lots of

19    businesses have focused on things like a database, for example,

20    but all of those relate to, shall I say, legacy markets as the

21    world is awash in unstructured data, and what I mean by that is

22    emails, video, audio, we all take pictures, we all send emails.

23         The ability to store that data and the ability to then

24    derive meaningful information from that data was a nascent

25    market that HP at that time felt would provide it a unique

1   opportunity to go build a significant presence in that market.

2   Q.   Let's go to page 5 of Exhibit 1591, please.  If we could

3   enlarge the portion of this slide at the bottom that says

4   "financial highlights."  Excellent.  A little tough to read,

5   but I think we will be okay.  If you could please highlight the

6   figure "870 million" in the first bullet point, please.

7        You said, Mr. Sarin, that the size of Autonomy scaled to

8   HP in a certain way.  What did you mean by that?

9   A.   Would you repeat that question?

10  Q.   My question is about your use of the term "scaling."

11  A.   Uh-huh.

12  Q.   And how that fits in.

13       Are you looking for a company of a certain size and if so,

14  why?

15  A.   Right.  So HP at that time was doing a little over

16  120 billion in revenues.  And I think HP had concluded that if

17  HP acquired smaller businesses, they would sort of get lost, if

18  you will, within HP because HP was a little over 300,000

19  employees.

20       So for things to make a meaningful difference to HP, they

21  needed to have a certain amount of market presence, certain

22  amount of scale, certain amount of growth rates and other such

23  attributes which would be important for the asset to have for

24  them to be additive to HP, if you will.

25  Q.   All right.  Thank you.

1          After you reviewed the presentations provided by Autonomy,

2     what, if anything else, did you do thereafter with regard to

3     your evaluation and consideration of a possible acquisition by

4     HP of Autonomy?

5     **A.**    We reviewed publicly-available information.

6          Now, the good news with Autonomy was it was a public

7     company, so there was a lot of information in the public

8     domain.  There were Wall Street research reports.  There were

9     research reports from independent research firms like Gartner

10    and Forrester that evaluated Autonomy's products in the various

11    markets that it served.

12         So we went through those.  And then I and my team sat with

13    the individuals from HP software and tried to spend a lot of

14    time and really put a lot of effort behind what would synergies

15    be if HP was to own Autonomy.

16    **Q.**    Let's go through some of that.  I would like to show you

17    what has been marked for identification as Exhibit 1796.

18         Do you have that before you?  This is a April 25th, 2011,

19    email from Mr. Bhaggat to you and Mr. Johnson, subject

20    "Atlantis."

21         Is that a code word for Autonomy in these days, Atlantis?

22    **A.**    It is.  If you give me a minute --

23         **MR. REEVES:**  I was mostly speaking to the judge, but

24    thank you for listening.

25         **THE COURT:**  Admitted.

1              (Trial Exhibit 1796 received in evidence)

2                  (Exhibit published to jury.)

3    BY MR. REEVES:

4    Q.    Do you have Exhibit 1796 before you?

5    A.    I do.

6    Q.    You were using a code word for this possible acquisition;

7    is that correct?

8    A.    Correct.

9    Q.    What was the code word for the possible acquisition of

10   Autonomy?

11   A.    Atlantis.

12   Q.    Atlantis.

13         And attached to Exhibit 1796, it looks like there is the

14   Q1/2011 earnings call and the 2011/Q1 financial results.  Do

15   you see that?

16   A.    I do.

17   Q.    Were you -- let's go to page 3 of Exhibit 1796.

18         In this time period, were you reviewing the press release

19   by Autonomy announcing its Q1/2011 performance?

20   A.    Yes.

21   Q.    For what purposes were you reviewing Autonomy's press

22   releases about it's Q1/2011 performance?

23   A.    I think we were building an internal case for would the

24   acquisition of Autonomy make sense for HP.

25         So a lot of the work we were doing at this time was a --

1    developing a better understanding of Autonomy as a business,

2    figuring out the financial performance of the business, and

3    then forming a view around should HP own the business, what

4    would synergies be, as an example.

5        So this was all in the spirit of us getting educated on

6    the business.

7    **Q.**   Did you rely on the accuracy of the information provided

8    by Autonomy in its press release?

9    **A.**   I did.

