Volume 18

Pages 3500 - 3643

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,      )
                               )
           Plaintiff,          )
                               )
  VS.                          )        NO. CR 16-00462 CRB
                               )
SUSHOVAN TAREQUE HUSSAIN,      )
                               )
           Defendant.          )
_____)
                               San Francisco, California
                               Tuesday, April 3, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

                    ALEX G. TSE
                    Acting United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
           BY:  **ROBERT S. LEACH**
                **ADAM A. REEVES**
                **WILLIAM FRENTZEN**
                **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:

                    KEKER & VAN NEST
                    633 Battery Street
                    San Francisco  CA  94111
           BY:  **JOHN W. KEKER**
                **JAN NIELSEN LITTLE**
                **BROOK DOOLEY**
                **KATE LAZARUS**
                **NIC MARAIS**
                **ATTORNEYS AT LAW**


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Pamela Batalo, CSR No. 3593, FCRR
              Official Reporters

<u>**I N D E X**</u>

Tuesday, April 3, 2018 - Volume 18

<u>**GOVERNMENT'S WITNESSES**</u>                              <u>**PAGE**</u>  <u>**VOL.**</u>

<u>**SARIN, MANISH (RECALLED)**</u>
(PREVIOUSLY SWORN)                                   3504  18
Direct Examination resumed by Mr. Reeves             3504  18
Cross-Examination by Mr. Marais                      3596  18

**E X H I B I T S**

<u>**TRIAL EXHIBITS**</u>                          <u>**IDEN**</u>  <u>**EVID**</u>  <u>**VOL.**</u>

1808                                              3508  18

1884                                              3510  18

2027                                              3510  18

2046                                              3521  18

2077                                              3525  18

2088                                              3528  18

2099                                              3527  18

2112                                              3533  18

2114                                              3534  18

2128                                              3563  18

2135                                              3576  18

2137                                              3543  18

2143                                              3567  18

2151                                              3639  18

2152                                              3571  18

2170                                              3584  18

2238                                              3580  18

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2251 | | 3588 | 18 |
| 2255 | | 3590 | 18 |
| 2259 | | 3589 | 18 |
| 2289 | | 3548 | 18 |
| 2332 | | 3592 | 18 |
| 2414 | | 3594 | 18 |
| 2545 | | 3528 | 18 |
| 2546 | | 3522 | 18 |
| 2547 | | 3546 | 18 |
| 2548 | | 3582 | 18 |
| 2585 | | 3516 | 18 |
| 2613 | | 3581 | 18 |
| 2718 | | 3564 | 18 |
| 2719 | | 3585 | 18 |
| 2720 | | 3586 | 18 |
| 2988 | | 3537 | 18 |
| 6531 | | 3622 | 18 |
| 6534 | | 3620 | 18 |
| 6603 | | 3611 | 18 |
| 6604 | | 3624 | 18 |
| 6606 | | 3628 | 18 |

<u>Tuesday - April 3, 2018</u>                              <u>9:03 a.m.</u>

<u>P R O C E E D I N G S</u>

---oOo---

(Proceedings were heard out of presence of the jury:)

    **THE COURT:**  Let the record reflect all parties are present.  The jury is not present.

    At the present time, I'm going to accept the Government's offer of limiting the testimony on direct to October 3rd.

    **MR. REEVES:**  October 3rd, Your Honor.

    **THE COURT:**  Fine.  And subject to -- I received the memo at 7:43 a.m.; is that right?  Is that what time it came in, something like that?

    **MR. KEKER:**  We just -- there is one --

    **THE COURT:**  I mean, do you guys ever sleep?  Okay.

    Anyway, I haven't read it I haven't read it.  I haven't read it.  Seventh inning today, I promise to read it.  Okay.  We're set.  Bring in the jury.

    (Proceedings were heard in the presence of the jury:)

    **THE COURT:**  Please be seated.  Let the record reflect all jurors are present.

    Good morning, ladies and gentlemen.  Again, thank you for being so prompt.  And we will resume the testimony.  Please have a seat.

    **THE WITNESS:**  Good morning.

    **MR. REEVES:**  Thank you, Your Honor.

1              <u>**MANISH SARIN**</u>,

2  called as a witness for the Government, having been previously

3  duly sworn, testified further as follows:

4              <u>**DIRECT EXAMINATION**</u>   **(resumed)**

5  **BY MR. REEVES:**

6  **Q.**   Good morning.

7        Good morning, ladies and gentlemen.

8        I would like to begin where we left off yesterday, and

9  with the Court's permission, please display what has been

10  marked as Exhibit 1792, please.

11              (Exhibit published to jury.)

12              **MR. REEVES:**   If we could go to the attachment on

13  page 4.

14  **Q.**   Mr. Sarin, do you recall your testimony yesterday about

15  HP's consideration of multiple possible software acquisitions

16  with code names Tacoma, Atlantis, and Singapore?

17  **A.**   I do.

18  **Q.**   All right.   I think you identified for the record that

19  Tacoma was BitCo?

20  **A.**   TIBCO.

21  **Q.**   And Atlantis was Autonomy?

22  **A.**   Yes.

23  **Q.**   And Singapore was SWAG?

24  **A.**   Software AG.

25  **Q.**   Software AG.   Okay.   Good.

1          In or around this April 2011 time period, what happened

2    amongst these competing considerations amongst the corporate

3    development team between TIBCO, Autonomy, and Software AG?

4    **A.**   So as I was mentioning yesterday, we were quite further

5    down the path with TIBCO.  We had had multiple rounds of

6    discussions with the TIBCO executive management team, several

7    at the HP facilities.  We had built a full financial model

8    around TIBCO, the synergies that HP that would derive should HP

9    own TIBCO.  We had also received approval from the board to

10   make an offer to TIBCO, which we did.

11         As I was discussing yesterday, the two parties couldn't

12   agree on a price, and then we started thinking about other

13   alternatives should HP want to make a bigger play in the

14   software industry.  Names like Atlantis, which is Autonomy,

15   Software AG and some others were discussed.

16         There was then an effort underway to go -- begin initial

17   discussions with several of these potential targets, and that's

18   what we were engaged in.

19   **Q.**   Okay.  So by May 2011 or so, did -- in the manner you've

20   described, did some of the attention of the corporate

21   development team turn more closely to Autonomy and the

22   possibilities of a combination with Autonomy?

23   **A.**   Yes.

24   **Q.**   All right.  So let's focus on that time period.

25         In or around this May 2011 time period, who were some of

1   the other members of your team that were evaluating Autonomy as

2   a possible acquisition?  Who were some of the people you were

3   working with on this work?

4   **A.**   So even before we got to this point, there were several

5   members in HP software that had been thinking about Autonomy as

6   a target for quite some time.  And given that we had already

7   spent a fair bit of time with TIBCO developing a synergy case,

8   we then leveraged a lot of that work and then worked with Marge

9   Breya and Jerome Levadoux, two senior executives from HP

10  software, in fine-tuning our models for the synergy case, for

11  the valuation case.  Those were the two individuals that come

12  to mind.

13  **Q.**   And did you work at all with Mr. Shane Robison?

14  **A.**   We did.  He was the executive sponsor, along with layer of

15  the transaction, and so he was fully apprised of what we were

16  developing.

17  **Q.**   Did you have outside consultants to assist you as we move

18  forward from May into June and July in this evaluation of

19  Autonomy?

20  **A.**   We had hired two investment banking firms, Barclays

21  Capital and Perella Weinberg, and they had been assisting

22  Barclays in fine-tuning our models and I guess Perella also in

23  discussions with executive management around the attractiveness

24  of the various assets we were evaluating.

25  **Q.**   Did you also retain KPMG to provide any advice in this

1   process?

2   **A.**   We did, although that was probably a little bit further

3   down in the process.

4   **Q.**   All right.  And beginning in or around June or so, did you

5   begin to interact directly with people from Autonomy?

6   **A.**   My first interactions with the Autonomy team were in the

7   June 29th meeting in London.  I believe there were other

8   interactions between HP senior management team and the Autonomy

9   team after that meeting, but I met them for the first time on

10  June 29.

11  **Q.**   Who were some of the people that you met on or around

12  June 29th from Autonomy?

13  **A.**   I met Dr. Lynch, Mr. Hussain, Pete Menell and Andy Kanter.

14  **Q.**   All right.  And thereafter, did you begin to have a

15  recurrent, sometimes daily, dialogue with those executives

16  about questions you had around the possibility of an

17  acquisition?

18  **A.**   My daily interactions with the management team happened

19  after the second meeting that we had in London with them, which

20  was July 29th.

21      In between June 29th and July 29th, I had limited

22  interaction with them, so we were still collecting all the

23  information we could from the public domain, fine-tuning our

24  models, and just getting ready for an extensive work around

25  diligence.

1    **Q.**   As part of that, did you review -- withdrawn.

2         Let me show you what has been marked for identification as

3    Exhibit 1808.  This is a May 17, 2011 email to Mr. Sarin and

4    others within HP, subject "Atlantis."

5         I offer it in evidence, please.

6              **THE COURT:**  Admitted.

7              (Trial Exhibit 1808 received in evidence)

8                   (Exhibit published to jury.)

9              **MR. REEVES:**  If we could just highlight the

10   attachments here.  Start withing UBS -- that's fantastic.

11   Thank you very much.

12   **Q.**   Mr. Sarin, in or around this time as part of the work

13   you're doing associated with your evaluation of Autonomy, did

14   you also look at certain analyst reports relating to Autonomy's

15   financial performance?

16   **A.**   I did.

17   **Q.**   Is this an email that is circulating some of those analyst

18   reports in this May 2011 time period?

19   **A.**   Yes, sir.

20   **Q.**   You may have touched on this yesterday, but I'm asking

21   again just to frame things:  Why are you looking closely at the

22   analyst reports?  Why is this helpful to you?

23   **A.**   Yes.  As I was mentioning yesterday, the good part of

24   looking at Autonomy was it was a public company, and public

25   companies need to, you know, report quarterly earnings.  For

**SARIN - DIRECT / REEVES**

1   example, they need to file annual reports.  There is normally a

2   whole host of Wall Street analysts that cover the company.

3   There is independent research firms like Gartner and Forrester

4   that cover the company.  So there is a wealth of information

5   out there.

6       And so what we were trying to do before we spent

7   significant time with the Autonomy team was to read everything

8   that we could lay our hands on in the public domain, and this

9   was, again, not just reading one research report.  If you read

10  multitude of views, you get, let's call it, the wisdom of the

11  crowds in terms of what the Wall Street community in general is

12  thinking about the company.

13  **Q.**   The wisdom of the crowds?

14  **A.**   Yes.

15  **Q.**   All right.  Good.

16      Who are some of the banks that are providing this research

17  that you are evaluating in this time period?

18  **A.**   The ones listed here are UBS, which is a Swiss investment

19  bank; BAML is Bank of America Merrill Lynch; CS is Credit

20  Suisse; MS is Morgan Stanley; and Nomura is a Japanese

21  investment bank.

22  **Q.**   I would like to show you what has been marked for

23  identification as Exhibit 2027.

24      This is a circulation to Mr. Sarin on or about July 27th,

25  2011 of the Autonomy press release earnings release for

```
 1    Q2/2011.  I offer it in evidence.
 2              THE COURT:  Admitted.
 3              (Trial Exhibit 2027 received in evidence)
 4                    (Exhibit published to jury.)
 5    BY MR. REEVES:
 6    Q.   So we are now up to in or around July 27.  I think that is
 7    just before the first meeting you said you had.  Is that about
 8    right?
 9    A.   Say that one more time.
10    Q.   I'm sorry.  I got ahead of myself.
11              THE COURT:  Well, the 2027 --
12              MR. REEVES:  I am going to come back to this in a
13    second.  I'm going to try to do it chronologically.
14              THE COURT:  All right.
15    BY MR. REEVES:
16    Q.   Let's take this down and let's go to the meeting that you
17    described having in London in or around -- I'm sorry.  I have
18    the exhibits in the wrong order.
19         Let me show you what has been marked for identification as
20    Exhibit 1884, please.  This is an email from Mr. Robison to
21    Dr. Lynch, with a copy to you, Mr. Sarin, on or about
22    June 27th, subject, "partnership questions."
23         I offer it into evidence, please.
24              THE COURT:  Admitted.
25              (Trial Exhibit 1884 received in evidence)
```

1          (Exhibit published to jury.)

2    **BY MR. LEACH:**

3    **Q.**    Okay.  Now we are in or around late June, 2011.  Was it at

4    or about that time you had your first meeting with the Autonomy

5    team in London?

6    **A.**    Yes, sir.

7    **Q.**    Is this a -- an email that is being circulated in advance

8    of that meeting?

9    **A.**    Yes.

10   **Q.**    And attached to this email, were there a set of questions

11   that you wanted to cover in the course of the meeting?

12   **A.**    Yes.

13   **Q.**    Okay.  So as you approached this meeting, tell us about

14   the work you're doing and the purpose of the meeting that

15   you're planning for in or around this June 27 to June 29 time

16   frame.  Go ahead.

17   **A.**    Sure.  So I was led to believe there was several

18   discussions between the Autonomy executive management team and

19   the HP executive management team.  The way Mr. Robison

20   described it to us was he wasn't entirely clear if Dr. Lynch

21   had broached the acquisition idea with the rest of his team, so

22   we had put together a list of questions to go understand the

23   Autonomy business, but under the guise of a partnership.

24         So the way this document reads is it is a set of questions

25   trying to elicit a deeper understanding of the Autonomy

1    business, but they're couched as if HP wants to enter into a

2    partnership discussion with Autonomy.

3        I put these questions together, had gotten input from HP

4    software, Marge and Jerome, and sent them to Shane so he could

5    send it to Mike ahead of the meeting.

6    Q.    Let's take a look at those questions and specifically

7    Exhibit 2585, please.  It's the next exhibit.  2585.

8        Is this a set of the Tesla question list that contains

9    your handwritten notations, Mr. Sarin?

10   A.    You said 2585?

11   Q.    2585.

12   A.    You have to give me a minute, please.

13   Q.    Please take your time.

14   A.    No.  These are from the July 29th meeting.

15   Q.    Okay.  We'll save it for July 29th.  You can leave it out,

16   though.

17       So let's go to the meeting on June 29th.  Okay?

18   A.    Uh-huh.

19   Q.    Once you're there, what do you recall happening at the

20   June 29th meeting?

21   A.    So as I was saying, there was four individuals or five

22   individuals from HP:  Mr. Robison, myself, Marge Breya, Jerome,

23   and Patrick Harr, who was representing HP cloud services.

24   There were four individuals from Autonomy:  Dr. Lynch,

25   Mr. Hussain, Pete Menell and Andy Kanter.

1    It was probably a fairly free-flowing conversation over

2  three to four hours.  We covered many aspects of the software

3  industry.

4    Dr. Lynch walked us through what made Autonomy unique, the

5  opportunities in unstructured data management, as I was

6  explaining yesterday, which is the opportunity to derive

7  meaningful intelligence from things like emails, audio/video,

8  which are hard to put in a traditional database.  We covered at

9  a high level again the opportunities that HP would have in that

10  market.

11    Dr. Lynch even walked us through at a high level the new

12  technology around Aurasma that they were developing, and it was

13  all -- it was a very interesting conversation.  Gave us a

14  high-level view of the Autonomy business and the opportunities

15  we could have as a company going forward.

16  **Q.**  Besides Dr. Lynch, who else was present for Autonomy at

17  this meeting?

18  **A.**  Mr. Hussain, Pete Menell, and Andy Kanter.

19  **Q.**  Who did most of the talking on behalf of Autonomy?

20  **A.**  Dr. Lynch probably did 90 percent or more of the talking.

21  **Q.**  Do you recall Mr. Hussain saying anything or making any

22  points in the course of the meeting?

23  **A.**  Not particularly.

24  **Q.**  Okay.  But did he contribute -- you just don't remember

25  about what topics?

1   **A.**   Yeah.  I'm sure he had some comments to make, but I don't

2   remember what they were.

3   **Q.**   After the June 29th, 2011 meeting that you've described,

4   what happened next in terms of your evaluation of Autonomy?

5   **A.**   So we all flew back and again we started updating our

6   models, again just getting ready for what we knew was going to

7   be the next round of discussions.

8        Things took a little bit of time logistically to arrange.

9   We wanted to go back to London in the next few weeks, but I

10  think the Autonomy team had a management off-site, and so the

11  next meeting was four weeks out on July 29th when we met them

12  again.

13  **Q.**   All right.  Let me show you now what I think has already

14  been received in evidence as Exhibit 2027.  This is the July

15  27, 2011 email circulating the Autonomy Q2/2011 earnings

16  announcement.

17                    (Exhibit published to jury.)

18  **BY MR. REEVES:**

19  **Q.**   Do you have that?

20  **A.**   I do.

21  **Q.**   So by in or around July 27, 2011, were you preparing for

22  your second meeting in London with the Autonomy team?

23  **A.**   Yes.

24  **Q.**   All right.  And in advance of that, did you review the Q2

25  results for Autonomy as reflected in this press release?

**SARIN - DIRECT / REEVES**

1   **A.**   Yes.

2   **Q.**   What did you think?

3   **A.**   I thought they were doing phenomenally well.

4   **Q.**   Why did you think that?

5   **A.**   Well, they just delivered Q2/'11 news.  The business was

6   up 16 percent from the same period in the year before, and,

7   again, like I was describing yesterday, if I looked at the

8   revenue piece parts, like the OEM business was growing 27

9   percent, cloud business again up 17 percent, the core IDOL

10  product line was going 13 percent, it all sounded like it was

11  doing really well.

12  **Q.**   Did you rely on the accuracy of the information contained

13  in this earnings release to evaluate Autonomy in the manner

14  you've described?

15  **A.**   Yes.

16          **THE COURT:**   Could you explain why is it called Tesla?

17  **BY MR. REEVES:**

18  **Q.**   Did the project name change at a certain point in your

19  evaluation of Autonomy from Atlantis to Tesla?

20  **A.**   It did.  So after the first meeting, because there was

21  several individuals at HP software that had been involved in

22  the evaluation of the asset, there was some risk, given the

23  size of the acquisition, that word may leak out, and so we

24  changed the code name from Atlantis to Tesla before the second

25  meeting.

1    Q.    Thank you.

2        So now let's go to the second meeting on or around

3    July 29th, 2011, and let me now show you what has been marked

4    for identification as Exhibit 2585, please.

5        Are those your -- are those the questions that were

6    discussed and some of your notes from that meeting?

7    A.    Yes.

8            MR. REEVES:  I offer it in evidence, please.

9            THE COURT:  Admitted.

10           (Trial Exhibit 2585 received in evidence)

11               (Exhibit published to jury.)

12   BY MR. REEVES:

13   Q.    Set this up for us, please, Mr. Sarin.  These are the

14   questions you want to cover in the second meeting.  Did you

15   help prepare these questions?

16   A.    I did.

17   Q.    What was your purpose and what's the overall outline and

18   what's your objective with these questions, please?

19   A.    So if I could just step back, before the second meeting,

20   Mr. Robison had asked the HP team to prepare for a week or ten

21   days' worth of diligence in person in London, and so we had all

22   prepared bags to that effect.

23       I put together this question list, again taking into

24   account both technical questions from the software team, as

25   well as more go-to-market financial questions, and we had sent

1    these to them ahead of time.

2         Right before this meeting was to start, Shane told me that

3    he had agreed with Dr. Lynch that we would only be covering

4    these things at a very high level.  They would not be providing

5    much information at the meeting but would only tell us in what

6    fashion would we get that information over time.

7         And so we would spend a few hours at that meeting just

8    going through these questions and then we would all fly back to

9    California.

10   **Q.**    So in preparation for this meeting, you had planned to

11   stay how long in London?

12   **A.**    Maybe two weeks.  Between a week and two weeks, depending

13   on however much time we needed to go through the diligence.

14   **Q.**    And right when you're about to go to London, you learn

15   that that plan changes?

16   **A.**    No.  When I'm in London.

17   **Q.**    When you're in London, ready to stay for two weeks.

18         And now how long does your trip last for?

19   **A.**    We came back the next day.

20   **Q.**    So one day in London?

21   **A.**    One day in London.

22   **Q.**    Do you know why that -- who was asking for that change or

23   why you couldn't stay longer?

24   **A.**    The way it was described to me is Mr. Robison told the

25   team and I that Dr. Lynch felt if there were several HP people

1    sitting in London, there was a potential, you know, leak risk

2    and that would be damaging to Autonomy.

3         And he felt all the information that we needed and all the

4    questions we had in mind could be covered over the telephone,

5    and so we -- that's what they felt most comfortable with.

6    **Q.**   So was the original plan to actually sit in a conference

7    room directly with executives from Autonomy and work through

8    the questions you had about Autonomy's performance, etc.?

9    **A.**   Yes.

