Volume 22

Pages 4347 - 4538

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
    VS.                             )      NO. CR 16-00462 CRB
                                    )
SUSHOVAN TAREQUE HUSSAIN,           )
                                    )
            Defendant.              )
_____)
                                    San Francisco, California
                                    Monday, April 9, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:
                    ALEX G. TSE
                    Acting United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
            BY:  **ROBERT S. LEACH**
                 **ADAM A. REEVES**
                 **WILLIAM FRENTZEN**
                 **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:
                    KEKER & VAN NEST
                    633 Battery Street
                    San Francisco  CA  94111
            BY:  **JOHN W. KEKER**
                 **JAN NIELSEN LITTLE**
                 **BROOK DOOLEY**
                 **KATE LAZARUS**
                 **NIC MARAIS**
                 **ATTORNEYS AT LAW**


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Pamela Batalo, CSR No. 3593, FCRR
              Official Reporters

## I N D E X

Monday, April 9, 2018 - Volume 22

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **HORAN, STEPHANIE** | | |
| (SWORN) | 4352 | 22 |
| Direct Examination by Mr. Reeves | 4353 | 22 |
| Cross-Examination by Mr. Marais | 4367 | 22 |
| **STEPHAN, MATTHEW** | | |
| (SWORN) | 4377 | 22 |
| Direct Examination by Mr. Frentzen | 4378 | 22 |
| Cross-Examination by Mr. Dooley | 4469 | 22 |
| Redirect Examination by Mr. Frentzen | 4521 | 22 |

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 203 | | 4388 | 22 |
| 216 | | 4393 | 22 |
| 360 | | 4371 | 22 |
| 394 | | 4457 | 22 |
| 456 | | 4400 | 22 |
| 488 | | 4408 | 22 |
| 519 | | 4428 | 22 |
| 544 | | 4483 | 22 |
| 545 | | 4479 | 22 |
| 567 | | 4484 | 22 |
| 638 | | 4515 | 22 |
| 677 | | 4440 | 22 |
| 697 | | 4510 | 22 |
| 728 | | 4458 | 22 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 743 | | 4460 | 22 |
| 765 | | 4442 | 22 |
| 1287 | | 4462 | 22 |
| 1449 | | 4450 | 22 |
| 1464 | | 4452 | 22 |
| 1466 | | 4445 | 22 |
| 2508 | | 4356 | 22 |
| 2642 | | 4359 | 22 |
| 2724 | | 4362 | 22 |
| 2724 | | 4366 | 22 |
| 2750 | | 4364 | 22 |
| 2751 | | 4365 | 22 |
| 2752 | | 4366 | 22 |
| 2753 | | 4365 | 22 |
| 3027 | | 4430 | 22 |
| 3028 | | 4433 | 22 |
| 3029 | | 4457 | 22 |
| 3030 | | 4457 | 22 |
| 3031 | | 4396 | 22 |
| 3032 | | 4457 | 22 |
| 3033 | | 4457 | 22 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 3034 | | 4457 | 22 |
| 6761 | | 4507 | 22 |
| 6762 | | 4505 | 22 |
| 6764 | | 4504 | 22 |

| | |
|---|---|
| 1 | <u>**Monday - April 9, 2018**</u>                    <u>**9:03 a.m.**</u> |
| 2 | **P R O C E E D I N G S** |
| 3 | ---000--- |
| 4 | (Proceedings were heard out of presence of the jury:) |
| 5 | **MR. LEACH:**  Good morning, Your Honor. |
| 6 | **THE COURT:**  Good morning.  The jury is not present. |
| 7 | The parties are. |
| 8 | **MR. LEACH:**  We have two out-of-town witnesses here |
| 9 | today, Your Honor.  One is from New York.  She's a single |
| 10 | mother who really needs to get back after today.  The other one |
| 11 | is a foreign witness from Australia who's taking leave in order |
| 12 | to be here with us.  We were requesting leave to take them out |
| 13 | of order just to make sure we can get them on or off today. |
| 14 | I'm hopeful we can also get to Andy Gersh and complete his |
| 15 | cross-examination and redirect today. |
| 16 | I understand there is no objection from counsel. |
| 17 | **THE COURT:**  Any objection? |
| 18 | **MS. LITTLE:**  I don't object to Ms. Heron coming in.  I |
| 19 | am concerned about Mr. Stephan also testifying because it might |
| 20 | kick the cross-examination into Friday.  If we were in session |
| 21 | tomorrow, it would be one thing, but I hate to break it up all |
| 22 | the way until Friday. |
| 23 | **THE COURT:**  I'm going to allow it.  I said for a long |
| 24 | time I'm going do this.  Sometimes it works to the detriment of |
| 25 | a party, I appreciate that, but that's what I do. |

PROCEEDINGS

1              **MR. LEACH:**  Thank you, Your Honor.

2              **THE COURT:**  Okay.  Bring in the jury.

3         (Proceedings were heard in the presence of the jury:)

4              **THE COURT:**  Let the record reflect all jurors are

5    present.  Parties are present.

6         Good morning, ladies and gentlemen of the jury.  Thank you

7    again for being so prompt.

8         As I've said from time to time, we interrupt the witness's

9    testimony, the present witness' testimony, to put on witnesses

10   who come from out of town who have obligations.

11        Since we're not meeting tomorrow, we want to make sure

12   that these two witnesses, who are going to come -- who have

13   come a considerable distance are able to testify, complete

14   their testimony, and then return to their homes.

15        So we will temporarily suspend the testimony,

16   cross-examination of Mr. Gersh, and start with the new witness.

17        Mr. Reeves.

18             **MR. REEVES:**  Thank you, Your Honor.  At this time, the

19   United States calls Ms. Stephanie Horan.

20                       **STEPHANIE HORAN**,

21   called as a witness for the Government, having been duly sworn,

22   testified as follows:

23             **THE CLERK:**  Please be seated.  Please state your full

24   name for the record and spell your last name.

25             **THE WITNESS:**  Sure.  It's Stephanie Horan, H-O-R-A-N.

1                    <u>**DIRECT EXAMINATION**</u>

2    **BY MR. REEVES:**

3    **Q.**   Good morning, Ms. Horan.

4    **A.**   Good morning.

5    **Q.**   How are you today?

6    **A.**   I'm fine, thank you.

7    **Q.**   Where are you from?

8    **A.**   Middletown, New Jersey.

9    **Q.**   Welcome to California.

10        What is your educational background?

11   **A.**   I graduated Marquette University 1998 with a BA.

12   **Q.**   After school, describe your career, please.

13   **A.**   After college, I went to Robert Wood Johnson University

14   Hospital, where I did medical billing, and then in March 2000,

15   I was recruited to SHI.

16   **Q.**   And is that where you still work?

17   **A.**   Yes.

18   **Q.**   So how long have you been working at SHI?

19   **A.**   Eighteen years.

20   **Q.**   Congratulations?

21   **A.**   Thank you.

22   **Q.**   What exactly is SHI?

23        First, what does SHI stand for?

24   **A.**   Software House International.

25   **Q.**   And what is the business of SHI?

1  **A.**    SHI is a global corporate computer reseller company where

2  we sell hardware, software, and services to our customers.

3  **Q.**    All right.  Let me direct your attention to the time

4  period 2009 to 2011.  You were at SHI in that period, were you

5  not?

6  **A.**    Yes.

7  **Q.**    What was your position within SHI in 2009 to 2011, that

8  three-year time period?

9  **A.**    I was the inside sales account manager for the Bank of

10  America account.

11  **Q.**    Describe, if you would, please, your duties and

12  responsibilities as the inside sales manager for the Bank of

13  America account.

14  **A.**    As the inside sales manager, I would support the inside

15  sales reps with any questions or concerns or escalation paths

16  that they had and I would also do their reviews.

17  **Q.**    Okay.  And describe the business that SHI is performing in

18  relation to its client, BofA.

19  **A.**    As far as what we did for Bank of America?

20  **Q.**    Sure.  What did you do for BofA?

21  **A.**    Okay.  We supported all their hardware needs and we would

22  provide them quotes and ship them any hardware that they

23  needed.

24  **Q.**    So how big a job is it to supply all the hardware needs of

25  a bank the size of Bank of America?

1  **A.**   It's pretty big.

2  **Q.**   Describe what you would have to do in order to meet that

3  responsibility to BofA, your client?

4  **A.**   Well, we had an inside sales support staff which would

5  filter all the phone calls and emails to provide the quotes and

6  process the orders.

7  **Q.**   All right.  And BofA sought certain types of hardware for

8  its bank functions that would be supplied by SHI; is that

9  correct?

10  **A.**   Yes.

11  **Q.**   Would that include hardware components from hardware

12  manufacturers like Dell computers?

13  **A.**   Yes.

14  **Q.**   All right.  And so how would you acquire -- withdrawn.

15       If BofA wanted X number of Dell computers, what would SHI

16  do?

17  **A.**   Well, they would normally put a request in for us to put

18  an inventory request into our system to bring stock into our

19  warehouse.

20  **Q.**   Would you have to reach out to Dell in that circumstance?

21  **A.**   What we would do is based on the bank's request, we would

22  initiate a PO.

23  **Q.**   Directly to Dell?

24  **A.**   Correct.

25  **Q.**   All right.  Okay.

1     Let me show you what has been marked for identification as

2 Exhibit 2508, please.  With luck, it will be in your stack.

3     Do you see that exhibit number on the bottom, Exhibit

4 2508?

5 **A.**  Yes.

6 **Q.**  Is this an email chain within SHI in or around December

7 2009 relating to Dell orders in the BofA account?

8 **A.**  Yes.

9          **THE COURT:**  Admitted.

10          **MR. REEVES:**  Thank you, Your Honor.

11     (Trial Exhibit 2508 received in evidence)

12          **MR. REEVES:**  If we could please display Exhibit 2508

13 and the middle email, after we get a little video input.  Let's

14 drop down if we could, please, Ms. Margen, to this middle --

15 keep going down.

16 **Q.**  There is somebody here named Stephanie Sepahbody.  Do you

17 know who is that?

18 **A.**  Yes.  That's me.

19 **Q.**  How did your name change?

20 **A.**  I'm divorced.

21 **Q.**  All right.  But in 2009, that was the name that you used?

22 **A.**  Correct.

23 **Q.**  So this is an email in or around December 2009.  At or

24 around that time, in December 2009, was there a change in any

25 way in the way SHI went about obtaining Dell products in order

1   to meet the needs of BofA?

2   **A.**    Yes.

3   **Q.**    Okay.  Are you familiar with a company by the name of

4   Autonomy?

5   **A.**    Yes.

6   **Q.**    Did you learn about Autonomy in this December 2009 time

7   frame?

8   **A.**    Yes.

9   **Q.**    Okay.  Tell us what happened, please.

10  **A.**    My boss, Jim Fogo, had contacted us, me, and said that he

11  was instructed by Thomas Carlisle at Dell to start ordering all

12  our Dell laptops through Autonomy.

13  **Q.**    And would that change?  What did that mean for you in

14  terms of acquiring Dell components as requested by BofA through

15  Autonomy?  What did that mean for you?

16  **A.**    Basically it really didn't impact me at all.  It was just

17  a matter of sending it through Autonomy instead of Dell,

18  meaning the purchase order.

19  **Q.**    It looks, like according to the email, on or around

20  December 21, 2009, you write, "Mike Sullivan just contacted me

21  and Autonomy is the reseller," etc.

22        Did you have an understanding as to who Mike Sullivan was

23  in this context?

24  **A.**    He was somebody that I was instructed to get the quote

25  from for the PO to be cut to Autonomy.

1    **Q.**    At Autonomy?

2    **A.**    Yes.

3    **Q.**    Okay.  And you say he said -- Mr. Sullivan said, "They

4    have special agreements where they are able to sell Dell

5    products.  He's looking to have a big end to this year and is

6    now asking that we bring in 3 million worth of E6400s by next

7    week."

8         What do you mean by the point you're making there?  What

9    did you mean?

10   **A.**    He was looking for us to put a large order in for the

11   E6400s.

12   **Q.**    What is an E6400?

13   **A.**    It's a Dell laptop.

14   **Q.**    All right.  Okay.  So did this begin a period of time in

15   which you were placing orders for Dell hardware through

16   Autonomy in order to meet the needs of BofA?

17   **A.**    Yes.

18   **Q.**    Now I'd like to show you what has been marked for

19   identification as Exhibit 2642, please.  Do you have a copy of

20   that before you?

21   **A.**    I do.

22   **Q.**    Do you recognize this document?

23   **A.**    Yes.

24            **THE COURT:**  Admitted.

25            **MR. REEVES:**  Thank you, Your Honor.

1          (Trial Exhibit 2642 received in evidence)

2                (Exhibit published to jury.)

3    **BY MR. REEVES:**

4    **Q.**   Let's go to the first page and talk about it generally.

5    This is Exhibit 2642, page 2, please.

6          Ms. Horan, what is this document?

7    **A.**   This is a sales report that we can take from our internal

8    systems and create at any time to show specific information

9    about purchases.

10   **Q.**   And has this particular version of your sales-out report

11   been limited to vendor or purchases that SHI is making on

12   behalf of BofA from Autonomy?

13   **A.**   Yes.

14   **Q.**   And then it is specified -- there is certain specified

15   time periods, are there not?

16   **A.**   Correct.

17   **Q.**   All right.  And what is each one of these rows?  Is each

18   one of these rows a separate purchase order that SHI is

19   submitting to Autonomy on behalf of BofA?

20   **A.**   I'm looking for the purchase order.

21         Yes.

22   **Q.**   Okay.  Order date on the left.  Is that the date of the

23   order?

24   **A.**   Correct.

25   **Q.**   And the vendor is Autonomy.  And then the products are

1  described there.  The amounts are further to the right.  Would

2  you agree?

3  **A.**   I agree.

4  **Q.**   All right.  So after the transition in the manner you've

5  described in December 2009, did you begin to place a lot of

6  orders, so to speak, with Autonomy for Dell products in order

7  to meet the needs of BofA?

8  **A.**   Yes.

9  **Q.**   Now, during this time period, did you disclose Autonomy's

10  role as the provider of Dell components to any of the people

11  with whom you were interacting at your client, BofA?  Is that

12  something you did?

13  **A.**   No.

14  **Q.**   To your knowledge, did anyone else at SHI disclose

15  Autonomy's role as the provider of Dell products to anyone at

16  BofA?  Do you know if that happened?

17  **A.**   No.

18  **Q.**   Let's -- let's look at the -- back at Exhibit 2642, the

19  sales for the time period 2009 to 2012.  Do you think that

20  reflects, as far as you know, the whole relationship with

21  regard to SHI purchasing hardware from Autonomy?

22  **A.**   Yes.

23  **Q.**   Let's take a look at the total of that figure for that

24  extended period of time.  I think that is reflected on

25  page 2642, page 12.  Let's blow up that number if we could,

1    please.  Super.  Thank you very much.

2        Ms. Horan, what is the total amount of purchase orders,

3    products, that SHI is buying from Autonomy for the time period

4    2009 to 2012?

5    **A.**  $71,085,730.56.

6    **Q.**  It seems like a lot of business.  Do you agree?

7    **A.**  Yes.

8    **Q.**  All right.  Good.

9        Let's break that down a little bit, please.  Let's look at

10   the second piece, page 2642, page 21 -- Exhibit 2642, page 21.

11   This looks like a breakdown for a slightly different time

12   period.  These are sales in 2010 through Q2/2011, that

13   six-quarter time period.  Do you see that?

14   **A.**  Yes.

15   **Q.**  So what is the total amount of hardware that SHI bought

16   from Autonomy and its subsidiaries for the time period all of

17   2010 and the first two quarters of 2011?

18   **A.**  $55,362,694.06.

19   **Q.**  And last, going back in time to the, I think,

20   comparatively small amount of hardware acquired in December

21   2009 as reflected on page 2642, Exhibit 2642, page 22, is that

22   a listing of the amount of sales in this December 2009 time

23   period?

24   **A.**  Yes.

25   **Q.**  And what was that amount, please?

1    A.    $1,096,400.

2    Q.    Thank you.

3          So each one of the rows on the sales-out report that we've

4    just gone through reflected a separate purchase order.  Would

5    you agree?

6    A.    Yes.

7    Q.    I'd like to show you an example of one rather than going

8    through all of those.  How does that sound?

9    A.    Okay.

10   Q.    All right.  Good.

11         Let me show you what has been marked for identification as

12   Exhibit 2724, please.  Do you have a copy of that before you?

13   A.    Yes.

14   Q.    Is this a copy of a March 18th, 2010 purchase order?

15   A.    Yes, it is.

16             THE COURT:  Admitted.

17          (Trial Exhibit 2724 received in evidence)

18                 (Exhibit published to jury.)

19   BY MR. REEVES:

20   Q.    Is this fairly typical of the way you would do your

21   business with Autonomy during this time period?

22   A.    Yes, it is.

23   Q.    And if we look down at the description, are there

24   descriptions of the components that SHI is buying from Autonomy

25   for BofA during this time period?

1   **A.**   Correct.

2   **Q.**   It looks like there are E6400s in the first row.  Do you

3   see that?

4   **A.**   Yes.

5   **Q.**   Those are the laptops?

6   **A.**   Correct.

7   **Q.**   And then there's this item down below that, "replicator."

8   What is a replicator?

9   **A.**   A port replicator is something you attach your laptop to

10   and other cords, a mouse keyboard.

11   **Q.**   And then below that there is a USB2 button optical mouse.

12   What is that?

13   **A.**   The mouse is something you can use to plug in and navigate

14   on your screen.

15   **Q.**   All right.  I think we probably have some here today,

16   don't we?

17   **A.**   Yes.

18   **Q.**   Yes.  Okay.

19       And then what's next is the keyboards.  What kind of

20   component is that?

21   **A.**   That's hardware.

22   **Q.**   Okay.

23   **A.**   It's something that you can use to type notes.

24   **Q.**   And what's the last piece, the swivel lock hardware, what

25   is that?

1    A.    That's a lock to lock your laptop up.

2    Q.    Are you familiar with all these products?

3    A.    Yes, I am.

4    Q.    These are all products that are manufactured by Dell?

5    A.    Correct.

6    Q.    And in this context, you were acquiring those products

7    through Autonomy in the way you've described?

8    A.    Yes.

9    Q.    One last exhibit.  Let me show you what has been marked

10   for identification as Exhibit 2750, please.

11         Do you recognize these photos of Dell products?

12   A.    Yes.

13              THE COURT:  Admitted.

14              MR. REEVES:  Thank you, Your Honor.

15           (Trial Exhibit 2750 received in evidence)

16                (Exhibit published to jury.)

17   BY MR. REEVES:

18   Q.    What is Exhibit 2750, page 1?  What is this a photo of?

19   A.    That's a laptop.

20   Q.    Are those the famed E6400s?

21   A.    Yes.

22   Q.    From Dell?

23   A.    Correct.

24   Q.    Let's take a look at page 2.  2751 --

25              THE COURT:  2750.

1              **MR. REEVES:**  Your Honor, I think each photograph is

2    marked as a separate exhibit, Your Honor.

3              **THE COURT:**  Okay.  2751.

4              **MR. REEVES:**  2751 please.

5              **THE COURT:**  Admitted.

6              **MR. REEVES:**  Thank you, Your Honor.

7              (Trial Exhibit 2751 received in evidence)

8              **MR. REEVES:**  Thank you, Your Honor.

9                   (Exhibit published to jury.)

10   BY MR. REEVES:

11   **Q.**   Do you recognize this?

12   **A.**   Yes.

13   **Q.**   What is this?

14   **A.**   That's a port replicator.

15   **Q.**   Is it like a docking station?

16   **A.**   Correct.

17   **Q.**   Does this contain any software on it?

18   **A.**   No.

19   **Q.**   Is that possible to do?

20   **A.**   No.

21   **Q.**   Let me show you what has been marked for identification as

22   Exhibit 2753.

23             **THE COURT:**  Admitted.

24             **MR. REEVES:**  Thank you, Your Honor.

25             (Trial Exhibit 2753 received in evidence)

1           MR. REEVES:  Thank you, Your Honor.

2                   (Exhibit published to jury.)

3    BY MR. REEVES:

4    Q.   What is that?

5    A.   That's a mouse.

6    Q.   Does that have any software on it?

7    A.   No.

8    Q.   No.  Okay.  That's a hardware component?

9    A.   Correct.

10   Q.   All right.  A couple more of these.  Let me show you

11   Exhibit 2752, please.

12           THE COURT:  Admitted.

13           MR. REEVES:  Thank you, Your Honor.

14           (Trial Exhibit 2752 received in evidence)

15                   (Exhibit published to jury.)

16   BY MR. REEVES:

17   Q.   Is that one of the keyboards from Dell?

18   A.   Yes.

19   Q.   Again, does that have any software on it?

20   A.   No.

21   Q.   And lastly, 2724, page 3, is this a set of a photo of all

22   five of the components, including the locks?

23   A.   I don't have it in front of me.

24           THE COURT:  Admitted.

25           (Trial Exhibit 2724 received in evidence)

1                    (Exhibit published to jury.)

2    BY MR. REEVES:

3    Q.   2724, page 3.  There we go.  Are you can comfortable using

4    the screen?

5    A.   Sure.

6    Q.   Do you recognize those photos?

7    A.   Yes.

8    Q.   And in the lower left-hand corner, there is a copy or a

9    photo of the swivel lock?

10   A.   Correct.

11   Q.   Is that the lock that you saw on that example purchase

12   order, for example?

13   A.   Yes.

14   Q.   Does that have any software on it?

15   A.   No, it does not.

16        MR. REEVES:  Thank you, Ms. Horan.

17   Thank you, Your Honor.  No further questions.

18        THE COURT:  All right.

19        MR. MARAIS:  Good morning, Your Honor.  Ladies and

20   gentlemen, good morning.

21                    CROSS-EXAMINATION

22   BY MR. MARAIS:

23   Q.   Good morning, Ms. Horan.  My name is Nic Marais.  I'm one

24   of the lawyers representing Mr. Hussain.

25        Are you familiar with the concept of a loss leader?

1    **A.**    No.

2    **Q.**    Does SHI ever sell one product to a customer at a discount

3    in the hopes that in the future, they'd be able to sell other

4    products to that same customer?

5    **A.**    Well, we go by whatever our distributors have to offer.

6    **Q.**    Do you ever offer discounts to new customers to try to get

7    them into the SHI stable?

8          **THE COURT:**  I don't think that's her role, is it?

9    **BY MR. MARAIS:**

10   **Q.**    Well, you work at SHI?

11         **THE COURT:**  But a lot of people work at SHI.  I mean,

12   I don't -- I don't know that is her role.  Her role is ordering

13   these things.  Have I missed that?

14        Do you have a role?  Do you sell products?

15         **THE WITNESS:**  My role at the time was just to support

16   the inside account.

17         **THE COURT:**  And that means what exactly?

18         **THE WITNESS:**  I was the inside sales manager, so I

19   would support the inside team and I would submit purchase

20   orders to our vendors.

21         **THE COURT:**  You would buy things?

22         **THE WITNESS:**  Yes.

23   **BY MR. MARAIS:**

24   **Q.**    Does inside sales manager mean inside to SHI?

25   **A.**    Yes.

1    Q.   You worked internally at SHI rather than directly with

2    external customers; have I got that right?

3    A.   Correct.

4    Q.   And SHI is a company that buys and sells hardware and

5    software 'right?

6    A.   Yes.

7    Q.   And one of the customers that you've talked about today is

8    BofA.  That's an SHI customer?

9    A.   Yes.

10   Q.   And you sell both hardware and software to Bank of

11   America?

12   A.   Yes.

13   Q.   Does SHI like to act as a one-stop shop, one place where

14   customers can come to get all of their hardware and software

15   needs?

16   A.   Yes.

17   Q.   And do you sometimes describe that as providing solutions

18   to customers?

19   A.   Yes.

20   Q.   In your experience, has Bank of America used SHI for

21   technology refreshes?

22   A.   Yes.

23   Q.   You are familiar with the term "technology refresh"?

24   A.   Yes.

25   Q.   That is where a particular customer decides that it needs

1    to replace a whole section of their technology; right?

2    **A.**    Right.

3    **Q.**    It could be hardware, it could be software, it could be

4    both?

5    **A.**    Uh-huh.

6    **Q.**    And presumably when a company comes to you to refresh its

7    technology, part of that order would often be for new computers

8    and new laptops; right?

9    **A.**    Correct.

10   **Q.**    Not just computers, companies at the same time would order

11   keyboards, mice, docking stations, and so on?

12   **A.**    Correct.

13   **Q.**    And that's often referred to as a bundle?

14   **A.**    Yes.

15   **Q.**    And you typically quote one price for the bundle of goods;

16   right?

17   **A.**    Yes.  But everything is quoted out as separate lines.

18   **Q.**    Okay.  But the bulk of the order would be the computer and

19   then some small add-on would be the bundle for the docking

20   stations and the keyboards and the mice and so on?

21   **A.**    Correct.

22   **Q.**    And if Bank of America comes to SHI and it says, "We want

23   the laptops and we also want the bundles," presumably you do

24   what you can to provide that for them; right?

25   **A.**    Yes.

1   **Q.**   I think you've testified that Autonomy started working

2   with SHI on the Bank of America account in late 2009 or early

3   2010?

4   **A.**   Yes.

5   **Q.**   And at that time, Bank of America was buying Dell

6   hardware; right?

7   **A.**   Correct.

8   **Q.**   And you were trying to get the hardware that Bank of

9   America need from Dell?

10   **A.**   Yes.

11   **Q.**   Isn't it true that at that time, SHI's relationship with

12   Dell was strained?

13   **A.**   Not that I recall.

14   **Q.**   Could we take a look at Exhibit 360.  This is an email

15   from Jim Fogo to Ms. Horan and others.

16       I would move it in, Your Honor.

17           **THE COURT:**  Admitted.

18           (Trial Exhibit 360 received in evidence)

19                   (Exhibit published to jury.)

20           **MR. MARAIS:**  If we could go to page 2, Jeff, and start

21   with the second email from Jim Fogo.  This is a discussion

22   about purchase orders for Dell hardware.

23   **Q.**   Do you see that?

24   **A.**   Yes.

25   **Q.**   And Mr. Fogo is one of your colleagues?

HORAN - CROSS / MARAIS

1    **A.**    He is my boss.

2    **Q.**    And he says, "If this is too much for Dell, let us know

3    and we will cancel the order."  Do you see that?

4    **A.**    Yes.

5    **Q.**    And a little further up on the page, Mr. Fogo follows up

6    and he says, "Does this have anything to do with the 700

7    layoffs in Malaysia."

8         And then on the first page, Mr. Carlisle -- he is at Dell;

9    right?

10   **A.**    Yes.

11   **Q.**    Writes, "You can't be serious."  Do you see that?

12   **A.**    Yes.

13   **Q.**    And a little further up, you respond, "I think you hit a

14   nerve, LOL."  Do you see that?

15   **A.**    Yes.

16   **Q.**    Do you remember at the time that there was some strain in

17   the relationship with Dell?

18   **A.**    Very vaguely.  I wasn't involved in those.  That was above

19   me.

20   **Q.**    Did you understand that in January 2010 Dell told SHI that

21   they were changing the relationship with Bank of America such

22   that SHI might lose out on its commission?

23   **A.**    No, I don't recall that.

24   **Q.**    Do you remember the people at SHI were concerned about

25   getting cut out of this deal?

1    **A.**    No, sir.

2    **Q.**    You don't know one way or the other whether if Autonomy

3    hadn't stepped up, this deal would have fallen apart?

4    **A.**    No.

5    **Q.**    It sounds as though at the time back in 2010 and 2011, you

6    didn't know very much about Autonomy; right?

7    **A.**    Correct.

8    **Q.**    You didn't know what software they sold?

9    **A.**    No.

10   **Q.**    Did you know that Autonomy had various products related to

11   preserving, collecting, and storing computer data?

12   **A.**    I did not.

13   **Q.**    Did you know they had a product called Autonomy Legal

14   Hold?

15   **A.**    No.

16   **Q.**    Do you know that Legal Hold is a software product that

17   runs on desktop computers and laptops?

18            **MR. REEVES:**    Objection.

