Volume 23

Pages 4538 - 4825

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )
  VS.                              )          NO. CR 16-00462 CRB
                                   )
SUSHOVAN TAREQUE HUSSAIN,          )
                                   )
          Defendant.               )
_____  )
                              San Francisco, California
                              Friday, April 13, 2018

                    TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**
For Plaintiff:
                    ALEX G. TSE
                    Acting United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
              BY:   **ROBERT S. LEACH**
                    **ADAM A. REEVES**
                    **WILLIAM FRENTZEN**
                    **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:
                    KEKER & VAN NEST
                    633 Battery Street
                    San Francisco  CA  94111
              BY:   **JOHN W. KEKER**
                    **JAN NIELSEN LITTLE**
                    **BROOK DOOLEY**
                    **KATE LAZARUS**
                    **NIC MARAIS**
                    **ATTORNEYS AT LAW**


Reported By:   Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
               Pamela Batalo, CSR No. 3593, FCRR
               Official Reporters

# I N D E X

Friday, April 13, 2018 - Volume 23

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **GERSH, ANDREW (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 4552 | 23 |
| Cross-Examination resumed by Ms. Little | 4552 | 23 |
| Redirect Examination by Mr. Leach | 4613 | 23 |
| Recross-Examination by Ms. Little | 4627 | 23 |
| | | |
| **SMITH, REAGAN** | | |
| (SWORN) | 4628 | 23 |
| Direct Examination by Mr. Frentzen | 4628 | 23 |
| Cross-Examination by Ms. Lazarus | 4645 | 23 |
| Redirect Examination by Mr. Frentzen | 4657 | 23 |
| | | |
| **MORLAND, PAUL** | | |
| (SWORN) | 4663 | 23 |
| Direct Examination by Mr. Frentzen | 4664 | 23 |
| Cross-Examination by Ms. Little | 4706 | 23 |
| Redirect Examination by Mr. Frentzen | 4735 | 23 |

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 11 | | 4666 | 23 |
| 81 | | 4669 | 23 |
| 176 | | 4672 | 23 |
| 206 | | 4673 | 23 |
| 235 | | 4676 | 23 |
| 291 | 4678 | | 23 |
| 293 | | 4695 | 23 |
| 630 | | 4687 | 23 |
| 1268 | | 4635 | 23 |
| 1275 | | 4636 | 23 |

# **I N D E X**

## **E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1387 | | 4637 | 23 |
| 1454 | | 4647 | 23 |
| 1522 | | 4640 | 23 |
| 1797 | | 4652 | 23 |
| 2182 | | 4613 | 23 |
| 2204 | | 4600 | 23 |
| 2249 | | 4609 | 23 |
| 2254 | | 4610 | 23 |
| 2520 | | 4700 | 23 |
| 3042 | | 4679 | 23 |
| 6521 | | 4607 | 23 |
| 6629 | | 4649 | 23 |
| 6630 | | 4648 | 23 |
| 6631 | | 4654 | 23 |
| 6632 | | 4655 | 23 |
| 6634 | | 4651 | 23 |
| 6830 | 4579 | 4580 | 23 |
| 6889 | | 4718 | 23 |
| 6890 | | 4718 | 23 |
| 6891 | | 4718 | 23 |
| 6892 | | 4718 | 23 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 6893 | | 4718 | 23 |
| 6894 | | 4733 | 23 |
| 6895 | | 4735 | 23 |
| 6898 | | 4723 | 23 |

| | |
|---|---|
| 1 | <u>Friday - April 13, 2018</u>                                    <u>8:59 a.m.</u> |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | ---oOo--- |
| 4 | (Proceedings were heard out of the presence of the jury:) |
| 5 | **THE COURT:**  Okay.  Let the record show the parties are |
| 6 | present.  The jury is not. |
| 7 | Good morning. |
| 8 | **MR. FRENTZEN:**  Good morning, Your Honor. |
| 9 | **THE COURT:**  So what's up?  What's up? |
| 10 | **MR. FRENTZEN:**  Your Honor, I just wanted to make sure |
| 11 | that the Court knew that there are motions about a couple of |
| 12 | our witnesses today. |
| 13 | **THE COURT:**  Right. |
| 14 | **MR. FRENTZEN:**  And Mr. Keker had sent a note I guess |
| 15 | prognosticating our order, and I wanted to let the Court know |
| 16 | that's not our order because Mr. Johnson is the one local |
| 17 | witness.  We have three witnesses that are from out of town, |
| 18 | and so those are the ones we'd like to get on and off. |
| 19 | **THE COURT:**  Okay. |
| 20 | **MR. FRENTZEN:**  So -- |
| 21 | **THE COURT:**  So let's address it. |
| 22 | **MR. FRENTZEN:**  Yeah.  There's two, I think, Meiers and |
| 23 | Morland -- and Morland is here from the U.K. and Meiers is in |
| 24 | from, I want to say Kansas City -- so -- |
| 25 | **MR. KEKER:**  There are motions, Your Honor.  Can we |

PROCEEDINGS

```
 1  address them?
 2           THE COURT:  Yes.
 3           MR. KEKER:  Okay.  The big headline here is time.  If
 4  you think this case is going to get over on Tuesday, you need
 5  to do something about it because the Government has got more
 6  witnesses that can possibly be done between now and Tuesday.
 7  And we've addressed substantively, not just because of time --
 8           THE COURT:  Let's talk about that point.
 9           MR. FRENTZEN:  Sure, Your Honor.
10           THE COURT:  My question is:  Is he right?
11           MR. FRENTZEN:  No.
12           THE COURT:  Okay.
13           MR. KEKER:  Oh, please.  Can I go over and tell you --
14           MR. FRENTZEN:  If I can just tell you, Mr. Meiers --
15           THE COURT:  I have an answer to that.  I have an
16  answer to that.  It will be over by Tuesday.
17           MR. KEKER:  Well, and what I'm worried about is that
18  we -- that --
19           THE COURT:  No, I'll give you legitimate time for
20  cross-examination, but it will be over -- they're electing --
21  they say "This Witness A and this Witness B and C and D, it's
22  important" and they have an argument for it, they have an
23  argument because they say essentially to all of these, they
24  say, "Well, look, that's the theme that has been developed in
25  the examination by the -- in the cross-examination"; like, you
```

1  knew about the hardware sales or hardware sales are really

2  unimportant.  Those are themes that have been developed by

3  virtue of cross-examination.

4      So I say to them, "I think That's right.  I heard the same

5  line of questioning.  I'm going to give you till the end of the

6  day Tuesday.  You make your election.  If it's that important,

7  you call them.  If it's not that important, because other

8  things are more important, you don't."

9          **MR. KEKER:**  That's fine, Your Honor.  One caveat.

10         **THE COURT:**  Yes.  Go ahead.

11         **MR. KEKER:**  One caveat, which is will you ask them --

12  tell them to call Brice on Monday so that we make sure that we

13  get finished with Brice?  The way they've got this set up is

14  that they'll get -- they will end Tuesday --

15         **THE COURT:**  And the answer to that is, excuse me for

16  cutting you off, but the answer to that is I'll have that

17  discussion at the end of today.

18         **MR. KEKER:**  Fine.

19      Okay.  Then --

20         **THE COURT:**  Yeah.

21         **MR. KEKER:**  -- we have -- we also have motions to go

22  to particular things, particularly Agent Bryant, because

23  Agent Bryant has --

24         **THE COURT:**  But that witness won't be called until

25  sometime after lunch.

 1            **MR. KEKER:**  Right.

 2            **THE COURT:**  Okay.

 3            **MR. KEKER:**  Okay.  Got it.  We can talk about it then.

 4            **MR. FRENTZEN:**  And just briefly, if I could,

 5    Your Honor.

 6        Two of these witnesses today are not witnesses that we

 7    thought we were going to have to call.  And, again, this is --

 8    we didn't have an opportunity to respond to the motions filed

 9    yesterday, but just so the Court knows --

10            **THE COURT:**  You just did.

11            **MR. FRENTZEN:**  I understand that, Your Honor, but just

12    so the Court knows, this, you know, Tuesday thing would be fine

13    if we didn't keep getting, for example, questions about, "Oh,

14    well, there was a deal between Autonomy and H&R Block in

15    connection with" -- hang on -- "in connection with the

16    software."

17        My point, Your Honor, is this:  Seeing Tuesday as a

18    drop-dead, which that's fine, I could see questioning of some

19    of these witnesses that I don't believe would actually be in

20    good faith, which is, "Well, there were other people involved

21    in the deal at Bank of America.  There were other people

22    involved in the deal with H&R Block."  And the truth is --

23            **THE COURT:**  Actually, the truth is I actually think

24    the cross-examination has been in good faith.  I mean, it's a

25    theme that they -- whether it carries the day, it's certainly a

 1  legitimate theme for them to argue.

 2          MR. FRENTZEN:  I understand that, Your Honor, but my

 3  point is a simple one.  I've talked to the lawyers at these

 4  entities that have investigated this themselves.  They've

 5  interviewed everybody under the sun, and they've said "Nobody

 6  knew anything about hardware sales from Autonomy or Autonomy

 7  being involved in these resellers selling us the hardware."

 8      Now, if they have somebody that they pitched on hardware

 9  to make the software deal, I'd be glad to go find that person

10  and end this line of examination; but, in other words, I don't

11  think that, you know, "Oh, well, somebody might have been in

12  the deal who might have been pitched on, you know, our

13  existence in this weird reseller chain" --

14          THE COURT:  You see, you see, Mr. Frentzen --

15          MR. FRENTZEN:  I'm just simply making the point.

16          THE COURT:  No, no, no.  Well, I think that deserves a

17  response.

18      You see, that if, in fact -- I don't know whether the

19  Defense is going to call anybody or not, but they need not -- I

20  mean, they need not.  However, I don't think it's an unfair

21  comment in argument to say exactly what you said, exactly what

22  you said; that is, "You know, if there was somebody out there

23  who could testify about this, that this deal was connected to

24  this and that and so forth, where is that person?"

25      I mean, it's not commenting on the defense.  It doesn't

 1  implicate the Fifth Amendment, in my view, but it's fair game.

 2  If a theme is raised by the Defense and they have the power to

 3  call X, Y, and Z, which clearly they do, and they don't, you

 4  can comment on it in argument.

 5          MR. FRENTZEN:  Understood.  I think I'll probably be

 6  accused of burden shifting, but I appreciate that.

 7          THE COURT:  No, I don't think that's a burden shift.

 8          MR. FRENTZEN:  I mean, I --

 9          MR. KEKER:  Yeah.

10          THE COURT:  Well, then two of us agree.

11          MR. KEKER:  Two out of three, Your Honor.

12          THE COURT:  Maybe that's to the disadvantage of the

13  Defense.

14          MR. KEKER:  Two out of three.

15      Your Honor, there's one other.

16          THE COURT:  Yes.

17          MR. KEKER:  John Meiers, are they planning to call him

18  today?  Because he was listed for Monday, and we don't have --

19          THE COURT:  Yeah, they are planning on calling him

20  today.  They're nodding their head yes.

21          MR. KEKER:  We don't even have the person --

22          THE COURT:  Well, go get whatever you need.

23      Okay.  I want to bring in -- I want to start --

24          MR. KEKER:  When is Meiers going to testify?  Can we

25  find out?

1    **MR. FRENTZEN:**  This morning.  He'll be 15 minutes.

2    **MR. KEKER:**  15 minutes with him.  When is Meiers going

3    to testify?  We've got Gersh cross-examination.  Then what?

4    We'd like to know.  They haven't --

5    **MR. FRENTZEN:**  Then we'll do Smith and Meiers.  Then

6    we'll do Morland.  Then we'll do Johnson.  Johnson's local.

7    **THE COURT:**  I don't care how you do it, just do it.

8    **MR. FRENTZEN:**  Great.

9    **THE COURT:**  Mr. Marais, you've been characteristically

10   silent.

11   **MR. MARAIS:**  Your Honor, this is the first that I'm

12   hearing that Mr. Meiers is testifying today.  Your Honor,

13   presumably the man flew in at some point.  Mr. Frentzen was

14   free to e-mail us to say he'll be up today.

15   I haven't had -- the first time I heard about John Meiers

16   was two days ago.  I haven't had a chance to look at any

17   documents.  No one was expecting him to be here today.  If they

18   want to call him on Monday, we can have a separate discussion

19   about whether they should have disclosed him at some point.

20   **MR. FRENTZEN:**  We disclosed -- I talked to him on

21   Wednesday.  He flew in late last night.

22   **MR. KEKER:**  He has never been on a witness list.

23   **THE COURT:**  They don't care about that.

24   **MR. FRENTZEN:**  He's now on a witness list.

25   **THE COURT:**  They care about when they were told.

1          **MR. MARAIS:**  We haven't been told until two minutes

2    ago that he's supposed to testify today.

3          **MR. FRENTZEN:**  Just so the Court knows, he is

4    responsive to a misleading line of inquiry of Dominic Camden

5    and of Mr. Scott that in some way this hardware from Zones --

6          **THE COURT:**  I'm concerned about --

7          **MR. FRENTZEN:**  -- had something to do with --

8          **THE COURT:**  I'm not concerned about significance.  I'm

9    concerned about notice.  They're not saying -- they're saying

10   they just found out when I did.

11         **MR. MARAIS:**  Your Honor, on Tuesday for the first

12   time --

13         **MR. FRENTZEN:**  I just found out about him, Your Honor.

14         **MR. MARAIS:**  On Tuesday for the first time Mr. Meiers'

15   name was mentioned.  At that point the Government told us that

16   he would be called on Monday.  Now, apparently Mr. Frentzen

17   spoke to him a few days ago.  Apparently he flew in yesterday,

18   but the first time that I've heard any mention of him --

19         **THE COURT:**  Where is he from?

20         **MR. FRENTZEN:**  Kansas City, Your Honor.

21         **THE COURT:**  It's much nicer here than Kansas City.

22   Maybe.

23        I'm concerned about notice.  I am concerned about notice;

24   and if they are complaining about lack of notice, it seems

25   legitimate and I will then tell you put him on Monday so they

1    have the weekend to prepare.

2         MR. MARAIS:  Thank you, Your Honor.

3         MR. FRENTZEN:  Can we see how the day goes?  They've

4    got a 302.  It's about -- it's a page long and --

5         THE COURT:  I don't know that that's --

6         MR. FRENTZEN:  -- not much more.

7         THE COURT:  This is the problem.  We have sort of a

8    set of rules that we each have to abide by; and if I just say,

9    "Oh, well, you know, never mind," the whole system fails.

10        I mean, and I think they -- I think at least,

11   Mr. Frentzen, the Government had an obligation -- I don't know,

12   Tuesday, Wednesday, Thursday -- to give them a call, send them

13   an e-mail and say, "Due to circumstances, we want to put

14   whoever this guy is on Friday."  I mean, that's an easy e-mail

15   to send.

16        MR. FRENTZEN:  It's an e-mail I thought was sent and

17   apparently it was not sent, Your Honor, and that's my fault.

18   That's my fault.

19        THE COURT:  By the way, I'm not pointing fingers.  I

20   guess to some extent I'm pointing fingers.  I'm just saying in

21   light of the fact whether through inadvertence it wasn't sent,

22   there's still prejudice.  That's their point.  There's still

23   prejudice.  Maybe it's a small prejudice.

24        I think Mr. Marais -- I've watched him -- I think he's

25   capable of flying by the seat of his pants; but, on the other

**PROCEEDINGS**

```
 1   hand, he would prefer not to.  He would prefer to give some
 2   thought to his trenching cross-examination of the witness who's
 3   going to testify about probably something that isn't in dispute
 4   and it will take five minutes for him to testify or so.  That's
 5   what I hear from the Government.
 6           MR. FRENTZEN:  I'd be happy to have --
 7           THE COURT:  But I'm always surprised.  You know,
 8   that's the nice thing about evidence, is you get to listen to
 9   it.
10           MR. FRENTZEN:  I can't wait.
11           MR. MARAIS:  The Government's direct may be five
12   minutes; but given that we're not getting an opportunity to
13   subpoena documents, I would like to at least look at the
14   documents that we have to see if there is an angle for
15   cross-examination.
16           THE COURT:  Why don't you do this, Mr. Marais:  We
17   won't put him on this morning, probably won't put him on this
18   afternoon.  If you change your mind -- I leave it up to you.
19   In good faith, if you feel you need more time after noon, I'll
20   give it to you.  Okay?
21           MR. MARAIS:  Okay.  Thank you, Your Honor.
22           THE COURT:  Up to you.
23           MR. MARAIS:  Thank you.
24           THE COURT:  Okay.
25           MR. FRENTZEN:  Thank you, Your Honor.
```

1          **THE COURT:**  Well, glad to be back.

2     Do we have our jurors?

3          **THE CLERK:**  Let me check.

4                    (Pause in proceedings.)

5          **THE COURT:**  Okay.  Bring them in.

6     (Proceedings were heard in the presence of the jury:)

7          **THE COURT:**  Please be seated.

8     Okay.  Let the record reflect all jurors are present, the

9     parties are present.

10     Good morning, ladies and gentlemen of the jury.  Sorry

11     about the confusion earlier this morning.

12     Now we are going to resume the testimony of Mr. Gersh, who

13     is in the process of being cross-examined by Ms. Little.

14     Go ahead.

15                    **ANDREW GERSH**,

16     called as a witness for the Government, having been previously

17     duly sworn, testified further as follows:

18          **MS. LITTLE:**  Thank you, Your Honor.

19     Good morning, members of the jury.

20               **CROSS-EXAMINATION**   (resumed)

21     BY MS. LITTLE:

22     **Q.**   Good morning, Mr. Gersh.

23     **A.**   Good morning.

24     **Q.**   We are going to resume my questioning of you that we were

25     working on a week ago Friday about your role working at KPMG

1    working on behalf of Hewlett Packard doing the due diligence

2    for the Autonomy acquisition.   Okay?

3    **A.**   Okay.

4    **Q.**   All right.  You testified in your direct examination about

5    your review of Autonomy's 2010 annual report.  Do you recall

6    that?

7    **A.**   Yes, I do.

8    **Q.**   And Mr. Leach showed you some pages from that report, and

9    I'd like to just show you a few other pages that he didn't show

10   you.

11        So if you could take a look at Exhibit 1352, which should

12   be in your black binder.  It's in evidence so we can put it on

13   the screen, and I'd like to direct your attention to page 44 of

14   the report -- which is I think page 46 of the exhibit, Jeff.

15        And directing your attention to the top left-hand corner,

16   I just want to ask you.  You understood that Autonomy reported

17   its financials under IFRS; correct?

18   **A.**   Yes.

19   **Q.**   And the last couple sentences here it says (reading):

20             "The financial reporting framework that has been

21        applied in their preparation is applicable law and

22        International Financial Reporting Standards (IFRS)."

23        Right?

24   **A.**   That is correct, yeah.

25   **Q.**   And this is what they call the back portion of the

GERSH - CROSS / LITTLE

1  financial report, which is audited by Deloitte; correct?

2  A.   Sorry.  I didn't understand.  What was your reference?

3  The back portion?

4  Q.   So Deloitte, when they audit the financial statement, they

5  audit what's known as the back end or the latter half where the

6  numbers are of the report; right?

7  A.   They audit the financial statements, uh-huh.

8  Q.   Okay.  Well, I'm just looking at the bottom of this page.

9  This page is signed by Nigel Mercer.  Do you see that?

10  A.   Yes, I do.

11  Q.   And Nigel Mercer was the partner at Deloitte who was

12  auditing these accounts; correct?

13  A.   If he signed the audit report, then, yes, he would be the

14  audit partner who was auditing or was responsible for auditing

15  the financial statements.

16  Q.   Okay.  Thank you.

17      If you would take a look, please, sir, at page 58 of the

18  report, which is page 60 in the exhibit, and I want to

19  highlight the third paragraph and just ask you.

20      Did you understand, sir, that Autonomy reported its

21  revenue in a single revenue line because there was a single

22  operating segment?

23  A.   (Witness examines document.)

24  Q.   Whoops.  Maybe that's the wrong one.  The product -- yeah,

25  this is it.

GERSH - CROSS / LITTLE

1   The sentence beginning (reading):

2    "Each customer selects from a list of options but

3   underneath from a single unit of the proprietary core

4   technology platform.  As a result, no analysis of revenues

5   by product type can be provided."

6   Did you read that when you reviewed this report?

7 **A.** Yes, I did read it.

8 **Q.** And then down in the second paragraph from the bottom

9 where it says (reading):

10    "As a consequence of the above factors, the group has

11   one operating segment in accordance with IFRS."

12   Did you read that when you read this report?

13 **A.** Yes, I did.

14 **Q.** And you understand, do you not, that that means that there

15 is one revenue line that reports all revenue together; correct?

16 **A.** So my understanding of that is the management has

17 determined that there is one reporting segment, and the

18 auditors have agreed to that classification of operating

19 performance.

20 **Q.** And the auditors did agree; correct?

21 **A.** Yes, otherwise they would have put a disclaimer in the

22 audit report around that presentation.

23 **Q.** And then can you also explain to us, sir, what does the

24 term "cost of revenue" mean?

25 **A.** Sorry.  Which paragraph is that in?

**GERSH - CROSS / LITTLE**

1  **Q.**    I'm not looking at a paragraph.  I'm just asking you based

2  on your expertise, based on your knowledge of accounting, what

3  does the term "cost of revenue" mean?

4  **A.**    So that is the cost to deliver the product or the service

5  that a company is selling to its customers.

6  **Q.**    So explain to the jury, if you would, please, how does

7  cost of revenue -- does that include salary, for example,

8  salaries that the company pays?

9  **A.**    It can -- it can include salaries.  So it's the cost of

10  revenue, the best way to think about it is the direct costs

11  of -- the direct costs of the particular product that's being

12  sold.  So it's not sales and marketing or general

13  administrative costs.  It's the direct costs.

14      So, for instance, in Autonomy's case if they're selling

15  the software, if they're hosting software, or if they're

16  providing services, then you would have different costs for

17  each element.  So on the sale of software, the cost to produce

18  that software might be the cost of a disk drive, it might be

19  the cost of manuals.  So that cost would -- typically or

20  normally would go into cost of revenue.

21      For a hosting service, you might -- you might host it in a

22  data center.  So you would have the cost of the data center,

23  which could be electricity.  It could be utilities for the data

24  center.  It could be the real estate for the data center.  It

25  could be -- it could be security on the data center.

1   And then on services, it would be -- typically it would be

2   the cost of -- or what I see in companies is for services is

3   the cost of the employees performing the services.  So if

4   there's implementation or customization of software, it's the

5   direct cost of the employees who are performing those services

6   that gets included in cost of revenue.

7   Occasionally you might get an overhead.  So if an employee

8   is paid $50,000 a year, there might be $10,000 of additional

9   costs relating to let's say the real estate where they work or

10  the computers that they use or just sort of overhead.  Maybe

11  some of the direct costs are around training.  An allocation of

12  those costs might be made to cost of revenue to reflect what is

13  the true cost of delivering that particular product.

14  **Q.**   That's quite an answer.  Let me see if I can boil that

15  down.

16  So is it fair to say that with respect to cost of revenue,

17  sometimes you have to spend money to make money; right?

18  **A.**   Sometimes, yes.

19  **Q.**   If I could direct your attention, please, sir, to page 51

20  of the report in front of you, and looking down toward the

21  bottom where it says "Cost of Revenue," and it says (reading):

22         "Cost of license revenue" --

23  License revenue is, of course, revenue from software;

24  correct?

25  **A.**   That is correct, yes.

1  Q.   (reading)

2       -- "cost of license revenue includes the cost of

3       royalties to third-party licenses, costs of product

4       media, product duplication, hardware, and manuals."

5       Did you read this when you read the financial report?

6  A.   Yes, I did.

7  Q.   We can take that down, Jeff.

8       I'd like to turn your attention to the daily due diligence

9  calls in August of 2011 that you testified about on direct.

10      And I think you testified that you began to work on due

11 diligence really in earnest starting August 1st?  You read the

12 reports and stuff before that, but the calls, the daily calls,

13 started August 1st; correct?

14 A.   Is that the Monday?

15 Q.   The Monday.

16 A.   Yes, correct.

17 Q.   You were still in Florida?

18 A.   Yes, correct.

19 Q.   But you dialed into the call?

20 A.   Yep.

21 Q.   Okay.  And if we could take a look at Exhibit 2053, which

22 is in evidence.  This is an e-mail that you sent the day before

23 on -- or two days before on Saturday the 30th of July; correct?

24 A.   Yes, correct.

25 Q.   And you talk in paragraph 1, there's a call with the CFO

1    on Monday at 8:00 or 9:00 o'clock Pacific time.  And then in

2    paragraph 3 you say (reading):

3              "Only a limited number of Tesla management know about

4         the deal - fewer than two [sic] people."

5         Do you remember that?

6    **A.**    Yes, I do.

7    **Q.**    And then similarly down below you say, the

8    second-to-the-last paragraph (reading):

9              "HP does not want too many folk dialing into the

10        Monday call and has asked that we limit to two to three

11        dial-in for KPMG."

12        Do you recall that?

13   **A.**    Yes, I do.

14   **Q.**    And it's fair to say that there was concern both on HP's

15   side and Autonomy's side about confidentiality; correct?

16   **A.**    That is correct.

17   **Q.**    And during these calls -- they would last about an hour I

18   think you said?

19   **A.**    Yes.  This call lasted about an hour.

20   **Q.**    And on the HP side, HP was represented by Mr. Sarin and/or

21   Mr. Johnson; correct?

22   **A.**    Yes.  I recall both of them were on this call.

23   **Q.**    And I take it that Mr. Apotheker or his colleague

24   Mr. Robison didn't call into any of these calls; right?

25   **A.**    I don't think.  I don't recall.  I don't know.

1  Q.   With respect to this first call, I believe you testified

2  that Mr. Sarin described it as a baseline view of Autonomy.  Do

3  you recall that testimony?

4  A.   Can you point me to the -- where it comes from?  It's -- I

5  knew it was an overview call, and I may have used the word

6  "baseline."  I just can't recall when I used it.

7  Q.   Is that a fair characterization?

8  A.   Yes, it's a fair characterization.

9  Q.   And you can't recall anything from that August 1st call

10  that had any impact on your due diligence; correct?

11  A.   That is correct.

12  Q.   And then you also testified about an August 2nd call, and

13  Mr. Leach showed you Exhibit 2083.

14      Maybe we can pull that up, Jeff.  This is in evidence.

15      And I would direct your attention, sir, to the third page

16  and Question 3 in particular, "Do you sell professional..."

17  There we go.

18      I think you testified about this paragraph (reading):

19          "Do you sell professional services on a stand-alone

20      basis (i.e., sold outside of the license agreement?"

21      And I would ask you, sir, did you ask about any other

22  standalone sales that Autonomy might have made outside of

23  license agreements?

24  A.   Yes.  I would -- 1A covers standalone sales outside of

25  license agreements.

1    **Q.**    Where does it say that?

2    **A.**    It says (reading):

3            "Do all arrangements include license, maintenance,

4        professional services, or hosting subscription?"

5        So what we're looking for there are the sales that don't

6    include license, maintenance, professional services, or

7    hosting.

8    **Q.**    So Question 3 specifically calls out standalone sales and

9    services, but you agree with me that Question 1 does not?

10   **A.**    That's right.

11           **MR. LEACH:**    Objection.    Argumentative.    Misstates his

12   answer.

13           **THE COURT:**    Overruled.

14       Go ahead.

15           **THE WITNESS:**    Question 3 has got a very different

16   purpose from Question 1A.    So Question 3 is less about are they

17   just selling professional service on a standalone basis, and

18   the essence of Question 3 is around whether they have

19   standalone sales such that they can establish VSOE of fair

20   value for the professional services revenue, which is a very

21   critical element as it relates to the revenue recognition.

22   **BY MS. LITTLE:**

23   **Q.**    You'd agree with me, sir, that a person reading Question A

24   would not -- Question 1 would not see the words "standalone

25   basis" because they're not there; right?

1   **A.**    The words "standalone basis" are not there, but the --

2   **Q.**    Thank you.

3   **A.**    -- question is:  Do all arrangements include license?

4   **Q.**    These written questions that were given, they were not

5   answered in writing.  They were all answered orally; right?

6   **A.**    That is correct, yes.

7   **Q.**    And you and your team would take notes during these calls

8   during these conversations with Autonomy management?

9   **A.**    Yes, that's correct.

10  **Q.**    And you don't have your notes anymore, do you?

11  **A.**    No, I do not.

12  **Q.**    None of your team has notes anymore; right?

13  **A.**    I believe that's it.  Any notes we had would have -- would

14  have been collected by counsel, but I don't have any notes.

15  **Q.**    Well, it was KPMG's policy to purge all notes taken and

16  work papers that were compiled during due diligence; right?

17  **A.**    That is correct.

18  **Q.**    And as you sit here today, you don't know whether there's

19  any concrete evidence that Autonomy did not disclose the

20  information that you claim today was not disclosed.  You have

21  no concrete evidence of that because you have no notes.

22  **A.**    No, I have my report and my report captures the items that

23  are important in diligence in that report.  So now in the due

24  diligence our report stands alone.  So anything that is

25  important to me or I believe is important is in that report.

1    Q.   Do you agree with me, sir, that you have no concrete

2    evidence that Autonomy did not disclose the information that

3    you now claim was undisclosed?

4              MR. LEACH:  Objection.  Vague.  Argumentative.

5              THE COURT:  Well, sustained.  What is "concrete

6    evidence"?  I mean --

7              MS. LITTLE:  May I show the witness, Your Honor,

8    Exhibit 5076, which is in the white binder?

9              THE COURT:  5076.

10             MS. LITTLE:  It's a report of a witness statement on

11   October 18th, 2013.

12   Q.   And I --

13             THE COURT:  I need to look at it.

14   BY MS. LITTLE:

15   Q.   -- direct your attention to page 6 under "KPMG's Retention

16   of Notes."  Would you read that to yourself, sir, and

17   specifically the last sentence of that paragraph?

18   A.   (Witness examines document.)

19             THE COURT:  5076, what page?

20             MS. LITTLE:  Page 6, the paragraph labeled "KPMG's

21   Retention of Notes" and the last sentence beginning "Mr. Gersh

22   did not know..."

23             THE WITNESS:  (Witness examines document.)

24             THE COURT:  I'm having trouble finding the page.

25                       (Pause in proceedings.)

 1          THE COURT:  Okay.  Thank you.

 2                      (Pause in proceedings.)

 3          THE COURT:  And your question is?

 4          MS. LITTLE:  Well, I'd like now to ask the witness

 5  whether or not he told HP's lawyers the information in this

 6  sentence.

 7          THE COURT:  His testimony is consistent with that

 8  statement.

 9          MS. LITTLE:  I don't think it is.  I asked him if

10  there was any --

11          THE COURT:  All right.  Well, let's read the

12  statement.  Read the paragraph in its entirety.

13      And, ladies and gentlemen, it is for you to judge, not my

14  opinion or counsel's opinion, it's for you to judge the

15  testimony yourselves.

16      So read the whole paragraph, it's a short one --

17          MS. LITTLE:  Thank you, Your Honor.

18          THE COURT:  -- and then ask the witness "Is that an

19  accurate statement?"  Okay?

20          MS. LITTLE:  (reading)

21           "Mr. Gersh indicated that while KPMG employees took

22       notes during their conversations with Autonomy's

23       management, KPMG did not have any of these notes.

24       Mr. Gersh explained that KPMG's policy is that its report

25       to the client reflects all information collected and the

1    analysis of its work.  It is also KPMG's policy to purge

2    all notes taken and work papers used by KPMG employees

3    during the course of a project at the conclusion of such

4    project.  Mr. Gersh did not know whether there was any

5    concrete evidence that Autonomy had not disclosed the

6    information that Mr. Gersh said Autonomy had not disclosed

7    other than KPMG's comments from its report to HP."

8    **Q.**    And, Mr. Gersh, I would ask you:  Is this an accurate

9    rendition of what you told HP's lawyers in 2013?

10   **A.**    I think it is if -- it's in court, so I assume it's an

11   accurate rendition.

12   **Q.**    Thank you.

13          Returning to this August 2nd call, Mr. Hussain did talk

14   about hardware on that call, did he not?

15   **A.**    They described their business model, which was consistent

16   with the disclosure in the financial statements around the

17   different product offerings.

18   **Q.**    Do you recall Mr. Hussain saying, as a part of the

19   response to Question 1 of that attachment, that Mr. Hussain

20   said that Autonomy sold hardware as a matter of convenience

21   when Autonomy software was needed to work with hardware?  Do

22   you recall that?

23   **A.**    Yes.

24   **Q.**    And did you ask Mr. Hussain any follow-up questions about

25   that?

1  **A.**   I can't recall.

2  **Q.**   Did you ask about other situations where Autonomy might

3  have sold hardware for the convenience of its customers?  I'm

4  just asking, did you ask that question?

5  **A.**   Sorry.  I need to make sure I understand.  Is the question

6  did I ask did they sell standalone -- or held hardware on a

7  standalone basis?

8  **Q.**   That's not my question.

9      My question, sir, is:  You've indicated that Mr. Hussain

10  did talk about selling hardware as a matter of convenience, and

11  I asked whether you asked him about other examples where

12  Autonomy may have sold hardware for the convenience of its

13  customers.

14  **A.**   Yes.  I would say Question 1A is that question.  It's

15  (reading):

16          "Do you sell" -- "Do all your arrangements or any

17      certain arrangements include license, maintenance,

18      professional services, or hosting and subscription?"

19  **Q.**   Let me try one more time.

20      When Mr. Hussain in this phone call talked about selling

21  hardware as a matter of convenience for its customers, did you

22  ask any follow-up questions about other situations where

23  hardware might be sold for the convenience of customers?  It's

24  a yes or no.  Did you ask?

25  **A.**   So I don't know if I asked a follow-up question to that

1    specific response.

2    **Q.**    Fine.  That's what I'm asking.  Thank you.

3    **A.**    Okay.

4            **THE COURT:**  Well, you can answer the question.  Go

5    ahead.

6            **THE WITNESS:**  Yeah, but I asked Question 1A, which --

7    which the purpose of 1A was to understand all the types of

8    arrangements that they were selling, and it was never disclosed

9    to us that they were selling hardware on a standalone basis.

10   **BY MS. LITTLE:**

11   **Q.**   But when he talked about convenience of -- selling

12   hardware for the convenience of customers, you didn't ask any

13   follow-up questions to that statement; correct?  I know you've

14   got Question 1 there, but I'm asking:  Did you ask follow-up

15   questions during that phone call?

16           **MR. LEACH:**  Objection.  Asked and answered.

17           **THE COURT:**  I'll allow it.

18           **THE WITNESS:**  I did not ask a follow-up question to

19   the response to the answer about what are appliances, what are

20   you selling in appliances.

21   **BY MS. LITTLE:**

22   **Q.**   Okay.  Fine.

23        Mr. Gersh, you can't recall one way or the other whether,

24   during due diligence, a question was ever specifically asked

25   whether Autonomy sold hardware; correct?

1   **A.**   I can't recall if we ever asked a question "Do you sell

2   hardware on a standalone basis?"

3   **Q.**   Or just whether Autonomy sold hardware.  That question was

4   never asked so far as you can recall; correct?

5   **A.**   No.  The question was asked because we asked about "What

6   are you selling in appliances?"  We knew there was hardware

7   being sold in appliances.

8   **Q.**   Do you recall, sir, testifying before the Federal Grand

9   Jury here in July of 2016?

10  **A.**   Yes, I do, ma'am.

11  **Q.**   And I'd like you to look back in that white binder again.

12  I direct your attention to Exhibit 5080, page 48.

13          **MS. LITTLE:**  And, Your Honor, I would like to read

14  lines 6 through 14 -- actually, 6 through 16 of this Grand Jury

15  testimony at page 48.

16                      (Pause in proceedings.)

17          **THE COURT:**  Okay.  But read -- you can start on

18  line 16 --

19          **MS. LITTLE:**  No, no.  I want to start on line 6,

20  Your Honor.

21          **THE COURT:**  Oh, I'm sorry.  Start on line 6 and go to

22  line 7 -- line 6 of page 49.

23          **MS. LITTLE:**  Okay.  So how about the -- I need to read

24  the answer, which would be on line 9.  So I'd read 6 through 9.

25          **MR. LEACH:**  I think we should read the witness' entire

```
 1  answer.
 2          THE COURT:  I'm sorry.  I don't understand that.  I'm
 3  looking at page --
 4          MS. LITTLE:  48.
 5          THE COURT:  Line 6?  You start on page 48, line 6.
 6          MS. LITTLE:  "I have a question related to that."
 7          THE COURT:  And then you go to page 49 --
 8          MS. LITTLE:  Oh, okay.  You want me to read all the
 9  way through.  Okay.  Page 49, line?
10          THE COURT:  Line 6.
11          MS. LITTLE:  Okay.
12          THE COURT:  Go ahead.
13          MS. LITTLE:  This is a grand juror asking you a
14  question (reading):
15              "I have a question related to that.  Was the question
16          specifically asked about selling hardware, whether the
17          company sold hardware?"
18              The Witness, that's you (reading):
19              "I can't recall.  We know they sold hardware because
20          there's a couple of mentions in the financial statements
21          that they would occasionally sell hardware.  I think the
22          wording is 'We will occasionally sell hardware with the
23          IDOL license.'  We're under the impression that it's
24          insignificant.  It's not part of the products they're
25          selling.
```

1          "And every -- the way that Autonomy described its

2     business, it describes it as a pure software business.  So

3     we're under -- we would never imagine they're selling

4     hardware because they don't have manufacturing.  They're

5     not -- they're not making any hard products.  They've

6     described themselves as a pure software company.

7          "We were only imagining them selling software with

8     the exception of their brief mention that occasionally

9     they'll sell hardware.  And so we weren't -- I can't --

10    sitting here today, I can't imagine I would have asked 'Do

11    you sell hardware on a standalone basis?" because I just

12    wouldn't have -- we just wouldn't have imagined that they

13    would have."

14    And, actually, can I read the next question and answer,

15    Your Honor?

16              THE COURT:  Sure.

17         MS. LITTLE:  Mr. Leach asked Mr. Gersh (reading):

18         "You said -- the hardware that you understood

19    Autonomy was selling, was that limited to the appliance

20    that was described in the annual report that we looked at

21    previously?"

22    And your answer is "I don't know."

23              THE COURT:  And then read 13 through 16.

24         MS. LITTLE:  (reading)

25    "Q.  Did you have any understanding that Autonomy sold

**GERSH - CROSS / LITTLE**

1      approximately 100 million worth of hardware in 2010?

2      "**A.**  No, I did not know that."

3      Thank you.

4  **Q.**   And that was true testimony that you gave to the

5  Grand Jury; correct?

6  **A.**   That is correct.

7  **Q.**   And in this testimony you talk about how you were under

8  the impression that hardware sales were insignificant and

9  under -- yeah, under the impression -- and you presumed that

10  they weren't selling much hardware; correct?

11  **A.**   That is correct.

12  **Q.**   And basically you had no idea how much hardware Autonomy

13  was selling; correct?

14  **A.**   So I didn't know the exact dollar amounts of hardware that

15  Autonomy was selling.  We -- based on their disclosure,

16  particularly around the appliances, it was relatively

17  insignificant because there was two -- they refer to their

18  appliance sales as relatively insignificant; and, then,

19  secondly, their margin profile on appliances they contend was

20  the same as the margin profile on standalone license sales.

21  So, therefore, there just couldn't be a significant amount of

22  hardware being sold if that statement was correct.

23  **Q.**   But it's true, sir, is it not, that you had no idea how

24  much hardware Autonomy was selling; correct?

25  **A.**   That is correct, I did not know how much hardware they

1    were selling.

2    **Q.**   But you did know -- you did find unusual the timing, that

3    sometimes hardware was being sold at different times from when

4    they were selling software; correct?

5    **A.**   So can you point me to -- did I mention that somewhere or

6    is that a statement or what?

7    **Q.**   I have to get an answer from you before I point you

8    somewhere, so --

9    **A.**   So can you repeat the question, please?

10    **Q.**   Did you notice and find unusual the timing of hardware

11    sales because hardware sales were made at a time different from

12    when Autonomy was selling software?

13    **A.**   I know the hardware sales in the UBS contract were

14    unusual.  That was a very unusual contract, but I can't recall

15    a situation -- I can't recall a situation just now where I

16    would have known that hardware sales were being sold at a

17    different time other than the UBS contract.  If you can point

18    me to it, I can --

19    **Q.**   Sure.  I'm looking at page 66 of your Grand Jury

20    testimony.

21          **MS. LITTLE:**  Your Honor, lines -- well, the question

22    starts at 13, and then the answer I would read down to --

23          **THE COURT:**  So what you have to do is give it to

24    him --

25    \\\

1  **BY MS. LITTLE:**

2  **Q.**   If you take a look, sir --

3         **THE COURT:** -- and let him read it and ask him if it

4  refreshes his recollection.

5  **BY MS. LITTLE:**

6  **Q.**   Page 6, sir, your answer at lines 17 through 21?

7  **A.**   (Witness examines document.)  Yep, and this is --

8  **Q.**   Let me ask you a question.

9         So is it true, sir, that you noticed and found unusual the

10  timing of hardware sales, that they were being -- that hardware

11  was being sold at different times from when Autonomy was

12  selling software?

13  **A.**   Yes.  This is the -- this is my answer to the UBS contract

14  where the hardware was being sold at a different time than --

15  or it appeared to be being sold at a different time than the

16  software.

17  **Q.**   Okay.  Thank you.

18         So just to sum up, you knew Autonomy was selling some

19  hardware; correct?

20  **A.**   That is correct.

21  **Q.**   And you knew that Autonomy sold hardware sometimes at

22  different times than they were selling the software to a

23  customer; correct?  That's what we just looked at; right?

24  **A.**   We looked at a specific answer to the UBS contract, which

25  was just a huge contract, so -- and it -- it was a redacted

1  contract so we couldn't tell the exact elements of it.  But

2  when we read the UBS contract, it appeared to us that they were

3  selling a solution and --

4  **Q.**   Is there anything in this question and answer, sir, that

5  references the UBS contract?  It's a general question; right?

6         **MR. LEACH:**  Objection.  Argumentative.  It's hearsay.

7         **THE COURT:**  Look at page 13 -- I mean, look at line 13

8  (reading):

9       **"Q.**  So reviewing this portion of this contract" --

10        **MS. LITTLE:**  Okay.  Fair enough.  Excuse me.  You're

11  right.

12  **Q.**   Okay.  So this is talking about the UBS contract?

13  **A.**   This is a specific answer to the UBS contract, ma'am,

14  correct.

15  **Q.**   But overall you didn't know how much hardware Autonomy was

16  selling; right?

17  **A.**   Correct.  We had no idea how much hardware Autonomy was

18  selling at that point in time.

19  **Q.**   And you were saying you were under the impression and

20  presumed and assumed that it wasn't much?

21  **A.**   That is correct, yes.

22  **Q.**   And you didn't ask more questions about that other than

23  the questions that we've already talked about?

24  **A.**   We tried to answer -- ask a question around the UBS

25  contract, and we tried to answer -- or ask questions around

1  some of the other contracts that we read, which did contain

2  hardware, but they were never answered.

3  **Q.**  And I'm going to get to those in a minute.

4      Okay.  Let's take a look -- this is a good segue -- at

5  Exhibit 2134, which is in evidence, and page 3 in particular.

6  Do you have that before you?

7  **A.**  (Witness examines document.)

8         **MS. LITTLE:**  If we take a look at page 3 of the

9  exhibit, Jeff, "Revenue Recognition," "Confirm Revenue."

10     Maybe I've got the wrong one here.  Is this Exhibit 2134?

11  Yep.

12     Okay.  There we go.  Okay.  Up at the top -- the top box.

13  **Q.**  So these are the requests that you're making and Request

14  Number 2 is (reading):

15          "Customer contracts split by major line of business

16          (Licensing, OEM, Hosted, SAS," et cetera.

17     Do you see that?

18  **A.**  Yes, I do.

19  **Q.**  And this is the way that KPMG drafted this request for

20  customer contracts; right?  This is KPMG's language?

21  **A.**  Yes.  This is our -- we drafted this request.

22  **Q.**  Okay.  And then in response to this request, redacted

23  contracts were placed in the data room; right?

24         **MR. LEACH:**  Objection.  Vague and argumentative.  This

25  is going to HP.

1          **MS. LITTLE:**  I'm sorry?  This is going to HP.  Okay.

2    Well, fair enough.

3    **Q.**   Is it true, sir, that redacted contracts were posted into

4    the data room?

5    **A.**   That is correct, redacted contracts were posted in the

6    data room.

7    **Q.**   And the posting of redacted contracts is the procedure

8    that was agreed to between HP and Autonomy; correct?

9    **A.**   I assume so.  We weren't involved in the discussions, but

10   what was going to be provided in the data room between HP and

11   Autonomy, we weren't involved in those discussions so I can't

12   give you an answer.

13   **Q.**   Right.  Because that was agreed to between HP and

14   Autonomy; right?

15   **A.**   I wasn't involved in the discussions.  I don't know who

16   agreed to it.

17   **Q.**   Okay.  And you understood that the data room would not

18   contain all Autonomy contracts; right?

19   **A.**   I didn't know one way or another.  I just -- I made my

20   request for contracts and I read the contracts that were placed

21   in the data room.

22   **Q.**   And you understood that Autonomy was providing their large

23   or significant contracts during a specific time frame; correct?

24   **A.**   That is correct.  We were led to believe that the

25   contracts that were in the data room were the most significant

1    ones.

2    **Q.**   And you don't remember today the exact criteria for the

3    selection mix of contracts other than they were supposed to be

4    significant; right?

5    **A.**   We made the request for the largest contracts by revenue

6    that were signed in those periods, and that was the -- I was

7    under the impression that's what was in the data room.

8    **Q.**   Let me ask my question again.  You don't remember, as you

9    sit here today, the exact criteria for the selection mix of

10   contracts other than they were supposed to be significant; is

11   that correct?

12           **MR. LEACH:**  Objection.  Assumes facts.  Argumentative.

13           **THE COURT:**  Go ahead.

14           **THE WITNESS:**  I don't know what criteria was agreed

15   between HP and Autonomy.  I just wasn't involved in those

16   discussions.

17   **BY MS. LITTLE:**

18   **Q.**   Okay.  So you don't know the criteria for the selection

19   mix of contracts; correct?

20   **A.**   So I don't know what criteria was agreed.  I know what we

21   requested from HP, and I was under the impression from -- based

22   on discussions with HP that these were the largest contracts

23   that were signed in those -- in the period, but I don't know --

24   I wasn't party to the discussions between HP and Autonomy.

25   **Q.**   They were supposed to be the significant contracts; right?

1    **A.**    That is correct.

2    **Q.**    And, in fact, your memory is that early on in the process

3    you requested Autonomy's software contracts for 10 to 20 of its

4    largest customers; correct?

5    **A.**    We requested the contracts, and we -- we would have

6    requested the software -- in fact, I did request the software

7    contracts because we were under the impression they only sold

8    software.

9        And the reason we requested the software contracts is

10    because we wanted to see the software contracts and we wanted

11    to see the hosting contracts.  We wanted to see the largest

12    contracts for each of the different product lines that they

13    were offering or services they claimed they were selling, such

14    as software, hosting, OEM, and appliance.

15    **Q.**    So just to make sure we're clear, you recall that early on

16    in the process, you requested Autonomy's software or customer

17    contracts for 10 to 20 of their largest customers; correct?

18    **A.**    That is one of the requests I made, yes.

19        **MR. LEACH:**  Objection.  Vague.  To who?

20        **THE WITNESS:**  I --

21        **THE COURT:**  Go ahead.

22        **THE WITNESS:**  I requested the software contracts and I

23    requested the significant contracts for each of the different

24    lines that they were selling, which would have been sort of

25    software licenses, OEM, appliance, and hosting.

 1          **MS. LITTLE:**  We can take that down, Jeff.

 2  **Q.**   So on your direct examination the Government showed you

 3  Exhibit 2130, which is in evidence.  You can take a look at

 4  that.

 5          Oh, I think, actually, it's -- it's in evidence.  We can

 6  just put it up on the screen just so I can remind you.

 7          So this is the e-mail on August 4th that says this is to

 8  alert you to the fact that new documents have been added into

 9  the Project Daniel room, et cetera.

10          And I believe Mr. Leach pointed out the fact that there is

11  no "To" line in this e-mail but you were, in fact, a recipient

12  of this e-mail.  Do you recall that?

13  **A.**   Yes, I do.

14  **Q.**   Okay.  And, in fact, you received a series of e-mails like

15  this saying, "Here's to let you know that new things have been

16  posted in the data room"; right?

17  **A.**   That is correct, yes.

18  **Q.**   Okay.  I'd like to show you an exhibit that's not in your

19  book.  It's Exhibit 6830.

20          (Trial Exhibit 6830 marked for identification)

21  **BY MS. LITTLE:**

22  **Q.**   And if you would take a look at Exhibit 6830, please.  Is

23  this a compilation of a number of e-mails that you received

24  letting you know that there was additional information being

25  posted to the data room?

1  **A.**   (Witness examines documents.)

2  **Q.**   The first one is August 4th and it goes all the way

3  through September 13th.

4  **A.**   (Witness examines documents.)  So the e-mails would come

5  out when documents were placed in the data room.  I -- I can't

6  recall if these were the exact e-mails I was sent or not, but I

7  was sent e-mails by the Project Daniel or by Slaughter and May

8  as documents that were replaced in the data room.

9  **Q.**   Do you have any reason to believe that these were not the

10  e-mails that you received on a daily or semi-daily basis?

11  **A.**   (Witness examines documents.)  No, no reason not to

12  believe them.

13          **MS. LITTLE:**  Move them in, Your Honor.

14          **MR. LEACH:**  No objection.

15          **THE COURT:**  Admitted.

16      (Trial Exhibit 6830 received in evidence)

17  **BY MS. LITTLE:**

18  **Q.**   So taking a look, if we could, at page -- we looked at --

19  well, let's take a look at page 1.  We'll start at the

20  beginning.

21      This is the e-mail that we've just seen, which is also

22  Exhibit 2130, correct, the August 4th e-mail saying that new

23  documents have been added?  And if we look at the second page

24  under Section IV (Legal), it lists a number of contracts that

25  were posted to the data room that day; correct?

1  **A.**    It appears to be so, yes.

2  **Q.**    Agreement 1, Agreement 2; right?

3  **A.**    Yes.  There's a list of agreements, yep.

4  **Q.**    Okay.  And then if we could look, then, Jeff, at page 4,

5  which is an e-mail that went out the next day, August 5th.

6       And we look at page 5 under Section IV.  These are more

7  contracts that were posted to the data room; correct?

8  **A.**    Correct.

9  **Q.**    Okay.  And then let's jump ahead to page 8, which is the

10  August 8 notification.

11       And then looking at page 9, we've got various other

12  documents.  Some are contractual arrangements, some are share

13  options, et cetera; correct?

14  **A.**    (Witness examines document.)  Correct.  That looks to be

15  two or three contractual documents and then six documents

16  related to the stock option schemes and plans.

17  **Q.**    I don't want to go through all of these, but it's fair to

18  say sometimes on a daily basis, sometimes a couple times a day,

19  sometimes every other day, a whole host of documents would be

20  added to the data room; correct?

21  **A.**    That's correct.  Sometimes daily; sometimes, based on

22  these e-mails which you told me are accurate, maybe a couple of

23  times a day; sometimes there might be a gap for a day.

24  **Q.**    And let's take a look at page 18, if we could.  I'm sure

25  the jury will read all of these with great attention, but let's

1    just focus on page 18.  It's an update on August 10th; correct?

2    **A.**  (Witness examines document.)  That looks to be correct.

3    **Q.**  And look at page 19 under Section IV.  These are more

4    contracts being posted to the data room; right?

5    **A.**  Yep, that looks to be correct.

6    **Q.**  And then jumping ahead to page 21.  Another contract;

7    right?

8    **A.**  Yep, that looks to be correct.

9    **Q.**  And page 23.  We've got more contracts?

10   **A.**  (Witness examines document.)

11   **Q.**  Right?

12   **A.**  It looks to be more contracts, yep.

13   **Q.**  And then let's look at page 28, if we could.  This is an

14   e-mail on August 11th.  Now, at this point your report's

15   already done; right?

16   **A.**  That is correct.  Sorry.  It's not done.  We've issued our

17   first draft report to HP.

18   **Q.**  But you never revised the report after that; right?

19   **A.**  That is correct, we didn't issue a revised report.

20   **Q.**  And then taking a look at page 29 to see what came in on

21   August 11th, these are various ancillary documents that go with

22   some of those first contracts that you were looking at;

23   correct?

24   **A.**  I don't recall.

25   **Q.**  Well, you remember Agreement Number 2?  You talked about

 1   that on direct.  That was the UBS contract.  Do you remember

 2   that?

 3   **A.**   UBS, yeah.  I think UBS is 2.

 4   **Q.**   Okay.  So these are just more contract documents going

 5   into the data room; right?

 6   **A.**   I don't know.  I don't know when they refer to

 7   Agreement 2, I don't know if they're referring to the UBS

 8   contract or not.

 9   **Q.**   Well, we can look at it.  Agreement 2 was the UBS

10   contract; right?

11   **A.**   If you tell me Agreement 2 is the UBS contract, correct,

12   but I don't know what this Agreement 2, Ancillary Document 1

13   is.

14   **Q.**   Okay.  We can put that down.

15        Let's take a look, if we could, at Exhibit 2167, which is

16   in evidence.  You testified about this e-mail.  This is an

17   e-mail from Mr. Lashua to you, correct, on August 7th?

18   **A.**   That's correct.  It's an e-mail from Timothy Lashua to

19   myself.

20   **Q.**   Lashua.  Excuse me.

21        And he writes (reading):

22        "Andy -

23        "Attached is the list of the 40 contracts that have

24        been uploaded to the data room split by Arsenal" --

25        "Arsenal" is Autonomy; right?

1   **A.**   That is correct.  That's the code name for Autonomy.

2   **Q.**   (reading)

3       -- "Arsenal revenue categories.  We have read 23 of

4       these contracts."

5       So at that point Mr. Lashua had only read 23 contracts;

6   correct?

7   **A.**   23 contracts had gone through two or three sort of levels

8   of review with Tim having looked at -- or Mr. Lashua having

9   looked at 23 of them, but his team might have looked at more

10  but it just might not have made it through his review.

11  **Q.**   Okay.  And then he attaches a list of questions that

12  Mr. Leach showed you starting at page 7; correct?  We talked

13  about these before.  These are questions that were put together

14  about the contracts that had been reviewed; right?

15  **A.**   That's correct.

16  **Q.**   And then if we could take a look at page 12 of the exhibit

17  down toward the bottom where it says "Agreement Number 2."

18  This is the famous UBS contract we've been talking about;

19  right?

20  **A.**   (Witness examines document.)  Yes, it is.

21  **Q.**   And the questions that are asked here, it says (reading):

22          "This is product schedule with end user for hardware,

23      software development, and maintenance/supports."

24      Correct?

25  **A.**   Yep.  It does read (reading):

1          "This is a product schedule with end user for

2      hardware, software development, and maintenance/supports."

3  **Q.**   And then moving on to the next page, there are specific

4  questions asked (reading):

5          "You are required to provide hardware supports,

6      including repair, et cetera.

7          "How do you support them when you're not in the

8      hardware business?

9          "When do you recognize hardware revenue since certain

10     instances, title and risks, are not transferred to the

11     customer at the same time?"

12     Is that what we were talking about earlier today about the

13 timing issue, that sometimes software gets delivered at a

14 different time than hardware?

15 **A.**   Let's be -- I just want to be specific.  It was -- we -- I

16 think the testimony on page, is it, 66 or 67, was specific to

17 the UBS contract; and this is a specific point about the UBS

18 contract where we could see the hardware was potentially

19 delivered -- or appeared to be delivered at a different time

20 from the software.

21 **Q.**   Right.  So it's the same issue we've been talking about;

22 right?

23 **A.**   It's the issue as it relates to the UBS contract, correct.

24 **Q.**   And timing?

25 **A.**   That's right.  Why was -- there was different delivery

GERSH - CROSS / LITTLE

1    times for hardware and software and the different delivery

2    times could impact the revenue recognition.

3    **Q.**    And you testified in your direct testimony, sir, that you

4    didn't know how much hardware was included with this contract

5    but you didn't think it was significant.  Do you recall that

6    testimony?

7    **A.**    Yes, I do.

8    **Q.**    Did you ask?

9    **A.**    We --

10   **Q.**    Did you ask how much hardware is in this contract?

11   **A.**    We never had an opportunity to ask any questions on the

12   contract.

13   **Q.**    Well, you had an opportunity to submit questions to HP for

14   them to ask; right?

15   **A.**    We submitted questions for HP to ask, but we never

16   received a response from HP or from Autonomy; and we -- the

17   questions we submitted were -- it was a very limited number of

18   questions.

19   **Q.**    No, we're going to talk about that.

20        So initially you sent this large number of questions to

21   HP; correct?

22   **A.**    Not this specific document.  This was -- I added to this

23   document and then sent the edited document to HP.

24   **Q.**    Okay.  All right.  So we'll talk about your edited

25   version.

1      Before we leave this version, just if you could look

2  quickly at page 11 about two thirds of the way down,

3  Agreement 28.  Mr. Leach asked you about this.  This is a

4  purchase order for additional storage.  Do you recall

5  testifying about this?

6  **A.**    Yes, I do.

7  **Q.**    And the fourth bullet, the question is (reading):

8          "Is revenue recognized upfront for the archive

9      storage cells (i.e., once title passes and delivery

10     occurs)?"

11     And storage cells, just to make sure we're on the same

12  page, that's hardware, right, with software involved?

13  **A.**    So the storage -- the contract --

14  **Q.**    An archive storage cell is a piece of hardware; right?

15  **A.**    So in the contract it's described as an archive storage

16  cell.  Our understanding is that this is an appliance sale; and

17  when it's an appliance sale, again, it -- we're looking at it

18  from they're selling software because you need the software for

19  the appliance to -- it's a software sale but something has to

20  deliver the -- there has to be a delivery mechanism for the

21  software.  So they're selling the hardware with the software.

22  **Q.**    Okay.  And then you forwarded these questions to your

23  team, and I'd like you to take a look at Exhibit 6517, which is

24  in evidence.

25     You can put that on the screen.

**GERSH - CROSS / LITTLE**

1    And just to orient us, down at the bottom we've got the

2    e-mail that we just talked about (reading):

3         "Andy -

4         "Attached is a list of 40 contracts," et cetera.

5    And then up at the top you respond (reading):

6         "You guys need to review these," you say.

7    And then you give some information.  And then the last

8    sentence (reading):

9         "I am working through the ones that they did not

10        review and I will change the template since as far as I

11        can tell, they have not captured free software or hardware

12        pass-through."

13   That's what you wrote to your team; correct?

14   **A.**   Yes, that's correct.

15   **Q.**   So you understood that there was pass-through hardware

16   sales?  Those are your words; right?

17   **A.**   Yes, those are my words; but so what I'm --

18   **Q.**   Sir, I just want to make sure that that's what you wrote.

19   Those are your words; right?

20        **THE COURT:**  Well, I'm going to allow him to explain.

21   Go ahead.

22        **THE WITNESS:**  Thank you.

23   So what we are -- software revenue recognition is

24   extremely complex and a lot of it depends on when you deliver

25   things and how things are delivered; and the reference to free

1    software or hardware pass-through and it's -- there's nothing

2    free in the contract.  It's just how they describe the

3    allocation of value to different elements.

4        And so you might -- I might have a contract which says

5    "We're going to give you a free -- free piece of software but

6    we're going to charge you $100 for another piece of software."

7    It's not really free.  It may be $50 for each piece.

8        On the hardware pass-through, we -- and this is coming

9    back to the UBS contract, and I could see it on the -- I think

10    there was two appliance contracts.  I didn't feel they

11    accurately captured the -- what was being sold.

12        So in my example where you might have, let's say,

13    something described as free software and you're charged for

14    another piece of software, it's a similar thing with hardware.

15    You have to understand what are the total components of the

16    sale so that you can then ensure that revenue's recognized

17    correctly when each component is delivered and the value is

18    allocated to the different components.

19        And while there are differences between IFRS and

20    U.S. GAAP, and we recognized and understood that, for HP we

21    were looking very much at what is the -- how would -- how would

22    some of these transactions look under U.S. GAAP; and to be able

23    to do that, we have to know every single component of every

24    single sale.

25    \\\

1    BY MS. LITTLE:

2    **Q.**   Including the hardware sales?

3    **A.**   Every single component of every single sale.

4    **Q.**   And based on the information that you looked at and your

5    team looked at in the data room, you were able to determine

6    that Autonomy had hardware pass-through; correct?

7    **A.**   I could see three hardware sales.  I could see two sales

8    that we believed were appliances and I could see the UBS sale,

9    which seemed to be sort of hardware pass-through; but we just

10   couldn't tell because it was the -- the UBS contract is what

11   appeared to be a solution where Autonomy was doing everything.

12        And when I -- whenever I refer to pass-through in this

13   instance, Autonomy is not a hardware manufacturer.  They've

14   claimed they're selling software.  So the only -- so if they

15   have hardware on their arrangements, they're going to a Dell or

16   an IBM or an HP because they've got to get hardware from

17   somewhere to be able to sell it.

18        So when we refer to pass-through, it's that pass through

19   of them purchasing it from somebody.  In this case in the UBS

20   arrangement they're doing the solution, they're not doing

21   anything to the hardware other than loading it with Autonomy

22   software and configuring the Autonomy software so that it

23   operates in the specific solution in the specific sort of

24   customer environment and application.

25   **Q.**   Let me just ask again.  Based on what Autonomy put in the

1   data room, you were able to determine that there was hardware

2   pass-through; correct?

3               **MR. LEACH:**  Objection.  Asked and answered.

4               **MS. LITTLE:**  Well, it was asked but not answered.

5               **THE COURT:**  Overruled.  Overruled.

6               **THE WITNESS:**  I was able to see that there was

7   hardware pass-through on the UBS contract.

8   **BY MS. LITTLE:**

9   **Q.**   Thank you.

10      All right.  I'd like to direct your attention to the top

11  40 list that we talked about and Mr. Leach talked to you about

12  on direct.

13      You took a look at Exhibit 2626 in your direct testimony.

14      And do you recall, sir, that you testified that this was a

15  top 40 customer list?

16  **A.**   (Witness examines document.)  Yes.

17  **Q.**   Then you also looked at Exhibit 2627, which we can put on

18  the screen.

19      And do you recall testifying that this was a top 40

20  contracts list?

21  **A.**   That was my understanding, yes.

22  **Q.**   And Mr. Leach asked you to be very clear that the first

23  one showed a list of customers and the second one showed a list

24  of contracts.  Do you recall that testimony?

25  **A.**   I do.

1  **Q.**  And looking in particular at this 2627, you talked about

2  the 45 million up at the top, and you testified 45 million is a

3  huge software contract.  Do you recall that testimony?

4  **A.**  Yes, I do.

5  **Q.**  You got these lists completely backwards, didn't you?

6  **A.**  That's what I was informed afterwards, but let me tell you

7  why I --

8  **Q.**  Let me -- how did you -- who informed you afterwards?

9  **A.**  Mr. Leach.

10  **Q.**  Okay.  Mr. Leach talked to you out in the hall at

11  lunchtime and told you that you got them backwards?

12  **A.**  Yes, he did.

13  **Q.**  Okay.  And these are the lists that you claim that you

14  studied so carefully; right?

15  **A.**  So during diligence, I studied these lists but I didn't

16  put them in the report because they didn't make sense.  So let

17  me explain why they didn't make sense.

18      If you're a big customer and you're signing a contract and

19  you're signing an MSA contract, you have -- you have one

20  contract with one company.  So the contracts we were seeing

21  were large sort of Master Service Agreements to a customer like

22  a UBS.  A UBS isn't going to sign three or four Master Service

23  Agreements.  They're going to sign one contract for the

24  software and it's likely to cover everything they would need

25  the software for.

1    So when we're looking at these two lists, to -- for

2    $45 million to be the revenue that's recognized in that year,

3    there would have to be multiple contracts, but that didn't --

4    that didn't make sense because a UBS isn't going to sign

5    multiple contracts for software.  They're going to sign one

6    contract.

7        So what we couldn't understand -- so to give you an

8    example, if UBS signs it -- let's say this $45 million contract

9    is for UBS.  The way that Autonomy recognized revenue is they'd

10   recognize the license when it was delivered and they would

11   recognize the support over time, and the support in the UBS

12   contract would be something like 5 percent.

13       So let's say this $45 million contract is a five-year

14   contract at 5 percent would be about $1 million.  You would get

15   a situation where you would have $40 million recognized as

16   license in the year it was delivered and then $1 million of

17   maintenance -- I'm getting the math slightly wrong, but let's

18   say a million dollars of maintenance each year.  And so UBS

19   isn't going to sign two or three different contracts of

20   $20 million to be able to get to $45 million.

21       So now I know they were selling hardware independently of

22   the software contracts, but at the time we didn't know they

23   were selling hardware independently of the software contracts.

24   But a company like Autonomy would never have three different

25   very large software arrangements with their clients.  They

1    would have one contract with their clients.  So you would

2    expect the contract value to be larger than the revenue that

3    was recognized in that year.

4    **Q.**    Okay.  You done?

5    **A.**    Did you understand that?

6    **Q.**    I'm not sure that I did, but I did understand one thing

7    you said, and I agree with it, which is that these lists make

8    no sense, do they?

9    **A.**    That is correct, they didn't make any sense at the time.

10   **Q.**    They're basically meaningless.  They don't give you any

11   meaningful information.  There's no customer.  They're not

12   helpful, are they?

13   **A.**    They're helpful in -- they're helpful in a couple of

14   respects.  It does give us the concentration of revenue, and

15   we're under the impression that 2626 is the revenue for the

16   contracts that year.  And I think in an e-mail Mr. Kanter sort

17   of confirmed I think the revenue for the top 40 contracts was

18   about 20 percent, which appeared consistent with 2626.

19        And 26 --

20   **Q.**    Actually, let's talk about 2626 for a minute.  Let's put

21   that up on the screen.

22              **MR. LEACH:**  Can he finish his answer, Your Honor?

23              **THE COURT:**  Yeah.  Go ahead.  Finish your answer.

24              **THE WITNESS:**  And then 2627 is significant because as

25   I mentioned before, $45 million is an enormous contract; and

1    it's complex software and it does some complex things but,

2    nonetheless, $45 million for the IDOL product is just extremely

3    significant.

4        It would -- so there is significant -- there's

5    significance in both these lists but it does -- the explanation

6    of contracts or revenue, it didn't make sense unless 26 --

7    based on what we knew, 2626 was the revenue for the year and

8    2627 was the contract otherwise they were selling products that

9    they weren't telling us about.

10   **BY MS. LITTLE:**

11   **Q.**   Well, let's go back to 2627 for a minute with the

12   45 million.  You keep talking about a $45 million contract, but

13   you've just testified that you got these lists backwards.  This

14   is the customer list, not the contract list; right?

15   **A.**   That's right, it is the customer; and that's what I

16   understand, this is the -- this is the revenue for those

17   customers, but --

18   **Q.**   But there's no $45 million contract.  You've got it

19   backwards; right?

20   **A.**   And that is correct, but we don't know what the value of

21   the contracts are because they've been redacted.  The

22   observation that we've made from -- so we put the contracts

23   backwards because if it's $45 million, then we haven't got

24   the -- we haven't been given the top contracts because you

25   can't get to a situation where you could get out of this list

1    of contracts to $45 million.

2         So we think that there's been an error in how it's been

3    described to us and we think that the 20 -- the 2626 list is

4    the revenue for those customers and the 2627 was the contract.

5    And so we -- so, A, we think there's been an error in how it's

6    been described to us; B, the top 40 contracts are a significant

7    portion of revenue; and then I'd say, C, on the 2627, the

8    $45 million is an enormous contract.

9    **Q.**    Okay.  All these -- I think we've established that's the

10   customer list, not the contract list.

11        Anyway, you're talking about all these things that are

12   significant.  You didn't -- that's what you think now.  You

13   didn't think that at the time, right, at the time you were

14   looking at these?

15   **A.**    No, I did.

16   **Q.**    Did you ask any questions about it in these questions that

17   we've seen you submitted to HP?  Did you ask any questions, a

18   single question about these lists?

19   **A.**    Yes.  We've asked -- we've asked about these lists.  We've

20   tried to get clarification as to what the revenue is to HP, and

21   we've got a response from Mr. Kanter in one of the -- there's

22   an e-mail communication between Mr. Sarin and Mr. Kanter around

23   the top, I think, 40 contracts, do they represent 30 percent of

24   the business or an amount and Mr. Kanter responded.

25        But when these documents were available, I don't have

1  another opportunity to speak to any of the individuals at

2  Autonomy so I can't ask Autonomy any of the questions.

3  **Q.**    No, but you can -- we've seen a number of questions that

4  you gave to Mr. Sarin to pose, and there's not a single

5  question saying, "Ask about these lists"; correct?  I mean,

6  when we go through it, if you see it, you let me know.  Okay?

7  **A.**    No, there is a question.  There's some e-mail

8  communication between Mr. Sarin and Mr. Kanter.

9  **Q.**    I'm asking about you to Mr. Sarin.

10  **A.**    There's no e-mail.

11  **Q.**    You never raised the issue about these lists that you now

12  claim are so important even though you got them backwards;

13  right?

14  **A.**    I don't have any e-mails between myself and Mr. Sarin, but

15  the question on these sort of lists is the one that Mr. Sarin

16  has asked Mr. Kanter.  We've been involved in those

17  discussions.

18  **Q.**    Let's just look one more time at 2626, which we've now

19  established is the contract list; correct?  You agree with me

20  on that now?

21  **A.**    You and Mr. Leach have told me it's the contract list.

22  **Q.**    Okay.  You never even saw this list when you were doing

23  the due diligence; correct?

24  **A.**    Originally I couldn't recall it, but I saw an e-mail which

25  reminded me that I'd seen it.

1    **Q.**   When you were originally shown this list, you didn't

2    recognize it; correct?

3    **A.**   That is correct, I didn't recognize it; but, as I said, I

4    went back and looked through some of the e-mails I do have on

5    the transaction, and I remember it.  I remember we specifically

6    didn't put it in our report because it didn't make sense.

7    **Q.**   Okay.  Do you recall the first time you talked to the

8    Government about this list and indicating that you'd never seen

9    it before?

10   **A.**   I can't remember which of the meetings.  I know we

11   discussed it at the Grand Jury.

12   **Q.**   How about the day before on July 6?  Do you recall talking

13   to the Government about this list?

14   **A.**   I can't recall.

15   **Q.**   Would you take a look, sir, in your book at page --

16   Exhibit -- the white book -- Exhibit 5078 at page 6, the

17   paragraph it's I guess the one, two, three, fourth paragraph

18   beginning "Gersh could not remember"?  Do you see that?

19   **A.**   (Witness examines document.)  Sorry.  Which page and

20   paragraph?

21   **Q.**   Page 6, the one, two, three, four, fifth full paragraph

22   that begins "Gersh could not remember..."

23   **A.**   (Witness examines document.)  Yes, I do.

24          **MS. LITTLE:**  Your Honor, I'd like to read this.

25          **THE COURT:**  That's consistent with his testimony.  No.

1   He said when he first discussed it or when he discussed it, he

2   didn't remember.  Then he saw some e-mails and it refreshed his

3   recollection.  That's his testimony.

4          MS. LITTLE:  Okay.

5   Q.   The Government refreshed your recollection; right?

6          THE COURT:  Fine.  Okay.  You can ask that.

7          THE WITNESS:  No, the Government didn't refresh my

8   memory.  I went back and I looked at some of the e-mails that

9   we had retained, and I saw references to it and my involvement

10  in those e-mails; and while I couldn't recall the exact numbers

11  that were there, I recalled the lists and I recalled why we

12  didn't put them in the report.

13  BY MS. LITTLE:

14  Q.   But you also recalled and you told the jury that the

15  actual document itself did not help you in your findings;

16  correct?

17  A.   That is correct.

18         MS. LITTLE:  I have got probably another 15 minutes.

19  Do you want me to keep going or do you want to take a break?

20         THE COURT:  No, I'd like to keep going and finish.

21         MS. LITTLE:  All right.  Let's talk about the report

22  itself, which is Exhibit 2215.  It's in evidence.

23      And with the Government's permission, I'd like to use --

24  we have a color version of the report that's Exhibit 2204.

25  Would you object if we use that?  It's a little easier to see.

1          **MR. LEACH:**  No objection.

2          **MS. LITTLE:**  Okay.  So let's -- Your Honor, I would

3     offer 2204, which is another copy of the report but it's in

4     color.

5          **THE COURT:**  Admitted 2204.

6        (Trial Exhibit 2204 received in evidence)

7          **MS. LITTLE:**  Thank you.

8  **Q.**   Directing your attention, sir, to page 3 of this report.

9  I know Mr. Leach went through some pages.  I want to show you

10 some different pages.

11 **A.**   Uh-huh.

12 **Q.**   Let me find it myself.

13      I'd like to direct your attention to page 3.  This is the

14 cover letter that goes to Meeta Sunderwala at Hewlett Packard.

15 Who's Meeta Sunderwala?

16 **A.**   Meeta Sunderwala is the -- she was a senior director in

17 the Enterprise Financial Reporting Group at HP at the time.

18 She's the person we were dealing with on sort of a day-to-day

19 basis at that part of -- on the financial side, not the

20 corporate development side.

21 **Q.**   And at the very first sentence you say (reading):

22          "Dear Meeta -

23          "We have not yet completed our engagement to assist

24      Hewlett Packard in performing due diligence," et cetera.

25      And then the last sentence of that paragraph you say that

1  your report will be updated as further data and access is

2  provided.  Is that what you wrote to Ms. Sunderwala?

3  **A.**  Yes, that's what I wrote.

4  **Q.**  And, in fact, this report never was updated, was it?

5  **A.**  That's correct, it was not updated.

6  **Q.**  Okay.  Take a look at page 7 of the report.  I'd like to

7  direct your attention to the top box, "Due Diligence Process,"

8  and you write (reading):

9          "Due diligence comprised telephone discussions with

10      management and access to very limited proprietary

11      financial and tax information."

12      That's true; right?

13 **A.**  That is true, correct.

14 **Q.**  And then the second bullet you write (reading):

15          "This acquisition is under the remit of the U.K. City

16      Code or Takeover and Mergers (The Code).  The rules in The

17      Code regarding treatment of bidders frequently results in

18      very limited information being provided prior to a

19      transaction closing.  The data and access provided to us

20      during due diligence was very limited but was comparable

21      with other acquisitions involving large U.K. publicly

22      traded companies."

23      Is that correct?

24 **A.**  That was correct at the time, yes.

25 **Q.**  And you wrote that and you agree with it; right?

**GERSH - CROSS / LITTLE**

1   **A.**   Yes, I wrote it and I agree with it.

2   **Q.**   And then just briefly the paragraph "Revenue Recognition,"

3   we've talked about this earlier (reading):

4          "Target recognizes revenue in accordance with IFRS."

5      That's correct; right?

6   **A.**   That is correct, yeah.

7   **Q.**   Okay.  And then turning to page 12 of the report, just you

8   highlighted again for HP, "This report reflect our due

9   diligence."  And the last sentence says (reading):

10       "The limited provision of data is not unusual in

11      acquisitions of U.K. public companies."

12      Correct?

13   **A.**   Sorry.  What was the question?

14   **Q.**   Well, that was your understanding -- right? -- that the

15   limited provision of data -- the data was limited in what was

16   provided but that's not unusual for U.K. mergers; correct?

17   **A.**   That's correct, for acquisitions of U.K. public companies

18   at the time, yes.

19   **Q.**   And then looking at page 13, you're talking about various

20   differences between IFRS and U.S. GAAP; correct?

21   **A.**   Yes, that's correct.

22   **Q.**   And the one, two, third bullet that you highlight is a

23   difference between U.S. GAAP and IFRS is that under IFRS

24   sell-in versus sell-through.  Under IFRS you recognize revenue

25   when it goes to a reseller not necessarily when the reseller

1    sends it on to a customer; correct?

2    **A.**    No, that's not correct.

3    **Q.**    Okay.  What's --

4    **A.**    Both IFRS and U.S. GAAP provide for you can recognize

5    revenue on both sell-in or sell-through under both bases of

6    accounting.  HP's policy was -- and it's this criteria which

7    determines when you can recognize it on sell-in and

8    sell-through both under IFRS and U.S. GAAP.

9        HP typically takes a very -- their typical policy is

10    sell-in.  It may be sell-in for all their business just out of

11    expediency, but it's not an IFRS/U.S. GAAP difference.  It's a

12    policy difference.

13        In this case IFRS has got -- has got criteria and rules

14    about when you can recognize revenue on sell-in versus

15    sell-through.

16    **Q.**    But you understood that Autonomy recognized revenue on

17    sales to resellers on a sell-in basis; correct?

18    **A.**    That's correct.

19    **Q.**    And that was approved by Deloitte?  Is that your

20    understanding?

21    **A.**    It's -- Deloitte doesn't approve their accounting.

22    Deloitte audits their financial statements.

23    **Q.**    Fair enough.

24        Okay.  Finally, I want to show you page 67 of this report,

25    and up in the top left you say (reading):

1          "Procedures that could not be performed appear in

2      bold."

3      Right?

4  **A.**   (Witness examines document.)  Sorry.  Which page is it?

5  **Q.**   Page 67.

6  **A.**   (Witness examines document.)  Sorry.  I don't have it in

7  this book.

8  **Q.**   You don't have page 67 of Exhibit 2204?

9  **A.**   (Witness examines document.)

10  **Q.**   It should be in color.  It should be a color copy.

11          **MR. LEACH:**  The exhibit page is 16.

12          **THE WITNESS:**  Yeah, I've got it in the black-and-white

13  one.

14  **BY MS. LITTLE:**

15  **Q.**   Okay.  So it says "SOW Procedures."  That's your Statement

16  of Work procedures; right?

17  **A.**   That is correct.  These are the Statement of Work

18  procedures.

19  **Q.**   And the first lines you're listing various procedures, but

20  you explain at the top, "Procedures that could not be performed

21  appear in bold"; correct?

22  **A.**   That is correct.

23  **Q.**   And then you list a number of things.  Then in the

24  left-hand column all of them are in regular type, they're not

25  in bold; but over in the right-hand column -- and it's probably

GERSH - CROSS / LITTLE

1    hard to see on the screen, but the jurors will have the actual

2    hard copy -- Item Number 5 is in bold; correct?

3    **A.**    (Witness examines document.)  Yes, it is.

4    **Q.**    And so one of the things that could not be done is reading

5    the auditor work papers; correct?

6    **A.**    That is correct.

7    **Q.**    Okay.  And then down beneath, Item Number 6 you talk about

8    obtaining and reading materials, outlining target's historical

9    revenues.  And other than the first one, all of these other

10   items listed below are in bold, which means that you did not

11   review them; correct?

12   **A.**    (Witness examines document.)

13   **Q.**    Work that was not able to be performed is the way you put

14   it.

15   **A.**    Yes.  Work that could not be performed or work that could

16   not be completed is how I would sort of characterize it because

17   we tried to inquire about all of these items with Mr. Hussain

18   on the revenue recognition call and subsequent calls, but we

19   weren't able to complete them.

20   **Q.**    Are you saying you asked all of these questions in bold on

21   the various calls that you had, the one-hour calls?

22   **A.**    (Witness examines document.)  We asked the majority of

23   these questions.  I don't know if we asked -- I couldn't -- I

24   can't say we specifically asked about every single question,

25   but we've asked the majority of them.  I may not have asked

1  about cutoff, for instance, but we've asked about acquisition,

2  organic growth, revenue and cash collections, discounts,

3  seasonality, foreign exchange, the pricing model, the trends,

4  the revenue composition, the methodology for establishing fair

5  value.  So we've asked what we would view as the most important

6  ones in this section.

7  **Q.**  And then one of the -- the third bullet, one of the items

8  that you say was information that you were not -- work you were

9  not able to complete was revenue composition, for example,

10 license, professional services, hosting, maintenance; correct?

11 **A.**  It's the full -- the full question.  It's revenue

12 composition, license professional services, hosting,

13 maintenance by significant product and offering.

14 **Q.**  Okay.  And you understood, sir, that it's the choice of

15 the company that's being acquired as to what they will share,

16 and you're simply highlighting to HP what information was not

17 available to you; correct?

18 **A.**  We're highlighting the procedures that we couldn't

19 complete.

20 **Q.**  But, again, it's the choice of the company that's being

21 acquired to decide what they will and won't share; right?

22 **A.**  Yes, that is correct.

23 **Q.**  And if HP doesn't want to do the deal, they can walk away?

24 **A.**  Yes, that's correct.

25 **Q.**  So you sent this report on to HP.  If we take a look

1    quickly at Exhibit 2215, on August 10th you send the report to

2    HP and you say, "Look forward to discussing tomorrow"; correct?

3    **A.**    Yes, that's correct.

4    **Q.**    And you did, in fact, have a phone call to discuss this

5    report with various representatives of HP; correct?

6    **A.**    That's correct.

7    **Q.**    If you would take a look, sir, in your book at

8    Exhibit 6521, which is not yet in evidence, but I'd like to

9    offer it.  It's an e-mail setting up the phone call.

10    **A.**    Sorry.  Which?

11    **Q.**    6521.

12            **MR. LEACH:**  No objection.

13            **MS. LITTLE:**  With no objection, I'd ask that it be

14    admitted.

15            **THE COURT:**  Admitted.

16        (Trial Exhibit 6521 received in evidence)

17    **BY MS. LITTLE:**

18    **Q.**    This is a calendar invite for the call, and under

19    "Required Attendees," this lists the various people from HP and

20    from your organization that would attend this call; right?

21    Mr. Sarin, Ms. Harvey, Mr. Johnson, you, Mr. Smith, Ms. Hsiao,

22    Mr. Bhagat; correct?

23    **A.**    Yes.  That's a list of some of the individuals on the

24    call.

25    **Q.**    And there were other people on the call; right?  There

1  were from HP Mr. Blank and Mr. Thomas -- do you recall? --

2  Mr. Hammerschmidt?

3  **A.**    I don't recall if they were on or not.  I know

4  Mr. Thomas -- and it's Rusty Thomas, he's a KPMG partner -- he

5  would be on, possibly a Mr. Steve Messier.  I can't remember

6  who was on from -- or which EFR individuals were on.

7  John Blank being part of the EFR time.

8  **Q.**    There were a number of people from HP on the call; right?

9  **A.**    Yes, there were a number of people from HP on the call.

10  **Q.**    And they had the opportunity to ask whatever questions

11  they wanted to ask?

12  **A.**    Yes.

13  **Q.**    Mr. Leach asked you some -- we can take that down.

14      Mr. Leach asked you some questions about audit work

15  papers, and he asked you whether it was common or uncommon to

16  obtain audit work papers.  Do you recall that?

17  **A.**    Yes, I do.

18  **Q.**    You actually looked into this issue in 2011 and you

19  learned that it is rare to get work papers in a U.K.

20  acquisition; correct?

21  **A.**    That is correct.

22  **Q.**    Okay.  And just looking quickly at Exhibit 2249, which is

23  in evidence, you say in here that, in fact, it is an infrequent

24  occurrence.  Second paragraph you stated that audit work paper

25  is granted sometimes but it is an infrequent occurrence;

1   correct?

2   **A.**   That is correct.

3   **Q.**   That's because of the U.K. takeover rules and the fact

4   that it could be -- once you disclose to one bidder, it can be

5   disclosed to other bidders; correct?

6   **A.**   That's right.  So I think just to be clear, it's not --

7   the U.K. takeover rules don't limit what you can and can't

8   provide.  It was market practice at the time that --

9   **Q.**   The takeover rules create consequences if you provide

10  information?

11  **A.**   That is correct, they create consequences if you provide

12  information.

13          **THE CLERK:**  Ms. Little, 2249 is not in.

14          **MS. LITTLE:**  Oh.  I'm told 2249 is not in evidence,

15  and I'd like to move it in.

16          **THE COURT:**  Admitted.

17      (Trial Exhibit 2249 received in evidence)

18          **MS. LITTLE:**  Thank you.

19  **BY MS. LITTLE:**

20  **Q.**   All right.  So once it was determined there was no access

21  to the work papers, it was agreed that instead there would be a

22  call with Deloitte; correct?

23  **A.**   Yeah.  HP and Autonomy agreed that we would have a call

24  with the auditors.

25  **Q.**   And that call took place on August 17th; correct?  We can

 1  look at Exhibit 2254, which is a calendar invite.

 2          **MS. LITTLE:**  I'd move it in.

 3          **THE COURT:**  Admitted.

 4      (Trial Exhibit 2254 received in evidence)

 5  **BY MS. LITTLE:**

 6  **Q.**   Is this a calendar invite for the call with the auditors,

 7  sir?

 8  **A.**   Yes, it's a calendar invite for a call with Deloitte.

 9  **Q.**   And you and your team and some of HP's folks were on that

10  call?

11  **A.**   Yes.  I'm on that call, one of my colleagues is on the

12  call, there's representatives from HP, Autonomy, and Deloitte.

13  **Q.**   And during -- and also Mr. Hussain I think was on that

14  call and Mr. Kanter?

15  **A.**   Yes, they were.

16  **Q.**   And during that call, you went through a number of written

17  questions and questions were asked and Deloitte gave answers;

18  correct?

19  **A.**   That's correct, yes.

20  **Q.**   And at the end of the call, Deloitte discussed a complaint

21  that had been made by an Autonomy employee alleging that

22  Autonomy had engaged in some accounting improprieties.  Do you

23  recall that?

24  **A.**   Yes, I do.

25  **Q.**   A whistleblower?

1    **A.**    It was a complaint.  Using the term "whistleblower," I

2    don't know if they used that term or it was used on the call

3    but it was a complaint about the accounting.

4    **Q.**    Throughout this due diligence process, sir, HP never

5    complained to you that you weren't doing enough, did they?

6    **A.**    No, not that I recall.  They -- we had daily calls.  We

7    were having multiple calls every day to discuss what we could

8    and what we couldn't do.

9    **Q.**    And HP never complained that the process was too rushed,

10   did they?

11   **A.**    HP never complained to me that it was too rushed, no.

12   **Q.**    And it's fair to say, sir -- we've seen some of the

13   e-mails that you sent to Mr. Sarin -- you recommended more

14   questions be asked than HP actually did ask; correct?

15   **A.**    We recommended a number of questions that were asked, and

16   we sent a number of request lists across but I don't know if HP

17   managed to ask them or not.

18   **Q.**    And Mr. Sarin would sometimes narrow the questions?  He'd

19   say, I think you said on direct, "We can only -- we can't ask

20   them all.  Let's ask three"?

21   **A.**    That's right.  On the contracts, that's correct.

22   **Q.**    After this project was done, sir, you continued to do work

23   for HP?

24   **A.**    On this particular engagement or --

25   **Q.**    This engagement or any engagement.

1    **A.**    Yes, I did.

2    **Q.**    And you still do work for them today?

3    **A.**    I work for one of the HP companies today.

4          **MS. LITTLE:**  Nothing further.

5          **THE COURT:**  Okay.  Ladies and gentlemen, we will be in

6    recess until five minutes to 11:00.

7       Remember the admonition given to you:  Don't discuss the

8    case, allow anyone to discuss it with you, form or express any

9    opinion.

10                 (Recess taken at 10:36 a.m.)

11              (Proceedings resumed at 10:54 a.m.)

12       (Proceedings were heard out of presence of the jury:)

13          **THE CLERK:**  Come to order.  Court is now in session.

14          **MS. LITTLE:**  Your Honor, there was one document I

15    forgot to admit.  I've checked with --

16          **THE COURT:**  Oh, it's too late.

17          **MS. LITTLE:**  Ah, come on.

18          **THE COURT:**  Okay.

19          **THE CLERK:**  Which one?

20          **MS. LITTLE:**  2182.

21          **THE COURT:**  Do you want to do it in front of the jury?

22          **MS. LITTLE:**  I'm not going to question him about it.

23          **THE COURT:**  What document is it?

24          **MS. LITTLE:**  It's an email from Mr. Gersh to Mr. Sarin

25    transmitting --

1           **THE COURT:**  Number --

2           **MS. LITTLE:**  I'm sorry.  2182.

3           **THE COURT:**  Okay.  Admitted.

4           (Trial Exhibit 2182 received in evidence)

5        (Proceedings were heard in the presence of the jury:)

6           **THE COURT:**  Please be seated.  Okay.

7      Let the record reflect that all parties are present, all

8  jurors are present.

9        You may proceed.  Any questions?

10          **MR. LEACH:**  Question, Your Honor.  Thank you.

11                    <u>**REDIRECT EXAMINATION**</u>

12  BY MR. LEACH:

13  **Q.**   Good morning, Mr. Gersh.

14       Good morning, ladies and gentlemen.

15       Mr. Gersh, you put a number of questions to Sushovan

16  Hussain during due diligence; is that correct?

17  **A.**   That's correct, yes.

18  **Q.**   And did you expect truthful answers from him?

19  **A.**   Yes, I did.

20  **Q.**   Did you think it was acceptable if Mr. Hussain didn't want

21  to answer the question to not give you truthful answers?

22  **A.**   No.  That wouldn't be acceptable.

23  **Q.**   For example, if you asked about A, B, and C and he didn't

24  want to tell you about A, B and C, did you think it was okay

25  for him to lie about A, B and C?

1   **A.**   No.   I did not think it would be okay to lie.   I would

2   just expect him not to answer the question.

3   **Q.**   Okay.   You testified about the initial due diligence call

4   on August 1st, 2011.   Do you recall some cross-examination

5   about that?

6   **A.**   Yes.

7   **Q.**   This is the call that you -- where you were in Florida?

8   **A.**   Yes.

9   **Q.**   Was this an overview of Mr. Hussain -- of Autonomy's

10   second quarter of 2011 financial results?

11   **A.**   It was an overview of the first half results, the H1

12   results, the interim -- essentially the interim statements and

13   the investor presentation that Autonomy prepared.

14   **Q.**   Okay.   And who went through those numbers for the second

15   quarter of 2011?

16   **A.**   Mr. Hussain.

17   **Q.**   And I believe you said there was no new information on

18   that call.   Can you explain what you meant by that?

19   **A.**   That's right.   It was -- there was -- he -- he described

20   the -- so he presented the different pages in the investor

21   presentation, referred to the financial numbers in the first

22   half report, but there was no new information that wasn't

23   already described in the -- in the interim statement or the

24   investor presentation and which we'd seen prior to the call.

25   **Q.**   So you had read the company's press release for the second

GERSH - REDIRECT / LEACH

1    quarter of 2011?

2    **A.**    Yes.

3    **Q.**    You read the investor presentation?

4    **A.**    Yes.

5    **Q.**    Did you rely on the accuracy of those?

6    **A.**    Yes.

7    **Q.**    Was Mr. Hussain on this August 1st, 2011 call essentially

8    repeating those numbers that you were relying on?

9    **A.**    Yes.

10    **Q.**    Were those numbers somehow unimportant to you?

11    **A.**    No.  They were -- they were critically important.  They

12    were -- they were a fundamental -- they were fundamental to the

13    diligence work we were doing.  They were the core numbers that

14    we were -- we were looking into as part of our diligence and

15    that HP were utilizing for their investment case.

16    **Q.**    You were asked some questions about KPMG's policy

17    regarding keeping its notes.  Do you recall that testimony?

18    **A.**    Yes, I do.

19    **Q.**    Is that something that's unique to this acquisition?

20    **A.**    No.  We have firm policies regarding document retention on

21    engagements.

22    **Q.**    There is nothing about KPMG's policy that is different

23    from any of the other engagements that it -- or activities here

24    that are different from other engagements KPMG has?

25    **A.**    Correct.  This was consistent with other engagements that

1   I've led and that other parties would lead.

2   **Q.**   And why -- at the conclusion of your work, you prepare a

3   due diligence report?

4   **A.**   We will prepare -- we will prepare a due diligence report

5   during the process.  We might issue more than one report, but

6   ultimately the conclusion of our report -- we'll either issue a

7   final report or we'll issue a -- something called a closure

8   letter if the client doesn't require a final report.

9   **Q.**   Let's focus on the report in this case, your due diligence

10   report.  You consider that to be an important document in the

11   context of your work?

12   **A.**   Yes.  It's an important document.

13   **Q.**   What do you mean by that?

14   **A.**   It captures our findings from due diligence through --

15   through the date that the report was issued and it captures

16   what we think -- think is important to HP and that they should

17   know about through that particular date.

18   **Q.**   And based on your report, can you say with confidence that

19   no one from Autonomy disclosed to you that it was selling $100

20   million worth of hardware in 2010?

21   **A.**   Correct.  Nobody from -- from Autonomy ever disclosed

22   they're selling $100 million of hardware.

23   **Q.**   Do you need your notes to remember that?

24   **A.**   No.

25   **Q.**   Based on your report, can you say with confidence that no

1   one from Autonomy disclosed to you that Autonomy sold hardware

2   on a standalone basis?

3   **A.**   Yes.

4   **Q.**   And can you say that with confidence without your notes?

5   **A.**   Yes.

6   **Q.**   I'd like to go back to the due diligence calls, please.

7   If we could please display what is in evidence, Exhibit 2083.

8                  (Exhibit published to jury.)

9   **BY MR. LEACH:**

10  **Q.**   If we could please go to the third page.

11       Mr. Gersh, do you recognize these as the questions you

12  asked in your August 2, 2011 diligence call?

13  **A.**   Yes.

14  **Q.**   These are questions that you prepared?

15  **A.**   Yes.  I prepared them.

16  **Q.**   And I draw your attention back to question 1 and question

17  1-A.

18       Can you say with confidence, Mr. Gersh, that you asked

19  questions of Mr. Hussain during the diligence that, if

20  responsive, should have elicited Autonomy sold $100 million of

21  hardware in 2010?

22  **A.**   Yes.

23  **Q.**   Explain that for us, please.

24  **A.**   So in question 1, I'm asking him to describe their sales

25  model by product or vertical.  We want to know what are they --

1    what are they selling.

2         So we can't understand what they're selling in the

3    financial statements.  We've got the general description of --

4    or their description of products.  But we want them to go into

5    much more detail and be explicit about the different components

6    within each of those models because -- and to one of my earlier

7    responses, we need to know exactly what they're selling, how

8    they're selling it, and the different components in the

9    different offerings because of the implication for -- for how

10   HP would have to consider the revenue recognition.

11   **Q.**   Okay.  Had multiple conversations with Sushovan Hussain

12   during the diligence process; is that correct?

13   **A.**   We had -- I think I was on five calls with Mr. Hussain.

14   **Q.**   Is it fair to say you asked multiple questions that, in

15   your mind, should have elicited Autonomy's sales of hardware on

16   the standalone basis?

17   **A.**   Yes.

18   **Q.**   Is it fair to say you asked numerous questions that should

19   have elicited Autonomy sold $100 million in hardware in 2010?

20   **A.**   Yes.

21   **Q.**   Could we please display what is in evidence as Exhibit

22   2130.

23                    (Exhibit published to jury.)

24   **BY MR. LEACH:**

25   **Q.**   Do you recall some questioning about this email alerting

GERSH - REDIRECT / LEACH

1    you to information that was in the data room?

2    **A.**    Yes.

3    **Q.**    Okay.  And if we could please look at page 2.

4         Up at the top, do you see where it says "Copy of Top 40

5    contracts, 2010 through '11, final"?  Do you see that?

6    **A.**    Yes.

7    **Q.**    And was it your understanding in some form or another you

8    were getting Autonomy's top 40 contracts by revenue in 2010 to

9    2011?

10   **A.**    Yes.

11   **Q.**    Did you in any way limit that to only certain contracts?

12   **A.**    No.

13   **Q.**    Do you see where it says "Top 40 Customer Analysis,

14   2010-2011, final"?  What did you understand you were getting

15   there, Mr. Gersh?

16   **A.**    What I understood was I was getting the revenue for the --

17   or the -- the list of customers that represented the -- the

18   largest 40 customers by revenue for that period, 2010 to '11.

19   **Q.**    Did you ever instruct somebody to take out particular

20   customers?

21   **A.**    No.

22   **Q.**    Did anyone ever tell you that certain customers were being

23   removed from the list?

24   **A.**    No.

25   **Q.**    Did you rely on the information that was in the data room?

1    **A.**    Yes, I did.

2    **Q.**    Why do you say that?

3    **A.**    Because, you know, HP and Autonomy are -- were large

4    public companies.  They had a responsibility -- we had -- we

5    believed they had a responsibility to share accurate and honest

6    data with us, and if they put something in the data room and

7    they represented that was -- and they labeled it top 40

8    contracts or here is a contract for customer X, we assumed it

9    was accurate.

10    **Q.**    And you relied on it?

11    **A.**    And I relied on it.

12    **Q.**    Ms. Little showed you a number of other updates in Exhibit

13    6830.  I don't think we need to display it.

14        But my question, Mr. Gersh, is there was other information

15    in the data room besides the top 40 lists and the top 40

16    contracts; isn't that right?

17    **A.**    That is correct.

18    **Q.**    What other categories of information, as best you can

19    remember, was Autonomy placing in the data room?

20    **A.**    So the categories I can recall, there was tax information

21    around some of their structuring and around their assessment of

22    losses that could be utilized.  It was called a Section 382

23    analysis.

24        There was quite a lot of material around health and

25    welfare plans and stock option plans, mostly employee-type --

GERSH - REDIRECT / LEACH

 1   type documents.

 2        And there were some -- there were -- from -- from the list

 3   Ms. Little provided, there were some other agreements around

 4   OEMs, but it was -- there was nothing in those agreements

 5   that -- you know, that I can recall, but I -- there was nothing

 6   in those agreements because we didn't -- there was nothing in

 7   those agreements that changed our findings from the list of

 8   contracts that we -- the initial list of contracts we saw or

 9   our report, because we didn't -- we would have updated HP on

10   them.

11        I remember reading the OEM contracts.  It was -- from

12   recollection, they were bland.  I couldn't recall anything

13   unusual about them.

14   **Q.**   Okay.  Could we please display what is in evidence as

15   Exhibit 2626.

16                     (Exhibit published to jury.)

17   **BY MR. LEACH:**

18   **Q.**   Do you recall some cross-examination about this particular

19   list, Mr. Gersh?

20   **A.**   Yes, I do.

21   **Q.**   And I draw your attention to some of the industries listed

22   to the right.  Do you see that?  Do you see where it says,

23   "Bank, Bank, Energy, European Government"?

24   **A.**   Yes, I do.

25   **Q.**   And do you see where there's an entry for 11,550,000

**GERSH - REDIRECT / LEACH**

1  associated with a European government?

2  **A.**   Yes, I do.

3  **Q.**   And the listing of these industries, was this validation

4  for you that Autonomy was selling to reputable customers?

5  **A.**   It -- it was another data point to support the position

6  they were selling to reputable customers, yes.

7  **Q.**   At any point did anyone from Autonomy tell that you this

8  $11.55 million amount was never sold to a European government?

9  **A.**   No.

10  **Q.**   That this had been sitting with a reseller for more than a

11  year and a half?  Did anybody ever tell that you?

12  **A.**   No.  Nobody told us that.

13  **Q.**   Would that have been relevant to you?

14  **A.**   Yes.  Very relevant.

15  **Q.**   Why is that?

16  **A.**   Because why -- well, if I was looking at it from a U.S.

17  GAAP perspective, if you have got an $ 11.5 million on this

18  contract and this isn't off-the-shelf, sort of, shrink wrap

19  software like a Microsoft license; this is very complex where

20  you are selling solutions to specific customers.

21      If something was sitting for a year and a half with

22  somebody, then it -- I -- I would have come to the conclusion

23  there was no real sale.  It was more of a financing transaction

24  where somebody was making a loan in exchange for -- for an

25  asset or else there was a significant discount or it wasn't an

1    appropriate sale because resellers -- no reseller wants to hold

2    onto software for a year and a half.  You're acting like a bank

3    if you're doing that.

4    **Q.**    Can we please display what is in evidence as Exhibit 963.

5                        (Exhibit published to jury.)

6    **BY MR. LEACH:**

7    **Q.**    If we could please go to the next -- I'm sorry.  973,

8    please.

9                        (Exhibit published to jury.)

10    **BY MR. LEACH:**

11    **Q.**    Mr. Gersh, on cross-examination, you were asked a number

12    of questions about the UBS contract that you observed in the

13    data room.  Do you remember?

14    **A.**    Yes, I do.

15    **Q.**    And you understand that -- understood that at the time to

16    be a solution -- a package solution; is that fair?

17    **A.**    That's fair, yes.

18    **Q.**    Hardware, software, and services sold together?

19    **A.**    That's correct.

20    **Q.**    And did that in any way alert you to the fact that

21    Autonomy was selling a hundred million dollars worth of

22    hardware in 2010?

23    **A.**    No.

24    **Q.**    Why not?

25    **A.**    Because it's a solution sale so we can -- we -- they're a

GERSH - REDIRECT / LEACH

1  software business, but as software businesses evolve, they look

2  to sell larger contracts, and customers sometimes want a --

3  sort of just one vendor or one prime contractor if they are

4  doing a very large sort of implementation or installation of

5  software.

6       So to us, it just -- it -- it supported the position that

7  Autonomy was a growing company and it was looking to get larger

8  and larger contracts with more -- with sort of increasingly

9  sophisticated buyers and/or customers, and as that was the

10 case, it would have to start sort of including more components

11 in the overall offering.

12 **Q.**   And I've placed before -- on the screen Exhibit 973, this

13 $7 million purchase order with Zones.  This is something you

14 did not see in the data room; right?

15 **A.**   That is correct.  I did not see this in the data room.

16 **Q.**   Do you distinguish this from the UBS contract that you did

17 see?

18 **A.**   Yes.

19 **Q.**   How was that?

20 **A.**   This is the sale of something that is completely different

21 from the UBS contract.  The UBS contract is a solution sale of

22 an Autonomy sort of product and service that is going to be

23 used, and the core element that UBS is using is the Autonomy

24 software.

25      This is just the sale of, you know, screens and personal

1    computers to, I think, to H&R Block.  There is no Autonomy

2    software here at all.  It's a -- this is a different business

3    from Autonomy.

4        Autonomy -- Autonomy's a software company that sells

5    software.  This is -- this is -- this is like -- this is sort

6    of Dell selling to a reseller and Autonomy is inserting itself

7    between the normal reseller and Dell for -- for -- I don't know

8    what the purpose is that -- this reseller would probably

9    normally go to Dell directly, and it's -- maybe it's getting

10   some concession from Autonomy or something, but there is no --

11   there doesn't seem any logical business reason for Autonomy to

12   be --

13   Q.   Would this raise a big red flag for you, Mr. Gersh?

14   A.   Yes.

15   Q.   Was this responsive to question 1-A that we looked at?

16   A.   They did not provide this in response to our question 1-A.

17   Q.   Would this have been responsive to your question?

18   A.   Yes, it would have been responsive.

19   Q.   If we could please go back to Exhibit 2626.

20                    (Exhibit published to jury.)

21   BY MR. LEACH:

22   Q.   If we could please highlight line 6, line 10, line 24,

23   line 33, and line 34.

24       Do you see where it says, "U.S. government,

25   Pharmaceutical, Technology, U.S. government, Media," Mr. Gersh?

1   **A.**    Yes, I do.

2   **Q.**    At any point in time, did anybody from Autonomy tell you

3   that the product referenced with respect to those customers had

4   not sold through to the U.S. government, a pharmaceutical

5   company, a technology company, or a media company?

6   **A.**    No, they did not.

7   **Q.**    Would that have been relevant to you?

8   **A.**    Yes, it would have been relevant.

9   **Q.**    Why is that?

10  **A.**    Because it -- similar to my first point, in this case,

11  the -- why would a reseller be holding such large complex

12  licenses because it's not -- the reseller isn't the one making

13  the sale.  Autonomy is still making the sale, because these are

14  large complex contracts.

15      So they're not -- a customer doesn't just go out and buy a

16  $4 million license.  They'd probably be negotiating with them

17  for months and months.

18      So ultimately Autonomy is intimately involved in every

19  single sale with these licenses, and they are probably just

20  getting the reseller to do the installation and implementation.

21      So the time lag between selling in and ultimately going to

22  the customer should be a very short -- short period of time.

23  It might be -- there might be a gap at the end of the quarter,

24  but it shouldn't be -- it shouldn't be an extended period.

25  **Q.**    Thank you, Mr. Gersh.

1    Thank you, Your Honor.  I have nothing further.

2         **THE COURT:**  Ms. Little?

3         **MS. LITTLE:**  Very briefly, Your Honor.

4                    <u>**RECROSS-EXAMINATION**</u>

5    **BY MS. LITTLE:**

6    **Q.**   Could we please put back up Exhibit 2083.  And

7    specifically, the question 1-A that Mr. Leach was asking you

8    about.

9                    (Exhibit published to jury.)

10   **BY MS. LITTLE:**

11   **Q.**   You have told Mr. Leach about various things that you say

12   Mr. Hussain did not say, but I just want to make sure that we

13   are really clear about this.

14        That as part of the response to question 1 of the

15   attachment, on that August 2nd call, Mr. Hussain said that

16   Autonomy sold hardware as a matter of convenience; is that

17   true?

18   **A.**   Mr. Hussain said they sell hardware with the appliance

19   function as a matter of convenience, but it was in the context

20   of the appliance product.

21   **Q.**   He said that Autonomy sold hardware as a matter of

22   convenience when software was needed for the hardware; correct?

23   **A.**   He -- he said hardware was sold when they were selling the

24   appliance device.  It was in the context of the appliance

25   device.

SMITH - DIRECT / FRENTZEN

1    Q.   And he called it "hardware"; right?

2    A.   Well, as I said, they were selling the appliance product,

3    and with the appliance product, hardware was a component of the

4    appliance product.

5              **MS. LITTLE:**  Nothing further.

6              **THE COURT:**  Thank you, Mr. Gersh.  You're excused.

7              **THE WITNESS:**  Thank you very much.

8              **THE COURT:**  Call your next witness.

9              **MR. FRENTZEN:**  Your Honor, the Government calls Reagan

10   Smith.

11             **THE CLERK:**  Please raise your ride hand.

12                         **REAGAN SMITH**,

13   called as a witness for the Government, having been duly sworn,

14   testified as follows:

15             **THE CLERK:**  Please be seated.  Please state your full

16   name for the record and spell your last name.

17             **THE WITNESS:**  My name is Reagan William Smith.  My

18   last name is spelled S-M-I-T-H.

19                     **DIRECT EXAMINATION**

20   BY MR. FRENTZEN:

21   Q.   Why don't you go ahead and spell your first name for the

22   court reporter, if you don't mind, sir.

23   A.   Reagan, R-E-A-G-A-N.

24   Q.   Where do you currently live?

25   A.   I live in Austin, Texas.

**SMITH - DIRECT / FRENTZEN**

1  **Q.**   What do you do for a living currently?

2  **A.**   I'm the procurement executive at Dell Technologies in

3  Austin.

4  **Q.**   How long have you been doing that?

5  **A.**   I've been at Dell for about a year.

6  **Q.**   Can you give us a little bit of background on yourself.

7  Tell us about your education, please, sir.

8  **A.**   I went to college at LSU Baton Rouge.  I went on and got a

9  Master's degree at Texas Tech, as well as a law degree at Texas

10  Tech.

11      I went on to practice law for about three years.

12      I then moved into corporate procurement at Bank of America

13  in Charlotte.  From Bank of America, I came over to the Bay

14  Area and worked at Visa, again in procurement for about three

15  years.

16      From Visa, I relocated back to Austin where I worked for

17  Hewlett-Packard for about 15 months and then Dell.

18  **Q.**   I would like to take you to in or around 2010.  Where were

19  you and what were you doing in 2010?

20  **A.**   In 2010, I worked at Bank of America in procurement in

21  Charlotte, North Carolina.

22  **Q.**   What does that mean, when you say you worked in

23  procurement?  What were you doing?

24  **A.**   The team I worked on in procurement bought things for Bank

25  of America.  We were the mirror opposite to the people trying

SMITH - DIRECT / FRENTZEN

1  to sell things into the company.

2      Specifically I focused on the purchase of IT and most

3  specifically on software.

4  **Q.**  And what kind of -- can you describe for us -- you

5  described a team.  Can you tell us about that team and where

6  you fit in that team?

7  **A.**  Certainly.  I ran -- I was managing a large organization

8  of procurement people who specialized in sourcing technology

9  contracts.  So they negotiated the contracts for Bank of

10  America with IT providers.

11  **Q.**  I don't mean to stop you, but can you just move that mic a

12  little bit closer to you there.  Make sure everybody is getting

13  it.

14  **A.**  Certainly.

15      I managed a large team of procurement folks who worked at

16  Bank of America, and they negotiated the contracts as well as

17  the commercial terms, the price points, for the things that

18  Bank of America purchased from various software suppliers.

19      I ran that team on a day-to-day basis, which included

20  management of the individuals and overall accountability for

21  that portfolio of IT spend.

22      I ultimately reported to the chief procurement officer of

23  the company who had visibility over all the purchasing for the

24  company at a global level.

25  **Q.**  And just in terms of -- can you describe in this -- within

SMITH - DIRECT / FRENTZEN

1   the IT procurement, I think you said your focus was software?

2   A.    Yes, it was.

3   Q.    Were there also individuals at Bank of America who focused

4   on procurement of hardware?

5   A.    Yes, there were.

6   Q.    And did you know who those people were?

7   A.    Yes.  We were peers and regularly interacted.

8   Q.    Okay.  And were you physically separated or in kind of the

9   same space?

10  A.    We sat very close to each other, in the same facility, in

11  the same area of the Bank of America offices.

12  Q.    All right.  I want to direct your attention now to 2010,

13  the tail end of 2010.

14        Did you become involved in trying to purchase software

15  from a company by the name of Autonomy?

16  A.    Yes, I did.

17  Q.    Could you tell us what was the issue at Bank of America

18  and what was this -- what was this procurement about?

19  A.    On December 6th, 2010, which was a Monday, I came into the

20  office like any other Monday and was asked to join my boss, a

21  man named Ron Johnson, in his office.  Walked down to his

22  office, let myself in, and found Ron on the phone with two

23  people who I would later learn were our corporate counsel, a

24  man named Todd Taylor, as well as an IT executive named Vince

25  Debban.

1    Over the next 30 to 60 minutes, it was explained to me

2    that Vince owned email archiving for Bank of America.  It was

3    his job to make sure that the emails in and out of the company

4    were stored properly so they could be searched and later used

5    if needed.

6        Through Bank of America's mergers with Fleet Bank, as well

7    as its merger with Merrill Lynch in the wake of 2008, Vince was

8    running three independent email achieving systems.  None of

9    them ran on the same tools.  None of them ran in the same

10   location.

11       As any good business executive would, Mr. Debban had

12   created a business case to bring three systems into one system,

13   and it was his desire to use Autonomy as the system of choice

14   for future use.

15       In Vince's estimation, this would be cheaper, it would be

16   less risky, and the Autonomy tool was superior.

17       Where I came in is that Vince had agreed in principle to

18   meet with several C-level executives and members of the

19   Autonomy staff the very next day in New York City to broker a

20   deal to purchase the Autonomy software and make this -- this

21   vision a reality.

22       This was not typical.  We didn't typically jump planes

23   same day to new locations to do deals like this.  Nonetheless,

24   my boss, Ron Johnson, asked that I join Vince to do the best

25   that we could in supporting him.

SMITH - DIRECT / FRENTZEN

1   **Q.**   So did you, in fact, travel in connection with this --

2   this ongoing discussion?

3   **A.**   Yes, I did.  I caught an airplane that day and was in

4   Manhattan that night.

5   **Q.**   All right.  And did -- were there then meetings related to

6   whether or not Bank of America was going to make this purchase

7   of software from Autonomy?

8   **A.**   Yes.  Over the next two days, teams from Bank of America

9   and from Autonomy met with one another and worked out a

10  construct for a deal between the two companies.

11  **Q.**   Do you have a recollection of who was present for the

12  meeting on Autonomy's side, if you recall?

13  **A.**   I recall the president or CEO of the North Americas, a man

14  named Stouffer Egan.  I recall a man named Joel Scott, who

15  described himself as the chief operating officer and general

16  counsel.

17       I recall Sushovan Hussain, the CFO of Autonomy, as well as

18  the account executive for Bank of America, that is, the person

19  who sold from Autonomy to Bank of America, a man named Jim

20  Krakoski.

21       My memory is a little hazy.  There might have been one or

22  two other Autonomy members there, but I don't recall them.

23  **Q.**   Did negotiations go from that point there in New York?

24  **A.**   Yes.  Over the next two days, the parties worked both as a

25  group and then in individual break-out sessions to structure a

SMITH - DIRECT / FRENTZEN

1    deal.

2    **Q.**   At any point in time during the course of these meetings

3    in New York, was it ever brought to your attention that

4    Autonomy had been involved in reselling hardware to SHI for

5    eventual resell to Bank of America?

6    **A.**   No.   I'm not aware of any hardware engagements between the

7    parties.

8    **Q.**   Did that -- in the course of the discussions/negotiations

9    with the folks from Autonomy, did that come up?

10   **A.**   Than I recollect, no.

11   **Q.**   No one raised that as a selling point in any way to Bank

12   of America on Autonomy's side?

13   **A.**   No.

14   **Q.**   In terms of this deal, was there any sort of a timing

15   issue that was being communicated to Bank of America from

16   Autonomy's side?

17   **A.**   There was an interest by Autonomy in closing the deal that

18   we had negotiated over the two days before the end of the

19   calendar year, which for them was either a quarter's end or a

20   fiscal year end, I don't recall.   But Autonomy did have an

21   interest in closing the deal by December 31st.

22   **Q.**   And do you have a recollection of the, you know, of a --

23   of a dollar figure on this deal?   Was this a big deal?

24   **A.**   It was a large deal.   I don't remember the specific

25   number, but it was in the neighborhood of 19 to 20-plus million

1    dollars.

2    **Q.**    Following the meeting in New York, did you continue to

3    engage in the discussions about whether or not this deal was

4    going to close by the end of the quarter?

5    **A.**    Following the meetings in New York, the primary activity

6    that I was engaged in was trying to arrange for the approval of

7    the deal by executives at Bank of America, as well as trying to

8    finalize the administrative items associated with -- with

9    closing a deal that size.

10    **Q.**    And I'd like to just show you a couple of documents, if I

11    could.  I'm going to show you what's been marked as Exhibit

12    1268 and then 1275.

13        Take a look, please, at 1268.  See if you recognize what

14    that is, sir.

15    **A.**    I recognize it as an email from myself to my boss, Ron

16    Johnson.

17            **THE COURT:**  Admitted.

18        (Plaintiff's Exhibit 1268 received in evidence)

19                (Exhibit published to jury.)

20    **BY MR. FRENTZEN:**

21    **Q.**    Is it sort of an email chain, basically?

22    **A.**    It is.  It's an email chain which began with Vince Debban,

23    who I referenced earlier.  He was the IT executive responsible

24    for the deal.  Forwarded through his boss and then on to me.

25    **Q.**    If we could, if we could go to the bottom of this first

SMITH - DIRECT / FRENTZEN

1  page, please.

2      All right.  Was this -- was this deal effectively also

3  viewed as a way to reduce costs for Bank of America?

4  **A.**   Yes.  As I mentioned at the outset, we were running three

5  systems.  It was Vince's estimation that by bringing the three

6  systems together, the company would save money.

7  **Q.**   All right.  And is there a discussion here of key

8  components of the proposal at that particular time?

9  **A.**   Yes.  What Vince is doing here is emailing his boss, Carol

10  Korn-Smith, advising her on some of the outcomes of the two-day

11  negotiation between Bank of America and Autonomy, and detailing

12  some of the highlights.

13  **Q.**   All right.  And among the highlights, do you see here

14  Autonomy wants execution by year end so they can recognize net

15  new revenue?

16  **A.**   Yes.

17  **Q.**   Could you take a look now at 1275, Exhibit 1275.

18           **THE COURT:**  Admitted.

19           **MR. FRENTZEN:**  Thank you, Your Honor.

20           (Trial Exhibit 1275 received in evidence)

21               (Exhibit published to jury.)

22  **BY MR. FRENTZEN:**

23  **Q.**   Just so we're clear, Mr. Smith, was Mr. Hussain personally

24  involved in writing to various folks at Bank of America about

25  trying to get this deal done by the end of the year?

1    **A.**    Yes, he was.

2    **Q.**    And is that part of sort of what's being discussed here in

3    Exhibit 1275 on December 20, 2010?

4    **A.**    Yes.  I recognize this as an email from Mr. Hussain to

5    Andy McGowan, who was an IT vendor management executive, and

6    then later to my boss, Ron Johnson, who was a peer to

7    Mr. McGowan, and as you can see, it was forwarded on from

8    there.

9    **Q.**    So this is a chain, but basically this is Mr. Hussain

10   trying to -- continuing to try to push this deal through at

11   Bank of America?

12   **A.**    Yes.  This is Mr. Hussain trying to elevate the visibility

13   of the deal to my boss to close it before the end of the year.

14   **Q.**    I'd like to go now to show you Exhibit 1387.  Do you know

15   what 1387 is, sir?

16   **A.**    (Witness reviews document.)

17          **THE COURT:**  Admitted.

18          (Trial Exhibit 1387 received in evidence)

19                (Exhibit published to jury.)

20          **MR. FRENTZEN:**  Thank you, Your Honor.

21   **Q.**    Could we bring up page 2 of this, please.  You can go down

22   a little bit.  Yeah.  Great.  No.  So we can see the top.  Up.

23   Great.

24          Okay.  Mr. Smith, you're not on the chain at this point

25   but later are.  Is this -- this December 31, 2010.

**SMITH - DIRECT / FRENTZEN**

1        Is this basically like this is not going to happen by year

2   end?

3   **A.**   That's correct.

4   **Q.**   And that went to Mr. Egan, according to this?

5   **A.**   Yes.  That's correct.

6   **Q.**   All right.  Can we go to page 1 at the bottom, please.

7        And on this chain -- which eventually got sent to you,

8   Mr. Smith -- is there just discussion here from Mr. Egan to

9   Mr. Lynch and Mr. Hussain about, you know, "we tried to get it

10  done, but it's not getting done"?

11  **A.**   Yes, sir.  It appears so.

12  **Q.**   And can we scroll down a little bit.

13       Is there then an email from Mr. Hussain, which is where

14  you come in, and he is still -- he's asking for basically a

15  smaller deal, if you will, by the end of the year?

16  **A.**   Yes.  He's asking for a continuation of the existing Bank

17  of America deal at this time.

18  **Q.**   Okay.  And if we could just scroll to the top here, okay.

19       You're basically saying nothing's going to happen before

20  the end of the year?

21  **A.**   That's correct.

22  **Q.**   So then did the deal eventually occur in or around January

23  of 2011?

24  **A.**   Yes.  Ultimately the deal was struck, I believe, in

25  February of 2011.

SMITH - DIRECT / FRENTZEN

1  **Q.**  February.  Sorry.

2  During January of 2011, did you continue to negotiate this

3  deal with folks from Autonomy?

4  **A.**  We made -- yes.  We made minor changes to some of the

5  technical terms and the support terms of the agreement.  Our

6  primary objective, coming back from the holidays and into

7  January, was getting through the approvals at Bank of America

8  for the deal.

9  **Q.**  Was there also -- or did there come a point when there was

10  the introduction of the concept of a reseller into the deal?

11  **A.**  Yes.

12  **Q.**  Could you describe that for us, please.

13  **A.**  Although I don't remember a specific date, at some point

14  during January or February of 2011, the concept of introducing

15  a reseller into the overall transaction was provided to me.  We

16  ultimately did use a reseller named MicroTech.

17  **Q.**  And during the course of the negotiation on this deal, was

18  MicroTech ever a participant in the negotiations?

19  **A.**  No.

20  **Q.**  So who brought MicroTech into the equation, if you will?

21  **A.**  I don't recall if it was -- I don't recall a specific

22  member of Autonomy, but one of the Autonomy deal team members

23  brought it to my attention.

24  **Q.**  MicroTech was introduced through Autonomy?

25  **A.**  Yes.

**SMITH - DIRECT / FRENTZEN**

1   **Q.**   And in terms of doing the deal through MicroTech, was that

2   eventually something that Bank of America agreed to do?

3   **A.**   Yes, it was.

4   **Q.**   And was one of the issues that arose about MicroTech was

5   that it was an 8(a)?

6   **A.**   Yes.  It was an 8 -- qualified as an 8(a) reseller to Bank

7   of America.

8   **Q.**   And so was that an aspect of it that was, I guess,

9   appealing in terms of -- from Bank of America's perspective?

10  **A.**   Yes.  8(a) resellers are resellers which qualify as being

11  minority, women, or veteran-owned, and Bank of America attempts

12  at all costs to drive business through companies that qualify

13  as 8(a) resellers for a number of reasons.

14  **Q.**   And I'd like to show you now what's been marked as Exhibit

15  1522.  Take a quick look at 1522, Mr. Smith.

16  **A.**   (Witness reviews document.)

17  **Q.**   Do you recognize what 1522 is, sir?

18            **THE COURT:**  Admitted.

19            (Trial Exhibit 1522 received in evidence)

20                    (Exhibit published to jury.)

21            **MR. FRENTZEN:**  Thank you, Your Honor.

22  **Q.**   Could we go to page 2, please.  Great.

23      Okay.  Do you see here this appears to be an email from

24  Mr. Egan to you on January 25th --

25  **A.**   Yes.

**SMITH - DIRECT / FRENTZEN**

1    Q.    -- 2011?

2        And he says, "Reagan, I was not able to get Sushovan, but

3    I'm going to write him an email letting him know what we

4    discussed.  I want to check that I'm representing what we

5    discussed accurately."

6        Then there are some issues he brings up.

7        And can we go to the next page, please, at the top.  Keep

8    going down.  Is this page 3?  Great.  Right there.

9        And amongst the issues that he's going to raise is "we

10   will process the deal through the 8(a) MicroTech"?

11   A.    Yes.

12   Q.    And can we go to the top of this -- I'm sorry.  Page 1,

13   the very first part of it.  And actually can we just -- sorry.

14   Could we go to the bottom of page -- not page 2.  Could we go

15   to the top of page 2.  I apologize.

16       Does it appear this is your response, Mr. Smith?

17   A.    I'm sorry.  Could you repeat that, please?

18   Q.    Does this appear this is part of your response to

19   Mr. Egan?

20   A.    Yes, it is.

21   Q.    And "We are validating there is no issues with processing

22   the deal through the 8(a) MicroTech.  I don't think this will

23   be an issue.  I have a meeting on it tomorrow morning with our

24   diversity chair"?

25   A.    Yes.  That's correct.

SMITH - DIRECT / FRENTZEN

1   Q.   Can we go to -- I'm sorry.  Now to the top of page 1.

2        Did you also ask -- "Let me ask one quick follow-up.  I

3   reviewed the document you sent from MicroTech.  What services

4   specifically will they offer as part of this?"

5   A.   Yes.

6   Q.   And Mr. Egan was responding or he responded to you, "They

7   are eligible as a service provider, but they are not truly

8   providing us service in the classic sense other than reselling

9   the software"?

10  A.   Yes.

11  Q.   Okay.  But he says, "They are providing a discount as an

12  accredited 8(a).  That is the real situation."

13  A.   I -- yes.  I see that.

14  Q.   "They are capable of providing Autonomy services.  That's

15  at the bank's sole option."

16  A.   Yes.

17  Q.   Did the -- did the deal eventually go through?

18  A.   It did.

19  Q.   Okay.  And was -- was there an agreement for the deal to

20  go through MicroTech?

21  A.   Yes.  MicroTech was used.

22  Q.   At any point in time during the negotiations of this deal,

23  did you ever or was an entity, another reseller by the name of

24  Capax, ever brought to your attention that you can recall?

25  A.   No, not that I recall.

1   **Q.**   Can we take a quick look at 1549, which I believe is

2   admitted, Your Honor.

3                    (Exhibit published to jury.)

4   **BY MR. FRENTZEN:**

5   **Q.**   Mr. Smith, does this appear to be the software deal that

6   was negotiated with Autonomy?

7   **A.**   May I ask that you scroll down on it, please?

8   **Q.**   Yeah.  Sure.

9   **A.**   Scroll back up, please.

10          This is a portion of the deal.  This is an amendment

11  bringing together parts of prior deals.  It is not the entire

12  deal.

13  **Q.**   Okay.

14  **A.**   Ah, there it is.  Yes.  This is the deal.

15  **Q.**   Can we keep going just a little bit further.

16          Does this describe the software and so on?

17  **A.**   Yes, it does.

18  **Q.**   Keep scrolling.

19          And do you see a dollar figure there?

20  **A.**   Yes.

21  **Q.**   Nineteen and a half million for the license fee?

22  **A.**   And.

23  **Q.**   And then maintenance and support and an option exercise

24  fee.

25          At any point in time, Mr. Smith, from the beginning of

**SMITH - CROSS / LAZARUS**

1    this deal to the end of this deal, was it ever brought to your

2    attention by anyone at Autonomy that Autonomy was in some way

3    involved in reselling hardware to SHI for resale to Bank of

4    America?

5    **A.**    No.

6    **Q.**    Would that have mattered to you at all in terms of

7    negotiating this deal?

8    **A.**    No.

9    **Q.**    Did anyone at Bank of America bring to your attention that

10   Autonomy was reselling hardware to SHI for resale to Bank of

11   America?

12   **A.**    No.

13   **Q.**    Did Bank of America have a long-standing relationship with

14   SHI, to your knowledge?

15   **A.**    Yes, they did.

16   **Q.**    And what about with Dell?  Was there a relationship with

17   Dell?

18   **A.**    Yes.

19   **Q.**    And -- I'll leave it at that.

20        May I have a moment, Your Honor?

21        (Government counsel confer off the record.)?

22            **MR. FRENTZEN:**  That's all I have.

23        Thank you very much, Mr. Smith.

24            **THE COURT:**  Ms. Lazarus.

25   \\\

SMITH - CROSS / LAZARUS

1                    <u>CROSS-EXAMINATION</u>

2   BY MS. LAZARUS:

3   Q.    Mr. Smith, my name is Kate Lazarus.   I represent Sushovan

4   Hussain.

5         How are you?

6   A.    Fine, thank you.

7   Q.    Did you ever work for Hewlett-Packard?

8   A.    Yes.

9   Q.    That was back in 2016?

10  A.    Yes.

11  Q.    You did IT procurement at HP after Bank of America?

12  A.    Yes.

13  Q.    The deal you've been testifying about that you were

14  negotiating in the fall of 2010, that was a big -- big deal;

15  right?

16  A.    Yes.

17  Q.    You were transitioning several different email archive

18  systems over to Autonomy's Digital Safe product; is that

19  correct?

20  A.    That was my understanding of it, yes.

21  Q.    And the bank believed that this product was superior to

22  all the other products that it had been using for email

23  archiving?

24  A.    That was the feedback Mr. Debban gave me, yes.

25  Q.    And you said Autonomy wanted to close the deal by the end

SMITH - CROSS / LAZARUS

1  of 2010; right?

2  A.    Yes.

3  Q.    But the bank also wanted to close the deal by the end of

4  2010 if possible; right?

5  A.    If possible.

6  Q.    Mr. Debban and your colleagues were concerned that the

7  budget might not be there in 2011 if you didn't get the deal

8  done?

9  A.    I don't recall.  That's possible.

10  Q.    Fair to say that both sides were striving towards getting

11  the deal done in 2010?

12  A.    Yes, that's fair to say.

13  Q.    You also testified that a reseller named MicroTech got

14  involved with the deal; correct?

15  A.    That's correct.

16  Q.    From your experience in software procurement, resellers

17  are pretty common; right?

18  A.    That's correct.

19  Q.    Would you say they've proliferated since the '90s in the

20  software space?

21  A.    They have.

22  Q.    And you also testified that you came to understand that

23  MicroTech was an 8(a) company; right?

24  A.    That was my understanding, yes.

25  Q.    And could we take a look at Exhibit 1454, which should be

1  in your bigger binder up there.

2        **THE COURT:**  Is it in evidence?

3        **MS. LAZARUS:**  I don't think so.

4        **THE COURT:**  1454?

5        **MS. LAZARUS:**  1454.

6        **MR. FRENTZEN:**  No objection.

7        **THE COURT:**  Admitted.

8        (Trial Exhibit 1454 received in evidence)

9             (Exhibit published to jury.)

10       **THE WITNESS:**  May I clarify.  1454?

11       **THE COURT:**  It's on the screen.

12 **BY MS. LAZARUS:**

13 **Q.**   This is an email to you from your colleague, Vince Debban

14 at Bank of America?

15 **A.**   Yes, it is.

16 **Q.**   And Mr. Debban is providing you some information about the

17 8(a) program here; correct?

18 **A.**   Yes.  It appears so.

19 **Q.**   And he writes, "The 8(a) program is a Small Business

20 Administration program intended to provide assistance to

21 economically and/or socially disadvantaged business owners."

22       And then at the end of the paragraph, he concludes, "The

23 program has been an important one for thousands of minority

24 entrepreneurs over the past few years."

25       Is that consistent with your understanding of the 8(a)

1  program?

2  **A.**    That is consistent with my understanding, yes.

3  **Q.**    You also said it was a major goal of Bank of America's to

4  increase spend withing 8(a) companies, women and minority-owned

5  companies?

6  **A.**    That is correct.

7  **Q.**    I believe you testified that BofA was attempting to do

8  this at all costs?

9  **A.**    Yes.

10  **Q.**    You spoke to a number of people about the 8(a) program in

11  connection with this deal, didn't you?

12  **A.**    I spoke to several folks about it, yes.

13  **Q.**    Could we take a look at Exhibit 6630 in your binder.

14        **THE COURT:**  Admitted.

15        (Trial Exhibit 6630 received in evidence)

16              (Exhibit published to jury.)

17  **BY MS. LAZARUS:**

18  **Q.**    This is an email from you to Mr. Joel Scott of Autonomy?

19  **A.**    Yes.

20  **Q.**    And at the top of this email, Mr. Scott writes, "Following

21  up on my voicemail from yesterday, please give me a call when

22  you have a moment so we can talk through the 8(a) concept in

23  more detail."

24        Do you see that?

25  **A.**    I do.

1  Q.    Did you talk to Mr. Scott about the 8(a) program?

2  A.    I don't recall.

3  Q.    If you could also take a look at Exhibit 6629, also in the

4  binder.

5          THE COURT:  Admitted.

6          (Trial Exhibit 6629 received in evidence)

7                  (Exhibit published to jury.)

8  BY MS. LAZARUS:

9  Q.    This is an email from Mr. Stouffer Egan to you, and he

10  writes at the bottom of the email, "I'm attaching a little bit

11  of data and 8(a) credentials for MicroTech for your files."

12      Do you see that?

13  A.    Yes.

14  Q.    If you look at the next page, the attachment is a letter

15  to Mr. Jimenez of MicroTech.  Do you see that?  It looks like

16  we may not have it on the screen, but it should be the second

17  page of the exhibit in your binder, right behind the first blue

18  sheet.

19  A.    Could you repeat the question, please?

20  Q.    Sure.  Yeah.

21      Did you find that letter from the U.S. Small Business

22  Administration to Mr. Jimenez of MicroTech?

23  A.    I have, yes.

24  Q.    And this says, "Congratulations.  Your firm has been

25  certified as a participant in the U.S. Small Business

1   Administration's SBA 8(a) BD program."  Do you see that?

2   **A.**    Yes, I do.

3   **Q.**    So this was providing you some more information about the

4   8(a) program and MicroTech's certification?

5   **A.**    Yes.

6   **Q.**    And then you said you also met with Bank of America's

7   diversity chair to discuss the 8(a) program; is that right?

8   **A.**    That's correct.

9   **Q.**    Was that Mr. Gerry Jones?

10  **A.**    I believe his name was Jeffrey Jones.

11  **Q.**    Jeffrey Jones.  Thank you.

12       He told you a little more about the 8(a) program and the

13  bank's relationship with the program?

14  **A.**    Jeff Jones owned the program for Bank of America and

15  informed our decisions and when we engaged 8(a) resellers and

16  when we didn't, so, yes, we did have a conversation.

17  **Q.**    So you let Mr. Jones into the negotiations on this and

18  discussion of working with MicroTech?

19  **A.**    He was not part of the negotiations.  He was just part of

20  an offline discussion with me.

21  **Q.**    And the offline discussion was about MicroTech and the

22  8(a) program?

23  **A.**    It was.

24  **Q.**    And then after these meetings, the bank did decide to buy

25  the software through MicroTech; right?

1  **A.**   That's correct.

2  **Q.**   If you could look at 6634 in your binder, please.

3  Actually it's -- the tab says 6334.  It's the last exhibit, but

4  it's actually Exhibit 6634.

5          **THE COURT:**  Admitted.

6          **MR. FRENTZEN:**  Your Honor, I don't think this

7  witness --

8          **MS. LAZARUS:**  He's at the bottom of the chain.

9          **MR. FRENTZEN:**  Sorry, Your Honor.  I don't think --

10  there is portions of this that --

11          **THE COURT:**  6634?

12          **MS. LAZARUS:**  Your Honor, the bottom email is from

13  Mr. Smith.  It gets forwarded along.  We would ask the document

14  come in.

15          **THE COURT:**  Admitted.

16          (Trial Exhibit 6634 received in evidence)

17          **MS. LAZARUS:**  Thank you.

18               (Exhibit published to jury.)

19  **BY MS. LAZARUS:**

20  **Q.**   You see the bottom email from yourself to Mr. Egan and

21  Mr. Scott?

22  **A.**   I do.

23  **Q.**   You wrote, "This email confirms that the use of MicroTech

24  as an 8(a) will be fine.  I have confirmed it through our

25  diversity council chair, and he has asked that I pass along his

1    thanks to Autonomy for its support of 8(a) businesses."

2        That was correct, that your diversity chair was pleased

3    that the bank was working through MicroTech, an 8(a) company?

4    **A.**   That's correct.

5    **Q.**   And, in fact, after this deal was signed, BofA wanted to

6    drive additional Autonomy business through MicroTech; right?

7    **A.**   I don't recall.

8    **Q.**   Do you recall that there were some subsequent payments due

9    in 2011 and BofA wanted those to go through MicroTech?

10   **A.**   I don't know which payments you're referring to

11   specifically.  I'm sorry.

12   **Q.**   That's okay.

13       Take a look at Exhibit 1797 in your binder, please,

14   Mr. Smith.  This is an email chain.  The top email is from

15   Mr. Marinelli.  He was your colleague at the bank; is that

16   right?

17   **A.**   He was a colleague of mine, yes.

18   **Q.**   This is from April 2011.

19       We would move it in, Your Honor.

20           **MR. FRENTZEN:**  No objection.

21           **THE COURT:**  Admitted.

22           (Trial Exhibit 1797 received in evidence)

23               (Exhibit published to jury.)

24   BY MS. LAZARUS:

25   **Q.**   I believe this is a discussion about further payments to

**SMITH - CROSS / LAZARUS**

1  Autonomy; is that right?

2  **A.**   (No response.)

3  **Q.**   Do you see the last sentence of the top paragraph where

4  Mr. Marinelli writes, "MicroTech is a partner of Autonomy and

5  we plan to drive some or all of our spend through MicroTech

6  this year and going forward."  Do you see that?

7  **A.**   I do.

8  **Q.**   Does this refresh your recollection about seeking to drive

9  additional business through MicroTech?

10  **A.**   No, it doesn't.

11  **Q.**   Separate from MicroTech's 8(a) status, you understood that

12  MicroTech was a professionals services provider?

13  **A.**   So far as I was aware.

14  **Q.**   And you knew they were capable of providing services for

15  Autonomy products?

16  **A.**   Yes.

17  **Q.**   So did it make sense to you that they might want to be

18  introduced to the bank and know the people who were working

19  with Autonomy?

20  **A.**   Yes.

21  **Q.**   You also testified earlier that you didn't know about some

22  of Bank of America's hardware purchases from Autonomy; right?

23  **A.**   That's correct.

24  **Q.**   Do you recall in December 2010 you did a separate deal

25  that was an extension of Bank of America's license for

**SMITH - CROSS / LAZARUS**

1   Autonomy's Supervisor product?

2   **A.**   Yes.

3   **Q.**   And do you recall that that deal involved software and

4   hardware?

5   **A.**   No, I don't.

6   **Q.**   Let's look at Exhibit 6631 in your binder, please.

7              **THE COURT:**  Admitted.

8         (Trial Exhibit 6631 received in evidence)

9                   (Exhibit published to jury.)

10  **BY MS. LAZARUS:**

11  **Q.**   You will see this is an email from George -- and I'm going

12  to guess at the pronunciation of his last name -- Tziahanas at

13  Autonomy to yourself and a few other people at Bank of America.

14  Do you remember this email?

15  **A.**   I see it now, yes.

16  **Q.**   And the email starts, "Please find attached the hardware

17  costs breakdown.  You will see the total here ends up at

18  1.931 million versus 1.95."

19        And then if you look at the next page, there is a chart of

20  some hardware.  Do you see that?

21  **A.**   Yes, I see that.

22  **Q.**   Does this refresh your recollection that you were

23  negotiating over hardware to be purchased from Autonomy?

24  **A.**   It doesn't refresh my recollection, no.

25  **Q.**   Okay.  Let's turn to 6632, please.  That's the next

1    exhibit in your binder.

2             **THE COURT:**  Admitted.

3             (Trial Exhibit 6632 received in evidence)

4                  (Exhibit published to jury.)

5    **BY MS. LAZARUS:**

6    **Q.**    This is an email from you to a few people at Autonomy and

7    Bank of America, and you say, "Please see attached for a copy

8    of the executed S6 amendment."

9         Do you think S6 is Supervisor 6?

10   **A.**    Yes.

11   **Q.**    And then if you look at the attachment, does this look

12   like the final agreement for the S6 extension?

13   **A.**    It does.

14   **Q.**    And you see under Section 2 on the first page where it

15   says "Infrastructure:  Autonomy shall acquire infrastructure

16   that shall consist of the following:  The infrastructure," and

17   then it lists some Dell and EMC hardware.  Do you see that

18   there?

19   **A.**    I do see it.

20   **Q.**    Does this refresh your recollection that the deal involved

21   hardware and software?

22   **A.**    It does, yes.

23   **Q.**    So through this deal, there was a kind of one-stop shop

24   going on for Bank of America; right?  You were able to get the

25   software and the hardware both from Autonomy at the same time?

**SMITH - CROSS / LAZARUS**

1    **A.**    We bought the software and Autonomy purchased the hardware

2    needed to support it.  We didn't buy that -- that hardware

3    directly.

4    **Q.**    It was part of the same deal, the hardware and the

5    software were being handled together?

6    **A.**    Yes.

7    **Q.**    You said your job at Bank of America mostly focused on

8    software procurement; correct?

9    **A.**    It did.

10    **Q.**    You weren't in charge of all the procurement for the bank?

11    **A.**    No.

12    **Q.**    In connection with this deal that we've been discussing,

13    the $20 million software deal, you were aware that some

14    higher-ups at Autonomy and the bank were having conversations

15    about the deal?

16    **A.**    Yes.

17    **Q.**    You knew that Mr. Hussain was reaching out to some

18    high-level executives at the bank?

19    **A.**    I was aware that he had reached out to my boss and my

20    boss' peer, Andy McGowan.

21    **Q.**    You were you aware that Dr. Lynch was reaching out to some

22    of his investment banking contacts at Bank of America?

23    **A.**    Yes.  I had heard that.

24    **Q.**    You don't know what the content of those conversations

25    was, do you?

1    A.    I don't, no.

2          MS. LAZARUS:  Your Honor, we would like to move in

3    Exhibit 6633.  The witness is not on this email.  It's from

4    Dr. Lynch, but it's about this deal.  If there is no objection.

5          MR. FRENTZEN:  Objection.  I haven't seen this before.

6          THE COURT:  Well, look at it.

7          MR. FRENTZEN:  He's not on it, so I assume we can

8    debate --

9          THE COURT:  We can deal with it later.

10         MS. LAZARUS:  Okay.  Nothing further.  Thank you.

11                    <u>REDIRECT EXAMINATION</u>

12   BY MR. FRENTZEN:

13   Q.    Mr. Smith, the deal that you were shown about -- I'm

14   sorry.  Let me get the number.  Let's start with 6631.

15         Do you have a recollection of what this relates to, this

16   hardware here?

17   A.    It appears to relate to the hardware that was specified in

18   the product schedule that we discussed earlier in the deal.

19   The hardware schedule.

20   Q.    All right.  And it -- so is this -- is this resale of

21   hardware from Dell to Autonomy to SHI to Bank of America in

22   this particular deal here?  Or is this just something related

23   to the deal from Autonomy to Bank of America?

24   A.    (No response.)

25   Q.    Let me ask a different question.

1      Is this actually even a purchase of hardware, if you know?

2  **A.**   It's a purchase by Autonomy of hardware from another

3  party.  I don't know whom.

4  **Q.**   Can you describe that for us?  When you say Autonomy is

5  purchasing hardware, what do you mean that by that?

6  **A.**   In order to run the software that Bank of America

7  purchased, you had to have hardware storage, networking

8  in-points, and related gear to make it work.

9      Bank of America gave Autonomy funds and Autonomy purchased

10  hardware with those funds.  Bank of America did not receive

11  hardware from Autonomy or buy hardware from Autonomy as part of

12  this.

13  **Q.**   Can you explain that?  In other words, if Bank of America

14  is buying software, that's your deal; right?

15  **A.**   Uh-huh.

16  **Q.**   And then if there has to also be a purchase of hardware

17  and that's not coming to Bank of America, can you describe that

18  for us, please, sir.

19  **A.**   The product Autonomy was selling Bank of America was

20  hosted, which means Autonomy owned the hardware and ran the

21  hardware in one of its own data centers.  Bank of America did

22  not run it itself.  Bank of America did not own or run the

23  servers or any of the hardware with it so it was managed

24  off-site by Autonomy.

25  **Q.**   So this refers to the purchase by Autonomy of hardware so

1    that Autonomy can deal with Bank of America's data, if you

2    will?

3    **A.**    That's correct.

4    **Q.**    So this is not a sale of hardware by Autonomy or anyone

5    else to Bank of America?

6    **A.**    No.

7    **Q.**    I want to turn now just briefly -- you were asked about

8    the interest in getting the deal done by the end of the year.

9    Do you recall those questions?

10   **A.**    Yes.

11   **Q.**    And do you have a recollection that Autonomy actually was

12   saying that Bank of America needed to get the deal done or else

13   the deal would change once the clock went to 2011; in other

14   words, they could not offer as good a deal?

15   **A.**    Yes.

16   **Q.**    And you were asked a lot of questions about MicroTech and

17   8(a).  Was Autonomy driving you towards an 8(a) in 2010 or was

18   it only in 2011 after the calendar turned over that they

19   introduced MicroTech and this notion of an 8(a) into the deal?

20   **A.**    My first recollection of MicroTech or any reseller being

21   introduced into the deal happened in 2011.

22   **Q.**    Before 2011 when Mr. Hussain was trying to get the deal

23   done by 2010, nobody was saying, "Hey, you should go through an

24   8(a)"?

25   **A.**    That's my recollection, yes.

PROCEEDINGS

1              MR. FRENTZEN:  Thank you, sir.  That's all I have,

2     Your Honor.

3              THE COURT:  Anything further?

4              MS. LAZARUS:  Nothing further.

5              THE COURT:  You are excused.  Thank you very much.

6         Ladies and gentlemen, we are going to take our recess now.

7     We will be in recess until 1:00.

8         Remember the admonition given to you:  Don't discuss the

9     case, allow anyone to discuss it with you, form or express any

10    opinion.

11        (Proceedings were heard out of presence of the jury:)

12             THE COURT:  The jury has retired.

13        So where are we with witnesses and so forth?

14             MR. FRENTZEN:  Your Honor, Paul Moreland and Andy

15    Johnson, and I think we'll go in that order, unless there is

16    something I'm not aware of.

17             THE COURT:  Okay.  How long will these witnesses be?

18             MR. FRENTZEN:  Actually, I don't -- well, I don't know

19    that they will eat the day, Your Honor, so I don't expect --

20    well, Mr. Moreland should go pretty quick.  We were hoping to

21    get Mr. Meiers on also later this -- later today and get him

22    out of here, but --

23             MR. KEKER:  And we've said no, that is not going to

24    happen.  There is 4,000 documents that Mr. Marais has got to

25    look at.

PROCEEDINGS

```
1          THE COURT:  4,000 documents?

2          MR. KEKER:  4,000 H&R Block documents.  Your Honor,

3   the amount -- for every one of these witnesses, it's days'

4   worth of preparation.

5          THE COURT:  Why is he sitting here --

6          MR. KEKER:  Because he's got the weekend to do it.

7          THE COURT:  Yeah.  But that's like a thousand

8   documents a day.

9          MR. FRENTZEN:  I thought they --

10         THE COURT:  How is he going to do it?

11         MR. KEKER:  If you want --

12         THE COURT:  Do you want us to suspend the case for a

13  week and give him --

14         MR. KEKER:  If you want us to send Mr. Marais home to

15  work in his little cubicle and with an airless room, we will do

16  it, but he would prefer to see the trial and then work really

17  hard tonight and all weekend.

18         THE COURT:  A room without a window --

19         MR. FRENTZEN:  I --

20         THE COURT:  What else do want to talk about?

21         MR. FRENTZEN:  I thought they could search

22  unstructured data, Your Honor.

23         THE COURT:  They can use IDOL.

24      Tell me, where are we?  We will have those two --

25         MR. FRENTZEN:  Yes, Your Honor.
```

PROCEEDINGS

1          **MR. KEKER:**  And their next witness after those two is

2    Agent Bryant, and we have issues about Agent Bryant that we

3    want to talk to you about whenever is convenient for you.

4          **THE COURT:**  I mean, I have all these things to talk

5    about.  Why don't we do that at the end of the day then.

6          **MR. KEKER:**  That's fine.

7          **MR. FRENTZEN:**  That's I think fine, Your Honor.  Okay.

8          **THE COURT:**  Just so it's clear in everybody's mind,

9    the -- what are the purported summaries?

10          **MR. FRENTZEN:**  I believe there is issues with

11    summaries.  Your Honor, I lost track.  They all came in in a

12    flurry yesterday afternoon.

13          **THE COURT:**  Anyway, I will be prepared to talk about

14    all of those.

15          **MR. KEKER:**  The things that we -- there's a motion to

16    exclude the purported top 40 summary charts from evidence.

17    There's a motion regarding the Government's summary witness.

18    That's Agent Bryant.  And there is a motion in limine regarding

19    the testimony of Steven Brice, which goes to whether or not he

20    should be able to talk about the things he hasn't analyzed as

21    opposed to the 22 which cover all of these, and they all --

22    your ruling on them will all affect time greatly.

23          **THE COURT:**  Okay.

24          **MR. KEKER:**  And we'll --

25          **THE COURT:**  If I grant them all, we'll be finished

PROCEEDINGS

1    earlier.

2            MR. KEKER:  If you grant them all, we will be finished

3    earlier.  If you don't grant them all --

4            THE COURT:  Weeks.

5            MR. FRENTZEN:  And apropos of my point earlier,

6    Your Honor, I can't wait to see the defense call the witnesses

7    who got pitched on all of the resold hardware to make this Bank

8    of America deal happen.

9            MR. KEKER:  Can we sort of save the arguments until

10   argument time?

11           MR. FRENTZEN:  Well, this is on a point that happened

12   earlier this morning.  I'm simply reiterating my earlier point.

13       Thank you, Your Honor.

14           THE COURT:  Great.  Everyone have a nice lunch.

15           (Luncheon recess was taken at 12:06 p.m.)

16   **Afternoon Session**                              **1:03 p.m.**

17       (Proceedings were heard in the presence of the jury:)

18           THE COURT:  Please be seated.

19                   (Pause in proceedings.)

20           MR. FRENTZEN:  The Government calls Paul Morland.

21           THE CLERK:  Please raise your right hand.

22                        **PAUL MORLAND**,

23   called as a witness for the Government, having been duly sworn,

24   testified as follows:

25           THE WITNESS:  I do.

```
 1              THE CLERK:  Thank you.  Please be seated.
 2         Please state your full name for the record and spell your
 3    last name.
 4              THE WITNESS:  Paul Morland, M-O-R-L-A-N-D.
 5              THE CLERK:  Thank you.
 6         MR. FRENTZEN:  Proceed, Your Honor?
 7              THE COURT:  Yes.
 8                      DIRECT EXAMINATION
 9    BY MR. FRENTZEN:
10    Q.   Good afternoon, Mr. Morland.
11         Where do you live?
12    A.   I live in Somerset, England.
13    Q.   And what do you currently do for a living?
14    A.   I'm an activities analyst covering the technology sector.
15    Q.   How long have you been an analyst?
16    A.   I've been an analyst for most of the last 25 years.
17    Q.   Could you give the members of the jury some idea about
18    your education, sir?
19    A.   So I read liberal studies in science at Manchester
20    University.  After leaving university, I joined
21    Price Waterhouse, an accountancy firm, where I became a charged
22    accountant after three years.
23    Q.   All right.  And then in terms of being an analyst, could
24    you give us some idea of how much of your time as an analyst
25    you focused on technology?
```

1  **A.**   When I first became an analyst, I covered a sector called

2  the support services sector; and in the U.K. in 1998, that

3  sector was split into two sectors, the business services sector

4  and the technology sector, and I started following the

5  technology sector in 1998.

6  **Q.**   In the course of your work, I'd like to direct your

7  attention to around the time of let's start in late 2008.

8  Around that time, were you working as an analyst?

9  **A.**   I was.

10  **Q.**   And could you tell us who you were an analyst for?

11  **A.**   I was working for Astaire Securities.

12  **Q.**   And what was Astaire?

13  **A.**   It was a small brokerage firm.

14  **Q.**   And the jurors have heard from some analysts, but could

15  you just give us an idea of what your -- what entities you

16  covered?

17  **A.**   Okay.  So typically an analyst would cover between 12 and

18  15 different quoted stocks; and because I look at the

19  technology sector, all of my stocks would have been technology

20  stocks ranging from hardware stocks, IT services stocks, and

21  software stocks.

22  **Q.**   Was one of the companies that you covered in 2008 through

23  2011 a company called Autonomy?

24  **A.**   It was, yes.

25  **Q.**   Okay.  And do you have a recollection of when you first

1    started covering Autonomy?

2    **A.**    I first became aware of the company when it floated in the

3    sort of late 1990s, but I didn't actually write research on it

4    back then.  So I was aware of it going back quite a long time.

5    I probably started covering it round about 2005 probably.

6    **Q.**    I'd like to show you what's been marked as Exhibit 11 and

7    just see if you recognize what Exhibit 11 is, sir.

8    **A.**    (Witness examines document.)  Yes, this was a note that I

9    wrote in October 2008.

10           **THE COURT:**  Admitted.

11       (Trial Exhibit 11 received in evidence)

12           **MR. FRENTZEN:**  Thank you, Your Honor.

13           **THE WITNESS:**  If I might just say, it's got Blue Oar

14    on it but Blue Oar changed its name to Astaire Securities so

15    it's the same company.

16    **BY MR. FRENTZEN:**

17    **Q.**    Same company, different name?

18    **A.**    Yeah.

19    **Q.**    Okay.  I'd like to just start with this particular note.

20    Was this a note in which you were covering Autonomy and some

21    other tech companies?

22    **A.**    Yes, it was.

23    **Q.**    All right.  So in the course of this note, did you also

24    have some comments about other companies --

25    **A.**    I did.

1  Q.   -- within it?

2       And if we could, just if I could focus your attention --

3  and there's a screen right next to you there, Mr. Morland -- do

4  you see what I've circled right there?

5  A.   (Nods head.)

6  Q.   Was that your -- in October of 2008, was that your

7  recommendation related to Autonomy?

8  A.   It was, yes.

9  Q.   And if you could, could you just very briefly, from a very

10  high level, in 2008 what was your view on Autonomy that you

11  thought was positive?

12  A.   Well, first of all, it was a software company and software

13  companies tend to attract very high valuations because software

14  is something that is relatively easy to replicate and,

15  therefore, it can be sold at very high margins.  Software

16  companies can both generate high margins and also they can grow

17  very, very quickly when they've got good software.

18       Also, they give quite good -- they can give quite good

19  visibility of revenues as well, which is another important

20  thing to an analyst, and that's in terms of the maintenance

21  contracts that you sell.  Typically back in those days you

22  would sell a software license and then maintenance would come

23  on the back of that, and then maintenance was renewable on an

24  annual basis so it gave investors some idea that it was

25  visibility in the model.

1     I remember that during 2008, Autonomy signed a number of

2  very large deals with large banking clients, and it looked as

3  if those deals would last for multiple years.  So the prospects

4  for the company looked very good indeed, and that's why I had a

5  buy recommendation.

6  **Q.**  And if I could, could we go to page 21 of this note,

7  please?

8     And I just wanted to highlight one issue that you included

9  in your note, Mr. Morland.

10     Page 21 if you would.  Can you scroll this up?  Great.

11  Right there.

12     Okay.  Mr. Morland, do you see the paragraph here about

13  positive impact from financial crisis?

14  **A.**  Yes.

15  **Q.**  And was that something that around this time that folks at

16  Autonomy were talking about to analysts and to the investors

17  such as yourself?

18  **A.**  It was, yes.  It was generally quite a difficult time for

19  corporate entities.

20  **Q.**  This was, like, the great recession 2008 and the crash?

21  **A.**  Yes.  Generally, you know, the economic situation wasn't

22  looking good, and so people were getting worried about

23  companies' ability to generate profits, but it appeared that

24  Autonomy software was actually going to be very beneficial in

25  this environment by helping banks with their discovery process.

1    Q.    So meaning that the crash would create litigation and

2    litigation would create a need to utilize software such as

3    Autonomy's?

4    A.    Correct.

5    Q.    All right.  And this was one of the things that in 2008

6    you thought would be potentially beneficial as Autonomy was

7    promoting?

8    A.    Yes, I did.

9    Q.    I'd like to turn your attention now to the 2009 period and

10   there is an exhibit I'd like to show you, Exhibit 81.

11        Take a quick look at Exhibit 81 and see if you recognize

12   what that is, sir.

13   A.    (Witness examines document.)

14        THE COURT:  81 admitted.

15        (Trial Exhibit 81 received in evidence)

16        MR. FRENTZEN:  Thank you, Your Honor.

17        THE WITNESS:  I recognize it, yes.

18   BY MR. FRENTZEN:

19   Q.    All right.  And so is this one of your -- or is this sort

20   of more of a report and less of a note, if you will?

21   A.    Yes.

22   Q.    Or does that even make a difference?

23   A.    Yes.  This is more of a thematic piece.

24   Q.    And in the course of this, were you sort of pointing out

25   things to watch out for in the technology sector?

1  A.    Yes.  We called them red flags in the industry, things to
2  look out for, things going on in companies that might be
3  warning signals about what might happen in the future.
4  Q.    All right.  And was one of sort of the test cases in this
5  report that you mentioned Autonomy?
6  A.    Yes, it was.
7  Q.    All right.  And if we could, could we go to page 13 of
8  this document, please?  And if we could scroll down a little
9  bit.
10       Was one of your concerns around audits?
11  A.    It was, yes.
12  Q.    And can you describe that for us, please, sir?
13  A.    There's regulations that cover the audit industry that
14  requires single offices not to have clients that are overly
15  important to them in terms of revenue for that particular
16  office.
17  Q.    Was that a concern around Autonomy for you?
18  A.    It was a potential concern given that they were audited by
19  the Deloitte's Cambridge office, and I would normally have
20  expected such a large company to be audited by the London
21  office.
22  Q.    Was this an issue in "Small Office of a Large Firm" that
23  you brought up for investors?
24  A.    Yes, it was.
25  Q.    I'd like to take your attention to earnings calls, please,

1    Mr. Morland.

2         In the time that you spent covering Autonomy, did you

3    participate in earnings calls?

4    **A.**   I did, yes.

5    **Q.**   Could you tell us -- we've heard about earnings calls, but

6    just briefly if you could remind us, what are the earnings

7    calls?  What takes place and what are you looking for as an

8    analyst?

9    **A.**   Okay.  So typically every -- every six months, but in

10   Autonomy's case it was every three months, which is the case in

11   the U.S., companies report results on a quarterly basis.  They

12   report their results between a month and two months after the

13   period end.  They release those results in the U.K. at

14   7:00 a.m. in the morning, and they typically have an earnings

15   call or a meeting with analysts which typically starts at

16   9:00 or 9:30 that morning.

17   **Q.**   Okay.  And did you attend the earnings calls for Autonomy

18   for the third quarter in 2009?

19   **A.**   I did, yes.

20   **Q.**   And, actually, I apologize.  I want to back up and cover

21   one other issue first.

22        I want to show you what's been marked as Exhibit 176.

23             **MR. FRENTZEN:**  And, actually, Your Honor, this is a

24   large batch of notes.  I have no problem breaking it down if

25   there's an objection to any of them in particular.

1          **MS. LITTLE:**  No objection.

2          **MR. FRENTZEN:**  Great.  Thank you.

3          **THE COURT:**  Admitted.

4      (Trial Exhibit 176 received in evidence)

5          **MR. FRENTZEN:**  So could we bring up 176, page 18?

6  **Q.**  All right.  Mr. Morland, do you recognize a note that you

7  wrote related to Autonomy in September of 2009?

8  **A.**  Yes, I do.

9  **Q.**  All right.  And at that time what was your recommendation

10 on Autonomy?

11 **A.**  I had a sell recommendation at that time.

12 **Q.**  Okay.  What does that mean?

13 **A.**  It means different things for different brokerages, but

14 typically it means that you think the share price is going to

15 go down.

16 **Q.**  All right.  Okay.  And at this point in time -- could we

17 scroll up just a little bit?  Great.  That's good -- did you

18 have concerns about the growth at Autonomy?

19 **A.**  I did, yes.

20 **Q.**  And why was growth a concern with Autonomy just in terms

21 of -- I mean, what would that mean for the company if growth

22 was -- growth and core licenses has gone into reverse?

23 **A.**  Okay.  One of the reasons I was concerned about growth was

24 it was -- in Q1 that year, Autonomy bought Interwoven and I was

25 worried about the adjustments that the company was making when

1   it calculated the organic growth rate.

2       Because if you buy a business and that business doesn't

3   have -- will then contribute to your revenues in the future but

4   it doesn't contribute to the comparable period.  So to

5   calculate organic growth you need to strip out those revenues

6   to work out what the organic growth was.

7       So I started to think at that time that Autonomy was

8   exaggerating its organic growth, and that's very important

9   because companies -- the principal valuation metric -- and you

10  can see it on the front page of that note -- is the PE ratio

11  and there's a very close relationship between the PE ratio and

12  how fast a company is growing.  So high-growth companies tend

13  to have high PEs, which means high valuation.  So growth is

14  very important, particularly in the software sector.

15  **Q.**   All right.  And just to be clear, at this time in

16  September of 2009, did you have any clue at this particular

17  time that Autonomy was selling or was engaging in sales of

18  hardware in terms of its revenue -- affecting its revenue

19  figures?

20  **A.**   I did not, no.

21  **Q.**   I'd like to show you now what's been marked as

22  Exhibit 206.  Would you take a quick look at 206 and see if you

23  recognize what that is, sir?

24          **THE COURT:**  Admitted.

25      (Trial Exhibit 206 received in evidence)

1          **THE WITNESS:**  (Witness examines document.)

2   **BY MR. FRENTZEN:**

3   **Q.**   Was -- well, following your note of 18th September 2009

4   recommending a sell, did Autonomy write to your, I guess --

5   well, did they write about you to Astaire?

6   **A.**   They did, yeah.

7   **Q.**   Okay.  Was that brought to your attention?

8   **A.**   Yes, it was.

9   **Q.**   And could you tell us, in terms of the allegations made by

10  Autonomy -- could we scroll down a little bit? -- what were

11  the -- what were the complaints Autonomy was making about you

12  to Astaire?

13  **A.**   From what I remember, they were saying that I had made

14  incorrect statements and these statements were known by me to

15  be incorrect.  Of course, any analyst can make -- unknowingly

16  make incorrect statements.  We try not to but it does happen,

17  but it would be very unusual, I'd suggest, to knowingly make an

18  incorrect statement.

19  **Q.**   Why do you see that?  As an analyst, why do you say that?

20  **A.**   As an analyst in the market, and bear in mind in the

21  London market covering technology at the time there were

22  probably about, I don't know, seven or eight recognized

23  analysts, maybe a couple more and your reputation is very

24  important to you, and you could ruin a career by deliberately

25  saying something that you didn't believe.

MORLAND - DIRECT / FRENTZEN

1   Q.   Are there also issues just with -- I mean, as an analyst,

2   do you get anything out of knowingly falsifying something?

3   A.   It's very hard to imagine a case or a situation.

4   Q.   Why do you say that?  I mean, who is your consumer?

5   A.   The institutional investor.

6   Q.   And so if you knowingly mislead an institutional investor,

7   what do you get out of that?

8   A.   Well, you're trying to give them good recommendations so

9   they can make money; and if you knowingly falsify someone,

10  that's probably not going to be a -- end up in giving them a

11  good recommendation.

12  Q.   All right.  In addition to accusing you of that, was there

13  a second accusation -- and if we could scroll up just a little

14  bit -- made about you?

15  A.   Yes.

16  Q.   What was that?

17  A.   I believe it said that I had access to price-sensitive

18  information.

19  Q.   And could we just scroll down to see who wrote or signed

20  this document?

21       Do you know who Andy Kanter is?

22  A.   Yes.  He sat -- I can't remember if he was on the board,

23  but he used to sit in all the analyst call meetings.

24  Q.   It says here "Chief Operating Officer"?

25  A.   Yeah.  He was an employee of Autonomy, yeah, the chief

1  operating officer.

2  **Q.**   In terms of this -- or these allegations, could you just

3  briefly tell us how this was resolved?

4  **A.**   Well, Astaire at the time was a very small brokerage and

5  it couldn't risk getting involved in any kind of litigation, so

6  they decided to retract the statement that I'd made.

7  **Q.**   All right.  Let me show you what's been marked as

8  Exhibit 235.  Take a look and see if you recognize 235.

9  **A.**   (Witness examines document.)

10      **THE COURT:**  Admitted.

11      (Trial Exhibit 235 received in evidence)

12      **MR. FRENTZEN:**  Thank you, Your Honor.

13      Could we blow up the top part?

14  **Q.**   Do you see here, sir, there's an e-mail October 1st, 2009?

15  **A.**   Yes.

16  **Q.**   And it's from Michael Armitage.  Who's that?

17  **A.**   He was the head of research at Astaire and also the

18  telecom's analyst.

19  **Q.**   And this is to Andrew Kanter at Autonomy with a cc to you?

20  **A.**   Yes.

21  **Q.**   And you said a retraction.  Do you see here that it's

22  described as a clarification by Mr. Armitage?

23  **A.**   (Witness examines document.)  Yes.

24  **Q.**   Okay.  Could we go to page 8, please?

25      All right.  And does this appear to be the clarification

1    that was sent?

2    **A.**    Yes, it does.

3    **Q.**    All right.  And if you could scroll up, please.  Keep

4    going.  Great.

5    Okay.  Was this actually a retraction or was this

6    basically just a clarification, Mr. Morland?

7    **A.**    Well, I wasn't keen to retract my statement and I still

8    stand by it today, so I've described it as a clarification.

9    **Q.**    All right.  And in terms of what got clarified, it's

10    indicated "We accept this can be open to misinterpretation,"

11    et cetera, et cetera.

12    And then can we go down to "Astaire view"?  If you could

13    keep scrolling.

14    Okay.  Does it then go on to say (reading):

15    "We continue to believe that Autonomy has

16    consistently recognized revenues too aggressively at

17    acquired companies, exaggerated organic rates of growth,

18    and delivered consistently poor cash conversion as

19    discussed in our recent note"?

20    **A.**    Yes, it does.

21    **Q.**    So it's a clarification but not much of a change and not a

22    change on the ultimate conclusion?

23    **A.**    Correct.

24    **Q.**    Autonomy's accusations about your utilizing nonpublic

25    information, did that go anywhere?

**A.** It didn't.
**Q.** Why not?
**A.** I can't remember precisely, but the document that they were referring to certainly wasn't -- I mean, to be price sensitive, it has to be unpublished, and it was definitely from published sources, the information that I had.
**Q.** All right. I want to take you past this time period in early October to late October and get to that earnings call, if we could.
**MR. FRENTZEN:** May I have one moment, Your Honor?
**THE COURT:** Yes.
(Pause in proceedings.)
**MR. FRENTZEN:** Your Honor, at this time if it's not already in evidence, I'd like to offer Exhibit 3042, which is the audio of the Q3 2009 earnings call.
**MS. LITTLE:** No objection with the same proviso that the tape is the evidence and the transcripts are just an aid.
**THE COURT:** The tape is the evidence.
**MS. LITTLE:** Correct. And the transcripts are an aid.
**MR. FRENTZEN:** Yeah. What I just referred to is the tape. The transcript, Your Honor, is Exhibit 291. I propose to play some clips and display Exhibit 291 while playing the audio.
**THE COURT:** So 291 will be marked for identification.
(Trial Exhibit 291 marked for identification)

1        **THE COURT:**  3042 is admitted.

2        (Trial Exhibit 3042 received in evidence)

3        **MR. FRENTZEN:**  Great.  Thank you, Your Honor.

4    Okay.  Could we just blow up the first page of this?

5    Oh, sorry.  I don't want to mess up what you're doing.

6    No?  Not going to happen?

7                    (Pause in proceedings.)

8        **MR. FRENTZEN:**  Can we just blow up right here

9    (indicating) just to show the -- okay.  There you go.

10   **Q.**  And, Mr. Morland, is this the Q3 2009 earnings call on

11   October 20th, 2009?  Is that what it appears to be?

12   **A.**    Yes.

13       **MR. FRENTZEN:**  Could we go to the first clip?

14   And, Your Honor, for the record we're starting at

15   6 minutes, 15 seconds into the --

16       **MS. LITTLE:**  Your Honor, if I could just ask for some

17   clarification.  I don't see Mr. Morland listed on page 2, so we

18   need to have some foundation as to whether he participated in

19   this call.

20       **THE COURT:**  Sustained.

21       **MR. FRENTZEN:**  Well, okay.  May I approach with the

22   transcript, which is not in evidence?

23       **THE COURT:**  Yes.

24       **MR. FRENTZEN:**  Let me just ask.

25   **Q.**  Mr. Morland, did you attend this conference?

1   **A.**    Yes.

2   **Q.**    Okay.  And so, in other words, you didn't call in; you

3   actually attended physically?

4   **A.**    Correct.

5   **Q.**    And you recall being there?

6   **A.**    (Nods head.)

7   **Q.**    And if I could -- may I approach, Your Honor?

8        If you just take a look at page 2, does that list

9   "Corporate Participants" and then "Conference Call

10  Participants"?

11  **A.**    (Witness examines document.)  Yes.

12  **Q.**    Okay.  And so it lists people that are there for the

13  corporation and folks that apparently called in?

14  **A.**    Yes, but not the people who are sitting in the audience.

15  **Q.**    So you were sitting in the audience?

16  **A.**    Yes.

17  **Q.**    Okay.  Great.

18          **MR. FRENTZEN:**  May I proceed now, Your Honor?

19          **THE COURT:**  Yes.

20          **MR. FRENTZEN:**  Thank you.

21      If we could start at 6:15, start the first clip and blow

22  up...

23                    (Pause in proceedings.)

24          **MR. FRENTZEN:**  Just to indicate I'm starting here

25  (indicating).

1                    (Pause in proceedings.)

2                  (Audio was played but not reported.)

3          **MR. FRENTZEN:**  If we could just bring up what we had,

4    and I'll ask a couple of questions off of that.

5          **MS. LITTLE:**  Are you in a different part of the tape

6    or what?

7          **MR. FRENTZEN:**  No.  I was going to point something

8    out.

9          **MS. LITTLE:**  Okay.

10                   (Pause in proceedings.)

11   **BY MR. FRENTZEN:**

12   **Q.**   Okay.  Mr. Morland, do you remember a big issue in the

13   course of this earnings call was a discussion of the launch of

14   a new product?

15   **A.**   Yes, I do.

16   **Q.**   And do you also -- do you have a recollection of whether

17   or not there was a discussion later around this Quick Start

18   program?

19   **A.**   Yes.  There was a discussion on that as well, yeah.

20   **Q.**   Do you have a recollection of whether or not in the course

21   of this that Autonomy was telling investors and analysts that

22   there was a large amount of extra spend on sales and marketing

23   due to this new product?

24   **A.**   Yes.  I think the extra spend on sales and marketing in

25   this quarter was about $20 million.

1    Q.   And was that also reflected in a PowerPoint that was

2    handed out to the analysts in connection with this

3    presentation?

4    A.   Yes, it was.

5         MR. FRENTZEN:   All right.   If we could, can we

6    continue from where we were?   Is that possible?

7         SPECIAL AGENT BRYANT:   Yes.

8         (Audio was played but not reported.)

9    BY MR. FRENTZEN:

10   Q.   All right.   So during the course of this, Mr. Morland, was

11   Mr. Lynch ascribing this uptick in the spend to IDOL SPE, the

12   launch of IDOL SPE, and this Quick Start program?

13   A.   Yes, he was.

14        MR. FRENTZEN:   And, actually, one moment.

15             (Pause in proceedings.)

16   BY MR. FRENTZEN:

17   Q.   And I think I should say for the record, Mr. Morland, the

18   voice that was speaking on the clip we just heard, who was

19   that?

20   A.   Mike Lynch.

21        MR. FRENTZEN:   And I'd like to go now to a clip.

22   Your Honor, this is going to start at 19 minutes, 48 seconds,

23   and this is on page 7 in terms of the transcript.

24             (Audio was played but not reported.)

25   \\\

MORLAND - DIRECT / FRENTZEN

1    BY MR. FRENTZEN:

2    Q.    So, Mr. Morland, was Mr. Hussain describing the revenues

3    for the year?

4    A.    Yes.

5    Q.    All right.  And is that normal?

6    A.    Yes.

7    Q.    All right.  And in terms of product sales, did he describe

8    that as "Product sales, which include OEM and hosted, showed

9    strong growth"?

10   A.    Yes.

11   Q.    And in terms of the margins, are margins important as an

12   analyst observing margins for a software company?

13   A.    Yes.

14   Q.    Why is that?

15   A.    It's a measure of the profitability and ultimately profits

16   that turn into cash, and it's the cash that the business

17   generates that dictates its value over the long term.

18   Q.    Okay.  And when Mr. Hussain describes 86 percent as the

19   gross margins and he says, "We saw the effect of a couple of

20   percentage points of the overdemand on the Quick Start program

21   for the new product release," what did you take that to mean?

22   A.    It's quite unusual to have an extra cost because demand's

23   high.  Normally you spend to create demand and then the demand

24   comes later.  But I think that was just to try and explain why

25   the gross margin was a little bit lower than an analyst might

1  have expected for a software company.

2  **Q.**   Okay.  So meaning at 86 percent it was a little low that

3  quarter?

4  **A.**   Yes.  I think it was 2 or 3 percent below where it would

5  normally be.  It was normally around 88, 89 percent.

6  **Q.**   Did Mr. Hussain at any point during the course of this

7  earnings call describe the effect of the margin or the extra

8  spend on the basis of selling hardware?

9  **A.**   No.

10     **MR. FRENTZEN:**  Could we go to the next clip, very

11  short, 25 minutes, 51 seconds?

12     (Audio was played but not reported.)

13  **BY MR. FRENTZEN:**

14  **Q.**   So that statement there by Mr. Hussain, Mr. Morland,

15  "Sales and marketing expenses increased in the quarter versus

16  previously in relation to the new product launch," what did you

17  take that to mean?

18  **A.**   I took that to mean that there was a lot of marketing

19  expenditure required in the quarter to drive sales of the new

20  product.

21  **Q.**   Okay.  And, again, did Mr. Hussain tell you that increase

22  in sales and marketing was due to purchases of hardware for

23  resale?

24  **A.**   No, he did not.

25  **Q.**   What sort of issues would that have raised for you as an

MORLAND - DIRECT / FRENTZEN

1  analyst?

2  **A.**   Well, it would have come as a shock for one.

3  **Q.**   Why is that?

4  **A.**   Well, Autonomy always told the analyst community that it

5  was a pure software company and pure software companies don't

6  sell hardware.

7  **Q.**   I'd like to now show you --

8       **MR. FRENTZEN:**  May I have one moment, Your Honor?

9       **THE COURT:**  Yes.

10 **BY MR. FRENTZEN:**

11 **Q.**   -- that is the clip starting at 33:03.

12                   (Pause in proceedings.)

13               (Audio was played but not reported.)

14       **MR. FRENTZEN:**  Pause.

15 **Q.**  Who is speaking here, Mr. Morland?

16 **A.**  Sushovan Hussain.

17 **Q.**  And in terms of -- can we blow that section back up,

18 please, on the transcript?

19     Okay.  And in terms of the discussion here on revenue

20 recognition, what was Mr. Hussain telling you as an analyst

21 about the standards applied for revenue recognition by

22 Autonomy?

23 **A.**   He was basically saying -- or the message, as I took it,

24 was that they took the most prudent revenue recognition policy.

25 They were acquired to abide by IFRS, which is the European

1    standard; but if they felt that -- I think that should be "SOP"

2    rather than "SAP" -- but SOP 97-2 where it was more

3    conservative, they applied that.

4    **Q.**   And SOP 97-2, is that a part or a section of U.S. GAAP?

5    **A.**   It is, yes.

6    **Q.**   And one that specifically relates to what sort of product?

7    **A.**   Revenue recognition of software.

8    **Q.**   And I think this may be a typo.  Is it SOP?

9    **A.**   Yes.

10   **Q.**   All right.  So in terms of you as an analyst, the

11   investing public, was it Autonomy's position for revenue

12   recognition, "Hey, we just follow IFRS," or was it something a

13   little different?

14   **A.**   Something a little different.

15   **Q.**   And what is that?

16   **A.**   I think the message here was that they followed what they

17   considered to be the most prudent approach, whether it be the

18   U.S. GAAP or U.K. European GAAP.

19   **Q.**   And there's reference here to the website.  Have you

20   actually seen this on the website?

21   **A.**   I haven't, no.

22   **Q.**   This -- I mean, and I'm saying them talking about IFRS

23   versus U.S. GAAP on their website, the Autonomy website.

24   **A.**   I can't remember if I've seen it on the website.

25   **Q.**   All right.  We'll get into it.

1    **A.**    I can remember them talking about it in meetings, though.

2    **Q.**    We'll get into it in a minute.

3    **A.**    Okay.

4    **Q.**    In terms of them going on here, does Mr. Hussain make

5    reference twice to pure software companies?

6    **A.**    Yes, he does.

7    **Q.**    All right.  Describing Autonomy?

8    **A.**    Yes.

9           **MR. FRENTZEN:**  And I'd like to go now, if we could, to

10   a clip at 1 hour, 4 minutes and 22 seconds.

11           (Audio was played but not reported.)

12   **BY MR. FRENTZEN:**

13   **Q.**    Mr. Morland, that question and answer there, was that a

14   question about the extra expense in the quarter; and what was

15   the description there by Mr. Hussain?

16   **A.**    He said that the extra expense was due to sales and

17   marketing around SPE and it wouldn't be repeated in future

18   quarters.

19   **Q.**    I'd like to now direct your attention to Exhibit 630.

20        I don't have it here.

21           **MR. FRENTZEN:**  Is it already in evidence?

22           **THE CLERK:**  No.

23           **MR. FRENTZEN:**  I'll do it like this.

24           **THE COURT:**  630 admitted.

25        (Trial Exhibit 630 received in evidence)

1  **BY MR. FRENTZEN:**

2  **Q.**   Mr. Morland, are you familiar with the Investors' Question

3  Board for Autonomy?

4  **A.**   Yes, I am.

5  **Q.**   Okay.  All right.  And what's the Investors' Question

6  Board?

7  **A.**   It's really for people who didn't get an opportunity to

8  ask questions at the meeting or any sort of follow-up questions

9  were addressed to the board and then Autonomy, there IR

10  Department, would answer the questions on the board.

11  **Q.**   Was this on a website or posted on a website do you know?

12  **A.**   Yes, it was.

13  **Q.**   All right.  So when we talked earlier about the website,

14  is this part of Autonomy's website?

15  **A.**   Yes.

16  **Q.**   Okay.  And if we could, could we scroll down -- could we

17  go to page 2, please, and scroll up some?

18      I want to focus your attention, Mr. Morland, on this Q & A

19  right here that shows a pin next to it.  Could you tell us what

20  is stated here and what the answer is?

21  **A.**   It says that Autonomy doesn't -- didn't make any sales to

22  MicroLink in Q4 2009.

23  **Q.**   And there were no Q4 '09 revenues for MicroLink?

24  **A.**   That's what it says.

25  **Q.**   Could we go to page 10, please?

1      And at the top do you see here -- do you see where I put a

2  little box around?  And the question is (reading):

3          "What types of revenue streams do you have?"

4      And does the response appear to be (reading):

5          "We sell standard software and 95 percent of Group

6          revenues are product related"?

7  A.   Yes.

8  Q.   All right.  And do you see then there's a list of items

9  here (reading):

10         "Upfront license revenues.  Normally perpetual and

11         recognized on delivery in accordance with IFRS, which in

12         terms of revenue recognition is consistent with U.S. GAAP

13         SOP 97-2.  SOP 97-2 contains more detailed specific

14         guidance on software revenue recognition which fits within

15         the framework of IFRS."

16     Number two, "Maintenance Revenues" and it talks about the

17  percentages.  (reading)

18         "Hosted SAAS revenues, pay as you go or subscription

19         recognized rateably.

20         "OEM revenues split as development and ongoing."

21     Do you see each of those categories?

22  A.   Yes, I do.  Yeah.

23  Q.   And as an analyst, as somebody observing information that

24  Autonomy has put out, does any of that appear to be hardware?

25  A.   None of that's hardware.  "Product" was used as a term

MORLAND - DIRECT / FRENTZEN

1   to -- it meant software product, and those four items are all

2   categories of software revenue.

3   Q.   Okay.  Then it says "Other" and it says (reading):

4           "Primarily professional services but can include

5       training and appliances."

6   Do you see that?

7   A.   Yes.

8   Q.   Is that the first reference in this -- or the only

9   reference in this list of things to any sort of hardware?

10  A.   Yes, it is.

11  Q.   I'd like to go now to page 11, and if we could go to the

12  bottom of page 11, please.

13  Can you comment in more detail on your revenue recognition

14  policy?  Do you see that there, Mr. Morland?

15  A.   Yeah.

16  Q.   Okay.  All right.  And does this go on to say effectively

17  that Autonomy uses IFRS as the formal recognition policy used

18  to prepare its accounts; but then rather than stop going on

19  (reading):

20          "However, being in a pure software business, there

21      are certain areas where IFRS does not have specific

22      guidelines to cater for all situations but merely provides

23      guiding principles.  Thus, for revenue recognition, we

24      voluntarily adhere to the principles set out in U.S. GAAP

25      SOP 97-2, which is far more detailed, prescriptive, and

1    conservative than IFRS and that has made it the gold

2    standard for other software companies like Oracle and

3    Microsoft.  In fact, the guidelines to SOP 97-2 and SAB

4    101 run to over 100 pages as they have evolved over the

5    years in tandem with the much broader U.S. software market

6    requirements.  IFRS, on the other hand, is far less

7    detailed and less conservative when it comes to software

8    companies.  In short, we use SOP 97-2 because it is

9    designed specifically for software revenue recognition

10   and" -- if we could go to the next page -- "hence, tends

11   to be more relevant; but if IFRS for any revenue

12   recognition point became more relevant or restrictive than

13   SOP 97-2, we would use IFRS for revenue recognition since

14   that is the formal policy."

15       And then goes on to list or to describe aspects of

16   SOP 97-2.

17       So as an analyst, as an investor, does this strengthen

18   what you were talking about previously in terms of

19   Mr. Hussain's statement to you about how or what rules Autonomy

20   used for revenue recognition?

21   **A.**   Yes, it does.

22   **Q.**   Okay.  And can you just describe for us -- I mean, what

23   was your view on how Autonomy recognized revenue?

24   **A.**   Well, it used -- I mean, this makes it clear that it uses

25   GAAP specifically designed for software recognition and

1    reinforces the argument really that Autonomy was a pure

2    software company and that's why it was using GAAP designed for

3    software companies.

4        And it also makes the point that they were very

5    conservative in their recognition as well because where they

6    thought IFRS wasn't conservative enough, they would voluntarily

7    adopt SOP 97.

8    **Q.**   And that's information that was out there for investors

9    for the public?

10   **A.**   Yes, it was.

11   **Q.**   Can we scroll up some?  Yeah, the other way.  Great.  Keep

12   going.  All right.  Stop here.

13       I want to direct your attention here to this paragraph,

14   Mr. Morland.  And the question here posted was (reading):

15           "Autonomy has been very successful at maintaining

16       consistently high operating leverage.  Please, can you

17       help me understand the company's margin profile and what I

18       should expect going forward?"

19       What's "margin profile" refer to?

20   **A.**   Two things really.  One, how I can expect the margin to

21   develop in the future; and, two, something that's called

22   operational gearing, which is whether if you've got a high

23   gross margin, then each additional sale you make contributes

24   directly to the bottom line and can ultimately mean that you

25   generate a higher or a rising operating margin.

MORLAND - DIRECT / FRENTZEN

1  Q.   All right.  Does this, then, go on to talk about pure

2  software model?

3  A.   It does.

4  Q.   (reading)

5           "Autonomy is one of the very rare examples of pure

6       software model.  Many software companies are actually

7       pseudo-services outfits that do an awful lot of

8       customization work on a product for every single

9       implementation while Autonomy ships a standard product

10      that requires very little tailoring with the necessary

11      implementation work carried out by approved partners such

12      as IBM Global Services, Accenture, and others.  This means

13      that after the cost base has been covered, for every extra

14      dollar of revenue that comes in, you simply take off

15      9 cents to get to the gross margin and then a further

16      10 cents, which is paid in commissions to our partner

17      managers.  That leaves 81 cents which falls straight

18      through to the bottom line.  We see no reason operating

19      margins of 45 to 50 percent should not be consistently

20      achievable in the future."

21      Is that a description of Autonomy as a pure software

22  model?

23  A.   Yes, it is.

24  Q.   And could we now take a look at the last paragraph here?

25  Does this last paragraph here actually relate to hardware?

1   **A.**   (Witness examines document.)  Yes.

2   **Q.**   Okay.  In other words -- well (reading):

3            "Historically, companies that have achieved these

4        levels often diversify into hardware or other areas, which

5        has a big impact on operating margin.  For Autonomy, it's

6        hard to see what other areas could be valuable enough to

7        warrant such a large departure from the pure software

8        model."

9        Does it appear here that Autonomy is saying "pure software

10   model" means "we don't get into hardware"?

11  **A.**   It does.

12  **Q.**   Did you take that to mean that as an analyst in advising

13  your investors?

14  **A.**   I did.

15  **Q.**   And was that available for the public, the Investor Board

16  Questions?

17  **A.**   Yes.  I mean, it states quite clearly that it has no

18  intention of Autonomy to ever get into the sale of hardware.

19  **Q.**   I'd like to now go very -- actually, let me -- I want to

20  show you one more document.  I don't have a copy of it here.

21          **MR. FRENTZEN:**  Counsel, is there any objection to 293,

22  the PowerPoint?

23          **MS. LITTLE:**  (Shakes head.)

24          **MR. FRENTZEN:**  Your Honor, I'd offer 293 into

25  evidence.

1          **THE COURT:**  Admitted.

2      (Trial Exhibit 293 received in evidence)

3          **MR. FRENTZEN:**  And could we go quickly to page 3?

4  **Q.**   And, Mr. Morland, is this the PowerPoint that came with

5  your -- that was handed out at that Q3 '09 earnings call?

6  **A.**   Yes, it is.

7  **Q.**   Okay.  And do you see this?  Was this one of the lively

8  topics of discussion there, was that new product-related spend

9  at about 20 million?

10 **A.**   Yes, it was.

11 **Q.**   And could we go to the next page, please?

12     Okay.  And here there's discussion about launching IDOL

13 SPE, which we heard about before --

14 **A.**   Yes.

15 **Q.**   -- on the recording?

16     Okay.  And I'd just like to go briefly, if we could, to

17 page 17.

18     On page 17 is there more discussion about this launch with

19 a beta program and a Quick-Start initiative and customer

20 events, and so on?

21 **A.**   Yes.  The Quick-Start initiative is the initiative that

22 affected the gross margin that we mentioned earlier.

23 **Q.**   Describing some of the money they spent, the extra

24 20 million, on this launch?

25 **A.**   I believe the Quick Start was about 4 million and then

1    16 million was the extra sales and marketing.  So the total

2    extra spend was 20 million.

3    **Q.**    Thank you.

4        I want to direct your attention now to a slightly

5    different time period.  And if we could, do you recall an

6    Autonomy earnings call in April of 2010 for the Q1 2010 --

7    sorry -- that earnings call?

8    **A.**    Yes, I do, Q1 2010 earnings call.

9    **Q.**    All right.  And the jurors have already heard, we've

10   already heard a fair amount of that; but if you could just,

11   first, from your recollection -- then I want to play one brief

12   clip from that call -- do you recall there being a pretty

13   lively issue there about inventory?

14   **A.**    Yes, I do.

15   **Q.**    And could you just describe for us what was that issue?

16   What's your recollection about that?

17   **A.**    I can remember the results and when I first saw the

18   results, there was an item in inventory of $10 million; and up

19   to that point in all the years I'd covered Autonomy, it had

20   never been above 1 million so it looked quite odd, and then I

21   think it became quite a major topic of conversation in the

22   ensuing meeting.

23   **Q.**    And do you have a recollection of whether or not that

24   $10 million -- well, first of all, just why did that become an

25   issue?

1    **A.**   Software companies -- I mean, inventory and stock, it's

2    the same thing.  Software companies don't tend to carry stock

3    but hardware companies do.  So it was an indication that

4    Autonomy might be selling hardware so there were a number of

5    questions, I believe, at the meeting to investigate that matter

6    further.

7    **Q.**   And in the course of that -- in the entire course of that

8    meeting, was it ever revealed to you as an analyst that

9    Autonomy was engaging in the resell of hardware without a

10   connection to software?  In other words, was that ever told to

11   you?

12   **A.**   I don't recall that being mentioned.  My recollection is

13   that the hardware was described by Mr. Lynch, I believe, as

14   being an appliance which was used to load the software up to

15   speed up the process of selling the software to the client.

16           **THE COURT:**  Let's take just a little recess so

17   people --

18           **MR. FRENTZEN:**  Sorry, Your Honor.

19           **THE COURT:**  -- can stand and stretch before we start.

20       About how much longer do you have?

21           **MR. FRENTZEN:**  Not long, Your Honor.  I'm almost

22   there.

23                   (Pause in proceedings.)

24           **MR. FRENTZEN:**  Thank you, Your Honor.

25       Could we listen to 2688?  And this clip is at about 45

1    minutes, Your Honor.  And this is one I just want to remind

2    this witness, and then we'll get into it.

3                  (Audio was played but not reported.)

4    BY MR. FRENTZEN:

5    Q.   Mr. Morland, was that basically the upshot that you got

6    from that earnings call related to what that inventory was

7    about and what that hardware was about?

8    A.   Yes, it was.

9    Q.   And if, instead, you knew that Autonomy was reselling

10   hardware at a loss during that period of time, would that have

11   been significant to you in your coverage of Autonomy?

12   A.   It would have been very significant.

13   Q.   Why is that?

14   A.   You know, I'm more of a software expert than a hardware

15   expert, but I have followed hardware companies in the past and

16   hardware companies, I would say the average margin of a

17   hardware company, operating margin, is round about 5 percent.

18        I think at its peak Autonomy generated a 50 percent

19   operating margin with its pure software model.  So that's 10

20   times the average margin of a hardware company and, hence,

21   software companies are valued much more highly than hardware

22   companies.

23   Q.   And I'd like to take you now to 176, and if we could go to

24   page 42 of 176.

25                  MR. FRENTZEN:  And, again, Your Honor, this is a large

1    group of different notes by Mr. Morland.

2            **THE COURT:**  Okay.

3    **BY MR. FRENTZEN:**

4    **Q.**  All right.  In July of 2010, would this be a note after

5    your attendance at that Q1 2010 earnings call?

6    **A.**  (Witness examines document.)  Yes.

7    **Q.**  And you're still at Sell?

8    **A.**  Yes, I am.

9    **Q.**  Okay.  And you say there's evidence to suggest early

10   recognition of revenues?

11   **A.**  Yes.

12   **Q.**  I want to go now to page 57, if we could, which is within

13   that same note, 176, page 57.  And could you go down to the

14   bottom?  Okay.  Great.

15       All right.  And in the course of this particular note, did

16   you get into sales of an appliance?

17   **A.**  I talked about it, yes.

18   **Q.**  And you said (reading):

19           "Key issues for Q2 2010 are likely to be around

20       organic growth," and so on.

21       And then you said (reading):

22           "Cash from $10 million of Arcpliance stock that

23       appeared on the balance sheet in Q1."

24   **A.**  Yes.

25   **Q.**  All right.  And just in terms of your note, then, did that

1    incorporate your view that the sales of hardware were related

2    to an appliance?

3    **A.**    Yes, it did.

4    **Q.**    And I think the jury has heard a lot about this, but are

5    sales of appliances different than reselling hardware at a

6    loss?

7    **A.**    Yes, it is.

8    **Q.**    Why or how?

9    **A.**    Well, the sale of an appliance is very closely related to

10   that software because the software's loaded onto it and then

11   it's sold as a package.  If you're just reselling hardware,

12   then the customer can put any kind of software on that

13   hardware.

14   **Q.**    Mr. Morland, did you at some point in time send a copy of

15   a worksheet that you kept to the federal government?

16   **A.**    I did, yes.

17           **MR. FRENTZEN:**  Okay.  And, Your Honor, at this time

18   I'd offer Exhibit 2520.  I don't need the e-mail.  I just want

19   the attachment.

20           **MS. LITTLE:**  No objection.

21           **THE COURT:**  Admitted.

22       (Trial Exhibit 2520 received in evidence)

23           **MR. FRENTZEN:**  Can we pull up 2520, please?  Sorry.

24   The attachment.

25                       (Pause in proceedings.)

1    **MR. FRENTZEN:**  Is it not here?

2                    (Pause in proceedings.)

3    **MR. FRENTZEN:**  If you guys want to take the screen

4    down and look for that, I'll get into some other stuff.

5    **Q.**   Mr. Morland, did you -- in your time spent working on

6    Autonomy, did you spend a fair amount of time focused on the

7    details of Autonomy's business as best you could?

8    **A.**   I did.

9    **Q.**   Can you describe that for us?  I mean, how did you go

10   about doing that, and how much time would you spend basically

11   taking in the information you could find about Autonomy?

12   **A.**   It became a matter of focus each time the company

13   reported.  So every three months when you knew the company was

14   going to report, you would read the statements in detail,

15   attend the meetings, and crucially you would have discussions

16   with management around what the future looked like, what the

17   order book was like, what the growth rate was likely to be, how

18   sustainable the margins were, whether the margins were going to

19   go up or down.

20       And then you would use all that information to update your

21   model because the most important thing about keeping a model on

22   a company for an analyst is to forecast future earnings because

23   a company is valued off its future earnings typically.

24   **Q.**   And do you believe there were areas that you could have

25   looked into that were publicly available that you just

1  disregarded in terms of trying to figure out how to advise the

2  investors that were consuming your product?

3  **A.**    I'm not aware of anything that I deliberately disregarded,

4  no.

5  **Q.**    And so during the course of 2009, from your vantage point,

6  did you have any idea at all that Autonomy during 2009 had

7  resold hardware, not appliances, untethered to software in the

8  amount of $57 million?

9  **A.**    I had no idea.

10 **Q.**    And during that period of time, did you have any idea that

11 in 2010, Autonomy in the same fashion sold approximately

12 $100 million worth of hardware?

13 **A.**    I had no idea.

14 **Q.**    And in terms of -- were that true, would that be a

15 surprise to you?

16 **A.**    It would be a very big surprise, yeah.

17 **Q.**    When you were first asked about that in London, do you

18 recall your reaction to it?

19 **A.**    I think I said "Blimey."

20 **Q.**    What does that mean for those of us who live over here?

21 **A.**    It means it's awesomely surprising I would say.

22 **Q.**    And what sort of impact would that type of information

23 have had for you as an analyst in evaluating Autonomy?

24 **A.**    I mean, it would have had a massive impact.  I mean,

25 firstly, I described how much more valuable software is than

1    hardware, so it would have had a huge impact on how the

2    analysts and the investment community in general perceived

3    Autonomy.  It would be clear that it wasn't a pure software

4    stock; and then it would, of course, beg the question, you

5    know, how material is this and what are margins on that

6    hardware.

7        So you'd have to completely reassess the way you valued

8    the company because it would be -- you'd have to value it as

9    some sort of hybrid model rather than just a pure software

10   company.

11       And the second ramification of it would be that the

12   investment community would have grown very concerned about what

13   they'd been led to believe by management.  One of the most

14   important things in stock analysis is the credibility of the

15   management; and if management had apparently been hiding the

16   fact that they'd been selling hardware, then it would be very

17   bad indeed for management's reputation and that would have a

18   very negative impact on the stock as well.

19   Q.   What about if this was part of the revenue that was

20   recognized in each of those years, would there have been issues

21   in terms of evaluating Autonomy's growth?

22   A.   There would have been, yes.  I mean, to calculate growth,

23   of course, you look at the revenues from the corresponding

24   period in the prior year and see how much that has grown over

25   that 12-month period.  So you would need to know how much

1    hardware the company sold in the prior period.  So if there was

2    no hardware at all in the prior period, then any hardware that

3    was sold in the next year would all represent growth.

4        So the 57 million that you suggested that I think it was

5    in 2009, if they hadn't sold any hardware in 2008, then all of

6    that 57 million would have contributed to growth.  And if you

7    subtracted that from the software growth that they reported,

8    you would probably reach the conclusion that the actual

9    software business itself was not growing at all.

10   **Q.**   And all of these things, would this have had any impact on

11   Autonomy's value?

12           **MS. LITTLE:**  Objection.  Calls for speculation.

13           **THE COURT:**  Overruled.

14           **THE WITNESS:**  It would have had a very seriously

15   negative impact on the valuation, yes.

16           **MR. FRENTZEN:**  May I have a moment, Your Honor?

17                    (Pause in proceedings.)

18           **MR. FRENTZEN:**  That's all I have, Your Honor, other

19   than we'll figure out what's going on with that one exhibit

20   but, thank you.

21           **THE COURT:**  Okay.  Ladies and gentlemen, let's take a

22   recess until 20 to 3:00.

23       Remember the admonition given to you:  Don't discuss the

24   case, allow anyone to discuss it with you, form or express an

25   opinion.

PROCEEDINGS

1      (Proceedings were heard out of the presence of the jury:)

2          **THE COURT:**  Okay.  Let the record reflect the jurors

3   have left.

4      So cross, do you have any idea about how long?

5          **MR. KEKER:**  Do you want to get him off, Your Honor?

6          **THE COURT:**  Sure.

7      You can step down.  You don't have to sit here.  You can

8   leave.  I mean, you have to come back.

9          **THE WITNESS:**  I can't go back to England?

10          **THE COURT:**  Not quite yet.

11      I was going to inquire how long the cross -- you

12   anticipate the cross to be?

13          **MS. LITTLE:**  I'm going to look at it during the break.

14   There's some things I can take out.  Half hour, 45 minutes.

15          **THE COURT:**  Sorry?

16          **MS. LITTLE:**  Half hour, 45 minutes.

17          **THE COURT:**  Okay.  All right.  So do we have another

18   witness after this?

19          **MR. FRENTZEN:**  We do, Your Honor.

20          **THE COURT:**  How long is that witness?  Who is it?

21          **MR. LEACH:**  It's Andy Johnson, Your Honor.  We may be

22   able to start him.  I don't think we'll be able to finish him.

23          **THE COURT:**  Oh, okay.

24          **MR. LEACH:**  But he's local as well.

25          **THE COURT:**  Okay.  All right.  I want to conclude by

 1    4:00 today.  Okay.

 2                **MR. LEACH:**  Understood.

 3                        (Recess taken at 2:25 p.m.)

 4                    (Proceedings resumed at 2:44 p.m.)

 5         (Proceedings were heard in the presence of the jury:)

 6                **THE COURT:**  Let the record reflect all jurors are

 7    present.

 8         Cross-examination.

 9                **MS. LITTLE:**  Thank you, Your Honor.

10                        <u>**CROSS-EXAMINATION**</u>

11    **BY MS. LITTLE:**

12    **Q.**  Good afternoon, Mr. Morland.  My name is Jan Little and

13    I'm one of Mr. Hussain's attorneys.  Good afternoon.

14    **A.**  Good afternoon.

15    **Q.**  Mr. Morland, the jury has heard from another analyst who

16    followed Autonomy, Mr. Daud Khan.  You and Mr. Khan are

17    friends; right?

18    **A.**  Correct.

19    **Q.**  You both went to work at Canaccord Securities around the

20    same time?

21    **A.**  Correct.

22    **Q.**  That was in about February or March 2016?

23    **A.**  Correct.

24    **Q.**  And you worked together at Canaccord?

25    **A.**  We did.

1   Q.   In fact, on your LinkedIn page, you specifically mention

2   that you work with Mr. Khan; right?

3   A.   I can't remember, but maybe, yeah.

4   Q.   Are you aware that Mr. Khan came here to this courtroom

5   last month to testify in this trial?

6   A.   I am, yeah.

7   Q.   Have you talked with Mr. Khan about his testimony?

8   A.   He mentioned it to me when he came back, and we talked

9   probably for about a minute about it, yeah.

10  Q.   And what did he say and what did you say?

11  A.   He said that he'd been asked to explain what pure software

12  was.  And he said he'd been on the stand for -- he was on the

13  stand for about two hours.  And what else did he say?  Not a

14  lot.  Not a lot more.

15  Q.   But you talked about the substance of what he testified

16  to; correct?

17  A.   Yes.

18  Q.   Did anyone advise you that there is a rule in this

19  courtroom that witnesses are not supposed to talk with each

20  other about their testimony?

21  A.   No.

22  Q.   What was your purpose in talking to him about his

23  testimony?

24  A.   There was no purpose.  He -- he -- I knew he was going to

25  California, and he called me when he got back, and I said at

1   the time that I wasn't going because I didn't think at the time

2   I was going to be required.

3        I was told in February I would be required and then I was

4   told I wouldn't be required.  And then about two weeks ago, I

5   was told that I'd be required again.

6   **Q.**   Okay.  And then you talked to him to find out what he

7   testified to before you came and testified here today?

8   **A.**   Yes.

9   **Q.**   Did he tell you -- give you any tips?

10  **A.**   He just told me about the pure software, that he said what

11  he thought pure software was.

12  **Q.**   Was he asking you to testify in the same manner that he

13  was testifying?

14  **A.**   No.

15  **Q.**   Was he trying to make sure you were consistent?

16  **A.**   No.

17  **Q.**   Are you aware of a news article that the *Telegraph*

18  published about Mr. Khan's testimony?

19  **A.**   I am, yes.

20  **Q.**   Did Mr. Khan tell you about it?

21  **A.**   No.  I -- I didn't know it included -- I was told by

22  somebody that it included something he had said, but the reason

23  I know about it is somebody said it quoted me from when I'd

24  written a *Telegraph* article some time ago.  It referred to me

25  as a veteran analyst.  That's what I remember.

MORLAND - CROSS / LITTLE

1   Q.   The article about Mr. Khan also talked about you; correct?

2   A.   Yeah.   I didn't know he was mentioned in it, actually.

3   Q.   Well, you read the article and it was a description of his

4   testimony; right?

5   A.   I didn't read the article.   Somebody pointed it out to me

6   and said, "This is a bit about you," and I only read the bit

7   that was about me.   I haven't read the whole article.

8   Q.   Have you talked to the *Telegraph* or any media sources

9   about your anticipated testimony today?

10  A.   No, I haven't.

11  Q.   Have you talked to anyone in the last month, other than

12  Mr. Khan, about your anticipated testimony today?

13  A.   I've told people I'm coming here, yes.   My family.

14  Q.   Other than your family, have you talked with any of your

15  colleagues about it?

16  A.   I would say that some of my colleagues are aware.   I had

17  to tell them at work why I needed to take two days off work.

18  Our head of sales asked me where I was going to be today and I

19  said I'm going to California to testify in a trial.   I didn't

20  specify what it was.   It has been necessary to tell a few

21  people, yes.

22  Q.   And you're a UK citizen; right?

23  A.   Yes.

24  Q.   You didn't have any legal obligation to come here to

25  testify.   You are here voluntarily; correct?

MORLAND - CROSS / LITTLE

1    A.    I am, yeah.

2    Q.    You mentioned that you started following the tech sector

3    in 1998; is that right?

4    A.    Yes.  That's correct.

5    Q.    About 20 years ago.  And in the last 20 years, you've held

6    a number of different positions as an analyst; correct?

7    A.    Yes.

8    Q.    In the late '90s, you were at NatWest Securities?

9    A.    Correct.

10   Q.    And then you were an analyst at Deutsche Bank for a short

11   time?

12   A.    That's right.  Deutsche Bank acquired NatWest Securities.

13   Q.    All right.  Then in 2003, you were an analyst at Societe

14   Generale, a French company?

15   A.    Yes.

16   Q.    And you were there for about two and a half years, March

17   2003 to October 2005?

18   A.    Correct.

19   Q.    And then after about two and a half years, you moved --

20   and I won't pronounce it right -- Arbuthnot?

21   A.    Arbuthnot, correct.

22   Q.    You were there for a little under three years?

23   A.    Correct.

24   Q.    And after that, you moved to BlueOar Securities, which

25   later became Astaire?

MORLAND - CROSS / LITTLE

1   **A.**   Astaire, correct.

2   **Q.**   You were there for about two and a half years?

3   **A.**   Correct.

4   **Q.**   And then after that, you moved to Peel Hunt?

5   **A.**   Yes.

6   **Q.**   And you were an analyst at Peel Hunt for a little less

7   than three years?

8   **A.**   Correct.

9   **Q.**   And then you were on your own for about a year, right,

10  from June of 2013 to December of 2014?

11  **A.**   Self-employed, correct.

12  **Q.**   And then after that, you spent a little over a year at

13  Arden Securities or Arden Partners?

14  **A.**   That is correct.

15  **Q.**   And then after that, you moved to Canaccord Securities

16  where you've been for the last two years; correct?

17  **A.**   Correct.

18  **Q.**   So ten positions in 20 years?

19  **A.**   Correct.

20  **Q.**   During the period of 2009 to 2011, you covered Autonomy;

21  correct?

22  **A.**   Correct.

23  **Q.**   And there were between 20 and 30 analysts covering

24  Autonomy?

25  **A.**   I would say less than that, but ...

1   **Q.**   Less than 30 or less than 20?

2   **A.**   Less 20.

3   **Q.**   About how many?

4   **A.**   I'd say 10 to 15, probably.

5   **Q.**   Is it fair to say that most of the analysts had a positive

6   view, but there were a few of you who were negative on

7   Autonomy; correct?

8   **A.**   That's right, yeah.

9   **Q.**   You and Mr. Khan in particular; right?

10  **A.**   Correct.

11  **Q.**   And you spent, I think you said, about a quarter of your

12  time analyzing and writing about Autonomy?  Twenty percent,

13  something like that?

14  **A.**   Twenty percent probably, yeah.

15  **Q.**   And you became fairly committed in your negative views

16  about Autonomy; correct?

17  **A.**   I did, yeah.

18  **Q.**   You've published, we've seen, a fair number of research

19  notes critical of Autonomy?

20  **A.**   Correct.

21  **Q.**   And since 2009, you've been consistently negative on

22  Autonomy; right?

23  **A.**   That's right.

24  **Q.**   You have been communicating with the Government a fair

25  amount in the last few years about this case; right?

1    **A.**    Correct.

2    **Q.**    You spoke to the Government by phone a couple times in mid

3    2005?  Do you remember that?  2015.  Excuse me.

4    **A.**    I was going to say --

5    **Q.**    2015.  My apologies.

6    **A.**    Yes.  That's probably right.

7    **Q.**    And then after that, you began sending the FBI emails with

8    various documents; correct?

9    **A.**    Correct.

10   **Q.**    And you would send them things that you thought would be

11   helpful to them?

12   **A.**    Correct.

13   **Q.**    Or things that you said might be of interest or

14   interesting?

15   **A.**    Correct.

16   **Q.**    And you said, "Hopefully this is of some help to you."

17   You were trying to help them; right?

18   **A.**    Correct.

19   **Q.**    And you're still trying to help them; right?

20   **A.**    Correct.

21   **Q.**    And after sending these mails, did you meet with the

22   Government in July of 2015?

23   **A.**    I don't recollect the date, but right about that time, I

24   definitely met with them in London, yes.

25   **Q.**    Around July 22, 2015?

1    **A.**    What was the first date you gave me?

2    **Q.**    July 22nd, 2015 did you meet with the Government?

3    **A.**    Is that the second date?

4    **Q.**    I think that's the first, but you tell me.

5          When was the first time you met with the Government?

6    **A.**    I've met with them twice, and the first time was around

7    that date and the second time was more recently.  This year.

8    **Q.**    Just to refresh your recollection, take a look at Exhibit

9    2520.  We can put that up on the screen.  It's in evidence.

10                    (Exhibit published to jury.)

11   **BY MS. LITTLE:**

12   **Q.**    Just look up at the top just to refresh your recollection

13   here.  It's an email from Mr. Castro.  He is an FBI agent;

14   right?

15   **A.**    Yes.

16   **Q.**    Or to Mr. Castro from you.  Excuse me.  Right.

17          And you said, "Okay, how about 3:00 p.m. on the 22nd?"

18   **A.**    Okay, yeah.

19   **Q.**    So does that refresh your recollection that you met with

20   someone from the Government on July 22nd?

21   **A.**    Yes.

22   **Q.**    And do you recall where you met?

23   **A.**    I remember the chief station was Marble Arch, and it was a

24   hotel near that.

25   **Q.**    And who was present?

1    **A.**    There were three FBI people and two government lawyers.

2    **Q.**    Was it any of the government lawyers who are here today?

3    **A.**    Yes.

4    **Q.**    Who was it?

5    **A.**    The two on this end.

6    **Q.**    Mr. Reeves and Mr. Leach?

7    **A.**    Yeah.

8    **Q.**    How long was that meeting?

9    **A.**    About four hours, I think.

10    **Q.**    And did anyone take notes at that meeting?

11    **A.**    I didn't notice, but I expect so, yeah.

12         **MS. LITTLE:**  Your Honor, at this point I would ask

13    that the notes or any report of that meeting be produced.  They

14    haven't been produced.

15         **MR. FRENTZEN:**  Your Honor, I think they have.  I think

16    the dates are just crisscrossed.

17         **THE COURT:**  Proceed.

18    **BY MS. LITTLE:**

19    **Q.**    You talked to the FBI and the Government again in 2017 and

20    you met with them in 2018; correct?

21    **A.**    Correct.

22    **Q.**    And, again, you would continue to sort of give them tips

23    on what they should be looking out for or what they should look

24    at?

25    **A.**    Yes.

**MORLAND - CROSS / LITTLE**

1    **Q.**   And you also talked to lawyers and representatives of HP,

2    Hewlett-Packard; correct?

3    **A.**   I don't remember.  I spoke to somebody from HP at a

4    meeting in relation to something else.  I don't remember

5    speaking to an HP lawyer.

6    **Q.**   Do you remember speaking on the phone to attorneys from

7    the firm of Morgan Lewis representing HP in 2015?

8    **A.**   I can't remember.  Maybe.

9    **Q.**   You've testified about some various concerns that you had

10   about organic growth.  Do you recall that testimony?

11   **A.**   Yes, I do.

12   **Q.**   And your concerns were based on estimates and opinions

13   that you had.  You didn't have access to the company's books

14   and records; correct?

15   **A.**   Correct.

16   **Q.**   Obviously Autonomy management had those records, and are

17   you aware that their auditors would have had access to those

18   records?

19   **A.**   Yes.

20   **Q.**   And would you agree with me that the auditors would be in

21   a better position than you to understand the rationale behind

22   calculation of organic growth rates?

23         **MR. FRENTZEN:**  Objection.  I'm sorry.  Objection.

24   Calls for speculation.

25         **THE COURT:**  Sustained.

MORLAND - CROSS / LITTLE

```
1    BY MS. LITTLE:
2    Q.   And your view on organic growth was based on an
3    understanding about Autonomy's acquisitions; correct?
4    A.   Correct.
5    Q.   It's acquisitions of other companies?
6    A.   Yeah.
7    Q.   Did you review the press releases of when Autonomy would
8    acquire other companies?
9    A.   Yes, I did.
10   Q.   And did you review those to have an understanding of the
11   reasoning behind those acquisitions?
12   A.   Yes, I did.
13   Q.   And I'd like to just offer as a group five press releases.
14   It's Exhibit 6889, 6890 --
15        THE COURT:  Wait, wait, wait.  68 -- 6889 --
16        MS. LITTLE:  6890.
17        THE COURT:  90 --
18        MS. LITTLE:  6891, 6892, and 6893.
19        MR. FRENTZEN:  I'm sorry.  Counsel, are you sure -- I
20   don't have press releases for two --
21        THE COURT:  Those are the numbers I have.
22        MR. FRENTZEN:  6898 I've got is a note by this
23   witness.  Not that I'm objecting to -- it's probably already
24   in.  I'm just saying I don't think it's a press release.
25        THE COURT:  6889 is something from 2005.  6890 is
```

1    2007.  6891 is 2009.  6892 is 2010.  6893 is 2011.

2           MR. FRENTZEN:  Sorry.  I didn't go deep enough.  Thank

3    you.

4           THE COURT:  Okay.  Admitted.

5        (Trial Exhibits 6889, 6890, 6891, 6892 and 6893

6         received in evidence)

7           MS. LITTLE:  If we just take a quick look on the

8    screen at 6889.

9                  (Exhibit published to jury.)

10   BY MS. LITTLE:

11   Q.   Is this the December 2009 press release for Autonomy's

12   acquisition of Verity?

13   A.   Yes.

14   Q.   Did you review this press release?

15   A.   That's a long time ago.

16          THE COURT:  When?  When are you asking?

17   BY MS. LITTLE:

18   Q.   Well, at any time.  Did you review it when you were making

19   your statements about acquisitions and organic growth?  Did you

20   go back and look at the press releases about Autonomy's

21   acquisitions?

22   A.   I can't remember that I looked at this one, but my work

23   around acquisitions really started with Zantaz in 2007.

24   Q.   Okay.

25   A.   I can remember the Verity acquisition, but I can't

 1  remember the detail of it and I can't remember if I looked at

 2  that particular statement.

 3  **Q.**   You remember that Verity was a serious competitor of

 4  Autonomy's; correct?

 5  **A.**   Yes.  I remember that, yeah.

 6  **Q.**   And then you did look at the press release for Zantaz,

 7  which is Exhibit 6890.

 8                  (Exhibit published to jury.)

 9          **THE WITNESS:**  I'm sure I would have done -- I can't

10  specifically remember reading it.

11  **BY MS. LITTLE:**

12  **Q.**   The acquisition of Zantaz permitted Autonomy to get into

13  the archiving eDiscovery --

14  **A.**   Correct.

15                  (Exhibit published to jury.)

16  **BY MS. LITTLE:**

17  **Q.**   And then the Interwoven acquisition, which is Exhibit 6891

18  in March of 2009, did you review that press release?

19  **A.**   Yes.

20  **Q.**   And the acquisition of Interwoven was for Autonomy to get

21  into, I think they call it, HCI, Human Computer Interaction?

22  **A.**   It was -- I thought of it more as document management,

23  really.

24  **Q.**   It was specifically to assist law firms and regulators in

25  managing information, right, or regulated industries?

```
 1   A.   It enabled them to apply their IDOL software to that sort

 2   of the application, yes, by putting the two together.  That was

 3   the logic, I think.

 4                     (Exhibit published to jury.)

 5   BY MS. LITTLE:

 6   Q.   And then Exhibit 6892 pertains to the January 2010

 7   acquisition of MicroLink.  Did you review that one?

 8   A.   Yes.

 9   Q.   That pertained to the need for a cleared company to do

10   classified government work; correct?

11   A.   Yes.

12                     (Exhibit published to jury.)

13   BY MS. LITTLE:

14   Q.   And then Exhibit 6893, finally, is the 2011 acquisition of

15   Iron Mountain.  Do you recall that?

16   A.   Yes, I do.

17   Q.   And that pertained to moving more -- into more eDiscovery

18   and storage; correct?

19   A.   Yes.

20   Q.   All right.  I want to talk just for a minute about your --

21   your research notes.

22        Mr. Frentzen showed you a number of research notes, and

23   you'd agree with me that these reports that you write represent

24   your opinion; correct?

25   A.   Correct.
```

1   Q.   And people may have different opinions?

2   A.   Correct.

3   Q.   In fact, at the end of each of your reports, you put a

4   disclaimer saying "this is just my opinion"; right?

5   A.   Yes.

6   Q.   And if we can just look really quickly at Exhibit 11,

7   which is in evidence, page 47.

8                    (Exhibit published to jury.)

9   BY MS. LITTLE:

10  Q.   In about the middle of the page, it says, "The company may

11  have provided information to the office in relation to the

12  matter covered by this report, but the opinions stated in this

13  report are those of the authors.  Opinions expressed are

14  current opinions as of the date appearing and relate to this

15  material only"; correct?

16  A.   Correct.

17  Q.   It also goes -- they skip a line -- "Any opinions

18  expressed are subject to change without notice"?

19  A.   Correct.

20  Q.   And if we look at all the other reports, we'll find a

21  similar disclaimer at the end saying "this is our opinion"?

22  A.   They tend to change from year to year with regulations,

23  but that's pretty much consistent across them all, I'd say,

24  yeah.

25  Q.   Okay.  You testified about the -- hang on a second here.

1    Okay.

2         You testified about the Q1/2010 earnings call, and a

3    little snippet of that was played for you.  Do you recall that?

4    **A.**    Yes.

5    **Q.**    And you weren't physically present for that call, were

6    you?

7    **A.**    I can't remember.

8    **Q.**    The jury has heard testimony that there was a volcano, a

9    volcanic eruption then and people couldn't fly.  Do you

10   remember that?

11   **A.**    I do.  But I thought I was there.

12   **Q.**    Well, Dr. Lynch was not physically present for that call;

13   correct?

14   **A.**    Okay.  I can't remember.

15   **Q.**    You don't know.  Okay.

16        But you've mentioned that the topic of hardware or

17   appliances came up in this call; correct?

18   **A.**    Yes.

19   **Q.**    And you found out sometime after that that Autonomy had

20   classified part of its hardware costs as sales and marketing;

21   correct?

22   **A.**    Yes.

23   **Q.**    And you spoke to Dr. Lynch about it; right?

24   **A.**    I can't remember.

25   **Q.**    Did you speak to Mr. Lynch and did he explain to you that

 1  the justification for putting hardware -- some hardware costs

 2  under sales and marketing?

 3  **A.**   I have heard the justification.  I can't remember if he

 4  told it to me, but I do remember the justification.  I can't

 5  remember whether it was Mr. Lynch or Mr. Hussain or the head of

 6  IR or who it would have been I would have been speaking to.  I

 7  can't remember.

 8  **Q.**   Didn't Dr. Lynch tell you that the justification for

 9  putting some hardware costs under sales and marketing was that

10  the hardware sales led to software sales?

11  **A.**   Yes.  That's correct.

12  **Q.**   And you understood that?

13  **A.**   Yes.

14  **Q.**   And you also wrote a note -- it's not one that

15  Mr. Frentzen showed you -- but you wrote a round around the

16  Q2/2010 earnings that discussed hardware; correct?

17  **A.**   Yes.

18  **Q.**   If you would take a look at Exhibit 6898, which is in your

19  book.  It's a note that you wrote on July 23rd, 2010.

20       I'd offer it, Your Honor.

21           **THE COURT:**  Sorry.  What number?  6898?

22           **MS. LITTLE:**  6898.

23           **THE COURT:**  Admitted.  Admitted.

24           (Trial Exhibit 6898 received in evidence)

25               (Exhibit published to jury.)

MORLAND - CROSS / LITTLE

```
 1   BY MS. LITTLE:
 2   Q.   It's way in the back.  Is this a note you published in
 3   July of 2010, sir?
 4   A.   Yes, it is.
 5   Q.   Going down to the bottom paragraph, it says, "The Q2
 6   results appear to confirm our concerns about true organic
 7   growth rates and the performance looks even more disappointing
 8   given the contribution of two large banking deals in the
 9   quarter and a boost from the sale of hardware."
10   A.   Correct.
11   Q.   Those are your words; right?
12   A.   Yes.
13   Q.   And anybody reading this would conclude that there was a
14   sale of hardware; right?
15   A.   Yes.  I think I said earlier that I wasn't aware of the
16   sale of hardware in 2009, but after Q1/2010 when the stock
17   appeared on the balance sheet, that's when I first became aware
18   of the sale of hardware.
19   Q.   And it's right out there for anyone to see.  Anyone
20   reading your report is going to see that; right?
21   A.   From 2010 onwards, yes, correct.
22   Q.   And I take it you don't know what Hewlett-Packard knew or
23   didn't know about Autonomy's hardware sales when it made its
24   acquisition?
25   A.   I didn't know what they knew, no.
```

1    **Q.**    Mr. Frentzen showed you Exhibit 630, which was the

2    investor bulletin board.  Do you recall that?

3    **A.**    Yes.

4    **Q.**    Just to pause for a moment, the types of information that

5    are publicly available to you as an analyst, the sort of the --

6    the number one thing you look at is the annual reports; right?

7    That's sort of the --

8    **A.**    More the earnings releases, but the annual reports follow

9    the earnings release, so they just contain a bit more detailed

10   information, but it's really the earnings release, is the main

11   focus, because that's what you get first, and the full year of

12   earnings release tends to have a lot of information in it, you

13   know, almost as much information as the annual report.

14        The annual report just has lots of pictures and a bit more

15   discussion about the company.  So it's really the earnings

16   release first.  And the annual report normally comes out a

17   couple months after -- sometimes at the same time, but normally

18   after the earnings release.  So it gets less attention based on

19   it, yes.

20   **Q.**    And reporting annually is something that is required of a

21   public company in the UK; correct?

22   **A.**    Yes.  That is correct.

23   **Q.**    And then there is also a half year report you've talked

24   about?

25   **A.**    Yes.

1  Q.    And that's required, but it's generally not as detailed as

2  the annual reports; right?

3  A.    Correct.

4  Q.    Then there were quarterly press releases; correct?

5  A.    Yes.

6  Q.    Those are not required, but some companies voluntarily do

7  them; is that right?

8  A.    It depends on what exchange you're on.  In some markets,

9  it's required.  In some, it's not.

10  Q.    And then there could be analyst calls?

11  A.    And there will be, yeah.  If there is an earnings release,

12  there will be an analyst call as well.

13  Q.    And then there's other various pieces of information such

14  as this bulletin board that was on the website that you looked

15  at?

16  A.    Yes.  That's quite unusual.  I mean, I've not seen any

17  other company do that, but Autonomy used it as an extra way to

18  communicate with investors, which I think people found quite

19  helpful.

20  Q.    And you don't know who wrote the material on that bulletin

21  board or who maintained the bulletin board?

22  A.    I think it was probably the head of IR.

23  Q.    Okay.  I'd like to show you a page of that exhibit, 630,

24  the bulletin board, page 12.  And Mr. Frentzen was reading you

25  some of the language at the very top of the page that talks

MORLAND - CROSS / LITTLE

1   about SOP 97-2 and IFRS; correct?

2   **A.**   Yes.

3   **Q.**   Do you recall that?

4   **A.**   Yes, I do, yeah.

5   **Q.**   And then some -- a part that wasn't read to you begins,

6   "Software revenue should be recognized if the following

7   criteria are met," and you see that there are four criteria

8   that are listed here.  "Persuasive evidence of an arrangement";

9   correct?

10  **A.**   Correct.

11  **Q.**   And then "delivery has occurred" --

12  **A.**   Correct.

13  **Q.**   -- correct?

14       And then moving down, "the vendor's fee is fixed or

15  determinable"?

16  **A.**   Correct.

17  **Q.**   And then the last one is "collectibility is probable"?

18  **A.**   Correct.

19  **Q.**   Those, as far as you understood, were the criteria that

20  Autonomy applied in recognizing revenue; correct?

21  **A.**   Correct.

22  **Q.**   You testified about the Q3/2009 earnings call which --

23  where there was a discussion of SPE and Mr. Frentzen played you

24  various clips from that.  Do you recall that?

25  **A.**   I do.

MORLAND - CROSS / LITTLE

1    Q.    And you were physically present for that call; right?

2    A.    Yes.

3    Q.    And do you recall in addition to what Mr. Frentzen played

4    you, that Dr. Lynch made a long presentation about SPE;

5    correct?

6    A.    Yes.

7    Q.    It was about 10 or 15 minutes long?

8    A.    A long time, yeah.

9    Q.    And he showed a video; right?

10   A.    Yeah.

11   Q.    And there was an opportunity for analysts to ask

12   questions?

13   A.    Yeah.

14   Q.    And many analysts did ask questions; right?

15   A.    Yes.

16   Q.    You didn't ask any at that particular call or you didn't

17   ask about SPE certainly?

18   A.    No.

19   Q.    And are you aware that Deloitte, Autonomy's auditors,

20   generally would listen in on these calls?

21   A.    I didn't know that, no.

22   Q.    I'd like to direct your attention to the September 2009

23   issue with the letter from Mr. Kanter.  Do you recall

24   testifying about that?

25   A.    Yes, I did.  Sorry.

1    Q.    And you had reported in your note that Autonomy had

2    changed its accounting policies with respect to Zantaz hosted

3    revenue; correct?

4    A.    Yes.

5    Q.    And Mr. Kanter told you that that was incorrect; right?

6    A.    Yes, he did.

7    Q.    And if we could take a look at Exhibit 206 and

8    particularly page 32.

9                        (Exhibit published to jury.)

10   BY MS. LITTLE:

11   Q.    Can we blow that up.

12         This is an email from Peter Goodman to you; correct?

13   A.    Correct.

14   Q.    And who is Peter Goodman?

15   A.    He would have been the head of IR at the time.

16   Q.    And is this email Mr. Goodman saying, "I saw your note,"

17   and he's raising questions about what you said in your note;

18   correct?

19   A.    Correct.

20   Q.    And he tells you in the third paragraph, "This is

21   factually inaccurate as it would be misaccounting to recognize

22   a hosted service," etc., etc.  "I'm certain you would want to

23   correct this misinformation in the market as soon as possible.

24   Please could you confirm when you have done this."

25         Do you see that?

1    **A.**    Yes, I can.

2    **Q.**    You never responded to this email, did you?

3    **A.**    Probably not, no.

4    **Q.**    And then the next paragraph says, "On a second matter, you

5    mentioned that you had access to what we understand to be

6    non-public Zantaz documents."

7        You're the one that mentioned the information that gave

8    Autonomy concern; correct?

9    **A.**    Are you saying that we -- we are saying --

10        **MR. FRENTZEN:**    Excuse me.    Vague as to "information."

11    I don't -- is she insinuating that he said he has non-public

12    information?

13    **BY MS. LITTLE:**

14    **Q.**    No.

15        I'm saying you are the one that brought it up; right?

16    You're the one that mentioned to people at Autonomy that you

17    had access to certain information; correct?

18    **A.**    I had access to a Zantaz closing balance sheet, yeah.    But

19    the point I made earlier was that it was publicly available.

20    **Q.**    Well, Mr. Goodman said in the last sentence here, "We are

21    concerned that this may be inside information"; correct?

22    **A.**    Correct.

23    **Q.**    And you never responded; right?

24    **A.**    Yeah.    I'm surprised I didn't respond, but I can't

25    remember responding.

1  Q.   Let's take a look at page 1 of this exhibit and the one,

2  two, three, four, fifth paragraph which says -- this is a

3  letter, by the way, to your boss; right?

4  A.   Yes.

5  Q.   And the fifth paragraph says, "The matter has been raised

6  directly with the analyst, attachment 3."  We just looked at

7  attachment 3.  "But as of the writing of this letter, we have

8  had no reply."

9  A.   Right.

10  Q.   And it's appropriate, wouldn't you agree, that if Autonomy

11  writes to you and you don't reply and there's genuine concern,

12  they escalate it to your boss; right?

13          MR. FRENTZEN:  Objection.  This is just argument.

14          THE COURT:  Overruled.

15          THE WITNESS:  Yeah.  I don't think that's unreasonable

16  to escalate to my boss.

17  BY MS. LITTLE:

18  Q.   And then Astaire looked at this and then they sent out the

19  clarification as we discussed; right?

20  A.   Yes.

21  Q.   And in the clarification, it was made clear that the

22  change in revenue recognition timing was not due a change in

23  policy, but simply how the deals were structured; correct?

24  A.   Exactly.  That's correct.

25  Q.   Okay.  Finally, sir, were you involved in a company called

1  Imaginatik?

2  **A.**   Yes, I was.

3  **Q.**   In the spring of 2011, did you approach Dr. Lynch and

4  Mr. Hussain about Autonomy's buying Imaginatik?

5  **A.**   I don't recall that, no.

6  **Q.**   Would you take a look, sir, at Exhibit 6894.

7       **THE COURT:**  Admitted.

8       **MR. FRENTZEN:**  I'm sorry, Your Honor, I object.  None

9  of this -- he's not on this.  If the Court will take a

10 moment --

11      **MS. LITTLE:**  If you look at the bottom, it's an email

12 from Paul Morland to Dr. Lynch and Mr. Hussain.

13      **MR. FRENTZEN:**  Hang on.

14      **THE COURT:**  I don't have it.

15      **MS. LITTLE:**  Oh, you don't have it?  Oh, my goodness.

16      **THE COURT:**  Maybe it's here in the black binder.

17      **MR. FRENTZEN:**  If I could just --

18      **THE COURT:**  Wait a minute.  Let me look at it.  6894.

19 6894.

20      **MR. FRENTZEN:**  I got it.  Sorry, Your Honor.  There is

21 a different name that it's from, so  ...

22      **THE COURT:**  Pardon me.

23      **MR. FRENTZEN:**  It's from somebody else's email

24 address.

25      **MS. LITTLE:**  I can lay a foundation.

1  **Q.**  Who is Sean Taylor, sir?

2  **A.**  He is the CFO of Imaginatik.

3  **Q.**  And looking at this email, Exhibit 6894, it says "Regards,

4  Paul" at the end.

5      This is from you, is it not?

6  **A.**  I can't see it, sorry.

7  **Q.**  Okay.  It's in the black binder.  It should be right

8  toward the end.

9      **THE COURT:**  I see.  It's on the second page.  That's

10  the problem.

11      **MR. FRENTZEN:**  Yes.  That's --

12      **THE WITNESS:**  What number is it?

13      **THE COURT:**  6894.  It's one page, but take a look at

14  the -- turn over the first page, and that's, I think, what

15  counsel is referring to.

16      Do you see that?

17      **MS. LITTLE:**  Mine printed on one page, but different

18  printer.

19      **THE COURT:**  Anyway, it's admitted.

20      (Trial Exhibit 6894 received in evidence)

21          (Exhibit published to jury.)

22  BY MS. LITTLE:

23  **Q.**  If it's admitted, we can put it up on the screen.

24      Is this an email from you to Dr. Lynch and Sushovan

25  Hussain about Imaginatik?

1    **A.**    Yes.

2    **Q.**    You say, "Mike/Sushovan, if we can put to one side for a

3    moment our differences about what constitutes organic growth

4    and what is an acceptable level of cash conversion for a growth

5    company" -- those are the things you wrote about in your notes

6    about Autonomy?

7    **A.**    Correct.

8    **Q.**    "I have a very interesting company that I think you should

9    have a look at.  At least if you did buy it, I could never say

10    it didn't make strategic sense."

11    **A.**    Correct.

12    **Q.**    You were asking Dr. Lynch and Mr. Hussain to have Autonomy

13    look at this company, Imaginatik, that you were involved with;

14    correct?

15    **A.**    Right.

16    **Q.**    And this is after you had been writing various negative

17    things about Autonomy, you still thought enough of them that

18    you were willing to try to sell them -- have them buy your

19    company; right?

20    **A.**    Yes.

21    **Q.**    And then Dr. Lynch said he would consider buying it;

22    correct?

23        You can take a look at Exhibit 6895.  It's the next one in

24    your binder.

25        **THE COURT:**  Admitted.

```
 1                    (Trial Exhibit 6895 received in evidence)

 2                         (Exhibit published to jury.)

 3    BY MS. LITTLE:

 4    Q.   So up at the top, Dr. Lynch writes back, "May be a bit

 5    small for us, but happy to learn more"; right?

 6    A.   Yep.

 7    Q.   No hard feelings, no problems?

 8    A.   No problems at all.

 9    Q.   And then --

10    A.   We were sort of joking because, you know, I did write a

11    lot -- very negative stuff about them and, you know, it -- your

12    conversations with the company have to be sort of open, and I

13    don't think either of us wanted to stop communicating with each

14    other.  They just needed to demonstrate that I was wrong and

15    obviously I thought I was right.  So, you know, there was no

16    point in stopping communicating.  So -- yeah.

17    Q.   And again you thought well enough of Autonomy that you

18    would consider pitching this company for them to buy; right?

19    A.   Correct.

20         MS. LITTLE:  Nothing further.

21                        REDIRECT EXAMINATION

22    BY MR. FRENTZEN:

23    Q.   You were asked what you thought about Autonomy at that

24    time.  Did you think they had a lot of money?

25    A.   Are you talking about Imaginatik?
```

1  **Q.**   Did you think Autonomy had a lot of money?

2  **A.**   Yeah.  Autonomy had a lot of money.

3  **Q.**   You were looking for a buyer?

4  **A.**   Yes.

5  **Q.**   I want to go back to -- there were questions about sort of

6  do you know who wrote the website.  Do you remember those

7  questions?

8  **A.**   Yes.

9  **Q.**   And if we could, could we pull up Exhibit 291, page 11.

10                    (Exhibit published to jury.)

11 **BY MR. FRENTZEN:**

12 **Q.**   And I just want to -- so can you see this -- again, this

13 is from the -- the 2009 earnings call.  It's Mr. Hussain

14 talking here and then can we scroll down.

15      Okay.  Great.

16      And right here, do you see what Mr. Hussain said --

17 sorry -- said to the group there on revenue recognition.  "I'll

18 again restate what Mark has already said.  There is no change

19 in revenue recognition policies.  We use IFRS, and where IFRS

20 is silent, we use SOP 97-2, which again you can find on our

21 website"?

22 **A.**   Yes.

23 **Q.**   So does it appear Mr. Hussain was aware of what was

24 written on the website of Autonomy?

25 **A.**   Yes.

1   **Q.**   You were asked questions about that one note that made a

2   reference to hardware.  I'd like to get back into that for a

3   moment.  If I could get some assistance from the other side.

4   6898, please.

5                    (Exhibit published to jury.)

6   **BY MR. FRENTZEN:**

7   **Q.**   If we can just -- all right.  First of all, this note --

8   do you see the date here, Mr. Morland?

9   **A.**   Yes.

10  **Q.**   July 23, 2010?

11  **A.**   Yeah.

12  **Q.**   And actually, here you are -- you moved to a hold from a

13  sell.  What does that mean?

14  **A.**   That meant that I was feeling a bit more positive about

15  the company.

16  **Q.**   And I just want to go down to the part that you were asked

17  about, and I think it was in this paragraph here where there is

18  a reference to the sale of hardware.

19       If you would, could you take a look up above in the

20  paragraph above, and do you see you made a reference to the

21  sale of some 5 million of hardware?

22  **A.**   Yes, I see that.

23  **Q.**   And would you agree that a sale of 5 million of hardware

24  is different than a sale of a hundred million dollars worth of

25  hardware?

1    **A.**    Yes, it is.

2    **Q.**    And do you have a recollection that there was actually a

3    earnings call the very day before on July 22nd, 2010?

4    **A.**    Yes.    That would be the timing of when the earnings calls

5    were after the quarter end which would have been a June quarter

6    end.

7    **Q.**    So then this would be for Q2/2010?

8    **A.**    Yes.

9         **MR. FRENTZEN:**    And, Your Honor, I will represent we'll

10   get the audio clip of this, but I'd like to go to a portion of

11   the transcript from that just to address this issue.    Thank

12   you, Your Honor.

13        Can we get -- and I apologize.    Can we switch back over.

14   Can we get Exhibit 1006.par.

15                  (Exhibit published to jury.)

16   **BY MR. FRENTZEN:**

17   **Q.**    Do you see here, Mr. Morland, on July 22, 2010, there was

18   the Q2/2010 earnings call for Autonomy?

19   **A.**    Yes.

20   **Q.**    Can we go now to page 16, please.    Can we go to the bottom

21   of the page and blow up from here down -- that's pretty good.

22        So do you see here a question and answer, Mr. Morland, and

23   go ahead and take a look at this.    Is this what you were

24   talking about in your note of the next day?

25   **A.**    Yes, it was.

MORLAND - REDIRECT / FRENTZEN

1   **Q.**   So Mr. Briest is asking -- he is another analyst?

2   **A.**   Yes, he is.

3   **Q.**   "On the inventory, I notice there was still about 6

4   million on the balance sheet at the end of Q2.  I was expecting

5   that to have flowed through in the quarter.  Can you talk a bit

6   about that and when we should expect those deals to close."

7        Okay.  And do you see here Mr. Lynch -- Dr. Lynch -- "on

8   the inventory, that inventory was actually sold last quarter."

9        Is this a continuing reference to the 10 million in

10   inventory and the whole discussion about the appliance from

11   Q1/2010 that's just continued into Q2/2010?

12   **A.**   Yes, it is.  There was 10 million on the balance sheet at

13   the end of the first quarter and the understanding of the

14   analysts was that that would have disappeared by the end of the

15   second quarter, but there was still 6 million left.  And I

16   think Mike Lynch goes on to explain that the customer for

17   whatever reason delayed the purchase of that stock and then it

18   was subsequently sold in Q3.

19   **Q.**   Can we go through to the next page, to the top of that

20   page.

21        And basically Dr. Lynch is saying, "Half of it went on day

22   one.  Half of it they're going to get around to when they dealt

23   with the other things they're dealing with.  It's already sold.

24   We expect it to be delivered this quarter.  Obviously that will

25   be recognized -- be recognized after delivery set hasn't been

MORLAND - REDIRECT / FRENTZEN

1  recognized yet"?

2  A.    Yes.

3  Q.    So this was still this same chunk of appliances that

4  Dr. Lynch said was the inventory from Q1/2010.  He's now

5  attributing that inventory to these appliances in Q2 and then

6  presumably into Q3 of 2010?

7  A.    Yes.

8  Q.    And so is that specifically what you were referencing in

9  your note when you talk about a 5 million-dollar boost of

10 hardware?

11 A.    Yes.

12 Q.    And --

13 A.    Although I should just point out that it's not possible to

14 work out exactly what the sale value of an item of inventory is

15 because you don't know what the pricing is and also that 6

16 million of stock at the end of Q2 might not have been part of

17 the 10 million that was there at the end of Q1.  They might

18 have sold that and bought some more, so, you know, it's very

19 difficult for an analyst.  All you can see is the snapshot at

20 the end of the quarter.

21 Q.    All right.  But this was being attributed again to the

22 appliances that Dr. Lynch had talked about in the prior

23 quarter?

24 A.    It was, yeah.

25 Q.    So this was not reselling hardware in -- what you were

1   referencing in your note.  This was still appliances?

2   **A.**  Correct.

3   **Q.**  Just briefly, you were asked whether or not you spoke with

4   Mr. Khan.  Did your conversation with Mr. Khan influence your

5   testimony here today at all?

6   **A.**  No.

7   **Q.**  Are you represented by a lawyer at all in this case?

8   **A.**  I'm not, no.

9   **Q.**  You were asked whether or not you wanted to be helpful to

10  the Government.  Can you explain what you meant by this?

11  **A.**  What I meant by being helpful?

12  **Q.**  You were asked if you were being helpful to the

13  Government, and you said, "Yeah, at times."  Can you just

14  explain for us what you mean by that?

15  **A.**  Yes.  I'm -- this is a complicated case and I think that

16  I'm as close to anybody from the outside.  It was mentioned

17  earlier in this -- in this courtroom that the analyst is only

18  able to see publicly-available information.  I mean, of course

19  all the auditors in the company itself, they get to see

20  everything.  So that's why it has to be my opinion based on

21  what I see and it's all third-party information.

22      So, you know, you're at a bit of a disadvantage as an

23  analyst, but you have as much information as anybody, outside

24  the auditor and the company, because you spend a lot of time

25  looking at it.  So, you know, I was keen to pass on my

1  knowledge and expertise and experience around what I've been

2  doing around this over a three-year period to the

3  investigation.

4  **Q.**   Trying to just provide the information you have?

5  **A.**   That's right if it helps the case.  I think we all want to

6  see justice done, and if that helps, then ...

7          **MR. FRENTZEN:**  May I have one moment, Your Honor?

8          (Government counsel confer off the record.)

9          **MR. FRENTZEN:**  That's all I have.  Thank you,

10  Your Honor.

11      Thank you very much, Mr. Morland.

12          **MS. LITTLE:**  Nothing further.

13          **THE COURT:**  Thank you.  You're excused.  Thank you for

14  coming.

15      Next witness.

16          **MR. LEACH:**  Your Honor, it's 3:30.  I don't think I

17  will finish the next witness.  We're happy to call him or wait

18  until Monday.

19          **THE COURT:**  Why don't we wait until Monday.  Everybody

20  has had a full day.

21      Ladies and gentlemen of the jury, you are, of course,

22  interested in how we're doing in terms of where we are, and I

23  believe on Monday, I will be able to give you a fairly concrete

24  picture.  The Government is about to wrap up their case.  I

25  would anticipate that that will be done in the first part of

1  next week.  And so we are -- we are moving along, and on

2  Monday, I think I can give you a picture of when you can expect

3  to get the case for deliberations.  Okay?

4      So until then, remember the admonition given to you:

5  Don't discuss the case, allow anyone to discuss it with you,

6  form or express any opinion.

7      Have a nice weekend.  I'll see you on Monday.

8      (Proceedings were heard out of presence of the jury:)

9          **MR. FRENTZEN:**  Your Honor, one issue that --

10         **THE COURT:**  Okay.  The jury has left.

11     Yes.  Go ahead.

12         **MR. FRENTZEN:**  One issue that just arose, I just want

13  to make sure that it's a non-issue, but there was the whole

14  thing about when did you meet with who and then where is the

15  report and the notes.

16     I don't want to let Mr. Morland go -- I didn't want to get

17  into that in front of the jurors like a *Jencks* dive or whatever

18  that was and I don't think it's an issue, but I didn't want to

19  let Mr. Morland go if the Court had any concerns about it.

20         **THE COURT:**  Well, I don't know what the defense's view

21  is.

22         **MS. LITTLE:**  According to the exhibit and the email

23  that we looked at, it appeared there was a meeting on

24  July 22nd, 2015.  I've asked the Government for the report of

25  that interview.  I was told that all *Jencks* material has been

1  provided, but with no confirmation of whether there was a

2  meeting or wasn't a meeting.

3      And so I thought it incumbent to ask the witness whether

4  there was a meeting or not.  And he said they met for four

5  hours, so I would think that there would be --

6      **MR. FRENTZEN:**  There are multiple meetings, but I

7  think the dates just got -- in other words, she is playing off

8  one email that says "can you meet at this time" and then she

9  asked the witness "did you meet at that time some" -- I don't

10 know how many years ago.  He says, "Well, yeah, I met," and we

11 think it's a different meeting, which we've produced.

12     **THE COURT:**  Well --

13     **MR. FRENTZEN:**  And I think that's it.

14     **MS. LITTLE:**  Maybe I can inquire of the Court to ask

15 counsel was there a meeting on July 22nd or not?

16     **MR. FRENTZEN:**  I wasn't even on this case.  I don't

17 know.

18     **MS. LITTLE:**  If there was no meeting, then there is no

19 report.  But I haven't been able to determine if there was a

20 meeting or not.

21     **THE COURT:**  Okay.  Fair enough.

22     **MR. REEVES:**  There was a four-hour meeting in

23 September.  Mr. Leach and I both attended.  I think that's what

24 the witness --

25     **THE COURT:**  Is that -- have the notes of the statement

PROCEEDINGS

1   been provided?

2          **MR. REEVES:**  Yes.

3          **MS. LITTLE:**  I do have September.

4          **THE COURT:**  So it's your view, as far as you know,

5   there was no meeting on the 22nd of July?

6          **MR. REEVES:**  Not that Mr. Leach and I attended and not

7   to my knowledge, no.

8          **THE COURT:**  Well, that's as good as it gets.

9          **MS. LITTLE:**  Thank you.

10          **THE COURT:**  Let's deal with all these other issues.

11          **MR. KEKER:**  Starting --

12          **THE COURT:**  Let's start for a moment -- I don't know

13   -- yeah.  Okay.  Let's just go through -- Mr. Keker, they're

14   your motions.  How do you want to proceed?

15          **MR. KEKER:**  What I'd like to do, if the Court -- we

16   want to see -- you said this is an accounting case.  We would

17   like to see Mr. Brice hit the stand and get adequately

18   cross-examined and know that there is enough time for that.

19          Given the Government's addition of witnesses, given their

20   plan to call Agent Bryant and talk about 200 exhibits and the

21   connectivity and so on, no way is this going to get done.

22          So unless Agent Bryant is very severely limited and unless

23   the Government gets Mr. Brice on and off the stand, I think

24   there is going to be a problem finishing the case on Tuesday.

25          Having said that, I'm prepared to talk about the legal

1   reasons why Agent Bryant should be limited and why the summary

2   shouldn't come in and so on.

3          **THE COURT:**  Okay.  Well, let's do that.

4          **MR. KEKER:**  I'll start with that.

5          **THE COURT:**  What do you want to start with first?

6          **MR. KEKER:**  I'll start with the summary.

7          **THE COURT:**  The what?

8          **MR. KEKER:**  The summary --

9          **MR. FRENTZEN:**  Which one?

10          **THE COURT:**  Okay.  This is the --

11          **MR. KEKER:**  There is two pieces to the summary.  One

12   is Agent Bryant.

13          **THE COURT:**  PX 3040, summary of annual -- you're not

14   talking about the compensation?

15          **MR. KEKER:**  No.

16          **THE COURT:**  You're talking about those exhibits?

17          **MR. KEKER:**  I'm talking about the 200 exhibits --

18          **THE COURT:**  The 200 exhibits.  The document dump.

19          **MR. KEKER:**  The document dump, exactly.

20          **THE COURT:**  Got it.  Okay.

21          **MR. KEKER:**  And there are a few of those exhibits that

22   we object to.  Most of them I think are admissible and --

23          **THE COURT:**  Maybe I should -- maybe I should find out

24   what he's talking about, what the Government is talking about

25   here.  I mean, all I know is that there are -- you're going to

 1  call the agent and the agent was going to say here are --

 2  whatever that number is.  I don't -- forget the number for a

 3  moment, but these documents are documents that what?  That --

 4  what is the agent going to say.

 5         MR. FRENTZEN:  Your Honor, there's -- still working on

 6  that, but there's a couple of different areas.  One involves --

 7  the primary thing is emails, Your Honor, and these are emails

 8  that are -- the defendant's emails predominantly.  Possibly

 9  Lynch's emails.  So it's just a convenient way of putting that

10  into evidence.

11         THE COURT:  So all he is going to say is document X is

12  an email of the defendant?

13         MR. KEKER:  Why are we --

14         MR. FRENTZEN:  Yes.  And there's --

15         THE COURT:  Basically, as I understand it, an

16  authentication, in a sense.

17         MR. KEKER:  Which we don't oppose --

18         THE COURT:  He's not going to say what it means, is

19  he?

20         MR. FRENTZEN:  No, but we would -- most of them are

21  very short, and we would like to take the opportunity to

22  highlight them or read them into the record --

23         THE COURT:  You want to show them to the jurors?

24         MR. FRENTZEN:  So they don't just get a big stack of

25  paper.

1    **THE COURT:**  In other words, you believe that some

2    number of them are probative of the guilt of the defendant and

3    you want to be able to, in your case in chief -- you want to

4    show it to the jury?

5    **MR. FRENTZEN:**  Just so the Court understands how we've

6    done this, for the majority of the witnesses when they

7    testified, if they were on a chain of emails or a recipient of

8    emails from the defendant, we put it in through that witness so

9    that that witness could put it into context.

10    **THE COURT:**  And are these -- if I understand it, these

11    are documents that have not been shown to the jury yet?

12    **MR. KEKER:**  No.  Twenty-six of them are already in

13    evidence.

14    **MR. FRENTZEN:**  I can double check that.  I mean, if

15    it's already in evidence, then I don't think we're getting back

16    into it.

17    So -- just so the Court understands, we had a long list of

18    emails at the beginning of the case that we figured we can get

19    these in through the case agent at the tail end of the case.

20    **THE COURT:**  Listen, it's perfectly legitimate to bring

21    them in through a case agent or bring them in through somebody

22    who conducted a search or anything like that.  But I'm just --

23    but I think in terms of --

24    **MR. FRENTZEN:**  My point --

25    **THE COURT:**  And you want to use the vehicle of having

1    a live person up there rather than standing up and saying,

2    "Ladies and gentlemen of the jury, here are Exhibits No. 2, 3,

3    4, 5 and 6 and I want to read them to you."

4         **MR. FRENTZEN:**  Correct.  And we're not doing 200 and

5    I'm not doing ones that are already in evidence.

6         **MR. KEKER:**  Well, okay.

7         **THE COURT:**  Why can't he do that?

8         **MR. FRENTZEN:**  We had a list once upon a time.  That's

9    what has been attached to the agent.  That's what he got.

10        **THE COURT:**  Here is what I would like you to do.  What

11   I would like you to do is prepare that list, a list, and give

12   it to the defense sometime this weekend.  Pick a day.  And so

13   they'll see what it is, and I'm going to permit it.

14        **MR. FRENTZEN:**  Great.

15        **THE COURT:**  It doesn't seem to me -- in a sense the

16   testimony is irrelevant in that -- his testimony is irrelevant,

17   but you don't -- and I have no idea whether the emails are

18   probative or not.  I have to assume they are because you

19   wouldn't waste time doing it.

20        **MR. KEKER:**  Wait and see.

21        **THE COURT:**  Well, we'll see.  Exactly.

22        But in any event, I'm going to allow it.  I just want to

23   get things organized so that the defense knows what is going to

24   happen.

25        **MR. KEKER:**  Thank you, Your Honor.

 1      And could we request that this go after Agent Brice -- I

 2 mean, Mr. Brice.

 3          THE COURT:  I don't know.  We'll talk about timing

 4 afterwards.

 5      Now, the thing is I just want to line up the rest of the

 6 case.  As to timing, once the case is lined up, we can talk

 7 about timing.  Okay.

 8      What's next?

 9          MR. KEKER:  What's next is that Agent Bryant was

10 going -- was introducing an argumentative -- as a piece of

11 evidence something that they call a summary, something that is

12 indeed highly argumentative --

13          THE COURT:  Now, let --

14          MR. KEKER:  -- and is, at best, demonstrative.

15          THE COURT:  Let me turn to that.  If I understand --

16 that's this thing about the top 40?

17          MR. KEKER:  Yes.

18          THE COURT:  And their comments and so forth and so on.

19          MR. KEKER:  Yes.

20          THE COURT:  Okay.  I -- at first blush, it doesn't

21 seem to me to be a summary.  And the reason it doesn't seem to

22 be a summary is because it -- for two reasons.

23      Number one, it doesn't really reflect, quote, voluminous

24 materials, though it might, and I don't know enough about that

25 yet.

1       But more significantly, it is argumentive in the sense

2    that if it's -- I understand it's color-coded.  All of that is

3    argument.  Wait.  All of it is argument.  Argument.

4       Now, I have no -- number one, it can come into evidence, I

5    think, if in fact it is a -- in fact it's a summary.  And it's

6    voluminous -- and it's voluminous.  So I will hear from you on

7    that.

8       But even if it did, it can't come in with all those colors

9    and bells and whistles and everything else attached to it.   It

10   has to be simply vanilla, and it says, "Here are" -- I don't

11   know.  Is that the 40 contracts or whatever it is?  And -- and

12   these are the amounts it represents, if, in fact, it is a

13   summary of that which is in evidence.

14           **MR. FRENTZEN:**  If I can explain --

15           **THE COURT:**  And if it's voluminous.  But it has to be

16   voluminous; otherwise, it's just a pedagogical device for --

17   for making the evidence that is in evidence sort of clear, and

18   it's an argument.

19           **MR. FRENTZEN:**  The records supporting it are

20   voluminous, Your Honor, in this sense.

21       The truth comes from a lot of different documents in terms

22   of what was actually sold to this customer, what was actually

23   sold to that customer, what constituted those sales, how much

24   of it was hardware, how much of it was software and so on.

25   That is voluminous.

**PROCEEDINGS**

1         And then to be able to demonstrate on a list why the list

2    that was provided to Hewlett-Packard was falsified, that -- in

3    other words, to be able to represent where things should have

4    fallen on the list -- so it is actually -- the truth is

5    voluminous.  In other words, all of the different contracts,

6    all of the entries in the books and records and so on that then

7    demonstrate how the list should have been reflected, it is a

8    summary of voluminous evidence.

9         **THE COURT:**  Okay.  But here's the problem.

10        **MR. FRENTZEN:**  I'm okay with the colors, even though

11   having a look at those big charts with a bunch of colors and

12   the prosecutors were red with the -- you know, how many

13   meetings they had with the Government -- that's okay.

14        **THE COURT:**  They were rather attractive.

15        **MR. FRENTZEN:**  Because they were colorful.

16        **THE COURT:**  Okay.  Right.

17       Number one --

18        **MR. FRENTZEN:**  I don't need colors.

19        **THE COURT:**  Well, look, I'm expecting a full

20   technicolor argument, and I'll get it.

21        **MR. KEKER:**  Later.

22        **THE COURT:**  Later.  But I think if you start to

23   analyze what you're saying, I think you are actually saying

24   that it's argument.

25       I think you can, as an example -- you could say, "Here is

**PROCEEDINGS**

1   a contract and it represents, quote, a sale of X or a sale of

2   Y," because there are a lot of documents that go into that

3   contract, as I understand it?  Is that correct?  Have I missed

4   what this document is?  I'm looking at it.

5           **MR. FRENTZEN:**  What it is, Your Honor, there is a top

6   40 list.

7           **THE COURT:**  Yeah.

8           **MR. FRENTZEN:**  What is voluminous is to be able to

9   recreate what the top 40 list should have been.

10          **THE COURT:**  That's a different thing.

11          **MR. KEKER:**  The rabbit is --

12          **THE COURT:**  That is actually an argument.

13          **MR. KEKER:**  The rabbit --

14          **MR. FRENTZEN:**  Hold on.  It's not an argument.  It's

15  numbers.  It is a summary.  I'm stating it in that fashion

16  because what we are trying to do is recreate a top 40.

17          **MR. KEKER:**  They're trying to create --

18          **MR. FRENTZEN:**  Which we --

19          **MR. KEKER:**  -- their version of the top 40.

20          **MR. FRENTZEN:**  Excuse me.  If I could finish --

21          **MR. KEKER:**  And our version is different.

22          **MR. FRENTZEN:**  A top 40, right, by definition

23  basically is a list, so for us to prepare a list, we have to

24  look at -- I mean, we want to talk about time, how long am I

25  going to have the agent on the stand if we have to go through

1    every single contract and then compare it to the line of the

2    top 40 list and then move down and show every single contract,

3    what got put in the books and records, how much of this was

4    revenue from hardware, how much of it was revenue from

5    software, how much did they strip out, and so on.

6        Then we're going to have a much longer presentation than

7    just saying, "Did you do the following?  Did you compare this

8    with this and is this the list that you then have?"  And what

9    it's basically done is it's just combined that list, if you

10   will -- the purpose of the colors -- and we can do something

11   other than colors -- I don't know -- is to show how the list

12   was and then where these things would fall on the list based on

13   the examination of voluminous records, if that makes sense.

14       It's not argument.  It's actually just numbers.

15           MR. KEKER:  It's total argument.

16           MR. FRENTZEN:  It's all numbers.  Take a look at the

17   chart.

18           MR. KEKER:  We have a document that says -- that

19   Mr. Hussain put on the list that says hardware -- it says

20   host -- license, hosted and so on.  What the argument is about

21   is what were these lists supposed to be, what was the

22   discussion about these lists.  You heard from Gersh about

23   various things --

24           THE COURT:  Let me ask you this, Mr. Keker.

25           MR. FRENTZEN:  No, no, no.

1      **THE COURT:**  Let me ask a question.  Let's assume the

2   top 40 list was never there.  It wasn't in evidence.  Could he

3   call an agent -- but the issues were all the same.

4      Could he call an agent and say, "Have you reviewed all of

5   the contracts in this case or 50 contracts?  I've given you a

6   list of contracts to look at," 60, 80, whatever it is.  "Now, I

7   want to ask you, have you reviewed them?"  "Yes, I have."  "Did

8   you come to a conclusion compiling all these documents as -- as

9   to what contract A represented, what contract B represented, C,

10  D, E," and he could go through 40 of them, say "contract number

11  D represented -- letter D represented $12 million in hardware

12  sales.  Contract number F represented $10 million in contract

13  sales."

14     In my view, that -- assuming that the documents, the

15  underlying documents were voluminous, he can do that.  That's

16  called a summary.

17          **MR. KEKER:**  That's all -- all of that evidence is in.

18          **MR. FRENTZEN:**  We are allowed to summarize it.  That

19  is exactly the point of a summary.

20          **THE COURT:**  That's right.  That is a summary.  He

21  can't summarize that which is not in evidence, but, in fact, if

22  what is in evidence is voluminous, he can then summarize it any

23  way he wants to; that is, he could say "did you find -- were

24  there hardware sales here?"

25     Autonomy says it's a pure software and that these hardware

1    sales are not -- are marginal or not material.  He could say,

2    "Let me ask you.  You looked at the contracts for 2010 and

3    revenues of $856 million.  Looking at all those contracts, have

4    you prepared a summary of how much -- how much represents

5    hardware sales?"  And he says yes.  He says, "If you take A, B,

6    C, D, E, F, G, you get to a hundred million dollars."

7        You can do that.  That's what summaries are all about.

8        Now, he can't do things like color them green and red and

9    yellow and put a bell and whistle on it and a nah-nah naughty.

10   You can't do any of that, but I think he can present a list

11   that is called a summary under 1006.  But it can't be anything

12   other than "I did this and it represents these contracts which

13   are in evidence."  I think that is appropriate.

14       I'd like -- and I also think it has to be shown -- it has

15   to be -- if you're going to do it, it has to -- I want it done

16   and shown to the defense before.

17       **MR. KEKER:**  There will be some cross-examination on

18   that.

19       I, again, ask that you get Brice on and off and then we

20   can deal with this because we are not going to let Agent Bryant

21   get on the stand and give what they call a summary without full

22   Sixth Amendment confrontation and cross-examination, which will

23   involve documents, which will involve going back to the actual

24   lists that were exchanged between these people.

25       This is all made-up argument, which I expect.  I know

PROCEEDINGS

1    we're going to get it, but why an agent can do the argument --

2    why we have to end this case with an argument with an agent --

3        THE COURT:  I don't know that we have to end it.

4    Maybe he would go on first.  I don't know.  Your argument is he

5    should go on before Brice goes on?

6        MR. KEKER:  No.  My argument is that --

7        THE COURT:  He shouldn't go on at all.

8        MR. KEKER:  Make sure we get Brice off the stand.

9    What I'm terrified about --

10       THE COURT:  What?

11       MR. KEKER:  -- is that they put up Agent Bryant.  We

12   get into a big beef over things that we could basically

13   stipulate to, documents and so on.  We get into a big beef

14   about that, and all of a sudden they are putting Brice on on

15   Tuesday at 10:00 and they examine him for four hours and then

16   somebody says "you don't have any time to cross-examine him."

17       THE COURT:  No.  No.  But, you know what?  You'll have

18   as much time as need to cross-examine.  I don't care.  I don't

19   care when that takes place.  I'm not going to deny you the

20   right to cross-examine.

21       MR. KEKER:  Okay.  So, Your Honor, I think we hear

22   you.

23       THE COURT:  Now I have another --

24       MR. KEKER:  They will do what they want to do with the

25   summaries --

1        **THE COURT:**  I have a question.  I have a question.

2   Because my clerk has an idea, not a bad idea.  Rather than

3   using the agent for, quote, the summary -- is it the agent that

4   is going to say "this is a summary of the hardware and this" --

5        **MR. FRENTZEN:**  That was our intention, Your Honor.

6        **THE COURT:**  And couldn't you use Brice for that?

7        **MR. FRENTZEN:**  Presumably.

8        **THE COURT:**  You would rather not because then he

9   becomes -- because if his credibility is attacked, then -- as I

10  assume it will be, then it's better to have the agent do it.

11  It's better to have the agent do it.

12       **MR. FRENTZEN:**  That's our view, Your Honor.

13       **THE COURT:**  I think that's right.

14       **MR. FRENTZEN:**  I think Brice is perfectly capable, but

15  that doesn't mean that's how we want to do it.  I think they're

16  both perfectly capable.

17       **MR. KEKER:**  Can I --

18       **THE COURT:**  Go ahead.

19       **MR. KEKER:**  When is the Government's case going to

20  end?  I just want to draw the Court's attention to we've got

21  Johnson, we've gone --

22       **THE COURT:**  I'm sorry.  Who is Johnson?

23       **MR. KEKER:**  Andy Johnson.

24       **THE COURT:**  Who is he?

25       **MR. FRENTZEN:**  Andy Johnson worked at HP at the time,

1    Your Honor.  He was Mr. Sarin's supervisor.

2           THE COURT:  What is his role in this?  What is he

3    going to say?

4           MR. FRENTZEN:  Not a whole lot, I don't think.

5           THE COURT:  I have another -- why do we need him?

6           MR. FRENTZEN:  He is essential to two wires,

7    Your Honor, and he is also going to, I think, bring the thing

8    home in terms of finalizing the deal effectively.  But we

9    expect to be pretty short.

10        Well, no.  There is two wires that are charged,

11   Your Honor, that are halos that we don't have testimony about.

12           THE COURT:  Okay.

13           MR. FRENTZEN:  Because he --

14           THE COURT:  That's necessary.

15           MR. FRENTZEN:  Because he was there and no other

16   witness was present --

17           THE COURT:  Just try and confine his testimony, if you

18   can.

19           MR. FRENTZEN:  Yes.  Absolutely.

20           THE COURT:  Who else are you calling?  You are calling

21   Brice.  You are calling the agent.  You are call halo.  Who

22   else?

23           MR. KEKER:  That guy Meiers that is coming, the H&R

24   Block person that just has been added, and Lynn Zell, who is

25   the FRRP witness, and another analyst, Mr. Toms, who is

1    going --

2         THE COURT:  Why do you need two of these analysts?

3    Actually when I came out here, I thought that I -- that I was

4    going to change my mind and not have Toms, but then because of

5    Ms. Little's trench in cross-examination in which she suggests

6    that this witness, the last witness, colluded with the other

7    witness, you might very well need to call Toms, if Toms didn't

8    have a conversation, if they all didn't get together.

9         MR. FRENTZEN:  Yeah.  Didn't know about that.

10        One issue that Toms needs to deal with is the --

11        THE COURT:  The notes.

12        MR. FRENTZEN:  -- is the misimpression that his

13   note -- where it says "hardware" was anything other than the

14   same appliance talk that everybody else -- you know, if we get

15   a stipulation to that, I don't think we need Toms.

16        THE COURT:  Well, that may be something --

17        MR. KEKER:  We will get a stipulation that any idiot

18   reading the analyst reports --

19        MR. FRENTZEN:  I'm pretty sure I'm not going to agree

20   to this.

21        MR. KEKER:  -- where it says "we're selling hardware"

22   shouldn't be able to come in and say "I am a victim.  I had no

23   idea about hardware."

24        THE COURT:  You don't have to use the word "idiot."

25   You can use the word "moron."  That apparently has a specific

PROCEEDINGS

1    connotation in government circles.

2        So anyway, we can do that.

3        Why don't you see whether maybe you can neutralize --

4    neutralize -- and Mr. Toms, if he were called to testify, would

5    say X or any way you want to do that.

6        **MR. KEKER:**  He's too good.  He just writes in his

7    analyst report for HP to read, "They're selling hardware.

8    They're revenues are flattered by hardware."  I don't care what

9    he meant.  It's there to read.  So if they want to call him,

10   we'll explore that with him.

11       **MR. FRENTZEN:**  That's great.  He will be able to

12   explain that.  So there you go.

13       **THE COURT:**  There you go.

14       **MR. KEKER:**  So when are we going to -- we're not going

15   to get this done by Tuesday.

16       **THE COURT:**  Well, I don't know.

17       **MR. KEKER:**  Okay.

18       **THE COURT:**  Let's give it our best shot.

19       **MR. FRENTZEN:**  We could have gotten Meiers on today.

20   You could have put me on a clock.  Ten minutes.

21       **THE COURT:**  It's not a problem because you will have

22   ten minutes on Monday to do it.

23       **MR. FRENTZEN:**  The guy is flying back to Kansas City.

24       **THE COURT:**  So we are doing him a favor not being in

25   Kansas City.  Are you kidding?

1        **MR. FRENTZEN:**  No.  I mean, he's flying back over the

2   weekend.

3        **THE COURT:**  Why is that?

4        **MR. FRENTZEN:**  His son's first communion.

5        **THE COURT:**  Okay.  There you go.

6        **MR. KEKER:**  Your Honor, there is one other motion.

7        **THE COURT:**  Oh, no.  There are some other motions,

8   too.  Sorry about that.

9        **MR. KEKER:**  The Brice motion.

10        **THE COURT:**  That, by the way, can be laid at the

11   Government's feet.

12        **MR. FRENTZEN:**  I hear that, Your Honor.  We didn't

13   know about that either.

14        **THE COURT:**  Mr. Marais, where is he?  I can't --

15        **MR. FRENTZEN:**  He's getting ready.

16        **THE COURT:**  I can't believe he is still here.  He has

17   got three thousand documents to read.

18        **MR. FRENTZEN:**  Four thousand.

19        **THE COURT:**  Four thousand.

20      By the way, just so you -- so there is no question as to

21   competency, as there wouldn't be, I do want you to file a

22   declaration saying that you've had -- that you have read all

23   four thousand documents before you proceed with the cross.

24      Okay.  So we have -- there is one issue about

25   Mr. Hussain's compensation.  As to that -- yes?  Do you have

1  something to say?

2      **MR. FRENTZEN:**  I do, Your Honor.  If I could just

3  shortcut it.

4      I'm not sure exactly what went out whenever it got

5  everybody -- I got to go back and take a look at this summary.

6  I haven't actually -- I looked at it once upon a time.  I need

7  to take another look at it.

8      I think there may be one decent point that they make and

9  then another point that I think is not decent and maybe we will

10  work something out.

11      **THE COURT:**  I think they do make a decent point that

12  the cost of exercising the -- the options should be deducted

13  from the -- from there.  As to that, I think that's a good

14  point.

15      As to all the tax implications, no, because everybody has

16  got those problems in one form or another, though it's

17  perfectly proper -- perfectly proper -- to raise that in cross

18  and so forth.  So that takes care of that.

19      **MR. FRENTZEN:**  Just so the Court knows, I had seen it

20  once upon a time.  That actually was part of the --

21      **THE COURT:**  It doesn't make any difference.

22      **MR. FRENTZEN:**  Anyway, we fixed that.

23      But what I want to reserve also is I also want to go back

24  and take a look at what they used in terms of figures for

25  Mr. Egan because I think there may be a goose/gander issue

PROCEEDINGS

 1  thing, but other than that, yes, we're on board.

 2      THE COURT:  Okay.  Now, there was -- oh, with

 3  Mr. Brice.  Here we go.  Mr. Brice.

 4      There is a motion to limit Mr. Brice's testimony in three

 5  respects.  The first was that he be limited to discussing

 6  transactions about which the jury has heard substantive

 7  evidence.  That's denied.  I think the argument is that -- I

 8  don't know -- whatever the argument is.  As to that, it's

 9  denied.

10      Number two, that it be limited to 22 transactions.  I

11  thought that he's actually examined more than 22.

12      MR. LEACH:  He has examined -- well, he has an opinion

13  that 67 were incorrectly accounted for.  He opined that in his

14  reports to the defendant.  He is prepared to talk about all 67.

15  We're going to do it in categories, but the premise of the

16  motion is just fundamentally wrong.  He has an opinion.  It was

17  disclosed.  There is no reason to limit him.

18      THE COURT:  I'm not going to limit him except I'm

19  going to exclude any reference to the --

20      MR. DOOLEY:  Restatement?

21      THE COURT:  -- restatement, even though that was a

22  part of his opinion.  But I'm just going to exclude it.

23      MR. DOOLEY:  It's not a basis of his opinion,

24  Your Honor, and I agree it should be excluded.

25      THE COURT:  I don't know whether it is or not.  Wait.

1    Everybody is panic over on the Government's side.  Why?

2         **MR. LEACH:**  Mr. Brice reviewed the restatement.  He

3    considered it in coming to his opinion.  Experts can rely or

4    not rely on any particular piece of evidence.  It doesn't

5    necessarily need to be in evidence.

6         And so I also thought --

7         **THE COURT:**  I don't disagree with that as a matter of

8    law.  But I think as a matter of -- and I'm not even saying it

9    is a matter of fairness.

10        I think that I have decided, without more at this point,

11   to exclude from consideration the -- from the jury's

12   consideration the restatement for a variety of reasons.  Okay?

13        After having done that, it seemed to me that this is --

14   and, again, if you talk about the law -- a way legally to get

15   it back in when in fact I've excluded it.

16        So it undoes, you know, exactly what I am attempting to

17   do, which is the basis of my opinion to keep it out in the

18   first place.

19        And also I would say this.  If you guys have to rely on

20   that, then -- then there we are, if that's the thrust of the

21   case or major part of the case.  I don't think it undercuts his

22   opinion, but, again, I haven't heard his cross, and if his

23   cross is such that -- that I think that you're being unfairly

24   restricted, as I said, I'll allow in the restatement.

25        **MR. DOOLEY:**  We're not going to go there --

1        **MR. FRENTZEN:**  If I --

2        **MR. DOOLEY:**  We're --

3        **THE COURT:**  You're not going there?

4        **MR. FRENTZEN:**  I will explain how.

5    Your Honor, the reason I jumped up is I argued this last

6  time, if the Court recalls, and the point we hit on, if I

7  recall what we understood was the Court made the point to the

8  defense that an expert can rely on anything.

9        The restatement is already in evidence through

10  Ms. Anderson, and our understanding -- oh, it's in.  So our

11  understanding was that Mr. Yelland was not going to testify.

12  We weren't going to get into issues of bias around Mr. Yelland

13  personally.  But that Mr. Brice could talk about the

14  restatement because, A, it's in evidence; B, an expert can

15  consider anything in reaching their opinion.

16        That's why we -- at that point, the argument ceased

17  because we understood we were going to get it in through Brice.

18  We preferred Yelland just because we didn't go expert, expert

19  then, but we would take Brice so long as the restatement was

20  there.

21        In other words, that was kind of what we were fighting

22  about at the time and that's what we understood the Court's

23  ruling to be.  It's still actually -- I'm not saying the Court

24  can't remove it from evidence, but we got it in through

25  Ms. Anderson, and Mr. Brice, we understood -- and here is where

PROCEEDINGS

1    they are going to go on cross, Your Honor.

2        **THE COURT:**  Let me stop you there.  Stop there and

3    then I'll hear more.

4        I think probably everything you said is accurate.  But I'm

5    now trying to think my way through this again in the context of

6    where we are today.

7        And it seems to me with a given promise of Tuesday, given

8    whatever you understood, that this would significantly, if now

9    allowed in -- would significantly increase the length of time

10   because, after all, if he says, "Well, I relied on the

11   restatement," okay, then in cross-examination, the defense gets

12   up and they say, "We were relying on this document, on this

13   restatement," right?  "Well, did you know that" or "did you

14   consider that when the restatement was done, the person who did

15   the restatement may have done X, Y or Z?"

16       I mean, "Would it make a difference to your opinion if, in

17   fact, the person who prepared the restatement ignored A, B, C,

18   D and E?  Would it make a difference to your opinion if" dah,

19   dah, dah.  And the answer is -- I don't know what he's going to

20   say, but these are perfectly legitimate questions under cross.

21       And then you get into if he says "no, it wouldn't make any

22   difference" -- let's say he said "no, it wouldn't make any

23   difference," then the question is well, if it wouldn't make any

24   difference whether the person who put it together was corrupt,

25   as an example, or didn't look at half the documents, as another

1    example, or misunderstood all these basic concepts as another

2    example, if that doesn't make any difference to him, his

3    testimony is nearly worthless because if he's relying on

4    something, he has to rely on the accuracy of that.  And if it's

5    not accurate, then why is -- then how can he say he's relying

6    on it?

7         I think everybody's too close to the case, with due

8    respect, as people always say to me.  But with due respect, I

9    just don't think you need it.

10        I'm not saying -- I'm not evaluating the evidence.  I'm

11   simply saying that this does introduce a host and a lengthy

12   cross-examination.

13        Now, I have to wait and hear the cross-examination.

14             **MR. DOOLEY:**  Your Honor --

15             **THE COURT:**  And if they say something that suggests to

16   me that it would be unfair to exclude it, as I've said, I'll

17   let this person come in and testify.

18             **MR. DOOLEY:**  Two points on that, Your Honor.

19        Mr. Brice does not rely on the restatement for the basis

20   of his opinion.  That is simply not in the report.  So because

21   of that, we don't intend to raise the restatement on

22   cross-examination.  He shouldn't be able to raise it.  We don't

23   intend to bring it in on cross-examination.

24        The second point, Your Honor, is we had understood as sort

25   of part and parcel of Your Honor's ruling on Mr. Yelland was

1  that we were drawing a line at October 3rd and that Mr. Yelland

2  wasn't going to come in because it opened up a whole bunch of

3  doors, and as a result, the restatement was going to come out.

4  I understand it's in evidence, but our view is that it should

5  come out.

6      MR. FRENTZEN:  I read the transcript at the end of

7  that day because that's what I thought we -- our grand bargain

8  was:  We don't get Yelland, but the restatement which is

9  already in evidence could be relied on.

10     The restatement is in the report -- and I will just say

11  this.  This is what their -- they've been arguing about this

12  restatement from word go, and here is really what they're

13  afraid of.  Okay?

14     What they're afraid of is they took a look at every piece

15  of paper in this case.  They spent like a year and a half on

16  this thing and all that came in through Ms. Anderson.

17     They want to attack Brice as a paid expert for the

18  Government, therefore inherently biased, far more than the fact

19  that some guy worked at HP.  I don't think that -- how many

20  guys have we seen who worked at HP and, you know, big whoop.

21     But this is going to -- but this is going to be you only

22  looked at X number of transactions.  Then you extrapolated.

23  You did a -- you know, a shoddy job, you did a half job,

24  whatever percentage, I don't even know, and so on, when what

25  you really have is you have a restatement from two people, one

1  of them has already testified, who looked at everything, went

2  back through, did a restatement, as legally required to do, and

3  then you've got another expert who takes a look at that, does

4  his -- whatever you want to call it -- sampling, whatever,

5  extrapolates out, and gets what I would -- Mr. Leach may argue

6  it -- pretty darn close, very close to what is in the

7  restatement.

8      And that is, if you will, sort of a -- you know, a

9  comparison point for Mr.-- for Mr. Brice, as I understand it.

10 And that's what they're really afraid of.

11     So while they won't bring up the restatement, of course,

12 why would they?  It's a crushing document for them.  It says

13 their accounting was wrong and this is other accountants who

14 went through, you know, everything.

15     What they're going to do is attack Brice for doing, you

16 know, a half a job, which immediately will bring up the

17 restatement.  "Oh, well did you compare your sampling to folks

18 that you understood looked at everything?"  "Yes, I did."  You

19 know, "How was that?"  "It was a little off, but very, very

20 close."  And, you know, etc.

21     So this is -- it's going to come up in the cross.  The

22 restatement -- the value of the restatement, if you will, both

23 for the expert and in general and for the jurors is going to

24 come up.

25     And reread that transcript, Your Honor, and what we were

 1   discussing there is Yelland is not going to testify, so we are

 2   not going to get into whatever bias issues they claim exist,

 3   which we get, but, as the Court pointed out during that, you

 4   know, discussion, an expert can rely on things that they

 5   themselves did not generate.

 6       And that -- in their cross-examination, when they attack

 7   Brice, the restatement is going to become relevant and it's

 8   already in.

 9           THE COURT:  Wait.  Wait.  Wait.  Wait.  I now have to

10   look at -- is it 706?  What is it?  Has anybody got the code --

11           MR. FRENTZEN:  Yes, Your Honor.

12           THE COURT:  -- the rule?

13           MR. FRENTZEN:  You're talking about Federal Rule of

14   Evidence 706, opinions, expert opinions.

15           THE COURT:  Okay.  As I understand it, he can rely on

16   it but whether it comes in is another issue.

17           MR. FRENTZEN:  Understood.  It's just -- I mean, it's

18   already in technically.

19           THE COURT:  Let's not rely on that.

20           MR. FRENTZEN:  Okay.  In other words -- I mean, I

21   understand the point -- the Court's point as a technical matter

22   if he were the sponsoring witness for this statement --

23           THE COURT:  705.

24           MR. FRENTZEN:  -- but he's not.

25           MR. KEKER:  Your Honor, somebody should read the

1    expert report.  He said -- the only mention of the

2    restatement --

3            THE COURT:  703.

4        MR. KEKER:  -- the only mention of the restatement in

5    Brice's report is when he is defensive.  He comes and says,

6    "This is my opinion, 22 examined, 67 sampled, and so on."  And

7    then he goes on to try to explain why his opinion is different

8    from the restatement.  That part is not the basis of his

9    opinion.  It is unnecessary.  If it comes in, then the

10   restatement is in and the whole problem with the restatement is

11   before us.

12           MR. FRENTZEN:  This is --

13       MR. KEKER:  This reading of the transcript and this

14   remembering of the discussion we had about this before I think

15   is completely wrong.

16           THE COURT:  I don't know whether it's right or wrong,

17   but I'm looking at it to try to figure out how we're going to

18   proceed and end on Tuesday.

19       MR. FRENTZEN:  So the Court understands, it's what we

20   relied -- I mean, we thought we were relying on when we sent

21   Yelland away was -- I mean, quite frankly, at this point, I

22   would love to see the cross of Mr. Yelland on the restatement

23   about HP because I don't think it's going to -- I mean, we had

24   witnesses here from HP.

25       What is this cloud about, you know --

 1          **THE COURT:**  I don't think there's a cloud.  I'm not

 2   saying there's a cloud, not a cloud.

 3          **MR. FRENTZEN:**  Have at it, you know, but --

 4          **MR. KEKER:**  And with Defense witnesses, too.  It's not

 5   just Mr. Yelland.  It's the whole -- everything that happened

 6   from October 3rd until Yelland comes up with this report and

 7   all that went into it and all of the problems that that has

 8   presented.

 9      I thought you did make a Solomon-like judgment on a

10   line --

11          **THE COURT:**  I don't know about Solomon.

12          **MR. KEKER:**  -- and we have not crossed it, but --

13          **THE COURT:**  I was concerned about the -- and I'm not

14   talking about its admissibility -- I was concerned -- because I

15   think there is a case that suggests that it is admissible.  I

16   was concerned -- *Jasper*, is that it?  I forget the name of it.

17      I was concerned about going basically post-October

18   whatever date that is, 10/3rd, because then I thought it

19   introduced -- it made at least marginally relevant all the

20   events that occurred at Hewlett Packard post-October 10th as a

21   way of explaining all sorts of things, and I didn't know quite

22   how it all could be connected and so forth.

23      But if I were the Defense, I would just start saying,

24   "Here they're in trouble and here they're doing that and here

25   they're doing that," and then that's the motivation for trying

PROCEEDINGS

1    to find as a scapegoat the Autonomy transaction, to which you

2    say "Bring it on because that's not what happened."  I got

3    that, but what happened and what didn't happen doesn't

4    necessarily dictate admissibility of lines of questioning and

5    so forth.

6         MR. DOOLEY:  And that won't get their package --

7         MR. FRENTZEN:  My point was a little different,

8    Your Honor, which is that --

9         THE COURT:  I'll hear Mr. Dooley.

10        MR. DOOLEY:  I feel like we're having the same

11   argument over again.

12        THE COURT:  Well, we are, but go ahead.

13        MR. DOOLEY:  Yeah, sure.

14        THE COURT:  That happens in trials.

15        MR. DOOLEY:  If we get into the restatement on Brice,

16   that's exactly where we are because the process of the creation

17   of the restatement brings in all of the post-October 3rd stuff.

18        MR. KEKER:  And Gersh and Sarin, we followed the

19   rules, drew the line.  We had plenty with Gersh.  We'll have to

20   call them back.  I mean, we're -- anyway, we drew the line

21   where we understood you had drawn it, October 3rd, and there

22   was a lot that we could have done with those witnesses and

23   we'll have to think about that.

24        MR. FRENTZEN:  This -- well, this notion that the

25   restatement -- it's in evidence.  The issue, then, becomes bias

**PROCEEDINGS**

1    as to particular witnesses.  And I hear the Court's point, but

2    the cross-examination -- the point I'm making is a simple one.

3    The cross-examination, if the attack on Brice is "You only

4    looked at X, Y, Z, you didn't look at the full universe," we're

5    going to be right back with the restatement.

6        And that's why they don't want it in.  That's why they're

7    terrified of this document.  That's why I've been listening to

8    them argue about the restatement since before -- I think there

9    were multiple waves of motions pretrial, once we started trial.

10   And every time there's a time constraint, all of a sudden, oh,

11   my God, it's the restatement.  That's because the restatement

12   kills them.  They know that, and that's why -- you know, this

13   has nothing to do with anything other than that.  They've had

14   eight different reasons to try to keep the restatement out.

15       We've argued this before --

16           **MR. KEKER:**  Let's have another month-long trial.

17           **MR. FRENTZEN:**  Excuse me.

18       We've argued this before, and the restatement was Brice

19   could rely on, consider the restatement.  We don't need

20   Yelland.  That's where we -- that's where I thought we came

21   down on this before.

22       And, again, they're going to try to hide behind, "Well,

23   the Government -- nobody did a thorough job here on the

24   accounting.  They just put up some guy who looked at some

25   percentage of it."  It's going to be a horribly misleading

1    argument.

2        And the restatement is in evidence.  They had a shot at

3    Antonia Anderson.  Brice is not going to go through the whole

4    thing.  He's just going to utilize it as something that he

5    considered in the course of his examination, and that it was

6    there.

7            MR. DOOLEY:  Well --

8            MR. FRENTZEN:  It's in.  She testified.  They could

9    have gone bananas with her.  They didn't.

10           MR. DOOLEY:  Your Honor --

11           MR. FRENTZEN:  Well, they tried to.  I don't know.

12           MR. DOOLEY:  -- again, our understanding of the

13   Court's prior ruling was different.  We understood that the

14   Court had drawn a line at October 3rd; and if we are going to

15   get into the restatement on Brice, then we're back into all the

16   stuff that we wanted -- we made an offer of proof on, which is

17   all of the conduct after October 3rd.

18           MR. KEKER:  And, actually, in some ways, except for

19   the fact that we're going to be here for another several weeks,

20   it's not bad.  All this talk about how terrified we are of

21   Yelland and all the things that Yelland did during this period

22   and bringing it out, that's actually something in some ways we

23   would welcome.

24       But everybody needs to understand we're talking about

25   weeks of trial, and I thought that's what we were talking about

 1    before, about when is the jury going to be finished.

 2            MR. FRENTZEN:  We've heard this and heard this; and,

 3    again, it does not raise that issue.  In other words, the --

 4            MR. DOOLEY:  Sure it does.

 5            MR. FRENTZEN:  No.  You guys -- they're arguing as if

 6    a witness didn't come in here and testify and put a document

 7    into evidence and like they didn't have a clean shot at her.

 8    They did.

 9            And so now what we're talking about is we did not call

10    another witness to go through the details of it because there

11    was this offer of proof.  By that point, and we all decided

12    October 3 -- I don't want -- the Court decided October 3.  We

13    don't get a decision.  And then the only issue is this document

14    that's already in evidence that the witness, who's going to

15    testify, the expert, who is not our preferred witness -- and if

16    we want to talk about time, Brice is going to take a lot longer

17    than Yelland would have taken.  I think we had Yelland at an

18    hour.  Brice now is -- now after saying, "Well, if you call

19    Yelland, it's going to take forever," well, we were going to be

20    faster with Yelland.  Our timing actually expanded one day with

21    Brice, not with anything else.

22            But now to have a document that's already in evidence, we

23    already argued about this, the Court made the point that the

24    expert can consider it, and that's what we were planning on

25    doing with Brice.

**PROCEEDINGS**

1    What they're afraid of is just this jury hearing that

2   folks went through with a fine-tooth comb and actually looked

3   at everything, and the expert had an opportunity to consider

4   that and came to pretty much the same place because they want

5   to say he did just a spot check and it's not reliable and he's

6   a hack or whatever.

7          **MR. DOOLEY:**  If we get into the restatement --

8          **MR. FRENTZEN:**  That's what's going to happen.

9          **MR. DOOLEY:**  If we get into the restatement with

10   Brice, then we're into the whole story, and then --

11          **MR. FRENTZEN:**  That is just not accurate.  Brice has

12   no bias.  Brice didn't work at HP.

13          **MR. DOOLEY:**  But if he's going to testify --

14          **MR. FRENTZEN:**  It does not bring out the full story.

15   Ms. Anderson was at HP.  She already testified.  They didn't go

16   there.

17          **MR. KEKER:**  So just for timing purposes, it would be

18   good to know, plus tonight we've got to tell them who our

19   witnesses are and so on.  So we need to get this decided, I

20   think, one way or the other.  We're not going anywhere for the

21   next few weeks.

22          **THE COURT:**  So did you make the offer of calling

23   Yelland and not Brice?

24          **MR. FRENTZEN:**  Absolutely.  That was -- we weren't

25   going to call Brice.  We told -- yes, we'll go back to Yelland.

1          Can we get Yelland here?

2          We'll put on Yelland.  Forget about Brice.  Well, I don't

3    know.  You've been working on him.  Sorry.

4              **THE COURT:**  No, no, no.

5              **MR. FRENTZEN:**  Mr. Leach is --

6              **MR. LEACH:**  We did make the offer, Your Honor.

7              **THE COURT:**  What?

8              **MR. LEACH:**  We did make the offer.

9              **MR. FRENTZEN:**  We did and it would have shortened

10   things immensely.  It's already in evidence.  Ms. Anderson

11   already testified about it.

12             **MR. DOOLEY:**  Your Honor, if --

13             **MR. FRENTZEN:**  It is in.

14             **THE COURT:**  Maybe that's the answer.  What about it,

15   Mr. Dooley?

16             **MR. DOOLEY:**  That --

17             **MR. KEKER:**  You --

18             **THE COURT:**  Well, I understand.  Let's just say --

19             **MR. KEKER:**  I'm not -- I'm not holding you to

20   anything.  If Yelland comes -- if Yelland comes --

21             **THE COURT:**  No Brice.

22             **MR. KEKER:**  -- yeah, no Brice and then the sky's the

23   limit.  As you've said before, it opens every single thing

24   about the circumstances of the restatement, what was going on

25   at HP.  We've made an offer of proof.  We want to do that.  We

1    want to prove it with examination of witnesses that we need to

2    call back, and we want to call witnesses to further prove it.

3        So what happened after October 3rd all implicates the

4    restatement.  He was a hired gun to do what Meg Whitman wanted

5    him to do in putting together this restatement.  He made the

6    judgments that the HP superiors wanted him to make.

7            THE COURT:  See, the problem I have with Mr. Keker's

8    point is not the merits of it, not whether he's right, but how

9    could I not -- how could I circumscribe the cross on that

10   witness?  He's a key witness.  It's extremely important you

11   say.  You're standing in front of me saying it's highly, highly

12   probative, it's very, very important; and now I say, "Okay.

13   You win.  You get him; but, by the way, the cross -- I'm going

14   to limit the cross on him," which is one thing that puts me --

15   it puts -- it makes it very unfair to the Defense actually.

16           MR. FRENTZEN:  Your Honor, let me compare this to

17   608(b), if I might.

18           THE COURT:  Okay.

19           MR. FRENTZEN:  Let us call Yelland.  Let them

20   cross-examine Yelland about a parade of horribles that he

21   thinks influenced Mr. Yelland, but that doesn't mean we have to

22   sit through a whole trial of extrinsic evidence about that.  He

23   can cross him on it.

24       We think -- he's an accountant.  We don't think he was,

25   you know, put up to do a hit job.  They can cross-examine him

1    on that.  And like with 608(b), you know, there's no reason to

2    expand the scope of the case in order to go off on a minitrial

3    on extrinsic facts related to one particular witness on this

4    allegation.

5            MR. KEKER:  That makes no sense.

6            MR. FRENTZEN:  It actually makes perfect sense.

7            MR. KEKER:  We've made an offer of proof about all the

8    things that are implicated, and we need Gersh and Sarin at

9    least back to reopen --

10           THE COURT:  Why?

11           MR. KEKER:  -- because the rule --

12           THE COURT:  I don't see that.  I mean --

13           MR. KEKER:  Well, they --

14           THE COURT:  -- some guy comes in -- some guy comes in

15    two years afterwards and does a restatement.  Now, the argument

16    is that he was biased and didn't do a proper job, didn't do a

17    fair job in doing the restatement, an attack which obviously

18    you'd be entitled to make.  I don't know that any other

19    witnesses come in.

20           MR. KEKER:  But, Your Honor, that's not the way it

21    worked.  What happened was that he was put as Autonomy's chief

22    financial officer.  Everything was fine.  He didn't make a peep

23    about things, and then all of a sudden the allegation of fraud

24    comes in November of 2012 and then we're off and running.

25        In the meantime, Sarin --

PROCEEDINGS

1          THE COURT:  All of which, by the way, I think is

2    legitimate cross.

3          MR. KEKER:  -- Sarin and Johnson, who were involved in

4    the due diligence, know a lot of things that happened during

5    that period, including the chief executive officer -- the chief

6    financial officer of Hewlett Packard showing the board or

7    something this big chart, bar chart, that says "Hardware

8    11 percent."

9          I mean, these facts, which we say implicates what they

10   thought back then and the fact that this is a made-up effort to

11   blame Autonomy for their own failure, there's a lot of

12   witnesses that have information about that if we end up going

13   there.  So we can argue about each one later, but if that's

14   where we're going, that's where we're going.

15         MR. FRENTZEN:  What the Court --

16         MR. KEKER:  It's not one cross-examination of

17   Mr. Yelland.  It's a lot more than that.

18         MR. DOOLEY:  It's also --

19         MR. FRENTZEN:  If the restatement is the entire point,

20   then it would strictly be who created that, and it was Yelland

21   and Anderson.  Anderson already testified.  She put it in.

22         If Yelland testifies, it's does this particular witness

23   have bias or not.  There's no reason to get into a minitrial

24   about the purported reasons why he may or may not have bias.

25         In other words, it doesn't expand the scope of the entire

1  trial.  It means if the Court deems that to be relevant with

2  that particular witness as a line of cross-examination as to

3  whether or not that witness is biased, okay.

4      Is he going to deny some things happened?  I doubt it.  Is

5  he going to say "Did this affect or influence what you did?"

6  Okay, there you go.  But you don't have to have a whole trial

7  about everything that purportedly happened.  None of -- this is

8  kind of a fantasy to begin with.

9      **THE COURT:**  I don't understand that.  You would say,

10  "Did this make a difference?"  I mean, you can raise those

11  points is what -- I don't know that it --

12      **MR. FRENTZEN:**  But you don't then have to have a

13  minitrial about whether or not that actually occurred, if that

14  makes sense.

15      **MR. DOOLEY:**  We're going to have to --

16      **MR. FRENTZEN:**  That's the extrinsic evidence point.

17  It's who cares?  It's did it affect or influence this witness.

18      **MR. DOOLEY:**  There's going to be a whole lot of

19  testimony -- there's going to be a whole lot of examination

20  about the process behind the creation of the restatement that

21  does open up all this.  It opens up the impairment charge.  It

22  opens up the valuation -- the related valuations of the

23  company.  It opens up -- it does open up testimony from HP

24  advisers who provided valuations.  I mean, all of these things.

25      The idea that the restatement is completely a standalone

1  document that is not related to any of this other stuff is not

2  true.

3        **THE COURT:**  Are you going to call an expert who is

4  going to counter Brice?

5        **MR. KEKER:**  We have an expert and whether or not we're

6  going -- yes, Gervase MacGregor, and we're going to decide

7  whether or not to call him after we see Brice.

8        **MR. FRENTZEN:**  And I have looked through his stuff,

9  Your Honor.  The restatement is throughout that.  I looked at

10  the --

11        **THE COURT:**  That may be.  If they do that, that may

12  very well open the door to Yelland coming in in surrebuttal.

13        **MR. FRENTZEN:**  Absolutely, and the restatement,

14  especially since one of the primary criticisms from my review

15  of Mr. Gervase's work is Mr. Brice should have looked at more.

16  He didn't look at enough stuff and the statement goes directly

17  to that.

18      Again, one thing the Court has not heard is that they're

19  not going to criticize Brice over what he -- in other words,

20  the universe of his examination.  "Examination" is totally the

21  wrong word I'm sure, but whatever the accounting version of,

22  you know, his accounting.

23        **MR. DOOLEY:**  The argument is not that he didn't look

24  at enough stuff, Your Honor.  The argument is there's no

25  connection between the set that he looked at and the larger --

1  the 67 that he's opining about.  It's not that he didn't go out

2  and look at, you know, 120 or whatever is in the restatement.

3  It's the methodological link between the 22 and the 67.  I

4  think that's fair game.

5          THE COURT:  I think he looked at 67.  How many did he

6  look at?

7          MR. DOOLEY:  He looked in detail at 22.  He wrote up

8  22 and then he opines on 67.

9          THE COURT:  Mr. Leach, tell me what is it.

10          MR. LEACH:  He looked at detail in 93.  He concluded

11  67 were incorrectly accounted for.

12          THE COURT:  He looked at 93 in detail?

13          MR. LEACH:  Yes.

14          THE COURT:  He looked at 93 transactions and he

15  concluded of that 67 were inappropriate?

16          MR. LEACH:  Yes, Your Honor, noncompliant with --

17          THE COURT:  And the 67 -- I'm sorry I haven't read

18  it -- I mean, I haven't read it recently.

19     The 67, what dollar figure -- what does that amount to in

20  terms of either as a percentage of revenues or is it a dollar

21  figure or something?  What is it?  What does it all lead to?

22          MR. LEACH:  I don't have it in front of me,

23  Your Honor --

24          THE COURT:  Roughly.

25          MR. LEACH:  -- but I think it comes to over 10 percent

1    per quarter.  I think it comes to 100-something-odd-million

2    over 10 quarters.

3            **MR. DOOLEY:**  It's 15 percent, Your Honor.

4            **THE COURT:**  It's 15 percent.

5            **MR. LEACH:**  Yes.

6            **THE COURT:**  Okay.  And, by the way, now it's just

7    jumped to the restatement for a moment.  What is the figure out

8    of the restatement when he looked at everything, analyzed

9    everything's, and so forth?

10           **MR. LEACH:**  It varies from quarter to quarter,

11   Your Honor, but I think it's -- the restatement is 24 percent

12   of revenue in 2010, so there are some differences but we feel

13   they're explainable.  The restatement is larger than what

14   Mr. Yelland -- Mr. Brice finds.

15           **THE COURT:**  Yeah, but you're satisfied to move -- to

16   have your expert.

17           **MR. LEACH:**  Yes, and his consideration of the

18   restatement.

19           **THE COURT:**  Are you saying that you don't think you

20   can make your -- are you saying that the expert doesn't make

21   the appropriate case?  If it's 15 percent or whatever that

22   first percent was -- 10 percent, 11 percent -- you're saying

23   that that's not enough in the case?

24           **MR. LEACH:**  Either will prove materiality, Your Honor.

25           **THE COURT:**  What?

1        **MR. LEACH:** Either would be sufficient evidence of

2    materiality.

3        **THE COURT:** That's what I think.

4        **MR. LEACH:** But there are -- I've said this before,

5    but the Government wants its choice of proof.  Like, there are

6    attacks on Brice that Mr. Yelland doesn't have.  There are

7    attacks on Mr. Yelland that aren't germane to Mr. Brice.  And

8    we had originally made the judgment to go with Mr. Yelland.  We

9    were prepared to call Mr. Brice so long as he is able to say he

10    considered the restatement in some form.  That's where we were.

11        **THE COURT:** If I don't -- if I don't let Yelland

12    testify now and go with Brice, what do I do with the testimony

13    and the documents that are already in evidence?  And basically

14    Victoria -- what's her name?  Antonia?

15        **MR. FRENTZEN:** Anderson, Your Honor.

16        Your Honor, I --

17        **THE COURT:** What's the Defense position?

18        **MR. DOOLEY:** Sorry?

19        **THE COURT:** What is your position as to all the

20    evidence that's been received from that witness?

21        **MR. DOOLEY:** Our position is that the restatement

22    ought to be withdrawn out of evidence.

23        **THE COURT:** Well, then I ought to strike her

24    testimony.

25        **MR. FRENTZEN:** Oh, no, Your Honor.  There's a lot more

1    in it than that.

2              **THE COURT:**  Okay.

3              **MR. DOOLEY:**  I'm not talking about all of Anderson's

4    testimony.  I'm talking about the short amount of testimony

5    that she did on the restatement and the restatement comes out.

6         Again, the Defense's understanding is this is where we had

7    arrived when we had this discussion the last time.

8              **MR. FRENTZEN:**  But this was after Anderson testified,

9    Your Honor.  I mean, and this is not -- I repeat --

10             **THE COURT:**  That's true.

11             **MR. FRENTZEN:**  -- the issue came -- I mean, Anderson

12   testified.  She provided a basis for the admission of the

13   restatement.  They had cross-examination.  This whole pantheon

14   of horribles was raised after that and the offer of proof or

15   whatever was after the fact, after she'd already testified.

16        I'm looking for a legal basis on which Ms. Anderson's

17   testimony and -- now, she didn't spend a lot of time on the

18   restatement because we were going to call Yelland for that.

19   Then we hit this whole -- the Yelland-versus-Brice point.

20        But, again, because the Court made the point that the

21   expert could consider things because it was already in

22   evidence, that we just roll with Brice.  Brice cannot support

23   the restatement as well as Yelland can but it's already in

24   evidence.  He can talk about how he considered it.

25        I mean, there's -- what's the legal mechanism by which

1    Ms. Anderson's -- you know, when this was not --

2         MR. DOOLEY:  403.

3         MR. FRENTZEN:  Excuse me.

4         -- when this was not an issue.  When they cross-examined

5    Ms. Anderson, this was not an issue.  We put it in through her.

6    She supported it.  It's in evidence as we sit here right now.

7         And all of their griping about Yelland has got nothing to

8    do -- I don't see a legal basis for, like, a grab back from

9    Ms. Anderson's testimony, them having the opportunity to

10   cross-examine her.  And it's in and Brice can then consider it.

11   Is he going to further support it?  No, he's going to consider

12   it.

13        THE COURT:  But at that time Brice was going -- I

14   mean, Yelland was going to testify.

15        MR. DOOLEY:  Exactly.

16        THE COURT:  And so they can pick and choose how they

17   want to approach -- how they want to attack a particular

18   document.  They may think that the way to attack it is to

19   attack it through Yelland, not to attack it through a witness

20   who seemed rather sympathetic, and so they kept their powder

21   dry and awaited the other person.

22        MR. DOOLEY:  That's exactly --

23        MR. FRENTZEN:  So they rolled the dice -- excuse me --

24   and then we didn't pull Yelland.  It's not like we pulled a

25   fast one on them.  Like, "Oh ho, you didn't take your shot at

**PROCEEDINGS**

1  Anderson.  Now we're going to pull Yelland.  You don't get your

2  shot."  Hey, they had their shot.  That's what they're entitled

3  to.  They didn't take it.  Then they demanded that Yelland go,

4  and we fought about that.  We wanted Yelland, and so here we

5  are.

6       Again, as a legal grounds to try to withdraw it, it's --

7  we're -- what we're talking about here is simply that the

8  expert be allowed to say he considered it.  It's already in

9  evidence and he can talk in more broad terms about what that

10 was and in what way is that reinforced, if it did, the opinion

11 that he reached.

12      It is -- I mean, I'm understanding I'm repeating myself,

13 but it is in evidence.  The witness testified.  They had their

14 shot.

15      The Court is absolutely correct.  Perhaps they made a

16 tactical choice at that time, but then they're the ones who

17 engineered getting Yelland out.  We'd probably be wrapping this

18 case up.

19           **MR. DOOLEY:**  Your Honor, Your Honor, we didn't --

20           **THE COURT:**  Does anybody have the transcript of what I

21 said the last time?

22           **MR. FRENTZEN:**  I don't, Your Honor, but I did go back

23 and check.

24           **MR. KEKER:**  We can get the transcript --

25           **THE COURT:**  Pardon?

1          **MR. KEKER:**  -- but might I remind the Court --

2          **THE COURT:**  Yes, go right ahead.

3          **MR. KEKER:**  -- that you brought it up.

4       I mean, first of all, as you've said from the beginning of

5    this trial, you make decisions, sometimes you have to revisit

6    them.  You decided to revisit this decision quite, in our view,

7    quite rightly.  We had a big discussion about it and it was

8    your statement at the time that, "Well, we can withdraw the

9    restatement and we can fix this by withdrawing the

10   restatement."

11         **MR. FRENTZEN:**  Not true.

12         **MR. KEKER:**  This is after we made the proffer.  You'd

13   asked for a proffer.  We made a proffer, said, "All of this is

14   going to get raised."  So you looked at it and saw it as a

15   problem to be solved, as I recall, and you began to raise

16   possibilities.

17      And they said, "We've got Yelland and we've got Brice."

18      And you said, "Use Brice and then we'll see about Yelland

19   later depending on the cross-examination and so on."

20      And what our point at this point is, is that we then

21   relied on that for cutting off examination of Gersh, Sarin at

22   least, and it was our understanding that Brice's report -- and

23   this is true, I mean, just read it -- Brice's report says,

24   "I've studied all this, the 93.  I worked really hard.  Here's

25   my opinion."

1     And then he doesn't say, "I came to my opinion by reading

2     the restatement."  He says, "And by the way, my opinion is

3     different from the restatement and here's all my excuses why

4     it's different and it doesn't matter.  My opinion is still my

5     opinion."

6         But we're not going to that part of his -- he didn't rely

7     on the restatement.  He distinguished the restatement from his

8     opinion.  So he can testify fully and fairly about his opinion,

9     according to his report, without any mention of the

10    restatement, and that's where I thought we were going.

11         MR. FRENTZEN:  Well, that is not what I recall from

12    the discussion, and what I recall from the discussion was the

13    Court made the point, which was a good point, that an expert

14    could consider -- an expert could consider work done by

15    somebody other than themselves, and that was the point at which

16    we said --

17         THE COURT:  That's true.  That's all true.

18         MR. FRENTZEN:  -- "Well, then, maybe we want Brice."

19         THE COURT:  I'm trying to figure out -- the reason I

20    was motivated to raise the issue again was not a question of

21    admissibility and it was not a question that I came -- that I

22    thought I came to the wrong decision and wanted to rethink it.

23    The reason it came to that was that I foresaw, since I'm

24    getting concerns from the jury, that a natural line -- about

25    the length of the case -- and, therefore, okay, the length of

1    the case -- and is there a line that you could draw that would

2    at least limit, to some extent, the length of the case.

3        It appeared to me, yeah, the line very much so is

4    October 10th because then I don't get into the thousands of

5    things that Hewlett Packard did, the acquisitions, the concerns

6    of the board, whether it was important or not, and so forth,

7    especially in a case in which the real issue is the crime, if

8    it were a crime, was committed as of October 10th.

9        It's not -- it doesn't become a crime because of what

10    happened on October 11th and it doesn't become a crime because

11    of an analysis that's done a year later, 11 months or 17 months

12    later.  That's not the crime.  So I thought logically I can

13    control it that way.

14        Now, the thing that concerns me is, of course, I'm dealing

15    with something that I haven't heard yet, which is the testimony

16    of your expert.  So I thought that I better leave some escape

17    hatch on this in case the expert says, "Well, you know, you

18    looked at X number of transactions and that's really not very

19    many and, dah dah dah, and, you know, your opinion is

20    something, whatever it is, but it's based upon an inadequate

21    search of the books and records of the corporation."

22        So I thought, well, if that's where it's going to go, then

23    I don't see why you couldn't bring in a person that says,

24    "Well, I did conduct a thorough search of it and this is what I

25    found."

1      Now, I sort of -- you know, I'm sitting here thinking:  Am

2  I just going to anticipate that -- or is it unrealistic for me

3  to anticipate that somehow they're going to treat the expert

4  without raising the issues of the inadequacy of the search of

5  the documentation?

6      You say, of course, they're going to attack it and they're

7  not denying that, and so I assume that that would be their

8  approach.  So maybe --

9          **MR. DOOLEY:**  Why doesn't Brice --

10         **THE COURT:**  -- I'm going to have to listen to it.  Now

11 I'm addressing it to see, well, okay, if that's going to be

12 their approach, they're going to say, "You know, Mr. -- what's

13 his name?  Brice?

14         **MR. DOOLEY:**  Brice.

15         **THE COURT:**  What?

16         **MR. FRENTZEN:**  Brice.

17         **THE COURT:**  -- "Mr. Brice, you just really didn't do

18 much of a search here, did you?  You know, you just didn't --

19 you looked at too few documents and so forth and so on," and

20 then that calls into question the whole thing and then you

21 bring in the guy that did the search.

22         **MR. DOOLEY:**  Why doesn't Brice testify, Your Honor?

23         **MR. FRENTZEN:**  If I may, Your Honor, what we're -- we

24 abandoned Yelland -- well, the Court --

25         **THE COURT:**  Well, I mean, I don't want to go back.  I

 1    just say --

 2            MR. FRENTZEN:  No, no, no.

 3            THE COURT:  -- that was my logic, and now I'm

 4    listening to you saying, "Well, this is what we want to do.  We

 5    want to take Brice's opinion in our direct -- in our direct --

 6    and show that, in fact, he did his -- came to his conclusion in

 7    part -- in part -- based upon an exhaustive analysis of every

 8    document."

 9        The problem -- that's one way to approach it.  I would

10    think there are a lot of different ways to approach it.

11            MR. REEVES:  Your Honor --

12            THE COURT:  "Have you seen anything?  Are you aware

13    that other analyses have been conducted in this case?  Have you

14    seen anything that calls into question the conclusions that you

15    found?"  I don't know.  Maybe you can cross him on that.

16            MR. FRENTZEN:  And that's exactly, Your Honor, why we

17    thought that the compromise, if you will, was:  We don't get to

18    use Yelland; we get to use Brice but the restatement stays in

19    evidence -- it was not at that time -- it's still in evidence;

20    and that then Brice says, if he needs to, "There was also the

21    restatement.  Anderson has provided the background for it."

22            THE COURT:  I don't know if it stays in.  I'm

23    concerned --

24            MR. FRENTZEN:  But that --

25            THE COURT:  Be that as it may, I'm concerned about a

 1   document that is highly probative of a number of the elements

 2   of the offense without giving the Defense the opportunity to

 3   cross.  Now, of course, they can always call him.  I understand

 4   that.

 5        But here is a document --

 6             MR. REEVES:  Your Honor --

 7             THE COURT:  -- but they did anticipate -- they did

 8   anticipate when they left Antonia, whatever her name is, alone

 9   that she was part one of a two-part series.

10             MR. FRENTZEN:  Well, they crossed her for --

11             MR. DOOLEY:  Yelland had been disclosed at that point,

12   Your Honor.

13             MR. FRENTZEN:  They crossed her for hours but, you

14   know, yes, they did not do what they're now talking about that

15   they would have to do had Yelland shown up, although they had a

16   witness.  And at that time there was no ruling related to, you

17   know, the restatement is going to relate to the -- kind of the

18   timetable that we're operating on.

19             THE COURT:  Maybe my answer is, okay, I'm going to

20   listen to the -- I'm going to tell the Government not to

21   specifically refer to the restatement with respect to that on

22   direct, and we'll wait and see what the cross is, and then I'll

23   make a final decision as to whether or not you call Yelland.

24             MR. DOOLEY:  I think that's exactly right, Your Honor.

25             MR. FRENTZEN:  Well, I don't even know --

1    **THE COURT:**  Mr. Frentzen's representation is accurate

2   as I can see it because on age 3898, he makes the following

3   statement during the last proceeding (reading):

4        "Your Honor, we have -- and I'm currently rethinking

5        this and trying to tactfully -- but if the expert

6        testifies and relies on the restatement and describes what

7        the restatement is and what he understood the restatement

8        to be and he can rely on that, then that may get us where

9        we need to be.

10        "The restatement will be in evidence.  And

11        Ms. Anderson already testified about the creation of the

12        restatement, and maybe there we go and there's no bias

13        issue.  They'll just be the usual did --"

14    **MR. KEKER:**  That's what he said.

15    **THE COURT:**  No, but that's what he said was --

16    **MR. KEKER:**  That's not what we understood.

17    **THE COURT:**  He said that's what his understanding was.

18    **MR. FRENTZEN:**  And, excuse me, that was in response to

19   the Court --

20    **THE COURT:**  And you said --

21    **MR. FRENTZEN:**  I'm sorry.

22    **THE COURT:**  No, that's all right.

23    **MR. FRENTZEN:**  That was in response, I think, to the

24   Court referring to the fact that --

25    **THE COURT:**  Then I go on to say (reading):

1        "Well, I think they can ask -- I think they can say

2   to the expert, "Well, you don't know what motivated the

3   person.  A person at Hewlett-Packard made the restatement.

4   He did it two and a half years later; right?"  You know,

5   and -- and you were -- Hewlett-Packard was preparing for

6   litigation.

7            "**MR. KEKER:**  All that's true.

8            "**THE COURT:**  All that comes in.

9            "**MR. KEKER:**  All that's true.  It's not our

10  understanding that -- I think they're exaggerating how

11  much Yelland looked at it, Your Honor.  It's a sample.

12  It's 67.  I think that this is the universe."

13  Mr. Frentzen says (reading):

14       "The expert, as I understand it, looked at a select

15  number of transactions but also considered the

16  restatement.

17           "**THE COURT:**  I understand that.

18           "**MR. FRENTZEN:**  The restatement considered -- looked

19  at every transaction.

20           "**THE COURT:**  The restatement looked at every

21  transaction.

22           "**MR. FRENTZEN:**  Every transaction.  That's the

23  important distinction for us.

24           "**THE COURT:**  So an expert can base his opinion on

25  anything.  And he can base it on that."

1          MR. FRENTZEN:  I think that's when I conferred with --

2          THE COURT:  Then I say (reading):

3          "Let's say they don't call this guy and they put on

4      the expert."  I'm turning to Mr. Keker.  "Are you going to

5      argue that they should have?  Are you going to argue that

6      this was a small number and the person -- and why doesn't

7      Hewlett Packard bring in the person that conducted the

8      complete audit?

9          "MR. KEKER:  No, definitely not going to argue that.

10     I mean, when the expert testifies, we are going to find

11     out what Brice relied on the restatement.  That's not the

12     way we read his report."

13         So, in other words, Mr. Keker is saying that's not what he

14     did base the opinion on.  He didn't base it on the restatement.

15         MR. FRENTZEN:  So he can cross him on that.

16         MR. KEKER:  And that's what I -- no, but we're not

17     going to cross-examine him on -- if the restatement -- that was

18     in the context of the restatement not coming in.

19         MR. FRENTZEN:  No.

20         MR. KEKER:  I've been trying to say from the beginning

21     that Brice's report does not rely on the restatement.  It seems

22     to me that that's awfully important.

23         THE COURT:  I think I have to read Brice's report.

24         MR. DOOLEY:  It's Section 8, Your Honor, where he

25     talks about the restatement and he's talking about a

1    spreadsheet prepared that summarizes what's in the restatement;

2    and what he goes on to talk about are "the principal

3    differences between my adjustments and the HP restatement."

4    And he says, "I've compared" -- and it's just as Mr. Keker

5    described it, it's a defensive, peremptory "There are

6    differences between the restatement and what I've concluded and

7    here's why."

8         MR. FRENTZEN:  So there are differences but they both

9    wind up in an entirely different place than the work that the

10   defendant did.

11        MR. DOOLEY:  That's not the point.

12        MR. FRENTZEN:  And that is the point.

13        MR. DOOLEY:  That is not the point.

14        MR. FRENTZEN:  If there's going to be an attack on

15   this -- the Court has already read where we were at the last

16   time, which is we won't call Yelland but Brice considered it,

17   so why can't he also refer to that if necessary during the

18   course of his testimony?  That's all we're asking for today.

19        THE COURT:  He may or may not, but there are ways to

20   refer to it.  You can refer to it and say, "Yes, by the way,

21   this person found 500 transactions that were questionable."

22   There are ways to -- you could also say, "I looked at -- I

23   looked at documents that were prepared subsequent and, in my

24   opinion, looking at it there's -- while they came to a

25   different -- while they" -- he doesn't even have to say that.

1    "There's nothing in that restatement that would change my

2    position -- my opinion -- I think my opinion is consistent with

3    that."  He could say that, period.  He could say that.

4            MR. KEKER:  If the restatement is in evidence --

5            THE COURT:  Pardon?

6            MR. KEKER:  If the restatement is in evidence, then --

7            THE COURT:  I'll get to that.  I don't know what to do

8    about that.  I think I have to do something about that.

9        I think if that's -- if it were limited -- his reliance

10   were limited to just the way I suggest -- that is, "I looked at

11   the document, I looked at" -- let's say we took that

12   restatement and withdrew it from evidence and used it for

13   identification purposes and say:

14           "Here is a document that was prepared by accountants

15       at Hewlett Packard.  Is there anything in there -- looking

16       at it -- did you look at it before you formed a final

17       opinion?

18           "Yes, I did.

19           "Is there anything there that you believe is

20       inconsistent or calls into question your opinion?

21           "No."

22           MR. KEKER:  If that's all he says -- if that's as far

23   as it went, that's not a problem.

24           THE COURT:  Let's say he just said that.

25           MR. KEKER:  That's not a problem, but that's --

1    **THE COURT:**  And then if the Defense -- wait a

2    minute -- then the Defense either has to leave it alone and

3    just leave it at that, or they start to go after him on that;

4    and if they do, then, of course, Yelland comes in.

5    You know what the odd thing is at least from where I sit?

6    I don't think it makes any difference to this jury.  I really

7    don't.  I mean, the jury has heard hours and hours and days and

8    days of everything that happened up to October 3rd.  After

9    October 10th -- what happened after October 10th?

10    **MR. FRENTZEN:**  The problem, Your Honor, is that we've

11    actually -- and I know this may be shocking and dismaying, but

12    we've actually been selective on the particular deals that

13    we've proved up in the course of this trial; in other words,

14    and that's the point of the restatement and/or Yelland.

15    What we've proved is, as a total of what was going on with

16    the accounting at Autonomy, is a smaller subset of the

17    overall --

18    **THE COURT:**  Well, but that's what he's going to

19    testify to.

20    **MR. FRENTZEN:**  Correct, Your Honor.

21    **THE COURT:**  He's going to say that looking at the 67

22    transactions or the 96, or whatever -- 60 -- whatever it is --

23    96 transactions, you can find that 67 of them were

24    inappropriate.

25    Now, you know --

1          MR. FRENTZEN:  Correct.

2          THE COURT:  -- what's wrong with that?

3          MR. FRENTZEN:  Well, we don't think anything's wrong

4    with it except that it is buttressed by the restatement, which,

5    again, is in.  He could consider it.  He could rely on it.

6          And what I'm hearing -- I hear the Court, but if the

7    cross-examination is on -- and they haven't said we're not

8    going here -- if the cross-examination is on, it's just spot

9    check, "This is -- you know, you should have done more,"

10   et cetera, et cetera, then this, without a doubt, supports his

11   position.

12         And, again, we were going to go without the expert and

13   just go with that because regardless of any --

14         THE COURT:  My question to you is:  Can you limit your

15   direct as I've suggested?

16         MR. FRENTZEN:  In terms of the restatement?

17         THE COURT:  Yes.  Yeah, can you limit it as I

18   suggested?

19         MR. FRENTZEN:  If we can have a moment --

20         THE COURT:  He can say he looked at it.

21         MR. FRENTZEN:  If I can have a moment to confer.

22         THE COURT:  Okay.  Have a moment.

23         MR. FRENTZEN:  My point is on the cross they're not

24   going to bring up the restatement, I agree with that.  They

25   don't want to touch it.  They know it kills them.  What they're

1   going to do is they're going to say, "But you did half of the

2   job or a third of the job."

3       I mean, I've read their expert's report and it's basically

4   an attack on the quantum of transactions.  There's other stuff

5   in there, of course, but it's basically "he didn't do enough"

6   is a large part of it.  And so I'm assuming the cross, that's

7   going to be an aspect of it.

8       And the restatement then -- again, these are folks who

9   spent X amount of time and looked at everything, and so when

10  we -- again, the Court looked at the transcript.  I think I'm

11  right about where we ended at the last instance, which was

12  Brice testifies, not Yelland.  The restatement is already in;

13  and if Brice, you know, has to refer to it or it confirmed

14  things for him, then there you are.

15      I hear what the Court is saying about limiting the direct,

16  and I want to confer.  I think we're okay with that, but the

17  cross that I see that they will not say they're not going to

18  do, then I think it comes in in redirect.

19          **THE COURT:**  It might.  It might.  It might.  In other

20  words, it's in evidence.

21          **MR. FRENTZEN:**  Right.

22          **THE COURT:**  I might be willing to take it out of

23  evidence depending on what the cross is like.

24          **MR. FRENTZEN:**  Understood.  We understand.

25      And the point -- the simple point I was making is --

PROCEEDINGS

1      **THE COURT:**  The reason I'm sort of interested in that

2  solution is because it addresses actually what I am very

3  concerned about, which is losing the jury.  Now, maybe -- now,

4  I know your argument is I won't lose them, but you should be

5  aware one juror has indicated to me that, as she indicated on

6  her questionnaire, that on April 26 she has a trip planned and

7  it's not a pleasure trip.  It's an employment trip for

8  something that is important to her that is offered by her boss

9  and it would affect her livelihood.

10      **MR. FRENTZEN:**  We saw that.

11      **THE COURT:**  So she -- you know, and I've talked to

12  her.  I tried to see whether there's some way that she can

13  postpone the trip or that the courts would pay for any loss of

14  funds, and so forth, but I don't think that's going to work.

15      So then we're down -- you know, I'll certainly -- down to

16  two; and what's clear to me is you need 12 at the start, then

17  somebody gets sick.  I mean, one person today -- you know, one

18  is pregnant and the other has a bad back and, you know,

19  suddenly you're down to 12.

20      **MR. FRENTZEN:**  And, again, I don't see how we expand

21  the trial --

22      **THE COURT:**  No, no, no, I do think it's an expansion.

23      **MR. FRENTZEN:**  Well, if it's --

24      **THE COURT:**  I think it's -- it could be.  Now, I mean,

25  maybe we can get some agreement from the Defense that their

1   defense will be a lot shorter.  I don't know what they -- I

2   have no idea what they're going to do in their defense.  Maybe

3   you have some idea.  Well, I think tonight you will know

4   because they've agreed to give you the names of the witnesses

5   that they're going to call.

6          MR. KEKER:  And it will be completely dependent on

7   whether or not the restatement comes in and Yelland.

8          MR. FRENTZEN:  Comes in?  It's in.

9          MR. KEKER:  We'll give them both.  If it doesn't come

10  in this; if it does come in, that.

11         THE COURT:  Okay.  That's fair enough.  That's fair

12  enough.  Give me List A, List B.  I understand that in List B

13  it will have everybody, including Meg Whitman and Carly Fiorina

14  and, unfortunately --

15         MR. KEKER:  Mark Hurd.

16         MR. FRENTZEN:  My point is, Your Honor, they keep

17  moving the goalposts in the sense that it's in; right?  They

18  had a shot at the witness.  It's in.

19      Then we talk about Bryce versus Yelland.  We don't get

20  Yelland because of this supposed expansion of the trial, but

21  the document being considered by the expert does not raise

22  this, you know, pantheon of horribles.  I don't even see the

23  legal mechanism by which it does.

24      But if I could confer briefly about --

25         THE COURT:  I see it.  Actually, I do see it.  I do

PROCEEDINGS

```
 1   see it.

 2        MR. FRENTZEN:  In the examination of Brice?  He's

 3   going to say, "I have no idea what was going on at that

 4   particular time or who was influenced by who."

 5        You don't then go to put on a whole -- put HP --

 6        THE COURT:  No, no.  Yelland.  Yelland.

 7        MR. FRENTZEN:  Yelland's out.  Yelland's out but a

 8   witness already put this in.

 9        All right.

10        THE COURT:  I'm getting a sense of de ja vu.

11             (Government counsel conferring.)

12        MR. FRENTZEN:  I mean, Your Honor, again, I thought I

13   understood and I think I did understand last time, but so I

14   want to try to make sure I understand this time because, again,

15   I think the goalposts keep moving on us.

16        But the Government can live with what the Court talked

17   about in terms of the restatement in its direct; but if

18   Mr. Brice is challenged in terms of the quality of his work or

19   the -- in terms of the extent of his work or things of that

20   nature, the restatement just has to be, in our view, retained

21   in evidence; and that's because, I mean, in large part, as I

22   understand now, since I wasn't on the case at the time, he was

23   retained to basically sort of check the -- I mean, try to make

24   sure the restatement is accurate; in other words, that it's not

25   totally off.
```

1    And so, again, the -- I just -- I don't understand the

2   cross that won't go there, and so what I'm saying is we accept

3   what the Court is saying about direct and we can live with that

4   on direct, but -- unless the cross is something that I think

5   I've never seen before, which goes in some completely different

6   direction.

7    And I also think arguments after the fact would have to be

8   tailored because it would be incredibly misleading to, you

9   know, steer the jurors towards some notion that, you know, a

10  thorough accounting had not been done in this situation; or

11  that, you know, in any way there was not an adequate view of

12  the overall aspects of what was going on at Autonomy in the

13  relevant time period.

14   I mean, the restatement for all of that is relatively

15  crucial for us, and that's why we fought so hard before trial.

16  We got -- you know, and I understand all rulings, you know, can

17  change.

18   So if that's the caveat that we're operating under, then

19  we'll accept it, but I have a hard time conceiving of a cross.

20  And, again, we haven't heard that they're not going to do it.

21  I think they're just going to do it and then hope that the

22  goalpost moves again and scream about how it will take two more

23  weeks to finish this trial, which I think is a total red

24  herring.

25   But, in any event, I mean, we've heard a lot that hasn't

PROCEEDINGS

1   necessarily panned out during the course of this trial.  So

2   that's -- that's -- again, we're accommodating.

3           THE COURT:  How can you live with the Court's ruling?

4           MR. DOOLEY:  Sorry?

5           THE COURT:  How can you -- I mean, how can you not

6   attack the expert on the basis that the expert's work is

7   incomplete?

8           MR. DOOLEY:  We can attack -- I don't -- we can attack

9   the expert's methodology and what he considered and what he

10  didn't consider.  That's not the argument.  Their argument is

11  "We need to have -- you can't attack the number of

12  transactions," and that's, frankly, not the focus of the

13  cross-examination.  The focus of the cross-examination is the

14  analysis that he did do and why it's wrong.

15          THE COURT:  But if the analysis -- the thrust of the

16  cross-examination is that he came to the wrong conclusion of

17  the -- you know, he looked at 96 transactions and came to the

18  wrong conclusion with respect to those, I understand if the

19  cross were circumscribed, limited to that, I don't think he

20  need be -- necessarily need the restatement.

21      But if it's, "Gee, you only looked at 96 and there were

22  800 of them" --

23          MR. KEKER:  We're not going there.

24          MR. DOOLEY:  We will not argue that he only looked at

25  96, Your Honor.  We will not argue he only looked at 96.

PROCEEDINGS

1      **THE COURT:**  I don't know what you're arguing.

2   Mr. Frentzen says he has no idea.  How can you not argue that?

3      **MR. FRENTZEN:**  That seems to be the thrust of their

4   expert's report.  We've been asked --

5      **THE COURT:**  That's why the flip also has some appeal,

6   which is forget Brice; just bring in the -- just bring in

7   Yelland and then go at it, and go at it.  And then just cross

8   him any way you want to cross him, talk about Hurd or Whitman

9   or any -- Fiorina or anybody and just go for it because that's

10  the way case was originally set out.

11      And we did fight the battle about the restatement, and it

12  was permitted and if -- and I just -- actually, I just -- I

13  don't -- I have a hard time in a case limiting subject matter

14  cross-examination.  I just do, especially -- I think it's an

15  error to -- it's -- number one, it's an error that may not

16  be -- that could be a serious error for the defense because

17  it's a constitutional right, and on the other side, it's simply

18  unfair to the Government not to let them prove their case,

19  so -- with admissible evidence.  With admissible evidence.

20      So that's why I think we're at the heart of it, and maybe

21  I'm just too concerned about this jury.  If we lose one, we

22  lose one.  It doesn't mean we are going to lose three.

23      And, by the way, who is taking that risk?  I guess

24  everybody is taking that risk:  The Government, the defense.

25  It's not an issue for the Court.

1    I want to think about it for, you know, five, ten minutes

2    or so, but I think the -- I guess what I'm asking you,

3    Mr. Dooley, is how really, in good faith, can you represent to

4    the Court that you wouldn't attack Brice -- wouldn't draw into

5    question the inadequacy, the incompleteness of his analysis?

6    That's really the question.

7            **MR. DOOLEY:**  Your Honor, I had understood the concern

8    was about the breadth and number of transactions that he looked

9    at and that that was the concern, and that's the reason that

10   they said they need Yelland because he looked at all of them

11   and Brice only looked at a subset.  I think it's perfectly

12   within our -- within our bounds to attack the quality and depth

13   of the work that Brice did on the transactions that he looked

14   at.

15       If the line that we want to draw is we can't attack the

16   number that he looked at, then we're willing to live with that.

17   We can't attack the number, but we can attack the depth of the

18   treatment of --

19           **THE COURT:**  Let's say you would attack the depth,

20   which is a fair way of attacking them.  Then why wouldn't they

21   then be entitled to bring in his expert -- he says, "Well,

22   look, his analysis was inadequate because it wasn't deep

23   enough.  We'll show you something that is deep enough and it

24   confirms his analysis."

25           **MR. DOOLEY:**  Aren't we just back then to 40 -- I

1    feel -- this is why I feel like we are having the same

2    argument.  We are back to 403.

3         **THE COURT:**  If we are back to 403, it's one or the

4    other.  If we are back to 403, it's sort of one or the other,

5    and maybe the way to go is to go back, get rid of Brice, and

6    bring in Yelland.

7         Where is Yelland?

8         **MR. FRENTZEN:**  UK, Your Honor -- wait.  UK?

9         **MR. REEVES:**  Yes.

10        **THE COURT:**  He can be here, I assume.

11        **MR. FRENTZEN:**  We can certainly try and make that

12   happen.

13        Your Honor, just one other thing.  I just want to point

14   out that Mr. Dooley is saying he's not going to attack that,

15   you know, while the expert is on the stand.  We've been asked

16   to sign off on a stipulation about how there were, I don't

17   know, 28,000 total transactions or deals that took place in the

18   time period, so it's pretty clear to me that some aspect of the

19   defense case -- this was a proposed defense stipulation where

20   they say they counted up, you know, all the deals that I guess

21   were even -- I don't understand it completely, so, you know --

22   if that's where they're headed, how is it not then going to be

23   an argument later on -- 28,000 transactions and, you know, this

24   bum looks at, you know, 96 or whatever.  I just can't see it.

25        And so -- well, so -- I think --

1          **MR. DOOLEY:**  It's not like the difference between

2   Brice and Yelland is that great.  Brice looked at 93

3   transactions and Yelland looks at a hundred and something.

4   It's --

5          **THE COURT:**  What does he look at?  What is the basis

6   for the restatement?  How many transactions did he look at?

7          **MR. LEACH:**  I don't have the number, Your Honor.  I

8   think it's in excess of 90.  Somewhere south of 300.  I don't

9   have the exact number with me.

10         **THE COURT:**  The difference between Brice and Yelland

11  is the difference between a hundred and 300?

12         **MR. KEKER:**  No.  It's between 93 that one looked at

13  and I thought 127 is what Yelland looked at.

14         **MR. REEVES:**  There is another important difference.

15  Mr. Yelland has the obligation to -- with regard to the

16  accuracy of the financial reporting for ASL.  So his -- his

17  analysis isn't sampling, it isn't picking a number.  It is

18  doing what is required to restate the financial statements

19  properly.  That would be a difference.

20         **MR. KEKER:**  Under different rules, of course, but

21  that's all right.

22      Anyway, what -- what we -- I think everybody --

23         **THE COURT:**  The problem with that is that introduces

24  another whole other host of concerns.

25         **MR. KEKER:**  I think what we need is some guidance from

1   you, and everybody can work over the weekend and get ready for

2   whatever is going to happen.  We think --

3          MR. FRENTZEN:  I --

4          MR. KEKER:  I mean, okay.  I just don't want to listen

5   to this anymore.  We are saying the same thing, all of us, over

6   and over and over again --

7          MR. FRENTZEN:  I'm simply making a different point,

8   Your Honor -- is with the Court's permission, we would want --

9   in other words, we understood the restatement was in, staying

10  in the.  The Court knows now what we understood from the

11  transcript.

12      I want to make sure that -- there are some figures that

13  come from the restatement in terms of -- the Court has heard us

14  use some of them, a hundred million dollars in hardware sales

15  in 2010 and so on, and I think we are going to have to make

16  sure that there is not some things that we were counting on

17  from the restatement to argue later on that we now have to go

18  back and actually put into evidence in some other fashion.

19         MR. DOOLEY:  That's fine with us.

20         MR. FRENTZEN:  Well --

21         MR. DOOLEY:  If it's an issue --

22         MR. FRENTZEN:  That may be fine with them.  What I'm

23  saying is we need to take a hard look at where there are things

24  we were going to argue that we now have to call some other

25  witness to try to substantiate in terms of different figures,

1    analysis of particular quarters and so on to make sure that we

2    still have that without the restatement in evidence, if that

3    makes sense.

4         And I don't know -- I'm not threatening weeks of extra

5    trial, as I keep hearing, but I'm simply saying that I think we

6    need to take a hard look at our -- what we wanted to argue

7    because there is a lot of things from the restatement that I --

8    we need to make sure that we have because, again, we thought it

9    was staying in without further, you know, exhaustive testimony

10   from Yelland.  So there's that.

11        **MR. REEVES:**  Your Honor, you had suggested possibly

12   taking a break.  I definitely think we might benefit from

13   speaking a little bit, thinking about this.

14        On behalf of the Government, I share the Court's concern

15   about the longevity of the trial and bringing the trial to a

16   conclusion in an efficient way.  I do think this is a decision

17   that all of us need to make and make carefully for the planning

18   purposes of next week, and I do think it would help just sort

19   of regroup, think about it, think about what the contours might

20   be and come back in about 20 minutes and maybe discuss a

21   possible proposal and way through.

22        **THE COURT:**  See you at 5:30.

23              (Recess taken at 5:07 p.m.)

24           (Proceedings resumed at 5:31 p.m.)

25      (Proceedings were heard out of presence of the jury:)

1        **THE COURT:**  Let the record reflect all parties are

2   present.  The jury is not present.

3        I have thought further on it, and I want to just sort of

4   lay out what I think -- where we are today, if I might, at 5:30

5   in the evening.  Where we are.

6        Number one, this entire conversation arose in the context

7   of the Court's concern about the length of the trial.  That was

8   basically where I was concerned.

9        Putting it another way, if that wasn't a concern to the

10  Court, I don't -- having ruled that the restatement is

11  admissible under the *Jasper* case, it would come in, and it did

12  come in, in fact, and then the Court was very concerned about

13  the length of time.  Okay.

14       So the Court looked for some alternatives and based its

15  thinking on the fact that to have both Yelland and Brice would

16  be cumulative, at least in part, and therefore -- therefore

17  Yelland would not testify because of what the defense said was

18  going to entail extensive cross-examination, perhaps collateral

19  matters would be relevant at that point in terms of

20  impeachment, and therefore the shorter witness -- the way to

21  deal with it was going to be simply having Brice.

22       At that point, the Court -- the Government said it would

23  be their understanding that they could live with just Brice,

24  provided that -- and I read it into the record, what

25  Mr. Frentzen said -- provided that he could say that he relied

1  on the restatement in terms of his opinion, to which the

2  defense has said "wait a minute now" -- and they may have said

3  it at the time, so I'm not -- I'm not saying oh, anybody did

4  anything.  I think this was all occasioned by the Court's

5  ruminations and concerns, and the defense says "look, that

6  restatement should go out because we didn't cross-examine to

7  the extent we wanted to Antonia Frazer" -- what is her name?

8          **MR. REEVES:**  Antonia Anderson.

9          **THE COURT:**  "And it's highly prejudicial and it's a

10  document that is just sort of hanging out there without the

11  creator and so we don't think it's fair.  We are being denied

12  our right to cross-examine."

13      By the way, that to me is fundamentally correct.  And I

14  can see a serious appellate point if -- that I would recognize

15  if -- if, in fact, we followed that particular course.

16      Also the defense says well -- so it says it has to be

17  stricken.  It can't be considered by the jury.  The document

18  goes out and we give a cautionary instruction.  I think in a

19  sense that's where we are in terms of the record.

20      Then moving ahead, the defense says well -- Government

21  says, "look, we want -- we'll -- we'll even live with that,

22  reluctantly, but it depends on the cross of Brice, and how can

23  we say in the cross of Brice it's not going to implicate the

24  restatement," that is to say, one, he did have it, and, two, it

25  provides the necessary corroboration for Brice's opinion

 1  because it was an in-depth, broad analysis, I guess -- I

 2  haven't seen it -- and it will either fall or not on the

 3  strength of that analysis.

 4      So looking at it and thinking about it, it seems to me

 5  that that's correct.  I can't see -- and it's not been

 6  explained to me how you can have an effective cross-examination

 7  of the Government's expert -- cross without questioning the

 8  depth, which is the defense word -- the depth and scope of his

 9  analysis, and that -- that -- and they're clear they have to be

10  given unfettered latitude in cross-examining an expert witness,

11  one who is going to say this is material and this is as large

12  as it is.

13      Which all leads me back to the original offer of the

14  Government, which is give them Yelland, don't have Brice, allow

15  extensive cross examination of Yelland for a variety of

16  reasons:  One, the restatement is in evidence; two, Antonia has

17  testified to as to the restatement; three, the parties at that

18  point believed that Yelland was going to testify so they're not

19  prejudiced, nobody is prejudiced by it; four, why can't the

20  Government prove the case they want to prove the way they want

21  to prove it, as long as it's admissible; five, the answer to

22  that generally is that they can, except if it's cumulative.

23  'And, six, they're saying it won't be cumulative because we

24  won't call Brice.

25      So that's my analysis at that point, so I think the

1   appropriate -- and I have to make up my mind because that's

2   supposedly my job now, and the only people really

3   inconvenienced by this is the Government because the case has

4   been tried up until now, maybe not the last day or so, with

5   Gersh -- we have to deal with that, but has been based upon the

6   analysis that the restatement would be in.

7       So my -- my view of it is that -- is that Yelland should

8   testify, Brice should not.  The restatement stays in.  The

9   defense should be given latitude in their cross-examination as

10  to the motivation of Yelland, and whether or not they can call

11  additional witnesses in their case of course depends on two

12  things.  It depends, number one, on what is the

13  cross-examination, and, two, how collateral is the evidence

14  that they intend to offer to impeach Yelland.  And that's

15  something that can't be predicted until after the events occur.

16      But I certainly would allow a good-faith vigorous

17  cross-examination of Yelland; that is to say, obviously you're

18  not going to ask a question of which you don't have a basis,

19  but I don't think I would try to limit your bases in your

20  cross-examination.

21      And then I end up with all right, it may take longer, it

22  may not take longer.  I'm sitting here thinking that my

23  brilliant solution to this wasn't so brilliant because it

24  wasn't going to save any time one way or the other and I can't

25  predict how much time or longer period of time.  Everybody

PROCEEDINGS

1    knows we may lose a juror, and even in light of that, the

2    Government wants to go forward this way.  Sometimes it can be a

3    Government's concern as well, and they're eyes wide open.

4        And I actually think, with due deference to the defense,

5    this is really a Government issue.  The Government is entitled

6    to prove their case the way they want to, assuming there is

7    evidence and not cumulative, and I can't say, you know, this

8    witness is better than that witness for you.

9        So that's my ruling.  I do believe that at least in terms

10   of -- I can't now predict the length of time on cross.  I give

11   you that.  But as far as the Government, I'm holding you to

12   Tuesday; that is to say, you may have to make some elections as

13   to -- as to how long it's going to go, but in fact if you get

14   it all in -- I mean, I would call Yelland on Tuesday.  We'll

15   see how short you're going to be and on Monday put in everybody

16   else that you have to put in.

17            **MR. KEKER:**  Your Honor, we --

18            **THE COURT:**  Yes?  Mr. Keker.

19            **MR. KEKER:**  -- asked to call back Gersh, Sarin,

20   Welham, Daryanani and Garner, whose examinations were cut short

21   by agreement with the understanding that we weren't going to go

22   beyond the October 3rd date.  All of those people have very

23   relevant testimony that will be implicated by the Court's

24   ruling.

25            **THE COURT:**  Well, the answer is maybe.  As to any

PROCEEDINGS

 1  recall of a witness, I will take into account whatever --

 2  whatever the understandings were at the time that you entered

 3  into.  That's number one.

 4      And number two, whether they would give particularly

 5  relevant evidence on a particular issue.  So I'm not

 6  artificially cutting you off; that is, I'm not saying well, you

 7  had your opportunity.  No.  That would be untrue.

 8      But I'm still going to hold the defense to a -- the task

 9  of demonstrating why it's particularly relevant to call this

10  witness or that witness.

11          MR. KEKER:  We'll do that, Your Honor, but we would

12  like to have them recalled in the Government's case because we

13  got --

14          THE COURT:  No.  I'm not going to do that.  I'm not

15  going to do that.  And -- look, I don't want to -- I don't know

16  what I'm going to do.  I mean, I've got to see your proffers

17  and so forth with respect to it, but I'm now saying what I've

18  just said.  It's up to the Government to try to limit their

19  case.  They're going to call -- if your election is to call

20  Yelland, you call Yelland.  If your election is to go to Brice,

21  you go to Brice, but the restatement goes out.  But it's up to

22  you.

23          MR. KEKER:  Would you at least -- because of sort of

24  late hour, order the Government to make available through their

25  process these witnesses if we're going to have to call them.

**PROCEEDINGS**

1  We need Gersh, Sarin, Welham, who is in England and Daryanani

2  and Garner.  They have already been cooperating with these

3  people.  They brought them to court.  They should be

4  responsible for getting them back here.

5          **THE COURT:**  Here is my view.  My view is if you make a

6  showing that somebody should be recalled, then I'm going to

7  tell the Government to recall.

8          **MR. KEKER:**  Okay.  All right.

9          **THE COURT:**  But you've got to make a showing.  But

10  that showing won't even -- you can't even do it until after

11  Yelland has testified.  Maybe you can.

12          **MR. KEKER:**  No.  We think we can.  The whole point is

13  what happened after October 3rd is now relevant.

14          **THE COURT:**  Okay.

15          **MR. KEKER:**  That's what -- that's why we're getting

16  the restatement.

17          **THE COURT:**  It is relevant if it goes to the issue of

18  the restatement.  It's not relevant as to -- you're not opening

19  the door -- under any circumstances I would not have allowed

20  some of the things that happened post October 10th.  I mean, by

21  the fact that the restatement was created 17 months later

22  doesn't make everything that happened up to those 17 months

23  relevant.

24          **MR. KEKER:**  Agreed, Your Honor.

25          **THE COURT:**  It has to go to how did that event affect

 1  the restatement, the creation of the restatement.  If it goes

 2  to that, certainly there is some -- there may be some relevance

 3  there.

 4       **MR. KEKER:**  We made a proffer before, and you very

 5  clearly stated on the record -- and I can give you the page

 6  numbers when we went through this --

 7       **THE COURT:**  Yeah.

 8       **MR. KEKER:**  -- that all of that material was

 9  proffered.  Anything that affects the valuation, the -- anyway,

10  I can -- I'll pull it out --

11       **THE COURT:**  Whatever I said I said, but I think I said

12  it in the context of now we don't have to deal with all of

13  that, not that it's all highly admissible and now it will

14  become inadmissible.  I don't feel that I made an admissibility

15  determination.  I think I made a determination that I don't

16  have to reach that if, in fact, I have a cutoff point at some

17  time.

18       Now, of course, the cutoff point has changed now as by

19  virtue of Yelland, but it still has to be evidence related to

20  Yelland and how the restatement was created.

21       **MR. KEKER:**  So then the question is in fairness to the

22  defense, if the Government produces this evidence, which was

23  the restatement, don't I have to let all this other evidence

24  in?  I think the answer to that is absolutely yes, from where I

25  sit now, having listened to all of this.

1    So, in any event, I understand the Court can change its

2 mind, do whatever, but --

3    THE COURT:  I don't want to do just whatever --

4    MR. KEKER:  We're headed into lala land.

5    THE COURT:  No -- maybe.  But I tried to bring some

6 clarity to the situation now.  And the clarity I'd like to

7 bring is that if it is admissible and relevant to the

8 restatement and not cumulative and so forth, meets all the

9 tests, it may come in.  It may come in.

10    MR. KEKER:  Okay.  We -- we will look forward tonight

11 to getting the Government's final witness order.  I hope it's

12 fixed.  And we will then respond -- actually, I mean, if it

13 looks like they can finish the case on Tuesday --

14    THE COURT:  Well, what about that?

15    MR. REEVES:  Well, Yelland was in the UK.  I think he

16 was happy to return there.  I will certainly call tonight and

17 try to get him back.  I expect he will be able to come.  I will

18 try.

19    I would appreciate some flexibility about Tuesday,

20 Wednesday, but I think barring something unforeseen, I think we

21 can probably accomplish that, Your Honor.

22    THE COURT:  Let's try to accomplish it.  Okay.  Any

23 questions as to where we are going from here?

24    MR. REEVES:  Yes.  I expect reciprocal defense notice,

25 based on the Court's ruling about Mr. Yelland.  He will now be

PROCEEDINGS

1   a Government witness.  We'll give them the order as we have

2   done.  I would like to know the defense case as I've been

3   promised.

4           THE COURT:  They said they would get it to you

5   tonight.

6           MR. REEVES:  Thank you, Your Honor.

7           MR. KEKER:  Yes, we will.

8           THE COURT:  Okay.  Thank you.

9               (Proceedings adjourned at 5:47 p.m.)

10                  ---oOo---

11

12              **CERTIFICATE OF REPORTERS**

13       I certify that the foregoing is a correct transcript

14   from the record of proceedings in the above-entitled matter.

15

16   DATE:  Friday, April 13, 2018

17

18

19   _____

20       Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter

21

22

23   _____

24       Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                U.S. Court Reporter

25