Volume 26

Pages 5352 - 5595

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                )
  VS.                           )       NO. CR 16-00462 CRB
                                )
SUSHOVAN TAREQUE HUSSAIN,        )
                                )
          Defendant.            )
_____)
                                San Francisco, California
                                Wednesday, April 18, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

                    ALEX G. TSE
                    Acting United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
            BY:  **ROBERT S. LEACH**
                 **ADAM A. REEVES**
                 **WILLIAM FRENTZEN**
                 **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:

                    KEKER & VAN NEST
                    633 Battery Street
                    San Francisco  CA  94111
            BY:  **JOHN W. KEKER**
                 **JAN NIELSEN LITTLE**
                 **BROOK DOOLEY**
                 **KATE LAZARUS**
                 **NIC MARAIS**
                 **ATTORNEYS AT LAW**


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Pamela Batalo, CSR No. 3593, FCRR
              Official Reporters

# I N D E X

Wednesday, April 18, 2018 - Volume 26

|  | **PAGE** | **VOL.** |
|---|---|---|
| Government's Rests | 5522 | 26 |

| **GOVERNMENT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|

**BRYANT, ALEXANDRA (RECALLED)**

| | PAGE | VOL. |
|---|---|---|
| (PREVIOUSLY SWORN) | 5359 | 26 |
| Direct Examination resumed by Mr. Frentzen | 5359 | 26 |
| Cross-Examination by Mr. Keker | 5448 | 26 |
| Redirect Examination by Mr. Frentzen | 5500 | 26 |

**MENZ, MICHAEL**

| | PAGE | VOL. |
|---|---|---|
| (SWORN) | 5510 | 26 |
| Direct Examination by Mr. Reeves | 5510 | 26 |
| Cross-Examination by Ms. Little | 5515 | 26 |

| **DEFENDANT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|

**LESJAK, CATHERINE**

| | PAGE | VOL. |
|---|---|---|
| (SWORN) | 5523 | 26 |
| Direct Examination by Mr. Keker | 5523 | 26 |
| Cross-Examination by Mr. Frentzen | 5577 | 26 |

# E X H I B I T S

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 24 | | 5359 | 26 |
| 79 | | 5360 | 26 |
| 86 | | 5447 | 26 |
| 211 | | 5361 | 26 |
| 213 | | 5362 | 26 |
| 214 | | 5363 | 26 |
| 217 | | 5364 | 26 |
| 281 | | 5366 | 26 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 281 | | 5369 | 26 |
| 425 | | 5400 | 26 |
| 462 | | 5402 | 26 |
| 492 | | 5407 | 26 |
| 495 | | 5403 | 26 |
| 497 | | 5405 | 26 |
| 498 | | 5406 | 26 |
| 499 | | 5410 | 26 |
| 500 | | 5405 | 26 |
| 516 | | 5413 | 26 |
| 554 | | 5478 | 26 |
| 651 | | 5421 | 26 |
| 691 | | 5364 | 26 |
| 709 | | 5447 | 26 |
| 725 | | 5423 | 26 |
| 737 | | 5425 | 26 |
| 757 | | 5429 | 26 |
| 884 | | 5447 | 26 |
| 1432 | | 5366 | 26 |
| 1588 | | 5447 | 26 |
| 1848 | | 5370 | 26 |

# I N D E X

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2030 | | 5372 | 26 |
| 2052 | | 5373 | 26 |
| 2055 | | 5376 | 26 |
| 2066 | | 5377 | 26 |
| 2067 | | 5379 | 26 |
| 2101 | | 5380 | 26 |
| 2102 | | 5452 | 26 |
| 2104 | | 5382 | 26 |
| 2127 | | 5394 | 26 |
| 2144 | | 5385 | 26 |
| 2787 | | 5421 | 26 |
| 2788 | | 5428 | 26 |
| 2946 | | 5442 | 26 |
| 2984 | | 5390 | 26 |
| 3026 | | 5447 | 26 |
| 3049 | | 5447 | 26 |
| 3050 | | 5435 | 26 |
| 3051 | | 5435 | 26 |
| 3052 | | 5447 | 26 |
| 3053 | | 5447 | 26 |
| 3054 | | 5447 | 26 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 3070 | 5438 | 5438 | 26 |
| 3071 | 5431 | | 26 |
| 5685A | | 5443 | 26 |
| 5685B | | 5443 | 26 |
| 6528 | | 5464 | 26 |
| 6579 | | 5526 | 26 |
| 6587 | | 5566 | 26 |
| 6773 | | 5476 | 26 |
| 6777 | | 5479 | 26 |
| 6779 | | 5474 | 26 |
| 6780 | | 5475 | 26 |
| 8201 | | 5527 | 26 |
| 8204 | | 5542 | 26 |
| 8205 | | 5544 | 26 |
| 8271 | | 5522 | 26 |
| 8272 | | 5522 | 26 |
| 8273 | | 5482 | 26 |

| | |
|---|---|
| 1 | <u>**Wednesday - April 18, 2018**</u>                          <u>**9:02 a.m.**</u> |

2                    P R O C E E D I N G S

3                         ---000---

4        (Proceedings were heard out of presence of the jury:)

5            **THE COURT:**  Let the record show that the jury is not

6    present.  The parties are present.

7        Good morning.

8            **MR. REEVES:**  Good morning, Your Honor.  One very brief

9    matter.

10           **THE COURT:**  Yes.

11           **MR. REEVES:**  It relates to the draft summary chart and

12   the instruction that we discussed yesterday with regard to

13   striking what I believe is Exhibit 6953 and the testimony about

14   that draft summary chart.

15           **THE COURT:**  Yes.  What about it?

16           **MR. REEVES:**  I just want to make certain that we

17   instruct the jury about that piece of the testimony.

18           **THE COURT:**  Okay.  Fine.  I'll do that.

19           **MR. REEVES:**  It's Exhibit --

20           **MR. KEKER:**  Just tell them forget about 6953.

21           **THE COURT:**  I will.  I have a special way I'm going to

22   do it, too.  Just pay attention.  6953.

23           **MR. REEVES:**  Thank you very much, Your Honor.

24           **MR. KEKER:**  I want to bring to your attention we just

25   filed this morning the proffer that you offered to let us do on

1    the post October 3rd evidence.

2            THE COURT:  Yeah.

3            MR. KEKER:  We filed a brief.  It cites a lot of

4    exhibits.  We're in the process of filing the exhibits.  That's

5    taking a little bit longer, but it's there for you to look at

6    and for the Government to look at, and we're getting copies

7    brought over here so we can hand you hard copies.

8            THE COURT:  Okay.  I appreciate that.

9            MR. FRENTZEN:  And obviously we haven't seen that yet,

10   but we'll take a look at it.

11       Just so the Court knows, when we get -- before we get into

12   the Defense case with Ms.-- what I anticipate will be

13   Ms. Lesjak, I have a couple of points -- a couple of issues to

14   raise --

15           THE COURT:  Then we'll take a recess -- once the

16   Government rests, we'll take a recess and discuss the case.

17           MR. FRENTZEN:  That's fine.

18           THE COURT:  Okay.  All right.  Let's bring in the

19   jury.

20       (Proceedings were heard in the presence of the jury:)

21           THE COURT:  Let the record reflect all jurors are

22   present, parties are present.

23       Ladies and gentlemen, there was an exhibit, No. 6953.

24   What it was was a draft of an earlier or -- it was a draft of

25   another document.  The other document wasn't received in

1    evidence.  The draft was offered and then the defense withdrew

2    that document, so that document is withdrawn.

3        There was some testimony, brief testimony, about the

4    document, and you are instructed to disregard it.  Okay.  Let's

5    proceed.

6            MR. FRENTZEN:  Thank you, Your Honor.

7                       **ALEXANDRA BRYANT**,

8    called as a witness for the Government, having been previously

9    duly sworn, testified further as follows:

10                **DIRECT EXAMINATION**   (resumed)

11   BY MR. FRENTZEN:

12   Q.   Good morning, Special Agent Bryant.

13   A.   Good morning.

14   Q.   I have handed you now a stack of exhibits and I'll call

15   this category sort of updates and some more hardware.

16       Could you take a look, please, at the first in that stack,

17   Exhibit 24.  What is Exhibit 24?

18   A.   It's an email from Mr. Hussain to Mike Lynch.

19           THE COURT:  Admitted.

20           (Trial Exhibit 24 received in evidence)

21           MR. FRENTZEN:  Thank you, Your Honor.  Could we pull

22   it up.

23                   (Exhibit published to jury.)

24   BY MR. FRENTZEN:

25   Q.   What is the date of this email?

BRYANT - DIRECT / FRENTZEN

1    **A.**    March 18, 2009.

2    **Q.**    It's from Mr. Hussain?

3    **A.**    Yes.

4    **Q.**    To Mr.-- Dr. Lynch and others?

5    **A.**    Yes.

6    **Q.**    What is the subject?

7    **A.**    Group revenue.

8    **Q.**    And what did Mr. Hussain report?

9    **A.**    "Currently at 139 million.  Obviously I'm being

10   optimistic, though I believe we can squeeze deferred a bit

11   more, but I wanted you to know where the deals are.  Consensus

12   is 127 to 128 million."

13   **Q.**    And then is there discussion about "closed around 80

14   million"?

15   **A.**    Yes.  "With green 27 million big deals on left.  JPMorgan,

16   Bank of America.  Verdasys, Capax Global.

17   **Q.**    I would like to move now to Exhibit 79.  Is that another

18   email from Mr. Hussain?

19   **A.**    Yes.  To Mike Lynch.

20             **THE COURT:**  Admitted.

21             (Trial Exhibit 79 received in evidence)

22                     (Exhibit published to jury.)

23             **MR. FRENTZEN:**  If we could blow that up.

24   **Q.**    And the date of this email is what?

25   **A.**    June 19th, 2009.

1   **Q.**   And what was the subject of this email?

2   **A.**   "U.S. commercial call was poor."

3   **Q.**   And what does Mr. Hussain go on to say after saying the

4   U.S. commercial call was poor?

5   **A.**   "I believe we need EMC and VMS.  Mooney will call you for

6   EMC.  We believe it only works for keyview for all EMC products

7   for three years.  EMC's quarter ends on the 26th so it has to

8   be closed by then."

9   **Q.**   Take a look at Exhibit 211, please.  Is that another email

10  from Mr. Hussain to Dr. Lynch?

11  **A.**   Yes.

12          **THE COURT:**  Admitted.

13          (Trial Exhibit 211 received in evidence)

14              (Exhibit published to jury.)

15          **MR. FRENTZEN:**  Thank you, Your Honor.

16      If we could blow up the top part.

17  **Q.**   What's the date of this email?

18  **A.**   September 24th, 2009.

19  **Q.**   What is the subject?

20  **A.**   "Update."

21  **Q.**   And in terms of the first couple, two deals, what was

22  Mr. Hussain reporting?

23  **A.**   "For Eli Lilly, procurement came back.  Want to discuss

24  good news.  For Kraft they're saying it's a struggle, bad

25  news."

BRYANT - DIRECT / FRENTZEN

1   **Q.**   I'd like you to then skip down to the bottom section,

2   right about there.  Can you tell us what that -- what

3   Mr. Hussain reported there?

4   **A.**   He's reporting that "EMC replaced Sony with Credit Suisse

5   for the same amount so we're back to 41 million.  This gives me

6   more leeway."

7   **Q.**   And the line below?

8   **A.**   "So I am at 193 million but Kraft looks dodgy."

9   **Q.**   Can we go to 213.  Is that another email from Mr. Hussain?

10  **A.**   Yes.  To Mike Lynch.

11          **MR. FRENTZEN:**  Offer it, Your Honor.

12          **THE COURT:**  Admitted.

13          (Trial Exhibit 213 received in evidence)

14          **MR. FRENTZEN:**  Thank you.

15                  (Exhibit published to jury.)

16  **BY MR. FRENTZEN:**

17  **Q.**   Can we start with the bottom part here.

18  **A.**   Yes.  Mr. Hussain is receiving an email from Anthony

19  Bettencourt.

20  **Q.**   And it says what?

21  **A.**   "Pall Corp. can't get the deal done in Q3."

22  **Q.**   And then is that what Mr. Hussain forwards to Mike Lynch?

23  **A.**   Yes.

24  **Q.**   What is the date?

25  **A.**   September 25th, 2009.

1   **Q.**   And what did Mr. Hussain say?

2   **A.**   "Another one.  I have an idea on Kraft."

3   **Q.**   Let's go to Exhibit 214, please.  What is 214?

4   **A.**   Another email from Mr. Hussain to Mike Lynch.

5           **THE COURT:**  Admitted.

6           (Trial Exhibit 214 received in evidence)

7                   (Exhibit published to jury.)

8   **BY MR. FRENTZEN:**

9   **Q.**   The date of this particular email?

10  **A.**   It's the next day, September 26th, 2009.

11  **Q.**   What's the subject?

12  **A.**   "Update."

13  **Q.**   Can you tell us what's the first line?

14  **A.**   "Went through deals with Brent and Mooney this evening."

15  **Q.**   And let's go to the next paragraph.

16  **A.**   "Yesterday was very bad.  Interwoven 2 million off and

17  U.S. IDOL 6 million off.  Covered with part JPMorgan, EMC, but

18  now worried -- but now worried more will fall out.  Am at 189

19  million to 190 million with 30.7 million of EMC stuff.  We have

20  41 million so 10.3 million left to recognize."

21  **Q.**   Could we go now to Exhibit 217.  What's Exhibit 217,

22  Special Agent?

23  **A.**   Two days later, an email from Mr. Hussain to Mike Lynch.

24          **MR. FRENTZEN:**  Offer it --

25          **THE COURT:**  Admitted.

1              (Trial Exhibit 217 received in evidence)

2                  (Exhibit published to jury.)

3          **MR. FRENTZEN:**  Blow that up, please.

4     **Q.**  And so the date of this email is what?

5     **A.**  September 28th, 2009.

6     **Q.**  Subject?

7     **A.**  "Update as of 10:00 p.m."

8     **Q.**  First line?

9     **A.**  "With 41 million from EMC related, I am at 200 million

10    plus, but..."

11    **Q.**  The first part of the next line?

12    **A.**  "Federal is absolutely rubbish."

13    **Q.**  Then if we can skip down, could you read us that

14    paragraph, please.

15    **A.**  "U.S. IDOL is weak.  Will probably only close circa 35

16    deals, half the number of 3 years ago, with more reps,

17    managers.  No competition and more products to sell."

18    **Q.**  And the last line of the email?

19    **A.**  "Europe is also weak.  Three years ago we did 68 deals

20    versus 42 deals this quarter."

21    **Q.**  Could you take a look, please, at Exhibit 691.  Do you

22    recognize what that is?

23    **A.**  Yes.  It's an email from Mike Lynch to Mr. Hussain.

24          **THE COURT:**  Admitted.

25              (Trial Exhibit 691 received in evidence)

```
 1                    (Exhibit published to jury.)

 2             MR. FRENTZEN:  Will you pull that up.

 3             MR. KEKER:  Let me see it.  Yes.  I'm sorry.  Beg your

 4   pardon.

 5   BY MR. FRENTZEN:

 6   Q.   What's the date of this particular email?

 7   A.   March 31st, 2010.

 8   Q.   And what's the -- what is the attachment, if you will?

 9   A.   "SH route to 25 cents."

10   Q.   And if we could go to the second page of this document,

11   please.

12        Special Agent Bryant, what -- what does this appear to be

13   here?

14   A.   It appears to be a list of large deals from the quarter.

15   Q.   What is the top line?

16   A.   "Route to 25 cents requires 200 million."

17   Q.   All right.  And is there then a listing of particular

18   deals and starting with "closed"?

19   A.   Yes.

20   Q.   And do you see the third line down, what is that?

21   A.   VAT at 22.5 million.

22   Q.   Do you also see FSA?

23   A.   Yes.

24   Q.   FileTek?

25   A.   Yes.
```

BRYANT - DIRECT / FRENTZEN

1   **Q.**   Eli?

2   **A.**   Yes.

3   **Q.**   So on?

4        Is there a total at the bottom?

5   **A.**   211.8 million.

6   **Q.**   Can you take a look at Exhibit 281, please.  What is 281?

7   **A.**   An email from Mr. Hussain to Mike Lynch.

8        **MR. FRENTZEN:**  Offer it, Your Honor.

9        **THE COURT:**  Admitted.

10       (Trial Exhibit 281 received in evidence)

11            (Exhibit published to jury.)

12  **BY MR. FRENTZEN:**

13  **Q.**   What's the date of this particular email, Special Agent --

14  **A.**   December 13th, 2010.

15  **Q.**   And what was Mr. Hussain saying to Mike Lynch?

16  **A.**   "DOI not happening."

17  **Q.**   I'd like to go now -- can you take a look at 1432.  What's

18  1432?

19  **A.**   It's an email from Mr. Hussain being forwarded to Steve

20  Chamberlain.

21       **THE COURT:**  Admitted.

22       (Trial Exhibit 1432 received in evidence)

23            (Exhibit published to jury.)

24  **BY MR. FRENTZEN:**

25  **Q.**   And -- okay.  So this indicates it's forwarded on what

BRYANT - DIRECT / FRENTZEN

1  date?

2  **A.**  January 10th, 2011.

3  **Q.**  And the forwarded topic?

4  **A.**  "Targets for 2011."

5  **Q.**  Could we scroll down to the original email.  The original

6  email is an email from who?

7  **A.**  It's from Mr. Hussain to Mike Lynch.

8  **Q.**  What date?

9  **A.**  Also January 10th.

10  **Q.**  Targets for 2011?

11  **A.**  Yes.

12  **Q.**  You see the first line here is "Mike"?

13  **A.**  Yes.

14  **Q.**  Could we go to the second page, please.  At the top, what

15  is Mr. Hussain reporting?

16  **A.**  He provides a list showing the sales achievements for

17  2010.

18  **Q.**  And do you see here a category of U.S. IDOL?

19  **A.**  Yes.

20  **Q.**  And what's the amount listed under U.S. IDOL?

21  **A.**  114 million.

22  **Q.**  Is there also an indication for EMEA?

23  **A.**  Yes.

24  **Q.**  And that's how much?

25  **A.**  102 million.

BRYANT - DIRECT / FRENTZEN

1    **Q.**   Can we scroll -- yeah.  Great.  Keep going a little bit.

2    Okay.  That's perfect.  Thank you.

3        Do you see one of the achievements for 2010 here?

4    **A.**   Yes.  "Strategic low margin at $101 million."

5    **Q.**   And do you see what's listed below that?

6    **A.**   Yes.  "Management sales, Stouffer, $75.5 million."

7    **Q.**   Could we go to the next page, please.  The top.

8        What was the total Mr. Hussain indicated then for 2010?

9    **A.**   868.5 million.

10   **Q.**   All right.  Does Mr. Hussain then go on to talk about?

11   **A.**   He goes on to propose targets for 2011, provides a similar

12   list with targets for 2011.

13   **Q.**   And among the targets for 2011 -- could we go to the next

14   page, please.  That's great.

15       Do you see a target here for "strategic low margin"?

16   **A.**   Yes.  110 million, up 9 percent.

17   **Q.**   And "management sales, Stouffer, Mooney," what is the

18   target there?

19   **A.**   "Now at 100 million."

20   **Q.**   And this 100 million is more than the 2010 figure of

21   75.5 million?

22   **A.**   Yes.

23   **Q.**   Could you scroll a little bit further down.  Great.

24       And can you just read this sentence here that I've

25   underlined.

1    **A.**   "I have told Mike S that the target is 25 million minimum

2    for Q1."

3    **Q.**   And did we hear from an individual named Mike Sullivan in

4    this case?

5    **A.**   Yes.  He was our first witness.

6    **Q.**   Can you scroll up a little further.

7         How does Mr. Hussain go out?

8    **A.**   He's asking Mr. Lynch to confirm if he's okay with these

9    targets.

10   **Q.**   Could you go -- sorry -- back just a little bit and take a

11   look at Exhibit 281.

12   **A.**   Yes.  It's an email from Mr. Hussain to Mike Lynch.

13         **MR. FRENTZEN:**  Offer it, Your Honor.

14         **THE COURT:**  Admitted.

15         **MR. FRENTZEN:**  Thank you, Your Honor.

16         (Trial Exhibit 281 received in evidence)

17              (Exhibit published to jury.)

18         **MR. FRENTZEN:**  Could you go to the bottom part first.

19   Thank you.  That's great.

20   **Q.**   What was the date of this email?

21   **A.**   October 18th, 2009.

22   **Q.**   And what did Mr. Hussain write to Mike Lynch?

23   **A.**   "Mike, I'm burnt out.  Given my anal nature, I'm spending

24   all my time worrying about the 10 minutes on Tuesday where I

25   have to answer the analysts questions and I'm not doing

1    anything else.  I need you to take the questions this time

2    around unless they are really easy.  I don't want to deal with

3    the analysts anymore.  All I want to do is deliver Q4, deliver

4    the audit, deliver the acquisition and capital raising.  The

5    analysts take up too much time and I worry about it all the

6    time rather than the business."

7    **Q.**    And what did Mike Lynch say to Mr. Hussain?

8    **A.**    "Relax.  It will be fine."

9    **Q.**    Can we scroll down.

10         And Mr. Hussain's response?

11   **A.**    "Fine for you to say."

12   **Q.**    Could you take a look at Exhibit 1848, please.

13   **A.**    Yes.  It's an email from Mr. Hussain to Mike Lynch.

14         **MR. FRENTZEN:**  Offer, Your Honor.

15         **THE COURT:**  1848?

16         **MR. FRENTZEN:**  Yes, Your Honor.

17         **THE COURT:**  Admitted.

18         **MR. FRENTZEN:**  I'm sorry -- yeah.  1848.

19         **THE COURT:**  Admitted.

20         **MR. FRENTZEN:**  Great.  Thank you.

21         (Trial Exhibit 1848 received in evidence)

22              (Exhibit published to jury.)

23         **MR. FRENTZEN:**  If we could go down.  Okay.  Actually

24   could we take a look at the top part first.

25   **Q.**    Special Agent Bryant, does this appear to be a -- an email

1    from Mr. Hussain to Mike Lynch, June 14, 2011, with an update

2    of an update, if that makes sense?

3    **A.**    Yes.

4    **Q.**    And if you look at the bottom part, are there some parts

5    in caps and some parts not in caps?

6    **A.**    Yes.

7    **Q.**    Could you scroll down -- or up.  Yeah.  Sorry.  So we can

8    see the next email.  Great.

9         I just wanted to focus your attention to a couple of these

10   lines.  Do you see the line I've just indicated right here?

11   **A.**    Yes.

12   **Q.**    What does that line say?

13   **A.**    "SE-HP 10 million.  SGI, 7.5 million.  SGI meeting went

14   well.  USPS meeting went excellently.  Means HP is on."

15   **Q.**    And could you take a look at the next line and read that

16   out for us, please.

17   **A.**    "MS-low margin.  He's backtracking on his commitment of

18   25 million.  USPS 5 million.  MS being slippery.  No chance for

19   25 million.  Likely 5 million short."

20   **Q.**    And down here, where it says "new," could you just read

21   that line for us, please?

22   **A.**    Yes.  "Abbott chance of a $15 million software deal."

23   **Q.**    Thank you, Special Agent Bryant.

24        I'd like to move now to a different topic.  I'd like to

25   move now into some of the due diligence related to the

1    Hewlett-Packard acquisition.

2        Special Agent Bryant, can you take a look at Exhibits --

3    I'm sorry -- Exhibit 2030, please.

4    A.   Yes.  It's an email from Mr. Hussain to Andrew Kanter.

5             THE COURT:  Admitted.

6             (Trial Exhibit 2030 received in evidence)

7                 (Exhibit published to jury.)

8    BY MR. FRENTZEN:

9    Q.   What's the date of this email?

10   A.   July 27th, 2011.

11   Q.   And does it appear to attach another document to it?

12   A.   Yes.  A questions Word version.

13   Q.   Would you show the next page, please.

14       Do you see what -- sorry -- what's right here?

15   A.   Yes.  These are the Tesla Question List.

16   Q.   Could we go to page 2, please, of this.  And do you see

17   after customers, there's "SH."

18   A.   Yes.

19   Q.   And following the question about "total number of customer

20   accounts installed base by industry product category, size of

21   account, revenue contribution to the extent available," do you

22   then see the "SH" and then a response written out?

23   A.   Yes.

24   Q.   And does it list many thousands of customers?

25   A.   Yes.

1    Q.   Then can you read us what the last sentence of this is.

2    A.   "We don't record by product as most customers buy multiple

3    products."

4    Q.   Can we go to page 7 of this document, please.

5         And at the bottom, do you see what's in here where it says

6    "differences between U.S. GAAP and IFRS"?

7    A.   Yes.

8    Q.   Can we go to the next page, please.

9         Do you see a paragraph here, "revenue recognition"?

10   A.   Yes.

11   Q.   Could you read the top line of that, please.

12   A.   "Although IFRS is a rules based" -- "is less rules based

13   than U.S. GAAP, we use U.S. GAAP principles."

14   Q.   And then -- that's good.  Could you take a look at

15   Exhibit -- I'm sorry.  I will skip that.

16        2052.

17   A.   Yes.

18   Q.   What is 2052?

19   A.   It's an email from Stephen Chamberlain to Mr. Hussain.

20        THE COURT:  Admitted.

21        (Trial Exhibit 2052 received in evidence)

22        MR. FRENTZEN:  Could we pull that up, please.

23             (Exhibit published to jury.)

24   BY MR. FRENTZEN:

25   Q.   Special Agent Bryant, what's the date of this --

1    **A.**    July 29th, 2011.

2    **Q.**    What is the subject?

3    **A.**    "Revenue by customer."

4    **Q.**    And what is Mr. Chamberlain -- does he go on to talk about

5    pulling data, basically?

6    **A.**    Yes.  And he attaches what he pulls.  He is pulling

7    billings from the NIBS and ERP systems.

8    **Q.**    Do you have some understanding of what NIBS and ERP

9    systems were for Autonomy?

10    **A.**    Yes.  They were billing systems.  We heard testimony about

11    it yesterday.

12    **Q.**    That was --

13    **A.**    Mr. Yelland.

14    **Q.**    Mr. Dooley introduced some spreadsheets with Mr. Yelland

15    and then asked about the total number of deals?

16    **A.**    Yes.

17    **Q.**    And those were pulled from the ERP and NIBS system?

18    **A.**    Yes.  And I believe also Softrax, which is mentioned in

19    the next line.

20    **Q.**    Right.  And there is also Softrax?

21    **A.**    Yes.

22    **Q.**    And the attachments here to this document, could we pull

23    up --

24    **A.**    They're in native format.

25    **Q.**    Yeah.  Could we pull up 2052-1.

1  **A.**   Yeah.  That one, Beth.

2  **Q.**   Can we go to the top of this, please.  Or are we at the

3  top?

4  **A.**   There are two spreadsheets attached.

5  **Q.**   Is this 1 or 2?  Sorry.  This is 2052-2.  Could we get

6  2052-1?

7  **A.**   3.

8  **Q.**   1, please.

9  **A.**   3.

10 **Q.**   3?  Great.  That's the one I'm looking for.  Is it?  Yes.

11 Okay.  Great.  Okay.

12     All right.  Special Agent Bryant, was this attached to the

13 email sent by Steve Chamberlain to Mr. Hussain?

14 **A.**   Yes.

15 **Q.**   And in this particular spreadsheet, do you see on the

16 right -- far right-hand side "grand total"?

17 **A.**   Yes.

18 **Q.**   And does that appear to be the 2009, 2010, and 2011 added?

19 **A.**   Yes.

20 **Q.**   Who's at the very top of this particular list that was

21 sent to Mr. Hussain?

22 **A.**   SHI International.

23 **Q.**   And do you see a couple lines down that line I've just

24 made -- what -- what company was that?

25 **A.**   Capax.

1   Q.   Do you see a couple lines down where I've drawn that line,

2   what company is that?

3   A.   Zones.

4   Q.   And if you get down here, what company is on the line I

5   just made a line on?

6   A.   Discover Technologies.

7   Q.   A few lines down from that?

8   A.   The Vatican Library.

9   Q.   And based on the right-hand side, does this appear to be a

10  list of companies based on sales to the companies?

11  A.   Yes.

12  Q.   So at least with respect to this list sent by

13  Mr. Chamberlain and Mr. Hussain, for example, who's on top?

14  A.   Software House International, SHI.

15  Q.   Could we now take a look at 2055, please.  What is 2055?

16  Do you have that up there?

17          **THE COURT:**  Admitted.  Admitted.

18          **MR. FRENTZEN:**  Thank you, Your Honor.

19          (Trial Exhibit 2055 received in evidence)

20              (Exhibit published to jury.)

21  **BY MR. FRENTZEN:**

22  Q.   2055.  Sorry, Ms. Margen.  Can you scroll up just a little

23  bit -- or down.  Okay.

24       Special Agent Bryant, does this appear to be the email

25  that we had just looked at?

1  A.   Yes.

2  Q.   And is there then a reply?

3       Could we go to the top, please.  Go to the top, please.

4  Thanks.

5       What's the date of this email?

6  A.   July 30th, 2011.

7  Q.   From who?

8  A.   Mr. Hussain.

9  Q.   To who?

10  A.   Mr. Chamberlain.

11  Q.   And what is Mr. Hussain's response to the lists that he

12  was sent?

13  A.   "Let's get a list together.  Suggest you come down on

14  Monday to London."

15  Q.   Could we take a look now at 2066.  What is 2066?

16  A.   It's an email from Mr. Chamberlain to Mr. Hussain and

17  Andrew Kanter.

18            THE COURT:  Admitted.

19       (Trial Exhibit 2066 received in evidence)

20            MR. FRENTZEN:  Thank you, Your Honor.

21            (Exhibit published to jury.)

22            MR. FRENTZEN:  Could we blow up the top.

23  Q.   What is the date of this email?

24  A.   August 1st, 2011.

25  Q.   What is the subject?

A.    "Top customers."

Q.    What is Mr. Chamberlain reporting in the first line?

A.    He's providing a list of all customers over 4 million in revenues from the period 2009 to June 2011.

Q.    Could we take a look at page 3 of this.  All right.

      Is this the attachment, Special Agent Bryant?

A.    Yes.

Q.    And in this particular display -- first of all, are there customer names on the left?

A.    Yes.  And the three billings databases.

Q.    These -- by that, you mean ERP, NIBS and Softrax?

A.    Yes.

Q.    And in this particular list, who comes out third on that particular list?

A.    SHI.

Q.    And in terms of a little further down, do you also see Discover Tech and Capax Global?

A.    Yes.

Q.    Zones?

A.    Yes.

Q.    A little further down, Vatican Library and FileTek?

A.    Yes.

Q.    I'd like to also take a look a little further down.  Do you see Amulet Hotkey and Insight?

A.    Yes.

**BRYANT - DIRECT / FRENTZEN**

1  Q.   To your knowledge, what sort of things did Amulet Hotkey

2  and Insight -- what do they sell or what do they do?

3  A.   Hardware.

4  Q.   Can we now go -- can you take a look at 2067.  What is

5  2067?

6  A.   It's an email from Mr. Hussain to Mr. Chamberlain.

7           **THE COURT:**  Admitted.

8           (Trial Exhibit 2067 received in evidence)

9           **MR. FRENTZEN:**  Thank you, Your Honor.

10              (Exhibit published to jury.)

11 BY MR. FRENTZEN:

12 Q.   Does this appear to be a reply to the email we just had

13 taken a look at sent by Mr. Chamberlain to Mr. Hussain?

14 A.   Yes.

15 Q.   What's the date of this?

16 A.   August 1st, 2011.

17 Q.   And from Mr. Hussain to Mr. Chamberlain?

18 A.   Yes.

19 Q.   Still "top customers"?

20 A.   Yes.

21 Q.   What are the instructions from Mr. Hussain to

22 Mr. Chamberlain?

23 A.   "Can you split out the end users for SHI, IBM, Discover,

24 Capax, Zones."

25 Q.   Can you take a look now, please, Special Agent Bryant, at

1    2075 -- I'm sorry.  2101.  My apologies.

2              **THE COURT:**  Sorry.  What is it?

3              **MR. FRENTZEN:**  2101, Your Honor.

4              **THE COURT:**  Admitted.

5              **MR. FRENTZEN:**  Thank you, Your Honor.

6              (Trial Exhibit 2101 received in evidence)

7                   (Exhibit published to jury.)

8    **BY MR. FRENTZEN:**

9    **Q.**   All right.  Special Agent Bryant, what's the date of this

10   email?

11   **A.**   August 3rd, 2011.

12   **Q.**   From Mr. Hussain to Mr. Chamberlain?

13   **A.**   Yes.

14   **Q.**   And what does it list in terms of "subject"?

15   **A.**   It's the Top 40 contracts, 2010 to '11.

16   **Q.**   Could we go to the next page, please.

17        In terms of this list, Special Agent Bryant, do you see

18   anything listed -- if you take a look on the left-hand side --

19   and actually, I apologize.  Could we go back to the first page

20   very briefly.

21        What did Mr. Hussain indicate here?

22   **A.**   "It would be helpful we should put the type of industry."

23   **Q.**   Can we go to the next page, please.

24        And so take a look here at this list.  Do you see any

25   contracts in this list that are SHI?

BRYANT - DIRECT / FRENTZEN

1    **A.**    No.

2    **Q.**    Zones?

3    **A.**    No.

4    **Q.**    In terms of the industry that's listed here, are you

5    familiar with a deal, the Vatican deal?

6    **A.**    Yes.

7    **Q.**    And do you see what industry is listed over here?

8    **A.**    Yes.   The European government.

9    **Q.**    Do you also see an indication here about the VA and a list

10   of industry there?

11   **A.**    Yes.   The U.S. government.

12   **Q.**    Down here where it says Abbott Labs, what is listed over

13   here?

14   **A.**    Pharmaceutical.

15   **Q.**    USPS/HP, what is listed for industry?

16   **A.**    Just government.

17   **Q.**    Down at the bottom, Dell/Hyatt, what is listed there?

18   **A.**    Leisure.

19   **Q.**    And each of these that I've talked about, they also list a

20   reseller?

21   **A.**    Yes.

22   **Q.**    Down here where it says "McAfee," what is listed there?

23   **A.**    Technology.

24   **Q.**    And the reseller?

25   **A.**    Capax.

BRYANT - DIRECT / FRENTZEN

1    **Q.**  With respect to each of those deals, Special Agent Bryant,

2    did those deals actually go through to the end users listed on

3    this list?

4    **A.**  No.  I've not seen any contracts that are directly with

5    those end users.

6    **Q.**  Or indirectly?

7    **A.**  Or indirectly.

8    **Q.**  Okay.  So the industries listed here, did they actually

9    ever obtain the software that's indicated on this list?

10    **A.**  No.

11    **Q.**  I'd like to move now to Exhibit 2104.  Take a look at

12    that, please.

13          **THE COURT:**  Admitted.

14          (Trial Exhibit 2104 received in evidence)

15          **MR. FRENTZEN:**  Thank you, Your Honor.

16                (Exhibit published to jury.)

17          **MR. FRENTZEN:**  If you could blow up the top.

18    **Q.**  Do you see a date on this email?

19    **A.**  August 3rd, 2011.

20    **Q.**  From who?

21    **A.**  Mr. Hussain to Andrew Kanter, copying Mike Lynch and

22    Stephen Chamberlain.

23    **Q.**  What is attached to this email?

24    **A.**  A copy of the Top 40 Customer Analysis for 2010 to '11.

25    **Q.**  What did Mr. Hussain list?

1   **A.**   "This schedule provides recognized revenue by customer for

2   software, hosted and maintenance over the period 2010 to

3   today."

4   **Q.**   And below that.

5   **A.**   "I confirm that this schedule is to be placed in the data

6   room after you have redacted column B."

7   **Q.**   Below that?

8   **A.**   "Mike, please, could you have a quick look to see if I

9   have reflected the industry against the customer."

10  **Q.**   Who is the only "Mike" on this email chain?

11  **A.**   Mike Lynch.

