Volume 29

Pages 5901 - 6002

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )      NO. CR 16-00462 CRB
                               )
SUSHOVAN TAREQUE HUSSAIN,      )
                               )
          Defendant.           )
_____)
                          San Francisco, California
                          Tuesday, April 24, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

                    ALEX G. TSE
                    Acting United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
               BY:  **ROBERT S. LEACH**
                    **ADAM A. REEVES**
                    **WILLIAM FRENTZEN**
                    **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:

                    KEKER & VAN NEST
                    633 Battery Street
                    San Francisco  CA  94111
               BY:  **JOHN W. KEKER**
                    **JAN NIELSEN LITTLE**
                    **BROOK DOOLEY**
                    **KATE LAZARUS**
                    **NIC MARAIS**
                    **ATTORNEYS AT LAW**


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Pamela Batalo, CSR No. 3593, FCRR
              Official Reporters

# **I N D E X**

Tuesday, April 24, 2018 - Volume 29

|                                          | **PAGE** | **VOL.** |
|------------------------------------------|----------|----------|
| Closing Argument (resumed) by Mr. Keker  | 5903     | 29       |
| Rebuttal Argument by Mr. Frentzen        | 5960     | 29       |

1   <u>**Tuesday - April 24, 2018**</u>                    <u>**9:02 a.m.**</u>

2                      P R O C E E D I N G S

3                         ---oOo---

4   (Proceedings were heard in the presence of the jury:)

5            **THE COURT:**  Okay.  Please be seated.

6       Let the record reflect all jurors are present, the parties

7   are present.

8       We are proceeding with Mr. Keker's argument.

9       You may proceed.

10           **MR. KEKER:**  Thank you, Your Honor.

11                <u>**CLOSING ARGUMENT**</u>   **(resumed)**

12           **MR. KEKER:**  And good morning, maybe for the last time,

13  ladies and gentlemen.

14      Since I won't be talking to you again, the Government gets

15  the last word, let me begin by saying how much I and I think

16  every lawyer in this room, and I'm speaking for both sides,

17  appreciate what you have sacrificed to be a juror in this case.

18  A lot of you are traveling from a long way.  You sit here

19  through at times -- I don't want to overcharacterize it -- but

20  tedious -- little tedious testimony at times, to serve as

21  jurors.

22      You've had -- you've been patient.  You've always been on

23  time.  So I want to thank you for our team, Ms. Little and

24  Mr. Dooley and Ms. Lazarus and Mr. Marais.

25      I also specially want to thank you on behalf of Sushovan

1  Hussain, who's our client and the person whose fate you will be

2  deciding.

3       To fulfill the duty as jurors in this case, I said this

4  yesterday, you're the ones who can take a fair, neutral look.

5  Everybody else is invested in an outcome.  You-all are the ones

6  that can decide whether or not the law and the facts come

7  together and whether or not the Government has proved the case

8  beyond a reasonable doubt or not.  So Mr. Hussain thanks you as

9  being the bulwark against abusive or arbitrary charges or

10 power.

11      I ended yesterday by talking about Mr. Yelland's

12 restatement.  You remember Mr. Yelland.  He's the HP person who

13 did the restatement, which he began after Hewlett Packard's CEO

14 Meg Whitman announced that a year after the acquisition closed

15 that Hewlett Packard had been defrauded.

16      Before that, he was working, you'll remember, working

17 productively with Deloitte.  They were almost finished with the

18 audit of the books.  Nobody had made a peep about fraud or

19 anything.  The rebasing exercise had not found -- they found a

20 tiny bit of revenue that was not IFRS compliant, but basically

21 they hadn't found any serious problems.

22      And then once Ms. Whitman cried fraud, everything changed.

23 They fired Deloitte.  Mr. Yelland began working with the

24 lawyers and accountants for the HP machine that was working in

25 London, started helping on the civil case and on this

1  prosecution.  The restatement was designed for litigation.

2      Jeff, could we see Slide 45?

3      And these are some of the criticisms that we have made

4  about this restatement that Mr. Yelland worked on.

5      First of all, these are after-the-fact judgments, and we

6  talked yesterday about the need to make a decision about

7  revenue recognition based on the facts that are known at the

8  time, not later.

9      Most importantly, I think, is that Mr. Yelland in reaching

10  these judgments did not review Deloitte's work, didn't review

11  the Deloitte work papers.  He said, I think this is a quote

12  (reading):

13          "I'm not really aware of what Deloitte did or didn't

14      do."

15      He was reviewing the restatement of a different company

16  than the one that Mr. -- than the Autonomy Group that

17  Mr. Hussain was the CFO of.  He was applying a different set of

18  rules.  He's an expert in U.K. GAAP, not in IFRS.  That's how

19  he was trained.  He's not an expert on IFRS.  So different

20  rules, different standards.

21      As you saw yesterday, he disallowed all the reseller

22  transactions with Capax, MicroTech, MicroLink, and FileTek

23  without even looking at these work papers or seeing why they

24  approved the revenue recognition for those transactions.

25      Now, he also disallowed something that Mr. Reeves spent an

1  enormous amount of time on yesterday, sales with customers,

2  back and forth with customers, which everybody has called

3  reciprocal transactions.  He simply ignored the accounting

4  work -- and I'm going to show you some of it -- that Deloitte

5  had done to establish fair value because that's what you need

6  to do in these transactions.  It's not the customers can't sell

7  to each other; it's that you have to do it at fair value and

8  assure that both sides of the transaction are properly

9  accounted for.

10     He never -- Mr. Yelland never tried to understand why

11  Deloitte believed that the revenue recognition requirements had

12  been met.

13     I mentioned it yesterday, we heard a lot about this, let

14  me show you something that Ms. Anderson said in one of her work

15  papers when she worked at Deloitte.

16     This is a revenue recognition work paper that she was

17  working on on the MicroLink acquisition, and what Ms. Anderson

18  said when she was at Deloitte is (reading):

19         "It is not uncommon for companies within the software

20      sector to purchase software off their major customers as

21      well as selling to them and, therefore, for transactions

22      to flow both ways."

23     That's true.  All the testimony in the case establishes

24  that.  There's nothing wrong with it if each side of the

25  transaction is at fair value, and that's what Deloitte spent a

1    lot of time and energy establishing.

2        Let's talk about the MicroLink acquisition, which she's

3    talking about here.

4        MicroLink, you remember, is this very successful company

5    that Dave Truitt mostly owned that was in the federal space

6    doing classified work, making federal sales, and really they

7    were Autonomy's only access to the federal sales because

8    Autonomy didn't have cleared people.  They did have cleared

9    people awhile earlier through their acquisition of Verity.

10   Verity lost their clearances, and so they didn't have access to

11   federal sales.  And in the United States federal sales of this

12   unstructured data software, you can imagine, is a huge market

13   from the CIA, the NSA, you name it, all the surveillance

14   agencies.

15       MicroLink was already a partner and an expert with

16   Autonomy software.  Mr. Hussain fully documented why they were

17   buying it.  MicroLink was an important acquisition and Deloitte

18   analyzed it carefully.

19       Can we see the next slide, please?

20       Nobody in this courtroom has testified that the purchase

21   price wasn't fair.  Dave Truitt had approximately a $55 million

22   price in mind in the beginning.  He wasn't going to sell the

23   company for anything less.  He testified that he turned down a

24   $45 million offer.

25       Next.

 1        The MicroLink -- there's much made about this MicroLink

 2   debt to Autonomy.  Most of it was not overdue.  I think you saw

 3   that chart that showed $16 million at the time of the

 4   acquisition was not due yet; another $6 million was, like, two

 5   to four days overdue.

 6        MicroLink made profits.  And, importantly, nobody, this is

 7   Truitt talking, nobody even talked about the MicroLink debt in

 8   connection with the purchase price and the acquisition.

 9        Deloitte knew all about MicroLink's debt, and Ms. Anderson

10   testified about the extensive due diligence that they did to

11   make sure that this was a fair, properly accounted for

12   transaction.

13        And much has been made of this too.  Autonomy did not

14   write off the debt.  What happened was there was $23 million in

15   debt.  They did write off 5.5 million, and that included the

16   2.3 million that Mr. Rizek said "We'll never collect because

17   Discover Tech is not going to buy."  Their contracts with the

18   end users continued, and Autonomy collected about $7 million of

19   those -- from those contracts.

20        Previously MicroLink owed $7 million for the eDiscovery

21   software purchase, and that was -- once Autonomy bought it,

22   that was classified as an asset so that came off.

23        And the remaining $9.1 million in debt was reclassified as

24   an investment and was not written off until after -- it was

25   written off but that was after the acquisition.  I think the

 1  testimony was that that was in October of 2011.  Autonomy

 2  didn't do it.

 3       Now, this is also the transaction where there was

 4  testimony about grossed-up revenue, dummy cash, and so on.

 5  That was a complete phony red herring.  The reason that they

 6  were talking about grossed-up revenue is that Mr. Rizek, the

 7  bank fraud man, was not putting debt on his books and was

 8  defrauding his bank.  He told you he was.

 9       What Autonomy, when they did the acquisition, insisted was

10  that that debt had to go on the books and so that they provided

11  both the debt and also the amount of the sale.

12       Mr. Hussain did not inflate the revenues.  They had

13  $25 million in revenues.  That's what he reported to the board.

14  That's what he reported to Deloitte.

15       Let's look at some of the work that Deloitte did on this

16  transaction.

17       And the reason I'm giving you this is because you'll

18  see -- let me pull this out for a second.  I can barely move

19  it.

20       These are the exhibits that you can look forward to

21  getting in the jury room.  There's a lot of them and it's going

22  to be hard to find things.  They're going to be hard to roll.

23  So, I mean, if you wanted to see the work that Deloitte did,

24  those of you who were taking notes, 482C would be the work

25  paper.

1          Let's look at the next one.

2          Mr. Hussain's memo on the acquisition is 351.

3          Ms. Anderson's memo on the acquisition and why it was

4     properly accounted for is 922.  And we'll go through some other

5     transactions just like that.

6          So Deloitte gave it a good hard look.  Yelland didn't.

7     Yelland never saw what they did, but Yelland simply writes it

8     off, writes off all the MicroLink stuff.

9          Okay.  Let's go to FileTek StorHouse.  You've heard a lot

10    about FileTek.  FileTek StorHouse -- FileTek was looking to

11    grow its sales for its Trusted Edge product.  You heard about

12    that.  Autonomy software solved certain technical issues.  They

13    had a license.  It was going to cost them $2500 every time they

14    used it.  They wanted to rejigger that license into an upfront

15    license to be able to use it without paying each time they sold

16    the product.

17         Autonomy was moving into the structured data space.  It

18    had unstructured.  It was moving into structured.  FileTek

19    StorHouse was a structured data product.  Autonomy's structured

20    data offerings were important to the launch of SPE, the

21    thing -- the structured probabilistic engine that you heard

22    about.

23         FileTek's storage product was an important piece of the

24    structured data strategy, and the software -- what StorHouse

25    does is enables structured data to be stored, accessed, and

1    searched in a range of storage devices.

2        The most senior engineers at Autonomy looked at it,

3    studied it.  They determined that StorHouse was a very useful

4    piece of technology.  The exhibits show that.

5        They also determined that StorHouse could extend the reach

6    of both SPE and Autonomy's Digital Safe product into structured

7    data.

8        They negotiated for a 45 and at times -- I think one of

9    them was at 55 percent discount so it was a fair price.

10        And each new license that they got when they bought

11    StorHouse covered new Autonomy customers or new Autonomy

12    products, like LiveVault when they bought Iron Mountain.

13        And, again, they used it.  They deployed it from FileTek.

14    The exhibits show that.  They used it for Kraft.

15        Go ahead, Jeff.

16        And Deloitte -- I'm going to show you more on this --

17    reviewed, tested, approved these purchases; and FileTek would

18    confirm, they would sign these audit confirmation letters

19    saying that, "Yes, we owe the money."  It was a legitimate

20    transaction, a legitimate purpose of necessary software from a

21    partner.

22        Let's look at what Deloitte did.

23        Again, they -- there's a work paper, 482M, where they

24    carefully analyzed the situation.  They actually, I think, got

25    a demonstration of it, and they wrote up some technical

1    material to show how it worked and why it would be better than

2    what Autonomy had.

3          More of that, 6465.

4          The next one.

5          And then they wrote up an audit paper, 537.

6          And then they concluded -- remember there was a sale in

7    one quarter and then a purchase in another quarter?  Here's

8    what they concluded.  They knew about that (reading):

9              "To document the commercial rationale for the

10             purchase made from FileTek during Q2 2010 to assess

11             whether it has any impact on the revenue recognition on

12             the license deal that was transacted in the previous

13             quarter...

14             "Based on the information which we have obtained, we

15             concur that the accounting for both the purchase of

16             FileTek software and the sale of Autonomy software to

17             FileTek is appropriate," blah blah blah.

18         They studied this.  Mr. Yelland -- who knows what

19    Mr. Yelland did, but they studied this and Mr. Yelland

20    certainly didn't bother to find out why Deloitte approved the

21    accounting for this FileTek purchase.

22         Same thing with DiscoverPoint.  DiscoverPoint, you

23    remember, is the product that Dave Truitt wanted to take out

24    when he sold MicroLink and start a new company called

25    Discover Tech; and DiscoverPoint was the software that went

1  into something called DiscoverEngine, which is what

2  Discover Tech was going to sell to the market.

3      They needed -- this is what -- and this goes back to the

4  profiling software.  This is the product to work with IDOL,

5  they needed profiling software, and that went through the

6  $2.3 million that we talked about yesterday.

7      But the point here is, DiscoverEngine using IDOL was an

8  important product because MicroTech's SharePoint -- and I wish

9  I could tell you more what SharePoint is, but it's a terribly

10  important organizing tool that Microsoft users use.  This

11  product was the only one that was Microsoft certified for

12  SharePoint.

13      They sold DiscoverEngine to big companies.  Even Autonomy

14  had a similar product but it wasn't as good.  Everybody's

15  testified that it wasn't as good.  And, as I said, the

16  DiscoverEngine was Microsoft certified and Autonomy's product

17  wasn't.  That's why they needed it.

18      And it was fairly priced.  The contract was between

19  Autonomy and Discover Tech.  Autonomy got the right to

20  distribute a certain amount of instances.  And an instance is

21  an infinite number of people or a huge number of people but one

22  time.  So if you're at Blue Shield or something, you could buy

23  one instance and everybody at Blue Shield can use it.

24      The distribution agreement was more valuable than a

25  regular sale.  As I said, the single instance can have

 1    thousands of users.  They have the right to use DiscoverEngine

 2    in every IDOL sale making IDOL, the software, more profitable.

 3        And Truitt testified that not only did Autonomy buy this

 4    product at fair value but it actually got a steep discount.

 5    And when the Government tried to compare it to another sale

 6    that they had done to Tech Resources, Truitt said, "No, that's

 7    apples and oranges," and it was.

 8        And, again, Deloitte -- I won't go through their work

 9    papers, but Deloitte studied it, approved it, looked at whether

10    or not it made sense for them to buy it.

11        Mr. Welham testified that it would have been relevant if

12    he had known that Autonomy had no use for DiscoverEngine, but

13    I'm sure it would be relevant but it did have a use for

14    DiscoverEngine, and that was testified to by a number of

15    people.

16        Autonomy engineers said it was a good product.

17    DiscoverEngine would speed up the search indexing; and if you

18    had a big job, like Autonomy's customers often did,

19    DiscoverEngine would be very valuable.

20        Is there one more on that?  No.

21        Okay.  Let's move on.  I know I'm doing these quickly, but

22    you're probably happy I'm doing them quickly.

