ALEX G. TSE (CABN 152348)
Acting United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

ROBERT S. LEACH (CABN 196191)
ADAM A. REEVES (NYBN 2363877)
WILLIAM FRENTZEN (LABN 24421)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7453
    Fax: (415) 436-7234
    robert.leach@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 16-462 CRB |
| Plaintiff, | **UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR ACQUITTAL PURSUANT TO RULE 29** |
| v. | |
| SUSHOVAN TAREQUE HUSSAIN, | |
| Defendant. | |

## INTRODUCTION

Defendant Hussain has filed a Motion for Acquittal despite the jury's conviction after trial. Because the evidence of Hussain's guilt was overwhelming, the government respectfully submits that the Court should deny his motion.

## ARGUMENT

**I.   Defendant Cannot Overcome the High Deference to the Jury's Determination That Evidence Was Sufficient to Convict Him**

    **A.   The Legal Standard Under Rule 29**

Federal Rule of Criminal Procedure 29 permits courts to set aside a jury's guilty verdict

and enter a judgment of acquittal "of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Where a jury has returned a verdict, however, courts must accord great deference to the jury's determination, even if the trial judge disagrees with it.

> But this inquiry does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 319-20 (1979) (emphasis original) (citation omitted). In addition to viewing the evidence in the light most favorable to the prosecution, a reviewing court must also assume that the jury resolved any conflicts of evidence in favor of the prosecution, determined witness credibility in favor of the verdict, and made any reasonable inferences from the evidence in a way that supports the conviction.

> First, the evidence must be viewed in the light most favorable to the government; and second, the reviewing court must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts, by assuming that the jury resolved all such matters in a manner which supports the verdict. In brief, the reviewing court must determine: whether the evidence, considered most favorably to the government, was such as to permit a rational conclusion by the jury that the accused was guilty beyond a reasonable doubt.

*United States v. Ramos* 558 F.2d 545, 546-47 (9th Cir. 1977) (citation omitted) (reversing trial court's granting of a motion for acquittal); *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1143 (9th Cir. 2012) ("when 'faced with a record of historical facts that supports conflicting inferences,' a reviewing court 'must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution'") (quoting *Jackson*, 443 U.S. at 326); *United States v. Bunker*, 532 F.2d 1262, 1264 (9th Cir. 1976) ("Credibility is exclusively within the jury's province.") (sufficiency of the evidence claim on appeal); *United States v. Wallace*, 800 F.2d 1509, 1512 (9th Cir. 1986) ("In determining whether or not the evidence is sufficient to support the verdict, all conflicts are

resolved in favor of the verdict.") (citing *Ramos*, 558 F.2d at 546-47) (sufficiency of the evidence claim on appeal).

With respect to the weight of the evidence, the Ninth Circuit has held that the testimony of only a single witness can be sufficient. "The testimony of the one witness, if believed, was sufficient to support the conviction, and the resolution of any question as to his credibility was properly entrusted to the jury." *United States v. Gudino*, 432 F.2d 433, 434 (9th Cir. 1970).

In this case, the overwhelming weight of the evidence supported the jury's verdict as to each and every element and count of the Indictment.

### B. The Evidence Presented at Trial Proved Every Count of the Indictment

#### 1. COUNT ONE – CONSPIRACY

Notwithstanding Hussain's unfocused complaints about the government's case, the evidence at trial supported every element of the offense of conspiracy. The evidence unquestionably proved an agreement between numerous individuals – including Hussain, Stouffer Egan, CEO Michael Lynch, Stephen Chamberlain, and others – to commit wire fraud by falsely inflating the public financial statements of Autonomy through valueless transactions that Hussain and Autonomy should not have recognized as revenue and by misrepresenting and hiding the quantity, nature, and value of hardware sales as revenue. The evidence demonstrated this single conspiracy persisting over the course of several years and many quarters.

While the agreement clearly began as one designed to defraud investors and the public at large regarding Autonomy's growth, value, and revenue, it continued as a joint effort to defraud Hewlett Packard ("HP") regarding the exact same information. It makes perfect sense that, once Autonomy published false and fraudulent public financial statements, that Autonomy would then use those same inflated financial statements to pitch the sale, and its value, to HP. Hussain, Lynch, Egan, Chamberlain, and others knew that Autonomy's financial statements were false, fraudulent and misleading and they used those false statements to incentivize HP to part with money in the acquisition. This agreement is a single conspiracy and, while complex in its various machinations, its objective was simple – falsely inflate Autonomy's value to the public, investors, and HP.

