KEKER, VAN NEST & PETERS LLP
JOHN W. KEKER - # 49092
jkeker@keker.com
JAN NIELSEN LITTLE - # 100029
jlittle@keker.com
BROOK DOOLEY - # 230423
bdooley@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:      415 397 7188

Attorneys for Defendant
SUSHOVAN HUSSAIN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>       v.<br><br>SUSHOVAN HUSSAIN,<br><br>            Defendant. | Case No. 3:16-cr-00462-CRB<br><br>**DEFENDANT SUSHOVAN HUSSAIN'S REPLY IN SUPPORT OF HIS MOTION FOR A NEW TRIAL**<br><br>Judge:        Hon. Charles R. Breyer<br><br>Date Filed:  November 10, 2016 |

The government dramatically *under*states the significance of the post-October 3 evidence that the defense was precluded from introducing, and grossly *over*states the value of the limited post-acquisition evidence that came in. The truth is that Mr. Hussain was precluded from introducing post-close evidence that directly refuted the existence of any intent to defraud and the allegation that the "misrepresentations" to Hewlett Packard (HP) were material. This evidence bore directly on whether or not the crimes had been committed *before* the closing in October 2011. And while courts "regularly struggle" to assess whether such evidence is admissible, Opp'n at 8:16, the shifting goalposts and later exclusion of most post-close evidence here was erroneous and severely prejudicial. That prejudice compounded when the Court overruled the defense's objections to the jury instructions, and thereby answered vital questions about the scheme that were the jury's to decide. Because these errors, "in any reasonable likelihood, could have affected the judgment of the jury," *United States v. Cervantes*, 2016 WL 6599514, at *1 (N.D. Cal. Nov. 8, 2016) (brackets omitted) (quoting *United States v. Butler*, 567 F.2d 885, 891 (9th Cir. 1978)), the law demands that Mr. Hussain be awarded a new trial.

**I.    Mr. Hussain is entitled to a new trial because the court's evidentiary rulings prevented him from presenting a complete defense.**

The Court's October 3, 2011, cut-off barred the defense from presenting evidence that undermined critical aspects of the government's case. *See* Dkt. 305 (first offer of proof); Dkt. 355 (second offer of proof); Dkt. 413 (supplement to second offer of proof). The government's opposition conspicuously omits to mention virtually all of this evidence, and as to the fragments upon which it fixates, mischaracterizes their probative value and relevance. The targeted, post-close evidence the defense was barred from presenting includes, among other things, evidence on the following topics.

**A.    Evidence regarding HP's post-closing knowledge of—and reaction to—Autonomy's hardware sales.**

Evidence on this topic would have refuted the contentions that Autonomy deceived HP about its hardware sales and that the hardware sales were material to HP. It therefore speaks directly to the elements of the offenses and, specifically, whether they were committed before

October 3, 2011.[1]  The government notes that Mr. Hussain was able to inquire in part about Manish Sarin's reaction to Autonomy's hardware sales, but the defense was hamstrung in that line of questioning, *see, e.g.*, Dkt. 409 at 13, and in any event, was precluded entirely from offering the most probative evidence on this topic at trial, including:

- **Exhibit 6463**.  In this October 12, 2011, email thread, Autonomy transmitted its "trial balances"—its then-current books and records—directly to various HP and KPMG employees, including Andy Gersh.  Among other things, these trial balances made plain precisely how much hardware Autonomy sold (and the cost of those sales) in 2010 and the first half of 2011.  The fact that these detailed records were turned over in early October 2011 tends to disprove HP witnesses' claims that they did not learn the truth until much later.  Exhibit 6463 also bears directly on materiality: that HP had full access to this information right away but took no action whatsoever for at least eight months shows that Autonomy's hardware sales were immaterial.  The exhibit further bears on Mr. Hussain's intent: why would he conceal the hardware information knowing that it would be plainly apparent within days of closing?  The Court acknowledged that this was "a very good argument" that refutes the existence of an intent to defraud.  Tr. 3455:19–20.

