IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

USA,

              Plaintiff,

     v.

SUSHOVAN TAREQUE HUSSAIN,

              Defendant.

Case No. 16-cr-00462-CRB-1

**ORDER ON APPLICATION OF SENTENCING GUIDELINES**

On April 30, 2018, after a 29-day trial, the jury returned a guilty verdict against Defendant Sushovan Tareque Hussain for one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; fourteen counts of wire fraud, in violation of 18 U.S.C. § 1343; and one count of securities fraud, in violation of 18 U.S.C. § 1348, in the run-up to Autonomy's acquisition by Hewlett-Packard ("HP"). Jury Verdict (Dkt. 394); see also Order Denying Motions for New Trial and Judgment of Acquittal (Dkts. 419, 420). Sentencing is set for May 13, 2019. The Court has already issued an order establishing the application of the Sentencing Guidelines as to Hussain, Order On Application of Sentencing Guidelines ("Guidelines Order") (Dkt. 521). This opinion explains the reasons for that order.

The Court has already addressed at length the factual background of this case. See Order Denying Motions for New Trial and Judgment of Acquittal at 1-49. The Court thus assumes the parties' familiarity with the background of this case and discusses the relevant facts where appropriate below.

For the reasons that follow, the Court concludes that Hussain's Criminal History

Category is I and his Total Offense Level is 29. This yields a Guidelines range of 87 to 108 months of imprisonment.

## I. LEGAL STANDARD

"All sentencing proceedings begin with the district court's calculations of the applicable Guidelines range." United States v. Prien-Pinto, 917 F.3d 1155, 1157 (9th Cir. 2019) (citing Gall v. United States, 552 U.S. 38, 49 (2007)). The Guidelines thus provide the "'initial benchmark' for determining an appropriate sentence under 18 U.S.C. § 3553(a)." United States v. Treadwell, 593 F.3d 990, 999 (9th Cir. 2010) (quoting United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008) (en banc)); see also United States v. Staten, 466 F.3d 708, 710 (9th Cir. 2006) ("[A]lthough district courts are no longer required to follow the United States Sentencing Guidelines . . . 'the [Sentencing Reform] Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals.'" (quoting United States v. Booker, 543 U.S. 220, 259 (2005) (second alteration in original))).

The government bears the burden of proving the facts necessary to enhance a defendant's offense level under the Guidelines. United States v. Burnett, 16 F.3d 358, 361 (9th Cir. 1994); accord United States v. Ameline, 409 F.3d 1073, 1086 (9th Cir. 2005) (en banc) ("[W]hen the government seeks an upward adjustment, it bears the burden of proof." (citation omitted)). While "the district court may rely on undisputed statements in the [presentence investigation report]," if the defendant objects to those statements "the district court is obligated to resolve the factual dispute, and the government bears the burden of proof . . . . The court may not simply rely on the factual statements" in that report. Ameline, 409 F.3d at 1085-86; see also Fed. R. Crim. P. 32(i)(3)(B); United States v. Showalter, 569 F.3d 1150, 1160 (9th Cir. 2009).

In the usual case, the Government can meet its burden by showing that the preponderance of the evidence supports an enhancement. United States v. Berger, 587 F.3d 1038, 1047 (9th Cir. 2009). However, "'when a sentencing factor has an extremely

disproportionate effect on the sentence relative to the offense of conviction,' due process may require a district court to apply a heightened standard." Id. (quoting <u>United States v. Restrepo</u>, 946 F.2d 654, 659 (9th Cir. 1991) (en banc)). In such cases, "a clear and convincing standard applies." <u>United States v. Zolp</u>, 479 F.3d 715, 718 (9th Cir. 2007).

## II.  DISCUSSION

The parties agree that Hussain's Base Offense Level is 7 and that Hussain's Criminal History Category is I. Def. Sentencing Memo #1 at 1 (Dkt. 486); U.S. Sentencing Br. at 2, 8-9 (Dkt. 505); <u>see also</u> Presentence Investigation Report ¶¶ 51, 66 ("PSR") (Dkt. 427); Guidelines Order at 1. The parties also do not dispute that Hussain should receive a +2-level enhancement under U.S.S.G. § 3B1.3 because he employed a "special skill," that is, "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing," based on his expertise as an accountant. U.S.S.G. § 3B1.3 cmt. n.4; Def. Sentencing Memo #1 at 3; U.S. Sentencing Br. at 13-14; <u>see also</u> PSR ¶ 55; Guidelines Order at 1. This brings Hussain's Total Offense Level to 9.

The parties, however, vigorously dispute the remaining issues in the case. There are three potential enhancements to Hussain's Total Offense Level: (a) the offshore offense enhancement, U.S.S.G. § 2B1.1(b)(10)(B), (b) the aggravating role enhancement, <u>id.</u> § 3B1.1, and (c) the loss or gain that resulted from the offense, <u>id.</u> § 2B1.1(b)(1); <u>id.</u> cmt. n.3(B).

### A.  Offshore Offense Enhancement (U.S.S.G. § 2B1.1(b)(10)(B))

Pursuant to U.S.S.G. § 2B1.1(b)(10)(B), if a "a substantial part of a fraudulent scheme was committed from outside the United States," the defendant's total offense level must "increase by 2 levels."

Hussain does not contest that the "fraudulent scheme was committed from outside the United States." <u>See id.</u>; Def. Sentencing Memo #1 at 1-2. Nor could he, because when Hussain committed the crimes for which he was convicted, Hussain lived and worked in

3

the United Kingdom. Order Denying Motions for New Trial and Judgment of Acquittal at 2-3; PSR ¶ 7. Rather, Hussain argues that "[t]his enhancement is designed to punish domestic defendants who seek to conceal their offenses by committing them from an overseas location," not those who commit their crimes abroad because of where they happened to live. Def. Sentencing Memo #1 at 1-2.

But neither the text nor purpose of § 2B1.1(b)(10)(B) supports Hussain's view. Crucially, the text draws no distinction between domestically-domiciled defendants who commit their crimes abroad and foreign defendants who commit their crimes from their home countries. See U.S.S.G. § 2B1.1(b)(10)(B). To the contrary, the text of § 2B1.1(b)(10)(B) turns on the location of the scheme, not the location of the defendant. See id. ("[A] substantial part of a fraudulent scheme was committed from outside the United States."). This is especially significant because the previous sub-part of § 2B1.1(b)(10) does turn on the location of the defendant: § 2B1.1(b)(10)(A) calls for a +2-level increase "[i]f [] the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials." Id. (emphasis added). So the difference between § 2B1.1(b)(10)(A)—which turns on the location of the defendant—and § 2B1.1(b)(10)(B)—which turns on the location of the scheme—reinforces the conclusion that § 2B1.1(b)(10)(B) covers not just domestic defendants who commit crimes abroad, but also foreign defendants, like Hussain, who commit their crimes abroad.