10   **Q.**   Specifically, did you rely on its claim that it had record

11   Q1 revenues of 220 million?

12   **A.**   Yes, sir.

13   **Q.**   Okay.  And were there other things about the financial

14   performance of Autonomy as you're looking at it in this time

15   period that caught your eye or peaked your interest in pursuing

16   a possible acquisition of Autonomy?

17   **A.**   Yes, sir.  If you just look further down on that, there

18   is -- the fifth bullet down, for example, talks through the

19   various piece parts of Autonomy's revenue, and so the fact that

20   their IDOL business on an organic basis was growing 17 percent.

21   This is the IDOL product line.  They had recently introduced

22   the same product in a cloud fashion, and what cloud is, selling

23   it on a subscription basis, and so that had obviously seen

24   tremendous growth and that was growing also 17 percent.

25       They had an OEM piece where other companies were

1    incorporating elements of Autonomy's technology in their

2    products which was also purported to be growing 28 percent.

3         So it seemed like all the piece parts of Autonomy's

4    revenue were all growing strongly in the double digits.  Their

5    operating margin, which here shows 43 percent, was again, as I

6    said earlier, one of the hallmarks of Autonomy, that it was a

7    very higher margin business compared to other software

8    companies.

9         I think these are some of the things that jumped out at

10   me.  And certainly the fact that the gross margins, which is

11   two more bullets down, was 88 percent.  Again, very healthy in

12   the industry.

13   **Q.**   You've used the term "organic growth."  What do you mean

14   by that, Mr. Sarin?

15   **A.**   What I mean by that is the sale of Autonomy's products --

16   this is not the products that they acquired, but Autonomy's

17   products, which is the way I understood this to be, they were

18   generating sales which in the aggregate were showing these

19   growth rates that we are seeing.

20   **Q.**   Also attached to Exhibit 1796 is a -- appears to be a

21   transcript of an earnings call on or about page 18 of the

22   exhibit.  Do you see that?

23   **A.**   I do.

24   **Q.**   In this time period, in this April 2011 time period, did

25   you review the transcript of the earnings call or otherwise

1  listen to the call?

2  **A.**   I didn't listen to the call, but I believe I reviewed the

3  transcript.

4  **Q.**   Why would you read through the transcript?  How was that

5  relevant to what you were doing?

6  **A.**   Many a times, the Wall Street analyst would ask questions

7  of management.  This is true for any public company.  And their

8  answers in a transcript would provide more information than is

9  readily available just reading the financials.

10     So it just provides more color commentary around the

11  business that is interesting to note.

12  **Q.**   Sometimes the analysts ask probing and good questions?

13  **A.**   Sure.

14  **Q.**   Does that illuminate issues for you as someone who is

15  considering the acquisition of this company, possibly?

16  **A.**   Yes.

17  **Q.**   I'd like to show you what has been marked for

18  identification, please, as Exhibit 1804.  This is a -- an email

19  from Emily Hsiao.

20     Was Ms. Hsiao on your team?

21  **A.**   Yes.

22  **Q.**   And she is circulating it to you and Jerome Levadoux on or

23  about May 10, 2011.

24     I offer it in evidence, please.

25         **THE COURT:**  Admitted.

1          (Trial Exhibit 1804 received in evidence)

2               (Exhibit published to jury.)

3    **BY MR. REEVES:**

4    **Q.**   In Exhibit 1804, it looks like Ms. Hsiao is circulating

5    the 2011/Q1 financial results, the financial results

6    presentation, the 2010 annual report, and certain other

7    materials in this email, is she not?

8    **A.**   Yes.

9    **Q.**   Did you review these materials when you got them in this

10   time period, Mr. Sarin?

11   **A.**   I did.

12   **Q.**   All right.  We've gone through the press release.  Let's

13   take a look at the 2010 annual statement.  That's page 20 of

14   Exhibit 1804.  If we could please display that.

15               (Exhibit published to jury.)

16          **MR. REEVES:**  Let's just see the whole page.  Great.

17   Thank you very much.

18   **Q.**   Mr. Sarin, did you spend time reviewing Autonomy's 2010

19   annual report?

20   **A.**   I did.

21   **Q.**   Did you read it with care?

22   **A.**   As far as I remember, I did.

23   **Q.**   Okay.  All right.