10   **Q.**   And instead, the plan was to return to California and have

11   that discussion by telephone?

12   **A.**   That's what it changed to, yes.

13   **Q.**   Is that what wound up happening?

14   **A.**   Yes.

15   **Q.**   All right.  So you're in London for a shorter period of

16   time in the way you've described.  Nonetheless, you cover some

17   of the questions that are set forth in the Tesla question list

18   in your one meeting, face-to-face meeting, do you not?

19   **A.**   Yeah.  I go through all of these questions one by one.  So

20   it does take us three to four hours to do that.

21        The notes on the side of the questions here where it says

22   "video conference," what they told me is that they would cover

23   that over video conference.  Where it says "doc," that's my

24   shorthand for "document," so they would send us a document to

25   answer that particular question.  Where it says "call," of

1    course that's going to be a telephone call.

2        So we went through all of these questions, and they shared

3    with us in what fashion they would be able to answer the

4    questions in the diligence list.

5    **Q.**   Did they give you substantive answers to your questions or

6    explain how they intended to provide those answers at a later

7    date?

8    **A.**   It was more the latter, how they would provide answers at

9    some later point in time.

10   **Q.**   Let me ask a couple questions about the questions that you

11   had for Autonomy in this time period.

12       Let's look at product development, question number 1.  The

13   question reads, "Please provide an overview of major product

14   categories and new products under development."

15       Why are you asking Autonomy for information about their

16   products?

17   **A.**   So at this time, we have read what is out in the public

18   domain.  So this is research reports.  This is their own annual

19   report.  We have certainly read what Gartner and Forrester, the

20   independent research houses, have written about the company.

21       This is an attempt by us to understand from executive

22   management how do they describe their products, what new things

23   are they working on.

24       You recall at the last meeting on June 29th, for example,

25   we had gotten an initial look at Aurasma, which is the

1    technology that allows you to identify a video and serve it up

2    in realtime.  So it was an augmented reality kind of product,

3    which was very interesting to us.

4        And so this was again an attempt by us to understand from

5    them how were they viewing the market, what new products were

6    they looking to develop such that we could be better informed

7    of the acquisition we were about to make.

8    Q.   One more question about your questions to Autonomy.  If we

9    go down to the so-called "go-to-market, sales and marketing"

10   portion, what does "go-to-market" mean?

11   A.   Go-to-market is a catch-all term that describes not just

12   your sales function, but how do you bring products to market,

13   how do you market your products.  Do you do events?  Do you do

14   trade shows?  Do you do a whole bunch of web marketing?  How do

15   you price your products?  Do you give discounts?  If you give

16   discounts, what sort of discounts do you give?

17       So everything around -- one side of it is developing a

18   product.  This is how do you actually bring it to market and

19   sell it to customers.

20   Q.   And why is that relevant to you?  Withdrawn.

21       Were you interested in a complete understanding of all

22   products that Autonomy had as a result of these questions?  Is

23   that part of what you're inquiring about?

24            MR. MARAIS:  Objection.  Leading.

25            THE COURT:  Sorry?

1          **MR. MARAIS:**  I'm objecting to the leading.

2          **THE COURT:**  Overruled.

3      Go ahead.

4  **BY MR. REEVES:**

5  **Q.**  Do you understand my question?

6  **A.**  Would you repeat that, please.

7  **Q.**  The question goes to efforts by you to get a complete

8  understanding about all products directly from the Autonomy

9  executives that you're talking about.  Was that part of the

10  purpose of your questions, Mr. Sarin?

11  **A.**  Yes.  At no point am I trying to exclude certain products.

12  **Q.**  All right.  Let's -- we'll come back to that in a little

13  bit.

14      Let me show you what has been marked as Exhibit 2046,

15  please.

16      This is a July 29th, 2011 email to Mr. Sarin and

17  Mr. Johnson from Emily Hsiao on or about -- excuse me.

18  Subject, "Tesla equity research and call transcript."

19      I offer it in evidence, please.

20          **THE COURT:**  Admitted.

21      (Trial Exhibit 2046 received in evidence)

22              (Exhibit published to jury.)

23  **BY MR. REEVES:**

24  **Q.**  Mr. Sarin, is this another example of the circulation of

25  research reports within your corporate development team

1    relating to Autonomy?

2    **A.**    Yes.

3    **Q.**    And also there appears to be earnings call transcripts.

4    Is that for the second quarter of 2011, do you believe?

5    **A.**    Yes.

6    **Q.**    All right.  And is this part of your work to research and

7    understand Autonomy in detail?

8    **A.**    Yes.

9    **Q.**    All right.  Thank you.  I'm done with that.

10        I'd like to show you, please, what is marked for

11    identification as Exhibit 2546, please.  This is a calendar

12    entry for August 1 through August 7, 2011.

13        Mr. Sarin, is this for your calendar?

14    **A.**    Just give me one minute.

15        (Witness reviews document.)

16        Yes.

17    **Q.**    Does it reflect your meetings in the course of your due

18    diligence with Autonomy in this time period?

19    **A.**    Yes.  They're not on the screen, though.

20    **Q.**    Thank you.  I'm about to get them on the screen.

21        I offer it into evidence, please.

22            **THE COURT:**  Admitted.

23        (Trial Exhibit 2546 received in evidence)

24            (Exhibit published to jury.)

25    \\\

1    BY MR. REEVES:

2    Q.   Is this your calendar, Mr. Sarin?

3    A.   Yes.

4    Q.   Are there notations about "Tesla finance call, 8:00 a.m.,"

5    for example?

6    A.   Yes.

7    Q.   In or around this time period, did you begin a daily call

8    of any type with the team in Autonomy, including Mr. Hussain?

9    A.   Yes.  So when we came back after the July 29th meeting in

10   London, we went about putting together a diligence plan.  So a

11   lot of the meetings that you see highlighted on the calendar

12   are the ones that we had scheduled.

13       There was -- for the next several days, there was a

14   morning call with Mr. Hussain to cover various aspects of the

15   financials.  You'll see that recurring on several days.

16       There was a noon California-time call between the

17   principals that we had set up, so that would be Mr. Hussain,

18   Dr. Lynch, and Andy Kanter, Shane, Andy Johnson, myself, and

19   Paul Porrini to cover, you know, other germane matters which

20   might be a gating item to the acquisition.

21       Marge and Jerome, who are the two individuals from HP

22   software who I had mentioned earlier, they had set up their own

23   technical diligence sessions which were happening in parallel

24   to the sessions that you see here.

25       So there was a full-fledged diligence plan trying to pull

**SARIN - DIRECT / REEVES**

1  through every aspect of Autonomy's business.

2  **Q.**   Are you familiar with this term, "due diligence"?

3  **A.**   I am.

4  **Q.**   What does that mean?  Is that a sort of corporate legal

5  term associated with evaluation of information for a possible

6  acquisition?

7  **A.**   Yeah.  I think the term broadly refers to trying to

8  develop a fairly deep understanding of a company's business,

9  which would include, as I was saying earlier, products,

10  go-to-market, sales, human resources, contracts, legal aspects.

11  **Q.**   Okay.  Are you doing the best you can to test the

12  reliability of the information that you're given by Autonomy as

13  part of this due diligence process?

14  **A.**   Yes.  And some of it we're trying to test the information

15  they've given to us.  A lot of it is us asking them questions,

16  open-ended questions, to try to understand their business.

17  **Q.**   And did you rely on the accuracy and completeness of the

18  information that you were being provided by Mr. Hussain and the

19  others from Autonomy as part of this due diligence process?

20  **A.**   Yes.

21  **Q.**   Thank you.

22      I'd like to show you, please, what has been marked for

23  identification as Exhibit 2077.  This is an email from

24  Mr. Hussain on or about August 1st, 2011, to you, Mr. Sarin.

25          **THE COURT:**  Admitted.

1          **MR. REEVES:**  Thank you, Your Honor.

2          (Trial Exhibit 2077 received in evidence)

3                (Exhibit published to jury.)

4          **THE WITNESS:**  I need to find it.  One minute.  You

5    said 2077?

6          **THE COURT:**  It's on the screen.

7    **BY MR. REEVES:**

8    **Q.**   Are you comfortable using the screen, Mr. Sarin?

9    **A.**   I would rather see it in paper fashion, if I could.

10   **Q.**   Okay.  Good.

11   **A.**   You said 20 --

12   **Q.**   2077.  Can I show you my copy?

13   **A.**   I don't think it's here.

14   **Q.**   In this time period, did you begin to speak on a daily

15   basis with Mr. Hussain about financial issues relating to the

16   due diligence?

17   **A.**   Yes.

18   **Q.**   And in advance of that, did you circulate your questions

19   and the topic areas that you wanted to cover on these calls?

20   **A.**   Yes.

21   **Q.**   In addition, were there other calls that were going on

22   amongst the teams at Autonomy and at HP happening at other

23   levels and at other times as well?

24   **A.**   Yes.

25   **Q.**   All right.  I think I'm going to need my exhibit back for

1    a second.

2          If we could please go to page 3 of Exhibit 2077.

3          In or around this time period, it looks like you're

4    circulating on July 30th to Mr. Hussain a set of baseline

5    questions or seeking a baseline view.

6          If we look at the second paragraph.  Do you see that?

7          What did you mean by that, Mr. Sarin?

8    **A.**    So this was the first call with Mr. Hussain after we came

9    back from London.  As I was explaining earlier, we had a big

10   team at HP.  There were people in the corporate development

11   team, Varoon and Emily on my team, certainly Andy Johnson.

12   There were individuals from KPMG.  There were individuals from

13   the two investment banks.

14         So this was -- this was my attempt at making sure

15   everybody had a basic understanding of the Autonomy financials

16   before we could spend time digging through the various

17   components either of revenue or in the P&L or the balance

18   sheet.

19         So the first call was really an open-ended call from

20   Mr. Hussain to walk everybody through the Autonomy financials.

21   **Q.**    And did Mr. Hussain do that?

22   **A.**    He did.

23   **Q.**    What are some of the topics he covered in this open-ended

24   call for the other members, the broader members of your team?

25   **A.**    He covered, I believe, the Q2/2011 results, which was the

1   most recent quarter.  Certainly it was the most recent.  Just

2   going from memory, I believe he just walked through that P&L

3   and just gave a high-level overview of the Autonomy financials,

4   starting from revenue going all the way down.

5   **Q.**   I'd like to show you what has been marked for

6   identification as Exhibit 2099.  It looks like an email to you,

7   Mr. Sarin, scheduling the next call, subject "Tesla daily

8   finance call."

9             **THE COURT:**  Admitted.

10            **MR. REEVES:**  Thank you, Your Honor.

11            (Trial Exhibit 2099 received in evidence)

12                  (Exhibit published to jury.)

13   **BY MR. REEVES:**

14   **Q.**   Did you, on a daily basis, circulate call-ins and schedule

15   calls in the manner reflected in Exhibit 2099, Mr. Sarin?

16   **A.**   Yes.

17   **Q.**   Thank you.  I'm done with that.

18        And similarly, did you circulate questions in advance of

19   each of these calls?

20   **A.**   I did.

21   **Q.**   Let me show you what has been marked for identification as

22   Exhibit 2088.  Is this a set of questions for the first call

23   relating to due diligence follow-up?

24        Your Honor, I offer Exhibit 2088 in evidence, which is an

25   email --

 1          THE COURT:  Admitted.

 2          MR. REEVES:  Thank you, Your Honor.

 3          (Trial Exhibit 2088 received in evidence)

 4                  (Exhibit published to jury.)

 5   BY MR. REEVES:

 6   Q.   I think I'm going to use your notes and we'll drill down

 7   on those, but if you're comfortable enough using the screen for

 8   some of the setup documents --

 9   A.   Sure.

10   Q.   -- that might move things along.

11        Are you, in this email, Exhibit 2088 -- are you

12   circulating your questions in advance?

13   A.   Yes.

14   Q.   All right.  Let's go to some of those questions.  I'd like

15   to show you Exhibit 2545.  This might be one you need to look

16   for, Mr. Sarin.

17        Are these your notes on the project Tesla financial due

18   diligence follow-up for that -- the call that's happening on or

19   about August 2nd, 2011?

20   A.   2545?

21   Q.   2545.

22          THE COURT:  Admitted.

23          (Trial Exhibit 2545 received in evidence)

24                  (Exhibit published to jury.)

25   \\\

1    BY MR. REEVES:

2    **Q.**    Why don't we try to use the screen slowly and I'll

3    highlight certain portions.  Would that be okay with you?

4    **A.**    Sure.

5    **Q.**    Okay.  Good.

6        Let's take a look at page 2 of Exhibit 2545, please.  I'm

7    sorry.  Let's go back to page 1 just for the moment.

8        At the very top, it looks like in some very nice

9    handwriting, there is the word "Manish."  Whose handwriting is

10   that?

11   **A.**    Mine.

12   **Q.**    Are these your notes?

13   **A.**    Yes.  I had a tendency -- where many people are faster

14   typing notes, I'm old school, so I just write things by hand

15   and I just annotate things as I go along.

16   **Q.**    Go on.

17   **A.**    Yes.  So these are my notes, and what I would tend to do

18   is, again, write things that are relevant next to the question.

19   And if somebody is giving a lengthier explanation, I might flip

20   over and write on the back.  But most of those notes tend to be

21   handwritten.

22   **Q.**    Do you have a series of these notes for each of these

23   calls in this time period relating to Autonomy?

24   **A.**    I do.

25   **Q.**    All right.  Let's go to page 2, please, and let's

1    highlight the notes at the very top, if we could, please.  And

2    highlight question 1 and sub-question A.  Let's talk a little

3    bit about this.

4        All right.  In this due diligence follow-up call on or

5    about August 2nd, 2011, was that a call in which Mr. Hussain

6    also participated?

7    **A.**   Yes.

8    **Q.**   All right.  And what is the purpose of this call?  What

9    are you -- what are the types of questions that you're pushing

10   on and working through in this call?

11   **A.**   So the prior day on August 1st, we had covered a

12   high-level overview of the business, again bringing the rest of

13   the HP team and our advisers up to speed on the business.

14       So the second call, which was this call, August 2nd, we

15   wanted to start from the top, which is start from revenue, and

16   then go all the way down.

17       And so this call is really all around digging into revenue

18   details for the business.  And so the question that you've

19   highlighted really asks "describe to us the Autonomy business

20   by product," and I've listed out the products the way they've

21   described them in their annual report, so hosted versus SaaS,

22   on prem license versus OEM and appliance, and so the intention

23   here was for us to understand the revenue aspect for each of

24   these products that Autonomy sold.

25   **Q.**   Let's talk closely about the wording of your question.  It

1   begins, "Describe your sales model by product or vertical," and

2   then there's a parenthetical that continues.

3       But on that focus or that part of the question, was your

4   intention to be broad?

5   **A.**   Very much so because in the parenthetical, it says "i.e.,"

6   as in for example, here is what you describe in your annual

7   report, but help me understand the revenue by your product

8   lines, and by "vertical," I mean end-market vertical.

9       Many a times we find that financial services industry --

10  as an example, could be insurance, could be banks -- tend to

11  have a different buying pattern than healthcare, for example,

12  or industrial, so the idea here was as you or as Autonomy

13  begins to describe the revenue for their products, is it any

14  different by the various products or by the various end

15  verticals?  That's what we were trying to get at.

16  **Q.**   Are you trying to leave anything out or are you trying to

17  encompass all products, all revenue-generating products?

18  **A.**   All products.

19  **Q.**   Do you recall what, if anything, Mr. Hussain said about

20  revenue-generating products for Autonomy in this conversation?

21  **A.**   What he -- he covered each one of these, so he did cover

22  the OEM business, he did cover the cloud business, the IDOL

23  product business.  Some of my notes that I've written up

24  address each one of those.

25      The fact that maintenance is very high, and what I mean by

1    maintenance, compliance rate, which is customers tend to

2    keep/renew their maintenance contracts.

3         Services I've written down, which wasn't a big part of

4    their revenue.

5         So he covered all of them.  The way I outlined them here,

6    he covered all of them.

7    **Q.**    Let's go to question 1-A.  You ask, "Do all or only

8    certain arrangements include license, maintenance, professional

9    services, or hosting/subscription?"

10        Why do you ask about all revenue-generating arrangements

11   for Autonomy?

12   **A.**    Sitting where I sit, I don't run the Autonomy business.

13   I'm trying to elicit from Mr. Hussain information around all

14   their products and how revenue is recognized from all their

15   products.

16   **Q.**    If it were the case that in 2010 Autonomy resold hardware

17   manufactured by other hardware manufacturers without any

18   software license or maintenance or services, would that

19   information have been responsive to your question?

20   **A.**    That information should have been responsive -- should

21   have been offered up here.

22   **Q.**    Was it disclosed by Mr. Hussain in this conversation to

23   you if he knew that?

24   **A.**    If he knew that, he didn't disclose it to us.

25   **Q.**    Would that have been relevant to you if Autonomy had been

1   reselling hardware in the tens of millions of dollars

2   generating top-line revenue in 2010 and in Q1/2011 and in

3   Q2/2011 -- would that have been relevant in the context of your

4   discussion about revenue for Autonomy?

5   **A.**   Very relevant.

6   **Q.**   Why would that be so relevant?  Why would that matter?

7   **A.**   Because we wanted to understand the full picture around

8   Autonomy's revenues, and we knew and it's written in their

9   annual report that they sell a small portion of appliances,

10  which we understood to mean Autonomy software preloaded on

11  industry-standard servers, but if you were describing that

12  Autonomy was reselling third-party hardware without any

13  software installed on it, that would have been meaningful and

14  absolutely new news to us.

15  **Q.**   I'd like to show you what has been marked for

16  identification as Exhibit 2112, please.  This is another email

17  scheduling another one of the calls on or about August 3rd,

18  2011, to you, Mr. Sarin.

19          **THE COURT:**  Admitted.

20          (Trial Exhibit 2112 received in evidence)

21              (Exhibit published to jury.)

22  **BY MR. REEVES:**

23  **Q.**   Is this another one of the emails that is scheduling the

24  due diligence calls?  This is a good one to use on the screen.

25  **A.**   Yes.

1   Q.   Okay.  Good.  Thank you.

2       And, again, let me show you what has been marked as

3   Exhibit 2114.  Is this an email circulating the questions for

4   the next day's call on or about August 3rd, 2011, to

5   Mr. Hussain, Mr. Kanter, from you, Mr. Sarin?

6           THE COURT:  Admitted.

7           MR. REEVES:  Thank you, Your Honor.

8       (Trial Exhibit 2114 received in evidence)

9               (Exhibit published to jury.)

10  BY MR. REEVES:

11  Q.   And now you can answer the question using the screen.  Is

12  that what you're doing here?

13  A.   Yes.  It was my standard practice to send to Mr. Hussain

14  questions in the evening California time such that he would

15  have them for the next morning's call.

16  Q.   Very good.

17      And then did you walk through them on the call?

18  A.   I'm sure I did.

19  Q.   Okay.  Good.

20      Let's take a look, if we could, please, at Exhibit 2709.

21  Are these your notes from the August 3rd, 2011 call about cash

22  flows and related questions?

23  A.   2709?

24  Q.   2709.

25      I offer them in evidence, Your Honor.

1           THE COURT:  Admitted.

2    BY MR. REEVES:

3    Q.   Did the system work?

4    A.   Yes.

5    Q.   Okay.  Good.

6    A.   It worked this time.

7    Q.   If we could please display Exhibit 2709.

8           THE COURT:  This is March 22nd.

9           MR. REEVES:  2709.

10          THE WITNESS:  Actually 2709 is what is being displayed

11   and it's what's in the folder.

12          THE COURT:  March 22nd.

13          MR. REEVES:  What is the next exhibit number, please?

14   2988.

15          THE COURT:  What are we doing with 2709?

16          MR. REEVES:  I think we have --

17          THE COURT:  Well, just mark it for identification at

18   this point.

19          MR. REEVES:  Yes.  Hold on one second.  Can I see the

20   exhibit that is marked up here 2709?

21      I'm sorry, Your Honor.  I think we have two exhibits with

22   the same number.  I would like Exhibit 2709 to be in the

23   record.

24          THE COURT:  That's fine.  The number is in the record.

25   But what exhibit is in the record?

SARIN - DIRECT / REEVES

 1              MR. REEVES:  2709 is a --

 2              THE COURT:  The what?

 3              MR. REEVES:  It's a March 2nd, 2011, Halo scheduling

 4   call.

 5              THE COURT:  March?  How are we dealing with March?

 6              MR. MARAIS:  Well, it's before the acquisition,

 7   Your Honor, but Mr. Sarin wasn't on this call, and the

 8   Government may have a witness that was, but not this one.

 9              MR. REEVES:  I withdraw that.  I'm sorry about the

10   confusion.