19            **THE COURT:**    I think if she didn't know the product,

20   she probably wouldn't know how it worked.

21            **MR. MARAIS:**    That's a great point, Your Honor.    Thank

22   you.

23            **THE COURT:**    I just want to move this along.

24            **MR. MARAIS:**    I'm trying.

25   **Q.**    You have no idea, I take it, whether Autonomy software was

1   installed on these computers or not; right?

2   **A.**   No.

3   **Q.**   Let's take a look at Exhibit 2642, which is the

4   spreadsheet that Mr. Reeves just showed you.

5       I believe it's in evidence, so we can display it.  Thank

6   you, Jeff.

7       Did you know that SHI also bought and sold Autonomy

8   software?

9   **A.**   I did not.

10  **Q.**   Okay.  Do you know why there is no software listed in

11  Exhibit 2642?

12  **A.**   I do not.

13  **Q.**   Did the Government ask you to prepare a list that focused

14  only on sales of hardware?

15  **A.**   I didn't put this together, so I don't know.

16  **Q.**   These sales are listed in chronological order; correct?

17  **A.**   Yes.

18  **Q.**   And I think you referred earlier to $77 million number.

19  Have I got that right?

20  **A.**   Yes.

21  **Q.**   That's the total volume of sales between 2009 and 2012 as

22  it relates to hardware; right?

23  **A.**   Yes.

24  **Q.**   But if we -- Jeff, if we could turn to page 11 of this

25  exhibit.  One back.  Sorry.

1          Do you see, with the exception of -- in fact, no

2    exceptions.  Do you see that all the orders from this page on

3    occurred after August 18th, the date that HP announced its deal

4    with Autonomy?

5    A.    Yes.

6    Q.    And on the next page, there are some more orders in 2012,

7    again, well after August of 2011; right?

8    A.    Yes.

9    Q.    So I'm not going to make you count, but $9.1 million of

10   the sales in this chart occurred after August of 2011, and

11   based on that, this $71 million number includes those

12   $9.1 million of sales that happened after HP announced its deal

13   with Autonomy; right?

14             THE COURT:  Well, accepting your facts.

15             MR. MARAIS:  Accepting my premise.

16             THE COURT:  Accepting your math.  Okay.  Whatever it

17   is.

18   BY MR. MARAIS:

19   Q.    Do you know whether Autonomy was buying and selling this

20   hardware at a loss or at a profit?

21   A.    I have no idea.

22   Q.    Do you know that during the 18-month period the Government

23   has focused you on, Autonomy sold $39.5 million worth of

24   software to Bank of America?

25   A.    Not to my knowledge.

**HORAN - CROSS / MARAIS**

1  **Q.**   From SHI's side, who managed the Bank of America

2  relationship?

3  **A.**   Jim Fogo.

4  **Q.**   And you didn't attend any meetings directly with Bank of

5  America; is that right?

6  **A.**   No.

7  **Q.**   Okay.  And so you wouldn't know whether Autonomy attended

8  any of those meetings with Bank of America?

9  **A.**   No.

10  **Q.**   And presumably you wouldn't know if Autonomy had any of

11  its own meetings with Bank of America?

12  **A.**   Correct.

13  **Q.**   And certainly, there was no reason that Autonomy couldn't

14  talk to Bank of America about the hardware that it had sold;

15  right?

16          **MR. REEVES:**  Objection.

17          **THE COURT:**  Well, she wouldn't know.

18  **BY MR. MARAIS:**

19  **Q.**   Well, if you don't know --

20          **THE COURT:**  Well, she wouldn't know.  I don't know.

21  Do you know?

22          **THE WITNESS:**  No.

23          **THE COURT:**  Okay.

24  **BY MR. MARAIS:**

25  **Q.**   HP is another of SHI's customers; correct?

1   **A.**   Yes.

2   **Q.**   And so you buy products from HP and sell them on to other

3   end users; is that right?

4   **A.**   Yes.

5   **Q.**   And do you remember learning in August of 2011 that HP had

6   announced that it was going to acquire Autonomy?

7   **A.**   Yes.

8   **Q.**   Do you know whether anyone from SHI called anyone at HP to

9   discuss the hardware sales that we've been talking about today?

10  **A.**   No, I do not know.

11          **MR. MARAIS:**  I have nothing further, Your Honor.

12          **THE COURT:**  Thank you.  Thank you very much.  You may

13  go.

14      Next witness.

15          **MR. FRENTZEN:**  Your Honor, the Government calls Matt

16  Stephan.

17          **THE COURT:**  Ladies and gentlemen, if you want to stand

18  up, you may.

19                          **MATTHEW STEPHAN**,

20  called as a witness for the Government, having been duly sworn,

21  testified as follows:

22          **THE COURT:**  Would you prefer sitting in the back row

23  or the row you're in?

24      We have a juror who has a back issue, and she would prefer

25  sitting in the cryer's seat.  There are we.  So please

 1    accommodate her.

 2          **MR. FRENTZEN:**  Does the monitor work?

 3          **THE COURT:**  Does the monitor work?  Let's just check

 4    and see whether it does or not.

 5          **MR. FRENTZEN:**  She might want to be able to see.

 6    Maybe she can see that.

 7          **THE COURT:**  Can you see the screen across?  Great.

 8    Okay.

 9          **THE CLERK:**  Can you please state your full name for

10    the record and spell your last name.

11          **THE WITNESS:**  Matthew Paul Stephan, S-T-E-P-H-A-N.

12          **MR. FRENTZEN:**  May I proceed, Your Honor?

13          **THE COURT:**  Yes.

14                      <u>**DIRECT EXAMINATION**</u>

15    BY MR. FRENTZEN:

16    **Q.**   Good morning, Mr. Stephan.

17    **A.**   Good morning.

18    **Q.**   If you would, please, speak into the microphone as we go

19    through this so everyone can here you.

20          Where do you live?

21    **A.**   I live in Sidney, Australia.

22    **Q.**   Where are you originally from?

23    **A.**   I was born in Sidney.  Grew up in Canberra in Australia.

24    **Q.**   Could you tell us a little bit about your education, sir.

25    **A.**   I studied in Australia and completed my Bachelor's in

1   commerce at the University of Queensland in Brisbane.  And

2   subsequent to that, I moved to the United Kingdom and spent

3   three years at Deloitte training to be a Chartered Accountant.

4   **Q.**   And let's -- we'll get into your work history and kind of

5   what happened during that in just a minute.

6        What are you currently doing for a living?

7   **A.**   I'm an operations manager for a concrete company in

8   Sidney.

9   **Q.**   What does that mean, "operations manager"?

10  **A.**   I look after a group of production plants and a bunch of

11  concrete drivers, so a very operational, hands-on role.

12  **Q.**   How long have you been doing that?

13  **A.**   About six months.

14  **Q.**   Prior to that, were you working for the same company for a

15  long period of time?

16  **A.**   Yeah.  I've been with them since March -- sorry -- April

17  2011.

18  **Q.**   Up until this sort of most recent job change, were you

19  working for that company doing more of a financial role?

20  **A.**   Yeah.  I started in financial roles for probably the best

21  part of four years and then moved to a strategy role for two

22  years and now into my operational role.

23  **Q.**   I wanted to go back now to when you talked about working

24  in the UK.  Around when did you start working in the UK?

25  **A.**   It was September 2005.

1    **Q.**   And where was that?

2    **A.**   At Deloitte as an auditor.

3    **Q.**   Deloitte where?

4    **A.**   In Cambridge.

5    **Q.**   During your time there, did you become familiar with a

6    company called Autonomy?

7    **A.**   Yes.  I was on part of the audit team that was there every

8    quarter end, so I think my first time at Autonomy was January

9    2006.

10   **Q.**   And if you could, could you just give us some idea of the

11   folks that you worked with when you were working on auditing

12   Autonomy?

13   **A.**   The folks at Autonomy or Deloitte?

14   **Q.**   Let's start with the folks at Deloitte?

15   **A.**   I had people like Poppy Prentis, Lee Welham, Rob Knight

16   and Richard Knights.  So -- yep.

17   **Q.**   And what about some of the folks that you remember working

18   with from Autonomy while you were at Deloitte?

19   **A.**   Yeah.  I guess the main point of contact was Steve

20   Chamberlain; also Lisa Harris and various members of her

21   finance team.  And to a lesser extent, the senior manager,

22   Sushovan Hussain.

23   **Q.**   When you -- well, actually, even currently, are you a

24   Chartered Accountant?

25   **A.**   I'm still a Chartered Accountant, yes, in the United

1    Kingdom.

2    **Q.**    What does that mean?

3    **A.**    It just means I pay an annual fee and have to keep up

4    studies to stay relevant.

5    **Q.**    That's what it means for you, but just being a Chartered

6    Accountant, what does that mean?

7    **A.**    It's I guess a qualification like any other, but it's

8    specific to being an accountant so that it's that I've trained

9    and learned the accounting rules to a sufficient standard and

10    passed a series of tests and it's, I guess, a pretty

11    well-respected profession to maintain.

12    **Q.**    And how long did you work at Deloitte?

13    **A.**    I was there for just over three years.  I left in December

14    2008.

15    **Q.**    Where did you go when you left Deloitte?

16    **A.**    I went to a company in London called Johnson Matthey, PLC,

17    and I was there for a couple -- about three months.

18    **Q.**    What were you doing there?

19    **A.**    I was a group -- it was called group accountant, so I was

20    working on consolidating the financial statements of the

21    company each month end.

22    **Q.**    After you left Deloitte, did you stay in touch with

23    anybody from Autonomy?

24    **A.**    Not actively, but after I had been at Johnson Matthey for

25    a few months and it was not the job that had it had been

1    advertised to be, I reached out to Steve Chamberlain about

2    whether there would be any positions at Autonomy available.

3    **Q.**    What was the result of those conversations with

4    Mr. Chamberlain?

5    **A.**    At that point, he thought there could be a role, and he

6    had to work on it on his side, and not long thereafter, I left

7    Johnson Matthey and joined Autonomy.

8    **Q.**    So around when did you start working at Autonomy?

9    **A.**    I think it was probably April 2011.

10    **Q.**    2011?

11    **A.**    Sorry.  2008 -- sorry.  2009.

12    **Q.**    Okay.  April 2009?

13    **A.**    Yeah.  I left Deloitte December '08.  Joined March or

14    April '09.

15    **Q.**    With Autonomy?

16    **A.**    Autonomy.

17    **Q.**    Okay.  When you went to Autonomy to work there, what was

18    your title?

19    **A.**    I was senior finance manager.

20    **Q.**    What was your job responsibility while at Autonomy?

21    **A.**    I was focused on the revenue recognition side of the

22    business and also on the credit collections, so it would be

23    reviewing revenue contracts for the accounting on those.  It

24    would be managing the team that chased -- chased our debts, and

25    then it would be working with the auditors at the quarter end

1    to get through the audit process from the revenue side.

2    **Q.**   And those were the auditors from Deloitte?

3    **A.**   That's right.

4    **Q.**   Who was your immediate supervisor at Autonomy?

5    **A.**   It was Steve Chamberlain.

6    **Q.**   And who did Steve Chamberlain work for?

7    **A.**   Mr. Hussain.

8    **Q.**   During the course of your time with Autonomy, where were

9    you primarily based?

10   **A.**   I was nearly always in the Cambridge office with

11   occasional trips to the U.S.

12   **Q.**   All right.  And I think we'll get into some of those.

13        Just in terms of physically where you were working and who

14   was around you in Cambridge, who were your day-to-day

15   interactions primarily with?

16   **A.**   I would be sitting with a small team that reported through

17   to me and then I would be sitting the distance from me to you

18   from Mr. Chamberlain, probably similar distance from Lisa

19   Harris and Poppy Prentis when she joined the company.

20   **Q.**   So fair to say -- your interactions with Mr. Chamberlain

21   were how frequent?

22   **A.**   Many times a day.

23   **Q.**   What about Mr. Hussain?  How frequently would you say that

24   you interacted directly with Mr. Hussain?

25   **A.**   It would vary month to month, week to week.  It just

1    depended on what I was working on, and as we got closer to

2    quarter end, there would be more need to help reconcile revenue

3    figures for the deals that were closing or, you know, get

4    updates about different parts of the revenue forecasts that we

5    were looking at.  So it would sort of start slow and then build

6    up towards the quarter end.

7    **Q.**    Would you say that your interactions with Mr. Hussain

8    directly would increase as you would reach quarter end?

9    **A.**    Yes.

10   **Q.**    Where physically -- where was -- what's your understanding

11   of where Mr. Hussain was most of the time?

12   **A.**    Most of the time he was in London or in the U.S., in

13   San Francisco.

14   **Q.**    So your interactions with him were -- would you say they

15   were more face-to-face or more over the phone?

16   **A.**    Over the phone.

17   **Q.**    All right.  Can you give us a -- kind of a general sense.

18   You talked about revenue recognition.  How would you go

19   about -- what was your role in dealing with or assisting with

20   those issues?  What would you do?

21   **A.**    Depending on the way the deal had been done, I would be

22   involved earlier in the process with the legal team on

23   reviewing the contracts before they were signed because

24   different wording of contracts could result in different

25   revenue recognition issues.

1    And then once the deals were done, it was a matter of

2 compiling, I guess, a package of information that we would

3 ultimately pass on to the auditors so it would be the invoice

4 to the customer, the purchase order or the contract, the

5 history of the payments of the -- the -- whether they paid on

6 time, that sort of thing, and then we would end the delivery of

7 the software as well, so a package of all information to put

8 into files for the audit.

9 **Q.**   In terms of these deals that you're talking about, did you

10 have a way of having an understanding of kind of what deals

11 were in the pipeline?

12 **A.**   Yeah.  I would periodically dial into the SMS call, which

13 was the weekly sales update call, and also I would get access

14 to, at different points, the group revenue spreadsheet that

15 Mr. Hussain used to track all the deals and that would show

16 what was -- what was closed or what was yet to come in and what

17 was forecasted.

18 **Q.**   I want to talk a little bit about both of those things.

19    Can you describe for us -- what was your observation of

20 Mr. Hussain's role and responsibilities at Autonomy?

21 **A.**   As wells as --

22       **MR. DOOLEY:**  Objection to foundation.  Can we get a

23 time?  What time period we are talking about?

24 **BY MR. FRENTZEN:**

25 **Q.**   While you were at Autonomy.

1    **A.**    As well as leading the finance function, he was very much

2    leading the sales function as well.

3    **Q.**    And can you tell us how you understood that he was leading

4    the sales function?

5    **A.**    He would directly run or be involved in SMS calls at

6    different times and he would be tracking the sales in minute

7    detail on his revenue spreadsheet.

8    **Q.**    Can you describe for us these SMS calls?

9    **A.**    Yeah.  It would go through region by region, sales rep by

10    sales rep and talk about the deals they were working on and get

11    an update on each deal one by one, you know, what stages it was

12    at, whether, you know -- whether there were going to be issues

13    internally getting it to the quarter end, the value.  Go

14    through every single line item for the quarter.

15    **Q.**    All right.  And that was something that Mr. Hussain would

16    participate in?

17    **A.**    Yes.

18    **Q.**    You talked about revenue spreadsheets.  Can you just

19    describe those for us?  What were those?

20    **A.**    It was the main spreadsheet that was used to track the

21    buildup of all the individual sales that were happening in that

22    quarter, along with other revenue, such as services revenue or

23    support and maintenance revenue to get to the final figure for

24    the Autonomy group.

25    **Q.**    Who kept those revenue spreadsheets?

1  **A.**    Mr. Hussain.

2  **Q.**    Would you get access to them from time to time?

3  **A.**    Yes.  I would get access to help reconcile particularly

4  the final values of closed deals once the paperwork had all

5  been signed and delivered.

6  **Q.**    Can you describe for us in terms of accessing these

7  revenue spreadsheets, the documents, was this some sort of a

8  shared document or was this a document kept and maintained by

9  one particular individual?

10  **A.**    It was -- it was always on Mr. Hussain's computer.  I

11  might edit a version and send it back to him, but I never -- no

12  one else controlled the main document.  It was always his.

13  **Q.**    Okay.  So, for example, did you have the ability to, in

14  some way -- like a shared document -- go in and access it,

15  check on it, make changes to it?

16  **A.**    No.  It was kept on his local drive, as I understood.

17  **Q.**    So from time to time, would you get these revenue

18  spreadsheets because they were sent to you?

19  **A.**    That's right, yeah.

20  **Q.**    Who would send them to you, typically?

21  **A.**    Generally Mr. Hussain.

22  **Q.**    Who else, to your knowledge, would be asked to contribute

23  to these revenue spreadsheets?

24  **A.**    Usually it would be to myself and Mr. Chamberlain, but it

25  would also at times use different sales managers, I think would

1  directly be work on their piece, so it might be Mike Mooney

2  working on the Autonomy U.S. spreadsheet, Brent Hogenson worked

3  for a while on the Interwoven spreadsheet.  So -- but they

4  would generally have just their piece of the puzzle.  They

5  wouldn't have the whole spreadsheet.

6  **Q.**   I'd like to show you a document -- the Court's indulgence

7  one moment, Your Honor.

8       May I have one moment, Your Honor?  Sorry.

9       (Pause in proceedings.)

10  **BY MR. FRENTZEN:**

11  **Q.**   Let me show you what's been marked as Government's -- I'm

12  sorry, Exhibit 216 -- wait.  Never mind.

13            **THE COURT:**  216?  Two-one-six?

14            **MR. FRENTZEN:**  I think so, Your Honor.  Yes,

15  Your Honor.  216.

16            **THE COURT:**  Concerning Capax?

17            **MR. FRENTZEN:**  No.  Sorry.  That's the wrong one.  I

18  apologize.  Thank you, Your Honor.

19       There we go.  Let's take a look at 203.  Sorry.

20            **THE COURT:**  203.  Admitted.

21       (Trial Exhibit 203 received in evidence)

22                 (Exhibit published to jury.)

23  **BY MR. FRENTZEN:**

24  **Q.**   Mr. Stephan, do you see what's in front of you there?

25  **A.**   I do.

STEPHAN - DIRECT / FRENTZEN

1   **Q.**   Can you describe for us what this email -- generally

2   speaking, what is this?

3   **A.**   I would have been sent the group revenue spreadsheet to

4   run through and check the figures, so it would have involved

5   ringing around, in particular, the finance team for things like

6   where it says S&M there, support and maintenance, to get the

7   latest forecast figures for all those areas and send it back to

8   Mr. Hussain.

9   **Q.**   Could we bring up the attachment, please.  Great.  Okay.

10      All right.  Mr. Stephan, do you recognize what all of this

11  is?

12  **A.**   Yes, I do.

13  **Q.**   Okay.  What is this that we're looking at, this

14  attachment?

15  **A.**   So this is the spreadsheet that Mr. Hussain would use

16  every quarter to track the total revenue forecast for the

17  group.

18  **Q.**   And if we can, can you give us an idea of what the -- it

19  was fine as it was.  Great.  Thanks.

20      Can you tell us what these top -- let's start with the top

21  box up here.  What is this?

22  **A.**   So looking across the top, it's broken down by each of the

23  different divisions -- well, divisions or sales areas as they

24  were managed, and then down the left, it's -- the closed green

25  or white depends on the status of the deal.

1      So closed deals meant they were -- it's just closed, the

2  paperwork was done and we had all the information we needed to

3  book the revenue.

4      Green suggested that it was at the legal stage so the

5  commercial terms would have been complete and agreed and it was

6  just a matter of the paperwork.

7      And then white was yet to get to that stage.

8  Q.   All right.  And so this was the way of tracking all of the

9  revenue for Autonomy for the quarter?

10 A.   Correct.

11 Q.   If this email was September 18th of 2009, does this give

12 you a sense of which quarter this particular spreadsheet

13 related to?

14 A.   It would be the Quarter 3 2009.

15 Q.   When this document got sent to you, did you have a sense

16 from this document of what Mr. Hussain's goal, let's say, was

17 for the quarter?

18 A.   I don't think at this point I would have had an idea of

19 what the goal was.

20 Q.   All right.  In terms of the total number that's reflected

21 over here, what was your understanding of what that was?

22 A.   That was at this point the forecast for revenue for

23 Autonomy group for the quarter, Quarter 3.

24 Q.   And that's for all of these groups?

25 A.   That's right.

1  Q.   All right.  And then in terms of the breakdown, does this

2  top line here reflect at that time, Q3/2009, what the breakdown

3  was in terms of different groups?

4  A.   Yes.

5  Q.   So what were these groups?

6  A.   So, for instance, IDOL U.S. was the Autonomy business in

7  North America, excluding the Interwoven business and excluding

8  Zantaz, so those were separately split out, as you can see.

9       Column F -- actually Column F, Column G, Column H, those

10  were all separate businesses that Autonomy had acquired over

11  the years.

12       IDOL EUR is the rest of world for the Autonomy group.  So

13  that would be Europe, Middle East, Asia, the whole rest of the

14  world.

15       Again, he eTalk, Meridio were small businesses that still

16  had a separate sales process involved.

17  Q.   So the figures at the bottom on this row here, what did

18  that reflect?

19  A.   That would be the forecasted revenue for that piece of the

20  business.

21  Q.   So for each of the different pieces of business?

22  A.   Yes.

23  Q.   Can we zoom back out just a little bit.

24       In terms of -- at the bottom here, can we go ahead and

25  click on IDOL U.S. briefly.  All right.

1    Can you describe for us on each of these different groups,

2    if you will, IDOL U.S., IDOL Europe, and here we are in IDOL

3    U.S., what is reflected here, Mr. Stephan?

4    **A.**    The items at the top that are highlighted purple are the

5    closed deals, so they are a booked -- should be booked revenue.

6    And then below that, you've got a sort of mixture of white

7    and green, green being that they are at the legal stage of

8    negotiation and white being they haven't got to that stage yet.

9    **Q.**    So these would be things that were hopeful to close but

10    not yet closed?

11    **A.**    Right.  And I guess the green deals would be more likely

12    to close given that they were at a more advanced stage of

13    negotiation.

14    **Q.**    All right.  And then there are comments sort of throughout

15    off on the -- on this Column L.  What's your understanding of

16    what -- what those --

17    **A.**    They would be notes taken by Mr. Hussain or all sales

18    managers, depending on who the latest update of the spreadsheet

19    was based on the SMS calls.

20    **Q.**    So could you -- is this commentary here, is this basically

21    a way for Mr. Hussain to track where the deals are?

22    **A.**    That's right.

23    **Q.**    Okay.  All right.  And just as an example, do you see here

24    there's Kraft --

25    **A.**    Yep.

1    Q.    -- indicated here?  All right.  And then there's comments

2    over here about Kraft?  Do you see that?

3    A.    Yep, I do.

4    Q.    All right.  Just incidentally, do you see up here where it

5    says "VA"?

6    A.    Yes.

7    Q.    The purple deal?  And MicroLink is indicated off to the

8    right-hand side?

9    A.    Yes.

10    Q.    Did you have an understanding of what MicroLink was?

11    A.    MicroLink was a value added reseller working generally on

12    federal government U.S. transactions.

13    Q.    As you -- during the course of 2009, did you begin to see

14    a, if you will, larger number of reseller deals that were

15    occurring towards quarter end, to your observation?

16    A.    Quarter 3 I don't think was such a significant number, but

17    certainly Quarter 4, they were a very large number in terms of

18    the number of deals and the quantum of those deals.

19    Q.    All right.  I want to go ahead and get into that now then.

20        As you started to reach -- actually I wanted to show you

21    one other document before we get to that and that was this

22    Exhibit 216.  Take a quick look at this and see if you

23    recognize what 216 is, Mr. Stephan.

24            THE COURT:  Admitted.

25            (Trial Exhibit 216 received in evidence)

1                     (Exhibit published to jury.)

2     **BY MR. FRENTZEN:**

3     **Q.**   Mr. Stephan, the large part of it is up there.

4          All right.  Do you have a recollection of having to deal

5     with an entity called Capax?

6     **A.**   Yes, I do.  At this point, it was trying to intercede

7     where Cynthia Watkins, who was the U.S. finance manager, was

8     struggling to get a payment from them by quarter end and Steve

9     Chamberlain was going to contact them but then he was unable

10    to, so he passed it to me to ring the manager of Capax.

11    **Q.**   Okay.  All right.

12         And does this email relate your conversation with

13    Mr. Baiocco at Capax?

14    **A.**   Yes, it does.

15    **Q.**   All right.  And do you have a recollection that

16    Mr. Baiocco was saying that "as soon as they received payment

17    from us, they will pay our invoices"?

18    **A.**   Yes.  That's what I recall.

19    **Q.**   Did that seem odd to you at that time?

20    **A.**   It seemed unusual, yes.

21    **Q.**   Around that time, did you have any understanding of

22    whether or not Autonomy was paying money to Capax for EDD work

23    to be done?

24    **A.**   At that time I wasn't really sure what money we owed them.

25    I knew we had a few different transactions going in either

 1    direction, but the substance of those I wasn't aware of.

 2    **Q.**   So the deal that you were trying to collect on from Capax,

 3    what was that?

 4    **A.**   It would have been a previous reseller transaction we did

 5    through them for a license revenue deal, I assume.

 6    **Q.**   All right.   To your -- just to your knowledge or

 7    information, was Capax doing any -- did you have any idea

 8    whether Capax was actually doing any EDD work for Autonomy?

 9    **A.**   No.

10         **MR. DOOLEY:**   Objection.   Foundation.

11         **THE COURT:**   Foundation.

12         **MR. FRENTZEN:**   My question was whether or not he knew

13    at all.   He didn't know.

14         **THE COURT:**   That's fine.

15    **BY MR. FRENTZEN:**

16    **Q.**   Did this situation to you seem odd, that he wasn't going

17    to pay you money that Autonomy was owed until he got his money?

18    **A.**   It seemed odd at the time, but, then again, it was

19    probably not unusual that if -- yeah, that companies would try

20    and find ways of delaying payment to us, so it wasn't sort of

21    as unusual as it might look here.

22    **Q.**   And who were the individuals that you notified about this

23    conversation that you had with Mr. Baiocco?

24    **A.**   So I was replying to Cynthia Watkins and copying in

25    Mr. Hussain and Mr. Chamberlain.

1  Q.   I would like to move now to towards the end of 2009, and

2  if we could, I want to start with an exhibit that's 3031.

3  Could we -- I don't know -- is there an objection to us pulling

4  it up or should we just go witness only first?

5          MR. DOOLEY:  I need to see the exhibit.

6          MR. FRENTZEN:  Can we pull up 3031, please.

7          THE COURT:  Admitted.

8              (Trial Exhibit 3031 received in evidence)

9                  (Exhibit published to jury.)

10         MR. FRENTZEN:  Thank you, Your Honor.

11 Q.   Mr. Stephan, can you take a look at 3031, and if we could,

12 could we go to the "file" and "information."

13      Mr. Stephan, do you see on here an author and "last

14 modified by"?

15 A.   Yes.  Mr. Hussain.

16 Q.   And then do you also see a date of last modified?

17 A.   Yes.  It's 24th of December, 2009.

18 Q.   Can we go back to the sheet itself.

19      Mr. Stephan, do you recognize what this is?

20 A.   Yes.  It's, again, the same type of spreadsheet we talked

21 about before, the group revenue spreadsheet that's tracking the

22 Quarter 4/2009 revenue.

23 Q.   And with respect to this one, do you see right here where

24 I've circled -- what does that say?

25 A.   It is saying "the route to 225."

1  **Q.**   What does that mean?

2  **A.**   It would be saying that the target for that quarter would

3  be 225 and it was a reconciliation of how to get there.

4  **Q.**   All right.  And is that something that Mr. Hussain would

5  do each quarter in terms of notifying you of what his target

6  was?

7  **A.**   He wouldn't formally notify me as such, but at some point

8  in the quarter end, whether it was right near the quarter end

9  or immediately after, we'd be aware of -- myself and the

10  finance team would be aware of what the target was for the

11  quarter.

12  **Q.**   And is this one of the ways in which you might be notified

13  of what the target was?

14  **A.**   Yes, it would be.

15  **Q.**   All right.  And then, if you could, could you take a look

16  at the top box here in "revenue" and do you see a total as a

17  goal?