12  **Q.**   Could we go to the next page, please.

13      Now, Special Agent Bryant, on the first page, Mr. Hussain

14  asks that column B be redacted.  What would column B be about

15  in this table here?

16  **A.**   The customer name.

17  **Q.**   So, in other words, removing the names from this column?

18  **A.**   Yes.

19  **Q.**   And could you take a look, please, at the -- some of the

20  customers and the industry listed just briefly.

21      Do you still have VA listed?

22  **A.**   Yes.

23  **Q.**   How much?

24  **A.**   12.5 million.

25  **Q.**   And it says U.S. government?

BRYANT - DIRECT / FRENTZEN

1   **A.**   Yes.

2   **Q.**   Vatican Library?

3   **A.**   Yes.

4   **Q.**   And the industry?

5   **A.**   European government.

6   **Q.**   Abbott labs?

7   **A.**   Yes.

8   **Q.**   Pharmaceutical and so on.

9       Again, were any of those sales actually made to these

10  customers or the industry listed on the far right-hand side?

11  **A.**   So the contracts we saw on the prior sheet, none of those

12  were sold through.  I do believe they did do other business

13  with Abbott Labs and the VA, but those contracts we saw from

14  the previous exhibit never sold through.

15  **Q.**   Sorry.  So, in other words, Abbott Labs and Veteran

16  Affairs would have a much smaller number?

17  **A.**   Yes.

18  **Q.**   And Vatican Library, that never went to the Vatican

19  Library?

20  **A.**   What I reviewed, no.

21  **Q.**   Can we take a look now at Exhibit 2127, please -- oh, I'm

22  sorry.  Actually, before we go there -- let me skip over that

23  one.  I will just have to come back to it.  Sorry.  That's a

24  little out of place.

25      Could we go to 2144, please.  Can you take a quick look at

```
 1    that.
 2              THE COURT:  Admitted.
 3              MR. FRENTZEN:  Thank you, Your Honor.
 4              (Trial Exhibit 2144 received in evidence)
 5                   (Exhibit published to jury.)
 6    BY MR. FRENTZEN:
 7    Q.   What's the date of this email?
 8    A.   August 4th, 2011.
 9    Q.   From Mr. Hussain to who?
10    A.   Mr. Chamberlain, Mr. Lynch, and Mr. Kanter.
11    Q.   And does it list two attachments?
12    A.   Yes.
13    Q.   And then what is the -- what does Mr. Hussain say about
14    these lists?
15    A.   "These two schedules are ready for redaction."
16    Q.   And at the bottom?
17    A.   "Steve, FYI, I changed UK government to European
18    government."
19    Q.   And if we could go to the next page.
20         Do you see Vatican Library is still listed here and
21    European government is still listed here?
22    A.   Yes.
23    Q.   The next page.  Scroll to the top.  Great.
24         Here do you see "customer," then "BAV," which is an
25    abbreviation for the Vatican?
```

1    A.    Yes.

2    Q.    Then still European government?

3    A.    Yes.

4    Q.    I'd like to move now to a summary.

5          Special Agent Bryant, we've talked a little bit about the

6    NIBS and the ERP and the Softrax.  Did you or were you present

7    for the testimony of Antonia Anderson?

8    A.    Yes.

9    Q.    And during the course of her testimony, did she testify

10   about pulling data off of those same systems?

11   A.    Yes.

12   Q.    The same systems that we saw data introduced yesterday or

13   at least talked about --

14   A.    Yes.

15   Q.    -- by Mr. Dooley and Mr. Yelland?

16   A.    Yes.

17   Q.    Have you reviewed the spreadsheets that were pulled by

18   Ms. Anderson?

19   A.    Yes.

20   Q.    Are they voluminous?

21   A.    Yes.

22   Q.    Would they be difficult to review here in the courtroom

23   today?

24   A.    Yes.

25   Q.    The data that's contained on Ms. Anderson's spreadsheets,

1    does that appear to be data that was taken from the systems at

2    Autonomy in the ordinary course of their business?

3    **A.**    Yes.

4    **Q.**    And was the -- was the information in Ms. Anderson's

5    spreadsheets made available to both sides?

6    **A.**    Yes.

7    **Q.**    Did you review those spreadsheets, and from that, did you

8    sort of double check and then modify a summary related to the

9    data that you saw off of those spreadsheets?

10   **A.**    Yes.

11   **Q.**    And could you take a look at Exhibit 2984, please.  You

12   have it already.  Sorry.

13        Do you recognize what 2984 is?

14   **A.**    Yes.  It's a summary of the data we've been discussing.

15        **MR. FRENTZEN:**  Your Honor, at this time I would offer

16   Exhibit 2984.

17        **MR. KEKER:**  Your Honor, I object because it's not a

18   proper summary and I would like to cross-examine.  I could do

19   it now or I could do it later.

20        **THE COURT:**  Let me ask a question.  I think it's

21   proper to have some further discussion on this.

22        When you say that it was voluminous, what exactly do you

23   mean?  Can up quantify it in some way, because what may be

24   voluminous to some person may not be voluminous to another.

25   What do you mean by voluminous?

1          **THE WITNESS:**  So we have --

2          **THE COURT:**  Pardon?

3          **THE WITNESS:**  We have the native spreadsheet, if we

4   want to look at it.  There is hundreds of rows of data over

5   multiple time periods.  It's, you know, a pull of revenue by

6   customers, and there's is hundreds of customers listed.

7          **THE COURT:**  So in order to -- in order to come to the

8   figures that are on this summary, do you have any sense of

9   approximately how many documents you would have to look at in

10  order to come to the number, that is, that number that is

11  represented on the summary?  Is that -- I mean, that's on

12  the --

13         **MR. FRENTZEN:**  If I could ask the question a slightly

14  different way, Your Honor.

15         **THE COURT:**  Yes.

16  **BY MR. FRENTZEN:**

17  **Q.**   What's your understanding of what Ms. Anderson took in

18  order to create the spreadsheets?  How did she do that?

19  **A.**   Similar to what we've seen with Mr. Chamberlain.  She took

20  underlying revenue information from the billing system and

21  dumped it into an Excel spreadsheet.

22  **Q.**   And then that Excel spreadsheet -- and we've seen a

23  version of it, I think, yesterday.  Mr. Dooley talked about it

24  with Mr. Yelland.

25         How many deals, in the course of the time period that

1    we're talking about, did Mr. Dooley point out with Mr. Yelland?

2    **A.**    Thousands.

3    **Q.**    About 22,000 on one of them and then he looked at some

4    other ones?

5    **A.**    Yes.

6    **Q.**    So within the course of the spreadsheet, which is in an

7    Excel form, there are -- there is voluminous data within that

8    spreadsheet?

9    **A.**    Yes.

10    **Q.**    And it would be difficult -- it would be inconvenient and

11    difficult to review and go back and forth and try to add things

12    up and transpose here in the courtroom off of the spreadsheet?

13    **A.**    Yes.

14           **THE COURT:**    Okay.  Are you going to ask any further

15    questions about the document?

16           **MR. FRENTZEN:**    Yeah.  I want to put it into evidence

17    and show --

18           **THE COURT:**    Well, I understand that.  But I think what

19    I'm going to do is the following:

20        Number one, I'm going to admit it subject to a motion to

21    strike, and that will be the subject of cross-examination of

22    the witness.  But in any event, it will come in for

23    demonstrative purposes.

24        So the only question is -- and I will admit it into

25    evidence at this point.  The only question is will I ultimately

 1    allow it in as evidence or will I decide that it should be

 2    demonstrative.  That issue can await the cross-examination of

 3    the Defense.

 4            MR. FRENTZEN:  And I'm fine with that, Your Honor, so

 5    long as I know before redirect.

 6            THE COURT:  So long as you know before redirect.

 7    Okay.  Well, let's just --

 8            MR. FRENTZEN:  We will have the cross and then I will

 9    know where we are at.

10            THE COURT:  Let's take it one step at a time.  It's in

11    evidence subject to a motion to strike.

12            MR. FRENTZEN:  Thank you, Your Honor.

13            (Trial Exhibit 2984 received in evidence)

14                (Exhibit published to jury.)

15    BY MR. FRENTZEN:

16    Q.   All right.  Can we blow this up.  Great.

17         Is that as readable as we can get it?  That is?  Okay.  I

18    just need the top part for now.  Sorry.  Ms. Margen, I just

19    need the top part for now.  Great.  Okay.  All right.

20         Special Agent Bryant, can you describe for us what we have

21    here as we work across this summary.

22    A.   Yes.  So we have the customer name, and then the first

23    column of numbers is based off of information Antonia Anderson

24    pulled, and that was admitted into evidence.  That's the

25    revenue for each customer over the period 2010 to June 2011

BRYANT - DIRECT / FRENTZEN

1    from the systems she looked at.

2         The next column is the Top 40 Customer List, which is also

3    in evidence.  That was put in the data room for HP.

4         And the last column is also from Ms. Anderson.  She, in

5    her data, highlighted what was tagged as hardware revenue in

6    the systems.

7    **Q.**   And so in terms of the first -- what's listed here as the

8    first -- the top customer of Autonomy for the time period, who

9    is it?

10   **A.**   SHI.

11   **Q.**   And was this listed on Autonomy's Top 40, the ones we just

12   saw, the creation of -- that was placed in the data room?

13   **A.**   No.

14   **Q.**   Then as you move down on line 6, do you see the customer

15   listed there?

16   **A.**   Yes.  Zones.

17   **Q.**   Okay.  And was Zones included in the customer list that

18   was prepared by Autonomy?

19   **A.**   No.

20   **Q.**   Now, down below, you have IBM, but then there's -- it

21   looks like it was sort of broken out.  Can you describe that?

22   **A.**   Yes.  So the number in parentheses by the two IBM deals

23   refers to the number on the list provided to HP.  So IBM from

24   Ms. Anderson was 18 million.  But what was put on the list were

25   those two subset deals.

1    **Q.**    In other words, it was broken into different deals --

2    **A.**    Yes.

3    **Q.**    -- in some capacity?

4    **A.**    Yes.

5    **Q.**    All right.  And if we could go down, do you see Discover

6    Tech listed down here?

7    **A.**    Yes.

8    **Q.**    Could you describe what's -- what's happened here in terms

9    of the difference between Discover Tech and what's -- what was

10   listed on the Autonomy Top 40?

11   **A.**    Yes.  So, again, the two contracts, Abbott Labs and

12   Dell/Hyatt, were listed as No. 17 and No. 25 on the list to HP,

13   but in total Discover Tech in Antonia's Anderson's sheet was at

14   14 million.

15   **Q.**    In terms of these Discover Tech deals being listed on the

16   Autonomy Top 40 as Abbott Labs and Dell/Hyatt, did Discover

17   Tech ever actually sell or close a deal with Abbott Labs or

18   with Dell/Hyatt in these amounts?

19   **A.**    No.  I've seen no evidence of that.

20   **Q.**    Okay.  And similarly, Autonomy did not directly make these

21   deals with Abbott Labs or Dell/Hyatt in these amounts?

22   **A.**    No.

23   **Q.**    So in truth, Discover Tech was a customer to the tune of

24   14.6 million, but that software is just presumably in

25   cyberspace somewhere or something?

1  **A.**    It's sitting with Discover Tech.

2  **Q.**    If we could drop down to -- do you see U.S. Department of

3  Veteran's Affairs?

4  **A.**    Yes.

5  **Q.**    And that is -- I'm sorry.  That is listed here in this

6  amount?

7  **A.**    Yes.

8  **Q.**    Could we go ahead and take this off and do the bottom

9  part.  Great.  Thank you, Ms. Margen.

10     Do you see a listing here for Capax Global?  Oh, wait.

11  Sorry.  I think I need a little more.

12  **A.**    Line 21.

13  **Q.**    Two lines up.  Sorry.  There you go.

14     Do you see Capax Global?

15  **A.**    Yes.

16  **Q.**    Was Capax listed on Autonomy's Top 40 for -- sorry -- for

17  Hewlett-Packard?

18  **A.**    No.

19  **Q.**    What about Amulet Hotkey?

20  **A.**    No.

21  **Q.**    What about Insight?

22  **A.**    No.

23  **Q.**    And in terms of some of these other entities that are

24  listed here, Bank of New York Mellon and Metro Business Systems

25  on the right-hand side, are those attributed to hardware,

BRYANT - DIRECT / FRENTZEN

1   according to the system?

2   A.   Yes.

3   Q.   All right.  Are those things that were listed on the Top

4   40?

5   A.   No.

6   Q.   I'd like to move on now from the Top 40 lists, and could

7   you take a look, please, at Exhibit 2127.

8          THE COURT:  Admitted.

9          (Trial Exhibit 2127 received in evidence)

10                  (Exhibit published to jury.)

11         MR. FRENTZEN:  Thank you, Your Honor.

12  Q.   What's the date of this email?

13  A.   August 3rd, 2011.

14  Q.   And who is this -- well, let's --

15  A.   From Mr. Kanter to Mr. Hussain.

16  Q.   All right.  And then can you take a look at the bottom

17  part of it, the original email.

18  A.   Yes.  It's from Mr. Hussain to Chamberlain and Kanter,

19  attaching questions.  Or due diligence follow-up questions.

20  Q.   What's the date of it?

21  A.   August 2nd, 2011.

22  Q.   And it's "Project Tesla financial DD follow-up"?

23  A.   Yes.

24  Q.   And does it say "for the call allocated questions"?

25  A.   Yes.

BRYANT - DIRECT / FRENTZEN

1   **Q.**   And then in terms of Mr. Kanter's response, is he just

2   asking for one that isn't marked up?

3   **A.**   Yes.

4   **Q.**   Could we go now to page 2.  All right.

5       Does this appear to be financial due diligence follow-up,

6   Project Tesla?

7   **A.**   Yes.

8   **Q.**   Can you go to the bottom of the page, please.

9       Does there appear to be an entity that this is from?

10  **A.**   HP.

11  **Q.**   Can we go to the next page, please.

12      Can you make out at the end of this question a couple of

13  initials?

14  **A.**   Yes.  "SH."

15  **Q.**   It says, "Describe your sales model by product or

16  vertical, i.e., hosted versus SaaS versus on-premise license

17  versus OEM versus appliance.  For each, describe the standard

18  elements in each arrangement by sales model and how revenue is

19  recognized with each."

20      In the right-hand side, do you see what appear to be

21  responses?

22  **A.**   Yes.

23  **Q.**   And if you could take a look through there, is there a

24  listing down here of appliance?

25  **A.**   Yes.

BRYANT - DIRECT / FRENTZEN

1    Q.   Combination of license on hardware recognized as

2    delivered?

3    A.   Yes.

4    Q.   Other than appliance, is hardware listed anywhere in this

5    response?

6    A.   No.

7    Q.   The next question down, "Do all or only certain

8    arrangements include license, maintenance, professional

9    services or hosting/subscription," do you see initials there?

10   A.   Yes.

11   Q.   What are the initials?

12   A.   "SH."

13   Q.   And what's written in there?

14   A.   "Most contracts are straight license with maintenance."

15   Q.   One last question that I had about the Top 40.  I'm sorry.

16   Could we pull up 2626, which is in evidence.  Blow that up.

17        In this listing, Special Agent Bryant, do you see item 4

18   that says eleven and a half million, European government?

19   A.   Yes.

20   Q.   Was that ever sold to a European government?

21   A.   In the unredacted version that is the Vatican, so, no.

22   Q.   And in terms of line 6, this ten and a half million

23   dollars to U.S. government, in the unredacted version, VA, was

24   that ever sold to the VA?

25   A.   I've not seen any evidence, no.

**BRYANT - DIRECT / FRENTZEN**

1   **Q.**   That was sold to FileTek?

2   **A.**   Yes.

3   **Q.**   Line 10, almost nine and a half million sold to

4   pharmaceutical, is that the Abbott contract?

5   **A.**   Yes.

6   **Q.**   Was that ever sold through to Abbott?

7   **A.**   The specific contract, no.  It was with Discover Tech.

8   **Q.**   Item No. 22 listing a little over five and a half million

9   dollars there was supposedly for Hyatt, and it lists "leisure"

10   as the industry.  Was that ever sold through to the leisure

11   industry?

12   **A.**   No.

13   **Q.**   That was with Discover Tech?

14   **A.**   Yes.

15   **Q.**   Item 24, 5.25 million, this is the McAfee deal that lists

16   technology as the industry.  Was that ever sold through to

17   McAfee or did it sit with Capax?

18   **A.**   I've only see the contract with Capax.

19   **Q.**   Item 33, 4.2 million they list to the U.S. government.

20   This is the DOI contract.  Did that ever go through to the DOI?

21   **A.**   No.

22   **Q.**   That was a MicroTech deal?

23   **A.**   I believe so.

24   **Q.**   And then 34, 3.8 million for media, the Prisa deal, was

25   that ever sold through to Prisa?

1    **A.**   This specific contract, no.  It was with Discover Tech.

2    **Q.**   Have you added up the amount of the contracts that were

3    listed here that did not go through to the end user, did not go

4    through to this industry, and were basically left sitting with

5    resellers?

6    **A.**   Yes.  It's approximately $50.3 million.

7    **Q.**   Out of how much total did you add up, approximately?  How

8    much the whole thing was?

9    **A.**   Approximately 289 million, if I recall correctly.

10   **Q.**   So of their Top 40 list here, 50 million of this didn't go

11   to the industry they list?

12   **A.**   I saw contracts with resellers.

13   **Q.**   I'm sorry.  May I have one moment, Your Honor.

14        (Government counsel confer off the record.)

15   **BY MR. FRENTZEN:**

16   **Q.**   Well, I'll ask you.  Special Agent Bryant, do you see the

17   approximately $7 million deal between Autonomy and MicroTech

18   with HP as the intended end user on this list?

19   **A.**   I only see $7 million deals for insurance companies and

20   banks.

21   **Q.**   All right.  And -- okay.

22        I want to move now to -- sorry.  Let me just make sure

23   I've closed out this issue.

24        Yeah.  Okay.  I would like to move to a couple of

25   different topics, please.

1      Special Agent Bryant, have you conducted some

2  investigation into a transaction related to the Vatican deal

3  referred to as Poste Italiane, which I'm probably butchering

4  the pronunciation of?

5  **A.**    Yes.  I have evaluated a deal with Sales Consulting and

6  Poste Italiane.

7  **Q.**    And in terms of that particular transaction, could you

8  take a look at -- one minute, Your Honor.-- at Exhibit 425,

9  please.

10 **A.**    Yes.  It's an email from Julie Dolan to Corrado Broli.

11     **MR. KEKER:**  We have an objection we made to this,

12 Your Honor.  Hearsay.

13     **THE COURT:**  Let me --

14     **MR. FRENTZEN:**  You actually already ruled on it,

15 Your Honor.

16     **THE COURT:**  I've already ruled?  Well, does somebody

17 want to refresh my recollection of what my ruling was.

18     **MR. FRENTZEN:**  It's coming in.

19     **THE COURT:**  It's coming in.  He said I've ruled,

20 Mr. Keker.  He said I've let it in.

21     **MR. KEKER:**  You did.

22     **THE COURT:**  Okay.

23     **MR. KEKER:**  We made --

24     **THE COURT:**  So it's in.  And if you have a further

25 objection, I'll hear it later.

1        MR. KEKER:  No further objection.

2        THE COURT:  Okay.  425 in.

3        MR. FRENTZEN:  Great.  Thank you, Your Honor.

4        (Trial Exhibit 425 received in evidence)

5              (Exhibit published to jury.)

6   BY MR. FRENTZEN:

7   Q.   I'm sorry.  I misspoke.  This is not related to the

8   Vatican.  That's the next one.

9   A.   This is Poste and Sales Consulting.

10  Q.   Could we take a look at the bottom part of Exhibit 425,

11  page 5.  Thank you.

12       All right.  What's the date of this original email?

13  A.   December 31st, 2009.

14  Q.   And is that the last day of the quarter?

15  A.   Yes.

16  Q.   From who?

17  A.   Julie Dolan.

18  Q.   And what is the subject?

19  A.   "Need delivery for reply purchase order."

20  Q.   And what -- what is Ms. Dolan saying here at the bottom of

21  the page?

22  A.   "The attached purchase order should be signed shortly and

23  Sushovan wants to ensure we have delivery."

24  Q.   Can we roll over to the next -- to the end of the email.

25  The other way.  Great.  Thanks.  There.

**BRYANT - DIRECT / FRENTZEN**

1        And what is the request here from Ms. Dolan?

2   **A.**   "Please provide me with a POD.  Thanks."

3   **Q.**   What is POD?

4   **A.**   It's proof of delivery.

5   **Q.**   Can you go to the next page, please.  Show the top.

6        This purchase order here, is the date the same date,

7   December 31, 2009?

8   **A.**   Yes.

9   **Q.**   And what's attached here, this purchase order, is there

10  any -- is it with anyone else?

11  **A.**   No.  It's a generic purchase order.

12  **Q.**   Could we go back to the email on page 4, please.  And the

13  bottom.  Okay.

14       Do you see the email here still on December 31, 2009 --

15  **A.**   Yes.

16  **Q.**   -- agent Bryant?

17       And at this point in time, has Mr. Hussain been added?

18  **A.**   Yes.

19  **Q.**   And what's the request here from James Murray?

20  **A.**   "Please refer to the technical contact at reply on

21  previous agreements.  That will suffice.  If none available,

22  then Corrado should be able to supply."

23  **Q.**   Are you aware of who Corrado Broli was?

24  **A.**   He was a sales representative of Autonomy in Italy.

25  **Q.**   Can we then go to the -- page 3, and the middle part right

```
 1   here.  Great.

 2        Is there a response with information from Corrado?

 3   A.   Yes.

 4   Q.   And it's -- this is the person for delivery?

 5   A.   Yes.

 6   Q.   Is Mr. Hussain still on this chain?

 7   A.   Yes.

 8   Q.   Could we go to the page -- the first page.  And at the

 9   bottom.  Okay.

10        Is Mr. Broli here saying, "I don't know it yet, but I can

11   get a proof of delivery signed"?

12   A.   Yes.

13   Q.   Could we go now to Exhibit 462.  Do you recognize what 462

14   is?

15   A.   It's an email from Mr. Hussain to Brent Hogenson.

16             THE COURT:  Admitted.

17             (Trial Exhibit 462 received in evidence)

18                  (Exhibit published to jury.)

19   BY MR. FRENTZEN:

20   Q.   Could we blow up the bottom part.

21        What is the date of this email?

22   A.   December 31, 2009.

23   Q.   From who?

24   A.   Mr. Hussain to Brent Hogenson.  Sorry.

25   Q.   Is it the other way around?
```

1    A.    From Mr. Hogenson to Mr. Hussain.

2    Q.    What's the substance of the email?  Can you read the first

3    sentence of it, please?

4    A.    "I had a discussion with James this morning regarding

5    reply/Poste and understand that there is a confirmation letter

6    required under Section 11 of the purchase order."

7    Q.    The -- and it goes on from there to say in substance what?

8    A.    He is asking essentially should it be recognized since we

9    don't have the confirmation letter, and he's discussing the

10   differences between U.S. GAAP and IFRS and bringing it to

11   Mr. Hussain's attention.

12   Q.    And what's Mr. Hussain's response?

13   A.    "Thank you, Brent.  You do the delivery, we'll do the

14   paperwork here.  The paperwork is being changed as we speak and

15   may not be the way you describe."

16   Q.    What's the last part of it?

17   A.    "However, we will let you know on recognizability."

18   Q.    Could we go now to Exhibit 495, please.  What is 495?

19   A.    It's an email from Corrado Broli to Julie Dolan.

20           THE COURT:  Admitted.

21         (Trial Exhibit 495 received in evidence)

22               (Exhibit published to jury.)

23   BY MR. FRENTZEN:

24   Q.    What is the date of this?

25   A.    January 4, 2010.

BRYANT - DIRECT / FRENTZEN

1   Q.   And what is Mr. Broli asking Ms. Dolan to do?

2   A.   "To convert the attached purchase order to a one-shot

3   agreement and can you please check if the proof of delivery is

4   right."

5   Q.   Now let's go to page 2.

6        What is this?

7   A.   This is a proof of delivery now for a company called Sales

8   Consulting.

9   Q.   Can we go to the next page, page 3, at the top.  Great.

10  Okay.

11       And what is the date on this?

12  A.   December 31, 2009.

13  Q.   And the date on the email when this is being sent is what?

14  A.   January 4th, 2010.

15  Q.   Is that after the end of the quarter?

16  A.   Yes.

17  Q.   Could we go to the next page of the purchase order,

18  please.  Great.  That's great.

19       What is the amount of this?

20  A.   1.5 million euros.

21  Q.   And that line 11 that was discussed between Mr. Hussain

22  and Mr. Hogenson, what does that say in terms of the

23  commencement date?

24  A.   "On the effective date, the VAR will confirm the purchase

25  order by providing Autonomy with a letter of confirmation."

1   Q.   Take a look please now at Exhibit 500.

2   A.   It's an email from Julie Dolan to Corrado Broli.

3           THE COURT:  Admitted.

4        (Trial Exhibit 500 received in evidence)

5               (Exhibit published to jury.)

6   BY MR. FRENTZEN:

7   Q.   What is the date of this?

8   A.   January 4, 2010.

9   Q.   What does Ms. Dolan attach?

10  A.   The purchase order.  "Attached is the one-off reseller."

11  She is asking, "Do you still need the provision that the

12  partner should confirm in writing.  I have removed it.  The

13  proof of delivery is the correct form to use."

14  Q.   Could we go to page 3 of this document, please.

15       So now this is a contract between Autonomy and Sales

16  Consulting S.R.L.?

17  A.   Yes.

18  Q.   All right.  Could we go to page 7, please.

19       Do you see a change to the commencement date?

20  A.   Yes.  It now just states "on the effective date."

21  Q.   No need to confirm?

22  A.   No.

23  Q.   Could we go now to Exhibit 497, please.

24          THE COURT:  Admitted.

25       (Trial Exhibit 497 received in evidence)

```
 1                    (Exhibit published to jury.)

 2            THE WITNESS:  This is an email from Mr. Hussain to

 3   Julie Dolan.

 4   BY MR. FRENTZEN:

 5   Q.   And this particular email, what's the date?

 6   A.   January 4th, 2010.

 7   Q.   The -- and what's Mr. Hussain's question?

 8   A.   "Okay," question mark, and there is an attached Sales

 9   Consulting letter.

10   Q.   Could we go to the next page, please.

11        And what is this letter?

12   A.   It's a letter from Autonomy to Sales Consulting.

13   Q.   Basically allowing them to do what?

14   A.   To resell the software if it does not go through to the

15   end user, Poste Italiane.

16   Q.   What's the date of the letter?

17   A.   December 31st, 2009.

18   Q.   Can we scroll up.  Okay.

19        Whose signature is it made out for?

20   A.   It's printed "Sushovan Hussain."

21   Q.   Can we go to Exhibit 498, please.

22            THE COURT:  Admitted.

23        (Trial Exhibit 498 received in evidence)

24                    (Exhibit published to jury.)

25            THE WITNESS:  An email from Mr. Hussain to Julie
```

1   Dolan.

2   **BY MR. FRENTZEN:**

3   **Q.**   Well, go down to the bottom, the original email.  Sorry.

4        Does this appear to be a reply to that original letter

5   attaching the letterhead that had December 31st and then

6   Ms. Dolan's response?

7   **A.**   Yes.

8   **Q.**   Could you scroll up.  Yeah.  One more.  Great.  Okay.

9        So still January 4, 2010.  What is Ms. Dolan reporting to

10  Mr. Hussain?

11  **A.**   "Andy is not at his desk.  Do you want to go ahead and

12  sign."

13  **Q.**   Can we go to the top part.

14       What is Mr. Hussain's response on January 4, 2010?

15  **A.**   "Andy should sign as I negotiated."

16  **Q.**   I'd like to pull up briefly, if we could, what's in

17  evidence as Exhibit 492, please, and the attachment, the

18  spreadsheet.  Actually, let's just pull up the first part of

19  492.

20            **THE CLERK:**  It's not in.

21            **MR. FRENTZEN:**  492 is not in?  I thought it was in.

22            **THE COURT:**  492 is not in.  It's admitted now.  492

23  admitted.

24            (Trial Exhibit 492 received in evidence)

25                 (Exhibit  published to jury.)

1          **MR. FRENTZEN:**  Great.  Thank you, Your Honor.  I

2    apologize.  I thought it was already in.

3    **Q.**   Who is this from?

4    **A.**   Mr. Hussain to Mr. Chamberlain and Mr. Stephan.

5    **Q.**   What's the date of this?

6    **A.**   January 1st, 2010.

7    **Q.**   And if we go down to the first part from Mr. Hussain, can

8    you just see what he's saying in the first part of this?

9    **A.**   "Obviously we are looking to find 2 million out of

10   deferred as well as the difference in services and maintenance.

11   I believe there is upside in the hosted numbers which needs an

12   aggressive look."

13   **Q.**   Could we go now to the attachment, the native part of 492.

14        And, Special Agent Bryant, do you have these spreadsheets

15   that were testified about by Matt Stephan?

16   **A.**   Yes.

17   **Q.**   Can we go to the "IDOL Europe" tab.

18   **A.**   Oh, we're --

19   **Q.**   What's that?

20   **A.**   Never mind.

21   **Q.**   Did I miss something?  All right.

22        Can we go to line 56 of this?  Great.  There we go.

23        And in terms of this, do you see Poste Italiane listed

24   here?

25   **A.**   Yes.

BRYANT - DIRECT / FRENTZEN

1    **Q.**    And Corrado Broli?

2    **A.**    Yes.

3    **Q.**    And at this point, is this listed as closed?

4    **A.**    No.  In column A, you see it's still zero.

5    **Q.**    So as of January 1, 2010, Mr. Hussain did not list Poste

6    Italiane as closed?

7    **A.**    In this spreadsheet, correct.

8    **Q.**    And this is the same -- this is Poste Italiane related to

9    the emails that we're now talking about on January 4th, 2010,

10   Mr. Hussain is sending?

11   **A.**    I believe so.

12   **Q.**    Could we go now to Exhibit -- may I have one moment,

13   Your Honor.

14        (Government counsel confer off the record.)

15   **BY MR. FRENTZEN:**

16   **Q.**    Could we go to the "Interwoven" tab, please.  Sorry.

17   Before we leave this.

18        And line -- the "Interwoven" tab, line 225.  Down.

19   **A.**    That's line 225.

20   **Q.**    What's that?  You can also draw on the screen, if you

21   want.

22   **A.**    We see a deal that is enclosed that has in the comments

23   section "Poste Italiane," but also has Valueteam listed.

24   **Q.**    All right.  Gotcha.  This is right here?

25   **A.**    Yes.

1   Q.   So it's showing it as not closed?

2   A.   Correct.  In this spreadsheet.

3   Q.   January 1st, 2010?

4   A.   Yes.

5   Q.   Could we now take a look at Exhibit 499.

6           THE COURT:  Admitted.

7           (Trial Exhibit 499 received in evidence)

8           MR. FRENTZEN:  Thank you, Your Honor.

9                  (Exhibit published to jury.)

10          THE WITNESS:  Yes.  It's an email from Mr. Hussain to

11  Corrado Broli.

12  BY MR. FRENTZEN:

13  Q.   What is the date on Exhibit 499, Special Agent Bryant?

14  A.   January 4th, 2010.

15  Q.   And this is --

16          THE COURT:  Let me ask a question here.

17      Agent, you may know the answer, you may not.  But when you

18  look at the date and you look at the time, what -- is that the

19  time of the person who is the sender?  In other words, is the

20  local time -- we're dealing with sometimes emails that go

21  across the country or go across water.

22      What is it?

23          THE WITNESS:  So unfortunately I think it differs from

24  where the document came from.  So I believe if the document was

25  produced by HP -- I would need to check -- double check, but I

 1   believe the most recent one you're seeing is East Coast time so

 2   it's not the local time, but I would have to confer, double

 3   check that.

 4        **THE COURT:**  So looking at this one that was from --

 5   purports to be from the defendant -- I assume he was in the

 6   United Kingdom, but I don't know that for a fact.  I have no

 7   idea.  But that's where he was most of the time.

 8        So let's assume for the moment that that's where he was.

 9   And you look at this at the top.  I'm now looking at the top,

10   which is different from the next one, but it says 9:00 -- well,

11   no.  It says Monday, January 4, 2010, 9:02:40 a.m.  Is that the

12   time in England?  Or is that -- or do we not know?  If we don't

13   know, we don't know.  I'm just trying -- nobody knows.

14        **MR. FRENTZEN:**  I don't want to ask the agent a

15   question she doesn't know the answer to.

16        **THE COURT:**  Well, I don't know the answer to.  And the

17   jury -- we're trying to get dates and sometimes times are

18   relevant.  Sometimes they may not be relevant.  But it would be

19   helpful to know that.

20        **MR. FRENTZEN:**  I think we could probably answer that

21   after the break, Your Honor, if we get to a break, but I --

22        **THE COURT:**  More complicated than I thought.

23        **MR. FRENTZEN:**  I don't want to testify.

24        **THE WITNESS:**  I believe so, yeah.

25        **THE COURT:**  Sorry?

1           THE WITNESS:  It's complicated.

2           THE COURT:  It's complicated.  Okay.  Unlike anything

3    else in this case, that is really complicated.

4           MR. FRENTZEN:  I --

5           THE COURT:  Fine.  We'll deal with it later.

6           MR. FRENTZEN:  Okay.  Thank you, Your Honor.

7    Q.    Special Agent Bryant, do you see the date here on the 4th?

8    A.    Yes.

9    Q.    And also -- is this also the January 4th -- the

10   originating email?

11   A.    Yes.

12   Q.    And the originating email is from where?

13   A.    It says "scanner."

14   Q.    To who?

15   A.    Julie Dolan and Sushovan Hussain.

16   Q.    And then do you see Mr. Hussain forwarding the letter on

17   to anyone?

18   A.    Yes.  To Corrado Broli.

19   Q.    And we go to page 2 to see the letter.  Is this still

20   dated December 31, 2009?

21   A.    Yes.

22   Q.    And this is that "permission to resell" letter?

23   A.    Yes.

24   Q.    Could you scroll to the bottom there and -- who has now

25   signed the letter?

BRYANT - DIRECT / FRENTZEN

1   **A.**   Mr. Kanter.

2   **Q.**   On -- could you take a look, please, at Exhibit 516.

3   **A.**   Yes.  It's an email from Mr. Hogenson to Mr. Hussain and

4   Mr. Chamberlain.

5          **THE COURT:**  Admitted.

6          (Trial Exhibit 516 received in evidence)

7                 (Exhibit published to jury.)

8   **BY MR. FRENTZEN:**

9   **Q.**   And what's the date on -- if we could go to the second

10  page, please.  What is the date?

11  **A.**   January 5th, 2010.

12  **Q.**   All right.  And then what's the subject?

13  **A.**   "Poste one-off for your records."

14  **Q.**   From Ms. Dolan?

15  **A.**   Yes.

16  **Q.**   To Brent Hogenson, Percy Tejada, so on, Matt Stephan?

17  **A.**   Yes.

18  **Q.**   Could we take a look at the attachment, please, by going

19  to page 4.  Page 4, please.  Great.  Thank you.  If you could

20  blow up just the top part.

21      Do you see a date there?

22  **A.**   Yes.  December 31, 2009.

23  **Q.**   And is this basically a reseller agreement between

24  Autonomy and Sales Consulting S.R.L.

25  **A.**   Yes.

1  **Q.**  Could we go to page 8 of this document, please.  And --

2  okay.

3      Does this list -- does this include a purchase order?

4  **A.**  Yes.

5  **Q.**  Could we go to the next page, so page 9, please.

6      Is there a license fee listed here?

7  **A.**  Yes.  1.5 million euros.

8  **Q.**  And then going back to page -- could we go back to page 1,

9  please, the very first page of the whole document.  516, page

10 1, the email.  Can you blow up the top there.

11     What is the date of this?

12 **A.**  January 5th, 2010.

13 **Q.**  This is listing "SC/Poste executed"?

14 **A.**  Yes.