23        Let's move on to the ATIC.  Much has been made of the

24    ATIC.  Remember, MicroTech built this platform that was going

25    to be a showcase for products to classified users where they'd

1    be able -- you'd come in in a cleared environment -- the CIA

2    could come in, the National Reconnaissance Office could come

3    in, the Homeland Security office could come in -- and get a

4    demonstration of what these products could do for them.  This

5    was a very valuable proposition to people who wanted to do

6    business in the federal space.

7         Dave Truitt pitched the idea to Mr. Scott and Mr. Hussain

8    at a dinner in New York.  There wasn't any mention during that

9    dinner of any debt or repayment of debt or anything else.  This

10   is months after the Vatican transaction.  Mr. Hussain said to

11   Scott, "You negotiate.  You know, you be the one to negotiate

12   with Dave Truitt."

13        The pricing, which Scott negotiated, rewarded extended

14   terms.  They picked the one that came at the biggest discount,

15   which was the three-year deal.  Most of that money, the

16   9.6 million, were salaries, and you could see that in the

17   workup of the pricing.

18        Pete Menell, who was the chief technology officer, told

19   Mr. Hussain that the price was reasonable.  Scott, who

20   negotiated it, agreed with him.  That's in Exhibit 6298.  And

21   Dave Truitt testified that the deal was fairly priced.

22        So ATIC was built and used.  They collaborated.  There was

23   a grand opening attended by a whole lot of people.  They built

24   a portable data center in the basement of their building.

25        Next.  Whoops.

1    Okay.  And you'll find in the Deloitte work papers that

2   Deloitte was all over ATIC, looked at it, understood it, and

3   approved the accounting for it.

4    Okay.  The next one, the next what they call reciprocal

5   deal that they've criticized, is this federal cloud project.

6   The federal cloud -- what -- FISMA was a federal regulation

7   that said before you can put federal data -- Social Security

8   data, any kind of secure data, any kind of personal data --

9   into the cloud, we want it to meet certain requirements.  And

10   the requirements were under FISMA, and I don't know what it

11   stands for but that's what FISMA is about.

12    And so Steve Truitt knew that Autonomy was doing business,

13   for example, with the Social Security Administration and trying

14   to sell more software to them and knew that they would need a

15   FISMA-certified product, and so he worked up -- had

16   Dr. Channing, a very well-credentialed man, work up a proposal,

17   and he had been pitching this cloud technology to them for a

18   while and finally he got the federal cloud proposal.

19    It was designed specifically for Autonomy.  It addressed

20   Autonomy's issues with the Social Security Administration

21   contract.  The proposal was for two different solutions.  One

22   was hosted, that means using Autonomy's servers; and the other

23   was on premises behind a firewall.  And, as I said,

24   Dr. Channing designed these two solutions.

25    Next.

1       Mr. Hussain told Mr. Egan to review the Autonomy contract

2  with the Social Security Administration to verify that the

3  federal cloud would work.  He also asked him to help negotiate

4  the price down.

5       Pete Menell said that there was no other -- no fast way

6  for Autonomy to get certified, FISMA certified.  This was the

7  best way.

8       Steve Truitt testified that he honestly priced the federal

9  cloud proposal at 8.2.

10      Joel Scott, again, was the one that was assigned to

11 negotiate this price, not Mr. Hussain.

12      And they built it.  MicroTech had the capacity.  Tony

13 Jimenez, who was the head of MicroTech, was shopping around for

14 a data center for hosting.  Steve Truitt knew from the e-mails

15 that we showed him -- he said he'd forgotten all about this,

16 but we showed him e-mails showing that as late as March 2012,

17 this is six months after the acquisition, they were still

18 working on it and they expected the project to be completed

19 March 1st.

20      And then this is the one that had the assignment clause.

21 I'm not sure -- we didn't hear about that from Mr. Reeves, but

22 in this contract, Mr. Truitt insisted apparently on an

23 assignment clause that said "You can't assign this to anybody

24 else and if you do, we don't have to perform."

25      They made a big deal about that, but there's no evidence

 1  whatsoever that anybody invoked the assignment clause, that

 2  anybody once the sale happened to Hewlett Packard, anybody

 3  said, "We're not going to build this because of the assignment

 4  clause."  They were still working on it after Hewlett Packard

 5  had done it.  So that is a red herring as far as I'm concerned.

 6      And then, lastly, of these deals that were talked about

 7  yesterday, this is the MicroTech/Bank of America situation

 8  where MicroTech bought software for Autonomy to use for

 9  services work with the Bank of America, and the Government and

10  apparently Mr. Yelland has criticized that revenue recognition.

11  Again, Deloitte knew all about it and approved it.

12      Bank of America, if you'll remember, there was going to be

13  a $19.5 million sale to Bank of America.  It didn't close at

14  the end of the year.  It did close in February of the following

15  year.  The sale was made to MicroTech who then bought the

16  software from Capax and from Discover Tech who had bought it

17  earlier, and MicroTech sold it to the Bank of America.

18      Steve Truitt said that they did get -- the reason that

19  MicroTech wanted to do it is that they wanted services work

20  with the Bank of America.  Bank of America would buy Autonomy

21  software and MicroTech would hope that they could get services

22  work on that software.

23      So they bought some more software from Autonomy.  Autonomy

24  told Deloitte that MicroTech was going to use this software to

25  provide support services to Autonomy's customers.  Deloitte

CLOSING ARGUMENT / KEKER

1    said that was fine.

2        Autonomy assigned the Bank of America services work to

3    MicroTech -- that's what the Government is apparently

4    complaining about -- just as they told Deloitte that they were

5    going to do, and that the whole thing worked out.

6    Bank of America wanted to do more reseller deals with

7    MicroTech.  They were very excited about being able to work

8    with an 8(a) vendor, and they thought it was a good deal.

9        So all of those reciprocal sales, which Mr. Yelland has

10   just wiped clean off the slate, were properly accounted for,

11   reviewed by Deloitte, and are not a problem in the accounting

12   is our position.

13       The prosecutors need to prove that Mr. Hussain had some

14   criminal intent, some intent to deceive people.  It hasn't done

15   that, ladies and gentlemen.

16       What the Government has proved is a dispute between

17   accountants.  They've proved a dispute between Deloitte, who

18   knowing what they needed to know said that the revenue

19   recognition that Mr. Hussain presented to them was correct and

20   signed off each quarter and said it was satisfactory on the

21   one -- and doing it at the time, and there's a dispute between

22   those accountants and Mr. Yelland, who is backed up by all the

23   Hewlett Packard lawyers and accountants and people working on

24   the civil case trying to make their fraud claim, who says --

25   who came along later and basically is trying to create evidence

 1   to support that case.  It's a dispute between accountants.

 2        And to paraphrase a very famous lawyer, the late

 3   Johnnie Cochran:  If the accountants disagree, Sushovan must go

 4   free.  He was entitled to rely on the auditors who approved

 5   Autonomy's accounts, and that was Deloitte.

 6        Before moving on to discuss hardware, I want to tie up

 7   some loose ends.  There's so many deals in this case that I'm

 8   afraid I've got to do it, so let me talk about transactions

 9   that were -- that are part of the Government's attack on

10   Autonomy's accounting and the sign-off by Deloitte.

11        Auxilium is the first one.  Auxilium -- there's not

12   evidence that Auxilium is backdated.  Nobody came in here and

13   testified about Auxilium.  Nobody testified that it was

14   backdated.  The Government didn't offer testimony from the

15   people who were directly involved.

16        And you see who was directly involved.  Not Sushovan

17   Hussain.  There's the salesman named Broli; there's the

18   Autonomy lawyer Julie Dolan; there's the Autonomy lawyer Andy

19   Kanter; and there's witnesses from Auxilium, Luca Mastroianni.

20        Next one.

21        The best evidence that we have is that the agreement was

22   reached on or before the end of the quarter, March 31, 2010.

23   The reseller agreement is dated that date.  That's 2788 at

24   page 47.  Again, some of these documents, to find the relevant

25   piece of it is going to be a chore.

 1        Proof of delivery is bated March 31, 2010, in that same

 2   document, page 8.

 3        There's an audit confirmation letter that's signed saying,

 4   "Yes, we owed the money and it was due that date."

 5        This is independent third-party evidence that the deal was

 6   reached at the end of the quarter.  The audit confirm was sent

 7   directly to Deloitte, and here's the exhibit number.

 8        And what the Government is relying on is a March 31 e-mail

 9   and a draft VAR agreement, but you already know that Autonomy

10   was negotiating with multiple resellers, not just Auxilium.

11   What they showed you is a draft and, anyway, various e-mails do

12   not -- that don't involve Mr. Hussain and don't show that the

13   transaction was agreed to after the quarter.  These e-mails

14   don't show that.

15        So let me go to the next one.

16        Sales Consulting, also one about which you've gotten no

17   evidence except on paper.  The Sales Consulting contract was

18   dated December 31, 2009.  It says "Effective Date" on it.

19   Delivery was confirmed by Sales Consulting as December 31,

20   2009.  Deloitte audited the transaction.  There are the

21   numbers.

22        And there was no attempt to mislead Deloitte.  When the

23   contract says effective date is December 31, there's been

24   testimony that sometimes paperwork comes in later.  When Andy

25   Kanter signed this, he dated it January 15, 2010.  He didn't

1    make any effort to try to pretend like he had signed it on some

2    date before the end of the quarter.  The point was the deal was

3    made in Italy before the end of the quarter and whatever

4    paperwork he had to sign, he signed later.  That wasn't hidden

5    from anybody.

6         No witness testified that the agreement was reached after

7    December 31.  No witness has been here to talk about this deal.

8    The e-mails only show that the agreement was documented later.

9         And the spreadsheet is completely inconclusive evidence.

10   Matt Stephan said it was frequently the case that paperwork on

11   deals didn't even arrive at Autonomy's office until after the

12   close of the quarter.  There's nothing wrong with that as long

13   as there was a final fixed agreement by the end of the quarter,

14   as there was here.

15        The next one that they talked about, the next loose end I

16   want to talk about is this Tikit/KPMG business.  There's

17   absolutely nothing wrong -- again, Yelland disallowed this, but

18   there's nothing wrong with Autonomy's sale to Tikit as a

19   reseller.  It was a noncancelable contract.  They delivered the

20   software.  Tikit reported the software in its inventory.  The

21   deal went direct eventually with KPMG but Tikit was still on

22   the hook and had to pay.

23        Mr. Araujo said (reading):

24        "Q.  So whatever happened with KPMG or didn't happen with

25        KPMG, Tikit owned the Autonomy software and owed Autonomy

1      for the software; right?

2      "A.  That's correct."

3      And Tikit, in fact, paid Autonomy back in full for the

4  software that it purchased.

5      And then there's the side letter business.  Mr. Hussain

6  told three lawyers that he was going to disclose the side

7  letter to the accountants.  If you look at 1708B, it is

8  perfectly plain that Chamberlain did disclose the side letter

9  because they're talking about the contents of the side letter.

10  They don't call it a side letter, they don't do anything, but

11  they're talking about what the provision is in the side letter

12  about Tikit's ability to do something with the software and get

13  services and so on.  So 1708B shows that they knew about that.

14      Eventually they obtained the side letter, and we don't

15  know where it was.  It was supposed to be in the file, but

16  eventually they got the side letter from Tikit and it didn't

17  change the accounting and Deloitte thought that the deal was

18  fine.

19      And then, finally, in this string of loose ends, I want to

20  talk about Morgan Stanley.  And, first, I want you just to step

21  back and imagine Mr. Apotheker thinking about buying Autonomy,

22  which was valued at $6 billion, and he's going to buy it for

23  almost $12 billion, and he thinks it's going to be worth 17 or

24  $46 billion, I want you to imagine Mr. Apotheker, just get your

25  head around Mr. Apotheker worrying about whether or not the

1    hardware was delivered in Q2 or in Q3.  It's not something

2    that's very easy to even imagine.

3         But in this instance, Mr. Hussain thought that the

4    hardware to Morgan Stanley had been delivered as he was told it

5    was delivered in the second quarter of 2009.  We now know that

6    some of this hardware was delivered later.

7         But what he knew, this is from his point of view, he knew

8    that Autonomy had bought a surplus of EMC hardware.  They just

9    had a $9 billion purchase.  They knew that Autonomy had paid

10   for the hardware.  They knew that Morgan Stanley, who had

11   wanted Hitachi hardware, had agreed to generic hardware from --

12   Mr. Egan had changed the purchase order, said they didn't have

13   to provide Hitachi; they could provide anybody that could do

14   the job.

15        He knew that delivery -- or if he knew, but if he looked

16   at it, he would have known that delivery occurs under the terms

17   of this contract when the product is shipped.  And EMC -- he

18   knew that EMC had promised to ship the products on or about

19   June 29, 2009.  That's Exhibit 3022.

20        And he knew that Morgan Stanley confirmed receipt of the

21   order by July 2, 2009.  That's Exhibit 130.

22        So he believed that the hard -- that EMC had done what

23   they said they would do and delivered the hardware on or about

24   June 29, 2009.

25        He had no reason to believe that these weren't proper

 1   sales made timely and that the accounting for the quarter was

 2   not right.  They don't establish any intent on his part to

 3   deceive anyone nor are they material to anything.

 4        Okay.  We've heard a lot about something called SPE.  I'm

 5   going to quickly talk about that.  I still don't understand

 6   what the prosecutors claim is wrong about that, but -- wrong

 7   about the accounting, but here's SPE.

 8        It applies the IDOL software to structured data.  It was

 9   going to be the Holy Grail because they were going to have --

10   and this is what HP thought the Holy Grail was too.  You have

11   something that can handle unstructured data, you combine it

12   with something that can handle structured data, and you can

13   take over the world of business intelligence.

14        Mr. Blanchflower called it radical, a technological shift,

15   a huge new product line.  It was included in a lot of Autonomy

16   contracts.  Hewlett Packard in these exhibit numbers you'll see

17   saw that was part of the basis for the synergies with SPE.

18   They were going to combine SPE and Hewlett Packard software and

19   the Vertica structured data company and things were going to be

20   great for them.

21        And the research and development capitalization was

22   proper.  They made a big deal about the research and

23   development, about how they only spent -- I don't know --

24   100,000 or something, but they had all these research and

25   development costs.  Mr. Blanchflower recognized that all of the

 1    work they'd been doing on SPE -- on IDOL over the years was

 2    properly viewed as going into SPE.  It wasn't just the launch;

 3    it was all the improvements that they'd been doing to IDOL,

 4    which made SPE what it was.  The audit memo, 229, explains why

 5    it should be capitalized.

 6        They actually went to His Majesty's -- HMRC is His

 7    Majesty's Revenue Service, I think, and they had changed the

 8    rules and they expanded what research -- how research could be

 9    capitalized and approved this, so they applied those rules.

10        Deloitte sampled and tested the engineer time.  Figured

11    that 75 percent of the engineers' time should be -- from their

12    time sheets could be attributed to this.

13        And then, this, I think, is important.  Deloitte thought

14    this was hard enough and complicated enough so that they took

15    it out of their audit team and sent it to their national

16    accounts technological people, and they reviewed and approved

17    it.

18        And then, finally, all the documents about this indicate

19    that it was Ms. Prentis, Poppy Prentis; Mr. Chamberlain,

20    Deloitte; and so on.  Mr. Hussain really wasn't much involved

21    in making these decisions.  He's not apologizing for them.  He

22    thinks they were right, but he wasn't doing it.

23        Okay.  Those are loose ends.

24        Now, the prosecutors and the HP machine, I think, have

25    found mistakes that are just that, mistakes, and I'm going to

 1   talk about them.  Let me start by saying these mistakes --

 2   there's no evidence that Mr. Hussain made these mistakes.

 3        One is the statement that Deloitte -- to Deloitte that

 4   Discover Tech was an 8(a).  Remember MicroTech is an 8(a),

 5   Service Disabled Vendor that gets special privileges when

 6   you're bidding on contracts with the federal government.  We

 7   don't know who made the mistake, but we do know that people at

 8   Autonomy referred to all of the resellers as 8(a)s.

 9        And here's an e-mail that you've seen before where

10   Mr. Hussain is writing to Joel Scott asking (reading):

11             "8(a) deals, could you please send a list?"