Included in the trial evidence of the agreement to generate and disseminate false financial records were the following:

- The testimony of every VAR representative – including John Baiocco, David Truitt, Stephen Truitt, Bill Loomis, and others – that there were side agreements and agreements *directly with Hussain and others* to reimburse the VAR for sales that were not completed to an end user. *See, e.g.*, Ex. 44, 622, 1329, 1361, 1392, 1694.

- The wide variety of valueless transactions between Autonomy and VARs that balanced out to make both sides to the transactions whole while allowing Autonomy to claim worthless revenue. *See, e.g.*, Exs. 32, 42, 50, 212, 330, 427, 511, 516, 615, 622, 668, 707, 720, 809, 1085, 1104, 1334, 1393, 1900, 1901, 1912, 1971, 2013, 2068, 2216, 2279, 2523, 3036, 3063.

- The testimony of Deloitte witnesses – including Antonia Anderson and Lee Welham – that Hussain and others lied to them about the actual business practices and accounting at Autonomy. *See, e.g.*, Exs. 229, 484, 583, 702, 757, 1183, 1417, 1503, 1509, 1708, 1945, 2279. The testimony of Stouffer Egan that Hussain – with the knowledge and assistance of others – directly ordered Egan to take steps that Hussain accounted for falsely in the financial statements. *See, e.g.*, Exs. 654, 719, 1056, 1076, 1115.

- The testimony of Joel Scott that Hussain directly ordered Scott to take steps that Hussain accounted for falsely in the financial statements, and to cover up disclosure of the fraudulent financial statements.

- The testimony of Matthew Stephan that Hussain ordered Stephan and Chamberlain to take steps that Hussain accounted for falsely in the financial statements. *See, e.g.*, Ex. 507. In addition, Stephan's testimony that Chamberlain reported Stephan's concerns to Hussain and that Hussain ordered them to continue to act in a fraudulent manner.

- The documents admitted that represented the concerns raised by Brent Hogenson that Hussain and others were engaging in fraudulent accounting practices, and the efforts by Hussain and others to silence and punish Hogenson. *See, e.g.,* Exs. 915, 979, 1068, 1226.

- The testimony of multiple analysts regarding false representations made to the analysts

and the public regarding Autonomy's true growth, revenues, and value. *See, e.g.*, Exs. 165, 291, 293, 592, 630, 2763, 2767, 2769.

- Hussain's emails to and from Lynch that (1) Hussain was afraid to answer the analysts' questions while they were actively misleading the analysts and the public, (2) Hussain and Lynch were aware that the market for IDOL and other Autonomy products was shrinking, not growing, and (3) Hussain and Lynch were aware that Autonomy would have to sell more hardware at a loss and reimburse more VAR deals in order to maintain its false public image of growth and success. *See, e.g.*, Exs. 214, 217, 281, 645, 758, 1209, 1274, 1432, 1848.
- The updated spreadsheets of Hussain that demonstrated that he charted all of Autonomy's sales, was aware of the fraudulent accounting, and shared those spreadsheets and accounting with others, including Chamberlain and Lynch. *See, e.g.*, Ex. 24, 394, 492, 488, 507, 519, 680, 709, 3026, 3029, 3030, 3032, 3033.
- The letters and statements to Deloitte by Hussain that were factually false in an effort to further the falsified accounting for the financial statements. *See, e.g.*, Exs. 37, 157, 159, 611, 1561, 1793.
- Emails between Hussain and others demonstrating a concerted effort to falsify financial statements and embellish the growth, revenues, and value of Autonomy. *See, e.g.*, Exs. 395, 490, 725, 737, 1420, 1452, 1726, 1734, 1745, 1763.
- Testimony and documents demonstrating Hussain and others communicating the false financial statements of Autonomy to HP to cause HP to acquire Autonomy and to part with money. *See, e.g.*, Exs. 1588, 1594, 1788, 2027, 2046, 2709, 3035, 3036,

The discussion above is without even describing the evidence of Hussain's efforts – with his co-conspirators – to defraud the public, and then HP, about the extent to which it larded up its reported revenues with worthless hardware resales. Obviously, this portion of the scheme was carried out by – at a minimum – Hussain, Lynch, Egan, Chamberlain, and others.

The evidence of this portion of the conspiracy and the scheme included the following:
- Emails between Lynch and Hussain demonstrated the genesis of the effort to get Michael

Sullivan to maximize sales of revenue at a loss and to falsely account for those efforts as "sales and marketing" expenses. *See, e.g.*, Exs. 131, 838, 1077, 1646.