- **Exhibit 8229**.  This is a November 4, 2011, email between various individuals at Ernst & Young (EY) discussing the auditors' "review of Deloitte workpapers."  In this email summary, EY notes—just weeks after the deal closed—that Autonomy "had about $100 million in hardware revenue," and goes on to explain that the revenue "is primarily just pass through revenue for laptops and servers," that the sales were "normally [made] at a loss," and that they did not typically include hardware—facts that the government alleges were "concealed."  The fact that Autonomy did not conceal this information tends to disprove the existence of a scheme to defraud.  It also undermines the existence of any illicit intent.

- **Exhibit 8234**.  This is a November 9, 2011, email from EY to HP, in which they summarize their review of Deloitte's workpapers, "not[ing] there was approximately $100M of hardware revenue and some of it was sold at a loss…."  The accompanying presentation specifically notes that approximately 11% of Autonomy's revenues came from sales of hardware.  *See, e.g.*, Ex. 8234A.0007.  Again, no outcry from HP until over one year later.  This evidence further undermines the claim that hardware sales were "hidden" or, in any event, were material.  It is also further evidence that undermines the existence of any illicit intent on the part of Mr. Hussain.

- **Exhibit 8231**.  This is a November 11, 2011, memorandum received and reviewed by Andy Gersh that summarizes EY's review of Deloitte's audit papers.  This memorandum,

---

[1] The government's claim that it did not rely heavily on its hardware case is absurd.  *See* Opp'n at 3:19–20.  The government brought at least two different cases with different theories.  One was about Autonomy's accounting on reseller transactions, the defense for which was that Autonomy's accounting was proper and approved by Autonomy's auditors.  Another was about Autonomy's failure to disclose hardware sales to HP.  The jury could easily have rejected the former theory and convicted Mr. Hussain based on the latter.  And because the Court issued a *Pinkerton* instruction, the erroneous exclusion of post-close evidence that speaks to the latter theory could have affected all of the counts.

circulated just weeks after the acquisition closed, discusses many of the issues the government alleged were misrepresented to HP. It demonstrates that Autonomy made no effort to conceal these issues from HP, and that HP was not "shocked" to learn the "truth."

### B.   Evidence regarding HP's post-closing valuations of Autonomy.

Evidence on this topic would have shown that, even with full access to Autonomy's books and records, HP continued to value Autonomy at or above the price it paid. It also would have shown that the alleged accounting improprieties would not have altered HP's purchasing decision or the price. Contrary to the government's assertion, Opp'n at 9:2–9, this evidence is therefore relevant and highly probative because it goes to materiality. The excluded evidence includes:

- **Exhibit 8171**. This is a January 2012 report prepared by Duff & Phelps entitled "Hewlett-Packard Company Draft Valuation Report." This report valued Autonomy at $11.3 billion, undermining the claim that any hardware sales or "accounting improprieties" were material.

- **Exhibit 8092**. This is a February 2012 report prepared by Economic Partners entitled "HP-Autonomy Legal Entity Valuation Report, Valuation Date: October 3, 2011." This report arrives at approximately the same $11 billion value and further undermines the claim that the alleged accounting improprieties were material.

- **Exhibit 8227**. This is a December 2012 EY memorandum analyzing HP's impairment of Autonomy's goodwill and intangible assets. In it, EY concludes that most of the allegations leveled by the government "would not have had a material impact" on HP's DCF (discounted cash flow) valuation model. EY also concludes that the impairment charge related to "changes in forecasts," not changes in HP's valuation of Autonomy itself. This information further undermines the government's materiality allegations.

- **Exhibit 8228**. This is a January 2013 EY report further analyzing HP's impairment charge. EY concludes that "[g]iven the wide range of valuations at the time of the acquisition," the alleged accounting improprieties are "*not expected to have altered [HP's] purchasing decision or the overall amount paid*." (emphasis added) This evidence strongly refutes the government's materiality allegations.

- **Exhibit 8226**. This is a report dated December 10, 2011, summarizing EY's review of a valuation conducted by Duff & Phelps. That valuation—conducted after HP had full access to Autonomy's books and records—was in line with HP's pre-acquisition valuation. EY, for its part, concurred with Duff & Phelps's analysis. This is further evidence still that the alleged accounting improprieties were not material.

- **Exhibit 6962**. This is an April 2015 valuation model, prepared by HP to assess its civil claim, which continued to value Autonomy at $11 billion. As discussed, this evidence further undermines the claim that any information allegedly withheld from HP was material.