Nor is this plain-text reading of § 2B1.1(b)(10)(B) contrary to the purpose of that provision. As Hussain identifies, the 1998 Amendments to the Sentencing Guidelines describe the purpose of this provision as providing an increase for offenders who, by committing crimes abroad, "make[] it difficult for law enforcement authorities to discover the offense or apprehend the offender." 1998 Amendments to the Sentencing Guidelines, Policy Statements, and Official Commentary at 7 (May 18, 1998) ("1998 Amendments"); Def. Sentencing Memo #1 at 2. Hussain emphasizes that these amendments "targeted offenses 'involv[ing] sophisticated concealment.'" Def. Sentencing Memo #1 at 2 (quoting

1998 Amendments at 8 (emphasis and alterations in original)). But the 1998 Amendments list "sophisticated concealment" merely as an example of the source of the difficulty to law enforcement, not as the reason for the amendment. See 1998 Amendments at 7. The overarching purpose that the 1998 Amendments describe—to penalize conduct that is done in such a way that inhibits the ability of law enforcement to discover the crime or apprehend the offender—is broader than concealed conduct. See id. And that broader purpose is consistent with the text of the guideline because, as § 2B1.1(b)(10)(B) states, it is the fact that "a substantial part of [the] fraudulent scheme was committed from outside the United States," not the intent of the defendant in doing so, that "makes it difficult for law enforcement authorities to discover the offense or apprehend the offender," 1998 Amendments at 7.

So, because a substantial part of the fraud scheme was committed in the United Kingdom, the offshore enhancement applies. See U.S.S.G. § 2B1.1(b)(10)(B).[1] This results in a +2-level enhancement to the offense level, id., bringing Hussain's Total Offense Level to 11.

**B.     Aggravating Role Enhancement (U.S.S.G. § 3B1.1)**

Section 3B1.3 of the Sentencing Guidelines provides that "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." U.S.S.G. § 3B1.3. However, this guideline cautions that "if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1

---

[1]  Hussain also suggests that "the Government is trying to 'have it both ways'" by "arguing for purposes of sentencing that the conduct was outside the U.S., while claiming for purposes of trial that the offenses were not extraterritorial because they occurred inside the U.S." Def. Sentencing Memo #1 at 2 n.1 (citing U.S. Memo in Opp. to Mot. to Dismiss Indictment at 2-3 (Dkt. 115)). Not so. The extraterritorial application of the statutes under which Hussain was convicted is irrelevant to the application of U.S.S.G. § 2B1.1(b)(10)(B), because the fact that there was sufficient connection to the United States to support an indictment says nothing about whether, additionally, "a substantial part" of the conduct also occurred abroad. See U.S.S.G. § 2B1.1(b)(10)(B); Order Denying Motion to Dismiss (Dkt. 129).

(Aggravating Role)." Id.

Hussain has received an enhancement under § 3B1.3 based on his special skill as an accountant. Guidelines Order; see also U.S. Sentencing Br. at 13-14; PSR ¶ 55. As a result, the PSR concluded that an aggravating role enhancement under § 3B1.1 was impermissible. PSR ¶ 56. Hussain urges the Court to adopt the conclusion of the PSR on this point. Def. Sentencing Memo #1 at 3.

The Government responds that an aggravating role enhancement under § 3B1.1 is appropriate in this case because § 3B1.1 may be applied in addition to § 3B1.3 where the § 3B1.1 enhancement is "based upon an abuse of a position of trust" as well as the defendant's special skill. U.S.S.G. § 3B1.3; U.S. Sentencing Br. at 13-14. The Government argues that Hussain did "abuse a position of trust" because he "used his status as a director [at Autonomy] to induce the Audit Committee, the auditors, analysts, regulators, and ultimately HP that his representations could be relied on. He exercised substantial professional or managerial discretion, which enabled him to deceive Autonomy's auditors, regulators, and analysts." U.S. Sentencing Br. at 14.

The Court cannot conclude that this enhancement is appropriate based on the Government's "abuse of trust" theory. The question whether a defendant has committed an "abuse of trust" is "analyzed from the perspective of the victim of the crime." United States v. Technic Servs., Inc., 314 F.3d 1031, 1051 (9th Cir. 2002), overruled on other grounds by United States v. Contreras, 593 F.3d 1135 (9th Cir. 2010); see also U.S.S.G. § 3B1.3 cmt. n.1 (defining "public or private trust"); United States v. White, 270 F.3d 356, 371 (6th Cir. 2001) ("The abuse-of-trust enhancement may only be applied where the defendant abused a position of trust with the victim of his charged conduct."); United States v. Thomsen, 830 F.3d 1049, 1074 (9th Cir. 2016) (same). The Government itself acknowledges that Hussain "was not a fiduciary to HP." U.S. Sentencing Br. at 14. Nor does the Government offer any support for its assertion that Hussain's status as director at Autonomy created a trust-type relationship with HP. See id. at 13-14. And so there is no reason to conclude, and the Government has not met its burden to show, that the

aggravating role enhancement is permissible under U.S.S.G. § 3B1.1. The enhancement therefore does not apply.

### C.    Loss/Gain Enhancement (U.S.S.G. § 2B1.1(b)(1))

The final dispute as to enhancements to Hussain's Total Offense Level is whether and to what extent an enhancement should apply under U.S.S.G. § 2B1.1(b)(1). Section 2B1.1(b)(1) imposes an increase to the offender's offense level according to the loss, or gain, of the offense. Id. There are three points of dispute. First, can the loss be "reasonably . . . determined" such that this Court can apply an enhancement based on the loss? See id. § 2B1.1(b)(1). Second, if not, can the "gain that resulted from the offense" be determined? See id. § 2B1.1 cmt. n.3(B). Third and finally, if either loss or gain can be determined, what is the amount of the loss or gain; that is, (a) how should that amount be calculated; (b) should a defendant receive credit for taxes paid; and (c) how should co-conspirators be considered?

### 1.    Loss

Section 2B1.1(b)(1) contains a table providing for increases in the offense level based on the loss, or, if the loss "reasonably cannot be determined," the "gain that resulted from the offense." Id. § 2B1.1 cmt. n.3(B). As the Ninth Circuit has explained, "[t]he guidelines do not present a single universal method for loss calculation under § 2B1.1— nor could they, given the fact-intensive and individualized nature of the inquiry." Zolp, 479 F.3d at 718. The commentary to § 2B1.1 does, though, "offer several possible approaches to" loss calculation. Id.; see also U.S.S.G. § 2B1.1, cmt. n.3(A). That commentary "indicates that 'loss' for this purpose is 'the greater of actual loss or intended loss.' Actual loss is defined as 'the reasonably foreseeable pecuniary harm that resulted from the offense.'" Intended loss is defined as "the pecuniary harm that was intended to result from the offense." Zolp, 479 F.3d at 718-19 (quoting U.S.S.G. § 2B1.1, cmt. n.3(A)(i)). A district court "need not make its loss calculation with absolute precision;

rather, it need only make a reasonable estimate of the loss based on the available information." Id. at 719; see also U.S.S.G. § 2B1.1, cmt. n.3(C) (setting out factors for estimates of loss).