24          And for what reason did you review the annual report?  Why

25   were you doing that?

1    **A.**    As I was mentioning earlier, again, it gives a lot more

2    detail behind the performance of a business than what is

3    apparent from the profit and loss statement.

4         So it gives you color commentary around, for example, the

5    cash conversion cycle.  It would also give color commentary

6    around the products themselves, how do they take them to

7    market, a lot of other good information around a business that

8    is helpful to know.

9    **Q.**    Did you read with particular care the financial reporting

10   contained in the annual report provided by Autonomy to its

11   shareholders and to the public?

12   **A.**    I believe I did.

13   **Q.**    And was the -- did you rely on the accuracy of the

14   financial information provided by Autonomy in its 2010 annual

15   report?

16   **A.**    Yes, sir.

17   **Q.**    To your knowledge, was the annual report supported in any

18   sense by an audit or review opinion by independent auditors?

19   **A.**    Yes.

20   **Q.**    Okay.  Was the fact that the annual report and other

21   financial statements filed by Autonomy -- that they had been

22   audited or reviewed by independent auditors -- was that

23   important to you in any way?

24   **A.**    Absolutely.

25   **Q.**    Why was it absolutely important that the financial

1    reporting of Autonomy be audited?

2    **A.**    So what auditors do is they provide an independent

3    verification of the financial results of a company.  For all

4    practical purposes, as we go through M&A, the fact that an

5    independent set of eyes has taken a look through and checked

6    the veracity of the financial statements is an additional level

7    of comfort that any buyer wants to have.  So the fact that

8    Autonomy was audited by a Big Four accounting firm, Deloitte,

9    was certainly very comforting.

10    **Q.**    If Autonomy had not been audited by Deloitte or a Big Four

11    accounting firm and its financial statements were not

12    independently reviewed in the manner you've described, would

13    that have been relevant to you in -- with regard to your level

14    of interest in pursuing a possible acquisition of a company

15    like Autonomy?

16    **A.**    It would have certainly forced us to do a lot more

17    introspection and work off the company itself because we would

18    then have had to go out and get an accounting firm to dig

19    deeper into the financials.

20        And certainly HP and other buyers do actually ask

21    accounting firms to cull through the books of private companies

22    that don't have the same level of sophistication and review

23    that Autonomy did.

24    **Q.**    Now, in this time period, in this March-April 2011 time

25    period, was Autonomy the only software company that HP was

1   considering possibly acquiring or combining with or were there

2   others?

3   **A.**   There were two others at least.  And one was a company

4   called TIBCO and the code name for that was Tacoma.  Another

5   one was Software AG which was a German company.  The code name

6   for that was Singapore.  And we had had initial discussions

7   with another public company called Red Hat.

8   **Q.**   So it's not like your interest was limited to Autonomy.

9   You were considering other companies as well?

10  **A.**   Yes.

11  **Q.**   I'd like to show you, if I could, please, what has been

12  marked for identification as Exhibit 1621.  This is a March

13  18th, 2011 email with a copy to Mr. Sarin from Andy Johnson,

14  subject "Atlantis."

15          **THE COURT:**  Admitted.

16          (Trial Exhibit 1621 received in evidence)

17              (Exhibit published to jury.)

18          **MR. REEVES:**  Thank you, Your Honor.

19  **Q.**   If we could go, please, to the second page.  If we could

20  come out a little bit.  Okay.  And maybe enlarge as much of the

21  document as we can so we can -- that's fantastic.  Thank you.

22          So "Tacoma vs. Atlantis" as used in this document in this

23  March 2011 time period, what does that mean, Mr. Sarin?

24  **A.**   So we had been spending more time with code name Tacoma,

25  which was TIBCO, at that time.  Atlantis or Autonomy was

1  something we had considered but wasn't higher up on our list,

2  and so we had been spending a lot of time with Tacoma, building

3  a similar business case for Tacoma, having discussions with

4  their executive management, just going through the various

5  processes that you go through before you consummate a

6  transaction.

7       And so we were at a point where there was disagreement on

8  price between the two principals.  And I believe at this time,

9  we were looking at should Tacoma not come to pass, what other

10  options did we have.