11              THE COURT:  Okay.

12              MR. REEVES:  I'd like to show the notes for the

13   August 3rd, 2011 call that are marked for identification as

14   Exhibit 2988 --

15              THE COURT:  Wait a minute.  2988.

16              MR. REEVES:  This is -- I'm just going to have to use

17   the hard copy that I have here, Your Honor.

18              THE COURT:  That's fine, but I have to look at it for

19   a minute.

20              MR. REEVES:  I don't think you --

21              THE COURT:  29 -- 29 --

22              MR. REEVES:  I don't think you'll have a copy of it.

23              THE COURT:  That's fine.  I just need to know what

24   we're looking at.  2988 and that's admitted.

25          You don't know what it is?

1        **MR. MARAIS:**  I have never seen it, Your Honor.

2        **MR. REEVES:**  I think you've seen it.

3        **THE COURT:**  What he means when he says he has never

4   seen it is that in preparation for this.

5        **MR. REEVES:**  You've seen it; right?

6        **MR. MARAIS:**  I'm sure it's somewhere in here.  There

7   are 3,000 exhibits, Mr. Reeves.

8        **THE COURT:**  Is there an objection?

9        **MR. MARAIS:**  No, Your Honor.

10        **THE COURT:**  2988 admitted.

11       (Trial Exhibit 2988 received in evidence)

12        **MR. REEVES:**  Could I please use the screen.

13        **THE COURT:**  We are doing the --

14        **MR. REEVES:**  The ELMO, please.

15        **THE COURT:**  The ELMO.  Okay.  So, Mr. Frentzen, get up

16   here.

17        **MR. FRENTZEN:**  Sorry, Your Honor.

18             (Exhibit published to jury.)

19        **MR. REEVES:**  Excellent.  Okay.

20   **Q.**   Is that your name up there, Mr. Manish Sarin?

21   **A.**   It is.

22   **Q.**   Are these your notes from the August 3rd, 2011 due

23   diligence meeting?

24   **A.**   Yes.

25   **Q.**   All right.  Let's take a closer look, if we could, please.

**SARIN - DIRECT / REEVES**

1  All right.  It looks like there are questions on the second

2  call about the subject of cash flow and related questions.  Do

3  you see that?

4  **A.**   I do.

5  **Q.**   I've highlighted a few things that I want to ask you

6  about, including DSOs.  Did you discuss DSOs with Mr. Hussain

7  in this call?

8  **A.**   I did.

9  **Q.**   And what is a DSO again, please?

10  **A.**   A DSO stands for "days sales outstanding," so if you think

11  about how any business works, when you sell a product to a

12  customer, they don't pay you that same day.  You send them an

13  invoice, you give them certain payment terms, could be 30, 60,

14  90, whatever the case may be, and then in your books of record,

15  you show those sales -- the receivables from that is

16  outstanding.  So the customer owes you money, which is

17  receivables, and when you quantify them as the number of days

18  worth of sales that is outstanding, that's what this refers to.

19  **Q.**   Why do you care about that?  Why is that relevant to your

20  evaluation of Autonomy?

21  **A.**   So you recall on August 2nd, we had gone through revenue

22  recognition and revenue broadly speaking for all the product

23  lines and by vertical.  The next call, which is this call, we

24  then wanted to understand balance sheet and cash flow, which

25  are the other two financial statements in any company.  So

1    income statement, balance sheet, and cash flow.

2        The reason cash flow is important is at the end of the

3    day, a business is only worth whatever cash it is producing in

4    selling its products, and we wanted to understand at a high

5    level the cash conversion cycle, so the process that a business

6    goes through from quoting a customer all the way to collecting

7    that cash, and so all the questions here are designed to

8    understand elements of the balance sheet and elements of their

9    cash flow.

10   **Q.**   Do you also ask questions about the aging profile in the

11   course of this conversation and bad debt?

12   **A.**   We do.

13   **Q.**   Okay.  And what, if anything, was -- did Mr. Hussain or

14   the others from Autonomy participating in this call say on the

15   subject of bad debt?

16   **A.**   Can you show me my notes from what I've written?

17   **Q.**   I'm going to show you page 5 of Exhibit 2988.  It's a

18   coveted copy so I'm not going to be able to give it to you, but

19   take a look a this, please, and tell us if this refreshes your

20   recollection about what was said on the subject of bad debt?

21   **A.**   Yes.  Mr. Hussain answered that bad debt is very small.

22   It is less than one percent of all the receivables outstanding,

23   which to me is a hallmark of a very well-run business.  They

24   have checked the credit quality of the customer, and the

25   customers, it sounds like, always pay them.  None of them,

1   actually, not pay them.

2   **Q.**   So not a problem, according to Mr. Hussain?

3   **A.**   No.

4   **Q.**   All right.

5        Was there any discussion about accumulated debts to

6   Autonomy by its value-added resellers?  Did that topic come up

7   when Mr. Hussain was addressing the subject of write-offs and

8   bad debts?

9   **A.**   No.

10  **Q.**   At any point, did he describe to you a need within

11  Autonomy to buy products from its value-added resellers to

12  facilitate the ability of value-added resellers to pay debts to

13  Autonomy?  Did that topic come up?

14  **A.**   No.

15  **Q.**   If it was the case that Autonomy needed to buy products

16  from resellers in the millions of dollars in order to

17  facilitate the ability of the resellers to pay their debts on

18  the value-added reseller license deals that they had with

19  Autonomy, would that have been relevant or important for you to

20  know?

21           **MR. MARAIS:**  Objection, Your Honor.  Compound and

22  argumentive.

23           **THE COURT:**  Overruled.

24           **THE WITNESS:**  Do you mind repeating the question one

25  more time?

1          **THE COURT:**  Why don't you read it back.

2          (Record read as follows:  "Q. If it was the case that

3          Autonomy needed to buy products from resellers in the

4          millions of dollars in order to facilitate the ability

5          of the resellers to pay their debts on the value-added

6          reseller license deals that they had with Autonomy,

7          would that have been relevant or important for you to

8          know?")

9          **THE WITNESS:**  Just to make sure I understand the

10    question, what you are asking is for the reseller to have funds

11    to pay Autonomy for purchase of Autonomy products, Autonomy is

12    looking to buy products from the reseller such that there is

13    flow of funds to the reseller so they can buy Autonomy

14    products?

15    **BY MR. REEVES:**

16    **Q.**    Exactly that, Mr. Sarin.  Did that topic come up?

17    **A.**    Never.

18    **Q.**    Okay.  Would that topic, if it were known to Mr. Hussain,

19    have been relevant to you in your evaluation of Autonomy in the

20    manner that you're going through on this morning as part of

21    your diligence call?

22    **A.**    Yes.

23    **Q.**    Why would that be relevant?  Why would it be relevant to

24    Autonomy -- excuse me -- to HP to know that Autonomy resellers

25    had difficulties repaying their debts and Autonomy had to

1  acquire products from the resellers in order to facilitate

2  their ability to do that?  Why would that be important for you

3  to know?

4  **A.**   It would be important for HP to know the consumption or

5  the buying pattern of Autonomy's products.  Whether it's to the

6  end customers or to the resellers, the fact that, I don't know,

7  some or many, I don't know, resellers have trouble paying for

8  Autonomy's products, which would only imply that they are not

9  able to sell it to the end customer, that would be very

10  meaningful to HP.

11  **Q.**   Why would -- why would an inability to sell all the way

12  through to the end customers for the reseller deals be relevant

13  to HP?

14  **A.**   Because that would tell HP that the implied revenues and

15  sales of the products isn't entirely correct if those products

16  are not finding an end home with a customer.  And if those

17  products do come back to Autonomy one way or the other, then

18  the growth rate that Autonomy is showing for those quarters

19  probably isn't correct either.

20      And if the growth rate isn't the 16 percent or the 21

21  percent, as we were seeing in some of the earlier exhibits,

22  that sort of calls into question what is the true growth rate

23  of the business.

24      And if a business isn't growing, which tells me that there

25  isn't end market demand for the product, then it opens up a can

 1   of worms around what is going on with the business.

 2   **Q.**   Let me show you what has been marked for identification as

 3   Exhibit 2137.  This is another email to Mr. Hussain from

 4   Mr. Sarin on August 4, 2011, subject "Tesla."

 5            **THE COURT:**  Admitted.

 6            (Trial Exhibit 2137 received in evidence)

 7                   (Exhibit published to jury.)

 8   **BY MR. REEVES:**

 9   **Q.**   If we could please display that.

10        Do you recognize this email, Mr. Sarin?

11   **A.**   I do.

12   **Q.**   Okay.  On or around August 4th, did you have a discussion

13   with Mr. Hussain and others from Autonomy about a financial

14   model that you were working on at HP?

15   **A.**   I did.

16   **Q.**   Why don't you please describe the context in which you had

17   this particular call on or around August 4th, 2011.  What was

18   happening?

19   **A.**   So when the HP team and I -- we were in London for the

20   July 29th meeting, which is the second meeting with Autonomy.

21   I had asked Mr. Hussain if they had a three-year financial

22   plan.

23        Many companies do because if you are a public company of

24   any scale, you tend to plan ahead of time, and particularly an

25   enterprise software where it takes up to 12 months to get sales

1    reps productive, you need to be on board in headcount well

2    ahead of entering a new fiscal year.

3         Dr. Lynch and Mr. Hussain said they did not have a

4    three-year plan.  They were a very innovative, fast-moving

5    company, so they didn't spend any time building a three-year

6    plan.

7    **Q.**   Were you surprised by that?

8    **A.**   I was surprised by it.

9    **Q.**   Why were you surprised?

10   **A.**   Because a company that did 870 million in the prior year

11   probably had some sense for what -- not a three -- not a

12   ten-year goal, but what was their three-year plan, what was

13   their -- how were they going to grow their business in the next

14   two to three years.  So I was surprised they didn't have

15   anything to that effect.

16        And in sort of just taking that as the final answer, what

17   I had offered up to Mr. Hussain was we would walk him through

18   the HP model.  That way we would get comfort around some of the

19   assumptions we were using in the HP model around their

20   financials, particularly, you know, elements of revenue as I've

21   said earlier.  Because to build any financial model, you need

22   to incorporate things like growth rates, gross margin, which is

23   the profit that the company derives after cost of goods has

24   been taken out.

25        I don't remember walking him through the OPEX line items,

1  but the whole idea was if I could at least have him opine on

2  the assumptions that go into the HP financial model, that would

3  give us a lot more comfort then because we didn't have their

4  three-year plan.

5  **Q.**  So because Autonomy didn't have a financial model, you

6  actually, within HP, prepared a financial model relating to

7  Autonomy?

8  **A.**  We were going to prepare that anyways.  Usually what

9  happens, you don't share your financial plan with the target.

10  We might have a different view around their future performance,

11  but given that there was nothing to rely upon here, the next

12  best thing was to walk Mr. Hussain through our own financial

13  model.

14  **Q.**  And did that happen?

15  **A.**  It did.

16  **Q.**  All right.  So there's a discussion, and during the

17  discussion, are you looking at the financial model?

18  **A.**  I am.

19  **Q.**  And if you're in California and Mr. Hussain is in the UK,

20  how did you accomplish that?

21  **A.**  So HP had -- one of the facilities available to us was

22  what was a proprietary HP product called Halo.  It is very

23  similar to using WebEx or GoToMeeting.  It's kind of a video

24  conference system, so it allows the recipient on the other side

25  to see whatever document you're sharing with them.

1    **Q.**   Is that what you used?

2    **A.**   I believe so.

3    **Q.**   All right.  Let me show you what has been marked as

4    Exhibit 2547.

5        Is this a set of your notes of the conversation that you

6    had with Mr. Hussain and others at Autonomy on or around

7    August 4th, 2011, about the financial model?

8            **THE COURT:**  Admitted.

9            (Trial Exhibit 2547 received in evidence)

10               (Exhibit published to jury.)

11   **BY MR. REEVES:**

12   **Q.**   If you use the screen -- these are short enough so that

13   maybe you'll be comfortable using the screen, Mr. Sarin.

14   **A.**   I did find it.

15   **Q.**   Okay.  Good.

16       Do you recognize these notes?

17   **A.**   I do.

18   **Q.**   All right.  Let's use them to go through the conversation

19   that you had with Mr. Hussain about the financial model.

20       You're looking at the model on the Halo.  He is looking at

21   the model on the Halo.  What was said?

22   **A.**   So starting from the first bullet down, so you recall we

23   are now in August of 2011.  So they finished fiscal year 2010

24   at 870 million in revenues.  Two quarters of 2011 have been

25   publicly announced, so we are now trying to figure out the

1    other two quarters of 2011 and where they would end up for that

2    fiscal year and then fiscal year '12 and then from there on

3    out.

4        Most financial models tend to at least go for five years

5    so you can get a sense for what would the business do, again,

6    not saying that people need to have a crystal ball, but they

7    would at least have a gut feeling for what the business would

8    accomplish in the next few years.

9        So the first bullet here relates to revenue consensus at

10   1.05 billion.

11   **Q.**   That's per the remainder of 2011?

12   **A.**   That's for the remainder of 2011.

13   **Q.**   Go on.

14   **A.**   And consensus really means for any public company which is

15   covered by Wall Street analysts, each analyst will put out an

16   estimate of what they believe the company will do in that year.

17   A lot of it is driven by the company guidance, so the company

18   would guide to the next quarter, for example, and many a times

19   they might give a full year guidance.

20       And when you take the average across the analyst

21   community, that is -- that number is called the consensus

22   number, which is back to, you know, the wisdom of the crowds,

23   as I was saying earlier.

24   **Q.**   What did Mr. Hussain say about the consensus number of

25   1.05 billion for revenue for Autonomy in fiscal year 2011?

SARIN - DIRECT / REEVES

**A.**   Mr. Hussain said what I've written in the parenthetical there, that "believe that is a little bit behind what Autonomy will accomplish on its own."

**Q.**   It will do even better, according to Mr. Hussain?

**A.**   It should do even better.  So that's where I have written down my three sub bullets.  So the number could be a little higher.

I had also walked him through -- looking at the way they had described their product lines in the public filings, we had put together what would be revenue numbers for license, which is the IDOL product, the cloud business, the OEM business.  The services business was very small so we didn't -- I didn't specifically worry about calling that out here.  So I walked him through my model on the license numbers, and he said it is reasonable and he said the same for cloud and OEM.

And then he said -- if you look at the UBS report, which is at 1.06 billion, he said that is probably closest to what Autonomy would end up doing.

**Q.**   Let me show you now, if I could, please, the financial model marked for identification as Exhibit 2289.

This is an Excel spreadsheet, Your Honor.  And I think the witness has reviewed this in advance.  And I'd like to display it on the screen.

**THE COURT:**  Admitted.

(Trial Exhibit 2289 received in evidence)

1          (Exhibit published to jury.)

2   **BY MR. REEVES:**

3   **Q.**   Is this a copy on the screen, Mr. Sarin, of the financial

4   model that you used with Mr. Hussain in your August 4th, 2011

5   conversation?

6   **A.**   Yes.

7   **Q.**   All right.  So let's take a look at -- so you're modeling

8   the future performance of Autonomy, are you not?

9   **A.**   I am.

10  **Q.**   Okay.  And working through your assumptions in the manner

11  you've described with Mr. Hussain?

12  **A.**   Yes.

13  **Q.**   And he's agreeing with the modeling that you've done in

14  the way you've described your conversation?

15  **A.**   Yes.  And I'm -- I'm walking him through the model.

16  **Q.**   All right.  Why don't you walk us through -- withdrawn.

17          Let me set up a little bit more -- it looks like your

18  model has notations for 2010 and then the first two quarters of

19  2011 in blue.  Do you see that?

20  **A.**   I do.

21  **Q.**   What is meant by those figures in blue?  Why are they in

22  blue?

23  **A.**   The methodology, when you build any financial model, is

24  all the inputs are done in blue so you know that's what

25  somebody keyed in.  So if you just click on any one of those

1  cells, you will see it has a hard quoted number.  There is no

2  formula or math behind it.

3      As you then project out for the rest of the financial

4  model, those numbers tend to be in black because there is --

5  they're driven by a formula, and you tend to write out all the

6  assumptions underneath so it's easy to follow what's driving

7  that revenue number.

8  **Q.**  So were these the historically-reported numbers for

9  Autonomy, according to its financial statements, for the four

10  quarters of 2010 and the two quarters of 2011?

11  **A.**  Yes.

12  **Q.**  Are the inputs in your model here based on the financial

13  reporting that Autonomy disseminated to the public, including

14  HP?

15  **A.**  Yes.

16  **Q.**  Did you rely on the accuracy and completeness and

17  truthfulness of those financial figures to prepare your

18  financial model?

19  **A.**  Yes.

20  **Q.**  You go through, then, the product categories that are

21  listed on the left here, do you not?

22  **A.**  I do.

23  **Q.**  Were you endeavoring to account for one hundred percent of

24  the revenue-generating products at Autonomy?

25  **A.**  Yes.

SARIN - DIRECT / REEVES

1    Q.   In order to model out how they might work after an

2    acquisition and how they might perform over time into the

3    future?

4    A.   Yes.

5    Q.   All right.  Let's -- and what are the product categories

6    that you went through with Mr. Hussain?

7    A.   So I went through four categories here.  So IDOL product

8    license, which I've listed down as "license" in my handwritten

9    notes; IDOL cloud, which is the "cloud" annotation in my notes;

10   OEM, which is also written down in my notes; and then

11   maintenance.  I walked him through the formula that I was using

12   to project out maintenance, and I distinctly remember

13   Mr. Hussain saying that's a clever way of doing it and he was

14   fine with that number and the full total number, too.

15   Q.   Mr. Hussain complimented you?

16   A.   That's what I member.

17   Q.   And he complimented you about your modeling around

18   maintenance?  Is that what you said?

19   A.   Yes.

20   Q.   Go on.  Then you come down to "services."  Is that a piece

21   of the puzzle here?

22   A.   Yes.  Given the services are such a small number, I'm not

23   sure if I bothered to get Mr. Hussain's input on the services

24   number.  But I did go through all the other piece parts of

25   revenue.

1    **Q.**    It's a small number for services, but are you trying to

2    account for one hundred percent of Autonomy's

3    revenue-generating products?

4    **A.**    Absolutely.

5    **Q.**    And you walked through each of those products in the

6    manner you've described directly with Mr. Hussain?

7    **A.**    Yes.

8    **Q.**    I would like to ask you a few more questions about

9    services.

10        The services, according to the financial reporting for

11    Autonomy in Q1/2011, were what?

12    **A.**    Nine million.

13    **Q.**    Nine million.  Okay.  That's a small number.  That's one

14    of the reasons you didn't dwell on it in your discussion?

15    **A.**    Right.

16    **Q.**    All right.  If it were the case that in this very quarter,

17    Q1/2011, Autonomy had resold at a loss approximately 20 million

18    in hardware, would that have been relevant to your evaluation

19    of Autonomy's products, revenue-generating products, in your

20    financial model?

21    **A.**    It would have been.  It would have been almost ten percent

22    of the revenues in the quarter.

23    **Q.**    Okay.

24    **A.**    So that would be very relevant.

25    **Q.**    If Mr. Hussain knew that, did he disclose it to you when

1  you walked through these products using this model in the

2  manner you've described?

3  **A.**   No.

4  **Q.**   He did not say anything about that, if he knew that?

5  **A.**   About reselling third-party hardware at a loss?

6  **Q.**   20 million of it.

7  **A.**   No.

8  **Q.**   The topic didn't come up?

9  **A.**   No.

10 **Q.**   All right.  Let's go to Q2.

11     What's the service revenue in Q2/2011, according to the

12 financial reporting for Autonomy?

13 **A.**   8.8 million.

14 **Q.**   In your conversation with Mr. Hussain as you're going

15 through the financial model and accounting for one hundred

16 percent of the revenue-generating products for Autonomy, did

17 Mr. Hussain disclose to you that Autonomy had just, in the

18 quarter that is just ended, resold at a loss approximately

19 $20 million in hardware?  Did that come up?

20 **A.**   No.

21 **Q.**   Would that have mattered to you if it had?

22 **A.**   Very much so.

23 **Q.**   Why would it be -- why would it matter very much,

24 Mr. Sarin?

25 **A.**   Because these numbers that you're quoting are big enough

1  to be material.  We are trying to ascertain all the revenue

2  elements of Autonomy.  This is taken directly from their public

3  filings.  If there is information that is not captured in the

4  public filings but Mr. Hussain is viewing my model and he sees

5  that I've missed that information, that would be the time for

6  him to let me know that.

7  **Q.**  And that didn't happen?

8  **A.**  It didn't.

9  **Q.**  I'd like to show you, please, what is marked for

10  identification --

11       **THE COURT:**  Before we leave this, I notice that, at

12  least in my copy, when you go to Q3 and Q4 for 2011, it's in

13  green.  What is the significance of green?