18  **A.**   Yes.  It's 224 is the forecast at this point.

19  **Q.**   And in terms of this particular breakdown on December 24th

20  of 2009, do you see a number that is projected for IDOL U.S.

21  over here?

22  **A.**   Yes.  It's 67.2 million.

23  **Q.**   And what about IDOL Europe, how much is projected or a

24  goal for IDOL Europe?

25  **A.**   It's 23.2 million.

1    Q.   I'd like to go briefly now to the breakdown.  Could we go

2    to IDOL Europe, please.  Okay.

3        All right.  Again, Mr. Stephan, is this the list of

4    different potential -- some closed deals and other potential

5    deals to get to the number for each group?

6    A.   That's correct.  So the purple ones down to row 47 were

7    all closed and then the section from row 49 to 56 were yet to

8    close.

9    Q.   All right.  And do you see here on line -- I'm sorry.

10   Can -- I can't see what line number that is.  I just need to be

11   able to see it.  56.

12       Do you see what is indicated there?

13   A.   I do.  It was a transaction with the Vatican for

14   7.8 million euros which converted to 11 1/2 million U.S.

15   dollars.

16   Q.   Is this deal a deal with the Vatican one that you were

17   familiar with?

18   A.   I was aware that it was something that was being worked

19   on.  It was, you know, an out-of-the-ordinary kind of

20   transaction because it involved the Vatican Library, which was

21   full of all sorts of, you know, ancient ticks and treasures of

22   the world, so it was an interesting transaction that we were

23   trying to win.

24   Q.   It would have been a cool deal?

25   A.   It could have been very cool.

1   Q.   So at this time, the IDOL Europe that totaled the 23.2 --

2   can you go out?  All right.

3       Do you see down here that there is 23.2 total at that

4   time?

5   A.   Yes, I do.

6   Q.   And at that time, does that include 11 -- a little under

7   11.5 million from the Vatican?

8   A.   Yes, it does.

9   Q.   If we could go now to IDOL U.S., please, take a look at

10  that.  At this time -- and if we could scroll up a little bit.

11  If you could quickly, could you just scan this.

12      Is there any reference to an Eli -- Capax/Eli Lilly deal

13  or Capax/EDD deal for 4 million or a FileTek deal for 8

14  million?  Mr. Stephan, do you see any of those encompassed in

15  those?

16  A.   No, I don't.

17  Q.   Can we scroll down -- or up, I guess.  Great.  Thanks.

18  A.   They're not there either.

19  Q.   All right.  Okay.  And the total estimate at that time for

20  IDOL U.S. from Mr. Hussain is about 67 million?

21  A.   That's correct.

22  Q.   Can we go down to line 285, please.  If you could back out

23  so I can see where that is.  Is that line 285?  I can't see.

24  All right.  Great.

25      Do you see here among the deals that are out is Eli Lilly?

1    **A.**    Yes, I do.

2    **Q.**    That's 6.6 million?

3    **A.**    Yes.

4    **Q.**    So at that point, Eli Lilly is out --

5    **A.**    Correct.

6    **Q.**    -- in this accounting?  Okay.

7         I'd like move now to a different version of these

8    spreadsheets.  I'd like to go to Exhibit 456.

9              **THE COURT:**  Admitted.

10         (Trial Exhibit 456 received in evidence)

11              **MR. FRENTZEN:**  Thank you, Your Honor.  Can we bring

12    up -- before we bring up the Excel, can we just bring up the

13    email.

14              (Exhibit published to jury.)

15    **BY MR. FRENTZEN:**

16    **Q.**    All right.  Now, Mr. Stephan, are you on the eventual

17    response here from Mr. Hussain on December 31st, 2009?

18    **A.**    Yes, I am.

19    **Q.**    Was this attaching another of these revenue spread sheets

20    from the 31st of December, apparently?

21    **A.**    Yes, it was.

22    **Q.**    Could you tell us in the initial email from

23    Mr. Chamberlain, what was Mr. Chamberlain asking of

24    Mr. Hussain?

25    **A.**    Mr. Chamberlain was asking for an updated version of this

1    revenue spreadsheet.  He was keen to get the latest information

2    because a deal had been brought to his attention through Capax,

3    the reseller, that was significant.

4    **Q.**   This was the reseller that you were having trouble getting

5    money from until you paid them?

6    **A.**   Correct.

7    **Q.**   And then Mr. Chamberlain says, "Capax/Lilly news to me.

8    We are now adding 9.9 million to their balance, which causes me

9    issues.  I am dealing with Stouff."

10   **A.**   Yeah.  He is basically pointing out that that deal is

11   going to be difficult to recognize revenue on and get through

12   the quarterly audit because Capax already had a significant

13   amount of overdue debt.

14   **Q.**   All right.  And was there -- was there any information

15   related to you that in terms of these sales, in keeping up with

16   the sales, that Capax was going to do another $10 million in

17   business with Autonomy as of the last day of the quarter?

18   **A.**   Was I aware before this?  No.

19   **Q.**   Okay.  Could we go to the attachment now, please.  Could

20   we click on the file.

21       Do you see the "last modified" here, Mr. Stephan?

22   **A.**   Yes, I do.

23   **Q.**   And "author" and "last modified by"?

24   **A.**   Yes.  Mr. Hussain.

25   **Q.**   Let's go to the sheet, please.  All right.  Is there still

1  a "route to 225" on here?

2  **A.**   Yes, there is.

3  **Q.**   But the total here now appears to be how much?

4  **A.**   About 223 million.

5  **Q.**   Okay.  At this point in time -- could we slide over just a

6  little bit that way.  Great.  Thank you.  Sorry.  Perfect.

7       All right.  Do you see a difference in the forecast here

8  for IDOL Europe from the 23 million?

9  **A.**   Yes.  It's gone down to 11 million.

10 **Q.**   And what about IDOL U.S. from 60 some-odd million to what?

11 **A.**   It's gone up to 86 million.

12 **Q.**   Could we now click on IDOL U.S., please.  No.  I'm sorry.

13 Could we go to IDOL Europe first.  I apologize.

14      All right.  Is the -- can you see now, if we take a look

15 at the deals -- purple is what, Mr. Stephan?

16 **A.**   Those are the closed deals.

17 **Q.**   And then green means what?

18 **A.**   It's still yet to close.

19 **Q.**   And just briefly, do you see what the green customer is?

20 **A.**   The customer called Poste Italiane.

21 **Q.**   So at this point is the Vatican any longer included in

22 IDOL Europe?

23 **A.**   No, it's not.

24 **Q.**   All right.  And if we can scroll down, I think, to line

25 167 -- okay.  Do you actually see the Vatican is now in the

1    "out" category?

2    **A.**    Yes.  I see it.

3    **Q.**    Let's now go to IDOL U.S., please.  In IDOL U.S., do you

4    now see that Capax has come in at $10 million?

5    **A.**    Yes, I do see that.

6    **Q.**    What's the breakdown of that 10 million for Capax?

7    **A.**    It's $6 million for Eli Lilly and 4 million for EDD.

8    **Q.**    Was that the transaction that Mr. Chamberlain was

9    concerned about in his email to Mr. Hussain?

10           **MR. DOOLEY:**  Objection.  Foundation.

11           **MR. FRENTZEN:**  It was the email we just looked at.

12           **THE COURT:**  Overruled.

13           **THE WITNESS:**  Yes.  That would be the transaction.

14    BY MR. FRENTZEN:

15    **Q.**    And in terms of FileTek, do you now see a FileTek --

16    **A.**    Yes, I do.  For $8 million.

17    **Q.**    Incidentally, do you see anywhere in here a reference to

18    MicroLink or Discover Tech for about $2 million?

19    **A.**    No, I don't.

20    **Q.**    So as of December 31st, 2009, MicroLink or Discover Tech

21    at about $2 million was not anywhere on the IDOL U.S. --

22    **A.**    No, it wasn't.

23    **Q.**    -- sheet?

24           And briefly, can we go to the Interwoven tab.  On the

25    Interwoven tab, can we go to line 222, please.

1    Do you see that there is an entry that has not closed for

2    Valueteam for around 2.2 million?

3    **A.**   Yes, I do see that.

4    **Q.**   Do you see a reference in the comments to Poste Italiane?

5    **A.**   Yes, I do.

6    **Q.**   I would like to move now to, generally speaking, the tail

7    end of 2009 and into the very beginning of 2010.  Did that

8    period of time cause concerns for you, Mr. Stephan?

9         **MR. DOOLEY:**  Objection.  Vague.  What are these

10   concerns?

11        **THE COURT:**  Well, otherwise it's leading.  You can't

12   get it both ways.

13        **MR. FRENTZEN:**  I'm happy to lead, Your Honor.

14        **THE COURT:**  Overruled.

15        **THE WITNESS:**  Yeah.  Because of, particularly as you

16   saw in the IDOL U.S. tab, there were some very large figures

17   going through resellers.

18   **BY MR. FRENTZEN:**

19   **Q.**   What was it about that that caused you concerns at the end

20   of the quarter?

21   **A.**   They were small companies that should we enforce those

22   debts against them, from everything I could see, they would be

23   unable -- unable to pay their bills, you know, to the point

24   that it would send them under, so they were completely reliant

25   on getting the money from the end customer eventually to pay

1    us, which was a problem from a revenue recognition perspective.

2    **Q.**    Why is that?

3    **A.**    Just there is a risk that they would not be collectible

4    and therefore that they shouldn't be taken to revenue.

5    **Q.**    When you started to see these types of reseller deals at

6    the end of 2009, did it -- did you compare those to

7    Mr. Hussain's forecast, if you will?

8    **A.**    The -- most of them in this quarter end came -- came out

9    of the blue, I suppose, on the last couple days of the quarter.

10    **Q.**    All right.  And what was your view on what would happen in

11    terms of Autonomy's -- let me put it this way.

12        Were you aware -- did you have an understanding of

13    Mr. Hussain's concerns about the analysts?

14    **A.**    I mean, we had -- Autonomy management had worked with

15    analysts to have a forecast of revenue, and if we didn't hit

16    that, that would be negative -- a negative thing for the

17    company and it would affect the share price.

18    **Q.**    Based on what you were seeing, without these reseller

19    deals, what kind of a miss, if you will, would Autonomy have

20    had at the end of 2009?

21    **A.**    It would have been at least 10 percent, upwards of 20

22    percent, I think.

23    **Q.**    What sort of concerns did that cause for you?

24    **A.**    It was a concern that these deals were only being done to

25    get to that revenue figure.  That they were a problem on many

```
 1   fronts from an audit perspective, from ongoing credit
 2   collection perspective, so we wouldn't want to have anything to
 3   do with them if we didn't need them to hit the number.
 4        MR. FRENTZEN:  Your Honor, I don't know if it's a good
 5   time --
 6        THE COURT:  Ladies and gentlemen, let's take a recess
 7   now.  We will be in recess until 20 to 11:00.
 8      Remember the admonition given to you:  Don't discuss the
 9   case, allow anyone to discuss it with you, form or express any
10   opinion.
11      (Proceedings were heard out of presence of the jury:)
12        MR. FRENTZEN:  Very briefly, but it relates --
13        THE COURT:  Let the record reflect the jurors have
14   left.
15        MR. FRENTZEN:  This relates to this witness, so I
16   don't know if they want to have him excused from the courtroom
17   or not.  I don't think it matters.
18        MR. DOOLEY:  Why doesn't he step down.
19        THE COURT:  Would you step outside, Mr. Stephan.
20          (The witness leaves the courtroom.)
21        MR. FRENTZEN:  Sorry, Your Honor.  I didn't want to
22   hold everyone up from the break, but there are a number of
23   spreadsheets that we gave notice of yesterday, last night, that
24   I have not yet shown to this witness.
25      I just thought maybe we could take the laptop and the
```

 1   witness for a couple minutes, have the agent show them to him

 2   in succession -- not questions about them, just do you

 3   recognize these as a spreadsheet so I could put them in

 4   en masse to save everybody time.

 5          THE COURT:  Any objection?

 6          MR. DOOLEY:  If that is all it is, is just having him

 7   look at the spreadsheets, that's fine.

 8          MR. FRENTZEN:  I don't even need be there for it.

 9          THE COURT:  Fine.

10          MR. FRENTZEN:  Great.  Thank you.

11                 (Recess taken at 10:22 a.m.)

12                 (Proceedings resumed at 10:41 a.m.)

13        (Proceedings were heard in the presence of the jury:)

14          THE COURT:  Please be seated.

15      Okay.  Let the record reflect all jurors are present, the

16   parties are present.

17      You may proceed.

18          MR. FRENTZEN:  Thank you, Your Honor.

19      With apologies, Mr. Stephan, and ladies and gentlemen, I

20   want to get through just a couple more of these spreadsheets

21   before we get to some more generally issues.

22      Can we take a look at Exhibit 488, please?

23          THE COURT:  What number is it?

24          MR. FRENTZEN:  488, Your Honor.

25          THE COURT:  Admitted.

1           (Trial Exhibit 488 received in evidence)

2           **MR. FRENTZEN:**  Thank you, Your Honor.

3     **Q.**   All right.  Mr. Stephan, can you see here this couple

4     lines of e-mail that you were on?

5     **A.**   Yes, I can.

6     **Q.**   All right.  And on January 1st, 2010, what was -- well,

7     Mr. Hussain was e-mailing you and Mr. Chamberlain?

8     **A.**   Yes, that's right.

9     **Q.**   All right.  He's saying (reading):

10          "Obviously we are looking to find the 2 million out

11          of deferred as well as the difference in services and

12          maintenance.  I believe there is upside in the hosted

13          numbers, which needs an aggressive look at.  This, then,

14          gives the 223 million we need."

15          Was this Mr. Hussain's goal at that point in time?

16    **A.**   Yes, it would appear so.

17    **Q.**   All right.  And at this time, so this is January 1st,

18    first day in the new quarter, he's saying he's trying to find

19    2 million?

20    **A.**   Yes, that's right.

21    **Q.**   Okay.  Mr. Hussain also said (reading):

22          "Please make sure the documentation on FileTek is

23          good on fair value."

24          What does that mean?

25    **A.**   I'm assuming he was meaning that we needed to get the

 1   paperwork together to get it through the audit process.

 2   **Q.**   All right.  And then he has a note on (reading):

 3          "MicroTech - Been told they will pay the OEM as early

 4       as next week (before auditors appear) to alleviate our

 5       concern on collectibility."

 6       Do you know what that's in reference to?

 7   **A.**   Where we were recognizing revenue from these resellers, we

 8   were highly reliant on being able to prove that they were not a

 9   risk in terms of paying us after the fact; and this is saying

10   that if they were going to pay us an amount of money after the

11   quarter end but before the audit, that it would help with that

12   argument that they were going to be good for the payment.

13   **Q.**   Do you have a recollection of a scenario in the end of

14   2009 where Autonomy was purchasing MicroLink and in connection

15   with that there was going to be a relatively large transaction

16   to sell software through to Discover Tech?

17          **MR. DOOLEY:**  Objection.  Leading.

18          **THE COURT:**  Overruled.

19          **THE WITNESS:**  I can't remember the exact timing and

20   circumstances, but I do remember this Discover Tech

21   transaction.

22   **BY MR. FRENTZEN:**

23   **Q.**   Okay.  So do you know whether or not this is in reference

24   to MicroTech paying soon but paying with 10 million that

25   ultimately comes from the acquisition of MicroLink?

1          **MR. DOOLEY:**  Same objection.  Leading.

2          **THE COURT:**  Overruled.

3          **THE WITNESS:**  I can't -- I can't remember.

4    BY MR. FRENTZEN:

5    **Q.**    You don't recall that?

6    **A.**    No.

7    **Q.**    Okay.  All right.

8          All right.  But what is the idea here?  In other words, if

9    the payment is received quickly from the reseller, what does

10   that do in terms of you trying to get through the audit

11   process?

12   **A.**    It provides some evidence that they've got a history of

13   paying their bills, which then gets the auditors more

14   comfortable sort of irrespective of what's going on underneath

15   with the end customers, that they would be able to pay

16   regardless and, therefore, we'd be able to recognize the

17   revenue.

18   **Q.**    Okay.  And in terms of dealing with the auditors, if you

19   will, while you were at Autonomy, who was on the frontline of

20   dealing with the auditors?

21   **A.**    In terms of the revenue sort of things, it would be myself

22   and Mr. Chamberlain by and large.  We would be the point people

23   that would then funnel different questions to whoever needed to

24   help us answer them, and then there were other members of the

25   team that dealt with them from the cost side or the balance

1    sheet side.

2    **Q.**    And in terms of how the relationship worked with the

3    auditors, can you compare sort of your role or your

4    interactions with those of Mr. Chamberlain?

5    **A.**    Yeah.    I guess I would field the vast majority of queries

6    and help get through the sort of bulk of the volume of deals

7    because they would be auditing dozens of deals each quarter.

8    And then when I would get stuck, for instance, on these more

9    complicated reseller-type deals, that's when Mr. Chamberlain

10    would be involved.

11    **Q.**    All right.    And what about in the audit process?    At what

12    point would Mr. Hussain get involved?

13    **A.**    He would -- he would be aware of the issues coming up in

14    the audit, but he would be more involved towards the end of the

15    process.

16    **Q.**    So would you and Mr. Chamberlain keep Mr. Hussain informed

17    on what sort of issues you were dealing with from the auditors?

18    **A.**    It would be Mr. Chamberlain by and large, not myself.

19    **Q.**    You would inform Mr. Chamberlain?

20    **A.**    That's right, or the auditors would inform us all.    They

21    would have regular lists of what their issues were to both

22    Mr. Chamberlain and myself, Lisa Harris, all the key finance

23    people.

24    **Q.**    Okay.    In terms of your role at Autonomy dealing with

25    these audits, did you have a good opportunity to view the

1  relationship between the Deloitte audit team and Autonomy?

2  **A.**   Yes, I did.

3  **Q.**   Okay.  And how would you describe the relationship during

4  the course of these audits?

5  **A.**   They would start off pretty standard.  We would just be

6  getting through the workload, but fairly quickly they would

7  boil down to a number of key issues that would become sticking

8  points; and so I guess the pressure would build throughout the

9  period, especially, say, one of these resellers, like a FileTek

10  or MicroTech, et cetera, those would become outstanding issues

11  that would remain unresolved until late in the process.

12  **Q.**   So what was your observation inside Autonomy with how

13  those issues would be dealt with or get resolved?

14       **MR. DOOLEY:**  Objection.  Foundation.  Can we find out

15  what specific observations he's talking about, when, and with

16  whom?

17       **MR. FRENTZEN:**  What I'm asking is a more general

18  impression of the relationship, and I actually took this

19  question directly from Mr. Dooley with Mr. Welham.

20       **THE COURT:**  Overruled.

21       **THE WITNESS:**  Could you rephrase it for me just

22  quickly?

23  **BY MR. FRENTZEN:**

24  **Q.**   Yeah.  Sure.

25       As you were -- I mean, what was your observation in

 1    general in dealing with the auditors about how this -- how the

 2    relationship would go during the audit process?

 3    **A.**    Yeah, like I said, there would be this list of issues that

 4    were very difficult to close out.  We would get whatever

 5    evidence we could together during the process to give to the

 6    auditors, but they would have a list of demands that was more

 7    than we could fulfill and they would be left outstanding till

 8    later and later in the process.

 9         And then it would get escalated to the audit partners, and

10    they would be dealing directly with Mr. Hussain.  And, by and

11    large, I can't really recall many examples of where it ended

12    with any change.  We got -- Autonomy would got way it wanted,

13    not the auditors.

14    **Q.**    From your time working at Deloitte in Cambridge, was

15    Autonomy an important client to Deloitte in the Cambridge

16    office?

17    **A.**    Yes.  It was if not the largest, it was one of the top

18    three or four.

19    **Q.**    All right.  And to your observation, was Autonomy -- what

20    was the stance that Autonomy would take with Deloitte in terms

21    of issues in the audit?

22    **A.**    It was quite an aggressive -- I guess the approach, as I

23    saw it, was to back them into a corner and make it a kind of

24    make-or-break decision for Deloitte on whether they wanted to,

25    you know, really blow things up.  That meant they were

1    pressured into giving way.

2    **Q.**   Well, for Deloitte's process, was there a timetable?  Was

3    there a clock they were on to get it done?

4    **A.**   Deloitte -- yeah, Deloitte had to sign off before Autonomy

5    released its results to the London Stock Exchange, and so they

6    would have to work back from that deadline to get various

7    reviews internally done.

8    **Q.**   All right.  I want to go back now to this January 1st

9    e-mail.

10       And then it looks like at first Mr. Hussain didn't have

11   the attachment, and then he says "Doh" and he has it.  Do you

12   see that there?

13   **A.**   Yeah.

14   **Q.**   Okay.  Could we go to that attachment, please?

15       All right.  And here, again, Mr. Hussain in the e-mail has

16   just talked about getting to 223.  Can you see from the total

17   where --

18       Oh, I'm sorry.  Can we just do real quick the file, get

19   that part?

20       Whoa.  No, that's not right.  Let's go back and we'll try

21   to find that one.

22       All right.  This is attached to an e-mail January 1st of

23   2010, though, where Mr. Hussain is indicating he needs to get

24   to 223.  Do you remember that?

25   **A.**   (Nods head.)

1  Q.    All right.  And this is at 221?

2  A.    Yes, it is.

3  Q.    Can we go to -- or can we just take a look at IDOL U.S.?

4  Where is IDOL U.S. at now?

5  A.    84.7 million.

6  Q.    All right.  And IDOL Europe is at what?

7  A.    (Witness examines document.)  12.6.

8  Q.    Interwoven is how much?

9  A.    66.7.

10  Q.    Can we go to IDOL Europe?

11        And do you see a reference here again to this

12  Poste Italiane?

13  A.    Yes, I do.

14  Q.    Okay.  And what color does this appear to be in now?

15  A.    It appears to be in green seeing that it's legals but

16  not -- the deal is not closed.

17  Q.    All right.  Is part of it in green and part of it that's

18  kind of like in white and green?

19  A.    Yeah.  Actually it looks like it's green to me.

20  Q.    Can we scroll up some.  Great.  Perfect.

21        Is this Poste Italiane, nonetheless, in the total that's

22  currently being counted for IDOL Europe --

23  A.    Yes, it is.

24  Q.    -- of 12.6?

25        Okay.  Can we go to IDOL U.S?

1      And IDOL U.S. at this point -- again, this is January 1st,

2  2010.  And if you could, could you just kind of scroll through

3  here, Mr. Stephan?  Is there any reference to a MicroLink or

4  Discover Tech for somewhere around 2 million?

5  **A.**   (Witness examines document.)  No, not that I can see.

6  **Q.**   Can we go to Interwoven tab?

7      All right.  On the Interwoven tab, could we go to line

8  222, please?  Yeah.  Okay.  Great.

9      Do you see a deal here for Valueteam?

10  **A.**   Yes, I do.

11  **Q.**   All right.  That's 2.2?

12  **A.**   2.2, yep.

13  **Q.**   And there's a comment over here that's Poste Italiane?

14  **A.**   Yes, same end user.

15  **Q.**   All right.  And is that included in the Interwoven

16  numbers?

17  **A.**   Yes, it is.

18  **Q.**   Great.

19         **MR. FRENTZEN:**  I want to go now to Exhibit 490, which

20  I believe, Your Honor, I think is in evidence already.

21         **THE CLERK:**  Yes.

22         **MR. FRENTZEN:**  Great.  Thank you.

23      Can we blow that up?

24  **Q.**   All right.  Do you see Exhibit 490 is an e-mail from

25  Mr. Hussain to yourself and Mr. Chamberlain?

STEPHAN - DIRECT / FRENTZEN

```
 1  A.   Yes, it is.  Yeah.

 2  Q.   Okay.  January 1st, 2010?

 3  A.   Yes.

 4  Q.   First day of the new year.

 5       And you see there it says 2:30 p.m.?

 6  A.   Yes.

 7  Q.   Do you see here Mr. Hussain says (reading):

 8            "I forgot to add a $2 million deal."

 9  A.   Yes, I do.

10  Q.   (reading)

11            "That was closed but paperwork outstanding.  Sorry."

12  A.   Yes.

13  Q.   When Mr. Hussain -- from working on these spreadsheets, as

14  you were, to your recollection -- I mean, when Mr. Hussain was

15  aware of a deal, was that deal on the spreadsheets?

16  A.   Yes, it was.

17  Q.   Okay.  So he says (reading):

18            "I forgot to add a $2 million deal that was closed

19       but paperwork outstanding.  Sorry."

20       Okay.  And then he goes on to discuss some other stuff,

21  some other places maybe to find revenue?

22  A.   Yes.

23  Q.   And I want to go now to Exhibit 507, which I don't believe

24  is in evidence.

25            THE CLERK:  It's in.
```

1          **MR. FRENTZEN:**  What's that?

2          **THE CLERK:**  It's in.

3          **MR. FRENTZEN:**  It is in?  Okay.  Great.

4     Can we pull up 507?

5  **Q.**  All right.  And here, is this, again, from Mr. Hussain?

6  **A.**  Yes, it is.

7  **Q.**  Did you receive this e-mail?

8  **A.**  Yes, I did.

9  **Q.**  And this is January 4th, 2010.  Do you see that?

10 **A.**  Yes, I do.

11 **Q.**  And Mr. Hussain was saying, "We need to get to 223."  Do

12 you see that?

13 **A.**  Yes.

14 **Q.**  Can we go to the attachment?

15      All right.  Do you see here where the forecast is at at

16 this point?

17 **A.**  Yeah.  It's still 2 million short at 221.

18 **Q.**  All right.  And do you see that IDOL U.S. is now kind of

19 back up to 86.6 million?

20 **A.**  Yes, I see that.

21 **Q.**  All right.  IDOL Europe is at 11.2?

22 **A.**  Yes.

23 **Q.**  And Interwoven is still at 66 -- or is at 66.7?

24 **A.**  Yes, I see that.

25 **Q.**  I want to go now to the IDOL U.S. tab, please.

1       All right.  Do you see here, Mr. Stephan, on this line

2  I've just drawn?  What is indicated here?

3  **A.**   It's indicating there's a deal for 1.9 million with

4  MicroLink slash Discover Tech.

5  **Q.**   All right.  And is that a deal that we've looked for but

6  not found on the prior spreadsheets that you looked at?

7  **A.**   That's right.

8  **Q.**   All right.  And over here, what is the meaning of what's

9  listed on the left-hand side?

10  **A.**   It means that it's with a reseller that Stouffer Egan is

11  the point person for, and "management" means there's no -- it's

12  not a deal being done by the sales team.

13  **Q.**   Can you describe that for us?  When it says "management,"

14  what was your understanding of that on these spreadsheets?

15  **A.**   These deals would not be common knowledge with the sales

16  team of the business and that would be through resellers.

17  **Q.**   All right.  To your knowledge on management deals, were

18  there any commissions?

19  **A.**   No, there were not, not to the sales reps in any case.

20  **Q.**   All right.  Can we go now to the Interwoven -- or, I'm

21  sorry -- IDOL -- wait.  Sorry.

22      Can we go to IDOL Europe?  I apologize.

23      Do you see now, Mr. Stephan, that -- before there were two

24  deals Poste Italiane; right?  There was a bigger one and a

25  smaller one?

1  **A.**   Right.

2  **Q.**   And now do you see that the bigger one is now gone?

3  **A.**   Yeah, I see that.

4  **Q.**   Could we go to Interwoven?  And can we go to line 220?

5  Yeah, there we go.  Great.

6       Do you see now for Interwoven there is something that says

7  "Poste" for about 2.2 million and it also says "Sales

8  Consulting"?

9  **A.**   Yes, I do.

10  **Q.**   I'd like to now move back to what we were talking about

11  shortly before the break.

12       Mr. Stephan, what you were expressing to us, your concerns

13  about all of the reseller deals that you saw sort of cropping

14  up there at the end of 2009, what, if anything, did you do

15  internally at Autonomy when you became concerned about these

16  reseller deals?

17  **A.**   I raised my concerns repeatedly with Mr. Chamberlain.

18  **Q.**   What did you say --

19       **MR. DOOLEY:**  Objection, Your Honor.  Can we get a time

20  and a place, when this happened, when these conversations

21  happened?