15 **Q.**  Okay.  This is from who?

16 **A.**  Mr. Hogenson.

17 **Q.**  To who?

18 **A.**  Mr. Hussain and Mr. Chamberlain.

19 **Q.**  What is Mr. Hogenson's question?

20 **A.**  "Let me know if I should track this deal for Poste as a

21 booking in Q4 or Q1."

22 **Q.**  And on January 5th, 2010, what do you take that Q4 or Q1

23 to mean?

24 **A.**  Which quarter; last quarter of 2010 or first quarter of --

25 or last quarter of 2009 or first quarter of 2010.

BRYANT - DIRECT / FRENTZEN

1    **Q.**   Was this -- was this deal -- was this recognized in

2    Q4/2009, to your knowledge?

3    **A.**   Well, when I looked at the audit committee report for

4    2009, it is listed.

5    **Q.**   And was this a debt that was eventually written off by

6    Autonomy, to your knowledge?

7    **A.**   I believe so.

8    **Q.**   In other words, it never went through to anyone?

9    **A.**   No.

10   **Q.**   Could we take a look -- is Exhibit 507 in?

11          **THE CLERK:**  Yes.

12          **MR. FRENTZEN:**  Great.  Could we pull up 507.

13                 (Exhibit published to jury.)

14          **MR. FRENTZEN:**  Great.  Just blow that up.

15   **Q.**   What is 507, Special Agent Bryant?

16   **A.**   It's an email from Mr. Hussain to Mr. Chamberlain and Matt

17   Stephan attaching a revenue spreadsheet.

18   **Q.**   And this is something that Mr. Stephan testified about

19   when he was here?

20   **A.**   Yes.

21   **Q.**   And what was Mr. Hussain saying?

22   **A.**   "We need to get to 223 million."

23   **Q.**   Can we go to the native of the attachment, "revenue

24   draft."  Go to -- yeah.  There you go.  And could you go to the

25   "Interwoven" tab of that.  Okay.

PROCEEDINGS

```
 1          Do you now see what I've circled right here, Special Agent
 2   Bryant?
 3   A.    Yes.
 4   Q.    What is that?
 5   A.    So $1.5 million euro deal that's been closed with the
 6   customer named Poste and Sales Consulting in the notes.
 7   Q.    For how many euro?
 8   A.    1.5 million.
 9   Q.    Which would be what in U.S. dollars, according to this?
10   A.    2.2.
11   Q.    And that -- the purple and then being if the total, is
12   that shown as closed?
13   A.    From prior testimony, yes.
14   Q.    I'd like to move to a new topic, Your Honor?
15          THE COURT:    Then let's take a recess.
16       Ladies and gentlemen, we will be in recess now until 10 to
17   11:00.
18       Remember the admonition given to you:  Don't discuss the
19   case, allow anyone to discuss it with you, form or express any
20   opinion.
21       (Proceedings were heard out of presence of the jury:)
22          THE COURT:    Okay.  Let the record reflect the jurors
23   have left.
24       So about how much longer do you think?
25          MR. FRENTZEN:    I have -- I got to just rally with
```

1    those guys, you I think I have two more topics.  One is a

2    little long like that Poste Italiane.  I will finish that.  And

3    then I think I've got some phone records, and subject to being

4    told by co-counsel I have to do anything else, that's it,

5    Your Honor.

6             THE COURT:  Okay.

7        Mr. Keker?

8             MR. KEKER:  In *Catch-22* there's a --

9             THE COURT:  I'm sorry.?

10            MR. KEKER:  In *Catch-22*, a book, there is a character

11   who makes his life longer by being bored and so a minute seems

12   like an hour and an hour seems like a day and so on, and this

13   was an --

14            THE COURT:  I was in the Army when I read *Catch-22*.

15   That was the best place to read it.

16            MR. KEKER:  I was in the Marines.

17       This was supposed to be an hour examination.

18       But in any event --

19            THE COURT:  But it's been tremendously entertaining.

20            MR. FRENTZEN:  I thought it was better than some of

21   the crosses we had to sit through.

22            THE COURT:  Well, now, let's now -- you know, Justice

23   Jackson.  You know, just get rid of that last line,

24   Mr. Frentzen.  Because Mr. Keker will respond to it because of

25   his instincts, right?  His instincts.  It makes his blood boil.

1    Just --

2            MR. FRENTZEN:  I have the same instincts, Your Honor.

3            THE COURT:  I know you do.  You have to catch that.

4        You don't have to stand up.  Everybody sit down.

5        Okay.  Go ahead.

6            MR. KEKER:  Your Honor, we have the offer of proof

7    that I mentioned this morning.  We have a copy of it, and the

8    exhibits that are mentioned in it have been filed.  They are

9    this thick, but --

10           THE COURT:  All right.  I will take a look at it and I

11   would like the Government to respond.  I think they may be able

12   to respond orally, but you look at it and you can decide what

13   to do.

14       So you have your -- whatever amount it's going to take,

15   it's probably not going to go until 12:00, right, Mr. Frentzen?

16           MR. FRENTZEN:  Oh, no.

17           THE COURT:  That means --

18           MR. KEKER:  We have exhibits to give you for that,

19   too.

20           THE COURT:  Okay.  Just give it to my clerk, if you

21   will, those exhibits.

22       Are you talking about exhibits for your offer of proof?

23           MR. KEKER:  These are the exhibits for the offer of

24   proof.  We only have one copy here.  We will get another copy

25   for the Government.  They have been filed.  We are giving you a

**PROCEEDINGS**

 1   copy of the filed ones.

 2          **THE COURT:**  All right.

 3       Moving ahead, moving ahead, so your cross of --

 4          **MR. KEKER:**  I have some cross for the agent.  It will

 5   take --

 6          **THE COURT:**  How long will it be?

 7          **MR. KEKER:**  Forty-five minutes to an hour.

 8          **THE COURT:**  Okay.  All right.  So that will take us

 9   past 1:00.

10       I have an evidentiary hearing at noon that I have to

11   conduct.  So -- on another matter.  And -- and then you'll be

12   finished -- you may or may not have any redirect and then the

13   Government rests.  Is that correct?

14          **MR. FRENTZEN:**  That's correct, Your Honor.

15          **THE COURT:**  Okay.  So then, I mean, maybe I have to

16   address the issue of what -- of what your first witness is

17   going to say because I understand the Government wants to raise

18   some issues, and maybe we can do that at -- I'm trying to

19   figure out the timing.

20       I'd almost like to do it like at quarter to 1:00 --

21   depending on when we break -- depending on when we break, I'll

22   figure it out, but that's what I would like to do, so even

23   though it's before they formally rest.

24          **MR. KEKER:**  Fine.

25          **THE COURT:**  That's okay.  So, in other words, you will

1  have time to talk to your witness or not and we can move

2  seamlessly, just seamlessly --

3          **MR. KEKER:**  She is not about to talk to me.  But we

4  will tell her to be back here at 1:00.

5          **THE COURT:**  That's great.  You're not on speaking

6  terms with her?

7          **MR. KEKER:**  No.  It's just she's the CF -- she is

8  suing my client.

9          **THE COURT:**  This may be an opportunity for you to have

10  a -- okay.  Thank you.

11              (Recess taken at 10:34 a.m.)

12             (Proceedings resumed at 10:52 a.m.)

13      (Proceedings were heard in the presence of the jury:)

14          **THE COURT:**  Please be seated.

15      Okay.  Let the record reflect all jurors are present, the

16  parties are present.

17      You may proceed.

18          **MR. FRENTZEN:**  Thank you, Your Honor.

19  **Q.**   Special Agent Bryant, do you -- are you aware of a

20  transaction involving a sale by Autonomy to an outfit called

21  Auxilium?

22  **A.**   Yes.

23  **Q.**   And if we could, could you take a look at Exhibit 651,

24  please.

25  **A.**   (Witness examines document.)  It's an e-mail from

1    Mr. Hussain to Corrado Broli.

2              **MR. FRENTZEN:**  I offer it.

3              **THE COURT:**  Admitted.

4         (Trial Exhibit 651 received in evidence)

5              **MR. FRENTZEN:**  Blow that up, please.

6    **Q.**   All right.  And what's the date of this?

7    **A.**   March 29th, 2010.

8    **Q.**   And what was -- if you could, is there a list of things

9    that Mr. Hussain wants to go through --

10   **A.**   Yes.

11   **Q.**   -- with Mr. Broli?

12        All right.  And what's the subject here?

13   **A.**   "BAV - the route to closing the deal tomorrow."

14   **Q.**   All right.  And this, again, is March 29, 2010?

15   **A.**   Yes.

16   **Q.**   Is that near the close of quarter?

17   **A.**   Yes.

18   **Q.**   Could we go now to Exhibit 2787?  Do you have 2787?

19   **A.**   Yes.  It's an e-mail from Julie Dolan to Sushovan Hussain

20   and others.

21             **THE COURT:**  Admitted.

22        (Trial Exhibit 2787 received in evidence)

23             **MR. FRENTZEN:**  Thank you, Your Honor.

24        Can we blow up the top part?

25   **Q.**   Special Agent Bryant, this particular e-mail, the date on

BRYANT - DIRECT / FRENTZEN

1   this is what?

2   **A.**   March 31st, 2010.

3   **Q.**   All right.  And did it attach an agreement?

4   **A.**   It did.  It's an agreement with --

5   **Q.**   If we could go to page 2, please.

6   **A.**   (Witness examines document.)

7   **Q.**   I'm sorry.  Page 3, the top part.  Great.

8        Is there, then, an agreement attached?

9   **A.**   Yes, with in bold Ital Brokers SpA.

10  **Q.**   Okay.  If we could then just kind of scroll through.  Does

11  this appear to be a proposed but unsigned agreement between

12  Autonomy and Ital Brokers SpA?

13  **A.**   Yes.

14  **Q.**   And if we could go to -- sorry.

15       Well, if you could just -- is this a really long

16  agreement?

17  **A.**   Yes, and it's also a version in Italian.

18  **Q.**   Okay.  And if we could go to page 43 of this document,

19  please.  Is that 43?  Oh, there you go.

20       Is this part of a product schedule?

21  **A.**   Yes.

22  **Q.**   And do you see -- if you could scroll up just a little

23  bit -- do you see reference to the Vatican deal here?

24  **A.**   Yes.

25  **Q.**   Then if we could go to the following page, page 44.

1      Do you see this deal is for a total of about 23 million

2  Euros?

3  **A.**  Yes.

4  **Q.**  All right.  But this is an unsigned deal?

5  **A.**  Yes.

6  **Q.**  Based on your investigation, does this particular deal go

7  through at that time?

8  **A.**  No.

9  **Q.**  Could we go now to Exhibit 725?  Do you have that?

10 **A.**  Yes.  It's an e-mail from Mr. Hussain to Mr. Chamberlain.

11         **THE COURT:**  Admitted.

12     (Trial Exhibit 725 received in evidence)

13         **MR. FRENTZEN:**  Blow that up.

14 **Q.**  What is the date on this, Special Agent?

15 **A.**  April 6, 2010.

16 **Q.**  Is that after the end of a quarter?

17 **A.**  Yes.

18 **Q.**  And you said this is from Mr. Hussain to Mr. Chamberlain?

19 **A.**  Correct.

20 **Q.**  Okay.  And it says what?

21 **A.**  (reading)

22         "Audit paper.  Very first draft.  Confidential."

23 **Q.**  Could we go to page 2 of the draft?  Can you scroll

24 towards the bottom?

25     All right.  And for this audit paper, is there a

BRYANT - DIRECT / FRENTZEN

1   description of orders related to the Vatican Library?

2   A.    Yes.

3   Q.    And could we go to the next page, please, page 3?

4         Okay.  Does this discuss phases of the potential deal

5   between Autonomy and the Vatican?

6   A.    Yes.

7   Q.    This, again, is the Vatican deal the end deal doesn't

8   happen?

9   A.    Yes.

10  Q.    At some point they do about 11 and a half million with

11  MicroTech that never goes through?

12  A.    Correct.

13  Q.    All right.  And is there a discussion here of "We have

14  selected two partners to help us with the project; namely,

15  B.E.E. Team Spa and MicroTech"?

16  A.    Correct.

17  Q.    And then is there a description here that "MicroTech, a

18  long-established federal-based partner of Autonomy's, provides

19  U.S. input into the project"?

20  A.    Correct.

21  Q.    So that's saying that MicroTech's providing U.S. input

22  into the Vatican project?

23  A.    Correct.

24  Q.    Okay.  And then B.E.E. Team is providing Italian input?

25  A.    Correct.

BRYANT - DIRECT / FRENTZEN

1    Q.   Then there's a description of B.E.E. Team.

2         Could we go down to the bottom here?

3         Does it say here (reading):

4              "We have sold approximately 50 percent of the

5         software required to these two partners who are going to

6         work with us and the Italian umbrella partner to provide

7         services to BAV"?

8    A.   Yes.

9    Q.   Could we go now to Exhibit 737?  Take a look at that,

10   please.

11   A.   It's an e-mail from Mr. Kanter to Corrado Broli --

12            THE COURT:  Admitted.

13         (Trial Exhibit 737 received in evidence)

14            THE WITNESS:  -- with a copy to Mr. Hussain.

15            MR. FRENTZEN:  Could we blow up the bottom part first?

16   Yeah.  Great.

17   Q.   What is the date of this original e-mail?

18   A.   April 9th.

19   Q.   And this is from Corrado Broli to who?

20   A.   Mr. Kanter.

21   Q.   What's the subject?

22   A.   "B.E.E. Team."

23   Q.   And what does it say?

24   A.   It's asking him to prepare a new 2X version changing the

25   amount from 7 to 5 million Euro.

1  **Q.**  And then "The VAR agreement should be signed by B.E.E.

2  Sourcing instead of B.E.E. Team"?

3  **A.**  Correct.

4  **Q.**  And this is well after the end of the quarter?

5  **A.**  Yes.

6  **Q.**  Would you then go up to the top part of this?

7      Okay.  All right.  And then what is the date of the final

8  e-mail listed here?

9  **A.**  April 11th, 2010.

10  **Q.**  And this is from who?

11  **A.**  Mr. Broli to Mr. Kanter with a copy to Mr. Hussain.

12  **Q.**  And what is the -- what is listed here?

13  **A.**  He wants him to prepare paperwork, 3 million Euro plus

14  5 percent maintenance for a company called Auxilium Group in

15  Rome.

16  **Q.**  And does it then provide an address and a CEO?

17  **A.**  Yes.

18  **Q.**  Let's go now to 736.  Take a look at 736, please, Special

19  Agent Bryant.

20  **A.**  Yes.  It's an e-mail from Mr. Kanter to Mr. Broli.

21  **Q.**  What is the --

22      **MR. FRENTZEN:**  Well, I'd offer it, Your Honor.

23      **THE COURT:**  It's already admitted.

24      **THE CLERK:**  It's already admitted.

25      **MR. FRENTZEN:**  Oh, it is?

1        **THE CLERK:**  Yes.

2        **MR. FRENTZEN:**  Thank you.

3     Let's pull it up and blow up the top.

4   **Q.**   What is the date on this?

5   **A.**   April 11th.  It's the same day as the previous e-mail.

6   **Q.**   Could we then go to page 2 of this, the attachment?

7     Does this appear to be a product schedule for the proposed

8   deal?

9   **A.**   Yes.

10  **Q.**   Could we go to page 3 and the bottom of page 3?  Okay.

11  Great.

12    Do you see here the "Territory of Software Installation"?

13  **A.**   Yes.  The Vatican.

14  **Q.**   And then in terms of the fees, what are the fees?

15  **A.**   3 million Euro plus maintenance.

16  **Q.**   And do you see a commencement date?

17  **A.**   March 31st, 2010.

18  **Q.**   And could we go to page 4 at the top?

19    Is this a reseller agreement between Autonomy and now

20  Auxilium, the outfit that they had just been told to switch the

21  deal to?

22  **A.**   Correct.

23  **Q.**   Could we go to page 10 at the bottom?

24    Is this deal unsigned?

25  **A.**   Correct.

1    Q.    Take a look now at 2788, please.

2    A.    An e-mail from Mr. Broli to Mr. Kanter.

3          MR. FRENTZEN:  I'd offer it, Your Honor.

4          THE COURT:  Admitted.

5          (Trial Exhibit 2788 received in evidence)

6    BY MR. FRENTZEN:

7    Q.    And at the top is there a -- what is the -- oh, sorry.

8          Could we go to the bottom, please, for the original part,

9    the bottom part of that page?

10          What is the date, if you can make that out, Special Agent

11    Bryant?

12    A.    I believe it's April 14th, 2010.

13    Q.    All right.  From who?

14    A.    Mr. Kanter to -- or from Mr. Broli to Mr. Kanter.

15    Q.    And what does Mr. Broli say here?

16    A.    The subject is "Auxilium Group."  It says (reading):

17          "Dear Andy -

18          "Please find attached a copy of the purchase orders

19    that I already sent to you the 31st of March.  Please call

20    me for further details about this."

21    Q.    In the course of your investigation, are you aware of this

22    document being sent on March 31st of 2010?

23    A.    I've not seen the reference document.

24    Q.    And could we go now to page 4, please?

25          On page 4 do you see the amount here of this particular

1    deal?

2    **A.**    Yes.  2.6 million Euros.

3    **Q.**    And do you see the squiggly at the bottom there?  Does

4    this appear to be an executed contract at this point?

5    **A.**    I believe so.

6    **Q.**    All right.  Well, it's in evidence.

7            The next exhibit I'd like you to take a look at is 757,

8    please.

9    **A.**    Yes.  It's an e-mail from Mr. Chamberlain to Mr. Murray,

10   Matt Stephan, and copying Mr. Hussain.

11   **Q.**    And if you could, could you tell us --

12           **MR. FRENTZEN:**  Oh, I'm sorry, Your Honor.  I would

13   offer this into evidence.

14           **THE COURT:**  Admitted.

15       (Trial Exhibit 757 received in evidence)

16   **BY MR. FRENTZEN:**

17   **Q.**    What is the date on this particular e-mail, Special Agent

18   Bryant?

19   **A.**    April 16th, 2010.

20   **Q.**    And what is -- who is it from?

21   **A.**    Mr. Chamberlain.

22   **Q.**    To who?

23   **A.**    Mr. Murray at Deloitte.

24   **Q.**    And what is Mr. Chamberlain describing to Mr. Murray?

25   **A.**    The subject is "Auxilium."  He's providing summary

1   financials, and then he has at the bottom a paragraph

2   (reading):

3           "We are in the advantageous position of being very

4       close to the negotiations of the end user deal with BAV.

5       We know that they are expecting to receive payment from

6       BAV on May 15th.  They are not due to pay us until well

7       after this date."

8   Q.   All right.  And is this -- at the bottom is this saying

9   they have comfort recognizing the deal?

10  A.   Yes.

11  Q.   And is this recognizing the deal in Q1 2010?

12  A.   Yes.

13  Q.   Was this deal recognized by Autonomy in Q1 2010?

14  A.   Yes.

15  Q.   Was it eventually -- did it not go through to the Vatican

16  and eventually get written off?

17  A.   I believe so.

18          MR. FRENTZEN:  Can I have one moment, Your Honor?

19                  (Pause in proceedings.)

20          MR. FRENTZEN:  Can I have one moment, Your Honor?

21                  (Pause in proceedings.)

22          MR. FRENTZEN:  May I approach briefly, Your Honor?

23          THE COURT:  Sure.

24          MR. FRENTZEN:  Special Agent Bryant -- I'm not

25  offering this into evidence.  Counsel, do you want it marked?

1    MR. KEKER:  Yes, please.

2    MR. FRENTZEN:  Can we get the last number?

3    MR. KEKER:  We can do it later.

4    MR. FRENTZEN:  I just want to put a number on it.

5    UNIDENTIFIED SPEAKER:  3071.

6    THE COURT:  I'm sorry.  What number?

7    MR. FRENTZEN:  3071.

8    (Trial Exhibit 3071 marked for identification)

9    BY MR. FRENTZEN:

10   Q.   Special Agent Bryant, during the break did you make an

11   effort to answer the judge's question?

12   A.   Yes, in regards to the time zone of the e-mails.

13   Q.   Okay.  And were you able to retrieve any information that

14   the Government had received a few years ago?

15   A.   Yes.  We received an e-mail from HP representation.

16   Q.   And is this in connection with at least the e-mails that

17   we received from Hewlett Packard?

18   A.   Yes, and it's specifically in regards to the top e-mail.

19   So the first e-mail you see in the exhibits.

20   Q.   Okay.  And at least in terms of that, what's your

21   understanding of the time zone -- when you say "the top," you

22   mean the last e-mail of the chain, which in e-mail format is

23   listed on the top?

24   A.   Yes, that's correct.

25   Q.   Okay.  And with the Court's permission, what is your

1   current understanding related to the top e-mail on the chain?

2   **A.**   It's standardized to the Eastern time zone.

3   **Q.**   Did you get any understanding with respect to how the

4   other times, in other words, e-mails in the chain beyond the --

5   sorry -- the last e-mail in the chain with regard to what time

6   that might reflect?

7   **A.**   Unclear, but the first one on the chain from HP is

8   standardized to Eastern time.

9   **Q.**   Okay.  And when you're talking about HP, are you referring

10  to HP Bates stamps; in other words, documents produced by

11  Hewlett Packard stamped with "HP"?

12  **A.**   Yes.

13  **Q.**   All right.

14          **THE COURT:**  Well --

15          **MR. FRENTZEN:**  Go ahead, Your Honor.

16          **THE COURT:**  -- a lot of the documents are Autonomy

17  documents.  Do we know anything about them?

18          **MR. FRENTZEN:**  Well, they --

19          **THE COURT:**  I mean, I'm just assuming.  I guess

20  Autonomy documents are in the -- it's United Kingdom.  It would

21  be Greenwich Mean Time or something like that; is that it?

22  **BY MR. FRENTZEN:**

23  **Q.**   Well, is it your understanding, Special Agent Bryant, that

24  by the time that the production was done, Hewlett Packard had

25  acquired Autonomy?

BRYANT - DIRECT / FRENTZEN

1  **A.**   Yes.

2  **Q.**   And so Hewlett Packard was producing Autonomy's documents?

3  **A.**   Yes.

4         **THE COURT:**  Well, if -- okay.

5  **BY MR. FRENTZEN:**

6  **Q.**   So the Autonomy -- I'm sorry.

7         **THE COURT:**  No, no, no.  Maybe you'll clear it up.

8      But, I mean, they received a number of documents from

9  Autonomy, and my question is -- which are of some significance

10 in this litigation, and so my question is:  Whose time do I

11 look at?

12     Let's take, as an example, a transmission to what's called

13 the data room and so forth.  I don't know.  I assume there was

14 some transmission transmitting documents on it and I assume

15 they have time stamps.

16     They later became documents -- they became documents of

17 Hewlett Packard because Hewlett Packard received it, but do we

18 know anything about when Autonomy sent the documents?  I guess

19 it would be out of Hewlett Packard.

20     Anyway, I think this is maybe the best way to handle it is

21 some informal discussion with the parties and maybe we can get

22 some enlightenment, because I think that all I'm doing is

23 making it cloudier rather than clearer.  So let's just...

24        **MR. FRENTZEN:**  I agree with --

25        **THE COURT:**  My characterization.

1        **MR. FRENTZEN:**  -- the Court entirely that we should

2   give the jurors --

3        **THE COURT:**  Okay.  We'll work on that.  I mean,

4   there's a definite answer.  It may or may not be known to the

5   parties, and we'll just work on it and we'll somehow put it in

6   for your consideration so you can look.

7        When you look at an e-mail, I think, and even a string of

8   e-mails, I think -- and dates are important -- I think times

9   are of some significance when the dates are important; and,

10  therefore, we'll get some evidence on that subject and maybe

11  the parties can agree because I don't think it's in dispute.

12       Okay.

13       **MR. FRENTZEN:**  That will be great, Your Honor.

14       **THE COURT:**  Okay.  Let's go.

15  **BY MR. FRENTZEN:**

16  **Q.**   And if I could, just is it your understanding, Special

17  Agent Bryant, that documents, whether they were obtained from

18  Autonomy or directly from Hewlett Packard produced by Hewlett

19  Packard with HP Bates stamp, that at least the top e-mail is

20  East Coast -- U.S. East Coast standard time?

21  **A.**   Yes.

22  **Q.**   Okay.  I'd like to turn now to a couple of e-mails that I

23  had forgotten, and then I'm almost done.

24       Could you take a -- oh, I've got to pass them up.

25       I'm going to hand you what's been marked as 3050 and 3051.

1    Look at those, please.

2    **A.**   (Witness examines document.)

3    **Q.**   Let's start with 3051.  Do you recognize what that is?

4    **A.**   Yes.  It's an e-mail from Mr. Hussain to Mr. Lynch.

5         **THE COURT:**  Admitted.

6    (Trial Exhibit 3051 received in evidence)

7         **MR. FRENTZEN:**  Thank you, Your Honor.

8    Just blow that up.

9    **Q.**   Okay.  Special Agent Bryant, this particular e-mail,

10   what's the date?

11   **A.**   March 12th, 2009.

12   **Q.**   And what is Mr. Hussain saying to Mike Lynch?  What's the

13   subject?

14   **A.**   "Capax Deal."

15   **Q.**   And what does he say?

16   **A.**   (reading)

17        "Stouff's had a bite at a $5 million deal."

18   **Q.**   Could we now take a look at 3050?

19   **A.**   (Witness examines document.)  It's an e-mail from

20   Mr. Hussain to Mr. Lynch.

21        **THE COURT:**  Admitted.

22   (Trial Exhibit 3050 received in evidence)

23   **BY MR. FRENTZEN:**

24   **Q.**   All right.  And so by that you mean the last e-mail in the

25   chain is from Mr. Hussain to Mike Lynch?

BRYANT - DIRECT / FRENTZEN

1   **A.**    Yes.  He's forwarding an e-mail chain below to Mr. Lynch.

2   **Q.**    Could we go to page 5, please, of this chain?

3       Does this appear to just start out as a discussion way

4   back in 2008 between Mr. Hussain and somebody Raimo Lenschow?

5   **A.**    Yes.

6   **Q.**    And if we could, could you just scroll a little bit

7   further the other way -- sorry -- down?

8       Do you see here in the signature block from Mr. Lenschow

9   there's reference here to -- oh, stop.

10  **A.**    Merrill Lynch.

11  **Q.**    -- Merrill Lynch?

12      I'd like to now go to page 3, please.  Do you see -- and

13  could we go to the bottom of page 3?

14      Do you see here now -- what's the date at this point?

15  **A.**    September 10th, 2009.

16  **Q.**    Okay.  So this individual has picked back up the

17  conversation, and here the subject he has is "Revenue

18  Recognition"?

19  **A.**    Correct.

20  **Q.**    And he's e-mailing Mr. Hussain?

21  **A.**    Correct.

22  **Q.**    And what does he say reading down to here (indicating)?

23  **A.**    (reading)

24          "I looked at your annual report but it does not state

25      it specifically.  Are you using U.S. GAAP SOP 97-2 or are

1          you using IFRS revenue recognition rules?"

2     Q.   Okay.  And this person appears to be asking "because I had

3     a client asking about your revenue recognition"?

4     A.   Correct.

5     Q.   Could we go to the top of this page?

6          Does it appear that a few days later this same individual

7     pings Mr. Hussain again?

8     A.   Correct.

9     Q.   Still there, this is September 14th, 2009?

10    A.   Uh-huh.  Correct.

11    Q.   And what is he asking when he sort of pings him again in

12    the first part of this?

13    A.   He's just asking if he could "please answer my previous

14    question."

15    Q.    (reading)

16          "I e-mailed you with a question from a large U.S.

17     account last week."

18    A.   Yes.

19    Q.    (reading)

20          "Could you please help?  He is asking" --

21     He is also asking something else.  Okay.

22     Could we go now to the bottom of page 2, please?

23     And what's the date of this?

24    A.   September 14th, 2009.

25    Q.   From who?

BRYANT - DIRECT / FRENTZEN

1    **A.**    Mr. Hussain.

2    **Q.**    To who?

3    **A.**    Mr. Lenschow.

4    **Q.**    And what does he say here in the first part of this?

5    **A.**    (reading)

6          "Raimo, apologies.  Have been traveling.  Back now.

7          IFRS is the general set of rules that we follow; but on

8          rev rec, we adopt the general SOP 97-2 guidelines."

9    **Q.**    Could we scroll to the top?

10    And Mr. Lenschow is saying (reading):

11          "Many thanks.  That's what I thought"?

12    **A.**    Yes.

13    **Q.**    Okay.  All right.  And then eventually that gets forwarded

14    on to Mr. Lynch?

15    **A.**    Yes.

16          **MR. FRENTZEN:**  I want to turn now to an exhibit that

17    unfortunately, Your Honor, I didn't -- we failed to mark it,

18    but 3070.  I've shown it to counsel, and if I could approach

19    the witness.

20          (Trial Exhibit 3070 marked for identification)

21    **BY MR. FRENTZEN:**

22    **Q.**    Do you recognize what 3070 is, Special Agent Bryant?

23    **A.**    Yes.  It's an e-mail from Mr. Kanter to Mr. Hussain.

24          **THE COURT:**  Admitted.

25          (Trial Exhibit 3070 received in evidence)

1          **MR. FRENTZEN:**  Thank you, Your Honor.

2      Your Honor, I'm sorry.  It will take me one second.  I

3  should probably use the Elmo for this just to show this chain.

4          **THE COURT:**  All right.

5                  (Pause in proceedings.)

6  **BY MR. FRENTZEN:**

7  **Q.**  Special Agent Bryant, if you could just follow along.

8      Do you see here on December 17th of 2009, this is an

9  e-mail from Dave Truitt to Andy Kanter?

10 **A.**  Yes.

11 **Q.**  All right.  And what is Mr. Truitt listing here?

12 **A.**  He's listing employees of MicroLink and he's discussing

13 the ones he believes are key.

14 **Q.**  Key employees.  And this is close to the acquisition of

15 MicroLink by Autonomy?

16 **A.**  Yes.

17 **Q.**  All right.  Do you see -- and I've got to move ahead to

18 get these all caps.

19     Do you see here that it's then sent from Mr. Kanter to

20 Mr. Hussain?

21 **A.**  Yes.

22 **Q.**  All right.  And here -- or at this point do you see

23 after -- or interlineated with people listed there are then all

24 caps?

25 **A.**  Yes.

**BRYANT - DIRECT / FRENTZEN**

1  Q.    And can you see here where the original has "Alan Rizek,

2  CFO"?

3  A.    Yes.

4  Q.    And then what is the question that's posed interlineated

5  in all caps by Mr. Kanter to Mr. Hussain?

6  A.    (reading)

7          "Need him at all or does he go day 1?"

8  Q.    And this is about whether or not to keep people on at

9  MicroLink?

10  A.    Correct.

11  Q.    And do you see here on December 21, 2009, do you see

12  Mr. Hussain's response to Mr. Kanter and Mr. Lynch?

13  A.    Yes.

14  Q.    And what did he say?

15  A.    (reading)

16          "We have to talk to Dave today but keep Ops people.

17  Rizek not needed."

18  Q.    "Steve can subsume"?

19  A.    Yes.

20  Q.    Steve Chamberlain?

21  A.    I believe so.

22  Q.    And what else does Mr. Hussain say about the folks at

23  MicroLink?

24  A.    (reading)

25          "Dave - Need for leadership.

1          "Cronin - Doubt he would become an employee but keep

2      him as the consultant."

3  **Q.**   So Mr. Hussain is talking about keeping Mr. Cronin and

4  dumping Mr. Rizek at this point?

5  **A.**   Correct.

6  **Q.**   And do you see here a response from -- or, I'm sorry --

7  eventually a response from Mike Lynch?

8  **A.**   Yes.  He's okay with it.

9  **Q.**   And then this just gets forwarded from Mr. Kanter back to

10  Mr. Hussain?

11  **A.**   Yes.

12  **Q.**   All right.  To your knowledge was Mr. Rizek fired from

13  MicroLink by Autonomy?

14  **A.**   No.

15  **Q.**   I want to ask you now about -- just put in a couple of

16  phone records.

17      Special Agent Bryant -- let me just get to the right

18  place -- have you reviewed telephone records for some of the

19  individuals involved in this case?

20  **A.**   Yes.

21  **Q.**   Were you -- was an effort made by the federal government

22  to obtain telephone records from the U.K. for Mr. Hussain's

23  telephones?

24  **A.**   I believe so.

25  **Q.**   And were you -- did we obtain anything responsive to those

1  requests through the U.K. government?

2  **A.**  I've not received anything yet.

3  **Q.**  Have you, nonetheless, taken a look at telephone records

4  related to Stouffer Egan in particular?

5  **A.**  Yes.

6  **Q.**  Okay.  And have you analyzed the telephone records of

7  Mr. Egan?

8  **A.**  Yes.  We've seen a demonstrative weeks ago that analyzed

9  those records.

10      **MR. FRENTZEN:**  I'd like to offer at this point,

11  Your Honor, Exhibit 2946, which are the telephone records of

12  Mr. Egan, Stouffer Egan.

13      **THE COURT:**  Admitted.

14    (Trial Exhibit 2946 received in evidence)

15  **BY MR. FRENTZEN:**

16  **Q.**  And did you at a later point also obtain telephone records

17  related to Mr. Cronin, John Cronin?

18  **A.**  Yes.  We obtained them during trial.

19      **MR. FRENTZEN:**  And, Your Honor, the Defense wanted

20  this particular so I think we've worked it out, so it's

21  marked -- we had it marked as something else but now it's

22  marked as 5685A.

23      **THE COURT:**  I'm sorry?  Give me the number again.

24      **MR. FRENTZEN:**  Yeah.  5685A.

25    Is that right, John?

1              THE COURT:  56 --

2              MR. FRENTZEN:  Is the "A" important, John?

3              THE COURT:  5685?

4              MR. FRENTZEN:  5685.  Let me find out --

5              MR. KEKER:  I don't know why it's A, but that's what

6    it's marked, let's stick with it.

7              MR. FRENTZEN:  We'll just do it.  Is there a B I

8    should know about?

9         Wait.  There is.  Hang on.  What is this?

10        Sorry, Your Honor.

11             THE COURT:  Well, 5685A admitted.

12        (Trial Exhibit 5685A received in evidence)

13             MR. FRENTZEN:  There's also a 5685B.  I apologize --

14             THE COURT:  That's also admitted.

15        (Trial Exhibit 5685B received in evidence)

16             MR. FRENTZEN:  -- I did not cruise through the whole

17   thing.

18        Okay.  Great.  Thank you, Your Honor.

19   Q.   Okay.  Special Agent Bryant, did we see some

20   demonstratives that were put on the screen at various points by

21   the Defense during the course of this case?

22   A.   Yes.

23   Q.   And if we could -- if I could ask for some assistance

24   here, could we get 5741 up, please?  Thank you.

25        All right.  What is the date of this demonstrative,

1   Special Agent Bryant?

2   **A.**   January 1st, 2010.

3   **Q.**   And in connection with this date, did you take a look at

4   telephone records related to Mr. Cronin?

5   **A.**   Yes.

6   **Q.**   And are there also a couple of phone calls on this

7   particular date between Mr. Cronin and Mr. Scott?

8   **A.**   Yes.

9   **Q.**   Were there also -- and this doesn't purport to have

10  e-mails, but did you also take a look and compare e-mails that

11  were sent by Mr. Hussain on this particular date, January 1st,

12  2010?

13  **A.**   Yes.

14          **THE CLERK:**  What's that number again?

15          **MR. FRENTZEN:**  5741.  It's not in evidence but it's a

16  demonstrative.

17          **THE CLERK:**  Thank you.

18  **BY MR. FRENTZEN:**

19  **Q.**   I'd like to move now to Exhibit, another demonstrative,

20  5744.  Thank you.

21      All right.  And what is the date on this demonstrative,

22  Special Agent Bryant?

23  **A.**   I believe it has a couple of pages, but it starts with

24  January 25th, 2011.

25  **Q.**   In terms of your analysis of telephone calls of Stouffer

1    Egan, does this demonstrative list some phone calls by

2    Mr. Egan?

3    **A.**   It does.