12        And from the deals you can tell that he's referring not

13   just to MicroTech but anybody -- but to these other resellers,

14   or at least that's the way Mr. Scott responds because he has

15   MicroTech deals, Discover Tech deals, Capax deals in the

16   response.  So we don't know who gave the erroneous information,

17   but there's no -- there's no indication that it was

18   Mr. Hussain.

19        Can we see Slide 38?

20        Deloitte thought that Discover Tech was an 8(a) reseller

21   but they said it was not material to Deloitte's analysis.  They

22   considered it only for additional assurance.  That's 1945D.

23        And, as I said, there's simply no evidence that

24   Mr. Hussain was responsible for this mistake, but it was a

25   mistake.

1      Okay.  The other mistake that I want to talk about is in

2  the FRRP letter that Mr. Lindsell came and testified about, and

3  that's a statement that MicroTech and Discover Tech have

4  separate shareholders.  There's no evidence that Mr. Hussain

5  knew that Dave Truitt was a minority shareholder in MicroTech.

6      Tony Jimenez was the face -- remember, it's a veterans

7  disabled and so on.  Tony Jimenez is the face of MicroTech.

8  Nothing on the website talks about who the minority

9  shareholders are.  The Government used Exhibit 3049 to prove

10  that Mr. Hussain knew that Dave Truitt was a minority owner.

11  Let's look at that.

12      Look at the bottom e-mail.  This is from John Cronin.

13  This is from 2004, ladies and gentlemen.  And Cronin is writing

14  to people that you don't really know about and says that

15  (reading):

16          "MicroTech is a 'small service disabled'" -- this is

17      when MicroTech is just getting started -- "'small service

18      disabled veteran owned" company, a special designation

19      that allows the government to buy with less competition

20      and procurement hassles.  This company is partially owned

21      and sponsored by MicroLink.  Dave Truitt has requested

22      that we allow MicroTech to become a reseller."

23      And then you go up to the top back in 2004, and somebody

24  writes -- Jodi Irwin writes to Sushovan Hussain saying

25  (reading):

1          "Tiny reseller MicroTech who wants to be our partner

2     has no D&B report" -- Dun & Bradstreet I assume -- "on

3     which to base a credit evaluation - John seems to indicate

4     that MicroLink would be willing to provide a guarantee,"

5     and so on.

6          That's the Government -- that's the 2004 evidence that

7     they rely on that Mr. Hussain in 2010, when that FRRP letter

8     was written -- yeah, '10 or '11, I can't remember; I think it

9     might be '11 -- was knowledgeable about Dave Truitt's minority

10    stake.  That is just the way -- I mean, first of all, it

11    doesn't say that Dave Truitt owned shares in MicroLink.  It

12    says -- what it says -- in MicroTech.  I'm confusing myself.

13         What it says is that MicroLink was a partial owner of

14    MicroTech.  And by the time the letter was written, MicroLink

15    was owned by Autonomy, and they certainly knew when they were

16    owning MicroLink that they didn't have any shares, they didn't

17    have a stake in MicroTech.  So this doesn't begin -- if you

18    even remembered it that many years later, this doesn't begin to

19    indicate that Mr. Hussain knew that Dave Truitt was a minority

20    shareholder.

21         This isn't the kind of evidence that shows Mr. Hussain

22    deliberately deceiving anybody; and when the Government

23    stretches that far to make its case, you ought to be

24    suspicious.

25         And, by the way, there is no related-party issue in the

1    accounting sense.  You've seen some e-mails that talk about

2    related party in the accounting sense.  So failure to disclose

3    that Dave Truitt was a minority owner was completely

4    immaterial.

5        By 2009, this tiny little company MicroTech had grown into

6    a behemoth with Tony Jimenez being the face of it.  It was,

7    you'll remember, the fastest growing Hispanic-owned company --

8    that's the way they billed themselves, Hispanic-owned

9    company -- in the United States, the fastest growing company in

10   the Washington, D. C. metropolitan area.

11       Here's what Steve Truitt said about it, he was the

12   vice president (reading):

13       "Q.  Can you tell us about the growth?  Take us to 2009.

14       "A.  It was literally exponential.  It's difficult to

15       remember now when we hit what marks, but I think in 2006

16       we went from 1 million to I'm going to say something like,

17       because I don't remember the numbers well, but we probably

18       quintupled in size to 5 million and then the next year

19       probably tripled and then the year after that we were

20       approaching 100 million; and then a year or two after

21       that, we were over 250 million, so we had explosive

22       growth."

23       The reason there is no related-party issue is that Dave

24   Truitt, as a minority shareholder, had no responsibilities and

25   no control of MicroTech; and that's what Steve Truitt, his

 1  brother, testified.

 2      Dave Truitt testified that he was simply a liaison, not

 3  even part of the team.  Decisions were made by Tony Jimenez.

 4  Truitt -- Dave Truitt testified that he always had to ask Tony

 5  or Steve about Autonomy deals, which is exactly what he did in

 6  this case.  You know that.  He had a passive ownership and no

 7  control over MicroTech; therefore, there is no related-party

 8  issue.

 9      And Ms. Anderson testified that even if they were related

10  parties, that doesn't mean revenue recognition was wrong.  That

11  just means if transactions had commercial substance and they

12  were done at value, then it could be correct, which was the

13  case here.

14      But, most importantly, there's no evidence that

15  Mr. Hussain knew about Dave Truitt's minority stake when that

16  FRRP letter said MicroTech and Discover Tech have different

17  offices, drew different -- I can't remember all the things they

18  said were different but one of them was different shareholders.

19  He didn't know about the minority stake so that was a mistake.

20      So that brings me to -- let me finish.  Go back to that,

21  Jeff -- finish on this FRRP letter.

22      Remember that that letter was reviewed extensively, and

23  these exhibits are the ones that show it, by Deloitte and they

24  went over Autonomy's responses.  They made suggestions about

25  changing things.  Mr. Welham testified that if he thought

1    anything in it was wrong, he would have said so.

2        Mr. Chamberlain told there's a response about how much

3    Discover Tech owes.  Look at this e-mail from Mr. Chamberlain

4    to Mr. Hussain who says exactly that, that "Discover Tech owes

5    us $1.4 million."  That's 6644.

6        And then I've already talked about the mistake about

7    Discover Tech and MicroTech minority ownership.

8        So that brings me to hardware.  There's no dispute that

9    hardware was properly recognized, that the revenue for hardware

10   was properly recognized.  Even Mr. Yelland agrees with that and

11   did not remove the hardware revenue from his restatement.

12       It was proper to recognize revenue from hardware sales on

13   a gross basis.  That exhibit reflects that the hardware -- that

14   was the big summary exhibit -- reflects that the hardware

15   revenue was properly recognized as revenue.  So there's no

16   dispute about that.

17       There's also no dispute that the auditors at Deloitte knew

18   all about the hardware sales, hardware sales at a loss and so

19   on, and decided that because Autonomy had only one operating

20   segment, as that term has been provided to you and defined, it

21   did not need to be reported as a separate item.

22       They knew that EMC and Dell hardware were sold at a loss.

23   They knew that hardware was sold without software physically

24   being placed on it.  They knew that the hardware included

25   laptops that you've seen.  They knew that they sold to existing

CLOSING ARGUMENT / KEKER

 1   EMC and Dell customers.  They knew that they sold through

 2   resellers.  SHI was the reseller for the Bank of America and

 3   Zones was H&R Block.  You remember that.

 4        Deloitte knew all of that and they approved Autonomy's

 5   revenue disclosures.  They demonstrated that it has one

 6   segment.  That was the key to it.  If it has more than one

 7   segment, then you have to break out your products into the

 8   segments, but this was a one-segment company.

 9        Deloitte said (reading):

10        "Autonomy has been selling hardware products at an

11        overall loss as part of a wider strategic move to secure

12        additional license revenue.  We conclude that the

13        strategic hardware sales would not constitute a separate

14        operating segment under IFRS 8."

15        This is exactly what you've been told.  This was a program

16   of strategic sales to try to sell more software.  I'm going to

17   show you more about that in a minute.  And in the books they

18   list sale of goods, and that includes -- so the money for the

19   hardware is included in the books.

20        They discussed it with the Audit Committee and, once

21   again -- yeah, they discussed it with the Audit Committee

22   (reading):

23        "Q.  Was the Deloitte audit team comfortable with the

24        level of disclosure made by Autonomy with respect to

25        hardware sales?

1    "A.   Yes.   We could accept the level of disclosure

2         provided."

3         So looking at the financial statements and looking at the

4    annual reports, Deloitte was satisfied that what was being

5    disclosed was a fair picture and a proper picture of Autonomy's

6    finances.

7         There was nothing misleading about Autonomy calling itself

8    a pure software model since everything about it was geared to

9    software sales, not to providing services.   That's what

10   everybody has testified about.

11        Mr. Welham said he understood the reference to pure

12   software model distinguished it from professional services

13   (reading):

14            "You didn't mean that to understand the sentence

15        would mean that Autonomy only sold software?"

16        He didn't understand it that way.   (reading)

17            "And you didn't believe the statement was misleading

18        in any way in light of the Autonomy hardware sales?

19            "I did not, no."

20        This idea, this really is kind of a thing that's been made

21   up.   The use of the words "pure software model" in an annual

22   report that distinguishes it from selling services, which they

23   did because they list "We sell services," and distinguishes it

24   from selling hardware, which they did because they talk about

25   appliances -- and in a minute I'm going to show you them

1    talking about hardware explicitly -- doesn't make it any --

2    this hyperbolic word about "We're a pure software company" when

3    at the same time you're telling people that purity doesn't get

4    you 100 percent, purity gets you most of the way, our goal is

5    to sell software, not to do anything else, and that was true.

6         The dispute, then, is not that the auditors knew about it,

7    not that it was properly accounted for, but was it because they

8    weren't broken out in public filings was Hewlett Packard

9    somehow misled.  And so let's go back to the undisputed facts.

10        Let's talk about, first of all, what do the public filings

11   of this company say.  If you wanted to buy it, you'd think

12   you'd read the public filings.

13        Back in 2009 with Deloitte's approval, they talked about

14   (reading):

15             "During the quarter, we saw some of our larger

16        customers promote Autonomy to strategic supplier status.

17        This has led them to adopt a broader set of solutions in a

18        number of significant deals."

19        This is the quarter when there's a lot of hardware sales.

20        The next reference in the earnings release in Q4 '10,

21   they've been talking about a small number of customers with

22   package solutions, construction of services, hardware, and

23   software, such as Arcpliance.  Not only Arcpliance, not only

24   are appliances hardware.

25        In the annual report (reading):

1           "Cost of license revenues includes hardware."

2       Mr. Apotheker assumed that hardware sales were 5 to

3   7 percent of revenues, and he also assumed that the hardware

4   sales were only appliances.

5       Mr. Apotheker, he balked at this a little bit, but finally

6   after looking at his prior statements when I was asking him

7   about the 5 to 7 percent estimate, he said (reading):

8       "A.  Yes, it's possible.

9       "Q.  And did you know that Hewlett Packard sold Autonomy

10          hardware for resale?

11      "A.  I did, yes, but not for resale."

12      He knew.  And let's get the numbers.  I mean, 5 to

13  7 percent is 50 or 45 to $65 million worth of hardware in this

14  company that Mr. Apotheker knew about.

15      He talked to Mr. Lynch about it.  Mr. Lynch said it was

16  small, and it was relatively.  This is the total -- the

17  percentages of hardware to total revenues, and it comes out --

18  these hardware sales which so much has been made of comes out

19  to about 9.1 percent.  Not a big part of Autonomy's business.

20      Mr. Apotheker never asked how much hardware was sold.  He

21  didn't care if it was 45 or 60, which he assumed, or if it was

22  closer to 90.  He just didn't ask.

23      And this appliance-versus-standalone hardware distinction

24  is something that I think has been made up for purposes of this

25  case.  You don't see "standalone hardware" in the documents.

1          What an appliance was was hardware running Autonomy

2     software.  There were contracts in the data room that made it

3     completely plain that hardware was being sold, I think in that

4     case, to UBS and was delivered at a different time than the

5     software that they were also buying.  All of this hardware was

6     designed to increase sales of Autonomy software and to be used

7     in most cases with it.

8          "Appliance," I guess is what I'm saying, is a far broader

9     term than this narrow term that Mr. Apotheker used, but the

10    point Mr. Apotheker is he didn't care about hardware, period.

11         Now, you're going to buy a company, you're going to read

12    the analyst reports.  Let's see what's in the analyst reports,

13    and they brought a lot of them in here to say what their

14    reports meant but let's see what they said.

15         Mr. Geall reports in his analyst reports (reading):

16              "Gross margin" blah blah "due to additional costs

17         associated with hardware sales."

18         Somebody interested in hardware, you'd think reading the

19    analyst report would say, "What are the hardware sales and how

20    much?"

21         Next.

22         Mr. Khan (reading):

23              "The company explained the reduction in gross margins

24         by the unexpected shift to the cloud but it could be

25         explained by the sale of additional hardware in the

1      quarter."

2          "Additional hardware in the quarter."  So somebody reading

3  that could ask the question.

4          Next.

5          Paul Morland, whom you heard from (reading):

6              "The performance looks even more disappointing given

7          the combination of the larger banking deals and a boost

8          from the sale of hardware."

9          So imagine you're HP getting ready to buy this company and

10  you're trying to figure out what you want to ask questions

11  about, you're reading the analyst reports, you read that.

12          Mr. Toms (reading):

13              "Surprising level of potential 'reselling revenue.'

14          We remain unclear why Autonomy is potentially booking

15          material 'reselling' revenue.

16              "Product seasonality (particularly adjusting for

17          hardware-related revenue).

18              "Revenue is potentially flattered by hardware sales.

19          Q3 '09, Q2 '10 we saw elevated hardware.  Idol product

20          benefits from hardware."

21          Mr. Toms said it right, he was asked (reading):

22              "Q.  And if someone were interested in finding out more

23          about Autonomy's revenue, your reports could give them a

24          clue to ask more questions; right?"

25          And the answer is, "Right."

1    How in the world could Mr. Sarin and his colleagues read

2    these reports and not ask about hardware sales if they were

3    interested?  The reason they didn't ask him about it is that

4    they weren't interested.  They just wanted to know about the

5    software side of the business.

6        Now, this is the one that boggles my mind that was left

7    out completely of the prosecutor's opening.

8        Mr. Gersh during due diligence said that Mr. Hussain said

9    to him on one of these calls, "We sell hardware for the

10   convenience of our customers."  He said it to him and Mr. Gersh

11   got that and didn't care.

12       Later on he wrote to his colleagues an e-mail that says

13   (reading):

14          "So far as I can tell, they have not captured free

15       software or hardware pass-through."

16   He knew that there was hardware being passed through and

17   couldn't find it in the books or whatever, but he chose not to

18   ask any more questions about it.  He didn't care.

19       The auditors who were helping with due diligence knew that

20   Autonomy sold hardware separately from software.  I just

21   mention that.  They saw the contracts to that effect in the

22   data room.

23       Agreement Number 2:  This is a contract for hardware and

24   software development.  When do you recognize hardware revenue?

25   This is being shipped separately.

1      This contract includes implementation -- Agreement 19 --

2  of networking hardware and infrastructure.

3      Agreement 28, this is a purchase order for additional

4  storage.  Storage is hardware, the big cells that Digital Safe

5  runs on.

6      They wanted Mr. Sarin to ask questions about -- to ask

7  some of their questions about this, but he never did.

8      Gersh -- from Andy Gersh (reading):

9          "Attached your questions for Autonomy.  Please feel

10         free to defer them."

11     And then Sarin says (reading):

12         "Andy - These are very specific.  We need to find the

13         right way to accomplish our goals."