- Emails detailing the financial incentives for Sullivan from Hussain and others that demonstrated that the purpose was for recognizable revenue, not for sales and marketing. *See, e.g.*, Exs. 131, 1845.
- Testimony by various hardware resellers including Dominic Camden and Stephanie Sephabody that the system established by Autonomy could not have furthered sales and marketing because the end customer was not aware of Autonomy's role in the hardware resales.
- Testimony by end customers from H&R Block and Bank of America – including John Meiers and Richard Smith – that they had no idea that Autonomy was involved in the hardware purchases that they made.
- Testimony by employees of Deloitte regarding the false information provided by Hussain and others to Deloitte regarding the true nature and purpose of the hardware sales. *See, e.g.*, Ex. 5788.
- Recordings of analysts calls demonstrating false statements made by Lynch and Hussain and others regarding the quantity, nature, and purpose of hardware sales made by Autonomy. *See, e.g.*, Ex. 776.
- Public statements, financial disclosures, and website information from Hussain and others that falsely stated that Autonomy was a "unique" and/or "rare" instance of a "pure software" model or company. *See, e.g.*, Exs. 291, 630, 1352.
- The crystal clear fraud perpetrated on HP through the due diligence process, including Hussain and others describing Autonomy's "products" and "sales" by hiding the sales of hardware. *See, e.g.*, Exs. 2545, 2988, 2289.
- False statements made by Hussain and others to link all known sales of hardware to "appliances" – where the real revenue is from the software – or to sales and marketing of software. *See, e.g.*, Exs. 776, 1352.
- Hussain and others doctoring and falsifying the "Top 40" list of customers to exclude

customers of hardware and in include end users who were not customers at all because the sales had never passed through the VAR. *See, e.g.*, Exs. 2130, 2135, 2144, 2626, 2627, 2984, 3037.

- Hussain and others doctoring and falsifying the "Top 40" list of contracts to exclude sales of hardware and to include contracts with end users who were not customers at all because the sales had never passed through the VAR. *Id.*

Hussain's Motion does not contradict or explain this avalanche of evidence that demonstrated his agreement with others to defraud the public, investors, and then HP regarding Autonomy's growth, revenue, and value. The evidence cited above, along with the remainder of the two month trial, when viewed in the light most favorable to the government and taking all appropriate inferences in favor of the government undoubtedly supports the jury's verdict. The evidence overwhelmingly showed that Hussain entered into an overt agreement with others to inflate Autonomy's perceived value to everyone who was interested, including the eventual buyer, HP.

Obviously, in addition to proving the illegal agreement, the evidence demonstrated no end of overt acts taken in furtherance of the conspiracy. Since there was an illegal agreement to commit wire fraud and abundant overt acts in furtherance of the agreement, Hussain's Motion as to Count One should be denied.

## 2. COUNTS TWO THROUGH FIFTEEN – WIRE FRAUD

Obviously, since the conspiracy was proved and because Hussain and his co-conspirators carried out the scheme to defraud that they agreed on, the wire fraud counts were proven. Hussain makes no comprehensible argument to the contrary. Importantly, Hussain does not challenge any of the particular wires that the jury found were wires in furtherance of Hussain's scheme to defraud. *See, e.g.*, Exs. 1512, 1531, 3036, 1546, 3035, 2710, 1727, 1588, 3035, 1594, 2709, 1788, 3036, 2027, 2077, 3038, 2545, 2988, 2289, 2130, 2144, 2626, 2627, 2984, 2135, 3037, 2241. In the absence of any dispute about the use of interstate wires to carry out the scheme to defraud, the evidence of wire fraud, as detailed above, was overwhelmingly proved at trial.

### 3. COUNT SIXTEEN – SECURITIES FRAUD

As to Count Sixteen, defendant Hussain asserts that there was no evidence that he knew or intended or caused HP to make any false statements to investors. This argument is meritless, particularly given the deference owed to verdict. As demonstrated above, Hussain undoubtedly intended to defraud HP – and the public – regarding the value of Autonomy. Hussain obviously knew that HP was a publicly traded company. Hussain obviously knew that – upon the purchase of Autonomy – HP would tout Autonomy's value to the investing public. In addition, Hussain signed a letter directed to HP's subsidiary specifically warranting information to be included in public announcements about the acquisition. *See, e.g.*, Exs. 2309 & 2295. Hussain's warranty is sufficient evidence that he caused HP to make a false statement to investors. Hussain's Motion as to Count Sixteen should be denied without further consideration.

### CONCLUSION

For the reasons stated above, the government hereby respectfully requests that the Court deny defendant Hussain's motion and reaffirm the jury's proper verdict.

Dated:  June 6, 2018  
                                        Respectfully Submitted,

                                        ALEX G. TSE  
                                        Acting United States Attorney

                                        /s/
                                        _____

                                        ROBERT S. LEACH  
                                        ADAM A. REEVES  
                                        WILLIAM FRENTZEN  
                                        Assistant United States Attorneys