### C. Evidence regarding HP's acquisition history and its failure to integrate Autonomy.

The government asserts that HP's acquisition history is "irrelevant," but that is incorrect. Opp'n at 9:11. Evidence on this topic would have disproved the government's claim that the acquisition was disastrous for HP due to the alleged fraud. And evidence that HP's claims of fraud were unfounded or overstated, or contradicted in HP's records, would have undermined the government's theory of the case—that Mr. Hussain engaged in a scheme to defraud HP. The excluded evidence includes:

- **Evidence** that HP publicly attributed a majority of the November 2012 write-down of Autonomy to "accounting improprieties" on the part of Autonomy's management and that HP's auditors at Ernst & Young *refused* to sign off on that statement. This evidence undermines the government's claim that Mr. Hussain engaged in a scheme to defraud.

- **Exhibits 5526, 5525, 5524**. These press releases show that HP took three other major write-downs after acquiring Autonomy: (1) Palm in November 2011 ($1.67 billion); (2) Compaq in May 2012 ($1.2 billion); and (3) Electronic Data Systems in August 2012 ($8 billion). This evidence suggests that the Autonomy write-down was due to HP's mismanagement, not any alleged fraud. It is therefore relevant and highly probative because it undermines the existence of a scheme to defraud.

- **Exhibit 8278**. This is a transcript of an earnings call that took place on May 23, 2012—more than *seven months* after HP had full access to Autonomy's books—where HP told the market that it had done "a fairly deep dive to understand" why Autonomy had missed its second-quarter forecast: "And in my view, this is not the product. Autonomy is a terrific product. It's not the market. There is an enormous demand for Autonomy. . . . *This is classic entrepreneurial company scaling challenges*. . . . We need to put in better interfaces into HP in terms of how Autonomy interfaces with our services business . . . and we need a new organizational structure to support a $1 billion-plus company." (emphasis added) This evidence suggests that the Autonomy write-down was due to HP's mismanagement, not Autonomy's alleged fraud, therefore undermining the existence of any scheme to defraud.

- **Exhibits HP-SEC-00194420 + HP-SEC-00194423**. This is a November 30, 2012, email from Marc Levine to Cathie Lesjak admitting that HP "never formally prepared anything to attribute the irregularities to the amount of the write down," attaching Autonomy slides for Treasury. This further undermines the existence of any alleged "fraud" and suggests that HP's claims are either fabricated or overstated.

- **Exhibit 8168**. This report shows that EY reviewed HP's write-down and concluded that the alleged errors in Autonomy's accounts identified by HP "do not have a material impact on the original valuation model." This evidence disproves the claim made by the government in its opening argument—and then raised with HP investor Nigel Upton—that the alleged accounting fraud at Autonomy "meant disaster for HP and its shareholders." The evidence suggests that HP's claims of fraud were overblown.

### D. The evidence that Mr. Hussain got in was no substitute.

To deflect attention from the exclusion of the vital evidence just discussed, the government invokes Mr. Sarin's reaction to Autonomy's hardware sales, Christopher Yelland's work on the rebasing exercise, and a stipulation about Autonomy's books and records. These fragments of the relevant storylines were no substitute for the crucial evidence the Court elected to exclude (on top of the evidence just discussed): Mr. Sarin's actual email evincing his contemporaneous reaction; the valuations that impeached Mr. Yelland's work; and the ample evidence showing that Mr. Hussain made Autonomy's books (and Deloitte's workpapers) available to HP after the close and continued to report for duty for months. Moreover, the defense should have been able to probe these topics with its own witnesses and documents, and to put these details into their proper context using the post-close evidence already discussed. The bottom line is that the government was able to put in the post-close evidence *it* wanted—Autonomy Systems Limited's restatement—but Mr. Hussain was not, even though his evidence "*after* October 3, 2011 had a bearing on whether the crimes had or had not been committed *before* October 3, 2011," Opp'n at 6:6–8, because it undermined each element of the conspiracy, wire fraud, and securities fraud counts. A new trial is thus warranted in which (1) the evidentiary rules are bilateral, clear, and known from the outset, and (2) Mr. Hussain is entitled to put on post-closing evidence that supports his defense (or, at a minimum, neither party is entitled to put on post-closing evidence).