The application notes to § 2B1.1 also set out the following factors for determining loss:

> (i) The fair market value of the property unlawfully taken, copied, or destroyed; or, if the fair market value is impracticable to determine or inadequately measures the harm, the cost to the victim of replacing that property. (ii) In the case of proprietary information (e.g., trade secrets), the cost of developing that information or the reduction in the value of that information that resulted from the offense. (iii) The cost of repairs to damaged property. (iv) The approximate number of victims multiplied by the average loss to each victim. (v) The reduction that resulted from the offense in the value of equity securities or other corporate assets. (vi) More general factors, such as the scope and duration of the offense and revenues generated by similar operations.

U.S.S.G. § 2B1.1 cmt. n.3(C).

Where a district court cannot "determine either actual or intended loss with sufficient certainty," that court "shall use the gain that resulted from the offense as an alternative." U.S.S.G. § 2B1.1 cmt. n.3(B); Zolp, 479 F.3d at 719.

Because the loss calculation would result in an enhancement to Hussain's offense level, the Government bears the burden of proving the loss amount. See Showalter, 569 F.3d at 1160. In this case, there was no jury finding as to the loss to the victim. See Jury Verdict. Nor was there direct evidence introduced at trial on loss. See Order Denying Motions for New Trial and Judgment of Acquittal at 26-28 (summarizing evidence).

The PSR calculates loss in this case as follows. It begins by recognizing that the total loss caused is "arguable based on the models used to calculate loss." PSR ¶ 36. HP paid $11.1 billion to purchase Autonomy. Id. After HP became aware of the fraud, it initially "wrote down the value of Autonomy by $8.8 billion." Id. Later, in a Victim Impact Statement and Supplemental Victim Impact Statement HP provided to the U.S. Probation Office, "HP valued Autonomy at $9.5 billion as a stand-alone company, and

8

more when potential synergies were considered," based on Autonomy's reported—and inflated—revenues. Id. ¶ 37. But these "revenues were overstated by $235 million when accounting for hardware sales, and overstated by $375 million when excluding hardware sales." Id. ¶ 38. HP's Supplemental Victim Impact Statement indicates that "HP conducted a revaluation of Autonomy for sentencing purposes." Id. ¶ 39. To do so, "HP took their original valuation model, and replaced Autonomy's overstated revenue figures for 2010 and first half of 2011, with [the] revised figures from his restatement of accounts." Id. "Based on the revaluation, HP reported that its model lowered Autonomy's stand-alone by $1.7 billion when the concealed hardware sales been included as Autonomy revenue, and lowered it by $2.7 billion when the hardware revenue was omitted from Autonomy's revenue. Therefore, HP argues the defendant's conduct caused it to overvalue Autonomy by $1.7 billion to $2.7 billion." Id. The PSR adopts HP's determination as to loss, concluding that $1.7 billion to $2.7 billion "is a reasonable estimate of the amount of loss caused by the defendant's conduct." Id.

Relying on the PSR, the Government proposes a loss calculation of "at least $1.7 billion," and urges that the Court should thus increase the offense level by 30. U.S. Sentencing Br. at 9-10; PSR ¶¶ 36-40; see also U.S.S.G. § 2B1.1(b)(1)(P) (imposing a +30-level enhancement if the loss exceeds $550,000,000). It urges that this is an appropriate measure of the loss to HP because "[i]t stands to reason that HP would have offered and paid at least $1.7 billion less than what it paid based on the fraudulent numbers." U.S. Sentencing Br. at 10.

There is a fundamental problem with the Government's proposal. At most, what the Probation Office has provided is a loss range. See PSR ¶ 39. But a range is not an amount. And the Court sees no reason—nor has the Government offered one—to conclude that a staggeringly large range—a billion dollars—falls within the Guideline's requirement that the loss be "reasonably . . . determined," U.S.S.G. § 2B1.1 cmt. n.3(B), for the Court to use that loss in the Guidelines calculation. This could end the inquiry—if the loss can only be estimated within a range of a billion dollars, that loss cannot be said to be "reasonably

9

. . . determined." <u>See</u> <u>id.</u>[2]

The Government seems to recognize this problem by offering the low end of the range that the PSR calculates: $1.7 billion. U.S. Sentencing Br. at 10. This approach creates an additional, and equally insurmountable, problem.

As Hussain has pointed out, "the reduction in value of an asset is not the same as the reduction in what one potential buyer might have chosen to pay." Def. Mot. to Set Sentencing Date (Dkt. 464) at 6-7. The Supreme Court has explained, albeit in the civil context, that "the logical link between the inflated share purchase price and any later economic loss is not invariably strong," so, "the most logic alone permits us to say is that the higher purchase price will sometimes play a role in bringing about a future loss." <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S. 336, 342-43 (2005). Indeed, as a matter of logic, participants in a transaction each value the thing they are purchasing more highly than the thing they are giving away in exchange—otherwise, there would be no economic incentive to conduct the transaction. Take a simple hypothetical: If a person offers to sell an apple to another for a dollar, the person offering the apple must value the dollar more highly than she values the apple; similarly, if the person with the dollar accepts the trade, she must value the apple at over one dollar. If either person does not value the other person's item more highly than she does her own, she has no reason to complete the transaction.

Moreover, there is no doubt that this principle applied to the transaction at issue here. HP paid $11.1 billion for Autonomy. PSR ¶ 36. But HP's internal valuation models "valued Autonomy at $9.5 billion as a stand-alone company, and more when potential synergies were considered." <u>Id.</u> ¶ 37. And HP valued those "synergies" as highly as upwards of $8 billion, for a total value of Autonomy to HP of over $17 billion. Trial Exh. 6562.0015; <u>see also</u> Def. Mot. to Set Sentencing at 9. This means that the value of Autonomy to HP at the time of purchase cannot be determined by looking at the price HP

---

[2] Indeed, at one point in its most recent Sentencing Memorandum, the Government has argued that HP's loss was $11.7 billion—more than six times the loss it proposed in its previous Sentencing Brief. <u>Compare</u> U.S. Sentencing Memo at 5 (Dkt. 535) <u>with</u> U.S. Sentencing Br. at 10.

paid, because HP paid only a fraction of Autonomy's value to HP. And, so, the loss that HP experienced from the fraud at Autonomy cannot be reasonably determined by looking at the difference in what HP might have paid and what HP actually paid, as the PSR and the Government urge. See U.S. Sentencing Br. at 10; PSR ¶¶ 36-40. In fact, as discussed below, the evidence at both trial and sentencing leads to the conclusion that HP would not have purchased Autonomy at all if it had known in advance about the fraud, and so there is even less reason to credit the Government's claim that the difference in HP's internal calculations of Autonomy's values based on revenue figures could reflect the actual loss to HP. As HP itself stated, the $1.7 to $2.7 billion range "does not come close to reflecting the actual harm Mr. Hussain inflicted on HP." U.S. Sentencing Br. Exh. B.