11  **Q.**   Okay.  Let's leave the TIBCO price issue to the side, and

12  let me ask you as an asset, as a company to be acquired, what

13  did you like about TIBCO?  Why were you so interested in TIBCO?

14  **A.**   TIBCO was also a software company.  The main asset of the

15  company was slightly different than Autonomy.  It is what's

16  called a service-oriented architecture.  They sell you an

17  information bus, and what an information bus is, it connects

18  the various systems within an enterprise.

19       So if you think about any big company, the mode in which

20  various systems in that company in the back end share

21  information with each other is what Tacoma or TIBCO brings to

22  bear.

23       So it was an interesting asset, but obviously a little

24  different in market but also scaled.  And Autonomy was bigger

25  than TIBCO, certainly.  But both were, along with the other

1    assets I mentioned, scaled software businesses that were

2    attractive to HP.

3    **Q.**    Through this point in time, leaving aside the price issues

4    that you talked about, based on what you knew in this March

5    2011 time period, do you know if HP had a preference to pursue

6    TIBCO over Autonomy?

7    **A.**    During this time period?

8    **Q.**    During this time period.

9    **A.**    Yes.

10    **Q.**    Okay.  Why did you like TIBCO more than Autonomy?

11    **A.**    It's in Palo Alto, which is not very far from HP.  There

12    was enough discussion between the two principals where we had

13    gone all the way to submitting an offer for TIBCO.

14        Again, as I was saying, because there was disagreement on

15    price in the end, that transaction couldn't come to pass.  But

16    TIBCO was -- if that price disagreement wasn't there, it would

17    be the asset HP would have bought.

18    **Q.**    Okay.  Let me show you one more exhibit, and then with the

19    Court's permission, we'll call it a day.

20        Let me show you, please, what is marked for identification

21    as Exhibit 1792.  This is an April 21, 2011 email to Andy

22    Johnson with a copy to Mr. Sarin from Emily Hsiao, subject

23    "Atlantis."  I offer it in evidence.

24            **THE COURT:**  Admitted.

25            (Trial Exhibit 1792 received in evidence)

1        (Exhibit published to jury.)

2   **BY MR. REEVES:**

3   **Q.**   And it looks like by April, you have "Tacoma vs. Atlantis

4   vs. Singapore."  There is a third entrant in here.  Do you see

5   that?  I'm referring to the subject line on the first page, and

6   there is a screen right next to you that may highlight it with

7   a little more --

8   **A.**   Yes.

9   **Q.**   Okay.  So there was a third company that you were also

10  considering in this time period?

11  **A.**   There was a third company as -- yes.  We were also

12  considering.

13  **Q.**   Let's go to page 4 of the exhibit, 1792.  Page 4, please.

14       And now it's "Tacoma vs. Atlantis vs. Singapore."  Who is

15  Singapore again?

16  **A.**   It's a German software company called Software AG.

17  **Q.**   And what -- and in this time period, were you interested

18  in a possible acquisition of Software AG?

19  **A.**   We were evaluating them, again in the spirit that HP was

20  looking to make a significant software acquisition.  If for

21  some reason Tacoma didn't come to pass, what were our other

22  options, and Singapore was another option, along with Atlantis.

23  **Q.**   What did you like about Software AG?

24  **A.**   It was a scaled software business.  It didn't have the

25  growth profile or the operating margin characteristics that the

**SARIN - DIRECT / REEVES**

1    other two had.  It was a slower growth business, which was the

2    reason why it wasn't very attractive to HP.  It was certainly

3    one of the options we had, but certainly was not the first --

4    first or second option.

5         But it would again provide more significant scale in terms

6    of a software asset to HP.

7    **Q.**   And in this time period, I think you testified earlier

8    that you were also considering a fourth possible company, Red

9    Hat.  Do you recall that testimony?

10   **A.**   I do.

11   **Q.**   Why were you considering Red Hat in this time period?

12   What is Red Hat and why were you considering it?

13   **A.**   Red Hat provides a version of what's called a Linux

14   operating system so all the servers that power, for example,

15   the internet email servers, what have you, all run on a Linux

16   operating system, just the way our desktops run on the Windows

17   operating system.

18        What Red Hat provides is a paid-for version of Linux

19   because Linux is actually open source, which means you can

20   download it for free off the web.  But if you need any support,

21   if you need any customization, that is what Red Hat provides.