14       **THE WITNESS:**  Versus black, Your Honor?

15       **THE COURT:**  Sorry?

16       **MR. REEVES:**  Versus black, yes.

17       **THE COURT:**  Versus black and versus blue and versus

18  any other color.  Why is it green?  I don't mean that you

19  picked green for aesthetic reasons.  I mean that there is --

20  it's a different color.

21       **THE WITNESS:**  Yes, sir.  So the blue -- and if you

22  wouldn't mind just clicking on any of the blue ones, you would

23  note that it is just a number that is punched in.

24       If you click on the green one right next to it, so let's

25  say the 9.5, this goes to a tab called revenue -- "rev spread"

1   and it might be helpful to look at that tab.

2        So all that is, is it is a -- by individual in a Wall

3   Street bank, it lists out what they're saying Autonomy would do

4   in that particular quarter.

5             THE COURT:  So it's an expectation?

6             THE WITNESS:  It is an expectation.

7             THE COURT:  Okay.

8             THE WITNESS:  And then the projections from there are

9   in black because they're driven by a formula, so the green is

10  just linking to another tab, the blue is hard-coded, and the

11  black is projections.

12            THE COURT:  And a projection is something that isn't

13  necessarily based upon either some consensus of Wall Street

14  or -- it's basically based upon the model that you have

15  created, and therefore it yields that particular number?

16            THE WITNESS:  Yes, sir.

17       And if counsel would allow, those are some of the other

18  questions I had asked to validate the assumptions driving the

19  future growth of the business.

20            THE COURT:  Well, that's up to counsel.

21       Let me ask a different question now.

22            THE WITNESS:  Yes, sir.

23            THE COURT:  You have testified about hardware sales.

24            THE WITNESS:  Yes.

25            THE COURT:  Okay.  Looking at -- let's deal with the

**SARIN - DIRECT / REEVES**

1  blue.

2  **THE WITNESS:**  Sure.

3  **THE COURT:**  Okay.  Looking at these different revenue

4  categories, is there a category that captures hardware sales?

5  Profit/loss makes no difference.  It's a revenue; right?

6  **THE WITNESS:**  Right.  So in Autonomy's annual report,

7  they talk about appliances and they say it is a very small

8  number.  I had asked Mr. Hussain, when we began this, this

9  doesn't capture appliances, and he had said it's a small number

10  and therefore it's insignificant, so we didn't delve into it.

11  An appliance is industry-standard hardware so it could be

12  Dell, it could be HP, any hardware where you load your own

13  software on it, and because it was considered small and

14  confirmed as such, it wasn't listed here.

15  **THE COURT:**  Okay.  So let me ask a different question.

16  So since it's not on this chart, let's take -- it says

17  revenue -- take Q2.  It says 22.1.  Do you see that?  Total

18  revenues.

19  **THE WITNESS:**  221.

20  **THE COURT:**  Million.

21  **THE WITNESS:**  Yes.

22  **THE COURT:**  So you say look, looking at various

23  documents historically and so forth, revenues are 221.  Okay.

24  But it was your understanding that that wasn't a complete

25  picture of all of the revenues; is that right?  Because it

1    didn't include such things as appliances.  Even though it may

2    be small, it's not the same -- it's not the accurate total.

3             THE WITNESS:  No.

4             THE COURT:  Do you understand my question?

5             THE WITNESS:  I do.  Your question is the 221 isn't

6    the complete revenue --

7             THE COURT:  Yeah.  I mean, a company reports its

8    revenues.

9             THE WITNESS:  Right.

10            THE COURT:  It reports its revenues.  You look at the

11   reports and so forth that we've had three thousand documents

12   with -- that's an exaggeration.  We have had many documents

13   that say "the revenues this quarter were X."  Okay.

14        So if it did say -- what I'm trying to figure out, is the

15   221 something that the company said "the revenues this quarter

16   are 221" or is the 221 some other figure --

17            THE WITNESS:  Yes.

18            THE COURT:  -- other than the total figure?

19            THE WITNESS:  No.  The 221 is the total figure.  That

20   is the publicly-reported full revenue.  It does not omit

21   anything.

22        What I'm trying to say is the appliance piece, which is

23   small, is buried in any of the other numbers that adds up to

24   221.

25            THE COURT:  I got it.  Okay.  So if I add this up,

 1   which of course I'm not about to do -- but if I add it up, I'm

 2   going to get 221; right?

 3              THE WITNESS:  Yes, sir.  It's shown on the bottom of

 4   the exhibit.

 5              THE COURT:  All right.  That is going to be consistent

 6   with a report of the company, a publicly -- and the answer is

 7   that somewhere in these categories, the appliance figure has

 8   been incorporated?

 9              THE WITNESS:  Yes, sir.

10              THE COURT:  Right?

11              THE WITNESS:  Yes.

12              THE COURT:  Okay.  Thank you.

13              MR. REEVES:  Thank you, Your Honor.

14       I have a couple more questions on this very topic and

15   maybe we can take a break after that.

16              THE COURT:  Okay.

17   BY MR. REEVES:

18   Q.   Following up on the Court's questions, Mr. Sarin --

19              THE COURT:  By the way, ladies and gentlemen, just

20   because I ask questions doesn't mean anything in terms of what

21   I think of the evidence or what it means and so forth.  I just

22   am asking the question to get some clarification in my mind,

23   which I think may be helpful to the jury.  But do not take any

24   inference one way or the other as to what I believe the

25   significance of the responses are.  Okay.  That's for you to

1    decide, not for the Court.

2    **BY MR. REEVES:**

3    **Q.**    How much time and effort did you put into the work around

4    the financial model that you've described using in this

5    process, Mr. Sarin?  Is this a lot of work?

6    **A.**    This was a ton of work for me, Emily, and Varoon.  We

7    spent many weeks working on the model.

8    **Q.**    Are you trying to do it as carefully and with as much

9    precision and thought and analysis as you can?

10   **A.**    Yes, sir.

11   **Q.**    All right.

12         Now, in your efforts here, are your -- is your modeling

13   designed to account for one hundred percent of Autonomy's

14   revenue-generating products?

15   **A.**    Yes.

16   **Q.**    And model it out over the future, going from the

17   historical blue to the future-oriented green and black numbers,

18   so to speak; yes?

19   **A.**    Yes.

20   **Q.**    All right.

21         If it was the case, focusing on 2010, that Autonomy resold

22   $99 million, approximately, in hardware at a loss, hardware

23   that was not an appliance, reselling hardware manufactured by

24   other major hardware manufacturers, is that something that

25   would be relevant to your analysis and modeling of Autonomy and

1    its revenue-generating products?

2    **A.**    That would be very relevant because your number of

3    99 million, if I divide by 870 million in total revenues, would

4    be close to 13, maybe 15 percent of total revenues.  It would

5    be very germane to our analysis.

6    **Q.**    Help us understand why that would be so germane.

7    **A.**    We're trying to project out revenue for all product lines.

8    And I'm sure we will go through the various assumptions that

9    underlie the growth rates of the various product lines and the

10   margins associated with them.

11       The model is built on 90 percent margins, which is after

12   you've sold that product, what do you get to pay for other

13   costs in the business:  The sales and marketing costs, the cost

14   to run your office.

15       So a software business, which is what this is, if you get

16   90 percent gross margins, if they were reselling hardware at a

17   loss, those margins would be incorrect because they're not

18   selling it at a profit, whereas we assume they're selling it at

19   90 percent gross margin.

20       If that is to the tune, as you outlined, 15 odd percent of

21   the business, that would call into question the validity of the

22   financial model in terms of what this is projecting for the

23   future performance of the business, and as I was saying

24   earlier, all financial models, the way we derive valuation, it

25   is driven by the cash that the business produces to the benefit

1    of its shareholders for future performance that you then

2    discount back using a weighted average discount rate to get to

3    what would be considered fair value for that business in

4    today's terms.

5        So to the extent there was significant hardware being sold

6    here at a loss, that would jeopardize the financial results

7    that this model is showing, which would have a detrimental

8    effect on the valuation of the business.

9    **Q.**    Last question:  And as you went through the product

10   categories with Mr. Hussain using the Halo, using the financial

11   model in the manner you've described, and the care with which

12   you went through each of those products, do you recall

13   Mr. Hussain saying anything to you about Autonomy's reselling

14   hardware at a loss to generate top-line revenue -- if that's

15   something he knew?  Did he ever say anything about that?

16   **A.**    No.

17        **MR. REEVES:**  This might be a good place to stop.

18        **THE COURT:**  Ladies and gentlemen, we are going to take

19   our recess.  We will be in recess until a quarter to 11:00.

20       Remember the admonition given to you:  Don't discuss the

21   case, allow anyone to discuss it with you, form or express any

22   opinion.

23              (Recess taken at 10:26 a.m.)

24            (Proceedings resumed at 10:45 a.m.)

25        (Proceedings were heard out of the presence of the jury:)

1    **MR. REEVES:**  Your Honor, we had a very brief thing to

2    put on the record, please.

3    **THE COURT:**  Let the record reflect the jurors aren't

4    present.

5    Go ahead.

6    **MR. FRENTZEN:**  Your Honor, I don't think this is a big

7    deal but just in case anybody wants anything said about it to

8    the jurors, I was on a cell phone call on an unrelated case.

9    One of the jurors came around the corner while I was on the

10   cell phone.  I realized it as she was walking by.

11   I was having a conversation about an unrelated case.  The

12   subject matter I think she would recognize was unrelated; but

13   if anybody wanted a repetition of, you know, whatever, on the

14   outside -- if she thinks I only have one case, I don't think

15   so.  Anyway, I just didn't want to leave it unsaid.

16   **THE COURT:**  Why don't you just tell the -- you don't

17   have to put it on the record, but go tell the Defense what you

18   were talking about, what case and so forth.

19   Okay.  I mean, you weren't saying things, like -- I'm not

20   going to speculate --

21   **MR. KEKER:**  He probably was.

22   (Laughter)

23   **MR. KEKER:**  Anyway --

24   **THE COURT:**  -- "Hanging is too good," that sort of

25   thing, for this person.

1          Okay.  Are we ready to proceed?

2               MR. REEVES:  Yes, Your Honor.

3               THE COURT:  Okay.  Bring in the witness and bring in

4     the jury.

5               MR. REEVES:  We spent some time on the exhibits so I

6     hope we don't --

7               THE COURT:  Pardon?

8               MR. REEVES:  We spent some time fixing the exhibits.

9               THE COURT:  Oh.  That's always helpful.

10              MR. REEVES:  I agree.

11         (Proceedings were heard in the presence of the jury:)

12              THE COURT:  Please be seated.

13         Okay.  Let the record reflect all jurors are present, the

14    parties are present.

15         You may proceed.

16              MR. REEVES:  Thank you, Your Honor.

17    Q.   Mr. Sarin, I'd like to show you what has been marked as

18    Exhibit 2128.  We did a little work on the exhibits during the

19    break, so I hope we'll have an easier time.  Was it right on

20    top?

21    A.   Uh-huh.

22    Q.   Okay.

23              MR. REEVES:  Thanks, guys.

24              THE COURT:  Admitted.

25         (Trial Exhibit 2128 received in evidence)

1   BY MR. REEVES:

2   Q.   If we could please display this e-mail to Mr. Kanter from

3   you, Mr. Sarin, on or about August 3rd, 2011, Exhibit 2128.

4        All right.  Did you have a -- are you circulating a

5   question list for a call about sales and go-to-market overview?

6   A.   Yes.

7   Q.   All right.  And that was part of your normal procedure?

8   A.   Yes.

9   Q.   Let me show you now what has been marked as

10  Exhibit 2728 [sic].  Are these your notes of that call?

11           THE COURT:  Admitted.

12       (Trial Exhibit 2718 received in evidence)

13           MR. REEVES:  Thank you, Your Honor.

14           THE WITNESS:  2718, yes, those are my notes.

15  BY MR. REEVES:

16  Q.   2718.  2718.  Do you recognize those notes?

17  A.   I do.

18  Q.   Okay.  And let's first -- before we go through the notes

19  or talk about the notes, let's talk about the questions.

20       If we could go to page 3 of the Exhibit 2718, there are

21  questions about go-to-market.  And let's drop down just a

22  little bit.  That's great right there.  And let's highlight

23  question 4(b), please.

24       Okay.  So on or around August 4th, 2011, did you have a

25  discussion with Mr. Hussain and others from Autonomy about

1  sales and go-to-market?

2  **A.**   Yes.

3  **Q.**   Okay.  Take a moment and tell us what you remember

4  covering in this particular call with Mr. Hussain.

5  **A.**   So I think this, as you follow the sequence of calls, we

6  started with the financial overview calls, spent time going

7  through the revenue details by product, then spent time going

8  through the cash flow and balance sheet.

9       This was then bringing it full circle looking at or asking

10  questions around the go-to-market, which is how do you sell

11  your products, as I was saying earlier, what discounts do you

12  give, what prices do you get, so that we could form a full

13  picture of the business.

14       The questions here in 4(b), as you highlight, is trying to

15  understand the sales cycle overview.  And what I mean by "sales

16  cycle" is how early on in the process do you engage with either

17  the end customer or the reseller and then you sort of bring it

18  back full circle how quickly do you get paid, so you have the

19  full cycle.

20       And so we wanted to just get a complete picture through

21  that question.

22  **Q.**   Okay.  And what, if anything, do you recall Mr. Hussain

23  saying about the sales cycle relating to Autonomy's use of

24  value-added resellers?  Anything unusual or anything about that

25  that you recall?

1   **A.**   I only recall what I've written down in my notes, and my

2   notes don't reflect anything out of the ordinary for how they

3   conducted business.

4   **Q.**   Okay.  Was there any discussion, if you recall, by

5   Mr. Hussain about the extent to which Autonomy used value-added

6   resellers at the very end of the quarter, maybe on the last day

7   of the quarter, when Autonomy salespeople had been unable to

8   sell through to the end user?  Did that -- did Mr. Hussain, if

9   you knew that, raise that with you in the call?

10   **A.**   Just so I understand the question, did he raise with me

11   the topic that to the extent they're unable to meet their

12   numbers for the quarter, they engaged in talking with

13   value-added resellers at the end of the quarter?

14   **Q.**   On the very last day of the quarter, for example.

15   **A.**   No.

16   **Q.**   Okay.  Would that issue, if it's coupled with an inability

17   to actually close a sale to the end user within the quarter,

18   have been relevant to you in your discussion about sales and

19   go-to-market?

20   **A.**   Yes.  It would have told me that they would have been

21   unable to meet the -- well, not just the external expectations

22   for the quarter but most likely even their internal plans; and

23   that would mean, if you follow that logic through, they would

24   underperform based on what the Wall Street community was

25   expecting them to do, which would certainly have a detrimental

1   effect on how they're perceived in the market and most

2   certainly their stock price.

3   **Q.**   Thank you.

4       I'd like to show you what is marked for identification as

5   Exhibit 2143.  This is an e-mail from you, Mr. Sarin, to

6   Mr. Hussain on or about August 4th, 2011.

7               **THE COURT:**  Admitted.

8       (Trial Exhibit 2143 received in evidence)

9               **MR. REEVES:**  Thank you, Your Honor.

10  **Q.**   Are these more follow-up items that you are reaching out

11  to Mr. Hussain about during this week in August?

12  **A.**   (Witness examines document.)  Yes.

13  **Q.**   Do those include D&T auditor work papers?  Do you see

14  that?

15  **A.**   I do.

16  **Q.**   What are you asking about here, Mr. Sarin?

17  **A.**   So "D&T" stands for Deloitte and Touche, which is their

18  outside audit firm.  The way auditors work is, as they complete

19  their processes, they maintain a set of work papers which

20  informs certainly the various people involved in the audit all

21  the processes that the auditors went through to reconfirm the

22  veracity of the financial statements.

23      And so what we were looking for here is -- we had

24  certainly done a fair bit of verbal diligence.  What would have

25  been very helpful is to look at the work that was done by their

1  external auditors to confirm their financial statements.  That

2  would give us a lot of comfort that these financial statements

3  were true and correct.

4  **Q.**    Was Mr. Hussain and Autonomy able to provide the auditor

5  work papers to you?

6  **A.**    No.  They refused to provide them.

7  **Q.**    Okay.  Did you work out some type of workaround with

8  regard to their refusal?

9  **A.**    We asked them repeatedly for several days.  This was the

10  noon call that I said earlier between the principals at

11  Autonomy and the senior management at HP.

12      And because they had always pushed back, we -- we felt the

13  only workaround would be if we and our adviser KPMG was to talk

14  with the Deloitte and -- Deloitte team themselves.  That would

15  be, you know, just talking with the auditors directly would

16  give us a lot of color commentary around the financial

17  statements that we were hoping to get by looking at the work

18  papers.

19  **Q.**    Okay.  And did you eventually have such a conversation?

20  **A.**    We did.

21  **Q.**    I'd like to show you what has been marked for

22  identification as Exhibit 2152.  This is an e-mail to Mr. Sarin

23  from within HP on or about August 5th, 2011, "Subject:  Tesla."

24      **MR. MARAIS:**  Your Honor, I'm going to object to the

25  document as hearsay.  I imagine Mr. Reeves intends to introduce

 1  this out-of-court statement for the truth of the matters

 2  asserted in it.

 3          **MR. REEVES:**  I intend to introduce this as a business

 4  record of HP, Your Honor.

 5          **THE COURT:**  Well, let me look at it.  2152?

 6          **MR. REEVES:**  2152 about the top 40 contracts and the

 7  requests being made by Autonomy -- excuse me -- HP to Autonomy.

 8          **THE COURT:**  Let me look at it.

 9                      (Pause in proceedings.)

10          **MR. REEVES:**  2152.

11                      (Pause in proceedings.)

12          **MR. MARAIS:**  Your Honor, I think the fact that

13  Mr. Reeves is citing the business records exception means we

14  all agree that the document is hearsay.  If he wants to call

15  Mr. Binns to testify about whether he regularly keeps these

16  documents in the course of his business conduct, we're happy to

17  cross-examine him.

18          **THE COURT:**  Well, it starts -- my copy starts with an

19  e-mail of August 4th.

20          **MR. REEVES:**  Oh.

21          **THE COURT:**  What is it that -- which of these

22  e-mails -- there are three or four -- that you're intending to

23  introduce?

24          **MR. REEVES:**  I have Exhibit 2152, page 1, I think it's

25  a one page e-mail on August 5th, Your Honor.  I can show you my

 1    copy if you'd like.

 2              **THE COURT:**  Okay.  No, no.  I have it.

 3              **MR. REEVES:**  Okay.

 4              **THE COURT:**  So it starts out it is from Mr. Binns to

 5    the witness.

 6              **MR. REEVES:**  It is from Mr. Binns to the witness,

 7    "Subject:  Tesla," about the top 40 contracts and top 40

 8    customers.

 9              **THE COURT:**  Okay.

10              **MR. MARAIS:**  I don't disagree with the description,

11    Your Honor, but it is still hearsay.

12              **THE COURT:**  Well, it's not being introduced for the

13    truth of the matter.  It's being introduced as documents that

14    he has examined, whether they're accurate or not, in coming to

15    any conclusions that he came to.

16              **MR. REEVES:**  That would be fine, Your Honor.

17              **MR. MARAIS:**  Your Honor, if I may.

18              **THE COURT:**  Yes, go ahead.

19              **MR. MARAIS:**  I think that Mr. Reeves intends to use

20    this document to put into evidence Mr. Binns' understanding of

21    what was happening.  Mr. Binns isn't here.  He's not on the

22    Government's witness list.

23              **THE COURT:**  Well, okay.  I'm going to allow it in

24    subject to a motion to strike, and I'll have to deal with it

25    after hearing the testimony about it.

1          (Trial Exhibit 2152 received in evidence)

2              **MR. REEVES:**  Thank you, Your Honor.

3          If I can please have that displayed.

4              **THE COURT:**  So it's 2152 subject to a motion to

5     strike.

6     **BY MR. REEVES:**

7     **Q.**   All right.  Mr. Sarin, in or around this time period in

8     August 2011, did you endeavor to obtain from Autonomy from

9     Mr. Hussain a list of their top 40 revenue-generating

10    contracts?

11    **A.**   Yes.

12    **Q.**   And a list of their top 40 revenue-generating customers?

13    **A.**   Yes.

14    **Q.**   All right.  Does this e-mail pertain to that effort on

15    HP's part to get that information from Autonomy?

16    **A.**   (Witness examines document.)  Yes.  This e-mail is from

17    Rob Binns, who was my colleague from HP software, informing me

18    that two such documents had been loaded into the data room.

19    **Q.**   All right.  And let's go into the top 40 contracts 2010 to

20    2011, according to Mr. Binns, are as follows (reading):

21          "I'm interpreting an individual deal as complete in

22          the last six quarters back to start of 2010."