22  **BY MR. FRENTZEN:**

23  **Q.**   When did you first start becoming, let's say -- when did

24  you first become concerned enough about the reseller deals to

25  say something about it?

1  **A.**   I believe I would have -- I had conversations with Steve

2  very early on in my time at Autonomy; but when it came to more

3  of a head, it was in January of 2010.

4  **Q.**   After you'd seen what happened at the end of 2009?

5  **A.**   That's right.

6  **Q.**   Okay.  What, if anything, did you express to

7  Mr. Chamberlain about what you were concerned about?

8  **A.**   I basically thought that the transactions shouldn't be

9  recognizing revenue, and I felt conflicted about having to

10  front these up as legitimate transactions to the auditors.

11  **Q.**   When you expressed these views to Mr. Chamberlain, what

12  did he express to you about his own feelings about these

13  reseller deals?

14  **A.**   He felt the same as me, that the deals were not --

15       **MR. DOOLEY:**  Objection, Your Honor.  Can we find out

16  what Mr. Chamberlain actually said?  I mean, what were the

17  words he said?

18       **THE COURT:**  Well, I don't know that -- go ahead.  I

19  mean, I think -- no, no.

20       I mean, to the best of your recollection, would you say

21  what he said to you and what you said to him?

22       **THE WITNESS:**  I would have said something along the

23  lines of "These deals are, you know, terrible deals.  We

24  shouldn't be doing them.  We can't recognize them."

25  \\\

1  BY MR. FRENTZEN:

2  Q.   You can say what you actually said, Mr. Stephan.

3  A.   "These deals are a pile of shit.  We shouldn't have

4  anything to do with them."

5       Steve agreed but he said, "Look, it's out of my control.

6  It's, you know, Mr. Hussain's call and we just have to go

7  through the motions."

8  Q.   Did Mr. Chamberlain say to you -- or did he express to you

9  any sort of reassurances in terms of the size of reseller deals

10  as he expressed it?

11            MR. DOOLEY:  Same objection, Your Honor.

12            MR. FRENTZEN:  I'm asking him what he said.

13            THE COURT:  Overruled.

14            THE WITNESS:  I think in late -- in, say, Q3 2009 it

15  was an argument that the deals, as a proportion of the entire

16  company's revenue, were quite small and, you know, it was

17  almost a rounding error; but that argument fell over in Q4 2009

18  when we closed 20-odd-plus million dollars worth of them.

19  BY MR. FRENTZEN:

20  Q.   In material 2010, were you sent by folks at Autonomy to

21  the United States?

22  A.   Yeah.  I was sent in March 2010 to Washington, D. C.

23  Q.   What did you -- what were you sent to Washington, D. C.

24  for?

25  A.   Autonomy had acquired a company called MicroLink, and I

1  was asked to go over and do some basic audit tests on their

2  opening balance sheet.

3  **Q.**  Can you describe for us, best you can recall, around when

4  was that?

5  **A.**  I think it was probably the first week of March, maybe the

6  second week.

7  **Q.**  In 2010?

8  **A.**  2010, yeah.

9  **Q.**  All right.  Where did you go?

10  **A.**  I went to their offices, which are sort of in the

11  outskirts of the D.C. area, and went to MicroLink offices and

12  worked with Alan Rizek on the process.

13  **Q.**  When you went to MicroLink, were you allowed to review the

14  books there?

15  **A.**  Yes.  I wasn't -- I could look -- I looked at everything

16  except transactional information, you know, what they were

17  actually hands-on working on the systems and things, but I had

18  full access to the financial records.

19  **Q.**  When you looked at the financial records at MicroLink, was

20  there anything that caused you concern?

21  **A.**  Yeah.  They did not have on their books an equal and

22  opposite amount of accounts payable due to Autonomy that

23  Autonomy had in their books as owed to them, if that makes

24  sense.

25  **Q.**  All right.  Can you describe that for us?  I mean, what

1  were you seeing and what were your concerns?

2  **A.**   I think -- I can't recall the figures, but Autonomy was

3  owed over $10 million by MicroLink at that point and MicroLink

4  had a much, much smaller balance on their books as owing to

5  Autonomy.

6  **Q.**   Was that because they were listing smaller figures for the

7  deals?

8  **A.**   No.   The deals -- the deals were just not on the books.

9  **Q.**   So debts --

10 **A.**   A number of the deals -- sorry.   A number of the big deals

11 that we'd signed in recent quarters were just not in the books

12 at all.

13 **Q.**   So debts to Autonomy by MicroLink were not reflected in

14 MicroLink's books?

15 **A.**   That's correct.

16 **Q.**   So why did this cause you concern?

17 **A.**   It indicated to me that despite signing audit confirmation

18 letters and different things about not having any side

19 agreements in place, it suggested that from MicroLink's

20 perspective, they were never going to have to pay that money if

21 they didn't get paid or if they didn't close the deal with the

22 end user.

23 **Q.**   If we could, as you paid attention to the SMS calls at

24 Autonomy, did you have some -- and from these spreadsheets, did

25 you have some sense of what deals the sales force were working

1    on?

2    **A.**    Yeah.  Especially the larger size ones, it was always

3    clear what the big deals were that were going to really matter.

4    **Q.**    And were there instances in which you saw some of those

5    big deals go to a reseller?

6    **A.**    Oh, you mean by general close of business?

7    **Q.**    No.  I mean, like, where near the end of the quarter it

8    went to a reseller rather than being sold through to the actual

9    end user direct?

10    **A.**    Yes.  I saw that a number of times.

11    **Q.**    Did you -- were you aware of instances in which you knew

12    that it had gone to a reseller for some end user but you

13    observed the sales staff still continuing to try to sell what

14    supposedly had been sold to a reseller?

15    **A.**    Yes.  I saw that a number of times.

16    **Q.**    Can you describe that for us?

17    **A.**    Yeah.  Say Eli Lilly or Amgen were a couple of the names.

18    The sales guys had to keep pushing and talk about it on the SMS

19    calls every week despite the fact that Autonomy had already

20    recognized the revenue previously.  There was no change from

21    their perspective of how they behaved with the deal at all.

22    **Q.**    Did you ever hear, you know, Mr. Hussain call them off and

23    say, "Why are you trying to sell to Eli Lilly or to Amgen?

24    That's Capax's deal now"?

25    **A.**    No.

1   Q.   To your way of observation, was that a bizarre use of the

2   sales team if it had already legitimately been sold to a

3   reseller?

4   A.   Yeah.  If it was legitimate, then they shouldn't need to

5   be doing that.

6   Q.   All right.  So when you were at MicroLink reviewing the

7   books and these deals weren't even on MicroLink's books, did

8   you raise that with Mr. Rizek?

9   A.   Yes, I did.

10   Q.   What kind of response did you get from Mr. Rizek?

11   A.   Sort of an awkward -- awkward silence, and then a comment

12   that it was Dave Truitt deals, special deals.

13   Q.   They were Dave Truitt's special deals?

14   A.   Yeah.

15   Q.   Did that make sense to you?

16   A.   Only from the fact that I realized what was going on, it

17   made sense.  It didn't make sense from a business perspective

18   or from what we'd been arguing with the auditors for many

19   months.

20   Q.   Was this another sort of incident that caused you some

21   concern --

22   A.   Yes.

23   Q.   -- about what Autonomy was doing?

24   A.   This was a particularly bad example, yes.

25   Q.   When you learned about what was not on MicroLink's books,

1    did you raise that with anybody at Autonomy?

2    **A.**    Yeah.  That evening when I got back to the hotel, I called

3    Mr. Chamberlain to discuss and told him, you know, what I

4    found.

5    **Q.**    Can you tell us in terms of what you said and what

6    Mr. Chamberlain said back to you in response?

7    **A.**    I said that this looked really bad and, frankly, that it

8    looked like it was a fraud.

9        Mr. Chamberlain said something along the lines of, "Don't

10    say that word.  You know, it's a big deal to be saying that.  I

11    will raise it with Mr. Kanter and Mr. Hussain."

12    **Q.**    Mr. Chamberlain said he would raise it with Mr. Kanter and

13    Mr. Hussain?

14    **A.**    Yes.

15    **Q.**    Did Mr. Chamberlain ever get back to you after that point

16    about what you had observed on MicroLink's books?

17    **A.**    No, he didn't.

18    **Q.**    Around this period of early 2010 with the things that you

19    had seen, what, if anything, did you start to do in terms of

20    planning for your own future?

21    **A.**    I guess it further enhanced my desire to leave the U.K.

22    and move back to Australia because I -- it wasn't a long-term

23    job prospect for me to stay at Autonomy from my perspective.

24    **Q.**    Did there come a time when you started looking around for

25    another job?

1    **A.**   You know, I had my eye on what was going on in the job

2    market, but it was the depths of the great depression and, you

3    know, there was very little work out there at the time, in 2010

4    that is.

5    **Q.**   I want to go ahead and move to another exhibit, this is

6    Exhibit 519, if we could.

7            **MR. FRENTZEN:**  Is that --

8            **THE CLERK:**  I don't think so.

9            **MR. FRENTZEN:**  Okay.  I'll show it to him.

10           **THE CLERK:**  Okay.

11   **BY MR. FRENTZEN:**

12   **Q.**   Would you take a look at 519, please, Mr. Stephan?

13           **THE COURT:**  Admitted.

14       (Trial Exhibit 519 received in evidence)

15           **MR. FRENTZEN:**  Thank you, Your Honor.

16   **Q.**   All right.  I'm sorry.  I'm moving back in time a little

17   bit.

18       But do you see here, Mr. Stephan, on 519, it's still in

19   the early part of 2010, January 5th, 2010?

20   **A.**   Yes.

21   **Q.**   Is this from Mr. Hussain to yourself?

22   **A.**   From Mr. Hussain to Mike Lynch, yeah, copying myself and

23   Mr. Chamberlain.

24   **Q.**   Just, incidentally, was this fairly typical, that at times

25   Mr. Lynch would be in the e-mail thread on the spreadsheets?

1  A.   Very infrequently I would see this -- I'd be copied on

2  this kind of e-mail.

3  Q.   Okay.  But from time to time he was in the loop, if you

4  will?

5  A.   Occasionally, yes.

6  Q.   Okay.  So on January 5th of 2010, Mr. Hussain is

7  indicating (reading):

8         "Collating and reconciling - will take some time at

9         nearly 222 but looking for the extra 1 million."

10 A.   Yes.

11 Q.   All right.  Is that, again, trying to get to 223?

12 A.   That's right.  There's still that $1 million gap to get to

13 223.

14 Q.   Okay.  Could we take a look at the attachment, please?

15 And could we go to "IDOL Summary" at line 349, please?  Okay.

16 Great.

17      Do you see this line here of "Poste" and "Sales

18 Consulting" now being purple?

19 A.   Yes, I do.

20 Q.   Again, what does purple mean?

21 A.   That would mean that it's closed.

22 Q.   I'm sorry.  What's that?

23 A.   That would mean that it's closed.  It's a done deal.

24 Q.   Great.

25      All right.  I want to move now to another exhibit, which

1    is marked as 3027.

2       Mr. Stephan, did you have some time to review some of

3    these many, many spreadsheets to go ahead and just see if you

4    recognized them?

5    **A.**   Yes.

6    **Q.**   Okay. All right.

7       **MR. FRENTZEN:** And on that basis, Your Honor, I'd

8    offer 3027.

9       **THE COURT:** Admitted.

10      (Trial Exhibit 3027 received in evidence)

11    **BY MR. FRENTZEN:**

12    **Q.**   Can you take a look at the -- can we go to the file and

13    the info, please?

14       Do you see the date that's last modified here,

15    Mr. Stephan?

16    **A.**   Yes. The end of Quarter 1, 2010.

17    **Q.**   And the author and last modifier?

18    **A.**   It says Mr. Hussain.

19    **Q.**   3/31/2010, that's the end of Q1 of 2010?

20    **A.**   Yes, that's right.

21    **Q.**   Can we take a look now at the spreadsheet?

22       All right. And can we take a look at the --

23       **MR. FRENTZEN:** Is there just a revenue?

24       **SPECIAL AGENT BRYANT:** (Shakes head.)

25       **MR. FRENTZEN:** Okay. All right.

1    **Q.**    Do you see the "IDOL Summary"?

2    **A.**    Yes, I do.

3    **Q.**    And can we actually take a look at where it says "IDOL

4    Summary"?

5    Can you sort of scan?  Do you see any reference to the

6    Vatican or MicroTech/Vatican in terms of this part of the

7    spreadsheet?

8    **A.**    (Witness examines document.)  No.

9    **Q.**    And, again, we talked about the Vatican, but the Vatican

10    was a deal that you were aware of?

11    **A.**    Yes.  Yeah.

12    **Q.**    Who were you aware was working on the Vatican?

13    **A.**    It was being worked on by senior people in the technical

14    team.  So, for instance, Peter Menell I understood was

15    involved, a guy named Fernando Lucini, various of the senior

16    technical guys were working the deal because it was more of a

17    proof of concept rather than just a straight sales process.

18    **Q.**    Do you have any recollection of a guy named Corrado?

19    **A.**    Yes.  He was fairly famous within the finance team for

20    bringing deals that never paid.

21    **Q.**    All right.  Did he have anything to do with the Vatican as

22    far as you know?

23    **A.**    I think his name was associated with it, yes.

24    **Q.**    Okay.  Can we take a look at the Hutchinson tab, please?

25    And could we go to line 48, please?

1      All right.  Do you see the Vatican listed here,

2  Mr. Stephan?

3  **A.**   Yes, I do.

4  **Q.**   Okay.  This is the Vatican deal that we talked about

5  before?

6  **A.**   Yes.

7  **Q.**   And do you see it's listed for how much?

8  **A.**   For 17 million Euros, which converted to about 22 and a

9  half million U.S.

10  **Q.**   And is this what you were talking about, Mr. Broli --

11  **A.**   That's right.

12  **Q.**   -- Corrado Broli's name being attached?

13  **A.**   He's a sales rep.

14  **Q.**   And what is the meaning -- I mean, this particular -- do

15  you get anything out of the color here; in other words, as we

16  talked about before, the color up here?

17  **A.**   It's not booked work.  It's still outstanding.

18  **Q.**   Okay.  So this is 3/31/2010.  So the end of the quarter?

19  **A.**   Yeah.

20  **Q.**   Do you have a recollection of the Vatican deal coming

21  through not with the Vatican but with a reseller at some point?

22  **A.**   Yeah.  Shortly after the quarter ended, it came in a VAR

23  and MicroTech purchase order or contract.  I can't recall

24  which.

25  **Q.**   All right.  Can we take a look at -- sorry --

1    Exhibit 3028?

2        And, Mr. Stephan, again, Exhibit 3028, did you take a look

3    at some of these spreadsheets independent -- did you already

4    review some of these spreadsheets?

5    A.    Like the last one?

6    Q.    Yeah.

7    A.    Yes.

8            THE COURT:  Admitted.

9        (Trial Exhibit 3028 received in evidence)

10           MR. FRENTZEN:  Thank you, Your Honor.

11       Could we go to the file information?

12   Q.    All right.  Mr. Stephan, do you see "Last Modified" here?

13   A.    Yes, on the 2nd of April 2010.

14   Q.    All right.  And you see that there's an author?

15   A.    Yeah.  The author is Mr. Hussain and the last modified is

16   Mr. Chamberlain.

17   Q.    Could we go to the spreadsheet?  And could we go to --

18   yeah -- within Mooney.

19       Who is Mooney?

20   A.    That was Mike Mooney, the sales manager for the U.S.

21   Q.    And do you now see on this spreadsheet on April 2nd, 2010,

22   that the Vatican and MicroTech -- or MicroTech -- sorry -- is

23   listed here for 11 million?

24   A.    Yes, I do.

25   Q.    And do you have any recollection of seeing the contract

1  related to the Vatican with MicroTech as a reseller?

2  **A.**   Yes, I remember that.

3  **Q.**   Around this time period?

4  **A.**   Yeah.

5  **Q.**   When this happened, when the Vatican all of a sudden moved

6  from Europe to the U.S. through a reseller, had you been sort

7  of paying attention to the progress of this Vatican deal, which

8  you thought was kind of a cool deal?

9  **A.**   Indirectly, yes.  From time to time when I'd be on the SMS

10 call, I would be listening for updates on it.

11 **Q.**   Had you heard any indication that the Vatican deal was

12 going to go to a reseller in the Washington, D. C. area?

13 **A.**   No.

14 **Q.**   Did that surprise you?

15 **A.**   Yeah.  I was incredulous.  I couldn't believe it.

16 **Q.**   Was this something that further concerned you about the

17 reseller deals?

18 **A.**   Yeah.  It suggested that -- to me it indicated that they

19 were just a conduit for giving us paperwork to close -- to book

20 deals in the quarter end because there was no linkage in my

21 mind between a U.S. federal government reseller and, you know,

22 the Vatican in Italy.

23 **Q.**   When you got concerned about this particular transaction,

24 the Vatican deal, did you raise that with anyone?

25 **A.**   I raised it with Mr. Chamberlain again.

1    Q.    When you -- let me just ask a question.

2          I mean, when you're raising these concerns with

3    Mr. Chamberlain, why didn't you go straight to Mr. Hussain?

4    A.    Just he wasn't the sort of person that you could approach

5    with discussions about revenue recognition.  Our job was just

6    to get it done, get it through the audit.

7    Q.    When you raised this with Mr. Chamberlain, what did

8    Mr. Chamberlain say to you about the Vatican deal going to

9    MicroTech?

10   A.    He shared my surprise that it would be going that way.  I

11   can't recall the exact conversation.

12          MR. DOOLEY:  Your Honor, I --

13   BY MR. FRENTZEN:

14   Q.    Is there anything that might help to refresh your

15   recollection?

16          MR. DOOLEY:  Your Honor, I move to strike.  He can't

17   recall the conversation.  He can testify to what he remembers

18   Mr. Chamberlain said not impression.

19   BY MR. FRENTZEN:

20   Q.    Is there anything I can show you that might help to

21   refresh your recollection, Mr. Stephan?

22          THE COURT:  Sustained.

23          MR. FRENTZEN:  Counsel, I'm on the declaration of

24   Mr. Matt Stephan, paragraph 20.

25   Q.    Mr. Stephan, can you take a minute and read that to

1   yourself, and just let me know when you're done reading it?

2   **A.**   (Witness examines document.)  I said in substance --

3   **Q.**   I'm sorry.  Sorry.  The way this works is you have to read

4   it to yourself.  Go ahead, take your time, read it to yourself,

5   and see if that refreshes your recollection about the

6   conversation that you had with Mr. Chamberlain.

7   **A.**   (Witness examines document.)  Yes, it does.

8          **MR. FRENTZEN:**  May I retrieve that, Your Honor?

9   **Q.**   Mr. Stephan, can you tell us what you said to

10  Mr. Chamberlain and what Mr. Chamberlain said to you?

11         **MR. DOOLEY:**  Your Honor, I have the same objection if

12  it's going to be what I'm reading.  The testimony shouldn't be

13  "In substance this is what he said."  If he remembers what

14  Mr. Chamberlain said --

15         **THE COURT:**  Right.  I think the question is:  What did

16  Mr. Chamberlain say to you and what did you say to

17  Mr. Chamberlain?  I think that's the question.

18         **MR. FRENTZEN:**  And if we want to go past recollection

19  recorded, we can do it that way, but --

20         **THE COURT:**  Okay.  Fine.

21      You may answer the question.

22  **BY MR. FRENTZEN:**

23  **Q.**   Mr. Stephan, do you have a recollection of your

24  conversation with Mr. Chamberlain?

25  **A.**   It was the same -- the same as the conversation we'd had

1    previously, that these deals were, you know, garbage.  They

2    were not worth the paper they were written on, and I wasn't

3    happy to front them up as good deals to our auditors.

4    **Q.**   And what did Mr. Chamberlain say in response to you?

5    **A.**   He said that it's not his -- it's not our call, it's

6    Mr. Hussain's call, and we just need to do our job and put it

7    to the auditors.

8    **Q.**   Did he say anything about Mr. Hussain ordering this to

9    happen and Mr. Hussain being responsible?

10           **MR. DOOLEY:**  Objection.  Leading.

11           **THE COURT:**  Overruled.

12           **THE WITNESS:**  That was always his -- his stance was,

13   like, troops in an Army.  The general says what to do and we

14   have to follow our orders.  So, yes.

15   **BY MR. FRENTZEN:**

16   **Q.**   Did you have a -- from knowing Mr. Chamberlain, did you

17   have a sense of, if you will, Mr. Chamberlain's -- well, forget

18   it.  I'll move on.

19        All right.  Following the Vatican deal, were you still

20   continuing to think about your future at Autonomy?

21   **A.**   I just generally became less willing to front up things to

22   the auditors that I didn't agree with, so I would -- if these

23   deals had issues with the audit, I wasn't going to be putting

24   up arguments in my words that they were good.  I would let them

25   be escalated to Mr. Chamberlain or ultimately Mr. Hussain.

1   Q.   I want to ask you now about some of your dealings with the

2   auditors.

3        And could we take a look at briefly --

4        **MR. FRENTZEN:**  Is 534 already in evidence?

5        **THE CLERK:**  Yes.

6        **MR. FRENTZEN:**  Okay.  Thank you.

7        Could we pull up 534?

8        And, Mr. Stephan -- can we go to page -- sorry -- page --

9   at the bottom of this page?  Keep going if you would.

10       Wait.  This is page 4.

11       Oh, yeah.  Okay.  Great.  Can we go to -- sorry -- the

12  bottom of page 2?  That's where we're at.  Okay.

13  Q.   Are you on this e-mail, Mr. Stephan?

14  A.   Yes.

15  Q.   Do you have a recollection about questions from the

16  auditors related to a deal in the fourth quarter of 2009

17  involving Discover Tech?

18  A.   Yeah.  As I remember it, there were issues with the

19  paperwork not lining up with what we presented as a deal being

20  in Q4.

21  Q.   And do you have a recollection that it was being

22  represented to the auditors that delivery was not required for

23  the software?

24  A.   Yes, that's right.

25  Q.   What was your understanding about that, if any?

1   **A.**   It sort of came down to a technical argument that it was

2   like giving them the legal right to more software than they

3   already had in their possession so, therefore, there was no

4   need to prove delivery.

5   **Q.**   And could we go to the top of that page, please?

6   All right.  And is Mr. -- who's Mr. Murray?

7   **A.**   He was sort of lead person on the audit at the time.

8   **Q.**   Okay.  And he is asking to understand how this works

9   (reading):

10        "The deal with MicroLink looks like it is selling

11        Discover Tech a license to use profiling function within

12        IDOL.  Is this a function that can be switched on

13        remotely, then, without the need for further delivery of

14        any software?"

15        Do you see that?

16   **A.**   Yes.

17   **Q.**   Okay.  And then if we could just go to the very top of

18   this.

19        All right.  Do you see here where Mr. Chamberlain has

20   taken this to Mr. Hussain and Mr. Menell?

21   **A.**   Yeah.

22   **Q.**   Is this representative, if you will, of kind of how the

23   dealings with the auditors would go from time to time; in other

24   words, the escalation?

25   **A.**   Yes, that's right.  Particularly Mr. Chamberlain would

1    throw arguments at them and if they didn't get them across --

2    didn't get the auditors across the line, then it needed to be

3    escalated to Mr. Hussain and different people, Mr. Kanter,

4    Mr. Menell.

5    **Q.**   I'd like to show you now Exhibit 677.  I don't think it's

6    in.

7            **THE CLERK:**  No, it's not.

8            **THE COURT:**  Admitted.

9        (Trial Exhibit 677 received in evidence)

10           **MR. FRENTZEN:**  Thank you, Your Honor.

11   **Q.**   Mr. Stephan, you'd indicated part of your

12   responsibilities, which was chasing down debts?

13   **A.**   Yes.

14   **Q.**   Could you take a look at 677?  Were you a part of this

15   e-mail chain?

16   **A.**   Yes.  I was on the initial e-mail between Mr. Chamberlain

17   and Mr. Hussain.

18   **Q.**   What were the issues at Autonomy around sort of collecting

19   cash?

20   **A.**   As well as having a good revenue number, there was a lot

21   of pressure on having a good cash flow figure because some of

22   the analysts were questioning the quality of our revenues.  And

23   so a good cash collection indicated they were good deals

24   because, you know, people were paying, they must be -- they

25   must be fine.

1        The reseller deals were causing a lot of problems because

2   their balances were getting bigger and bigger and they weren't

3   paying on time.

4   **Q.**   And is this an example of this being raised in March of

5   2010 with Mr. Hussain?

6   **A.**   Yes, it is.

7   **Q.**   All right.  And Mr. Chamberlain -- is this an issue that

8   you were -- why are you on this e-mail?

9   **A.**   I would help Steve collect the information from the U.S.

10  in terms of collections.  So there was a local team chasing

11  customers for money but -- as well as monitoring how much --

12  what the cash forecast would be.  I also would need information

13  about payments to be able then to front up to the auditors

14  within a matter of weeks after this e-mail was sent.

15  **Q.**   All right.  And Mr. Chamberlain is expressing here

16  (reading):

17          "Sushovan - The above three make or break my cash

18      forecast and I am increasingly concerned with the radio

19      silence on this one."

20      What's a cash forecast?

21  **A.**   It was literally a forecast of how much of each of our

22  outstanding debts were going to get paid in the quarter.  And,

23  you know, if the debt was due to be paid, we'd be normally

24  forecasting it to be paid unless we knew of an issue.

25  **Q.**   And the three that he's got problems with are Capax,

1    MicroTech, and FileTek?

2    **A.**    Yes, that's right.  They were all the deals that were done

3    in the prior quarter or part of the big deals that were done in

4    the prior quarter.

5    **Q.**    All right.  So Capax is due to pay 8.7 million, and that

6    was broken down in Eli Lilly, EDD deals, and something called

7    TXU; MicroTech due to pay 6.2 million; FileTek owes

8    4.2 million?

9    **A.**    Yes.

10   **Q.**    And can you tell us what Mr. Hussain's response was to

11   this?

12   **A.**    I can see he forwarded it to Mr. Egan and Mr. Kanter

13   asking if Capax owed us some money -- oh, sorry -- we owed

14   Capax some money.

15   **Q.**    And, again, did you have any understanding of Autonomy

16   paying Capax supposedly for EDD work being done?

17   **A.**    Not -- not really at this time.

18   **Q.**    I'd like to move now to Exhibit 765, if we can.

19        **THE COURT:**  Admitted.

20        (Trial Exhibit 765 received in evidence)

21        **MR. FRENTZEN:**  Thank you, Your Honor.

22   **Q.**    Do you see Mr. Hussain sending in April a sales analysis?

23   **A.**    I do.

24   **Q.**    Can we pull up the document itself?  The attachment.  I'm

25   sorry.

1       Do you recognize what this is?

2   **A.**   Yes.  It was the spreadsheet that was -- it was a sub --

3   it was a version of the previous spreadsheet we looked at that

4   tracked all the deals, and we modified to help fill in a series

5   of numbers in the financial press release.

6   **Q.**   What do you mean by that?

7   **A.**   So it did things like track how many large deals over a

8   million dollars there were, what the average selling price was,

9   the split between the U.S. and the rest of the world.  There

10  were a whole series of numbers that we reported on every

11  quarter, and this took the total revenue from his previous

12  spreadsheet and just broke it down in a slightly different way.

13  **Q.**   During the course of your time at Autonomy, did you get

14  involved in dealing with revenue recognition related to

15  hardware?

16  **A.**   Yes.  Yes.

17  **Q.**   Can you describe for us, when did the hardware first start

18  coming to your attention?

19  **A.**   There had always been an element of hardware deals usually

20  attached to software deals, so it would be a large -- a large

21  software deal with some hardware associated.  Throughout 2010,

22  though, it changed to be a larger proportion of the total

23  sales.

24  **Q.**   What do you mean by that?

25  **A.**   We started doing deals with Dell in particular where we

1  were effectively sort of being a middleman to provide a

2  discount on the hardware and the volume of those increased.

3  **Q.**   Did that cause you any concerns?