4    **Q.**   And have you taken a look at this particular date,

5    January 25th, 2011, to see whether or not there were any phone

6    calls between Mr. Egan and Sushovan Hussain on this date?

7    **A.**   Yes, I have.

8    **Q.**   And are there phone calls that are not on this

9    demonstrative between Mr. Egan and Mr. Hussain?

10   **A.**   Yes.

11   **Q.**   Did that come from Mr. Egan's phone records?

12   **A.**   Yes.

13   **Q.**   How many calls between Mr. Egan and Mr. Hussain are not

14   listed on this demonstrative?

15   **A.**   There are multiple.  If you have something to remind me.

16   **Q.**   Is there anything I can show you to help refresh your

17   recollection?

18   **A.**   Yes.

19                      (Pause in proceedings.)

20   **BY MR. FRENTZEN:**

21   **Q.**   Does that help to refresh your recollection?

22   **A.**   (Witness examines document.)  Yes.

23   **Q.**   I'll take it back.

24        On January 25th, 2011, how many calls were there between

25   Mr. Egan and Mr. Hussain?

**BRYANT - DIRECT / FRENTZEN**

 1    **A.**    I believe there were seven calls.

 2    **Q.**    I'd like to go now to the second page of this

 3    demonstrative, 5744.

 4         On January 26, 2011, does this demonstrative list calls

 5    involving Mr. Egan?

 6    **A.**    Yes.

 7    **Q.**    And does it leave off any calls between Mr. Egan and

 8    Mr. Hussain?

 9    **A.**    Yes.  I believe it leaves off eight calls.

10    **Q.**    If we could, could we go to 5742, please?

11         Special Agent Bryant, on 5742, this is broken down calls

12    involving Mr. Egan, Mr. Truitt, Mr. Cronin on March 29 through

13    March 31.  On these days, did you take a look to see whether or

14    not there were also calls between Mr. Egan and Mr. Hussain?

15    **A.**    Yes.

16    **Q.**    And with respect to each of those days, were there calls

17    between Mr. Egan and Mr. Hussain that are not on the

18    demonstrative?

19    **A.**    Yes.

20    **Q.**    How many on March 29?

21    **A.**    If there's something I can use to refresh my memory.

22    **Q.**    All right.

23    **A.**    (Witness examines document.)  There were six calls on the

24    29th.

25    **Q.**    Okay.  How about March 30th?

1   **A.**   I believe eight calls.

2   **Q.**   How about March 31st?

3   **A.**   I believe 10 calls.

4   **Q.**   And what about April 1st?  Do you need to refresh your

5   recollection?

6   **A.**   Yes.

7   **Q.**   That's fine.

8   **A.**   (Witness examines document.)  Seven calls.

9   **Q.**   I'd now like to show you a series of e-mails that I don't

10  need to read, but I just want you to take a quick look at.

11           **MR. FRENTZEN:**  Counsel and for the Court, this is

12  3053 -- do you want me to do them all at once, Your Honor?

13           **THE COURT:**  Well, are they going to come into

14  evidence?

15           **MR. FRENTZEN:**  They're going to come in, but we're not

16  going to read off them.

17           **THE COURT:**  Okay.  What are they?  Yes.  Three zero?

18           **MR. FRENTZEN:**  3053.

19           **THE COURT:**  Yeah.

20           **MR. FRENTZEN:**  86.

21           **THE COURT:**  86.

22           **MR. FRENTZEN:**  3054, 3052, 709, 3026, 1588, 884, and

23  3049.

24           **THE COURT:**  Okay.  Admitted.

25       (Trial Exhibits 3053, 86, 3054, 3052, 709, 3026, 1588,

 1          884, and 3049 received in evidence)

 2              **MR. FRENTZEN:**  Oh, great.

 3          May I have one moment, Your Honor?

 4                       (Pause in proceedings.)

 5              **MR. FRENTZEN:**  That's all I have.  Thank you.

 6              **THE COURT:**  Okay.  Cross.

 7                       (Pause in proceedings.)

 8              **MR. KEKER:**  Ready, Your Honor?

 9              **THE COURT:**  Oh, sure.  Go right ahead.

10                       <u>**CROSS-EXAMINATION**</u>

11     **BY MR. KEKER:**

12     **Q.**   Good morning, Agent Bryant.

13          Good morning, ladies and gentlemen.

14     **A.**   Good morning, Mr. Keker.

15     **Q.**   I want to start with these top 40 or the lists that you

16     talked about at some length and introduced evidence about.

17          You obviously and nobody from the Government was on these

18     due diligence calls between Autonomy and HP, were you?

19     **A.**   No.

20     **Q.**   And you understood that these lists came out of back and

21     forth between the two companies about what was going to be

22     provided?

23     **A.**   Yes.

24     **Q.**   You understood that the parties negotiated over what

25     information was going to be provided?

 1              MR. FRENTZEN:  Objection.

 2              THE COURT:  Yeah.  I --

 3              MR. FRENTZEN:  Foundation at this point.

 4              THE COURT:  She's not here to comment on her

 5    understanding of what the evidence is.  I mean --

 6              MR. KEKER:  Okay.

 7              THE COURT:  -- she wasn't a party to anything other

 8    than when this case started.  So she can --

 9              MR. KEKER:  All right.  Then let me ask this.

10              THE COURT:  Yeah.

11    BY MR. KEKER:

12    Q.  When you were pulling out those -- we've seen a lot of

13    lists before they were redacted, after they were redacted.  Did

14    you try to pull out all of the relevant lists in the back and

15    forth to make the jury have a good full understanding of what

16    happened?

17    A.  We tried to look at the relevant e-mails from

18    Mr. Chamberlain who seemed to be the primary person pulling the

19    lists.  There was a revised one we were not able to get the

20    native of but, yes, we did.

21    Q.  Okay.  But did you -- was there one e-mail in particular

22    that showed what Mr. Hussain thought was being listed?

23              MR. FRENTZEN:  Objection.  I don't -- I'm sorry.  I

24    don't know how she would -- I don't even understand that

25    question.

**BRYANT - CROSS / KEKER**

1          **THE COURT:**  Well, I understand the question.  I just

2    don't know that --

3          **MR. KEKER:**  Your Honor, can I just follow this up?

4    Because she's got --

5          **THE COURT:**  Yeah, you can.

6          **MR. KEKER:**  We're going to get -- I'm going to show

7    her the document in a minute.

8    **Q.**   Do you remember a list that had at the top exactly what

9    Mr. -- from Mr. Hussain -- had at the top what Mr. Hussain

10   thought was being listed?

11         **MR. FRENTZEN:**  Objection.  That's obviously argument.

12         **THE COURT:**  Yeah, it is.  I think you can say "Do you

13   remember a list in which Mr. Hussain said this is" whatever it

14   is, whatever he said, whether it was --

15         **MR. KEKER:**  Well, let's --

16         **THE COURT:**  Go ahead.  Go ahead.

17         **MR. KEKER:**  Let's go back and show the jury.

18         **THE COURT:**  Yeah, there we go.

19         **MR. KEKER:**  You showed them -- let me make sure I get

20   the right number.  You showed them 2101.  Can we put up 2101?

21        And this is now in evidence, and can we blow up the top?

22   **Q.**   This is Mr. Hussain sending Chamberlain a list of what

23   it's called "Top 40 Contracts" (reading):

24              "In red - to be helpful, we should put together the

25        type of industry."

1          And he sent it at 6:16 a.m., wherever the time was.

2          And let's look at the attachment.

3          Okay.  It's got Bank of America up here, 19,500 and so on.

4          Was there a list Mr. Hussain sent a few minutes after this

5     that said at the top what he thought was being listed?

6     **A.**   I actually do believe I remember -- I don't know the

7     exhibit number but, yes, he says software, maintenance,

8     et cetera.

9     **Q.**   This is 2101.  2102 was in the binder that you gave us

10    that we thought you were going to introduce into evidence, but

11    somebody pulled it out.  Who pulled it out?

12    **A.**   I don't think anyone pulled it out.  We just didn't speak

13    about it this morning.

14    **Q.**   Okay.  2102 is the e-mail with the list that Mr. Hussain

15    sent just a few minutes -- within 15 minutes of that e-mail;

16    right?

17    **A.**   I'd need to look at it.

18          **MR. KEKER:**  Okay.  I'd move in 2102, Your Honor.

19          **THE COURT:**  Admitted.

20          **MR. FRENTZEN:**  One moment, Your Honor.

21          **MR. KEKER:**  Okay.  Let's put it up.

22          **THE COURT:**  Well --

23          **MR. FRENTZEN:**  I don't actually have 2102, I don't

24    think.  It's not here.

25          **MR. KEKER:**  2102 is in the cross binder.

1          **MR. FRENTZEN:**  I don't think it's in yet.  It

2    shouldn't be up.

3          **MR. KEKER:**  I thought he just said it's admitted.

4          **THE COURT:**  I did say it was admitted, but I was

5    waiting to see if there was an objection but let's wait.  Let's

6    go piece by piece.

7    **BY MR. KEKER:**

8    **Q.**   2102 is an e-mail --

9          **THE COURT:**  Okay.  No.  Wait.  I know what it is.

10   Let's see whether --

11         **MR. FRENTZEN:**  I have no objection to this document.

12         **THE COURT:**  Okay.  2102 in evidence.

13         (Trial Exhibit 2102 received in evidence)

14         **MR. KEKER:**  Okay.

15         **THE COURT:**  There we go.

16   **BY MR. KEKER:**

17   **Q.**   Okay.  This was sent at 6:20.  This is Mr. Hussain to

18   Mr. Chamberlain said (reading):

19              "Similar to last mail, in red, to be helpful

20         designate industry."

21         And let's flip it over and see what's on the next page,

22   and it's the same list that's got Bank of America.  This is a

23   different -- this is bigger numbers, Bank of America,

24   45 million, JPMC; and at the top what does that say there at

25   the top?

1    **A.**    (reading)

2         "Recognized revenue from software, maintenance, and

3    hosted."

4    **Q.**    Okay.  Recognized revenue from software, hosted -- excuse

5    me -- software, maintenance, and hosted is not a list of

6    hardware, is it?

7    **A.**    No.

8    **Q.**    Okay.  This list -- did you understand that as they're

9    scrambling around on August 3rd Mr. Hussain was preparing lists

10   that he thought were recognized revenue from software,

11   maintenance, and hosted?

12        **MR. FRENTZEN:**  Obviously it says that, Your Honor.

13        **THE COURT:**  Sustained.

14   **BY MR. KEKER:**

15   **Q.**    Well, look at 2104, which is in evidence.  2104 is from

16   Mr. Hussain to Kanter on the same day.  This is about an hour

17   later, 7:45 a.m., and a copy of top 40 customer lists

18   (reading):

19        "The schedules provides recognized revenue by

20   customer for software, hosted, and maintenance over a

21   period 2010 to today."

22   That's not a list of hardware sales, is it?

23   **A.**    No.  And I read this earlier this morning.

24   **Q.**    Okay.  Why did you take out 2102, the one that said this

25   is the list about software, hosted, and so on?

1              MR. FRENTZEN:  Objection.  Assumes facts not in

2    evidence.

3              THE COURT:  Sustained.

4    BY MR. KEKER:

5    Q.   Why was it not --

6              MR. FRENTZEN:  It's not relevant.

7    BY MR. KEKER:

8    Q.   Why was it not included?

9              THE COURT:  You can ask her.

10   BY MR. KEKER:

11   Q.   Why was it not --

12             THE COURT:  I think, Mr. Keker, you can ask her does

13   she have any understanding as to why it was not included, does

14   she have any information on that subject.

15   BY MR. KEKER:

16   Q.   Who put together the exhibits that you were going to

17   testify to?

18   A.   I put all of the exhibits in the binder and provided them

19   to the Assistant U.S. Attorneys.

20   Q.   Okay.  So you put together the list and then you gave them

21   to Mr. Frentzen?

22   A.   Yes.

23   Q.   And then you and Mr. Frentzen went through them and

24   decided which ones you would show the jury?

25   A.   We went through them together.  We did not discuss

 1  finality.

 2  **Q.**   Mr. Frentzen decided which ones you should show the jury?

 3  **A.**   Mr. Frentzen asked me questions and we admitted evidence.

 4  **Q.**   Fair enough.  Right.

 5      Okay.

 6          **MR. FRENTZEN:**  So, Your Honor, that assumes that I

 7  ever had 2102.

 8  **BY MR. KEKER:**

 9  **Q.**   2102 was in the original designation of exhibits that you

10  gave us; right?

11          **MR. FRENTZEN:**  Well, that was from I don't know how

12  many months ago.

13          **THE COURT:**  But did you ask her -- I think your

14  question was, and I don't know what the answer is, and I may

15  have misunderstood the question, but I thought the question

16  was:  2102 was originally in the binder and somebody took it

17  out?  Is that the question?

18          **MR. KEKER:**  That's the question.

19          **THE COURT:**  That's your point.

20          **MR. FRENTZEN:**  Your Honor --

21          **THE COURT:**  Okay.  So I think you have to lay a

22  foundation.  I think that's a proper question.  I think you

23  have to lay a foundation that, number one, does she know

24  whether 2102 was in the original binder.  I mean --

25          **MR. FRENTZEN:**  Your Honor, I have a very fundamental

 1   reason why this is inappropriate, which I'm happy to address at

 2   sidebar and I think counsel knows.

 3        **MR. KEKER:**  I have no idea.

 4        **MR. FRENTZEN:**  Well, I can explain it to him.

 5        **THE COURT:**  Well --

 6        **MR. KEKER:**  I don't think we need a sidebar.  I'd like

 7   to ask Agent Bryant questions.

 8        **THE COURT:**  Well, maybe we do need -- I think actually

 9   we do need a sidebar because we're getting into issues of how

10   the case is prepared or how it was presented, and the jury

11   basically is not to consider those issues, so let's have a

12   sidebar.

13        Ladies and gentlemen, stand up, have a conversation,

14   whatever you want.

15        **MR. FRENTZEN:**  It's fundamental and there's something

16   I'm not allowed to do and he knows it.

17        **(The following proceedings were heard at the sidebar:)**

18        **THE COURT:**  Go ahead, Mr. Frentzen.

19        **MR. FRENTZEN:**  Judge, I'm happy to take the stand and

20   I'm not allowed to, and this whole line of inquiry about me --

21   I'd never seen 2102 before today, but I can't get up there and

22   say that.  Okay?

23        Mr. Leach made a list of exhibits a long time ago.  The

24   agent went through them.  She culled ones out.  I've never seen

25   2102.  Frankly, I don't care about it.  But to insinuate that I

**SIDEBAR**

1   pulled it out of somewhere and then actually to propose that to

2   the jurors when he knows -- when he knows I can't get on the

3   stand and whip his butt is inappropriate.  Highly

4   inappropriate.

5         **THE COURT:**  I think it is inappropriate.

6         **MR. KEKER:**  Why is it inappropriate?

7         **MR. FRENTZEN:**  You don't mention a AUSA's name, plus

8   it goes into work product.  I mean, this whole insinuation is

9   false like the woodshedding.

10         **THE COURT:**  Okay.  This case is going to linger in

11  people's nightmares.

12      How the Government has chosen to present its case is not

13  fair game, and the reason it's not fair game is that if the

14  jury wants to consider it, the Government would have to

15  testify.  This is why we chose to do it this way.  This is why

16  we chose to do it that way.

17      So I really don't think it's -- I don't think it is proper

18  because those people can't testify as to it.

19         **MR. FRENTZEN:**  Exactly.

20         **THE COURT:**  I think you can certainly take that

21  exhibit, argue that it's highly relevant, doesn't it show this

22  or does it show that.  Of course, that's fair game, but not why

23  the Government either did or did not elect to show it.

24         **MR. FRENTZEN:**  And it's not -- I'll stipulate that the

25  defendant didn't want to tell them about hardware.  That's not

1    the issue.  I'll stipulate that the defendant stripped out the

2    hardware.  That's obvious.

3            THE COURT:  Well, you don't have to stipulate one way

4    or the other.  I think the exhibit comes in, but I think I'm

5    going to strike the questions as to why it was taken out if it

6    was taken out --

7            MR. FRENTZEN:  I would ask that you strike --

8            MR. KEKER:  I would like to state my objection.

9            THE COURT:  Okay.  I'll let you do that.

10        -- and what the Government knew and what they didn't know.

11        So you want to put your objection on the record?

12            MR. KEKER:  Yes.  I object to striking the questions.

13    They're completely appropriate.  They sent us a list of

14    exhibits to use with Agent Bryant.  They know perfectly well

15    that 2102 was on it.

16            MR. FRENTZEN:  I don't know that.

17            MR. KEKER:  When Mr. Frentzen questions her, he goes

18    from 2101 to 2104.  They skip right over it.  I can ask her

19    about that.

20            MR. FRENTZEN:  Your Honor, I can pull my binder out

21    right now.  Okay?  I don't have 2102 in the binder.

22            MR. KEKER:  I know it's not there now.

23            MR. FRENTZEN:  Mr. Leach a long time ago made great

24    lists.

25            THE COURT:  My point, I don't --

SIDEBAR

1          **MR. FRENTZEN:**  This whole insinuation is false.

2          **MR. KEKER:**  I'm not going to go into it anymore, but

3    you shouldn't say anything.

4          **THE COURT:**  I have to say something, otherwise he has

5    to testify, so I'm going to strike it over your objection.

6          **MR. KEKER:**  Yes, sir.

7          **THE COURT:**  And we'll proceed and I'm going to say a

8    few things.

9          **MR. FRENTZEN:**  Just so I could say -- I almost filed

10   something about this once upon a time, but it kind of tailed

11   off -- but, you know, I'm used to attacks on the Government.

12   That's fine.  But when you get into the individual AUSAs, that

13   raises issues that we can't respond to.

14         **THE COURT:**  Okay.

15         **MR. FRENTZEN:**  I don't think it's appropriate and I

16   don't see it happening all the time.

17         **MR. REEVES:**  I'd like to --

18         **THE COURT:**  And I'll let you make any record you want

19   to make outside the presence of the jury.

20         **MR. FRENTZEN:**  Thank you, Your Honor.  I appreciate

21   that.

22         **THE COURT:**  This is not a jury consideration.

23         **MR. REEVES:**  I'd like to note one thing for the

24   record.  That Exhibit 2104, which the Government did admit and

25   which the agent did testify to, specified that the deals were

1    for software, hosted, and maintenance --

2            **MR. FRENTZEN:**  Yeah.  I put in the same information.

3            **MR. REEVES:**  -- just like the language in the

4    Exhibit 2102 that Mr. Keker just admitted into evidence and for

5    which the Government had no objection.

6            **THE COURT:**  Okay.  Got it.

7            **MR. FRENTZEN:**  I put it in.

8            **THE COURT:**  Thank you.

9            **(The following proceedings were heard in open court:)**

10           **THE COURT:**  Okay.  Ladies and gentlemen, there has

11   been a few questions asked of this witness relating to I think

12   it's 2102 -- if I have the number right -- was it in a binder,

13   why wasn't it produced, who made the decision, and so forth;

14   and obviously, number one, I am striking those questions or the

15   responses to those questions.  It's not for you to consider.

16       There are literally hundreds of thousands of documents in

17   this case.  I don't know what any attorney or witness knew

18   about the documents at any given time, how they chose to go

19   through them, what they thought the relevant value of any

20   case -- of any particular document is.  Those are decisions

21   that you can't consider.

22       What you can consider, obviously, are documents that are

23   presented to you and what you believe those documents show or

24   don't show, and that's for your consideration.  It is not for

25   your consideration as to the motivation or work product of any

1    counsel, whether it be for the Government or for the Defense,

2    as to why you were shown what you were shown or not shown --

3    what was or wasn't shown.

4        So I don't know whether I've made it clearer or worse, but

5    I'm striking the questions and the responses and instructing

6    you not to consider the issues that were raised by virtue of

7    the question.

8        Now, go ahead, Mr. Keker.

9            MR. KEKER:  And, Your Honor, as I understand it, the

10   jury can consider 2102 and what it says.

11           THE COURT:  Of course.

12           MR. KEKER:  Okay.  Let's put that back up.

13   Q.   The language up here -- blow up "Recognized revenue from

14   software, maintenance, and hosted 2010 and 2011 to date."

15       That was also language that Hewlett Packard told Autonomy

16   that it wanted, wasn't it?

17   A.   I don't know.

18   Q.   Okay.  Look at 6528, please, an e-mail to Mr. Menell and

19   Dr. Lynch from HP.  And this is in our cross binder.

20           THE COURT:  So it hasn't been received in evidence?

21           MR. KEKER:  Oh, okay.  6528 is in evidence.  Let's

22   look at it.

23           THE COURT:  Is it?

24           MR. KEKER:  I thought he said -- okay.  Then keep it

25   down.

```
 1              THE CLERK:  No.

 2              MR. KEKER:  I thought it wasn't in evidence.

 3              THE COURT:  I'm out.  Is it in evidence?

 4              MR. KEKER:  No, I don't think so.

 5              THE COURT:  Okay.  It's not in evidence.

 6         Is there an objection?

 7              MR. FRENTZEN:  There is, Your Honor.

 8              THE COURT:  Okay.  So I need to look at it.  Okay?

 9    6528.

10                       (Pause in proceedings.)

11              MR. KEKER:  If there's a problem, I'd like to be heard

12    on this, Your Honor.  This goes to people whose state of

13    minds --

14              THE COURT:  Okay.  Let me look at it first.

15              MR. KEKER:  Right.

16              THE COURT:  I have to look at it.  Okay?

17              MR. KEKER:  All right.

18                       (Pause in proceedings.)

19              THE COURT:  It's an e-mail from Jerome Levadoux to --

20              MR. KEKER:  It's from HP to Mr. Menell and Mr. Lynch

21    with a copy to Ms. Breya at HP.

22              MR. FRENTZEN:  I have an objection obviously.

23              MR. KEKER:  And the state of mind of the recipients is

24    something that you've deemed relevant, Your Honor.

25              THE COURT:  Recipients?  Who are the recipients?
```

```
 1              MR. KEKER:  The recipients are Menell and Lynch at

 2   Autonomy.

 3              THE WITNESS:  Is the date relevant as well?

 4              MR. KEKER:  Pardon?

 5              THE COURT:  It's August 7th, 2011.

 6              MR. FRENTZEN:  It's after the list.

 7              MR. KEKER:  It's in the middle of due diligence.

 8              MR. FRENTZEN:  It's after what we just looked at.

 9              THE COURT:  Let me look at it and try to figure this

10   out.

11              MR. FRENTZEN:  Seriously, Your Honor.

12                        (Pause in proceedings.)

13              THE COURT:  And Jerome Levadoux is whom?

14              MR. KEKER:  HP, involved in due diligence at HP.

15              THE COURT:  And he's not testified?

16              MR. FRENTZEN:  We could have heard about this during

17   due diligence witnesses, Your Honor.

18              THE COURT:  Pardon?

19              MR. FRENTZEN:  We could have heard about this during

20   due diligence witnesses, Your Honor.

21              THE COURT:  Well, I don't know that they're restricted

22   to a particular witness.

23              MR. FRENTZEN:  I'm saying this witness has got no

24   personal knowledge of this document.  It comes in from -- it's

25   clearly hearsay and it doesn't go to the defendant and it's not
```

1    in the time period in which he had just described.

2            MR. KEKER:  It goes to people --

3            MR. FRENTZEN:  It's actually subsequent to what he

4    just described.

5            MR. KEKER:  It goes to people whose state of mind you

6    have deemed relevant in dealing with our objections,

7    Your Honor.  And 806 is another citation I give for it.

8            THE COURT:  I mean, I don't see how it's particularly

9    relevant.  That's the concern I have.

10            MR. KEKER:  It's relevant --

11            THE COURT:  Is there a particular portion of this

12    e-mail that --

13            MR. KEKER:  Yes.  Yes, Your Honor.  It shows down at

14    the bottom next-to-the-last where the numbers are, 2008,

15    2009 --

16            THE COURT:  2008, 2009 --

17            MR. KEKER:  -- revenue and then it goes on to say what

18    they want, how they want this revenue explained, and it's

19    consistent with what Mr. Hussain is talking about.

20            THE COURT:  I'm going to allow it during that period.

21        (Trial Exhibit 6528 received in evidence)

22            MR. KEKER:  All right.  Let's put it up, 6528.

23    Q.   Agent Bryant, this is from Jerome Levadoux with a copy to

24    Marge Breya.  Do you know who Marge Breya was?

25    A.   I can see she has an HP e-mail address.

**BRYANT - CROSS / KEKER**

1    **Q.**   But was she somebody leading the due diligence?

2    **A.**   I do not recall.

3    **Q.**   Okay.  And do you recognize the P -- do you recognize the

4    addressees, the "To" lines?

5    **A.**   Yes.  Mr. Menell and Mr. Lynch.

6    **Q.**   Okay.  They're at Autonomy.

7    And this is (reading):

8       "Mike, Pete -

9       "Thanks for all the time for presentation and demos

10    this week.  We got a lot of information we were looking

11    for.  We were very impressed by the breadth and

12    capabilities of your product portfolio."

13    And then down at the bottom "2008, 2009, 2010" -- okay.

14    I'm sorry.  (reading)

15       "Other terms still missing from the data room 2008,

16    2009, 2010 revenue split by license, support, and services

17    by product and region."

18    That's not a request for hardware, is it?

19       **MR. FRENTZEN:**  This is not the copy before you,

20    Your Honor.  This is totally misleading.

21       **THE COURT:**  Sustained.

22       **MR. KEKER:**  My question was that's not --

23       **MR. FRENTZEN:**  It was sustained.

24       **MR. KEKER:**  Okay.

25    **Q.**   What is that a request for?

1              MR. FRENTZEN:  Move to strike.

2              THE COURT:  I don't know that she has information on

3    that subject.

4              MR. KEKER:  All right.

5    Q.   You do have information that the contracts that were in

6    the data room did include hardware, don't you?

7    A.   Yes.  I think in Mr. Gersh's testimony the UBS contract

8    had hardware as part of it.

9    Q.   Let me ask you some questions about 2984.  That's your --

10   the chart, the summary chart, that was admitted conditionally.

11        Who made that chart?

12   A.   There's a forensic accountant on the FBI, and I reviewed

13   the native file with her.

14   Q.   Okay.  And what records did you personally review to make

15   this chart?

16   A.   I've reviewed Exhibit 2712.  This is also not the most --

17   we revised it this morning and provided you a hard copy.  This

18   is --

19   Q.   Oh, I see.  Okay.  So this -- I'm sorry.  This is the

20   wrong one.

21              THE COURT:  Okay.

22              MR. KEKER:  Do you have it?  Please bring it up.

23              THE COURT:  I don't know what the right one is.

24              MR. FRENTZEN:  We gave it to you this morning.

25              MR. KEKER:  I know.  I have a copy but I don't have a

BRYANT - CROSS / KEKER

1    way to show it.

2              **THE COURT:**  You can show it on the Elmo.

3              **MR. KEKER:**  Great.  No, we've got it right here.  This

4    is the one you gave me this morning.

5              **THE COURT:**  Okay.

6    **BY MR. KEKER:**

7    **Q.**   Okay.  And whose records -- were these made from

8    Ms. Anderson's records?

9    **A.**   The first and third column with numbers, Exhibit 2712 was

10   admitted by Ms. Anderson and it was records she pulled from her

11   access to Autonomy Systems.

12   **Q.**   Okay.  And then what's the -- the next column says what?

13   **A.**   2627.  It is the numbers from the top 40 customer list.

14   **Q.**   Oh, I see.

15        Okay.  So whatever this top 40 customer -- what

16   Ms. Anderson did is go into the files and look for, as she

17   testified, look for everything that she could find and she

18   found SHI had sold $56 million worth of hardware; right?

19   **A.**   She pulled revenue for all their customers and I created

20   it by customer.

21   **Q.**   And then the next column is something that you got -- of

22   the list that you got from Autonomy -- or, excuse me -- that HP

23   got from Autonomy?

24   **A.**   Yes.  It's what was in the data room.

25   **Q.**   And so one thing that's important would be to understand

1  what the list was that they gave to HP, what they -- what it

2  was meant to be; right?  Right?

3         THE COURT:  I'm sorry.  I think -- I'm looking at

4  this.  Maybe I don't understand the chart, but the chart refers

5  to Exhibit 2627.  Now, that exhibit then is compared, as I

6  understand it, to other information.

7         MR. KEKER:  Absolutely.

8  Q.  And my question is:  You need to understand -- to make any

9  kind of meaningful comparison, you need to understand what that

10  list was supposed to be by agreement of the parties; right?

11        MR. FRENTZEN:  Objection.  It's actually

12  argumentative.  She just took the numbers on the list that was

13  submitted to the data room.

14        THE COURT:  Sustained.

15  BY MR. KEKER:

16  Q.  Well, I mean --

17        THE COURT:  I think you can argue it.  No one says you

18  can't argue it, but she's not the -- she's not going to --

19        MR. KEKER:  Okay.

20  Q.  But, like, we've heard testimony from -- who was it that

21  said he thought the list was meaningless?  Was that Mr. Gersh?

22        MR. FRENTZEN:  Objection.  That misstates the

23  evidence.

24        THE COURT:  Okay.  Sustained.

25        MR. KEKER:  Somebody --

 1   Q.    Okay.  Somebody said the list was meaningless.  Do you

 2   remember who it was?  You probably remember better than I do?

 3        MR. FRENTZEN:  Objection.  That misstates the

 4   testimony.

 5        THE COURT:  Okay.

 6        MR. KEKER:  Never mind.

 7   Q.    Look at IBM.  You go into certain records and you find out

 8   there's $18 million worth of something in the Autonomy books

 9   and records, and in some other list they're talking about deals

10   with Met Life and Am Ex.  Those are software deals; right?

11   A.    I'd have to review the contract.

12   Q.    Do you know what agreement had been reached in terms of

13   the redacted abbreviated lists that were going to be provided

14   about whether or not you were going to list -- instead of the

15   customer, you were going to list the nature of the industry

16   that the end user came from?

17        MR. FRENTZEN:  I'm sorry.  I don't understand the

18   question.

19   BY MR. KEKER:

20   Q.    If you're delivering -- do you know -- you heard Mr. Sarin

21   talk about this some, didn't you?  Mr. Sarin --

22        MR. FRENTZEN:  Objection.

23   BY MR. KEKER:

24   Q.    -- said that they --

25        MR. FRENTZEN:  Objection.  We shouldn't just be

 1  reading other people's testimony.

 2  BY MR. KEKER:

 3  Q.   You were here when Mr. Sarin testified, weren't you?

 4  A.   Yes.

 5  Q.   Okay.  And you remember he said --

 6         MR. FRENTZEN:  Objection.  Is he trying to impeach?  I

 7  don't know why he's reading other testimony.

 8         MR. KEKER:  No.  I'm just reminding her.  He said

 9  that --

10         THE COURT:  I don't know.  Reminding her of what?

11         MR. KEKER:  That he said that they were interested in

12  the end customer.  Sarin wanted the end customer.

13         THE COURT:  Okay.  But that actually is an argument as

14  to -- as to the case, so I think that you can't -- all she is

15  saying, as I understand it, is you take this exhibit, you take

16  that exhibit, and you take the third exhibit, and these are the

17  numbers.

18         THE WITNESS:  Yes.

19         THE COURT:  These are the numbers.  Now, if you want

20  to argue these numbers are meaningless or they're wrong or

21  they're not consistent, and so forth, of course, you're free to

22  do that; but this witness is not going to say, "You know,

23  Mr. Keker, you're absolutely right.  Thinking about it, looking

24  at the case, I evaluate it just the way you do."

25      And that may or may not be her testimony.  It may or may

 1    not be interesting.  I wouldn't allow it.  I wouldn't allow it

 2    one way or the other because she's not here to give her opinion

 3    as to either the consequences or the impact of these things.

 4    She's simply here to say, "This is what happened mechanically.

 5    It was voluminous records.  We went through, conducted an

 6    analysis, and here are the figures we came up with."  That's

 7    it.

 8            MR. KEKER:  Fair enough.

 9            THE COURT:  Okay.

10    BY MR. KEKER:

11    Q.   Citigroup, line 14, Ms. Anderson came up with $14 million

12    of something.  The list provided that you're taking the

13    column B from says $21 million, and there's nothing in

14    hardware.  The jury has heard about hardware being sold to

15    Citigroup; right?  Where's the hardware in Citigroup?

16    A.   I believe when Ms. Anderson testified, you know, she

17    pulled the data from the systems and not necessarily everything

18    was tagged.

19    Q.   Okay.  Okay.  I mean, so what does this summary show, if

20    anything?  What's it all about?

21    A.   It's comparing the values we asked Ms. Anderson to look at

22    the books and records of Autonomy and pull top revenue to the

23    best of her ability and we're listing that sorted compared to

24    what was put in the data room for HP.

25    Q.   Look at, if you would, please, I think it's 2066.  Can we

1    put that back up?  The next page.

2        I'm sorry.  This list.  This is back in July when they're

3    starting on this project.  The number one customer name is

4    Bank of America and the total is $63 million; right?

5    **A.**    I believe this time period also includes 2009 if you go to

6    the top of the sheet -- or to the e-mail.

7    **Q.**    Okay.  But they're sorting out -- over this two-day period

8    they're trying to sort a lot of data and get something that

9    they have negotiated with the other side they will provide;

10   right?

11            **MR. FRENTZEN:**  Objection.  Foundation.  Argument.

12            **THE COURT:**  Sustained.

13   **BY MR. KEKER:**

14   **Q.**    Well, I mean, you come up -- ah, never mind.  Okay.

15   **A.**    This includes 2009 and our summary is 2010 to 2011.

16   **Q.**    Okay.  All right.  Let me ask you some different

17   questions.

18        The Government asked Hewlett Packard to provide records of

19   Hewlett Packard hardware sales to Autonomy preacquisition for

20   resale to Autonomy; right?

21   **A.**    I was not involved in that discussion or may not have been

22   on the case yet.

23   **Q.**    Look at 6779, please, in your binder.

24   **A.**    (Witness examines document.)

25   **Q.**    It's in the back.

BRYANT - CROSS / KEKER

```
 1   A.   Yes.
 2             THE COURT:  Okay.  Well, wait.  Wait.  Wait.
 3                  (Pause in proceedings.)
 4             MR. FRENTZEN:  Objection.
 5             THE COURT:  Sustained.  I'll deal with this outside
 6   the presence of the jury.
 7   BY MR. KEKER:
 8   Q.   Okay.  Are you --
 9             THE COURT:  This is a communication with the
10   Government, and I'll deal with it outside the presence of the
11   jury.
12   BY MR. KEKER:
13   Q.   Are you aware in the files of -- you're the case agent --
14   in the files of the Government that there is a schedule showing
15   Hewlett Packard's sales to Autonomy for resale to other
16   customers before the acquisition?
17             MR. FRENTZEN:  Objection.
18             THE COURT:  I'll allow it.
19             THE WITNESS:  I would need to go check.  There are
20   numerous documents.
21   BY MR. KEKER:
22   Q.   Would you look at 6779?  Turn the page and look at the
23   attached schedule.
24   A.   (Witness examines document.)  Yes.  This looks like it was
25   provided to us.
```

1          **MR. KEKER:**  Okay.  I'd move it in, Your Honor.

2          **MR. FRENTZEN:**  Objection.

3          **THE COURT:**  I'll allow it.

4      (Trial Exhibit 6779 received in evidence)

5          **MR. KEKER:**  Okay.  Could we put it up?

6  **Q.**   This is attached to an e-mail from Hewlett Packard to the

7  Government, and it lists HP's sales of hardware to Autonomy for

8  resale to other customers; right?  It goes on for three

9  pages -- two pages.

10          Let's get down to the bottom, actually.  The next page,

11  Jeff.  And can we blow up the totals?

12          It lists $15 million worth of total invoice value.

13          **MR. FRENTZEN:**  Objection.  Excuse me, Your Honor.