14     And Mr. Sarin narrowed the questions and never asked the

15  questions that KPMG suggested to him about hardware.  They just

16  didn't care.

17     When the deal closed on October 3rd, Hewlett Packard got

18  all the books and records of Autonomy and it got the Deloitte

19  work papers and could review them, and those work papers and

20  books and records clearly showed -- this is the stipulation

21  that says that -- clearly showed the hardware sales.  You

22  couldn't miss it.

23     The claims that they are making now, ladies and gentlemen,

24  and that the Government is making in this case that hardware

25  sales by Autonomy were unknown or that it mattered to Hewlett

CLOSING ARGUMENT / KEKER

1    Packard is just plain false.  Hewlett Packard brought it up a

2    year later as a basis for its claim of fraud.  During due

3    diligence one of the ironies is that Hewlett Packard was

4    selling hardware to Autonomy during due diligence for resale.

5    This is Exhibit 5943.  Take a look at it.

6        Big picture from our point of view is that hardware sales

7    had absolutely nothing to do with the purchase of Autonomy.

8    Mr. Apotheker knew that there were hardware sales.  He didn't

9    care.  All he cared about was his vision.  His vision is, among

10   other places, in these exhibits.  They're the exhibits you've

11   seen where they talk about the reasons for buying Autonomy, the

12   way it's going to help them disrupt and take over the business

13   intelligence market, the way they're going to mix Autonomy

14   software with Vertica and some of Hewlett Packard's software.

15   They're going to completely disrupt the industry and they're

16   going to transform Hewlett Packard into a different sort of

17   company.

18       Now, Ms. Lesjak, who came in, she talked about -- she was

19   at the meetings where this acquisition was discussed.  She

20   opposed Mr. Apotheker's purchase not because of any financial

21   metric or "I saw this in the books," or anything else, she

22   didn't even look at the financial statements, but because she

23   thought that Hewlett Packard was paying too much, that they

24   could get it for cheaper, they were paying too much of a

25   premium.

1    The claim that the financial statements of Autonomy were

2    important to Mr. Apotheker's decision to buy Autonomy is just

3    nonsense.  They bought it for the IDOL software based on a

4    belief that they could make all these synergies happen and make

5    a whole bunch of money.

6        Mr. Apotheker didn't care what he paid.  He had a

7    conversation with Dr. Lynch.  We negotiate, this is over lunch

8    in France, Deauville, four hours, and they finally settled on

9    2550 -- or the lunch they settled on a range before there was

10   any due diligence.

11       Ms. Lesjak, the CFO, the chief financial officer of

12   Hewlett Packard who bought a company for $11.7 billion, didn't

13   really learn that the board had -- about the maximum price

14   until she was on the stand.  And Mr. Sarin said that, yeah, the

15   price range before due diligence even happened had already been

16   established.

17       Ms. Lesjak thought they could get it for less.  Neither --

18   she didn't read the analyst reports.  She didn't read the

19   financial statements.  She didn't read the KPMG due diligence

20   report.  This is the CFO.

21       Mr. Apotheker didn't -- none of them asked a question

22   about hardware sales.  They just didn't care.  They were

23   persuaded that they were getting a $17 billion value for a

24   cheap $11.7 billion.

25       I mentioned Mr. -- and I think you've seen from the

 1   evidence if you look at those slides -- Mr. Apotheker was

 2   desperate to transform Hewlett Packard.  He thought Hewlett

 3   Packard was in trouble.  He thought it was sort of going down

 4   the tubes.  He wanted to buy, remember, all three software

 5   companies according to Ms. Lesjak.  He wanted to by TIBCO,

 6   Autonomy, and Software AG.  She said they couldn't afford them.

 7   That sort of ruined their relationship.

 8        She thought and she told you that she thought that

 9   Mr. Apotheker and Mr. Robison were too excited about Autonomy.

10   They didn't negotiate the price properly.  They didn't do the

11   old Hewlett Packard tried-and-true merger tactic of dance and

12   walk away were her words.

13        She thought the -- and, remember, they did this heading

14   towards an August 18 announcement.  She thought that the

15   results of that announcement were going to be a disaster

16   because of all the news that the investors were going to react

17   to.

18        Mr. Apotheker thought that they had no choice but to go

19   ahead and do it because Autonomy was simply crucial to Hewlett

20   Packard.

21        Nothing that Hewlett Packard did in this period in this

22   regard had anything to do with any exact quantum of hardware

23   sales.  They knew that some hardware was being sold.  They

24   didn't care.

25        I've said this mantra about standalone hardware sales is

 1    meant to, I think, mislead you.  The evidence is that the

 2    hardware sales weren't standalone.  They were made primarily to

 3    software customers, big banks and other big software customers

 4    of Autonomy, and the purpose was relationship building and

 5    selling more software.

 6        Mr. Sullivan talked about that, that it frequently happens

 7    in the industry.

 8        Mr. Goodfellow talked about it, about the benefits of

 9    buying hardware and software from one source, the one-stop

10    shopping.

11        Mr. Egan talked about it, hardware was sold with the

12    intention that the customer would buy software, the more

13    higher-margin software (reading):

14        "Q.  It was never your concern that hardware sales were

15        inconsistent with a pure software model?"

16        He said he wasn't concerned about that.

17        And these are just some of the quotes (reading):

18        "It happens in the software and hardware industries

19    frequently," Sullivan.

20        "It's a relationship builder" is Egan.

21        "You sell hardware to drive revenue," Sullivan.

22        "Hardware sales were made in aid of selling more

23    software," Egan.

24        "Absolutely a benefit to future software purchases," Egan.

25        And, remember, Autonomy and Deloitte tracked the

1    relationship between the sales.  They kept track of it, the

2    sales of low-margin or below-cost hardware to customers, and

3    then they would track how are we doing with them as are we

4    getting more money from software sales than we are losing and

5    are we getting more software sales.  It's a way to drive

6    revenue.

7          To make this part of the case, this hardware piece of the

8    case, the Government has relied a lot on some very confusing

9    lists of customers.

10         Your Honor, this would be a good time.  Could we just

11   stretch for a second?

12              **THE COURT:**  That's a great idea.

13         Ladies and gentlemen, stand up, stretch.

14                        (Pause in proceedings.)

15         **MR. KEKER:**  Okay.  A lot of words in a short period of

16   time.

17         I want to go on to this top 40 issue.  They've talked a

18   lot about these lists and there's been testimony about these

19   lists being fairly confusing.  The due diligence team certainly

20   thought that the lists were confusing because they said they

21   didn't make sense.

22         Mr. Gersh said -- first of all, Mr. Gersh couldn't keep

23   the lists straight.  He didn't know which one was the contract

24   list and which one was the customer list, and he said he didn't

25   use them in his due diligence report because they didn't make

1    sense.  He thought that -- he just didn't make sense of them.

2        And Mr. Sarin also got them reversed, didn't know which

3    was which.

4        These lists were created in about a day in August, mostly

5    around August 3rd and August 4th, with a note of -- and they

6    were heavily redacted so that all you got was an amount of

7    money and an industry for the end user, which was discussed and

8    talked about, and that was it.  Yeah, with a note about who the

9    end user would be if the sale had been to a reseller.

10       Let's go back to the earlier one.

11       Okay.  During due diligence they agreed that the top 40

12   list would focus on software licenses, not hardware sales.  And

13   here's some of the exhibits that show that.

14       A Sarin e-mail, he wrote to confirm that the lists include

15   license and maintenance and service revenue, not hardware

16   revenue.  License and maintenance and service revenue.  That's

17   software contracts.

18       Mr. Levadoux (reading):

19           "The request was for revenue split by license,

20       support, and services."

21       Mr. Hussain's spreadsheet, which you saw, 2102, when

22   Agent Bryant was testifying, recognized revenue -- it says

23   right at the top (reading):

24           "Recognized revenue from software, maintenance, and

25       hosted 2010 and 2011 to date."

1    So what he thought that list was was software revenue.

2    And then his e-mail, 2104 (reading):

3         "The schedule provides recognized revenue by customer

4         for software, hosted, and maintenance."

5    They weren't talking about hardware sales when they were

6    talking about these lists.  What HP was interested in is:  Who

7    were the software companies?  We want to see sample terms.  We

8    want to know what industries they're in.

9    All of the transactions -- and there was an agreement not

10    to identify the end -- excuse me -- not to identify resellers.

11    If it was a sale to a reseller, what HP wanted to know was who

12    the end user was going to be, what industry were they in, and

13    that's Mr. Sarin (reading):

14         "If a software company like Autonomy sold a deal

15         through a reseller, the piece of information you would be

16         interested in in these lists is not the reseller but the

17         end user; right?"

18    Mr. Sarin says, "Yes."

19    All of the deals that are listed in the software list that

20    eventually went over listed the end user.  All of them to the

21    extent that they are resellers, were expected to close with the

22    end user later on, and that's why the end user was listed and

23    not the reseller.

24    Hewlett Packard never asked about hardware sales,

25    including about appliance sales.  Here's the -- you can go

1    through these (reading):

2              "Describe your sales model by product or vertical.

3              "Hosted versus SAS, on-premise license versus OEM

4         versus appliance.

5              "Provide a historical revenue split by license,

6         support, and services.

7              "Customer contracts split by major line of business:

8         Licensing, OEM, Hosted, SAS."

9         They focus on what they call core revenues, which is

10   product licenses, cloud, and OEM, and so on.

11        They never asked a specific question about how much

12   appliances, how much hardware do you sell, and so on.

13        The lists were the product of very limited due diligence

14   under the English takeover rules.  Hewlett Packard was scared

15   to death that Oracle was going to come sweeping in and mess

16   this deal up, which they considered transformative.

17        Remember Mr. Apotheker thought that Autonomy was the key

18   to saving Hewlett Packard.  Those were his words.

19        Ms. Lesjak testified to him he wanted to take no chances

20   that another bidder would come in and interfere with what he

21   saw as the key to HP's future.  So the information that was

22   exchanged was heavily negotiated and very limited.

23        Mr. Sarin recognized that the process would be that they

24   would ask questions.  Autonomy would answer the questions.

25   They wouldn't try to read their mind.  The burden is on the

 1    company that is buying -- that's HP -- to say, "Here's the

 2    information we want.  Please give it to us."  That's what Andy

 3    Johnson recognized.  (reading)

 4            "It's fairly standard for the buyer to sort of drive

 5        the process and define what information it wants?"

 6    Mr. Gersh said, "Yes."

 7            "You wouldn't expect anybody at Autonomy to try to

 8        read your mind?"

 9    Mr. Sarin agreed with that.

10            "Responsibility of the target company to answer

11        questions.  They're not expected to volunteer

12        information?"

13    Andy Johnson agreed with that.

14            "There's no general duty of the target," that's

15    Autonomy, "to open its files and say, 'Come on in and look

16        at whatever you want'?

17            "That's correct."

18        And, in fact, they couldn't be more clear that they

19    negotiated limits on disclosure.  The Hewlett Packard proposed

20    in this exhibit that they wanted all reasonable access to all

21    information, and the Autonomy drafters took it out of the

22    agreement so they were making plain that that was not the

23    standard that they were following.

24        But there's another sort of larger question about this

25    that I think you ought to consider.  Why would Mr. Hussain

 1   knowing that all the Autonomy books and records would be in the

 2   possession of his new employer when he was planning to work for

 3   Hewlett Packard and did for eight months, why would he lie to

 4   them before the acquisition knowing that they were going to

 5   find out whatever they were going to find out because they were

 6   going to have the books and records?

 7        Mr. Reeves suggested yesterday that somehow he was going

 8   to clean up the books so nobody would ever know but that's

 9   absurd.  These books that went over and the Deloitte work

10   papers that went over clearly talked about these hardware

11   sales.  They talked about the one segment.  They talked about

12   the sales of the loss.  They talked about all this that you've

13   seen.  The debts, the write-offs, anything that had happened

14   would be clear in the books and it makes no sense that

15   Mr. Hussain would think otherwise.

16        Hewlett Packard was not misled about anything that they

17   cared about.  They weren't misled about hardware.  They weren't

18   misled about sales to resellers.  They weren't misled about

19   sell-in versus sell-through.

20        As I said, Mr. Apotheker was determined to buy Autonomy.

21   He was going to announce it on August 18 because he had a lot

22   of other bad news to give the market, and he thought announcing

23   the purchase of Autonomy would be good news.  Unfortunately for

24   him, this is -- right when he announced it, it didn't work out

25   and he was fired.  The visionary was gone.  The vision was

CLOSING ARGUMENT / KEKER

1    never achieved.

2        This case, which then a year after they got rid of

3    Mr. Apotheker, this case became a claim of fraud case by

4    Hewlett Packard, and what it has turned into is a battle of

5    accountants; and the Government has not provided you with any

6    way to decide who is right in this battle.

7        So what you have to ask:  What is the relationship between

8    not knowing what the evidence shows and the very important

9    principle of proof beyond a reasonable doubt?  And I submit

10   that if you're confused and uncertain about what this evidence

11   shows, now or after your deliberations or after you try to plow

12   through those exhibits, then you have a reasonable doubt; they

13   have not proved Mr. Hussain guilty beyond a reasonable doubt.

14       You can't simply trust that the Government is right.  For

15   Mr. Hussain's sake, I certainly hope and beg you not to blindly

16   put blind faith in what the prosecutors have to say.  They want

17   to win this case.  To do it they are willing to put before you

18   contradictory and sometimes ridiculous testimony, particularly

19   from witnesses that they've immunized, and I just want to

20   remind you about a few instances of it.

21       Dave Truitt saying that he didn't know about the

22   $2.3 million profiling sale that went to his own company, that

23   he just didn't know about it, never heard of it, and so on,

24   that was a lie.

25       Mr. Baiocco, Hewlett Packard's preferred partner,

 1    testified that Capax did no eDiscovery work but the evidence

 2    shows that they did a lot.

 3         Then there's Mr. Egan sending pretextual e-mails to London

 4    saying things that weren't true and then turning around and

 5    telling you that Sullivan and Scott both knew that Capax wasn't

 6    doing any eDiscovery work and was getting paid anyway.  Both

 7    Sullivan and Scott say that's not true.

 8         Why does Mr. Egan need to lie to people in London?  Why

 9    does he need to send pretextual e-mails?  There's no evidence

10    that auditors look at those e-mails.  He's sending lies about

11    Capax needing -- Capax having lots of work to do and we need to

12    give them more money and so on.  He's telling Sullivan that,

13    he's telling Chamberlain that, he's telling Kanter that, and

14    he's telling Mr. Hussain that.  Why does he need to lie to

15    London if they know what he's up to?

16         And then there's that great moment, one of my favorite

17    moments in the trial, which I don't know if you remember this,

18    but Mr. Baiocco -- Mr. Baiocco meets Mr. Hussain for the first

19    time in April of 2011.  He gets up and tells you that

20    Mr. Hussain comes up to him and says, "You were supposed to do

21    another reseller deal" or "backdate reseller deal," or I can't

22    even remember what he claimed.

23         It was pointed out to him that he's talked to the

24    Government 10 times and never come up with that lie, and he

25    insists it's not a lie and says that they made a deal that

1  Capax would somehow be paid back for the new agreement.  He was

2  going to make a reseller deal or a new amendment, or something,

3  and Capax would be paid back and that Mr. Hussain had agreed to

4  that.

5      And, again, you ask him questions:  Who said what?  How

6  long was this meeting?  Where was it?  And eventually it turns

7  out that what he's talking about is a 30-second exchange where

8  he goes and sees Mr. Hussain after giving him a contract and

9  says, "Are we good?"  And Mr. Hussain says, "Yeah, we're good."

10     And that's -- so he tries to blow up this thing and when

11 he gets pushed, even he admits that it's a big nothing.