## II. Mr. Hussain is entitled to a new trial due to instructional error.

The jury should have been instructed on specific issue unanimity. The government failed to respond to this argument whatsoever. But specific unanimity instructions are "not the same" as multiple conspiracy instructions, *United States v. Anguiano*, 873 F.2d 1314, 1318 (9th Cir. 1989), and they are required—even in single-defendant cases, and even where the indictment alleges a single conspiracy—where, as here, "there is a 'genuine possibility of jury confusion' or a possibility 'that a conviction may occur as the result of different jurors concluding that the defendant committed different acts.'" *United States v. Lapier*, 796 F.3d 1090, 1097–98 (9th Cir. 2015) (quoting *United States v. Payseno*, 782 F.2d 832, 836 (9th Cir. 1986)). *Lapier* is apt.

There, the indictment charged a single conspiracy but the defendant engaged in narcotics transactions with a host of different people. 796 F.3d at 1093–94. The court held that it was *plain error* not to give a specific unanimity instruction because a portion of the jury could have convicted based on the defendant's transactions with one supplier, while other jurors could have convicted based on a later potential conspiracy with a different supplier. *Id.* at 1096–97. The same possibility existed here. The government asserts that it proved "twenty-one separate" deals involving scores of different players spread across the globe. Opp'n at 3:3. The government also concedes—as it must—that the evidence of these schemes adduced at trial was undeniably "complex." Dkt. 412 at 3:26. In these circumstances, the jury could have distinguished the many schemes to inflate revenue not just from one another, or collectively from an "overarching" scheme, but also from the sale to HP and the scheme to mislead HP shareholders—giving rise to a "genuine possibility" of jury confusion. Mr. Hussain was therefore entitled to a specific unanimity instruction.

The jury should also have been instructed on the possible existence of multiple conspiracies. The instruction is warranted where it is merely "*possible* under the evidence for the jury to find that multiple conspiracies existed." *United States v. Eubanks*, 591 F.2d 513, 518 (9th Cir. 1979) (emphasis added). That possibility was present in this case, *see* Dkt. 409 at 19–25 (describing at least a dozen potential conspiracies), and the government's half-hearted appeals to the contrary are unconvincing. The government alludes to "portion[s]" of the conspiracy, Dkt. 412 at 5:27, as if it was not "possible under the evidence" for the jury to have understood each portion to represent a standalone scheme. It was. The government, moreover, can hardly identify the participants in its conspiracy; "at a minimum," it apparently included "Hussain, Lynch, Egan, [and] Chamberlain," but also—tellingly—"others." Dkt. 412 at 5:25–26. The government also references distinct time-frames with shifting conspiratorial goals, *see* Dkt. 412 at 7:8–9 (describing an "agreement with others to defraud the public, investors, and *then* HP"), another hallmark of multiple conspiracies. *See United States v. Zemek*, 634 F.2d 1159, 1168 (9th Cir. 1980). Lastly, the government's insistence that the "other conspiracies are more reasonably construed as evidence of th[e] broad over-arching conspiracy," Opp'n at 9:27–28, is irrelevant

6

because that is "a fact question . . . for the jury to decide," *United States v. Griffin*, 464 F.2d 1352, 1357 (9th Cir. 1972) (quoting *United States v. Varelli*, 407 F.2d 735, 746 (7th Cir. 1969)). Simply put, the multiple conspiracies instruction was required on this record. *See United States v. Job*, 871 F.3d 852, 867 (9th Cir. 2017) (multiple conspiracy instruction is "required" where it is supported by law and has "some foundation" in the evidence).

### III. Conclusion

For the foregoing reasons, Mr. Hussain respectfully requests that the Court grant this motion and order a new trial. If the Court does not so order, Mr. Hussain submits that the issues identified herein raise "substantial question[s] of law or fact," which, if resolved in his favor on appeal, would be "likely to result in reversal or an order for a new trial," *United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir. 1985) (quotation omitted); *see* 18 U.S.C. § 3143(b)(1), and should entitle Mr. Hussain to bail pending appeal.

Respectfully submitted,

Dated:  June 13, 2018

KEKER, VAN NEST & PETERS LLP

By:  */s/ John W. Keker*
JOHN W. KEKER
JAN NIELSEN LITTLE
BROOK DOOLEY

Attorneys for Defendant
SUSHOVAN HUSSAIN