In light of the foregoing, the Court cannot conclude that the Government has met its burden to demonstrate that the loss can be "reasonably . . . determined" under even the preponderance of the evidence standard. See U.S.S.G. § 2B1.1 cmt. n.3(B). Thus, the Court cannot consider loss for the purposes of applying a sentencing enhancement under U.S.S.G. § 2B1.1(b)(1).

### 2. Gain

The Guidelines next instruct that "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." U.S.S.G. § 2B1.1 cmt. n.3(B). Because there is no doubt that there was a loss but, as discussed, that loss is not able to be "reasonably . . . determined," the Court thus turns to whether the gain can be calculated. The Court concludes that gain, unlike loss, can be determined with reasonable accuracy. And so the Court concludes that the appropriate specific offense characteristic enhancement under U.S.S.G. § 2B1.1(b)(1) is a +18-level increase, because the gain fell between $3,500,000 and $9,500,000. See U.S.S.G. § 2B1.1(b)(1)(J).

### a. Gain Calculation

The Government urges that, if loss cannot be reasonably determined, the Court should calculate "the gain that resulted from the offense," U.S.S.G. § 2B1.1 cmt. n.3(b), by considering Hussain's "salary, bonuses, and equity compensation during the scheme to defraud," and the gain on the sale of Autonomy shares between 2009 and July 2011, for a total of $15,913,985. U.S. Sentencing Br. at 11.

The Court agrees with the Government that the appropriate approach is, if possible, to determine "the gain that resulted from the offense," U.S.S.G. § 2B1.1 cmt. n.3(b). But, as the Court explained at the hearing on April 8, 2019 on the Sentencing Guidelines, the Government's approach is flawed. See April 8, 2019 Hearing Tr. at 6-7 (Dkt. 515). While some portion of the salary, bonuses, and equity compensation that Hussain received during the relevant period can likely be traced back to his fraud, his employment, and resulting compensation, at Autonomy was not solely the result of his fraud. That is, Hussain would have earned a salary and other compensation for his work at Autonomy independent of his fraudulent behavior as a result of his non-fraudulent work for Autonomy in that period. The same is true of the Government's suggestion that the Court consider the entirety of the Autonomy shares that Hussain received. See U.S. Sentencing Br. at 11. Although some portion of the value of Autonomy's shares was a result of fraudulent inflation, see Order Denying Motions for New Trial and Judgment of Acquittal at 2-5, Autonomy did have some legitimate value. And so the value of Autonomy's shares—and thus the pecuniary value of the sale of those shares to Hussain—is not entirely the result of the offense conduct. Rather, like Hussain's compensation, the value of the sale of Autonomy's shares is partly a result of the fraud and partly the result of legitimate business enterprises.

Since Hussain's salary, bonuses, and equity compensation are, at least in part, the result of legitimate work, his salary, bonuses, and equity compensation cannot be said to have "resulted from the offense." See U.S.S.G. § 2B1.1 cmt. n.3(b). And the Government offers no mechanism—nor does the Court see any—to disentangle what portion of Hussain's income from his time with Autonomy was attributable to his legitimate work

and what portion was attributable to the fraud for which he was convicted.

Without any way to disaggregate Hussain's legitimately-obtained compensation from his illicitly-obtained compensation, the Government's proposal that the Court consider these gains is overbroad. There is no method by which this Court can determine with any degree of certainty what portion of those gains "resulted from the offense," U.S.S.G. § 2B1.1 cmt. n.3(b), and what portion was lawfully obtained. As such, the Court cannot use the Government's proposed gain calculation. See U.S. Sentencing Br. at 11.

Instead, as the Court has informed the parties, the correct approach in this circumstance is to look to the gain that indisputably and solely resulted from the fraud: the premium HP paid on the Autonomy shares Hussain owned. See April 8, 2019 Hearing Tr. at 8-9. The parties agree that Hussain owned, and sold, 399,274 Autonomy shares. Id. at 10. The parties also agree that the market value of those shares on the date of the Autonomy acquisition was £15.58 per share. Id. at 11. Further, there is no dispute that, as part of the Autonomy purchase, HP paid a premium on those shares; it paid £25.50 per share. Id. at 12; see also U.S. Post-Hearing Sentencing Br. Exh. A (Dkt. 516-1) ¶ 3 ("Bryant Decl."); Def. Sentencing Memo #3 Exh. 8320 ¶¶ 14-15 ("Kidder Report"). The parties agree that, converted into U.S. dollars, Hussain gained $6,112,000 solely as a result of the premium that HP paid in the Autonomy transaction. See April 8, 2019 Hearing Tr. at 12-14; Bryant Decl. ¶ 3. The Court thus concludes that the Government met its burden to show that Hussain received $6.1 million in gain, under either the preponderance of the evidence or the clear and convincing evidence standard. Cf. Zolp, 479 F.3d at 718.

Unlike the Government's proposal, this gain calculation provides a method by which to assess what "gain resulted from the offense," see U.S.S.G. § 2B1.1 cmt. n.3(b), for three reasons. First, there is no dispute that Hussain received this gain—that $6.1 million was the premium that Hussain received on his Autonomy shares as a result of the premium HP paid on the market value of Autonomy's shares. Second, it is determinable—as just explained, there is no dispute about the amount. Third, and crucially, the gain from the premium paid on the shares resulted directly from the offense.

This third point, however, Hussain disputes. He argues that the Government cannot prove that HP would not have purchased Autonomy had it known about the fraud. Def. Sentencing Memo. #3 at 2-19. And so, he urges, the premium calculation is flawed because HP would have purchased Autonomy regardless of its knowledge of the fraud, and thus HP would have paid at least a portion of the premium even without the fraud. Id.

But the evidence is precisely to the contrary. Most importantly, at trial, the Defense's own witness, HP's Chief Financial Officer, Catherine Lesjak, testified that she was "confident that if [she] had known about the fraud and that [HP's CEO] had known about the fraud, [HP] wouldn't have done the deal." Trial Tr. 5581:17-19 (Dkt. 383). Hussain offered no follow up questions nor any further witnesses, and so Lesjak's statement is uncontroverted by the trial evidence. See id. at 5581-82. The evidence at trial thus supports the conclusion that HP would not have purchased Autonomy if it had known about the fraud.

The evidence at sentencing reinforces this conclusion. HP reiterated in its Victim Impact Statement that "[u]nder no circumstances would HP have purchased Autonomy had HP known of Autonomy's fraudulent conduct, much less the extensive nature of the conduct that Mr. Hussain and other former members of Autonomy management engaged in and concealed from HP." U.S. Sentencing Br. Exh. F at 4 (HP Victim Impact Statement, July 18, 2018); accord id. at 7 ("It is undisputed that had HP known of Mr. Hussain's fraudulent scheme, the Company would not have acquired Autonomy—and certainly not at the price it paid.").