22        So it was very interesting to HP, given its presence in

23   the server market, but for a variety of reasons, it wasn't

24   exactly the right fit because HP wasn't a "freemium" model, if

25   you will, which is give a lot of your stuff away for free and

1    then charge premium to the rest of the customers, so that

2    business model would have been a difficult fit for HP.

3            **MR. REEVES:**  Your Honor, I propose we end for the day.

4        **THE COURT:**  Ladies and gentlemen, we are going to take

5    our evening recess.  Remember the admonition given to you:

6    Don't discuss the case, allow anyone to discuss it with you,

7    form or express any opinion.

8        I will see you tomorrow for the half-day, basically.

9    Thank you.

10        (Proceedings were heard out of presence of the jury:)

11        **THE COURT:**  Let the record reflect the jurors have

12    retired.

13        So let's have the offer of proof first and then we'll move

14    on to other issues.  I would like to return also to the issue

15    about the last count, the shareholder's claim that the

16    shareholder was defrauded because, again, I don't really

17    understand the defense argument in that regard.

18        If -- let's assume for a moment that the value of the

19    shareholder's interest was really depleted or affected by the

20    mismanagement of the company, is that -- is that the test?  I

21    thought the test would be did a shareholder buy a share of

22    stock because he saw -- he or she saw that -- that this

23    acquisition would, in that shareholder's opinion, be

24    profitable, increase the value of the stock.

25        I mean, you can't -- what I'm saying -- to do it another

PROCEEDINGS

1    way, you can't just lie and then get away with it because the

2    lie turned out to have no harm -- cause harm.  I understand

3    your argument is that the shareholder wasn't harmed by it.  I

4    don't know whether he is harmed by it or not.  But is that an

5    element of the offense?  You have to show harm to the

6    shareholder?

7            MS. LAZARUS:  Your Honor, we would point out that the

8    Government elicited testimony from Mr. Upton that he did, in

9    fact, lose money on his HP shares --

10           THE COURT:  My question to you is a different

11   question.  I only asked you because you brought it to

12   everybody's attention, so I'm asking you.  You don't have to

13   argue if you don't want to, but you're not telling me that's an

14   element of the offense, are you?

15           MS. LAZARUS:  I think I need to take another look at

16   1348.  It's a bit of an unusual count --

17           THE COURT:  I would be surprised.  I mean, it's like

18   gee -- I don't think that's the law.  Okay.  If it is the law,

19   you can tell me it's the law and I'll go back and look at it.

20       So, anyway, why don't you -- Ms. Lazarus, why don't you

21   make your offer of proof.  I keep interrupting you.  Go ahead.

22           MS. LAZARUS:  Your Honor, we would have elicited

23   testimony from Mr. Daryanai about his lowered price targets

24   following the acquisition in August 2011.  We would have

25   elicited testimony about several impairment charges that HP

1  took in 2011 and 2012.  We would have elicited testimony about

2  the change in CEO at HP.

3          THE COURT:  Okay.  That's fine.  I know -- okay.  Go

4  ahead.  Go ahead.

5          MS. LAZARUS:  That's the evidence that we would --

6          THE COURT:  Okay.  Now I say to you so what?  Tell me

7  why it's significant to your case or to the case that's being

8  presented against you.

9          MS. LAZARUS:  Well, we expect that HP witnesses are

10  going to talk about the writedown charge that they took for the

11  Autonomy acquisition, and we think that the other impairment

12  charges relate to their motives for doing that and their desire

13  to change the narrative on what had been happening with HP.

14          THE COURT:  I guess I'm confused.  So HP says, "We

15  paid" and you don't have any objection to this -- "We paid

16  $11 billion for this company"; right?  I don't know what they

17  paid.

18          MS. LAZARUS:  Yes.

19          THE COURT:  11 billion.  Okay.  Okay.  And then -- I

20  don't know.  Do they come in and say a year later "We took a

21  writedown of 8 billion"?  I don't know that I would let that

22  into evidence.

23          MR. KEKER:  You have.  It's in evidence.

24          THE COURT:  Come on, Mr. Keker.  Join in.

25          MS. LAZARUS:  I will just point out, in Mr. Leach's

1  opening statement, I believe he said the acquisition was a

2  disaster for HP and its shareholders.