23    Was that consistent with your understanding of the types

24    of contracts that you were seeking from Autonomy?

25    **A.**   I believe so.

Q.   All right.  And down below -- oh, that means there would
be 40 deals in excess of 2.9 million in revenue for the period?
Is that how you read that?

          MR. MARAIS:  Your Honor, objection.  Hearsay.

          THE COURT:  Well, he's interpreting what his
understanding was of this particular document.  I'm not sure
that it's being introduced for the truth of the matter that
these are representations by the defendant or by the company,
Autonomy.  It's being introduced to say this is what his
understanding was of these documents.

          MR. REEVES:  That's correct, Your Honor.

          MR. MARAIS:  Your Honor, that's not true.

          THE COURT:  It's not being introduced for the truth of
the matter.

          MR. MARAIS:  There's no one from Autonomy on these
e-mails, Your Honor.  These are internal HP communications, and
these are assertions made by an individual who isn't here and
who isn't on the Government's witness list.

          THE COURT:  I understand, but my understanding of the
testimony was that he requested documentation and in response
to the request, he then received this particular e-mail.

          MR. REEVES:  Yes.  And we have additional exhibits
that demonstrate --

          THE COURT:  Well, I don't know what you have.  I'm
just saying this, then -- it's not being introduced that

1  actually Autonomy produced these records.  That is not being

2  produced.  What is being produced is the statement by -- that

3  this witness requested certain documentation and this is what

4  he reviewed in connection with that request --

5         **MR. REEVES:**  That's correct, Your Honor.

6         **THE COURT:**  -- as he understood it to be.

7     Now, it hasn't been established yet that it was the

8  defendant who furnished this information.  That hasn't been

9  established yet, and I have to give some thought as to that

10 because it may or may not come in under some exception.

11    Okay.

12        **MR. REEVES:**  All right.

13 **Q.**  Mr. Sarin, in the course of your due diligence calls with

14 Mr. Hussain, did you talk about top revenue-generating

15 contracts and customers?

16 **A.**  That was one of the requests we had going back to the

17 July 29th meeting when we were in London.  Dr. Lynch at that

18 time had suggested they would give us the top 80 contracts,

19 eight zero.  His initial thinking was the smallest one of those

20 would be 5 million in revenue.

21    What we ended up getting, because we had kept asking for

22 this, was top 40 contracts, four zero, with the smallest one

23 being 2.9 million in revenues, but this was something we had

24 asked for.

25 **Q.**  And that had been in a conversation at the beginning of

1  the process; and the way you've described, that included

2  Mr. Hussain, did it not?

3  **A.**   Yes.

4  **Q.**   He was there when the request was made for this type of

5  information from Autonomy?

6  **A.**   Yes.

7  **Q.**   All right.  And is this a follow-up now on this piece of

8  your due diligence relating to the top 40 contracts and the top

9  40 customers?

10 **A.**   Yes.

11 **Q.**   All right.  Is Mr. Binns' discussion of the request

12 consistent with your understanding of the request that you're

13 making to Autonomy for this information, specifically that it

14 would be top 40 contracts which, when you work through the

15 levels, are deals in excess of $2.9 million?  Is that

16 consistent with your understanding?

17 **A.**   My understanding was the top 40 contracts would include

18 all revenue for those customers.  It was meant to cover the top

19 40 without excluding anything, and the way it's described here

20 with the smallest one in the list being 2.9 million.

21 **Q.**   Okay.  And was that request conveyed to Mr. Hussain and

22 others within Autonomy in the course of your due diligence

23 process?

24 **A.**   Yes.

25 **Q.**   Same question for the top 40 customers.  What is the

1    nature of the request that is being made in the course of the

2    due diligence with regard to the top 40 customers?

3    **A.**    The intent behind the request is to understand.  Many

4    times companies have significant revenue concentration.  They

5    might have one to five customers that comprise the bulk of the

6    revenues.  So we wanted to understand and see the dispersion,

7    if you will, between the top 40 customers.

8        We knew their total revenue was 870 million for the prior

9    year.  We certainly knew the revenue in the first two quarters

10   of 2011.  So over that six-quarter period, the intent was to

11   understand the biggest customer and all the way down to the

12   40th so we could just understand the materiality of those

13   customers.

14   **Q.**    Without qualification I think you said earlier.  What did

15   you mean by that?

16   **A.**    In other words, we wanted the full contract value.  So if

17   a customer is buying three products -- cloud, software, and

18   services -- I'm expecting the value associated with that

19   customer would include every revenue element that that customer

20   is purchasing from Autonomy.

21   **Q.**    I'd like to show you what has been marked for

22   identification as Exhibit 2135.  This is an e-mail from

23   Mr. Andrew Kanter to Mr. Sarin and others on or about

24   August 5th, 2011.

25           **MR. REEVES:**  I offer it in evidence.

1              **THE COURT:**  Admitted.

2          (Trial Exhibit 2135 received in evidence)

3              **MR. REEVES:**  Thank you, Your Honor.

4   **Q.**   In Mr. Kanter's e-mail, he writes, last sentence in the

5   first paragraph (reading):

6              "A few comments below in the meantime."

7          Do you see that?

8   **A.**   I do.

9   **Q.**   Okay.  By that did Mr. Kanter mean he interlineated

10  certain answers to the e-mail in the lower e-mail?  Is that the

11  way you read that?

12  **A.**   Yes.

13  **Q.**   Let's go to page 2 of Exhibit 2135, please.  And if we go

14  down to -- and let's highlight, if we would, small Roman

15  numeral i and ii.

16         And do you see this is (reading):

17             "As discussed on the call on 3 August, please could

18         you provide..."

19         This is HP asking -- or you asking Autonomy for

20  information, is it not?

21  **A.**   Yes.

22  **Q.**   And number one (reading):

23             "Copies of the top 40 customer contracts by revenue."

24         And then in caps, is that Mr. Kanter's response?

25  **A.**   Yes.

1    **Q.**    And what does he say?

2    **A.**    He says for both of those, both top 40 customer contracts,

3    they're all in the data room.

4    **Q.**    And what is the data room?

5    **A.**    So in sort of e-mailing documents back and forth, a data

6    room is an online repository or an online place where you keep

7    documents, not dissimilar to how we all use Dropbox or Box

8    today.  It is a way to share, you know, documents.  It could be

9    photos.  It could be anything.  And you just tell the other

10    party "I've uploaded the documents into that data room or

11    repository."

12    **Q.**    And if we could go back out, please.

13          One other topic before we leave this --

14          **THE COURT:**  Well, before you leave this, so it's my

15    understanding that the question is, as to Document Number 2152,

16    which was the top 40 document -- right?

17          **MR. REEVES:**  I'm not leaving the subject of the top 40

18    contracts yet, if that helps.

19          **THE COURT:**  Okay.  Oh, you are not.  They are being --

20    they are being introduced for the truth of the matter; isn't

21    that correct?  That is, they are being produced by -- as a

22    statement of the Defense, are they not?

23          **MR. REEVES:**  Are you talking about Exhibit 2152?

24          **THE COURT:**  I'm talking about the one that counsel has

25    objected to on the grounds of hearsay.

1    **MR. REEVES:**  That's 2152.  And we offered it on the

2  basis of -- as a business record of HP or, alternatively, with

3  the limiting instruction for the purpose that the Court

4  identified.

5    **THE COURT:**  No.  I think my limiting instruction is

6  inappropriate.

7    **MR. REEVES:**  Okay.

8    **THE COURT:**  That's what I think.  I think it does come

9  in for the truth of the matter; that is, that this is a

10  statement made by the Defense.

11    **MR. MARAIS:**  Your Honor, just to be clear --

12    **THE COURT:**  I will --

13    **MR. MARAIS:**  -- the Defense is nowhere on this

14  document, Your Honor.

15    **THE COURT:**  Well, I don't -- I'm -- the answer is -- I

16  understand that, I mean, when you say they're not on that

17  document; however, under the hearsay, the general catchall is

18  whether or not there is indicia of reliability.  And to the

19  Court's view, there is indicia of reliability by virtue of the

20  e-mail which they are part of.

21    **MR. MARAIS:**  Your Honor --

22    **THE COURT:**  So the Court will not strike the document.

23  It is being introduced for the truth of the matter, and the

24  jury can consider it as a document -- they can consider it for

25  whatever purpose they want to consider it for.

1            **MR. REEVES:**  Thank you, Your Honor.

2    **Q.**   I have other questions about the top 40 contracts, but

3    before I leave this e-mail, I'd like to go to one point

4    Mr. Kanter made at the top, please.

5         If we go all the way to the top of the document.  Right

6    there is fine.  Come down a little bit so that we can see it's

7    from Mr. Andy Kanter.

8         Okay.  And if you'd highlight the first sentence, please,

9    of the second paragraph, "Our hope."

10        So Mr. Kanter writes in this time period on August 5th

11   (reading):

12            "Our hope is that we can wrap up calls this week, so

13         please let us know availability today," et cetera.

14        Do you see that?

15   **A.**   I do.

16   **Q.**   In this time period did you receive any pushback or

17   comments that suggested that Autonomy was bothered or in any

18   way concerned about the level of detail and the amount of

19   information and the scope of the due diligence that HP was

20   asking Autonomy in this time period?

21   **A.**   So I didn't get that pushback in the first week, but I

22   definitely got it multiple times in the second week; and

23   multiple members of the HP team received pushback not just from

24   Autonomy but from their advisers, which was Catalyst, the law

25   firm.  We were told repeatedly that we were asking too many

1    questions.

2    **Q.**   All right.   Thank you very much.

3         Let's go back to the subject of the top 40 customers and

4    top 40 contracts, and let me show you, please, what's marked

5    for identification as Exhibit 2238.   This is an e-mail from

6    Mr. Sarin to others within HP forwarding an e-mail from

7    Mr. Kanter to Mr. Sarin on August 12th, 2011.

8              **THE COURT:**   Admitted.

9         (Trial Exhibit 2238 received in evidence)

10             **MR. REEVES:**   Thank you, Your Honor.

11        So let's look at Mr. Kanter's e-mail on August 12th, and

12   let's highlight, if we can, the first line of the second

13   paragraph about top 40 contracts.

14   **Q.**   Mr. Sarin, Mr. Kanter wrote back (reading):

15             "Re the top 40 contracts, I can confirm that the

16        revenue/customer shown on the pages includes license plus

17        maintenance plus service revenue, i.e., the contracted

18        value."

19        Do you see that?

20   **A.**   I do.

21   **Q.**   What is your understanding of what Mr. Kanter is conveying

22   here?

23   **A.**   What Mr. Kanter is conveying here is, to the extent a

24   customer has bought either multiple products or has different

25   elements of Autonomy's revenue stream -- or contributes

 1   different elements of Autonomy's revenue stream, it is all

 2   captured in the total contract value ascribed to that customer

 3   in that schedule provided to us.

 4   **Q.**   If it were the case that a top 40 customer had both bought

 5   software and hardware, not an appliance, but they contracted

 6   for that and that was part of the value associated with that

 7   customer in the contracts, would you expect that to be

 8   disclosed to you in the course of your due diligence as a

 9   result of your request?

10   **A.**   Yes.

11   **Q.**   All right.  Thank you very much.

12        I'd like to show you, please, what's marked for

13   identification as Exhibit 2613.  It's a two-page document.  Do

14   you have Exhibit 2613?

15   **A.**   (Witness examines documents.)  I have this.  It doesn't

16   have a number.

17   **Q.**   Do you recognize that?

18   **A.**   I do.

19   **Q.**   What is that?

20   **A.**   This is the top 40 customers and the top 40 contracts that

21   was shown to us or given to us by Autonomy.

22   **Q.**   All right.  And put --

23             **THE COURT:**  Admitted.

24        (Trial Exhibit 2613 received in evidence)

25             **MR. REEVES:**  Thank you, Your Honor.

**SARIN - DIRECT / REEVES**

1   **Q.**   This was the one that Mr. Kanter said was put into the

2   data room, do you know?

3   **A.**   Yes.

4   **Q.**   All right.  Let me show you now, if I could, please,

5   what's marked for identification as Exhibit 2548.  I think this

6   is a version of the top 40 customer list with your notes on it.

7   Do you have that before you, Exhibit 2548?

8   **A.**   Yes.

9   **Q.**   Do you recognize your notes here?

10  **A.**   I do.

11          **THE COURT:**  Admitted.

12      (Trial Exhibit 2548 received in evidence)

13          **MR. REEVES:**  Thank you, Your Honor.

14      We can just leave it right like that.

15  **Q.**   And what were you doing with regard to evaluating the top

16  customers here as reflected in this version of the top customer

17  list 2548 that has your notes, Mr. Sarin?  What were you doing?

18  **A.**   So I'm doing two things.  One is you notice the tick marks

19  with respect to certain customers, and all of those are banks.

20  As I was saying before, financial services industry is

21  invariably one of the largest consumers of new technology so

22  I'm trying to get a sense for how many banks they have in their

23  top 40.

24      And then I've added up the total contract value for the

25  top 40, which is 287, and I say to the right approximately 290,

1  and that is about give or take 34 percent of their total

2  revenues.  So it gives me a sense of customer concentration.

3  **Q.**  Did you rely on the accuracy of the information put into

4  the data room with regard to Autonomy's top 40 contracts and

5  top 40 customers?

6  **A.**  Yes.

7  **Q.**  Okay.  Did you use that in formulating a decision about

8  whether to move forward with HP's acquisition of Autonomy?

9  **A.**  Yes.

10  **Q.**  In the course of your discussions with Mr. Hussain and

11  others from Autonomy about the top 40 customers, Mr. Sarin --

12  let's go back to the top of this, please.  Let's just pause

13  there.

14      In the course of your discussions with Mr. Hussain and

15  others from Autonomy about the top 40 customers, did

16  Mr. Hussain, or anyone else from Autonomy, disclose to you that

17  the very first, the top customer, in terms of revenue for

18  Autonomy in the time period in the top 40 customer list was

19  SHI, a reseller and a tech provider for Bank of America?  Did

20  that -- was that disclosed to you?

21  **A.**  No.

22  **Q.**  And the amount of the hardware sold by Autonomy to SHI was

23  approximately $56 million.  If that happened, was that

24  disclosed to you?

25  **A.**  No.

1    Q.    The number six customer is a customer known as Zones.  Was

2    that disclosed to you in any way?  Did that topic -- did that

3    subject -- was that subject disclosed by Autonomy in the course

4    of the discussions about the top 40 customers?

5    A.    The one that says "U.S. Government" over there?

6    Q.    No.

7    A.    You said "number six."

8    Q.    It would be something missing from this list.

9    A.    Oh.

10    Q.    A customer that bought hardware from Autonomy in the

11    amount of $20 million with the name of Zones.  Was that

12    disclosed to you in any way?

13    A.    No.

14    Q.    All right.  I'd like to show you, please, what has been

15    marked for identification as Exhibit 2170.  This is an e-mail

16    on or around August 7th from Mr. Sarin to Mr. Kanter and

17    Mr. Hussain and others, "Subject:  Tesla."

18            THE COURT:  Admitted.

19        (Trial Exhibit 2170 received in evidence)

20    BY MR. REEVES:

21    Q.    As we move forward into August, do you continue to have

22    more follow-ups and more discussions with Autonomy about the

23    questions relating to your due diligence?

24    A.    Yes.

25    Q.    And do you continue to circulate follow-up questions in

SARIN - DIRECT / REEVES

1    the form that's reflected in Exhibit 2170?

2    **A.**   Yes.

3    **Q.**   All right.  I'd like to show you now your notes -- what

4    appear to be your notes in Exhibit 2719.  Are these a set of

5    your notes for those follow-up questions for discussion on or

6    around August 6, 2011?

7    **A.**   (Witness examines document.)  Give me one minute.

8    **Q.**   Sure.

9    **A.**   (Witness examines document.)

10           **THE COURT:**  What number is it?

11           **MR. REEVES:**  2719, please.

12           **MR. MARAIS:**  Your Honor, we don't have a copy either.

13           **THE COURT:**  Are these notes?  Okay.

14       Do you have a copy?

15           **MR. MARAIS:**  No, sir.

16           **THE COURT:**  Oh.

17                    (Pause in proceedings.)

18   **BY MR. REEVES:**

19   **Q.**   Do you recognize Exhibit 2719?

20   **A.**   I do.

21   **Q.**   Okay.  What is that?

22           **THE COURT:**  Admitted.

23       (Trial Exhibit 2719 received in evidence)

24           **MR. REEVES:**  Thank you, Your Honor.

25   **Q.**   Are these your notes from a follow-up conversation on or

1   around August 6, 2011?

2   **A.**   Yes.

3   **Q.**   Okay.  And what are you covering in the course of this

4   call?

5   **A.**   So we're covering the open items that are listed in the

6   document.  There are some accounting finance-related ones.

7   There are some on HR.  There are some related to intellectual

8   property, compliance, employment, and such.  So we're just

9   going through the list of open items, and my notes here cover

10  some of the important things that I wanted to annotate for my

11  future reference.

12  **Q.**   All right.  Let me show you what has been marked for

13  identification as Exhibit 2720.  Are these more notes

14  reflecting further calls on or about August 8th, 2011, about

15  the subject of hosting?

16  **A.**   Yes.

17          **THE COURT:**  Admitted.

18          (Trial Exhibit 2720 received in evidence)

19          **MR. REEVES:**  Thank you, Your Honor.

20  **Q.**   Is this another detailed call that you had in the course

21  of your due diligence with Mr. Hussain on the subject of

22  hosting?

23  **A.**   These are my notes on the subject of hosting.  I'm not

24  sure who was on the Autonomy side.

25  **Q.**   Okay.  And why was -- so are these notes of a call or are

1  they notes that you're accumulating about the subject of

2  hosting over the course of your due diligence?

3  **A.**   It's from a call.

4  **Q.**   It's from a call?

5  **A.**   Yeah.

6  **Q.**   Okay.  Do you recall if Mr. Hussain was involved in this

7  particular call about hosting?

8  **A.**   I don't remember.

9  **Q.**   Okay.  You don't remember.

10      All right.  Why are you asking questions about hosting?

11 **A.**   So Autonomy had a fast-growing business, which we saw

12 earlier was the IDOL cloud business.  The way the IDOL cloud

13 business runs, it's a multitenant solution.  What I mean by

14 that is information for a lot of customers is hosted, which is

15 kept in that cloud instance.

16      Given the broader acceptance of the subscription business

17 model where customers pay for using software on a pay-as-you-go

18 basis, just the way we buy utilities today -- you know,

19 electricity as an example -- we wanted to just understand the

20 IDOL cloud business and the hosting ramifications around it.

21 So this was the call that we had to gain a better understanding

22 of that business.

23 **Q.**   Thank you.

24      I'd like to show you what has been marked as Exhibit 2251.

25 This is an e-mail from Mr. Sarin on or about August 15, 2011,

1    to Mr. Johnson and Mr. Robison, "Subject:  Tesla."

2         **THE COURT:**  Admitted.

3         (Trial Exhibit 2251 received in evidence)

4    **BY MR. REEVES:**

5    **Q.**   Now, in your e-mail, paragraph 2, it looks like there's a

6    discussion about having a conversation with Deloitte; is that

7    correct, Mr. Sarin?

8    **A.**   Yes.

9    **Q.**   And what are you raising with Mr. Johnson and Mr. Robison

10   with regard to having a conversation with Deloitte?

11   **A.**   Because we had repeatedly been denied access to the

12   Deloitte working papers, as I had said earlier, in sort of just

13   taking that as the answer, we wanted to come up with another

14   way to get comfort from the auditors as they had been reviewing

15   the Autonomy financials for many years.

16        We had come up with a process where KPMG, our financial

17   adviser, who's well-versed in accounting and auditing matters,

18   would create a list of questions.  They would then send those

19   over to Deloitte.  KPMG would ask questions of Deloitte

20   regarding their audit process, if they'd ever come across

21   anything that was in terms of audit adjustments, were the

22   processes followed consistent with a 4C-100 client, as an

23   example.

24        We were just looking to get some comfort from Deloitte

25   that they had done all the work they were supposed to do to

1  audit a company Autonomy's size.  And this is just me saying,

2  "Given that we don't have the work papers, we'll go around this

3  process and have KPMG ask questions of Deloitte."

4  **Q.**   Okay.  And with whom from KPMG were you working on this

5  engagement or this due diligence process?

6  **A.**   With Andy Gersh, who was the partner from KPMG working

7  with us.

8  **Q.**   And did that conversation among KPMG, yourself, and

9  Deloitte take place?

10  **A.**   It did.

11  **Q.**   In advance did you circulate questions that you wanted to

12  cover with Deloitte?

13  **A.**   I did.

14  **Q.**   I'd like to show you Exhibit 2259, please.  Is this an

15  e-mail from you to Mr. Kanter circulating questions relating to

16  Deloitte on or about August 16, 2011?

17  **A.**   Yes.