4  **A.**   It did because the initial argument we had been making for

5  some period before I joined the company was that these deals

6  were all part of strategically aligning ourselves with big

7  customers and being a sort of one-stop shop to the customers

8  and, you know, selling them hardware and giving -- getting them

9  a discount on hardware was worth doing even though it lost

10  Autonomy money because it would get us big software deals.

11  **Q.**   And as you started to see this happening, how did this

12  put -- if it -- did this put you in an uncomfortable position,

13  let's say?

14  **A.**   It did from the perspective that it moved from selling

15  servers to JP Morgan to selling desktop computers to a retail

16  company or an insurer or other people that we hadn't dealt with

17  before.

18  **Q.**   And did you have -- or were you called upon to fill a role

19  in terms of justifying this to the auditors?

20  **A.**   Yeah.   I would help update a spreadsheet we gave them each

21  quarter that compared who we were selling hardware to, who we'd

22  sold software to.   So it would track, you know, if we made a

23  loss on hardware to Bank of America but then we made X million

24  dollars of sales software to Bank of America say.

25  **Q.**   Were you sometimes responsible -- or did there come a

1    point in time where you were responsible in putting together

2    that spreadsheet to justify for the auditors?

3    **A.**    Yes.  I think I helped update it every quarter in one way

4    or another.

5    **Q.**    Okay.  And in that spreadsheet, was there any real

6    analysis done of whether the hardware deal actually related to

7    a software deal or not?

8    **A.**    Not to my knowledge.  It was a mathematical exercise of

9    matching names of customers.

10   **Q.**    What do you mean by that?

11   **A.**    So if we sold a hardware to Customer A, we'd be looking

12   for Customer A through the historic revenue to try and find

13   software sales to them.

14   **Q.**    So, in other words, there wasn't somebody sort of --

15   nobody came to you saying, "Yes, the hardware really assisted

16   us in making this software deal"?

17   **A.**    No.

18   **Q.**    You were just matching up names?

19   **A.**    Yes.

20   **Q.**    Okay.  And if we could take a look at Exhibit 1466, I

21   believe, as an example.

22            **THE COURT:**  Admitted.

23        (Trial Exhibit 1466 received in evidence)

24            **MR. FRENTZEN:**  Thank you, Your Honor.

25   **Q.**    Okay.  Mr. Stephan, we've jumped ahead a little bit, but

1    January 20, 2011.  Do you see the question here from Leo at

2    Deloitte?

3    **A.**    Yes.  He's asking for the spreadsheet that we've just

4    discussed.

5    **Q.**    Okay.  And this was -- he was asking for it to justify the

6    rationale that the purpose of selling hardware at a loss is to

7    generate more software revenue from these customers?

8    **A.**    Right.

9    **Q.**    Okay.  And so did you prepare or did you update, I guess,

10    the Autonomy hardware revenue analysis for Deloitte?

11    **A.**    Yes, I did.

12    **Q.**    Could we go to the attachment, please?

13        All right.  Can you describe for us what we're taking a

14    look at here, Mr. Stephan?

15    **A.**    The spreadsheet scrolls to the right, but it's -- at the

16    front there the first part is hardware sales to the customers.

17    So it shows a total revenue and then it shows the loss incurred

18    on those sales.

19    **Q.**    Can you back out just a little bit so we have the total?

20    Okay.  Great.

21        All right.  I'm sorry.  Go ahead, Mr. Stephan.

22    **A.**    Yes.  I suppose it was looking at in this point six

23    quarters worth of hardware sales totaling $157.8 million, and

24    we made a loss on that of 17 or $18 million.

25        And then on the right, if you keep scrolling right, it's

1  then comparing them against the software deals made to those

2  same customers.

3  **Q.**  All right.  And as an example here, if we were to take --

4  first of all, what's at the top here, "Nonpromotion" versus

5  "Promotion"?

6  **A.**  The basis of that was, particularly the large Citicorp

7  one, it was made sold at a profit -- or both of them actually

8  were sold at a profit so they weren't the same type of hardware

9  sales.

10 **Q.**  Okay.  And then where it says "Promotion," again, do you

11 have any idea if the hardware sales were actually in fact

12 related to any of the software sales?

13 **A.**  No, I don't.

14 **Q.**  So, for example, if we take a look at Zones here, do you

15 see a grand total of sales to Zones?

16 **A.**  Yeah.  We sold $20.8 million worth of hardware to Zones.

17 **Q.**  All right.  And then is there a loss figure there?

18 **A.**  Yeah.  Basically 2.1 million.

19 **Q.**  And then where it says "Large Software Deals," how much is

20 listed there?

21 **A.**  We've got $2.8 million.

22 **Q.**  All right.  Can we -- I think if you scroll out, it will

23 show -- there will be another box that comes out on the left

24 there.  And then if you slide over.  Well -- sorry -- go back.

25     All right.  Do you see here "HRB"?

1    **A.**    Yes, I do.

2    **Q.**    Do you know what "HRB" was?

3    **A.**    It was H&R Block.

4    **Q.**    Okay.  So do you have any idea whether or not Autonomy's

5    involvement in selling to the reseller Zones had anything to do

6    with the sale that eventually occurred of some software

7    apparently to H&R Block?

8    **A.**    No, I don't.

9    **Q.**    You just found H&R Block software deal and H&R Block

10   listed in the Zones contracts?

11   **A.**    That's -- yeah, that's what I remember.

12   **Q.**    And that's what you provided to Deloitte to try to -- or

13   to justify the hardware sales?

14   **A.**    Right.

15   **Q.**    Who asked you to do that?

16   **A.**    Like I said, I think we did it every quarter from memory.

17   In this instance, Deloitte was prompting it specifically.  It

18   wasn't something we did on the first day of the new quarter.

19   We would do it towards the end when requested.

20   **Q.**    I'm talking about internally at Autonomy do you know who

21   put that system in place.

22   **A.**    Oh, Mr. Chamberlain back when -- back when the initial

23   argument was made about doing these deals as a marketing

24   exercise.

25   **Q.**    I'd like to ask you another question about hardware if I

1    could.

2        Did there come a time in early 2010 -- I'm sorry -- early

3    2011, I believe, where you were asked to get involved with

4    dealing with the auditors on a hardware deal with a company

5    called VMS?

6    **A.**   Yes, I remember.

7    **Q.**   Can you just describe for us, what was that issue about?

8    Why were you tasked with it?

9    **A.**   It was a deal that we got the paperwork for late on, I

10   think after the quarter end; and when reviewing the paperwork,

11   it turned out we had sold them a whole collection of hardware

12   but that hardware was not -- there was no -- it wasn't a

13   similar deal to these other ones with Dell.  It was hardware

14   that was coming from Autonomy's own data centers by and large.

15   **Q.**   Okay.  Meaning what?

16   **A.**   Meaning that we were effectively carving out a portion of

17   our own data center assets and selling them to them under this

18   deal.

19   **Q.**   Who came to you about this issue, if you recall?

20   **A.**   I think it was just part of the -- I initially would try

21   and find delivery information as always, and in this case I

22   couldn't -- couldn't get there.  So it was a lot of back and

23   forth with the auditors about what I could provide and

24   different ways of going about it.

25   **Q.**   All right.  So what were you asked -- I mean, were you

1    asked to justify this to the auditors?

2    **A.**   Yes.

3    **Q.**   Who asked you to do that?

4    **A.**   Mr. Chamberlain.

5    **Q.**   All right.  So what did you set out to do?

6    **A.**   I had to work with senior technical people, Mr. Menell and

7    Mr. Goodfellow -- initially Mr. Goodfellow and then it got

8    escalated to Mr. Menell -- to try and come up with what we'd

9    actually sold them to be able to give that to the auditors.

10   **Q.**   Did anyone bring to your attention that what you'd

11   supposedly sold them was still plugged into the wall and

12   operating Autonomy's business?

13   **A.**   Yeah.  It wasn't -- it was from the Fixed Asset Register

14   of our assets in Zantaz, which were data centers for general

15   customers.  Whether or not it was possible to carve some of

16   those out or technically feasible to have them set aside, I

17   have no idea.

18   **Q.**   All right.  Were you, nonetheless, asked to justify it?

19   **A.**   Yes.

20   **Q.**   I'd like to just show you a couple of exhibits.  This is

21   1449.  Take a look at this, please, see if you recognize what

22   1449 is, Mr. Stephan.

23          **THE COURT:**  1449 admitted.

24      (Trial Exhibit 1449 received in evidence)

25          **MR. FRENTZEN:**  Pull that up.

1   Q.   All right.  Mr. Stephan, this is January 17th of 2011,

2   from you to Mr. Goodfellow about VMS hardware (reading):

3            "Hi, Chris -

4            "The auditors need to track back to find the purchase

5       values of the reallocated hardware on this deal.  Have you

6       got the reports where these assets were taken from and is

7       there any way to trace these values from your schedules?"

8       I mean, at this point in time did you think that the

9   assets had actually been delivered to VMS?

10  A.   No.

11  Q.   Okay.  How did -- what was your understanding about what

12  had happened here?

13  A.   I think it was -- the deal was done late in the day and

14  not much thought had gone into how we were actually going to

15  prove that these assets had been -- or whether the assets had

16  been set aside or not, but there was no information ready to

17  hand to prove that we'd done what we say we'd done what with

18  carving these assets out and putting them in a separate

19  location and, you know, having them recognized as belonging to

20  VMS.  None of that was in place.

21  Q.   Did you eventually try to sort of generate a story,

22  something to tell Deloitte?

23  A.   One of the arguments was that under the contract, we could

24  designate any area we want as a bonded warehouse.  So that was

25  the argument we could make around fixed assets being sort of

1    sold to VMS, that we were -- you know, that we had partitioned

2    them off and they were -- you know, if VMS wanted, they could

3    just roll up and put them in the back of the truck and off they

4    go.  So that was the argument we had to put forward to try and

5    get the auditors across this one.

6    **Q.**    Did you come up with that one yourself or were you told to

7    argue that to the auditors?

8    **A.**    I was told.  This deal I really wanted nothing to do with,

9    but I was -- I was told to do it by Mr. Chamberlain.

10   **Q.**    I'd like to show you Exhibit 1464.

11            **THE COURT:**  Admitted.

12           (Trial Exhibit 1464 received in evidence)

13            **MR. FRENTZEN:**  Is it in evidence?

14            **THE COURT:**  It's in.

15            **MR. FRENTZEN:**  Okay.  Great.  We can just pull it up

16   then.

17   **Q.**    And here, Mr. Stephan, by January 20th, 2011, are you

18   arguing that Deloitte needs to understand what a bonded

19   warehouse actually means in practice?

20   **A.**    Yes.

21   **Q.**    Did you believe this yourself?

22   **A.**    No, not at all.

23   **Q.**    (reading)

24            "We can designate whatever we like to be the bonded

25       warehouse (Autonomy-designated per the contract) so in

1          this case we designate our own facility to be the

2          warehouse for the reallocated stock."

3          Okay.  And then there was also -- do you have a

4     recollection there was actually also some of the stock came

5     from a reseller and was actually sort of new hardware?

6     A.    Yeah.  There were a couple of pockets of the hardware, as

7     I recall.

8     Q.    All right.  So this was -- did this make you

9     uncomfortable?

10    A.    Yes, very uncomfortable.  I didn't believe what I was

11    being made to spout to the auditors.

12    Q.    In or around mid-2010, did you go back to Mr. Chamberlain

13    again to raise your concerns about what was happening at

14    Autonomy related to the reseller deals?

15    A.    Yeah.  I think as I said before, I had issues with this

16    constantly, to the point where it was making me fairly down --

17    you know, fairly depressed about my job and where it was going;

18    and every time I'd raise it, he would be very sympathetic and

19    agree with my point of view, but say, "Don't worry.  It's going

20    to get better.  There's light at the end of the tunnel."

21          MR. DOOLEY:  Objection, Your Honor.  Same objection.

22    If we could just find out when the conversation was, what he

23    said, and what Mr. Chamberlain said.

24          THE COURT:  Okay.  Sustained.

25    \\\

1   BY MR. FRENTZEN:

2   **Q.**   When you said "he," are you referring to your

3   conversations with Mr. Chamberlain?

4   **A.**   Yes.

5   **Q.**   And in mid-2010, did there come a time when

6   Mr. Chamberlain reported back to you what Mr. Hussain had told

7   you -- had told him -- I'm sorry -- about the reseller deals?

8   **A.**   He related to me that Mr. Hussain didn't want to be doing

9   these deals either and that we'd be dialing them back in future

10  quarters so, you know, "Chin up.  You'll be right.  This is

11  just a bad point in time and it will get better."

12  **Q.**   Did Mr. Chamberlain report whether or not Mr. Hussain had

13  said anything about what portion of the overall sales the

14  reseller deals represented?

15          **MR. DOOLEY:**  Objection.  Can we get any more

16  specificity on when this conversation was?  Is this mid -- when

17  in the year?

18          **THE COURT:**  He said mid --

19          **MR. FRENTZEN:**  2010, Your Honor.

20          **THE COURT:**  -- 2010.

21          **THE WITNESS:**  I can't give any more specificity, but

22  it was always argued that it was a small portion of the deals,

23  you know, but, by and large, a proper business doing proper

24  sales and it's just this little piece on top that's no good.

25  \\\

1    BY MR. FRENTZEN:

2    **Q.**    And did Mr. Chamberlain tell you that's what he was

3    getting back from Mr. Hussain?

4    **A.**    Yeah, because he -- as he relayed to me, he was having the

5    same issues internally with himself about what was going on and

6    raising the same concerns with Mr. Hussain and having been

7    reassured in a similar way so he was reassuring me.

8    **Q.**    Reassuring -- Mr. Chamberlain reported to you that

9    Mr. Hussain reassured him how?

10    **A.**    That these deals were not going to be the way we do

11    business forever, that we were going to be doing less of them;

12    that, "You know, don't worry.  It's only a small amount.  Look,

13    we're a good company.  We're growing.  It's all good.  You

14    know, things will get better."

15    **Q.**    But never that they were perfectly fine and there was no

16    reason to be concerned about them?

17    **A.**    No.

18    **Q.**    Did that also continue to cause you concerns?

19    **A.**    Yes.

20    **Q.**    Did you see a drop-off to your perspective -- from your

21    perspective of these reseller deals over time?  Did it seem

22    like they were going away to you?

23    **A.**    No.  I mean, I'd be sitting there in the quarter thinking

24    things are going to be okay, and then I'd get to the first of

25    the following month after the quarter end and there would be a

1    whole bunch more again to argue about.

2        So, you know, during the -- during the quarter I would

3    quite enjoy things that we were working on real sales with real

4    customers and negotiating contracts and doing -- you know,

5    doing my job as I saw it, and then it would be sort of ruined

6    in my eyes by the stuff that was signed late in the day with

7    resellers.

8        **MR. FRENTZEN:**  I apologize, Your Honor.  I misplaced a

9    list of spreadsheets that I wanted to put in through this

10   witness.

11       Ah, here we go.

12       Okay.  All right.  And, Your Honor, at this time -- well,

13   I think I can get this done -- if we could offer Exhibits 3029,

14   3030, 3032, 3033, and 3034, all of which are spreadsheets.

15       And I'll notify the Court I told counsel --

16   **Q.**   Mr. Stephan, have you examined these various spreadsheets

17   that I'm talking about?

18   **A.**   Yes, I have.

19   **Q.**   Were some of them at a date after you left Autonomy?

20   **A.**   Yeah.  I think two of them were quarter one 2011

21   spreadsheets that were dated after I'd left.

22       **MR. FRENTZEN:**  And, I'm sorry, Your Honor, I'd add to

23   that list Exhibit 394, which was when he was still at Autonomy.

24   **Q.**   But with respect to the ones that were after you left

25   Autonomy, did you, nonetheless, take a look at these

1    spreadsheets and did they appear to be the same or similar

2    spreadsheets that you would receive from Mr. Hussain?

3    **A.**    Yes, the same -- the same sheets tracking revenue and

4    costs and the financial position.

5          **MR. FRENTZEN:**  Your Honor, I'd like to offer those

6    remaining Exhibits 3029, 3030, 3032, 3033, 3034, and 394 into

7    evidence.

8          **THE COURT:**  Admitted.

9        (Trial Exhibits 3029, 3030, 3032, 3033, 3034, and 394

10          received in evidence)

11          **MR. FRENTZEN:**  Okay.  And, Your Honor, I think I'm

12    about to wind down but if we could take the break --

13          **THE COURT:**  Sure.

14          **MR. FRENTZEN:**  -- then I would know for sure, if that

15    works for the Court.

16          **THE COURT:**  Okay.  That's fine.

17        Ladies and gentlemen, we're going to take our noon recess.

18    Remember the admonition given to you:  Don't discuss the case,

19    allow anyone to discuss it with you.

20        We will resume at 1:00 o'clock.

21              (Luncheon recess taken at 11:58 a.m.)

22

23

24

25

1    <u>Afternoon Session</u>                                    <u>1:03 p.m.</u>

2            **THE CLERK:**  Come to order.  Court is now in session.

3        (Proceedings were heard in the presence of the jury:)

4            **THE COURT:**  Let the record reflect all jurors are

5    present; parties are present.

6        Mr. Frentzen.

7            **MR. FRENTZEN:**  Thank you, Your Honor.

8    **Q.**    Good afternoon, Mr. Stephan.  I wanted to show you two

9    more exhibits.  Let me start with Exhibit 728.  See if you

10   recognize what that is.  Do you recognize Exhibit 728,

11   Mr. Stephan?

12   **A.**    Yes, I do.

13   **Q.**    What is it?

14   **A.**    It was an email from Mr. Chamberlain advising Cynthia

15   Watkins that her numbers were going to have to change post

16   quarter end to reflect some revenue adjustments.

17           **MR. FRENTZEN:**  I would offer --

18           **THE COURT:**  Admitted.

19           **MR. FRENTZEN:**  Thank you, Your Honor.

20           (Trial Exhibit 728 received in evidence)

21               (Exhibit published to jury.)

22   **BY MR. FRENTZEN:**

23   **Q.**    What is the date on this email?

24   **A.**    It's the 8th of April, 2010.

25   **Q.**    All right.  And this is from Mr. Chamberlain?

1  **A.**    Yes.  That's right.

2  **Q.**    You said it's to Cynthia Watkins and you were also cc'd?

3  **A.**    Yes.  Correct.

4  **Q.**    All right.  This says "revenue adjustments," and

5  Mr. Chamberlain says, "Firstly, I apologize for the constant

6  changing of your numbers.  Powers greater than me are making

7  these decisions and whilst I understand them, I know they will

8  be causing you a lot of pain."

9         Who is the power greater than Mr. Chamberlain at Autonomy?

10 **A.**    Mr. Hussain.

11 **Q.**    "I will make sure this is remembered when it comes to

12 sorting out Q1 bonuses."

13        Can we scroll down some.

14        Then it goes on, "We need to make adjustments to revenue

15 which affects hardware revenue and costs, as well as normal

16 license."

17        Do you see here where it says "defer Capax end user FSA"?

18 **A.**    Yes.

19 **Q.**    That's about a $4.2 million indication here?

20 **A.**    Yes.

21 **Q.**    Can we keep scrolling.

22        No. 2, "Defer additional hardware deals as per attached,

23 some ins and outs from last night's schedule."

24        What is meant by "defer"?

25 **A.**    It meant that we weren't going to be taking up the revenue

1    in Quarter 1 for those items.

2    **Q.**    And then can you keep scrolling up a little bit.

3         What does this mean here, Mr. Stephan, if you recognize

4    what that means?

5    **A.**    Yeah.  It just meant in order to actually effect this in

6    the financial statements, there was a process that Cynthia

7    would have to go through to change the accounts and then

8    re-send some information to Cambridge.

9    **Q.**    All right.  And I would like to show you now Exhibit 743.

10   See if you recognize what that is.

11             **THE COURT:**  Admitted.

12        (Trial Exhibit 743 received in evidence)

13             **MR. FRENTZEN:**  Thank you, Your Honor.

14                  (Exhibit published to jury.)

15   **BY MR. FRENTZEN:**

16   **Q.**    What is 743, Mr. Stephan?

17   **A.**    So it looks -- it was about four days later, similar email

18   from Steve making more changes, this time putting things back

19   into revenue.

20   **Q.**    All right.  So it says, "We have had to make further

21   changes to your numbers.  Capax back in and hardware have had

22   to recognize more hardware."

23        Mr. Stephan, is this the kind -- an example of the kind of

24   emails that caused you concerns while you were at Autonomy?

25   **A.**    Yes.  Because --

STEPHAN - DIRECT / FRENTZEN

1    Q.    Why?

2    A.    Because it seems like it's picking and choosing which

3    deals are going to be in a given quarter rather than, you know,

4    where things lie -- under the accounting standards where they

5    should lie.

6    Q.    Is that the way things are supposed to work in accounting

7    for revenue recognition?

8    A.    I mean, you can have differences of opinion on revenue

9    recognition, but assuming there was an opinion that it

10   shouldn't be in revenue, I don't recall any good evidence for

11   why it should suddenly be back in and recorded as a revenue.

12   Q.    Are you aware of a term "managed earnings"?

13   A.    Yes.

14   Q.    Was that something that concerned you while you were at

15   Autonomy?

16   A.    Yes.

17   Q.    What is "managed earnings"?

18   A.    That we would recognize various deals or sign deals with

19   resellers, etc., in order to hit a particular number that was

20   targeted in each quarter.

21   Q.    Did you also have the same type of concern with regard to

22   hardware?

23   A.    Yes.  I recall instances where we had a whole mixture of

24   delivery dates on hardware, and at different times they were

25   trying to argue that they should be in or out of a given

1    quarter, despite it being black and white about whether they

2    were delivered or not.

3    **Q.**   Did you have a view of whether or not hardware was being

4    used to plug revenue?

5              **MR. DOOLEY:**  Objection.  Argumentive.

6              **THE COURT:**  Overruled.

7              **THE WITNESS:**  In certain quarters, definitely.

8    **BY MR. FRENTZEN:**

9    **Q.**   What do you mean by that?

10   **A.**   There would be -- for instance, pre-quarter end, there

11   would be a push to get more revenue -- more hardware revenue

12   deals signed, and then in this given quarter, some of the

13   hardware would be pushed out, if possible, into the future

14   quarter, even if it had a delivery note saying it was in

15   Quarter 1.  So it was managing to a set number.

16   **Q.**   One other exhibit I wanted to show you.  This is 1287.

17   Mr. Stephan, can you take a look at 1287 and see if you

18   recognize what that is, sir.

19             **THE COURT:**  Admitted.

20        (Trial Exhibit 1287 received in evidence)

21            **MR. FRENTZEN:**  Thank you, Your Honor.

22                   (Exhibit published to jury.)

23   **BY MR. FRENTZEN:**

24   **Q.**   Can we scroll down to the -- sorry -- the fourth page.

25   And -- okay.

1          Mr. Stephan, we see this coming to you later, but do you

2     know who Mike Sullivan is?

3     **A.**   I can't remember his job title, but he was senior within

4     the historic Zantaz business, so he looked after hosted --

5     hosted sales and hardware.

6     **Q.**   And there is somebody here named Stephanie Sepehbody?

7     **A.**   Yes.  I don't know who that is.

8     **Q.**   And -- I'm sorry.  Do you know who that is?

9     **A.**   No.

10    **Q.**   Okay.  All right.  But in any event, Mr. Sullivan is

11    saying, "Following up on our discussion, Autonomy will extend

12    an additional 5 percent discount to SHI provided that SHI

13    orders an additional 3 million in Dell product prior to

14    12/29/2010."

15         Do you see that?

16    **A.**   Yes.

17    **Q.**   Let's go -- there is some back and forth, but let's go to

18    the first page of the email, and can you scroll down -- there

19    you go.  Sorry.  Back to the -- so we can see what's up here.

20    Great.

21         Who is Jorge Salazar?

22    **A.**   He was the contracts manager in the legal department at

23    the time, and he was managing the paper trail on the Autonomy

24    side for all these agreements with hardware sales.

25    **Q.**   You see at this point in the email chain, you have been

STEPHAN - DIRECT / FRENTZEN

1  brought in as a cc along with Steve Chamberlain?

2  A.  Yes.

3  Q.  And it's Q4 incentive?

4  A.  Yep.

5  Q.  This is going to Mr. Hussain on December 14th of 2010?

6  A.  Yes.

7  Q.  It says, "Sushovan" -- can you scroll up a little bit.

8      "Sushovan, Matt suggested I run this by you."  Is that

9  you?

10  A.  That's me.

11  Q.  "We are requoting SHI for additional Dell hardware orders.

12  We are offering an additional five percent discount on hardware

13  orders placed by SHI before end of the year, provided such

14  orders total 2.5 million.  Please confirm this have been

15  approved.  We offered similar incentives to SHI last quarter."

16      Why did you -- well, first of all, when this came to your

17  attention, did this trouble you or concern you in any way, as

18  you talked about before?

19  A.  It was, I guess, an example of using -- of trying to book

20  more hardware revenue to improve our earnings for that quarter.

21  Q.  If you could scroll down some, why did you suggest that

22  this go to Mr. Hussain?

23  A.  The fact that it was giving a further five percent

24  discount was just throwing money out the door and I didn't want

25  them going through that without having approval from

1   Mr. Hussain.

2   **Q.**   And you see what Mr. Hussain said here?

3   **A.**   Yeah.  That he approved it.

4   **Q.**   In terms of expenses at Autonomy, did you have -- working

5   in the finance department, did you have some understanding

6   about who had to authorize expenses and money going out from

7   Autonomy?

8   **A.**   Not in detail because I wasn't looking after the payables

9   out of the business, but everything on cost side was very

10  tightly managed.

11  **Q.**   What do you mean by that?

12  **A.**   Payments down to a very low number needed senior approval.

13  If you wanted someone to get a pay raise within the team, it

14  had to get signed off I think all the way up to Dr. Lynch and

15  other examples, but those are the most obvious to me.

16  **Q.**   Okay.  I want to ask you now about -- I want to direct

17  your attention to around June or July 2010.

18      Did you, around that time, come to learn that there was

19  some sort of an issue going on with an individual by the name

20  of Brent Hogenson?

21  **A.**   Yes, I did.

22  **Q.**   Could you describe for us how that came to your attention.

23  **A.**   I think it was a conversation with Mr. Chamberlain that

24  first alerted me to it, that basically Mr. Hogenson had sent

25  off a series of letters to regulators and, I think, the audit

 1   committee alleging a series of things that Autonomy management

 2   had been doing.

 3   **Q.**   When Mr. Chamberlain described this to you, what, if

 4   anything, did he describe about how he was reacting to this

 5   news?

 6           **MR. DOOLEY:**  Same objection.  Foundation.  Say what

 7   Mr. Chamberlain said without characterizing.

 8           **MR. FRENTZEN:**  I'm trying to get to the subject matter

 9   that I'm questioning about, Your Honor, without leading.

10           **THE COURT:**  Overruled.

11           **THE WITNESS:**  Mr. Chamberlain was outraged that they

12   had betrayed Autonomy.

13           **MR. DOOLEY:**  Objection.  Move to strike, Your Honor.

14   That's not a statement about what he heard Mr. Chamberlain.

15   It's a characterization of Mr. Chamberlain.

16           **THE COURT:**  What did he say?

17   **BY MR. FRENTZEN:**

18   **Q.**   What did Mr. Chamberlain say to you?

19   **A.**   He was basically saying how could they do this.  You know,

20   he's making up all these lies against Autonomy.  That was --

21   that was the crux of it.

22   **Q.**   Did Mr. Chamberlain -- how did he appear visibly in

23   reaction to this news or how he was conveying it to you?

24   **A.**   He was agitated by it.  There was a great deal of stress

25   caused by it in him.

1  **Q.**   Did this become something of a topic of conversation at

2  Autonomy in general?

3  **A.**   I wouldn't say in general.  It was between me and Steve

4  Chamberlain and Lisa Harris, just at that level.  Poppy --

5  Poppy Prentis.  Just the sort of more senior members of the

6  team would discuss it.

7  **Q.**   Did you come to learn what sorts of allegations Mr.-- or

8  what sorts of questions Mr. Hogenson was raising?