14  This witness has no knowledge of this document or how it was

15  prepared.  There may be witnesses for this that they can call

16  but this isn't it.

17          **THE COURT:**  Sustained.

18          **MR. FRENTZEN:**  I move to strike it.

19          **THE COURT:**  It is what it is.

20          **MR. KEKER:**  All right.  It is what it is.

21          **THE COURT:**  It's admitted into evidence.

22          **MR. KEKER:**  Got it.

23          **THE COURT:**  Yeah, right.

24  BY MR. KEKER:

25  **Q.**   And then look also at the 6780.  It appears to be the same

1  thing with another spreadsheet attached of HP sales.

2  **A.**    (Witness examines document.)

3         **MR. FRENTZEN:**  Same objection.

4  **BY MR. KEKER:**

5  **Q.**   HP providing a list of its sales to Autonomy to the

6  Government.

7         **THE COURT:**  As to the letter, I'm not going to permit

8  it.

9         **MR. KEKER:**  Okay.

10  **Q.**   How about the list that's attached, sales of HP hardware

11  identified to date?

12        **MR. FRENTZEN:**  Objection.  Foundation.  I mean, they

13  can get a witness for this.  This is not --

14        **MR. KEKER:**  Well, we've got it.

15        **THE COURT:**  Sustained.

16        **MR. KEKER:**  We can call Ms. Resley.  She's sitting

17  here in the courtroom.

18        **MR. FRENTZEN:**  Go for it.

19        **MR. KEKER:**  We move in 6780, the letter.

20        **THE COURT:**  I'm going to allow it.  Let's get with it.

21     (Trial Exhibit 6780 received in evidence)

22        **MR. KEKER:**  All right.  That's fine.  Let's move on.

23     Go ahead, Jeff.  Put it up.

24  **Q.**   There's the schedule.  The jury can look at it at its

25  leisure.

1          **THE COURT:**  I don't expect they'll have much leisure.

2          **MR. KEKER:**  Or not.  Or not.

3    **Q.**   Questions about Poste Italiane, which I probably

4    mispronounced it too.

5          The Deloitte audited the delivery of the software to

6    Poste Italiane, didn't they?

7    **A.**   I believe they audited the transaction.

8    **Q.**   Pardon?

9    **A.**   I believe they audited the transaction.  I don't know

10   about the specifics.

11   **Q.**   Would you look at 6773, please?

12   **A.**   (Witness examines document.)

13   **Q.**   And if you go -- 6773 is an e-mail from Mr. Murray at

14   Deloitte to Mr. Chamberlain.

15         **MR. KEKER:**  I move it in, Your Honor.

16         **MR. FRENTZEN:**  I object, Your Honor.

17         **THE COURT:**  I'll allow it.  Admitted.

18         (Trial Exhibit 6773 received in evidence)

19   **BY MR. KEKER:**

20   **Q.**   Look at the second page, please.  Chamberlain is writing

21   to the auditors (reading):

22             "Delivery.  This method of delivery has often been

23         used in Italy," and so on.

24         Again, I'm not going to linger on it, but do you recall

25   having seen this, that Deloitte audited whether or not the

1    delivery of the software to Poste Italiane was timely and

2    proper?

3    **A.**    I see that they're auditing the transaction and

4    specifically asking about delivery.

5    **Q.**    Okay.  And the effective date of the transaction was

6    31 December what year?  2000 --

7    **A.**    '9.

8    **Q.**    2009.  And then there was some -- well, look at 554,

9    please.

10            **THE COURT:**  Sorry?

11            **MR. KEKER:**  554 in the --

12            **THE COURT:**  554.

13            **MR. KEKER:**  -- in the cross binder.

14            **THE WITNESS:**  (Witness examines document.)

15   **BY MR. KEKER:**

16   **Q.**    And this is --

17            **THE COURT:**  Is it in evidence?

18            **THE CLERK:**  No.

19            **MR. KEKER:**  I'd move it in, Your Honor.

20            **THE COURT:**  Okay.  Let me look at it.  Wait.  Wait.

21   Wait.  554.

22                      (Pause in proceedings.)

23            **MR. KEKER:**  I think it may be the same as --

24            **MR. FRENTZEN:**  I think this is already in.

25            **THE COURT:**  Well, anyway, 554 admitted.

1          (Trial Exhibit 554 received in evidence)

2          **MR. KEKER:**  Okay.

3   **Q.**   554.  So let's see what 554 is.  That's from the scanner

4   to Schern -- I don't know, never mind -- to Mr. Westwood on

5   January 15th, and the first few pages are the agreement with an

6   effective date of December 31 '09; right?  And it's signed on

7   the signature page?

8          Can we look at the signature page?

9          Mr. Kanter signs it.  It's signed by Sales Consulting.

10  Mr. Kanter signs it on January 15, 2010; right?

11  **A.**   That's what the signature block says, yes.

12  **Q.**   Do you know when that agreement was made?  The effective

13  date is December 31.  Do you know when the agreement between

14  the parties was made?

15         **THE COURT:**  I'll sustain the objection.

16         **MR. FRENTZEN:**  Thank you, Your Honor.

17  **BY MR. KEKER:**

18  **Q.**   Look back further at the letter.  It's '09.  The letter

19  that you were shown before, this is dated December 31, '09,

20  signed by Mr. Kanter.  That is not the contract; is it?

21  **A.**   No.

22  **Q.**   Okay.  This is something that says if the deal doesn't

23  work out, you can sell the software to somebody else; right?

24  **A.**   It's a letter, yes.

25  **Q.**   Okay.  But whether or not the deal was made on

1    December 31, '09, is not affected by this letter, is it?

2          **THE COURT:**  Sustained.

3    **BY MR. KEKER:**

4    **Q.**    Look at the next page, "Proof of Delivery."  What's the

5    date of the dispatch, date dispatch where the software was sent

6    off?

7    **A.**    It states December 31st, 2009.

8    **Q.**    Thank you.

9          And then look at 6777, please.

10          **THE COURT:**  Any objection?

11          **MR. FRENTZEN:**  Well...

12          **THE COURT:**  I'm going to admit it.

13          **MR. FRENTZEN:**  All right.

14          (Trial Exhibit 6777 received in evidence)

15    **BY MR. KEKER:**

16    **Q.**    This is proof of delivery for the Auxilium deal; right?

17    Confirmation of delivery to Deloitte?

18    **A.**    (Witness examines document.)  I see a confirmation letter

19    signed.

20    **Q.**    Well, if you look at the second page, Ms. Hird of Deloitte

21    is writing to Mr. Mastroiani and says, "As part of the

22    quarterly review, we sent confirmation requests," blah blah

23    blah.

24          And then on the next page Mr. Mastroiani writes to Adriana

25    Murrah, who is the personal assistant, writes back and says

```
 1   (reading):

 2              "As requested, please find attached the documents

 3         signed."

 4         And then Ms. Hird sends it on to Tom Murray; right?

 5         And if we could read Italian, we'd know what the bottom

 6   e-mail said; right?

 7   A.   Yes.  It's a confirmation letter.

 8   Q.   Okay.  Thanks.

 9         There's been much said about SPE, and I want to know

10   whether or not you're aware of any -- and whether or not there

11   was a differentiator, and so on.

12         Are you aware of any records in the case that show that

13   Morgan Stanley was very interested in SPE?

14   A.   I believe there are records with Morgan Stanley employees

15   discussing SPE.

16   Q.   Okay.  Can we look at 6264?

17              MR. FRENTZEN:  Objection.

18              THE COURT:  Well --

19              MR. FRENTZEN:  There's also -- there's two issues

20   here, Your Honor.

21              THE COURT:  And they are?

22              MR. FRENTZEN:  There's two different SPE issues.

23   There's SPE for the archiving and there's SPE for search.

24   They're two different things.  I know because I talked to them.

25   There's witnesses about this and she's just not it.
```

1        **THE COURT:**  I think this person is just not the

2    witness for it.

3        **MR. KEKER:**  I'm just going to ask about one document

4    and that's 6264.

5        **MR. FRENTZEN:**  Well, the document, I can almost

6    guarantee that I haven't looked at it, is going to be

7    misleading.

8        **MR. KEKER:**  Well, why don't we find out if it's

9    misleading, Mr. --

10        **MR. FRENTZEN:**  Well, then we've got to bring somebody

11    from Morgan Stanley, which is what he ought to do if he wants

12    to make this point.

13        **THE COURT:**  I don't think this is the witness to allow

14    that.  I may allow it otherwise but not -- but not now, so

15    objection sustained.

16    **BY MR. KEKER:**

17    **Q.**    Okay.  You were asked some questions about SOP 97-2 and

18    whether or not -- and you were shown some things where

19    Mr. Hussain said we follow whatever you said.  I can't remember

20    exactly.  Have you ever read SOP 97-2?

21        **THE COURT:**  Sustained.  I mean, I think she identified

22    the document.  I don't know that she can -- whether she's read

23    it or not seems to be not relevant.

24        **MR. KEKER:**  Okay.  Well, then --

25        **MR. FRENTZEN:**  I'd offer it into evidence, Your Honor.

1          MR. KEKER:  Okay.  Done deal.  It's in.  Let me show

2    it to her.

3          THE COURT:  We're making a lot of headway here --

4          MR. KEKER:  We are.

5          THE COURT:  -- notwithstanding -- this is like a

6    little bit trial by ambush.

7          MR. KEKER:  Mr. Frentzen and I agree.

8          THE COURT:  Okay.  Whether it's in or not, I'll allow

9    it in; however, I'm not going to allow questions of this

10   witness on that subject.  She's not an expert in it.  She's not

11   offered for that purpose.

12      There we are.  Okay.

13         MR. KEKER:  Could I get --

14         THE COURT:  So it's in.

15     (Trial Exhibit 8273 received in evidence)

16         MR. KEKER:  Could I read one paragraph?

17         THE COURT:  No, actually you can't because she's not

18   going to testify about it.

19         MR. FRENTZEN:  And I may need a couple portions of

20   U.S. GAAP that it refers to.

21         THE COURT:  All right.  Anyway, this seems to be a

22   matter of negotiation, ladies and gentlemen of the jury, and

23   we'll get to that later, but I'm not going to allow her to

24   testify on that subject.  Okay?

25         MR. KEKER:  Okay.  We have perhaps -- well.

1    **THE CLERK:**  What was the exhibit number?

2    **MR. KEKER:**  Pardon?

3    **THE CLERK:**  The exhibit number?

4    **MR. KEKER:**  What is the exhibit?  What's our next

5    exhibit?

6    **THE COURT:**  We'll deal with that later.  I don't want

7    to -- I think we're about --

8    **MR. KEKER:**  Could I have one second, Your Honor?

9    **THE COURT:**  Yeah, sure.  Maybe we're finished.

10    (Pause in proceedings.)

11    **MR. KEKER:**  No further questions.  Thank you,

12    Agent Bryant.

13    **THE COURT:**  Okay.  So, ladies and gentlemen, we'll

14    take our recess.  We're stopping at 12:15.  We'll resume at

15    1:15.

16    Remember the admonition given to you:  Don't discuss the

17    case, allow anyone to discuss it with you, form or express any

18    opinion.

19    (Proceedings were heard out of the presence of the jury:)

20    **THE COURT:**  All right.  Let the record reflect the

21    jurors have retired.

22    So what I need to know, because I'm about to start an

23    evidentiary hearing in a criminal matter, is where we are.  I

24    don't want to get into the arguments that are being back and

25    forth, but I just need to know for scheduling purposes where we

PROCEEDINGS

1    are.

2        We are at the point where you would do redirect if that's

3    appropriate.  When I say "appropriate," I mean -- do you have

4    redirect?

5        **MR. FRENTZEN:**  I might have a few minutes, Your Honor,

6    and then I'm done on redirect.

7        **THE COURT:**  Okay.  And then the Government rests; is

8    that correct?

9        **MR. FRENTZEN:**  That is -- that is correct, Your Honor.

10       **THE COURT:**  Okay.  So then we would go into -- we

11   would go into the first witness that the Defense wishes to

12   call, who is?

13       **MR. KEKER:**  Ms. Lesjak, CFO of HP.

14       **THE COURT:**  Okay.  And we need to deal with some of

15   the issues with respect to her.

16       **MR. FRENTZEN:**  Correct, Your Honor.

17       **THE COURT:**  So what I propose is for the parties to

18   come back at 1:00 o'clock, 15 minutes before the jury, and I'll

19   try to go through those issues.  Hopefully I'll be able to get

20   through them in 15 minutes.

21       **MR. FRENTZEN:**  Your Honor, that's great.

22       **THE COURT:**  Do you think we'll be able to get through

23   in 15 minutes, or does it look --

24       **MR. LEACH:**  Yes.

25       **THE COURT:**  Yes.  Mr. Leach tells me yes.  Actually,

**PROCEEDINGS**

1  he's the only one who's absolutely kept to his estimates.

2  These other people have been --

3        **MR. KEKER:**  He's only --

4        **THE COURT:**  -- widely inaccurate.

5        **MR. KEKER:**  He's only missed them by 200 percent every

6  time.

7        **THE COURT:**  Okay.  But that's better.

8        **MR. KEKER:**  But that's consistent.  It's consistent.

9        **THE COURT:**  Okay.  We're in recess now, and I will

10  call the other criminal matter.

11        **MR. FRENTZEN:**  Your Honor, I'm sorry.

12        **THE COURT:**  Yes.

13        **MR. FRENTZEN:**  This is the binder that the agent put

14  together for me for testimony.  I'm sorry.

15        **THE COURT:**  I don't even think it's an issue.

16        **MR. FRENTZEN:**  There's no 2102.  I'd like to lodge it

17  with the Court during the break.

18        **THE COURT:**  No.  You want me to look at it?

19        **MR. FRENTZEN:**  So that I -- no, but I don't want it in

20  my hands.  I have not modified it, and so I can show it to the

21  agent that I had no 2102 --

22        **THE COURT:**  No.

23        **MR. FRENTZEN:**  -- in my binder.

24        **THE COURT:**  You know what you do?  Show it to

25  Mr. Keker.

PROCEEDINGS

1          **MR. FRENTZEN:**  I already did.

2          **THE COURT:**  Okay.  So if he accepts it --

3          **MR. KEKER:**  I mean, if we go into that, that opens --

4          **THE COURT:**  It's finished.  It's finished.

5          **MR. FRENTZEN:**  I didn't start it.

6          **MR. KEKER:**  Okay.  But he's planning to show the agent

7    something about his binder --

8          **THE COURT:**  No, he's not.

9          **MR. KEKER:**  -- and if we go there, then we're going to

10   go there.  And I took your --

11         **THE COURT:**  Don't make any threats.

12         **MR. KEKER:**  No, no.

13         **THE COURT:**  He'll do what he wants to do.

14         **MR. KEKER:**  I'm not.

15         **THE COURT:**  I've stricken it so I don't know why he

16   would want to raise it again.  I've stricken it.  I've stricken

17   it.

18         **MR. KEKER:**  Well, that's what I thought, and so -- but

19   if he reopens it, then it's reopened.

20         **MR. FRENTZEN:**  As I said -- as I said at the sidebar,

21   it was a false accusation.  Thank you.

22         **THE COURT:**  Who wants the last word?

23         **MR. KEKER:**  I don't.

24         **THE COURT:**  Okay.  There we go.

25       See, that's what age does, Mr. Frentzen?  You see, age

**PROCEEDINGS**

1    dictates that you step back.  Having made your point, you step

2    back.

3            **MR. KEKER:**  Age before wisdom.

4            **THE COURT:**  From age, that's where the wisdom comes

5    from.

6                (Luncheon recess taken at 12:18 p.m.)

1    **Afternoon Session**                                      **12:59 p.m.**

2         (Proceedings were heard out of presence of the jury:)

3         **THE COURT:**  Let the record reflect that we're meeting

4    outside the presence of the jury and operating on the

5    assumption that the Government will rest.

6         **MR. FRENTZEN:**  Your Honor, apparently not.

7         **THE COURT:**  Not operating on that assumption?

8         **MR. FRENTZEN:**  Well, so I will have some redirect.  I

9    think it will be short.  And then we apparently have a witness

10   on the timestamp issue, which I think Mr.--

11        **THE COURT:**  Can't we get an agreement?  I mean, it

12   seems to me -- is it not --

13        **MR. FRENTZEN:**  If we can, then we don't need to call

14   him.  He's an IT guy from Hewlett-Packard that we had --

15        **THE COURT:**  I'll tell you.  I have an idea.

16      Mr. Marais, get up here.  Mr. Marais, come here.

17   Mr. Marais.

18        **MR. MARAIS:**  Good afternoon, Your Honor.

19        **THE COURT:**  You speak English, don't you?

20        **MR. MARAIS:**  I speak an variation of English, yes,

21   sir.

22        **THE COURT:**  Where are you from?

23        **MR. MARAIS:**  South Africa originally.

24        **THE COURT:**  Have you spent any time in Great Britain?

25        **MR. MARAIS:**  I have.

**PROCEEDINGS**

 1        **THE COURT:**  All right.  So you're an expert.  So I

 2   want you to meet -- who is the person who knows something about

 3   this on your side?

 4        **MR. FRENTZEN:**  Mr. Reeves, Your Honor, who I think is

 5   currently talking to the witness.

 6        **THE COURT:**  I want you to go out there and talk to

 7   Mr. Reeves.

 8        **MR. MARAIS:**  Okay.

 9        **THE COURT:**  And see whether you guys can get an

10   agreement.

11        **MR. MARAIS:**  Okay.

12        **THE COURT:**  Goodbye.

13        **MR. MARAIS:**  Thank you.

14        **MR. KEKER:**  Highest and best use.  I'm not sure

15   Mr. Marais agrees.

16        **THE COURT:**  I knew he was in this case for some

17   reason.  I just had to figure out what it was.  No.  He's

18   wonderful.  That's not an issue.

19     So let's see if we can get an agreement on that.

20        **MR. FRENTZEN:**  And then I think that's it for the

21   Government.

22        **THE COURT:**  Let's talk about Ms. Lesjak because that's

23   who the Defense wishes to call.  And I have -- I have a -- in

24   some form, I think I have an offer of proof from the Defense as

25   to what she would testify to.

PROCEEDINGS

1          **MR. KEKER:**  Only after -- the offer of proof is after

2    October 3rd when we understand we can't go into anything.  And

3    I had a question about that.  She --

4          **THE COURT:**  So you know what I'm working off of, I'm

5    working off of the Defendant's offer of proof, which was filed

6    April 18th.  It's Document No. 349.  And I'm looking at page 4,

7    and it has Catherine Lesjak on it.

8          **MR. KEKER:**  Yes, sir.  And that's what she would

9    testify to if I asked her questions after October 3rd, and I

10   had understood that I'm not going to ask her questions about

11   October 3rd, so that's why it's in the offer of proof.  I have

12   questions to ask her about the merger and how it happened up to

13   October 3rd.

14         **MR. FRENTZEN:**  And there is a couple of those

15   exhibits --

16         **THE COURT:**  All right.  Okay.

17         **MR. FRENTZEN:**  Sorry.

18         **THE COURT:**  We're not dealing with that.  We're

19   dealing up to October 3rd now.

20         **MR. FRENTZEN:**  Okay.  I didn't understand --

21         **THE COURT:**  Well, now we understand it.

22         **MR. FRENTZEN:**  Okay.  Great.

23         **THE COURT:**  Now, the question is any objection to her

24   testifying up to October 3rd?

25         **MR. FRENTZEN:**  Yes, Your Honor.  Just with respect to

**PROCEEDINGS**

1    a couple of documents that I think I got last night that appear

2    to me --

3              THE COURT:  And what are they?

4         MR. FRENTZEN:  -- to be hearsay and also related to an

5    issue that I thought the Court had struck once upon a time.

6         So I've got to put my hands on them.

7              THE COURT:  Take a moment -- take a moment.  Maybe

8    Mr. Keker has them.

9         MR. FRENTZEN:  They're the two I got -- here you go.

10   I've got them.  Oh, no.  These are not them.  These are the

11   ones I want to put in.

12        MR. LEACH:  I can describe it, Your Honor.  It's an

13   August 19th, 2011 email from a Barclays banker or presumably a

14   banker to Ms. Lesjak that makes some reference to a tax issue.

15   Presumably it has something to do with how HP is going to

16   account for the transactions on its tax returns.

17        We had filed a motion in limine to exclude evidence of the

18   tax treatments of the Autonomy acquisition.  If you remember

19   during Mr. Apotheker's testimony, there was a document which

20   made some reference to it.  The United States renewed its

21   objection at that point and it was sustained and Mr. Keker

22   moved on.

23        I'm not sure what their intention with this particular

24   document is, but it appears to raise that same concern.

25             THE COURT:  Okay.

1          **MR. FRENTZEN:**  It's also hearsay.

2          **THE COURT:**  Mr. Keker?

3          **MR. KEKER:**  Your Honor, these are subjects I'm just

4    going to bring up any way.  She is a director of Bidco.  Bidco

5    is the company that is suing Mr. Hussain.  I want to bring out

6    that she is a director of Bidco because that makes her --

7          **THE COURT:**  That may be fine.  I'm talking about the

8    tax treatment of the -- I don't know whether it's fine or not.

9    I need you -- I need you to address this particular document,

10   the August 19th, 2011 document.

11         **MR. KEKER:**  The document which is labeled 8222 is an

12   email from Barclays Capital to Cathie Lesjak saying "I know you

13   were in tough meetings."  This shows the investor reaction to

14   the merger announcement, which is what led to Mr. Apotheker's

15   firing, and she says, among other things --

16         **THE COURT:**  I better look at it.

17         **MR. KEKER:**  And she talks about with more clarity --

18   she talks about strategic partners and then she says, "This is

19   not coming through in messaging and I know it's like a runaway

20   train.  Regarding Autonomy, the market does not seem to get

21   that the bridge is just a bridge to you offshore," quote -- I

22   mean parentheses, "otherwise taxable," close quote, "cash."

23         So what -- what she is saying and what I think they're

24   objecting to is the same item with respect to this merger that

25   I raised before and you said don't go into and I didn't go

1    into.

2        But there is references in the pitch, the reason that they

3    did this, bought Autonomy, was because of, quote, "trapped

4    cash."  Trapped cash is nothing more or less than offshore cash

5    that hasn't been brought back.  And it's one much the reasons

6    they did the merger, and I -- I want to ask her about that, but

7    I also want to ask her about investor reaction and her reaction

8    to this email, which is the day after the announcement.

9        **MR. FRENTZEN:**  It's total -- well, I'll let the Court

10   get to it.

11       **THE COURT:**  First of all, this is a memo -- this is

12   not her writing what she thought.  This is what somebody is

13   telling her.

14       **MR. FRENTZEN:**  Correct.  It's hearsay.

15       **THE COURT:**  Now, so it would be -- so the Defense is

16   offering it to show the impact on the listener, I guess --

17       **MR. FRENTZEN:**  What's that got to do with anything?

18   Well, I'm sorry.

19       **THE COURT:**  Well, I don't know whether it does or not.

20   I don't know whether it does or not.

21       **MR. FRENTZEN:**  More fundamentally, Your Honor, I

22   recall a whole argument about tax treatment and the Court

23   discussing who knows what the -- how long are we going to spend

24   talking about the bona fides of tax treatment and whether it

25   was taxable this way or that way, and this is what the Court's

1  already said is not coming in in other instances, and this is a

2  similar effort at the same.

3       **THE COURT:**  I'm not -- okay.  The document is excluded

4  and questions about -- that are raised in the document are also

5  excluded.  Okay.

6     What's next?

7       **MR. KEKER:**  Can I ask her what Bidco is?

8       **THE COURT:**  What is Bidco?

9       **MR. KEKER:**  Bidco is the offshore company that was set

10  up to do this -- we made a motion about this.  Bidco is the

11  entity that bought Autonomy with offshore money.  She's a

12  director.  Bidco is the plaintiff, not HP.  Bidco is the

13  plaintiff in this -- in the case in London.

14       **MR. FRENTZEN:**  So is this supposed to go to bias to a

15  witness they're calling?  Who cares?

16       **THE COURT:**  No.  I think --

17       **MR. KEKER:**  Yes.

18       **MR. FRENTZEN:**  He said "yes."

19       **THE COURT:**  The reason they wanted to acquire Autonomy

20  wasn't because -- wasn't because they thought it was going to

21  generate 46 percent or 80 percent or 20 percent or anything.

22       **MR. KEKER:**  46 billion.

23       **THE COURT:**  Whatever it was.  The reason they wanted

24  to acquire Autonomy was for a tax reason to deal with cash that

25  was offshore and this is further evidence because of the way it

1    was handled.  That's their argument.

2         MR. KEKER:  Our big argument is that she -- is that

3    she would -- would testify to facts.  I don't know what she'll

4    testify to because I've never talked to her, but she'll testify

5    to facts that will allow a -- a reasonable jury to conclude

6    that the reason that HP bought Autonomy had nothing to do with

7    any of the things that the prosecutors have been putting

8    forward in this case and instead had much more to do with other

9    considerations like this big vision, value of the software,

10   ability to do it with, quote, trapped cash, and so on.

11   That's --

12        MR. FRENTZEN:  They have already --

13        MR. KEKER:  That's what we want to get into.

14        MR. FRENTZEN:  They've already put in reams of

15   evidence about that.  How the CFO, who actually wasn't in favor

16   of the deal, is somehow going to shed additional light on that

17   particular subject, which is already -- I mean, there is

18   literally reams -- I remember the examination of Mr. Sarin in

19   which they dumped every, you know, PowerPoint, etc., that said,

20   you know, they're the leaders in strategic vision and synergies

21   and all this techno babble that I was trying to follow, and so

22   that's already happened.

23        This is somebody who was marginally involved in all of

24   that, as I understand it, and wasn't in favor of the

25   acquisition to begin with.  So I don't know how her testifying

1  is going to shed light on that particular topic beyond what

2  Mr. Apotheker already testified about, Mr. Sarin, Mr. Johnson,

3  etc., etc., who are actually really involved in the teeth of

4  this acquisition versus somebody who is only marginally

5  involved and was against it.

6      **THE COURT:** So based on that offer of proof, I'm

7  denying her testimony on that subject.

8      **MR. KEKER:** The subject of Bidco?

9      **THE COURT:** Right.

10     **MR. KEKER:** Okay. Got it.

11     **MR. FRENTZEN:** And just so I understand, we're not

12  doing anything past October 3, 2011.

13     **THE COURT:** That's right.

14     **MR. FRENTZEN:** Great. Okay. Thank you.

15     **THE COURT:** So, Mr. Marais, by virtue of your South

16  African skills, were you able to participate in a truth and

17  reconciliation with Mr. Reeves and come out with an agreement?

18     **MR. MARAIS:** Your Honor, I spoke to Mr. Reeves. He

19  and Susan Resley explained the facts that they expect a witness

20  to testify to. They seemed fine to me. I offered to

21  stipulate.

22     My understanding is that Mr. Reeves would still rather put

23  the witness on the stand.

24     **MR. REEVES:** I think it will be faster. That's the

25  only reason. I think it's four questions and we happen to have

**PROCEEDINGS**

 1  the right witness --

 2          **THE COURT:**  Okay.  Let's do it that way.

 3      Thank you very much.  Mr. Marais.

 4          **MR. MARAIS:**  I did try, Your Honor.

 5          **THE COURT:**  I think you are instrumental in bringing

 6  this case to a successful conclusion.  I want to thank you.

 7      Okay.  So, Mr. Frentzen, while you're up, how long do you

 8  expect to be?

 9          **MR. FRENTZEN:**  The redirect, Your Honor, will probably

10  be in the neighborhood of 10 to 15 minutes.

11          **THE COURT:**  That was a couple more minutes; right?

12          **MR. KEKER:**  It was an hour and then it was a couple

13  more minutes.  We'd like to get on with it.

14          **MR. FRENTZEN:**  I'm about to get on it.

15          **THE COURT:**  Don't we all.

16          **MR. FRENTZEN:**  He won't be disappointed.

17          **THE COURT:**  Okay.  Bring in the jury when they're

18  ready.

19      I've gone through the jury instructions.  I don't know who

20  is doing them on anybody's side, but let me just raise a couple

21  of questions that I'd like the parties to address.

22      I assume I won't give 4.8.  You can take a look at it.

23  You don't have to address it now.  Just take a note.

24          **MR. LEACH:**  Okay.

25          **THE COURT:**  For 4.9, I need names.

1    4.14, I need names.

2    I need to have a better discussion of 8.122, the vicarious

3    liability, and the two versions that are offered.

4    I need to have -- if the Defense wishes to offer an

5    instruction on their theory of the case, I need to have that.

6    I'm not quite sure I understand the proposal, "why are

7    fraud victims' conduct" -- "negligence is not a defense."  I'm

8    not sure I understand that.  The reason I don't understand it

9    is that, yeah, this isn't -- just hold them one minute.

10    Obviously it's not a negligence case, but if a person is

11    careless, which is a common definition of negligence, that may

12    be a factor considered as to whether or not he had the intent

13    to defraud.  I mean, it sort of goes into it.  If you want to

14    argue -- if the Defense wants to argue, look, there are some

15    dates here one way or the other and he just -- he was careless,

16    you know, well, if he's careless, he's careless, and that's

17    what negligence is and that's a factor that I think the jury

18    can consider.  Now, we may need some clarification of that, you

19    know.

20    There is no reason to give 6.10, mere presence at the

21    scene.  That's not what this case is about.

22    Okay.  So those are questions that I have.  I'll go

23    through them in some detail, obviously, before closings, but

24    they're the ones that my first run-through -- and what I

25    propose to do then is to file them before we have a final

1    conference so everybody can really take a look at it and make

2    sure that they understand what's going to be given and then be

3    given the opportunity to speak to them before final argument.

4    Okay?  So I think that's sort of the fastest way to proceed.

5              MR. LEACH:  Agreed, Your Honor.  Understood.

6              MS. LITTLE:  Two questions.  When and in what form

7    would you like responses to what you just read us?  Do you

8    want --

9              THE COURT:  Oh, well, proposed jury instructions, but,

10   I mean, I think you can get them -- you should get them to me

11   tomorrow.  Don't you think?  I'm -- I don't know.

12             MS. LITTLE:  That's fine.

13       Second question is do you instruct before argument or

14   after argument?

15             THE COURT:  I do.  I do.  I always have.  I always

16   have.  But, you know, somebody comes in and says "I got a

17   better way to do it" --

18             MS. LITTLE:  Judge Schwarzer used to instruct after

19   argument, so that is how I was brought up.

20             THE COURT:  Oh, well, Judge Schwarzer, listen, gold

21   standard of jurisprudence.

22       But I think -- I mean, the answer really is I think it

23   gives some comfort to the lawyers in their argument for them to

24   be able to say,"as you just heard," that sort of thing, and it

25   sort of melds it into an argument.

1       Whatever I say, they'll forget and especially after

2   whatever it is, and -- and then they get a written copy of it,

3   so I don't like to have to -- I certainly wouldn't do it twice.

4       Now, of course there is always a reservation, the

5   reservation being that if somehow in the argument some --

6   something is said that then would warrant in -- either -- in

7   the parties' opinion, a further comment by the Court in terms

8   of instruction, I then do it.

9       Okay.  You can bring in the jury.  Yes.

10      **MR. LEACH:**  Should we schedule the charging conference

11  now, Your Honor?

12      **THE COURT:**  No.  No.

13      **MR. LEACH:**  Thank you.

14      **THE COURT:**  Bring in the jury.

15  (Proceedings were heard in the presence of the jury:)

16      **THE COURT:**  Please be seated.  Let the record reflect

17  all jurors are present, parties are present.

18      You may proceed.

19      **MR. FRENTZEN:**  Thank you, Your Honor.

20                    **<u>REDIRECT EXAMINATION</u>**

21  BY MR. FRENTZEN:

22  **Q.**   Good afternoon, Special Agent Bryant.

23  **A.**   Good afternoon.

24  **Q.**   I would like to briefly display 2102 that was introduced

25  by the Defense into evidence.  Great.  Thank you.

1                      (Exhibit published to jury.)

2     **BY MR. FRENTZEN:**

3     **Q.**   Do you remember the questions about 2102, Special Agent

4     Bryant?

5     **A.**   Yes.

6     **Q.**   And can we go to page 2 of this document and go to the top

7     there.  Okay.

8          This language that Mr. Keker asked you about, "recognized

9     revenue from S/W, maintenance and hosted 2010 and 2011 to

10    date," that's on this iteration, 2102 that he asked you about;

11    right?

12    **A.**   Yes.

13    **Q.**   Can we go to the first page of 2102, please, back to the

14    first page.

15         Special Agent Bryant, what is the date of this copy of the

16    Top 40?

17    **A.**   August 3rd, 2010 -- or 2011.

18    **Q.**   And if we could, now, Ms. Margen, could we pull up 2144,

19    which is in evidence.  Could you blow up the top part.  Great.

20         And could you tell us, what's the date of this iteration

21    of the list from Mr. Hussain?

22    **A.**   August 4th, 2011.

23    **Q.**   And, Ms. Margen, could we go to page, I think, 3 of this

24    document to start with.  Great.  Can you go up to the top.

25         Did -- did Mr. Hussain, in this particular version of the

1  document -- did he leave in the language about what constituted

2  the value?

3  **A.**   He did not.

4  **Q.**   Can we go to the native version of the attachment of 2144,

5  please, Ms. Margen.

6      And actually up here, did Mr. Hussain change it the next

7  day to "value excluding services"?

8  **A.**   Yes.

9  **Q.**   It doesn't say "excluding hardware"?

10 **A.**   No.

11 **Q.**   And could we pull up the final of the Top 40 list, 2626,

12 which is in evidence.

13      In other words, what went into the data room for

14 Hewlett-Packard?

15      2626, please.

16                     (Exhibit published to jury.)

17 **BY MR. FRENTZEN:**

18 **Q.**   Could you blow up the top part of that.  This is the one

19 we've already gone through and seen all the industry stuff

20 that's inaccurate here.

21      But what is listed at the top of this here, please,

22 Special Agent Bryant?

23 **A.**   "Value excluding pro serv."

24 **Q.**   Professional services?

25 **A.**   I believe so.

**BRYANT - REDIRECT / FRENTZEN**

1    **Q.**    It doesn't say "excluding hardware"?

2    **A.**    No.

3    **Q.**    So what was on Mr. Hussain's prior iteration was not

4    presented by Mr. Hussain to Hewlett-Packard; is that right?

5    **A.**    It's not listed here.

6    **Q.**    I'd like to move now -- Mr. Keker asked you about this

7    document, 6528, as if -- if I could get 6528, please, with the

8    a assistance of Mr. Dahm.  Thank you, sir.  Could you blow up

9    the top portion.

10        First of all, does this email go to Mr. Hussain?

11    **A.**    No.

12    **Q.**    And what's the date here?

13    **A.**    August 7th, 2011.

14    **Q.**    Can we go to the bottom, please, Mr. Dahm.

15        And what Mr. Keker asked you "well, isn't this what they

16    wanted in the Top 40," does this have anything to do with the

17    Top 40?

18    **A.**    The Top 40 was placed into the data room.

19        **MR. KEKER:**  Objection.

20    I'm sorry, Agent Bryant.

21    That calls for speculation.  She's not -- I mean.

22        **MR. FRENTZEN:**  He asked the question.

23        **THE COURT:**  No.  But I think -- I think -- the

24    objection is sustained.  She can't give that kind of testimony.

25        **MR. FRENTZEN:**  I'm sorry, Your Honor.  Maybe I'm

1  missing something.

2  **Q.**    Did Mr. Keker ask you whether or not Hewlett-Packard had

3  indicated what information they wanted on the Top 40 when he

4  questioned you just about an hour ago?

5  **A.**    He asked his question in relationship to the Top 40 list.

6  **Q.**    And is this -- and, again, this is August 7.  Does this

7  here talk about the Top 40 or something else?

8  **A.**    I can read what's stated.  It's asking about 2008, 2009,

9  2010 revenue split out by different categories by product and

10  region.

11  **Q.**    And it says "items still missing from the data room"; is

12  that right?

13  **A.**    Yes.