12     So where does that leave you?  It suggests that you can't

13 trust the Government witnesses, you can't trust the prosecutors

14 to screen the Government witnesses for truthful testimony.  So

15 what are you -- ask yourself:  Do I understand the evidence

16 that has been thrown at me for the last two months?  If you

17 don't, the Government has not proven its case beyond a

18 reasonable doubt.

19     In his opening Mr. Leach said that the case was a puzzle

20 and he said to you (reading):

21         "There are a number of pieces to this puzzle, so be

22      patient, have an open mind, do the best you can.  And when

23      the Government stands up again," which is now, "after

24      you've heard from all the witnesses, after you've seen all

25      of the documents, after all of the pieces of the puzzle

 1        have been played, I submit to you that a clear picture

 2        will emerge."

 3        Well, let's look at the puzzle, and there it is

 4   (indicating).  There's nothing clear about this puzzle.

 5   There's nothing complete about this puzzle.  Without that clear

 6   picture that Mr. Leach promised, the Government is admitting

 7   that it cannot fit the puzzle together.  Reasonable doubt as to

 8   Mr. Hussain's culpability and guilt exists.

 9        Again, stepping back, a big picture, the prosecutors in

10   this case are selling -- have been selling an absolute fantasy

11   that the HP machine has created for them.  Think about what

12   they're saying.  They're saying that hardware revenue is proper

13   revenue, it was properly accounted for in a one-segment

14   company, but it's important because low-margin hardware sales

15   drag down gross margins.

16        Well, that's exactly what the financial statements of

17   Autonomy show.  Every penny of these hardware sales is

18   accounted for properly.  All the numbers are right.  To the

19   extent that they are not making money on hardware sales, the

20   gross margins are depleted.  No one is claiming that the

21   numbers aren't right.  They're claiming that somehow HP didn't

22   understand them properly.

23        The cash shown is all there.  Nobody's saying one penny of

24   cash is missing.  What they're saying is these revenue numbers

25   should be taken out the way Mr. Yelland has taken them out.

1    They want to change the numbers by taking out sales that

2    Deloitte had accounted for as proper and were leading into the

3    revenue numbers.

4        This is a slide I showed you in the opening.  This is a

5    slide of a company whose revenues were growing every year, who

6    was confidently buying companies for a lot of money, including

7    right up until 2011 when they bought Iron Mountain's digital

8    part for $380 million, but in 2009 they'd spent 775 million on

9    Interwoven.  They're depicting this company as some desperate

10   company who needs to be acquired.  It's false.  That's not who

11   they were and it's not where they were in 2011.

12       Andy Johnson said that as late as August 16, Dr. Lynch --

13   this is two days before the announcement -- Dr. Lynch was

14   willing to walk away if HP tried to lower the price.

15       Can we see 151, Jeff, down here at the bottom.

16       "As late as August 16, 2011, is it your recollection that

17   as of that time, you felt that Dr. Lynch was willing to walk

18   away if HP tried to renegotiate the price?"

19       Autonomy didn't need HP; HP needed it and was willing to

20   pay almost anything to reach Apotheker's vision.

21       So the Government gets the last word, as they should

22   because they have the burden of proof beyond a reasonable

23   doubt, but there are dangers in them having the last word.

24   They can say things that I can't rebut, I can't challenge, I

25   can't say what's wrong with them.  They can characterize

 1    evidence unfairly.  So that's why it's important for you to

 2    listen with a skeptical mind, professional skepticism, as

 3    Deloitte would say.

 4        I hope you have enough information now so that when the

 5    prosecutor is exaggerating or has his facts wrong that you'll

 6    be able to tell.

 7        I expect them to talk about common sense, because they

 8    always do.  Mr. Reeves has already talked about common sense.

 9    That's what they always do when they're trying to jump from

10    here to there, when they are trying to bridge a hole in the

11    evidence, when they're trying to figure out -- they want to get

12    you from here to there without really explaining how you can

13    get there.

14        Does common sense tell you whether or not Deloitte, who

15    studied these accounts so hard and approved them, or

16    Mr. Yelland, who was working for the HP machine -- does common

17    sense tell you which one of those are right?  I don't think so.

18    But you -- obviously you will decide.

19        I expect them to say that Mr. Hussain lied to the

20    auditors.  They said that a number of times.  But they never

21    proved it.  Who -- when did he lie to the auditors and about

22    what did he lie to the auditors?  If he made mistakes, fine,

23    but when did he lie to the auditors?  There is no evidence of

24    that.

25        The fact that they bring in Ms. Anderson and Mr. Welham,

1   who are both juniors, and they say, "well, I didn't know

2   something," that doesn't prove anything.

3        Look at the work papers and you'll see the scope and

4   extent of the information that Deloitte had when they were

5   making these judgments that the accounting is proper and

6   telling Mr. Hussain that his judgments about the accounting

7   were satisfactory and met accounting standards.

8        And of course Deloitte -- and this is the other trick that

9   they've been playing with the case.  Deloitte doesn't know what

10  Mr. Hussain doesn't know.  So Egan has made some dirty deal or

11  side deal with Baiocco or if Egan has backdated something in

12  the United States and Mr. Hussain doesn't know about it, yes,

13  Deloitte doesn't know about it because he doesn't have it to

14  tell them.  But for all of the main transactions, look at the

15  extensive work that is described in the Deloitte work papers.

16       And then another thing I hope the prosecutors will answer

17  in this case is when Hewlett-Packard bought Autonomy -- and

18  we've already said got access to all the books and records and

19  to Deloitte's work papers -- Mr. Hussain went to work for HP

20  and was there for eight months.  Deloitte continued as the

21  auditors once it became part of Hewlett-Packard.  The hardware

22  sales continued, by the way, when -- once it became

23  Hewlett-Packard.  Mr. Yelland became the chief financial

24  officer of Autonomy within Hewlett-Packard, and certainly

25  during that period, Mr. Hussain and Deloitte weren't acting

1   like they had something to hide or were concerned about.

2        Mr. Sullivan testified nobody --

3           **MR. FRENTZEN:**  I actually object to that, Your Honor.

4   There is no evidence of that, period.  It's speculation.

5           **THE COURT:**  Go ahead, Mr. Keker.

6           **MR. FRENTZEN:**  It's not true.

7           **MR. KEKER:**  I predict that when I sit down, the

8   rebuttal is going to be an ugly attack on Mr. Hussain, and I

9   want you, when you're listening to it, to think about where

10  it's coming from, I guess.  That's all I have to say about

11  that.

12       Mr. Sullivan testified that no one suggested to him that

13  hardware sales should be hidden from Hewlett-Packard.

14  Mr. Sullivan went to work for Hewlett-Packard, too.

15       The rebasing exercise in June, 2012, found no fraud and

16  minimal adjustments to the books, and yet a year later, it took

17  a year for HP to claim fraud.  Isn't that proof that the claim

18  of fraud was made up in hindsight?

19          **MR. FRENTZEN:**  I object, Your Honor.  This is exactly

20  what we argued about before closing --

21          **THE COURT:**  Ladies and gentlemen, you listen to the

22  evidence.  You'll form your own judgments.  You are entitled to

23  consider any reasonable inference based upon the evidence.

24       Okay.  Let's continue.

25          **MR. KEKER:**  This is a case without a soul.  It's

1  bureaucracy in search of a crime.  They flyspecked three years

2  of accounting judgments, ignored three years of careful work by

3  Deloitte, embraced the restatement created by Yelland and the

4  HP machine, all to crush Sushovan Hussain and give everyone

5  else you've heard about in this case, everyone, a free pass.

6       Why is he here alone?  We know why he's here.  Because the

7  HP machine wants him convicted.  With countless lawyers and

8  consultants working on the civil case for money damages in

9  England, HP wants a criminal conviction that they can point to

10  in that civil case.

11      This case is a dispute about accounting.  That accounting

12  dispute is being litigated in English courts for money damages,

13  and that's where it belongs.

14      I ask you to -- first I thank you for your attention, and

15  I ask you to not become part of the HP machine and to return a

16  verdict of not guilty.

17      Thank you very much.

18           **THE COURT:**  Okay, ladies and gentlemen.  We are going

19  to take a recess now.  We will be in recess until 10 to --

20  well, let's see.  Five to 11:00.

21      Remember the admonition given to you:  Don't discuss the

22  case, allow anyone to discuss it with you, form or express

23  opinion.

24                  (Recess taken at 10:42 a.m.)

25                (Proceedings resumed at 10:52 a.m.)

REBUTTAL ARGUMENT / FRENTZEN

1    **THE CLERK:**  Come to order.  Court is now in session.

2    (Proceedings were heard in the presence of the jury:)

3    **THE COURT:**  Please be seated.  Let the record reflect

4    that all parties are present, the jury is present.

5    You may proceed.

6    **MR. FRENTZEN:**  Thank you, Your Honor.

7    **REBUTTAL ARGUMENT**

8    **MR. FRENTZEN:**  Good morning, ladies and gentlemen.

9    Don't let Mr. Hussain, Mr. Keker, turn this case upside down.

10   What do I mean by turning the case upside down?  Well, what you

11   just heard for two days now is a long story, a story in which

12   Mr. Hussain is the villain -- I'm sorry -- is the victim, and

13   Hewlett-Packard, some machine, some amorphous machine that's

14   Hewlett-Packard has taken over this case and Mr. Hussain is the

15   victim.  That's simply not consistent with the evidence.

16   It's an interesting theory.  We can talk about that a

17   little bit, but it's completely inconsistent with the evidence

18   and, dare I say it at the get-go, it is consistent with common

19   sense.

20   This case is not -- it just doesn't work like that, and

21   there is a couple of things that have been mentioned already

22   that I want to talk about very briefly in terms of what this

23   case is not about.

24   One of those you heard from Mr. Keker twice now, that

25   everyone you've heard of mentioned in this case -- that

1    everyone got a pass.  Number one, that's irrelevant.  We're

2    here about Mr. Hussain.  We're not here about other folks,

3    except to the extent they may have testified or they are

4    alleged to be have been involved with Mr. Hussain.  But it's

5    also not true.  So let's put that aside.  It's irrelevant and

6    untrue that everybody else got a pass.

7         The other thing Mr. Keker has spent a lot of time talking

8    about is this supposed Hewlett-Packard machine.  He's pointed

9    out some lawyers that have been here, in the audience here and

10   there.  He has somehow determined that there is a grand

11   conspiracy.  In turning it upside down, I want you to just

12   think for a minute about the conspiracy that this requires,

13   rather than the conspiracy alleged, which is that Mr. Hussain

14   and other folks at Autonomy in and around early 2009 decided to

15   start inflating their books, and in that way, defrauding the

16   public, the auditors, which we'll get to in a minute, and

17   eventually Hewlett-Packard, to pump up their numbers, that

18   that's not the conspiracy that the evidence showed.

19        Instead Mr. Keker is arguing that somehow a

20   Hewlett-Packard machine has created a gigantic conspiracy that

21   has encompassed not only every witness that testified in this

22   case, but apparently the auditors and, in fact, the federal

23   government.  I don't know what this conspiracy is called.  The

24   "Printer Mafia"?  It doesn't make sense.

25        The folks over here at this table, ladies and gentlemen,

**REBUTTAL ARGUMENT / FRENTZEN**

 1    there is only one name on the front of the jersey for this

 2    table and it's not HP.  It's US DOJ, the Department of Justice.

 3    We serve one client, that is the government.  We do not serve

 4    Hewlett-Packard.

 5        And even more important, what you should know is what's

 6    being turned upside down is that there is actually a statutory

 7    provision for HP's role, if you will, although they don't

 8    really have a role in this case.  This is between the

 9    Government and Mr. Hussain.  But there is something called a

10    Crime Victims' Rights Act, and the Crime Victims' Rights Act

11    provides for certain things.

12        It provides for victims of crime or purported victims of

13    crime to be able to consult about important things with the

14    Government.  It provides for victims of crime to come and

15    appear in court.  It does not mean they are driving the train.

16    They are not.  It does not mean there is some grand conspiracy.

17    In other words, this is not the upside-down conspiracy.  The

18    evidence will show -- the evidence did show that Mr. Hussain

19    was involved himself in the conspiracy.  So let's not get

20    everything turned upside down.

21        I want to talk just for a minute about one of the main

22    things that Mr. Keker has tried to turn upside down.  Yesterday

23    you heard about dueling accountants.  Today you heard about

24    battle of accountants.  You also heard some quip about Johnny

25    Cochran, which I may get wrong, but if the accountants

 1    disagree, you must let his guy go free or something like that.

 2    Funny.

 3        That's not the evidence you have, ladies and gentlemen.  I

 4    want you to think about the evidence that you have in this

 5    courtroom and the folks that took the stand and took an oath

 6    and testified.  The accountants.  There were a lot of them.

 7        What do you get from those accountants?  I'm talking about

 8    the ones that actually came in here.  They're in agreement,

 9    ladies and gentlemen.  I'm going to go through that.  But every

10    accountant who came in here and testified agreed.

11        They agreed that the accounting by Mr. Hussain at Autonomy

12    was fraudulent, was wrong, was inaccurate.  Did any accountant

13    come in here -- and we have the burden of proof at all times,

14    ladies and gentlemen.  Make no mistake.  And we embrace that.

15    But in an accounting case, framed up to you as battle of the

16    accountants, dueling accountants, no.  We'll go through this.

17        What do you have?  You have the accountants saying this

18    was bogus.  All of them.  There is no duel.  You've got to have

19    two to have a duel, last time I checked.  Maybe more.  Battles.

20    I don't know how many.  But they all agree.

21        Mr. Yelland.  Mr. Yelland came in and obviously that was

22    the restatement.  The restatement which Mr. Keker claims is,

23    you know, somehow bogus, it's part of this HP conspiracy

24    machine.  The restatement was required by law, and Mr. Yelland

25    told you that.  It was something that had to be done.  They

1    spent years on it.  A year plus.  They spent a lot of time.

2    They went through every scrap of paper.  They redid the

3    accounting.

4        And I'm going to get into in a minute some of the things

5    that Mr. Keker has talked to you about that were not accurate,

6    but, listen, let me just say this.  I have limited time.  I

7    have the benefit of you already having heard my friend and

8    colleague, Mr. Reeves, go through everything with you, and it

9    was a long time.  Mr. Reeves covered everything.  Probably the

10   most important thing I will do here today is to refer you back

11   to him going through everything.

12       I know Mr. Keker was -- said that -- you know, he was

13   flashing things at you, and I want you to think back.  Was he

14   flashing things or was he moving through solidly?  And did he

15   show you weird bubbles on the screen that he had made like

16   Mr. Keker did or did he actually show you the exhibits that

17   were in evidence and things that you could review?

18       One of the things that Mr. Keker said about Mr. Yelland

19   and the restatement was he made the claim that Mr Yelland just

20   went through, and if there was a reseller and a reseller deal,

21   that he tossed it.  Not true.  And Mr. Yelland actually

22   testified about this.

23       If you would just take a quick look.  You can see Discover

24   Tech and Capax Discovery, and because these are not in parens,

25   what that means is Mr. Yelland actually added these in.  He

1  simply added them in in the correct quarter.  In other words,

2  if they went to a reseller which was bogus -- and we'll talk

3  about that -- because the reseller wasn't reselling to anyone.

4  I don't know how it gets more fake than that.  Oh, you're a

5  reseller but you're just not going to do anything.  Then he

6  didn't credit it for that quarter.

7      But Mr. Keker told you that he just tossed all of the

8  reseller deals.  Not true.  Here they are.  He adds them back

9  in if the deal went through.

10      Now, if the deal never goes through, he doesn't add it

11  back in because it's not really revenue, which is actually the

12  way exactly that Mr. Hussain accounted for it.  He would just

13  come up with something fraudulent to reimburse them.  We'll

14  talk about that.  We've already talked about that a lot.

15      But Mr. Yelland's restatement and Mr. Keker didn't lead

16  you down the right path on that one.