The evidence at both trial and sentencing thus comports with the common-sense understanding that, as the Government has pointed out, "[a]ny publicly traded company is going to shy away from purchasing another company that it knows has engaged—and is currently engaged—in rampant accounting fraud in its public statements." U.S. Sentencing Br. at 8. Indeed, at the hearing on April 8, 2019 the Court asked the Defense for any examples of situations in which a major, publicly-traded company acquired a company when the purchasing company "acknowledged that the figures which were supplied to the

buyer were fraudulent?" April 8, 2019 Hearing Tr. at 37. The Defense was unable to provide even a single example, id., and for good reason. HP is a publicly-held company, and thus such a purchase would expose HP to not only the possibility of a decrease in its own value as a result of purchasing a company that acknowledged that its value was at least in part the result of a massive fraudulent scheme, but also the serious possibility of shareholder litigation as a result of that purchase. See March 27, 2019 Hearing Tr. at 11-12. There is thus ample evidence to conclude that, if HP had known about the fraud, it would not have purchased Autonomy. And so the fraud is the cause of the premium HP paid on the market value of the shares in that purchase.

None of Hussain's arguments to the contrary alter that conclusion. The fundamental problem with his arguments is that he misunderstands the question at issue. The question is not, as Hussain would have it, whether HP would have purchased Autonomy if it had known about the full extent of Autonomy's hardware sales. See Def. Sentencing Memo #4 at 3 (Dkt. 508). The question is whether HP would have purchased Autonomy if it knew about the fraud. That is so because the Guidelines instruct the Court to look to the gain that results from the "offense." U.S.S.G. § 2B1.1 cmt. n.3(b). Here, Hussain was not convicted of selling hardware; he was convicted of wire fraud, securities fraud, and conspiracy to commit wire fraud. Jury Verdict; see also Superseding Indictment (Dkt. 52); Order Denying Motions for New Trial and Judgment of Acquittal at 1-49. So, the proper inquiry is whether HP would have purchased Autonomy if it had known about the fraud.[3] And on that score, Hussain's arguments offer no rebuttal to the above-discussed evidence set out at trial and sentencing.

First, Hussain points to evidence from a civil trial currently underway in the United Kingdom. Def. Sentencing Memo #4 at 3-4. But Hussain fails to explain why the Court should weigh the evidentiary record in a wholly separate, civil action in a foreign tribunal

---

[3]  To be sure, HP's Victim Impact Statement does point to HP's executives' surprise when they learned about Autonomy's hardware sales. U.S. Sentencing Br. Exh. D at 3. But those quotations are useful because the falsified hardware sales were evidence of the fraud at Autonomy. Id.; Order Denying Motions for New Trial and Judgment of Acquittal at 26-28.

above the evidence that was put forth in this case before this Court. See id. Moreover, to the extent that HP claims before the court in the United Kingdom that it would not have purchased HP if it had known about the extent of Autonomy's hardware sales, see id., as discussed above, this is a separate question from whether it would have completed the purchase if it had known about the fraud.

Second, Hussain contends that HP would have purchased Autonomy even had it known about the fraud because HP's own strategic goals would still have favored the purchase, as evidenced by the fact that the sale occurred over Lesjak's objections. Id. at 4-5. HP, Hussain argues, purchased Autonomy not for its revenue stream, but because it needed to purchase a software company. Id. at 4-7. But Hussain's argument disproves itself. HP felt pressure to purchase a pure software company—which Autonomy fraudulently claimed to be, see Order Denying Motions for New Trial and Judgment of Acquittal at 2. If HP had known about the fraud, it would have known that Autonomy's claims about its software sales were inaccurate. And that knowledge would have undercut HP's purpose for purchasing Autonomy. Thus, contrary to Hussain's argument, HP's goal of purchasing a software company, in fact, reinforces the conclusion that HP would not have purchased Autonomy had it known about the fraud, because the purchase was motivated by HP's reliance on Autonomy's fraudulently inflated software portfolio. See Order Denying Motions for New Trial and Judgment of Acquittal at 2-49; Def. Sentencing Memo #4 at 4-7.

Third, Hussain argues that any determination about what HP would have done is necessarily "speculative" given the "level of corporate incompetence, dysfunctional leadership, and desperation" at HP at the time. Def. Sentencing Memo #4 at 8-9. As evidence for this position, Hussain points to HP's "total lack of interest in and the absence of any real due diligence in the run-up to the deal." Id. at 8. But HP's failure to uncover the fraud is hardly evidence of what HP would have done had it discovered the fraud. And so this argument, too, fails to undermine the conclusion that the fraud caused the purchase.

Fourth, Hussain argues that it "is impossible to prove by a preponderance of

16

evidence that HP would not have purchased Autonomy had it known of Autonomy's hardware sales," because, in fact, HP did know that Autonomy was conducting some hardware sales. Def. Sentencing Memo #4 at 9-11. But, again, this misstates the question—the inquiry is not whether HP would have purchased Autonomy if it had known about the full extent of the <u>hardware sales</u>. The question is whether HP would have purchased Autonomy if it knew about the <u>fraud</u>. And that is so because it is fraud—not hardware sales—that constitutes "the offense." <u>See</u> U.S.S.G. § 2B1.1 cmt. n.3(b). On that question, Hussain offers no argument that HP's limited, and inaccurate, knowledge about Autonomy's hardware sales provide any basis to think that if HP had known the full extent of Autonomy's misrepresentations and fraud, HP would have nevertheless still purchased Autonomy. <u>See</u> Order Denying Motions for New Trial and Judgment of Acquittal at 19-26; Def. Sentencing Memo #4 at 9-11.

The same is true of Hussain's fifth argument: that HP's reaction to learning that Autonomy's books reflected more than $100 million in hardware sales was insufficiently dismayed or outraged to support the conclusion that HP would not have purchased Autonomy. <u>Id.</u> at 11-17. Again, this argument is based on a misunderstanding of the question at issue. What HP learned about Autonomy's <u>hardware sales</u> after the purchase and its reactions thereto, shed no light on what HP would have done if it had known prior to the sale about the <u>fraud</u>.

Sixth and finally, Hussain argues that "[t]here was not 'rampant accounting fraud' at Autonomy from which one can conclude by a preponderance of the evidence that HP would not have bought Autonomy." <u>Id.</u> at 17. Hussain argues that he "always strove to 'check the boxes' on the criteria required to recognize revenue" and that he and the others involved "did not believe they were doing anything wrong." <u>Id.</u> This argument is unpersuasive. It is flatly contradicted by the fact that the jury returned a verdict of guilty against Hussain for sixteen counts of wire fraud, conspiracy to commit wire fraud, and securities fraud, Jury Verdict, for the very behavior that he now claims "check[ed] the boxes". <u>See</u> Def. Sentencing Memo #4 at 17. There is thus no reasonable doubt that

Hussain was "doing [some]thing wrong." See id. Hussain's argument that there was no fraud that would have caused HP to revaluate its decision to purchase Autonomy is thus utterly precluded by the jury's guilty verdict. And so there is no reason to alter the conclusion that HP would not have purchased Autonomy had it known about the fraud.