3          **THE COURT:**  Yeah.  Okay.

4          **MR. KEKER:**  And Mr. Upton has come in and testified

5  about how he lost money a year later and --

6          **THE COURT:**  When the announcement came out.

7          **MS. LAZARUS:**  Correct.  The announcement of the

8  writedown.  He sold his shares.

9          **MR. KEKER:**  The announcement of the writedown.

10          **THE COURT:**  But I don't know -- and you'll have to

11  refresh my recollection.  I don't know -- I have to think about

12  it a bit more.  But HP writes it down -- one, is it significant

13  as to what they wrote it down?  You say they do have evidence

14  they wrote down -- that they wrote down 8 billion, and that's

15  in evidence?

16          **MR. KEKER:**  Yes.

17          **THE COURT:**  I don't know whether it is or not.

18          **MR. KEKER:**  Mr. Upton.

19          **THE COURT:**  I understand you are saying that.  I just

20  have to go take a look at it or somebody has to take a look at

21  it.  Okay.

22          So let's say that's in evidence.  Let's say that's in

23  evidence.  And what they're saying is "we believe that the

24  asset that we acquired for 11 billion was actually -- is only

25  worth now 3 billion" or something like that.  That's what they

1    are saying.

2        And I'm trying to figure out -- so you come in and say,

3    "Oh, yeah, maybe it's worth less than 11 billion, but that's

4    because they mismanaged it."  That's the argument.  That's the

5    argument.

6        Is that right?  Did I get that right?

7            **MR. KEKER:**  Yes.

8            **MS. LAZARUS:**  Yes.

9            **THE COURT:**  They mismanaged it.  Therefore, evidence

10   of mismanagement is the evidence to show that it -- that it

11   was -- that that's what contributed to its loss of value.

12   Okay.

13       What does the Government say?  That's the argument.

14           **MR. REEVES:**  I think, first of all, with Mr. Upton,

15   the question was did he rely on the HP announcement that

16   repeated the claims of Autonomy's financial strength to

17   purchase his shares.  He said he did.

18       I think the Court is precisely correct that there has

19   either been a form of securities fraud at that moment with that

20   purchasing decision or not.  And what happens to the shares

21   thereafter is not relevant, in a direct sense, to the

22   commission of the crime.

23       The question put to Mr. Upton was, "Well, what happened to

24   your shares?  What did you do?"  I think it was, to follow the

25   narrative -- it's not intended to open a door on two years'

1  worth of corporate activity.  And he explained, I believe in

2  his answer, if I'm recalling this correctly, that when there

3  was a writedown, he sold.

4      So I think in a normal, appropriate way, the Government

5  was following what happened to this shareholder when he bought

6  shares in the manner he described based on a press release that

7  we've charged the defendant with making false and misleading.

8      THE COURT:  But did he disclose the amount of the

9  writedown?

10      MR. REEVES:  I think in candor he did, yes.

11      MS. LAZARUS:  And the amount of his loss.

12      THE COURT:  Well, the amount of his loss, I mean --

13      MR. REEVES:  It's $25,000 to him.  But prompted his

14  sale -- his sale was prompted by the writedown, if I recall the

15  testimony.

16      THE COURT:  I think it was relevant -- I don't know

17  whether it came in over objection or not.  Okay.

18      MS. LAZARUS:  I think our understanding was that the

19  Government was opening the door to what caused Mr. Upton to

20  lose --

21      THE COURT:  Okay.  So, in other words, you didn't

22  object?

23      MS. LAZARUS:  I don't believe we objected because we

24  understood we would be able to cover this --

25      THE COURT:  Either you did or didn't.  Okay.  I

**PROCEEDINGS**

1  understand.  I mean -- but I don't know -- I mean, I don't know

2  that I wouldn't give an instruction which says the amount --

3  "You heard evidence of the amount of the writedown.  You are

4  not to consider that in determining whether or not a securities

5  fraud occurred."

6          **MR. REEVES:**  We would not oppose that, Your Honor.

7          **THE COURT:**  Okay.  That.

8      Then you have to go on and you say, "The evidence was

9  received of a writedown only to -- for the sole purpose of

10  considering whether or not that investor," if that's what he

11  was --

12          **MR. REEVES:**  Yes.