18         **THE COURT:**  Admitted.

19     (Trial Exhibit 2259 received in evidence)

20  **BY MR. REEVES:**

21  **Q.**   And attached to the document are the questions.  Let's go

22  through again a version of the questions with your notes.

23     Let me show you what has been marked as Exhibit 2255.  Is

24  this a version of the questions to Deloitte with your

25  handwritten notations on them, Mr. Sarin?

1   **A.**   (Witness examines document.)  It is.

2        **THE COURT:**  Admitted.

3        (Trial Exhibit 2255 received in evidence)

4        **MR. REEVES:**  Thank you.

5   **Q.**   And so these are the questions that were actually put to

6   Deloitte?

7   **A.**   They were prepared by KPMG.  I had sent them over to Andy

8   Kanter from Autonomy, who had sent those over to Deloitte.  On

9   the call Andy Gersh from KPMG with the HP team listening in was

10  asking these questions of the Deloitte partners.

11  **Q.**   Do you remember the names of the people with whom

12  Mr. Gersh was speaking from Deloitte?

13  **A.**   I don't.

14  **Q.**   Okay.  But they were from Deloitte and they were

15  Autonomy's auditors?

16  **A.**   Yes.

17  **Q.**   And who was doing the talking?  Was it Mr. Gersh?

18  **A.**   Mr. Gersh.

19  **Q.**   Okay.  And then Deloitte was responding to these

20  questions?

21  **A.**   Yes.

22  **Q.**   All right.  And let's go through Question Number 8.  There

23  was a question here about (reading):

24        "Did you review any of Target's accounting issues

25     with your national office/professional practice team?"

1          et cetera.

2          Do you see that?

3     A.   I do.

4     Q.   What's the purpose of asking a question like that?

5     A.   The intent of a question like this is, in any company, at

6     times the contracts can get fairly complex.  It can open up new

7     accounting issues.  So for bigger clients, auditors tend to

8     surface things to their national office who can then either

9     confirm or give guidance to the auditors on how revenue ought

10    to be recognized.

11         And I believe what the Deloitte partners were saying is,

12    because Autonomy was big enough to be part of the 4C-100 -- the

13    4C-100 is like our Dow Jones index in the U.S. -- there was

14    additional scrutiny of the Autonomy financials, and they had

15    found nothing out of the ordinary.  That's what I remember.

16    Q.   All right.  And Question Number 10 it looks like there's

17    an inquiry about (reading):

18              "Did you identify any adjusted and unadjusted audit

19         differences during your most recent audit and review?"

20         What, if anything, did Deloitte provide with regard to

21    answering that question?

22    A.   Yeah, so most auditors at the end of the audit period

23    would recommend changes to the financial statements.  One would

24    hope they would tend to be small because of their big

25    differences, that calls into question the validity of the

1    financial statements altogether.

2        So what Deloitte was saying is, the adjustments that they

3    have suggested are small adjustments.  They are primarily on

4    the collection of receivables and there is no revenue

5    adjustments.

6    Q.   Thank you very much.

7        I'd like to show you, please, a couple more documents and

8    then I think I'll be wrapping up.

9        I'd like to show you Exhibit 2332, please.  This is an

10   e-mail to Mr. Sarin and others at HP from Derek Brown at

11   Autonomy on or about August 23rd, 2011, "Subject:  Background

12   Information Autonomy Organic Growth."

13           MR. REEVES:  I offer it in evidence, Your Honor.

14           THE COURT:  Admitted.

15       (Trial Exhibit 2332 received in evidence)

16   BY MR. REEVES:

17   Q.   All right.  Now, let's just pause for a moment.  On or

18   about August 18th, 2011, did you become aware that HP announced

19   its intention to acquire Autonomy in a public press release?

20   A.   Yes.

21   Q.   All right.  And you had contributed to that

22   decision-making in the manner you described on behalf of HP,

23   had you not?

24   A.   I was part of the due diligence team, and so all the due

25   diligence findings were surfaced up to senior management to

1   help them make decision around the acquisition of Autonomy.

2   **Q.**   And do you have an understanding as to what the corporate

3   process was for the final decision-making about whether to go

4   forward with the acquisition?

5   **A.**   I wasn't in the room when the decision was made, but I was

6   told by Andy Johnson later on that HP had decided to move

7   forward with the acquisition of Autonomy.

8   **Q.**   Okay.  And this is in the time period after the

9   announcement of the acquisition, a few days later, on or about

10  August 23rd; is that correct?

11  **A.**   Correct.

12  **Q.**   And the subject here is "Autonomy Organic Growth."  Do you

13  have an understanding as to the issue or the follow-up that's

14  happening with regard to Autonomy organic growth?

15  **A.**   Yes.  Based on what I remember, after the acquisition was

16  announced, HP received multiple queries from our shareholders,

17  as well as the research firms that covered HP, questioning the

18  organic growth of Autonomy.

19      And the questions primarily came to Cathie Lesjak, who was

20  HP's CFO at that time.  She forwarded those questions -- or she

21  made the request of Andy Johnson to go research this, and he

22  had been interfacing with individuals at Autonomy to get their

23  responses to organic growth.

24  **Q.**   Let's look at one of those responses.  On page 4,

25  Exhibit 2332, page 4.  And if we could enlarge the paragraph

1    that begins "Attempting to make simplistic adjustments for

2    hardware revenue." Do you see that? All right. Good.

3        So what is the context in which this information is being

4    provided by Autonomy back to HP in or around this time period

5    as you understand it, Mr. Sarin?

6    **A.**   So Derek Brown, the individual who's sending the

7    information, was their head of investor relations. He had

8    produced this document. And what you're highlighting here, it

9    just calls out that there is a limited number of appliance

10   sales, which are a small amount of hardware; and if you don't

11   adjust for that, people can have an erroneous number in terms

12   of organic growth. That's all this is saying.

13   **Q.**   Thank you very much.

14       Let's move forward to in or around October -- early

15   October 2011. At or around that time does HP's acquisition of

16   Autonomy formally close?

17   **A.**   Yes.

18   **Q.**   I'd like to show you what's marked for identification as

19   Exhibit 2414, please. This is an October 4th, 2011, e-mail

20   from Capita Registrars to Mr. Sarin and a group of other people

21   at HP relating to the closing of the acquisition.

22            **MR. REEVES:** I offer it in evidence, please.

23            **THE COURT:** It's admitted.

24       (Trial Exhibit 2414 received in evidence)

25   \\\

**BY MR. REEVES:**

**Q.**   So what is the difference between announcing the intention to acquire Autonomy and the actual closing of the deal in October 2011, Mr. Sarin?

**A.**   So for large acquisitions, there is regulatory clearances to be obtained, as an example.  There could be other things that are required of closing; but in here given that Autonomy had operations in several countries, there is antitrust regulations we need to go clear.  So HP was working with external counsel.

So when you announce the intent to buy something, that's just signaling to the broader market that you're going to go down that path, and then you go and proceed to get all the regulatory approvals.  When you receive those approvals, that's when the acquisition is formally closed.

**Q.**   That happened on or around October 4th, 2011?

**A.**   Yes.

**Q.**   All right.  And what's the role of Capita Registrars, if you know?  How do they fit into the picture, if you know?

**A.**   My understanding is they're similar to, you know, when you buy a home, there's a set of -- the firm that collects the money from the buyer and then makes sure the seller gets it.  So they're basically an intermediary collecting the money from HP and then distributing it out to the shareholders of Autonomy.

 1  **Q.**   All right.

 2                      (Pause in proceedings.)

 3            **MR. REEVES:**  Thank you, Your Honor.  I have no further

 4  questions.

 5            **THE COURT:**  Cross.

 6                      (Pause in proceedings.)

 7            **MR. MARAIS:**  Ladies and gentlemen, good morning.

 8                    <u>**CROSS-EXAMINATION**</u>

 9  BY MR. MARAIS:

10  **Q.**   Mr. Sarin, good morning.

11  **A.**   Good morning.

12  **Q.**   I know we've never met.  My name is Nic Marais, one of the

13  lawyers representing Mr. Hussain.

14  **A.**   Good morning, Nic.

15  **Q.**   You have an MBA from Columbia; correct?

16  **A.**   Correct.

17  **Q.**   All right.  And in your experience in business, I imagine

18  there's nothing wrong or illegal with a software company trying

19  to sell some hardware; right?

20  **A.**   Sure.

21  **Q.**   Okay.  And there's nothing wrong or illegal with a

22  software company using value-added resellers or VARS; right?

23  **A.**   Right.

24  **Q.**   And it's not unusual in business and in sales for there to

25  be an increase in sales activity at the end of the quarter;

**SARIN - CROSS / MARAIS**

1  correct?

2  **A.**    Correct.

3  **Q.**    And there's nothing wrong with a company buying products

4  from its own customers; right?

5  **A.**    If that's a one-off, yes.

6  **Q.**    You joined HP in 2010; correct?

7  **A.**    Correct.

8  **Q.**    And stayed for about two years?

9  **A.**    Correct.

10  **Q.**    And after you started at HP, you learned that the company

11  had an interest in buying Autonomy?

12  **A.**    Correct.

13  **Q.**    Have you previously used the code name Aggie, A-G-G-I-E,

14  for Autonomy?

15  **A.**    I have not.

16  **Q.**    But you're aware that it was a code name used at HP?

17  **A.**    I was aware that Aggie was the code name for Autonomy in

18  years gone by, but I wasn't familiar as to what time frame or

19  what were the reasons behind it.

20  **Q.**    As you understand it, when did HP first start thinking

21  about buying Autonomy?

22  **A.**    From the time when I was there, the only discussions that

23  I was privy to around Autonomy were around February or March of

24  2011.

25  **Q.**    Were you aware, though, that HP had been looking at

1    Autonomy even before you arrived?

2    **A.**    Most big companies have internal teams that will scour the

3    universe for interesting targets.  I'm not sure if HP ever

4    reached out to Autonomy, but I was aware that HP was always

5    thinking about acquiring a whole host of businesses, Autonomy

6    being one of them.

7    **Q.**    While you were at HP, you worked in corporate development?

8    **A.**    Yes.

9    **Q.**    And in that capacity, you answered to Andy Johnson; right?

10    **A.**    Yes.

11    **Q.**    And Mr. Johnson answered to Shane Robison?

12    **A.**    Yes.

13    **Q.**    And Mr. Robison answered to Leo Apotheker.

14    **A.**    Yes.

15    **Q.**    And you had very little interaction with Mr. Robison?

16    **A.**    Some interaction but not a lot.

17    **Q.**    And no interaction with Mr. Apotheker?

18    **A.**    A couple of times.

19    **Q.**    Very little interaction?

20    **A.**    Very little interaction.

21    **Q.**    There's been a lot of testimony today about HP's interest

22    in Autonomy picking up in 2011 after Mr. Apotheker arrived;

23    correct?

24    **A.**    Correct.

25    **Q.**    And at HP Mr. Apotheker was what you've referred to as the

1  deal sponsor for the Autonomy acquisition?

2  **A.**    Yes.

3  **Q.**    What is a deal sponsor?

4  **A.**    A deal sponsor is the person who is championing the

5  transaction.  So given the scale of the acquisition, it was the

6  CEO of the company that was sponsoring the acquisition.

7  **Q.**    So Mr. Apotheker is the one who goes to the HP board and

8  he says, "Here's what I want to do.  Here's the company I want

9  to buy"?

10  **A.**    That's my understanding.

11  **Q.**    And Mr. Apotheker is the one who explains to the board why

12  it's in HP's interest to buy Autonomy; right?

13  **A.**    Correct.

14  **Q.**    And Mr. Apotheker is the one negotiating the price?

15  **A.**    I presume so.  I don't know who negotiated the price.

16  **Q.**    Well, you certainly had no role in negotiating the price

17  of this acquisition?

18  **A.**    Correct.

19  **Q.**    And Mr. Apotheker as the deal sponsor is the person

20  responsible for making a success of the acquisition; right?

21  **A.**    He relies on the full force of HP to make the success --

22  make the acquisition successful.  I don't think individually he

23  would make the acquisition successful, but he's certainly the

24  champion behind the deal.

25  **Q.**    The buck stops with Mr. Apotheker?

1    A.    That's what I would think.

2    Q.    Just to make sure I have the chronology of all of this

3    right, you worked on valuation models in early 2011 through the

4    diligence period; right?

5    A.    For Autonomy, yes.

6    Q.    And the first time that you met with anybody from Autonomy

7    was at the end of June?

8    A.    Yes.

9    Q.    And separately, as you understand it, Mr. Apotheker was

10   having some meetings with Dr. Michael Lynch?

11   A.    Yes.

12   Q.    And Mr. Apotheker was negotiating the price in those

13   meetings?

14   A.    I don't know what he was negotiating, but he was certainly

15   having discussions with Autonomy.

16   Q.    And then due diligence on the Autonomy deal begins in

17   earnest in early August of 2011; right?

18   A.    Diligence in terms of asking questions of the Autonomy

19   team begins in early August.  Pouring over publicly available

20   information began many months before that.

21   Q.    But your daily interactions, the back and forth, the

22   questions and answers, that took place in early August?

23   A.    Yes.

24   Q.    And then the deal was announced on August 18th?

25   A.    Yes.

1  Q.   And then Mr. Apotheker, the deal sponsor, was fired on

2  September 22nd?

3  A.   I don't know what date he was fired, but he was

4  certainly -- he certainly left a few months thereafter.

5  Q.   Within weeks of announcing the acquisition, Mr. Apotheker

6  was fired?

7  A.   Yes.

8  Q.   And then the deal closed on October 3rd.  That's the day

9  that HP now owns Autonomy; right?

10  A.   Correct.

11  Q.   And Mr. Robison was fired a couple weeks after that;

12  right?

13  A.   I don't know fired or left, but I know he wasn't there.

14  Q.   The two key pieces of the proposed Autonomy acquisition

15  that you were involved in, as you've testified, were, one, the

16  valuation models that we've seen; and, two, later on the due

17  diligence process that you've been discussing; right?

18  A.   Yeah, the due diligence process and the valuation models,

19  yes.

20  Q.   Those were your two areas of focus?

21  A.   Correct.

22  Q.   And I think you said you spent weeks working on the

23  valuation model; correct?

24  A.   Correct.

25  Q.   And previously you've told the Government that you spent

1  hundreds of hours working on that valuation model?

2  **A.**  Correct.

3  **Q.**  And that was earlier in 2011?

4  **A.**  Correct.

5  **Q.**  And you testified that as your starting point for those

6  valuation models on the Autonomy deal, you looked at public

7  financial statements; right?

8  **A.**  Yes.

9  **Q.**  And to be clear, Autonomy wasn't listed on any American

10  stock exchanges; correct?

11  **A.**  I think their ADR is in the U.S. but, you're right, they

12  were listed on the London Stock Exchange.

13  **Q.**  And one of the advantages for you in buying a public

14  company like Autonomy is that you have access to public

15  financial statements?

16  **A.**  Correct.

17  **Q.**  That had been audited by, as you said yesterday, a Big 4

18  firm in Deloitte?

19  **A.**  Correct.

20  **Q.**  And when it comes to buying a public company, you take

21  comfort that their financial statements have been scrutinized

22  by independent auditors?

23  **A.**  Correct.

24  **Q.**  And in this case you understood that Deloitte was, in

25  fact, scrutinizing Autonomy's financials?

1   **A.**    I hope so.

2   **Q.**    You've also previously told the Government that you

3   studied the 2010 annual report; correct?

4   **A.**    Correct.

5   **Q.**    And that you went back and looked at Autonomy's press

6   releases for the previous two or three quarters?

7   **A.**    Correct.

8   **Q.**    So that would be Q3 of 2010, Q4 of 2010, and Q1 of 2011?

9   **A.**    I looked at many quarterly financial statements.  What

10  I've said is I reviewed the 2010 annual report, which was the

11  last annual report available, and we certainly went through the

12  Q1 2011 and Q2 2011 financial statements.

13  **Q.**    You don't remember whether you looked at any financial

14  data from 2009?

15  **A.**    The annual report probably incorporates last several years

16  worth of financials, so I only looked at what was in the 2010

17  annual report.

18  **Q.**    Yesterday the prosecutor marched you through a series of

19  PowerPoint presentations that you received from Frank Quattrone

20  in March of 2011.  Do you remember that?

21  **A.**    I received them from Andy Johnson.

22  **Q.**    Who had received them from Frank Quattrone?

23  **A.**    Yes.

24  **Q.**    And those came in in March; correct?

25  **A.**    Yes.

1  Q.   And at that time HP was only looking at public information

2  about Autonomy; right?

3  A.   Yes.

4  Q.   When you testified to the Grand Jury, you told them that

5  you didn't look at any nonpublic information until at least

6  May?

7  A.   I had no access to nonpublic information till Autonomy

8  made it available to me.

9  Q.   Okay.  So, again, until we get to the due diligence proper

10 period, everything you're looking at is material that was in

11 the public domain?

12 A.   Yes.

13 Q.   And that you understood had been audited and

14 double-checked by Deloitte?

15 A.   Yes.

16 Q.   Can we take a look at Exhibit 1792?  It is in evidence.

17 A.   Is it in this binder, or where shall I go find it?

18 Q.   Well, we've got it up on the screen if you'd like.

19      THE COURT:  It's on the screen.

20      THE WITNESS:  Fine.

21 BY MR. MARAIS:

22 Q.   Otherwise you might have to fetch one of the other

23 voluminous binders.

24      This is a document from April 2011; correct?

25 A.   Yes.

1   **Q.**   And, Jeff, if we could go to, I think, the last page.

2       And you said that at this time in April 2011, HP was also

3   looking at TIBCO; correct?

4   **A.**   Correct.

5   **Q.**   And it was thinking about Software AG, a European company?

6   **A.**   Yes.

7   **Q.**   And possibly also at Red Hat?

8   **A.**   Correct.

9   **Q.**   And all of those are software companies?

10  **A.**   Correct.

11  **Q.**   So HP's clear focus at this time in 2011 is in trying to

12  find a software company; right?

13  **A.**   Correct.

14  **Q.**   This is all the result of Mr. Apotheker's vision to change

15  HP's direction?

16  **A.**   That's what I was led to believe.

17  **Q.**   And Mr. Apotheker arrived at HP towards the end of 2010?

18  **A.**   Yes.

19  **Q.**   And announced that his plan was to find a software

20  company?

21  **A.**   Yes.

22  **Q.**   And six months later in Exhibit 1792, you're now

23  considering a slate of potential software deals for HP; right?

24  **A.**   Yes.

25  **Q.**   Let me ask you a side question here.

1        And maybe, Jeff, we can highlight the second-from-last

2   line focusing on fiscal year 2012.

3        The jury and I have heard a lot about accretion.  I have

4   to confess I'm still not sure I understand.  Can you explain

5   the difference here between accretion and dilution in this

6   table?

7   **A.**   Sure.  So accretion and dilution is calculated on the

8   earnings per share of a company.  So in this case, let's just

9   make up a number to make the illustration.  Let's say that HP's

10  earning per share was 1 dollar per year.  When you're buying a

11  business, that business produces some profit.  You're obviously

12  paying for it in cash, so you're losing the interest income on

13  that cash but you are making it up in the earnings per share

14  that that business is bringing to you.

15       If you add all of those three -- so my 1 dollar for HP

16  plus what I'm losing in interest income plus what I'm gaining

17  from the business in earnings per share -- if that net effect

18  is less than 1 dollar, then you say there is dilution; if it's

19  more than 1 dollar, it's accretion.

20  **Q.**   And the conclusion that you're drawing here is that for

21  fiscal year 2012, the first year after the acquisition,

22  Autonomy would be dilutive without synergies; right?

23  **A.**   Very marginally dilutive.  It would be less than 1 cent

24  per share but, yes.

25  **Q.**   The fact that that number is in parentheticals means that

**SARIN - CROSS / MARAIS**

1  it's dilutive?

2  **A.**    Correct.

3  **Q.**    Okay.  And does the $8.36 billion price at the top factor

4  into that?

5  **A.**    As I was saying, it does factor into it to the extent

6  you're paying cash, then you're losing the interest income on

7  the cash.  If you're paying for it in stock, you're increasing

8  the share count of the company, which will provide the

9  dilution.  So one way or the other, the 8.3 will factor into

10  the calculation.

11  **Q.**    Okay.  And in the end, HP paid more than 8.3 for Autonomy;

12  right?

13  **A.**    Right.

14  **Q.**    But just looking at your team's assessment in this chart,

15  the only way that the deal would have been accretive would have

16  been if you factored in synergies; right?

17  **A.**    Yeah.  This is just a footnote in the sense that

18  acquisitions are done all the time in the software industry.

19  Most of the times they may be dilutive in the first year.  That

20  isn't what either prevents you from doing a deal or forces you

21  into doing a deal, synergies or no synergies.