9  **A.**   I saw a copy of the letter he'd issued, I think, to one of

10  the UK regulators with all of the allegations he was raising.

11  **Q.**   Did you review what was in the letter?

12  **A.**   Yes, I did at the time.

13  **Q.**   Do you have a recollection of what sorts of issues

14  Mr. Hogenson raised to the regulators or in the letter you saw?

15  **A.**   I can't remember all the details, but one thing he

16  definitely raised was booking revenue deals through resellers

17  in one quarter, even though they were then closed with the end

18  customer by Autonomy in a future quarter.  So we were managing

19  earnings, effectively.

20  **Q.**   As you read the -- the issues that Mr. Hogenson was

21  raising, did you have a view in terms of whether -- what was

22  your -- sorry.

23        Did you have, in your own mind, some agreement or

24  disagreement with what Mr. Hogenson was raising in his letter?

25  **A.**   Yeah.  I had agreement with a lot of the stuff he was

1    raising.

2    **Q.**    Everything or just some of it?

3    **A.**    Some things I think he was reaching a bit because he

4    didn't have the full picture, but some of the things he was

5    raising were spot on, in my view.

6    **Q.**    Did you have an understanding of what happened -- may I

7    have one moment, Your Honor?

8         (Government counsel confer off the record.)

9    **BY MR. FRENTZEN:**

10   **Q.**    What's your understanding of what happened to Mr. Hogenson

11   after these issues were raised?

12   **A.**    He was -- he was dismissed on the spot.

13          **MR. FRENTZEN:**    May I have one moment again?    Sorry,

14   Your Honor.

15        (Government counsel confer off the record.)

16   **BY MR. FRENTZEN:**

17   **Q.**    To your recollection, what were the issues that

18   Mr. Hogenson raised that you thought were spot on, Mr. Stephan?

19   **A.**    It was principally the use of resellers to bring forward

20   sales into earlier quarters and they were actually booked.    I

21   believe he also raised the hardware being sold as another

22   issue.    Those are the two that I recall.

23   **Q.**    That stood out to you?

24   **A.**    That stood out, yes.

25   **Q.**    Mr. Stephan, do you have any sort of agreement or

STEPHAN - CROSS / DOOLEY

 1  arrangement with the Government --

 2  **A.**    No.

 3  **Q.**    -- related to your testimony?

 4  **A.**    Nothing at all.

 5  **Q.**    Are you traveling here during your holiday?

 6  **A.**    My annual leave, yeah.

 7          **MR. FRENTZEN:**  I have nothing further at this time,

 8  Your Honor.

 9          Thank you very much, Mr. Stephan.

10          **THE COURT:**  Cross.

11                          <u>**CROSS-EXAMINATION**</u>

12  **BY MR. DOOLEY:**

13  **Q.**   Good afternoon, Mr. Stephan.  My name is Brook Dooley.  I

14  represent Sushovan Hussain.

15          You and I have never met before, have we?

16  **A.**   No, we haven't.

17  **Q.**   You have met a number of times with the FBI and the U.S.

18  Attorney's Office; correct?

19  **A.**   Correct.

20  **Q.**   The first time was in 2014; right?

21  **A.**   That sounds correct, yes.

22  **Q.**   And you were actually stopped by an FBI agent while you

23  were traveling in the U.S. on vacation in 2014; right?

24  **A.**   Yeah.  They came and visited me at my hotel in Washington,

25  D.C.

STEPHAN - CROSS / DOOLEY

1    Q.   At that point in 2014, Hewlett-Packard had made its

2    allegations about Autonomy public; correct?

3    A.   I believe so, yes.

4    Q.   Hewlett-Packard had announced that it had referred its

5    allegations to the Department of Justice and the SEC and so

6    forth; right?

7    A.   Sure.

8    Q.   And you obviously knew that you had worked in the finance

9    department at Autonomy during the relevant time; right?

10   A.   Yes.

11   Q.   And you had worked with Mr. Hussain and you had worked

12   with Dr. Lynch, even if indirectly; right?

13   A.   Yes.

14   Q.   And in 2014, this FBI agent comes knocking at your hotel;

15   right?

16   A.   Yeah.  That's right.

17   Q.   Probably somewhat startled?

18   A.   Yeah.  It was a phone call at 8:00 in the morning saying

19   the FBI is downstairs.  It's unusual.  It sticks in my memory.

20   Q.   I bet it does.  I bet it does.

21        And the agent asked you if the FBI could interview you in

22   connection with its investigation of Autonomy; right?

23   A.   That's right.

24   Q.   And about ten days later, you sat down with the SEC for a

25   meeting in New York; right?

1  **A.**    Yes.  The timeline seems right.

2  **Q.**    And then later in 2014, the SEC and the FBI flew to

3  Australia to interview you over two days; right?

4  **A.**    Yes.

5  **Q.**    And then they came back, the FBI came back, with one of

6  the prosecutors in 2015; right?

7  **A.**    Yes.

8  **Q.**    And on the second trip back in 2015, the Government had

9  drafted a statement for you to sign; right?

10 **A.**    Yes.  That's right.

11 **Q.**    Do you recall that?

12 **A.**    I do.

13 **Q.**    It was fashioned as a sworn declaration, but the

14 Government wrote it for you to sign; right?

15 **A.**    Yes.

16 **Q.**    And it begins "I, Matt Stephan, declare as follows," but

17 you didn't sit down and write it; right?

18 **A.**    I didn't type it up, no.

19 **Q.**    When you read it, I think you made one correction; right?

20 You added -- there was a missing word and you added that, but

21 otherwise, you signed it?

22 **A.**    That's right.

23 **Q.**    And the Government interviewed you again in February of

24 this year, just a month and a half ago or so?

25 **A.**    Yeah.  Just a phone conference, yeah.

1  **Q.**   And have you met with the Government since you've been in

2  the U.S. on your most recent trip?

3  **A.**   This trip?

4  **Q.**   Yes.

5  **A.**   Yes.

6  **Q.**   When was that?

7  **A.**   It was yesterday.

8  **Q.**   You've testified, Mr. Stephan, a great deal about your

9  concerns around Autonomy's sales to value-added resellers.  So

10  I want to talk about these value-added reseller sales.

11       But let's back up before that.  The quarterly revenue

12  targets -- we saw some spreadsheets that had targets in them.

13       There is nothing wrong with a company setting quarterly

14  revenue targets, is there?

15  **A.**   No.

16  **Q.**   Nothing wrong with putting a forecast number in a

17  spreadsheet; correct?

18  **A.**   Correct.

19  **Q.**   That's -- would you imagine that's common for public

20  companies to do?

21  **A.**   Yeah.  Completely.

22  **Q.**   And there's similarly nothing wrong with the CFO of a

23  public company tracking sales during the quarter to see if the

24  company is going to meet those targets; right?

25  **A.**   Yeah.  That's fine.

1   **Q.**  And there's nothing wrong with that same CFO using a

2   spreadsheet to track sales; right?

3   **A.**  No.  That's fine.

4   **Q.**  It's a sensible way to do it.

5      And we looked at a number of the spreadsheets that you and

6   Mr. Hussain worked on.  Those were the purple and the green and

7   the white cells.

8      And I think you said that Mike Mooney sometimes had access

9   to those?

10  **A.**  Yeah.  Mike Mooney, Brent Hogenson, and Nigel Hutchinson.

11  They would look at their individual tab that was in their name

12  for their area of responsibility.

13  **Q.**  Okay.  Explain for the jury who those folks -- they've

14  heard Hogenson's name before, but Mike Mooney was the head of

15  sales or sales executive?

16  **A.**  He was a sales executive for the Autonomy-branded side of

17  the business.  Brent Hogenson was the VP of finance for the

18  U.S.  And Nigel Hutchinson was a sales manager for the rest of

19  the world.

20  **Q.**  All those folks had access to some or all of

21  Mr. Hussain -- the spreadsheet that you and Mr. Hussain

22  maintained?

23       **MR. FRENTZEN:**  Objection.  Vague as to "access."

24  **BY MR. DOOLEY:**

25  **Q.**  Well, they got copies of it?

1    **A.**    They got pieces of it at different types, yeah.

2    **Q.**    And it was known in the office at Autonomy that

3    Mr. Hussain maintained the spreadsheet.  That wasn't a secret

4    in the office; right?

5    **A.**    No.

6    **Q.**    And you've also talked about these SMS calls.  Those are

7    like -- it's like a sales pipeline call?

8    **A.**    Yes.

9    **Q.**    Nothing unusual about that, tracking sales through a sales

10    pipeline call?

11    **A.**    No.  You'd expect it.

12    **Q.**    And you've talked about -- you testified about sales

13    coming in at the end of the quarter, but assuming that all the

14    relevant accounting rules are met, there is nothing wrong with

15    making sales right at the end of the quarter to meet your

16    revenue target, is there?

17    **A.**    Well, it depends on what you mean by meet your target.  If

18    you shouldn't be recognizing the revenue, then I don't think

19    that's okay.

20    **Q.**    But that wasn't my question.

21         My question is assuming you meet the revenue recognition

22    rules, there is nothing wrong with doing a bunch of sales in

23    the last week of the quarter in order to hit that target;

24    right?

25    **A.**    Yeah.  In theory, yeah.

1  **Q.**    And, in fact, it's common for software companies, in

2  particular, to make a large percentage of their sales in the

3  last few days of the quarter; right?

4  **A.**    Yes.

5  **Q.**    And sometimes you get a lot of deals on the very last day

6  of the quarter; right?

7  **A.**    Yes.

8  **Q.**    And Mr. Frentzen showed you a couple of different versions

9  of Mr. Hussain's -- the spreadsheet that you and Mr. Hussain

10 maintained in December of 2009.  Do you remember that --

11 **A.**    Yes.

12 **Q.**    -- those two exhibits?

13        One was dated December 24th and one was dated

14 December 31st; right?

15 **A.**    Yes.

16 **Q.**    And in the December 31st, the revenue numbers are -- there

17 is a bunch of deals that weren't there on December 24th; right?

18 **A.**    Yes.

19 **Q.**    But that's not all that surprising, right, given that in

20 the software business, a lot of the deals get done at the end

21 of the quarter.  Nothing surprising about deals coming in that

22 last week of December; correct?

23 **A.**    Deals out of the blue, though, I don't believe they can

24 materialize in a week.

25 **Q.**    Okay.  But it's not unusual for deals to be signed in the

STEPHAN - CROSS / DOOLEY

1   last week of the quarter?

2   **A.**   No.   That's not unusual.

3   **Q.**   And there's nothing wrong with selling software through

4   value-added resellers; right?

5   **A.**   No.

6   **Q.**   And that's also common in the software industry; right?

7   **A.**   Yes.

8   **Q.**   And one of your concerns that you stated about these

9   value-added resellers is that they were being used to meet the

10  revenue targets at the end of the quarter, but if the deals

11  complied with the relevant IFRS accounting rules, there is

12  nothing wrong with Autonomy closing those deals at the end of

13  the quarter to meet their revenue targets, is there?

14  **A.**   Well, I -- in my opinion, they didn't really meet the

15  criteria, but the auditors signed off on them anyway.

16  **Q.**   In your opinion, they didn't, but let's assume the deals

17  did meet the IFRS revenue recognition criteria, there is

18  nothing wrong with Autonomy closing a bunch of deals at the end

19  of the quarter to meet their revenue target, is there?

20  **A.**   No.

21  **Q.**   And you talked about your opinion and you mentioned

22  Deloitte.   We'll talk about that.

23       But under IFRS, there's nothing wrong with recognizing

24  revenue on the sale to a reseller, even if the reseller has not

25  yet completed a sale on to the end user; right?

STEPHAN - CROSS / DOOLEY

1   **A.**   That's my recollection.  It's been a while since I've done

2   revenue recognition in my job.

3   **Q.**   But that was a big part of your job at Autonomy, revenue

4   recognition; right?

5   **A.**   Yes.

6   **Q.**   And Autonomy was an IFRS company; right?

7   **A.**   Right.

8   **Q.**   And to your recollection, Autonomy didn't need to prove

9   that there was an end deal with a customer in order to

10  recognize the revenue; right?

11  **A.**   That's right.

12  **Q.**   And that's different from U.S. GAAP; right?

13  **A.**   Yeah, as I understand it.  U.S. GAAP is a lot more

14  descriptive.

15  **Q.**   U.S. GAAP requires sell-through, a contract with the end

16  user; right?

17  **A.**   Yep.

18  **Q.**   But under IFRS, Autonomy could recognize revenue based on

19  a sale to the reseller; right?

20       **MR. FRENTZEN:**  Objection.  Unless it's characterized

21  as previous, that's vague, may call for a legal conclusion.

22       **THE COURT:**  Sustained.

23       **MR. DOOLEY:**  And -- well, I'm not sure what the

24  objection is.

25  **Q.**   Under IFRS --

1        **MR. FRENTZEN:**  The objection is that it was vague and

2   not qualified like you had previously qualified your other

3   question.

4   **BY MR. DOOLEY:**

5   **Q.**   Well, the question is this:  Under IFRS rules, Autonomy

6   can recognize revenue based on the sale to a reseller without a

7   requirement that there is a sale on to the end user; correct?

8   **A.**   Correct.

9   **Q.**   And Autonomy -- folks in the Autonomy finance department

10  made it clear to the Deloitte audit team that Autonomy was

11  recognizing revenue on the sale to the reseller without regard

12  to the reseller's onward sale; right?  Deloitte knew that

13  that's what Autonomy was doing?

14       **MR. FRENTZEN:**  Objection.  Foundation and that

15  actually misstates the evidence.

16       **THE COURT:**  Sustained.

17  **BY MR. DOOLEY:**

18  **Q.**   Well, did -- I'll ask the question.

19       Did Autonomy make it clear to Deloitte that it was -- to

20  the Deloitte audit team that Autonomy was recognizing revenue

21  on the sale to the reseller without regard to the reseller's

22  onward sale?

23       **MR. FRENTZEN:**  Same objection.

24       **THE COURT:**  Without regard to what?

25       **MR. FRENTZEN:**  Foundation.  And I think that misstates

1    the testimony thus far.

2         **THE COURT:**  Well, at any time.

3    **BY MR. DOOLEY:**

4    **Q.**   In 2009 and 2010, that's the question.  Did Autonomy make

5    it clear to the Deloitte audit team that it was recognizing

6    revenue on sale to the reseller without regard to the

7    reseller's onward sale to an end user?

8         **MR. FRENTZEN:**  Objection.  Vague.  And if we are going

9    to try to get down to specific conversations, then this is

10   about as vague as it gets.

11        **THE COURT:**  Sustained.

12   **BY MR. DOOLEY:**

13   **Q.**   Let's look at Exhibit 545.  It should be in your binder.

14        I would move it in, Your Honor.

15        **THE COURT:**  545, admitted.

16        (Trial Exhibit 545 received in evidence)

17             (Exhibit published to jury.)

18   **BY MR. DOOLEY:**

19   **Q.**   If you could look at the second page, the email that

20   starts on the second page at the bottom, from Alex Jackson to

21   you regarding the Centurylink/MicroTech deal on January 12th.

22        Do you recall that Centurylink/MicroTech was one of the

23   deals sold to MicroTech at the end of the fourth quarter, 2009?

24   **A.**   I recall the name.  No more specifics than that.

25   **Q.**   And Mr. Jackson, in the third paragraph, writes, "If

1    Centurylink had not sent a purchase order to MicroTech, they

2    have not committed to the order with them.  Could you request

3    any supporting documentation from MicroTech in terms of the

4    deal.  If we could get the agreement or a PO, that would be

5    very helpful.  Do you see that?

6    **A.**   Yes.

7    **Q.**   So he's looking for a deal between Centurylink -- he is

8    looking for evidence of a deal between Centurylink and

9    MicroTech; correct?

10   **A.**   Yes.

11   **Q.**   And then if you flip to the first page of the exhibit at

12   the bottom, you forward the email on to Mr. Chamberlain, and

13   Chamberlain writes, "I don't care if MicroTech have closed

14   their deal with Centurylink.  I have an order from MicroTech,

15   not Centurylink.  I am providing maintenance to MicroTech, not

16   Centurylink.  MicroTech have an obligation to pay us

17   irrespective of whether they get paid by Centurylink or indeed

18   close an order with Centurylink.  The issue is whether or not

19   MicroTech had the capacity to pay.  Nothing else."

20        That was Mr. Chamberlain's response; right?

21   **A.**   Yes.  That's right.

22   **Q.**   And then you forwarded it on to Mr. Jackson and wrote,

23   "Steve sums it up pretty neatly, I think"; right?

24   **A.**   Yes.

25   **Q.**   And to your recollection, Deloitte approved Autonomy's

1    recognition of revenue on this transaction; correct?

2    **A.**    Yes.

3    **Q.**    In fact, the Deloitte audit team reviewed all of

4    Autonomy's -- all of Autonomy's revenue recognition

5    determinations on deals greater than a million dollars; right?

6    **A.**    That's right.

7    **Q.**    And then they sampled deals over a hundred thousand.  Does

8    that sound right?

9    **A.**    Yeah.  That sounds right.

10   **Q.**    And the way it would work is that a week or a couple days

11   after the end of the quarter, the Deloitte audit team would

12   come physically to Autonomy's offices to conduct their review

13   or their audit; right?

14   **A.**    Yes.

15   **Q.**    And you would prepare deal binders for Deloitte with the

16   necessary documents for every deal over a hundred thousand

17   dollars; right?

18   **A.**    Right.

19   **Q.**    Was that something you personally did?

20   **A.**    Yes.

21   **Q.**    So you would put together -- for every sale over a hundred

22   thousand dollars, you would put together the relevant

23   paperwork, the contract, the purchase order, the invoice,

24   payment history, all of that?

25   **A.**    Yes.

STEPHAN - CROSS / DOOLEY

1   Q.   And physically in a binder so they could come and they

2   could look at it?

3   A.   That's right.

4   Q.   I think you've said previously they would drill down on

5   the deals over a million dollars?  They would really focus on

6   those?

7   A.   That's right.  Yes.

8   Q.   And that included Autonomy's sales to resellers, Deloitte

9   reviewed every one of those over a million dollars?

10  A.   Yes.

11  Q.   And as part of Deloitte's review, they reviewed

12  Autonomy's -- the contracts with the resellers; right?

13  A.   Yes.

14  Q.   The purchase orders, the invoices; right?

15  A.   Whatever paperwork we had for that deal.

16  Q.   Deloitte also looked for evidence of delivery that the

17  software had been delivered to the reseller; correct?

18  A.   Correct.

19  Q.   And one of the ways that they did that was they looked for

20  actual screenshots taken from Autonomy's Automator delivery

21  system; is that right?

22  A.   Yes.

23  Q.   The Automator was the computer system that delivered the

24  software electronically; is that right?

25  A.   Yes.  We would load the software up into some sort of

1    cloud-based, internet-based server, and the customer could then

2    download it.

3    **Q.**    And sometimes Deloitte would ask for screenshots and

4    sometimes they would ask for like an email confirmation that

5    there had been delivery; right?

6    **A.**    I think initially they were relying on the email until

7    they learned that it was a manual email and then they wanted to

8    see screenshots.

9    **Q.**    So suffice it to say, Deloitte was looking closely at

10    evidence of delivery?

11    **A.**    Yes.

12    **Q.**    And Deloitte also looked closely for evidence of what we

13    call collectibility; right?

14    **A.**    Yes.

15    **Q.**    And collectibility means the ability of the reseller or

16    the customer to pay; right?

17    **A.**    Yes.

18    **Q.**    Deloitte looked for evidence of a reseller's payment

19    history; right?

20    **A.**    That's right.

21    **Q.**    Look at Exhibit 544.

22            **THE COURT:**    Admitted.

23            (Trial Exhibit 544 received in evidence)

24                (Exhibit published to jury.)

25    \\\

STEPHAN - CROSS / DOOLEY

1    BY MR. DOOLEY:

2    Q.   This is an email from Mr. Murray to you on January 12th,

3    2010; correct?

4    A.   That's correct.

5    Q.   And he is saying, "Can you please send me a copy of the

6    MicroTech customer payment history so I can document the level

7    of historic deals done through this VAR."

8         So they are looking for payment history.

9         Deloitte also sent out audit confirmation letters to the

10   resellers; right?

11   A.   Yes.

12   Q.   They wanted confirmation from the resellers that they

13   understood that they owed Autonomy on these deals; right?

14   A.   Yes.

15   Q.   If you look at Exhibit 567 in your binder.

16        THE COURT:  Admitted.

17        MR. DOOLEY:  Move this in.

18        (Trial Exhibit 567 received in evidence)

19             (Exhibit published to jury.)

20   BY MR. DOOLEY:

21   Q.   Look at the top of the second page, Mr. Stephan, there is

22   an email from Lee Welham to Steve Chamberlain, and they're

23   talking about getting a confirmation from MicroTech.  Do you

24   see that?

25   A.   Yes.

1  **Q.**  And he wants to get the confirmation signed by the

2  MicroTech CFO, Mr. Esterrich, instead of Steve Truitt.  Do you

3  see that?

4  **A.**  Yes, I do.

5  **Q.**  And he says they want a confirmation from Mr. Esterrich

6  because they want confirmation signed by someone other than the

7  person who has signed all the MicroTech purchase orders.  They

8  want it from a different person at MicroTech; right?

9  **A.**  Yes.

10  **Q.**  Do those names ring a bell, Steve Truitt?

11  **A.**  Yeah.  I remember Steve Truitt's name being mentioned with

12  MicroTech.

13  **Q.**  And then if you look at Exhibit 746, I think this is

14  already in evidence.  This is a confirmation from MicroTech

15  signed by Mr. Esterrich verifying that the invoices were

16  proper; right?

17  **A.**  Yes.

18  **Q.**  And verifying that there are no side agreements with

19  Autonomy; correct?

20  **A.**  Yes.

21  **Q.**  In your direct testimony, Mr. Stephan, you testified that

22  one of your concerns about these reseller deals was that the

23  resellers were too small to pay on these deals, but we've seen

24  that Deloitte was doing a lot of work to confirm that the

25  resellers could pay; correct?

1   **A.**   Yeah.   A lot of -- it depended on the reseller.   Sometimes

2   they had very little to go on apart from a letter like this.

3   **Q.**   But you agree that Deloitte, having done the work of

4   checking payment history and sending confirmation letters --

5   Deloitte got comfortable that the resellers were able to pay

6   their debts; correct?

7   **A.**   Yes.   They would sign off.

8   **Q.**   And, in fact, you said "sign off."   I mean, every quarter,

9   Deloitte reviewed Autonomy's accounts and issued a clean audit

10  opinion; right?

11  **A.**   Right.

12  **Q.**   And every quarter, the Deloitte audit team concluded as

13  part of that opinion that nothing had come to its attention

14  that caused it to believe Autonomy's accounts were not prepared

15  in accordance with IFRS; right?

16  **A.**   Certainly within my time, that's what I remember, yeah.

17  **Q.**   And then every year after their annual audit, Deloitte

18  issued an opinion that Autonomy's financial statements gave a

19  true and fair view of its affairs; correct?

20  **A.**   Correct.

21  **Q.**   And that Autonomy's financial statements had been properly

22  prepared in accordance with IFRS?

23  **A.**   Yes.

24  **Q.**   You testified on direct that -- something about Deloitte

25  being painted into a corner.   When you were at Deloitte -- what

**STEPHAN - CROSS / DOOLEY**

1    years were you at Deloitte?

2    **A.**    Late 2005 to late 2008.

3    **Q.**    And you were in a fairly junior role there; correct?

4    **A.**    That's right.

5    **Q.**    You reported up through Lee Welham --

6    **A.**    Yes.

7    **Q.**    And Richard Knight above him --

8    **A.**    Yes.

9    **Q.**    Or Rob Knight above him and then Richard Knights above

10   him?

11   **A.**    Correct.

12   **Q.**    And then at Autonomy, you reported up through

13   Mr. Chamberlain and then up to Mr. Hussain; right?

14   **A.**    Yes.

15   **Q.**    And you acknowledged, I think, in your direct testimony

16   that during the course of an audit, a number of issues were

17   escalated to more senior people, kind of above the level that

18   you were working; right?

19   **A.**    Yes.

20   **Q.**    And you weren't part of those discussions; right?

21   **A.**    No.  I -- the final discussions, no, it was between the

22   partners of Deloitte and Mr. Hussain.

23   **Q.**    And at the level of those discussions, you don't know how

24   these -- how the issues were resolved, do you?

25          **MR. FRENTZEN:**  Objection.  Misstates the evidence.

STEPHAN - CROSS / DOOLEY

```
 1            THE COURT:  Sustained.
 2   BY MR. DOOLEY:
 3   Q.   Well, if Mr. Hussain and Mr. Knights were having a
 4   discussion, you weren't -- at the end of the audit process, you
 5   weren't part of those discussions, were you?
 6   A.   No.
 7   Q.   Now, you talked about your concerns about these reseller
 8   deals and you mentioned a couple in particular, and so I wanted
 9   to focus on just a couple.
10        You mentioned the sale to Capax for sale on to Eli Lilly
11   in the fourth quarter of 2009.
12        Can we put up Exhibit 456.  I think that came in in direct
13   testimony.  Maybe just blow up that email.
14                 (Exhibit published to jury.)
15   BY MR. DOOLEY:
16   Q.   You testified about this, "Mr. Chamberlain's statement
17   about the news to me now we're adding 9.9 million to their
18   balance."
19   A.   Yes.
20   Q.   Do you see that statement there?
21   A.   Yep.
22   Q.   Mr. Chamberlain is concerned about collectibility issues
23   here; correct?
24   A.   He's concerned about collectibility causing him revenue
25   recognition issues, yes.
```

STEPHAN - CROSS / DOOLEY

1  Q.  Sure.  And collectibility, as the jury has heard, is part

2  of the revenue recognition test; right?

3  A.  Yes.

4  Q.  Okay.  And Mr. Chamberlain knows that Deloitte is going to

5  be looking at Autonomy's ability to collect from Capax?

6  A.  Yes.

7  Q.  And he's concerned about -- that Capax's debt will mean

8  that Autonomy won't be able to recognize the revenue; right?

9  A.  Yes.

10 Q.  In other words, Mr. Chamberlain is concerned about meeting

11 the revenue recognition rules; right?

12 A.  Yes.

13 Q.  The Capax/Eli Lilly transaction -- if we could put up

14 Exhibit 439.

15                   (Exhibit published to jury.)

16 BY MR. DOOLEY:

17 Q.  This is the purchase order for Capax/Eli Lilly.  If we

18 could go to the second page.  There we go.  Blow that up.

19      Have you seen this before, Mr. Stephan, as part of your

20 work --

21 A.  Yes.

22 Q.  And if you -- if we just flip to the -- well, do you see

23 at the top, from Capax to Autonomy and then end user,

24 Eli Lilly?

25 A.  Yes.

1  **Q.**  And then the first sentence under the box where it is

2  labeled to Autonomy, it says, "This purchase order is issued

3  under and pursuant to a value-added reseller agreement dated

4  June 30th, 2009."

5      Do you recall that when Capax would buy licensing from

6  Autonomy, it was -- the purchase order is referred back to a

7  master agreement between Capax and Autonomy?

8  **A.**  Yes.

9  **Q.**  Let's -- if we could take a look at that master agreement.

10 It's Exhibit 32.  It's also in evidence.

11     My apologies.  I'm going to come back to that exhibit.  I

12 apologize.

13        **MR. FRENTZEN:**  I think it's the wrong contract.

14 **BY MR. DOOLEY:**

15 **Q.**  My apologies, Mr. Stephan.  I will come back to it.

16     Let's talk about the Vatican transaction.  That's another

17 one you mentioned that you said you were incredulous about.

18     You testified a moment ago that you associated Steve

19 Truitt with MicroTech?

20 **A.**  Yes.  I know one of -- I couldn't remember all the

21 Truitts, but one of them was at MicroTech, so, yeah, Steve

22 Truitt.

23 **Q.**  Did you ever hear or know Steve Truitt to say that he was

24 really excited about this Vatican deal?

25 **A.**  No.