14  **Q.**    And this was August 7th?

15  **A.**    Yes.

16  **Q.**    Could we get -- and we could switch back to the

17  Government.

18         Thank you, sir.  Could we get 2130.  Two-one-three-zero.

19         What's the date -- I'm sorry.  This is already in

20  evidence, Your Honor.

21         What's date on this, Special Agent Bryant?

22  **A.**    August 4th, 2011.

23  **Q.**    Can we go to the next page, please.

24         Does this show -- or does this say, sorry, "On 4 August

25  2011, the following new documents were added to the Project

BRYANT - REDIRECT / FRENTZEN

1    Daniel 1Room"?

2    **A.**    Yes.

3    **Q.**    "Copy of Top 40 contracts, copy of Top 40 customer

4    analysis"?

5    **A.**    Yes.

6    **Q.**    So the Top 40 list was already in the data room by the

7    time the email Mr. Keker showed you had been sent?

8    **A.**    Yes.

9    **Q.**    I'd like to go now and -- sorry.  We've got to switch back

10   again to the Defense, if that's fine.

11         Could we get 6779, please.  Are we back to the Defense

12   table?

13         I think that might be 67 -- is that 6779?

14   **A.**    Yeah.

15   **Q.**    Okay.  Great.  I guess mine is just not in color.  Great.

16   Excellent.

17         Special Agent Bryant, first of all, before today, had you

18   ever seen this document?

19   **A.**    I had not reviewed this specific document.

20   **Q.**    Okay.  But if we could take a look here at the top, what

21   does this -- I just changed colors on myself.

22         What does this say in the top left corner?

23   **A.**    So it provides an invoice number, invoice date, and the

24   quarter in which --

25   **Q.**    I'm sorry.  The very top line?

BRYANT - REDIRECT / FRENTZEN

1  A.    Oh, "sales of HP hardware identified to date."

2  Q.    Okay.  And from the first page of this, is it your

3  understanding this is an email from HP to the Government?

4  A.    Yes.  Providing this document.

5  Q.    Okay.  And if we could go now to page 3 of the document

6  and blow up the chart there.

7        Mr. Keker asked you about whether or not this showed

8  $15 million in hardware sales.  Do you remember that?

9  A.    Yes.  He mentioned the 15 million-dollar total.

10  Q.    And could we actually look at the top here and see what

11  this chart is about.

12        Do you see there where it says "total invoice value"?

13  A.    Yes.

14  Q.    And do you see next to that where it says "total

15  hardware"?

16  A.    Yes.

17  Q.    And do you see next to that where it says

18  something,"likely HP hardware"?

19  A.    Yes.

20  Q.    And in terms of the comments on identification of HP

21  hardware, does this list -- what does this list here?

22  A.    It's just listing how they identified what part of the

23  invoice possibly was HP hardware.

24  Q.    So it's what might possibly have included HP hardware?

25  A.    Yes.

1  Q.   And rather than the 15 million-dollar figure that

2  Mr. Keker pointed you to, could you take a look at the total

3  that's apparently likely HP hardware?

4  A.   6.6 million.

5  Q.   Sufficiently or substantially less?

6  A.   Yes.   The 15 million is the total invoice value for the

7  invoices listed.

8  Q.   So that's the value of these total contracts, not what

9  they identified as Hewlett-Packard hardware?

10  A.   That's how I interpret this document, yes.

11  Q.   Okay.   Great.

12      Let's take a look -- what's the big ticket item of that

13  6 million figure?

14  A.   It's a $3 million HP hardware purchase for video

15  monitoring systems or services.

16  Q.   All right.   And that's the VMS contract that we've already

17  heard a lot of testimony about where 2 million was delivered

18  and the rest of it was Mr. Goodfellow running around writing

19  down things that were already running in Autonomy's business

20  offices?

21  A.   I believe that relates to this contract, yes.   Or invoice.

22  Q.   All right.   So that's $3 million of the figure that

23  Mr. Keker was -- well, not even the figure he was pointing you

24  to.   He was pointing you to the wrong place.

25      And can we take a look also -- let me draw a line right

1   here.  Do you see something about the dates over here below the

2   line that I've drawn?

3   **A.**   Yes.  It's September 30th, 2011, which is after the

4   announcement of the acquisition.

5   **Q.**   So after the announcement of the acquisition, after the

6   due diligence?

7   **A.**   Yes.

8   **Q.**   So at this point in time, this is when HP is acquiring

9   Autonomy or in the process of closing the deal?

10  **A.**   Yes.  And it's approximately 2 million in hardware.

11  **Q.**   Sorry.  That's these two invoices right here?

12  **A.**   Yes.

13  **Q.**   So that gets you to a little over 5 million of what

14  Mr. Keker pointed you to, is either after the acquisition or

15  the VMS which we've already heard a lot about?

16  **A.**   Yes.

17  **Q.**   And I'd ask you to -- if you would or did you take a look

18  at the -- compare the total invoice value on both these pages

19  to the likely HP hardware for each of these lines?

20  **A.**   Yes.  They're either equal or less than the total invoice

21  value.

22  **Q.**   Okay.  Well --

23  **A.**   I only see one where they're equal.  TXU Energy.

24  **Q.**   So out of all of these, there is only -- you say one where

25  it's less than -- I'm sorry -- where it's equal?

BRYANT - REDIRECT / FRENTZEN

1    **A.**    No.   There's -- can we go to the page before real quick?

2        I see two where they're equal and they approximate

3    $80,000.

4    **Q.**    So $80,000 total where they're equal.

5        So if it's the likely HP hardware and then something else

6    to make up the whole invoice, does that mean these could be

7    hardware and software deals?

8    **A.**    That's how I interpret this, yes.

9    **Q.**    And other than the -- about 5 million that we've already

10   talked about, are the rest of these basically, at least by

11   Autonomy and HP standards, pip-squeaking little deals?

12   **A.**    They're in the thousands of dollars.

13         **MR. FRENTZEN:**   Withdrawn.

14       May I have a moment, Your Honor?

15       (Government counsel confer off the record)

16   **BY MR. FRENTZEN:**

17   **Q.**    So taking out the two that we've already talked about, VMS

18   and the other one, the remainder of all these deals amounts to

19   about a million total?

20   **A.**    A little over a million, yes.

21   **Q.**    And this is over the course of what time period?  Do you

22   know?

23   **A.**    About two and a half years.

24         **MR. FRENTZEN:**   That's all I have.   Thank you very

25   much.

MENZ - DIRECT / REEVES

```
 1              THE COURT:  Any recross?

 2              MR. KEKER:  No questions.

 3              THE COURT:  Thank you very much, Agent.

 4         Call your next witness.

 5              MR. REEVES:  Thank you, Your Honor.  Very briefly, the

 6    United States calls a custodian of records from Hewlett-Packard

 7    company.

 8              THE CLERK:  Please raise your right hand.

 9                         MICHAEL MENZ,

10    called as a witness for the Government, having been duly sworn,

11    testified as follows:

12              THE WITNESS:  So help me God.

13              THE CLERK:  Thank you.  Please be seated.

14         Please state your full name for the record and spell your

15    last name.

16              THE WITNESS:  Michael Menz, M-E-N-Z.

17                       DIRECT EXAMINATION

18    BY MR. REEVES:

19    Q.   Where do you work, Mr. Menz?

20    A.   Hewlett-Packard Enterprise, Roseville campus in

21    California.

22    Q.   Are you appearing here today as a custodian of records for

23    Hewlett-Packard on the subject of the email timestamps that

24    appear on emails produced by Hewlett-Packard to the Government

25    in this case?
```

**MENZ - DIRECT / REEVES**

1    **A.**    Yes.

2    **Q.**    With the Court's permission, I would like to display

3    what's in evidence as Exhibit 492, please.

4                        (Exhibit published to jury.)

5                **MR. REEVES:**    If we could enlarge the Bates number at

6    the bottom, please.    HP-SEC, if you could enlarge that, please.

7    **Q.**    Mr. Menz, are you familiar with these Bates stamps in this

8    case?

9    **A.**    Yes, I am.

10   **Q.**    And are you familiar with the prefix to the Bates stamp

11   "HP-SEC"?

12   **A.**    Yes, I am.

13   **Q.**    Is that the Bates stamp prefix convention that HP used for

14   the documents it produced to the Government in this case?

15   **A.**    Yes, it is.

16   **Q.**    Thank you.

17        If we could go up a little bit.    I'd like to talk with you

18   a little bit about the timestamps that appear on some of the

19   emails.    Are you familiar with that subject?

20   **A.**    Yes, sir.

21   **Q.**    All right.    And I'd like to begin with the lower email,

22   please.    Withdrawn.    I'm so sorry.    I think we want to look at

23   both emails together.    That's great.    Just like that.    Let's

24   highlight, if we could, the date and timestamp on the lower

25   email, just that.    Perfect.    And the upper email.    Just that.

1    Okay.

2        Well, let's walk through the timestamp convention in the

3    emails produced to the Government by HP in this case, beginning

4    with the lower email.

5        Do you see the reference to January -- 1 January 2010,

6    18:09?  Do you see that?

7    A.   Yes, I do.

8    Q.   And what does 18:09 mean as it's used in this document?

9    A.   18:09 is a 24-hour convention for timing.   Instead of

10   having, like in this one, 6:00 p.m., it's 1800 hours.

11   Q.   All right.   And if -- if this email were being generated

12   in London, England or in Cambridge, England, would the

13   timestamp still appear the same?

14   A.   Yes, it would.

15   Q.   All right.

16   A.   And that's -- it would more likely be the GMT time zone.

17   Q.   What is GMT?

18   A.   Greenwich Mean Time.

19   Q.   Very good.

20       Let's look at the email in response and work through the

21   timestamp for that.

22       It has a timestamp of Friday, January 1, 2010, at

23   1:27 p.m.  Do you see that?

24   A.   Yes.

25   Q.   What is your understanding of that timestamp?

MENZ - DIRECT / REEVES

1  A.  Because of the "p.m.", that's placed into the normal time

2  and date that you'd see day-to-day.  If you convert that to a

3  military time or the 24-hour time basis, that would be reading

4  15:27.

5          THE COURT:  15:27?

6  BY MR. REEVES:

7  Q.  13:27?

8  A.  13:27.

9  Q.  That's 13:27.  And now that number -- 13:27 is different

10 that 18:09; right?  It's five hours earlier?

11 A.  That's correct.

12 Q.  And do you have an understanding, based on the way HP

13 produced its documents, for the difference in that timestamp?

14 A.  Yes, I do.

15 Q.  What is that understanding, please.

16 A.  Because we produced it at an East Coast location, that

17 system was set to Eastern Standard Time.  That would

18 automatically correct the timing from GMT to the East Coast

19 time zone making it a five-hour difference.

20 Q.  So if we add those five hours for that reason to 13:27,

21 you get 18:27, do you not?

22 A.  That's correct.

23 Q.  And if you were trying to sequence correctly using the

24 timestamps the emails, would the sequence be the first email

25 was sent at 18:09 and the second email was sent at 18:27?

**MENZ - CROSS / LITTLE**

1  **A.**   That is correct.

2  **Q.**   All right.  And is that, that East Coast timestamp

3  convention, the one used on the top email, the last email, for

4  all the emails produced by HP in this case to the Government

5  with the Bates prefix HP-SEC?

6  **A.**   Yes.

7  **Q.**   So for all the emails with the HP-SEC Bates stamp, the

8  very top email will be in East Coast Standard Time; is that

9  correct?

10  **A.**   For this date of January 1st, yes.

11  **Q.**   Well, what do you mean by that qualification?

12  **A.**   If it was produced at a different time of the year when

13  you had Daylight Savings in play, it could be different.

14  **Q.**   That would be only one hour; right?

15  **A.**   Actually because the bottom one was in GMT, it would -- it

16  would still be the same.

17  **Q.**   I mean, the Daylight Savings difference would be only one

18  hour; right?

19  **A.**   Correct.

20  **Q.**   That would only be true during Daylight Savings?

21  **A.**   That's correct.

22        **MR. REEVES:**  Thank you very much.  I have no further

23  questions.

24  \\\

25  \\\

1              <u>CROSS-EXAMINATION</u>

2    **BY MS. LITTLE:**

3    **Q.**   Good afternoon, sir.  My name is Jan Little.  I'm one of

4    Mr. Hussain's attorneys.

5         You have been testifying about the timestamp that's at the

6    topmost email, the most -- the latest email in the chain;

7    correct?

8    **A.**   That's correct.

9    **Q.**   And you've testified that for the top email, it would be

10   East Coast time; right?

11   **A.**   Correct.

12   **Q.**   But for other emails that are embedded, for example, if

13   it's a reply to another email or if it's forwarding another

14   email, those embedded email timestamps are not necessarily East

15   Coast time; right?

16   **A.**   That's correct.

17            **THE COURT:**  Are they the time -- are they the time of

18   the place where -- the origin of the time of the sender?

19            **THE WITNESS:**  Correct, Your Honor.  In other words, to

20   explain that further, like on that email, the bottom email,

21   that was read at 6:00 in the evening basically wherever the --

22   wherever --

23            **THE COURT:**  So you said it was read.  Do you mean it

24   was sent?

25            **THE WITNESS:**  It was sent.

1          **THE COURT:**  It would be read at any time.  These don't

2    reflect when they're read.  They reflect when they were sent;

3    right?

4          **THE WITNESS:**  That's correct.

5          **THE COURT:**  Okay.  And they are, other than the

6    embedded emails -- are all sent at the time of -- of -- of

7    origin or not?

8          **THE WITNESS:**  I'm sorry, Your Honor.  The bottom one,

9    that's when he received -- it -- that email was sent or -- I'm

10   sorry.  I have to stop and think.

11        That is the time that -- that the email was sent to and he

12   received it at 18:09.  So when that email hit a reply to send

13   it back someplace, that's why that time says 18:09 because when

14   you print it off here in the United States, the only timestamp

15   that's changed is the top one.

16        So you're correct, it is when it was sent -- received --

17   received in England.

18        **MS. LITTLE:**  I think you're making my point,

19   Your Honor.

20   **Q.**  Sir, when an email is sent from, say, London to California

21   and then it's forwarded to someone else in California and back

22   to London, there is going to be differences in the embedded

23   time zones in that email; right?

24   **A.**  That is correct.

25   **Q.**  And they're not necessarily going to be New York time?

**MENZ - CROSS / LITTLE**

1  **A.**   Correct.

2  **Q.**   Okay.  And you've testified -- so California and

3  New York -- I think we all know this, but let's review it.

4  They're three hours apart; right?

5  **A.**   Yes.

6  **Q.**   And California and the UK is eight hours apart; right?

7  **A.**   Correct.

8  **Q.**   And New York and the UK is five hours apart.  And you

9  testified about the five-hour difference in that one email;

10  right?

11  **A.**   Correct.

12  **Q.**   And then you alluded to Daylight Savings Time.  Now,

13  Daylight Savings Time occurs at different weeks in the U.S.

14  than in the UK; right?

15  **A.**   That's correct.

16  **Q.**   And in 2010, in the spring of 2010, it was two weeks

17  apart?  Do you remember?  You probably don't remember.

18  **A.**   Just about two weeks apart.

19  **Q.**   And then in the fall, it was about a week apart?

20  **A.**   Yes.

21  **Q.**   And so the timestamps can be a little bit more confusing

22  during those periods as well; correct?

23  **A.**   Could be.

24  **Q.**   Okay.  And then are you aware, sir -- you talked about the

25  HP-SEC Bates numbers.  Are you aware of other Bates numbers for

1    documents that have been produced by Hewlett-Packard in

2    connection with this litigation?

3    **A.**    Offhand, no.

4    **Q.**    Are you aware that there are Bates numbers that begin with

5    the letters POS?

6    **A.**    Not offhand.

7    **Q.**    Are you aware there are documents that begin with the

8    Bates stamp PRA?

9    **A.**    I do not know what case that refers to.

10   **Q.**    Or AUD?

11   **A.**    No.

12   **Q.**    Or D?

13   **A.**    No.

14   **Q.**    And let me show you what is in evidence as Exhibit 5831.

15        If we can get that, Jeff.

16        So, sir, this is an exhibit that is in evidence and has

17   been discussed.  On March 1st of 2010 -- and I'll represent to

18   you that the person at the top, Mr. Geall, is from London, but

19   he was in San Francisco when he sent this email.  Okay?

20        And if we start at the bottom, there's an email from

21   Mr. Lucas, who also happened to be in San Francisco, saying,

22   "Gentlemen, since we're all in town at the same place, I

23   thought it would be great if we could grab a drink.  How about

24   5:30 p.m.," and the bottom email the timestamp is 17:28.  Do

25   you see that?

1    **A.**    Yes.

2    **Q.**    And that would be 5:28 -- no.  What time would that be in

3    San Francisco?

4    **A.**    That would be 5:28.

5    **Q.**    Okay.  If that --

6         **THE COURT:**  In the afternoon.

7    **BY MS. LITTLE:**

8    **Q.**    But if that email were sent in San Francisco -- let me

9    think this through now.  It would go from 17:28 to 9:34 --

10   excuse me.  Okay.  17:28 would be 9:28 p; m. correct?

11        **MR. REEVES:**  Your Honor, what is the Bates stamp?  If

12   this is not an HP-SEC --

13        **THE COURT:**  That is exactly Ms. Little's point.  We

14   understand how the HP documents work, but we don't have any

15   understanding as to how the non-HP documents work.

16        **MS. LITTLE:**  I can make this quick, Your Honor.

17   **Q.**    So 17:28 is 5:28 p.m.; right?

18   **A.**    Correct.

19   **Q.**    And 5:28 p.m. in London is 9:28 a.m. here in

20   San Francisco; right?

21   **A.**    Correct.

22   **Q.**    And that makes sense as they're talking about having

23   drinks later in the evening and then the response is six

24   minutes later at 9:34 a.m.; correct?

25   **A.**    I'll go along with that, yes.

1   **Q.**    So here we have an email where there is an eight-hour

2   difference between San Francisco and London, not a five-hour

3   difference like between New York and London; right?

4   **A.**    Eight-hour difference.  That would be correct.

5   **Q.**    And this has nothing to do with East Coast time?

6   **A.**    It doesn't look like it.

7            **MS. LITTLE:**  Thank you.  That's all I have.

8            **THE COURT:**  Thank you.  You're excused.

9            **MR. KEKER:**  Your Honor, we have a stipulation to read

10  in before the Government rests.

11           **THE COURT:**  Ms. Little, yes?

12           **MS. LITTLE:**  Your Honor, we have a stipulation that we

13  have agreed to with the Government that I would like to read

14  in --

15           **THE COURT:**  Well, I want to conclude the Government's

16  case.

17           **MS. LITTLE:**  Well, this -- excuse me.  This is

18  something that we talked about with Government witnesses.

19  Mr. Upton and Mr. Garner.  The chart was viewed as a

20  demonstrative, but we agreed to work it out with the

21  Government, that it would be admitted, so we view this as part

22  of our cross-examination of Government witnesses.

23           **THE COURT:**  Go ahead.  If it's a stipulation, just do

24  it now.

25           **MS. LITTLE:**  There is actually two of them.  Let me

1  get the other one.

2        **THE COURT:**  Go ahead.

3        **MS. LITTLE:**  Okay.

4        Ladies and gentlemen, this is a stipulation regarding

5  Exhibits 5528 and 5529, Autonomy's stock price.

6        And, Jeff, if I could get you to display 5529, the chart.

7        "Defendant Sushovan Hussain and the Government hereby

8  stipulate that Exhibit 5528 contains true and correct data

9  regarding the stock price of Autonomy as listed on the London

10  Stock Exchange for each trading date -- for each trading date

11  from January 2nd, 2009, to October 4th, 2011."

12        And then it goes on to say that, "Mr. Hussain and the

13  Government further stipulate that Exhibit 5529," which is being

14  displayed now, "is a summary chart of the closing price of

15  Autonomy stocks for all trading dates in the relevant period,

16  January 2nd, 2009, to October 4th, 2011.  The parties stipulate

17  that Exhibit 5529 is an admissible summary chart under Federal

18  Rule of Evidence 1006 because the underlying information cannot

19  be conveniently examined."  That's the first one.

20        And then the second stipulation is a stipulation regarding

21  Hewlett-Packard stock price.

22        And, Jeff, if you could put up 6335.

23        "Defendant Sushovan Hussain and the Government hereby

24  stipulate that Exhibit 6334 contains true and correct data

25  regarding the stock price of Hewlett-Packard Company listed on

1  the New York Stock Exchange for trading dates in 2009, 2010,

2  2011, and 2012.  The data was obtained from Yahoo Finance."

3       And then it goes on to explain the columns.

4       And finally, "Mr. Hussain and the Government further

5  stipulate that Exhibit 6335," which is the chart being

6  displayed, "is a summary chart of the closing price of

7  Hewlett-Packard securities for all trading dates in 2009, 2010,

8  2011, and 2012.  The parties stipulate that Exhibit 6335 is an

9  admissible summary chart under Federal Rule of Evidence 1006

10 because the underlying information cannot be conveniently

11 examined."

12      Thank you, Your Honor.

13      **THE COURT:**  And those stipulations should be entered

14 into evidence.  They will have exhibit numbers.

15      **MS. LITTLE:**  Okay.  We will deal with it.

16      (Trial Exhibits 8271 and 8272 received in evidence)

17      **THE COURT:**  Anything further from the Government?

18      **MR. LEACH:**  No, Your Honor.  On behalf of the

19 Government, the United States rests.

20                  (Government's rests.)

21      **THE COURT:**  Okay.  Ladies and gentlemen, the

22 Government has concluded its case in chief, and we now turn to

23 the Defense, and if they want to proceed now, they may call a

24 witness.

25      **MR. KEKER:**  Your Honor, we call Ms. Catherine Lesjak.

 1              **THE COURT:**  Okay.

 2              **MR. KEKER:**  Your Honor, we have a motion, but I take

 3    it we will do it some other time.

 4              **THE COURT:**  With respect to all Rule 29 motions -- is

 5    that what you are referring to, Mr. Keker?

 6              **MR. KEKER:**  Yes.

 7              **THE COURT:**  They can be addressed at a later time;

 8    however, it's deemed they are made now.

 9              **MR. KEKER:**  Okay.

10              **THE CLERK:**  Hello.

11              **THE WITNESS:**  Hi.  Do you want to do this hand?

12              **THE CLERK:**  Yes, please.

13                          **CATHERINE LESJAK,**

14    called as a witness for the Defendant, having been duly sworn,

15    testified as follows:

16              **THE WITNESS:**  I do.

17              **THE CLERK:**  Thank you.  Please be seated.  Please

18    state your full name for the record and spell your last name.

19              **THE WITNESS:**  Sure.  It's Catherine Ann Jack.  L-E-S,

20    as in "Sam," J-A-K.

21                        **DIRECT EXAMINATION**

22    BY MR. KEKER:

23    **Q.**   Ms. Lesjak, we met in the hall.  Good afternoon.

24         Good afternoon, ladies and gentlemen.

25         Let's get out of the way first, what's the matter with

**LESJAK - DIRECT / KEKER**

1   your arm?  What happened?

2   **A.**   I had rotator cuff surgery about three weeks ago.

3   **Q.**   Speedy recovery.

4        What is your job?

5   **A.**   I am the CFO, the chief financial officer, at HP.

6   **Q.**   Okay.  How long have you worked for Hewlett-Packard?

7   **A.**   So I have -- I started with Hewlett-Packard in 1986.

8   So -- coming up 32 years.

9   **Q.**   How long have you been the chief financial officer of

10  Hewlett-Packard?

11  **A.**   Since January of 2007, so just over 11 years.

12  **Q.**   After January of 2007, did there come a point when the

13  CEO, Mark Hurd, was fired?

14  **A.**   Yes.

15  **Q.**   Did you become the interim CEO for a period of time?

16  **A.**   Yes.

17  **Q.**   How long were you the interim CEO and when were you the

18  interim CEO?

19  **A.**   So I was the interim CEO for three months from basically

20  middle of August of 2010 until November 1st of 2010.

21  **Q.**   And in November of 2010, did Mr. Leo Apotheker, whom the

22  jury has met, become the CEO of Hewlett-Packard?

23  **A.**   Yes.

24  **Q.**   And you went back to your previous job, full-time job, as

25  chief financial officer?

LESJAK - DIRECT / KEKER

1    **A.**    Yes.

2    **Q.**    Now, Hewlett-Packard is -- you're a director of the

3    Hewlett-Packard subsidiary that is suing Mr. Hussain and

4    Dr. Lynch in England, aren't you?

5    **A.**    I believe that's the case, yes.

6    **Q.**    And you never met Mr. Hussain until after the acquisition;

7    is that right?

8    **A.**    That's my recollection.

9    **Q.**    Okay.  I want to go back to when the subject of

10    Autonomy -- when you became aware of it at Hewlett-Packard.

11    When did you -- when did you first hear about Autonomy as

12    a possible acquisition target?

13    **A.**    Roughly the -- May -- I think the May time frame of 2011.

14    **Q.**    But before that, you had heard that, for example, former

15    CEO Hurd was interested in Autonomy but thought it was too

16    expensive; right?

17    **A.**    I never understood that Mark Hurd was interested in

18    Autonomy.  Shane Robison had mentioned it in meetings that I

19    was in with Mark Hurd and he seemed uninterested.

20    **Q.**    Okay.  Could we look at -- 6579 is in that book in front

21    of you.  And what we can, I hope, do is get it into evidence

22    and on the screen so you don't have to use your arm.

23            **THE COURT:**  Let's see.

24            **MR. KEKER:**  6579 is an email to Ms. Lesjak from Brian

25    Humphries, and I would move it into evidence, Your Honor.

1          **THE COURT:**  Admitted.

2              (Trial Exhibit 6579 received in evidence)

3                  (Exhibit published to jury.)

4    **BY MR. KEKER:**

5    **Q.**   Ms. Lesjak, this is an email to you from Brian Humphries.

6    Who is he?

7    **A.**   I believe, based on the title, the SCD, that he was the

8    head of the strategic planning group in corporate development

9    at the time.

10   **Q.**   And he is writing to you and Shane Robison in October of

11   2010, and he says, "I should point out that I think that any

12   bid for Autonomy will be extremely competitive.  It is possible

13   that" -- is that Microsoft, Google, Oracle and perhaps even

14   IBM -- "could compete.  I see 70 percent plus premium as being

15   likely," and so on.

16       Do you remember getting this email?

17   **A.**   I don't directly, no.

18   **Q.**   Okay.  So Mr. Apotheker started, and when he started, were

19   you aware that he wanted to transform HP?  That was one of his

20   goals?

21   **A.**   Ultimately it was one of his goals.  When he first

22   started, he did not talk about transforming the company.  That

23   came a little bit later.

24   **Q.**   Did he talk about HP underperforming when he first

25   started?

LESJAK - DIRECT / KEKER

1    **A.**    Yes.

2    **Q.**    Did he talk about the investors in HP being unhappy when

3    he first started?

4    **A.**    I don't distinctly remember that, no.

5    **Q.**    So you told us the first time you remember is a May

6    meeting.  Was that a meeting of the finance and investment

7    committee of Hewlett-Packard?

8    **A.**    Yes.

9    **Q.**    And are you on that committee?

10   **A.**    I'm not on that committee, but I'm a standing attendee.

11   **Q.**    Let's look at 8201, which I think are the minutes of that

12   meeting.

13        And I would move that in.

14            **THE COURT:**  Admitted.

15            (Trial Exhibit 8201 received in evidence)

16            **MR. KEKER:**  Can we put that up, Jeff.

17                 (Exhibit published to jury.)

18   **BY MR. KEKER:**

19   **Q.**    On May 25, according to this, 2011, the finance and

20   investment committee met.  You're present.  Your name is in

21   there someplace.  And you remember that meeting?

22   **A.**    Yes.

23   **Q.**    Okay.  And on the next page under "M&A update," there was

24   discussion of HP's focus on larger-scale acquisitions like

25   Atlantis and Singapore to enhance HP's software portfolio

1    around enterprise information.

2         Tell us what you remember about what M&A, mergers and

3    acquisitions, discussions there were at that meeting.

4    **A.**    My recollection is that there were three acquisitions

5    discussed at that point in time.  One was TIBCO.  If I remember

6    correctly, we had made a bit for TIBCO at this time.  Could not

7    come to an agreement on price.  So we set it aside.  I wouldn't

8    say we completely walked away, but we set it aside.

9         We were then talking about Software AG as well as Autonomy

10   at that meeting.

11   **Q.**    And at that meeting, did you come to understand that

12   Mr. Apotheker wanted to buy not just one, but wanted to buy all

13   three?

14   **A.**    Yes.  That was a discussion that we had.

15   **Q.**    And -- and so Mr. Apotheker at that point was enthusiastic

16   enough about moving HP into software that he wanted to have

17   three separate acquisitions at the same time?

18   **A.**    Yes.

19   **Q.**    And you, as the chief financial officer, did what?  You

20   pushed back?

21   **A.**    I pushed back and I told him that we could not afford all

22   three.  That we did not have the -- the capital to do that.

23   That we would either do a TIBCO and a Software AG maybe, and I

24   needed to do more work, or Autonomy, but, again, the action

25   item for me coming out of that meeting was to go look at what

LESJAK - DIRECT / KEKER

1  we could and could not afford.

2  **Q.**   Fair enough.  But that was -- you pushing back was the

3  beginning of strained relations between you and Mr. Apotheker,

4  wasn't it?

5  **A.**   Yes.

6  **Q.**   In July, Mr. Apotheker and Shane Robison, who was sort of

7  his right-hand man, had decided that they really wanted to buy

8  Autonomy?

9  **A.**   Yes.

10        **MR. FRENTZEN:**  Objection.  Sorry.  Foundation and it's

11  also leading at this point.

12        **THE COURT:**  Well, number one, I'm going to let him

13  lead.  Okay.  That's number one.

14     Number two -- number two -- yeah.  I mean, it's sustained.

15  You have to lay a foundation as to how she knows what she is

16  testifying to.

17        **MR. KEKER:**  Yes, sir.

18  **Q.**   How do you know that Mr. Apotheker and Mr. Robison had

19  decided they really wanted to buy Autonomy by July of 2011?

20  **A.**   So between May and July, there were a lot of meetings in

21  which we were talking about the strategy for the company and

22  then what acquisitions would fit into that strategy, and there

23  were quite a few prep meetings.

24  **Q.**   And by this time, it's true, isn't it, that Mr. Apotheker

25  was using the word "transformative"?  He thought that buying

1  Autonomy would be transformative to HP?

2  **A.**    Yes.

3  **Q.**    And you thought the use of the word "transformative" was a

4  little hyperbolic, didn't you?

5  **A.**    I'm not sure that I thought about it at that point in

6  time.  Certainly by the time that we got to communicating to

7  investors in the August time frame, yes, I thought too much

8  emphasis on transformative was a little, to use your word,

9  hyperbolic.

10  **Q.**    And Mr. Apotheker thought and Mr. Robison thought that

11  Autonomy was the company that would have the biggest impact on

12  Hewlett-Packard by this July time frame?

13          **MR. FRENTZEN:**  Objection.  Foundation and again -- I

14  mean --

15          **THE COURT:**  Sustained.

16          **MR. FRENTZEN:**  Maybe some leading, but he called her.

17  **BY MR. KEKER:**

18  **Q.**    Did Mr. Apotheker and Mr. Robison say anything to you

19  about Autonomy being the company that would have the biggest

20  impact on Hewlett-Packard?

21  **A.**    Leo made statements like that when I -- to the board when

22  I was in the board room.

23  **Q.**    Did Mr. Apotheker say things to you indicating that he

24  thought Autonomy's IDOL software was very special and a big

25  deal, basically?

1    **A.**    Yes.  Both he and Shane did.

2    **Q.**    Okay.  And did they talk about their -- the plan to merge

3    Vertica -- excuse me -- Vertica was a structured data company

4    that Hewlett-Packard had bought back in March?

5    **A.**    Yes.

6    **Q.**    And by July, were they talking about merging Vertica and

7    Autonomy and some other software properties at Hewlett-Packard

8    to make -- become a disruptive effect in the software industry?

9    **A.**    I believe that was true, yes.

10    **Q.**    Okay.  And did Mr. Apotheker use the words that he thought

11    that Autonomy was the key to saving Hewlett-Packard?

12    **A.**    Yes.  He made that statement.

13    **Q.**    Okay.  And let's look at the rationale.  The jury has seen

14    it before.  Let's do it quickly.  It's in evidence.  6604.

15                    (Exhibit published to jury.)

16    **BY MR. KEKER:**

17    **Q.**    You can look at it in your book.  It's a stack,

18    PowerPoints in July that was used I think at various times.

19    6604.

20    **A.**    I don't seem to have a 6604.

21    **Q.**    It's in evidence.  You don't have that?

22    **A.**    I don't appear to.

23        (Mr. Keker hands the witness the document.)

24        Thank you.

25    **Q.**    We can put it on the screen.  It's in evidence.

 1          Look at page 2.  I may have my numbers wrong.  Yeah.
 2     Here, okay.  That's what I was looking for.
 3          Do you remember a PowerPoint being presented in July
 4     making this point that the combination of Atlantis, which is
 5     Autonomy, Vertica and HP's open stack -- "DB" is database?
 6          MR. FRENTZEN:  Your Honor, I'm sorry.  Maybe I
 7     misunderstand, but this is attached to an email.
 8          MR. KEKER:  Yeah.
 9          MR. FRENTZEN:  That says --
10          MR. KEKER:  It's in evidence.
11          MR. FRENTZEN:  Well, that doesn't mean it is
12     necessarily what was presented.
13     BY MR. KEKER:
14     Q.   Have you seen this slide or like this -- like this?
15     A.   I have seen a slide like this, yes.
16     Q.   And this slide says, "The combination of Atlantis, Vertica
17     and HP's open stack" -- what is DB?
18          THE COURT:  Well, can I ask, is it in evidence?
19          MR. KEKER:  Yes, it is, Your Honor.
20          MR. FRENTZEN:  I think it is, but the first page is an
21     email and it's like the latest iteration of something.
22          THE COURT:  Anyway, you may proceed.
23     BY MR. KEKER:
24     Q.   What's DB?
25          MR. FRENTZEN:  I'm sorry, Your Honor.  She's not on

1   the email, is my point.

2           **THE COURT:**  Did she see this?  Did the witness see

3   this?

4   **BY MR. KEKER:**

5   **Q.**   What's "DB," Ms. Lesjak?

6   **A.**   I believe it's database.

7   **Q.**   Okay.  "Provides HP a unique disruptive data stack," and

8   then if you turn to the next page, the rationale for acquiring

9   Atlantis, the jury has seen that before.

10          But if you look at the second set of things, "a

11  continuation of Vertica, HP's organic open stack DB and

12  Atlantis provides HP a unique disruptive data stack," and I

13  won't read the whole thing, but the jury has been through that.

14          And then was there talk about the synergies that

15  Hewlett-Packard could bring to Autonomy after it purchased it

16  during this July time period?

17  **A.**   Yes.

18  **Q.**   And look at page 6, please, "key areas of synergies."

19  Again, the jury has seen this.

20          Page 8 are the assumptions that went into the synergies.

21  The predictions about the synergies are on page 9.

22          Do you remember seeing -- let's focus on the revenue, how

23  the revenue was going to grow with the synergies, the revenue

24  down here about -- yeah.  The revenue line.  Was going to go

25  from a billion to 11 billion in five or six years?  Do you

**LESJAK - DIRECT / KEKER**

1   remember that kind of optimism around this acquisition?

2   **A.**    Yes.

3   **Q.**    And then the profit -- go down a little bit, Jeff, please.

4         The gross profits are going to go from less -- a little

5   less than a billion to more than 8 billion in five or six

6   years?

7   **A.**    Yes.

8   **Q.**    And then there was a synergy analysis.

9         Can we look at the last -- page 10.

10        At some point at this point, the discounted cash flow

11  analysis was spitting out with -- with synergies $46 billion as

12  an enterprise value.  Do you remember that?