17      So Mr. Yelland said all of the accounting -- not all of

18  the accounting -- that Autonomy's accounting was fraudulent.

19      Mr. Welham, Lee Welham, came from -- here from the UK,

20  worked for Deloitte, and this is what Mr. Keker supposedly

21  relies on, is Deloitte.  And we can go through this in a little

22  bit, but what did Mr. Welham tell you?  What Mr. Welham told

23  you was, "Had we known X, Y, Z -- first of all, we would have

24  wanted to know that.  We would have taken that into

25  consideration in our accounting.  And on a lot of these deals,

1    they should not have been recognized."

2        Mr. Welham, I think, boiled IFRS and all of the other

3    standards down to one of the best little quotes just in terms

4    of what it means in terms of collectibility and in terms of

5    continued managerial involvement.  What does it mean?  Why are

6    these reseller deals a problem?

7        And if you go to a reseller and you sell it and you're

8    really done with it, then we all agree that's not a problem,

9    under any standard.  But if you go to a reseller and you say,

10   "Here you go, can you hold this for me, you don't have to do

11   anything with it, and by the way, I'm still going to go resell

12   it, in fact, we don't even want you to try to resell it, we're

13   going to resell it," that's continued managerial involvement

14   and you don't know about collectibility because you're not

15   really collecting from the reseller to begin with.

16       What Mr. Welham said was cut and dry, it was short, and he

17   said, "Well, if you still have to sell it, then you haven't

18   made a sale, have you?"  And that's a pretty simple way of

19   saying if you -- if you still have to sell it, you still have

20   managerial involvement.  There's still risks and rewards at

21   issue.  There is collectibility at issue because this guy

22   said -- the reseller has said, "I'm going to resell" -- take a

23   look at the contracts.  There's an end user.  "I'm going to

24   resell to this end user."  But Autonomy has said, "Don't do

25   that.  We are going to take care of that."

1       How is that reseller really at risk?  Because what is he

2   going to do with it?  Autonomy is trying to sell to the actual

3   end user.  They've asked him not to sell to the end user, the

4   VAR; right?  It makes no sense.

5       So Lee Welham, had he known that -- and you all know that

6   is the circumstances.  I mean, every value-added reseller who

7   came in here told you two things, and we can go through it from

8   the transcripts, but if you just think about it and recall,

9   what Mr. Keker was focused on was well, you're still at risk on

10  the contract, right?  John Baiocco said "in the eyes of the

11  law," meaning the contract says you're at risk.

12      But the truth of the matter -- the truth of the matter

13  that Mr. Hussain had to be able to observe, even from London --

14  and we'll go through this -- was that the people were not

15  really at risk.  It's an impossible situation.  Don't sell.

16  We're still going to sell.  They have to take care of the

17  reseller.  There's no other option.  Otherwise, nobody would do

18  it.

19      And every reseller who came in here said eventually,

20  "Yeah, I mean, I took it, I was sort of at risk, but I wasn't

21  trying to sell it to anyone, and they told me they'd take care

22  of it," and eventually they did, whether it was by writing it

23  off, whether it was just saying "forget about it and here's a

24  marketing assistance fee for doing nothing other than holding

25  it."  Whether it was some other ATIC or FISMA, eventually they

1    take care of them.

2        Mr. Welham clearly said if that is the situation, then the

3    accounting is all wrong.  And you've heard that's how it

4    worked.  And so Mr. Welham -- and he went through a series of

5    things.  "If you knew this ..."  "Had you known that ..."  And

6    he said, "Yeah, that all would have been wrong."

7        Antonia Anderson, a very important witness because

8    Mr. Keker wants to claim that Deloitte is the accountant that

9    he's relying on somehow, even though nobody came in here and

10   took the stand and agreed with anything he's arguing about the

11   accounting.  I mean, the basics, the core, that the accounting

12   was okay at Autonomy.  Nobody said that.

13       But Ms. Anderson worked at Deloitte.  Then she worked at

14   Autonomy.  Then she worked at HP because she stayed on through

15   the transition.  And she worked very closely hand-in-hand with

16   Mr. Yelland, Chris Yelland.

17       And what Ms. Anderson told you, among many other things --

18   many situations in which she said that she would not have

19   agreed with the accounting.

20       But after working at Deloitte and after working on the

21   restatement:  "As part of the ASL restatements, did you restate

22   the FileTek transactions, the MicroTech transactions, the

23   MicroLink transactions and the Capax transactions that we've

24   been discussing today?"

25       Answer:  "Yes."

1    Question:  "Did you conclude that they were incorrectly

2    accounted for under IFRS?"

3    Witness:  "Yes."

4    So that's not the dueling accountant.  Ms. Anderson is on

5    board with Mr. Yelland.  She agrees.  When she was at Deloitte,

6    she was deceived.  When she got an opportunity to go back

7    through everything and do the accounting properly, she agreed.

8    So she's not dueling with Mr. Yelland.

9    Matt Stephan.  Matt Stephan was an accountant.  He worked

10   in the finance department at Autonomy.  Remember?  From

11   Australia, on his vacation, comes here to testify, has nothing

12   to gain or lose.  He works for a concrete company in Australia

13   now.  And just came, testified about what he saw when he was

14   working at finance in Autonomy for Mr. Hussain, and he told

15   you, "unquestionably, I took one look at these deals and I

16   thought they were garbage."  He said some stuff that was worse

17   about them.

18   He said he raised it with Mr. Chamberlain.  He said

19   Mr. Hussain, through Mr. Chamberlain, you know -- "Don't worry

20   about it.  It's a small percentage of our sales.  We've just

21   got to keep doing it."

22   But he's not -- he's a trained accountant.  He's not the

23   dueling accountant.

24   Andy Gersh.  Andy Gersh testified and said he would have

25   had a very different view of Autonomy had he really known what

 1    was going on at Autonomy.  So he's not the accountant who's

 2    dueling for Mr. Keker.

 3        Even Alan Rizek -- even Alan Rizek, who is an accountant,

 4    came in here and this is the guy that wasn't even putting

 5    MicroLink and Autonomy deals on the books.  I don't know what

 6    kind of accountant he was, but he said he felt uncomfortable

 7    about things.  He felt things were wrong.  He thought these

 8    deals -- that he was on the back end of some fraudulent

 9    accounting.

10        So there is no duel here, ladies and gentlemen.  There is

11    no battle.  That's a ruse.  No accountant came in here, with

12    all the lawyers and folks over here -- no accountant came in

13    here, took an oath, and said Sushovan Hussain and the way he

14    ran the accounting at Autonomy was just fine.

15        Just think about that for one minute.  In an accounting

16    case after everything Mr. Keker has argued, you have to

17    consider the evidence and the witnesses who actually came in

18    here and testified.  And nobody will vouch for Sushovan

19    Hussain's fraudulent accounting.  Nobody.

20        **MR. KEKER:**  Excuse me, Mr. Frentzen.

21    Your Honor, I object.  Burden shifting.

22        **MR. FRENTZEN:**  I said the burden is on us.

23    Nobody has taken that stand and said --

24        **MR. KEKER:**  I say burden shifting when he talks about

25    us bringing in witnesses and it's his burden.  That's burden

1    shifting.

2         **THE COURT:**  Well, ladies and gentlemen, let me just

3    point out that the Government needs to prove each and every

4    element of the offense.  The Defense need to prove -- needs not

5    to prove anything.  They have no burden of proving anything.

6         **MR. FRENTZEN:**  Every witness called here to testify

7    before you who was an accountant disagreed with the way

8    Mr. Hussain did the accounting.

9         As I said before, there's way too much here to respond to.

10   You don't want to listen to it.  I have limited time.  Again,

11   please rely on what you heard yesterday from Mr. Reeves.

12        Just a couple other quick things on what Mr. Keker talked

13   about during his review of the evidence.  You know, he talked

14   about the EDD No. III deal with Mr. Baiocco and where

15   Mr. Baiocco said he went and he met with Mr. Hussain in London

16   and -- or Cambridge, can't recall right now, and he was in the

17   UK, in any event, and Mr. Hussain hit him up for another 1.6,

18   $1.7 million EDD deal after the quarter in early April.

19        And Mr. Keker showed you a slide that said it was a

20   30-second meeting in which, you know, Mr. Baiocco said, "Am I

21   taken care of?"  And Mr. Hussain said, "Okay."

22        Well, that's just not right, ladies and gentlemen.

23   Mr. Baiocco testified -- if you recall, there was a whole piece

24   about this where he met with Mr. Hussain and Mr.-- he was

25   there, he was very interested in trying to finally get some of

1  this EDD work.  He'd been getting paid millions already for not

2  doing it, but he wanted to actually get in and do some of the

3  BP work.  And he approached Mr. Hussain about that, and if you

4  recall, Mr. Hussain -- that's when he said, "I need you to do

5  another deal."  He says, "I got investors, I can't" -- you

6  know, "I can't push another one through.  We're already in the

7  hole to you guys a lot."  And then eventually he goes and he

8  gets the -- he shows up at his -- at his hotel and, you know,

9  there's a deal there waiting for him and it's backdated and

10  then there's the email traffic with Mr. Hussain.  So it wasn't

11  a 30-second conversation.  It wasn't just an "okay."  That was

12  not accurate.

13      You've heard a lot of talk about them actually doing

14  eDiscovery work.  That's not the evidence, ladies and

15  gentlemen.  That's conflating the EAS services, which Capax had

16  done -- Mr. Baiocco testified about that -- done it for a long

17  time.  With the actual eDiscovery work, which he testified

18  repeatedly they were incapable of doing and did not do until

19  after Autonomy was acquired by Hewlett-Packard, that was simply

20  wrong.

21      Mr. Keker tried to tell you that the Capax -- that

22  Mr. Hussain did not sign off on the -- or approve the Capax

23  expenditures, and that, ladies and gentlemen, is just not the

24  state of the evidence.  If I could just show you briefly --

25  now, what Mr. Hussain did here on the Capax EDD authorizations,

1   approving the expenses was sort of interesting.

2       There was a flurry of emails in about mid 2009, if you are

3   looking back over the evidence, where he kind of gets nervous.

4   He starts asking questions that he supposedly already knows the

5   answer to in emails and asking other people to approve for him.

6   But if you take a look, it starts with Mr. Hussain and then

7   eventually after this flurry of emails trying to get other

8   people to approve it, you'll see he just starts approving it.

9       And so how do we know that?  Well, the Capax goes like

10  this.  This is Exhibit 50, and you have seen it before, but

11  this is page 2.  And this is April 16 of 2009.  So this is just

12  a couple of weeks after the initial Capax EDD deal.

13      And Mr. Hussain is saying -- people are saying, "What do

14  we do for these purchase orders?"  And Mr. Hussain says, "I

15  have no idea why this is so complex.  Create a PO for

16  outsourcing EDD processing, as we did last year.  Send details

17  of PO, gigabytes, price," or whatever, "to Stouff, Pete,

18  Sullivan and me.  We'll approve."  In other words, "Just put a

19  PO together.  We'll approve."

20      This is the head of finance, this is the chief financial

21  officer, this is the guy who has to approve all expenses over

22  $20,000 and he's saying "we'll approve."  This is his

23  instructions.

24      And then they get the -- sort of the draft from

25  Mr. Smolek.  You've seen this.  And how fake are these as it

1  turns out, ladies and gentlemen?  But Capax Global LLC,

2  outsourced specialized EDD services, 1250 gigabytes" at such

3  and such, a total cost 250,000.  There is not even a -- who

4  knows how much data is actually going to be processed.  It

5  doesn't even make sense.  But they're just listing some data so

6  they can get to a final number, and eventually Mr. Hussain

7  says, "Thanks, Phil, for turning round quickly.  I approve."

8  So the Capax EDD approvals start with Mr. Hussain.

9       People start to raise questions, obvious questions if you

10  are the head of finance for a company and you're approving

11  hundreds of thousands and eventually, as we will see, millions

12  of dollars.

13       And here, Chamberlain is probably not in on the deal yet

14  because he's saying, "We need to note on the invoice who the

15  end customer was and confirm we have billed them and paid

16  before we make payments."  In other words, how do you pay on

17  supposedly subcontracting out EDD customer work and nobody

18  knows who the customer is?  It's not on these invoices.  It's

19  an obvious question and it's one that never gets answered.

20       And eventually Mr. Hussain is -- is just approving and --

21  I'm sorry, but this is Exhibit 212.  "Need paperwork for Capax.

22  Suggest 750K or so.  They have to pay the outstanding amounts."

23  And this document also shows he knows why they're paying them.

24  They're paying them because they need to funnel the money back

25  in and "need paperwork this weekend."  You can see -- and this

1    is in September of '09.  He's starting to break down.

2        By December, it's just "Please find below another Capax

3    EDD services," and, "Hi, Andy and Sushovan," and Hussain is

4    saying, "Okay."  In other words, he's approving it.  So

5    mr. Keker tried to tell you he wasn't, but he was.

6        By 2010, there is a question again about we -- I'm sorry.

7    "Capax owes us money," and Mr. Hussain is saying, "Do we not

8    owe Capax some monies?"  He knows what's going on.  He knows it

9    was a circle and he was approving.

10        The invoices get sort of increasingly ridiculous.  I'll

11    just show you some.  This is the one that is actually signed by

12    Mr. Hussain.  You can see his initials down there.  And this is

13    one that says anything above 500 pounds needs to be authorized

14    by him.

15        And this is the one that says for European projects and

16    this is long before he tells Mr. Baiocco he's got to sign up

17    for another 1.5 million to do work in Europe, but he's already

18    approving payment for work in Europe.  And that, of course, if

19    you recall -- that's to make up the difference on that

20    Eli Lilly deal that went to him as a reseller.  When it

21    actually sold through directly to Autonomy, they were about

22    $700,000 short, and so they just come up with this additional

23    EDD processing in order to make up the difference.

24        Exhibit 2559 -- I'm sorry.  Let me get to this one.  Yeah.

25    2559-45, take a look at this.  Now, you can see Mr. Hussain is

REBUTTAL ARGUMENT /   FRENTZEN

1    up here in the top corner, AK and SH.  And by this point, we're

2    hitting $1.425 million for EDD processing that's not happening.

3    Additional 475,000 requested by Hussain.  Another

4    1.425 million, Hussain.  Yet another that totals to

5    1.425 million.

6        And, of course, as you get to the tail end of this thing,

7    you've seen the document where they paid 15 million -- about 15

8    million in total to this phony EDD processing, and it goes back

9    to this notion that you have to balance these things out, and

10   somehow for Mr. Hussain, you've heard all this argument about

11   how the expenses made sense.  ATIC made sense, FISMA made

12   sense, NearPoint made sense, ControlPoint made sense, discover

13   Engine -- DiscoverPoint made sense.

14       None of it went sense.  We went through each of those and

15   the problems with each of them.  But yet somehow it always

16   makes sense.  And you're going to pay exactly what you owe to

17   the resellers for the deals that can't sell through.  And here

18   they pay 15 million in EDD processing that Baiocco can't do and

19   he said that they couldn't do and they never did.  They've got

20   no contracts for it.  They don't list anything on the invoices.

21   It makes no sense at all.

22       But you add up what the EDD licensing deals were that got

23   shoved through with Mr. Baiocco, and it's 7.5 million,

24   4 million, at one point 8 million, which comes to 13-plus

25   million.  Add in the 10 percent, which Baiocco always wanted

1    his 10 percent, and you've got right at 15 million.

2        So that's how this scheme worked and everything kind of

3    gets balanced out.  But in any event, that wasn't accurate.

4        Mr. Keker told you that the Abbott Labs -- remember this

5    Abbott Labs?  They know it's not going to happen.  They're

6    trying to tell Abbott Labs "you need to front load your

7    expenses, do a $9 million deal with us, and then you'll save as

8    you chart out," and Abbott is traditional and they say "no, we

9    only want to pay as you go."