In light of the testimony at trial and the evidence produced at sentencing, the Court therefore concludes that the Government has met its burden—under either the preponderance of the evidence or clear and convincing evidence standard—to show that "the gain that resulted from the offense" is reasonably determinable by looking to the premium HP paid above the market value of the Autonomy shares that Hussain owned. See U.S.S.G. § 2B1.1 cmt. n.3(B). The gain to Hussain, therefore, is $6.1 million.[4]

### b. Taxes

The parties next dispute whether Hussain should be credited for the taxes he paid on his gains, that is, whether the gain amount should be reduced by the amount of taxes he paid on those earnings. See U.S. Sentencing Br. at 10-11; Def. Sentencing Memo #3 at 9-10 (Dkt. 507).

The Court agrees with the Government that it is not proper to exclude the amount that Hussain paid in taxes from the gain calculation. As the Eighth Circuit has reasoned in rejecting a similar argument, "the law does not favor crediting a defendant for the costs involved in his fraudulent scheme." United States v. Mooney, 425 F.3d 1093, 1102 (8th Cir. 2005). Compliance with tax laws are part of the costs associated with a fraudulent scheme such as the one involved here because Hussain received, and thus owed taxes on,

---

[4] After the hearing on April 8, 2019, the Government filed an additional brief arguing that "[i]f the premium on the shares purchased is a reasonable estimate of gain, then it is also a reasonable estimate of loss." U.S. Post-Hearing Br. at 2. Not so. As with the Government's other proposals for how to calculate loss, however, the premium HP paid on the Autonomy shares is only a portion of the loss to HP. And so using the premium to calculate loss would suffer from the same imprecision problems that plagued—and doomed—the Government's previous proposals. Not so, however, for gain, because the value of Hussain's shares, both their market value at the time of sale and the premium HP paid on them, is readily determinable and directly traceable to the purchase, and thus to the fraud.

those gains. And so the fact that Hussain paid taxes on the money he received from the premium does not mean that he did not gain the full $6.1 million. Put another way, Hussain's gain calculation should not be altered in his favor by the fact that he did not also engage in tax fraud on those earnings. Cf. United States v. Weiss, 754 F.3d 207, 216 (4th Cir. 2014) (holding that "the underlying offense is complete when a defendant fraudulently diverts income to himself," and thus failure to pay taxes on the gains from that offense constituted a wholly separate offense). Thus, the Court concludes that Hussain's gain of $6.1 million is unaffected by the taxes Hussain paid on that gain.

### c.    Co-Conspirators' Gain

The final question in determining Hussain's gain for the purposes of U.S.S.G. § 2B1.1 is whether and to what extent the Court should consider the gains of his co-conspirators. The Government urges that the Court must consider the gains of Hussain's co-conspirators, and includes in that group Michael Lynch, Christopher "Stouffer" Egan, Peter Menell, Andy Kanter, and Steve Chamberlain. U.S. Sentencing Br. at 13 (quoting PSR ¶ 8). Hussain responds that he is "responsible only for his gain—not gains to alleged co-conspirators." Def. Sentencing Memo #3 at 10.

### i.    Consideration of Co-Conspirators' Gains

Under U.S.S.G. § 1B1.3(a), "[u]nless otherwise specified," the offense conduct includes, "in the case of a jointly undertaken criminal activity . . . all acts and omissions of others that were—(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." Id. § 1B1.3(a)(1)(B). Applying this provision to the loss provision of § 2B1.1, the Ninth Circuit has "held that a district court may not automatically hold an individual defendant responsible for losses attributable to the entire conspiracy, but rather must identify the loss that fell within the scope of the defendant's agreement with his co-conspirators and was reasonably foreseeable to the defendant." Treadwell, 593 F.3d at

1002. So, for loss calculations under U.S.S.G. § 2B1.1(b)(1), courts must consider the losses caused by other participants in the offense conduct when those losses were within the scope of the agreement between the defendant and others and were reasonably foreseeable to the defendant. <u>Treadwell</u>, 593 F.3d at 1002.

The next question is whether the same is true of gain calculations. Though, as far as this Court is aware, the Ninth Circuit has yet to address this issue, the plain text of the Guidelines and the reasoning of <u>Treadwell</u> as to loss calculations apply with equal force to gain calculations.

Like "actual loss," which the Guidelines define as "the reasonably foreseeable pecuniary harm that resulted from the offense," U.S.S.G. § 2B1.1 cmt. n.3(A)(i), the Guidelines describe the "gain" as "the gain that resulted from the offense." <u>Id.</u> cmt. n.3(B). In other words, gain, like loss, focuses on the impact of the <u>offense</u>, not the impact solely of the defendant's <u>conduct</u>. Further, there is nothing in the description of "gain" that could be said to "otherwise . . . specif[y]" the exclusion of "jointly undertaken criminal activity." <u>See</u> U.S.S.G. § 1B1.3(a)(1)(B); § 2B1.1 cmt. n.3(B). The text of the Guidelines, thus, provides no basis to treat the gains of co-conspirators differently from the losses caused by co-conspirators.

The reasoning of <u>Treadwell</u> supports this conclusion. <u>Treadwell</u>'s reliance on U.S.S.G. § 1B1.3(a)(1)(B) in determining that loss under U.S.S.G. § 2B1(b)(1) can include the losses attributable to co-conspirators in no way turned on the particularities of "loss." <u>See</u> <u>Treadwell</u>, 593 F.3d at 1002-03. Rather, it "interpret[ed] § 1B1.3 as a limit on what conduct may be considered in making the corresponding loss estimate for a conspiracy conviction." <u>Id.</u> at 1003. <u>Treadwell</u>, thus, offers no basis on which to distinguish gain and loss for the purposes of determining whether to include co-conspirators, because the focus for determining either loss or gain is the conduct, not the offender. This conclusion comports with the decision that at least one other Court of Appeals has reached. Relying on <u>Treadwell</u>, the Fourth Circuit affirmed a district court decision that reached a gain determination by, in part, considering the gains his co-conspirators received. <u>United States</u>

20

v. Offill, 666 F.3d 168, 179-80 (4th Cir. 2011).

Hussain nevertheless contends that gain calculation must be based solely on the gain to the defendant, not the gain caused by the offense. Def. Sentencing Memo #3 at 10-11. But the cases he cites are inapposite. Though Hussain urges the Court to adopt the logic of Honeycutt v. United States, 137 S. Ct. 1626 (2017), that case involved 21 U.S.C. § 853(a)(1), a forfeiture statute with no applicability to the Sentencing Guidelines. Honeycutt, 137 S. Ct. at 1635; Def. Sentencing Memo #3 at 10-11. Further, the language of that statute differs materially from the loss and gain guidelines. Section 853(a)(1) states that "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result [of a qualifying offense]" is subject to criminal forfeiture. 21 U.S.C. § 853(a)(1) (emphasis added). The forfeiture statute, thus, emphasizes the benefit to the defendant. By contrast, again, the Guidelines addressing gain emphasize the "gain that resulted from the offense." U.S.S.G. §§ 1B1.3(a)(1)(B); § 2B1.1 cmt. n.3(B). Honeycutt and 21 U.S.C. § 853 are thus inapposite.