13          **THE COURT:**  -- "that investor was motivated for the

14  sale by virtue of the fact that this asset was written down and

15  for that purpose only."

16      Now, it may be that also horrendous things were happening

17  at HP and that he would have sold the stock in any event or he

18  would have sold it before or sold it afterwards.

19      But the Government simply wants to -- tried to, as I

20  understand it, close the loop to show the significance of that

21  particular asset in determining the person's purchase.

22      So I don't know that it -- I wouldn't -- I don't view it

23  as opening the door.  And I view it as a matter that has --

24  that's a question of instruction -- limiting instructions as to

25  the evidence.

1        **MR. KEKER:**  Your Honor, could I be heard?

2        **THE COURT:**  Yes.

3        **MR. KEKER:**  And maybe ask you to sleep on it.

4        **THE COURT:**  But not on the bench.

5        **MR. KEKER:**  They tried -- you cannot, in a criminal

6   case, open on the idea that some horrible fraud has happened

7   here with a lot of money lost and poor HP is a victim.  That's

8   how they opened.  That's what the case is about.  They bring in

9   Mr. Upton who says what he says.

10       You're letting them put in the restatement.  They are

11  going -- they get up and they get to say, "Oh, we've written

12  off all this money.  That justifies the writedown."  All of

13  that is the story, and then we can't -- I'm not talking about

14  spending a lot of time, but the idea that we can't let the jury

15  know that -- that there are big, big holes in that story, both

16  because of materiality, because of -- on a lot of levels I

17  think is really unfair.

18       And what I would like to do tonight is go back, think

19  about it a little bit harder, try to write a one pager or two

20  pager and give it to you --

21       **THE COURT:**  That's fine.  I appreciate that.  From

22  both side.  I appreciate that.

23       My mind isn't made up on this.  Okay?

24       **MR. KEKER:**  Okay.  We will do that.

25       **THE COURT:**  It's open.  But I'm sitting here thinking

1    about -- about not whether it's marginally relevant, but

2    whether it is under 403 -- whether it simply gets us into a

3    totally open-ended -- and I'm telling you this so you may be

4    able to give me some assurances that it's not -- open-ended

5    inquiry into what else is going on at HP post acquisition.

6    That's the thing that I -- that I'm concerned about.

7        I'm concerned about it for a variety of reasons, but I

8    think that it just is un-- it's un-- it's almost unmanageable.

9        **MR. KEKER:**  We will try to figure out how to make it

10   not unmanageable and more straightforward.

11       **THE COURT:**  Well, one way to approach it is to make a

12   detailed offer of proof from the defense as to why this

13   information is relevant.  I mean, I don't know what you're

14   going to write, but the more detailed and the more pinned it is

15   to particular things -- the concept itself -- the problem with

16   the concept itself is that it's too open-ended, you know, and

17   to say well, it's unfair and so forth and so on, I understand

18   that.  And I understand the trial must be fair.

19       But "fair" doesn't mean to be -- let everything in and

20   then let the jury sort it all through and they will figure out

21   what is important and what isn't important.  That's not the way

22   I operate.

23       Anyway, that's not going to be my decision.  My decision

24   has to be how it is tethered to a particular issue that the

25   jury has to determine.  They have to determine materiality.

1    Obviously that's -- that is an issue.  And they have to

2    determine falsity.  That's a second issue.  Maybe there is some

3    other issue.

4            **MR. KEKER:**  And intent.  They have to decide intent.

5            **THE COURT:**  And of course they have to decide intent.

6            **MR. REEVES:**  The defendant's intent.

7            **THE COURT:**  That's right.  Well, yeah.  But that's --

8    the burden is on the Government in that regard.  I mean, all --

9    the burden is on the Government on all three issues.

10           **MR. KEKER:**  We will go to work on that --

11           **THE COURT:**  Let me just -- that's fine.  I think we've

12   discussed enough of that.

13           **MR. REEVES:**  May I say one thing, please, Your Honor?

14           **THE COURT:**  Yes.

15           **MR. REEVES:**  With regard to this witness, I would be

16   grateful if the Court obtained a proffer from the defense about

17   any evidence that they would elicit after October 2011 in

18   compliance with what the Court has already preliminarily said,

19   and I do think it's a good idea to take it one step at a time.