22       Because markets understand that software is a high-growth

23  business with high margins and, therefore, higher multiples you

24  need to pay to buy that business, and so it's well understood

25  that there might be dilution in the first year or so.

1   **Q.**   But you would expect that if you factored in synergies,

2   this chart excludes synergies, but if you factored in

3   synergies, that might tip it over from dilutive to accretive?

4   **A.**   Sure.

5   **Q.**   All right.  And yesterday you said that synergies are,

6   quote, "what HP can do with a company"; correct?

7   **A.**   Correct.

8   **Q.**   A couple months after you put this table together, the

9   TIBCO deal fell apart; right?

10  **A.**   I am not remembering what date it fell apart, but at this

11  point we were considering TIBCO.  At some point it fell off

12  because we couldn't agree on the price, but I don't know what

13  date it was.

14  **Q.**   The deal broke down because Mr. Apotheker wasn't willing

15  to pay whatever TIBCO was asking?

16  **A.**   Yeah.  There was -- I forget, but there wasn't that much

17  delta between both parties, and I was more involved in the

18  pricing for that deal, but we were uncomfortable paying that

19  price and so that deal fell apart.

20  **Q.**   And at that point Mr. Apotheker has been at HP for seven

21  or eight months; right?

22  **A.**   Correct.

23  **Q.**   And so when it comes to his vision of acquiring a software

24  company, the clock is ticking, he wants a software company, and

25  your team's focus turns back to Autonomy; right?

1    **A.**    Correct.

2    **Q.**    When it comes to setting a price for a target like

3    Autonomy, do you tell Mr. Apotheker, "Here's what I recommend,"

4    or does he say, "Here's what I'm going to pay.  You tell me how

5    to justify that"?

6    **A.**    We provide to Shane, Mr. Robison, what's called AVP, which

7    is analysis at various prices, which is think of it as a matrix

8    where at this price, here's the dollar value of the deal,

9    here's the margins that will accrue to HP, here's the accretion

10    or the dilution.  At this price here's the various metrics.

11    So we give them a matrix to help them figure out at what

12    price we would be either paying too much or what the fallout

13    would be for HP.

14    At the end of the day, prices -- you know, as you look in

15    the rules, a fair price is what's negotiated between a willing

16    buyer and a willing seller.  That could be high to some people,

17    that could be low to some people.  We were just giving the

18    metrics to Mr. Robison to help him and Leo figure out the price

19    they could negotiate with Dr. Lynch.

20    **Q.**    When did you start focusing on the valuation models for

21    Autonomy, you and the two people who worked for you?

22    **A.**    We started building the Autonomy financial model I'd say

23    sometime around April-May because for us to show this

24    particular slide that you were showing me to show

25    accretion/dilution, I would need to have a valuation model

1    behind it.  And I forget the date of that slide.  I think it

2    was May.  So I would have had a model for Autonomy by that

3    time.

4    **Q.**   And the way this works is you and your team work on the

5    huge spreadsheet that we saw up on the screen earlier; right?

6    **A.**   My team works up the spreadsheet under my guidance.  I

7    spend a lot of time with HP software.  A lot of what goes into

8    valuing a business is the assumptions that go behind it, and so

9    my team are the ones who are more proficient and excel; and I

10   sort of work with the software business unit, reviewing public

11   filings, having discussions with other people to figure out

12   what the appropriate input assumptions should be.

13   **Q.**   And then you take the outputs from your spreadsheet and

14   you put them into PowerPoints, and those PowerPoints are used

15   to show to management; right?

16   **A.**   Yes.

17   **Q.**   Can we take a look at Exhibit 6603?  This isn't yet in

18   evidence, so if you could take a look in the black binder in

19   front of you at 6603.

20   **A.**   (Witness examines document.)

21          **THE COURT:**  6603?

22          **MR. MARAIS:**  Yes, sir.

23          **THE COURT:**  Do I have an exhibit list for these

24   exhibits?

25          **THE CLERK:**  No.

1          **MR. REEVES:**  I have no objection if that helps,

2     Your Honor.

3          **THE COURT:**  Well, okay.  Fine.  I'll just make notes.

4          6603 admitted.

5          (Trial Exhibit 6603 received in evidence)

6          **MR. MARAIS:**  Thank you, Your Honor.

7     **Q.**   The cover e-mail here is from Ms. Hsiao to you and a

8     couple of other people; correct?

9     **A.**   Correct.

10    **Q.**   And Ms. Hsiao works on your team?

11    **A.**   Yes.

12    **Q.**   And the PowerPoint that's attached behind the blue sheet,

13    is this a PowerPoint that your team would have worked on?

14    **A.**   Yes.

15    **Q.**   This one is dated May 2011.  Do you see that?

16    **A.**   Yes.

17    **Q.**   So this is relatively early on?

18    **A.**   Uh-huh.

19    **Q.**   In fact, if you look at the next page, page 2, the

20    executive summary hasn't been filled in yet.  Do you see that?

21    **A.**   Right.

22    **Q.**   And if we go to the next page, page 3, there's an overview

23    of Autonomy, which presumably you built using public financial

24    statements.

25    **A.**   Correct.

1  Q.   And you see on the top left there's a market

2  capitalization number?

3  A.   Yes.

4  Q.   $6.9 billion?

5  A.   Yes.

6  Q.   That's just a value of all the shares in the market;

7  right?

8  A.   Correct.

9  Q.   It's a shorthand proxy for what the market thinks Autonomy

10 is worth?

11 A.   Yes.

12 Q.   And at this time in May 2011, that number is $6.9 billion;

13 right?

14 A.   Correct.

15 Q.   Okay.  And over on the right-hand side under "Financial

16 Profile," you see that some of the numbers here have As.  So,

17 for instance, fiscal year 2010A.  That means you're using

18 actual numbers?

19 A.   Yes.

20 Q.   But for fiscal year 2011, the E means you're estimating a

21 number?

22 A.   Yes.

23 Q.   And you're doing that using public information?

24 A.   Yes.

25 Q.   And how do you come up with the estimate for 2011?

1  **A.**   This is looking at Wall Street consensus, and we might

2  have picked a report or two that was closest to consensus

3  because many times you won't get the breakdown of the operating

4  expenses by consensus.  So you will only get consensus for

5  revenue and for EBS.

6      So to arrive at R&D, sales and marketing, G & A, as an

7  example, we pick a report that's closest to consensus and just

8  follow the metrics from that particular report.

9  **Q.**   Okay.  You're using information from analysts on

10  Wall Street who are looking at the market; correct?

11  **A.**   Yes.

12  **Q.**   There's no information from Autonomy built into this?

13  **A.**   Correct.

14  **Q.**   And --

15      **MR. REEVES:**  I'm sorry.  Built into the estimates.

16  The question is ambiguous, Your Honor.

17      **THE COURT:**  Sustained.

18  **BY MR. MARAIS:**

19  **Q.**   No one --

20      **THE COURT:**  In other words, when you say there's no

21  information from Autonomy, there is obviously some information

22  from Autonomy.

23      **MR. MARAIS:**  I understand, Your Honor.

24  **Q.**   No one at Autonomy has given you any information that has

25  affected the numbers for fiscal year 2011 and 2012; correct?

1    **A.**    In May of 2011, correct.

2    **Q.**    And if we take a look at page 7, this is a forecast

3    looking into the future; correct?

4    **A.**    (Witness examines document.)    Yes.

5    **Q.**    So the first number on the left-hand side, that's how much

6    money Autonomy made in 2010, $870 million?

7    **A.**    Yes.

8    **Q.**    And what your team is working out here is that if HP were

9    to acquire Autonomy, within five years under HP's guidance, it

10   would turn into a $1.5 billion company; correct?

11   **A.**    No.    This is -- the heading says "Atlantis Standalone."

12   So this is Autonomy on its own.    The numbers are derived

13   strictly from Wall Street research, which is written on top of

14   the years.    This is not adding any HP synergies or what have

15   you.    This is Autonomy on its own based on extended forecasts

16   available from Wall Street.

17   **Q.**    Well, let's go to page 9.    This is a forecast including

18   synergies; correct?

19   **A.**    Correct.

20   **Q.**    And this one doesn't have the 2010 number but as I read

21   this chart, you're saying that by 2016, within five years, HP

22   could turn Autonomy into a $2.6 billion company; correct?

23   **A.**    Correct.

24   **Q.**    And, again, that's synergies, that's what HP could do with

25   Autonomy?

1    **A.**    Correct.

2    **Q.**    For instance, if we go back to page 8, this is a whole

3    sheet of synergy assumptions where your team has set out the

4    sorts of things that HP would need to do to turn Autonomy into

5    what you're predicting is a $2.6 billion company in five years;

6    right?

7    **A.**    Right.  These are the outline of the synergies, both the

8    description and our initial estimate of the revenue and

9    operating profit those synergies would produce, which would be

10   in addition to what Autonomy could do standalone, which is laid

11   out on page 7.

12   **Q.**    Right.  Let's look at page 10, which I think will help

13   explain this a little.

14       Page 10 is what you would refer to as a waterfall chart;

15   correct?

16   **A.**    Correct.

17   **Q.**    And I assume that's just because it looks like a

18   waterfall?

19   **A.**    Correct.

20   **Q.**    The numbers are cascading down.

21   **A.**    Uh-huh.

22   **Q.**    The number on the left here is your estimate of what

23   Autonomy is worth as a standalone company; correct?

24   **A.**    Yeah.  The leftmost bar, the 7.117.

25   **Q.**    And the number on the right is your estimate of what

1    Autonomy is worth once you factor in everything that HP is

2    going to do with it?

3    **A.**   The 12.178?

4    **Q.**   Correct.

5    **A.**   Yes.

6    **Q.**   And the difference between those numbers, roughly

7    $5 billion, those are the synergies that HP thinks it can

8    extract from this acquisition?

9    **A.**   Correct.

10   **Q.**   And synergies are things like using HP's existing sales

11   force to go out there and sell the Autonomy product?

12   **A.**   That's a very simplistic synergy because if you read

13   carefully everything that's listed out in Slide 8, it actually

14   talks about new products that HP was looking to build using the

15   Autonomy technology.  So it isn't just pushing it in to more

16   channels.  It's actually developing more product.

17   **Q.**   Building on the Autonomy products for HP to develop new

18   products?

19   **A.**   Yes.

20   **Q.**   And one synergy that you considered was bundling software

21   and hardware, cross-selling, using sales of software to sell

22   hardware to existing Autonomy customers; right?

23   **A.**   That isn't listed on Slide 8.

24   **Q.**   Do you remember having any discussions about that?

25   **A.**   Yeah.  There was discussion that HP had.  Obviously being

1  a PC and printer and server and networking and storage

2  business, which are all hardware businesses, HP had obviously

3  deep relationships with some of the biggest companies in the

4  world so we were certainly thinking that there was an

5  opportunity for us to take the Autonomy software and sell to

6  existing HP hardware customers.

7  **Q.**   Let me ask you just a couple more questions about this

8  exhibit.  Can we go to page 25?  Can you tell us what a

9  surprise analysis is?

10  **A.**   (Witness examines document.)  I do.

11  **Q.**   Can you explain it?

12  **A.**   Yeah.  A surprise analysis, I mean, there are various

13  names for it.  What this is outlining is over the last eight

14  quarters, what was Wall Street consensus or the expected

15  revenue number for Autonomy; what did they actually deliver,

16  which is the "Actual" column; the "Surprise" column is whether

17  it's to the upside or the downside, what was over or above

18  consensus; and the same three set of columns for the EPS, which

19  is earnings per share.

20  **Q.**   The jury's heard a lot about hidden consensus targets, and

21  a consensus is an aggregate, an average of the estimates that

22  Wall Street is forecasting; correct?

23  **A.**   Correct.

24  **Q.**   And that's the numbers under "Expected" in this

25  spreadsheet; correct?

1   **A.**   Correct.

2   **Q.**   So, for instance, if we look at Q1 '11, the consensus

3   number is 217 million and the actual number that Autonomy made

4   was 219; correct?

5   **A.**   Correct.

6   **Q.**   So in that quarter they hit the target, as it were?

7   **A.**   Yes.

8   **Q.**   But if you look down these eight quarters, there are four

9   hits and four misses; right?

10  **A.**   Right.

11  **Q.**   So 50 percent of the time, as you analyzed it, Autonomy

12  was missing its quarterly target number; right?

13  **A.**   Yes.

14  **Q.**   And you knew that in May of 2011 already?

15  **A.**   Correct.

16  **Q.**   And that didn't deter you from buying the company;

17  correct?

18  **A.**   We were unaware to the extent it would have missed had it

19  not done the other things we learned later on.

20          **MR. MARAIS:**  I'm going to move to strike that

21  response, Your Honor.

22          **THE COURT:**  Okay.  That may go out.

23  BY MR. MARAIS:

24  **Q.**   The question is:  Just at the time in May through August

25  of 2011, you were aware that Autonomy had missed four of its

1   quarterly targets; correct?

2   **A.**   Correct.

3   **Q.**   And at that time knowing that information, it didn't stop

4   HP from going ahead with the acquisition; correct?

5   **A.**   Correct.

6   **Q.**   The last slide in this presentation, page 26, HP is

7   thinking about other potential interested parties?

8   **A.**   Yes.

9   **Q.**   These are other companies that you think might swoop in

10  and buy Autonomy out from under you?

11  **A.**   Yes.

12  **Q.**   Are these sometimes referred to as interlopers?

13  **A.**   Interlopers refers to companies that may be from a

14  different industry but may have an interest in the target.

15  **Q.**   And you want to keep an eye on, say, Oracle because you're

16  worried about it coming in and stealing Autonomy or getting

17  into a bidding war, something like that?

18  **A.**   Sure.

19  **Q.**   Over the next couple of months, you and your team produced

20  dozens of variations of these financial models; right?

21  **A.**   Correct.

22  **Q.**   And there was pressure internally at HP for you to drive

23  the synergies number up; right?

24  **A.**   Yes.

25  **Q.**   I mean, no one at this time complained about your

1    assessment of the standalone value for Autonomy as its own

2    company; right?  There was no complaint about that?

3    **A.**    Correct.

4    **Q.**    The pressure was on the synergy side?

5    **A.**    Correct.

6    **Q.**    At some point, for instance, you had a conversation with a

7    man named Martin Risau?

8    **A.**    Yes.

9    **Q.**    He was Mr. Apotheker's chief of staff?

10   **A.**    Correct.

11   **Q.**    And Mr. Risau told you that he wanted you to double the

12   synergies?

13   **A.**    I remember hearing that from Andy Johnson.  He never told

14   me that.  I sat down with Andy Johnson and he said the request

15   was for us to double the synergies.  So I don't know who said

16   what to whom, but we created an upside case that never went

17   anywhere but there was certainly effort put behind it.

18   **Q.**    What does that mean when somebody asks you to, quote,

19   "double the synergies"?

20   **A.**    It just means they have a more rosier picture of what they

21   believe they can do with the target.

22   **Q.**    Let's take a look at Exhibit 6534.

23        **THE COURT:**  Admitted.

24        (Trial Exhibit 6534 received in evidence)

25   \\\

BY MR. MARAIS:

Q.   Do you recognize this as an online instant message chat that you had with Mr. Levadoux?

A.   Yes.

Q.   Who is Mr. Levadoux?

A.   Mr. Levadoux was a senior executive in HP software.

Q.   And he is telling you about instructions he's received from someone named Bill.  Do you see that?

A.   I need a moment to read this.

     (Witness examines document.)  Yes.

Q.   Who's Bill?

A.   Bill Veghte, who this is referring to, was the -- call it the general manager of the HP software business.

Q.   And Mr. Veghte is challenging you and your team to think about how you can turn Autonomy into a $5 billion business; correct?

A.   He's challenging Jerome, who was his direct report, into how can he make this into a much bigger business, and Jerome is just sharing that with me.

Q.   And when Jerome says "versus current assumption of 2 to 2 and a half billion," he's referring to your estimates which we've just been looking at?

A.   Yes.

Q.   So the pressure was coming from senior management to increase the proposed value of the synergies piece; right?

1  **A.**   Correct.

2  **Q.**   Can you turn to Exhibit 6531?

3         **MR. REEVES:**  I'm sorry, what number?

4         **MR. MARAIS:**  6531.

5         **THE COURT:**  Admitted.

6      (Trial Exhibit 6531 received in evidence)

7         **MR. MARAIS:**  Thank you, Your Honor.

8  **Q.**   This exhibit, again, is a transcription of an instant

9  message chat; correct?

10 **A.**   Correct.  I need a moment to just read it.

11 **Q.**   Take all the time.

12 **A.**   (Witness examines document.)  Yes.

13 **Q.**   Jeff, can you highlight the line at 11:10 that says "Leo

14 has given some directional feedback"?  And then the first three

15 lines at 11:11 from Mr. Sarin.

16     Is the Leo here a reference to Mr. Apotheker?

17 **A.**   Yes.

18 **Q.**   And you write (reading):

19         "We just need to come up with more synergies.  I

20     don't have too much more color.  He" --

21     Is that Mr. Apotheker?

22 **A.**   Uh-huh.

23 **Q.**   (reading)

24     -- "He wants the fiscal year '14 revenue number to

25     be," quote, "much higher than 2.1 billion."

**SARIN - CROSS / MARAIS**

1           Do you see that?

2   **A.**    I do.

3   **Q.**    How was that information relayed to you?

4   **A.**    Through Mr. Johnson.

5   **Q.**    Did anybody say how much higher than 2.1 billion?

6   **A.**    No.

7   **Q.**    Did you understand that Mr. Apotheker just wanted the

8   number to be as big as possible so that he could sell this deal

9   to the board?

10  **A.**    I understood -- I had very little color at that time, like

11  I say in this particular instant message, other than we should

12  revisit the synergies and see if we can actually get them to be

13  a little bit higher.  That's all I knew.

14  **Q.**    And how do you work out how to get the synergies higher?

15  **A.**    You just revisit some of the assumptions.  Maybe there are

16  assumptions around tax rates to various other HP products.

17  Maybe it's trying to bring the product to market much sooner.

18          All of this is within the CEO executive privilege.  You

19  get pressure from executive management all the time, so I took

20  this to mean that somebody who's running a big business, like

21  Leo running HP, probably has a unique vision around how he

22  would accomplish our synergies.

23  **Q.**    And his vision was more aggressive than yours as to what

24  synergies HP could extract?

25  **A.**    My vision was driven by working with Marge and Jerome on

1    what we could do.  I was not sitting in HP Software to have a

2    view around how quickly we could bring new products to market.

3    It was entirely driven by my understanding talking to my

4    colleagues in HP Software.

5    Q.   Once again, these numbers, the synergy numbers, they don't

6    come from anybody at Autonomy; right?

7    A.   They don't.

8    Q.   And they don't come from any Wall Street analysts; right?

9    A.   Yes.

10   Q.   These are just numbers that HP is coming up with on its

11   own?

12   A.   Yes.

13   Q.   Let's take a look at Exhibit 6604.

14        **THE COURT:**  Admitted.

15        (Trial Exhibit 6604 received in evidence)

16   **BY MR. MARAIS:**

17   Q.   And you weren't on this e-mail, but in the bottom section

18   Mr. Johnson -- he's your boss; right?

19   A.   Yes.

20   Q.   He writes (reading):

21             "A couple of things in this deck.  New financial

22        model to get to 6 billion by 2014."

23        Do you see that?

24   A.   I do.

25   Q.   Now, in 2010 Autonomy's revenues were under a billion

1  dollars; right?

2  **A.**  Correct.

3  **Q.**  And you're kicking around internally the idea that within

4  four years, HP could take Autonomy from a $1 billion asset and

5  turn it into a $6 billion asset; is that right?

6          **MR. REEVES:**  I object.  It misstates the evidence.

7  This witness was not on the e-mail.

8          **THE COURT:**  Sustained.

9  **BY MR. MARAIS:**

10  **Q.**  Did you have any conversations with Mr. Johnson about the

11  possibility of adjusting the synergies to reflect that Autonomy

12  could become a $6 billion business by 2014?

13  **A.**  This is back to the conversation we were having earlier

14  where we were asked to increase the synergies.  That

15  conversation was with Mr. Johnson as I had said earlier.

16  **Q.**  Well, Mr. Johnson wasn't making these valuation models on

17  his own; right?

18  **A.**  No, but he was sitting with us to, you know, add the

19  synergies, if you will, to get to the higher number.

20  **Q.**  And this presentation goes to Mr. Apotheker; right?

21  **A.**  That's what it says.

22  **Q.**  And if we look at the attachment, I just want to go to the

23  waterfall slide, which is at page 10, that -- are you there?

24  **A.**  I am.

25  **Q.**  Okay.  This is just another version of the waterfall slide

**SARIN - CROSS / MARAIS**

1    that we looked at earlier; correct?