1    Q.   Because he saw it as a services opportunity?

2             MR. FRENTZEN:  Objection.  Foundation.

3             THE COURT:  Overruled.

4        Go ahead, if he knows it.

5             THE WITNESS:  No.

6    BY MR. DOOLEY:

7    Q.   Did you ever hear Mr. Truitt say that he saw it as a

8    gigantic services opportunity because it would be a combination

9    of building technical staff and then having digitizing services

10   to provide?

11   A.   No.

12   Q.   Did you ever hear him say he thought the project could go

13   on for years with services work going on for years?

14   A.   No.

15   Q.   Did you know that Steve Truitt thought that the

16   MicroTech --

17            THE COURT:  I don't think you can ask that.  You can't

18   ask that.

19   BY MR. DOOLEY:

20   Q.   Well, in any event, Mr. Stephan, MicroTech signed a

21   binding purchase order for the software to sell on to the

22   Vatican; right?

23            MR. FRENTZEN:  I object to the phrase "binding."  Does

24   he mean on the paper?  Then I'll withdraw the objection.

25            MR. DOOLEY:  Let's look at it.  657.

STEPHAN - CROSS / DOOLEY

```
 1              MR. FRENTZEN:  How binding was it?

 2              MR. KEKER:  Are we going to argue the case now or

 3   later?

 4              MR. FRENTZEN:  Let's use phrases that are meaningful.

 5         MR. KEKER:  Let's --

 6         THE COURT:  Waiting a minute.  Mr. Dooley is handling

 7   it.

 8              MR. KEKER:  He is arguing the case.

 9              THE COURT:  Mr. Keker, have a seat.

10              MR. FRENTZEN:  I don't think I'm arguing.

11              MR. DOOLEY:  Let's look at Exhibit 657.

12                   (Exhibit published to jury.)

13   BY MR. DOOLEY:

14   Q.   Do you recognize Exhibit 657 as the purchase order that

15   MicroTech signed for the software to resell to the Vatican?

16   A.   I can't see who it's selling to on that point, but if you

17   scroll down.

18   Q.   Do you see on page 2, it says a -- No. 8, "authorized

19   use"?

20   A.   Yes.  Sure.

21   Q.   For the BAV.  That's the abbreviation, the Italian

22   abbreviation, for the Vatican?

23   A.   Yes.

24   Q.   And then it's signed by Steve Truitt?

25   A.   I'm assuming so, yes.  Okay.
```

1    Q.   While we're on this exhibit, Mr. Stephan, you don't have

2    any personal information about when this document was signed,

3    do you?

4    A.   No.

5    Q.   And I think you've previously said that you were not aware

6    of any deals being backdated while you were at Autonomy; is

7    that right?

8    A.   No.  Backdated that I knew of.

9    Q.   That you knew of.

10   A.   No.

11   Q.   Mr. Stephan, let's talk a little bit about your stated --

12   these concerns.  You said you had concerns about Autonomy's

13   reseller deals, but you never raised any of those concerns to

14   Mr. Hussain directly; right?

15   A.   Correct.

16   Q.   And you also never raised your concerns with anyone at

17   Deloitte; right?

18   A.   No.

19   Q.   You had worked -- we've established you worked at Deloitte

20   before joining Autonomy; correct?

21   A.   Yes.

22   Q.   You had been there for a couple years?

23   A.   Right.

24   Q.   And you knew Mr. Knights; right?

25   A.   Yeah.  Not well, but, yes.

STEPHAN - CROSS / DOOLEY

1    **Q.**    And you knew Rob Knight; right?

2    **A.**    Yes.

3    **Q.**    And you knew Lee Welham; right?

4    **A.**    Yep.

5    **Q.**    And you knew Antonia Anderson who worked there; right?

6    **A.**    Yes.

7    **Q.**    And Antonia Anderson, in fact, was a good friend of yours;

8    right?

9    **A.**    Yeah.

10    **Q.**    And during the course of your -- the -- Deloitte's audits,

11    you were in daily contact with members of the Deloitte audit

12    team; right?

13    **A.**    Yes.

14    **Q.**    So at least four times a year, they would come in for at

15    least a week, if not more, and they'd be there every day;

16    right?

17    **A.**    Yes.

18    **Q.**    And in addition to Ms. Anderson, did you have a close

19    relationship with Mr. Knight, Rob Knight?

20    **A.**    Yes.

21    **Q.**    Did you -- do you recall that when you were leaving

22    Autonomy to move back to Australia, you sent him a copy of your

23    resume to send around?

24    **A.**    Sure.

25    **Q.**    He made some comments on it and you thanked him for that?

1   **A.**    Yes.

2   **Q.**    But despite the close contacts you had with the Deloitte

3   folks and the personal relationships you had, you never raised

4   any of your concerns about Autonomy's reseller transactions

5   with Deloitte, did you?

6   **A.**    No.  Not in so many words.

7   **Q.**    Sorry?

8   **A.**    Not in so many words.

9   **Q.**    You didn't raise your concerns with Deloitte while you

10  were at Autonomy; right?

11  **A.**    No.

12  **Q.**    And you didn't raise your concerns with the people you

13  knew at Deloitte after you left Autonomy; right?

14  **A.**    No.

15  **Q.**    And the reason you didn't raise your concerns with

16  Deloitte was because you could not prove it to Deloitte; isn't

17  that right?

18  **A.**    I was embarrassed, to be honest, to be involved with these

19  deals.

20  **Q.**    Take a look -- there is a white binder there.  There is an

21  Exhibit 5176.  If you look at page 19, this is a summary of

22  your interview on October 24th of 2014.  And I would just like

23  you --

24  **A.**    Which page?  Sorry.

25  **Q.**    Page 19 at the top paragraph?

1          **THE COURT:**  I'm sorry.  What page are we looking at?

2          **MR. DOOLEY:**  19 of the October 24th 302.

3          **THE COURT:**  One moment, please.

4          **MR. FRENTZEN:**  I'm sorry.  What page?

5          **MR. DOOLEY:**  The top paragraph.

6          **MR. FRENTZEN:**  Top full or --

7          **MR. DOOLEY:**  And it's the last sentence that begins

8    "Stephan did not tell Deloitte."

9          **MR. FRENTZEN:**  I'm not seeing that.

10          **THE COURT:**  Where?  I'm sorry.

11          **MR. FRENTZEN:**  Page 19.

12          **MR. DOOLEY:**  Exhibit 5176.  It's the October 24, 2014,

13    302, page 19, top paragraph, last sentence, "Stephan did

14    not" --

15          **THE COURT:**  I don't think you're supposed to read.

16      Okay.  He didn't contradict that.

17          **MR. DOOLEY:**  Your Honor --

18          **THE COURT:**  You didn't ask him did he tell the

19    person -- did he tell the FBI --

20          **MR. DOOLEY:**  Okay.  I thought I asked him if the

21    reason --

22          **THE COURT:**  No.  You asked him --

23          **MR. DOOLEY:**  I will ask a different question.

24  **Q.**   Mr. Stephan, isn't it true --

25          **THE COURT:**  Wait a minute.  Wait a minute.  We are

1   doing this wrong so we are going to get it right as to how --

2   ladies and gentlemen, we are going to take a brief recess.

3       Remember the admonition given to you:  Don't discuss the

4   case, allow anyone to discuss it with you, form or express any

5   opinion.

6       We will be in recess until 10 after 2:00.

7       (Proceedings were heard out of presence of the jury:)

8           **MR. DOOLEY:**  I thought I was doing it the right way,

9   Your Honor.

10          **THE COURT:**  The jury has retired.

11      Let me read to you the question you asked and the answer

12  he gave.

13          **MR. DOOLEY:**  Okay.

14          **THE COURT:**  (Reading):

15      "Q.  And the reason you didn't raise your concerns with

16      Deloitte was because you could not prove it to Deloitte;

17      isn't that right?

18      "A.  I was embarrassed, to be honest, to be involved with

19      these deals."

20      Okay.  He didn't say "I didn't say that."  He said simply

21  said "Here is what" -- "here is why I didn't say something."

22      Now, let me just explain.  This witness should return

23  tonight to -- to Australia.  We should finish with this

24  witness.  And if you're going to use impeaching -- so-called

25  impeaching material, it has to be impeaching; that is to say,

1  unless you have a statement of his, which this is not -- so

2  it's very clear, it's a statement of an FBI agent recounting

3  what the witness said to him, purportedly what the witness said

4  to him.  It's not even in quotes.

5      So you cannot use that to impeach a witness unless it is

6  inconsistent with his statement.

7      What you're asking him isn't it all inconsistent with the

8  statement and so you can't do it.  And that's the rule that we

9  had that I said at the very outset of the case about witnesses'

10  purported statements.  That's number one.

11      **MR. DOOLEY:**  Your Honor, I apologize if I -- if I

12  didn't do it the way you laid it out.  I thought his statement

13  was inconsistent --

14      **THE COURT:**  How is that inconsistent?

15      **MR. DOOLEY:**  Because he was giving a different

16  explanation for why he didn't tell Deloitte.  The

17  explanation --

18      **THE COURT:**  But he -- you can give 10 explanations.

19  By the way, that's not inconsistent.  That is -- that's not

20  inconsistent.  In my view, it's not inconsistent.

21      Anyway, that's the rule going forward.  Okay.  So we all

22  know that.

23      No. 2, I have to tell you, I am totally perplexed by this

24  cross-examination.  Now, I know it's not up for me to divine

25  the purpose of it, but to simply go over these transactions,

1   some of which he has some information, most of which he doesn't

2   have direct information, simply goes into the Government's case

3   in chief, in which he doesn't know.  He doesn't know about when

4   things were signed.  He has no information on that subject.

5        **MR. DOOLEY:**  Well, I mean, a couple points,

6   Your Honor.

7        On that point, he was asked questions which suggested that

8   the -- in support of the Government's theory that the MicroTech

9   Vatican deal was backdated.  So I think --

10       **THE COURT:**  I didn't hear that.  I didn't hear that.

11   I didn't hear anything about backdating.

12       **MR. DOOLEY:**  Well, they didn't say the word

13   "backdating," but they used the --

14       **THE COURT:**  It's the Government's view, perhaps, that

15   something was backdated.  That's their view based upon

16   witnesses that they've called to actually -- that participated

17   in the signing of the documents.  They could be right, they

18   could be wrong, but, again, I go back to the thing that --

19   look, to go over the information that was given to Deloitte,

20   you can do that, if you want to.  But the Government's theme

21   here is that Deloitte was misled.

22       So I don't quite get it.  You know, I don't get the thrust

23   of the cross because if Deloitte was misled and -- by the way,

24   there is nothing wrong with asking him "Why didn't you tell

25   your friends at Deloitte?  If you felt bad about it, why didn't

 1  you raise that issue," and so forth.  All good

 2  cross-examination.

 3      MR. DOOLEY:  Well, I'm glad I'm getting better as I'm

 4  going long.

 5      THE COURT:  It's not a question of good and better.

 6  I'm trying -- look, if you have real questions to ask him

 7  that's going to advance the case, either bring into question

 8  his testimony or bring into question the other testimony, I

 9  understand that.  But you can't ask him things that he

10  doesn't -- or you can, but -- but it simply is a waste of time

11  to ask him things of which he has no information about, I

12  think.

13      MR. DOOLEY:  I didn't think I asked -- with a few

14  exceptions, I thought I was asking him questions that he had

15  information about that went directly to his testimony that he

16  thought these transactions were ludicrous when you've got

17  Deloitte looking at them, you've got all these people doing all

18  this work.  He's coming in with these inchoate concerns that

19  don't make any sense.  So that's --

20      THE COURT:  If they don't -- by the way, that would be

21  a legitimate line of cross-examination.  I just don't -- I

22  don't see it emerging.  The point of cross-examination is to

23  make a point in front of the jury.  That's part of it.  Maybe

24  it's to make arguments in closing arguments.

25      But I don't see that by asking him things that he has no

1   information about.  But if it's there, it's there.  And it's

2   how you want to use your time.  That's up to you.

3          MR. DOOLEY:  When he comes back, Your Honor, may I ask

4   him -- may I return --

5          THE COURT:  You can ask him any question you want to

6   ask him.  I'm simply giving you my opinion outside the presence

7   of the jury that I don't think it makes any points here.  But

8   you are free to ask him any question.

9       With respect to his prior statements however or interviews

10  of him, I do want you to follow the procedure that I've

11  outlined and I've spent years developing, and whether it's any

12  good or not, that's the procedure I follow.

13         MR. DOOLEY:  Okay.  Thank you.

14                (Recess taken at 2:02 p.m.)

15               (Proceedings resumed at 2:16 p.m.)

16      (Proceedings were heard out of the presence of the jury:)

17         THE COURT:  While the jury is out, let me ask you, how

18  much longer do you have?

19         MR. DOOLEY:  Probably half an hour.

20         THE COURT:  Okay.

21         MR. DOOLEY:  Forty minutes max.

22         THE COURT:  Okay.

23      (Proceedings were heard in the presence of the jury:)

24         THE COURT:  Please be seated.  Let the record reflect

25  all jurors are present, parties are present.

1    You may continue.

2        MR. DOOLEY:  Thank you, Your Honor.

3    BY MR. DOOLEY:

4    Q.   Mr. Stephan, directing your attention back to Exhibit

5    5176, when you were interviewed on October 24th --

6        MR. FRENTZEN:  Objection, Your Honor.  Isn't this

7    exactly what we talked about?

8        THE COURT:  Ask the question before -- go ahead.

9    Finish the question.

10       MR. DOOLEY:  I'm going to ask the question:

11   Q.   Did you state that you did not --

12       THE COURT:  No.  You can't ask it that way.

13       MR. DOOLEY:  Well, then I will withdraw the question,

14   Your Honor.

15   Q.   Mr. Stephan, you testified on direct about an email you

16   wrote in connection with the sale of hardware to VMS at the end

17   of 2010.  Can we put up Exhibit 1464.

18            (Exhibit published to jury.)

19   BY MR. DOOLEY:

20   Q.   I think your testimony was, Mr. Stephan, that this was not

21   an accurate email that you sent to Mr. He and Ms. Lu; is that

22   right?

23   A.   No.  I think I said that I didn't really believe what I

24   was writing, but it was the guidance I was given.

25   Q.   So you sent an email explaining a transaction to Autonomy

 1  auditors at Deloitte that you didn't really believe to be true;

 2  is that your testimony?

 3  **A.**    I just thought it was a dubious argument, but I didn't

 4  have any better information.

 5  **Q.**    So you didn't think it was a false statement that you were

 6  making to Autonomy's auditors, did you?

 7  **A.**    No.    I just thought it was a bit of a cute kind of

 8  argument that we were making.

 9  **Q.**    Okay.  Did you ever tell anybody at Deloitte that you

10  were -- that you thought the argument was cute or --

11  **A.**    No.

12  **Q.**    Did you ever tell anybody else that you thought this was

13  cute or --

14  **A.**    No.

15  **Q.**    You've also never wrote down any of the concerns that

16  you've identified, that you testified to today regarding the

17  resellers, did you?

18  **A.**    No.

19  **Q.**    We haven't seen an email setting out your concerns, have

20  we?

21  **A.**    No.

22  **Q.**    We haven't seen a letter or a memo recording your

23  concerns?

24  **A.**    No.

25  **Q.**    You never wrote to Mr. Chamberlain?

1    **A.**    No.

2    **Q.**    You never wrote to anybody else with these concerns, did

3    you?

4    **A.**    No.

5    **Q.**    You also testified that you were so concerned about -- or

6    you were so concerned about Autonomy's accounting practices

7    that it influenced your decision to leave the company.  Was

8    that your testimony?

9    **A.**    Yes.

10    **Q.**    The real reason you left Autonomy is that you wanted to

11    move back to Australia; right?

12    **A.**    At that time, yes.

13    **Q.**    Notwithstanding the -- your stated concerns, you were

14    looking for new opportunities and ways to contribute while you

15    were at Autonomy, weren't you?  Looking for new jobs and new

16    positions within the company?

17    **A.**    Yeah.  Probably at different times, yeah.

18    **Q.**    Why don't you look at Exhibit 6764.

19          It's not in evidence yet, but I would move it in.

20                **THE COURT:**  Admitted.

21          (Trial Exhibit 6764 received in evidence)

22                    (Exhibit published to jury.)

23    **BY MR. DOOLEY:**

24    **Q.**    This is an email, Mr. Stephan, that you wrote to

25    Mr. Hussain on March 25th, 2010.  Do you see that?

1    **A.**    Sure.

2    **Q.**    I'm sorry?

3    **A.**    Yes.

4    **Q.**    And this is after obviously December of 2009 when you

5    testified earlier that you had all these concerns about the

6    reseller transactions; right?

7    **A.**    Yes.

8    **Q.**    And you're writing to Mr. Hussain looking for an

9    opportunity to run the SMS calls; right?

10   **A.**    Yes.

11   **Q.**    You say, "I think it requires someone who is happy to

12   irritate the hell out of the sales team in order to get to the

13   bottom of whether their deals are real for the quarter or not."

14   And you go on and say, "What do you think?"

15        And you didn't raise any of your concerns with Mr. Hussain

16   in this email where you are asking for this assignment; right?

17   **A.**    No.  This would be in reference to the -- the other 90

18   percent of the deals we did in a quarter.

19   **Q.**    Okay.  Look at Exhibit 6762.

20        This is not in evidence, and I would move it in.

21             **THE COURT:**  Admitted.

22             (Trial Exhibit 6762 received in evidence)

23                  (Exhibit published to jury.)

24   **BY MR. DOOLEY:**

25   **Q.**    This is an email from you to Ms. Prentis in September of

1   2010, "U.S. team proposal."  Do you see that?

2   **A.**   Yes.

3   **Q.**   And this is after the conversation you testified about on

4   direct with Mr. Chamberlain in June or July of 2010; right?

5   **A.**   Yes.

6   **Q.**   And here you are, you are looking for an opportunity to

7   transfer full time to San Francisco to run the revenue teams

8   for the group directly"; right?

9   **A.**   Finance team.

10  **Q.**   In the fourth paragraph, you say, "I believe that the

11  local teams need someone who can give them leadership face to

12  face.  The legal and sales teams have been very appreciative to

13  have a contact in their offices to go directly to on revenue

14  queries.  It is also invaluable to be able to speak directly to

15  people like Joel, Mooney, and Stouffer," so forth.

16      And, again, you didn't raise any of your concerns in your

17  email to Ms. Prentis when you're asking about this opportunity?

18  **A.**   No.

19  **Q.**   And when you did leave the company, you asked if you could

20  stay on and work long distance; right?

21  **A.**   I can't recall.

22  **Q.**   Well, look at Exhibit 6770 -- 6761.  Apologies.  This is

23  an email you wrote to Steve Chamberlain on February 25th, 2011;

24  right?  "Proposition to help transition."

25      I will move this into evidence.

1          **THE COURT:**  Admitted.

2          (Trial Exhibit 6761 received in evidence)

3                (Exhibit published to jury.)

4    **BY MR. DOOLEY:**

5    **Q.**   In the second paragraph, you write, "If you would be

6    interested in accepting my help to smooth the transition, I

7    could work remotely as a contractor from Australia until new

8    people have been brought in.  One of the benefits would be that

9    I would be overlapping with the end of the U.S. day whereas we

10   are overlapping with the beginning, giving extra support."

11         Again, as you're leaving the company in early 2011, you

12   don't identify any of your supposed concerns to

13   Mr. Chamberlain?

14   **A.**   No.  This is purely about helping my friend Poppy.

15   **Q.**   Mr. Frentzen asked you some questions about the time

16   period immediately after the end of the fourth quarter, 2009.

17   If we could put up Exhibit 488.  It's in evidence.

18                (Exhibit published to jury.)

19   **BY MR. DOOLEY:**

20   **Q.**   There's a reference to "looking to find the two million

21   out of deferred."  Do you see that?

22   **A.**   Yes.  Yep.

23   **Q.**   The work of preparing Autonomy's quarterly books didn't

24   stop on the last day of the quarter; right?

25   **A.**   Correct.

STEPHAN - CROSS / DOOLEY

1    Q.    In fact, every quarter there were several weeks of work

2    after the last day of the quarter before the accounts were

3    finalized; right?

4    A.    Yes.

5    Q.    And it was not in -- it was frequently the case that

6    paperwork on deals didn't even arrive at Autonomy's offices

7    until after the close of the quarter; right?

8    A.    That's right.

9    Q.    And part of the work in this period after the last day of

10   the quarter involved the Autonomy finance group reviewing its

11   own books; right?

12   A.    Yes.

13   Q.    Before they went to the auditors; right?

14   A.    Yep.

15   Q.    Kind of a two-step process.

16       You guys reviewed your books and then you sent them to

17   Deloitte and there was a back and forth with Deloitte; correct?

18   A.    Correct.

19   Q.    And in this email, 488, that's what Mr. Hussain is asking

20   you to do here, to review the books to see if there is anymore

21   revenue that can be recognized; correct?

22            MR. FRENTZEN:  Objection.  Foundation.  Calls for

23   speculation.  If it's his understanding --

24   BY MR. DOOLEY:

25   Q.    Is that your understanding of what Mr. Hussain is --

1  **A.**   Your question again?

2  **Q.**   Mr. Hussain writes, "Obviously we are looking to find the

3  two million out of deferred, as well as the difference in

4  service and maintenance.  I believe there is an upside in the

5  hosted numbers."

6       Well, let me ask this question, Mr. Stephan.  During this

7  time period at the end -- after the quarter -- the last day of

8  the quarter when Autonomy finance is reviewing its books,

9  members of the finance team would look to deferred revenue to

10 see if there was additional revenue that could be taken in the

11 quarter; correct?

12 **A.**   Correct.

13 **Q.**   And deferred revenue is revenue that has been -- well, why

14 don't you explain what deferred revenue is rather than my

15 taking a stab at it.

16 **A.**   It's a revenue that we haven't yet supplied a service for

17 yet so we can't book it into revenue in that quarter.

18 **Q.**   And at the end, after the close of the quarter, Autonomy

19 would look back to see how much services or maintenance had

20 been performed to see if there is any additional revenue that

21 could be released from deferred revenue; right?

22 **A.**   Yes.

23 **Q.**   That was a fairly common quarter over quarter; correct?

24 **A.**   Correct.

25 **Q.**   There's nothing wrong with that, is there?

**STEPHAN - CROSS / DOOLEY**

1    **A.**    No.

2    **Q.**    The prosecutor showed you two exhibits regarding the Capax

3    FSA deal, one indicating that it was coming out of revenue and

4    one indicating that it was going back into revenue.  Do you

5    recall those exhibits?

6    **A.**    Yes.

7    **Q.**    Exhibit 728 and 743.

8          Do you recall that the Capax FSA purchase order had

9    particularly long extended payment terms?

10   **A.**    I don't recall --

11   **Q.**    Why don't you --

12   **A.**    -- with precision here.

13   **Q.**    Why don't you look at Exhibit 697.  I believe it's in

14   evidence, but if it's not, I'll move it in.

15            **THE CLERK:**  It's not.

16            **MR. FRENTZEN:**  What's the document?

17            **MR. DOOLEY:**  697, counsel.

18            **THE COURT:**  Admitted.

19         (Trial Exhibit 697 received in evidence)

20                 (Exhibit published to jury.)

21   **BY MR. DOOLEY:**

22   **Q.**    Do you see that this is a purchase order from Capax to

23   Autonomy with end user Financial Services Authority?

24   **A.**    Yes.

25   **Q.**    And if you flip it over, the second page, the license and

1    support fee payment terms, do you see those?

2    **A.**    Yes, I do.

3    **Q.**    And the payment terms call for payments spread out over

4    three years; correct?  The last payments not due until the

5    third anniversary of the effective date?

6    **A.**    Yes.

7    **Q.**    Does that qualify as long payment terms?

8    **A.**    Yes.

9    **Q.**    Do you recall that as a result of these payment terms,

10    these extended payment terms, there was a question about

11    whether Autonomy could recognize revenue on this transaction or

12    had to defer the revenue?

13    **A.**    I don't recall this deal.

14    **Q.**    I'm sorry?

15    **A.**    I don't recall the exact arguments we had on this deal.

16    **Q.**    Okay.  Do you recall that during the two weeks after the

17    quarter end, Autonomy obtained additional evidence of Capax's

18    ability to pay, additional evidence regarding a collectibility?

19    **A.**    I don't recall, but if you have an exhibit --

20    **Q.**    Let me see if you can take a look at Exhibit 6767.

21    It's --

22         **MR. FRENTZEN:**  Sorry, Your Honor.  I just don't see

23    the witness on here.

24         **THE COURT:**  Well, has the witness received this?

25         **MR. DOOLEY:**  The witness is not on this particular

1    email, but I'm going to ask him about the attachments and see

2    if it refreshes his recollection.

3        THE COURT:  Well, you can show him the document -- we

4    won't show it to the jury -- to see if it refreshes his

5    recollection.

6    BY MR. DOOLEY:

7    Q.   Mr. Stephan, take a look at the attachment to Exhibit

8    6767.

9        THE COURT:  You have to hand it to him.

10       Do you have it in front of you?

11       THE WITNESS:  Yes, I do.

12       THE COURT:  Okay.  The attachment.

13       THE WITNESS:  Yes.

14       THE COURT:  Look at the attachment.  Look at it just

15   to yourself and see if it refreshes your recollection.

16       THE WITNESS:  Not specifically when we requested such

17   things every quarter.

18   BY MR. DOOLEY:

19   Q.   This exhibit doesn't refresh your recollection that the

20   audit confirm came in during the first two weeks of the --

21   after the close of the quarter?

22   A.   I think a lot of the quarter -- a lot of the confirms

23   didn't come in until after the end of the quarter, so not this

24   one specifically, no.

25   Q.   Do you recall that Autonomy, during this time period, the

1  first two weeks after the end of the first quarter, received a

2  letter from Capax about its finances and its ability to pay?

3  **A.**    Not -- not specifically.  This would be the sort of thing

4  we were chasing every time there was a large deal with a

5  reseller.

6  **Q.**    Why don't you take a look at Exhibit 5444.  Again, it's

7  not one you're copied on, but see if it refreshes your

8  recollection that a letter came in to Autonomy from Capax about

9  its finances.

10       It's in evidence.  Why don't we put the letter up then.

11                  (Exhibit published to jury.)

12       **THE WITNESS:**  This doesn't ring a bell.  Sorry.  I

13  don't remember this letter at all.

14  **BY MR. DOOLEY:**

15  **Q.**    Do you recall that the reason that the Capax FSA was put

16  back into revenue was that the Autonomy finance team got

17  comfortable with Capax's ability to pay as a result of the

18  additional information that came in during that time period?

19  Do you remember that?

20  **A.**    No, I don't remember.

21       **MR. FRENTZEN:**  Object -- well, withdrawn.  Sorry.

22  **BY MR. DOOLEY:**

23  **Q.**    Mr. Stephan, you testified that you reviewed the books of

24  MicroLink in early 2010 following Autonomy's acquisition of

25  MicroLink; right?

1  **A.**    Yes.

2  **Q.**    And you also testified that you found certain payables to

3  Autonomy were not recorded on MicroLink's books; correct?

4  **A.**    Correct.

5  **Q.**    MicroLink had purchased licenses from Autonomy in 2009,

6  owed money to Autonomy, but those amounts had not been recorded

7  on MicroLink's books?

8  **A.**    Yes.

9  **Q.**    That's what you found; right?

10  **A.**    Yep.

11  **Q.**    And you reported that concern, that fact, to

12  Mr. Chamberlain; right?

13  **A.**    Yes.

14  **Q.**    And that was of concern to you?

15  **A.**    Yep.

16  **Q.**    And you're aware, aren't you, Mr. Stephan, that Autonomy

17  required MicroLink, once Autonomy found out about this --

18  required MicroLink to put the payables back on its books;

19  right?

20  **A.**    I think so, yes.

21  **Q.**    You think so.  Okay.

22       Let's look at Exhibit 638.  I don't think it's in your

23  binder up there.  It's one --

24            **THE COURT:**  I'm sorry.  638?

25            **MR. DOOLEY:**  638.

1          THE COURT:  One moment.

2          THE CLERK:  It's not admitted.

3          MR. DOOLEY:  It's not admitted.

4          THE COURT:  638 admitted.

5          (Trial Exhibit 638 received in evidence)

6          MR. DOOLEY:  That makes it easier.

7          MR. FRENTZEN:  I'm sorry, Your Honor.  I don't -- what

8   number is this?