13            **MR. FRENTZEN:**  Your Honor, I do object.  This email --

14  this attachment that it's attached to did not go to this

15  witness, and we have seen multiple iterations of this with

16  Mr. Sarin, and unless this particular draft went to this

17  particular witness, I don't know what we're doing here.

18            **THE COURT:**  Well, here is -- maybe we can lay a

19  foundation.

20        Did you see this -- was this a -- I think it's a

21  PowerPoint, isn't it?

22            **MR. KEKER:**  It is.  Of course.

23            **THE COURT:**  Was this PowerPoint presented to you?

24            **THE WITNESS:**  I don't know for sure because the value

25  here is $46 billion and the one that I'm familiar with is $17

1    billion.

2            MR. KEKER:  Okay.  We're going to get to that.

3            MR. FRENTZEN:  Your Honor --

4            THE COURT:  Okay.  This document and the questions

5    related to this document are stricken.  The jury --

6            MR. KEKER:  No.  Your Honor, she remembers seeing the

7    pages of this document up until the 46 billion-dollar number.

8    That's not what she --

9            THE COURT:  I'm actually confused.  I thought she said

10   that she didn't -- that the document that she saw had a

11   different figure from this document.

12           MR. KEKER:  This -- what she remembers is a 17

13   billion-dollar synergy -- what she just said was $17 billion in

14   synergies instead of 46 billion.

15           THE COURT:  Let's clarify that because that's not my

16   understanding of her testimony.

17   BY MR. KEKER:

18   Q.   We've been through a bunch of pages of this.  Do you

19   recall the other pages, the synergies, the rationale, all the

20   pages we just looked at?

21           THE COURT:  Do you mean did you see all -- the

22   question is you've seen a number of pages as to this exhibit.

23   And what we're trying to figure out is actually did you see

24   this exhibit or did you see some other presentation?  That's

25   what we need to know.

1          **THE WITNESS:**  So I believe I've seen a similar

2     presentation that had different numbers in it.

3          **THE COURT:**  Okay.  So I'm going to strike this

4     presentation and admonish the jury to disregard this

5     presentation, and if you want to show her the presentation that

6     she saw --

7          **MR. KEKER:**  We'll get to that.

8          **THE COURT:**  -- I'll allow questions.

9          **MR. KEKER:**  How can they not pay attention to this

10    presentation when it's been testified about and is in evidence?

11         **THE COURT:**  Because she didn't see it.

12         **MR. KEKER:**  I understand that's her testimony about

13    it.  But -- but they can't not pay attention to this

14    presentation because it's in evidence and people have talked

15    about it.

16         **THE COURT:**  Yes.  You can pay -- not pay attention to

17    something you never saw.  You're asking her what happened

18    during a particular period of time.  We're going back into the

19    history, which is perfectly permissible, and we're trying to

20    find out from this witness what did you see?  And when you saw

21    something, how did you react to it.  And we're also asking this

22    witness questions "well, did you hear this conversation or that

23    conversation."  Those are fair questions.

24         I don't know that you can ask her about a document which

25    is a Power presentation that actually she didn't see.  And

1    that's the point of the objection.

2            MR. KEKER:  Understood.

3            THE COURT:  And I'm sustaining that.  Okay.

4    BY MR. KEKER:

5    Q.    At some point, Ms. Lesjak, you decided that the price that

6    Mr. Apotheker and Mr. Robison were willing to pay for this

7    acquisition was too high; is that right?

8    A.    Not too high.  Higher than I thought it needed to be.

9    Q.    Okay.  You thought that the premium -- the company sold in

10   the stock market for a certain amount of money and the amount

11   that was going to be paid is called the premium?

12   A.    Yes.

13   Q.    And you thought the premium was too high?

14   A.    Was higher than it needed to be.

15   Q.    And was it close to the 70 percent that we looked at

16   before?

17   A.    Yes.

18   Q.    And you thought they could do better than 70 percent

19   premium?

20   A.    Yes.

21   Q.    Okay.  Did -- and did you think that the price negotiation

22   for this acquisition was different than the typical HP

23   acquisition to buy a company?

24            MR. FRENTZEN:  Objection.  Foundation.

25            THE COURT:  Yes.  Sustained.

1    BY MR. KEKER:

2    Q.   Did you think that the price negotiation hadn't been tough

3    enough?

4            MR. FRENTZEN:  Objection.  Foundation.

5            THE COURT:  Sustained.

6            MR. KEKER:  Did she think?

7            THE COURT:  I think you can ask her were you aware of

8    the negotiations, what was your awareness of the negotiations

9    and then you can ask her how she felt about the negotiations.

10   She has told you how she felt about the price.  If you want to

11   go into the negotiations, you can do that, but you have to lay

12   a foundation that she was aware of the negotiations.

13   BY MR. KEKER:

14   Q.   Were you aware of the negotiations?

15   A.   Interestingly enough, I wasn't until after they were

16   concluded.

17   Q.   Okay.  And after they concluded, what did you learn about

18   the negotiations?

19           MR. FRENTZEN:  Objection.  Foundation.

20           THE COURT:  I think I'm going to sustain that.

21   BY MR. KEKER:

22   Q.   Did HP usually walk away from negotiations and have them

23   take -- stretch out over time?

24   A.   I think every deal is a little bit --

25           MR. FRENTZEN:  Excuse me.  Vague and foundation.

1          **THE COURT:**  Well, it's both those things, but I think

2     she can answer the question.  She is answering the question.

3          So go ahead.  I think it's concrete enough that she can

4     give an answer to the question.

5          **MR. FRENTZEN:**  And I would -- I think I understand the

6     Court's ruling on the leading, but I would suggest that if we

7     had less leading, we might get to what --

8          **THE COURT:**  You know, I have let everybody lead,

9     everybody lead, with the wild and perhaps totally unjustified

10    expectation that the case might move a bit faster.

11         So I'm going to allow Mr. Keker and the Defense team the

12    same latitude that I allowed the Government.  Okay?

13         **MR. FRENTZEN:**  Understood.

14         **THE COURT:**  Do you have that question in mind?  Maybe

15    you could restate it, Mr. Keker.

16    **BY MR. KEKER:**

17    **Q.**   Did HP, in the normal course of an acquisition, usually --

18    and what -- your words, dance and walk away, or negotiate and

19    then take time to come to a lower price?

20    **A.**   I think every acquisition was a little bit different, but

21    it was certainly not uncommon for a negotiation to take place,

22    which is a back and forth, and at some point, one or both of

23    the parties wanting to walk away from one another.

24    **Q.**   Did you form the opinion that Mr. Apotheker and

25    Mr. Robison were too excited to use HP's normal sales tactics

1    to get a lower price?

2           MR. FRENTZEN:  Objection.  Foundation.

3           THE COURT:  Well, as of what time?

4           MR. KEKER:  As of the time she formed the opinion that

5    the price was too high.

6           THE COURT:  That could be beyond --

7    BY MR. KEKER:

8    Q.   When --

9           THE COURT:  Lay a foundation.  Lay a foundation.

10   BY MR. KEKER:

11   Q.   In July 15th -- in July, there was a meeting of the board

12   where the board approved a price of $11.7 million for -- that

13   they could negotiate up to $11.7 billion?

14   A.   So I'm not aware that the board approved a price.  I

15   did -- I was not in that meeting and was surprised when I found

16   out that Shane had gone off to negotiate because I was not in

17   the room when there was an approval of a price.

18   Q.   Okay.  Just one second.

19          You weren't in the room, but did you learn that the board

20   at this July board meeting had approved a price of

21   $11.7 billion?

22   A.   I'm not aware at what price the board approved.  I was

23   never told what the pricing was from the board.  I simply found

24   out after the fact that Shane had gone and negotiated a deal,

25   and I remember asking how that could be because I wasn't aware

1   that the board had approved a price.

2   **Q.**    Did you -- did you learn that the premium that they had

3   approved was 68 percent?

4   **A.**    No.  I learned that the deal that Shane had struck had a

5   very high premium after the deal was struck.

6   **Q.**    Did you learn that Mr. Apotheker had gone and met with

7   Dr. Lynch in France and negotiated a price range?

8   **A.**    I don't believe I knew that until well after the fact.

9   **Q.**    You learned that sometime before the deal was approved,

10  though, didn't you?

11  **A.**    I -- I don't remember.

12  **Q.**    You were the chief financial officer of the company at

13  that time?

14  **A.**    I was.

15  **Q.**    Okay.  At some point, did you try to talk to -- when you

16  did learn what the price was going to be, did you try to talk

17  to Mr. Apotheker about it?

18  **A.**    Yes, I did.

19  **Q.**    And at that point, was your relationship with him very

20  tense?

21  **A.**    By the end of that meeting, it was.

22  **Q.**    Did you begin to gather information to challenge the

23  price?

24  **A.**    I don't remember doing that.

25  **Q.**    Look at 8204, would you, please.

```
 1              THE COURT:  82 --

 2              MR. KEKER:  8204.  It's a memo --

 3              THE COURT:  Wait, wait, wait, wait.  8204.

 4              MR. KEKER:  This is a memo to Ms. Lesjak, and I move

 5   it in, Your Honor.  It's in the appropriate time period.

 6              THE COURT:  Admitted.

 7              (Trial Exhibit 8204 received in evidence)

 8                   (Exhibit published to jury.)

 9   BY MR. KEKER:

10   Q.   Who is Mr. Fieler?

11   A.   So Steve Fieler was the head of our -- vice-president of

12   investor relations at that time.

13   Q.   He is writing to you on August 3, 2011.  Were you aware

14   that due diligence on this acquisition was going on on August

15   3rd?

16   A.   Yes.

17   Q.   Okay.  And he's writing you that "it's important to point

18   out that Tesla has consistently" -- Tesla was Autonomy?

19   A.   Yes, it was.

20   Q.   "Consistently missed street consensus per Charly's

21   analysis below.  For HPQ, a 3 million revenue miss would be a

22   non-issue, but some investors may still argue that Tesla is not

23   as predictable as it should be, especially since two-thirds of

24   its revenue should be recurring maintenance, Cloud or OEM."

25        What is he saying to you there?  What did you understand
```

1  him to be saying?

2  **A.**    So if you read to the top paragraph where he says, "Cathie

3  one of the arguments I would like to make about why we both

4  spin Hermes," which was our personal systems group, "and

5  acquire Tesla is that our eventual business model becomes more

6  predictable and less variable."

7      What he was then saying, but if I try to make that

8  argument and investors go back and look at what Tesla or

9  Autonomy actually delivered, they actually aren't more

10  predictable.

11  **Q.**    Down at the bottom, there is an email that he is

12  forwarding on to you that says "Comparison of actuals with

13  street estimates below.  Out of last nine quarters, Tesla

14  missed five from a top-line perspective and four from a

15  bottom-line perspective."

16  **A.**    Yes.

17  **Q.**    All right.  So did that concern you?

18  **A.**    Concern me -- I didn't think it was going to have a

19  material impact on the company, just as Steve said, because we

20  were over a hundred billion in revenue.  But, yeah, I didn't

21  like the fact that the business was not as predictable as we --

22  as you might expect it to be, given its maintenance, Cloud, and

23  OEM revenue.

24  **Q.**    And 8205, look at that and tell me if that's an email that

25  you sent on August 10, 2011.

1              **THE COURT:**  Admitted.

2              (Trial Exhibit 8205 received in evidence)

3                   (Exhibit published to jury.)

4    **BY MR. KEKER:**

5    **Q.**   Can we put that up.

6         So here, again we're still in the due diligence period?

7    **A.**   Yes.

8    **Q.**   And you're asking somebody named Sam, "Can I get a listing

9    of all tech deals, 35 billion, by name and date and premium.

10   In the over 10 billion purchase price case for tech, the really

11   big premiums were mostly in 2000, tech boom/bubble, and one in

12   2003.  Otherwise, the premiums were all until 40 percent,

13   except for HP of EDS."  Explain that to the jury.  What were

14   you saying?

15   **A.**   Well, first of all there is a typo.  The "until" should be

16   "under 40 percent," but that's just my typing skills.

17        I was basically looking for the justification for the

18   premium and to make sure that we had the appropriate data that

19   we were putting together for the board.

20   **Q.**   Okay.  And were you gathering information about premiums

21   because you thought at this point the premium that they were

22   paying was too high?

23   **A.**   I -- I wasn't doing it for that express purpose, but there

24   was a document that was put in place and that we would be

25   showing the board that showed premiums of other deals, and I

1    wanted to make sure that the premiums was -- were relevant to

2    this particular deal.  I was not trying to change the premium

3    that we paid.

4    Q.    Okay.  And around this time, did you have to tell

5    Mr. Apotheker that you believed that HP would have to lower its

6    fourth quarter forecast?

7    A.    I don't -- it was in this time frame.  I don't remember

8    exactly what the date was, but it was obviously before we

9    announced our earnings.  Yes, I did tell him that.

10   Q.    And you announced your earnings on August 18, the same day

11   that the Autonomy acquisition was announced?

12   A.    Yes.

13   Q.    So sometime before that, you began to talk to

14   Mr. Apotheker about the need to lower the forecast for the

15   fourth quarter?

16   A.    That's right.

17   Q.    And that made him very unhappy?

18   A.    Yes.

19   Q.    And that started a little war between you and him, didn't

20   it?

21   A.    Yes.

22   Q.    Okay.  He accused you of deliberately altering the flash

23   reports and the information so that you would have to lower the

24   forecast?

25   A.    Yes.

1   **Q.**   And -- and you said that you wouldn't release numbers that

2   you weren't comfortable with?

3   **A.**   Correct.

4   **Q.**   And then you -- you thought you were going to be fired and

5   tried to negotiate a higher, what we call, golden parachute in

6   the outside world?

7   **A.**   I -- I don't think it's quite that way.

8   **Q.**   Tell us how it was.

9   **A.**   What I -- what I said to him was that at the end of the

10   day, that my credibility with the street, which is very

11   important for a CFO, was going to be damaged by this deal,

12   the -- the size of the deal and the premium of the deal.  And

13   that, you know, he basically was trading on my credibility.

14   And that I thought in the end, the board would have no choice

15   but to let me go because I could no longer be effective with

16   investors.  And, yes, I did try to negotiate a sweetening to

17   the contract that I had.

18   **Q.**   And he accused you of blackmailing him?

19   **A.**   That is correct.

20   **Q.**   And made a complaint to the Business Conduct -- who did he

21   make a complaint to?

22       **MR. FRENTZEN:**   Objection.  Sorry, Your Honor.  At what

23   point is this going to get relevant?

24       **MR. KEKER:**   You know --

25       **THE COURT:**   Okay.  Well, the answer to it is I'm going

1    to sustain the objection because I think we've sort of covered

2    that.

3          Okay.  Let's proceed.  Next question.

4    BY MR. KEKER:

5    Q.   All of this was happening during the due diligence period;

6    right?

7    A.   It all took place before the deal was announced, yes.

8    Q.   Did you get reports on how the due diligence -- you, the

9    chief financial officer, get reports on how the due diligence

10   was going?

11   A.   I think most of the reports that I saw were part of

12   report-outs to a team of people.  I don't remember getting

13   specific reports for me alone.

14   Q.   Oh, okay.  But you got the reports that everybody got?

15   A.   The summary reports.

16   Q.   For example, you got the report from the auditors, KPMG?

17   A.   I think in hindsight, it's been shown in my email that I

18   did get it.  I did not review it.

19   Q.   Okay.  So you didn't see any questions in -- from KPMG

20   about hardware sales or things like that?

21   A.   I did not.

22   Q.   Did you learn -- do you know Mr. Gersh, Andy Gersh?

23   A.   I'm -- I'm embarrassed to say I think I should, but I

24   don't.

25   Q.   Okay.  So I take it you didn't learn from anybody about

1  anything Mr. Hussain had said about hardware sales for

2  convenience or anything like that during due diligence calls?

3  **A.**   No, I didn't.

4  **Q.**   And did you -- did you hear about pass-through hardware

5  sales as part of the due diligence?

6  **A.**   I did not.

7  **Q.**   Look at 6517, please.

8          **MR. FRENTZEN:**  Objection.  Your Honor --

9          **THE COURT:**  6517, admitted.

10         **MR. KEKER:**  It's in evidence.  It's in evidence.

11         **MR. FRENTZEN:**  I'm sorry, Your Honor.  It doesn't go

12 to this witness.

13         **MR. KEKER:**  But it's in evidence.

14         **THE COURT:**  Has it been in evidence?

15         **THE CLERK:**  Yes.

16         **THE COURT:**  Okay.  All right.

17         **MR. FRENTZEN:**  Well --

18         **THE COURT:**  Let's hear what the question is.

19                (Exhibit published to jury.)

20 **BY MR. KEKER:**

21 **Q.**   The question is did you learn that as far -- that -- that

22 they have not captured free software or hardware pass-through

23 as part of due diligence?

24 **A.**   I'm not sure.  Where is that?

25 **Q.**   Right here in this sentence, the last sentence.

LESJAK - DIRECT / KEKER

1    **A.**    No.   I was not aware of that.

2    **Q.**    Okay.   Okay.   Then -- so you and -- all right.   Let's go

3    to the August 16 meeting.

4        Two days before the approval, the final approval, there

5    was a meeting of the board, wasn't there, on August 16?

6    **A.**    Yes.

7    **Q.**    And that's 6587 in evidence.   Could we see that.

8                    (Exhibit published to jury.)

9    **BY MR. KEKER:**

10   **Q.**    And this is a meeting that you attended?

11   **A.**    Yes.

12   **Q.**    And at some point during the meeting, you got up and

13   stated to the board why you approved -- did not approve of this

14   planned acquisition?

15   **A.**    That's correct.

16   **Q.**    All right.   And tell the jury what you told the board.

17   **A.**    So what I told the board was that I thought Leo was very

18   strategic in his thinking and that he was focused on driving

19   the company in the right direction, but that I didn't think the

20   timing was right for this deal.   I didn't think the timing was

21   right because I didn't believe that the investors were behind

22   us.

23       We had not been delivering to our expectations quarter in

24   and quarter out since Leo had joined us and therefore we didn't

25   have, my view, the backing from investors, and this deal was

1    large enough and would have been a surprise to them that we

2    needed that backing from investors.

3         I also said that I thought that the -- while we had a

4    business case that could justify paying $11 billion, that my

5    belief was that we didn't need to pay that big of a price and

6    that the investor reaction was going to be much worse than what

7    our consultants who we had hired, the advisers we had hired,

8    Perella Weinberg, were saying.

9    **Q.**   And Mr. Apotheker got up, and to paraphrase "The Dude" in

10   *Lebowski*, said that's just your opinion; right?

11   **A.**   That's what he said, yes.

12   **Q.**   He was very angry about you speaking out at that board

13   meeting, wasn't he?

14   **A.**   Yes.

15   **Q.**   And came into your office afterward and said you were

16   going to be fired in 90 days?

17   **A.**   I'm not sure he said 90.  He was very clear I was being

18   fired.

19   **Q.**   So you went to the chairman of HP, Ray Lane, didn't you?

20   **A.**   Ray Lane asked me -- I'm not sure -- I talked to Ray on a

21   number of occasions.

22   **Q.**   Let me ask you about this one.  Look at 8214, please.

23   82 -- well, first of all, I move it into evidence, Your Honor.

24   It's an email exchange between Ms. Lesjak and Ray Lane.

25        **MR. FRENTZEN:**  Objection.

1          **THE COURT:**  I'm just trying to figure out the

2    relevance.

3          **MR. FRENTZEN:**  Yeah.

4          **THE COURT:**  I'm sustaining the objection.  Not

5    relevant.

6          **MR. KEKER:**  Could I be heard on that, Your Honor?

7          **THE COURT:**  Yes.  But not right now.  We will take a

8    recess after --

9          **MR. KEKER:**  Well, I'm getting close.  I would like to

10   be heard at sidebar --

11         **THE COURT:**  All right.  I don't want to do sidebar.

12   It's 2:30.

13       Ladies and gentlemen, we will take a recess for 15

14   minutes.  Remember the admonition given to you:  Don't discuss

15   the case, allow anyone to discuss it with you, form or express

16   any opinion.

17       (Proceedings were heard out of presence of the jury:)

18         **THE CLERK:**  I didn't see that exhibit admitted.

19         **MR. KEKER:**  Excuse me?

20         **THE CLERK:**  6587.

21         **THE COURT:**  Please be seated.

22         **MR. KEKER:**  6587?

23         **THE COURT:**  What is the relevance of all this?

24         **MR. KEKER:**  The relevance, Your Honor --

25         **THE COURT:**  She has a terrible relationship with

1  Apotheker and she's being -- and she's going to be terminated.

2  Okay.  That's -- you have established that.  I don't even know

3  the relevance of that, but you've established that.

4         MR. KEKER:  The relevance of all of this,

5  Your Honor --

6         THE COURT:  Is what?

7         MR. KEKER:  Is that Hewlett-Packard, through the

8  Government, is taking the position that they were the victim of

9  something.

10     What -- the reason they did this acquisition had nothing

11  to do with any -- with whether or not something was delivered

12  in Q2 or Q3.  It had nothing to do with any specifics of the

13  financial statements.

14     What it was all about is this transformative, too excited

15  to deal, Mr. Apotheker.  He was insisting on going through this

16  over all opposition.  The -- the company was in complete

17  disarray.  The people who said to him "don't do it, it's too

18  much, you haven't -- you haven't negotiated properly" were

19  completely ignored, and for the Government to stand up and

20  argue to this jury that HP wouldn't have done something because

21  something was delivered in Q2 instead of Q3 is nonsense.

22  Apotheker was going to do this without -- he decided this was

23  great software that he had to have and so -- and he had a plan.

24         THE COURT:  So you're saying -- in other words, if --

25         MR. KEKER:  And they pushed him out.

1          THE COURT:  You have evidence --

2          MR. KEKER:  And they have pushed him out.

3          THE COURT:  You have evidence that if Apotheker or the

4    board were told that in fact the financials that Autonomy had

5    were false, that the growth statements were false, that -- that

6    the true state of affairs was a hundred million dollars or

7    less, that, in fact, they would have -- they would have said,

8    "Oh, well that doesn't make any difference, we're buying the

9    company anyway"?  Is that the evidence you have?  Because I

10   haven't heard that evidence at all.

11        You're just saying they wanted this company and they

12   didn't pay -- and you're saying -- and they paid a premium,

13   even though there was a lot of unhappiness with some persons in

14   it, and they would have bought the company anyway.

15        And the answer is that is highly speculative.  It seems to

16   me that unless you have evidence where people come in and say,

17   "you know, we would have bought the company anyway," then

18   maybe -- maybe that's relevant to whether or not the false

19   statement, the alleged false statements, were material or not.

20         MR. KEKER:  You're putting the bar way to too high and

21   completely ignoring what the arguments are in this case about

22   various things.

23        Mr. Apotheker didn't care -- Mr. Apotheker came in here

24   and told you that he thought that the -- the appliances would

25   be no more than five to seven percent.  They've proved that

1  hardware was maybe ten percent.  Big deal.  Apotheker didn't

2  care.  He -- it wasn't about how much --

3          THE COURT:  But that's not the evidence you have.

4          MR. KEKER:  It certainly is the evidence we have

5  from --

6          THE COURT:  No, no, no.  What your evidence is -- that

7  he wanted to buy the company and that he was determined to buy

8  the company.  And -- and -- and from that, you want to draw the

9  inference it didn't make any difference what the -- what the

10  company said its value was or what the business was and so

11  forth.  You want to draw that inference or have the jury draw

12  that inference.

13      I don't see how you can do it unless you bring in somebody

14  who says, "You know, it doesn't -- you know, we didn't care

15  about the percentages.  We didn't care about the truth of

16  the -- of the financials."  If you have that kind of witness --

17  and this is clearly not that kind of witness -- then of course

18  I have to listen to it and figure out whether that witness can

19  give an opinion.  But that's not this witness.

20      And the inferences that you want to draw -- I mean, you

21  can argue it as you want to argue it, but -- but I think we've

22  actually -- this is not the witness that will establish the

23  things that I thought you were going to establish with the

24  witness.

25          So --

1          **MR. KEKER:**  I don't know what you thought --

2          **THE COURT:**  I sustain the objection.

3          **MR. KEKER:**  I don't know what you thought I was going

4    to establish with the witness, except we've made a proffer

5    about what we were going to establish after October 3rd, and

6    now what I want to do is establish with this witness that there

7    was complete dysfunction around this merger and what they then

8    did is push the visionary, the guy that was going to make it

9    work, the guy that was -- that was the brains and strategic

10   person behind it, they threw him out and he was gone before

11   this thing enclosed.

12         **THE COURT:**  They certainly did that.  They certainly

13   did that.

14         **MR. KEKER:**  And I'm entitled to go into that with her.

15         **THE COURT:**  No.  But there may be a hundred reasons

16   why they got rid of him.  You're not even suggesting that the

17   reason they got rid of him was Autonomy.  To the contrary,

18   you're not saying it's Autonomy that got rid of him.

19         **MR. KEKER:**  I am.

20         **THE COURT:**  You are?

21         **MR. KEKER:**  Yeah.  Sure.

22         **THE COURT:**  They got rid of him because they acquired

23   Autonomy?

24         **MR. KEKER:**  They got rid of him because of this whole

25   debacle after August 18.

**PROCEEDINGS**

 1          **THE COURT:**  What debacle are you talking about?

 2          **MR. KEKER:**  Why don't you let me ask her questions.

 3          **THE COURT:**  No, no.  Tell me.  I might if you give me

 4   an indication --

 5          **MR. KEKER:**  The debacle is that they announced that

 6   they weren't going to make fourth quarter earnings.  They were

 7   closing down Palm that they just bought.  They were going to

 8   get out of the PC business, and they were buying Autonomy at a

 9   high premium.  Reaction, terrible.  A huge --

10          **THE COURT:**  By the way, that's been testified to.  I

11   mean, I recall Apotheker saying, "Yeah, it went down," and

12   there is no question it went down.  There is no question it

13   went down.  I mean, the stock's right there.  It went down.

14      But did -- the question is -- I -- I need -- I thought

15   that -- and maybe I was wrong and maybe I didn't understand it,

16   but I actually did think that the witness was going to say

17   something to the effect that "we had" -- "had we known that --

18   the various things that the Government has asserted here,"

19   whether they are true or not -- has asserted here, they

20   wouldn't -- they would have gone true through the transaction,

21   I'm not sure that comes in, but I'm not sure it doesn't, and

22   that's what I sort of anticipated the defense to be.  They

23   would have bought it anyway.  Even if it --

24          **MR. KEKER:**  That's our argument.  But the idea that I

25   can get the CFO of Hewlett-Packard to say that is --

1          **THE COURT:**  Zero.

2          **MR. KEKER:**  -- is wrong.  I didn't expect to get the

3    CFO.  But I do expect to be able to argue that based on the way

4    that this negotiation and -- and little war with -- inside HP

5    went.  And I think we're entitled to bring it out and make that

6    argument and -- and --

7          **THE COURT:**  And the answer is you are entitled to

8    argue any reasonable inference from the evidence.  The evidence

9    is there as to -- as to what happened, I think.  From her point

10   of view, the evidence is there as to what happened.

11         **MR. KEKER:**  But we should be able --

12         **THE COURT:**  She thought they were paying too much and

13   so forth and so on, and she had a big fight with Apotheker and

14   he threatened to fire her and -- and really, it seems to me,

15   that -- that Apotheker was very upset with her by the fact that

16   she is saying "I'm the chief financial officer and guess what?

17   I'm not going to certify," you know, "anything that's going to

18   show that -- that we're meeting our expectations and so forth

19   because we're not.  And the stock is going to go down because

20   we all know that's what happens."

21         **MR. KEKER:**  I would request being able to finish this

22   off, and that includes being able to use 8214, where she's

23   going -- where she is talking to the chair of the board in an

24   email --

25         **THE COURT:**  Let me look.  8214.

PROCEEDINGS

1              **MR. KEKER:**  Email strings that lead to Apotheker's

2    firing.

3              **THE COURT:**  8214.

4              **MR. KEKER:**  85 --

5              **THE COURT:**  Pardon?  I don't think this is it.  Which

6    document is it, Mr. Keker?

7              **MR. KEKER:**  We are talking about something different.

8    I'm sorry.

9              **THE COURT:**  Okay.  Well, anyway, if you have

10   something.

11             **MR. KEKER:**  Okay.

12        I'll deal with that.  You're right, Ms. Scott.

13        So, I'm sorry.  8214 is what I want to show her.

14             **THE COURT:**  8214?

15             **MR. KEKER:**  Yes, sir.

16             **THE COURT:**  Okay.  Let me look at it.

17             **MR. KEKER:**  And I want to show her 8215.  We might as

18   well talk about them right now.

19             (The Court reviews the document.)

20             **THE COURT:**  I mean, this is filled with -- how are

21   they going to pay for all these acquisitions and what rates of

22   interest and where is the cash coming from and -- I'm just

23   trying to figure out why this is at all relevant, any of this.

24        I understand the major point may be relevant, according to

25   your theory of the defense, which is that there were a number

**PROCEEDINGS**

 1   of things happening in August unrelated to Autonomy --

 2   unrelated to Autonomy -- which was causing the CEO of the

 3   company to contemplate firing and tried to fire or would fire

 4   the CFO.

 5            **MR. KEKER:**  No.  That's not --

 6            **THE COURT:**  That is a point and that's there.  That's

 7   there.

 8            **MR. KEKER:**  And then the chair and the CFO --

 9            **THE COURT:**  Yeah?

10            **MR. KEKER:**  -- begin to --

11            **THE COURT:**  They fight themselves and people are fired

12   and people are hired.

13            **MR. KEKER:**  No.  And they decide that they begin to

14   work and there is emails that show that they -- as a result of

15   the investor reaction to this, they decide that they're going

16   to fire the visionary, the person that wanted to buy this at

17   any cost.  And there is a few emails that show that and then

18   she's gone.  I'm doing that all before the acquisition closes.

19   And I ought to be able to do it.

20            **THE COURT:**  Mr. Frentzen?

21            **MR. FRENTZEN:**  Thank you, Your Honor.

22        This is not at all relevant to whether or not the

23   Defendant and Autonomy defrauded Hewlett-Packard by cooking

24   their books, which is basically what our case is about.  It's

25   what we've presented.  It's what we've proved.

PROCEEDINGS

1        And to extrapolate from irrelevant skirmishes within

2   Hewlett-Packard to this theory -- I mean, I don't know if there

3   is a scrap of paper at that company that they haven't been able

4   to comb through and they haven't found what they're looking

5   for, which is, you know, apparently, you know, "we would have

6   bought this anyway."

7        And the theory that they have supposedly is the guy who

8   makes the call, which is Apotheker, and we brought him.  He

9   testified.  They got to cross him.

10       I don't understand where this is coming -- this is

11  somebody who thought, you know, that it was bad timing for the

12  acquisition and actually didn't, you know -- wasn't in favor of

13  doing it, and to go beyond that, I just don't see any kind of

14  relevance whatsoever.

15           THE COURT:  Well, I don't see the relevance, but I

16  think that the facts that -- that Mr. Keker wants are actually

17  not contested; that is to say, that Apotheker himself was

18  fired.  That -- the reasons why he wanted it -- I mean, if you

19  got from her, "well, did you" -- "did Apotheker give you some

20  different reason why he wanted it?"  She's not going to say

21  that.  We know that.

22       Sure, she thinks they paid too much because they didn't go

23  into the usual bargaining thing, but that's not what is at

24  issue here.  They're not saying look, it wouldn't have been a

25  fraud if it were not -- if it were -- I forget what the premium

1    was.   46 percent?  Whatever that premium was.   It would have

2    been okay -- I don't even know that she has an opinion as to

3    what they should have paid.

4         But be that as it may, that doesn't mean that the, quote,

5    the fraud didn't occur, and reliance is not part of it.   The

6    question is the crime itself, if it did occur, it occurred

7    before October, and -- and the fact that they mismanaged or

8    failed to manage properly or were disappointed or not

9    disappointed, in the Court's view, even if it's relevant, would

10   introduce a whole host of issues that the Court would not

11   entertain.

12            MR. KEKER:  So can I make a proffer to make sure --

13            THE COURT:  Yes, you can.

14            MR. KEKER:  -- it's really, really clear what we think

15   we're entitled to do.

16        We think we're entitled too obviously hostile witnesses

17   and challenge their -- some of the statements that the

18   Government wants on cross-examination.  They did call

19   Mr. Apotheker.  Mr. Apotheker said, "Oh, it's a really big deal

20   to me about hardware."  Nonsense is our position.  We would

21   like to show that that's nonsense.  The way we show that that

22   is nonsense is by showing that this witness, when she learned

23   about hardware, both before and after and -- and -- anyway, all

24   this turmoil, they get rid of the visionary.  They learn about

25   the hardware.  They don't do anything.  You've ruled on that.

1    I'm not going back on that.

2        But we ought to be able to finish showing what was going

3    on at Hewlett-Packard at -- at the board level and the --

4    the -- I mean, one of these emails say that the chair wants to

5    get out of the deal and Mr. Apotheker says, "No, we got to do

6    it."  We ought to be able to do that --

7            THE COURT:  There may be a lot of legal reasons you

8    can't get out of a deal.  I have no idea.  Unless you were to

9    suggest that they -- if you were to suggest, Mr. Keker, that

10   they thought they should get out of the deal because they then

11   believed that -- that these financials were false in one way or

12   the other, that's a different story.  That's a different story.

13       But that's -- that's not why they -- if they did want to

14   get out, it's not because they thought that they had been lied

15   to.  They thought it simply wasn't worth as much as -- as they

16   originally thought it was worth or they thought it was worth

17   more or less, I don't know.

18           MR. KEKER:  I give up.

19           THE COURT:  But there is a missing nexus.  Well, don't

20   give up.

21           MR. KEKER:  Well, no, I am because what you are doing

22   is shutting down any ability to defend this case.

23           THE COURT:  I am shutting down that defense.  That --

24   listen, you deserve some candor from me; that is to say, you

25   have made an offer as to what you want to show.  I have

 1  rejected it for the reasons that I've rejected it.  I could be

 2  right and I could be wrong.  I understand that.  But that's the

 3  way the case is being tried and -- and --

 4          **MR. KEKER:**  I get it.

 5          **THE COURT:**  -- there we are.

 6          **MR. KEKER:**  So do I have to quit now?  I mean, is

 7  there anything that I can ask?

 8          **THE COURT:**  Don't quit.

 9          **MR. KEKER:**  I'm serious.  I've got questions that I'd

10  like to ask her about the way --

11          **THE COURT:**  Well, I can't --

12          **MR. KEKER:**  -- this all ended up.

13          **THE COURT:**  This is your witness.  You have to decide

14  whether there are questions that you can ask that, number one,

15  you think are different from the Court's ruling, and if not,

16  then -- then I certainly will allow you to make an offer of

17  proof of what you would have asked and what the Court's ruling

18  would have been.

19          **MR. KEKER:**  But, I mean, I would like to ask about the

20  conversations that she had with Lane, the chairman, about

21  getting rid of Mr. Apotheker.

22          **THE COURT:**  Okay.  And as to that, I would not -- I

23  think that that's irrelevant, unless you're representing to me

24  that these conversations entailed a discussion as to the issues

25  that have been raised in this case, that is, about the

PROCEEDINGS

```
 1   hardware, about the growth.  If they relate to those issues, of
 2   course they would all come in.
 3         MR. KEKER:  The issue --
 4         THE COURT:  When I say "relate," I don't mean well,
 5   that -- that somehow it wouldn't impact on that.  I'm saying
 6   that there was a discussion.
 7         MR. KEKER:  The issues --
 8         THE COURT:  -- with the chairman of the board.
 9         MR. KEKER:  The issue that we see that is raised in
10   this case is why HP bought -- the impetus, what was material to
11   HP in buying Autonomy.  And it's not what the Government is
12   saying.  That's --
13         THE COURT:  I thought the real issue under the law is
14   whether it would be material to an objective individual hearing
15   the same things.
16         MR. KEKER:  All right.  And showing that it's not
17   material to HP or arguing that it's not material to HP is some
18   evidence that leads us in that direction.  That's what I'm
19   saying about the defense.  We ought to be able to present to
20   the jury what we think is reasonably inferable about --
21         THE COURT:  And that's where you lose me because I
22   don't even know that it's reasonably inferable because there
23   are a thousand other circumstances that are existing at that
24   time.
25         By the way, not the least of which may be personality
```

1    problems among the people.  You know, as I commented earlier,

2    Hewlett-Packard, in many respects, was dysfunctional in --

3    in -- at least in certain aspects, from what I've seen.  And

4    this may be another example of it.