10       And yesterday Mr. Keker told you that Jane Snider said

11   that a deal did go through where they paid up front, and what

12   she actually testified to was other than this -- which was a

13   $600,000 deal at that point.  They were trying to push through

14   a $9 million deal.  They end up pushing it to the VAR.  But the

15   deal that actually pushed through, Ms. Snider testified:

16       "Other than the $600,000 licensing deal, did Abbott

17   basically continue to be on an à la carte, pay-as-you-go-type

18   relationship with Autonomy?"

19       "Entirely, yes."

20       So, again, please, if you -- if you're referring back

21   and -- listen, the beauty of this is that your memory controls

22   here.  But if you have questions about which side has given you

23   the straight scoop, I suggest to you that these are just a few

24   examples of where Mr. Keker strayed from what we actually

25   heard.

1          Mr. Hussain was not asleep at the wheel.  You've seen --
2    we've seen the care and the detail he went through in paying
3    attention to the sales, the expenses and so on.  And he's not
4    the unluckiest man on earth.  In other words, this is not just
5    some series of freak occurrences where he's being deceived by
6    his sales staff.  That wasn't happening at all.

7          He was paying attention.  He knew what was going on.  And
8    then he just happened to fall into deals that would make people
9    whole on these deals that were bogus.  This was a
10   well-orchestrated, set-up plan.  Lightning can strike a guy one
11   time.  Maybe if it's one deal in one quarter or two deals in a
12   quarter, but here -- you think about it.  You've got 6
13   successive -- I'm sorry, 10 successive -- two and a half years
14   of deals -- of a huge number of deals.  You've had to sit and
15   listen through all of them.  And somehow they just keep coming
16   up as phony, fake, and then being made up, being made whole on
17   the end.  This is like a guy getting struck by lightning
18   repeatedly over the course of two and a half years.  It does
19   not just happen.  This is not just happenstance.

20         This was a scheme.  This was a plan.  This was
21   orchestrated to pump up their numbers, make the quarter, every
22   quarter, no matter what, and then eventually as you saw it was
23   unsustainable.  You've got to do something with it.

24         Mr. Hussain knew that the deals were bogus, each and every
25   one of them.  How do we know that?  Well, we know that from --

1    Marc Geall told us about SMS calls.  And this is his testimony.

2    And that Mr. Hussain paid attention and ran SMS calls.

3         Mr. Geall also testified that within Autonomy, Mr. Hussain

4    was a *de facto* head of sales.  So he's in charge of the sales

5    and he's paying attention to them through the SMS calls.

6         Mr. Stephan from Australia, he also testified that

7    Mr. Hussain was leading the sales function.  So he's in charge

8    of all these sales and he's paying attention.

9         Mr. Stephan said something and this jibes with what

10   Mr. Welham said, and that was that the VAR sales were clearly

11   not passing the risks and rewards.  They were not passing the

12   managerial control, and that was very obvious.  Why?

13   Mr. Stephan said, "First of all, these are small companies.  I

14   could tell they wouldn't be able to pay their bills."  And then

15   what he also said was the sellers had to keep selling.  He was

16   a bit player in finance, but he would sit in, remember, on some

17   of the SMS calls.  He was interested.  And so he would hear,

18   well, this has gone to a reseller.

19        So how do you know that this is a fraudulent transaction?

20   Because Autonomy is still having to sell it.  If you're the

21   head of sales and you're tracking all these sales and you sell

22   it to the VAR and the VAR is really on the hook for it -- I'm

23   not talking about the contract and what the contract says, but

24   the VAR is really on the hook for it, what are you going to

25   tell your salespeople?  You're going to say why are you still

1   trying to sell it to Eli Lilly or Kraft or the Department of

2   whatever?  Go spend your time on something else.  That's the

3   VAR's problem now.  The VAR signed up for it, the VAR is good

4   for it.

5        Mr. Hussain never did that.  There's not one wit or spec

6   of evidence that that every happened.  In fact, to the

7   contrary, Mr. Stephan said it was normal.  You'd hear about a

8   sale going to a VAR and Autonomy is still trying to sell it.

9   And this -- remember, this is what Mr. Egan described as being

10  in a hole.  Because each quarter you pretend you've sold it

11  because you've stashed it with the VAR.  Yeah, you've made

12  delivery, which means you've sent them some software, which

13  means probably today still out in cyberspace somewhere there is

14  millions of dollars of software floating around that the VAR

15  has never had any purpose for because they never went on and

16  resold it.

17       But your sales staff is still working hard at it.  That's

18  how you know that Mr. Hussain knew that these deals were not

19  real.  Because otherwise, if you're the head of sales, you say

20  "Quit doing that.  Discover Tech's doing that.  MicroTech's

21  doing that.  FileTek's doing that."  You say, "Go sell to a new

22  customer.  Let's make some real money here.  We've already sold

23  that."  That's how you know Mr. Hussain knew these were not

24  at-risk deals.

25       Matt Stephan knew it and he was not the head of sales.  He

1   was just hanging around in finance and paying attention.

2       Mr. Hussain knew that's not how sales were supposed to

3   work.

4       Ms. Anderson, again, testified about -- in one of the

5   responses in the audit committee reports, about this, you

6   know -- the sale being reversed and coming back and Autonomy

7   making them whole for it.  And she said she actually spoke with

8   Mr. Hussain about that.  That's a discussion Deloitte had with

9   Mr. Hussain in the first quarter of 2010 which is that if this

10  is a practice, if there was a practice of risks and rewards not

11  transferring, then that's a problem.

12      Ms. Anderson had this exact conversation with Mr. Hussain.

13  He told her, "Oh, hey, no problem," but he knew this was going

14  on, ladies and gentlemen.  There is no way he didn't know, as

15  we just talked about.  So he knew this was a problem.  He knew

16  these deals were bogus.

17      Mr. Hussain told them keep doing it, basically.

18      Mr. Stephan raises his concerns with Mr. Chamberlain.

19  "These are a problem."  He says, "Terrible deals.  We can't

20  recognize them."  He then said what he really said and then he

21  talked to Chamberlain and Chamberlain says, "It's Mr. Hussain's

22  calls and we have to go through the motions."  And then they

23  kind of make up some reasons for it.  You know, they were small

24  and so on.

25      And then there's also the part where Mr. Stephan raises

1   the same issue, and here he says the deals were garbage, not

2   worth the paper they're printed on.  And Chamberlain says,

3   "It's not our call.  It's Mr. Hussain's call.  We just need to

4   do our job and put it to the auditors."

5        And, "Did he say anything about Mr. Hussain ordering this

6   to happen and Mr. Hussain being responsible?"

7        "That was always his -- his stance was like troops in an

8   Army.  The general says what to do and we have to follow our

9   orders, so, yes."

10       So Mr. Hussain was saying -- when it was brought to his

11  attention these are bad deals, and he was saying "keep doing

12  them, keep going."  So you know he knew these deals were bogus.

13       I just want to remind you that one of the representations

14  to the auditors -- and you're going to get a lot of this kind

15  of "how do you know Mr. Hussain really knew?"  Well, first of

16  all he is the CFO, he's the head of sales, he's supposed to be

17  paying attention to what's going on.  You know he was paying

18  attention to what's going on because of those spreadsheets, and

19  believe me, I'm not going to break those back out, but if you

20  want to just take a spin through those spreadsheets, one minor

21  point.

22       The point was made by Mr. Keker that there is that long

23  spreadsheet, 22,000 entries in that one spreadsheet that they

24  put into evidence and they counted up the total number of deals

25  and -- one second.  I will tell you the exhibit number, just in

1    case you actually want to recheck.  I'm sorry.  I have lost

2    track of that.  I will try to make it back to it.

3        But if you actually take a look -- yes, there are 22,000

4    lines in that exhibit, but if you actually take a look at the

5    number of deals that are in excess of a million dollars, in

6    other words, the big deals, like all deals are not equal, there

7    is maybe 200, and if you look at over 2 million, it's about a

8    hundred, and if you take a look at over 4 million, it's maybe

9    like 60 over the course of two and a half years.

10       So that 22,000 number is a very deceiving number.  That's

11   all of the deals, period, that Autonomy does, but when you

12   break it down to the million-dollar deals, it fits what's in

13   the spreadsheet.  It makes sense.  So he was tracking all of

14   that through the spreadsheets.

15       How else does he know they're bogus?  We've already talked

16   about this a lot, but he makes everybody whole.  And who is in

17   charge of expenses at Autonomy?  Mr. Stephan said, "I wasn't

18   looking after the payables, but everything in the costs side

19   was very tightly managed.  You needed senior approval all the

20   way up to Dr. Lynch," which would of course include

21   Mr. Hussain.

22       Mr. Scott said, "I needed to get approval on any

23   purchases, and the practice was to get Sushovan and, I believe,

24   Mike's on all deals over 20K.  All purchases over 20K required

25   both Sushovan Hussain's and Mike Lynch's approval."  You

1    actually saw on the purchase order it actually says everything

2    over like 500 pounds.  But all of our deals are well over

3    $20,000.

4        And you also heard about this phrase "management deals,"

5    and that's on -- you saw that on Mr. Hussain's spreadsheet,

6    "management deals," and Mr. Stephan told you management deals

7    that -- that it's not a deal being done by the sales team; in

8    other words, it's with a reseller and so on.  I'm going to get

9    back to this phrase "management deals," but Mr. Hussain can

10   kept track of that on his spreadsheets.

11       So he knew actually what was happening with the sales.  He

12   was in control of the expenses.  He was the guy responsible to

13   make all of these VARs whole if, in fact, it fell through, and

14   that's exactly what the evidence has shown that he did.

15       And this document, I know you saw it a -- a lot of it, but

16   I want you to just, for a moment, think about the significance

17   of this, and when I said this is like a guy getting struck by

18   lightning many, many times.  Each of these deals get made whole

19   on the other side.  This is an accountant.  This is a

20   spreadsheet guy.  You've seen these massive spreadsheets.  This

21   is a guy who's keeping track of -- he's in the best position of

22   "what deals are we doing, how are we doing them because are our

23   salespeople still hustling them after it's supposedly been

24   done, how are we managing those folks and then what are we

25   spending?"

1    And magically somehow, magically, ladies and gentlemen,

2    this all comes together.  And you've seen the flurry of

3    activity, you've heard about some of the ridiculous deals at

4    the very tail end as HP is coming in to acquire Autonomy, that

5    there's just no way this happens by chance or bad luck.  That's

6    why I say he's not the unluckiest guy on earth.  It's not like

7    he's been struck by lightning umpteen times.

8    And you take a look at the baseline, at the dollar

9    figures, and again, what that means is he's making them whole,

10   and then a little -- plus the little bit.

11   And if you recall, there's a very consistent 10 percent

12   figure from all of the VARs on these funky, bogus deals, and

13   they all talked about, you know, a little something -- because

14   of course you're not going to hold this resale, not be able to

15   resell it for nothing, and so it worked out to around 10

16   percent.  So they've got to kick in some extra money as well,

17   and that's why it cost $215 million to raise 190 million in

18   revenue.

19       **MR. KEKER:**  Excuse me, Your Honor.  We're 45 minutes.

20       **MR. FRENTZEN:**  I'm sorry, Your Honor.

21   I will then fly, ladies and gentlemen.

22   The VAR deals are bogus.  Making them whole again was

23   bogus.  The evidence has shown that irrefutably.

24   The accountants -- and I could go through all of this.

25   You've heard it.  You sat here.  You were through it.

1    Welham, everything he was confronted with that you've now

2  heard happened, he said, "No.  I would not have done that."

3    Anderson said, "I would not have done that and now when I

4  did the restatement -- when I did the restatement, I recognized

5  that this was an error."

6    So, again, all of the accounting.

7    And a very important issue just with the accountants,

8  Mr. Hussain is going to tell you he wants to hide behind --

9  Mr. Keker has told you --

10    **MR. KEKER:**  Mr. Hussain is not going to say anything.

11  We had --

12    **THE COURT:**  I think he misspoke.

13    **MR. FRENTZEN:**  Mr. Keker, I'm sorry.

14  Mr. Keker has told you that you can rely on the -- that he

15  could rely on the auditors.  That's not exactly how it works.

16    You've got this instruction.  It will be back there for

17  you.  And I want to point you to this part.

18    "For there to be good faith reliance on Deloitte's advice,

19  the defendant, before acting, must have made full and truthful

20  disclosure of all material facts to Deloitte."

21    And you heard from the Deloitte auditors.  They didn't get

22  all material facts.

23    **MR. KEKER:**  Your Honor, we made an agreement about

24  time, and I object.

25    **THE COURT:**  Well, I think he is finishing up.

1          **MR. FRENTZEN:** "Received Deloitte's" --

2          **THE COURT:** I will give you five more minutes. Just

3   conclude in five more minutes. Okay?

4          **MR. LEACH:** Thank you, Your Honor.

5          Received Deloitte's advice as to the specific course of

6   conduct that was followed. And he actually -- Mr. Hussain did

7   not. And he was told, among other things -- and this relates

8   to the hardware -- I will get into the hardware. I apologize

9   for taking so long.

10         On the hardware, he was advised by the auditors that --

11  repeatedly -- and these are in the documents 1509, 1183, 979,

12  271 -- that they should disclose the hardware and that it might

13  affect their operating, this single operating segment.

14         And this is important because at this point, they say --

15  or they are saying -- Autonomy is saying "we're now a reseller

16  of hardware and we want to take a certain cut on what we owe,"

17  and Autonomy's response is -- sorry -- "given the increasing

18  significance of hardware sales to the group's revenues and the

19  resultant impact on the gross and operating margin of the

20  quarter and full year results, we expect appropriate

21  explanation to be given in the 2010 annual report."

22         They also recommended that they actually disclose the

23  hardware sales. Listening to an auditor's advice and ignoring

24  it but the auditor still signing off is not the same as

25  following an auditor's advice. You heard the term "negative

1    assurances."  That means Deloitte has to spot check.  Deloitte

2    comes in and says "you might want to do this different."

3    Autonomy ignored that.  Mr. Hussain ignored that.  They told

4    them this might affect your single operating segment; they

5    didn't do it.

6        Why did they try and fight so hard not to disclose the

7    hardware?  Ladies and gentlemen, they did it for the reasons

8    we've talked about.

9        It is not just random happenstance that again and again

10   and again with the analysts, to the public, and then to

11   Hewlett-Packard, Mike Lynch lies about the hardware, Sushovan

12   Hussain lies about the hardware.  Sushovan Hussain himself says

13   in those emails that you saw -- we went through them with

14   Special Agent Bryant and yesterday -- cut out the end users for

15   the hardware, take the hardware out of the Top 40 as the end

16   result.

17       Is that just chance again?  Just random chance?  No.  They

18   knew what the hardware meant to Hewlett-Packard.  It meant,

19   along with all of these bogus VAR deals, that Sushovan Hussain

20   was cooking the books.

21       I want you, before I break, to just think about one last

22   thing.  The time period.  This case involves fraud that begins

23   in the first quarter of 2009.  In the first quarter of 2009,

24   ladies and gentlemen, the financial crisis had just occurred.

25   Folks were in shock.  Autonomy has nothing to do with the cause

1    of the financial crisis nor does Sushovan Hussain.  But I want

2    you to think if there were a time period in which you would

3    expect corporations to be cautious, to be careful about their

4    accounting, to think about the effects of their activities.

5    And it's this very first quarter of 2009, within months of the

6    financial collapse in 2008, that Sushovan Hussain and Autonomy

7    decide "let's pretend that we're defying gravity, let's pretend

8    that the financial crisis is not affecting us, and let's start

9    cooking our books right now when we should have learned a

10   lesson."

11        And if I may, one last document, Your Honor.

12        I just want to talk about whether or not all of this

13   argument about whether or not sales of hardware would have

14   mattered to Hewlett-Packard, and I refer you, ladies and

15   gentlemen, to the Defense star witness.  I can say she was a

16   star witness because it was the one witness, Ms. Lesjak, Cathie

17   Lesjak.  And they brought her in here to try to say

18   Hewlett-Packard was in disarray, Hewlett-Packard was fighting

19   and so on.