So, too, with Hussain's reliance on Zolp, 479 F.3d at 715; see Def. Sentencing Memo #3 at 10. Hussain makes much of Zolp's statement that "[i]f the court is unable to determine either actual or intended loss with sufficient certainty, it may rely on the defendant's personal gain from the fraud as an alternate measure of loss." 479 F.3d at 719; Def. Sentencing Memo #3 at 10. But Zolp's reference to "personal" gain was, at most, dicta—in Zolp the Guideline calculation turned on loss, not gain, and did not address whether or how to consider losses caused by co-conspirators. See Zolp, 479 F.3d at 718-20. Nor has any court adopted Zolp's "personal gain" language in the way Hussain suggests.

In light of Treadwell's holding that loss calculation includes at least some of the conduct of co-conspirators, and the textual similarities between the loss and gain calculations, see U.S.S.G. §§ 1B1.3(a)(1)(B); § 2B1.1 cmt. n.3(B); accord Offill, 666 F.3d at 179-80, the Court thus concludes that the gain calculation must include the gains of co-conspirators when those gains were within the scope of the agreement between the

defendant and others and were reasonably foreseeable to the defendant.

### ii. Application of Co-Conspirators' Gains

Having concluded that it is appropriate to consider co-conspirators' gains in determining the appropriate gain enhancement under U.S.S.G. § 2B1.1(b)(1), the next question is what the amount of that enhancement is in this case. The parties dispute both who qualifies as a co-conspirator for the purposes of sentencing and what the Government's burden of proof is as to this determination. Def. Sentencing Memo #3 at 10-11; U.S. Sentencing Br. at 10-11; see also March 27, 2019 Hearing Transcript at 23.

As to the former, the Government urges that the Court must consider the gains of Hussain's co-conspirators, and includes in that group Christopher "Stouffer" Egan, Michael Lynch, Peter Menell, Andy Kanter, and Steve Chamberlain. U.S. Sentencing Br. at 13 (quoting PSR ¶ 8).

The Court begins with Christopher "Stouffer" Egan. At trial, Egan admitted to his role in the conspiracy. Trial Tr. Vol. 11 at 1916:12-24 (Dkt. 293); see also Def. Sentencing Memo #3, Exh. 8320 ¶¶ 31-32 ("Kidder Decl."). Egan also testified that he engaged in this misconduct with and at the direction of Hussain. Trial Tr. Vol. 12 at 2007-09 (Dkt. 294); see also Order Denying Motions for New Trial and Judgment of Acquittal at 30-31. There is thus no question that Egan was part of the conspiracy with Hussain or that Egan's gain was "within the scope of the defendant's agreement with his co-conspirators and was reasonably foreseeable to the defendant," Treadwell, 593 F.3d at 1002. It is therefore appropriate to consider the scope of Egan's gains.

Pursuant to a Settlement and Cease and Desist Order with the Securities and Exchange Commission ("SEC"), Egan disgorged $923,391 to the SEC, which Egan characterized as all the money that Egan received from the fraud at Autonomy. Tr. at 1919; SEC Settlement and Cease and Desist Order; Def. Sentencing Memo #3, Kidder Report. ¶ 31. The parties have not disputed the accuracy of this figure as a measure of Egan's gain. See generally U.S Sentencing Br.; Def. Sentencing Memo #3; Def. Sentencing Memo #4.

The Court thus concludes it is appropriate to include Egan's $923,391 in the gain calculation for purposes of Hussain's sentencing. Cf. Treadwell, 593 F.3d at 1002-05. This puts the gain calculation at just over $7 million. Adding Egan's gain to the gain calculation has no effect on the Guidelines calculation, because, like a gain of $6.1 million, a gain of $7 million falls between $3,500,000 and $9,500,000, and thus would result in a +18-level increase to Hussain's offense level. See U.S.S.G. § 2B1.1(b)(1)(J).[5]

The Government next contends that, in addition to Egan, there is sufficient evidence to include the gain of other members of the conspiracy. U.S. Sentencing Br. at 10-11; April 8, 2019 Hearing at 13, 16-17. The Government specifically focuses on Michael Lynch. U.S. Sentencing Br. at 10-11; see also Bryant Decl. ¶ 4. According to the Government, Hussain's gain, using the premium calculation discussed above, was "approximately $315.8 million." Bryant Decl. ¶ 4; Table A.[6]

Adding Lynch's gain to the gain calculation would increase the total gain calculation from $7 million to $322.8 million—which would result in an increase in Hussain's offense of a +28-level enhancement, instead of a +18-level enhancement. See U.S.S.G. §§ 2B1.1(b)(1)(J), (O). Considering Lynch's gain would thus yield, instead of a Total Offense Level of 29, a Total Offense Level of 39. Along with Hussain's Criminal History Category of I, that additional ten-level increase would increase Hussain's Guidelines range from 87-108 months to 262-327 months—an increase of over 300%. Such an increase falls squarely within the "extremely disproportionate effect" rule that

---

[5] Because Egan's gain has no effect on Hussain's Sentencing Guidelines calculation, the Court sees no reason to apply the more demanding clear and convincing evidence standard to the determination of Egan's gain. See Treadwell, 593 F.3d at 1002-05. Nevertheless, even under the heightened standard, the Court would include Egan's gain given the parties' lack of dispute over the appropriateness of using the amount that Egan disgorged to the SEC to determine the amount of gain he received from his role in the conspiracy.

[6] Alternatively, the Government contends that Lynch's gain was "536,561,373 in salary, bonuses, and equity." U.S. Sentencing Br. at 2; see also U.S. Sentencing Memo at 8 n.1. But, assuming this calculation is accurate, for the same reason that Hussain's gain cannot be determined by totaling the compensation he received in his time at Autonomy, the Government's calculation of Lynch's gain by reference to his "salary, bonuses, and equity" would also be inaccurate. So, if Lynch's gain were included, Hussain's additional level increase would be, according to the premium calculation, a +28-level increase, not a +30-level increase. See U.S.S.G. §§ 2B1.1(b)(1)(O)-(P).

United States District Court
Northern District of California

triggers the requirement that, to apply this enhancement, the Government must show the requisite facts by clear and convincing evidence. See Berger, 587 F.3d at 1047; see also United States v. Hymas, 780 F.3d 1285, 1291 (9th Cir. 2015) (holding that the district court should have employed clear and convincing evidence standard when Guidelines determination would have resulted in a +8-level increase).

But the Government has failed to meet its burden to show by clear and convincing evidence that Lynch was part of the conspiracy with Hussain. Indeed, in its papers, the Government offers no argument at all—it merely asserts that Lynch was part of the conspiracy, and that "[t]here is no question that Lynch's gain was fully foreseeable to Hussain." U.S. Sentencing Br. at 2, 6, 10-11. Such bare assertions do not meet the "clear and convincing evidence" standard. Nor may the Government rely alone on the factual statements in the PSR, because Hussain objects to those statements. See Ameline, 409 F.3d at 1085-86; Def. Sentencing Memo #3 at 4 n.8; April 8, 2019 Hearing Tr. at 19.