20   But he is now on the stand.  If we were to go into that, that

21   would have an effect on the subjects in our direct.  If the

22   Court were to remain and draw the line that you've indicated

23   that you might today, that would have a different effect on our

24   direct.

25           **THE COURT:**  Let's turn it around a bit.  What is it

**PROCEEDINGS**

1    you intend to elicit yourself?  If allowed to present this

2    witness as you would want to present the witness, let's say

3    you're comfortable as to whatever the law is, just tell me what

4    would your witness in chief say?

5              **MR. REEVES:**  I would --

6              **THE COURT:**  What would your witness say under direct?

7              **MR. REEVES:**  I would end at October.

8              **THE COURT:**  You would end at October?

9              **MR. REEVES:**  Yes.

10             **THE COURT:**  Any events that occurred subsequent to

11   October would not be elicited by you?

12             **MR. REEVES:**  No.

13             **THE COURT:**  Yes.

14             **MR. REEVES:**  No, they would not be elicited by me

15   after October 2011, Your Honor.

16             **THE COURT:**  Okay.  All right.  So that's what the

17   Government's view is.

18        He resides in California; right?

19             **MR. REEVES:**  Yes, he does.

20             **THE COURT:**  All right.  Okay.  That's --

21             **MR. KEKER:**  We will go to work.

22        The other question, I mean, the game starts at 1:30.  You

23   are going to leave at 1:00?

24             **THE COURT:**  Yes.  It's baseball.

25             **MR. KEKER:**  This can be off the record.

**PROCEEDINGS**

1    **THE COURT:**  I understand it's a possibility that the

2    no hitter and perfect game will be decided before we get there.

3    I think I have to -- I have to have them work until 1:00.  You

4    can sneak the way I usually do, which is you take the subway

5    here, Metro, and it takes you right there.  You don't have to

6    park.  You don't have to do anything.  And you will arrive in

7    time for a hot dog.

8        Okay.  Anyway, I do want to find out where we are in this

9    case.  So we have this witness, and then who do we have?

10    **MR. REEVES:**  We have Mr. Apotheker, who will be next,

11    and then after him, Mr. Welham will testify.

12    **THE COURT:**  Who?

13    **MR. REEVES:**  Mr. Welham.

14    **THE COURT:**  And Mr. Welham is the expert?

15    **MR. REEVES:**  No.  He is the auditor from Deloitte.

16    **THE COURT:**  The auditor from Deloitte.  Okay.  That's

17    it?

18    **MR. KEKER:**  Junior auditor from Deloitte.

19    **MR. REEVES:**  I think we are going to give notice about

20    the remaining witness for the end of the week, but we have a

21    full week.  We think we're on track, Your Honor.

22    **THE COURT:**  Okay.  On track.

23    **MR. KEKER:**  Could we -- he is going to give us notice

24    in two hours.  How about now?

25    **THE COURT:**  No.  Don't -- don't upset his schedule.

**PROCEEDINGS**

1   This is working out very well.  I don't want any changes in the

2   schedule.  You don't know how people will react to a sudden

3   change in the schedule.  It's like a change in the schedule.

4   Okay.

5       Thank you all.  See you all tomorrow morning.

6           **MR. REEVES:**  Thank you, Your Honor.

7           **THE COURT:**  How much longer do you have on your

8   direct?

9           **MR. REEVES:**  Maybe two hours.

10          **THE COURT:**  So, Mr. Keker, if you finish your cross --

11  you're not doing --

12          **MR. KEKER:**  I'm not doing it.  Mr. Marais is doing it.

13          **THE COURT:**  You are not excused.  You have to stay

14  here through the entirety; however, if he ends early, I may

15  recess.

16          **MR. KEKER:**  If you see me going behind there and

17  changing my clothes --

18          **THE COURT:**  All right.  Thank you.

19          **MR. REEVES:**  Thank you.

20              (Proceedings adjourned at 4:16 p.m.)

21                      ---oOo---

22

23

24

25

1

2

3                        **CERTIFICATE OF REPORTERS**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Monday, April 2, 2018

8

9

10

11    _____

12          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                     U.S. Court Reporter

13

14

15    _____

16          Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                     U.S. Court Reporter

17

18

19

20

21

22

23

24

25