2    **A.**    Correct.

3    **Q.**    And the dotted line at the bottom, which says "Current

4    EV," is that equity value?

5    **A.**    Enterprise value.

6    **Q.**    Enterprise value.  And is that similar to market

7    capitalization?

8    **A.**    So an enterprise value is the true value of a business.

9    So when you were showing me 6.9 billion, that's the value of

10    the shares.  As you can imagine, there could be a debt on the

11    business, so somebody has to pay off the debt holders.  So

12    enterprise value is equity value plus debt less cash.

13    **Q.**    All right.  But the true value of the company were the

14    words you just used; right?

15    **A.**    Is EV at 7 billion here.

16    **Q.**    Okay.  And that dotted line is at 7 billion.  The idea is

17    the true value of Autonomy at this time is $7 billion; correct?

18    **A.**    True value defined by the market value is 7 billion, yes.

19    **Q.**    Okay.  The market's estimation of Autonomy is that it's a

20    $7 billion company; right?

21    **A.**    Correct.

22    **Q.**    And HP's estimation in this spreadsheet is that it's a

23    $10 billion company, give or take a few hundred million?

24    **A.**    Correct.

25    **Q.**    And the synergies value on the right-hand side in this

1    waterfall chart is $47 billion; right?

2    **A.**    Correct.

3    **Q.**    And so as I read this, HP is saying "We think Autonomy is

4    a $10 billion company, but we can turn it into a $47 billion

5    company"; is that fair?

6    **A.**    We can turn it into a business that is worth 47 billion if

7    all the synergies come to pass the way they're outlined here.

8    **Q.**    And the synergies, again, are what HP can do with

9    Autonomy?

10    **A.**    A lot of it driven by the new products.  You see

11    information life cycle management, content analytic solution,

12    document processing, so on and so forth.  So taking HP

13    technology, marrying it with the Autonomy technology, creating

14    new products, and bringing those to market.

15    **Q.**    Did you think that this analysis slide that we're looking

16    at was realistic?

17    **A.**    This was an upside case that we were asked to formulate.

18    We weren't putting a lot of -- it certainly seemed a little bit

19    more overreaching.

20    **Q.**    But unrealistic?

21    **A.**    Nobody can predict the future.  It just seemed a little

22    unrealistic.

23    **Q.**    Let's do one more of these quickly.  Could you look at

24    6606?

25                **THE COURT:**  Admitted.

1          (Trial Exhibit 6606 received in evidence)

2          **MR. MARAIS:**  Thank you, Your Honor.

3    **Q.**   Do you see the date on the front cover is August 18, 2011?

4    **A.**   Yes.

5    **Q.**   Do you understand that that's the day the HP board made a

6    decision to buy Autonomy?

7    **A.**   Yes.

8    **Q.**   And do you understand that this is the presentation that

9    went to the board to explain the work that you and your team

10   had been doing?

11   **A.**   Correct.

12   **Q.**   And if you look at page 2 under "Transaction Value," the

13   bottom entry there is "Enterprise Value," which we've been

14   discussing.

15          Do you know why that's so much higher now?  Earlier it was

16   close to 7 billion U.S. dollars, and in this version it says

17   £6.7 billion.  Do you know why the enterprise value has gone up

18   so much?

19   **A.**   I'm guessing a run-up on their stock price.

20   **Q.**   And the $11.7 billion, that's what HP paid for Autonomy?

21   **A.**   Right.

22   **Q.**   And let's look at the waterfall, which is Slide 7 in this

23   exhibit.  This is the final product of the work that your team

24   had been doing with the financial models; correct?

25   **A.**   Correct.

1  Q.   And here, again, the enterprise value is roughly

2  $6.3 billion.  Do you see that?

3  A.   Uh-huh.

4  Q.   So that's, to use your words, the true value as seen by

5  the market of Autonomy, 6.3 billion; correct?

6  A.   Correct.

7  Q.   HP's estimation of what it thinks Autonomy is worth is

8  9.5 billion?

9  A.   Correct.

10 Q.   And then the difference between the left hand bar and the

11 right hand bar, which is 7 and a half billion dollars, that's

12 the synergies piece; right?

13 A.   Yeah, but that is over a five-year period.

14 Q.   Over the next five years after the acquisition, HP thinks

15 that it can turn Autonomy into a $17 billion company; right?

16 A.   Right.  And not even five-year.  It's the valuation of the

17 synergies to infinity discounted back in today's terms.  So

18 should all of those things come to pass, you're right, the

19 9-and-a-half-billion-dollar company would be worth 17 billion.

20 Q.   And that difference, the $7.5 billion, that's the piece

21 that what HP can do with Autonomy?

22 A.   Yeah.  That's the value add from HP's side.

23 Q.   Let's take a look at the spreadsheet that Mr. Reeves

24 displayed earlier.

25      I think you used 2218; is that right?  There were two

**SARIN - CROSS / MARAIS**

1    versions.  2289.  It's already in evidence.

2        Can we start with the info section of this document?  Just

3    at the top, Jeff, "File Info."  Thanks.  That's perfect.

4        All right.  This now says "Last modified by Jeff Dahm,"

5    who's over there helping me, but in the original version, it

6    says "Emily Hsiao," who was one of your colleagues; right?

7    **A.**    Sure.

8    **Q.**    All right.  And the created date on this is back to

9    November 2006.  Was this just a financial model that HP had

10   that it used and reused for various different deals?

11   **A.**    Yes.

12   **Q.**    And -- all right.  We don't have a last-modified date

13   anymore.

14       Let's go back to the spreadsheet itself.

15       The waterfall presentations that we were just looking at,

16   they were based on these financial models; correct?

17   **A.**    Correct.

18   **Q.**    And if we click over to "Standalone DCF," which is a tab

19   at the bottom.

20       Now, "DCF" stands for discounted cash flow?

21   **A.**    Correct.

22   **Q.**    Can you explain what that means?

23   **A.**    Right.  So at a very high level, as I've been saying

24   earlier, the value of a business is its future cash streams

25   that are attributable to shareholders.

1    So said another way, you project out revenues over the

2    next 10 years to the best you can.  You then try to compute

3    from that what is the free cash flow that will be available to

4    the shareholders.  Once you've computed that, you discount it

5    back in today's terms, because a dollar a year from now isn't

6    worth the same thing as a dollar today.  You discount it back

7    in today's terms.  That is a discounted cash flow model.

8    That's what this is.

9    **Q.**   What you're interested in is how much cash Autonomy is

10   going to generate in the future?

11   **A.**   For any business that's considered the way to value any

12   business.

13   **Q.**   And the value in the gray block over here, 9.5 billion,

14   that's the same 9.5 billion we just saw in the waterfall for

15   the standalone value?

16   **A.**   Correct.

17   **Q.**   That's the ultimate conclusion of this spreadsheet, if you

18   will, on the standalone piece?

19   **A.**   Correct, based on the assumptions as built into this

20   model.  Because at the end of the day, the 9 and a half could

21   be some other number depending on whether you're growing the

22   business slower or faster or you're working less in terms of

23   cash or your margins are much lower because now you're selling

24   different products, not selling software.

25       So there's a lot of assumptions that go into it, which is

1  part of the reason I spent enough time with Mr. Hussain

2  confirming some of the high-level assumptions that this model

3  was built on.

4  Q.  Well, we'll get to that call.

5      Didn't you tell HP's lawyers that this is a process that

6  involves, quote, "an element of judgment"?

7  A.  Every model involves an element of judgment.

8  Q.  And you told them that this model was, quote, "less

9  elegant" than you would have liked; right?

10 A.  I don't remember saying that.

11 Q.  Okay.  The ultimate $9.5 billion calculation on this page

12 is based on the cash flow from 2012 onwards; right?  The inputs

13 to this conclusion --

14 A.  Right.

15 Q.  -- are the cash flow line from 2012 out to infinity?

16 A.  And maybe the two quarters of 2011.  That's what I don't

17 know what's built in; but, by and large, you're correct, yes.

18 Q.  Well, there's nothing on this spreadsheet from 2009;

19 correct?

20 A.  From 2009 and '10, that's history.

21 Q.  Definitely nothing.

22 A.  Right.

23 Q.  And, in fact, the 2011 numbers right up at the top aren't

24 factoring into your ultimate calculation here at all; right?

25 A.  I'd have to look at the formal list to confirm.

1   **Q.**   Jeff, can you just delete those two numbers under 2011?

2       All right.  They're gone and the value is still the same,

3   right, 9.5 billion?

4   **A.**   No.  So the way these models are built is they're put in a

5   static mode.  So I would delete a bunch of things and nothing

6   would change.  You'd have to go hit F9 and make sure it's

7   linking properly.  This doesn't tell me anything.

8   **Q.**   Okay.  As you sit here, you don't know whether there were

9   any 2011 revenue numbers involved in the $9.5 billion

10  calculation on this standalone model; correct?

11  **A.**   Yeah.  By looking at the screen, I wouldn't be able to

12  tell you.

13  **Q.**   Could we take a quick look at the rev buildup spreadsheet

14  you were talking about earlier?

15      All right.  There was a lot of discussion about these five

16  categories:  Product license, cloud, OEM, maintenance, and

17  services.  Do you remember that?

18  **A.**   I do.

19  **Q.**   And were these categories as they were reported in the

20  annual report or the financial statements?

21  **A.**   They were as reported in the financial statements, yes.

22  **Q.**   And so they would have been audited by Deloitte?  The

23  categories and the numbers would have been audited by Deloitte;

24  correct?

25  **A.**   Yeah.  The historical numbers would have been audited by

SARIN - CROSS / MARAIS

1  Deloitte, yes.

2  **Q.**    And you understood at this time that at a minimum,

3  Autonomy was selling some appliances; right?

4  **A.**    Yes.

5  **Q.**    And that those would have involved the sales of hardware;

6  correct?

7  **A.**    Software loaded on top of hardware, yes.

8  **Q.**    And so you knew -- and this was Judge Breyer's question

9  earlier -- that built into these numbers were some hardware

10  revenues; correct?

11  **A.**    A small number of appliances was built into this, yes.

12  **Q.**    That was your understanding at the time?

13  **A.**    Correct.

14  **Q.**    Did you know that Autonomy had a single operating segment?

15  Do you know what that term is?

16  **A.**    No, I don't know.  What is that term?

17  **Q.**    I'm not here to testify.  It's an accounting term in IFRS.

18  If you don't know what it is, you don't know what it is.

19       But ultimately, once again, you took comfort in the fact

20  that Deloitte had looked at these numbers, audited them, and

21  that these were public financials; right?

22  **A.**    Right.

23  **Q.**    Jeff, could we switch over to the rev spread tab?  There

24  are a lot of tabs here.

25       Thank you.

1          Do you know how many tabs there are on this spreadsheet?

2     **A.**    Many.

3     **Q.**    These numbers here all have -- with the exception of Q1

4     and I think probably Q2, they're all estimate numbers; right?

5     **A.**    They're Wall Street broker estimates by quarter for the

6     various revenue elements.

7     **Q.**    All right.  And these are the inputs for your formula?

8     You're looking at the estimates from Wall Street analysts to

9     try to work out how much cash Autonomy is going to generate in

10    the future; right?

11    **A.**    Only for 2011.

12    **Q.**    After that, you're using your own numbers?

13    **A.**    After that, we are using the growth rates.  That's what

14    we're using for 2012 and beyond for growth rates by IDOL

15    product, IDOL cloud, OEM, maintenance; and then based on

16    discussions and looking at prior cash conversion cycles,

17    estimating for that sale how much would convert into cash.

18    That's what we're then projecting out.

19    **Q.**    Your starting point, then, are these estimates from the

20    Wall Street analysts; right?

21    **A.**    For 2011, yes.

22    **Q.**    Okay.  And you have, I think, 19 analysts listed here, but

23    you only have estimate numbers from four or five of them.  Why

24    is that?

25    **A.**    Yeah, so this is breaking it down by the revenue element.

1    So, I'm sorry, this is not very clear.  But if you look at

2    row 11 in what you're showing me, that is IDOL product revenue.

3    So what I'm saying is even though the 16 or 19 analysts provide

4    estimates on the company, only five, six, or whatever the

5    number is, actually break out IDOL product.

6        Then the next column over is cloud revenue.  So a handful

7    of analysts break out cloud revenue.

8        If you scroll down, a handful of analysts break out OEM

9    revenue.

10        So most analysts don't need to show all the revenue

11    elements.  They can just go with the high-level revenue number.

12    Some break it out, so I'm using the benefit of what they've

13    provided me.

14    **Q.**   Okay.  And there's significant variation between these

15    estimates; correct?

16    **A.**   I don't know about significant variation, but they will

17    have some variation in them.

18    **Q.**   Well, just looking at the IDOL product revenue for the

19    year 2011, these estimates that you're using range from

20    296 million to $400 million; right?

21    **A.**   Hold on.  Which column are we looking at, sir?

22    **Q.**   Column R.

23    **A.**   Column R, okay.

24        (Witness examines document.)  Yeah, so they vary from 296

25    to 400, sure.

**SARIN - CROSS / MARAIS**

1   Q.   And I think you stressed earlier that Mr. Hussain had

2   mentioned UBS as an analyst that he thought you could look at;

3   is that right?

4   A.   Correct.

5   Q.   And UBS, for instance, in the IDOL product revenue is

6   actually below the mean over the estimates that you've

7   collected; right?

8   A.   It's marginally below the mean, yes.

9   Q.   How many hours would you say you spent working on this

10  spreadsheet with all these tabs?

11  A.   I think you told me several hundred was what I'd said

12  before, and I think that's a true statement.

13  Q.   How many hours would you say Ms. Hsiao has spent?

14  A.   Substantially more than that.

15  Q.   And there are other people at HP who've worked on it as

16  well?

17  A.   Varoon.

18  Q.   Mr. Bhagat?

19  A.   Yes.

20  Q.   How many hours has he spent on it?

21  A.   Many hours.

22  Q.   And you testified earlier that you demonstrated the

23  spreadsheet to Mr. Hussain and Mr. Chamberlain on a WebEx;

24  right?

25  A.   I showed Mr. Hussain the rev buildup tab on a

1    videoconference.

2    **Q.**    How long was that WebEx call that you had with Autonomy?

3    **A.**    I'd say about an hour or so, but we only went through one

4    tab.

5    **Q.**    You didn't show him all of the data that we've been

6    looking at today?

7    **A.**    No.

8    **Q.**    He didn't see any of that?

9    **A.**    No.

10    **Q.**    He didn't see your final valuation number; right?

11    **A.**    No.

12    **Q.**    And it wasn't actually you who walked them through the

13    valuation model; right?

14    **A.**    When you say "them," who is "them"?

15    **Q.**    I'm sorry.  You said you were on a call with people from

16    Autonomy to discuss your valuation model, or small pieces of

17    it.

18    **A.**    I walked Mr. Hussain through the rev buildup tab from a

19    model that we were using at that time.  We didn't walk them

20    through -- or Mr. Hussain through the valuation of the

21    business.

22    **Q.**    Okay.  And I just want to be clear that it wasn't you who

23    walked Mr. Hussain through.  It was one of your colleagues?

24    **A.**    No.  It was me.

25    **Q.**    Well, let's take a look at Exhibit 2151.

1           **THE COURT:**  Wait.  2151.  2151.  Is that in evidence?

2   Admitted.

3           (Trial Exhibit 2151 received in evidence)

4           **MR. MARAIS:**  Thank you, Your Honor.

5   **Q.**   This is an e-mail from you to Ms. Hsiao?

6   **A.**   Hold on.  It's not in this binder; right?

7   **Q.**   It's in one of the other binders.

8   **A.**   Never mind.  I see it.

9   **Q.**   I suppose it's an e-mail from you to Andy Johnson and

10  others, but you make a comment to Ms. Hsiao; right?

11  **A.**   Yes.

12  **Q.**   And Ms. Hsiao worked for you?

13  **A.**   Yes.

14  **Q.**   And here you write (reading):

15          "Emily, please send to Andy Gersh the model that you

16          walked Sushovan through yesterday."

17  **A.**   Yeah.  What I'm implying in here is she is clicking

18  through the model while I'm walking through the numbers with

19  Mr. Hussain.

20  **Q.**   And, again, here you say, "Just the base case standalone."

21  And that's a reference to some small subset of the data that

22  you showed them via the WebEx; right?

23  **A.**   Correct.

24  **Q.**   You never sent them a copy of this valuation model; right?

25  **A.**   As far as I remember, I don't think so.

**SARIN - CROSS / MARAIS**

1   **Q.**   Neither before nor after your discussion with them?

2   **A.**   Most likely.  I don't remember, but I don't think so.

3   **Q.**   I mean, it wouldn't make sense to; right?  You're

4   negotiating a transaction at arm's length.  You don't want to

5   tell the target what you think they're worth; right?

6   **A.**   Correct.

7   **Q.**   So you're keeping most of this spreadsheet pretty close to

8   your chest; right?

9   **A.**   Correct.

10  **Q.**   And when you get on the WebEx, Mr. Hussain and

11  Mr. Chamberlain over in England can see the demonstration that

12  Ms. Hsiao is giving them via the Internet; right?

13  **A.**   Correct.

14  **Q.**   And that's the first time Mr. Hussain ever saw that model?

15  **A.**   Correct.

16          **THE COURT:**  Is this a good time to take our recess?

17          **MR. MARAIS:**  Sure, Your Honor.

18          **THE COURT:**  Okay.  Ladies and gentlemen, we're going

19  to take our recess now.

20      Remember the admonition given to you:  Don't discuss the

21  case, allow anyone to discuss it with you, form or express any

22  opinion.

23                  (Pause in proceedings.)

24          **THE COURT:**  No, I mean, recess.  We're done now.

25  We're done now, yes.  Sorry.  Maybe I was misleading.

1    We're finished for the day.  Some of us have some other

2  work to do, but remember the admonition given to you.  I'll see

3  you at 9:00 o'clock tomorrow.

4          MR. MARAIS:  Thank you.

5          THE COURT:  Thank you.

6      (Proceedings were heard out of the presence of the jury:)

7          THE COURT:  Okay.  Let the record reflect the jurors

8  have retired.

9      So could you give me some idea of how much longer you

10 have?

11         MR. MARAIS:  Your Honor, I'm not entirely sure.

12 Mr. Reeves obviously covered a lot of ground.

13         THE COURT:  Yes.

14         MR. MARAIS:  I think another hour maybe, somewhere in

15 that range.

16         THE COURT:  Okay.  So I would like from the Government

17 a response to the memo that the Defense has filed this morning

18 on the subject of evidence that --

19         MR. REEVES:  We're happy to provide one.

20         THE COURT:  All right.  Anything else we need to

21 discuss?

22         MR. FRENTZEN:  No, Your Honor, other than just if

23 anybody wants something said to the jurors as I mentioned

24 before.

25         THE COURT:  Oh, yeah.  Is there anything that you want

PROCEEDINGS

1   me to say?

2           MR. KEKER:  No.  I don't think we should say anything.

3           MR. FRENTZEN:  Great.

4           MR. KEKER:  I think everything's fine.

5           MR. FRENTZEN:  That's all.  I just want that on the

6   record.  Thank you.

7           THE COURT:  Yes, Mr. Keker?

8           MR. KEKER:  At some point we want to raise this Cronin

9   phone records business --

10          THE COURT:  The what?

11          MR. KEKER:  -- but we don't need -- Cronin phone

12  records.  We filed a *Brady*, basically, motion saying that --

13          THE COURT:  Right.  Do you want to file a response to

14  that?

15          MR. FRENTZEN:  We did, Your Honor.

16          THE COURT:  Pardon?

17          MR. FRENTZEN:  We did.  I think we filed it either the

18  same day or the next day.

19          THE COURT:  I'll read that as well.

20          MR. FRENTZEN:  Thank you, Your Honor.

21          THE COURT:  I've got a lot of reading to do this

22  afternoon.  I'm going to be very busy reading.

23          MR. FRENTZEN:  Ours is pretty short.

24          THE COURT:  Yeah, but, still, I've got a lot of

25  reading to do.

PROCEEDINGS

```
1          Okay.  I mean, if you want to stay for a while, we could
2    stay.
3               MR. FRENTZEN:  No, Your Honor.
4               THE COURT:  All right.  We're in recess.  Thank you.
5               MR. REEVES:  Thank you, Your Honor.
6               MR. KEKER:  Thank you, Your Honor.
7                    (Proceedings adjourned at 12:35 p.m.)
8                              ---oOo---
9
10                     CERTIFICATE OF REPORTERS
11          I certify that the foregoing is a correct transcript
12    from the record of proceedings in the above-entitled matter.
13
14    DATE:   Tuesday, April 3, 2018
15
16
17
18    _____
19          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter
20
21
22    _____
23          Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                    U.S. Court Reporter
24
25
```