9          MR. DOOLEY:  638.

10          THE COURT:  638.

11                (Exhibit published to jury.)

12   BY MR. DOOLEY:

13   Q.   Exhibit 638 is an email that you are copied on regarding

14   the MicroLink closing working capital.  Do you see that,

15   Mr. Stephan?

16   A.   Yes.

17   Q.   And if you look at the second page, there's -- it shows 23

18   million in accounts payable there.

19   A.   Yes.  Yep.

20   Q.   Does that reflect your recollection that that was the

21   amount that had been missing from MicroLink's books?

22          MR. FRENTZEN:  I'm sorry.  Which -- I apologize,

23   counsel.  Which figure?

24          MR. DOOLEY:  The 23 million.

25          THE WITNESS:  I can't recall the precise figures now.

 1   BY MR. DOOLEY:

 2   Q.   Okay.  But you do recall that Autonomy, once they found

 3   out about MicroLink's books not being properly kept, required

 4   MicroLink to put the payables or the debts back on the books;

 5   correct?

 6   A.   Yes.

 7   Q.   You were involved in preparing the opening balance sheet

 8   for MicroLink; right?

 9   A.   I reviewed it.  I didn't prepare it, I don't believe.

10   Q.   Let's look at Exhibit 5874.  And I would move it into

11   evidence.  It's --

12        MR. FRENTZEN:  What number?

13        THE CLERK:  It's already in.

14        MR. DOOLEY:  Is it in already?

15        THE CLERK:  Yes.

16             (Exhibit published to jury.)

17   BY MR. DOOLEY:

18   Q.   5874.  If we can just blow up the top part.

19        Do you see that top email there, Mr. Stephan?

20   A.   Sure.

21   Q.   From you to Alan Rizek at MicroLink regarding "opening

22   balance sheet."

23        Does that refresh your recollection that you were

24   involved, to a certain extent, in preparing the opening balance

25   sheet?

STEPHAN - CROSS / DOOLEY

1    **A.**    Yes.

2    **Q.**    And there's -- in the second sentence under, "Hi, Alan,"

3    it says, "The adjustments that have been put through are as

4    follows.  Provision against deposits on software.  The list

5    below shows the deals we understand have little chance of ever

6    closing and thus require a provision as part of the acquisition

7    account."

8         Do you see that?

9    **A.**    Yes.

10   **Q.**    And those -- what is a -- what is a provision?

11   **A.**    It's taking of a cost, assuming that you won't ever

12   recover the amount.

13   **Q.**    It's not a writeoff, but it's a recognition that you are

14   unlikely to recover that amount --

15   **A.**    That's right.

16   **Q.**    -- is that right?

17   **A.**    Yeah.

18   **Q.**    And if we could go, Jeff, to the attachment.

19        This is part of the attachment to the email.  What this

20   spreadsheet or worksheet shows is a $5.5 million provision

21   being taken based on five deals not expected to close; correct?

22   **A.**    Yes.

23   **Q.**    If we go back to the cover email, Jeff.

24        So it's fair to say then, Mr. Stephan, that as of the date

25   of this email in March, Autonomy anticipated taking a

 1    $5.5 million -- roughly $5.5 million provision on five deals

 2    that did not expect MicroLink to be able to close?

 3    **A.**    Yes.

 4    **Q.**    Okay.  Autonomy was not writing off all of the payables

 5    from MicroLink; correct?

 6    **A.**    I don't --

 7                **MR. FRENTZEN:**  I'm sorry.  Objection.  Vague and

 8    foundation.

 9    **BY MR. DOOLEY:**

10    **Q.**    Well, as reflected in this document, Mr. Stephan --

11    Autonomy is not writing off or taking a provision on all of

12    MicroLink's payables; correct?

13    **A.**    This looks like MicroLink's software assets, so not quite

14    the same thing, but there was a provision against these.

15    **Q.**    Against these five deals here?

16    **A.**    Yes.

17    **Q.**    Okay.  And then point two, it says "EDD deal, this has

18    been brought on to the balance sheet."  Do you recall what that

19    relates to?

20    **A.**    I think it was a large purchase that MicroLink did from

21    Autonomy pre the acquisition.

22    **Q.**    And that was being moved to the balance sheet?

23    **A.**    Yeah.  That they owed us $6.9 million, roughly.

24    **Q.**    You testified about Autonomy's hardware sales,

25    Mr. Stephan, and you said you were uncomfortable about them.

**STEPHAN - CROSS / DOOLEY**

1  That was your testimony?

2  **A.**   Yes.

3  **Q.**   There's nothing wrong with Autonomy -- nothing wrong with

4  a software company selling hardware, is there?

5  **A.**   No.

6  **Q.**   And there's nothing wrong with selling hardware to bring

7  in revenue, to meet a target, is there?

8  **A.**   No.

9  **Q.**   Did you -- and I take it you never reported your concerns

10 or your lack of comfort with hardware -- with the hardware

11 sales to Mr. Hussain, did you?

12 **A.**   Not Mr. Hussain.

13 **Q.**   And you never reported your lack of comfort with the

14 hardware sales to Deloitte, did you?

15 **A.**   No.

16 **Q.**   And you never told Deloitte that you thought the hardware

17 sales were being used to plug numbers?  That was a question you

18 were asked.

19 **A.**   Deloitte, no.

20 **Q.**   And, in fact, Deloitte -- you prepared a spreadsheet every

21 quarter that you sent to Deloitte listing out the amount of

22 hardware that had been sold in that quarter; right?

23 **A.**   Yes.

24 **Q.**   And so Deloitte knew from -- if only from your spreadsheet

25 how much hardware Autonomy was selling; right?

1  A.   Yes.

2  Q.   And Deloitte knew it was -- that Autonomy was selling Dell

3  hardware; right?

4  A.   Yes.

5  Q.   And there was no suggestion in the spreadsheet that you

6  sent that there was a causal link between the hardware and the

7  software; right?  That's not what the spreadsheet says, is it?

8  A.   The spreadsheet was implying that, but it wasn't really

9  proving it.

10 Q.   It doesn't say it, though, does it?  It doesn't say there

11 is a causal link?

12       MR. FRENTZEN:  Objection.  Are we talking about the

13 full exhibit with the email or just the spreadsheet?

14       MR. DOOLEY:  I'm just talking about the spreadsheet.

15       THE WITNESS:  I don't think so, no.

16 BY MR. DOOLEY:

17 Q.   You don't think it says that.  Okay.

18       And Deloitte, armed with the full knowledge of Autonomy's

19 hardware sales, signed off on Autonomy's quarterly --

20       MR. FRENTZEN:  Objection.

21       THE COURT:  Sustained.

22       MR. DOOLEY:  Okay.  May I have just a moment,

23 Your Honor?

24       (Defense counsel confer off the record.)

25       MR. DOOLEY:  Nothing further at this time.

1      Thank you, Mr. Stephan.

2          **MR. FRENTZEN:**  Am I up, Your Honor?

3          **THE COURT:**  Pardon?

4          **MR. FRENTZEN:**  Am I up now?

5          **THE COURT:**  Briefly.

6          **MR. FRENTZEN:**  I hear you.

7                  <u>REDIRECT EXAMINATION</u>

8  **BY MR. FRENTZEN:**

9  **Q.**   Mr. Stephan, the declaration that counsel asked you about,

10 you remember the questions about the declaration that you

11 signed?

12 **A.**   Yes.

13 **Q.**   Okay.  If you could, was that declaration created and

14 edited on a laptop while you were there and present for it?

15 **A.**   Yes.  Yes, it was.

16 **Q.**   And just to be clear, I wasn't -- you and I met yesterday

17 evening; is that right?

18 **A.**   That's correct.

19 **Q.**   Okay.  And as you went through the declaration with that

20 attorney, did you make modifications to the document?

21 **A.**   Yeah.  I didn't need to make a hell of a lot but I did,

22 yes.

23 **Q.**   Okay.  And was it read to you line by line?

24 **A.**   Every word.

25 **Q.**   And did you agree with it where you agreed with it and

STEPHAN - REDIRECT / FRENTZEN

1  correct it where you needed to correct it?

2  **A.**   Yes, that's right.

3  **Q.**   So as far as you're concerned, was that declaration

4  accurate?

5  **A.**   Yes.

6  **Q.**   Was the declaration also created after several prior

7  interviews between yourself and the Government?

8  **A.**   After two interviews, yes.

9  **Q.**   Okay.  And did the declaration cover subject matters that

10  you had previously covered with the Government?

11  **A.**   Yes.

12  **Q.**   I want to ask you about these reseller deals.  You were

13  asked a lot of questions about what was or wasn't okay.  What

14  was it about the reseller deals that caused you concerns about

15  revenue recognition under IFRS?

16  **A.**   I didn't believe that we could provide enough evidence

17  around collectibility to recognize them in revenue, and --

18  **Q.**   What -- go ahead.  Sorry.

19  **A.**   -- Deloitte were able to get themselves comfortable

20  somehow, but it was a very thin amount of information a lot of

21  these deals had.

22  **Q.**   Did you also have concerns about ongoing managerial

23  involvement by Autonomy?

24         **MR. DOOLEY:**  Objection.  Leading.

25         **THE COURT:**  Overruled.

1           **THE WITNESS:**  From my -- what I saw at MicroLink, I

2     was concerned that that was the *modus operandi* of all these

3     resellers, that the head of the company would sign whatever we

4     wanted them to sign for the auditors but they had no intention

5     of paying.

6     **BY MR. FRENTZEN:**

7     **Q.**   And in part was your concern about the reseller not paying

8     because the reseller -- or because Autonomy was still trying to

9     make the sale?

10    **A.**   Yes.

11    **Q.**   And how was that concerning to you?

12    **A.**   These companies weren't, in my opinion, big enough to

13    absorb a multimillion-dollar bill with Autonomy if we didn't

14    help them close the end deal or if we didn't close the end deal

15    and pass it through to them.

16    **Q.**   And just to be clear so we all understand, from your

17    vantage point, did you think that the resellers were actively

18    trying to get off the hook by trying to resell to the end

19    users?

20    **A.**    It varied, but most of the time it was the big deals that

21    we were working and they helped bring the revenue forward and

22    then we closed the deal afterwards.

23    **Q.**   And just in terms of the questions about IFRS and U.S.

24    GAAP, when it came to revenue recognition, did you hear

25    individuals at Autonomy indicate that they were following U.S.

1    GAAP to the public?

2    **A.**    Yeah.  I believe it was a statement we made on the

3    earnings calls, and it might have even been mentioned in the

4    financial statements.

5    **Q.**    Did you ever see that on the website, for example?

6    **A.**    Yeah.  I think it was on the website.  It was on the --

7    and on the disclosure that we gave the investors.

8    **Q.**    You were asked a fair number of questions about whether or

9    not you raised some of these issues with Mr. Hussain or

10   Deloitte.

11        Let me start with this:  When you became concerned about

12   the reseller deals at the end of 2009, who did you raise that

13   with?

14   **A.**    Mr. Chamberlain.

15   **Q.**    And in your conversations with Mr. Chamberlain, did

16   Mr. Chamberlain then inform you about what his understanding of

17   Mr. Hussain's view was on this topic?

18   **A.**    We went through this, but it was -- yeah.  I mean, it was

19   basically that we just had to get on and do them.  It was -- it

20   wasn't -- I don't know what words Sushovan used with

21   Mr. Chamberlain, but --

22   **Q.**    Of course.  What did Mr. Chamberlain tell you about

23   Mr. Hussain in connection with that?

24   **A.**    They were a necessary evil.

25   **Q.**    Each time you raised your concerns with Mr. Chamberlain,

**STEPHAN - REDIRECT / FRENTZEN**

1    did Mr. Chamberlain indicate to you that he was going to talk

2    to Mr. Hussain about it?

3    **A.**    Not every time.

4    **Q.**    Did he do that on some occasions?

5    **A.**    Some occasions, yeah.

6    **Q.**    Did anything change?

7    **A.**    No.

8    **Q.**    Why didn't you raise your concerns directly with

9    Mr. Hussain or with Deloitte?

10   **A.**    To some extent I was a bit ashamed about being involved in

11   this kind of -- these kind of transactions and fronting up to

12   former colleagues and friends at Deloitte about this sort of

13   stuff.  I just wasn't comfortable doing that.  And internally

14   I -- I mean, especially after mid-2010, I saw that the outcome

15   was it went nowhere and you'd be on the street.

16   **Q.**    Who were you referring to there?

17   **A.**    Mr. Hogenson, as well as Percy Tejada and Reena Prasad.

18              **MR. FRENTZEN:**  May I have a moment, Your Honor?

19                        (Pause in proceedings.)

20              **MR. FRENTZEN:**  That's all I have, Your Honor.

21              **THE COURT:**  Anything further?

22              **MR. DOOLEY:**  Nothing further, Your Honor.

23              **THE COURT:**  All right.  You're excused.

24                        (Witness excused.)

25              **THE COURT:**  Ladies and gentlemen, we are going to take

1    our recess for today.

2        Remember the admonition given to you:  Don't discuss the

3    case, allow anyone to discuss it with you, form or express any

4    opinion.

5        And we're going to start on Friday at 9:00 o'clock.

6        Okay.  Thank you.

7        (Proceedings were heard out of the presence of the jury:)

8        **THE COURT:**  Let the record reflect the jurors have

9    left.

10       I was advised that one of the jurors, the one who is

11   pregnant, was having some discomfort and she wanted to go to a

12   doctor's appointment.  The doctor could only -- she's in

13   San Rafael.  The doctor could see her at 4:00 at the latest,

14   and so I didn't want to cause undue pressure on her to get

15   there.  She's driving back, so that's why I adjourned at this

16   point when the witness is excused.

17       I do want to talk to counsel.  I have one other thing I

18   must take, so would counsel please remain here and I'll resume

19   the bench in a few minutes.

20                 (Recess taken at 2:54 p.m.)

21                 (Proceedings resumed at 3:00 p.m.)

22       (Proceedings were heard out of the presence of the jury:)

23       **THE COURT:**  Well, a couple things.  First of all, I do

24   want to make a record on cutting you off, Mr. Dooley, on your

25   examination.

1    Let me just explain to you what the procedure is because I

2    actually think, as they say, there's a failure to communicate,

3    and I think it might be me so I want to go through it so

4    everybody is clear as to the proper procedure.

5    There is nothing wrong as a subject matter to explore the

6    witness' reasons for not telling Deloitte.  It's fair game.

7    Perfectly good.

8    It is also true that on October 24th, according to I guess

9    it's the FBI, the witness informed the FBI as follows

10   (reading):

11         "Stephan did not tell Deloitte that these reseller

12         deals were 'dodgy' because this statement would have

13         'crossed the line' and Stephan could not prove it to him."

14   So, in other words, it's perfectly good saying, "Well, you

15   didn't tell Deloitte.  You couldn't prove it.  You felt you

16   couldn't prove it," or something to that line.  Let's say you

17   want to explore that, which is a perfectly legitimate area to

18   explore.  So the question is:  How do you do it?

19   Because this is hearsay.  What he said to the FBI is

20   hearsay.  Okay?  It's an out-of-court statement introduced for

21   the truth of the matter asserted.

22   Putting that aside, the way to examine him is to say,

23   "Mr. Stephan, did you believe that you didn't tell Deloitte --

24   one of the reasons you didn't tell Deloitte is you couldn't

25   prove it, could you?  And that was your belief?"  He says yes

1    or he says no.  If he says yes, end of the inquiry.  You've

2    proven it.

3        If he says no, you then go on to the second part, which

4    is, "Isn't it a fact, Mr. Stephan, that you did tell somebody

5    or tell the FBI or whatever you want that dat dat dat dat dat

6    dat dat?"  He says yes or he says no.  Third -- if he says,

7    yes, that's the end of it; and if he says third, you can then

8    impeach him with it.

9        So that's the -- it's a multistep process, and I explained

10    at the outset the reason is, in my -- and, by the way, judges

11    do it all differently, all differently.  So you can go

12    next-door and who knows what the judge will do.  But the reason

13    I do it is because, the way I look at it, is that it is -- it

14    could be highly probative.  That's not the issue.  The question

15    is:  How do you prove it?

16        And, in my view, since you don't have a direct statement

17    of the witness, you then -- in order to prove it, by the way,

18    you'd have to call the agent.  You'd have to go and call the

19    agent, and that is way down the line.

20        So you start with the beginning because you say, "Did you

21    believe that you didn't tell Deloitte because you couldn't

22    prove it?  At the time did you believe that?"  If he says no,

23    then you've got him set up for the impeachment.

24        But you've got to impeach him; that is to say, he has to

25    have said something that either directly or by way of

1    inference, I'll give you that, or by way of inference is

2    contrary to the -- contrary to his testimony.  He said on the

3    stand -- I forget what it was, but it wasn't contrary.  It was

4    something.  I forgot.  I wrote it down somewhere.

5            MR. FRENTZEN:  He said he was embarrassed.

6            THE COURT:  He was embarrassed.  Okay.  That's not

7    contrary but it may be -- and it's not inconsistent and it's

8    not contrary.  It may be that he had several reasons for not

9    doing it, but you have to tie him down if you're going to

10   impeach him.

11           Anyway, okay.  So that's the process.  I'm telling all the

12   lawyers.  The Government has the advantage or disadvantage of

13   appearing in front of me in many trials and I lecture them

14   nonstop that this is the process that I use in this court, so

15   they have the advantage of dealing with my idiosyncrasies; but

16   I just want to make sure because I really don't like to stop a

17   lawyer, especially in cross-examination and of course not in

18   front of the jury if I can avoid it because -- for all the

19   reasons.

20           Okay.  Now, where are we in this case?  I understand we

21   have not completed the examination of Mr. Gersh, and then where

22   are we then?  So I assume we're going to do that Friday morning

23   first thing or not, but where are we?

24           MR. LEACH:  We intend to proceed with Mr. Gersh first

25   thing on Friday, Your Honor.  Our additional witnesses are Paul

PROCEEDINGS

 1   Moreland, Andy Johnson, Steve Brice, David Lindsell from the

 2   F.R.C., Special Agent Alex Bryant, and another analyst named

 3   David Toms.  With that, the Government anticipates it will rest

 4   at some point on Tuesday the 17th.

 5       There's an issue with Mr. Toms' travel, which I'm

 6   optimistic we can work out with counsel, but we are close to

 7   the 17th.

 8       THE COURT:  Good as long as we're on this end of the

 9   17th, not like -- the 18th is not close to the 17th.  It may

10   seem that way on a calendar but, no, it's not close.  It's too

11   far away.

12       Okay.  All right.  So I think what I'm going to say to the

13   Defense is that if they rest as anticipated on the 17th, you

14   are to commence your case on the morning of the 18th.  I won't

15   require you to start earlier.  I mean, if they come in on

16   Monday and they say, "That's it.  We'll finish today at the end

17   of Monday," then, yeah, you have to start on Tuesday.

18       MR. KEKER:  That's fine, Your Honor.  We've said we'll

19   tell them in good faith what's going on Friday night.

20       THE COURT:  Okay.  All right.  So that's fine.

21       Do you --

22       MR. KEKER:  I guess I should say one thing.

23       THE COURT:  Yeah.  Go ahead.

24       MR. KEKER:  If they make a real run at Mr. Yelland,

25   that could screw everything up because that will affect us.  So

**PROCEEDINGS**

1    I just want to say that in front of everybody.  We plan to

2    cross-examine Mr. Brice and if after that it turns out that

3    instead of the list that you just got, that they raise the

4    Yelland issue, you let them do it, then that affects

5    everything.

6         **THE COURT:**  I don't know.  I mean, I have to just -- I

7    mean, what I said about that when we had this discussion still

8    stands.  It just depends on where we are on it.

9        When can I know from the Defense how long they anticipate

10   their case to be practically speaking?

11        **MR. KEKER:**  Friday.

12        **THE COURT:**  Friday evening?

13        **MR. KEKER:**  Friday evening.

14        **THE COURT:**  Friday night?

15        **MR. KEKER:**  Friday evening.  Sure, Friday evening.

16        **THE COURT:**  Are we going to have a conference call or

17   what?

18        **MR. KEKER:**  No.  I mean, we can --

19        **THE COURT:**  Well, listen, you don't have to tell me

20   till Monday.  Okay?  Tell them and just tell me on Monday.

21        **MR. KEKER:**  We'll tell them and then we'll tell you on

22   Monday.

23        **THE COURT:**  Okay.  All right.

24        I don't think -- two things.  Number one, I don't think

25   the instructions are particularly complicated in this case, but

PROCEEDINGS

1    maybe I'm naive.  You have gone through -- I've gotten the

2    parties' views on instructions.  Obviously we'll have a

3    conference and discuss them before argument is set.

4        I hope you-all are progressing on figuring out how to

5    display or give to the jury all the exhibits in evidence.  I

6    hope that's proceeding apace because Defense cases -- trials

7    have a way of just ending, as they should.  I mean, at some

8    point you evaluate -- the Defense evaluates on some

9    cost-benefit analysis whether that witness is worth it or not.

10   You know, maybe, maybe not.  I don't know.

11       Okay.  All right.  Well, we're proceeding.  I'm loath to

12   mention this, but I will.  I am supposed to be at a

13   Ninth Circuit meeting on the 22nd -- is that the right date?

14   Let me just look at my calendar.

15           MR. REEVES:  That's a Sunday.

16           THE COURT:  It's a Sunday?  Well, the Circuit could

17   probably use it.  They don't meet on -- let's see, it is -- no.

18       Do you know when it is, Lashanda?

19           THE CLERK:  I'm looking.  I don't see it on the

20   calendar.

21           THE COURT:  It's an afternoon.  I think it's the

22   afternoon of the 24th.

23       Anyway, I'll send out a little e-mail to you.  I just have

24   to go --

25       Can you go back and get my book?  It's on my desk.  The

1    brown calendar book.  I think I wrote it down.

2       This is a committee that actually -- I think it's actually

3    important for me to attend so I would like to do so, but --

4       MR. KEKER:  As long as we're talking, in terms of

5    closing, I just want to say we should have the same amount of

6    time as the Government has.  The Government has to split its

7    argument up between opening and rebuttal, but there ought to be

8    equal time.

9          THE COURT:  I've always taken that position.

10         MR. KEKER:  And we would be prepared to do it to get

11   it done in a day but if the Government -- I mean, so we would

12   like to know ahead of time if it's going to be two hours or

13   four hours, and maybe the Government can think about that too.

14         THE COURT:  I think both sides should have the same

15   amount of time and I don't care how they divide it.

16      Number one, I do believe that it should be the same amount

17   of time available.  I don't know what that time should be.

18      Number two, you can divide the argument -- and maybe this

19   is more to say to the Defense than it is to the Prosecution --

20   divide it any way.  If somebody wants to give ten minutes,

21   somebody wants to give an hour on Subject A, Subject B,

22   somebody wants to give two hours, that's up to you, but I'm not

23   precluding anybody on either side from making arguments.

24      You should not repeat what your colleague has said but, I

25   mean, there wouldn't be any point in it anyway so I don't think

1    that's going to happen, but we're pretty loose.

2         MR. KEKER:  The big issue is just is it going to be

3    two days of argument or one day of argument is the thing that

4    we've got to be thinking about.

5         THE COURT:  Well, I don't know.  I think what governs

6    me in this thing is -- I'll tell you what I would do if I were

7    the Government.  I would make a relatively brief argument, when

8    I say a couple hours maybe, because I would really marshal the

9    evidence and then -- the more complicated they make it, the

10   more complicated they make it, you know.  I know that but,

11   again, it's been a long case.  I'm not limiting you to two

12   hours.  Okay?

13       The jury, of course, will stop listening after some point.

14        MR. KEKER:  20 minutes.

15        THE COURT:  Yeah.

16        MR. KEKER:  Somebody used to say they stop listening

17   after 20 minutes.  Nobody found religion after 20 minutes.

18        THE COURT:  I mean, but, you know, I'm not arguing the

19   case.

20        MR. KEKER:  And the other thing --

21        THE COURT:  The 24th is the day that I'm supposed to

22   be with the Ninth Circuit.  My meeting is 1:00 to 5:00 but I

23   may arrive there late and do with the jury as I've normally

24   done, but I don't know where your witnesses are coming from.  I

25   mean, I have no idea.

1    **MR. KEKER:** From England among other places, but we'll

2    see. I mean, we're not committing to anything yet --

3    **THE COURT:** You don't have to.

4    **MR. KEKER:** -- and we don't have to.

5    I guess I just wanted to get in my mind, since we'll be

6    anticipating it anyway, what we're going to do for closing, how

7    long, and if it's going to be one day or multidays. That's

8    the --

9    And I guess I wanted to put on the record at some point

10    that the Government's argument should not be hide the ball. I

11    mean, they should say what they think what their theory is so

12    that the Defense can respond and there shouldn't be new

13    evidence. I mean, certainly rebuttal can come in and say why

14    the Defense is wrong but there shouldn't be new theories, new

15    strings, new whatever in the rebuttal argument that we hear for

16    the first time.

17    **THE COURT:** You're saying they shouldn't sandbag you?

18    **MR. KEKER:** They shouldn't sandbag us.

19    **THE COURT:** That's the word. "Woodshed" and

20    "sandbag" --

21    **MR. KEKER:** Right.

22    **THE COURT:** -- the operative words in this trial.

23    **MR. KEKER:** Neither are pejorative. Neither are

24    pejorative to some, but they are pejorative to others.

25    **THE COURT:** Well, the answer is, I know, a new

1  theory -- they're not going to do a new theory or if they do,

2  they're not going to get away with a new theory.

3      In terms of evidence, however, you know, anything in the

4  record is fair game.

5      **MR. KEKER:**  But that's part of the theory.  We've had

6  so many transactions.  I mean, if we have 50 transactions in

7  the opening and then they save 50 transactions for rebuttal and

8  we have no chance to talk about the second 50, that's

9  sandbagging.  They ought to say what they think --

10      **THE COURT:**  I don't know whether it is or not.  You

11  know, a number of these transactions have purported multiple

12  defects; they didn't do this or they didn't do that, this was

13  wrong, this is wrong, this is wrong about Transaction 1 or

14  Transaction 2.

15      And if they didn't mention Transaction 1, you know, then I

16  would have some problems with it; but if they say "Transaction

17  1 is this," you come up and say "It's not this," I think they

18  can come back and say, "It is this but, nevertheless, it's also

19  that."  You know, I think that's fair game.

20      **MR. KEKER:**  I hear that.

21      **THE COURT:**  The Indictment is the notice, you know.

22      **MR. KEKER:**  Right.

23      **MR. FRENTZEN:**  Well, and I think there's a broader

24  point, Your Honor, which is that it's not necessarily going to

25  be -- I think there's going to be a lot of transaction-by-

PROCEEDINGS

1  transaction; but if there's themes, let's say, of the Defense,

2  which is whatever the theme is, and there are transactions that

3  are directly responsive to that, whether they were mentioned in

4  the first -- in the opening or not but they are responsive to

5  the argument made by the Defense, then, of course, they're fair

6  game and not sandbagging.

7          MR. KEKER:  Okay.  As long as we have the no

8  sandbagging rule, we'll deal with it during the argument.

9          THE COURT:  We have the no sandbagging rule.

10     So I want you to very carefully woodshed your arguments.

11         MR. KEKER:  Woodshedding and put sandbags around it.

12  Don't worry about that.

13         THE COURT:  Okay.  Anything else that we need to deal

14  with today?

15         MR. LEACH:  Nothing from the Government, Your Honor.

16         THE COURT:  Okay.

17         MR. KEKER:  Thank you, Your Honor.

18         MR. REEVES:  Thank you, Your Honor.

19         MR. LEACH:  Thank you, Your Honor.

20         MR. FRENTZEN:  Thank you, Your Honor.

21              (Proceedings adjourned at 3:16 p.m.)

22                        ---oOo---

23

24

25

## CERTIFICATE OF REPORTERS

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Monday, April 9, 2018


_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter


_____

Pamela A. Batalo, CSR No. 3593, RMR, FCRR
U.S. Court Reporter