5        But even somebody dysfunctional can't be lied to and --

6    and -- and that's the issue that you have to deal with in this

7    case.  Which, of course, is -- the majority of your defense

8    anyway, as I understand it, is that the accounting was actually

9    accurate.  That these were -- these were properly accounted

10   for.

11           MR. KEKER:  All that's true, but the -- the

12   Government's case is based on poor HP having been lied to and

13   defrauded, and we -- our position is HP was not lied to or

14   defrauded, and what they're talking about, this is made-up

15   stuff that came a year later, along with the -- first the

16   announcement and then the restatement.  It is made up for

17   consumption here with the jury.  And we're not -- we're not

18   being allowed to put that on.

19       Your Honor, 6587 I thought was in evidence, but it's not.

20   It's the August 16, 2011 slide deck.  She was at the meeting.

21   I was -- was --

22           THE COURT:  She was at the meeting and that was

23   presented.  It's admitted.

24           MR. FRENTZEN:  No objection.

25           THE COURT:  Okay.  If that's what it is, it's

 1   admitted.

 2            **MR. KEKER:**  Yeah.  Okay.

 3            **THE COURT:**  Yeah.  It's admitted.

 4            (Trial Exhibit 6587 received in evidence).

 5            **MR. KEKER:**  6587, August 16, 2011, Project Hermes and

 6   Tesla, BOD update.

 7            **MR. FRENTZEN:**  I'm sorry, Your Honor.  This says

 8   "draft."

 9            **MR. KEKER:**  So what?

10            **MR. FRENTZEN:**  Well, usually drafts don't get shown --

11            **MR. KEKER:**  Well then let me ask her.  This is what

12   she says she saw because she remembers the 17 --

13            **THE COURT:**  I thought there was -- she said that she

14   saw something with different figures.

15            **MR. KEKER:**  That had 17 billion.  This has got 17

16   billion.

17            **MR. FRENTZEN:**  Maybe this is it.  I don't know.  It

18   just says "draft."

19            **THE COURT:**  Anyway, I'm going to let it in.  It's in.

20   Anything to -- it's in.  It's in.

21        Lashanda, do I have Volkswagen?

22            **THE CLERK:**  That's tomorrow.

23            **MR. KEKER:**  Can I have a moment before the jury --

24            **THE COURT:**  Of course you can.  Do you want to resume

25   at 3:00?

PROCEEDINGS

```
 1        Can I ask, Mr. Keker, where are we?  I mean --
 2            MR. KEKER:  She is our only witness.
 3            THE COURT:  Okay.  So you're, at the conclusion of
 4   this testimony, whenever that occurs --
 5            MR. KEKER:  We're going to rest.
 6            THE COURT:  You are going to rest.  Then what I
 7   propose to do then is to -- today is Wednesday?
 8            MR. FRENTZEN:  Yes, Your Honor.
 9            THE COURT:  Is to tell the jury to come back Monday
10   for argument.
11        Now, does anybody have any views contrary to that?
12            MR. FRENTZEN:  No, Your Honor.  I just wanted to, if I
13   could -- Tuesday is a short day?
14            THE COURT:  Well, unfortunately Tuesday --
15            MR. FRENTZEN:  I just want to know how short.
16            THE COURT:  Well, I'm supposed to go to a meeting at
17   1:00.  And I know I have inconvenienced everybody throughout
18   this trial with these other obligations.  But I think -- I know
19   I have to -- I know I have to be there like by 2:00.
20            MR. KEKER:  Why can't we get this done -- argument
21   done all day Monday and half a day Tuesday?
22            THE COURT:  I think we could.
23            MR. FRENTZEN:  Calm down.  I didn't know if it was,
24   you know, 11:00 or 12:00.
25            THE COURT:  No.  It's 1:00 that I should be leaving.
```

1    But I just don't know -- you're going to kill that jury.  They

2    can listen to this thing -- I don't see how they can listen to

3    anybody more than an hour and a half, and two hours really

4    stretches it.

5         **MR. KEKER:**  That's fine with me.

6         **THE COURT:**  I mean, I really think that -- that the

7    Government should -- well, whatever.  I have to listen to what

8    the parties have to say.

9         Think about it tonight and I will listen to you tomorrow.

10   We will have our charging conference tomorrow and then we'll --

11   we'll give it to the jury on Monday.

12        **MR. KEKER:**  Okay.

13        **MR. REEVES:**  What time for the conference?

14        **THE COURT:**  I have no idea.

15        **MR. KEKER:**  Your Honor, can we file the judgment of

16   acquittal motion?

17        **THE COURT:**  Okay.  There we go.  Okay.

18        **THE CLERK:**  Do you want to see them tomorrow at 1:00?

19        **THE COURT:**  I don't know what time I want to see

20   them -- what time I want to see you tomorrow.  I'll figure that

21   out.

22        Mr. Keker, would like some more time?  Until 3:00; right?

23        **MR. KEKER:**  Yes, sir.

24                  (Recess taken at 2:53 p.m.)

25                  (Proceedings resumed at 3:11 p.m.)

 1          (Proceedings were heard in the presence of the jury:)

 2          **THE COURT:**  Please be seated.

 3      Let the record reflect all parties are present, the jury

 4  is present.

 5      Mr. Keker.

 6          **MR. KEKER:**  Thank you, Your Honor.

 7  **Q.**   Ms. Lesjak, I didn't -- I might not have understood this,

 8  but were you at the board meeting July 20-21, 2011, when the

 9  decision was made to let Mr. Apotheker negotiate up to

10  11.7 billion?

11  **A.**   I was at -- I was not at the board meeting when the board

12  authorized him to spend up to $11.7 billion, and I'm assuming

13  that that is -- that happened but I wasn't in the room when it

14  happened and was not aware that it had happened.

15  **Q.**   But you were at the meeting?

16  **A.**   I was at parts of the board meeting for sure, but I didn't

17  attend executive sessions, as an example.

18  **Q.**   Did you see the slide deck that was presented there?

19  **A.**   I saw -- I saw the slide deck that was presented at the

20  time that I was in the room, yes.

21  **Q.**   Okay.  Would you look at 6558, which is in the binder?

22  And I think is in evidence.

23  **A.**   (Witness examines document.)

24          **THE CLERK:**  Let's see...  Yes.

25          **MR. KEKER:**  It is in evidence.

**LESJAK - DIRECT / KEKER**

1  **Q.**   This is the Board of Directors Presentation on Portfolio

2  dated July 20, 2011.

3        Were you -- look at it and tell me if you were in the room

4  when they went through this.

5  **A.**   (Witness examines document.)

6  **Q.**   I mean, you don't have to study, just --

7  **A.**   It looks familiar, yes.

8  **Q.**   Okay.  Fair enough.

9            **THE COURT:**  Admitted.  Is it in?

10            **MR. KEKER:**  It's is in evidence, Your Honor.

11            **THE COURT:**  Okay.  Go ahead.

12  **BY MR. KEKER:**

13  **Q.**   Would you turn way back to page -- tell the jury what was

14  being talked about that day.  What were the options?  There was

15  this divest and acquire, only acquire.  Just generally what was

16  being talked about?

17  **A.**   I'm sorry.  Are you talking about Slide 4?

18  **Q.**   Yeah.  Sure.  Slide 4.

19  **A.**   The Transformation Options?

20  **Q.**   Okay.  Sure.  And then the next page "Transformation

21  Options," let's look at 5, "Only Acquire, Divest and Acquire,

22  Status Quo, Only Divest."  Just generally what were you talking

23  about?  We don't need a lot of detail here.

24  **A.**   We were talking -- high level we were talking about the

25  strategy for the company, and then we were specifically talking

**LESJAK - DIRECT / KEKER**

1    about whether we make a material acquisition, yes or no; and

2    then whether or not we make a major divestiture, yes or no.

3    **Q.**    And do you remember an investment bank called Perella

4    Weinberg was there and made a report?

5    **A.**    Yes.

6    **Q.**    Okay.  Would you turn back to page 70 of the exhibit?  And

7    is that the executive summary of their report?

8    **A.**    (Witness examines document.)

9    **Q.**    Page 70 -- Bates stamp 70.

10   **A.**    (Witness examines document.)

11   **Q.**    We've got it on the screen.  Maybe that's easier than

12   making you use that one arm.

13   **A.**    Yeah.

14   **Q.**    Do you recognize that generally as the -- show the page

15   before, Jeff where it says "Executive Summary."

16       And then you turn over, this is the Perella executive

17   summary; right?

18   **A.**    Yes.

19   **Q.**    And they're saying (reading):

20           "Hawk is currently in a precarious position," second

21       bold.

22       Who was Hawk?

23   **A.**    HP.

24   **Q.**    And then they talk about various challenges and (reading):

25           "Given the nature of these challenges" -- look at the

1          third bullet point down here -- "Given the nature of these
2          challenges, Hawk will find it very hard to 'execute out'
3          of this predicament on a timely basis."
4          What does that mean?
5    **A.**   (Witness examines document.)  I think Perella Weinberg's
6    perspective would have been that we would have to execute the
7    business very well over a longer period of time in order to
8    change the direction of the stock price to actually have the
9    stock appreciate.
10   **Q.**   And then on the next page, executive summary continued, if
11   you'd look, the first bold part is (reading):
12          "In light of these circumstances, we believe that
13          Hawk needs to take a proactive and deliberative approach
14          to clearly identified strategic initiatives that will
15          transform Hawk mid- to long-term."
16          And there they talk about Poseidon.  What's Poseidon?
17   **A.**   Our personal systems business.
18   **Q.**   And you were talking about getting rid of that?
19   **A.**   We were looking at strategic options, and they were
20   suggesting that we separate from them through some sort of a
21   spin or sale transaction.
22   **Q.**   Okay.  And then (reading):
23          "In addition, we believe that" -- about the fifth
24          bullet down -- "In addition, we believe that Atlantis is a
25          critical offensive move towards Hawk's strategic vision

1          and that Hawk should pursue the acquisition

2          expeditiously."

3          That's a reference to Autonomy?

4   A.    Yes, it is.

5   Q.    And then they go on to say (reading):

6              "Atlantis provides a unique opportunity to reposition

7          Hawk as the undisputed leader in context-aware computing."

8   A.    Yes.

9   Q.    That was their recommendation --

10  A.    Yes.

11  Q.    -- at this July meeting?

12         And on page 81, again the title is "A Transformational

13  Opportunity," and they're talking about (reading):

14             "Atlantis represents the lynchpin of fulfilling

15         Hawk's strategic vision to provide context-aware

16         computing."

17         Do you see that?

18  A.    Yes, I do.

19  Q.    And then in this one the -- this is the one -- I think on

20  page 83 this is the one that puts the synergies at making

21  Autonomy possibly worth 17 billion.  This is the one you recall

22  seeing?

23  A.    Yes.  This is more familiar.

24  Q.    Okay.  If you look at 2008, which is in evidence.  This is

25  the minutes of this meeting, the July 19 through 21, 2011.

1    Have you ever seen these minutes?

2    **A.**    I don't recall.

3    **Q.**    And can we go to the next page?

4        This indicates that you were present; right?

5    **A.**    Yes.

6    **Q.**    And then the next page.

7        You see down in the second paragraph there under

8    "Strategic Considerations and Alternatives" (reading):

9            "After a full discussion, the board authorized

10        Apotheker, Robison, and other members of HP management to

11        pursue Project Tesla with a minimum acquisition price" --

12            **THE COURT:**    Maximum.

13    **BY MR. KEKER:**

14    **Q.**    Excuse me.

15        -- "maximum acquisition price of $11.7 billion."

16        Now, you weren't in the room when they did that?

17    **A.**    Not that I recall.

18    **Q.**    When did you first learn that, as chief financial officer,

19    the board had approved the pursuit of Autonomy for a maximum

20    price of 11.7 billion?

21    **A.**    I don't believe -- until today, I didn't know that the

22    board had authorized a maximum price of $11.7 billion.  What

23    I -- when I heard, it was that Shane had gone to U.K.,

24    negotiated a price, and I was told what that per-share price

25    was.

**LESJAK - DIRECT / KEKER**

1   **Q.**   And what were you told the per-share price was that

2   Mr. Robison had negotiated?

3          **MR. FRENTZEN:**  I'm sorry.  Objection.  Foundation.  Is

4   this direct or from somebody else?

5          **MR. KEKER:**  Sure.

6   **Q.**   Who told you what Mr. Robison had negotiated?

7   **A.**   I think it was the -- I think it was someone -- either

8   Andy Johnson or someone in his organization.  It was not Shane.

9   **Q.**   And what were you told was the share price that

10  Mr. Robison had negotiated?

11  **A.**   I'm sorry, I can't remember.  20-odd pounds or 18-odd

12  pounds.  I don't remember.

13  **Q.**   Okay.  At that point and, in fact, up until the closing,

14  did you ever look at Autonomy's financial statements?

15  **A.**   No, I don't believe I did.

16  **Q.**   And did you ever read an analyst report on Autonomy?

17  **A.**   I did not.

18  **Q.**   Did you ever read their annual report for the year?

19  **A.**   I did not.

20  **Q.**   You said you had no involvement in price negotiations and

21  you didn't have any involvement in closing the deal.  Do you

22  remember reading the due diligence report, KPMG's due diligence

23  report?

24  **A.**   I don't.

25  **Q.**   Okay.  Then let's go to August 18.

1          On August 18, Hewlett Packard announced several things; is

2     that right?

3     **A.**   Yes.

4     **Q.**   And one of them was that the fourth quarter guidelines

5     were going to be lowered?

6     **A.**   The earnings-per-share outlook would be lowered, yes.

7     **Q.**   Right.  And another was that you were closing down the

8     Palm division?

9     **A.**   Yes.

10    **Q.**   And another was that you were thinking pretty seriously of

11    getting out of personal computers?

12    **A.**   We were looking at strategic alternatives, yes.

13    **Q.**   And you paid $14 billion for Compaq a few years before,

14    and now you were announcing you were getting out of it?

15    **A.**   No, we did not announce that.

16    **Q.**   What did you announce about personal --

17    **A.**   So on the Compaq acquisition, my recollection -- it's been

18    a while -- was that we were writing down the trade name value,

19    and so I believe that we wrote that off or at least wrote it

20    down significantly.

21    **Q.**   Okay.

22    **A.**   But it was just the trade name.

23    **Q.**   And then you announced that you were buying Autonomy for

24    whatever the premium was, the price.

25         And about a month later Mr. Apotheker was gone from the

**LESJAK - CROSS / FRENTZEN**

1  company?

2  **A.**    Yes.

3  **Q.**    And shortly after that Mr. Robison was gone from the

4  company?

5  **A.**    Yes.

6        **MR. KEKER:**  That's all I have, Your Honor.

7        Thank you very much, Ms. Lesjak.

8                    **CROSS-EXAMINATION**

9  BY MR. FRENTZEN:

10  **Q.**    Good afternoon, Ms. Lesjak.

11  **A.**    Good afternoon.

12  **Q.**    My name is Will Frentzen.  We've spoken once on the phone;

13  is that right?

14  **A.**    That's right.

15  **Q.**    Ms. Lesjak, I just want to ask you a couple of questions

16  about -- you were just asked about what you did and didn't

17  review in connection with the acquisition of Autonomy.

18        Could you just describe for us in terms of your role

19  during the acquisition?

20  **A.**    Sure.  The way we were organized at that point in time was

21  the M&A team reported up to Shane Robison who reported up to

22  Leo Apotheker or the CEO.  I had a very high-level overview

23  role to play, and so I was in the review meetings.  I looked at

24  the summary due diligence reports, and there were no

25  significant issues found.

1          And so I was, I would say, one step removed, which is

2    different than the way a more typical company is organized and

3    the way we're organized today in which mergers and acquisitions

4    actually reports to me, and I have a much bigger role to play

5    in terms of due diligence and assessing acquisitions.

6    Q.   So some aspect of it was a structure at that time?

7    A.   That's correct.

8    Q.   And did you know some of the folks involved in the due

9    diligence process?

10   A.   I did, yes.

11   Q.   And were you relying on them?

12   A.   I did, and I had a lot of confidence in the team that was

13   doing the due diligence and doing the business analysis.

14   Q.   In terms of the -- I know there was questions about the

15   board and what the board approved.  Do you have an

16   understanding of whether the board approved a price or whether

17   the board approved some sort of a range, if you know?

18   A.   I don't know.

19   Q.   Okay.  In terms of your role as chief financial officer,

20   are you involved in preparing financial statements?

21   A.   I'm not directly involved.  I have a controller and had it

22   at the time, and that organization is responsible for doing all

23   of the accounting and putting together the financial

24   statements.  I review all of the SEC filings and the MD&A and

25   everything like that, but I don't specifically review the

**LESJAK - CROSS / FRENTZEN**

1  detailed numbers *per se*.

2  **Q.**   And -- well, just in your role as chief financial officer,

3  what's the importance of the -- for a public company, what's

4  the importance of the financial statements?

5  **A.**   It's very important to our investors to understand the

6  risks and the performance of a public company, and that's done

7  through SEC filings, quarterly filings, annual filings; and all

8  of the disclosures that go into those filings are very

9  important to investors to understand the business and the risks

10  associated with that business.

11  **Q.**   And is it important that the financial statements are

12  accurate?

13  **A.**   Absolutely.

14  **Q.**   Why is that?

15  **A.**   Because investors are putting their money into the

16  company.  They're investing with one set of expectations -- a

17  set of expectations, and we owe it to them to give them

18  accurate information so they can assess that appropriately.

19  **Q.**   With respect to your issues with the acquisition of

20  Autonomy, can you describe, was it a concern about the value,

21  as you perceived it, of the company or did you have a different

22  issue?

23  **A.**   I had a different issue.

24  **Q.**   Could you describe that for the jury, please?

25  **A.**   So I had two primary issues.  The first one was that I

1   believe that I'm kind of the steward and the voice of investors

2   in the company, and I believe that investors would react

3   extremely badly to an acquisition of this size at the time that

4   we were announcing it.

5        The company during Leo's tenure, we would guide a quarter,

6   we would guide the year, and we repeatedly over this 11 months

7   had to keep bringing it down.  So investors didn't have

8   confidence that we were going to deliver on what we said we

9   were going to do, and that was unusual for us.  We hadn't had

10  that experience before.

11       But then to come and ask them to basically back us in an

12  $11 billion acquisition I thought was an awful lot to ask.

13  **Q.**   And --

14  **A.**   Secondly --

15  **Q.**   Sorry.  Go ahead.

16  **A.**   Go ahead.

17  **Q.**   No, no.  Go ahead.  That's fine.

18  **A.**   My second issue was with the premium.  I did not believe

19  that investors would respond well to a 65, 70 percent premium

20  and that the view would be that we were overpaying.

21  **Q.**   So, basically, you had an issue about the timing; is that

22  right?

23  **A.**   The timing and the premium we were paying.

24  **Q.**   And just to be clear, you had an issue with the price but

25  not necessarily a dispute about what the overall value of the

**LESJAK - CROSS / FRENTZEN**

1  company, as you understood it, was?

2  **A.**    That's correct.  I thought we had a good, solid business

3  case that justified paying $11 billion; but if we can get it

4  for 10, I'd rather have done that.

5  **Q.**    Okay.  So those were your two issues.

6       And in terms of your dispute with Mr. Apotheker about this

7  acquisition, was your dispute about whether or not to buy

8  Autonomy over these issues the timing and the price?

9  **A.**    Yes.  That was the extent of my dispute.

10  **Q.**    So in terms of your dispute with Mr. Apotheker, so far as

11  you know, were you both operating on the premise that you had

12  accurate information about the value of Autonomy?

13  **A.**    Yes.

14  **Q.**    And if the value of Autonomy -- if you also had known that

15  the value of Autonomy, that its financial statements were

16  overstated, would that have caused you additional concern?

17  **A.**    Absolutely.  And I'm confident that if I had known about

18  the fraud and that Leo had known about the fraud, we wouldn't

19  have done the deal.

20       **MR. FRENTZEN:**  May I have a moment, Your Honor?

21            (Pause in proceedings.)

22       **MR. FRENTZEN:**  Thank you, Your Honor.

23       Thank you, Ms. Lesjak.

24       **THE COURT:**  Anything further?

25       **MR. KEKER:**  I have no questions.

1    **THE COURT:**  Thank you very much for coming in.

2    **THE WITNESS:**  Thank you.

3              (Witness excused.)

4    **THE COURT:**  So, ladies and gentlemen, let me tell you

5    what the game plan is.  The game plan is you will, as you know,

6    not meet on Friday, and I've had some discussions with counsel,

7    and you will not be required to meet tomorrow either because we

8    need to go over a number of things.

9         It is anticipated, though always subject to something, but

10    it's anticipated that on Monday morning we will start -- we

11    will have argument in the case, and that consists of two

12    things.  It consists, first of all, the Court gives you

13    instructions as to what the law is.

14         And the good news is that I give each of you a package,

15    not that you need more documents but they are extremely

16    important because it's the law of the case, and you will have

17    that during the course of your deliberations.  So you need not

18    make any notes or anything as I read them to you.

19         Then comes the second part.  Everything is really three

20    parts, but the second part, which we will have will be

21    argument.  And the way that works is the Government makes

22    what's called the opening argument, the Defense makes its

23    argument, and the Government is permitted to make a rebuttal to

24    it, at the conclusion of which the case goes to you for your

25    determination.

1        And you will have -- obviously, the exhibits will be

2    available to you.  We're discussing how we can put sort of two

3    forms of exhibits.  One will probably be the hard copies of a

4    lot of documents.  They will have numbers to them as exhibit

5    numbers, and they will be available to you in the jury room.

6    There also are some documents that are so voluminous, these

7    Excel sheets and so forth, but they have been received in

8    evidence, a number of them, and so they will be available on a

9    computer, which hopefully somebody there will know how to

10   operate.  It's supposedly relatively easy to do it.

11       A third thing, and at that point you'll have the case for

12   your consideration, and you will engage in what are called

13   deliberations.

14       Now, deliberations really mean the views of your fellow

15   jurors.  You've all heard the same evidence or been exposed to

16   the same evidence, the same exhibits, the same argument, and

17   then the question is:  What opinions can you come to?  What

18   findings can you come to?

19       And I found that it's very, very useful to have what I

20   call a full and frank exchange of views and listen to the views

21   of your fellow jurors, because the idea will be to see whether

22   it's possible that you can come to a unanimous decision as to

23   the issues that are being presented to you.

24       You'll also have what's called the form of verdict, and

25   that will ask a series of questions, and that's really how you

 1    will -- once you have all 12 of you agreeing to an answer to a

 2    particular question, you then will enter that into the verdict

 3    and proceed to the next question.

 4        So that's the process.  Now, I can't tell you will you be

 5    able to do it in a day, will you be able to do it in two days,

 6    three days, four days.  That's all in your control.  That's all

 7    in your control.  The only thing that the Court does is to try

 8    to make sure that you spend the day in deliberations.

 9        Of course, there will be 12 of you at that point, and I'll

10    discuss exactly how we're going to deal with that.

11        So I don't know how much more I can tell you at this point

12    other than, once again, I will tell you that you may have some

13    tentative ideas, you may have some thoughts, put them to the

14    side.  Just put them to the side because I think you will find

15    the argument of counsel extraordinarily helpful in viewing the

16    evidence.  It's their view as to what the evidence has shown

17    and how the evidence fits with the law, and that's extremely

18    valuable, much more valuable than really anything I could do in

19    this case and so I want you to listen.

20        Now, counsel -- we've had some conversations already and

21    counsel are going to make sure that in their argument to you if

22    they think that there is a particular document or series of

23    documents that are important or more important or demonstrate

24    their point, they're going to say "Exhibit 6554," or they're

25    going to give you the number.  So it is useful to make notes

1    during closing argument just because you get back there and you

2    say, "What did the lawyers say?  What's that exhibit number?"

3    And you don't want to rely too much on your memory on that, so

4    it's very useful to make a note or so.

5        I'm not saying you should write down the arguments.  You

6    get writer's cramp.  I'm simply saying that where there is

7    something helpful to you, that you think will be helpful to

8    you, be sure to write down that number if you think that that

9    may demonstrate a particular point or not.

10       Okay.  So with that --

11           MR. KEKER:  Your Honor, we should rest, I think.

12           THE COURT:  Well, not yet.  I want to have a

13   conversation with the parties before we do that.

14           MR. KEKER:  Okay.

15           THE COURT:  Okay.  So I will see you on Monday bright

16   and early, and we'll just move ahead.  Thank you very much.

17       (Proceedings were heard out of the presence of the jury:)

18           THE COURT:  Okay.  The jury has left.

19       I didn't want the -- have a seat.

20       I didn't want the Defense to rest until I have given the

21   Government and the Defense further opportunity to discuss the

22   offers of proof I think that -- in fairness to both sides.

23   Actually, who knows where the case goes; but if the case

24   results in a conviction, there will be an appeal and if there's

25   an appeal, the record will be crucial and I wanted to make sure

1    that both sides got to make the arguments not in the heat of

2    the moment with a witness standing, you know, on the stand but

3    really to give it some thought and to flesh it out.  So I'm not

4    foreclosing the Defense from making further arguments in that

5    regard.

6        I want to make sure that I've got a pretty solid

7    understanding of what the Defense theory is here on that aspect

8    of the case because obviously I'm well aware that the Defense

9    theory is that basically the accounting that occurred was not

10   erroneous, was within reasonable -- fairly and accurately

11   portrayed the books and records of the company.  I have to

12   assume that's going to be one of the points that they're going

13   to make.

14       A second point I guess they're going to make is that

15   notwithstanding whatever -- well, I think they're going to make

16   a point that this -- that all the testimony about hardware

17   sales -- and I'm not talking about hardware or appliance sales;

18   I'm talking about pure hardware sales -- was either, one, known

19   to Hewlett Packard, so notwithstanding if one says there was

20   concealment of that fact, it was nevertheless known to Hewlett

21   Packard; and, two, it made no difference to Hewlett Packard in

22   the acquisition.

23       Now, the evidence that they are offering, especially as to

24   that point, as I understand it from their offer of proof, is

25   essentially the Ernst & Young report and e-mails relating to

1    Ernst & Young's look at Hewlett Packard -- look at the

2    acquisition subsequent to its acquisition.   I think in November

3    they issued a report.   I have that in front of me and it's

4    Exhibit Number 8231.

5        And it is their position that that demonstrates that

6    not -- it doesn't demonstrate that they -- that Hewlett Packard

7    knew about it.   It simply demonstrates that these are not of

8    consequence and it doesn't affect -- it wouldn't affect the

9    purchase.

10       I am -- if you put that in a box, let's just put it to the

11   side because I'd like the Government to address that.

12       But let me address something that I think is a basic theme

13   of the Defense, which I have rejected and I see no reason to

14   return to that, which is the failure to cry fraud; and that

15   shows that either, one, they knew about it or, two, it made no

16   difference.   I'm relating it to the hardware sales.

17       And as I've said, I think from day one, there may be a

18   number of reasons why you wouldn't cry fraud, especially a

19   public company that is undergoing enormous changes and has

20   multi, multibusinesses and is in the public and is probably the

21   leader or a leader of the whole tech industry, or whatever it

22   is.   Whatever they want to call themselves.

23       Okay.   And so it seems to me that the reasons one might

24   not cry fraud -- and I'm not trying to adopt a set of reasons

25   over any other, but I want to use it by way of illustration --

1    is at the moment they cry fraud, the moment they say they

2    were -- which is another way of saying they've been bilked --

3    the moment they give some indication that there are concerns

4    about their acquisition, that moment triggers any number of

5    responses that they may have as a public company, and

6    ultimately we saw what they did.  They said that the asset was

7    impaired and then they did a restatement, as I think they were

8    required to do under the law.

9        And I don't even know -- I can't even remember, maybe it's

10   in evidence -- what impact that had on its stock.  I don't

11   know.  I mean, I don't think it went up; but be that as it may,

12   that happened quite a bit later in the game.

13       Okay.  Given those considerations, it seems to me that the

14   probative value of introducing the fact that they learned about

15   this in the second month of its acquisition is clearly

16   outweighed by the prejudicial effect of having reams of

17   testimony about why they did what they did because even without

18   the slightest bit of testimony and with an ounce of common

19   sense, I could say that I understand enough about public

20   companies to know what would happen if they started to take

21   action at that point.

22       So that's the balance that I see in it.  Now, there are a

23   number of other arguments that have been advanced, and I guess

24   we could talk about them.  One argument is and some of the

25   proffer is, "Look, we want to show that Autonomy turned over

1    all of its books and records at day one or day August --

2    October 6th.  So why would, why would -- knowing that you -- if

3    you're being brought all the records, all the books and records

4    are being turned over, why would you possibly conceal it?

5    Because it's going to be discovered."

6         Well, the answer, I guess, in part could be as obvious

7    because this started in 2009, continued in 2010, in 2011, and

8    what choice at that point do they have?  Are they going to go

9    to say, "Hewlett Packard, oh, by the way, these revenues are

10   overstated"?  Of course, they're not going to say that.

11        And it may be that, one, they think that notwithstanding

12   turning over the books and records, they're extremely

13   complicated to go through and make the analysis as to whether

14   or not they're overstated or not, and we've seen a lot of

15   evidence to that.

16        Number two, they were -- they managed -- and, by the way,

17   I am not saying -- and I want to be very careful here -- I'm

18   not saying I believe any of this testimony one way or the

19   other, and it's not up to me to believe it one way or the

20   other.  It's up to the jury to make those determinations, but

21   it is up to me to try to understand that if I allow certain

22   things in evidence, what does it prove, what does it go to

23   prove, how is it relevant, and how its probative value

24   outweighs the consumption of time, and so forth and so on.

25        And so to that extent I have certain views, and it seems

1    to me that this is fair game to argue, fair game to argue, and

2    it may go directly to whether or not -- that is, that they

3    would turn over the books and records -- whether or not it

4    shows the lack of intent of the defendant to defraud the

5    purported victim in this case; but it is not in and of itself,

6    then, introducing or opens the door to the type of evidence

7    that I think has been presented.

8         So I want the Government -- and I want to think more about

9    the Ernst & Young report, which is Exhibit Number 8231.  I

10   don't know how Exhibit 8234 shows anything, but there is a

11   report of Ernst & Young, 8231, that I think the Defense has

12   urged me to introduce.

13        Now, before I leave this whole subject, I want to find out

14   have I got that right?  I mean, is that what you're saying,

15   Mr. Keker?

16             **MR. KEKER:**  Yes, in part.  In part.

17             **THE COURT:**  Have I --

18             **MR. KEKER:**  But let me --

19          **THE COURT:**  I'll let you flesh it out, so go right

20   ahead.  We have plenty of time.

21             **MR. KEKER:**  I'll just take Ms. Lesjak.  Ms. Lesjak --

22             **THE COURT:**  You should stand in front of the

23   microphone.

24             **MR. KEKER:**  Ms. Lesjak was -- I'm used to being so

25   loud that it doesn't matter, but I will certainly do that.

1        Ms. Lesjak got this Ernst & Young information in a couple

2    of ways in November.  After that, she made positive statements

3    about the integration, everything's going fine.

4        After that, they got somebody to do this -- the Economic

5    Partners to do an analysis using the hardware numbers.  I mean,

6    using what they now knew, they value the company at

7    $11 billion.

8        All of those things to us seem important in understanding

9    the motivation of -- and then they go through the rebasing

10   exercise where they find just --

11           THE COURT:  That's in evidence.

12           MR. KEKER:  I agree.

13       -- a trivial amount of money that they can say is not

14   conforming.

15       And then Ms. Whitman does what she does, and we haven't

16   been able to go into that.

17       And then all of a sudden -- so then they say, "Okay,

18   Deloitte you're fired."  I mean, I heard his testimony.  His

19   testimony was he didn't really like him or something, but we

20   could have cross-examined about that.

21       Deloitte gets fired.  They get new auditors.  And after a

22   year of working with HP lawyers, accountants, people who are

23   bringing the civil case, I mean, it's a litigation job, this

24   guy comes up with a restatement; and we think that the whole

25   story, if we're going to impeach the restatement, that's the --

1    we need the whole story.  So we've been -- that's what we've

2    been arguing about.

3        And the only other thing I would point out, Your Honor,

4    and I'm not trying to reargue this, is that the Government --

5    you have all these concerns about all the reasons that a public

6    company would do things and the way people think and so on.

7    There's been no evidence that anything like that is happening

8    here.  The Government hasn't -- the Government --

9            THE COURT:  No.  What I -- you're quite -- number one,

10   you're right.  Okay?  Let's start with that.  You're right.

11   There's no evidence of it.

12       Number two, what I'm saying is in response to -- if your

13   evidence comes in, I have to anticipate that that's exactly

14   what would happen, and nobody has disabused me of that notion.

15           MR. KEKER:  I hear that.  I mean, I understand.

16           THE COURT:  Yeah.  No, you're right.  There's no

17   evidence of it.  I understand that.

18       Okay.  Well, let's take a look at it tomorrow.

19           MR. KEKER:  Yes, sir.

20           THE COURT:  Yeah, I didn't -- I forced you not to rest

21   just because I thought it would be good if you spend a

22   sleepless night to try to figure out what else you can say, and

23   I have no -- look, look, if I decide something comes in or I

24   should change something or something, we do it and I just

25   simply say to the jury, "Ladies and gentlemen, you know, we

1  definitely will go to you this week, but there is some evidence

2  that it's appropriate for you to consider."

3       MR. KEKER:  Okay.

4       THE COURT:  Those things don't make any difference,

5  you know.  That doesn't -- we don't have a big thing to have to

6  finish this thing.  Okay?

7       MR. KEKER:  We're certainly not asking you not to

8  change your mind, Your Honor.

9       MR. LEACH:  What time would you like us tomorrow,

10 Your Honor?

11      THE COURT:  Oh, I think -- what about 9:30?  How does

12 that sound for everybody?

13      MR. KEKER:  Sleep in.

14      THE COURT:  Yeah.  Sleep in till 4:00 and then -- I

15 don't know what it's like being a trial lawyer anymore --

16      MR. KEKER:  It's awful.

17      THE COURT:  -- but I will tell you -- well, I know

18 it's awful.  The last case I tried in federal court was before

19 Judge Ingram, who was a wonderful trial judge, I mean, actually

20 one of the best -- the best actually I ever appeared before.

21 Scrupulously fair and nice, and so forth.

22      So he said, "Well, how do you like it?  How do you like

23 this case?  How do you like trying a case?  It's great, isn't

24 it?"

25      And I looked at him and I said, "You know, Judge Ingram,"

**PROCEEDINGS**

1  I said, "trial law is for younger people."  At that time I was

2  50.

3       So, I mean, because, in fact, when you are in trial on

4  both sides, there's no such thing as a good night's sleep.

5  There's no such thing as a moment of conversation that you have

6  that you're not thinking about the case and not totally

7  consumed by it.  So it is both a reward and it's punishment,

8  and I think that's why people become trial lawyers.  It's

9  fabulous.  It's a totally consuming profession.

10       **MR. KEKER:**  I've been saying it's not work for grown

11  men, Your Honor, or women.

12       **THE COURT:**  Anyway, see you at 9:30.  Thank you very

13  much.

14       **MR. LEACH:**  Thank you, Your Honor.

15            (Proceedings adjourned at 3:52 p.m.)

16                  ---oOo---

17

18

19

20

21

22

23

24

25

1

2

3                        __CERTIFICATE OF REPORTERS__

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Wednesday, April 18, 2018

8

9

10

11    _____

12            Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                        U.S. Court Reporter

13

14

15    _____

16            Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                        U.S. Court Reporter

17

18

19

20

21

22

23

24

25