20        Well, two people there were fighting --

21        **MR. KEKER:**  That's five minutes, Your Honor.

22        **MR. FRENTZEN:**  You heard about it.  It was

23   Mr. Apotheker and Ms. Lesjak.

24        **MR. KEKER:**  And we object.

25        **MR. FRENTZEN:**  But at the very close of the case,

1  these two folks -- and she was brought in here to tell you how

2  problematic it was.

3      And what you can see is what that dispute was about was

4  really the timing and the price.  But she told you they were

5  both operating on the same premise, which is that a

6  publicly-traded company is not cooking its books.  That they

7  could rely on the value.  And she didn't dispute the value, as

8  they understood it.

9      But what brought these two people together, the one thing

10  it looks like they could agree on, is what Ms. Lesjak told you:

11      "If you'd known what was going on ..."

12      "Absolutely.  And I'm confident that if I had known about

13  the fraud and that Leo had known about the fraud, we wouldn't

14  have done the deal."

15      That was it, ladies and gentlemen.

16      Please give careful consideration to the evidence.  I'm

17  sorry this has been rushed in terms of my presentation.

18      I appreciate the Court's indulgence.

19      We ask that you find Mr. Hussain guilty for what he did.

20  This is about his conspiracy, not some wacko conspiracy that

21  involves Hewlett-Packard and every witness who came in here to

22  testify.

23          THE COURT:  Thank you, Mr. Frentzen.

24          MR. KEKER:  I have one --

25          THE COURT:  I want to instruct the jury and then I'll

 1  take any other comments.

 2          **MR. KEKER:**  I meant one minute to rebut that --

 3          **THE COURT:**  No.  I am going to instruct the jury now.

 4      "Ladies and gentlemen, when you begin your deliberations,

 5  elect one member of the jury as your foreperson who will

 6  preside over the deliberations and speak for you here in court.

 7  You will then discuss the case with your fellow jurors to reach

 8  agreement, if you can do so.  Your verdict, whether guilty or

 9  not guilty, must be unanimous.

10      "Each of you must decide the case for yourself, but you

11  should do so only after you've considered all the evidence,

12  discussed it fully with the other jurors, and listened to the

13  views of your fellow jurors.  Do not be afraid to change your

14  opinion if the discussion persuades you that you should, but do

15  not come to a decision simply because other jurors think it is

16  right.

17      "It is important that you attempt to reach a unanimous

18  verdict, but, of course, only if each of you can do so having

19  made your own conscientious decision.  Do not change an honest

20  belief about the weight and effect of the evidence simply to

21  reach a verdict.

22      "Perform these duties fairly and impartially.  Do not

23  allow personal likes or dislikes, sympathy, prejudice, fear or

24  public opinion to influence you.  You should also not be

25  influenced by any person's race, color, religion, national

1    ancestry, gender, profession, occupation, economic

2    circumstances, or position in life or in the community.  It is

3    your duty as jurors to consult with one other and to deliberate

4    with one other with a view towards reaching agreement, if you

5    can do so.

6         "During your deliberations, you should not hesitate to

7    reexamine your own views and change your opinion if you become

8    persuaded that it is wrong.  Because you must base your verdict

9    only on the evidence received in the case and on these

10   instructions, I remind you that you must not be exposed to any

11   other information about the case or to the issues it involves.

12   Except for discussing the case with your fellow jurors during

13   your deliberations, do not communicate with anyone in any way

14   and do not let anyone else communicate with you in any way

15   about the merits of the case or anything to do with it.  This

16   includes discussing the case in person, in writing, by phone,

17   or electronic means via email, text messaging, or any internet

18   chat room, blog, website, or other feature.  This applies to

19   communicating with your family members, your employer, the

20   media or press and the people involved in the trial.

21        "If you are asked or approached in any way about your jury

22   service or anything about this case, you must respond that you

23   have been ordered not to discuss the matter and to report the

24   contact to the Court.

25        "Do not read, watch or listen to any news or media

accounts or commentary about the case or anything to do with

it.  Do not do any research, such as consulting dictionaries,

searching the internet or using other reference materials, and

do not make any investigation or in any other way try to learn

about the case on your own.

"The law requires these restrictions to ensure the parties

have a fair trial based on the same evidence that each party

has had an opportunity to address.  A juror who violates these

restrictions jeopardizes the fairness of the proceeding and a

mistrial could result that would require the entire process to

start over.

"If any juror is exposed to any outside information,

please notify the Court immediately.

"Some of you have taken notes during the trial.  Whether

you took notes or not, you should rely on your own memory of

what was said.  Notes are only to assist your memory.  You

should not be overly influenced by your notes or those of your

fellow jurors.

"The punishment provided by law for these crimes is for

the Court to decide.  You may not consider punishment in

deciding whether the Government has proved its case against the

defendant beyond a reasonable doubt.

"A Verdict Form has been prepared for you.  After you've

reached unanimous agreement on a verdict, your foreperson

should complete the Verdict Form according to your

1    deliberations, sign it and date it and advise the clerk that

2    you are ready to return to the courtroom.

3         "If it becomes necessary during your deliberations to

4    communicate with me, you may send a note through the clerk

5    signed by your foreperson or by one or more members of the

6    jury.  No member of the jury should ever attempt to communicate

7    with me, except by a signed writing, and I will respond to the

8    jury concerning the case only in writing or here in open court.

9         "If you send out a question, I will consult with the

10   lawyers before answering it, which may take some time.  You may

11   continue your deliberations while waiting for the answer to any

12   question.

13        "Remember, you are not to tell anyone, including me, how

14   the jury stands numerically or otherwise on any questions

15   submitted to you, including the question of the guilt of

16   Mr. Hussain, until after you have reached a unanimous verdict

17   or have been discharged."

18        So, ladies and gentlemen, the case is now in your hands.

19   In a few minutes, you will receive copies of all the

20   instructions.  You'll receive a copy of the verdict.  We are

21   assembling the exhibits, and they will be made available to you

22   should you so choose to review any particular exhibit.

23        And so I want to wish you well during your deliberations.

24   Your timing is up to you.  As I said, your fate is in your

25   hands.  And you will now retire.

1        What will become obvious is that one of the jurors,

2   because of commitments which she advised us at the very outset

3   of the case, will not be serving, and the first alternate will

4   take your place.

5        So you may now retire and commence your deliberation.

6        As to the alternates, will the alternates remain here for

7   a minute.  Can you remain with the alternates.  Just have a

8   seat.  The alternates can have a seat.

9        No.  You are a member of the jury.  You may go back.

10             (Jury begins deliberations at 11:53 a.m.)

11   (Proceedings were heard out of presence of the jury:)

12        **THE COURT:**  Okay.  I have two alternates and one

13   member.  Please be seated.  One member who has been discharged.

14        First, I want to -- because this applies to all of you, I

15   want to thank you all for your service.  There's no way of

16   knowing when and if a verdict will be returned, but it is not

17   highly unusual that during the course of deliberations,

18   something occurs with respect to one juror or another and that

19   you then are required to come in and participate in the

20   deliberations.

21        If that occurs, then the jury is instructed to commence

22   deliberations anew, begin anew, if that occurs.  So even though

23   things may have transpired before you got into the jury room,

24   you will be required to -- they will be required, with you a

25   member, to commence their deliberations anew.

1    For that reason, you are still under the order of the

2    Court not to discuss the case with anyone.  And that means if

3    you receive inquiries -- or just the same rules as you've been

4    assiduously applying for months now are still in effect.

5    If you give your telephone number to Ms. Scott, she will

6    be able to contact you, if necessary, to participate in the

7    deliberations.

8    Also she will contact you once the jury has arrived at a

9    verdict or been discharged.  At that point, you are free to say

10    anything about the case you want or not to anyone who would

11    listen, but that's a matter entirely up to you.

12    So would you give Ms. Scott the -- your contact

13    information, if she doesn't have it already, and will you also

14    give to her your notebooks.  If you have notebooks, she will

15    hold on.  She will put them in a file, and should you be

16    required to participate in jury deliberations, it will be given

17    back to you to aid you in your deliberations.

18    But let me thank you.  On behalf of the counsel on both

19    sides, they're very appreciative of your service.  Both sides

20    expressed their appreciation and the Court does as well.  So

21    you may retire with Ms. Scott.

22    (Whereupon, Juror No. 10 and the alternate jurors leave

23    the courtroom.)

24    **THE COURT:**  Okay.  Let the record reflect the jury has

25    retired.  Anything further?

PROCEEDINGS

1          **MR. REEVES:**  One thing about the Juror 10.

2          **THE COURT:**  I should put that on the record?

3          **MR. REEVES:**  Please.

4          **THE COURT:**  The parties agreed, at least I understood

5   that they agreed, that I could excuse Juror No. 10.  You know,

6   interesting enough, as I was thinking about it -- I mean, I did

7   excuse her along with the other individuals.  I don't know

8   whether she is still, quote, a viable candidate to go into the

9   jury room or not.  I guess if we lose a juror, we can then take

10  a position.  "We," I mean you people can then take a position

11  as to who goes in next.

12         **MR. KEKER:**  I think -- I mean, she's gone.

13         **THE COURT:**  She's gone -- she's no more gone -- she's

14  a little bit further gone than the -- than the other two

15  because she's actually traveling.  Going out of town, coming

16  back on Monday.  Sunday night or Monday.  I have no idea where

17  the case is going --

18         **MR. KEKER:**  We don't object --

19         **THE COURT:**  Let's deal with that issue later if it

20  becomes a real issue.

21      Mr. Reeves.

22         **MR. REEVES:**  Thank you very much, Your Honor.

23      I think we're all talking about the same thing.  I would

24  like the record at this point to be clear.  Juror No. 10

25  indicated in her questionnaire she had travel plans for

**PROCEEDINGS**

 1   April 26.  I believe that is what the Court is referring to

 2   with her travel and I believe that's why counsel for

 3   Mr. Hussain does not object.  I would like it to be clear on

 4   the record.

 5            **THE COURT:**  I don't know why --

 6            **MR. KEKER:**  That's --

 7            **THE COURT:**  Mr. Keker doesn't have to explain why he

 8   does or doesn't object.  Yes, if he objected he would have to

 9   give a reason.  If he doesn't object, he doesn't have to give a

10   reason.

11            **MR. KEKER:**  I don't have any objection to excusing

12   Juror No. 10.

13            But I do have an objection to something that was said in

14   the rebuttal argument about our only witness, one witness.  I

15   believe that is burden shifting.  I wanted -- and I believe

16   that that is a comment on what we're obligated to do when the

17   law is otherwise.  So I object.

18            **MR. FRENTZEN:**  That was not.  It was intended to

19   reflect that this was an important witness to them.

20            **THE COURT:**  An important what?

21            **MR. FRENTZEN:**  An important witness to them, which is

22   a common thing.

23            **THE COURT:**  Okay.

24            **MR. KEKER:**  So that makes a lot of sense.  To say they

25   only called one witness and that the reason for saying that is

**PROCEEDINGS**

1  to indicate that it's an important witness, I don't think so.

2  But anyway ...

3          MR. FRENTZEN:  I said "star witness."

4          MR. KEKER:  We object.

5          MR. FRENTZEN:  I said "star witness."  That was my

6  point.  I was emphasizing --

7          MR. KEKER:  I think he is digging himself a hole.

8          THE COURT:  I don't know whether he was.

9          MR. FRENTZEN:  I was emphasizing --

10          THE COURT:  I was sitting up here trying to figure out

11  what -- it's an accounting case, and they put on X number of

12  accountants and they say, "Those number of accountants have

13  established these are the rules or this is how the evidence

14  should be viewed."  Can the Government say, "And, by the way,

15  the Defense didn't call a single witness to refute these

16  accountants"?

17          MR. FRENTZEN:  I didn't say that --

18          THE COURT:  No.  He didn't say it, but I'm just trying

19  to figure out is that burden shifting?  I mean, I'm not sure it

20  is.  It's not the situation that I'm facing.  But I don't know

21  that -- that that's necessarily burden shifting.

22          You know, I think the evidence is that it was sunny in

23  San Francisco on October 3rd from the -- what the Government

24  has shown.  And can the Government come in and say, you know

25  "They didn't bring in a single witness to show that it was dark

**PROCEEDINGS**

1    on October 3rd" or something.  I think you can do that, but

2    it's not this case.

3        Anyway, the failure -- if the Government is foreclosed

4    from ever saying about the quality of the evidence that is not

5    in the record or is in the record but hasn't been rebutted,

6    I -- I -- I think that you can make an argument that everything

7    is burden shifting.

8            **MR. KEKER:**  We respectfully disagree --

9            **THE COURT:**  Disagree with me.

10           **MR. KEKER:**  -- but hope we never have to argue about

11   it.

12           **THE COURT:**  Anyway, fair enough.

13           **MR. FRENTZEN:**  If I could --

14           **THE COURT:**  I'm ruminating and that's always

15   dangerous, but that is just the way I sort of look at it, and

16   maybe we -- this wasn't burden shifting.  Okay.  End of that

17   discussion.  Now I just am -- everything else is dicta.

18           **MR. FRENTZEN:**  Can I add one thing, understanding that

19   they may eventually make that argument?  It was --

20           **THE COURT:**  Oh, they will make that argument.  If

21   there's a conviction, they'll make that argument.

22           **MR. FRENTZEN:**  It was responsive, Your Honor, to the

23   dueling accountants, battle of accountants, the Cochran quip,

24   and so, you know, there we are.

25           **THE COURT:**  There we are.

1    **MR. KEKER:**  Your Honor, what is your pleasure for us?

2    **THE COURT:**  I think you all ought to stay in this

3    courtroom -- no.  Well, as you know, I'm leaving.  I told you

4    I'm out of here.

5    **MR. KEKER:**  Can we come with you?

6    **THE COURT:**  I think -- here is the situation.  If --

7    obviously any kind of note, other than something so

8    inconsequential -- sometimes they say, "Can we please get a

9    transcript of the proceedings?"I'll tell you about it, but I'll

10   answer it without any input.

11       But there are -- anything more that is more substantive,

12   of course I need your input.

13       So you have to -- somebody has to remain here.  Somebody

14   from your team has to remain here.

15       **MR. KEKER:**  Okay.

16       **THE COURT:**  Okay.  And just tell Lashanda where you're

17   going to be.

18       I assume you have gone through all the exhibits.  We are

19   not going to have a situation where there is some exhibit in

20   there that nobody checked out.  I've had that from the

21   Government before.

22       **MR. FRENTZEN:**  It wasn't me.

23       **MR. KEKER:**  We've worked pretty hard on the exhibits.

24   I think they're right.  We'll see.

25       Anyway, we will be in the Charles R. Breyer Attorneys'

PROCEEDINGS

1    Lounge.

2              THE COURT:  Be sure that there are no bugs in it and,

3    you know, overhear devices.  You know, they sometimes have tape

4    recorders around courthouses.  Did you know that?

5              MR. KEKER:  So I heard.

6              THE COURT:  Sometimes.  Sometimes.

7              MR. KEKER:  I'm an American citizen so I don't have to

8    worry about that.

9              THE COURT:  Okay.  We're all set, Lashanda?  Do you

10   have everything you need from them?  Okay.  Thank you.

11             (Jury left for day at 3:00 p.m.)

12                         ---oOo---

13             **CERTIFICATE OF REPORTERS**

14        I certify that the foregoing is a correct transcript

15   from the record of proceedings in the above-entitled matter.

16   DATE:  Tuesday, April 24, 2018

17

18

19   _____

20        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
               U.S. Court Reporter

21

22

23   _____

24        Pamela A. Batalo, CSR No. 3593, RMR, FCRR
               U.S. Court Reporter

25