At the hearing on April 8, 2019 the Government again asserted, without explanation or argument, that "the entire evidentiary record in the Hussain trial, the Court's observations in its order denying the motion for new trial, establish at least by a preponderance of the evidence, if not beyond a reasonable doubt, that Mike Lynch was one of the co-conspirators." April 8 Hearing Tr. at 17. But a cursory reference to "the entire evidentiary record" in the twenty-nine-day jury trial in this case does not suffice to meet the Government's heightened burden. See Zolp, 479 F.3d at 721. And the Government's lack of argument is particularly striking—and fatal to its claim that the evidence is "clear and convincing" that Lynch was a co-conspirator, because there was no special verdict form, and so there is no jury finding as to who was or was not a member of the conspiracy.[7] See Jury Verdict. And, unlike Egan, Lynch did not admit to his participation

---

[7] Nor can the Court infer that the jury concluded that Lynch was a participant in the conspiracy from the fact of Hussain's conviction for conspiracy. See Jury Verdict ¶ 1. Though a conspiracy, of course, requires the participation of more than one person, here, Egan admitted to his participation in the conspiracy with Hussain. So, the jury may have convicted Hussain of the conspiracy count based solely on Hussain's conspiracy with Egan; nothing in the jury's verdict necessitates that the jury also understood the conspiracy to have included Lynch.

24

in the scheme at trial. <u>See</u> Trial Tr. Vol. 12 at 2007-09. Although Lynch has since been indicted on allegations of wire fraud and conspiracy to commit wire fraud in connection with the Autonomy transaction, <u>see</u> Dkt. 3:18-cr-00577-CRB Superseding Indictment (Dkt. 21), he has not been convicted.[8]

Without a clear determination at trial that Lynch was a member of the conspiracy, and without any argument whatsoever by the Government at sentencing that Lynch was a member, the Court cannot conclude that the Government has met its burden to show by clear and convincing evidence that Lynch was part of the conspiracy, let alone that Lynch's gains fell within the scope of the conspiracy and were "reasonably foreseeable" to Hussain.[9] <u>See</u> <u>Treadwell</u>, 593 F.3d at 1002. So, the Court holds that Lynch's gains should

---

[8] To be sure, this Court's Order Denying Motions for New Trial and Judgment of Acquittal does at points state that the conspiracy included Michael Lynch. <u>See</u> Order Denying Motions for New Trial and Judgment of Acquittal at 3. But that characterization is in the context of describing the "Government's Case-in-Chief." <u>Id.</u> The Court's Order did not purport to make a factual determination as to the scope of the conspiracy, nor to characterize what facts the jury may have found.

[9] It is worth mentioning that the Government does not contend that the gain calculation should be construed to include the gains to non-co-conspirators who may have received some windfall from a defendant's conduct. <u>See</u> U.S. Sentencing Br. at 13-14. That is, the Government has made no argument that, even if Lynch were not a co-conspirator, any gain he received from the Autonomy sale is attributable to the conspiracy, and thus to Hussain. Nor does the Court see a basis to read "gain that resulted from the offense," U.S.S.G. § 2B1.1 cmt. n.3(B), so broadly.

The initial version of the gain rule provided that "[f]or the purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information. This estimate, for example, may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations. The offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss." U.S.S.G. § 2F1.1, cmt. n.9 (2000). This version clearly referenced the "offender's gain." <u>Id.</u>

This language was changed to the current version—"the gain that resulted from the offense"—in 2001. The Reason for Amendment explains that the altered language "retains the rule providing for the use of gain when loss cannot reasonably be determined. It clarifies that there must be a loss for gain to be considered," and, in doing so, resolved a circuit split on whether there must be a loss—even if the amount of that loss cannot be determined—to consider the gain. U.S.S.G. App. C, amend. 617 (eff. Nov. 1, 2001). Nothing about the alteration intended to expand the scope of the loss/gain enhancement to the windfalls that those not involved with the scheme may have received.

To reinforce this point, consider the Insider Trading guideline as an analogy. Section 2B1.4, like Note 3(B) in § 2B1.1, includes an increase for "gain resulting from the offense." The Background commentary then discusses what is meant by gain: "This guideline applies to certain violations of Rule 10b-5 that are commonly referred to as 'insider trading.' Insider trading is treated essentially as a sophisticated fraud. Because the victims and their losses are difficult if not impossible to identify, the gain, i.e., the total increase in value realized through trading in

not be considered for the purposes of applying an enhancement under U.S.S.G.

§ 2B1.1(b)(1). The same is also true for the others the Government asserts in passing were

members of the conspiracy—Menell, Kanter, and Chamberlain—as to whom the

Government offers only one passing reference in its sentencing briefing and no argument

at all. See U.S. Sentencing Br. at 13.

Thus, the proper increase under U.S.S.G. § 2B1.1(b)(1) is a +18-level increase,

because the gain to Hussain and Egan fell between $3,500,000 and $9,500,000. See

U.S.S.G. § 2B1.1(b)(1)(J).[10] This brings Hussain's Total Offense Level to 29.[11]

## III.   CONCLUSION

For the foregoing reasons, the Court determines that Hussain's Criminal History

Category is I and his Total Offense Level is 29. This yields a Guidelines range of 87 to 108

months of imprisonment.


**IT IS SO ORDERED.**

Dated: May 6, 2019

_____
CHARLES R. BREYER
United States District Judge

---

[10] securities <u>by the defendant and persons acting in concert with the defendant or to whom the defendant provided inside information</u>, is employed instead of the victims' losses." U.S.S.G. § 2B1.4 cmt. background (emphasis added). So, interpreting identical language to that in § 2B1.1, the Guidelines make clear that in the insider trading context that the "gain resulting from the offense" is the gain realized by the defendant and some other culpable individual acting in concert with the defendant, not just all the gain that flowed from the offense conduct to people unconnected to the criminal scheme. Given the language and history of § 2B1.1 cmt. n.3(B), the Court sees no reason to reach a different conclusion here.

[10] If Lynch's gains and the gains to the others the Government asserts were members of the conspiracy were included in the gain calculation, the Court would deem it appropriate to employ a downward departure in this case. See U.S.S.G. § 5K2.0(a)(2)(B); see also PSR ¶¶ 41-45. Given the complexity of the facts in this case and the disproportionate impact considering Lynch's gain would have on Hussain's Total Offense Level calculation, the Court would find that a downward departure, resulting in a Total Offense Level of 29, would be appropriate here.

[11] The Court also observes that the parties agree that the maximum permissible fine is $4 million. See Def. Sentencing Memo #1 at 5-6; Def. Sentencing Memo #3 at 20; U.S. Sentencing Br. at 14; see also 18 U.S.C. § 3571.